# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## INFORMAL BRIEF OF APPELLANT

**Case Number:** 24-2024

**Short Case Caption:** Golden v. Google, LLC

**Name of Appellant:** Larry Golden

---

**Instructions:** Read the Guide for Unrepresented Parties before completing this form. Answer the questions as best as you can. Attach additional pages as needed to answer the questions. This form and continuation pages may not exceed 30 pages.

Attach a copy of the trial court's opinion, order, and/or judgment. You may also attach other record material as an appendix. Any attached material should be referenced in answer to the below questions. Please redact (erase, cover, or otherwise make unreadable) social security numbers or comparable private personal identifiers that appear in any attachments you submit.

---

1. Have you ever had another case before this court?  ☑ Yes  ☐ No
   If yes, state the name and number of each case.

   > Larry Golden v. Google LLC, Case No. 22-1267 (vacated and remanded)

2. Did the trial court incorrectly decide or fail to take into account any facts?
   ☑ Yes  ☐ No
   If yes, what facts?

   > The trial court adjudicated the actions of a third party. Golden's claims do not include a limitation where a third-party is required to perform a process, instead Golden's claimed inventions include receivers, transmitters, transceivers, and CPUs that are needed for the inventions to function. The trial court agreed with Google when Google converted Golden's method claims [describes a device, apparatus, etc.], to a process claim [steps performed by a person]. The Federal Circuit acknowledged Golden has made an effort to identity where each element [receiver, transmitter, transceiver, and CPU] can be found in the alleged infringing devices of Google. Taken from Golden's patent claims asserted in this case, it is Golden's responsible to identify where each element is located inside Google's alleged infringing devices. Each patent claim name the type of device [smartphone], and go on to describe what the device COMPRISES

3. Did the trial court apply the wrong law? ☑ Yes ☐ No
   If yes, what law should be applied?

> The trial court applied 28 U.S.C. section 1498(a)-government infringement of a patent. Direct infringement under Section 1498(a) means a product is manufactured and suitable for use when all the requested components of the third-party contractors are combined and made available to the Government. The trial court adjudicated the government's third-party contractors Defense Threat Reduction Agency's ATAK software and Draper Laboratory CBRNE plug-in sensors. While, the trial court confirmed direct infringement under Section 1498(a) when the trial court determined infringement occurs when a " third-party modifies the device" to include the ATAK software and CBRNE plug-in sensors, IT WAS NOT WITHIN THE TRIAL COURT'S JURISDICTION TO MAKE THAT CALL. The trial court should have applied 35 U.S.C. section 271(a)-direct infringement by a single entity. By doing so, the trail court focus would have been on whether Golden has identified within the alleged Google infringing smartphones: a cpu; a transmitter; a receiver; wireless communication [modem]; a sensor disposed within, on, upon, or adjacent the cell phone; a biometric sensor; a lock disabling mechanism; a GPS receiver; a cellular modem; and antennas for Bluetooth, NFC, RF, and Wi-Fi. [claim 23 of Golden's '439 patent]. Therefore, the trial court adjudicated outside the Court's jurisdiction in the first instance, and in the second instance the trial court judge overstepped in adjudicating Golden's patent infringement claims that are issues of fact to be tried by a jury under the Seventh Amendment of the U.S. Constitution, while actually failing to adjudicating Golden's alleged direct infringement claims under 35 U.S.C. section 271(a).

4. Did the trial court fail to consider important grounds for relief?
   ☑ Yes ☐ No
   If yes, what grounds?

> Golden has repeatedly demanded a jury trial because patent infringement claims are issues of fact to be tried by a jury under the Seventh Amendment of the U.S. Constitution. Golden has repeatedly alleged Google's Tensor CPU/Chipset infringes at least independent claims 4, 5, & 6 of Golden's '287 patent; and, independent claim 11 and dependent claims 12-20 of Golden's '619 patent for Golden's patented smartphone central processing unit (CPU). The Trial Court to this day, have not granted Golden a jury trial, nor have the Defense or the trial court responded to Golden's allegations that the Google Tensor CPU/Chipset allegedly infringes Golden patented smartphone central processing unit (CPU).

5. Are there other reasons why the trial court's decision was wrong?
   ☑ Yes ☐ No
   If yes, what reasons?

> Vertical Stare Decisis:
> The trial Court is in violation of the doctrine of vertical stare decisis for not honoring the decision of the higher Appellate Court in Larry Golden v. Google LLC; Case No. 22-1267.
>
> Issue Preclusion:
> (1) Precluded from relitigating the pleading standards set forth in Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007), and Ashcroft v. Iqbal, 556 U.S. 662 (2009) for this case that has already been decided by the Federal Circuit.
> (2) In the DHS v. Larry Golden "Final Written Decision" Case IPR2014-00714, Entered: October 1, 2015, the PTAB construed "built in, embedded" as " something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device".
> (3) Precluded from relitigating the independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189.The Federal Circuit in Larry Golden v. Google LLC; Case No. 22-1267 examined and determined Golden has described how the Google "smartphone", that include the ATAK software and CBRN plugin sensors literally, and/or under the doctrine of equivalents, more likely than not, infringes at least claim 5 of Golden's '287 Patent; claim 23 of Golden's '439 Patent; and claim 1 of Golden's '189 Patent.

6. What action do you want this court to take in this case?

Vacate and Remand this case back to the District Court with instructions to grant Golden a jury trial to hear Golden's direct and indirect infringement claims, joint infringement claim, and willful infringement claim; or, instruct the trial court to grant summary judgement in Golden's favor.

Date: 07/08/2024

Signature: _Larry Golden_

Name: Larry Golden

**MEMORANDUM**

The Trial Court Judge either erred or lied for dismissing Golden's case because "Golden himself admits the device must be modified by a third party before it can function as a sensing device". Golden admits that the smartphone was developed and assembled under contract by the U.S. Government and Google's contribution to the Government's development and assembly is with the Google Android Open-Source Operating System Platform.

Golden admits that between the years 2003-2007, he shared information with various Governmental agencies about the need for a hand-held device that detects for hazardous agents. Golden admits he is responsible for a communicating, monitoring, detecting, and controlling (CMDC) device that the Government stole and authorized certain private entities to develop (including Google's implied contract for work performed for the Government). Golden admits that it was only after nine years of litigation in the Court of Federal Claims did the Judge state the smartphone (i.e., CMDC device) is the private property of the private entities. Golden admits it was the Trial Court who confirmed the Federal Circuit's determination that Google more likely that not infringed Golden's patented invention combination of a CMDC device; a central processing unit (CPU); and a cell phone detection device.

Golden admits that Google's role in the development of Golden's patented CMDC device was to provide a means of "interconnecting" or "intergrading" the software and hardware to enable the CMDC device to function as a sensing device. The development and assembly of the smartphone is described below.

- ***Department of Homeland Security***: For the program's initial phase in 2007, DHS released a call for proposals inviting the private sector to develop a proof of concept for the "*Cell-All Ubiquitous Biological and Chemical Sensing*" project in 2007 (DHS S&T BAA07-10). The ideological underpinning for the Cell-All project is one of neoliberal public–private partnerships, by which industry profits from privileged government contracts. Once mobile phone manufacturers routinely include chemical and other sensors in their devices, users can be compelled or coerced to communicate environmental data as such sharing becomes normalized in technical protocol. Cell-All began in 2010 with the goal of creating dozens of competing viable devices and refining the network capabilities of the system. At this stage, DHS also sought to standardize the data reporting protocols so that data from different devices could be received and processed by a centralized network operations center. HSARPA accelerates this process through direct commercial partnerships, where it funds researchers from both the public and the private sector to develop products that can then be brought to market. Public subsidization of private companies, is rationalized through discourses of efficiency. DHS believe that technology transfer directly to the commercial [sector] is an efficient way to

go. In order for the Cell-All public safety sensing and alerting system to be complete, four links must be forged and joined together: the sensor and computing hardware, the sensing application for mobile phones, a centralized server and network operations center, and the end consumer, whether individuals, emergency operations centers, first responders, government agencies, or private companies. The eventual goal of the project is to embed multiple nanoscale sensors (for environmental chemicals, industrial toxins, radiation, and bioagents) directly into mobile phones. During the development of second-generation prototypes, chemical sensors were separated from the phones, allowing for initial market deployment of the sensors through third-party products, such as sleeves, that could be added to existing phones. This use of accessory products is intended to speed up the technology's commercial availability so that people can begin using the Cell-All applications with their current phones before integrated sensors are fully operational and readily available. *Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks.* SciVerse ScienceDirect. Geoforum 49 (2013) 279–288. journal homepage: www.elsevier.com/locate/geoforum.

- *Rhevision*: A cell phone's camera used to monitor color changes to the camera lens: lenses spot a color related to poison, will trigger an alert system on the cell phone. Rhevision, invented the miniature tunable camera lens, which makes the lenses. *Homeland Security wants to turn your cell phone into a smell phone.* https://www.csmonitor.com/Science/2010/0520/Homeland-Security-wants-to-turn-your-cell-phone-into-a-smell phone#:~:text=The%20U.S.%20Department%20of%20Homeland%20Security%20%28DHS%29%20is,phones%20and%20alert%20users%20to%20potentially%20deadly%20smells

- *NASA*: The platform, developed using NASA nanotechnology, paved the way for interchangeable smartphone sensors. Li convinced the program manager at DHS that the sensor should be a module attached to the outside of the phone. The modular design paved the way for future smartphone chemical sensors; the line of interchangeable, smartphone-savvy sensors Yu would commercialize. The design for the microprocessor, memory, communication protocol, back-end Web structure, data storage, and cloud technology he developed for NASA and DHS. *Wireless Platform Integrates Sensors with Smartphones.* https://www.techbriefs.com/component/content/article/26213-wireless-platform-integrates-sensors-with-smartphones

- *Seacoast Science*: "I wanted to meet with the founders of Seacoast Science since I learned in late October that the Carlsbad, CA, startup is part of a government-sponsored initiative to embed tiny chemical sensors in cell phones", says Bruce Bigelow. Seacoast's technology is impressive: tiny microchips—about the size of the typeface on a postage stamp—each containing multiple individual sensors, or "chemical capacitors." In its development of chemical sensors for cell phones, Seacoast Science has been working with Qualcomm, the wireless technology giant based in San Diego. *Bigelow, B. (2010, Feb.4). The San Diego Union-Tribune: Seacoast Science Avoids VCs, Finds Other Money to Develop Tiny Chemical Sensors.*

- *Synkera Technologies*: The widespread use of cell phones could be harnessed with an ability to detect chemical threats and immediately notify authorities. Synkera proposes to develop a unique nanostructured ceramic sensor array for threat detection. This miniature detection system is well suited for integration with cellular and other wireless devices and will enable them to become part of a larger distributed alert network that improves

situational awareness for mission personnel. Miniature and Reliable Chemical Sensors for Cell Phones. https://www.sbir.gov/node/1302955

- ***Qualcomm***: HSARPA already is working with NASA, Qualcomm and Rhevision Technology to create the new sensors. Each organization takes different scientific approaches to the problem. According to the Department of Homeland Security (DHS), Qualcomm engineers specialize in the necessary miniaturization and have the knowledge required to move a product to the marketplace. https://www.afcea.org/signal-media/technology/sensor-every-pocket. HSARPA conducted a national search for ideas that was intended to leverage existing technological expertise in the public and private sectors, which led to the creation of six workable first-generation prototypes, including a "form factor phone" developed by Qualcomm: as a Qualcomm representative argued: "Let's take advantage of the 300 million cell phones that are out there today. They're always with us" (Hoffman, 2011) *Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks.* SciVerse Science Direct. Geoforum 49 (2013) 279–288. journal homepage: www.elsevier.com/locate/geoforum.

- ***Qualcomm***: Qualcomm's role has been to develop a smartphone app and the associated network software for processing data. When the application is installed, it will ask the user for permission to share sensor readings and location information over the network; then, whenever abnormal chemical levels are detected, the phone will send those data to a network gateway. According to Doug Hoffman, program manager at Qualcomm, the gateway will authenticate the sensor and phone to determine whether they are authorized to be on the network, scrub personal information from the data, assign a temporary identification number to the phone, and then send data to the network operations center (NOC). *Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks.* SciVerse ScienceDirect. Geoforum 49 (2013) 279–288. journal homepage: www.elsevier.com/locate/geoforum.

- ***Qualcomm, Apple, Samsung, and LG***: S&T pursued what's known as cooperative research and development agreements with four cell phone manufacturers: Qualcomm, LG, Apple, and Samsung. These written agreements, which bring together a private company and a government agency for a specific project, often accelerate the commercialization of technology developed for government purposes. Bill Gates once envisioned a computer on every desk in every home, so Stephen Dennis envisions a chemical sensor in every cell phone in every pocket, purse, or belt holster. *Cell-All: Super Smartphones Sniff Out Suspicious Substances.* https://www.dhs.gov/science-and-technology/cell-all-super-smartphones-sniff-out-suspicious-substances

- ***Google***: "Smartphone users can download the app from Google Play and, eventually, from Apple's iTunes store, so Cell-All will be operational on all phones using either Google's Android or Apple's iPhone operating systems." *Crowdsourcing urban surveillance: The development of homeland security markets for environmental sensor networks.* SciVerse ScienceDirect. Geoforum 49 (2013) 279–288. journal homepage: www.elsevier.com/ locate/geoforum. The *Android Team Awareness Kit*, ATAK (built on the Android operating system) ... a single interface for ... different CBRN-sensing technologies... a wearable smartwatch that measures ..., heart rate) or a device mounted on a drone to detect chemical warfare agents. It is a digital application available to

warfighters throughout the DoD. ATAK— on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK now includes … (CBRN) plug-ins.

Google's role in the development of Golden's patented CMDC device was to provide a means [the Google Android Open-Source Operating System] of "interconnecting" or "intergrading" the software and hardware to enable the CMDC device to function as a sensing device. If any modification was made, it was made by Google to its open-source code.

Mobile operating systems (mobile OS) manage the software and hardware of electronic devices such as smartphones, tablets, and smartwatches, and are, therefore, crucial to their performance. Google smartphone devices come with a pre-installed Android mobile OS, and different versions are regularly made available with improved security, stability, and performance.

The Google Android open-source operating system (OS) is software that allows the Google smartphones to run applications and programs. The Android mobile OS provides an interface between the Google smartphone device's hardware components and its software functions. It typically starts when the smartphone device powers on, presenting a screen with icons that show information and provide application access. The Google Android mobile operating system also manage cellular and wireless network connectivity and phone access.

The Google Android OS runs on a derivative of the Linux kernel, which acts as a low-level bridge between the device's hardware and software. The kernel is responsible for various tasks across a device, including resource management for Golden's patented central processing unit (CPU), and the communication of the internal storage device for installed apps.

Key Features of a Google Android Operating System

1. User Interface (UI): Touch inputs of Graphical User Interface (GUI) provided by mobile OS are optimized. This is where users can use touch gestures, in other words, swiping, tapping, and pinching, to interact with their gadgets.

2. Multitasking: It helps in running of many apps at the same time but what is more we can quickly switch between them without any hindrance. Such offloading is for applications that are not currently used actively.

3. *Connectivity: It provides a variety of connections such as cellular, Wi-Fi, Bluetooth, NFC (Near Field Communication) and others to facilitate the communication of the device with other devices and networks.*

4. Application Management: Is a platform that has its own app marketplace or store which the users utilize to browse, install, run and updates the applications exclusively for that platform.

5. Resource Management: Efficiently allocates hardware resources like the CPU, ram, and battery by achieving a balance between performance and battery life.

6. Cross platform and Ecosystem Integration: Devices work together better these days. Apple and Google want their phones, tablets, watches, and smart home stuff to feel like one big happy family.

The popularity of Google's Android mobile operating system has helped competitors like South Korea's Samsung and China's Huawei and Xiaomi flourish, with each company establishing strong footholds in the global mobile phone market. Which means Google also helped Samsung, Huawei and Xiaomi allegedly infringe Golden's patented inventions here in the United States.

## THE TRIAL COURT'S THEORY OF *"MODIFICATION"* IS WITHOUT MERIT

Golden is responsible for making significant changes to the products grouped by common features of design similarities, that includes handhelds, cell phones, PDAs, laptops, tablets, and desktop PCs.

The changes, or modifications are so significant, the United States Patent and Trademark Office (USPTO) issued Golden ten (10) patents with the presumption of validity [35 U.S.C. § 282] that includes twenty-eight (28) independent patent claims and eighteen (18) dependent patent claims for at least that of a cell phone (i.e., smartphone).

"A patent shall be presumed valid. Each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim. The burden of establishing invalidity of a patent or any claim thereof shall rest on the party asserting such invalidity. [35 U.S.C. § 282].

After multiple standard examinations, re-issue examinations, and post examinations (i.e., *inter partes review (IPR)*), conducted by the USPTO to challenge the validity of Golden's claim of a new, improved upon, and useful cell phone [35 U.S.C. § 101], the USPTO issued Golden the patent rights for a device that is now recognized as the "*smartphone*".

> Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title. [35 U.S.C. § 101].

A list of the significant modifications Golden made to the cell phone that are covered in Golden's patent specifications and claimed in twenty-eight (28) independent patent claims and eighteen (18) dependent patent claims of Golden's patents are as follows:

- modifying the cell phone's CPU for carrying out the functional and operational instructions of the smartphone.
- modifying the cell phone's CPU for carrying out the functional and operational instructions of the smartphone's lock, unlock, and disabling lock mechanism.
- modifying the cell phone's CPU for carrying out the functional and operational instructions of the smartphone's fingerprint and facial authentication.
- modifying the cell phone's CPU for carrying out the functional and operational instructions of the smartphone's radio-frequency near-field communication (NFC).
- modifying the cell phone's CPU for carrying out the functional and operational instructions of the smartphone's GPS for locating, navigating and tracking.
- modifying the cell phone's CPU for carrying out the functional and operational instructions of the smartphone's camera sensor for CBR detection.
- modifying the cell phone's operating system (OS) for interconnecting to a vehicle's operating systems.
- modifying the cell phone's operating system (OS) for interconnecting to the Internet-of-Things (IoTs) devices and sensors.
- modifying the cell phone's operating system (OS) for interconnecting to a watch (i.e., smartwatch) that detects for CBRNE agents.

The significant modifications Golden made to the cell phone that are covered in Golden's patent specifications and claimed in twenty-eight (28) independent patent claims and eighteen (18) dependent patent claims of Golden's patents has a USPTO priority date (disclosure document) of November 26, 2004. Three years before Apple introduced what Apple claims to be the first "smartphone".

> The system 10 [] can be adapted or incorporated with cell phone towers and satellites for use with satellite communication and/or a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, or a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween. [*Golden's patent specifications*]

According to the Supreme Court "the claims made in the patent are the sole measure of the grant." "It is a bedrock principle of patent law," says the Federal Circuit Court of Appeals, that "the claims of a patent define the invention." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004). And the U.S. Supreme Court agrees: "the claims made in the patent are the sole measure of the grant." *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 339 (1961).

In the words of Judge Giles Rich, an author of the U.S. Patent Act of 1952, "the name of the game is the claim." Giles S. Rich, *The Extent of the Protection and Interpretation of Claims—American Perspectives*, 21 Int'l Rev. Indus. Prop. & Copyright L. 497, 499 (1990).

In the Trial Court Judge decision to dismiss Golden's allegations of direct infringement at the pleading stage, the Judge is quoted as saying, "[a]s the complaint did not allege that the Google smartphones *themselves* infringed on the patents, Golden failed to allege direct infringement" ... "Mr. Golden's allegations, even if true, at best establish that [defendant's] smartphones might be modified post-sale to perform the accused detector/sensor functionality, which is not enough for direct infringement on the claims here."

The Trial Court's theory of modification is without merit. No legal basis exists for the acceptance, allowance, or crediting of a claim, defense, or legal argument. "[W]hile the invention has been shown and described in a preferred embodiment, it will be apparent to those skilled in the art that numerous alterations, modifications, and variations will possible and practicable

without departing from the spirit and scope of the invention as set forth by the appended claims."

[*Golden's patent specifications*]

Chief Judge Rader, in *Superior Industries v. Masaba* (Fed. Cir. 2014) writes: "In reviewing the claim constructions articulated by the district court, I observe that it read a great deal into the claims in the process of construing them. Thus, I write separately to articulate a couple claim construction principles that may assist the district court on remand when it revisits its constructions. First, in claim construction, one must not import limitations from the specification that are not part of the claim. *Deere & Co. v. Bush Hog, LLC*, 703 F.3d 1349, 1354 (Fed.Cir.2012). Indeed, claims generally are not limited to any particular embodiment disclosed in the specification, even where only a single embodiment is disclosed. *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1117 (Fed.Cir.2004).

Second, and relevant to this case, a system claim generally covers what the system is, not what the system does. *Hewlett–Packard Co. v. Bausch & Lomb Inc.*, 909 F.2d 1464, 1468 (Fed.Cir.1990); see also *Roberts v. Ryer*, 91 U.S. 150, 157 (1875) ("The inventor of a machine is entitled to the benefit of all the uses to which it can be put, no matter whether he had conceived the idea of the use or not."). Thus, it is usually improper to construe non-functional claim terms in system claims in a way that makes infringement or validity turn on their function. *Paragon Solutions, LLC v. Timex Corp.*, 566 F.3d 1075, 1091 (Fed.Cir.2009). Speaking specifically of U.S. law, a system is a physical thing, just like a device, a machine, an apparatus, a manufactured item or a composition of matter. A method, or process, is a series of steps or actions to achieve some end. A method might be performed by a person, (i.e., a third-party)

Golden has written description of modifications that determines the functionality of certain elements of the patented invention in the patent specifications of the patents asserted in this current case. The Trial Court Judge erred in allowing the Defendant to fabricate a limitation, before importing the species of the limitation taken from Golden's patent specifications (i.e., the device has to be modified by a third party in order to function") and making it a part of the patent claims asserted in this case.

## THE FEDERAL CIRCUIT MAINTAINS THAT CLAIM CONSTRUCTION IS NOT THE TYPE OF LEGAL QUESTION THAT SHOULD BE RESOLVED BY A JUDGE ON THE PLEADINGS WITHOUT THE DUE CONSIDERATION GIVEN IN THE *MARKMAN* PROCESS

The question presented is whether the district court correctly held, consistent with the Supreme Court's instruction in *Markman v. Westview Instruments, Inc.* 517 U.S. 370, 372 (1996), that it is the province of the jury to determine whether an accused product infringes the claims of an asserted patent.

A *Markman* hearing is a court hearing in which a Judge determines the meaning of disputed words and phrases in a patent infringement lawsuit. A *Markman* hearing is also known as a construction hearing. When a Judge determines the meaning of the disputed words, it's called claim construction.

To determine patent infringement, a jury must fully understand the definition of words used in the patent. A patented invention must be described with precise wording on its patent application. This wording and the defined definitions from the *Markman* hearing is what jurists use to determine if patent infringement has occurred.

In *Nalco v. Chem-Mod* (Fed. Cir. 2018), *Nalco* explained in detail its theory of infringement. For its part, the district court appeared to have conducted an informal claim construction that led to its ruling of no possible infringement.

Likewise, in the current case, the basic problem is Golden's patent claims do not include; nor expressly claim, the defendant's added limitation of "modified by a third-party in order to function", in the asserted patent claims limitations.

Thus, this current case is a case where direct infringement will likely be resolvable as a question of law following claim construction. However, the Federal Circuit in *Nalco* rejected the lower court's informal claim construction as premature at the pleading stage:

> *"As Nalco explained, these disputes between the parties' hinge on [] what limitations are appropriate ... 'It is not appropriate to resolve these disputes, or to determine whether the method claimed in the '692 patent should be confined to the preferred embodiment, on a Rule 12(b)(6) motion, without the benefit of claim construction.' The purpose of a motion to dismiss is to test the sufficiency of the complaint, not to decide the merits."*

What does this mean within the confines of the current case – although claim construction is an issue of law, the Federal Circuit maintains that claim construction is not the type of legal question that should be resolved by a judge on the pleadings without the due consideration given in the *Markman* process. The Federal Circuit admonishes that invalidating any patent prior to claim construction is the exception rather than the rule. *Bancorp Servs., L.L.C. v. Sun Life Assurance Co. of Canada*, 687 F.3d 1266, 1274-75 ("[I]t will ordinarily be desirable—and often necessary—to resolve claim construction disputes prior to a § 101 analysis...").

Therefore, the District Court Judge erred in dismissing Golden's case on a limitation, function, action, or step that does not appear in any of Golden's patent claims asserted in this case, and is only fabricated by the defense.

The District Court Judge inappropriately dismissed Golden's case at the pleadings stage, with knowledge that Defendant's added "modified by a third-party in order to function" limitation does not appear in any of Golden's patent claims asserted in this case. Golden believes the District Court Judge, before whom this matter is currently on appeal, has a personal bias or prejudice either against Golden or in favor of Google.

In *Markman v. Westview Instruments, Inc.*, the Supreme Court held that patent infringement cases "must be tried to a jury," whose role is to "answer [] the ultimate question of infringement." 517 U.S. 370, 377, 385 (1996) (citing *Bischoff v. Whethered*, 76 U.S. 812, 814 (1869). The District Court Judge overstepped.

After the trial court construes the Defendant's fabricated patent terms ["'modified' by a third party in order to function"], which is a question of law, a jury determines whether the accused product infringes, which is a question of fact, by comparing that product to the patent claim's limitations. It has been over twenty-five years since the Supreme Court last assessed the scope of the constitutional right to a jury in a patent-infringement case. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996).

## THE DISTRICT COURT JUDGE HAS DEMONSTRATED SHE IS NOT ONE SKILLED IN THE ART TO RECOGNIZE THE NUMEROUS ALTERATIONS, MODIFICATIONS, AND VARIATIONS OF GOLDEN'S PATENTED COMMUNICATING, MONITORING, DETECTING, AND CONTROLLING (CMDC) INVENTION

The District Court Judge is completely unaware of the structure and the novel way Golden created his patented CMDC devices. The District Court Judge lack the knowledge and skill in the art, to recognize the structure of Golden's patented CMDC devices:

According to 35 U.S.C. § 271(a), "whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent."

In the Judge decision to dismiss Golden's allegations of direct infringement at the pleading stage, the Judge is quoted as saying, "[t]he complaint's allegations made clear that whether Google's smartphones [] allegedly infringed on the patents-in-suit depended on the end user's download of the Android Team Awareness Kit ("ATAK"), which is a third-party application not made by Google. (Id. at 5–6.)" Golden has presented enough evidence to show the app is available for downloading from the Google Play app store; and, enough evidence to show Google owns and makes the Google android open-source operating system that is pre-loaded into the Google smartphones with a publicly available source code for any developers of the ATAK software to utilize.

Perhaps Google is responsible for making at least half the ATAK software. Whether Google makes the ATAK app is insignificant to the requirements of proving direct patent infringement. Adjudicating the ATAK app, which is developed by and for the Government (DTRA), for direct infringement, is outside the Northern District of California Court jurisdiction.

Direct patent infringement against the Government with an estimated liability in excess of $10, 000 is tried in the U.S. Court of Federal Claims.

Golden provided the District Court with enough factual allegations to show Google makes the alleged infringing smartphones; Google imports into the United States the alleged infringing smartphones; Google offers to sell the alleged infringing smartphones; Google sells the alleged infringing smartphones; Google owns the central processing unit (CPU/Chipset) that carries out the operational and functional instructions for the alleged infringing smartphones; Google owns the Android open-source operating system that connects the hardware and software for the alleged infringing smartphones; and, Google owns "Google Play", the app store that sells and offer for download the ATAK software and the software for downloading the CBRN Plugins:

Google also assembles and imports into the United States as standard components of the alleged infringing smartphones: ports (used to connect the ATAK CBRN plugins); camera

sensors (used to detect for CBRNE); ambient light sensors, spectrometer sensors, and optical waveguide sensors (used to detect bio/chem agents); near-field communication (NFC) sensors (used for communicate with an NFC tag that detects CBR); and, Bluetooth sensors (used as a Bluetooth/Beacon for CBRNE).

The chart below illustrates the relevant patent claims' *elements* of Golden's asserted patents and how they are "*interconnected*" to various components remote the Google phone.

| CLAIM CONSTRUCTION BASICS FOR INTERCONNECTING COMPONENTS AND IDENTIFYING ELEMENTS INSIDE THE ALLEGED INFRINGING SMARTPHONES | | |
|---|---|---|
| **Components** | **Elements** | **Functions Substantially the Same as a** *"Transceiver"* |
| Located **remote** the smartphones but are interconnected to the elements identified in the smartphones | Located **inside** the smartphones but are interconnected to the components identified remote the smartphones | The smartphone transceiver performs substantially the same function; in substantially the same way; to achieve substantially the same results |
| GPS Satellites | GPS Receiver | Receives radio waves from each satellite. Transmits the GPS data received, to track. |
| Cellular Towers | Primary Cellular Antenna | Receives and sends radio frequency (RF) signals |
| Smartwatch / Car | Bluetooth Antenna | Send and receive radio waves |
| Internet-of-Things (IoTs) [Devices and Sensors] | Cellular Modem | Translate data sent to and from the smartphone devices |
| Remote Detection Device [Draper's CBRN Sensors] | Operating System (OS) | Send and receive signals to enable communication between the devices' hardware and software |

## ISSUE PRECLUSION

Issue preclusion, also called collateral estoppel, means that a valid and final judgment binds Google [] as to same issues actually litigated and essential to the judgment in the first action.

In the first action the District Court of South Carolina dismissed Golden's complaint and claim charts as being "frivolous". On appeal in *Larry Golden v. Google LLC*, Case No. 22-1267 the Appellate Court "vacated and remanded" the case back to the District Court because the Federal Circuit found the complaint and the claim chart not to be facially frivolous. Therefore, it is the judgement of the superior Appellate Court that precludes Google and the Northern District of California Court from relitigating certain issues already litigated.

The four essential elements to decide if issue preclusion applies are: 1) the former judgement must be valid and final; 2) the same issue is being brought; 3) the issue is essential to the judgement; 4) the issue was actually litigated.

Google is collateral estoppel from relitigating the same issues found in Golden's complaint and claim charts submitted in the South Carolina District Court case [*Golden v. Google*] that was found not to be facially frivolous by the Appellate Court in *Larry Golden v. Google LLC*; Case No. 22-1267.

First, Google is precluded from relitigating the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) for this case that has already been decided by the Federal Circuit.

The Federal Circuit in *Golden v. Google LLC* Case No. 22-1267 disclosed in "Discussion" that the Circuit reviewed the case "under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), [a court must dismiss a complaint if it fails to allege "enough facts to state a claim to relief that is plausible on its face]." *Twombly*, 550 U.S. at 570; and, "plaintiff must allege facts that give rise to "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted)

> Three-Judge Panel: "DISCUSSION. 'Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal,* 556 U.S. 662 (2009), a court must dismiss a complaint if it fails to allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570 … [T]his standard

16

"requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (citation omitted). A plaintiff must allege facts that give rise to "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted) … this court has explained that a plaintiff … must plead "'enough fact[s] to raise a reasonable expectation that discovery will reveal' that the defendant is liable for the misconduct alleged."

The Federal Circuit in *Golden v. Google LLC* Case No. 22-1267 took notice that "in the patent context, th[e] court has explained that a plaintiff need not "plead facts establishing that each element of an asserted claim is met," *In re Bill of Lading Transmission and Processing Sys. Pat. Litig.*, 681 F.3d 1323, 1335 (Fed. Cir. 2012) (citing *McZeal v. Sprint Nextel Corp.*, 501 F.3d 1354, 1357 (Fed. Cir. 2007)), but must plead "'enough fact[s] to raise a reasonable expectation that discovery will reveal' that the defendant is liable for the misconduct alleged." *Id.* at 1341 (alteration in original) (quoting *Twombly*, 550 U.S. at 556)".

Second, Google is precluded from relitigating the independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189".

The Federal Circuit in *Golden v. Google LLC* Case No. 22-1267 goes on to say: "In the Google case, the district court again concluded that Mr. Golden's complaint was frivolous. Here, however, Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the Google [Pixel 5] Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189" … "to the extent that the chart includes the "exact same language" as previously rejected charts, it is simply the language of the independent claims being mapped to" … "[i]t attempts—whether successfully or not—to map claim limitations to infringing product features, and it does so in a relatively straightforward manner. We conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart. Mr. Golden has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart."

The Federal Circuit in *Larry Golden v. Google LLC*; Case No. 22-1267 examined and determined Golden has described how the Google "smartphone", that include the ATAK software and CBRN plugin sensors literally, and/or under the doctrine of equivalents, more

likely than not, infringes at least claim 5 of Golden's '287 Patent; claim 23 of Golden's '439 Patent; and claim 1 of Golden's '189 Patent. See the chart below:

| Literal Infringement (Precedence) | Literal Infringement (Fed. Cir. *Golden v. Google*) |
|---|---|
| Literal infringement means that each and every element recited in a claim has identical correspondence in the allegedly infringing device or process. To literally infringe a patent, the accused system, method, etc. must include each limitation of a claim. E.g., *Southwall* (Fed. Cir. 05/10/95) To establish literal infringement, every limitation set forth in a claim must be found in an accused product, exactly. *Becton Dickinson* (Fed. Cir. 12/13/90). "Infringement, both literal and under the doctrine of equivalents, is an issue of fact."); *Cobalt Boats* (Fed. Cir. 05/31/19) "patent infringement is an issue of fact, tried by a jury" [U.S. CONST. amend. VII] | "Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the Google Pixel 5 Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189 … It [claim chart] attempts [] to map claim limitations to infringing product features, and it does so in a relatively straightforward manner …[W]e conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart. Mr. Golden has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart…." |

Although the Federal Circuit did not specifically say "without a doubt, Google's smartphone products that include the ATAK software and CBRN plugin sensors are literally and/or under the doctrine of equivalents, infringing Golden's patents asserted in the case", the Federal Circuit imply to say under the "clear and convincing evidence" standard, Google's smartphone products that include the ATAK software and CBRN plugin sensors are more likely than not directly infringing Golden's patents asserted in the case.

"Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the Google Pixel 5 Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189 … It [claim chart] attempts [] to map claim limitations to infringing product features, and it does so in a relatively straightforward manner …[W]e conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart. Mr. Golden has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart…."

**Claim Chart Presented to the Federal Circuit is Precluded from being Re-litigated**

The following Claim Chart is a duplicate of the Claim Chart submitted on appeal to the Federal Circuit in *Larry Golden v. Google LLC*; Case No. 22-1267. The chart illustrates Google's literal infringement and/or infringement under the doctrine of equivalents. An inclusion is anticipated for the Google Pixel 9 Series provided Google fail to show a significant difference between the Google Pixel 5, 6, 7, & 8 smartphone series and the Google Pixel 9 Series; that would disqualify the Google Pixel 9 smartphone series as a new, improved upon, and useful smartphone invention. At least one of the alleged infringing products of Google (Google Pixel 5) is illustrated to show how the Google Pixel 5 allegedly infringes on at least one of the asserted independent claims of each of the patents-in-suit ('287, '439, and '189 patents).

| Google Pixel 5 Smartphone | Patent #: 10,163,287; Independent Claim 5 | Patent #: 9,589,439; Independent Claim 23 | Patent #: 9,096,189; Independent Claim 1 |
|---|---|---|---|
|  | A monitoring device, comprising: | A cell phone comprising: | A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal … |
| CPU: Octa-core (1 × 2.4 GHz Kryo 475 Prime & 1 × 2.2 GHz Kryo 475 Gold & 6 × 1.8 GHz Kryo 475 Silver) System-on-a-chip: Qualcomm Snapdragon 765G | at least one central processing unit (CPU); | a central processing unit (CPU) for executing and carrying out the instructions of a computer program; | at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, … |
| Ambient Temperature sensor supported by the Android platform. Measures the ambient room temperature in degrees Celsius (°C). Monitoring air temperatures. | at least one temperature sensor in communication with the at least one CPU for monitoring temperature; | X | X |

| | | | |
|---|---|---|---|
| Gravity sensor supported by the Android platform. Measures the force of gravity in m/s2 that is applied to a device on all three physical axes (x, y, z). Motion detection (shake, tilt, etc.). | at least one motion sensor in communication with the at least one CPU; | X | X |
| Light sensor supported by the Android platform. Measures the ambient light level (illumination) in lx. Controlling screen brightness. Screen: 6-inch flexible OLED display at 432 ppi | at least one viewing screen for monitoring in communication with the at least one CPU; | X | X |
| Connectivity: Wi-Fi 5 (a/b/g/n/ac) 2.4 + 5.0 GHz, Bluetooth 5.0 + LE, NFC, GPS (GLONASS, Galileo, BeiDou), eSIM capable | at least one global positioning system (GPS) connection in communication with the at least one CPU; | at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, ... or GPS connection; | at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, ... short-range radio frequency (RF) connection, or GPS connection; |
| Connectivity: Wi-Fi 5 (a/b/g/n/ac) 2.4 + 5.0 GHz, Bluetooth 5.0 + LE, NFC, GPS (GLONASS, Galileo, BeiDou), eSIM capable | at least one of an internet connection or a Wi-Fi connection in communication with the at least one CPU; | wherein at least one of... WiFi connection, internet connection, radio frequency (RF) connection, cellular connection... capable of signal communication with the transmitter or the receiver; | wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group... of satellite, Bluetooth, WiFi... |
| Connectivity: Wi-Fi 5 (a/b/g/n/ac) 2.4 + 5.0 GHz, Bluetooth 5.0 + LE, NFC, GPS (GLONASS, Galileo, BeiDou), eSIM capable | at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; | at least one of a... Bluetooth connection, WiFi connection, internet connection... cellular connection... short range radio frequency (RF) connection, or GPS connection; | X |

| | | | |
|---|---|---|---|
| Google's Android operating system features a lock mechanism ... known as pattern lock. To set, drag your finger along [] the screen. To unlock, replicate the pattern drawn. ... the phone locks and cannot be unlocked without logging int...<br><br>Google Nest × Yale Lock ... you can lock or unlock door from your phone. | at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the ... device, disengage (unlock) the ... device, or disable (make unavailable) the ... device; | whereupon the cell phone is interconnected to the cell phone detection device to receive signals or send signals to lock or unlock doors, to activate or deactivate security systems, to activate or deactivate multi-sensor detection systems, or to activate or deactivate the cell phone detection device; | X |
| Pixel phones use USB-C with USB 2.0 power adapters and cables. To charge your phone with a USB-A power adapter, use a USB-C to USB-A cable. | at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device; | X | X |
| BIOMETRICS: Biometric factors allow for secure authentication on the Android platform. The Android framework includes face and fingerprint biometric authentication. Android can be customized to support other forms of biometric authentication (such as Iris). | at least one biometric sensor in communication with the at least once CPU for providing biometric authentication to access the communication device; | wherein the cell phone is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, ... such that the cell phone is locked by the biometric lock disabler to prevent unauthorized use; and | wherein the communication device is equipped with a biometric lock disabler ... of a fingerprint recognition, ... face recognition... of the cell phone, the smart phone, the desktop, ... the laptop or the computer terminal is locked by the biometric lock disabler to prevent unauthorized use |
| *Android Team Awareness Kit*, ATAK (built on the Android operating system) ... a single interface for ... different CBRN-sensing technologies... a wearable smartwatch that measures ..., heart rate) or a device mounted on a drone to detect chemical warfare agents. | at least one sensor for chemical, biological, or human detection in communication with the at least one CPU; | the cell phone is at least a fixed, portable or mobile communication device interconnected to the cell phone detection device, capable of wired or wireless communication therebetween; and | the communication device is at least a fixed, portable or mobile communication device interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween... |

| | | | |
|---|---|---|---|
| *Android Team Awareness Kit*, ATAK (built on the Android operating system) is a digital application available to warfighters throughout the DoD. ATAK— on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK now includes ... (CBRN) plug-ins. | one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents; | at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone; | wherein the communication device receives a signal via any of one or more products listed in any of the plurality of product grouping categories; |
| Connectivity: Wi-Fi 5 (a/b/g/n/ac) 2.4 + 5.0 GHz, Bluetooth 5.0 + LE, NFC, GPS (GLONASS, Galileo, BeiDou), eSIM capable | at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU... | X | X |
| Google Nest × Yale Lock is connected to the Nest app; you can lock or unlock your door from your phone. *Android Team Awareness Kit*, ATAK (built on the Android operating system) provides a single interface for viewing and controlling different CBRN-sensing tech. | at least one of a transmitter or a transceiver in communication with ... CPU configured to send signals to ... detect at least one of a chemical biological... agent ... device is capable of communicating, monitoring, detecting, and controlling. | a transmitter for transmitting signals and messages to a cell phone detection device; a receiver for receiving signals from the cell phone detection device; | a transmitter for transmitting signals and messages to at least one of plurality product groups ..., a cell phone detection device... locking device; a receiver for receiving signals, data or messages from at least one of ... a cell phone detection device... locking device; |
| Google Nest × Yale Lock is connected to the Nest app; you can lock or unlock your door from your phone. *Android Team Awareness Kit*, ATAK (built on the Android operating system) provides a single interface for viewing and controlling different CBRN-sensing tech. | X | X | whereupon the communication device, is interconnected to a product equipped to receive signals from or send signals to lock or unlock doors, activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems |

| | | | |
|---|---|---|---|
| *Android Team Awareness Kit*, ATAK ATAK offers warfighters geospatial mapping for situational awareness during combat — on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK now ... (CBRN) plug-ins. | X | a transmitter for transmitting signals and messages to a cell phone detection device; a receiver for receiving signals from the cell phone detection device; | wherein at least one ..., Bluetooth connection, WiFi connection, internet connection, ... cellular connection, ... signal communication with the transmitter and the receiver of the ...device and transceivers of the products; |
| *Android Team Awareness Kit*, ATAK ATAK offers warfighters geospatial mapping for situational awareness during combat — on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK now includes CBRN) plug-ins. | X | whereupon a signal sent to the receiver of the cell phone detection device from ... chemical sensor, the biological sensor, the explosive sensor, ... or the radiological sensor, causes a signal that includes at least one of location data ... | X |

Google is also precluded from relitigating the construction for the patent claims' limitations for where and how the CBRNE device(s) can be found "within" the Google alleged infringing devices. In the *United States Department of Homeland Security v. Larry Golden* "Final Written Decision" Case IPR2014-00714, Entered: October 1, 2015, the PTAB construed "built in, embedded" as "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device".

In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced in the chart below.

| Claim Term | Construction |
|---|---|
| "built in, embedded" (claim 74) | "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device" |
| "communication device" (claim 81) | "monitoring equipment" |

Dec. to Inst. 11–16.

No party challenges these constructions. Both of these terms were modified or removed in the amendment. To the extent that any of these constructions remain relevant after the amendment, we see no reason to modify them.

We further determined that no explicit construction was necessary for any other claim terms. Dec. to Inst. 10–11. Based on the record adduced during trial, we see no need to construe any other terms.

The Trial Court Judge again erred in allowing Google to re-litigate issues that had already been adjudicated and a final decision was issued. The PTAB clearly stated the DTRA ATAK app and Draper's CBRNE Plug-in sensors are "an integral part of the device [Google smartphone]".

## THE JUDGE FAIL TO STRICTLY FOLLOW THE DECISION(S) HANDED DOWN BY THE HIGHER COURT WITHIN THE SAME JURISDICTION

The District Court is in violation of the doctrine of *vertical stare decisis* for not honoring the decision of the higher Appellate Court in *Larry Golden v. Google LLC*; Case No. 22-1267:

The Northern District of California Court, who is bound by and must follow the decisions of the U.S. Court of Appeals for the Federal Circuit [*vertical stare decisis*] fail to abide by the Circuit's decision in *Larry Golden v. Google LLC* Case No. 22-1267, that Google's "smartphone" literally and/or under the doctrine of equivalents infringes Golden's "independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189 … and it does so in a relatively straightforward manner". the District Court was bound by the doctrine of *vertical stare decisis*, to uphold the CAFC's decision.

*Vertical stare decisis* binds lower courts to follow strictly the decisions of higher courts within the same jurisdiction (e.g., the Northern District of California Court must follow the decisions of the U.S. Court of Appeals for the Federal Circuit). The Supreme Court defines *vertical stare decisis* as the doctrine, "a lower court must strictly follow the decision(s) handed down by a higher court within the same jurisdiction".

A court engages in *vertical stare decisis* when it applies precedent from a higher court. For example, if the Northern District of California Court in *Golden v. Golden* adhered to a previous ruling from the United States Court of Appeals for the Federal Circuit, in *Larry Golden v. Google LLC*; Case No. 22-1267, that would be *vertical stare decisis*.

## STANDARD CLAIM CHART – I

The claim chart presented and reviewed by the Federal Circuit in *Larry Golden v. Google LLC*; Case No. 22-1267 is based on reverse engineering. Reverse engineering, also called "tear down", is a method or process to discover how the DTRA ATAK software and/or its Draper CBRNE Plug-in Sensors functions with a Google smartphone product.

The following claim chart was presented to the Trial Court Judge for an element-by-element analysis of Google's alleged infringing smartphone product and how it functions with a Google smartwatch designed for CBRNE sensing that is *remote* the Google smartphone.

<table>
<tr>
<td>



ATAK (built on the Google Android operating system) … controlling different CBRN-sensing technologies, whether that is a wearable smartwatch that measures a warfighter's vitals (e.g., heart rate) …

</td>
<td>

**Google Smartwatch CBR Detector for Smartphone**

The US Military's Latest Wearables [Smart Watch] Can Detect Illness Two Days Before You Get Sick https://www. defenseone.com/technology/2020/09/militarys-latest-wearables-can-detect-illness-two-days-you-get-sick/168664/

Studies reveal smartwatch biometrics can detect COVID-19: "smartwatches and other wearables measuring biometrics like heart-rate variability have the ability to detect if a person is COVID-19 positive" https://www.biometricupdate.com/202101/studies-reveal-smartwatch-biometrics-can-detect-covid-19-before-symptoms-surface

Homeland Security's Smartwatch Will Detect Nuclear Bombs https://www.popular-mechanics.com/military/research/a18161/homeland-security -smartwatch-detect-nuclear-bombs/

</td>
</tr>
</table>

**IDENTIFYING IN THE ALLEGED INFRINGING SMARTPHONE WHERE EACH ELEMENT IS FOUND TO LITERALLY AND/OR UNDER THE DOCTRINE OF EQUIVALENTS INFRINGES GOLDEN'S PATENTS.**

| Google Pixel 8 Smartphone | Patent No. 9,589,439 (claim 23 of the '439 patent) |
|---|---|
| Golden has identified the Google smartphone(s) as "a new, improved upon, and useful cell phone" and the Google Pixel smartwatch as the multi-sensor detection device or a cell phone detection device | *A cell phone comprising:* |

| | |
|---|---|
| Golden has identified the Google "Tensor" as the CPU/Chipset for executing and carrying out instructions for the Google Pixel smartphone; the Qualcomm SW5100 / Cortex M33 co-processor CPU/Chipset for executing and carrying out instructions for the Google Pixel smartwatch | a central processing unit (CPU) for executing and carrying out the instructions of a computer program; |
| The Google Pixel smartphone transceiver connects the Smartwatch (i.e., multi-sensor detection device, or cell phone detection device) to the Google Pixel smartphone via Bluetooth | a transmitter for transmitting signals and messages to a cell phone detection device; |
| The Google Pixel smartphone transceiver connects the Smartwatch (i.e., multi-sensor detection device, or cell phone detection device) to the Google Pixel smartphone via Bluetooth | a receiver for receiving signals from the cell phone detection device; |
| Golden has identified the Google smartphone(s) as "a communication device" and the Google Pixel smartwatch as the multi-sensor detection device or a cell phone detection device for wireless communication therebetween, and | the cell phone is at least a fixed, portable or mobile communication device interconnected to the cell phone detection device, capable of wired or wireless communication therebetween; |
| Golden is identifying the Google Pixel smartphone(s) as "a new, improved upon, and useful cell phone" or "communication device", interconnected to the Google Pixel smartwatch as the cell phone detection device to receive signals or send signals to activate or deactivate | whereupon the cell phone is interconnected to the cell phone detection device to receive signals or send signals to … activate or deactivate multi-sensor detection systems, or to activate or deactivate the cell phone detection device; |
| Golden is identifying the Google Pixel smartwatch as the multi-sensor detection device or a cell phone detection device for CBRNE detection, that is adjacent the Google Pixel smartphone(s) as "a new, improved upon, and useful cell phone" or "communication device" | at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone |
| The Google Pixel smartphone transceiver connects the Smartwatch (i.e., multi-sensor detection device, or cell phone detection device) to the Google Pixel smartphone via Bluetooth | at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; |

| | wherein at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection is capable of signal communication with the transmitter or the receiver; |
|---|---|
| The Google Pixel smartphone transceiver connects the Smartwatch (i.e., multi-sensor detection device, or cell phone detection device) to the Google Pixel smartphone via Bluetooth | |
| Golden has identified the Google smartphone(s) fingerprint or facial recognition and the Google Pixel smartwatch as having voice recognition. *"Google Assistant voice commands on Google Pixel Watch"* https://support.google.com/ googlepixelwatch/answer/12677020?hl=en | wherein the cell phone is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature such that the cell phone is locked by the biometric lock disabler to prevent unauthorized use; |

### STANDARD CLAIM CHART – II

The claim chart presented and reviewed by the Federal Circuit in *Larry Golden v. Google LLC*; Case No. 22-1267 is based on reverse engineering. Reverse engineering, also called "tear down", is a method or process to discover how the DTRA ATAK software and/or its Draper CBRNE Plug-in Sensors functions with a Google smartphone product.

The following claim chart was presented to the Trial Court Judge for an element-by-element analysis of Google's alleged infringing smartphone product and how it functions with a Google smartphone camera designed for Chemical and Biological detection that is ***internal*** the Google smartphone.

**Camera [1][2] Used for Detecting Chem/Bio Agents.**



**1** The camera captures the image from the array of nanopores that uses fluid rather than bulky moving parts. The sensors contained in one array is determined by the resolution phone camera. The resolution in cell phone cameras; probe a million different spots on the sensor simultaneously. *Tiny sensors tucked into cell phones could map airborne toxins in real time*. Source: https:// www.understanding nano.com/cell-phone-sensors-toxins.html

**2**    Hyperspectral imaging scans for light frequencies that humans can't see in order to identify the unique chemical signatures of different substances. They say their device, which can be mass produced, is compatible with all standard smartphone cameras. *These New Smartphone Cameras Could Tell You What an Object Is Made of* https://www.sciencealert.com/new-smartphone-cameras-could-tell-you-what-an-object-is-made-of

| The Google "megapixel" Camera is "Native" to the Manufacture of the Google Pixel Smartphone | |
| --- | --- |
| **Patent No. 9,589,439 (Patent Claim 23 of Golden's '439 patent)** | **Google "megapixel Camera; embedded in the Google Pixel Smartphone, and interconnected for communication, therebetween** |
| *A cell phone comprising* | [Golden has identified the Google smartphone(s) as "a new, useful, and improved upon cell phone" and the Google "megapixel" Camera as the multi-sensor detection device or a cell phone detection device] |
| a central processing unit (CPU) for executing and carrying out the instructions of a computer program; | [Golden has identified the Google "Tensor" as the CPU/Chipset for executing and carrying out instructions for the Google Pixel smartphone; the Google "Tensor" CPU/Chipset for executing and carrying out instructions for the Google "megapixel" Camera] |
| a transmitter for transmitting signals and messages to a cell phone detection device; | [The Google Pixel smartphone transceiver connects the Google "megapixel" Camera (i.e., multi-sensor detection device, or cell phone detection device) to the Google Pixel smartphone via Bluetooth] |
| a receiver for receiving signals from the cell phone detection device; | [The Google Pixel smartphone transceiver connects the Google "megapixel" Camera (i.e., multi-sensor detection device, or cell phone detection device) to the Google Pixel smartphone via Bluetooth] |
| the cell phone is at least a fixed, portable or mobile communication device interconnected to the cell phone detection device, capable of wired or wireless communication therebetween; | [Golden has identified the Google smartphone(s) as "a new, useful, and improved upon cell phone" and the Google "megapixel" Camera as the multi-sensor detection device or a cell phone detection device for wireless communication therebetween], |
| at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone | [Golden is identifying the Google "megapixel" Camera as the multi-sensor detection device or a cell phone detection device for CBRNE detection, that is embedded in the Google Pixel smartphone(s) as "a new, improved upon, and useful cell phone" or "communication device"] |

| at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; | [The Google Pixel smartphone transceiver connects the Google "megapixel" Camera (i.e., multi-sensor detection device, or cell phone detection device) to the Google Pixel smartphone via Bluetooth] |
|---|---|
| wherein at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection is capable of signal communication with the transmitter or the receiver; | [The Google Pixel smartphone transceiver connects the Google "megapixel" Camera (i.e., multi-sensor detection device, or cell phone detection device) to the Google Pixel smartphone via Bluetooth] |
| wherein the cell phone is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature such that the cell phone is locked by the biometric lock disabler to prevent unauthorized use; | [Golden has identified the Google smartphone(s) fingerprint recognition and the Google "megapixel" Camera as having facial recognition. |

## STANDARD CLAIM CHART – III

Google and the Trial Court Judge completely ignored Golden's claim that Google's Tensor, Tensor 2, and Tensor 3 CPU/Chipset allegedly infringes indep. claims 4, 5, & 6 of Golden's '287 patent, and indep. claim 11, and dep. claims 12-20 of Golden's '619 patent.

The following claim chart was presented to the Trial Court Judge for an element-by-element analysis of Google's alleged infringing smartphone product.

| Google Tensor; Tensor 2; and Tensor 3 | Patent #: 10,984,619; Independent Claim 11 |
|---|---|
|  The Google Tensor (i.e. CPU; Chipset) is considered the "brain" of the Smartphone, capable of carrying out the operational and functional instructions | A central processing unit (CPU) of at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, capable of: |
| The Google Tensor (i.e. CPU; Chipset) is considered the "brain" of the Smartphone, capable of carrying out the operational and functional instructions of the Smartphone | processing instructions to lock, unlock, or disable the lock of the communication device; |

| | |
|---|---|
| The Google Tensor (i.e. CPU; Chipset) is considered the "brain" of the Smartphone, capable of carrying out the operational and functional instructions of the Smartphone | processing instructions to activate a lock, unlock, or disabling lock means by engaging a vehicle with a two-way communication key-fob; |
| The Google Tensor (i.e. CPU; Chipset) is considered the "brain" of the Smartphone, capable of carrying out the operational and functional instructions of the Smartphone | processing instructions to activate a start, stall, stop, or disabling means by engaging a vehicle's ignition system; |
| The Google Tensor (i.e. CPU; Chipset) is considered the "brain" of the Smartphone, capable of carrying out the operational and functional instructions of the Smartphone | processing instructions to activate a lock, unlock, or disabling lock means; a start, stall, stop, or disabling vehicle means by engaging the operational systems of the unmanned aerial vehicle; |
| The Google Tensor (i.e. CPU; Chipset) is considered the "brain" of the Smartphone, capable of carrying out the operational and functional instructions of the Smartphone | processing instructions to authenticate or identify a user by at least one of biometric fingerprint recognition, biometric facial recognition, biometric iris recognition, or biometric retina recognition; |
| The Google Tensor (i.e. CPU; Chipset) is considered the "brain" of the Smartphone, capable of carrying out the operational and functional instructions of the Smartphone | processing instructions to scan a senor or tag using the short-range wireless technology of radio frequency near-field communication (NFC); |
| The Google Tensor (i.e. CPU; Chipset) is considered the "brain" of the Smartphone, capable of carrying out the operational and functional instructions of the Smartphone | processing instructions to monitor or detect at least one of a chemical sensor, a biological sensor, a motion sensor, a biometric sensor, a signature sensor, or a human sensor; |
| The Google Tensor (i.e. CPU; Chipset) is considered the "brain" of the Smartphone, capable of carrying out the operational and functional instructions of the Smartphone | processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs); |
| The Google Tensor (i.e. CPU; Chipset) is considered the "brain" of the Smartphone, capable of carrying out the operational and functional instructions of the Smartphone | processing instructions received through at least one of a Bluetooth, a Wi-Fi, a satellite, a global positioning system (GPS), or a cellular transmission; |
| The Google Tensor (i.e. CPU; Chipset) is considered the "brain" of the Smartphone, capable of carrying out the operational and functional instructions of the Smartphone | processing instructions to connect the communication device to the internet or internet-of-things (IoTs) platform to sync, to at least one of a building's computer or security system, a vehicle's computer or security system, a lock, a detection device, or another communication device; and, |
| The Google Tensor (i.e. CPU; Chipset) is considered the "brain" of the Smartphone, capable of carrying out the operational and functional instructions of the Smartphone | whereupon, the ... (CPU) of the communication device is capable of processing instructions for operational and functional execution, and is capable of providing feedback of the execution, and storing the feedback into memory. |

# CONCLUSION

Golden is also responsible for the central processing unit (CPU); biometric authentication; lock disabling after multiple failed attempts to open; the internet; GPS; radio-frequency near-field communication; and the connectivity to a vehicle's operational systems, of the CMDC (smartphone) device. Golden's Disclosure filing date with the USPTO is November 26, 2004, and his first application filing date with the USPTO is April 5, 2006. Long before Steve Jobs filed the first *design* patent for the smartphone in 2007.

Golden was deprived by the Trial Court Judge his guaranteed right to a trial by jury for the patent infringement claims presented in this case, that are issues-of-fact tried by a jury [U.S. CONST' amend. VII]

Sincerely,

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

(H) 8642885605 (M) 8649927104

Email: atpg-tech@charter.net

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 8th day of July, 2024, a true and correct copy of the foregoing "PLAINTIFF-APPELLANTS INFORMAL BRIEF", was served upon the following Defendant by priority "express" mail:

Matthew S. Warren

WARREN LEX LLP

2261 Market Street, No. 606

San Francisco, California, 94114

Phone: (415) 895-2940

Fax: (415) 895-2964

Email: 22-5246@cases.warrenlex.com

Larry Golden, Pro Se

740 Woodruff Rd., #1102

Greenville, South Carolina 29607

atpg-tech@charter.net

864-288-5605

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LARRY GOLDEN,<br><br>      Plaintiff,<br><br>v.<br><br>GOOGLE LLC,<br><br>      Defendant. | Case No. 22-cv-05246-RFL<br><br>**ORDER GRANTING MOTION TO DISMISS AND DENYING LEAVE TO FILE A SURREPLY**<br><br>Re: Dkt. Nos. 44, 48 |

Larry Golden brings this action for patent infringement against Google LLC. Golden's original complaint was dismissed with leave to amend for failure to state a claim. (Dkt. No. 41.) Golden subsequently filed an amended complaint (Dkt. No. 42 ("FAC")), which Google now moves to dismiss for failure to state a claim (Dkt. No. 44 ("Mot.")). The motion to dismiss is **GRANTED WITHOUT LEAVE TO AMEND**. This ruling assumes the reader is familiar with the facts, the applicable legal standard, and the arguments made by the parties.[1]

As an initial matter, Golden's motion for leave to file a sur-reply (Dkt. No. 48) is **DENIED**. Under the Civil Local Rules, once a reply is filed, no additional memoranda, papers or letters may be filed without prior Court approval, except if new evidence has been submitted in the reply or a relevant judicial opinion was published after the date the opposition or reply was filed by filing. Civil L.R. 7-3(d). Google's reply did not submit new evidence, and Golden's proposed sur-reply does not reference a newly published relevant judicial opinion. To the extent

---

[1] This case is one of several patent infringement cases that Golden has filed against Google and other defendants. *See Golden v. Samsung Elecs. Am., Inc.*, No. 23-CV-00048-WHO, 2023 WL 3919466 (N.D. Cal. June 8, 2023), *aff'd*, No. 2023-2120, 2024 WL 539973 (Fed. Cir. Feb. 12, 2024) (describing Golden's litigation history over the past ten years in multiple jurisdictions).

Google raised new arguments on reply, such arguments are "not new evidence when [ ] submitted to rebut arguments raised in the opposition brief," which was the case here. *Applied Materials, Inc. v. Demaray LLC*, No. 5:20-CV-05676-EJD, 2020 WL 8515132, at *1 (N.D. Cal. Dec. 16, 2020).

As for the merits, the Court previously dismissed Golden's original complaint because it failed to allege either direct or indirect infringement of U.S. Patent Nos. 10,163,287 ("'287 Patent"), 9,589,439 ("'439 Patent"), and 9,096,189 ("'189 Patent") by Google. (*See* Dkt. No. 41.) The complaint's allegations made clear that whether Google's smartphones (Google Pixel 3, 3 XL, 3a, 3a XL, 4a, 4a (5G), and 5) allegedly infringed on the patents-in-suit depended on the end user's download of the Android Team Awareness Kit ("ATAK"), which is a third-party application not made by Google. (*Id.* at 5–6.) As the complaint did not allege that the Google smartphones *themselves* infringed on the patents, Golden failed to allege direct infringement. (*Id.* at 6.) As liability for indirect infringement is dependent on the existence of direct infringement, Golden also failed to allege indirect infringement. (*Id.* at 7.)

The FAC claims that newer models of Google's smartphones (Google Pixel 6a, 7, 7a, 7 Pro and Fold) infringe on the '287 Patent, the '439 Patent, '189 Patent, plus one additional patent, U.S. Patent No. 10,984,619 ("'619 Patent"). (*See* FAC at 2.) The FAC alleges five theories of direct infringement (*id.* ¶ 75, Exs. G & H), all of which suffer from the same defect for which the original complaint was dismissed: the theories all require that the accused products be modified in some way for them to infringe on the patents-in-suit. *See Golden v. Samsung Elecs. Am., Inc.*, No. 2023-2120, 2024 WL 539973, at *3 (Fed. Cir. Feb. 12, 2024) ("Mr. Golden's allegations, even if true, at best establish that [defendant's] smartphones might be modified post-sale to perform the accused detector/sensor functionality, which is not enough for direct infringement on the claims here."). Thus, like the original complaint, the FAC fails to allege direct or indirect infringement. The FAC's claims of joint infringement and willful infringement are conclusory and thus also not plausibly alleged, even applying the lenient pleading standards for *pro se* plaintiffs.

A.    **Direct Infringement**

*ATAK application.*  Golden's first claim of direct infringement (*see* FAC, Ex. G ("Ex.

G") at 2–9) fails for the same reason as the original complaint: it requires the use of ATAK, a

third-party application that the user must install on the accused product, for at least two elements

of each asserted claim.  (*See id.* at 6.)  *See Nazomi Commc'ns, Inc. v. Nokia Corp.*, 739 F.3d

1339, 1346 (Fed. Cir. 2014) (finding that the defendants' products "do not infringe without

modification—the modification of installing the required software").

*NFC tags.*  Likewise, Golden' second theory (*see* Ex. G at 10–17) requires combining

"Google's NFC sensor," which are allegedly embedded in the accused products, with external

NFC tags that have been converted to detect certain chemicals in order for there to be alleged

infringement.  Golden does not allege that the converted NFC tags are part of the accused

smartphones.  Thus, the FAC alleges only that the accused smartphones are capable of being

modified to operate in an infringing manner, which is insufficient to support a finding of

infringement.  *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1330 (Fed. Cir.

2001) ("[T]hat a device is capable of being modified to operate in an infringing manner is not

sufficient, by itself, to support a finding of infringement.").

*Camera sensors.*  Golden's third theory (*see* Ex. G at 18–25) relies on the combination of

"Google's camera lens" with a "microfluidic lens" that "uses a microscope to focus on a

chemical sensor" (*id.* at 22) to support infringement.  Again, though, the FAC alleges that the

chemical sensor is an external component, not part of the smartphone camera.  Specifically, the

allegation is that "[t]he camera, screen, and LED flashlight of the smartphone can be employed

as components of the sensor," thus indicating that external sensor components beyond the

smartphone are required.  (FAC at 26.)  The FAC also alleges that "[s]martphones provide

hardware and software capability which can be incorporated with [CBR] sensors, enabling

accurate on-site portable sensing," further confirming that the sensors are separate devices that

may be "incorporated" into the smartphone.  (*Id.*)  Therefore, this theory of infringement also

fails because the accused products do not infringe without modification.

*Smartphone biosensors.*  Golden's fourth theory (*see* Ex. G at 26–33) is that "Google Smartphone Biosensors" detect various biomarkers, pathogens, and the like.  The FAC does not specify how Google's smartphones incorporate the listed biosensors, but instead references a diagram.  (FAC at 27.)  The diagram shows an "add on device" with the alleged biosensors (i.e., "capillary inlet," "microfluidic cassette," VIS-NIR spectrometer, and "NNAP electrodes") *attached* to a nondescript smartphone.  (*Id.*)  As such, this theory also requires modification to the accused smartphones to state an infringement claim.

Furthermore, because Golden relies on the diagram to illustrate how Google allegedly infringes his patents, the Court may incorporate by reference into the FAC the journal article from which the diagram is derived.  *See, e.g.*, *SafeCast Ltd. v. Google, LLC*, No. 23-CV-03128-PCP, 2023 WL 8108657, at *4 (N.D. Cal. Nov. 22, 2023) (incorporating by reference defendant's policy webpages, which plaintiff selectively quoted in its claim chart, into complaint).  Google provides a link to the article as the source of the diagram in its motion to dismiss (Mot. at 5), and Golden does not dispute in his opposition brief that the article is the source of the diagram.  The article is attached as Exhibit A to this opinion, to preserve it for the record.  The article describes the diagram as "an illustration of [a] futuristic sensing device indicating some possibilities for multiplex sensing" that could be used to colonize Mars, and notes that "this ideal galactic sensing system remains fictional and may seem farfetched."  (Ex. A at 20.)  Accordingly, Golden's allegation appears to be that Google may incorporate these biosensors in the future, which does not state a plausible claim that infringement has occurred or is imminent.

*Google Beacon.*  Golden's fifth theory (*see* Ex. G at 34–41) fails for the same reason, as it requires "Google Beacon," which the FAC's own illustrations show is a separate device from the accused smartphones (*see* FAC at 27).

*Doctrine of equivalents.*  The doctrine of equivalents does not save Golden's claims.  (*See* FAC at 10.)  "Under the doctrine of equivalents, a product that does not literally infringe a patent claim may still infringe if each and every limitation of the claim is literally or equivalently

present in the accused device." *Bus. Objects, S.A. v. Microstrategy, Inc.*, 381 F. Supp. 2d 1107, 1109 (N.D. Cal. 2005), *aff'd*, 197 F. App'x 941 (Fed. Cir. 2006). Equivalence "requires a showing that the difference between the claimed invention and the accused product or method was insubstantial or that the accused product or method performs the substantially same function in substantially the same way with substantially the same result as each claim limitation of the patented product or method." *AquaTex Indus., Inc. v. Techniche Sols.*, 479 F.3d 1320, 1326 (Fed. Cir. 2007). The FAC lacks allegations explaining how the doctrine applies, as does Exhibit G. In any event, the doctrine of equivalents is inapplicable because, as described above, each of the theories under which Golden has sued requires significant modifications to the accused products in order to state a claim for infringement. As such, by Golden's own allegations, there is no equivalence between the claimed inventions and the accused products.

The FAC therefore fails to allege direct infringement by Google on the patents-in-suit.

### B.     Indirect Infringement

Golden fails to allege indirect infringement. "There are two types of indirect patent infringement: inducement and contributory infringement." *Redd Grp., LLC v. Glass Guru Franchise Sys., Inc.*, No. 12-CV-04070-JST, 2013 WL 3462078, at *4 (N.D. Cal. July 8, 2013) (citing 35 U.S.C. §§ 271(b)-(c)). "Liability for either active inducement of infringement or for contributory infringement is dependent upon the existence of direct infringement," and "[t]here can be no inducement or contributory infringement without an underlying act of direct infringement." *Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1326 (Fed. Cir. 2004) (citation and internal quotation marks omitted).

Golden alleges indirect infringement on two theories: (1) contributory infringement based on the Google Tensor Chipset (FAC, Ex. G at 2), and (2) inducement and contributory infringement involving Draper Laboratory, Inc., the developers of "ATAK-CIVILIAN," and the Defense Threat Reduction Agency ("DTRA"), the developers of "ATAK-MILITARY" (FAC, Ex. H). However, Golden does not allege that Google, Draper Laboratory, or the DTRA directly infringed the patents-in-suit. To the contrary, Golden concedes that there was no such direct

5

infringement by any of those parties: "Plaintiff has alleged Joint or Divided infringement between Google and Draper; and, Google and DTRA, because no single party carried out all the steps of Plaintiff's patented inventions, that would constitute infringement." (FAC, Ex. H at 3.)

The indirect infringement claims are inadequately pleaded for additional reasons. "For an allegation of induced infringement to survive a motion to dismiss, a complaint must plead facts plausibly showing that the accused infringer specifically intended another party to infringe the patent and knew that the other party's acts constituted infringement." *Lifetime Indus., Inc. v. Trim-Lok, Inc.*, 869 F.3d 1372, 1379 (Fed. Cir. 2017) (citation and internal quotation marks and brackets omitted). Golden fails to allege facts plausibly supporting an inference that Google purposely induced Draper Laboratory or DTRA to infringe the patents-in-suit. (*See* FAC at 3, Ex. H.) The FAC's allegations are entirely conclusory. Golden's mere invocation of the "doctrine of willful blindness" (*id.* at 4) is insufficient to allege the requisite intent without factual allegations supporting the theory's application.

Likewise, for contributory infringement, the FAC fails to plead facts supporting any of the elements of that claim against Google: "(1) selling a device capable of infringing the patent, which is not suitable for substantial non-infringing use; (2) with knowledge that the infringing device was especially adapted for use in an infringement of such patent; and (3) actual infringement by another. *Golden v. Qualcomm, Inc.*, No. 22-CV-03283-HSG, 2023 WL 2530857, at *3 (N.D. Cal. Mar. 15, 2023). For example, the FAC lacks factual allegations regarding Google's knowledge of the patents-in-suit and patent infringement. Also, the FAC does not explain to whose infringement the Tensor Chipset contributes, and his allegations that the Tensor Chipset lacks any substantial non-infringing uses are entirely conclusory. (*See* FAC at 3–4.)

## C.    Joint Infringement

Golden fails to allege joint infringement. "A claim of joint infringement . . . requires pleading facts sufficient to allow a reasonable inference that all steps of the claimed method are performed and either (1) one party exercises the requisite 'direction or control' over the others'

performance or (2) the actors form a joint enterprise such that performance of every step is attributable to the controlling party." *Lyda v. CBS Corp.*, 838 F.3d 1331, 1339 (Fed. Cir. 2016) (citation omitted).  A joint enterprise has four elements: "(1) an agreement, express or implied, among the members of the group; (2) a common purpose to be carried out by the group; (3) a community of pecuniary interest in that purpose, among the members; and (4) an equal right to a voice in the direction of the enterprise, which gives an equal right of control." *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020, 1023 (Fed. Cir. 2015) (citing Restatement (Second) of Torts § 491 cmt. c).  The FAC's allegations regarding joint infringement are sparse. (*See* FAC at 4, Ex. H.)  It appears that Golden is alleging joint infringement by Google and Draper Laboratory, or possibly by Google and DTRA, but there are no factual allegations regarding the degree of control that Google had over Draper Laboratory or DTRA, or vice versa, or supporting that those entities formed a joint enterprise.

### D.     Willful Infringement

Google fails to allege willful infringement.  "To state a claim for willful infringement, the plaintiff must plead that the defendant acted with knowledge of the patent and of his alleged infringement, or equivalent facts." *OpenTV, Inc. v. Apple, Inc.*, No. 14-1622, 2015 WL 1535328, at *7 (N.D. Cal. Apr. 6, 2015) (citing *Sentry Prot. Prods., Inc. v. Eagle Mfg. Co.*, 400 F.3d 910, 918 (Fed. Cir. 2005)).  As discussed above for indirect infringement, the FAC makes only conclusory statements about Google's alleged willful infringement. (*See* FAC at 4.)  There are no factual allegations supporting that Google knew about the patents-in-suit or any alleged infringement. *See, e.g., Hypermedia Navigation LLC v. Google LLC*, No. 18-CV-06137-HSG, 2019 WL 1455336, at *4 (N.D. Cal. Apr. 2, 2019) ("Nothing in the complaint provides specific factual allegations about Google's subjective intent or details about the nature of Google's conduct to render a claim of willfulness plausible, and not merely possible.").

### E.     Leave to Amend

Leave to amend may be denied for "repeated failure to cure deficiencies by previous amendment." *Abagninin v. AMVAC Chem. Corp.*, 545 F.3d 733, 742 (9th Cir. 2008).  Golden

asks for leave to amend but lists no specific facts that would cure the deficiencies at issue in the motion to dismiss. (Dkt. No. 46 at 27.) *See Salameh v. Tarsadia*, 726 F.3d 1124, 1133 (9th Cir. 2013) ("A plaintiff may not in substance say 'trust me' and thereby gain a license for further amendment when prior opportunity to amend has been given."). The flaws in the FAC are the same as those identified in the order dismissing Golden's original complaint. As Golden was already granted leave to amend once in this case but was unable to correct the deficiencies, further leave to amend would be futile.

Furthermore, Golden has had multiple suits with similar allegations dismissed, some as frivolous. *See, e.g., Golden v. Samsung Elecs. Am., Inc.*, No. 23-CV-00048-WHO, 2023 WL 3919466 (N.D. Cal. June 8, 2023), *aff'd*, No. 2023-2120, 2024 WL 539973 (Fed. Cir. Feb. 12, 2024); *Golden v. Qualcomm, Inc.*, No. 22-CV-03283-HSG, 2023 WL 2530857 (N.D. Cal. Mar. 15, 2023) *Golden v. Apple Inc.*, No. 20-cv-04353-JD-KFM, 2021 WL 5074739 (D.S.C. Nov. 2, 2021) (dismissing complaint as "frivolous"); *Golden v. Apple Inc.*, No. 20-cv-02270-JD-KFM, 2021 WL 4260782 (D.S.C. Sept. 20, 2021) (dismissing complaint as "frivolous").

As such, leave to amend is denied.

**F.   Conclusion**

Based on the foregoing, the motion to dismiss the amended complaint is **GRANTED WITHOUT LEAVE TO AMEND**. The Clerk of the Court shall enter judgment in favor of Google and close the case.

**IT IS SO ORDERED.**

Dated: April 3, 2024

RITA F. LIN
United States District Judge

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LARRY GOLDEN,<br><br>              Plaintiff,<br><br>      v.<br><br>GOOGLE LLC,<br><br>              Defendant. | Case No.  22-cv-05246-RFL<br><br>**ORDER DENYING MOTION FOR<br>RECONSIDERATION AND<br>DISQUALIFICATION**<br><br>Re: Dkt. No. 70 |

Larry Golden, who is not represented by counsel, moves to disqualify the undersigned from presiding over this action pursuant to 28 U.S.C. § 144 ("section 144"), and for reconsideration of the Court's order granting Google LLC's motion to dismiss the amended complaint.  Both motions are **DENIED**.  This ruling assumes the reader is familiar with the facts, applicable law, and the arguments made by the parties.

*Motion to disqualify.*  Section 144 provides:

> Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.

> The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time.  A party may file only one such affidavit in any case.  It shall be accompanied by a certificate of counsel of record stating that it is made in good faith.

28 U.S.C. § 144.  An affidavit is legally sufficient where "a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned."

1

*United States v. Hernandez*, 109 F.3d 1450, 1453-54 (9th Cir. 1997) (internal quotations and citation omitted).

The presiding judge has the authority to "pass upon [the affidavit's] legal sufficiency." *United States v. Azhocar*, 581 F.2d 735, 739 (9th Cir. 1978). After the judge determines that "the legal sufficiency of the affidavit has been established," the motion is "referred to another judge for a determination of its merits." *United States v. Sibla*, 624 F.2d 864, 867 (9th Cir. 1980) (citations omitted); *see also* Civil L.R. 3-14 ("Whenever an affidavit of bias or prejudice directed at a Judge of this Court is filed pursuant to 28 U.S.C. § 144, and the Judge has determined not to recuse him or herself and found that the affidavit is neither legally insufficient nor interposed for delay, the Judge shall refer the request for disqualification to the Clerk for random assignment to another Judge.").

The motion to disqualify does not comply with section 144's procedural requirements. Golden did not submit any affidavit with the motion. Even setting that deficiency aside, Golden has not demonstrated in his motion that recusal is warranted. Golden seeks disqualification because of the undersigned's adverse ruling on Google's motion to dismiss, contending that the reasoning and outcome in that decision demonstrates bias against him. But "conduct or rulings made during the course of the proceeding" are not grounds for disqualification. *See Toth v. Trans World Airlines, Inc.*, 862 F.2d 1381, 1388 (9th Cir. 1988) ("The bias or prejudice alleged arose from conduct during the judicial proceeding, and the motion and affidavit, thus, were legally insufficient."). As Golden has not presented a legally sufficient affidavit, the motion to disqualify is denied.

***Motion for reconsideration.*** Judgment was entered in Google favor after the Court granted the motion to dismiss the amended complaint. Where, as here, a court's ruling has resulted in a final judgment or order, a motion for reconsideration may be based either on Rule 59(e) (motion to alter or amend judgment) or Rule 60(b) (motion for relief from judgment) of the Federal Rules of Civil Procedure. *See Am. Ironworks & Erectors v. N. Am. Constr. Corp.*, 248 F.3d 892, 898–99 (9th Cir. 2001). The Ninth Circuit has clarified that motions under Rule 59(e)

may only be granted in limited circumstances: "(1) the district court is presented with newly discovered evidence, (2) the district court committed clear error or made an initial decision that was manifestly unjust, or (3) there is an intervening change in controlling law." *Zimmerman v. City of Oakland*, 255 F.3d 734, 740 (9th Cir. 2001). The denial of a motion for reconsideration under Rule 59(e) is construed as a denial of relief under Rule 60(b). *See McDowell v. Calderon*, 197 F.3d 1253, 1255 n.3 (9th Cir. 1999) (en banc).

Rule 60(b), in turn, permits a party to seek relief from a final judgment for any reason that justifies relief. *See* Fed. R. Civ. P. 60(b). Rule 60(b)(6) is a "catchall provision" that applies only when the reason for granting relief is not covered by any of the enumerated reasons set forth in Rule 60, which include, among others, "mistake inadvertence, surprise, or excusable neglect," "newly discovered evidence," and "fraud . . . , misrepresentation, or misconduct by an opposing party," Fed. R. Civ. P. 60(b)(1)–(3). Motions for reconsideration should not be frequently made or freely granted; they are not a substitute for appeal or a means of attacking some perceived error of the court. *See Twentieth Century-Fox Film Corp. v. Dunnahoo*, 637 F.2d 1338, 1341 (9th Cir. 1981).

Reconsideration of the dismissal order and entry of judgment against Golden is not warranted under either Rule 59(e) or Rule 60(a). The motion for reconsideration repeats some of Golden's arguments at the motion to dismiss stage, ultimately disagreeing with the Court's ruling resolving the case the pleadings stage. Golden does not provide any new evidence, legal authority, or arguments that would justify amending or altering the judgment. Therefore, the motion for reconsideration is denied.

**IT IS SO ORDERED.**

Dated: May 28, 2024

RITA F. LIN
United States District Judge

JUL 08, 2024

USPS
UNITED STATES
POSTAL SERVICE

20439

**$47.65**

S2324M501736-56

RDC 07




# UNITED STATES POSTAL SERVICE®

## PRIORITY MAIL EXPRESS®

EI 975 706 953 US

**CUSTOMER USE ONLY**

**FROM:** (PLEASE PRINT)   PHONE: 864 288-5605

Larry Golden
740 Woodruff Rd.
#1102
Greenville, SC 29607

**DELIVERY OPTIONS** (Customer Use Only)

☑ SIGNATURE REQUIRED *Note:* The mailer must check the "Signature Required" box if the mailer: 1) Requires the addressee's signature; OR 2) Purchases additional insurance; OR 3) Purchases COD service; OR 4) Purchases Return Receipt service. If the box is not checked, the Postal Service will leave the item in the addressee's mail receptacle or other secure location without attempting to obtain the addressee's signature on delivery.

**Delivery Options**
☐ No Saturday Delivery (delivered next business day)
☐ Sunday/Holiday Delivery Required (additional fee, where available)*
*Refer to USPS.com® or local Post Office™ for availability.

**TO:** (PLEASE PRINT)   PHONE: 202 275-8000

U.S. Court of Appeals for the Federal Circuit
Case No: 24-2024
717 Madison Place, NW
Washington, DC

**ZIP + 4®** (U.S. ADDRESSES ONLY)

2 0 4 3 9 - _ _ _ _

■ For pickup or USPS Tracking™, visit USPS.com or call 800-222-1811.
■ $100.00 insurance included.


⇦ **PEEL FROM THIS CORNER**

**PAYMENT BY ACCOUNT** (if applicable)
Federal Agency Acct. No. or Postal Service™ Acct. No.

**ORIGIN (POSTAL SERVICE USE ONLY)**

☐ 1-Day   ☐ 2-Day   ☐ Military   ☐ DPO

| PO ZIP Code | Scheduled Delivery Date (MM/DD/YY) | Postage |
|---|---|---|
| 29607 | 7-9-24 | $ 47.65 |

| Date Accepted (MM/DD/YY) | Scheduled Delivery Time | Insurance Fee | COD Fee |
|---|---|---|---|
| 7-8-24 | ☐ 6:00 PM  12pm | $ | $ |

| Time Accepted | ☐ AM ☐ PM | Return Receipt Fee | Live Animal Transportation Fee |
|---|---|---|---|
| 10-14 | | $ | $ |

| Special Handling/Fragile | Sunday/Holiday Premium Fee | Total Postage & Fees |
|---|---|---|
| $ | $ | $ 47.65 |

| Weight | ☐ Flat Rate | Acceptance Employee Initials |
|---|---|---|
| 2 lbs. 4 ozs. | AC | $ |

**DELIVERY (POSTAL SERVICE USE ONLY)**

| Delivery Attempt (MM/DD/YY) | Time | ☐ AM ☐ PM | Employee Signature |
|---|---|---|---|

| Delivery Attempt (MM/DD/YY) | Time | ☐ AM ☐ PM | Employee Signature |
|---|---|---|---|

LABEL 11-B, NOVEMBER 2023   PSN 7690-02-000-9996


GUARANTEED ★★★ TRACKED ★★★ INSURED