**2024-2024**
**VOLUME I OF II (SAppx1-580)**

# United States Court of Appeals for the Federal Circuit

LARRY GOLDEN,

*Plaintiff-Appellant,*

*v.*

GOOGLE LLC,

*Defendant-Appellee.*

*Appeal from the United States District Court for the District of the Northern District of California, in Case No. 3:22-cv-05246-RFL (Hon. Rita F. Lin, Judge)*

## APPELLEE'S SUPPLEMENTAL APPENDIX

Matthew S. Warren
WARREN KASH WARREN LLP
2261 Market Street, Suite 606
San Francisco, California, 94114
(415) 895-2940
matt@warrenkashwarren.com

*Counsel for Defendant-Appellee*

NOVEMBER 18, 2024

CP COUNSEL PRESS (800) 4-APPEAL • (JOB 714096)

**TABLE OF CONTENTS**
**APPELLEE'S APPENDIX**

| Docket No. | Document Description | Filed | Appendix Pages |
|---|---|---|---|
| **VOLUME I** | | | |
| 68 | Order Granting Motion to Dismiss and Denying Leave to File a Surreply | 04/03/2024 | SAppx1 |
| 68 | Exhibit A. Journal Article | 04/03/2024 | SAppx9 |
| 72 | Order Denying Motion for Reconsideration and Disqualification | 05/28/2024 | SAppx41 |
| | Docket Entries | | SAppx44 |
| 1 | Complaint | 09/14/2022 | SAppx54 |
| 1-1 | A. Judgment | 09/14/2022 | SAppx84 |
| 1-2 | B. Complaint for Patent Infringement | 09/14/2022 | SAppx92 |
| 1-3 | C. U.S. Patent No. US 10,163,287 | 09/14/2022 | SAppx123 |
| 1-4 | D. U.S. Patent No. US 9,096,189 B2 | 09/14/2022 | SAppx151 |
| 1-5 | E. U.S. Patent No. US 9,589,439 B2 | 09/14/2022 | SAppx179 |
| 1-6 | Civil Cover Sheet | 09/14/2022 | SAppx210 |
| 1-7 | Receipt | 09/14/2022 | SAppx212 |
| 11 | Defendant's Notice of Motion and Motion to Dismiss Complaint | 10/26/2022 | SAppx214 |
| 18 | Plaintiff's Response to Defendant's Motion to Dismiss and Cross-Motion for Summary Judgment | 11/01/2022 | SAppx230 |
| 18 | A. Report of Magistrate Judge | 11/01/2022 | SAppx237 |
| 18 | B. Opinion and Order | 11/01/2022 | SAppx250 |
| 18 | C. Judgment | 11/01/2022 | SAppx257 |
| 20 | Defendant's Reply in Support of Motion to Dismiss | 11/15/2022 | SAppx265 |
| 41 | Order Granting Motion to Dismiss with Leave to Amend | 08/10/2023 | SAppx274 |
| 42 | Plaintiff's Amended Complaint for Patent Infringement | 08/23/2023 | SAppx282 |
| 42-1 | A. Vertical Stare Decisis Chart | 08/23/2023 | SAppx315 |
| 42-1 | B. Duplicate of the Claim Chart | 08/23/2023 | SAppx323 |

| Docket No. | Document Description | Filed | Appendix Pages |
|---|---|---|---|
| 42-1 | C. Google, Not Plaintiff, is Responsible For The Modifications of Its Products to Operate In An Infringing Manner | 08/23/2023 | SAppx333 |
| 42-1 | D. Google Sells The "Software" That Enables The Infringement of Plaintiff's Patents | 08/23/2023 | SAppx343 |
| 42-1 | E. HazMat/CBRNE Mobile Apps Application Note | 08/23/2023 | SAppx370 |
| 42-1 | F. Flexible, Intelligent, Multi-Node CBRN Environnent Simulator Slide show | 08/23/2023 | SAppx386 |
| 42-1 | G. Claim Chart of Direct Infringement | 08/23/2023 | SAppx399 |
| 42-2 | H. Claim Chart of Induced Infringement | 08/23/2023 | SAppx440 |
| 42-2 | I. U.S. Patent No. US 10,984,619 B2 | 08/23/2023 | SAppx446 |
| 42-2 | J. U.S. Patent No. US 10,163,287 B2 | 08/23/2023 | SAppx473 |
| 42-2 | K. U.S. Patent No. US9,589,439 B2 | 08/23/2023 | SAppx501 |
| 42-2 | L. U.S. Patent No. US9,096,189 B2 | 08/23/2023 | SAppx532 |
| 42-3 | Shipping Envelope | 08/23/2023 | SAppx560 |
| 44 | Defendant’s Notice of Motion and Motion to Dismiss the Amended Complaint | 09/07/2023 | SAppx562 |
| | **VOLUME II** | | |
| 46 | Plaintiff’s Response to Defendant’s Motion to Dismiss Plaintiff’s Amended Complaint for Patent Infringement | 09/13/2023 | SAppx581 |
| 46 | A. Original Complaint for Patent Infringement | 09/13/2023 | SAppx612 |
| 46 | B. Defendant’s Answer to the Original Complaint for Patent Infringement | 09/13/2023 | SAppx645 |
| 46-1 | C. Judgment on Jury Verdict | 09/13/2023 | SAppx669 |
| 46-1 | D. Opinion | 09/13/2023 | SAppx672 |
| 46-1 | E. Complaint | 09/13/2023 | SA679 |

| Docket No. | Document Description | Filed | Appendix Pages |
|---|---|---|---|
| 46-1 | F. Informal Brief of Appellant | 09/13/2023 | SAppx710 |
| 46-2 | Shipping Envelope | 09/13/2023 | SAppx750 |
| 47 | Reply in Support of Motion to Dismiss the Amended Complaint | 09/28/2023 | SAppx751 |
| 48 | Plaintiff's Motion for Leave to File Sur-Reply in Opposition to Defendant's Reply to Motion to Dismiss Plaintiff's Amended Complaint | 10/03/2023 | SAppx765 |
| 49 | Plaintiff's Sur-Reply in Opposition to Defendant's Reply to Motion to Dismiss Plaintiff's Amended Complaint | 10/03/2023 | SAppx770 |
| 69 | Judgment in a Civil Case | 04/03/2024 | SAppx785 |
| 70 | Jury Trial Demanded | 04/10/2024 | SAppx786 |
| 70 | A. Plaintiff's Motion for Disqualification | 04/10/2024 | SAppx818 |
| 70 | B. Plaintiff's Reply in Support of Plaintiff's Motion for Disqualification | 04/10/2024 | SAppx839 |
| 70 | C. Defendant's Notice Regarding Related Proceedings | 04/10/2024 | SAppx857 |
| 70 | D. Jury Trial Demanded | 04/10/2024 | SAppx868 |
| 73 | Plaintiff's Notice of Appeal | 06/21/2024 | SAppx876 |
|  | U.S. Patent No. US 9,096,189 B2 | 08/04/2015 | SAppx878 |
|  | U.S. Patent No. US 9,589,439 B2 | 03/07/2017 | SAppx905 |
|  | U.S. Patent No. US 10,1063,287 B2 | 12/25/2018 | SAppx935 |
|  | U.S. Patent No. US 10,984, 619 B2 | 04/20/2021 | SAppx962 |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LARRY GOLDEN, Plaintiff, v. GOOGLE LLC, Defendant. | Case No. 22-cv-05246-RFL **ORDER GRANTING MOTION TO DISMISS AND DENYING LEAVE TO FILE A SURREPLY** Re: Dkt. Nos. 44, 48 |

Larry Golden brings this action for patent infringement against Google LLC. Golden's original complaint was dismissed with leave to amend for failure to state a claim. (Dkt. No. 41.) Golden subsequently filed an amended complaint (Dkt. No. 42 ("FAC")), which Google now moves to dismiss for failure to state a claim (Dkt. No. 44 ("Mot.")). The motion to dismiss is **GRANTED WITHOUT LEAVE TO AMEND**. This ruling assumes the reader is familiar with the facts, the applicable legal standard, and the arguments made by the parties.[1]

As an initial matter, Golden's motion for leave to file a sur-reply (Dkt. No. 48) is **DENIED**. Under the Civil Local Rules, once a reply is filed, no additional memoranda, papers or letters may be filed without prior Court approval, except if new evidence has been submitted in the reply or a relevant judicial opinion was published after the date the opposition or reply was filed by filing. Civil L.R. 7-3(d). Google's reply did not submit new evidence, and Golden's proposed sur-reply does not reference a newly published relevant judicial opinion. To the extent

[1] This case is one of several patent infringement cases that Golden has filed against Google and other defendants. *See Golden v. Samsung Elecs. Am., Inc.*, No. 23-CV-00048-WHO, 2023 WL 3919466 (N.D. Cal. June 8, 2023), *aff'd*, No. 2023-2120, 2024 WL 539973 (Fed. Cir. Feb. 12, 2024) (describing Golden's litigation history over the past ten years in multiple jurisdictions).

Google raised new arguments on reply, such arguments are "not new evidence when [ ] submitted to rebut arguments raised in the opposition brief," which was the case here. *Applied Materials, Inc. v. Demaray LLC*, No. 5:20-CV-05676-EJD, 2020 WL 8515132, at *1 (N.D. Cal. Dec. 16, 2020).

As for the merits, the Court previously dismissed Golden's original complaint because it failed to allege either direct or indirect infringement of U.S. Patent Nos. 10,163,287 ("'287 Patent"), 9,589,439 ("'439 Patent"), and 9,096,189 ("'189 Patent") by Google. (*See* Dkt. No. 41.) The complaint's allegations made clear that whether Google's smartphones (Google Pixel 3, 3 XL, 3a, 3a XL, 4a, 4a (5G), and 5) allegedly infringed on the patents-in-suit depended on the end user's download of the Android Team Awareness Kit ("ATAK"), which is a third-party application not made by Google. (*Id.* at 5–6.) As the complaint did not allege that the Google smartphones *themselves* infringed on the patents, Golden failed to allege direct infringement. (*Id.* at 6.) As liability for indirect infringement is dependent on the existence of direct infringement, Golden also failed to allege indirect infringement. (*Id.* at 7.)

The FAC claims that newer models of Google's smartphones (Google Pixel 6a, 7, 7a, 7 Pro and Fold) infringe on the '287 Patent, the '439 Patent, '189 Patent, plus one additional patent, U.S. Patent No. 10,984,619 ("'619 Patent"). (*See* FAC at 2.) The FAC alleges five theories of direct infringement (*id.* ¶ 75, Exs. G & H), all of which suffer from the same defect for which the original complaint was dismissed: the theories all require that the accused products be modified in some way for them to infringe on the patents-in-suit. *See Golden v. Samsung Elecs. Am., Inc.*, No. 2023-2120, 2024 WL 539973, at *3 (Fed. Cir. Feb. 12, 2024) ("Mr. Golden's allegations, even if true, at best establish that [defendant's] smartphones might be modified post-sale to perform the accused detector/sensor functionality, which is not enough for direct infringement on the claims here."). Thus, like the original complaint, the FAC fails to allege direct or indirect infringement. The FAC's claims of joint infringement and willful infringement are conclusory and thus also not plausibly alleged, even applying the lenient pleading standards for *pro se* plaintiffs.

**A. Direct Infringement**

***ATAK application.*** Golden's first claim of direct infringement (*see* FAC, Ex. G ("Ex. G") at 2–9) fails for the same reason as the original complaint: it requires the use of ATAK, a third-party application that the user must install on the accused product, for at least two elements of each asserted claim. (*See id.* at 6.) *See Nazomi Commc'ns, Inc. v. Nokia Corp.*, 739 F.3d 1339, 1346 (Fed. Cir. 2014) (finding that the defendants' products "do not infringe without modification—the modification of installing the required software").

***NFC tags.*** Likewise, Golden' second theory (*see* Ex. G at 10–17) requires combining "Google's NFC sensor," which are allegedly embedded in the accused products, with external NFC tags that have been converted to detect certain chemicals in order for there to be alleged infringement. Golden does not allege that the converted NFC tags are part of the accused smartphones. Thus, the FAC alleges only that the accused smartphones are capable of being modified to operate in an infringing manner, which is insufficient to support a finding of infringement. *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1330 (Fed. Cir. 2001) ("[T]hat a device is capable of being modified to operate in an infringing manner is not sufficient, by itself, to support a finding of infringement.").

***Camera sensors.*** Golden's third theory (*see* Ex. G at 18–25) relies on the combination of "Google's camera lens" with a "microfluidic lens" that "uses a microscope to focus on a chemical sensor" (*id.* at 22) to support infringement. Again, though, the FAC alleges that the chemical sensor is an external component, not part of the smartphone camera. Specifically, the allegation is that "[t]he camera, screen, and LED flashlight of the smartphone can be employed as components of the sensor," thus indicating that external sensor components beyond the smartphone are required. (FAC at 26.) The FAC also alleges that "[s]martphones provide hardware and software capability which can be incorporated with [CBR] sensors, enabling accurate on-site portable sensing," further confirming that the sensors are separate devices that may be "incorporated" into the smartphone. (*Id.*) Therefore, this theory of infringement also fails because the accused products do not infringe without modification.

***Smartphone biosensors.*** Golden's fourth theory (*see* Ex. G at 26–33) is that "Google Smartphone Biosensors" detect various biomarkers, pathogens, and the like. The FAC does not specify how Google's smartphones incorporate the listed biosensors, but instead references a diagram. (FAC at 27.) The diagram shows an "add on device" with the alleged biosensors (i.e., "capillary inlet," "microfluidic cassette," VIS-NIR spectrometer, and "NNAP electrodes") *attached* to a nondescript smartphone. (*Id.*) As such, this theory also requires modification to the accused smartphones to state an infringement claim.

Furthermore, because Golden relies on the diagram to illustrate how Google allegedly infringes his patents, the Court may incorporate by reference into the FAC the journal article from which the diagram is derived. *See, e.g.*, *SafeCast Ltd. v. Google, LLC*, No. 23-CV-03128-PCP, 2023 WL 8108657, at *4 (N.D. Cal. Nov. 22, 2023) (incorporating by reference defendant's policy webpages, which plaintiff selectively quoted in its claim chart, into complaint). Google provides a link to the article as the source of the diagram in its motion to dismiss (Mot. at 5), and Golden does not dispute in his opposition brief that the article is the source of the diagram. The article is attached as Exhibit A to this opinion, to preserve it for the record. The article describes the diagram as "an illustration of [a] futuristic sensing device indicating some possibilities for multiplex sensing" that could be used to colonize Mars, and notes that "this ideal galactic sensing system remains fictional and may seem farfetched." (Ex. A at 20.) Accordingly, Golden's allegation appears to be that Google may incorporate these biosensors in the future, which does not state a plausible claim that infringement has occurred or is imminent.

***Google Beacon.*** Golden's fifth theory (*see* Ex. G at 34–41) fails for the same reason, as it requires "Google Beacon," which the FAC's own illustrations show is a separate device from the accused smartphones (*see* FAC at 27).

***Doctrine of equivalents.*** The doctrine of equivalents does not save Golden's claims. (*See* FAC at 10.) "Under the doctrine of equivalents, a product that does not literally infringe a patent claim may still infringe if each and every limitation of the claim is literally or equivalently

present in the accused device." *Bus. Objects, S.A. v. Microstrategy, Inc.*, 381 F. Supp. 2d 1107, 1109 (N.D. Cal. 2005), *aff'd*, 197 F. App'x 941 (Fed. Cir. 2006). Equivalence "requires a showing that the difference between the claimed invention and the accused product or method was insubstantial or that the accused product or method performs the substantially same function in substantially the same way with substantially the same result as each claim limitation of the patented product or method." *AquaTex Indus., Inc. v. Techniche Sols.*, 479 F.3d 1320, 1326 (Fed. Cir. 2007). The FAC lacks allegations explaining how the doctrine applies, as does Exhibit G. In any event, the doctrine of equivalents is inapplicable because, as described above, each of the theories under which Golden has sued requires significant modifications to the accused products in order to state a claim for infringement. As such, by Golden's own allegations, there is no equivalence between the claimed inventions and the accused products.

The FAC therefore fails to allege direct infringement by Google on the patents-in-suit.

**B. Indirect Infringement**

Golden fails to allege indirect infringement. "There are two types of indirect patent infringement: inducement and contributory infringement." *Redd Grp., LLC v. Glass Guru Franchise Sys., Inc.*, No. 12-CV-04070-JST, 2013 WL 3462078, at *4 (N.D. Cal. July 8, 2013) (citing 35 U.S.C. §§ 271(b)-(c)). "Liability for either active inducement of infringement or for contributory infringement is dependent upon the existence of direct infringement," and "[t]here can be no inducement or contributory infringement without an underlying act of direct infringement." *Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1326 (Fed. Cir. 2004) (citation and internal quotation marks omitted).

Golden alleges indirect infringement on two theories: (1) contributory infringement based on the Google Tensor Chipset (FAC, Ex. G at 2), and (2) inducement and contributory infringement involving Draper Laboratory, Inc., the developers of "ATAK-CIVILIAN," and the Defense Threat Reduction Agency ("DTRA"), the developers of "ATAK-MILITARY" (FAC, Ex. H). However, Golden does not allege that Google, Draper Laboratory, or the DTRA directly infringed the patents-in-suit. To the contrary, Golden concedes that there was no such direct

infringement by any of those parties: "Plaintiff has alleged Joint or Divided infringement between Google and Draper; and, Google and DTRA, because no single party carried out all the steps of Plaintiff's patented inventions, that would constitute infringement." (FAC, Ex. H at 3.)

The indirect infringement claims are inadequately pleaded for additional reasons. "For an allegation of induced infringement to survive a motion to dismiss, a complaint must plead facts plausibly showing that the accused infringer specifically intended another party to infringe the patent and knew that the other party's acts constituted infringement." *Lifetime Indus., Inc. v. Trim-Lok, Inc.*, 869 F.3d 1372, 1379 (Fed. Cir. 2017) (citation and internal quotation marks and brackets omitted). Golden fails to allege facts plausibly supporting an inference that Google purposely induced Draper Laboratory or DTRA to infringe the patents-in-suit. (*See* FAC at 3, Ex. H.) The FAC's allegations are entirely conclusory. Golden's mere invocation of the "doctrine of willful blindness" (*id.* at 4) is insufficient to allege the requisite intent without factual allegations supporting the theory's application.

Likewise, for contributory infringement, the FAC fails to plead facts supporting any of the elements of that claim against Google: "(1) selling a device capable of infringing the patent, which is not suitable for substantial non-infringing use; (2) with knowledge that the infringing device was especially adapted for use in an infringement of such patent; and (3) actual infringement by another. *Golden v. Qualcomm, Inc.*, No. 22-CV-03283-HSG, 2023 WL 2530857, at *3 (N.D. Cal. Mar. 15, 2023). For example, the FAC lacks factual allegations regarding Google's knowledge of the patents-in-suit and patent infringement. Also, the FAC does not explain to whose infringement the Tensor Chipset contributes, and his allegations that the Tensor Chipset lacks any substantial non-infringing uses are entirely conclusory. (*See* FAC at 3–4.)

### C. Joint Infringement

Golden fails to allege joint infringement. "A claim of joint infringement . . . requires pleading facts sufficient to allow a reasonable inference that all steps of the claimed method are performed and either (1) one party exercises the requisite 'direction or control' over the others'

performance or (2) the actors form a joint enterprise such that performance of every step is attributable to the controlling party." *Lyda v. CBS Corp.*, 838 F.3d 1331, 1339 (Fed. Cir. 2016) (citation omitted). A joint enterprise has four elements: "(1) an agreement, express or implied, among the members of the group; (2) a common purpose to be carried out by the group; (3) a community of pecuniary interest in that purpose, among the members; and (4) an equal right to a voice in the direction of the enterprise, which gives an equal right of control." *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020, 1023 (Fed. Cir. 2015) (citing Restatement (Second) of Torts § 491 cmt. c). The FAC's allegations regarding joint infringement are sparse. (*See* FAC at 4, Ex. H.) It appears that Golden is alleging joint infringement by Google and Draper Laboratory, or possibly by Google and DTRA, but there are no factual allegations regarding the degree of control that Google had over Draper Laboratory or DTRA, or vice versa, or supporting that those entities formed a joint enterprise.

**D. Willful Infringement**

Google fails to allege willful infringement. "To state a claim for willful infringement, the plaintiff must plead that the defendant acted with knowledge of the patent and of his alleged infringement, or equivalent facts." *OpenTV, Inc. v. Apple, Inc.*, No. 14-1622, 2015 WL 1535328, at *7 (N.D. Cal. Apr. 6, 2015) (citing *Sentry Prot. Prods., Inc. v. Eagle Mfg. Co.*, 400 F.3d 910, 918 (Fed. Cir. 2005)). As discussed above for indirect infringement, the FAC makes only conclusory statements about Google's alleged willful infringement. (*See* FAC at 4.) There are no factual allegations supporting that Google knew about the patents-in-suit or any alleged infringement. *See, e.g.*, *Hypermedia Navigation LLC v. Google LLC*, No. 18-CV-06137-HSG, 2019 WL 1455336, at *4 (N.D. Cal. Apr. 2, 2019) ("Nothing in the complaint provides specific factual allegations about Google's subjective intent or details about the nature of Google's conduct to render a claim of willfulness plausible, and not merely possible.").

**E. Leave to Amend**

Leave to amend may be denied for "repeated failure to cure deficiencies by previous amendment." *Abagninin v. AMVAC Chem. Corp.*, 545 F.3d 733, 742 (9th Cir. 2008). Golden

asks for leave to amend but lists no specific facts that would cure the deficiencies at issue in the motion to dismiss. (Dkt. No. 46 at 27.) *See Salameh v. Tarsadia*, 726 F.3d 1124, 1133 (9th Cir. 2013) ("A plaintiff may not in substance say 'trust me' and thereby gain a license for further amendment when prior opportunity to amend has been given."). The flaws in the FAC are the same as those identified in the order dismissing Golden's original complaint. As Golden was already granted leave to amend once in this case but was unable to correct the deficiencies, further leave to amend would be futile.

Furthermore, Golden has had multiple suits with similar allegations dismissed, some as frivolous. *See, e.g.*, *Golden v. Samsung Elecs. Am., Inc.*, No. 23-CV-00048-WHO, 2023 WL 3919466 (N.D. Cal. June 8, 2023), *aff'd*, No. 2023-2120, 2024 WL 539973 (Fed. Cir. Feb. 12, 2024); *Golden v. Qualcomm, Inc.*, No. 22-CV-03283-HSG, 2023 WL 2530857 (N.D. Cal. Mar. 15, 2023) *Golden v. Apple Inc.*, No. 20-cv-04353-JD-KFM, 2021 WL 5074739 (D.S.C. Nov. 2, 2021) (dismissing complaint as "frivolous"); *Golden v. Apple Inc.*, No. 20-cv-02270-JD-KFM, 2021 WL 4260782 (D.S.C. Sept. 20, 2021) (dismissing complaint as "frivolous").

As such, leave to amend is denied.

**F. Conclusion**

Based on the foregoing, the motion to dismiss the amended complaint is **GRANTED WITHOUT LEAVE TO AMEND**. The Clerk of the Court shall enter judgment in favor of Google and close the case.

**IT IS SO ORDERED.**

Dated: April 3, 2024

RITA F. LIN
United States District Judge

# EXHIBIT A

 Review

# "The Smartphone's Guide to the Galaxy": In Situ Analysis in Space

**Joost Nelis, Christopher Elliott and Katrina Campbell ***

Institute for Global Food Security, School of Biological Sciences, Queen's University Belfast, David Keir Building, Stranmillis Rd, Belfast BT9 5AG, UK; J.Nelis@qub.ac.uk (J.N.); chris.elliott@qub.ac.uk (C.E.)
* Correspondence: katrina.campbell@qub.ac.uk; Tel: +44-028-90976535

Received: 14 September 2018; Accepted: 13 October 2018; Published: 19 October 2018

**Abstract:** A human mission to Mars can be viewed as the apex of human technological achievement. However, to make this dream a reality several obstacles need to be overcome. One is devising practical ways to safeguard the crew health during the mission through the development of easy operable and compact sensors. Lately, several smartphone-based sensing devices (SBDs) with the purpose to enable the immediate sensitive detection of chemicals, proteins or pathogens in remote settings have emerged. In this critical review, the potential to piggyback these systems for in situ analysis in space has been investigated on application of a systematic keyword search whereby the most relevant articles were examined comprehensively and existing SBDs were divided into 4 relevant groups for the monitoring of crew health during space missions. Recently developed recognition elements (REs), which could offer the enhanced ability to tolerate those harsh conditions in space, have been reviewed with recommendations offered. In addition, the potential use of cell free synthetic biology to obtain long-term shelf-stable reagents was reviewed. Finally, a synopsis of the possibilities of combining novel SBD, RE and nanomaterials to create a compact sensor-platform ensuring adequate crew health monitoring has been provided.

**Keywords:** smartphone; biosensor; space; analysis; health

## 1. Introduction

### 1.1. Need for Miniaturized Sensors for Future Space Missions

Scott Kelly and Mikhail Korniyenko spent 342 days in orbit on the international space station (ISS). Their achievement shows that long-term space flights are feasible and brings humanity one step closer to one of the biggest scientific challenges of this century: Human settlement on other worlds, with the most ambitious endeavor being a human mission to Mars. Significant resources are invested in the technological advancement of rocket science in order to make this dream a reality. However, some other important facets of the challenge should not be forgotten. One of these is a better understanding of the effects of a prolonged stay in space to one's health. For instance, it has been found that microgravity can lead to muscle atrophy after only a few weeks in space [1]. Moreover, decreased oxygen consumption during space flight can lead to a decrease in exercise capacity and might affect performance upon arrival [2]. In addition, a significant increased risk for renal stones has been reported [3] and is mainly subscribed to increased turnover of bone minerals due to bone atrophy [4]. Another possible threat to crew health is the emergence of infectious diseases. Indeed, it should not be forgotten that where humans go, microbes go. A study on the presence of microbes on a space shuttle has shown that the amount of colony forming units (CFUs) in the shuttle air increased by 300% within 12 days [5]. Moreover, it has been shown that microgravity can actually increase the growth rate and secondary metabolite production of microbes [6] and that the

susceptibility of opportunistic pathogens to antibiotics as well as their virulence may change aboard the space ship [7,8]. Next to this, it has been reported that space travel can reduce the efficiency of the immune system, increase cytokine blood plasma levels, and cause reactivation of Herpes virus (HV) [9], including Latent Epstein–Barr Virus, which can lead to infectious mononucleosis [10]. Moreover, increased exposure to radiation and stress can lead to a higher risk of cancer. Indeed, all the health risks mentioned above are included in the NASA human research roadmap (https://humanresearchroadmap.nasa.gov/) and will need to be closely monitored during any long term space mission [4]. Evidently, strict monitoring of the physical and biochemical parameters as indicators of the crew health during a mission or simulated events by use of portable analytical tools could improve the understanding of these biological phenomena and enable early diagnosis, treatment and intervention measures aboard the spacecraft. Similarly, continuous environmental monitoring of both inorganic and organic compounds present in the air, water and other surfaces as well as other systems such as waste/feces and biological life support of a spacecraft can help prevent the growth of pathogenic microbes on board. Requirements for such devices, as stated by NASA in the Human Research Program Requirements Document HRP 47052 Revision E, are especially low mass, volume and power consumption. Moreover, the devices should be reliable and durable, whilst avoiding laborious analysis with bulky instruments in microgravity. Proof of concept studies for the accurate detection of microbes in space using miniature devices have already been reported [11,12]. These include the use of a miniaturized PCR system [12] and a portable DNA sequencing device based on nucleotide recognition through conformational changes in the protein-based pore (Nanopore technology) [13]. The latter was used successfully for rapid microorganism identification and possible disease diagnostics through DNA sequencing was suggested. Miniaturized Gram positive/negative bacterial and fungal detection aboard the ISS using the Lab-On-a-Chip Application Development Portable Test System (LOCAD-PTS) has also been reported as a successful system for the quantification of microorganisms aboard a spacecraft [14]. Other such miniaturized devices have been developed to perform screening tests for the detection of extra-terrestrial life. Some examples are: an automated microfluidic device using capillary electrophoresis and laser induced fluorescence for amino acid detection [15], an antibody microarray for biomolecule detection [16] and an in situ DNA sequencing device based on Nanopore technology [17]. Although these sensors do not deliver pertinent conclusions regarding the discovery of extra-terrestrial life, they could filter out which samples are potentially interesting for more detailed sophisticated analysis back on earth (https://ntrs.nasa.gov/search.jsp?R=20180002121).

### *1.2. Smartphone Based Devices for Facile Crew Health Monitoring during Deep Space Missions*

The development of portable lab on a chip (LOC) or point of care (POC) bio-sensing devices is currently experiencing a major boost in many sectors, including environmental science [18], animal and human health monitoring, disease diagnosis, and food safety monitoring [19,20]. An interesting development is the use of smartphone-hyphenated biosensors that use the phone's built in sensors and hardware to directly analyze the sample in situ. Phones nowadays are equipped with a plethora of sensors including cameras, with ever increasing resolution, and ever more sophisticated processing units, memory storage capabilities and connectivity, all in a highly compacted design. So why not utilize this? In other words, why not benefit from the already optimized miniaturization of smartphones for the further development of sophisticated sensing devices. As previously mentioned, similar systems (in terms of compactness and simplicity), are already being developed by NASA such as the mentioned LOCAD system [14,21] and water monitoring systems for in-flight microbial contamination [22]. Such systems are being developed to enable more in-flight analysis instead of relying on analysis on the ground using bulky bench-top instruments, which is often still the case [22]. However, these systems are not capable to detect between species making it impossible to distinguish pathogens from rather harmless species. Moreover, more elegant solutions using SBDs, which might be able to replace current bench-top instruments for direct inflight analysis, might already exist. In fact, one could bring this question even one step further i.e., why not piggyback already

existing smartphone based sensing devices developed for biochemical sensing on Earth, for deep space missions? Indeed, such devices are often developed for use as robust and simple point of care devices in remote locations and, as such, inherently meet miniaturization and reduced power requirements. Moreover, additional costs implicated in the development of novel sensors complete with processing and memory units can be avoided by adopting currently developed systems. Thus, research in this direction seems a logical choice, if adequate robustness and sensitivity can be reached. Studies have shown that these devices can be quite sensitive. Long et al., for instance, compared the performance of a SBD spectrometer against conventional bench-top analyzers for quantifying analyte concentrations using two commercial assays based on transmission/reflection measurements (ELISA), or fluorescence intensity measurements [23]. This SBD uses either the flashlight or an integrated green laser diode for illumination of the sample which is held in a microfluidic chamber. Emerging light is then piped to the rear camera with fiber optic cable. The camera is covered by a diffraction grating which generates spectra when images are collected. The authors found that the SBD was able to predict analyte concentrations as accurately as bench-top analyzers and, in some cases, even outperform the latter. Moreover, the finding that SBDs can perform equally to bench-top instruments is not limited to a single study. Ludwig et al., tested a fluorescent protein micro array SBD for the detection of recombinant bovine somatotropin (rbST) in milk [24]. Briefly, UV light from LEDs embedded in a 3D-printed smartphone attachment was used for excitation of quantum dot fluorescent labels used to visualize the amount of rbST. The images, collected with the rear camera, were then corrected by a developed Android-based software on the SBD and used to estimate rbST concentration. The system was compared with a flow cytometry reference method and obtained excellent agreement. The usefulness of such devices has equally been demonstrated for the detection of infectious diseases. Laksanasopin et al., has developed and compared a SBD for the simultaneous detection of syphilis and HIV within 15 min [25]. In this system microfluidic channels are coated with antigen recognized by marker antibodies present in whole blood samples of HIV and/or Syphilis patients. Whole blood samples are flown through the channels (using a hand driven vacuum pump), followed by Gold labeled IgM antibodies held in a chamber in the microfluidic cassette. Then, silver reagent is added to amplify the signal and the optical density is measured. This device was compared to laboratory-based tests in a small ($n$ = 96) clinical trial in Rwanda and obtained excellent results. Finally, Priye et al., has recently developed a multiplex SBD for the detection of zika, chikungunya and dengue viruses. The authors use an isothermal PCR technique (reverse-transcription loop-mediated isothermal amplification) for fluorescent detection of the RNA viruses. The system is integrated in a small 3D printed box fitted with an excitation source and emission filters and powered with a 5V USB power source. Spectra are taken with the smartphone rear camera and analyzed using a developed smartphone app equipped with an algorithm to analyze the fluorescent signal. Again, it was shown that the SBD was capable to detect the targets in crude matrixes (blood, urine and saliva) with similar performance to bench-top devices [26]. Such techniques, embedded within a simple compact device that does not require extensive training before use, could potentially be used to scan for signs of stress, detect opportunistic microbes, keep track of an astronaut's metabolism and perform preliminary in situ scans for extra-terrestrial life. Moreover, hyphenated biosensors, combined with immunosorbent assays, have been proven to work both under microgravity and Martian gravity [27].

### *1.3. Obstacles to Overcome to Enable SBD Use in Space*

However, most SBDs have been developed for implementation on earth. In order to optimize a smartphone based device (SBD) for use in space travel special considerations are required with regards to the construction of the device such as the principle of detection, the biorecognition element and the sample type to be applied. One particular concern can be the degradation of protein-based recognition elements (antibodies/enzymes) used for bio-recognition. Thus, long-term stability to ensure functionality of the sensor throughout the trip is vital. Another possible obstacle for piggybacking SBDs for deep space analysis is the lack of protection of the electronics of the SBD

from galactic cosmic rays (GCR) and solar particle events (SPE). Luckily, the protective shielding integrated in a crewed spacecraft might mitigate the need for additional electronic shielding. Indeed several commercial off the shelve (COTS) devices are being tested and used on the ISS with interesting results [28], including a COTS device using smartphone software (mobiPV) [29]. However, GCR and SPE outside of the earth's magnetic field might still cause damage to such devices in deep space. Thus more research in the use of novel shielding materials, like doping polymeric casing with carbon nanotubes [30,31], or nanometals [32] would be useful to ensure the safe use of COTS devices in those settings. Another issue might be impaired functioning of REs such as proteins and DNA due to radiation damage. However, recent work has shown that proteins [33], including antibodies in protein arrays [34,35], as well as DNA based aptamers [36] show little to no loss of function at radiation levels which are orders of magnitude higher than the levels measured by the Curiosity rover on its mission to Mars [37]. Nonetheless antibody storage conditions remain stringent and long term storage can lead to reduced activity of antibodies [33]. Moreover, a study on radiation resistance of gDNA and primers showed PCR function inactivation at 180 Gy exposure to proton radiation at SPE energy levels [38]. This suggests higher radiation sensitivity for nucleic acid based systems as observed in [36]. Thus the use of more stable, synthetic REs might further increase the shelf-life of such devices and enable long term storage in less stringent conditions as needed for SBDs with protein based components. The aim of this review is to provide a guide to the presently developed SBDs that could prove utile, after limited adaptations, for their implementation in long-term space missions. Firstly, the possibilities to monitor human health with these devices will be discussed with an emphasis on the screening for infectious diseases, viruses, and the monitoring of biomarkers indicating the state of a person's health, e.g., stress and immune response levels, as well as options to monitor the external environment for the presence of pathogens. In each of these sections effort is made to identify which are the most pressing risks that could be addressed using, or adapting, an existing SBD and which requirements such a device should meet to be utile for deep space missions by using information gathered from the human research roadmap (https://humanresearchroadmap.nasa.gov/Risks/). Secondly, the possible weak points of these biosensors for in situ analysis in space will be critiqued including the choice of the integrated recognition element (RE) and the use of synthetic biology to obtain shelf-stable reagents. Finally, a short synopsis will focus on the predicted further development of such devices for this purpose.

## 2. Existing SBDs Useful for Space Missions

### *2.1. General Overview of Available SBDs to Monitor the Crew's Health*

The tasks that an SBD could perform during deep space missions are numerous and include monitoring the crew's health, checking the health of any biological elements of life support systems, investigating microbiome health and soil health, and screening for signs of life upon landing. In this paper the main focus is to investigate the possibility to piggyback on existing SBDs for crew health monitoring during space missions. This specific application was chosen for two main reasons: (i) By measure of time priority. If SBDs are to be used for any application at the final destination they must first undertake the journey. Thus advantageously they might firstly be utilized to monitor crew health during that journey. (ii) Use of SBDs on a manned spacecraft instead of an unmanned craft, send ahead for life detection for example, implies protection of both the electronics and RE elements of the SBD from radiation. This limits the threat of malfunctioning and allows faster actual implementation of such instruments for use in space. This however, does not mean that the systems discussed here below cannot be useful for the other bespoken applications simply by changing the RE. Possible use of SBDs to monitor crew health was further classified into four groups: (i) Monitoring the general health of the crew (cancer, reduced immunity and signs of stress); (ii) screening food for freshness and contamination; (iii) monitoring the air and water quality on-board and (iv) diagnosis of infectious diseases. In order to classify the SBD reported in the scientific literature a keyword search in Scopus was conducted. The general query was: "(smartphone OR cell phone) AND (portable OR mobile) AND

(instrument OR sensor OR device OR platform) AND (sensing OR testing OR analysis OR detection OR measurement OR monitoring OR diagnostics)". The following terms were added to that query for the individual groups: AND (biomarker OR protein OR cancer OR stress) for group (i). AND (food OR foodstuff OR milk OR fruit OR cereal OR meal AND NOT allergen OR allergy) for group (ii). AND (air OR water OR environment OR volatile OR inorganic) for group (iii). AND (pathogen OR bacteria OR virus OR infection) for group (iv). This search yielded 155 original research articles for group (i), 78 for group (ii), 579 for group (iii) and 118 for group (iv). In group (iii) all articles related to computer science mainly discussing advances in app development and algorithm improvement were then excluded in order to focus on articles related to advances in mobile biochemical analysis which led to a reduction in that group to 199 documents. Overall, articles were considered in scope if the focus was on mobile biochemical analysis and if at least one of the possible group-specific application-related keywords was mentioned in the article as a detection target. After deletion of duplicates (5) a total of 550 articles remained for analysis. Based on the abstract content this number was condensed to 186 articles. Finally, after full article analyses and cross referencing, the following number of articles were deemed to enter into the scope of this review: 51 for group (i), 22 for group (ii), 27 for group (iii) and 25 for group (iv). Another 23 articles were deemed relevant but difficult to classify into one of these groups and were denoted "other". Thus a total of 148 articles were reviewed and further classified into subgroups (Figure 1). There are approximately twice as many SBDs reported for general health monitoring compared to the other groups as perhaps more funding is available for research targeting all these issues including cancer (25% of the articles reported in the group) and cardiovascular and stress related problems (± 30% of the group). Moreover, the SBDs proposed to monitor cardiovascular and stress related disease often analyze the heart rate, using a variety of measurements such as pulse to pulse intervals and ECG, using a smartphone for the determination of stress levels [39–46], which is easier to accomplish than the specific detection of a pathogen. Some articles report the use of SBDs to monitor infectious diseases or to diagnose diseases that are unlikely to present during a space mission. However, these systems may still prove useful since they can be used to detect other targets by simply changing the bio-recognition element for detection of a specific contaminant. Interestingly, only one article was reported for the detection of fungi (Fusarium) using an SBD [47] indicating that more research in this direction is needed since fungi are major players in food spoilage [48] and several Fusarium species can produce toxic compounds [49]. The polyvalent group "Other" (16%) reports SBDs that use REs which require modification to become useful such as a printed paper assay for the quantification of streptavidin [50], or articles difficult to classify into a group as applied to diverse applications.

**Figure 1.** Classification of relevant SBD related literature. A pie chart showing the classification of the 148 articles kept for thorough analyses after the keyword searches. Groups (outer circle) are divided into subgroups (inner pie chart). Percentages indicate percentage of articles presenting the group or subgroup in relation to the total amount of articles kept for analyses.

### 2.2. *SBDs for Health Monitoring in Space*

General health monitoring can be performed by observing physical and biochemical parameters. Key examples are highlighted of SBDs for their current use in detecting stress, reduced immune response and general health monitoring and in cancer diagnosis of importance for prolonged space travel.

#### 2.2.1. Detecting Stress

The human research program integrated research plan identifies stress as a very real problem which can jeopardize the mission due to several factors (e.g., high workload, circadian desynchrony, elevated $CO_2$ levels, radiation and diet and nutrition), and stresses the need for early detection mechanisms to monitor the mental and cognitive health of crew members [4]. Moreover, risk of elevated cardiac rhythm problems during space flights was identified as a red zone in the likelihood consequence (LxC) rating in the human research plan and it is planned to conduct more detailed in-flight heart rate measurements to better predict risks for environmentally induced cardiovascular disease and determine the causes of this (https://go.nasa.gov/2OEifZN). Evidently, stress, equally listed as a risk factor in the human research plan, can be a contributor to this risk factor. On the other hand the multimodal nature of stress makes early detection using one single parameter virtually unattainable [51]. In fact, information regarding cortisol levels, heart rate (mainly ECG and heart rate variability (HRV)) and behavior should be integrated [51,52]. Unfortunately, most SBDs use only the heart rate to monitor stress levels although there are some exceptions where additional data from motion activity, posture [53] and communication data [54] are being used. This development increases the prediction accuracy [54]. However, it does not absolve the need for proper psychological assessment. Extended psychoanalyses and treatment can however be tedious during a mission to Mars since it requires intensive dialog which is complicated due to the extended one way light time (approx. 14 min) between Earth and Mars. Thus, the use of mobile devices that use a multimodal approach for early stress diagnosis and at the same time offer self-help solutions can be a welcome complementary approach. The U.S. military has recently developed an SBD that uses such a complementary approach. The SBD uses multiple sensors to detect stress and other psychological health problems and is equipped with an option for self-help via an app [55]. Another interesting paper reports the development of an application designed to deliver breathing awareness meditation to reduce stress levels [56]. Although data are preliminary, such systems could potentially not only allow diagnosis but also help reduce stress on a prolonged space mission. Apart from these developments other devices for monitoring an array of health related parameters including ECG measurements, blood oxygen levels, body temperature, and sleep quality are already commercially available and their potential usefulness for a mission to Mars was discussed in a recent perspective [57]. Although the paper might overestimate the ease with which the futuristic suggestions could be implicated and does not critically compare the functioning of the mentioned devices, it does provide an extensive list of commercial devices that are potentially interesting to test. In addition, other commercial devices like Google Glass, albeit in a slightly adapted format, have been tested and found interesting to use during space missions as a mobile procedure viewer assisting astronauts during various operations while enabling full two way video communication [29,58]. Moreover, commercially available wearable devices like smart-watches are already used in space and potentially integrate most measurements mentioned here. The interest of NASA for such devices is showcased by the crowd-sourced astronaut app competition that was recently held by NASA and won by I. Calvo and J. Richard for the design of such a system (https://bit.ly/2N1MDNy). In addition, major interest in tricorder like personal health monitoring devices became apparent during the Tricorder X-prize competition (https://tricorder.xprize.org/).

2.2.2. Detecting Reduced Immune Response and General Health Monitoring

The production of naïve T-cells, which form an important protection mechanism against opportunistic viral and fungal pathogens as well as latent viruses, has been shown to decrease in astronauts after space travel [59]. Moreover, this reduction in thymopoiesis was linked to increased amounts of glucocorticoids in plasma and urine. Interestingly, Geiger et al., recently suggested that cortisol levels increased by stress exposure can indeed negatively affect the immune response to pathogens [60]. Indeed, reduced immune response during space missions is a concern included in the human research program integrated research plan [4] and the need for in-flight evidence regarding this is identified as a gap in the program (https://go.nasa.gov/2Mctbkt). More research regarding stress and immune response interplay might reveal the cause of the observed reduced immune response during space travel. One interesting avenue to investigate the link between stress and immune response during space missions is monitoring the cortisol levels in saliva and to link this to CD4+ cell count. Recently, a competitive lateral flow immunoassay (LFIA) and horse radish peroxidase (HRP) conjugated cortisol was developed to detect and quantify chemo luminescence [52]. A 3D printed device shields the strip from background noise and operator variation thus creating a robust test that can be operated by the layman yet allows cortisol quantification directly in saliva with a LOQ of 0.3 ng/mL and a linear range between 0.3 and 60 ng/L. Cortisol levels in saliva vary depending the time of day but typically remain between 0.6 and 10 ng/L [52]. Thus the developed assay (which takes about 30 min) can reveal clinically relevant information. Interestingly, the performance of a variation of this device has very recently been tested aboard the ISS station (mission 52/53) using saliva samples from an Italian astronaut, further underlining the interest in such rapid tests for in situ monitoring of crew health, and the results are pending (https://go.nasa.gov/2Kb854L). Such a device, in combination with an SBD that can determine specific T-cell densities in blood, could then be used to further investigate this phenomenon directly in space while keeping tabs on stress levels and other major markers indicating reduced immunity or infection like reduced CD4+ levels. Indeed SBD based cell counting devices exist already including an SBD using fluorescent imaging cytometry [61] and another using magnetic bead ELISA [62]. The latter may be more fit for the purpose of rapid on-site cell counting since the device uses highly specific monoclonal antibodies and does not require extensive treatment of the blood sample prior to analysis, in contrast to the former. Moreover, since it has been shown in several studies using different detection mechanisms that SBDs can have a similar performance as bench-top reference methods [23–26], and since the discussed magnetic bead ELISA assay shows a CD4+ T-cell count accuracy of 97% at levels below normal (350 cells/µL instead of ~1000 cells/µL which is the normal level), it can be considered feasible to do such precise measurements with an SBD. Vitamin D (VD) is another important biomarker as levels have been reported to decrease during space missions whereby supplements are required to limit bone loss [63] and minimize effects on both the innate and adaptive immune response [64]. Recently an SBD has been developed that allows quantification of VD [65]. For this purpose VD was aminopropylated and immobilized on a glass substrate whereby antibody coated gold nanoparticles (Ab-GNPs) were allowed to bind to this substrate in a competitive assay (fewer Ab-GNPs will bind if free VD is present in the sample). Finally silver ion reduction on the gold surface of the Ab-GNPs bound to the immobilized VD allows for sensitive colorimetric detection by using a mobile application that applies the hue saturation brightness model to quantify VD at nanomolar concentrations. However, the method does hold some weak points such as a required lengthy 6-h incubation. Finally some interesting work has been reported on mobile devices to detect glaucoma i.e., a 3D printed retinal imager [66] and a pressure sensitive microchannel [67] to measure blood pressure behind the eye.

2.2.3. Detecting Cancer

The detection of certain cancers can be performed by SBD through the cellular image analysis or the detection of biomarker indicators. An exact risk assessment for cancer due to GCR is difficult due to the lack of sufficient data [68]. However, compelling indications that ionizing radiation can

increase the risk for melanoma [69] exist and that exposure to GCR and SPE during a Mars mission can increase the risk of skin cancer in astronauts by >1% [70]. Evidently, this does not mean that astronauts have a high risk of developing cancer during the mission but rather that the life-time cancer risk will be elevated due to the stay in deep space. This being said, the use of facile screening methods for melanoma and other cancers can still be considered desirable on long-term missions to ensure optimum crew health and allow early detection. Indeed developing technologies for risk mitigation and monitoring are mentioned as desirable in the human research roadmap (https://go.nasa.gov/2KSjIt8). Several interesting SBDs targeting skin cancer came to surface in the cancer subgroup detecting malignancies via image analysis [71–74]. Of these the most complete system uses deep convolutional neural networks (CNN) to diagnose keratinocyte carcinomas versus benign seborrheic keratosis and malignant melanomas versus benign nevi in a binary classification system [72]. The system was trained using a substantial dataset (129,450 clinical images representing over 2000 diseases), tested and found as proficient in its diagnostic capabilities as skilled dermatologists. However, such a system does require the mobile device to be fitted with CNN which remains difficult since CNN requires considerable computing power. However, this situation might change in the future since graphical processing units (GPUs) are becoming more common in mobile devices. These GPUs have parallel processing capabilities which can be exploited to accelerate CNN computations on mobile devices. Moreover, an open source, GPU accelerated, library has recently become available on github [75]. Apart from this there is also a neural compute stick (Movidius) available on the market which shows promising results for the use of some CNN on low power devices [76]. This being said, mobile GPUs remain constrained for the use of very deep CNN networks and much work remains to be done on the development of mobile devices for the use of such sophisticated machine learning techniques [77]. An alternative to computed image analysis is visual microscopic analysis via a SBD microscope [78]. Here sensitivity and specificity of a SBD microscope was compared to a conventional light microscope for the expert analyses of dermatopathologic samples. It was found that the SBD had a similar performance as the conventional microscope except for the diagnosis of malignant melanoma where the sensitivity was only 60% but with good specificity (99.9%). However effective, this method still requires expert knowledge for diagnosis and thus requires the images to be sent back to earth. In theory this is not a problem since one-way light time (around 14 min) is not limiting for sending such data between earth and Mars although this delay can quickly add up to hours if active guidance of an expert is required while acquiring images. Thus, it may be more interesting to limit sending microscopic images that have popped up interesting during a preliminary screening test to limit unnecessary data analysis by experts. To this end it might be a more fruitful approach to use the microscope to gather images that could be further processed using image analysis. In this manner more direct analysis with less background noise and variables could also reduce the need for algorithms that require excessive computing power. Another way to reduce background noise might be to use a SBD spectrometer [79]. Such a system could potentially prove useful if enough data is collected to build a solid database for chemometric analysis. Indeed NIR spectroscopy with commercial smartphones is already coming available making such an endeavor more feasible (https://bit.ly/2Kong71). An SBD to detect ovarian cancer using a microchip ELISA to detect human epididymis protein (HE4) in urine [80,81], as well as prostate cancer using a microchip ELISA targeting prostate specific antigen (PSA) [82]. The latter SBD uses magnetic nanoparticles and a magnet rather than pumps thus simplifying the design. Moreover, the surface to volume ratio is thus increased which has reportedly reduced the analysis time to 30 min in contrast to 5 h for the assay. In addition, a SBD using a spectrometer to detect Interleukin 6 (IL-6), a biomarker for several cancers, using conventional ELISA [83], and a SBD using microfluidic dielectrophoresis combined with image analyses on a smartphone camera to count MCF-7 breast cancer cells in culture media [84] have been reported. Apart from these systems other intriguing SBDs exist that could be used for monitoring the crew health. The target, detection method and pros and cons of these systems are illustrated in Table 1.

**Table 1.** A list of SBDs developed to monitor general health features relevant for space missions.

| Target and Device Working Conditions | Detection Method | Pros and Cons |
|---|---|---|
| Hemolysis in blood [85]. LOD: 1.39 mg/dL hemoglobin. Matrix: Plasma. System showed higher accuracy as conventional methods (Roche Cobas c501 and Siemens Dimension Vista 1500) and fast analyses time (10 min versus 4 h for conventional lab-based methods) | Colorimetric detection of free hemoglobin levels in plasma. Plasma is imaged and image-analyses is used to determine the amount of free hemoglobin levels present. | Pro: fast (10 min), cheap (few dollar), and relevant (astronaut anemia can be measured) |
| | | Con: Blood separation based on gravitation in capillary |
| Cell density detection [86]. System able to distinguish between normal red blood cells (RBCs) and RBCs from anemia patient. It was suggested as method to detect low-density neutrophils as well but this was not tested. | Magnetic levitation. Cells in a capillary filled with a paramagnetic medium are placed between 2 rare earth magnets and their levitation position is determined solely by their density. | Pro: Fast and facile identification of astronaut anemia and other diseases that evoke cell density changes |
| | | Con: Proof of principle only |
| Non-contact vital sign detection such as sleep apnea, pulse wave velocity measurements and respiration monitoring [87]. | Doppler radar sensor. Integration of demodulation techniques and miniaturization (System on chip) to enable SBD detection. | Pro: basic vital signals can be remotely measured and analyzed |
| | | Con: Experimental and not robust, sensitive for noise from movement |
| Tidal volume, V(T), estimator [88]. V(T) was estimated using a commercial spirometer for simple calibration. Method enables V(T) estimation with about 18% error compared to spirometer data. | Video analyses of chest movement | Pro: non-invasive monitoring of lung volume |
| | | Con: Other simple and more direct methods exist as well |
| Mobile cell migration assay for neutrophil and cancer cell chemotaxis [89]. System achieves 3 μm resolution and was validated for detection of chronic obstructive pulmonary disease in clinical samples. | Test kit consists of a smartphone-imaging platform using microfluidic channels, LED illumination, emission filters and image analyses. | Pro: Neutrophil chemotaxis can be tested directly from a drop of blood. |
| | | Con: System still at proof of principle stage |
| Detection of chronic obstructive pulmonary diseases [90]. System showed high correlation with breathing frequency and peak flow rate. | Resistance relative humidity sensor. Nanoparticle doped paper (NDP) resistance was measured during NDP exposure to breathe channeled through mouthpiece. | Pro: Quick way to detect chronic obstructive pulmonary diseases |
| | | Con: System still at proof of principle stage |
| Quantitative clinical method for total protein, albumin, and hematocrit analysis [91]. Calibration curves showed good dynamic range and RSD values under 5%. | Colorimetric detection on polyester-toner, laser printed, microfluidic disks. Test enables both whole blood separation and component detection using SBD image analyses. | Pro: System is quick and fully integrated. |
| | | Con: The system is complex (production costs) |
| Determine water-fat ratio in the body [92]. Method was compared to dual-energy X-ray absorptiometry (DXA) in healthy volunteers and showed a maximum absolute error of 6.5%. | Bioelectrical impedance analysis using a miniature multi-frequency impedance spectrometer for whole body impedance measurements. | Pro: Non-invasive, rapid and accurate |
| | | Con: System still at proof of principle stage |
| Determine hemoglobin concentration and detect HIV virus [93]. System was validated in clinical trial ($n = 38$) showing 95% limit of agreement for hemaglobin and 95% sensitivity and specificity for HIV immune assay. | Microfluidic device with colorimetric detection to determine hemoglobin concentration and absorbance (silver enhanced precipitation of colloid gold) for HIV related antibody detection. | Pro: System is simple does not require expertise for use |
| | | Con: System still at proof of principle stage |
| Urinary tract infection detection [94]. Application functions independently of room illumination and smartphone type (6 phones both Android and iPhone tested). | Colorimetric detection using image analyses. Device needs reference values for training set. Device is equipped with auto-localization to classify and detect ± 100 spots of 12 biomarkers simultaneously | Pro: multiplex detection of 12 biomarkers within one picture |
| | | Con: semi-quantitative only, varying illumination can effect results |

### 2.3. *Environmental Monitoring*

Environmental monitoring including both water and air quality both whilst on board the spacecraft and on arrival in Mars will be an important element of consideration for a SBD to be valuable.

#### 2.3.1. Inorganic and Organic Compounds in Water

The storage of drinking water on a prolonged space mission must be economized to avoid adding unnecessary weight to the spacecraft. However, recycling water from urine, air humidity and hygiene water can lead to higher amounts of toxic metals due to leaching from metal coatings and filter resin failure and cause hazardous levels of multiple toxic metals in the water supply calling for sensitive detection of these metals at the ppb level [95]. SBD sensors have been reported for the detection of lead(II) ions [96,97] with LODs around 20 µg/L which is 2 fold below the requirements for regenerated potable water aboard the ISS (http://emits.sso.esa.int/emits-doc/RD5-ITT-1-5247.pdf). Unfortunately one of the methods is based on gravitational force [96]. Three SBDs are reported for $Hg^{2+}$ quantification [98–100] and one for fluoride quantification [101]. Of these, one is especially [98] interesting since the LOD reported is almost 10 fold lower than bespoken requirements for potable water on the ISS (0.28 µg/L in [98] versus 2 µg/L aboard the ISS). Moreover, the testing time is limited to 20 min, and the sensor size is under 5 cm thus responding to the goal of reducing human systems resource requirements stipulated in the Human Research Plan-47052 revision E. However, none of these systems were used for the multiplex detection of toxic metals. Wang et al., used a paper fluidics device that uses stacked paper layers fitted with channels bordered by hydrophobic walls and adhesive tape to construct a device allowing the detection of 4 metals in 16 zones [102]. The system was tested for Cd, Ni, Cu and Cr using selective chromogenic reagents for a colorimetric readout that was then quantified using a smartphone camera and application. The authors found that quantification in the low ppm level was possible using this setup. Although sensing at ppb was not achieved the sensitivity could be increased by using other techniques for the detection like the immune detection of metals using HRP, GNP or quantum dots (QD) for enhancement while keeping the design of the device. As for the detection of organic compounds in water three SBDs were described including one that uses electrochemical detection of nitrate in water at the ppm level [103], one using colorimetric detection of catechols in river water [104] and finally one using an acetylcholinesterase inhibition assay to detect organophosphate pesticides in natural water resources [105]. Of these, one is especially [103] of interest since its LOD is 5 fold lower than ISS requirements (0.2 µg/L versus 10 µg/L respectively), while keeping the sensor mass at ~65 g and analysis time around 1 min.

#### 2.3.2. Aerosols, Pathogens and Volatile Organic Compounds (VOCs) in Air

Three existing SBDs have been described for the detection of small particles in air [106,107]. One focuses on the detection of particles on a miniaturized aerosol filter via subsequent image analysis of the observed color change and is effective to measure particle (mainly black carbon) concentrations but not particle size [106], an important parameter to determine particle carcinogenicity [108]. Another SBD, developed by the Ozcan group and termed c-Air [107], uses computational lens free imaging and machine learning to calculate particle size and distribution. In brief, the camera registers the holograms produced by the captured particles on a sticky surface. An iterative particle-peeling algorithm (which takes into account the generated twin image artifact and corrects for it) is then used to reconstruct the particle size from the interference patterns. Finally machine learning is used to further avoid the measurement of false positives. The system, which has a cut-off at 1.4 µm, was tested and found proficient when compared with a conventional device (BAM-1020, Met One Instruments, Inc., Grants Pass, OR, USA). Moreover, c-Air works at a ±15 times higher debit (amount of air analyzed per time unit) as other portable devices [107]. Moreover, the system would fit requirements (particle size ≤ 10 µM) described in NASA-STD-3001, VOLUME 2, REVISION A and adheres to the requirements for such in flight analysis devices (reduced mass, analysis time and power use) mentioned in the

Human Research Plan-47052 revision E. As for the measurement of VOCs several SBDs have been developed. Chen et al., [109] developed a system that uses a porous graphitized carbo-pack fitted with a tungsten heating wire that enables pre-concentration of VOCs followed by sudden release at 300 °C. A small GC-column (varying from 4 m to 19 m depending on sample complexity) is used for separation. Detection is achieved via quartz mechanical resonators fitted with molecular imprinted polymers (MIPs) leading to the selective detection of a number of mono-aromatic and alkyl hydrocarbons at the ppb level. The entire procedure (from pre-concentration to detection and flushing the system) only takes a few minutes and has proven efficient in real-life situations making this an attractive portable method to detect VOCs. Finally, one SBD has been reported that enables the detection of pathogens in air (influenza; H3N2) [110]. The detection of this pathogen is especially interesting since the majority of infectious disease incidents reported among approximately 742 crew members in 106 space missions were fever/chills and flu-like illnesses (11 out of 29) [111]. The system uses antibody functionalized silicon nanowires (Ab-Si-NW) in microfluidic channels to detect conductance changes created by the binding event. Information regarding air quality is then displayed on a smartphone through wireless connectivity [110]. Such a system however only works in a conductive medium such as water and not in air. Thus the authors used an electrostatic air sampling system that allowed transferring aerosols into hydrosols which could then be transported to the Ab-Si-NW via microfluidic channels. This innovative system is a prime example of opening up the real-time sensitive water-world of Ab-based label free sensing to the detection of pathogens in air whereby it may be made multiplex by splitting up the microfluidic channel before detection. Such capability would potentially be very facilitating for space missions and could be remotely monitored on a computer. Moreover, the aerodynamic reach of such a system could be increased significantly by using a Venturi system for aerosol sampling [112]. In such a set-up the inlet tube used for air sampling could be reduced in diameter (from 16 mm in the original setup to about 5 mm) thus allowing the reduction of the water volume used for hydrosol formation while improving vapor collection which could lead to a higher concentration of hydrosols in the microfluidic channels, improve the detection limit and limit water use. Figure 2 shows a schematic of this futuristic device. Evidently, the device depicted can transfer information to a SBD for data processing while stationary, a system which was used by the authors for data processing, or could even be used as a portable device due to the reduced need of water for hydrosol formation.

**Figure 2.** Schematic representation of a multiplex system for pathogen detection in air. The system depicted here follows the same principle as suggested in [100]. To this principle we added a presentation of enhanced aerodynamic reach as developed by [102] in combination with a simple microfluidic system to reach multiplex detection of several targets (as presented by pink, red and blue color particles).

*2.4. Food Screening*

Testing for microbial food contamination currently requires sample return and identification on Earth using culture-based methodology. Utilizing such a system in-flight on long missions is unfit for purpose due to the limited shelf life and mass of the consumables and other methods should be considered (https://go.nasa.gov/2P5XdUK). A recent review has already discussed the subject of SBDs for the screening of food quite thoroughly [19]. The most relevant articles on the testing of food freshness and screening for pathogens in food by SBDs are highlighted. This selection was chosen, excluding allergens and chemicals since the detection of these could be done prior to the mission whilst problems due to contamination with pathogens can emerge during the mission. Regarding food freshness most SBDs are used to determine the quality of fresh fruits using portable spectroscopy [113–115]. However, one interesting article focuses on the discrimination and semi-quantification of volatile amines emitted by microorganisms indicating rot [116]. In this article cellulose acetate membranes were spotted with 5 pH indicators. The membrane was then exposed to the amines that represent typical metabolic products from protein degradation by microorganisms. Red green blue (RGB) values were extracted and used to generate scores for a principal component analysis (PCA). The first 2 components of the PCA managed to explain over 72% of the variance ($n$ = 4) indicating good separation of these VOCs. In a separate experiment the authors also managed to explain 85% of the variance between several biogenic amines (tyramine, putrescine, cadaverine) in a proof of principle test using analytical standards. Thus this simple test might prove useful to check the quality of rehydrated, lyophilized food after long term storage. Apart from this work there have been several reports on the detection of *E. coli* [117–120] and Salmonella [121] individually and *E. coli* and Salmonella together [122] in various fresh food products. Of these, three articles reported a detection limit at 10 CFUs or lower in real sample matrix (milk, yoghurt or egg) [117,119,121]. Thus these sensors show promise to be used on long space missions since they approach the limit of 0 CFU per food sample set in NASA-STD-3001, VOLUME 2, REVISION A.

*2.5. Infectious Disease Detection*

As for infectious diseases, many reports focused on the detection of infectious diseases unlikely to occur during any space mission (e.g., malaria [123–125], HIV [25,126,127] schistosomiasis [128–130], tuberculosis [131,132], and leprosies [133]). Nonetheless, these systems could be adapted for the detection of other infectious diseases. However, some reports of SBDs focused on the detection of HV [134–136]. Of these systems one uses fluorescent imaging as a detection method and thus there is a requirement to first label the virus particles for detection [136]. A second system is based on the detection of virus DNA by measuring the changes in optical density in a DNA-GNP solution specific for HV DNA upon HV addition. The system is promising but remains at a proof of principle stage for the moment [135]. The final system however, developed by the Ozcan group, has been thoroughly tested utilizing real clinical samples and proven to attain over 98% accuracy [134]. This system uses standard ELISA tests, in a 96 well plate. The wells are illuminated by LEDs and light is transported from each well to the smartphone camera via optical fibers. The data is then remotely interpreted using a machine-learning algorithm. Although this system is portable and well beyond the proof of principle stage, it would need further simplification to make it suitable for non-expert use upon a spacecraft. Overall, the majority of SBDs currently developed for the detection of infectious diseases focus on diseases unlikely to develop during space missions (malaria, schistosomiasis, HIV, etc.). For space missions however, the focus should be on microbial infections known to occur during space missions such as HV, urine tract infection and subcutaneous skin infections https://ntrs.nasa.gov/search.jsp?R=20140002769. In fact, a list of recommended specific infectious disease targets to screen for during deep space missions can be found in [111] and include meningococcus, pneumococcus, typhoid and several fungi.

### *2.6. Other, Unclassified SBDs*

Many interesting technical papers describing the development of novel smartphone sensors fall within this group. Two describe the development of mobile spectrometers [137,138]. Another describes the development of an SBD with image resolution beyond the pixel size using lens free microscopy [138]. Fluorescent microscopy is evaluated also with the invention of a QD based Förster resonant energy transfer (FRET) SBD [139]. Another technique [140] describes the integration of an optical sensor into the touchscreen of smartphones by fabricating an optical waveguide just below the screen surface. The system is interesting because it allows the measurement of changes in the refractive index of liquids directly from the screen surface opening up the door to direct surface plasmon resonance (SPR) without the use of additional add-on devices. Although these SBDs can be promising in the future, none of them have been tested on real-life examples. Other SBDs, some of which show remarkable detection sensitivity, have been tested on targets from several groups. The targets and detection methods of these SBDs are illustrated in Table 2 together with their strengths and limitations.

**Table 2.** A list of the SBDs that were not classified in any group since they have targets from various groups. Targets, detection methods, advantages and limitations of each SBD are highlighted.

| Target | Method | Advantages | Limitation | Reference |
| --- | --- | --- | --- | --- |
| *Escherichia coli*, Salmonella enterica, Rift valley fever virus with sensitivity close to single target copy. Method was validated using RT-qPCR. | Inhibition of DNA-paramagnetic silica bead aggregation, otherwise induced in longer strand DNA mixtures, by centrifugation after LAMP (a). | Single copy detection of DNA using simple device replacing fluorescent detection with simple aggregation assay measurable directly with SBD camera. | No guaranty regarding specificity in assay. Any short DNA amplicons will shield the beads from aggregation | [141] |
| Water born parasites, CD4+ T-Cells are detected in an 81 $mm^2$ wide view with 10 µm resolution. An experimental protocol is included. | Fluorescent imaging flow cytometry using microfluidics, LED excitation and time-lapse video recording using the digital frames for cell counting. Also wide view microscopy using the smartphone camera is demonstrated. | Wide field of view for good diagnostics at low copy number and mobile cell counting. | Target must be fluorescently labeled prior to analyses | [142] |
| Multiplex (384) lateral flow protein micro array for clinically relevant biomarkers. Accuracy was 98% compared to established glass microarray for 26 antigen specific antibodies. | Paper based lateral flow protein microarray using biotin conjugated secondary Abs and anti-biotin coated GNPs | High multiplexing possibility and sensitive detection (30 ng/mL) in 10 min. | Multiple amplification steps can impede accurate quantification. High multiplexing can reduce signal to noise ratio. | [143] |
| DNA or RNA detection of multiple analytes in diverse matrixes (blood and water) using various microfluidic devices is described. | Microchip combining filtration, cell lysis, isothermal amplification and fluorescent detection for virus and bacteria. | Sensitivity and specificity comparable to conventional bench top methods | Complex matrix can impede enzyme assisted isothermal amplification | [126] |
| Human C-reactive protein (CRP) detection by sandwich ELISA, HRP detection for direct ELISA and BCA total protein estimation assays were performed for the SBD and compared to conventional microtiter plate readers (MTPR). | Standard ELISA tests read out by smartphone camera. SBD showed equal performance to conventional MTPR for LOD, LOQ, dynamic range, sensitivity and precision for all 3 assays. | Simple application using already existing established methods with low cost and miniaturized material. | Analyses requires same time frame and expertise as conventional ELISA | [144] |
| Carcinoembryonic antigen (CEA) (1) and (2), adenosine triphosphate (ATP). LOD for CEA was 6.1 pg/mL. LOD for ATP was 11 µM. Normal range of CEA is < 2.5 ng/mL and ATP roughly 1 mM. Thus mentioned LODs show usefulness' of the device. | Inhibition of peroxide induced etching of nanoprisms and color change by presence of more Ab-NPs at high target concentrations (1). GNP aggregation inhibition by ssDNA stabilization after target binding with aptamer and dsDNA dissociation (2) (b). | Simple system using the ambient light sensor to detect the color changes in the suspension. | Complicated setup. Especially using dsDNA which dissociates to ssDNA (for GNP stabilization) and aptamer-target complex. The functioning of the system might be very dependent on the salt concentration in the matrix | [145] |
| Relative particle number densities determined in food (fat droplets in milk, yeast in water) and medical (RBCs in whole blood) matrixes. | ELS (c) with diode laser is used to create angular resolved scattering patterns which are imaged by the SBD camera. Mie theory is then used to calculate particle size. | Cheap determination of size distribution of particles in blood, yeast and milk. | Poor accuracy (±20 nm) and at proof of principle stage. | [146] |

(**a**) Loop mediated isothermal amplification. (**b**) An inhibition assay where dsDNA (an ATP-aptamer and its complement) are incubated with ATP at 37 degree. ATP presence ensures structural change of the aptamer and avoids reformation of dsDNA thus preventing salt induced aggregation. (**c**) Elastic light scattering.

## 3. Limitations of the Smartphone for In Situ Analysis in Space

### *3.1. Novel Recognition Elements*

The RE used in a biosensor has a great influence on the price as well as the shelf life, selectivity and possibility of reuse of that sensor. The latter is especially of importance if quantitative, more expensive, SBDs are required for use during a space mission. Thus an informed choice regarding the RE to use for a certain type of SBD is paramount. The development, possible improvements and lurking pitfalls for effective sensor development using a variety of REs including antibodies [147,148], aptamers [149,150], MIPs [151,152], enzymes (divided in detection via substrate conversion [153,154] and inhibition of this conversion [155], riboswitches [156], affibodies [157] and cell-based biosensors (CBBs) [158] were recently reviewed. Table 3 lists each of these REs together with a summary of the findings of these reviews regarding the pros and cons of each RE. However, upcoming REs that can potentially entail major advancements in the development of rugged portable sensors with a longer shelf life and with expectations to be more capable to withstand harsh conditions, have not as yet been critically reviewed elsewhere and are described herein.

**Table 3.** A description of REs which illustrates the advantages and limitations of each.

| RE | Description | Advantage | Limitations | Reference |
| --- | --- | --- | --- | --- |
| Antibody | Specialized immune protein capable to recognize its antigen via a key-lock principle. Antibody antigen binding is based on Van der waals, hydrophobic and hydrogen bonds making it quite a stable complex. | Highly developed protocols exist, LOD often in pM range. Antibodies can often operate in quite varying conditions (pH, Salinity, complex matrix) and many protocols exist, making antibody based detection often the method of choice. | Production cost of monoclonal Ab is high. Protein can degrade limiting long-term storage. Setting up a reliable hybridoma line for monoclonal antibody is costly and can take years. Antibodies are primarily produced in animals. | [147,148] |
| Aptamer | Oligonucleotide designed to specifically bind its target (often upon conformation change) via subsequent systematic selection of the best binders available in a randomized pool of oligonucleotides. This selection process is called SELEX (systematic evolution by exponential enrichment). Many varieties of the process exist. | Developed protocols exist, LOD in the nm and even pM range is reported. Production is synthetic and cheaper as antibodies. Aptamer-target complexation often results in a significant conformational change of the aptamer which can be used as a label-free sensing principle. | Often binding specificity is sensitive to salt concentration. Degradation sensitive due to nucleases, hard to use in complex matrix. | [149,150] |
| MIP | Polymers with functional groups capable to interact with target functional groups are polymerized around the target. Next the target is eluded leaving a functionalized pocket behind to act with the target via a key-lock interaction principle | MIPs are cheap to produce if the target is not expensive. MIPs are very stable, leading to long shelf life. Detection limits in the pM range are reported but less common. | Washing out the template molecule can prove difficult. Target affinity can change between batches. Higher amounts of template is needed which can increase production costs. | [151,152] |
| Enzyme activity inhibition | The ability of an enzyme to catalyze its reaction is inhibited by the presence of a pollutant. The method is often used to detect organophosphorus pesticides. In such assays the enzymatic catalyzed conversion of a substrate to a colored product is often measured. Absence or reduction of the intensity of reaction indicates enzyme inhibition. | OFA (a), OFAA (b) and ACHE (c) enzyme inhibition assays are cheap and fast tests ideal for on-site screening. Especially OPH and OFAA enzymes are good candidates since they allow sensitive 1 step only detection. Moreover, genetically engineered recombinant enzymes of these groups exist and result in higher sensitivity. | Enzymatic activity can be reduced by many different compounds. Thus the specificity of this system can be compromised if real samples are used. Work remains to be done to further engineer OP and OFAA enzymes for optimal results. | [155] |
| Enzymatic substrate conversion | Enzymatic catalyzes of a compound leading to direct or indirect electron transport to an electrode used in electrochemical detection or conversion to a fluorochrome or colored compound for optical detection. | A wide variety of sensors based on this principle exist some of which like glucose sensors have proven to be fast, sensitive, low cost and reliable. | The inhibition of catalytic activity can lead to false negatives. Especially in matrices from patients containing ROS (d) and or inflamed tissues containing proteases capable to degrade the enzymes. | [153,154] |
| Riboswitches | RNA based system comprising 2 domains, a recognition domain (aptamer) and signaling domain. Upon recognition the conformational change frees an area of the signaling domain that can inhibit or promote translation of a protein or transcription of a reporter gene, triggering a fluorescent response. In some cases fluorescent response even occurs directly upon binding the analyte. These riboswitches are called fluorogenic riboswitches. | This system is very effective to enable small molecule induced gene regulation and can be used with synthetic aptamers to create fluorescent RNA based biosensors as internal validation for CBBs. Moreover, synthesis is synthetic and cheap compared to antibodies. | The best functioning riboswitches are prokaryotic. They will need to be adapted to use in eukaryotic cells to prevent rapid degradation of the RNA. For this non-natural nucleic acids, equally used for aptamer construction, might proof useful. | [156] |
| Affibodies | Synthetically constructed peptide scaffolds combined with a specific peptide sequence used as the RE. The Scaffold sequence (around 6.5 kDa) contains no cysteine and often stays the same. The variable region classically contains 13 amino acids and can be specifically engineered for a given target. | Smaller then antibodies thus closer to surface of transduction element leading to low LODs. Scaffold can be engineered to allow orientated immobilization. Absence of cysteine avoids artificial sulfur-bridge formation. | The method is relatively undeveloped. Some initial successes are booked but more research is needed. | [157,159] |
| CBBs | Living cells are integrated in the sensor. Their shape change, cell membrane damage or dead caused by interaction with the target are reported through optical or electrochemical detection. | CBBs have the unique ability to offer a measurable response to a pollutant related to actual physiologic responses of the subject to the substance. | The cells must be kept alive to function making long-term storage difficult. Many structurally different compounds can cause a similar response making downstream identification complex.<br>Moreover, CBB sensors often require lengthy incubation and measuring steps in an incubator seriously limiting portability. | [158] |

(**a**) OPH is organophosphorus hydrolase. (**b**) OPAA is organophosphorus acid anhydrolase. (**c**) ACHE is acetylcholinesterase. (**d**) ROS is reactive oxygen species.

### *3.2. MIP-Aptamer Hybrids*

Aptamers have been used for the construction of biosensors since SELEX was invented in the 1990s [160]. Although, the development of Aptasensors is promising, there are a few drawbacks to the system such as degradation of the aptamer by nucleases and lower affinity compared to antibodies [150]. One interesting sensor that was recently built to overcome these limits is a novel aptasensor that uses an aptamer covered with a layer of MIPs (Apta-MIPs). This RE has been developed for the electrochemical (EC) detection of PSA [161]. Briefly, a gold surface was functionalized with a PSA specific aptamer after which PSA was added to allow the aptamer-target complex to be formed. Then electro polymerization of dopamine was initiated around the complex. Finally PSA was washed away leaving the aptamer in a stable polymer layer which protects against degradation. The group showed that the LOD (1 pg/mL) was three times better than the LOD of the aptamer alone. Shortly after a similar technique was used by another group for the detection of enrofloxacin, (a fluoroquinolone antibiotic) via up-conversion fluorescence [162]. Again a very low LOD (0.04 ng/mL) was achieved as well as a good quantitation limit (0.12 ng/mL) with a relative standard deviation of 1–5%. These sensors are sensitive, stable and need less template as MIP sensors (a common obstacle for MIP production) [151], thus combining the best of 2 worlds. Finally another group showed that the polymerization of the fragments of an adenosine specific aptamer can rescue the binding of these fragments for adenosine, which was virtually absent for the free individual fragments [163]. This work opens the doors to new MIP fabrication using nucleic acids as functional monomers; the development of which is much needed to further boost MIP development for more diverse targets [151]. The basic production mechanism for Apta-MIPs is shown in Figure 3A.

### *3.3. Solid Phase MIPs*

The use of MIPs is summarized in Table 3 and more information can be found in reviews [151,152]. However, one particular type of MIP, which is believed to be especially interesting for SBD development (Solid phase MIPs or MIP nanoparticles (MIP-NPs)), was not treated in any identified review. Thus, these will be reviewed here in more detail. NP-MIPs are produced by covalently fixing the template molecule to a substrate (glass beads) after which initiated polymerization occurs around this fixed template. These "plastic antibodies" were first developed by Poma et al., for melamine, vancomycin and a model octapeptide [164]. MIP-NPs are promising because they show high affinity ($K_d$ in the nM range) at a lower production cost, improved shelf life and stability compared to antibodies [165]. MIP-NPs can be further functionalized with fluorescent groups, thiol groups, electro active groups or molecules with antifouling properties for further biosensor development [166]. Figure 3B shows the basic steps for MIP-NP construction. The system was also used for the construction of MIP-NPs targeting histamine [165,167], vacomycin [168,169] and fumonisin B2 as a first MIP-NP targeting a toxin [165]. Furthermore, the performance of the latter was compared with monoclonal antibody (mAb) performance in an ELISA assay and showed a 3X lower LOD (6.1 pM for the MIP-NPs in comparison with the mAb at 25 pM) as well as an improved linearity range [170]. Moreover, the system can be automated both for MIP synthesis in solvents [164] and in water [171]. The latter is preferable if proteins or other biomolecules are used as a template since buffers can be used that conserve the natural steric conformation of the templates [170,171]. Production in organic solvents is better for small molecules where H-bridge formation between template and functional monomer is important [151]. A protocol for the development of these MIP-NPs in both media [172] as well as a protocol describing how to perform enthalpy calculations of the monomer-template complex [173] were recently published. Unfortunately, the latter is based on software (Sybyl) that is no longer available. Although these developments are very interesting it must be stated that MIP-NPs generally require more template than aptamers or antibody production. Although this problem might be overcome by the use of rational design and multiple reuse of the covalently linked template in solid phase production, laborious and costly optimization might be needed to attain this goal. Moreover, non-covalent free radical or UV initiated polymerization used for MIP-NPs can attack double bonds in the template molecule, thus

covalently linking template and MIP-NP. This can potentially make it very hard to remove the template molecules containing alkene groups.

### 3.4. In Vitro Selection of More Diverse Polymers

In order to block nucleases and increase structural diversity, thus increasing the chance of better target recognition, aptamers are often modified with non-natural nucleic acids or peptide chains [150,174]. Recently some intriguing advances in this area have been made like the use of peptide nucleic acid (PNA), a nucleic acid sequence with a peptide backbone that cannot be degraded by nucleases nor proteases with lower salt sensitivity and greater affinity to its target nucleic acids as its DNA counter sequence [175], directly for the in vitro selection process using PNA transcription enzyme [176]. A similar technique was used by the Chaput team, which used enzymatic transcription of threose nucleic acid (TNA) for the in vitro selection of a TNA aptamer targeting thrombin [177]. The limitation of these techniques however is the enzymatic transcription step which ultimately limits the amount of possible polymers that can be used for in vitro selection. Recently, a novel system that uses enzyme free translation of non-nucleic acid polymers (NNAP) was developed [178]. This system uses a quintuplet codon, much like a T-RNA, to proximate monomers to each other using a random ss-DNA pool for template (Figure 3C). After in vitro selection the sequence of the polymer can be recuperated via a fluorescent PAGE assay and ESI-MS [178]. Although this system has not been used directly to develop an SBD yet it does hold great potential to develop more diverse polymers targeting a structurally highly diverse group of compounds more efficiently.

**Figure 3.** Novel recognition elements (REs). (**A**) This Schematic shows Apta-MIP hybrid fabrication steps where the aptamer is first immobilized on a gold surface after which the target is added. Next electropolymerization is followed by a washing step to produce the final hybrid; (**B**) Solid phase MIP production. The principle of solid phase MIP production starts with the immobilization of the target and ends with stringent washing to eluate the high affinity MIPs after whereby step 2 can be repeated several times; (**C**) A schematic showing the principle of enzyme free translation of polymers. The system that can be used to achieve the enzyme free translation of polymers carrying a pool of various side chains (here methacrylic acid (MAA) polyethylenglycol (PEG), 4-vinylpyridine (4-VP) and some amino acids with varying chirality are shown but others can be used).

### *3.5. Cell Free Synthetic Biology, the Answer to Long-Term Storage?*

Some of the issues for deep space missions and extra-terrestrial settlement are the cost and impracticality of shuttling goods to the destination. Indeed it was estimated that the transport of 1 unit of goods requires 99 additional units of mass in fuel to get the product into space [179]. Moreover, the cost is approximately $10,000 per pound payload [180]. Thus, solutions have been sought to limit payload including self-sustaining life support systems [181] and bio-printing for onsite food production [180]. To this end use of synthetic biology has often been suggested as a viable solution [179,180,182]. An interesting use of synthetic biology is cell free protein production. Here, reagents e.g., DNA, transcription and translation machinery, are mixed to produce metabolic products and proteins in a cell free reaction chamber. The main advantages of such a system are the high production rate, yield, product pureness and ease of gene editing. Post translational modified (PTM) protein production however, such as disulphide bridge formation and protein folding (paramount for antibody production), remains difficult [183]. Luckily, different strategies to surmount this problem exist, such as changing the redox potential using glutamate [184,185], or adding chaperone proteins to the reaction mix [186]. A detailed protocol for cell free protein production of reporter proteins is freely available [187]. Another big advantage of such a system, which is especially valid for deep space missions, is the possibility to transport the reagents in lyophilized form at room temperature (RT). This technique was recently used to manufacture a low cost (less than 1 $ per test), user friendly, paper based colorimetric test for the detection of Zika virus [188] as well as Ebola virus [189] from *Escherichia coli* based extracts. It was shown that these systems can remain stable over 1 year at RT which greatly improves storage facility. Other work from the same group also demonstrated the production of antimicrobial peptides, cancer biomarkers (HER2, CEA5), fluorescent protein (mCherry), cytokines, small molecules, *Clostridium difficile* exotoxin (TcdA) and several antibodies using freeze-dried cell free *E. coli* based extracts [185]. However, these systems remain quite novel and not all reports show similar performance. A report from Smith et al., for instance, shows that protein activity can indeed be partially preserved at sub-optimal temperatures (4 °C) although it does decrease drastically after only 90 days of storage at RT even when sucrose is added as a lyoprotectant [190]. Nonetheless the potential advantages that these techniques have for long space missions justify further development in this intriguing field.

## 4. Conclusions and Outlook

A plethora of SBDs for human health related purposes have been developed in recent years. These compact and novel sensors stretch from simple sensors that allow the detection of stress through heart rate measurements using photoplethysmography to sophisticated biosensors using microfluidics and isothermal nucleic acid amplification methods with single copy DNA detection limits. In order to view and improve those currently available, the cornucopia of sensors were divided into four groups based on their usefulness for the monitoring of the crew's health and further divided into subgroups as the most promising sensors for use aboard a spacecraft on a mission to Mars. Using this classification system and building on previous work mapping out LOC use in environmental monitoring [18] and food analyses [19,20], it became apparent that several SBDs for the monitoring of stress levels, skin cancer diagnostics, water screening for toxic metals, and infectious disease monitoring have been developed well beyond the proof of principle concept. However, different targets, more fit to the needs for microbial detection in space, would be necessary for the latter as pointed out in [111]. Moreover, the development of other groups such as testing for food spoilage (other than fruit) and scanning for airborne pathogens with SBDs is clearly lagging behind while demand for miniaturized devices for astronaut crew health monitoring is rising [191]. Thus more effort should be invested in these areas. Another observation is the prevalence of antibody based SBDs, in particular LFIAs with a smartphone readout that are often mentioned. Interestingly, LFIAs were previously identified as ideal systems for use in space [191] and thus LFIA SBDs might be the logical step forward. However, other more complex formats using unconventional REs have also been described herein as interesting alternatives. In

particular MIP-NPs, MIP-Aptas and NNAPs have been identified as promising REs for space missions due to their increased stability, shelf life and protection against degradation. In summary, it is believed that several of the currently available SBDs could in theory be adapted for the use in space and aid in the monitoring of the crew's health on a mission to Mars in a user-friendly fashion as light portable devices. When peering into the future, one could imagine an ideal SBD adapted for a prolonged space mission. This "galactic" SBD, would have to be equipped with a maximum number of sensors that are able to withstand harsh environments, without losing sensitivity, for a prolonged time as a primary requirement. Moreover, such sensors would ideally be integrated in the phone to maximize space, use shelf-stable components, have a user friendly "one step only" approach and work in (near) real-time to facilitate rapid and easy use by non-experts. A good sensor for the galactic, that potentially meets these requirements, is an integrated optical waveguide in the smartphone screen [140]. Such a system potentially allows direct multiplex SPR measurements on the screen. Covalently attached MIP-NPs could be used to enable sensitive sensing without degradation caused by proteases, temperature and pH variations and mechanical stress associated with touch screen use. This would in theory enable label free detection of multiple harmless analytes such as stress or cancer related biomarkers, by simply depositing a drop of sample on the indicated area of the screen. A limit for this technique would be the molecular weight of the target, which is correlated with the generated refractive index change upon binding. Moreover, it would be unfit to screen for pathogens. For the direct detection of smaller analytes an aptasensor, with electrochemical detection, could be used. Such a system is advantageous for small compounds since its sensing capabilities are based on the conformational change of the aptamer making the weight/electric resistance of the analyte less important. Moreover, a rapid one step approach can be achieved if a signal enhancer like methylene blue is attached to the aptamer [192]. Again, a stable synthetic RE like an NNAP would avoid degradation by proteases and nucleases and might enable direct analyses at the surface. An add-on device could be used for this purpose and could further be equipped with a VIS-NIR spectrometer/camera to allow spectrum analyses over a larger spectrum range and allow for the detection of more abundant compounds [115]. Moreover, the camera could be used for optical detection of a cornucopia of microfluidic assays such as fluorescent imaging cytometry or microfluidic dielectrophoresis for cell counting, magnetic bead ELISA for the detection of cancer or infectious disease markers or pathogens and an aerosol/hydrosol exchange system for the detection of pathogens in air. Microfluidic cassettes could be designed using a capillary plug-in so that multiple tests can be performed on the galactic by simply changing the cassette. This way the galactic could be made ready to perform even more tasks needed upon the arrival at Mars such as performing preliminary scans for extra-terrestrial life, or detecting the presence of essential nutrients or contaminants to realize Martian crop growth. Figure 4 shows an illustration of this futuristic sensing device indicating some possibilities for multiplex sensing. The envisaged compactness of such a system, combined with the vast arsenal of possible types of analyses that could be conducted by such a device, could greatly reduce the amount of space needed aboard. Moreover, analysis time, and thus workload (an ever persisting pressure on the crew), could be greatly reduced due to the multiplex nature of the "galactic" combined with the one-step only approaches mentioned. Keeping tabs on the concentration of multiple biomarkers in-flight might also improve our understanding of the effects of space travel on several biological phenomena and be beneficial for future missions. Thus such a system potentially provides interwoven benefits for the actual crew travelling to the faraway destination, and for those who will follow. Evidently, this ideal galactic sensing system remains fictional and may seem farfetched. However, technological advancement in the biotechnology sector is moving incredibly fast and the foundations for such a device have already been laid. This means that it might be more a question of perseverance and the will to dream and dare to turn this idea into a reality than anything else.



**Figure 4.** The galactic SBD. This figure shows a futuristic SBD that incorporates novel sensing technology with synthetic REs directly into the smartphone as well as using an add-on device equipped with interchangeable microfluidic cassettes. Possible uses and basic functioning mechanisms of these sensors are indicated.

**Funding:** This project has received funding from the European Union's Horizon 2020 research and innovation programme under the Marie Sklodowska-Curie grant agreement No. 720325.

**Conflicts of Interest:** The authors declare no conflict of interest.

## References

1. Hawkey, A. Physiological and biomechanical considerations for a human Mars mission. *J. Br. Interplanet. Soc.* **2005**, *58*, 117–130.
2. Ade, C.J.; Broxterman, R.M.; Moore, A.D.; Barstow, T.J. Decreases in maximal oxygen uptake following long-duration spaceflight: Role of convective and diffusive $O_2$ transport mechanisms. *J. Appl. Physiol.* **2017**, *122*, 968–975. [CrossRef] [PubMed]
3. Drinnan, N.R.; de Juniac, A.B. The effects of microgravity on the urological system: A review. *J. Clin. Urol.* **2013**, *6*, 391–394. [CrossRef]
4. Human Research Program Integrated Research Plan HRP 47065. Available online: https://www.nasa.gov/pdf/651214main_hrp47065_revc_IRP.pdf (accessed on 28 June 2011).
5. Pierson, D.L. Microbial contamination of spacecraft. *Graviatational Space Biol. Bull.* **2001**, *14*, 1–6.
6. Horneck, G.; Klaus, D.M.; Mancinelli, R.L. Space Microbiology. *Microbiol. Mol. Biol. Rev.* **2010**, *74*, 121–156. [CrossRef] [PubMed]

7. Taylor, P.W. Impact of space flight on bacterial virulence and antibiotic susceptibility. *Infect. Drug Resist.* **2015**, *8*, 249–262. [CrossRef] [PubMed]
8. Nickerson, C.A.; Ott, C.M.; Wilson, J.W.; Ramamurthy, R.; Pierson, D.L. Microbial Responses to Microgravity and Other Low-Shear Environments. *Microbiol. Mol. Biol. Rev.* **2004**, *68*, 345–361. [CrossRef] [PubMed]
9. Mehta, S.K.; Laudenslager, M.L.; Stowe, R.P.; Crucian, B.E.; Feiveson, A.H.; Sams, C.F.; Pierson, D.L. Latent virus reactivation in astronauts on the international space station. *Npj Microgr.* **2017**, *3*, 11. [CrossRef] [PubMed]
10. Mehta, S.K.; Crucian, B.E.; Stowe, R.P.; Simpson, R.J.; Ott, C.M.; Sams, C.F.; Pierson, D.L. Reactivation of latent viruses is associated with increased plasma cytokines in astronauts. *Cytokine* **2013**, *61*, 205–209. [CrossRef] [PubMed]
11. Yamaguchi, N.; Roberts, M.; Castro, S.; Oubre, C.; Makimura, K.; Leys, N.; Grohmann, E.; Sugita, T.; Ichijo, T.; Nasu, M. Microbial Monitoring of Crewed Habitats in Space—Current Status and Future Perspectives. *Microbes Environ.* **2014**, *29*, 250–260. [CrossRef] [PubMed]
12. Boguraev, A.-S.; Christensen, H.C.; Bonneau, A.R.; Pezza, J.A.; Nichols, N.M.; Giraldez, A.J.; Gray, M.M.; Wagner, B.M.; Aken, J.T.; Foley, K.D.; et al. Successful amplification of DNA aboard the International Space Station. *Npj Microgr.* **2017**, *3*, 26. [CrossRef] [PubMed]
13. Castro-Wallace, S.L.; Chiu, C.Y.; John, K.K.; Stahl, S.E.; Rubins, K.H.; McIntyre, A.B.R.; Dworkin, J.P.; Lupisella, M.L.; Smith, D.J.; Botkin, D.J.; et al. Nanopore DNA Sequencing and Genome Assembly on the International Space Station. *Sci. Rep.* **2017**, *7*, 1–12. [CrossRef] [PubMed]
14. Morris, H.C.; Damon, M.; Maule, J.; Monaco, L.A.; Wainwright, N. Rapid Culture-Independent Microbial Analysis Aboard the International Space Station (ISS) Stage Two: Quantifying Three Microbial Biomarkers. *Astrobiology* **2012**, *12*, 830–840. [CrossRef] [PubMed]
15. Mora, M.F.; Greer, F.; Stockton, A.M.; Bryant, S.; Willis, P.A. Toward Total Automation of Microfluidics for Extraterrestrial in Situ Analysis. *Anal. Chem.* **2011**, *83*, 8636. [CrossRef] [PubMed]
16. Parro, V.; de Diego-Castilla, G.; Rodríguez-Manfredi, J.A.; Rivas, L.A.; Blanco-López, Y.; Sebastián, E.; Romeral, J.; Compostizo, C.; Herrero, P.L.; García-Marín, A.; et al. SOLID3: A Multiplex Antibody Microarray-Based Optical Sensor Instrument for In Situ Life Detection in Planetary Exploration. *Astrobiology* **2011**, *11*, 15–28. [CrossRef] [PubMed]
17. Carr, C.E.; Mojarro, A.; Hachey, J.; Saboda, K.; Tani, J.; Bhattaru, S.A.; Smith, A.; Pontefract, A.; Zuber, M.T.; Doebler, R.; et al. Towards in situ sequencing for life detection. In Proceedings of the 2017 IEEE Aerospace Conference, Big Sky, MT, USA, 4–11 March 2017. [CrossRef]
18. Pol, R.; Céspedes, F.; Gabriel, D.; Baeza, M. Microfluidic lab-on-a-chip platforms for environmental monitoring. *TrAC Trends Anal. Chem.* **2017**, *95*, 62–68. [CrossRef]
19. Rateni, G.; Dario, P.; Cavallo, F. Smartphone-based food diagnostic technologies: A review. *Sensors (Switzerland)* **2017**, *17*, 1453. [CrossRef] [PubMed]
20. Yoon, J.Y.; Kim, B. Lab-on-a-chip pathogen sensors for food safety. *Sensors (Switzerland)* **2012**, *12*, 10713–10741. [CrossRef] [PubMed]
21. Maule, J.; Wainwright, N.; Steele, A.; Monaco, L.; Morris, H.; Gunter, D.; Flroes, G.; Effinger, M.; Damon, M.; Wells, M.; et al. LOCAD-PTS: Operation of a new system for microbial monitoring aboard the International Space Station (ISS). In Proceedings of the AIAA SPACE 2008 Conference & Exposition, San Diego, CA, USA, 9–11 September 2008; pp. 1–9. [CrossRef]
22. Van Houdt, R.; Mijnendonckx, K.; Leys, N. Microbial contamination monitoring and control during human space missions. *Planet. Space Sci.* **2012**, *60*, 115–120. [CrossRef]
23. Long, K.D.; Woodburn, E.V.; Le, H.M.; Shah, U.K.; Lumetta, S.S.; Cunningham, B.T. Multimode smartphone biosensing: The transmission, reflection, and intensity spectral (TRI)-analyzer. *Lab Chip* **2017**, *17*, 3246–3257. [CrossRef] [PubMed]
24. Ludwig, S.K.J.; Tokarski, C.; Lang, S.N.; Van Ginkel, L.A.; Zhu, H.; Ozcan, A.; Nielen, M.W.F. Calling biomarkers in milk using a protein microarray on your smartphone. *PLoS ONE* **2015**, *10*, e134360. [CrossRef] [PubMed]
25. Laksanasopin, T.; Guo, T.W.; Nayak, S.; Sridhara, A.A.; Xie, S.; Olowookere, O.O.; Cadinu, P.; Meng, F.; Chee, N.H.; Kim, J.; et al. A smartphone dongle for diagnosis of infectious diseases at the point of care. *Sci. Transl. Med.* **2015**, *7*, 273re1. [CrossRef] [PubMed]

26. Priye, A.; Bird, S.W.; Light, Y.K.; Ball, C.S.; Negrete, O.A.; Meagher, R.J. A smartphone-based diagnostic platform for rapid detection of Zika, chikungunya, and dengue viruses. *Sci. Rep.* **2017**, *7*, 1–11. [CrossRef] [PubMed]
27. Maule, J.; Fogel, M.; Steele, A.; Wainwright, N.; Pierson, D.L.; McKay, D.S. Antibody binding in altered gravity: Implications for immunosorbent assay during space flight. *J. Gravit. Physiol.* **2003**, *10*, 47–55. [PubMed]
28. Korth, D.W. Exercise Countermeasure Hardware Evolution on ISS: The First Decade. *Aerosp. Med. Hum. Perform.* **2015**, *86*, 7–13. [CrossRef] [PubMed]
29. Boyd, A.; Fortunato, A.; Wolff, M.; Oliveira, D.M. mobiPV: A new, wearable real-time collaboration software for Astronauts using mobile computing solutions. In Proceedings of the SpaceOps 2016 Conference, Daejeon, Korea, 16–20 May 2016; pp. 1–10. [CrossRef]
30. Li, Z.; Nambiar, S.; Zheng, W.; Yeow, J.T.W. PDMS/single-walled carbon nanotube composite for proton radiation shielding in space applications. *Mater. Lett.* **2013**, *108*, 79–83. [CrossRef]
31. Li, Z.; Chen, S.; Nambiar, S.; Sun, Y.; Zhang, M.; Zheng, W.; Yeow, J.T.W. PMMA/MWCNT nanocomposite for proton radiation shielding applications. *Nanotechnology* **2016**, *27*, 1–10. [CrossRef] [PubMed]
32. Atxaga, G.; Marcos, J.; Jurado, M.; Carapelle, A.; Orava, R. Radiation Shielding of Composite Space Enclosures. Available online: https://orbi.uliege.be/bitstream/2268/132394/1/IAC-12%2CC2%2C6%2C6%2Cx13735.pdf (accessed on 1 June 2012).
33. de Diego-Castilla, G.; Cruz-Gil, P.; Mateo-Martí, E.; Fernández-Calvo, P.; Rivas, L.A.; Parro, V. Assessing Antibody Microarrays for Space Missions: Effect of Long-Term Storage, Gamma Radiation, and Temperature Shifts on Printed and Fluorescently Labeled Antibodies. *Astrobiology* **2011**, *11*, 759–773. [CrossRef] [PubMed]
34. Ruhl, S.; Berlenbach, P.; Langenfelder, S.; Hörl, D.; Lehn, N.; Hiller, K.A.; Schmalz, G.; Durchschlag, H. Integrity of proteins in human saliva after sterilization by gamma irradiation. *Appl. Environ. Microbiol.* **2011**, *77*, 749–755. [CrossRef] [PubMed]
35. Coussot, G.; Moreau, T.; Faye, C.; Vigier, F.; Baqué, M.; Le Postollec, A.; Incerti, S.; Dobrijevic, M.; Vandenabeele-Trambouze, O. Biochip-based instruments development for space exploration: Influence of the antibody immobilization process on the biochip resistance to freeze-drying, temperature shifts and cosmic radiations. *Int. J. Astrobiol.* **2016**, *16*, 190–199. [CrossRef]
36. Baqué, M.; Le Postollec, A.; Ravelet, C.; Peyrin, E.; Coussot, G.; Desvignes, I.; Incerti, S.; Moretto, P.; Dobrijevic, M.; Vandenabeele-Trambouze, O. Investigation of Low-Energy Proton Effects on Aptamer Performance for Astrobiological Applications. *Astrobiology* **2011**, *11*, 207–211. [CrossRef] [PubMed]
37. Zeitlin, C.; Hassler, D.; Cucinotta, F.A.; Ehresmann, B.; Wimmer-Schweingruber, R.F.; Brinza, D.E.; Kang, S. Measurements of Energetic Particle Radiatino in Transit to Mars on the Mars Science Laboratory. *Am. Assoc. Adv. Sci.* **2013**. [CrossRef]
38. Carr, C.E.; Rowedder, H.; Vafadari, C.; Lui, C.S.; Cascio, E.; Zuber, M.T.; Ruvkun, G. Radiation Resistance of Biological Reagents for In Situ Life Detection. *Astrobiology* **2013**, *13*, 68–78. [CrossRef] [PubMed]
39. Choo, K.-Y.; Ling, H.-C.; Lo, Y.-C.; Yap, Z.-H.; Pua, J.-S.; Phan, R.C.-W.; Goh, V.-T. Android based self-diagnostic electrocardiogram system for mobile healthcare. *Technol. Heal. Care* **2015**, *23*, 435–442. [CrossRef] [PubMed]
40. Dehkordi, P.; Garde, A.; Karlen, W.; Petersen, C.L.; Wensley, D.; Dumont, G.A.; Mark Ansermino, J. Evaluation of cardiac modulation in children in response to apnea/hypopnea using the Phone Oximeter$^{TM}$. *Physiol. Meas.* **2016**, *37*, 187–202. [CrossRef] [PubMed]
41. Kang, S.; Kwon, S.; Yoo, C.; Seo, S.; Park, K.; Song, J.; Lee, Y. Sinabro: Opportunistic and unobtrusive mobile electrocardiogram monitoring system. *Assoc. Comput. Mach.* **2014**, *15*, 1–6. [CrossRef]
42. Kennedy, A.P.; Epstein, D.H.; Jobes, M.L.; Agage, D.; Tyburski, M.; Phillips, K.A.; Ali, A.A.; Bari, R.; Hossain, S.M.; Hovsepian, K.; et al. Continuous in-the-field measurement of heart rate: Correlates of drug use, craving, stress, and mood in polydrug users. *Drug Alcohol Depend.* **2015**, *151*, 159–166. [CrossRef] [PubMed]
43. Muhlestein, J.B.; Le, V.; Albert, D.; Moreno, F.L.; Anderson, J.L.; Yanowitz, F.; Vranian, R.B.; Barsness, G.W.; Bethea, C.F.; Severance, H.W.; et al. Smartphone ECG for evaluation of STEMI: Results of the ST LEUIS Pilot Study. *J. Electrocardiol.* **2015**, *48*, 249–259. [CrossRef] [PubMed]
44. Pierleoni, P.; Pernini, L.; Belli, A.; Palma, L. An android-based heart monitoring system for the elderly and for patients with heart disease. *Int. J. Telemed. Appl.* **2014**, *2014*, 1–11. [CrossRef] [PubMed]

45. Rachim, V.P.; Chung, W.-Y. Wearable Noncontact Armband for Mobile ECG Monitoring System. *IEEE Trans. Biomed. Circuits Syst.* **2016**, *10*, 1112–1118. [CrossRef] [PubMed]
46. Sinddhuja, A.K.; Mounika, M.; Dass, P. A heartbeat and temperature measuring system for remote health monitoring using gsm technology. *Int. J. Pharm. Technol.* **2016**, *8*, 20847–20855. [CrossRef]
47. Agarwal, T.; Bandivadekar, P.; Satpathy, G.; Sharma, N.; Titiyal, J.S. Detection of fungal hyphae using smartphone and pocket magnifier: Going cellular. *Cornea* **2015**, *34*, 355–357. [CrossRef] [PubMed]
48. Petruzzi, L.; Corbo, M.R.; Sinigaglia, M.; Bevilacqua, A. Microbial Spoilage of Foods: Fundamentals. *Microbiol. Qual. Food Foodborne Spoilers* **2016**, 1–21. [CrossRef]
49. Escrivá, L.; Font, G.; Manyes, L. In vivo toxicity studies of fusarium mycotoxins in the last decade: A review. *Food Chem. Toxicol.* **2015**, *78*, 185–206. [CrossRef] [PubMed]
50. Wong, J.X.H.; Liu, F.S.F.; Yu, H.-Z. Mobile app-based quantitative scanometric analysis. *Anal. Chem.* **2014**, *86*, 11966–11971. [CrossRef] [PubMed]
51. Alberdi, A.; Aztiria, A.; Basarab, A. Towards an automatic early stress recognition system for office environments based on multimodal measurements: A review. *J. Biomed. Inform.* **2016**, *59*, 49–75. [CrossRef] [PubMed]
52. Zangheri, M.; Cevenini, L.; Anfossi, L.; Baggiani, C.; Simoni, P.; Di Nardo, F.; Roda, A. A simple and compact smartphone accessory for quantitative chemiluminescence-based lateral flow immunoassay for salivary cortisol detection. *Biosens. Bioelectron.* **2015**, *64*, 63–68. [CrossRef] [PubMed]
53. Gaggioli, A.; Pioggia, G.; Tartarisco, G.; Baldus, G.; Ferro, M.; Cipresso, P.; Serino, S.; Popleteev, A.; Gabrielli, S.; Maimone, R.; et al. A system for automatic detection of momentary stress in naturalistic settings. *Annu. Rev. CyberTherapy Telemed.* **2012**, *10*, 182–186. [CrossRef]
54. Muaremi, A.; Arnrich, B.; Tröster, G. Towards Measuring Stress with Smartphones and Wearable Devices During Workday and Sleep. *Bionanoscience* **2013**, *3*, 172–183. [CrossRef] [PubMed]
55. Kizakevich, P.N.; Hubal, R.; Brown, J.; Lyden, J.; Spira, J.; Eckhoff, R.; Zhang, Y.; Bryant, S.; Munoz, G. PHIT for duty, a mobile approach for psychological health intervention. *Annu. Rev. CyberTherapy Telemed.* **2012**, *10*, 268–272. [CrossRef]
56. Gregoski, M.J.; Vertegel, A.; Shaporev, A.; Treiber, F.A. Tension tamer: Delivering meditation with objective heart rate acquisition for adherence monitoring using a smart phone platform. *J. Altern. Complement. Med.* **2013**, *19*, 17–19. [CrossRef] [PubMed]
57. Doule, O.; Poulet, L. Ergonomy of Head Mounted Displays Inside Analog. In Proceedings of the AIAA SPACE 2014 Conference and Exposition, San Diego, CA, USA, 4–7 August 2014; pp. 1–26. [CrossRef]
58. Chintamani, K.; Lierde, B.V.; Maloney, S.; Kiernan, P. Wearable crew support technology on the International Space Station: The mobile Procedure Viewer (mobiPV). *HFES Eur.* **2014**, *4959*, 1–11.
59. Benjamin, C.L.; Stowe, R.P.; St. John, L.; Sams, C.F.; Mehta, S.K.; Crucian, B.E.; Pierson, D.L.; Komanduri, K.V. Decreases in thymopoiesis of astronauts returning from space flight. *JCI Insight* **2016**, *1*, 1–8. [CrossRef] [PubMed]
60. Geiger, A.M.; Pitts, K.P.; Feldkamp, J.; Kirschbaum, C.; Wolf, J.M. Cortisol-dependent stress effects on cell distribution in healthy individuals and individuals suffering from chronic adrenal insufficiency. *Brain. Behav. Immun.* **2015**, *50*, 241–248. [CrossRef] [PubMed]
61. Zhu, H.; Mavandadi, S.; Coskun, A.F.; Yaglidere, O.; Ozcan, A. Optofluidic fluorescent imaging cytometry on a cell phone. *Anal. Chem.* **2011**, *83*, 6641–6647. [CrossRef] [PubMed]
62. Wang, S.; Tasoglu, S.; Chen, P.Z.; Chen, M.; Akbas, R.; Wach, S.; Ozdemir, C.I.; Gurkan, U.A.; Giguel, F.F.; Kuritzkes, D.R.; et al. Micro-a-fluidics ELISA for rapid CD4 cell count at the point-of-care. *Sci. Rep.* **2014**, *4*, 3796. [CrossRef] [PubMed]
63. Smith, S.M.; McCoy, T.; Gazda, D.; Morgan, J.L.L.; Heer, M.; Zwart, S.R. Space flight calcium: Implications for astronaut health, spacecraft operations, and Earth. *Nutrients* **2012**, *4*, 2047–2068. [CrossRef] [PubMed]
64. Manuscript, A.; Blood, W.; Count, C. Vitamin D and the Immune System. *J. Investig. Med.* **2009**, *49*, 1841–1850. [CrossRef]
65. Lee, S.; Oncescu, V.; Mancuso, M.; Mehta, S.; Erickson, D. A smartphone platform for the quantification of vitamin D levels. *Lab Chip Miniaturisation Chem. Biol.* **2014**, *14*, 1437–1442. [CrossRef] [PubMed]
66. Hong, S.C. 3D printable retinal imaging adapter for smartphones could go global. *Graefe's Arch. Clin. Exp. Ophthalmol.* **2015**, *253*, 1831–1833. [CrossRef] [PubMed]

67. Kong, J.E.; Koh, J.; Lin, J.; Di Carlo, D. Research highlights: Translating chips. *Lab Chip* **2015**, *15*, 1984–1988. [CrossRef] [PubMed]
68. Cucinotta, F.A.; Schimmerling, W.; Wilson, J.W.; Peterson, L.E.; Badhwar, G.D.; Saganti, P.B.; Dicello, J.F. Space radiation cancer risks and uncertainties for Mars missions. *Radiat. Res.* **2001**, *156*, 682–688. [CrossRef]
69. Fink, C.A.; Bates, M.N.; Fink, C.A.; Bates, M.N. Melanoma and Ionizing Radiation: Is There a Causal Relationship? *Radiat. Res.* **2005**, *164*, 701–710. [CrossRef] [PubMed]
70. Kim, M.H.Y.; George, K.A.; Cucinotta, F.A. Evaluation of skin cancer risk for lunar and Mars missions. *Adv. Space Res.* **2006**, *37*, 1798–1803. [CrossRef]
71. Ramlakhan, K.; Shang, Y. A mobile automated skin lesion classification system. In Proceedings of the International Conference on Tools with Artificial Intelligence (ICTAI), Boca Raton, FL, USA, 7–9 November 2011; Volume 23, pp. 138–141. [CrossRef]
72. Esteva, A.; Kuprel, B.; Novoa, R.A.; Ko, J.; Swetter, S.M.; Blau, H.M.; Thrun, S. Dermatologist-level classification of skin cancer with deep neural networks. *Nature* **2017**, *542*, 115–118. [CrossRef] [PubMed]
73. Zouridakis, G.; Wadhawan, T.; Situ, N.; Hu, R.; Yuan, X.; Lancaster, K.; Queen, C.M. Melanoma and other skin lesion detection using smart handheld devices. *Methods Mol. Biol.* **2015**, *1256*, 459–496. [CrossRef] [PubMed]
74. Wadhawan, T.; Situ, N.; Lancaster, K.; Yuan, X.; Zouridakis, G. SkinScan©: A portable library for melanoma detection on handheld devices. In Proceedings of the 2011 IEEE International Symposium on Biomedical Imaging: From Nano to Macro, Chicago, IL, USA, 30 Match–2 April 2011; Volume 11, pp. 133–136. [CrossRef]
75. Oskouei, S.S.L.; Golestani, H.; Hashemi, M.; Ghiasi, S. CNNdroid: GPU-Accelerated Execution of Trained Deep Convolutional Neural Networks on Android. *AC. ISBM* **2015**, 1201–1205. [CrossRef]
76. Gregg, D.; Ionica, M.H. The Movidius Myriad Archetecture's Potential for Scientific Computing. *IEEE Micro* **2009**, 6–14. [CrossRef]
77. Rallapalli, S.; Qiu, H.; Bency, A.J.; Karthikeyan, S.; Govindan, R.; Urgaonkar, R. Are Very Deep Neural Networks Feasible on Mobile Devices? In *Usc Conference Proceedings*; USC University of Southern California: Oakland, CA, USA, 2015.
78. Jahan-Tigh, R.R.; Chinn, G.M.; Rapini, R.P. A comparative study between smartphone-based microscopy and conventional light microscopy in 1021 dermatopathology specimens. *Arch. Pathol. Lab. Med.* **2016**, *140*, 86–90. [CrossRef] [PubMed]
79. Das, A.; Swedish, T.; Wahi, A.; Moufarrej, M.; Noland, M.; Gurry, T.; Aranda-Michel, E.; Aksel, D.; Wagh, S.; Sadashivaiah, V.; et al. Mobile phone based mini-spectrometer for rapid screening of skin cancer. *Proc. SPIE* **2015**, *9482*, 1–5. [CrossRef]
80. Wang, S.; Zhao, X.; Khimji, I.; Akbas, R.; Qiu, W.; Edwards, D.; Cramer, D.W.; Ye, B.; Demirci, U. Integration of cell phone imaging with microchip ELISA to detect ovarian cancer HE4 biomarker in urine at the point-of-care. *Lab Chip* **2011**, *11*, 3411–3418. [CrossRef] [PubMed]
81. Wang, S.; Akbas, R.; Demirci, U. Microchip ELISA coupled with cell phone to detect ovarian cancer HE4 biomarker in urine. *Methods Mol. Biol.* **2015**, *1256*, 111–121. [CrossRef] [PubMed]
82. Adel Ahmed, H.; Azzazy, H.M.E. Power-free chip enzyme immunoassay for detection of prostate specific antigen (PSA) in serum. *Biosens. Bioelectron.* **2013**, *49*, 478–484. [CrossRef] [PubMed]
83. Long, K.D.; Yu, H.; Cunningham, B.T. Smartphone instrument for portable enzymelinked immunosorbent assays. *Biomed. Opt. Express* **2014**, *5*, 3792–3806. [CrossRef] [PubMed]
84. Aslan, M.K.; Kulah, H. Android based portable cell counting system for label free quantification of dep manipulated cancer cells. In Proceedings of the 19th International Conference Solid-State Sensors, Kaohsiung, Taiwan, 19–22 June 2017; Volume 17, pp. 556–559. [CrossRef]
85. Archibong, E.; Konnaiyan, K.R.; Kaplan, H.; Pyayt, A. A mobile phone-based approach to detection of hemolysis. *Biosens. Bioelectron.* **2017**, *88*, 204–209. [CrossRef] [PubMed]
86. Felton, E.J.; Velasquez, A.; Lu, S.; Murphy, R.O.; Elkhal, A.; Mazor, O.; Gorelik, P.; Sharda, A.; Ghiran, I.C. Detection and quantification of subtle changes in red blood cell density using a cell phone. *Lab Chip* **2016**, *16*, 3286–3295. [CrossRef] [PubMed]
87. Lu, L.; Gu, C.; Li, C.; Lin, J. Doppler radar noncontact vital sign monitoring. *Neural Comput. Neural Devices Neural Prosthes.* **2014**, 41–62. [CrossRef]
88. Reyes, B.A.; Reljin, N.; Kong, Y.; Nam, Y.; Ha, S.; Chon, K.H. Employing an incentive spirometer to calibrate tidal volumes estimated from a smartphone camera. *Sensors (Switzerland)* **2016**, *16*, 397. [CrossRef] [PubMed]

89. Yang, K.; Wu, J.; Peretz-Soroka, H.; Zhu, L.; Li, Z.; Sang, Y.; Hipolito, J.; Zhang, M.; Santos, S.; Hillier, C.; et al. Mkit: A cell migration assay based on microfluidic device and smartphone. *Biosens. Bioelectron.* **2018**, *99*, 259–267. [CrossRef] [PubMed]
90. Bhattacharjee, M.; Nemade, H.B.; Bandyopadhyay, D. Nano-enabled paper humidity sensor for mobile based point-of-care lung function monitoring. *Biosens. Bioelectron.* **2017**, *94*, 544–551. [CrossRef] [PubMed]
91. Thompson, B.L.; Ouyang, Y.; Li, J.; Krauss, S.T.; Shukla, N.; Kessel, B.G.; Haverstick, D.M.; Garner, G.T.; Landers, J.P. Protein quantitation from whole blood on polyester-toner laser-printed microfluidic discs with cell phone image analysis. In Proceedings of the 18th International Conference Miniaturized Systems for Chemistry & Life Science MicroTAS, San Antonio, TX, USA, 26–30 October 2014; pp. 1434–1436.
92. Harder, R.; Diedrich, A.; Whitfield, J.S.; Buchowski, M.S.; Pietsch, J.B.; Baudenbacher, F.J. Smart Multi-Frequency Bioelectrical Impedance Spectrometer for BIA and BIVA Applications. *IEEE Trans. Biomed. Circuits Syst.* **2016**, *10*, 912–919. [CrossRef] [PubMed]
93. Guo, T.; Patnaik, R.; Kuhlmann, K.; Rai, A.J.; Sia, S.K. Smartphone dongle for simultaneous measurement of hemoglobin concentration and detection of HIV antibodies. *Lab Chip* **2015**, *15*, 3514–3520. [CrossRef] [PubMed]
94. Karlsen, H.; Dong, T. Smartphone-Based Rapid Screening of Urinary Biomarkers. *IEEE Trans. Biomed. Circuits Syst.* **2017**, *11*, 455–463. [CrossRef] [PubMed]
95. Dweik, B.; Argun, A.; Tempelman, L.; Mackenzie, N.; Forchione, J.; Hamdan, M. Portable Sensor for Rapid Measurement of Trace Toxic Metals in Water. *Techport NASA* **2015**, 1–4.
96. Sun, H.; Li, W.; Dong, Z.-Z.; Hu, C.; Leung, C.-H.; Ma, D.-L.; Ren, K. A suspending-droplet mode paper-based microfluidic platform for low-cost, rapid, and convenient detection of lead(II) ions in liquid solution. *Biosens. Bioelectron.* **2018**, *99*, 361–367. [CrossRef] [PubMed]
97. Lin, J.-H.; Tseng, W.-L. Ultrasensitive detection of target analyte-induced aggregation of gold nanoparticles using laser-induced nanoparticle Rayleigh scattering. *Talanta* **2015**, *132*, 44–51. [CrossRef] [PubMed]
98. Xiao, W.; Xiao, M.; Fu, Q.; Yu, S.; Shen, H.; Bian, H.; Tang, Y. A portable smart-phone readout device for the detection of mercury contamination based on an aptamer-assay nanosensor. *Sensors (Switzerland)* **2016**, *16*, 1871. [CrossRef] [PubMed]
99. Chen, G.-H.; Chen, W.-Y.; Yen, Y.-C.; Wang, C.-W.; Chang, H.-T.; Chen, C.-F. Detection of mercury(II) ions using colorimetric gold nanoparticles on paper-based analytical devices. *Anal. Chem.* **2014**, *86*, 6843–6849. [CrossRef] [PubMed]
100. Wang, L.; Li, B.; Xu, F.; Shi, X.; Feng, D.; Wei, D.; Li, Y.; Feng, Y.; Wang, Y.; Jia, D.; et al. High-yield synthesis of strong photoluminescent N-doped carbon nanodots derived from hydrosoluble chitosan for mercury ion sensing via smartphone APP. *Biosens. Bioelectron.* **2016**, *79*, 1–8. [CrossRef] [PubMed]
101. Levin, S.; Krishnan, S.; Rajkumar, S.; Halery, N.; Balkunde, P. Monitoring of fluoride in water samples using a smartphone. *Sci. Total Environ.* **2016**, *551–552*, 101–107. [CrossRef] [PubMed]
102. Wang, H.; Li, Y.-J.; Wei, J.-F.; Xu, J.-R.; Wang, Y.-H.; Zheng, G.-X. Paper-based three-dimensional microfluidic device for monitoring of heavy metals with a camera cell phone. *Anal. Bioanal. Chem.* **2014**, *406*, 2799–2807. [CrossRef] [PubMed]
103. Wang, X.; Gartia, M.R.; Jiang, J.; Chang, T.-W.; Qian, J.; Liu, Y.; Liu, X.; Liu, G.L. Audio jack based miniaturized mobile phone electrochemical sensing platform. *Sens. Actuators B Chem.* **2015**, *209*, 677–685. [CrossRef]
104. Wang, Y.; Li, Y.; Bao, X.; Han, J.; Xia, J.; Tian, X.; Ni, L. A smartphone-based colorimetric reader coupled with a remote server for rapid on-site catechols analysis. *Talanta* **2016**, *160*, 194–204. [CrossRef] [PubMed]
105. Sicard, C.; Glen, C.; Aubie, B.; Wallace, D.; Jahanshahi-Anbuhi, S.; Pennings, K.; Daigger, G.T.; Pelton, R.; Brennan, J.D.; Filipe, C.D.M. Tools for water quality monitoring and mapping using paper-based sensors and cell phones. *Water Res.* **2015**, *70*, 360–369. [CrossRef] [PubMed]
106. Ramanathan, N.; Lukac, M.; Ahmed, T.; Kar, A.; Praveen, P.S.; Honles, T.; Leong, I.; Rehman, I.H.; Schauer, J.J.; Ramanathan, V. A cellphone based system for large-scale monitoring of black carbon. *Atmos. Environ.* **2011**, *45*, 4481–4487. [CrossRef]
107. Wu, Y.-C.; Shiledar, A.; Li, Y.-C.; Wong, J.; Feng, S.; Chen, X.; Chen, C.; Jin, K.; Janamian, S.; Yang, Z.; et al. Air quality monitoring using mobile microscopy and machine learning. *Light Sci. Appl.* **2017**, *6*, e17046. [CrossRef] [PubMed]

108. Mirowsky, J.; Hickey, C.; Horton, L.; Blaustein, M.; Galdanes, K.; Peltier, R.E.; Chillrud, S.; Chen, L.C.; Ross, J.; Nadas, A.; et al. The effect of particle size, location and season on the toxicity of urban and rural particulate matter. *Inhal. Toxicol.* **2013**, *25*, 747–757. [CrossRef] [PubMed]
109. Chen, C.; Tsow, F.; Campbell, K.D.; Iglesias, R.; Forzani, E.; Tao, N. A wireless hybrid chemical sensor for detection of environmental volatile organic compounds. *IEEE Sens. J.* **2013**, *13*, 1748–1755. [CrossRef] [PubMed]
110. Shen, F.; Tan, M.; Wang, Z.; Yao, M.; Xu, Z.; Wu, Y.; Wang, J.; Guo, X.; Zhu, T. Integrating silicon nanowire field effect transistor, microfluidics and air sampling techniques for real-time monitoring biological aerosols. *Environ. Sci. Technol.* **2011**, *45*, 7473–7480. [CrossRef] [PubMed]
111. Mermel, L.A. Infection prevention and control during prolonged human space travel. *Clin. Infect. Dis.* **2013**, *56*, 123–130. [CrossRef] [PubMed]
112. Forbes, T.P.; Staymates, M. Enhanced aerodynamic reach of vapor and aerosol sampling for real-time mass spectrometric detection using Venturi-assisted entrainment and ionization. *Anal. Chim. Acta* **2017**, *957*, 20–28. [CrossRef] [PubMed]
113. Das, A.J.; Wahi, A.; Kothari, I.; Raskar, R. Ultra-portable, wireless smartphone spectrometer for rapid, non-destructive testing of fruit ripeness. *Sci. Rep.* **2016**, *6*, 1–8. [CrossRef] [PubMed]
114. Intaravanne, Y.; Sumriddetchkajorn, S.; Nukeaw, J. Cell phone-based two-dimensional spectral analysis for banana ripeness estimation. *Sens. Actuators B Chem.* **2012**, *168*, 390–394. [CrossRef]
115. Yu, X.; Lu, Q.; Gao, H.; Ding, H. Development of a handheld spectrometer based on a linear variable filter and a complementary metal-oxide-semiconductor detector for measuring the internal quality of fruit. *J. Near Infrared Spectrosc.* **2016**, *24*, 69–76. [CrossRef]
116. Bueno, L.; Meloni, G.N.; Reddy, S.M.; Paixão, T.R.L.C. Use of plastic-based analytical device, smartphone and chemometric tools to discriminate amines. *RSC Adv.* **2015**, *5*, 20148–20154. [CrossRef]
117. Zeinhom, M.M.A.; Wang, Y.; Song, Y.; Zhu, M.-J.; Lin, Y.; Du, D. A portable smart-phone device for rapid and sensitive detection of *E. coli* O157:H7 in Yoghurt and Egg. *Biosens. Bioelectron.* **2018**, *99*, 479–485. [CrossRef] [PubMed]
118. Borysiak, M.D.; Kimura, K.W.; Posner, J.D. NAIL: Nucleic Acid detection using Isotachophoresis and Loop-mediated isothermal amplification. *Lab Chip* **2015**, *15*, 1697–1707. [CrossRef] [PubMed]
119. Zhu, H.; Sikora, U.; Ozcan, A. Quantum dot enabled detection of *Escherichia coli* using a cell-phone. *Analyst* **2012**, *137*, 2541. [CrossRef] [PubMed]
120. Liang, P.-S.; Park, T.S.; Yoon, J.-Y. Rapid and reagentless detection of microbial contamination within meat utilizing a smartphone-based biosensor. *Sci. Rep.* **2014**, *4*, 5953. [CrossRef] [PubMed]
121. Park, T.S.; Li, W.; McCracken, K.E.; Yoon, J.-Y. Smartphone quantifies Salmonella from paper microfluidics. *Lab Chip* **2013**, *13*, 4832–4840. [CrossRef] [PubMed]
122. Rajendran, V.K.; Bakthavathsalam, P.; Jaffar Ali, B.M. Smartphone based bacterial detection using biofunctionalized fluorescent nanoparticles. *Microchim. Acta* **2014**, *181*, 1815–1821. [CrossRef]
123. Dallet, C.; Kareem, S.; Kale, I. Real time blood image processing application for malaria diagnosis using mobile phones. In Proceedings of the IEEE International Symposium on Circuits & Systems (ISCAS), Melbourne, Australia, 1–5 June 2014; pp. 2405–2408. [CrossRef]
124. Lillehoj, P.B.; Huang, M.-C.; Ho, C.-M. A handheld, cell phone-based electrochemical biodetector. In Proceedings of the 26th IEEE International Conference on Micro Electro Mechanical Systems, Taipei, Taiwan, 20–24 January 2013; pp. 53–56. [CrossRef]
125. Stemple, C.C.; Angus, S.V.; Park, T.S.; Yoon, J.-Y. Smartphone-Based Optofluidic Lab-on-a-Chip for Detecting Pathogens from Blood. *J. Lab. Autom.* **2014**, *19*, 35–41. [CrossRef] [PubMed]
126. Mauk, M.G.; Liu, C.; Sadik, M.; Bau, H.H. Microfluidic devices for nucleic acid (NA) isolation, isothermal NA amplification, and real-time detection. *Methods Mol. Biol.* **2015**, *1256*, 15–40. [CrossRef] [PubMed]
127. Sandoz, P.A.; Coskun, A.F.; Chung, A.J.; Weaver, W.M.; Adeyiga, O.; Khodadadi, D.; Ozcan, A.; Di Carlo, D. Digital readout platform for water-in-oil droplet immunoassays running on a cell-phone for point of care viral load sensing. In Proceedings of the The 16th International Conference on Microsystems for Chemistry and Life Sciences MicroTAS, Okinawa, Japan, 28 October–1 November 2012; pp. 338–340.

128. Coulibaly, J.T.; Ouattara, M.; D'Ambrosio, M.V.; Fletcher, D.A.; Keiser, J.; Utzinger, J.; N'Goran, E.K.; Andrews, J.R.; Bogoch, I.I. Accuracy of Mobile Phone and Handheld Light Microscopy for the Diagnosis of Schistosomiasis and Intestinal Protozoa Infections in Côte d'Ivoire. *PLoS Negl. Trop. Dis.* **2016**, *10*, e0005550. [CrossRef] [PubMed]
129. Ephraim, R.K.D.; Cybulski, J.S.; Duah, E.; Prakash, M.; D'Ambrosio, M.V.; Fletcher, D.A.; Keiser, J.; Andrews, J.R.; Bogoch, I.I. Diagnosis of Schistosoma haematobium infection with a mobile phone-mounted Foldscope and a reversed-lens CellScope in Ghana. *Am. J. Trop. Med. Hyg.* **2015**, *92*, 1253–1256. [CrossRef] [PubMed]
130. Holmen, S.D.; Kjetland, E.F.; Taylor, M.; Kleppa, E.; Lillebø, K.; Gundersen, S.G.; Onsrud, M.; Albregtsen, F. Colourimetric image analysis as a diagnostic tool in female genital schistosomiasis. *Med. Eng. Phys.* **2015**, *37*, 309–314. [CrossRef] [PubMed]
131. Veigas, B.; Jacob, J.M.; Costa, M.N.; Santos, D.S.; Viveiros, M.; Inácio, J.; Martins, R.; Barquinha, P.; Fortunato, E.; Baptista, P.V. Gold on paper-paper platform for Au-nanoprobe TB detection. *Lab Chip* **2012**, *12*, 4802–4808. [CrossRef] [PubMed]
132. Veigas, B.; Fortunato, E.; Baptista, P.V. Mobile based gold nanoprobe TB diagnostics for point-of-need. *Methods Mol. Biol.* **2015**, *1256*, 41–56. [CrossRef] [PubMed]
133. Duthie, M.S.; Balagon, M.F.; Maghanoy, A.; Orcullo, F.M.; Cang, M.; Dias, R.F.; Collovati, M.; Reed, S.G. Rapid quantitative serological test for detection of infection with Mycobacterium leprae, the causative agent of leprosy. *J. Clin. Microbiol.* **2014**, *52*, 613–619. [CrossRef] [PubMed]
134. Berg, B.; Cortazar, B.; Tseng, D.; Ozkan, H.; Feng, S.; Wei, Q.; Chan, R.Y.-L.; Burbano, J.; Farooqui, Q.; Lewinski, M.; et al. Cellphone-Based Hand-Held Microplate Reader for Point-of-Care Testing of Enzyme-Linked Immunosorbent Assays. *ACS Nano* **2015**, *9*, 7857–7866. [CrossRef] [PubMed]
135. Mancuso, M.; Cesarman, E.; Erickson, D. Detection of Kaposi's sarcoma associated herpesvirus nucleic acids using a smartphone accessory. *Lab Chip Miniaturisation Chem. Biol.* **2014**, *14*, 3809–3816. [CrossRef] [PubMed]
136. Wei, Q.; Qi, H.; Luo, W.; Tseng, D.; Ki, S.J.; Wan, Z.; Göröcs, Z.; Bentolila, L.A.; Wu, T.-T.; Sun, R.; et al. Fluorescent imaging of single nanoparticles and viruses on a smart phone. *ACS Nano* **2013**, *7*, 9147–9155. [CrossRef] [PubMed]
137. Gallegos, D.; Long, K.D.; Yu, H.; Clark, P.P.; Lin, Y.; George, S.; Nath, P.; Cunningham, B.T. Label-free biodetection using a smartphone. *Lab Chip* **2013**, *13*, 2124–2132. [CrossRef] [PubMed]
138. Lee, S.A.; Yang, C. A smartphone-based chip-scale microscope using ambient illumination. *Lab Chip Miniaturisation Chem. Biol.* **2014**, *14*, 3056–3063. [CrossRef] [PubMed]
139. Petryayeva, E.; Algar, W.R. Multiplexed homogeneous assays of proteolytic activity using a smartphone and quantum dots. *Anal. Chem.* **2014**, *86*, 3195–3202. [CrossRef] [PubMed]
140. Lapointe, J.; Parent, F.; De Lima Filho, E.S.; Loranger, S.; Kashyap, R. Toward the integration of optical sensors in smartphone screens using femtosecond laser writing. *Opt. Lett.* **2015**, *40*, 5654–5657. [CrossRef] [PubMed]
141. DuVall, J.A.; Borba, J.C.; Shafagati, N.; Luzader, D.; Shukla, N.; Li, J.; Kehn-Hall, K.; Kendall, M.M.; Feldman, S.H.; Landers, J.P. Optical imaging of paramagnetic bead-DNA aggregation inhibition allows for low copy number detection of infectious pathogens. *PLoS ONE* **2015**, *10*, e0129830. [CrossRef] [PubMed]
142. Zhu, H.; Ozcan, A. Wide-field fluorescent microscopy and fluorescent imaging flow cytometry on a cell-phone. *J. Vis. Exp.* **2013**, e50451. [CrossRef] [PubMed]
143. Gantelius, J.; Bass, T.; Sjöberg, R.; Nilsson, P.; Andersson-Svahn, H. A lateral flow protein microarray for rapid and sensitive antibody assays. *Int. J. Mol. Sci.* **2011**, *12*, 7748–7759. [CrossRef] [PubMed]
144. Vashist, S.K.; van Oordt, T.; Schneider, E.M.; Zengerle, R.; von Stetten, F.; Luong, J.H.T. A smartphone-based colorimetric reader for bioanalytical applications using the screen-based bottom illumination provided by gadgets. *Biosens. Bioelectron.* **2015**, *67*, 248–255. [CrossRef] [PubMed]
145. Fu, Q.; Wu, Z.; Xu, F.; Li, X.; Yao, C.; Xu, M.; Sheng, L.; Yu, S.; Tang, Y. A portable smart phone-based plasmonic nanosensor readout platform that measures transmitted light intensities of nanosubstrates using an ambient light sensor. *Lab Chip* **2016**, *16*, 1927–1933. [CrossRef] [PubMed]
146. Smith, Z.J.; Chu, K.; Wachsmann-Hogiu, S. Nanometer-Scale Sizing Accuracy of Particle Suspensions on an Unmodified Cell Phone Using Elastic Light Scattering. *PLoS ONE* **2012**, *7*, e46030. [CrossRef] [PubMed]

147. Byrne, B.; Stack, E.; Gilmartin, N.; O'Kennedy, R. Antibody-based sensors: Principles, problems and potential for detection of pathogens and associated toxins. *Sensors (Switzerland)* **2009**, *9*, 4407–4445. [CrossRef] [PubMed]
148. Welch, N.G.; Scoble, J.A.; Muir, B.W.; Pigram, P.J. Orientation and characterization of immobilized antibodies for improved immunoassays (Review). *Biointerphases* **2017**, *12*. [CrossRef] [PubMed]
149. Pfeiffer, F.; Mayer, G. Selection and Biosensor Application of Aptamers for Small Molecules. *Front. Chem.* **2016**, *4*, 1–21. [CrossRef] [PubMed]
150. Ruscito, A.; DeRosa, M.C. Small-Molecule Binding Aptamers: Selection Strategies, Characterization, and Applications. *Front. Chem.* **2016**, *4*, 1–14. [CrossRef] [PubMed]
151. Chen, L.; Wang, X.; Lu, W.; Wu, X.; Li, J. Molecular imprinting: Perspectives and applications. *Chem. Soc. Rev.* **2016**, *45*, 2137–2211. [CrossRef] [PubMed]
152. Ahmad, R.; Griffete, N.; Lamouri, A.; Felidj, N.; Chehimi, M.M.; Mangeney, C. Nanocomposites of Gold Nanoparticles@Molecularly Imprinted Polymers: Chemistry, Processing, and Applications in Sensors. *Chem. Mater.* **2015**, *27*, 5464–5478. [CrossRef]
153. Sharma, S.K.; Leblanc, R.M. Biosensors based on β-galactosidase enzyme: Recent advances and perspectives. *Anal. Biochem.* **2017**, *535*, 1–11. [CrossRef] [PubMed]
154. Rocchitta, G.; Spanu, A.; Babudieri, S.; Latte, G.; Madeddu, G.; Galleri, G.; Nuvoli, S.; Bagella, P.; Demartis, M.I.; Fiore, V.; et al. Enzyme biosensors for biomedical applications: Strategies for safeguarding analytical performances in biological fluids. *Sensors (Switzerland)* **2016**, *16*, 780. [CrossRef] [PubMed]
155. Songa, E.A.; Okonkwo, J.O. Recent approaches to improving selectivity and sensitivity of enzyme-based biosensors for organophosphorus pesticides: A review. *Talanta* **2016**, *155*, 289–304. [CrossRef] [PubMed]
156. Hallberg, Z.F.; Su, Y.; Kitto, R.Z.; Hammond, M.C. Engineering and In Vivo Applications of Riboswitches. *Annu. Rev. Biochem.* **2017**, *86*, 515–539. [CrossRef] [PubMed]
157. Bazin, I.; Tria, S.A.; Hayat, A.; Marty, J.L. New biorecognition molecules in biosensors for the detection of toxins. *Biosens. Bioelectron.* **2017**, *87*, 285–298. [CrossRef] [PubMed]
158. Banerjee, P.; Kintzios, S.; Prabhakarpandian, B. Biotoxin detection using cell-based sensors. *Toxins (Basel)* **2013**, *5*, 2366–2383. [CrossRef] [PubMed]
159. Löfblom, J.; Feldwisch, J.; Tolmachev, V.; Carlsson, J.; Ståhl, S.; Frejd, F.Y. Affibody molecules: Engineered proteins for therapeutic, diagnostic and biotechnological applications. *FEBS Lett.* **2010**, *584*, 2670–2680. [CrossRef] [PubMed]
160. Tuerk, C.; Gold, L. Systematic evolution of ligands by exponential enrichment: RNA ligands to bacteriophage T4 DNA polymerase. *Science* **1990**, *249*, 505–510. [CrossRef] [PubMed]
161. Jolly, P.; Tamboli, V.; Harniman, R.L.; Estrela, P.; Allender, C.J.; Bowen, J.L. Aptamer-MIP hybrid receptor for highly sensitive electrochemical detection of prostate specific antigen. *Biosens. Bioelectron.* **2016**, *75*, 188–195. [CrossRef] [PubMed]
162. Liu, X.; Ren, J.; Su, L.; Gao, X.; Tang, Y.; Ma, T.; Zhu, L.; Li, J. Novel hybrid probe based on double recognition of aptamer-molecularly imprinted polymer grafted on upconversion nanoparticles for enrofloxacin sensing. *Biosens. Bioelectron.* **2017**, *87*, 203–208. [CrossRef] [PubMed]
163. Zhang, Z.; Liu, J. Molecularly Imprinted Polymers with DNA Aptamer Fragments as Macromonomers. *ACS Appl. Mater. Interfaces* **2016**, *8*, 6371–6378. [CrossRef] [PubMed]
164. Poma, A.; Guerreiro, A.; Whitcombe, M.J.; Piletska, E.V.; Turner, A.P.F.; Piletsky, S.A. Solid-Phase Synthesis of Molecularly Imprinted Polymer Nanoparticles with a Reusable Template—"Plastic Antibodies". *Adv. Funct. Mater.* **2013**, *23*, 2821–2827. [CrossRef] [PubMed]
165. Smolinska-Kempisty, K.; Guerreiro, A.; Canfarotta, F.; Cáceres, C.; Whitcombe, M.J.; Piletsky, S. A comparison of the performance of molecularly imprinted polymer nanoparticles for small molecule targets and antibodies in the ELISA format. *Sci. Rep.* **2016**, *6*, 37638. [CrossRef] [PubMed]
166. Moczko, E.; Poma, A.; Guerreiro, A.; Perez, I.; Sansalvador, D.V.; Caygill, S.; Canfarotta, F.; Whitcombe, M.J.; Piletsky, S. Surface-modified multifunctional MIP nanoparticles. *Nanoscale* **2016**, *5*, 3733–3741. [CrossRef] [PubMed]
167. Basozabal, I.; Guerreiro, A.; Gomez-Caballero, A.; Aranzazu Goicolea, M.; Barrio, R.J. Direct potentiometric quantification of histamine using solid-phase imprinted nanoparticles as recognition elements. *Biosens. Bioelectron.* **2014**, *58*, 138–144. [CrossRef] [PubMed]

168. Korposh, S.; Chianella, I.; Guerreiro, A.; Caygill, S.; Piletsky, S.; James, S.W.; Tatam, R.P. Selective vancomycin detection using optical fibre long period gratings functionalised with molecularly imprinted polymer nanoparticles. *Analyst* **2014**, *139*, 2229–2236. [CrossRef] [PubMed]
169. Chianella, I.; Guerreiro, A.; Moczko, E.; Caygill, J.S.; Piletska, E.V.; De Vargas Sansalvador, I.M.P.; Whitcombe, M.J.; Piletsky, S.A. Direct replacement of antibodies with molecularly imprinted polymer nanoparticles in ELISA—Development of a novel assay for vancomycin. *Anal. Chem.* **2013**, *85*, 8462–8468. [CrossRef] [PubMed]
170. Altintas, Z.; Gittens, M.; Guerreiro, A.; Thompson, K.-A.; Walker, J.; Piletsky, S.; Tothill, I.E. Detection of Waterborne Viruses Using High Affinity Molecularly Imprinted Polymers. *Anal. Chem.* **2015**, *87*, 6801–6807. [CrossRef] [PubMed]
171. Poma, A.; Guerreiro, A.; Caygill, S.; Moczko, E.; Piletsky, S. Automatic reactor for solid-phase synthesis of molecularly imprinted polymeric nanoparticles (MIP NPs) in water. *RSC Adv.* **2014**, *4*, 4203–4206. [CrossRef] [PubMed]
172. Canfarotta, F.; Poma, A.; Guerreiro, A.; Piletsky, S. Solid-phase synthesis of molecularly imprinted nanoparticles. *Nat. Protoc.* **2016**, *11*, 443–455. [CrossRef] [PubMed]
173. Karim, K.; Cowen, T.; Guerreiro, A.; Piletska, E.; Whitcombe, M.J.; Piletsky, S.A. A Protocol for the Computational Design of High Affi nity Molecularly Imprinted Polymer Synthetic Receptors. *Glob. J. Biotechnol. Biomater. Sci.* **2017**, *1*, 001–007. [CrossRef]
174. Rohloff, J.C.; Gelinas, A.D.; Jarvis, T.C.; Ochsner, U.A.; Schneider, D.J.; Gold, L.; Janjic, N. Nucleic Acid Ligands With Protein-like Side Chains: Modified Aptamers and Their Use as Diagnostic and Therapeutic Agents. *Mol. Ther. Nucleic Acids* **2014**, *3*, e201. [CrossRef] [PubMed]
175. Egholm, M.; Buchardt, O.; Christensen, L.; Behrens, C.; Freier, S.M.; Driver, D.A.; Berg, R.H.; Kim, S.K.; Norden, B.; Nielsen, P.E. PNA hybridizes to complementary oligonucleotides obeying the Watson-Crick hydrogen-bonding rules. *Nature* **1993**, *365*, 566–568. [CrossRef] [PubMed]
176. Brudno, Y.; Birnbaum, M.E.; Kleiner, R.E.; Liu, D.R. An in vitro translation, selection and amplification system for peptide nucleic acids. *Nat. Chem. Biol.* **2010**, *6*, 148–155. [CrossRef] [PubMed]
177. Yu, H.; Zhang, S.; Chaput, J.C. Darwinian evolution of an alternative genetic system provides support for TNA as an RNA progenitor. *Nat. Chem.* **2012**, *4*, 183–187. [CrossRef] [PubMed]
178. Niu, J.; Hili, R.; Liu, D.R. Enzyme-free translation of DNA into sequence-defined synthetic polymers structurally unrelated to nucleic acids. *Nat. Chem.* **2013**, *5*, 282–292. [CrossRef] [PubMed]
179. Menezes, A.A.; Cumbers, J.; Hogan, J.A.; Arkin, A.P. Towards synthetic biological approaches to resource utilization on space missions. *J. R. Soc. Interface* **2015**, *12*, 20140715. [CrossRef] [PubMed]
180. Rothschild, L.J. Synthetic biology meets bioprinting: Enabling technologies for humans on Mars (and Earth). *Biochem. Soc. Trans.* **2016**, *44*, 1158–1164. [CrossRef] [PubMed]
181. Lasseur, C.; Brunet, J.; Weever, H.D.; Dixon, M.; Dussap, G.; Godia, F.; Leys, N.; Mergeay, M.; Straeten, D. Van Der Melissa: The European project of closed life support system. *Gravitational Sp. Biol.* **2010**, *23*, 3–12.
182. Verseux, C.N.; Paulino-Lima, I.G.; Baqué, M.; Billi, D.; Rothschild, L.J. Synthetic Biology for Space Exploration: Promises and Societal Implications. *Ambivalences Creat. Life Soc. Philos. Dimens. Synth. Biol.* **2016**, 73–100. [CrossRef]
183. Lu, Y. Cell-free synthetic biology: Engineering in an open world. *Synth. Syst. Biotechnol.* **2017**, *2*, 23–27. [CrossRef] [PubMed]
184. Bundy, B.C.; Swartz, J.R. Efficient disulfide bond formation in virus-like particles. *J. Biotechnol.* **2011**, *154*, 230–239. [CrossRef] [PubMed]
185. Pardee, K.; Slomovic, S.; Nguyen, P.Q.; Lee, J.W.; Donghia, N.; Burrill, D.; Ferrante, T.; McSorley, F.R.; Furuta, Y.; Vernet, A.; et al. Portable, On-Demand Biomolecular Manufacturing. *Cell* **2016**, *167*, 248–259. [CrossRef] [PubMed]
186. Groff, D.; Armstrong, S.; Rivers, P.J.; Zhang, J.; Yang, J.; Green, E.; Rozzelle, J.; Liang, S.; Kittle, J.D.; Steiner, A.R.; et al. Engineering toward a bacterial "endoplasmic reticulum" for the rapid expression of immunoglobulin proteins. *MAbs* **2014**, *6*, 671–678. [CrossRef] [PubMed]
187. Sun, Z.Z.; Hayes, C.A.; Shin, J.; Caschera, F.; Murray, R.M.; Noireaux, V. Protocols for Implementing an *Escherichia coli* Based TX-TL Cell-Free Expression System for Synthetic Biology. *J. Vis. Exp.* **2013**, 1–14. [CrossRef] [PubMed]

188. Pardee, K.; Green, A.A.; Takahashi, M.K.; Braff, D.; Lambert, G.; Lee, J.W.; Ferrante, T.; Ma, D.; Donghia, N.; Fan, M.; et al. Rapid, Low-Cost Detection of Zika Virus Using Programmable Biomolecular Components. *Cell* **2016**, *165*, 1255–1266. [CrossRef] [PubMed]
189. Pardee, K.; Green, A.A.; Ferrante, T.; Cameron, D.E.; DaleyKeyser, A.; Yin, P.; Collins, J.J. Resource Paper-Based Synthetic Gene Networks. *Cell* **2014**, *159*, 1–15. [CrossRef] [PubMed]
190. Smith, M.T.; Berkheimer, S.D.; Werner, C.J.; Bundy, B.C. Lyophilized *Escherichia coli*-based cell-free systems for robust, high-density, long-term storage. *Biotechniques* **2014**, *56*, 186–193. [CrossRef] [PubMed]
191. Roda, A.; Mirasoli, M.; Guardigli, M.; Zangheri, M.; Caliceti, C.; Calabria, D.; Simoni, P. Advanced biosensors for monitoring astronauts' health during long-duration space missions. *Biosens. Bioelectron.* **2018**, *111*, 18–26. [CrossRef] [PubMed]
192. Goud, K.Y.; Hayat, A.; Catanante, G.; Satyanarayana, S.M.; Gobi, K.V.; Marty, J.L. An electrochemical aptasensor based on functionalized graphene oxide assisted electrocatalytic signal amplification of methylene blue for aflatoxin B1 detection. *Electrochim. Acta* **2017**, *244*, 96–103. [CrossRef]

© 2018 by the authors. Licensee MDPI, Basel, Switzerland. This article is an open access article distributed under the terms and conditions of the Creative Commons Attribution (CC BY) license (http://creativecommons.org/licenses/by/4.0/).

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

LARRY GOLDEN,
Plaintiff,

v.

GOOGLE LLC,
Defendant.

Case No. 22-cv-05246-RFL

**ORDER DENYING MOTION FOR RECONSIDERATION AND DISQUALIFICATION**

Re: Dkt. No. 70

Larry Golden, who is not represented by counsel, moves to disqualify the undersigned from presiding over this action pursuant to 28 U.S.C. § 144 ("section 144"), and for reconsideration of the Court's order granting Google LLC's motion to dismiss the amended complaint. Both motions are **DENIED**. This ruling assumes the reader is familiar with the facts, applicable law, and the arguments made by the parties.

***Motion to disqualify.*** Section 144 provides:

> Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding.
>
> The affidavit shall state the facts and the reasons for the belief that bias or prejudice exists, and shall be filed not less than ten days before the beginning of the term at which the proceeding is to be heard, or good cause shall be shown for failure to file it within such time. A party may file only one such affidavit in any case. It shall be accompanied by a certificate of counsel of record stating that it is made in good faith.

28 U.S.C. § 144. An affidavit is legally sufficient where "a reasonable person with knowledge of all the facts would conclude that the judge's impartiality might reasonably be questioned."

*United States v. Hernandez*, 109 F.3d 1450, 1453-54 (9th Cir. 1997) (internal quotations and citation omitted).

The presiding judge has the authority to "pass upon [the affidavit's] legal sufficiency." *United States v. Azhocar*, 581 F.2d 735, 739 (9th Cir. 1978). After the judge determines that "the legal sufficiency of the affidavit has been established," the motion is "referred to another judge for a determination of its merits." *United States v. Sibla*, 624 F.2d 864, 867 (9th Cir. 1980) (citations omitted); *see also* Civil L.R. 3-14 ("Whenever an affidavit of bias or prejudice directed at a Judge of this Court is filed pursuant to 28 U.S.C. § 144, and the Judge has determined not to recuse him or herself and found that the affidavit is neither legally insufficient nor interposed for delay, the Judge shall refer the request for disqualification to the Clerk for random assignment to another Judge.").

The motion to disqualify does not comply with section 144's procedural requirements. Golden did not submit any affidavit with the motion. Even setting that deficiency aside, Golden has not demonstrated in his motion that recusal is warranted. Golden seeks disqualification because of the undersigned's adverse ruling on Google's motion to dismiss, contending that the reasoning and outcome in that decision demonstrates bias against him. But "conduct or rulings made during the course of the proceeding" are not grounds for disqualification. *See Toth v. Trans World Airlines, Inc.*, 862 F.2d 1381, 1388 (9th Cir. 1988) ("The bias or prejudice alleged arose from conduct during the judicial proceeding, and the motion and affidavit, thus, were legally insufficient."). As Golden has not presented a legally sufficient affidavit, the motion to disqualify is denied.

***Motion for reconsideration.*** Judgment was entered in Google favor after the Court granted the motion to dismiss the amended complaint. Where, as here, a court's ruling has resulted in a final judgment or order, a motion for reconsideration may be based either on Rule 59(e) (motion to alter or amend judgment) or Rule 60(b) (motion for relief from judgment) of the Federal Rules of Civil Procedure. *See Am. Ironworks & Erectors v. N. Am. Constr. Corp.*, 248 F.3d 892, 898–99 (9th Cir. 2001). The Ninth Circuit has clarified that motions under Rule 59(e)

may only be granted in limited circumstances: "(1) the district court is presented with newly discovered evidence, (2) the district court committed clear error or made an initial decision that was manifestly unjust, or (3) there is an intervening change in controlling law." *Zimmerman v. City of Oakland*, 255 F.3d 734, 740 (9th Cir. 2001). The denial of a motion for reconsideration under Rule 59(e) is construed as a denial of relief under Rule 60(b). *See McDowell v. Calderon*, 197 F.3d 1253, 1255 n.3 (9th Cir. 1999) (en banc).

Rule 60(b), in turn, permits a party to seek relief from a final judgment for any reason that justifies relief. *See* Fed. R. Civ. P. 60(b). Rule 60(b)(6) is a "catchall provision" that applies only when the reason for granting relief is not covered by any of the enumerated reasons set forth in Rule 60, which include, among others, "mistake inadvertence, surprise, or excusable neglect," "newly discovered evidence," and "fraud . . . , misrepresentation, or misconduct by an opposing party," Fed. R. Civ. P. 60(b)(1)–(3). Motions for reconsideration should not be frequently made or freely granted; they are not a substitute for appeal or a means of attacking some perceived error of the court. *See Twentieth Century-Fox Film Corp. v. Dunnahoo*, 637 F.2d 1338, 1341 (9th Cir. 1981).

Reconsideration of the dismissal order and entry of judgment against Golden is not warranted under either Rule 59(e) or Rule 60(a). The motion for reconsideration repeats some of Golden's arguments at the motion to dismiss stage, ultimately disagreeing with the Court's ruling resolving the case the pleadings stage. Golden does not provide any new evidence, legal authority, or arguments that would justify amending or altering the judgment. Therefore, the motion for reconsideration is denied.

**IT IS SO ORDERED.**

Dated: May 28, 2024

RITA F. LIN
United States District Judge

AO279,APPEAL,CLOSED,ProSe

**U.S. District Court**
**California Northern District (San Francisco)**
**CIVIL DOCKET FOR CASE #: 3:22-cv-05246-RFL**

Golden v. Google LLC
Assigned to: Judge Rita F. Lin
Case in other court: Federal Circuit, 24-02024
Cause: 35:145 Patent Infringement

Date Filed: 09/14/2022
Date Terminated: 04/03/2024
Jury Demand: Plaintiff
Nature of Suit: 830 Patent
Jurisdiction: Federal Question

**Plaintiff**

**Larry Golden** represented by **Larry Golden**
740 Woodruff Road
#1102
Greenville, SC 29607
864-288-5605
PRO SE

V.

**Defendant**

**Google LLC** represented by **Matthew S. Warren**
Warren Kash Warren LLP
2261 Market Street, No. 606
San Francisco, CA 94114
415-895-2940
Fax: 415-895-2964
Email: matt@warrenkashwarren.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Sachli Balazadeh-Nayeri**
Wilson Sonsini Goodrich & Rosati, PC
One Market Street, Spear Tower, Suite 3300
San Francisco, CA 94105
949-590-0161
Email: snayeri@wsgr.com
*ATTORNEY TO BE NOTICED*

**Virginia G. Kain**
Shearman & Sterling LLP
140 New Montgomery Street
10th Floor
San Francisco, CA 94105
650-838-3877
Fax: 650-838-5144
Email: Virginia.Kain@aoshearman.com
*TERMINATED: 01/19/2024*

| Date Filed | # | Docket Text |
|---|---|---|
| 09/14/2022 | 1 | for Patient Infringement COMPLAINT against Google LLC (Filing fee of $ 402 paid, receipt # 54611018898.). Filed by Larry Golden. (Attachments: # 1 Exhibit A to Complaint, # 2 Exhibit B to Complaint, # 3 Exhibit C to Complaint, # 4 Exhibit D to Complaint, # 5 Exhibit E to Complaint, # 6 Civil Cover Sheet)(bw, COURT STAFF) (Filed on 9/14/2022) (Additional attachment(s) added on 9/15/2022: # 7 Filing Free Receipt) (bw, COURT STAFF). (Entered: 09/15/2022) |
| 09/14/2022 | 2 | CONSENT/DECLINATION to Proceed Before a US Magistrate Judge by Larry Golden.. (bw, COURT STAFF) (Filed on 9/14/2022) (Entered: 09/15/2022) |
| 09/14/2022 | 3 | Summons Issued as to Google LLC. (bw, COURT STAFF) (Filed on 9/14/2022) (Entered: 09/15/2022) |
| 09/15/2022 | 4 | **CASE MANAGEMENT SCHEDULING ORDER: Initial Case Management Conference set for 12/13/2022 02:00 PM in Oakland, Courtroom 2, 4th Floor. (bw, COURT STAFF) (Filed on 9/15/2022)**<br>Any non-CM/ECF Participants have been served by First Class Mail to the addresses of record listed on the Notice of Electronic Filing (NEF)<br>**(Entered: 09/15/2022)** |
| 09/15/2022 | 5 | REPORT on the filing or determination of an action regarding patent (cc: form mailed to register). (Attachments: # 1 complaint)(far, COURT STAFF) (Filed on 9/15/2022) (Entered: 09/15/2022) |
| 09/15/2022 | 6 | CLERK'S NOTICE RE DOCKET NO. 4.<br><br>The 12/13 proceeding will be held by AT&T Conference Line. The parties are advised that in the event of an audio problem, counsel should be prepared to attend the hearing via Zoom conference at the Courts direction. The court circulates the following conference number to allow the equivalent of a public hearing by telephone.<br><br>For conference line information, see: https://apps.cand.uscourts.gov/telhrg/<br><br>All counsel, members of the public and press please use the following dial-in information below to access the conference line:<br><br>Dial In: 888-808-6929<br><br>Access Code: 6064255<br><br>The Court may be in session with proceedings in progress when you connect to the conference line. Therefore, mute your phone if possible and wait for the Court to address you before speaking on the line. For call clarity, parties shall NOT use speaker phone or earpieces for these calls, and where at all possible, parties shall use landlines. The parties are further advised to ensure that the Court can hear and understand them clearly before speaking at length.<br><br>PLEASE NOTE: Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited. See General Order 58 at Paragraph III.<br><br>Case Management Statement due by 12/6/2022. (ndr, COURT STAFF) (Filed on 9/15/2022) |

| | | |
|---|---|---|
| | | Any non-CM/ECF Participants have been served by First Class Mail to the addresses of record listed on the Notice of Electronic Filing (NEF) (Entered: 09/15/2022) |
| 10/12/2022 | 7 | SUMMONS Returned Executed by Larry Golden. Google LLC served on 10/5/2022, answer due 10/26/2022. (wsn, COURT STAFF) (Filed on 10/12/2022) (Entered: 10/19/2022) |
| 10/26/2022 | 8 | NOTICE of Appearance by Sachli Balazadeh-Nayeri (Balazadeh-Nayeri, Sachli) (Filed on 10/26/2022) (Entered: 10/26/2022) |
| 10/26/2022 | 9 | NOTICE of Appearance by Matthew S. Warren (Warren, Matthew) (Filed on 10/26/2022) (Entered: 10/26/2022) |
| 10/26/2022 | 10 | Certificate of Interested Entities by Google LLC identifying Corporate Parent Alphabet Inc., Corporate Parent XXVI Holdings Inc. for Google LLC. (Balazadeh-Nayeri, Sachli) (Filed on 10/26/2022) (Entered: 10/26/2022) |
| 10/26/2022 | 11 | MOTION to Dismiss filed by Google LLC. Motion Hearing set for 12/1/2022 02:00 PM in Oakland, Courtroom 2, 4th Floor before Judge Haywood S Gilliam Jr.. Responses due by 11/9/2022. Replies due by 11/16/2022. (Attachments: # 1 Proposed Order)(Warren, Matthew) (Filed on 10/26/2022) (Entered: 10/26/2022) |
| 10/26/2022 | 12 | MOTION to Strike filed by Google LLC. Motion Hearing set for 12/1/2022 02:00 PM in Oakland, Courtroom 2, 4th Floor before Judge Haywood S Gilliam Jr.. Responses due by 11/9/2022. Replies due by 11/16/2022. (Attachments: # 1 Proposed Order)(Warren, Matthew) (Filed on 10/26/2022) (Entered: 10/26/2022) |
| 10/26/2022 | 13 | CERTIFICATE OF SERVICE by Google LLC (Balazadeh-Nayeri, Sachli) (Filed on 10/26/2022) (Entered: 10/26/2022) |
| 10/27/2022 | 14 | CLERK'S NOTICE RE DOCKET NOS. 11 AND 12 . (ndr, COURT STAFF) (Filed on 10/27/2022)<br>Any non-CM/ECF Participants have been served by First Class Mail to the addresses of record listed on the Notice of Electronic Filing (NEF) (Entered: 10/27/2022) |
| 10/27/2022 | 15 | Renotice motion hearing re 11 MOTION to Dismiss filed byGoogle LLC. (Related document(s) 11 ) (Warren, Matthew) (Filed on 10/27/2022) (Entered: 10/27/2022) |
| 10/27/2022 | 16 | Renotice motion hearing re 12 MOTION to Strike filed byGoogle LLC. (Related document(s) 12 ) (Warren, Matthew) (Filed on 10/27/2022) (Entered: 10/27/2022) |
| 10/28/2022 | | Set Hearings as to 12 and 11 , See Docket Nos. 15 , 16 : Motion Hearing set for 2/16/2023 02:00 PM in Oakland, Courtroom 2, 4th Floor before Judge Haywood S. Gilliam Jr. (ndr, COURT STAFF) (Filed on 10/28/2022) (Entered: 10/28/2022) |
| 11/01/2022 | 17 | MOTION for Permanent Injunctive Relief filed by Larry Golden. Responses due by 11/15/2022. Replies due by 11/22/2022. (Attachments: # 1 Envelope)(far, COURT STAFF) (Filed on 11/1/2022) (Entered: 11/02/2022) |
| 11/01/2022 | 18 | RESPONSE TO DEFENDANTS MOTION TO DISMISS AND CROSS-MOTION for Summary Judgment filed by Larry Golden. Responses due by 11/15/2022. Replies due by 11/22/2022. (far, COURT STAFF) (Filed on 11/1/2022) (Entered: 11/02/2022) |
| 11/01/2022 | 19 | RESPONSE TO DEFENDANTS MOTION TO STRIKE AND PLAINTIFFS CROSS-MOTION to Strike filed by Larry Golden. Responses due by 11/15/2022. Replies due by 11/22/2022. (Attachments: # 1 Envelope)(far, COURT STAFF) (Filed on 11/1/2022) (Entered: 11/02/2022) |

| | | |
|---|---|---|
| 11/15/2022 | 20 | REPLY (re 11 MOTION to Dismiss ) filed byGoogle LLC. (Warren, Matthew) (Filed on 11/15/2022) (Entered: 11/15/2022) |
| 11/15/2022 | 21 | REPLY (re 12 MOTION to Strike ) filed byGoogle LLC. (Warren, Matthew) (Filed on 11/15/2022) (Entered: 11/15/2022) |
| 11/15/2022 | 22 | OPPOSITION/RESPONSE (re 18 MOTION for Summary Judgment ) filed byGoogle LLC. (Attachments: # 1 Proposed Order)(Warren, Matthew) (Filed on 11/15/2022) (Entered: 11/15/2022) |
| 11/15/2022 | 23 | OPPOSITION/RESPONSE (re 19 MOTION to Strike ) filed byGoogle LLC. (Attachments: # 1 Proposed Order)(Warren, Matthew) (Filed on 11/15/2022) (Entered: 11/15/2022) |
| 11/15/2022 | 24 | OPPOSITION/RESPONSE (re 17 MOTION for Permanent Injunction ) filed byGoogle LLC. (Attachments: # 1 Proposed Order)(Warren, Matthew) (Filed on 11/15/2022) (Entered: 11/15/2022) |
| 11/15/2022 | 25 | CERTIFICATE OF SERVICE by Google LLC (Balazadeh-Nayeri, Sachli) (Filed on 11/15/2022) (Entered: 11/15/2022) |
| 11/18/2022 | 26 | REPLY (re 18 MOTION for Summary Judgment ) filed byLarry Golden. (far, COURT STAFF) (Filed on 11/18/2022) (Entered: 11/21/2022) |
| 11/18/2022 | 27 | REPLY (re 19 MOTION to Strike ) filed byLarry Golden. (Attachments: # 1 Envelope)(far, COURT STAFF) (Filed on 11/18/2022) (Entered: 11/21/2022) |
| 11/18/2022 | 28 | REPLY (re 17 MOTION for Permanent Injunction ) filed byLarry Golden. (far, COURT STAFF) (Filed on 11/18/2022) (Entered: 11/21/2022) |
| 11/29/2022 | 29 | ADR Certification (ADR L.R. 3-5 b) of discussion of ADR options (Warren, Matthew) (Filed on 11/29/2022) (Entered: 11/29/2022) |
| 12/06/2022 | 30 | NOTICE of Pendency of Other Action Involving Same Patent by Google LLC (Warren, Matthew) (Filed on 12/6/2022) (Entered: 12/06/2022) |
| 12/06/2022 | 31 | CASE MANAGEMENT STATEMENT filed by Google LLC. (Warren, Matthew) (Filed on 12/6/2022) (Entered: 12/06/2022) |
| 12/06/2022 | 32 | NOTICE of Appearance by Virginia G. Kain (Kain, Virginia) (Filed on 12/6/2022) (Entered: 12/06/2022) |
| 12/06/2022 | 33 | CERTIFICATE OF SERVICE by Google LLC (Kain, Virginia) (Filed on 12/6/2022) (Entered: 12/06/2022) |
| 12/07/2022 | 34 | CASE MANAGEMENT STATEMENT filed by Larry Golden. (far, COURT STAFF) (Filed on 12/7/2022) (Entered: 12/08/2022) |
| 12/09/2022 | 35 | CLERK'S NOTICE. (ndr, COURT STAFF) (Filed on 12/9/2022)<br>Any non-CM/ECF Participants have been served by First Class Mail to the addresses of record listed on the Notice of Electronic Filing (NEF) (Entered: 12/09/2022) |
| 12/09/2022 | 36 | OBJECTIONS to Defendant's Motion (Non-Motion) to Change the Dates for Proceedings: Request Made in it's Case Management Statement by Larry Golden. (far, COURT STAFF) (Filed on 12/9/2022) (Entered: 12/12/2022) |
| 02/08/2023 | 37 | CLERK'S NOTICE RE DOCKET NOS. 11 AND 12 . (ndr, COURT STAFF) (Filed on 2/8/2023) |

| | | |
|---|---|---|
| | | Any non-CM/ECF Participants have been served by First Class Mail to the addresses of record listed on the Notice of Electronic Filing (NEF) (Entered: 02/08/2023) |
| 02/10/2023 | 38 | NOTICE of Pendency of Other Action Involving Same Patent by Google LLC (Warren, Matthew) (Filed on 2/10/2023) (Entered: 02/10/2023) |
| 04/05/2023 | 39 | SUPPLEMENTAL AUTHORITY IN SUPPORT OF PLAINTIFFS MOTION FOR SUMMARY JUDGMENT AND INJUNCTIVE RELIEF by Larry Golden (far, COURT STAFF) (Filed on 4/5/2023) (Entered: 04/06/2023) |
| 04/11/2023 | 40 | SUPPLEMENTAL AUTHORITY IN SUPPORT OF PLAINTIFF'S DIRECT AND INDIRECT INFRINGEMENT CLAIMS by Larry Golden (far, COURT STAFF) (Filed on 4/11/2023) (Entered: 04/12/2023) |
| 08/10/2023 | 41 | **ORDER by Judge Haywood S. Gilliam, Jr. GRANTING 11 MOTION TO DISMISS WITH LEAVE TO AMEND.Amended Pleadings due by 9/7/2023. **This Order DENIES AS MOOT WITHOUT PREJUDICE Docket Nos. 12 , 17 , 18 , and 19 .** (ndr, COURT STAFF) (Filed on 8/10/2023)** **Any non-CM/ECF Participants have been served by First Class Mail to the addresses of record listed on the Notice of Electronic Filing (NEF)** **(Entered: 08/10/2023)** |
| 08/23/2023 | 42 | AMENDED COMPLAINT against Google LLC. Filed byLarry Golden. (Attachments: # 1 Exhibit A to G, # 2 Exhibit H to End, # 3 Envelope)(sec, COURT STAFF) (Filed on 8/23/2023) (Entered: 08/23/2023) |
| 09/01/2023 | 43 | NOTICE by Google LLC *of Withdrawal of Sachli Balazadeh-Nayeri* (Balazadeh-Nayeri, Sachli) (Filed on 9/1/2023) (Entered: 09/01/2023) |
| 09/07/2023 | 44 | MOTION to Dismiss *Amended Complaint* filed by Google LLC. Motion Hearing set for 12/7/2023 02:00 PM in Oakland, Courtroom 2, 4th Floor before Judge Haywood S Gilliam Jr.. Responses due by 9/21/2023. Replies due by 9/28/2023. (Attachments: # 1 Proposed Order)(Kain, Virginia) (Filed on 9/7/2023) (Entered: 09/07/2023) |
| 09/07/2023 | 45 | CERTIFICATE OF SERVICE by Google LLC re 44 MOTION to Dismiss *Amended Complaint* (Kain, Virginia) (Filed on 9/7/2023) (Entered: 09/07/2023) |
| 09/13/2023 | 46 | OPPOSITION/RESPONSE (re 44 MOTION to Dismiss *Amended Complaint* ) filed byLarry Golden. (Attachments: # 1 part 2, # 2 Envelope)(far, COURT STAFF) (Filed on 9/13/2023) (Entered: 09/13/2023) |
| 09/28/2023 | 47 | REPLY (re 44 MOTION to Dismiss *Amended Complaint* ) filed byGoogle LLC. (Kain, Virginia) (Filed on 9/28/2023) (Entered: 09/28/2023) |
| 10/03/2023 | 48 | MOTION for Leave to File Sur-Reply in Opposition to Defendant's Reply to Motion to Dismiss Plaintiff's Amended Complaint filed by Larry Golden. (Attachments: # 1 Envelope)(far, COURT STAFF) (Filed on 10/3/2023) (Entered: 10/04/2023) |
| 10/03/2023 | 49 | Received Document: Sur-Reply in Opposition to Defendant's Reply to Motion to Dismiss Plaintiff's Amended Complaint by Larry Golden. (far, COURT STAFF) (Filed on 10/3/2023) (Entered: 10/04/2023) |
| 10/10/2023 | 50 | OPPOSITION/RESPONSE (re 48 MOTION for Leave to File ) filed byGoogle LLC. (Attachments: # 1 Proposed Order)(Kain, Virginia) (Filed on 10/10/2023) (Entered: 10/10/2023) |
| 10/10/2023 | 51 | CERTIFICATE OF SERVICE by Google LLC re 50 Opposition/Response to Motion (Kain, Virginia) (Filed on 10/10/2023) (Entered: 10/10/2023) |

| | | |
|---|---|---|
| 11/27/2023 | 52 | **ORDER REASSIGNING CASE.**<br><br>IT IS ORDERED that this case is reassigned to the Honorable Rita F. Lin in the San Francisco Division for all further proceedings.<br><br>1. All future filings shall bear the initials RFL immediately after the case number.<br><br>2. All case management conference dates are vacated and will be reset by the Court.<br><br>3. All hearing dates presently scheduled are **VACATED**. However, existing briefing schedules for motions remain unchanged. All pending motions (regardless of whether they are presently scheduled for hearing) must be **RENOTICED** for hearing before Judge Lin by the moving party for a date consistent with the Court's law and motion calendar, but the renoticing of the hearing does not affect the prior briefing schedule.<br><br>4. Deadlines for ADR compliance and discovery cutoffs remain unchanged.<br><br>5. All pretrial conference and trial dates currently set for after **March 4, 2024**, and all other deadlines associated with the case, will remain in place unless otherwise ordered.<br><br>6. All pretrial conference and trial dates scheduled on or before **March 4, 2024,** are vacated. Other pretrial deadlines (*eg*., motions in limine, pretrial statements, proposed joint trial exhibits, etc.) will remain in place. The Court will notify the parties when a status conference will be held to schedule a new pretrial conference and trial dates for affected cases.<br><br>7. Matters currently referred to a Magistrate Judge will remain before that Magistrate Judge absent further notice.<br><br>8. Each party is expected to review and become familiar with all applicable standing orders and scheduling notes.<br><br>9. On or before **December 11, 2023**, the parties shall file a Joint Case Management Statement (separate statements are appropriate if either party is proceeding without counsel). The statement should not exceed ten pages in length and should address the following items in the following order:<br><br>a. <u>Date Filed</u>: The date the case was filed;<br><br>b. <u>Parties</u>: A list or description of each party;<br><br>c. <u>Claims</u>: A summary of all claims, counter-claims, cross-claims, or third party claims;<br><br>d. <u>Facts</u>: A brief chronology of the facts and a statement of the principal factual issues in dispute;<br><br>e. <u>Legal Issues</u>: A brief statement, without extended legal argument, of the disputed points of law, including reference to specific statutes and decisions;<br><br>f. <u>Relief</u>: A description of the relief sought and the damages claimed with an explanation as to how damages have been (or will be) computed;<br><br>g. <u>Discovery</u>: The status of discovery, including any significant discovery management issues, as well as any limits or cutoff dates; |

| | | |
|---|---|---|
| | | h. Related Cases: The status, case name, and case number of any related cases or proceedings pending before another judge of this court, or before another court or administrative body;<br><br>i. Procedural History: A procedural history of the case, including any previous motions that were decided or submitted, any ADR proceedings or settlement conferences that have been scheduled or concluded, any appellate proceedings that are pending or concluded, and any previous referral to a magistrate judge;<br><br>j. Deadlines: A description of any other deadlines in place before reassignment, including those for ADR, dispositive motions, pretrial conferences, and trials;<br><br>k. Any modification of deadlines: Any requested modification of these dates, and the reasons for the request;<br><br>l. Consent to Magistrate: Whether the parties will consent to a magistrate judge for trial; and<br><br>m. Emergency: Whether there exists an immediate need for a case management conference to be scheduled in the action, and why the parties believe such a need exists.<br><br>10. The Joint Case Management Statement will not constitute a motion to extend or modify dates. If emergency relief is needed to modify a deadline, and the deadline is not of the type that can be modified via stipulation of the parties without a court order, the requesting party or parties shall additionally file a motion or stipulation for such relief in compliance with Local Rule 6.<br><br>11. The assigned judge participates in the Cameras in the Courtroom Pilot Project. Hearings and trials in any civil case assigned to a judge participating in the Pilot Project are eligible for video recording, upon request and with the consent of the parties and the presiding judge. Please see the Northern Districts webpage about participation in the Pilot Project and General Order 65 for more information.<br><br>IT IS SO ORDERED.<br><br>Dated: 11/27/2023<br>FOR THE EXECUTIVE COMMITTEE<br>Mark B. Busby, Clerk of Court<br><br>(kab-adi, COURT STAFF) (Filed on 11/27/2023)<br><br>Any non-CM/ECF Participants have been served by First Class Mail to the addresses of record listed on the Notice of Electronic Filing (NEF) (Entered: 11/27/2023) |
| 11/28/2023 | 53 | Case Reassigned to Judge Rita F. Lin. Judge Haywood S Gilliam, Jr no longer assigned to the case. Notice: The assigned judge participates in the Cameras in the Courtroom Pilot Project. See General Order No. 65 and http://cand.uscourts.gov/cameras. (jml, COURT STAFF) (Filed on 11/28/2023) (Entered: 11/28/2023) |
| 11/30/2023 | 54 | Renotice motion hearing re 44 MOTION to Dismiss *Amended Complaint* filed byGoogle LLC. (Related document(s) 44 ) (Kain, Virginia) (Filed on 11/30/2023) (Entered: 11/30/2023) |
| 11/30/2023 | 55 | CLERK'S NOTICE Vacating Hearing. The motion hearing, which was re-noticed for Tuesday, December 12, 2023, will be decided on papers submitted without oral argument. Accordingly, the hearing is hereby VACATED. |

| | | |
|---|---|---|
| | | *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (tmi, COURT STAFF) (Filed on 11/30/2023)<br>Any non-CM/ECF Participants have been served by First Class Mail to the addresses of record listed on the Notice of Electronic Filing (NEF)<br>(Entered: 11/30/2023) |
| 12/04/2023 | 56 | MOTION for Permanent Injunctive Relief, CROSS MOTION for Summary Judgment filed by Larry Golden. Responses due by 12/18/2023. Replies due by 12/26/2023. (Attachments: # 1 Envelope)(far, COURT STAFF) (Filed on 12/4/2023) (Entered: 12/05/2023) |
| 12/05/2023 | 57 | **ORDER DENYING 56 PLAINTIFF'S REQUEST TO RE-NOTICE MOTIONS THAT WERE PREVIOUSLY DENIED. Plaintiff seeks to re-notice his motion for permanent injunctive relief (Dkt. No. 17) and cross-motion for summary judgment (Dkt. No. 18), which the Court previously denied as moot without prejudice after granting the defendant's motion to dismiss the initial complaint with leave to amend (Dkt. No. 41). As set forth in the Court's prior order, the plaintiff may re-file his motions if the case proceeds beyond the motion to dismiss stage. (Id. at 7.) Currently, the defendant's motion to dismiss the amended complaint remains pending before the Court. In the event the motion to dismiss is denied, the plaintiff may then file a new motion for permanent injunctive relief and cross-motion for summary judgment based on the allegations in the amended complaint. Signed by Judge Rita F. Lin on 12/5/2023. *(This is a text-only entry generated by the court. There is no document associated with this entry.)* (rfllc1, COURT STAFF) (Filed on 12/5/2023)**<br>**Any non-CM/ECF Participants have been served by First Class Mail to the addresses of record listed on the Notice of Electronic Filing (NEF)**<br>**(Entered: 12/05/2023)** |
| 12/07/2023 | 58 | REQUEST FOR JUDICIAL REVIEW by Larry Golden. (Attachments: # 1 Envelope)(far, COURT STAFF) (Filed on 12/7/2023) (Entered: 12/08/2023) |
| 12/11/2023 | 59 | CASE MANAGEMENT STATEMENT filed by Google LLC. (Kain, Virginia) (Filed on 12/11/2023) (Entered: 12/11/2023) |
| 12/12/2023 | 60 | CASE MANAGEMENT STATEMENT filed by Larry Golden. (Attachments: # 1 Envelope)(far, COURT STAFF) (Filed on 12/12/2023) (Entered: 12/12/2023) |
| 12/12/2023 | 61 | DEMAND for Trial by Jury by Larry Golden. (far, COURT STAFF) (Filed on 12/12/2023) (Entered: 12/12/2023) |
| 01/11/2024 | 65 | NOTICE OF RELATED FILINGS IN THE SUPREME COURT by Larry Golden (Attachments: # 1 Envelope)(far, COURT STAFF) (Filed on 1/11/2024) (Entered: 01/29/2024) |
| 01/19/2024 | 62 | NOTICE of Change In Counsel by Matthew S. Warren *Notice of Withdrawal of Virginia G. Kain* (Warren, Matthew) (Filed on 1/19/2024) (Entered: 01/19/2024) |
| 01/19/2024 | 63 | NOTICE of Pendency of Other Action Involving Same Patent by Google LLC (Warren, Matthew) (Filed on 1/19/2024) (Entered: 01/19/2024) |
| 01/25/2024 | 64 | CLERK'S NOTICE re 63 NOTICE of Pendency of Other Action Involving Same Patent by Google LLC.<br>In response to the Notice of Pendency of Other Action Involving Same Patent, docket 63 , the Executive Committee has determined that no case reassignment will occur.<br>(wsn, COURT STAFF) (Filed on 1/25/2024) |

| | | |
|---|---|---|
| | | Any non-CM/ECF Participants have been served by First Class Mail to the addresses of record listed on the Notice of Electronic Filing (NEF) (Entered: 01/25/2024) |
| 02/28/2024 | 66 | NOTICE OF RELATED FILINGS IN THE SUPREME COURT by Larry Golden (Attachments: # 1 Envelope)(far, COURT STAFF) (Filed on 2/28/2024) (Entered: 02/29/2024) |
| 03/14/2024 | 67 | NOTICE OF RELATED FILINGS IN THE SUPREME COURT by Larry Golden (Attachments: # 1 Envelope)(far, COURT STAFF) (Filed on 3/14/2024) (Entered: 03/15/2024) |
| 04/03/2024 | 68 | **ORDER by Judge Rita F. Lin granting 44 Motion to Dismiss; denying 48 Motion for Leave to File Sur-Reply. (mkl, COURT STAFF) (Filed on 4/3/2024)** **Any non-CM/ECF Participants have been served by First Class Mail to the addresses of record listed on the Notice of Electronic Filing (NEF)** **(Entered: 04/03/2024)** |
| 04/03/2024 | 69 | CLERK'S JUDGMENT in favor of Google LLC against Larry Golden. (mkl, COURT STAFF) (Filed on 4/3/2024) Any non-CM/ECF Participants have been served by First Class Mail to the addresses of record listed on the Notice of Electronic Filing (NEF) (Entered: 04/03/2024) |
| 04/10/2024 | 70 | MOTION for Reconsideration and Motion for Disqualification filed by Larry Golden. (far, COURT STAFF) (Filed on 4/10/2024) (Entered: 04/16/2024) |
| 04/17/2024 | 71 | CLERK'S NOTICE REGARDING 70 MOTION FOR RECONSIDERATION AND DISQUALIFICATION: Pursuant to Civil Local Rule 7-1(b), the Court deems the motion suitable for disposition without oral argument. The matter is taken under submission, and the Court will issue a written order. (mkl, COURT STAFF) (Filed on 4/17/2024) Any non-CM/ECF Participants have been served by First Class Mail to the addresses of record listed on the Notice of Electronic Filing (NEF) (Entered: 04/17/2024) |
| 05/28/2024 | 72 | **ORDER by Judge Rita F. Lin denying 70 MOTION for Reconsideration and Disqualification filed by Larry Golden. (mkl, COURT STAFF) (Filed on 5/28/2024)** **Any non-CM/ECF Participants have been served by First Class Mail to the addresses of record listed on the Notice of Electronic Filing (NEF)** **(Entered: 05/28/2024)** |
| 06/21/2024 | 73 | NOTICE OF APPEAL to the Federal Circuit as to 68 Order on Motion to Dismiss,, Order on Motion for Leave to File, 72 Order on Motion for Reconsideration, by Larry Golden. Filing Fee Receipt No. 311169316. Appeal Record due by 7/22/2024. (Attachments: # 1 Receipt of Appeal Fee)(ecg, COURT STAFF) (Filed on 6/21/2024) (Entered: 06/21/2024) |
| 07/01/2024 | 74 | USCA Case Number 24-2024 Federal Circuit for 73 Notice of Appeal to the Federal Circuit, filed by Larry Golden. (Attachments: # 1 Appeal Documents)(far, COURT STAFF) (Filed on 7/1/2024) (Entered: 07/01/2024) |

**PACER Service Center**

**Transaction Receipt**

CAND-ECF

08/21/2024 11:16:27

| | | | |
|---|---|---|---|
| **PACER Login:** | mwoodall | **Client Code:** | |
| **Description:** | Docket Report | **Search Criteria:** | 3:22-cv-05246-RFL |
| **Billable Pages:** | 8 | **Cost:** | 0.80 |

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA – SAN JOSE**

Larry Golden, *Pro Se* Plaintiff
740 Woodruff Rd., #1102
Greenville, SC 29607
Phone (864) 288-5605
Email: atpg-tech@charter.net

FILED
SEP 14 2022
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
C 22 05246
HSG

| LARRY GOLDEN, Plaintiff, V. GOOGLE LLC Defendants. | CIVIL CASE NO: ______ **JURY TRIAL DEMANDED** **(Direct Patent Infringement), (Contributory Patent Infringement), (Joint Patent Infringement)** September 09, 2022 |
|---|---|

## COMPLAINT FOR PATENT INFRINGEMENT

The Federal Circuit on 09/08/2022, in *Larry Golden v. Google LLC*; Case No. 22-1267 — "VACATED AND REMANDED" the relevant Case No: 22-1267 Document 15; back to the District Court "to be filed and request service of process". **Exhibit A**

The Federal Circuit determined the complaint (**Exhibit B - duplicated herein**), "includes a detailed claim chart mapping features of an accused product, the Google Pixel 5 Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189" … "in a relatively straightforward manner" … and that the [Circuit] "express no opinion as to the adequacy of the complaint or claim chart except that it is not facially frivolous."

This is an action of patent infringement in which plaintiff, Larry Golden ("Golden", "Plaintiff" or "Patent Owner"), hereby asserts the following claims for patent infringement of

United States Patent Nos. 10,163,287 ('287 Patent), 9,589,439 ('439 Patent), and 9,096,189 ('189 Patent) ("patents-in-suit": attached hereto as **Exhibits C-E respectively**) against Defendant GOOGLE LLC ("Google" or "Defendant"), and alleges as follows:

Upon information and belief, Plaintiff alleges the patents-in-suit, that were issued with the presumption of validity, under 35 U.S. Code § 282 – "Presumption of validity; (a) In General", is Plaintiff's evidence that Plaintiff is the inventor of the Communicating, Monitoring, Detecting, and Controlling (CMDC) device(s) i.e., smartphones, laptops, tablets, etc.

Upon information and belief, Plaintiff alleges that the defendant Google, has in the past and continues to do so, makes, uses, offer to sell, or sells Google Pixel smartphones 3, 3XL, 3a, 3aXL, 4a, 4a(5G), and 5, that Plaintiff believes infringes at least one of the claims in the patents-in-suit under 35 U.S.C. § 271, "anyone who makes, uses, offers to sell, or sells any patented invention domestically, or imports a patented invention into the United States during the term of the patent, is infringing the patent."

Similarly, under 35 U.S.C. § 271, "anyone who offers to sell, sells, or imports a material component of something that is patented, knowing that the component was especially made for use in an infringement and is not a commodity suitable for a substantial non-infringing use, is also liable as a contributory infringer" Plaintiff is alleging that the defendant Google, has in the past and continues to do so, offer to sell, sells (i.e., to other smartphone and mobile device manufacturers; "Google Search", "Google Fi", "Google Android Operating Systems", "Google Cloud", etc.) or imports a material component of something that is patented (i.e., Plaintiff's CMDC devices). For example, "market.us" has published the following information on Google:

**2018?**

- On January 2018, Alphabet, Inc. acquired Redux – smartphone technology, which is specialized in turning smartphone screens into speakers.

- In October 2018, Google LLC to shut down Google+ after failing to disclose user data leak
- In November 2018, Google LLC acquired Workbench, which is a US-based company, that offers an online library of projects and lessons.
- Under this acquisition, the company focuses on integrating the Workbench tool with Google Classroom. In addition, currently, Google Classroom is one of the most widely used online educational tools, which lets parents, teachers, and students manage class discussions, assignments, and quizzes.
- In 2018, Google Search and Advertising tools helped generating **$335 billion** in economic activity for **more than 1.3 billion millions** of businesses, website publishers, and nonprofits across the United States.
- Many website publishers, non-profit organizations and 40,000 companies in the country benefited from the use of Google Ads and AdSense advertising tools.
- In 2018, Google had sent more than 14 billion dollars to music publishers around the world.
- As of November, 2018, in US, Google connects people to businesses nearby more than **9 billion times**, including over 1 billion phone calls and 3 billion direction requests to stores every month.

**Usage Statistics**

- In a minute on the Internet in 2020, there are **4.1 million search queries, 230 million per hour** and **6 Billion per day** that is **more than 2.5 Trillion searches per year** worldwide.
- Till July 2020, Google has 95.6% share of worldwide mobile search traffic.
- In April 2020, Google processed **12.7 billion** search queries in US, accounting **62.3 percent** of the US total desktop search queries and leading mobile search provider in the US with 95.04% market share
- Daily visitors to Google are **approximately 620 Mn**.
- According to the Datareportal, in June 2020, the top 10 search queries on Google were: Google, Facebook, Youtube, You, Weather, News, Amazon, Coronavirus, Translate and Instagram.
- In July 2019, Google accounted for **95 percent** of US mobile search visits and **93 percent** of overall U.S. organic search engine visits.

- As of May 2019, Gmail is a product that **1.5 billion users** rely on, to get things done every day.
- As of September 2019, People have already asked **Google Lens more than a billion questions** about things they see.
- Google sends **10 billion+ clicks per month** to news publishers' websites.
- As of May 2019, **2.5 million** web publishers use AdSense to make money through their content on the web.
- According to a survey, in Europe the news content linked through Google were **clicked more than 8 billion times a month** that is **3,000 clicks per second** to the publishers' websites in Europe resulting to each click between 4–6-euro cents.
- In the US, Google helps drive over **1 billion direct connections,** like calls and online reservations, for businesses nationwide every month.
- Google owns its **own common misspellings domains** such as www.gooogle.com, www.googlr.com, and www.gogle.com
- Google runs **over 1 Mn computer servers** in data centers around the world.
- Last year, Google **rejected more than 10 million ads** that we suspected of copyright infringement.
- Around **35% of clicks** for U.S. businesses, advertising on Google, came from outside the country.
- As of May 2019, about **80% of traffic** from Google's Showcase Shopping ads to retailer sites are from new visitors discovering the brands.
- Till date, Google has over **2 billion store** offers mapped to physical store locations globally, discoverable by their current local ad formats like local inventory ads.
- Google Station serves more than **10 million people in 1,300 locations** across India, Indonesia, Mexico, Nigeria, the Philippines, Thailand, Vietnam and Brazil.
- Google Assistant is now on **more than one billion devices**, available in more than 30 languages across 80 countries.
- As of 2019, **more than 20 million people visit Google Account every day** to review their settings, using Privacy Checkup.
- As of 2019, **90 million** teachers and students are using G Suite for Education worldwide.

- Google has a database of over 4 billion credentials that have been compromised through various data breaches
- According to a 2018 Survey, around **72% of consumers in Indonesia** see Google Search as the online gateway for personal loan information …

## THE PARTIES

1. Plaintiff Larry Golden is a citizen of South Carolina and has a principal place of business and residence at 740 Woodruff Road, #1102, Greenville, S.C. 29607.

2. On information and belief, Google is incorporated in the State of Delaware with a principal place of business at 1600 Amphitheatre Parkway, Mountain View, CA 94043 and does business in this judicial district by, among other things, committing jointly, directly, and/or indirectly the tort of literal patent infringement or infringement under the "doctrine of equivalents" giving rise to this complaint. Google may be served at its principal place of business at 1600 Amphitheatre Parkway, Mountain View, CA 94043.

3. Google LLC is one of the largest technology companies in the world and conducts product sales, and online search operations in the District of South Carolina. Google LLC directly, jointly, and/or indirectly distributes, markets, offers to sell, sells, and/or imports the infringing Google Pixel Series of smartphones and Google Android Operating Systems.

## STANDARD FOR REVIEW

4. Pursuant to the order of Magistrate Judge Kevin McDonald in United States District Court for the District of South Carolina; filed 12/17/2020; Case No. 6:20-cv-04353-BHH-KFM, Plaintiff was ordered to file "a short and plain statement of the claim showing that the pleader [Plaintiff] is entitled to relief." Fed. R. Civ. P. 8(a).

5. Plaintiff has attached a copy of the asserted patents as **Exhibits C, D, & E**. The attached patents satisfy the requirement of "enough factual allegations. For example, in *Incom Corp. v. Walt Disney Co.*, No. 2:15-cv-03011-PSG-MRW, Dkt. 39, at *4 (C.D. Cal. Feb. 4, 2016) the Central District of California declined to dismiss a complaint that attached the asserted patent, identified the accused products by name, and generally compared the technology disclosed in the patents to the accused products. The complaint *did not identify any specific asserted claim*, but the court found that: "Plaintiff has stated a plausible claim for direct infringement by specifically identifying the Defendant's products and alleging that they perform the same unique function as Plaintiff 's patented system." The Defendant in this case is allegedly liable for infringement of the asserted patents-in-suit under 35 U.S.C. § 271.

6. Plaintiff maintains he has additional factual allegations to support his claim in the form claim charts readily available by order of this Court.

## JURISDICTION AND VENUE

7. This is a civil action for patent infringement arising under the patent laws of the United States, Title 35 of the United States Code. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§§ 1331, 1332(a) and 1338(a).

8. On May 22, 2017, the U.S. Supreme Court narrowed the scope of proper venue for patent infringement actions for domestic corporations. *See TC Heartland LLC v. Kraft Foods Grp. Brands LLC*, No. 16-341 (May 22, 2017). The *TC Heartland* decision reverses the approach to venue previously adopted by the U.S. Court of Appeals for the Federal Circuit, which had held for 27 years that a domestic corporation can be sued for patent infringement anywhere that corporation was subject to personal jurisdiction.

9. The special venue statute for patent infringement actions, 28 U.S.C. § 1400(b), has two provisions permitting venue: "[1] where the defendant resides, or [2] where the defendant has committed acts of infringement and has a regular and established place of business."

10. Since the enactment of that statute, the Supreme Court consistently has interpreted Section 1400(b)'s first provision of proper venue— "where the defendant resides". *E.g., Fourco Glass Co. v. Transmirra Prods. Corp.*, 353 U.S. 222, 226 (1957). As a result, a domestic corporation may now be sued for patent infringement only in its state of incorporation or where it has committed acts of infringement and has a regular and established place of business.

## RELATED CASES

11. Plaintiff has alleged that Apple is infringing Plaintiff's communicating, monitoring, detecting, and controlling (CMDC) device in a related case *Larry Golden v. Apple, Inc. et al* filed on 12/16/2020 at the United States District Court for the District of South Carolina; Greenville Division (Case No. 6:20-cv-04353) against defendants, Apple Inc. ("Apple"), Samsung Electronics, USA ("Samsung"), LG Electronics, USA, Inc. ("LG"), Qualcomm Inc. ("Qualcomm"), Motorola Solutions Inc. ("Motorola"), Panasonic Corporation ("Panasonic"), AT&T Inc. ("AT&T"), Verizon Corporation Services Group ("Verizon"), Sprint Corporation ("Sprint"), T-Mobile USA, Inc. ("T-Mobile"), Ford Global Technologies, LLC ("Ford"), Fairway Ford Lincoln of Greenville ("Fairway Ford"), General Motors Company ("GM"), Kevin Whitaker Chevrolet ("Whitaker Chevrolet"), FCA US LLC ("FCA"), and Big O Dodge Chrysler Jeep Ram ("Big O").

12. Plaintiff has filed an action of Antitrust Law violations *Larry Golden v. Apple, Inc. et al* on June 16, 2020, at the United States District Court for the District of South Carolina; Greenville Division (Case No. 6:20-cv-02270) against defendants, Apple Inc. ("Apple"),

Samsung Electronics, USA ("Samsung"), LG Electronics, USA, Inc. ("LG"), Qualcomm Inc. ("Qualcomm"), Ford Global Technologies, LLC ("Ford"), General Motors Company ("GM"), and, FCA US LLC ("FCA").

## GOOGLE SMARTPHONE SPECIFICATIONS / ANDROID PLATFORM

13. Upon information and belief, Google is directly infringing Plaintiff's patented CMDC devices by making, using, offering for sale, selling and/or importing the aforementioned alleged infringing devices that have at a minimum, directly infringed Plaintiff's '287, '439, and '189 patents, to unjustly enrich itself.

14. Upon information and belief, Google is jointly infringing Plaintiff's patented CMDC devices by offering for use, using, offering for sale, selling and/or importing as essential, Google's Android platform for use with Google's smartphones, and other Android smartphone devices i.e., Samsung, LG, Motorola, etc., that have at a minimum, directly infringed Plaintiff's '287, '439, and '189 patents. Android smartphones have permanent default Google-owned apps like Google search, Google Play, YouTube, Maps etc. The main Android framework is signed in through a Google account too. So, you need to have a Google account to use Android.

15. The smartphone has come a long way since the first iPhone launched in 2007. While Apple's iOS is arguably the world's first smartphone operating system, Google's Android is by far the most popular. Android has evolved significantly since first being released on an HTC-made T-Mobile device in 2008.

16. It wasn't until 2005 that Google purchased Android, Inc., and while there wasn't much info about Android at the time, many took it as a signal that Google would use the platform to enter the phone business. Eventually, Google did enter the smartphone business —

but not as a hardware manufacturer. Instead, it marketed Android to other manufacturers, first catching the eye of HTC, which used the platform for the first Android phone, the HTC Dream, in 2008.

17. Upon information and belief, Google has copied the "product grouping" strategy of the Plaintiff (Golden) for a communicating, monitoring, detecting, and controlling (CMDC) device, i.e., Google's smartphone products are grouped together by "common features of design similarities". As illustrated below, Google's smartphones are basically the same.

18. Therefore, when analyzing the specifications, features, and functionality of Google's smartphones as a complete product, and not merely identifying the individual infringing processes; there is a strong likelihood that if one of Google's smartphones infringes Plaintiff's claimed invention of a CMDC device; it can be perceived that all of Google's smartphones infringes Plaintiff's claimed invention of a CMDC device as a 'whole' product.

**GOOGLE PIXEL 5 VS. PIXEL 4A WITH 5G VS. PIXEL 4**

| Category | Pixel 5 | Pixel 4A with 5G | Pixel 4A |
|---|---|---|---|
| Network | 5G | 5G | 4G |
| **Screen** | 6-inch flexible OLED display at 432 ppi | 6.2-inch OLED display at 413 ppi | 5.8-inch OLED display at 443 ppi |
| **Refresh Rate** | 90 Hz | 60 Hz | 60 Hz |
| **Resolution** | 1080 x 2340 | 1080 x 2340 | 1080 x 2340 |
| **Battery** | 4080 mAh | 3885 mAh | 3140 mAh |
| **Front Camera** | 8 megapixels | 8 megapixels | 8 megapixels |
| **Rear Camera** | 12.2-megapixel dual-pixel (16-megapixel ultrawide) | 12.2-megapixel dual-pixel (16-megapixel ultrawide) | 12.2-megapixel dual-pixel |
| **Camera Features** | Night Sight, Portrait Light, Cinematic Pan, Live HDR+ | Night Sight, Portrait Light, Cinematic Pan, Live HDR+ | Night Sight, Live HDR+ |

| Category | Pixel 5 | Pixel 4A with 5G | Pixel 4A |
|---|---|---|---|
| RAM | 8GB | 6GB | 6GB |
| Processor | Qualcomm Snapdragon 765G | Qualcomm Snapdragon 765G | Qualcomm Snapdragon 730G |
| Storage | 128GB | 128GB | 128GB |
| Audio | Stereo speakers, USB-C audio | Stereo speakers, USB-C audio, 3.5mm headphone jack | USB-C audio, 3.5mm headphone jack |
| Price | $699 | $499 | $349 |
| Wireless Charging | Yes | No | No |
| Water Resistant | Yes | No | No |
| Colors | Green, Black | White, Black | Black |
| Operating System | Pre-loaded with Android 11 | Pre-loaded with Android 11 | Pre-loaded with Android 10 |

GOOGLE PIXEL 3 SERIES SPEC COMPARISON

| Specification | Pixel 3A | Pixel 3A XL | Pixel 3 | Pixel 3 XL |
|---|---|---|---|---|
| Display | 5.6 inches | 6.0 inches | 5.5 inches | 6.3 inches |
| Resolution | 2220 x 1080 | 2160 x 1080 | 2160 x 1080 | 2960 x 1440 |
| Processor | Snapdragon 670 (2.0GHz and 1.7GHz, octa-core) | Snapdragon 670 (2.0GHz and 1.7GHz, octa-core) | Snapdragon 845 (2.5GHz and 1.6GHz, octa-core) | Snapdragon 845 (2.5GHz and 1.6GHz, octa-core) |
| RAM | 4GB | 4GB | 4GB | 4GB |
| Storage | 64GB | 64GB | 64GB, 128GB | 64GB, 128GB |
| Rear camera | 12 megapixels | 12 megapixels | 12 megapixels | 12 megapixels |

| Specification | Pixel 3A | Pixel 3A XL | Pixel 3 | Pixel 3 XL |
|---|---|---|---|---|
| Front camera | 8 megapixels | 8 megapixels | 8 megapixels, 8 megapixels(wide) | 8 megapixels, 8 megapixels(wide) |
| Battery | 3,000mAh | 3,700mAh | 2,915mAh | 3,430mAh |
| Water protection | N/A | N/A | IPX8 | IPX8 |
| Wireless charging? | No | No | Yes | Yes |
| Ports? | USB-C, 3.5mm headphone jack | USB-C, 3.5mm headphone jack | USB-C | USB-C |
| Weight | 0.32 pounds | 0.37 pounds | 0.33 pounds | 0.4 pounds |
| Dimensions (in.) | 6.0 x 2.80 x 0.30 | 6.30 x 3.00 x 0.30 | 5.70 x 2.70 x 0.30 | 6.20 x 3.00 x 0.30 |
| Starting price | $399.00 | $479.00 | $799.00 | $899.00 |
| Operating System | Pre-loaded Android | Pre-loaded Android | Pre-loaded Android | Pre-loaded Android |

SENSOR TYPES SUPPORTED BY THE "*ANDROID*" PLATFORM

| | | | |
|---|---|---|---|
| **Type Accelerometer** | Hardware | Measures the acceleration force in m/s$^2$ that is applied to a device on all three physical axes (x, y, and z), including the force of gravity. | Motion detection (shake, tilt, etc.). |
| **Type Ambient Temperature** | Hardware | Measures the ambient room temperature in degrees Celsius (°C). See note below. | Monitoring air temperatures. |
| **Type Gravity** | Software or Hardware | Measures the force of gravity in m/s$^2$ that is applied to a device on all three physical axes (x, y, z). | Motion detection (shake, tilt, etc.). |
| **Type Gyroscope** | Hardware | Measures a device's rate of rotation in rad/s around each of the three physical axes (x, y, and z). | Rotation detection (spin, turn, etc.). |

| | | | |
|---|---|---|---|
| **Type Light** | Hardware | Measures the ambient light level (illumination) in lx. | Controlling screen brightness. |
| **Type Linear Acceleration** | Software or Hardware | Measures the acceleration force in $m/s^2$ that is applied to a device on all three physical axes (x, y, and z), excluding the force of gravity. | Monitoring acceleration along a single axis. |
| **Type Magnetic Field** | Hardware | Measures the ambient geomagnetic field for all three physical axes (x, y, z) in μT. | Creating a compass. |
| **Type Orientation** | Software | Measures degrees of rotation that a device makes around all three physical axes (x, y, z). As of API level 3 you can obtain the inclination matrix and rotation matrix for a device by using the gravity sensor and the geomagnetic field sensor in conjunction with the get Rotation Matric () method. | Determining device position. |
| **Type Pressure** | Hardware | Measures the ambient air pressure in hPa or mbar. | Monitoring air pressure changes. |
| **Type Proximity** | Hardware | Measures the proximity of an object in cm relative to the view screen of a device. This sensor is typically used to determine whether a handset is being held up to a person's ear. | Phone position during a call. |
| **Type Relative Humidity** | Hardware | Measures the relative ambient humidity in percent (%). | Monitoring dewpoint, absolute, and relative humidity. |
| **Type Rotation Vector** | Software or Hardware | Measures the orientation of a device by providing the three elements of the device's rotation vector. | Motion detection and rotation detection. |
| **Type Temperature** | Hardware | Measures the temperature of the device in degrees Celsius (°C). This sensor implementation varies across devices and this sensor was replaced with the **Type—Ambient Temperature** sensor in API Level 14 | Monitoring temperatures. |

- **BIOMETRICS**: Biometric factors allow for secure authentication on the Android platform. The Android framework includes face and fingerprint biometric authentication. Android can be customized to support other forms of biometric authentication (such as Iris).

- **DISABLING LOCK MECHANISM:** Google's Android operating system features a lock mechanism to secure your phone, known as pattern lock. When setting the pattern, you must drag your finger along lines on the screen between different nodes. Afterward, to unlock the phone, you'll need to replicate the pattern drawn. If you fail to solve the pattern too many times, the phone locks and cannot be unlocked without logging into the associated Google account. If you can't log in, you'll have to employ some other methods to restore control of your phone.

- **CHEMICAL, BIOLOGICAL, RADIOLOGICAL, AND NUCLEAR (CBRN) DETECTION:** Through collaboration and innovation, the Defense Threat Reduction Agency has integrated its powerful, hazard-awareness-and-response tools into the *Android Tactical Assault Kit (or the Android Team Awareness Kit, ATAK).* ATAK is a digital application available to warfighters throughout the DoD. Built on the Android operating system, ATAK offers warfighters geospatial mapping for situational awareness during combat — on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK now includes chemical, biological, radiological, and nuclear (CBRN) plug-ins.

- **HEART RATE**: *Android Team Awareness Kit, ATAK* provides a single interface for viewing and controlling different CBRN-sensing technologies, whether that is a wearable smartwatch that measures a warfighter's vitals (e.g., heart rate) or a device mounted on a drone to detect chemical warfare agents.

- **NEAR FIELD COMMUNICATION (NFC)**: Pixel™, Phone by Google - Turn NFC on/off. Near Field Communication (NFC) allows the transfer of data between devices that are a few centimeters apart, typically back-to-back. NFC must be turned on for NFC-based apps (e.g., Tap to Pay) to function correctly. NFC is a set of short-range wireless technologies, typically requiring a distance of 4cm or less to initiate a connection. NFC allows you to share small payloads of data between an NFC tag and an Android-powered device, or between two Android-powered devices. Tags can range in complexity.

- **WARFIGHTERS:** The U.S. armed forces and their interagency and coalition partners value *Android Team Awareness Kit, ATAK* and the common operating picture it provides. DTRA continues to develop CBRN-specific plug-in capabilities to support warfighters on the battlefield.

---

## GOOGLE'S JOINT INFRINGEMENT WITH APPLE INC.

19. According to Gurman, 2020, "The U.S. government's antitrust assault against Google reveals new details about a secretive, multibillion-dollar deal between the internet giant and Apple Inc., the world's largest technology company. The Justice Department's lawsuit, filed Tuesday, targets paid deals Google negotiates to get its search engine to be the default on

browsers, phones and other devices. The biggest of these is an agreement that makes Google search the default on iPhones and other Apple devices."

20. The U.S. government said Apple Chief Executive Officer Tim Cook and Google CEO Sundar Pichai met in 2018 to discuss the deal. After that, an unidentified senior Apple employee wrote to a Google counterpart that "our vision is that we work as if we are one company."

21. The DOJ also cited internal Google documents that call the Apple search deal a "significant revenue channel" for the search giant and one that, if lost, would result in a "Code Red" scenario. That's because nearly half of Google search traffic in 2019 came from Apple products, according to the lawsuit.

22. Google pays Apple billions of dollars a year to make its search product the default option, according to analyst estimates. That means when a user buys a new iPhone or other Apple device, the built-in search engine in the Safari browser is Google.

23. The DOJ suit cited estimates that Apple gets $8 billion to $12 billion annually from Google through the agreement. Apple's income from the search deal is believed to be part of the company's growing Services segment, a key metric Apple has highlighted to investors and analysts in recent years.

> Gurman, Mark (2020, Oct. 20). *Apple, Google worked as 'one company' on search deal, U.S. says*. https://www.bloomberg.com/news/articles/2020-10-20/apple-google-worked-as-one-company-on-search-deal-u-s-says

**Joint Infringement**

24. Upon information and belief, Google and Apple are jointly infringing Plaintiff's patented CMDC devices by offering for use, using, offering for sale, selling and/or importing as essential, Google's Search for use with Google and Apple smartphones, that have at a minimum,

directly infringed independent claims 1, 2, and 3 of the '189 patent; independent claims 13, 14, 15, and 23 of the '439 patent; and, independent claims 4, 5, and 6 of the '287 patent.

25.    Plaintiff has alleged that Apple is infringing Plaintiff's communicating, monitoring, detecting, and controlling (CMDC) device in a related case *Larry Golden v. Apple, Inc. et al* filed on 12/16/2020 at the United States District Court for the District of South Carolina; Greenville Division (Case No. 6:20-cv-04353) against defendants, Apple Inc. et al.

26.    Plaintiff has also filed a case *Larry Golden v. Apple, Inc. et al* on 06/16/2020 at the United States District Court for the District of South Carolina; Greenville Division (Case No. 6:20-cv-02270) against defendants, Apple Inc. et al. for Antitrust Law Violations.

## GOOGLE'S JOINT INFRINGEMENT WITH QUALCOMM INC.

27.    According to a Qualcomm press release (2020), "Qualcomm Technologies, Inc. and Google announced their collaboration to enhance and extend Project Treble with the goal of enabling more devices with Qualcomm® Snapdragon™ mobile platforms to run the latest Android OS. The enhancements are intended to enable Original Equipment Manufacturers (OEMs) to upgrade their Snapdragon based devices to the latest Android OS without modifying Qualcomm Technologies' chipset-specific software and to use a common Android software branch to upgrade devices based on a wide range of Snapdragon mobile platforms across Qualcomm Technologies' portfolio. These enhancements are designed to reduce the time and resources required to upgrade Snapdragon based devices to the latest Android OS version."

28.    As part of this collaboration with Google, Qualcomm Technologies will now support four Android OS versions and four years of security updates for all Snapdragon platforms utilizing the Project Treble enhancements, starting with the new Snapdragon 888

Mobile Platform. These initiatives are designed to enable faster Android OS upgrades with fewer resources and a predictable software lifecycle for Snapdragon based devices, which together are expected to result in more consumers with Snapdragon based devices running the latest Android OS version.

29.     "Google continues to work closely with our technology partners to increase the freshness of the Android ecosystem. Through this collaboration with Qualcomm Technologies, we expect that Android users will have the latest OS upgrades and greater security on their devices," said David Burke, vice president of Android engineering, Google.

30.     "We are excited to work with Google to extend our support for Android OS and security updates on future Snapdragon mobile platforms utilizing the Project Treble enhancements," said Kedar Kondap, vice president, product management, Qualcomm Technologies, Inc.

**Terminology**

- Google's android operating system; same as "operating system".

- Google's android operating system; same as "computer program".

- Google's android operating system; same as "software".

- Qualcomm's chipset; used interchangeably as "processor".

- Qualcomm's chipset; used interchangeably as "central processing unit".

- Qualcomm's chipset; used interchangeably as "wireless technology" (WiFi, 3G, 4G, 5G, LTE, and so on).

31.     An operating system is a computer program, works as interface between user and hardware and provides common services for computer programs. The entire process or functionality of computer system depends on the operating system. An operating system is a

computer program that controls the execution of application programs and acts as an interface between the user of a computer and the computer hardware. The purpose of an operating system is to provide an environment in which a user can execute programs in a convenient and efficient manner. https://www.geeksforgeeks.org/introduction-of-operating-system-set-1/

32. A Central Processing Unit (CPU) is a machine that can execute computer programs. This broad definition can easily be applied to many early computers that existed long before the term "CPU" ever came into widespread usage. The term itself and its initialism have been in use in the computer industry at least since the early 1960s (Weik 1961). The form, design and implementation of CPUs have changed dramatically since the earliest examples, but their fundamental operation has remained much the same.

33. An Operating System is the core software that allows applications to interface with the hardware. Operating Systems control the specific details of your system, presenting a more manageable interface for applications (and the user) to make use of. To use an analogy, the CPU is the brain, the OS is the mind. The mind cannot exist without a brain to store it, and the brain is just a useless lump without a mind to control it. https://answers.yahoo.com/question/index?qid= 20090927101607AAiAJ42

34. An SoC, or system-on-a-chip to give its full name, integrates almost all of these components into a single silicon chip. Along with a CPU, an SoC usually contains a GPU (a graphics processor), memory, USB controller, power management circuits, and wireless radios (WiFi, 3G, 4G LTE, and so on). Whereas a CPU cannot function without dozens of other chips, it's possible to build complete computers with just a single SoC. The number one advantage of an SoC is its size: An SoC is only a little bit larger than a CPU, and yet it contains a lot more functionality. If you use a CPU, it's very hard to make a computer that's smaller than 10cm (4

inches) squared, purely because of the number of individual chips that you need to squeeze in. Using SoCs, we can put complete computers in smartphones and tablets, and still have plenty of space for batteries. https://www.extremetech.com/computing/126235-soc-vs-cpu-the-battle-for-the-future-of-computing.

**Joint Infringement**

35. Upon information and belief, Google and Qualcomm are jointly infringing Plaintiff's patented CMDC devices by offering for use, using, offering for sale, selling and/or importing as essential, Google's Android platform for use with Qualcomm's SoCs, CPUs, etc. for smartphones that have at a minimum, directly infringed independent claims 1, 2, and 3 of the '189 patent; independent claims 13, 14, 15, and 23 of the '439 patent; and, independent claims 4, 5, and 6 of the '287 patent.

36. Google developing its own phone processor would mean dumping the Qualcomm SoCs it usually uses. Of course, you can never truly be rid of Qualcomm: Google would presumably still need to use Qualcomm modems, something that even Apple still needs to do. There are other modem manufacturers out there—Samsung, Huawei, Mediatek—but Qualcomm's combination of patents and strong-arm licensing techniques has effectively locked its competitors out of the US and other markets.

37. Plaintiff has alleged that Qualcomm is infringing Plaintiff's communicating, monitoring, detecting, and controlling (CMDC) device in a related case *Larry Golden v. Apple, Inc. et al.* filed on 12/16/2020 at the United States District Court for the District of South Carolina; Greenville Division (Case No. 6:20-cv-04353) against defendants, *Apple Inc. et al.*

38. Plaintiff has also filed a case *Larry Golden v. Apple, Inc. et al* on 06/16/2020 at the United States District Court for the District of South Carolina; Greenville Division (Case No. 6:20-cv-02270) against defendants, *Apple Inc. et al.* for Antitrust Law Violations.

## CLAIM CONSTRUCTION

"*Inter Partes Review* (IPR): *Department of Homeland Security vs. Larry Golden;* Case No.: IPR2014-00454 (Patent RE43,990; Claims 11, 74, & 81); Final Written Decision entered on October 1, 2015. "In the 'Decision to Institute', we construed certain claim terms. Those constructions are reproduced in the chart below:

| Claim Term | Construction |
|---|---|
| "built in, embedded" (claim 74) | "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device" |
| "communication device" (claim 81) | "monitoring equipment" |

Dec. to Inst. 11-16

39. "No party challenges these constructions. Both of these terms were modified or removed in the amendment. To the extent that any of these constructions remain relevant after the amendment, we see no reason to modify them… [w]e further determined that no explicit construction was necessary for any other claim terms. Dec. to Inst. 10-11. Based on the record adduces during trial, we see no need to construe any other terms…"

40. "Beginning with the claim preamble amendment, the preamble of claim 11 originally read: "A communication device of at least one of *a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal at a monitoring site* for

monitoring products for communication therebetween, comprising…." In claim 154, the language in italics has been eliminated and replaced with "the products grouped together by common features in the product grouping category of design similarity (e.g., computer terminal, personal computer (PC)) …" Patent Owner contends that this new language is consistent with words found in the disclosure of the '118 application. Mot. To Amend 4. Patent Owner further contends that this new language is broad enough to include the removed items, such as cell phones and smart phones, because those items are "species terms" that are "included in the genus 'monitoring equipment' and 'communication device' when the clause 'products grouped together by common features in the product groupings category of design similarity' is included." *Id.* Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." *"Inter Partes Review* (IPR): *Department of Homeland Security vs. Larry Golden;* Case No.: IPR2014-00454 (Patent RE43,990; Claims 11, 74, & 81); Final Written Decision entered on October 1, 2015.

## COUNT I

### (Infringement of the '287 Patent)

41. Golden realleges and incorporates herein the allegations set forth in Paragraphs 1-40.

42. On information and belief, Google is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing at least independent claims 4, 5, and 6 of the '287 patent.

The alleged infringing products are: Google Pixel smartphones 3, 3XL, 3a, 3aXL, 4a, 4a(5G), and 5.

43. As set forth in Golden's preliminary infringement contentions that Google is making, using, offering for sale, selling and/or importing Plaintiff's CMDC device have at a minimum directly infringed the '287 patent and Google is thereby liable for infringement of the '287 patent pursuant to 35 U.S.C. § 271. Google have caused damage to Golden, which infringement and damage will continue unless and until Google is enjoined.

44. The alleged infringement of Golden identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

## COUNT II

### (Infringement of the '439 Patent)

45. Golden realleges and incorporates herein the allegations set forth in Paragraphs 1-44.

46. On information and belief, Google is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing at least independent claims 13, 14, 15, and 23 of the '439 patent. The alleged infringing products are: Google Pixel smartphones 3, 3XL, 3a, 3aXL, 4a, 4a(5G), and 5.

47. As set forth in Golden's preliminary infringement contentions that Google is making, using, offering for sale, selling and/or importing Plaintiff's CMDC device have at a minimum directly infringed the '439 patent and Google is thereby liable for infringement of the

'439 patent pursuant to 35 U.S.C. § 271. Google have caused damage to Golden, which infringement and damage will continue unless and until Google is enjoined.

48. The alleged infringement of Google identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

## COUNT III

### (Infringement of the '189 Patent)

49. Golden realleges and incorporates herein the allegations set forth in Paragraphs 1-48.

50. On information and belief, Google is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing claims 1, 2 & 3 of the '189 patent. The alleged infringing products are: Google Pixel smartphones 3, 3XL, 3a, 3aXL, 4a, 4a(5G), and 5.

51. As set forth in Golden's preliminary infringement contentions that Google is making, using, offering for sale, selling and/or importing Plaintiff's CMDC device have at a minimum directly infringed the '189 patent and Google is thereby liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271. Google have caused damage to Golden, which infringement and damage will continue unless and until Google is enjoined.

52. The alleged infringement of Google identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

## CLAIM CHART

53. The following Claim Chart is an illustration of literal infringement. At least one of the alleged infringing products of Google (i.e., Google Pixel smartphones 3, 3XL, 3a, 3aXL, 4a, 4a(5G), or 5) is representative of all the alleged infringing products of Google asserted in this complaint. At least one of the alleged infringing products of Google (Google Pixel 5) is illustrated to show how the Google Pixel 5 allegedly infringes on at least one of the asserted independent claims of each of the patents-in-suit ('287, '439, and '189 patents).

| **Google Pixel 5 Smartphone** | **Patent #: 10,163,287; Independent Claim 5** | **Patent #: 9,589,439; Independent Claim 23** | **Patent #: 9,096,189; Independent Claim 1** |
|---|---|---|---|
|  | A monitoring device, comprising: | A cell phone comprising: | A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, comprising: |
| CPU: Octa-core (1 × 2.4 GHz Kryo 475 Prime & 1 × 2.2 GHz Kryo 475 Gold & 6 × 1.8 GHz Kryo 475 Silver) System-on-a-chip: Qualcomm Snapdragon 765G | at least one central processing unit (CPU); | a central processing unit (CPU) for executing and carrying out the instructions of a computer program; | at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or a front-end processor for communication between a host computer and other devices; |

| | | | |
|---|---|---|---|
| Ambient Temperature sensor supported by the Android platform. Measures the ambient room temperature in degrees Celsius (°C). Monitoring air temperatures. Monitoring air temperatures. | at least one temperature sensor in communication with the at least one CPU for monitoring temperature; | X | X |
| Gravity sensor supported by the Android platform. Measures the force of gravity in m/s2 that is applied to a device on all three physical axes (x, y, z). Motion detection (shake, tilt, etc.). | at least one motion sensor in communication with the at least one CPU; | X | X |
| Light sensor supported by the Android platform. Measures the ambient light level (illumination) in lx. Controlling screen brightness. Screen: 6-inch flexible OLED display at 432 ppi | at least one viewing screen for monitoring in communication with the at least one CPU; | X | X |
| Connectivity: Wi-Fi 5 (a/b/g/n/ac) 2.4 + 5.0 GHz, Bluetooth 5.0 + LE, NFC, GPS (GLONASS, Galileo, BeiDou), eSIM capable | at least one global positioning system (GPS) connection in communication with the at least one CPU; | at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; | at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection; |

| | | | |
|---|---|---|---|
| Connectivity: Wi-Fi 5 (a/b/g/n/ac) 2.4 + 5.0 GHz, Bluetooth 5.0 + LE, NFC, GPS (GLONASS, Galileo, BeiDou), eSIM capable | at least one of an internet connection or a Wi-Fi connection in communication with the at least one CPU; | wherein at least one of… WiFi connection, internet connection, radio frequency (RF) connection, cellular connection… capable of signal communication with the transmitter or the receiver; | wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group… of satellite, Bluetooth, WiFi… |
| Connectivity: Wi-Fi 5 (a/b/g/n/ac) 2.4 + 5.0 GHz, Bluetooth 5.0 + LE, NFC, GPS (GLONASS, Galileo, BeiDou), eSIM capable | at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; | at least one of a… Bluetooth connection, WiFi connection, internet connection… cellular connection… short range radio frequency (RF) connection, or GPS connection; | X |
| Google's Android operating system features a lock mechanism to secure your phone, known as pattern lock. To set, drag your finger along lines on the screen. To unlock the phone, replicate the pattern drawn. If you fail to solve the pattern too many times, the phone locks and cannot be unlocked without logging into the associated Google account.<br><br>Google Nest × Yale Lock is connected to the Nest app; you can lock or unlock your door from your phone. | at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device; | whereupon the cell phone is interconnected to the cell phone detection device to receive signals or send signals to lock or unlock doors, to activate or deactivate security systems, to activate or deactivate multi-sensor detection systems, or to activate or deactivate the cell phone detection device; | X |

| | | | |
|---|---|---|---|
| Pixel phones use USB-C with USB 2.0 power adapters and cables. To charge your phone with a USB-A power adapter, use a USB-C to USB-A cable. | at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device; | X | X |
| BIOMETRICS: Biometric factors allow for secure authentication on the Android platform. The Android framework includes face and fingerprint biometric authentication. Android can be customized to support other forms of biometric authentication (such as Iris). | at least one biometric sensor in communication with the at least once CPU for providing biometric authentication to access the communication device; | wherein the cell phone is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature such that the cell phone is locked by the biometric lock disabler to prevent unauthorized use; and | wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature such that the communication device that is at least one of the cell phone, the smart phone, the desktop, the handheld, the PDA, the laptop or the computer terminal is locked by the biometric lock disabler to prevent unauthorized use |
| *Android Team Awareness Kit*, ATAK (built on the Android operating system) provides a single interface for viewing and controlling different CBRN-sensing technologies, whether that is a wearable smartwatch that measures a warfighter's vitals (e.g., heart rate) or a device mounted on a drone to detect chemical warfare agents. | at least one sensor for chemical, biological, or human detection in communication with the at least one CPU; | the cell phone is at least a fixed, portable or mobile communication device interconnected to the cell phone detection device, capable of wired or wireless communication therebetween; and | the communication device is at least a fixed, portable or mobile communication device interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween… |

| | | | |
|---|---|---|---|
| *Android Team Awareness Kit*, ATAK (built on the Android operating system) is a digital application available to warfighters throughout the DoD. ATAK offers warfighters geospatial mapping for situational awareness during combat — on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK now includes chemical, biological, radiological, and nuclear (CBRN) plug-ins. | one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents; | at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone; | wherein the communication device receives a signal via any of one or more products listed in any of the plurality of product grouping categories; |
| Connectivity: Wi-Fi 5 (a/b/g/n/ac) 2.4 + 5.0 GHz, Bluetooth 5.0 + LE, NFC, GPS (GLONASS, Galileo, BeiDou), eSIM capable | at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU… | X | X |
| Google Nest × Yale Lock is connected to the Nest app; you can lock or unlock your door from your phone.<br><br>*Android Team Awareness Kit*, ATAK (built on the Android operating system) provides a single interface for viewing and controlling different CBRN-sensing technologies | at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or… detect at least one of a chemical biological… agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. | a transmitter for transmitting signals and messages to a cell phone detection device; a receiver for receiving signals from the cell phone detection device; | a transmitter for transmitting signals and messages to at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device;<br><br>a receiver for receiving signals, data or messages from at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device; |

| | | | |
|---|---|---|---|
| Google Nest × Yale Lock is connected to the Nest app; you can lock or unlock your door from your phone.<br><br>*Android Team Awareness Kit*, ATAK (built on the Android operating system) provides a single interface for viewing and controlling different CBRN-sensing technologies | X | X | whereupon the communication device, is interconnected to a product equipped to receive signals from or send signals to lock or unlock doors, activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems |
| *Android Team Awareness Kit*, ATAK (built on the Android operating system) is a digital application available to warfighters throughout the DoD. ATAK offers warfighters geospatial mapping for situational awareness during combat — on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK now includes chemical, biological, radiological, and nuclear (CBRN) plug-ins. | X | a transmitter for transmitting signals and messages to a cell phone detection device; a receiver for receiving signals from the cell phone detection device; | wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection… short range radio frequency (RF) connection is capable of signal communication with the transmitter and the receiver of the communication device and transceivers of the products; |

| | | | |
|---|---|---|---|
| *Android Team Awareness Kit*, ATAK (built on the Android operating system) is a digital application available to warfighters throughout the DoD. ATAK offers warfighters geospatial mapping for situational awareness during combat — on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK now includes chemical, biological, radiological, and nuclear (CBRN) plug-ins. | X | whereupon a signal sent to the receiver of the cell phone detection device from at least one of the chemical sensor, the biological sensor, the explosive sensor, the human sensor, the contraband sensor, or the radiological sensor, causes a signal that includes at least one of location data or sensor data to be sent to the cell phone. | X |

## PRAYER FOR RELIEF

Wherefore, Golden respectfully requests that this Court enter:

A. A judgment in favor of Golden that the defendant has infringed at least one or more claims of the '287 Patent, the '439 Patent, and the '189 Patent as aforesaid;

B. A permanent injunction enjoining the defendant, its officers, directors, agents, servants, affiliates, employees, divisions, branches, subsidiaries, parents and all others acting in active concert or privity therewith from direct, indirect and/or joint infringement of the '287, '439, and '189 patents as aforesaid pursuant to 35 U.S.C. § 283;

C. A judgment and order requiring the defendant to pay Golden its damages with pre- and post-judgment interest thereon pursuant to 35 U.S.C. § 284;

D. As set forth in Golden's preliminary infringement contentions that the Defendant in this case is making, using, offering for sale, selling and/or importing the

aforementioned alleged infringing devices that have at a minimum, directly infringed the '287, '439, and '189 patents. The Defendant is thereby liable for infringement of the '287, '439, and '189 patents pursuant to 35 U.S.C. § 271. The Defendant has caused damage to Golden, which infringement and damage will continue unless and until the Defendant is enjoined.

E. Any and all further relief to which the Court may deem Golden entitled.

## DEMAND FOR JURY TRIAL

Golden requests a trial by jury on all issues so triable by right pursuant to Fed. R. Civ. P. 38. A right guaranteed under the Seventh Amendment of the Constitution.

Respectfully submitted,

S/ Larry Golden Date: 09 /12/2022

Larry Golden, Petitioner, Pro Se

740 Woodruff Rd., #1102

Greenville, South Carolina 29607

(H) 864-288-5605 / (M) 864-992-7104

atpg-tech@charter.net

# EXHIBIT A

# United States Court of Appeals for the Federal Circuit

---

**LARRY GOLDEN,**
*Plaintiff-Appellant*

**v.**

**GOOGLE LLC,**
*Defendant*

---

2022-1267

---

Appeal from the United States District Court for the District of South Carolina in No. 6:21-cv-00244-JD, Judge Joseph Dawson, III.

---

**JUDGMENT**

---

THIS CAUSE having been considered, it is

ORDERED AND ADJUDGED:

**VACATED AND REMANDED**

FOR THE COURT

September 8, 2022
Date

/s/ Peter R. Marksteiner
Peter R. Marksteiner
Clerk of Court

NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**LARRY GOLDEN,**
*Plaintiff-Appellant*

**v.**

**APPLE INC., SAMSUNG ELECTRONICS USA, LG ELECTRONICS USA, INC., QUALCOMM INCORPORATED, MOTOROLA SOLUTIONS, INC., PANASONIC CORPORATION, AT&T INC., VERIZON CORPORATION SERVICE GROUP, SPRINT CORPORATION, T-MOBILE USA, INC., FORD GLOBAL TECHNOLOGIES, LLC, FAIRWAY FORD LINCOLN OF GREENVILLE, GENERAL MOTORS COMPANY, KEVIN WHITAKER CHEVROLET, FCA US LLC, BIG O DODGE CHRYSLER JEEP RAM,**
*Defendants*

---

2022-1229

---

Appeal from the United States District Court for the District of South Carolina in No. 6:20-cv-04353-JD, Judge Joseph Dawson, III.

---

**LARRY GOLDEN,**
*Plaintiff-Appellant*

v.

**GOOGLE LLC,**
*Defendant*

---

2022-1267

---

Appeal from the United States District Court for the District of South Carolina in No. 6:21-cv-00244-JD, Judge Joseph Dawson, III.

---

Decided: September 8, 2022

---

LARRY GOLDEN, Greenville, SC, pro se.

---

Before DYK, TARANTO, and STOLL, *Circuit Judges*.

PER CURIAM

Larry Golden appeals two orders of the United States District Court for the District of South Carolina ("district court") dismissing his patent infringement claims against various defendants. We *affirm* the dismissal in Case No. 22-1229 but *vacate* the dismissal in Case No. 22-1267 and *remand* for further proceedings consistent with this opinion.

BACKGROUND

Mr. Golden owns a family of patents concerning a system for locking, unlocking, or disabling a lock upon the

detection of chemical, radiological, and biological hazards.[1] In 2019, he sued sixteen defendants in the district court, alleging patent infringement by their development and manufacturing of certain devices. The district court dismissed the suit without prejudice, and this court affirmed the dismissal "on the ground of frivolousness" because Mr. Golden's complaint "offer[ed] only vague generalities and block quotes of statutes, cases and treatises, but nowhere point[ed] us to any nonfrivolous allegations of infringement of any claim by any actual product made, used, or sold by any defendant." *Golden v. Apple Inc.*, 819 F. App'x 930, 931 (Fed. Cir. 2020).

On January 5, 2021, in Case No. 22-1229, Mr. Golden again sued the same sixteen defendants from the 2019 case for patent infringement ("the Apple case"). He initially filed the same over-300-page complaint held to be frivolous in the 2019 case. After the magistrate judge imposed a 35 page limit on the complaint, Mr. Golden filed a shortened complaint complying with the restriction. On January 26, 2021, in Case No. 22-1267, Mr. Golden separately sued Google LLC for patent infringement ("the Google case"). The magistrate judge reviewed the complaints in both cases and recommended summary dismissal with prejudice without issuance of service of process or leave to amend and monetary sanctions for the filing of frivolous litigation.

In both cases, the district court adopted the magistrate judge's recommendations in part. In the Apple case, the district court dismissed the complaint as frivolous without the issuance of service of process but declined to dismiss with prejudice. Additionally, the district court lifted the page restriction for an amended complaint. In the Google case, the district court dismissed the complaint with

---

1 The patents at issue in these cases are U.S. Patent Nos. 7,385,497; 9,096,189; 9,589,439; 10,163,287 and Reissue Patent Nos. RE43,891 and RE43,990.

prejudice and without the issuance of service of process. Mr. Golden appeals the district court decisions in both cases. We have jurisdiction under 28 U.S.C. § 1295(a)(1). On appeal, Mr. Golden has filed briefs, while the defendants have not filed responsive briefs.

DISCUSSION

Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), a court must dismiss a complaint if it fails to allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. This standard "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (citation omitted). A plaintiff must allege facts that give rise to "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). In the patent context, this court has explained that a plaintiff need not "plead facts establishing that each element of an asserted claim is met," *In re Bill of Lading Transmission and Processing Sys. Pat. Litig.*, 681 F.3d 1323, 1335 (Fed. Cir. 2012) (citing *McZeal v. Sprint Nextel Corp.*, 501 F.3d 1354, 1357 (Fed. Cir. 2007)), but must plead "'enough fact[s] to raise a reasonable expectation that discovery will reveal' that the defendant is liable for the misconduct alleged." *Id.* at 1341 (alteration in original) (quoting *Twombly*, 550 U.S. at 556). We review the district court's dismissal of the complaint de novo. *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014).

In the Apple case, the district court dismissed the docketed complaint as frivolous after finding that Mr. Golden "failed to include factual allegations beyond the identities of the Defendants, reference to the alleged infringing devices, and the alleged infringed-upon patents." Dist. Ct. Op. at 4–5. We agree with the district court: the docketed complaint is nothing more than a list of patent claims and

accused products manufactured by each defendant for each asserted patent. Mr. Golden contends that his original complaint contained sufficient factual allegations to support his claims. However, he concedes that the rejected original complaint was identical to the one that this court deemed frivolous in the 2019 case. His effort to relitigate the sufficiency of the original complaint is precluded under the doctrine of res judicata. *See Arizona v. California*, 530 U.S. 392, 412 (2000) ("[I]f a court is on notice that it has previously decided the issue presented, the court may dismiss the action *sua sponte*, even though [a preclusion] defense has not been raised."). Mr. Golden does not argue that the docketed complaint contains factual allegations beyond those contained in his original complaint or that the allegations in the docketed complaint do anything beyond listing the alleged infringed-upon patent claims and the alleged infringing devices. This is plainly insufficient. We see no error in the district court's without prejudice dismissal of the Apple case.

In the Google case, the district court again concluded that Mr. Golden's complaint was frivolous. Here, however, Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the Google Pixel 5 Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189. The district court discounted this claim chart because it "contains the exact same language as the claim charts previously rejected by the Federal Circuit [in the 2019 case], although Google Pixel 5 Smartphone appears in the far left column instead of Apple." Dist. Ct. Op. at 4. But to the extent that the chart includes the "exact same language" as previously rejected charts, it is simply the language of the independent claims being mapped to. The key column describing the infringing nature of the accused products is not the same as the complaint held frivolous in the 2019 case. It attempts—whether successfully or not—to map claim

limitations to infringing product features, and it does so in a relatively straightforward manner.

We conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart. Mr. Golden has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart. On remand, the district court should allow the complaint to be filed and request service of process. Our decision does not preclude subsequent motions to dismiss by the defendant for failure to state a claim or for summary judgment. We express no opinion as to the adequacy of the complaint or claim chart except that it is not facially frivolous.

CONCLUSION

For the foregoing reasons, we affirm the district court's dismissal in Case No. 22-1229, vacate the dismissal in Case No. 22-1267, and remand for further proceedings consistent with this opinion.

**CASE NO. 22-1229 AFFIRMED**

**CASE NO. 22-1267 VACATED AND REMANDED**

COSTS

No costs.

# EXHIBIT B

RECEIVED
USDC CLERK, GREENVILLE, SC
2021 JAN 26 AM 10: 13

**UNITED STATES DISTRICT COURT**
**FOR THE**
**DISTRICT OF SOUTH CAROLINA – GREENVILLE**

| | |
|---|---|
| LARRY GOLDEN,<br>Plaintiff,<br>V.<br>GOOGLE LLC<br>Defendants. | CIVIL CASE NO: ___________<br><br>**JURY TRIAL DEMANDED**<br><br>January 25, 2021 |

## COMPLAINT FOR PATENT INFRINGEMENT

This is an action of patent infringement in which plaintiff, Larry Golden ("Golden", "Plaintiff" or "Patent Owner"), hereby asserts the following claims for patent infringement of United States Patent Nos. 10,163,287 ('287 Patent), 9,589,439 ('439 Patent), and 9,096,189 ('189 Patent) ("patents-in-suit": attached hereto as Exhibits A-C respectively) against Defendant GOOGLE LLC ("Google" or "Defendant"), and alleges as follows:

Upon information and belief, Plaintiff alleges the patents-in-suit, that were issued with the presumption of validity, "[a] patent shall be presumed valid. Each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim. 35 U.S. Code § 282 - Presumption of validity; (a)

In General" is Plaintiff's evidence that the Plaintiff is the inventor of the Communicating, Monitoring, Detecting, and Controlling (CMDC) device(s) i.e., products grouped and commercialized today as smartphones, laptops, tablets, smartwatches, etc.

Upon information and belief, Plaintiff alleges that the defendant Google, has in the past and continues to do so, makes, uses, offer to sell, or sells Google Pixel smartphones 3, 3XL, 3a, 3aXL, 4a, 4a(5G), and 5, that Plaintiff believes infringes at least one of the claims in the patents-in-suit under 35 U.S.C. § 271, "anyone who makes, uses, offers to sell, or sells any patented invention domestically, or imports a patented invention into the United States during the term of the patent, is infringing the patent. Anyone who actively induces someone else to infringe the patent is also liable as an infringer."

Similarly, under 35 U.S.C. § 271, "anyone who offers to sell, sells, or imports a material component of something that is patented, knowing that the component was especially made for use in an infringement and is not a commodity suitable for a substantial non-infringing use, is also liable as a contributory infringer" Plaintiff is alleging that the defendant Google, has in the past and continues to do so, offer to sell, sells (i.e., to other smartphone and mobile device manufacturers; "Google Search", "Google Fi", "Google Android Operating Systems", "Google Cloud", etc.) or imports a material component of something that is patented (i.e., Plaintiff's CMDC devices). For example, "market.us" has published the following information on Google:

**2018?**

- On January 2018, Alphabet, Inc. acquired Redux – smartphone technology, which is specialized in turning smartphone screens into speakers.
- In October 2018, Google LLC to shut down Google+ after failing to disclose user data leak
- In November 2018, Google LLC acquired Workbench, which is a US-based company, that offers an online library of projects and lessons.

- Under this acquisition, the company focuses on integrating the Workbench tool with Google Classroom. In addition, currently, Google Classroom is one of the most widely used online educational tools, which lets parents, teachers, and students manage class discussions, assignments, and quizzes.
- In 2018, Google Search and Advertising tools helped generating **$335 billion** in economic activity for **more than 1.3 billion millions** of businesses, website publishers, and nonprofits across the United States.
- Many website publishers, non-profit organizations and 40,000 companies in the country benefited from the use of Google Ads and AdSense advertising tools.
- In 2018, Google had sent more than 14 billion dollars to music publishers around the world.
- As of November, 2018, in US, Google connects people to businesses nearby more than **9 billion times**, including over 1 billion phone calls and 3 billion direction requests to stores every month.

**Usage Statistics**

- In a minute on the Internet in 2020, there are **4.1 million search queries, 230 million per hour** and **6 Billion per day** that is **more than 2.5 Trillion searches per year** worldwide.
- Till July 2020, Google has 95.6% share of worldwide mobile search traffic.
- In April 2020, Google processed **12.7 billion** search queries in US, accounting **62.3 percent** of the US total desktop search queries and leading mobile search provider in the US with 95.04% market share
- Daily visitors to Google are **approximately 620 Mn.**
- According to the Datareportal, in June 2020, the top 10 search queries on Google were: Google, Facebook, Youtube, You, Weather, News, Amazon, Coronavirus, Translate and Instagram.
- In July 2019, Google accounted for **95 percent** of US mobile search visits and **93 percent** of overall U.S. organic search engine visits.
- As of May 2019, Gmail is a product that **1.5 billion users** rely on, to get things done every day.
- As of September 2019, People have already asked **Google Lens more than a billion questions** about things they see.

- Google sends **10 billion+ clicks per month** to news publishers' websites.
- As of May 2019, **2.5 million** web publishers use AdSense to make money through their content on the web.
- According to a survey, in Europe the news content linked through Google were **clicked more than 8 billion times a month** that is **3,000 clicks per second** to the publishers' websites in Europe resulting to each click between 4-6 euro cents.
- In the US, Google helps drive over **1 billion direct connections**, like calls and online reservations, for businesses nationwide every month.
- Google owns its **own common misspellings domains** such as www.gooogle.com, www.googlr.com, and www.gogle.com
- Google runs **over 1 Mn computer servers** in data centers around the world.
- Last year, Google **rejected more than 10 million ads** that we suspected of copyright infringement.
- Around **35% of clicks** for U.S. businesses, advertising on Google, came from outside the country.
- As of May 2019, about **80% of traffic** from Google's Showcase Shopping ads to retailer sites are from new visitors discovering the brands.
- Till date, Google has over **2 billion store** offers mapped to physical store locations globally, discoverable by their current local ad formats like local inventory ads.
- Google Station serves more than **10 million people in 1,300 locations** across India, Indonesia, Mexico, Nigeria, the Philippines, Thailand, Vietnam and Brazil.
- Google Assistant is now on **more than one billion devices**, available in more than 30 languages across 80 countries.
- As of 2019, **more than 20 million people visit Google Account every day** to review their settings, using Privacy Checkup.
- As of 2019, **90 million** teachers and students are using G Suite for Education worldwide.
- Google has a database of over 4 billion credentials that have been compromised through various data breaches
- According to a 2018 Survey, around **72% of consumers in Indonesia** see Google Search as the online gateway for personal loan information and the second most helpful source for Financial Services information, after the bank branches

## THE PARTIES

1. Plaintiff Larry Golden is a citizen of South Carolina and has a principal place of business and residence at 740 Woodruff Road, #1102, Greenville, S.C. 29607.

2. On information and belief, Google is incorporated in the State of Delaware with a principal place of business at 1600 Amphitheatre Parkway, Mountain View, CA 94043 and does business in this judicial district by, among other things, committing jointly, directly, and/or indirectly the tort of literal patent infringement or infringement under the "doctrine of equivalents" giving rise to this complaint. Google may be served at its principal place of business at 1600 Amphitheatre Parkway, Mountain View, CA 94043.

3. Google LLC is one of the largest technology companies in the world and conducts product sales, and online search operations in the District of South Carolina. Google LLC directly and/or indirectly distributes, markets, offers to sell, sells, and/or imports the infringing Google Pixel Series of smartphones and Google Android Operating Systems.

## STANDARD FOR REVIEW

4. Pursuant to the order of Magistrate Judge Kevin McDonald in United States District Court for the District of South Carolina; filed 12/17/2020; Case No. 6:20-cv-04353-BHH-KFM, Plaintiff was ordered to file "a short and plain statement of the claim showing that the pleader [Plaintiff] is entitled to relief." Fed. R. Civ. P. 8(a).

5. Plaintiff has attached a copy of the asserted patents as **Exhibits A, B, & C**. The attached patents satisfy the requirement of "enough factual allegations. For example, in *Incom Corp. v. Walt Disney Co.*, No. 2:15-cv-03011-PSG-MRW, Dkt. 39, at *4 (C.D. Cal. Feb. 4, 2016) the Central District of California declined to dismiss a complaint that attached the asserted

patent, identified the accused products by name, and generally compared the technology disclosed in the patents to the accused products. The complaint *did not identify any specific asserted claim*, but the court found that: "Plaintiff has stated a plausible claim for direct infringement by specifically identifying the Defendant's products and alleging that they perform the same unique function as Plaintiff 's patented system." The Defendant in this case is allegedly liable for infringement of the asserted patents-in-suit under 35 U.S.C. § 271.

6. Plaintiff maintains he has additional factual allegations to support his claim in the form claim charts readily available by order of this Court.

## JURISDICTION AND VENUE

7. This is a civil action for patent infringement arising under the patent laws of the United States, Title 35 of the United States Code. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§§ 1331, 1332(a) and 1338(a).

8. Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(c) and 1400(b). On information and belief, the defendant has purposely transacted business in this judicial district and has committed acts of joint, direct and/or indirect infringement in this judicial district.

9. On information and belief, the defendant is subject to this Court's specific and general personal jurisdiction, due at least to the defendant's substantial business in this forum, including: (A) at least part of the defendant's infringing activities alleged herein, and (B) regularly doing or soliciting business, engaging in others persistent causes of conduct, and/or deriving substantial revenue from goods and services provided to persons and other entities in

South Carolina and this judicial district. The defendant has allegedly used, sold, and/or offered products for sale in South Carolina and is licensed to do business in this state.

10. This Court has specific jurisdiction over the defendant because the defendant has committed acts giving rise to this action and has established minimum contacts within this judicial district such that the exercise of jurisdiction over the defendant would not offend traditional notions of fair play and justice.

## RELATED CASES

11. Plaintiff has alleged that Apple is infringing Plaintiff's communicating, monitoring, detecting, and controlling (CMDC) device in a related case *Larry Golden v. Apple, Inc. et al* filed on 12/16/2020 at the United States District Court for the District of South Carolina; Greenville Division (Case No. 6:20-cv-04353) against defendants, Apple Inc. ("Apple"), Samsung Electronics, USA ("Samsung"), LG Electronics, USA, Inc. ("LG"), Qualcomm Inc. ("Qualcomm"), Motorola Solutions Inc. ("Motorola"), Panasonic Corporation ("Panasonic"), AT&T Inc. ("AT&T"), Verizon Corporation Services Group ("Verizon"), Sprint Corporation ("Sprint"), T-Mobile USA, Inc. ("T-Mobile"), Ford Global Technologies, LLC ("Ford"), Fairway Ford Lincoln of Greenville ("Fairway Ford"), General Motors Company ("GM"), Kevin Whitaker Chevrolet ("Whitaker Chevrolet"), FCA US LLC ("FCA"), and Big O Dodge Chrysler Jeep Ram ("Big O").

12. Plaintiff has filed an action of Antitrust Law violations *Larry Golden v. Apple, Inc. et al* on June 16, 2020, at the United States District Court for the District of South Carolina; Greenville Division (Case No. 6:20-cv-02270) against defendants, Apple Inc. ("Apple"), Samsung Electronics, USA ("Samsung"), LG Electronics, USA, Inc. ("LG"), Qualcomm Inc.

("Qualcomm"), Ford Global Technologies, LLC ("Ford"), General Motors Company ("GM"), and, FCA US LLC ("FCA").

## GOOGLE SMARTPHONE SPECIFICATIONS / ANDROID PLATFORM

13. Upon information and belief, Google is directly infringing Plaintiff's patented CMDC devices by making, using, offering for sale, selling and/or importing the aforementioned alleged infringing devices that have at a minimum, directly infringed Plaintiff's '287, '439, and '189 patents. to unjustly enrich itself.

14. Upon information and belief, Google is jointly infringing Plaintiff's patented CMDC devices by offering for use, using, offering for sale, selling and/or importing as essential, Google's Android platform for use with Google's smartphones, and other Android smartphone devices i.e., Samsung, LG, Motorola, etc., that have at a minimum, directly infringed Plaintiff's '287, '439, and '189 patents. Android smartphones have permanent default Google-owned apps like Google search, Google Play, YouTube, Maps etc. The main Android framework is signed in through a Google account too. So, you need to have a Google account to use Android.

15. The smartphone has come a long way since the first iPhone launched in 2007. While Apple's iOS is arguably the world's first smartphone operating system, Google's Android is by far the most popular. Android has evolved significantly since first being released on an HTC-made T-Mobile device in 2008.

16. It wasn't until 2005 that Google purchased Android, Inc., and while there wasn't much info about Android at the time, many took it as a signal that Google would use the platform to enter the phone business. Eventually, Google did enter the smartphone business — but not as a hardware manufacturer. Instead, it marketed Android to other manufacturers, first

catching the eye of HTC, which used the platform for the first Android phone, the HTC Dream, in 2008.

17. Upon information and belief, Google has copied the "product grouping" strategy of the Plaintiff (Golden) for a communicating, monitoring, detecting, and controlling (CMDC) device, i.e., Google's smartphone products are grouped together by "common features of design similarities". As illustrated below, Google's smartphones are basically the same.

18. Therefore, when analyzing the specifications, features, and functionality of Google's smartphones as a complete product, and not merely identifying the individual infringing processes; there is a strong likelihood that if one of Google's smartphones infringes Plaintiff's claimed invention of a CMDC device; it can be perceived that all of Google's smartphones infringes Plaintiff's claimed invention of a CMDC device as a 'whole' product.

**GOOGLE PIXEL 5 VS. PIXEL 4A WITH 5G VS. PIXEL 4**

| Category | Pixel 5 | Pixel 4A with 5G | Pixel 4A |
|---|---|---|---|
| Network | 5G | 5G | 4G |
| **Screen** | 6-inch flexible OLED display at 432 ppi | 6.2-inch OLED display at 413 ppi | 5.8-inch OLED display at 443 ppi |
| **Refresh Rate** | 90 Hz | 60 Hz | 60 Hz |
| **Resolution** | 1080 x 2340 | 1080 x 2340 | 1080 x 2340 |
| **Battery** | 4080 mAh | 3885 mAh | 3140 mAh |
| **Front Camera** | 8 megapixels | 8 megapixels | 8 megapixels |
| **Rear Camera** | 12.2-megapixel dual-pixel (16-megapixel ultrawide) | 12.2-megapixel dual-pixel (16-megapixel ultrawide) | 12.2-megapixel dual-pixel |
| **Camera Features** | Night Sight, Portrait Light, Cinematic Pan, Live HDR+ | Night Sight, Portrait Light, Cinematic Pan, Live HDR+ | Night Sight, Live HDR+ |
| **RAM** | 8GB | 6GB | 6GB |

| Category | Pixel 5 | Pixel 4A with 5G | Pixel 4A |
|---|---|---|---|
| **Processor** | Qualcomm Snapdragon 765G | Qualcomm Snapdragon 765G | Qualcomm Snapdragon 730G |
| **Storage** | 128GB | 128GB | 128GB |
| **Audio** | Stereo speakers, USB-C audio | Stereo speakers, USB-C audio, 3.5mm headphone jack | USB-C audio, 3.5mm headphone jack |
| **Price** | $699 | $499 | $349 |
| **Wireless Charging** | Yes | No | No |
| **Water Resistant** | Yes | No | No |
| **Colors** | Green, Black | White, Black | Black |
| **Operating System** | Pre-loaded with Android 11 | Pre-loaded with Android 11 | Pre-loaded with Android 10 |

**GOOGLE PIXEL 3 SERIES SPEC COMPARISON**

| Specification | Pixel 3A | Pixel 3A XL | Pixel 3 | Pixel 3 XL |
|---|---|---|---|---|
| **Display** | 5.6 inches | 6.0 inches | 5.5 inches | 6.3 inches |
| **Resolution** | 2220 x 1080 | 2160 x 1080 | 2160 x 1080 | 2960 x 1440 |
| **Processor** | Snapdragon 670 (2.0GHz and 1.7GHz, octa-core) | Snapdragon 670 (2.0GHz and 1.7GHz, octa-core) | Snapdragon 845 (2.5GHz and 1.6GHz, octa-core) | Snapdragon 845 (2.5GHz and 1.6GHz, octa-core) |
| **RAM** | 4GB | 4GB | 4GB | 4GB |
| **Storage** | 64GB | 64GB | 64GB, 128GB | 64GB, 128GB |
| **Rear camera** | 12 megapixels | 12 megapixels | 12 megapixels | 12 megapixels |
| **Front camera** | 8 megapixels | 8 megapixels | 8 megapixels, 8 megapixels(wide) | 8 megapixels, 8 megapixels(wide) |

| Specification | Pixel 3A | Pixel 3A XL | Pixel 3 | Pixel 3 XL |
|---|---|---|---|---|
| Battery | 3,000mAh | 3,700mAh | 2,915mAh | 3,430mAh |
| Water protection | N/A | N/A | IPX8 | IPX8 |
| Wireless charging? | No | No | Yes | Yes |
| Ports? | USB-C, 3.5mm headphone jack | USB-C, 3.5mm headphone jack | USB-C | USB-C |
| Weight | 0.32 pounds | 0.37 pounds | 0.33 pounds | 0.4 pounds |
| Dimensions (in.) | 6.0 x 2.80 x 0.30 | 6.30 x 3.00 x 0.30 | 5.70 x 2.70 x 0.30 | 6.20 x 3.00 x 0.30 |
| Starting price | $399.00 | $479.00 | $799.00 | $899.00 |
| Operating System | Pre-loaded Android | Pre-loaded Android | Pre-loaded Android | Pre-loaded Android |

**SENSOR TYPES SUPPORTED BY THE "*ANDROID*" PLATFORM**

| Type | | | |
|---|---|---|---|
| **Type Accelerometer** | Hardware | Measures the acceleration force in $m/s^2$ that is applied to a device on all three physical axes (x, y, and z), including the force of gravity. | Motion detection (shake, tilt, etc.). |
| **Type Ambient Temperature** | Hardware | Measures the ambient room temperature in degrees Celsius (°C). See note below. | Monitoring air temperatures. |
| **Type Gravity** | Software or Hardware | Measures the force of gravity in $m/s^2$ that is applied to a device on all three physical axes (x, y, z). | Motion detection (shake, tilt, etc.). |
| **Type Gyroscope** | Hardware | Measures a device's rate of rotation in rad/s around each of the three physical axes (x, y, and z). | Rotation detection (spin, turn, etc.). |
| **Type Light** | Hardware | Measures the ambient light level (illumination) in lx. | Controlling screen brightness. |

| | | | |
|---|---|---|---|
| **Type Linear Acceleration** | Software or Hardware | Measures the acceleration force in $m/s^2$ that is applied to a device on all three physical axes (x, y, and z), excluding the force of gravity. | Monitoring acceleration along a single axis. |
| **Type Magnetic Field** | Hardware | Measures the ambient geomagnetic field for all three physical axes (x, y, z) in μT. | Creating a compass. |
| **Type Orientation** | Software | Measures degrees of rotation that a device makes around all three physical axes (x, y, z). As of API level 3 you can obtain the inclination matrix and rotation matrix for a device by using the gravity sensor and the geomagnetic field sensor in conjunction with the get Rotation Matric () method. | Determining device position. |
| **Type Pressure** | Hardware | Measures the ambient air pressure in hPa or mbar. | Monitoring air pressure changes. |
| **Type Proximity** | Hardware | Measures the proximity of an object in cm relative to the view screen of a device. This sensor is typically used to determine whether a handset is being held up to a person's ear. | Phone position during a call. |
| **Type Relative Humidity** | Hardware | Measures the relative ambient humidity in percent (%). | Monitoring dewpoint, absolute, and relative humidity. |
| **Type Rotation Vector** | Software or Hardware | Measures the orientation of a device by providing the three elements of the device's rotation vector. | Motion detection and rotation detection. |
| **Type Temperature** | Hardware | Measures the temperature of the device in degrees Celsius (°C). This sensor implementation varies across devices and this sensor was replaced with the **Type—Ambient Temperature** sensor in API Level 14 | Monitoring temperatures. |

- **BIOMETRICS**: Biometric factors allow for secure authentication on the Android platform. The Android framework includes face and fingerprint biometric authentication. Android can be customized to support other forms of biometric authentication (such as Iris).

- **DISABLING LOCK MECHANISM:** Google's Android operating system features a lock mechanism to secure your phone, known as pattern lock. When setting the pattern, you must drag your finger along lines on the screen between different nodes. Afterward, to unlock the phone, you'll need to replicate the pattern drawn. If you fail to solve the

pattern too many times, the phone locks and cannot be unlocked without logging into the associated Google account. If you can't log in, you'll have to employ some other methods to restore control of your phone.

- **CHEMICAL, BIOLOGICAL, RADIOLOGICAL, AND NUCLEAR (CBRN) DETECTION:** Through collaboration and innovation, the Defense Threat Reduction Agency has integrated its powerful, hazard-awareness-and-response tools into the *Android Tactical Assault Kit (or the Android Team Awareness Kit, ATAK)*. ATAK is a digital application available to warfighters throughout the DoD. Built on the Android operating system, ATAK offers warfighters geospatial mapping for situational awareness during combat — on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK now includes chemical, biological, radiological, and nuclear (CBRN) plug-ins.

- **HEART RATE**: *Android Team Awareness Kit, ATAK* provides a single interface for viewing and controlling different CBRN-sensing technologies, whether that is a wearable smartwatch that measures a warfighter's vitals (e.g., heart rate) or a device mounted on a drone to detect chemical warfare agents.

- **NEAR FIELD COMMUNICATION (NFC)**: Pixel™, Phone by Google - Turn NFC on/off. Near Field Communication (NFC) allows the transfer of data between devices that are a few centimeters apart, typically back-to-back. NFC must be turned on for NFC-based apps (e.g., Tap to Pay) to function correctly. NFC is a set of short-range wireless technologies, typically requiring a distance of 4cm or less to initiate a connection. NFC allows you to share small payloads of data between an NFC tag and an Android-powered device, or between two Android-powered devices. Tags can range in complexity.

- **WARFIGHTERS:** The U.S. armed forces and their interagency and coalition partners value *Android Team Awareness Kit, ATAK* and the common operating picture it provides. DTRA continues to develop CBRN-specific plug-in capabilities to support warfighters on the battlefield.

---

## GOOGLE'S JOINT INFRINGEMENT WITH APPLE INC.

19. According to Gurman, 2020, "The U.S. government's antitrust assault against Google reveals new details about a secretive, multibillion-dollar deal between the internet giant and Apple Inc., the world's largest technology company. The Justice Department's lawsuit, filed Tuesday, targets paid deals Google negotiates to get its search engine to be the default on browsers, phones and other devices. The biggest of these is an agreement that makes Google search the default on iPhones and other Apple devices."

20. The U.S. government said Apple Chief Executive Officer Tim Cook and Google CEO Sundar Pichai met in 2018 to discuss the deal. After that, an unidentified senior Apple employee wrote to a Google counterpart that "our vision is that we work as if we are one company."

21. The DOJ also cited internal Google documents that call the Apple search deal a "significant revenue channel" for the search giant and one that, if lost, would result in a "Code Red" scenario. That's because nearly half of Google search traffic in 2019 came from Apple products, according to the lawsuit.

22. Google pays Apple billions of dollars a year to make its search product the default option, according to analyst estimates. That means when a user buys a new iPhone or other Apple device, the built-in search engine in the Safari browser is Google.

23. The DOJ suit cited estimates that Apple gets $8 billion to $12 billion annually from Google through the agreement. Apple's income from the search deal is believed to be part of the company's growing Services segment, a key metric Apple has highlighted to investors and analysts in recent years.

> Gurman, Mark (2020, Oct. 20). *Apple, Google worked as 'one company' on search deal, U.S. says*. https://www.bloomberg.com/news/articles/2020-10-20/apple-google-worked-as-one-company-on-search-deal-u-s-says

**Joint Infringement**

24. Upon information and belief, Google and Apple are jointly infringing Plaintiff's patented CMDC devices by offering for use, using, offering for sale, selling and/or importing as essential, Google's Search for use with Google and Apple smartphones, that have at a minimum, directly infringed independent claims 1, 2, and 3 of the '189 patent; independent claims 13, 14, 15, and 23 of the '439 patent; and, independent claims 4, 5, and 6 of the '287 patent.

25.     Plaintiff has alleged that Apple is infringing Plaintiff's communicating, monitoring, detecting, and controlling (CMDC) device in a related case *Larry Golden v. Apple, Inc. et al* filed on 12/16/2020 at the United States District Court for the District of South Carolina; Greenville Division (Case No. 6:20-cv-04353) against defendants, Apple Inc. et al.

26.     Plaintiff has also filed a case *Larry Golden v. Apple, Inc. et al* on 06/16/2020 at the United States District Court for the District of South Carolina; Greenville Division (Case No. 6:20-cv-02270) against defendants, Apple Inc. et al. for Antitrust Law Violations.

## GOOGLE'S JOINT INFRINGEMENT WITH QUALCOMM INC.

27.     According to a Qualcomm press release (2020), "Qualcomm Technologies, Inc. and Google announced their collaboration to enhance and extend Project Treble with the goal of enabling more devices with Qualcomm® Snapdragon™ mobile platforms to run the latest Android OS. The enhancements are intended to enable Original Equipment Manufacturers (OEMs) to upgrade their Snapdragon based devices to the latest Android OS without modifying Qualcomm Technologies' chipset-specific software and to use a common Android software branch to upgrade devices based on a wide range of Snapdragon mobile platforms across Qualcomm Technologies' portfolio. These enhancements are designed to reduce the time and resources required to upgrade Snapdragon based devices to the latest Android OS version."

28.     As part of this collaboration with Google, Qualcomm Technologies will now support four Android OS versions and four years of security updates for all Snapdragon platforms utilizing the Project Treble enhancements, starting with the new Snapdragon 888 Mobile Platform. These initiatives are designed to enable faster Android OS upgrades with fewer resources and a predictable software lifecycle for Snapdragon based devices, which together are

expected to result in more consumers with Snapdragon based devices running the latest Android OS version.

29. "Google continues to work closely with our technology partners to increase the freshness of the Android ecosystem. Through this collaboration with Qualcomm Technologies, we expect that Android users will have the latest OS upgrades and greater security on their devices," said David Burke, vice president of Android engineering, Google.

30. "We are excited to work with Google to extend our support for Android OS and security updates on future Snapdragon mobile platforms utilizing the Project Treble enhancements," said Kedar Kondap, vice president, product management, Qualcomm Technologies, Inc.

**Terminology**

- Google's android operating system; same as "operating system".
- Google's android operating system; same as "computer program".
- Google's android operating system; same as "software".
- Qualcomm's chipset; used interchangeably as "processor".
- Qualcomm's chipset; used interchangeably as "central processing unit".
- Qualcomm's chipset; used interchangeably as "wireless technology" (WiFi, 3G, 4G, 5G, LTE, and so on).

31. An operating system is a computer program, works as interface between user and hardware and provides common services for computer programs. The entire process or functionality of computer system depends on the operating system. An operating system is a computer program that controls the execution of application programs and acts as an interface between the user of a computer and the computer hardware. The purpose of an operating system

is to provide an environment in which a user can execute programs in a convenient and efficient manner. https://www.geeksforgeeks.org/introduction-of-operating-system-set-1/

32. A Central Processing Unit (CPU) is a machine that can execute computer programs. This broad definition can easily be applied to many early computers that existed long before the term "CPU" ever came into widespread usage. The term itself and its initialism have been in use in the computer industry at least since the early 1960s (Weik 1961). The form, design and implementation of CPUs have changed dramatically since the earliest examples, but their fundamental operation has remained much the same.

33. An Operating System is the core software that allows applications to interface with the hardware. Operating Systems control the specific details of your system, presenting a more manageable interface for applications (and the user) to make use of. To use an analogy, the CPU is the brain, the OS is the mind. The mind cannot exist without a brain to store it, and the brain is just a useless lump without a mind to control it. https://answers.yahoo.com/question/index?qid= 20090927101607AAiAJ42

34. An SoC, or system-on-a-chip to give its full name, integrates almost all of these components into a single silicon chip. Along with a CPU, an SoC usually contains a GPU (a graphics processor), memory, USB controller, power management circuits, and wireless radios (WiFi, 3G, 4G LTE, and so on). Whereas a CPU cannot function without dozens of other chips, it's possible to build complete computers with just a single SoC. The number one advantage of an SoC is its size: An SoC is only a little bit larger than a CPU, and yet it contains a lot more functionality. If you use a CPU, it's very hard to make a computer that's smaller than 10cm (4 inches) squared, purely because of the number of individual chips that you need to squeeze in. Using SoCs, we can put complete computers in smartphones and tablets, and still have plenty of

space for batteries. https://www.extremetech.com/computing/126235-soc-vs-cpu-the-battle-for-the-future-of-computing.

**Joint Infringement**

35. Upon information and belief, Google and Qualcomm are jointly infringing Plaintiff's patented CMDC devices by offering for use, using, offering for sale, selling and/or importing as essential, Google's Android platform for use with Qualcomm's SoCs, CPUs, etc. for smartphones that have at a minimum, directly infringed independent claims 1, 2, and 3 of the '189 patent; independent claims 13, 14, 15, and 23 of the '439 patent; and, independent claims 4, 5, and 6 of the '287 patent.

36. Google developing its own phone processor would mean dumping the Qualcomm SoCs it usually uses. Of course, you can never truly be rid of Qualcomm: Google would presumably still need to use Qualcomm modems, something that even Apple still needs to do. There are other modem manufacturers out there—Samsung, Huawei, Mediatek—but Qualcomm's combination of patents and strong-arm licensing techniques has effectively locked its competitors out of the US and other markets.

37. Plaintiff has alleged that Qualcomm is infringing Plaintiff's communicating, monitoring, detecting, and controlling (CMDC) device in a related case *Larry Golden v. Apple, Inc. et al.* filed on 12/16/2020 at the United States District Court for the District of South Carolina; Greenville Division (Case No. 6:20-cv-04353) against defendants, *Apple Inc. et al.*

38. Plaintiff has also filed a case *Larry Golden v. Apple, Inc. et al* on 06/16/2020 at the United States District Court for the District of South Carolina; Greenville Division (Case No. 6:20-cv-02270) against defendants, *Apple Inc. et al.* for Antitrust Law Violations.

## CLAIM CONSTRUCTION

"*Inter Partes Review* (IPR): *Department of Homeland Security vs. Larry Golden;* Case No.: IPR2014-00454 (Patent RE43,990; Claims 11, 74, & 81); Final Written Decision entered on October 1, 2015. "In the 'Decision to Institute', we construed certain claim terms. Those constructions are reproduced in the chart below:

| Claim Term | Construction |
|---|---|
| "built in, embedded" (claim 74) | "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device" |
| "communication device" (claim 81) | "monitoring equipment" |

Dec. to Inst. 11-16

39. "No party challenges these constructions. Both of these terms were modified or removed in the amendment. To the extent that any of these constructions remain relevant after the amendment, we see no reason to modify them… [w]e further determined that no explicit construction was necessary for any other claim terms. Dec. to Inst. 10-11. Based on the record adduces during trial, we see no need to construe any other terms…"

40. "Beginning with the claim preamble amendment, the preamble of claim 11 originally read: "A communication device of at least one of *a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal at a monitoring site* for monitoring products for communication therebetween, comprising…." In claim 154, the language in italics has been eliminated and replaced with "the products grouped together by common features in the product grouping category of design similarity (e.g., computer terminal, personal computer (PC)) …" Patent Owner contends that this new language is consistent with

words found in the disclosure of the '118 application. Mot. To Amend 4. Patent Owner further contends that this new language is broad enough to include the removed items, such as cell phones and smart phones, because those items are "species terms" that are "included in the genus 'monitoring equipment' and 'communication device' when the clause 'products grouped together by common features in the product groupings category of design similarity' is included." *Id.* Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "*Inter Partes Review* (IPR): *Department of Homeland Security vs. Larry Golden;* Case No.: IPR2014-00454 (Patent RE43,990; Claims 11, 74, & 81); Final Written Decision entered on October 1, 2015.

## COUNT I

### (Infringement of the '287 Patent)

41. Golden realleges and incorporates herein the allegations set forth in Paragraphs 1-40.

42. On information and belief, Google is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing at least independent claims 4, 5, and 6 of the '287 patent. The alleged infringing products are: Google Pixel smartphones 3, 3XL, 3a, 3aXL, 4a, 4a(5G), and 5.

43. As set forth in Golden's preliminary infringement contentions that Google is making, using, offering for sale, selling and/or importing Plaintiff's CMDC device have at a minimum directly infringed the '287 patent and Google is thereby liable for infringement of the

'287 patent pursuant to 35 U.S.C. § 271. Google have caused damage to Golden, which infringement and damage will continue unless and until Google is enjoined.

44. The alleged infringement of Golden identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

## COUNT II

### (Infringement of the '439 Patent)

45. Golden realleges and incorporates herein the allegations set forth in Paragraphs 1-44.

46. On information and belief, Google is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing at least independent claims 13, 14, 15, and 23 of the '439 patent. The alleged infringing products are: Google Pixel smartphones 3, 3XL, 3a, 3aXL, 4a, 4a(5G), and 5.

47. As set forth in Golden's preliminary infringement contentions that Google is making, using, offering for sale, selling and/or importing Plaintiff's CMDC device have at a minimum directly infringed the '439 patent and Google is thereby liable for infringement of the '439 patent pursuant to 35 U.S.C. § 271. Google have caused damage to Golden, which infringement and damage will continue unless and until Google is enjoined.

48. The alleged infringement of Google identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

## COUNT III

### (Infringement of the '189 Patent)

49. Golden realleges and incorporates herein the allegations set forth in Paragraphs 1-48.

50. On information and belief, Google is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing claims 1, 2 & 3 of the '189 patent. The alleged infringing products are: Google Pixel smartphones 3, 3XL, 3a, 3aXL, 4a, 4a(5G), and 5.

51. As set forth in Golden's preliminary infringement contentions that Google is making, using, offering for sale, selling and/or importing Plaintiff's CMDC device have at a minimum directly infringed the '189 patent and Google is thereby liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271. Google have caused damage to Golden, which infringement and damage will continue unless and until Google is enjoined.

52. The alleged infringement of Google identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

## CLAIM CHART

53. The following Claim Chart is an illustration of literal infringement. At least one of the alleged infringing products of Google (i.e., Google Pixel smartphones 3, 3XL, 3a, 3aXL, 4a, 4a(5G), or 5) is representative of all the alleged infringing products of Google asserted in this complaint. At least one of the alleged infringing products of Google (Google Pixel 5) is illustrated to show how the Google Pixel 5 allegedly infringes on at least one of the asserted independent claims of each of the patents-in-suit ('287, '439, and '189 patents).

| Google Pixel 5 Smartphone | Patent #: 10,163,287; Independent Claim 5 | Patent #: 9,589,439; Independent Claim 23 | Patent #: 9,096,189; Independent Claim 1 |
|---|---|---|---|
| | A monitoring device, comprising: | A cell phone comprising: | A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, comprising: |
| CPU: Octa-core (1 × 2.4 GHz Kryo 475 Prime & 1 × 2.2 GHz Kryo 475 Gold & 6 × 1.8 GHz Kryo 475 Silver) System-on-a-chip: Qualcomm Snapdragon 765G | at least one central processing unit (CPU); | a central processing unit (CPU) for executing and carrying out the instructions of a computer program; | at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or a front-end processor for communication between a host computer and other devices; |
| Ambient Temperature sensor supported by the Android platform. Measures the ambient room temperature in degrees Celsius (°C). Monitoring air temperatures. Monitoring air temperatures. | at least one temperature sensor in communication with the at least one CPU for monitoring temperature; | X | X |

| | | | |
|---|---|---|---|
| Gravity sensor supported by the Android platform. Measures the force of gravity in m/s2 that is applied to a device on all three physical axes (x, y, z). Motion detection (shake, tilt, etc.). | at least one motion sensor in communication with the at least one CPU; | X | X |
| Light sensor supported by the Android platform. Measures the ambient light level (illumination) in lx. Controlling screen brightness. Screen: 6-inch flexible OLED display at 432 ppi | at least one viewing screen for monitoring in communication with the at least one CPU; | X | X |
| Connectivity: Wi-Fi 5 (a/b/g/n/ac) 2.4 + 5.0 GHz, Bluetooth 5.0 + LE, NFC, GPS (GLONASS, Galileo, BeiDou), eSIM capable | at least one global positioning system (GPS) connection in communication with the at least one CPU; | at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; | at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection; |
| Connectivity: Wi-Fi 5 (a/b/g/n/ac) 2.4 + 5.0 GHz, Bluetooth 5.0 + LE, NFC, GPS (GLONASS, Galileo, BeiDou), eSIM capable | at least one of an internet connection or a Wi-Fi connection in communication with the at least one CPU; | wherein at least one of… WiFi connection, internet connection, radio frequency (RF) connection, cellular connection… capable of signal communication with the transmitter or the receiver; | wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group… of satellite, Bluetooth, WiFi… |

| | | | |
|---|---|---|---|
| Connectivity: Wi-Fi 5 (a/b/g/n/ac) 2.4 + 5.0 GHz, Bluetooth 5.0 + LE, NFC, GPS (GLONASS, Galileo, BeiDou), eSIM capable | at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; | at least one of a... Bluetooth connection, WiFi connection, internet connection... cellular connection... short range radio frequency (RF) connection, or GPS connection; | X |
| Google's Android operating system features a lock mechanism to secure your phone, known as pattern lock. To set, drag your finger along lines on the screen. To unlock the phone, replicate the pattern drawn. If you fail to solve the pattern too many times, the phone locks and cannot be unlocked without logging into the associated Google account.<br><br>Google Nest × Yale Lock is connected to the Nest app; you can lock or unlock your door from your phone. | at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device; | whereupon the cell phone is interconnected to the cell phone detection device to receive signals or send signals to lock or unlock doors, to activate or deactivate security systems, to activate or deactivate multi-sensor detection systems, or to activate or deactivate the cell phone detection device; | X |
| Pixel phones use USB-C with USB 2.0 power adapters and cables. To charge your phone with a USB-A power adapter, use a USB-C to USB-A cable. | at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device; | X | X |

| BIOMETRICS: Biometric factors allow for secure authentication on the Android platform. The Android framework includes face and fingerprint biometric authentication. Android can be customized to support other forms of biometric authentication (such as Iris). | at least one biometric sensor in communication with the at least once CPU for providing biometric authentication to access the communication device; | wherein the cell phone is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature such that the cell phone is locked by the biometric lock disabler to prevent unauthorized use; and | wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature such that the communication device that is at least one of the cell phone, the smart phone, the desktop, the handheld, the PDA, the laptop or the computer terminal is locked by the biometric lock disabler to prevent unauthorized use |
|---|---|---|---|
| *Android Team Awareness Kit*, ATAK (built on the Android operating system) provides a single interface for viewing and controlling different CBRN-sensing technologies, whether that is a wearable smartwatch that measures a warfighter's vitals (e.g., heart rate) or a device mounted on a drone to detect chemical warfare agents. | at least one sensor for chemical, biological, or human detection in communication with the at least one CPU; | the cell phone is at least a fixed, portable or mobile communication device interconnected to the cell phone detection device, capable of wired or wireless communication therebetween; and | the communication device is at least a fixed, portable or mobile communication device interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween… |

| | | | |
|---|---|---|---|
| *Android Team Awareness Kit*, ATAK (built on the Android operating system) is a digital application available to warfighters throughout the DoD. ATAK offers warfighters geospatial mapping for situational awareness during combat — on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK now includes chemical, biological, radiological, and nuclear (CBRN) plug-ins. | one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents; | at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone; | wherein the communication device receives a signal via any of one or more products listed in any of the plurality of product grouping categories; |
| Connectivity: Wi-Fi 5 (a/b/g/n/ac) 2.4 + 5.0 GHz, Bluetooth 5.0 + LE, NFC, GPS (GLONASS, Galileo, BeiDou), eSIM capable | at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU… | X | X |
| Google Nest × Yale Lock is connected to the Nest app; you can lock or unlock your door from your phone.<br><br>*Android Team Awareness Kit*, ATAK (built on the Android operating system) provides a single interface for viewing and controlling different CBRN-sensing technologies | at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or… detect at least one of a chemical biological… agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. | a transmitter for transmitting signals and messages to a cell phone detection device; a receiver for receiving signals from the cell phone detection device; | a transmitter for transmitting signals and messages to at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device;<br><br>a receiver for receiving signals, data or messages from at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device; |

| | | | |
|---|---|---|---|
| Google Nest × Yale Lock is connected to the Nest app; you can lock or unlock your door from your phone.<br><br>*Android Team Awareness Kit*, ATAK (built on the Android operating system) provides a single interface for viewing and controlling different CBRN-sensing technologies | X | X | whereupon the communication device, is interconnected to a product equipped to receive signals from or send signals to lock or unlock doors, activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems |
| *Android Team Awareness Kit*, ATAK (built on the Android operating system) is a digital application available to warfighters throughout the DoD. ATAK offers warfighters geospatial mapping for situational awareness during combat — on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK now includes chemical, biological, radiological, and nuclear (CBRN) plug-ins. | X | a transmitter for transmitting signals and messages to a cell phone detection device; a receiver for receiving signals from the cell phone detection device; | wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection… short range radio frequency (RF) connection is capable of signal communication with the transmitter and the receiver of the communication device and transceivers of the products; |

| | | | |
|---|---|---|---|
| *Android Team Awareness Kit*, ATAK (built on the Android operating system) is a digital application available to warfighters throughout the DoD. ATAK offers warfighters geospatial mapping for situational awareness during combat — on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK now includes chemical, biological, radiological, and nuclear (CBRN) plug-ins. | X | whereupon a signal sent to the receiver of the cell phone detection device from at least one of the chemical sensor, the biological sensor, the explosive sensor, the human sensor, the contraband sensor, or the radiological sensor, causes a signal that includes at least one of location data or sensor data to be sent to the cell phone. | X |

## PRAYER FOR RELIEF

Wherefore, Golden respectfully requests that this Court enter:

A. A judgment in favor of Golden that the defendant has infringed at least one or more claims of the '287 Patent, the '439 Patent, and the '189 Patent as aforesaid;

B. A permanent injunction enjoining the defendant, its officers, directors, agents, servants, affiliates, employees, divisions, branches, subsidiaries, parents and all others acting in active concert or privity therewith from direct, indirect and/or joint infringement of the '287, '439, and '189 patents as aforesaid pursuant to 35 U.S.C. § 283;

C. A judgment and order requiring the defendant to pay Golden its damages with pre- and post-judgment interest thereon pursuant to 35 U.S.C. § 284;

D. As set forth in Golden's preliminary infringement contentions that the Defendant in this case is making, using, offering for sale, selling and/or importing the aforementioned

alleged infringing devices that have at a minimum, directly infringed the '287, '439, and '189 patents. The Defendant is thereby liable for infringement of the '287, '439, and '189 patents pursuant to 35 U.S.C. § 271. The Defendant has caused damage to Golden, which infringement and damage will continue unless and until the Defendant is enjoined.

E. Any and all further relief to which the Court may deem Golden entitled.

## DEMAND FOR JURY TRIAL

Golden requests a trial by jury on all issues so triable by right pursuant to Fed. R. Civ. P. 38. A right guaranteed under the Seventh Amendment of the Constitution.

Respectfully submitted,

S/ [signature] Date: 01 /25 /2021

Larry Golden, Petitioner, Pro Se

740 Woodruff Rd., #1102

Greenville, South Carolina 29607

(H) 864-288-5605 / (M) 864-992-7104

atpg-tech@charter.net

# EXHIBIT C



US010163287B2

(12) **United States Patent**
**Golden**

(10) **Patent No.: US 10,163,287 B2**
(45) **Date of Patent: Dec. 25, 2018**

(54) **MULTI SENSOR DETECTION, STALL TO STOP AND LOCK DISABLING SYSTEM**

(71) Applicant: **Larry Golden**, Greenville, SC (US)

(72) Inventor: **Larry Golden**, Greenville, SC (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **15/530,839**

(22) Filed: **Mar. 6, 2017**

(65) **Prior Publication Data**

US 2017/0186259 A1 Jun. 29, 2017

**Related U.S. Application Data**

(60) Continuation of application No. 14/806,988, filed on Jul. 23, 2015, now Pat. No. 9,589,439, which is a continuation of application No. 14/021,693, filed on Sep. 9, 2013, now Pat. No. 9,096,189, which is a continuation of application No. 13/288,065, filed on Nov. 3, 2011, now Pat. No. 8,531,280, which is a (Continued)

(51) **Int. Cl.**

| | |
|---|---|
| ***G08B 27/00*** | (2006.01) |
| ***G07C 9/00*** | (2006.01) |
| ***B60R 25/24*** | (2013.01) |
| ***B60R 25/04*** | (2013.01) |

(52) **U.S. Cl.**

CPC .......... ***G07C 9/00174*** (2013.01); ***B60R 25/04*** (2013.01); ***B60R 25/24*** (2013.01); ***G07C 9/00007*** (2013.01); ***G07C 9/00563*** (2013.01)

(58) **Field of Classification Search**

CPC .. G07C 9/00; G07C 9/00007; G07C 9/00174; G07C 9/00309; G07C 9/00388; G07C 9/00563; G08B 27/00; G08B 27/005; G08B 27/006; B60R 25/018; B60R 25/04; B60R 25/10; B50R 25/102

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,385,469 | A | 5/1983 | Scheuerpflug et al. |
| 4,544,267 | A | 10/1985 | Schiller |

(Continued)

OTHER PUBLICATIONS

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/199,853; copyright and dated Jan. 13, 2012, pp. 1-34, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; U.S. Appl. No. 13/288,065 (34 pages).

(Continued)

*Primary Examiner* — Van Trieu

(57) **ABSTRACT**

A multi sensor detection and disabling lock system includes detector cases for holding interchangeable detectors that sample for chemical, biological and radiological compounds, agents and elements, with each detector case disposed in or upon the monitored product. The detector case transmits detection information to a monitoring computer terminal and transmits a signal to a lock disabler engaged to the product to lock or disable the product's lock thereby preventing untrained, unauthorized and unequipped individuals from gaining access and entry to the product, and also preventing further contamination of the area. The detection system can be interconnected to surveillance towers scanning detector cases disposed at seaport docks, freight depots and rail terminals for monitoring containers being prepared for shipment or sitting on docks for long periods of time.

**6 Claims, 13 Drawing Sheets**



**Related U.S. Application Data**

division of application No. 12/802,001, filed on May 27, 2010, now Pat. No. 8,334,761, which is a continuation of application No. 12/657,356, filed on Jan. 20, 2010, now Pat. No. 8,106,752, which is a continuation of application No. 12/155,573, filed on Jun. 6, 2008, now Pat. No. 7,636,033, which is a continuation-in-part of application No. 11/397,118, filed on Apr. 5, 2006, now Pat. No. 7,385,497.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 4,586,441 A | 5/1986 | Zekich |
| 4,792,226 A | 12/1988 | Fishbine et al. |
| 5,222,152 A | 6/1993 | Fishbine et al. |
| 5,223,844 A | 6/1993 | Mansell et al. |
| 5,233,404 A | 8/1993 | Lougheed et al. |
| 5,557,254 A | 9/1996 | Johnson et al. |
| 5,682,133 A | 10/1997 | Johnson et al. |
| 5,766,956 A | 6/1998 | Groger et al. |
| 5,938,706 A | 8/1999 | Feldman |
| 5,959,529 A | 9/1999 | Kail |
| 5,963,657 A | 10/1999 | Bowker et al. |
| 5,986,543 A | 11/1999 | Johnson |
| 5,990,785 A | 11/1999 | Suda |
| 6,049,269 A | 4/2000 | Byrd et al. |
| 6,078,265 A | 6/2000 | Bonder et al. |
| 6,262,656 B1 | 7/2001 | Byrd et al. |
| 6,271,745 B1 | 8/2001 | Anzai et al. |
| 6,374,652 B1 | 4/2002 | Hwang |
| 6,411,887 B1 | 6/2002 | Martens et al. |
| 6,470,260 B2 | 10/2002 | Martens et al. |
| 6,542,076 B1 | 4/2003 | Joao |
| 6,542,077 B2 | 4/2003 | Joao |
| 6,588,635 B2 | 7/2003 | Vor Keller et al. |
| 6,610,977 B2 | 8/2003 | Megerle |
| 6,613,571 B2 | 9/2003 | Cordery et al. |
| 6,628,813 B2 | 9/2003 | Scott et al. |
| 6,647,328 B2 | 10/2003 | Walker |
| 6,738,697 B2 | 5/2004 | Breed |
| 6,923,509 B1 | 8/2005 | Barnett |
| 6,980,092 B2 | 12/2005 | Turnbull et al. |
| 6,988,026 B2 | 1/2006 | Breed et al. |
| 7,005,982 B1 | 2/2006 | Frank |
| 7,034,677 B2 | 4/2006 | Steinthal et al. |
| 7,034,683 B2 | 4/2006 | Ghazarian |
| 7,103,460 B1 | 9/2006 | Breed |
| 7,116,798 B1 | 10/2006 | Chawla |
| 7,148,484 B2 | 12/2006 | Craig et al. |
| 7,171,312 B2 | 1/2007 | Steinthal et al. |
| 7,184,117 B2 | 1/2007 | Breed et al. |
| 7,243,945 B2 | 7/2007 | Breed et al. |
| 7,339,469 B2 | 3/2008 | Braun |
| 7,346,439 B2 | 3/2008 | Bodin |
| 7,350,608 B2 * | 4/2008 | Fernandez ................ B60L 1/00 180/65.1 |
| 7,385,497 B2 | 6/2008 | Golden |
| 7,397,363 B2 | 7/2008 | Joao |
| 7,636,033 B2 | 12/2009 | Golden |
| 7,647,180 B2 | 1/2010 | Breed |
| 7,844,505 B1 | 11/2010 | Arneson et al. |
| 7,868,912 B2 | 1/2011 | Venetianer et al. |
| 7,872,575 B2 | 1/2011 | Tabe |
| 7,880,767 B2 | 2/2011 | Chinigo |
| 7,961,094 B2 | 6/2011 | Breed |
| 8,120,459 B2 * | 2/2012 | Kwak ................ G07C 9/00309 340/5.2 |
| 8,274,377 B2 | 9/2012 | Smith et al. |
| 8,531,521 B2 | 9/2013 | Romanowich |
| 8,564,661 B2 | 10/2013 | Lipton et al. |
| 2002/0145666 A1 | 10/2002 | Scaman |
| 2003/0063004 A1 | 4/2003 | Anthony et al. |
| 2003/0137426 A1 | 7/2003 | Anthony et al. |
| 2003/0179073 A1 * | 9/2003 | Ghazarian .............. E05B 47/00 340/5.6 |
| 2003/0206102 A1 | 11/2003 | Joao |
| 2004/0107028 A1 | 6/2004 | Catalano |
| 2004/0222092 A1 | 11/2004 | Musho |
| 2005/0195069 A1 | 9/2005 | Dunand |
| 2006/0164239 A1 | 7/2006 | Loda |
| 2006/0176169 A1 | 8/2006 | Doolin et al. |
| 2006/0181413 A1 | 8/2006 | Mostov |
| 2006/0250235 A1 | 11/2006 | Astrin |
| 2007/0093200 A1 * | 4/2007 | Dobosz ............. H04B 7/18565 455/3.02 |
| 2007/0171042 A1 | 7/2007 | Metes et al. |
| 2007/0257774 A1 * | 11/2007 | Stumpert ............... G06Q 10/08 340/7.1 |
| 2008/0045156 A1 | 2/2008 | Sakhpara |
| 2008/0122595 A1 | 5/2008 | Yamamichi et al. |
| 2008/0234907 A1 | 9/2008 | Labuhn et al. |
| 2010/0159983 A1 | 5/2010 | Golden |
| 2011/0178655 A1 | 6/2011 | Golden |

OTHER PUBLICATIONS

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/065,837; copyright and dated Dec. 2, 2011, pp. 1-27, publisher United States and Trademark Office, Alexandria, Virginia, USA; U.S. Appl. No. 13/288,065 (27 pages).

United States Patent and Trademark Office; Office Action, Office Action from U.S. Appl. No. 13/065,837; copyright and dated Nov. 1, 2011, pp. 1-18, publisher United States Patent and Trademark Office, Alexandria, Virgina, USA; U.S. Appl. No. 13/288,065 (18 pages).

United States Patent and Trademark Office; Office Action from U.S. Appl. No. 11/397,118; dated Nov. 14, 2007; Alexandria, Virgina, USA; pp. 1-12; U.S. Appl. No. 13/288,065 (12 pages).

United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/155,573; dated Apr. 9, 2009; Alexandria, Virgina, USA; pp. 1-7; U.S. Appl. No. 13/288,065 (7 pages).

United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/155,573; dated Jul. 30, 2009; Alexandria, Virgina, USA; pp. 1-9; U.S. Appl. No. 13/288,065 (9 pages).

United States Patent and Trademark Office; Notice of Allowability from U.S. Appl. No. 12/155,573; dated Oct. 28, 2009; Alexandria, Virgina, USA; pp. 1-5; U.S. Appl. No. 13/288,065 (5 pages).

United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/657,356; dated Jul. 12, 2010; Alexandria, Virgina, USA; pp. 1-14; U.S. Appl. No. 13/288,065 (14 pages).

United States Patent and Trademark Office; Notice of Allowability from U.S. Appl. No. 12/657,356; dated Mar. 10, 2011; Alexandria, Virginia, USA; pp. 1-4; U.S. Appl. No. 13/288,065 (4 pages).

United States Patent and Trademark Office; Office Action from U.S. Appl. No. 13/065,837; dated Jul. 18, 2011; Alexandria, Virgina, USA, pp. 1-9; U.S. Appl. No. 13/288,065 (9 pages).

A newspaper article of Mr. Melvin Sullivan and his family that references the date, Mar. 5, 2001, U.S. Appl. No. 13/288,065.

A letter of response Mr. Sullivan received from Pfeiffer & Gantt, PA, dated Sep. 16, 2002, U.S. Appl. No. 13/288,065.

A "Certificate of Existance" Bright Idea Inventor, LLC. Nov. 6, 2002, U.S. Appl. No. 13/288,065.

A letter of response Golden received from the Honorable Congressman from Maryland, Elijah E. Cummings, dated Dec. 16, 2002; U.S. Appl. No. 13/288,065.

A newspaper article of Mr. Melvin Sullivan and Mr. Larry Golden, dated Feb. 27-Mar. 5, 2003; U.S. Appl. No. 13/288,065.

A letter of response Golden received from the Honorable Senator from South Carolina, Ernest F. Hollings, dated May 21, 2003; U.S. Appl. No. 13/288,065.

A letter of response Golden received from the Office of the Vice President, Dick Cheney, dated Jun. 3, 2003; U.S. Appl. No. 13/288,065.

A letter of response Golden received from the Honorable Senator from South Carolina, Ernest F. Hollings, dated Oct. 1, 2003; U.S. Appl. No. 13/288,065.

A letter of response Golden received from the Honorable Senator from South Carolina, Lindsey O. Graham, dated Oct. 21, 2003; U.S. Appl. No. 13/288,065.

(56) **References Cited**

OTHER PUBLICATIONS

A letter sent to the President of the United States George W Bush, the President's Cabinet, the United States Senate and the Congressional Black Caucus, dated May 23, 2005; U.S. Appl. No. 13/288,065.
On Nov. 17, 2005, an "Inventor's Office Record of Invention", was filed in my name (Golden) at "The Law Office of David P. Gaudio,P.C.; the Inventors Network."; U.S. Appl. No. 13/288,065.
On Aug. 23, 2005, the "Disclosure Document Registration"; U.S. Appl. No. 13/288,065.
On Apr. 5, 2006, the "Patent Application" was filed in my name (Golden) at the United Stacts Patent & Trademark Office in Washington, D.C.; U.S. Appl. No. 13/288,065.
On Jun. 6, 2008, the "Continuance-In-Part, (CIP) Application" was filed in my name (Golden) at the United States Patent & Trademark Office in Washington, D.C.; U.S. Appl. No. 13/288,065.
On Jan. 20, 2010, a "Continuation Application" (U.S. Appl. No. 12/657,356) was filed in my name (Golden) at the United States Patent & Trademark Office in Washington, D.C.; U.S. Appl. No. 13/288,065.
Reissue of U.S. Pat. No. 7,636,033,"Swear Back"; in accordance to Title 37—Code of Federal Regulations Patents, Trademarks, and Copyrights; Apr. 8, 2011; U.S. Appl. No. 13/288,065.
Reissue of U.S. Pat. No. 7,636,033; "Swearback-History of Work"; Apr. 8, 2011; U.S. Appl. No. 13/288,065.
United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/802,001, dated Apr. 14, 2011, 2011; Alexandria, Virginia, USA; pp. 1-16; U.S. Appl. No. 13/288,065 (16 pages).
United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/802,001; dated May 27, 2011; Alexandria, Virginia, USA; pp. 1-14, U.S. Appl. No. 13/288,065 (14 pages).
United States Department of Homeland Security: Petition for Inter Partes Review of U.S. Pat. No. Re. 43,990 Under 35 U.S.C. §312 and 37 C.F.R. §42.104; Case IPR2014-00714 for U.S. Pat. No. Re. 43,990; Filed Apr. 30, 2014; Washington, D.C., USA: pp. 1-57; U.S. Appl. No. 14/806,988 (57 pages).
United States Department of Homeland Security; Declaration of Dr. Sriram Vishwanath; Case IPR2014-00714 for U.S. Pat. No. Re. 43,990; Filed Apr. 30, 2014; Washington D.C., USA; pp. 1-44; U.S. Appl. No. 14/806,988 (44 pages).
Richard R Brooks and S.S. Iyengar; Multi-Sensor Fusion Fundamentals and Applications with Software; published 1998; Copyright Prentice Hall PTR; Upper Saddle River, New Jersey, USA; pp. 1-20; copy enclosed (20 pages), U.S. Appl. No. 14/806,988 (20 pages).
Ramanarayanan Viswanathan and Pramod K Varshney; Distriubted Detection with Multiple Sensors: Part 1—Fundamentals; Proceedings of the IEEE; Jan. 1, 1997; pp. 1-11; vol. 85; No. 1; Southern Illinois University Carbondale OpenSIUC: Illinois. USA; pp. 1-11; U.S. Appl. No. 14/806,988 (11 pages).
Blum; Distributed Detection with Multiple Sensors: Part II—Advanced Topics: Proceedings of the IEEE; Jan. 1, 1997; pp. 1-16; vol. 85, No. 1; Southern Illinois University Carbondale OpenSIUC; Illinois, USA; U.S. Appl. No. 14/806,988 (16 pages).
Victor Lesser; Distributed Sensor Networks a Multiagent Perspective; 2003; pp. 1, 2, 5, 6322, 26, 27, 36, 275, 320: copyright 2003 Kluwer Academic Publishers; AH Dordrecht, The Netherlands; U.S. Appl. No. 14/806,988 (10 pages).
Samuel Blackman and Robert Popoli; Design and Analysis of Modern Tracking Systems; 1999; pp. 1, 2, 6, 472; copyright 1999 Artech House; Norwood, Massachusetts, USA; U.S. Appl. No. 14/806,988 (4 pages).
Jean-Francois Chamberland; Decentralized Detection in Sensor Networks; 2003; pp. 407-416 IEEE Transactions on Signal Processing; vol. 51, No. 2; Urbana, Illinois, USA; U.S. Appl. No. 14/806,988 (10 pages).
Oleg Kachirski and Ratan Guha; Effective Intrusion Detection Using Multiple Sensors in Wireless Ad Hoc Networks; pp. 1-8; Proceedings of the 36.sup.th Hawaii International Conference on System Sciences; copyright 2003; Orlando, Florida. USA; U.S. Appl. No. 14/806,988 (8 pages).
Lawrence A Klein; Sensor and Data Fusion a Tool for Information Assessment and Decision Making; 2004; pp. 1-4, 6, 81, 87-89; copyright 2004 The Society of Photo-Optical Instrumentation Engineers; Publisher is SPIE—the International Society for Optical Engineering; Bellingham, Waehington, USA; U.S. Appl. No. 14/806,988.
Dale Ferriere and Khrystyna Pysareva and Andrzej Rucinski; Using Technology to Bridge Maritime Security Gaps; Aug. 1, 2005; Sea Technology; pp. 1-6; copyright Compass Publications, Inc. Jan. 2009; Portsmouth, New Hampshire. USA; U.S. Appl. No. 14/806,988 (6 pages).
Corie Lok; Cargo Security; MIT Technology Review; Jun. 2004; No. 107; pp. 74-75; publisher is Massachusetts institute of Technology; Cambridge, Massachusetts, USA; USPASN14/806988 (2 pages).
Thomas C Chen; RFID and Sensor-based Container Content Visibility and Seaport Security Monitoring system; Proceedings of SPIE, vol. 5778; pp. 151-159; Mar. 28, 2005; Publisher is SPIE—the International Society for Optical Engineering; Bellingham, Washington, USA; USPASN14/806988 (10 pages).
United States Department of Homeland Security; The University of Texas at Austin College of Engineering Standard Resume of Sriram Vishwanath; CaseIPR2014-00714 for U.S. Pat. No. Re. 43,990; Filed Apr, 30, 2014; Washington, D.C., USA; pp. 1-21; USPASN14/806988 (21 pages).
Operating Agreement of Bright Idea Inventor, LLC received from Pfeiffer & Gantt, PA, dated Nov. 13, 2002; U.S. Appl. No. 13/288,065.
United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/802,001; dated Oct. 20, 2011; Alexandria, Virginia, USA; pp. 1-5; parent U.S. Appl. No. 13/288,065 (5 pages); U.S. Appl. No. 13/288,065 (5 pages).
United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 12/802,001; copyright and dated Dec. 12, 2011, pp. 1-9, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA, parent U.S. Appl. No. 13/288,065 (9 pages).
United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 12/802,001; copyright and dated Mar. 26, 2012, pp. 1-12, publisher United States Patent and Trademark Office; Alexandria, Virginia, USA; U.S. Appl. No. 13/288,065 (12 pages).
United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/199,853; copyright and dated Feb. 22, 2012, pp. 1-38, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; U.S. Appl. No. 13/288,065 (38 pages).
United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/065,837; copyright and dated Feb. 22, 2012, pp. 1-25, publisher United States Patent and Trademark office, Alexandria, Virginia, USA, U.S. Appl. No. 13/288,065 (25 pages).
United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/288,065; copyright and dated Aug. 24, 2012, pp. 1-4, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; U.S. Appl. No. 13/288,065 (4 pages).
United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/288,065; copyright and dated Nov. 28, 2012, pp. 1-11, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; U.S. Appl. No. 13/288,065 (11 pages).
United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/288,065; copyright and dated Apr. 16, 2013, pp. 1-9, publisher United States Patent and Trademark Office, Alexandria, Virgina, USA; U.S. Appl. No. 13/288,065 (9 pages).
United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 14/021,693; copyright and dated Apr. 20, 2015, pp. 1-20, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; U.S. Appl. No. 14/021,693 (20 pages).
United States Patent and Trademark Office, Office Action; Office Action from U.S. Appl. No. 14/021,693; copyright and dated Jan.

(56) **References Cited**

OTHER PUBLICATIONS

20, 2015, pp. 1-17, publisher United States Patent and Trademark Office, Alexandria, Virgina, USA; U.S. Appl. No. 14/021,693 (17 pages).
United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 14/021,693; copyright and dated Sep. 5, 2014, pp. 1-12, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; U.S. Appl. No. 14/021,693 (12 pages).
United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 14/806,988; copyright and dated Jul. 5, 2015, pp. 1-5, publisher United States Patent and Trademark Office, Alexandria, Virgina, USA; parent U.S. Appl. No. 14/806,988 (5 pages).
United States Patent and Trademark Office; Notice of Allowance from U.S. Appl. No. 14/806,988; dated Jan. 3, 2017; Alexandria, Virgina, USA; pp. 1-8; U.S. Appl. No. 14/806,988 (8 pages).
United States Patent and Trademark Office; Notice of Allowaance from U.S. Appl. No. 14/021,693; dated Jun. 19, 2015; Alexandria, Virginia, USA; pp. 1-8; U.S. Appl. No. 14/021,693 (8 pages).
United States Patent and Trademark Office; Notice of Allowaance from U.S. Appl. No. 13/288,065; dated May 24, 2013; Alexandria, Virgina, USA; pp. 1-8; U.S. Appl. No. 13/288,065 (8 pages).

* cited by examiner



32
INTERNET CONNECTION
34
GPS CONNECTION
36
POWER SOURCE
10
22
44
58
62
64
66
44
44
26
56
28
12
52
48
46
52
54
54
46
46
50
52
50
46
48

Fig. 1

Fig. 2

U.S. Patent Dec. 25, 2018 Sheet 2 of 13 US 10,163,287 B2

14
60
58
56

Fig. 3a

14
60
58
56

Fig. 3b

SAppx129

U.S. Patent Dec. 25, 2018 Sheet 3 of 13 US 10,163,287 B2

14
16
12
44
44

Fig. 4

14
12
42
42
112
16
12
12
42
12
POWER SOURCE
114

Fig. 5

SAppx130

U.S. Patent Dec. 25, 2018 Sheet 4 of 13 US 10,163,287 B2

18
12
44
12
44
12
44
20
112
POWER SOURCE
114
68
70
72
56

Fig. 6

Fig. 7

SAppx131

U.S. Patent Dec. 25, 2018 Sheet 5 of 13 US 10,163,287 B2

68
72
70
56

Fig. 8

SAppx132



32
INTERNET CONNECTION
34
GPS CONNECTION
36
POWER SOURCE
10
22
42
58
64
62
66
44
44
26
56
12
28
52
48
52
46
54
46
54
46
50

Fig. 9



38
22
12
26
30
26
32
34
36
38
24

Fig. 10

76
AGENT DETECTED?
NO
YES
80
SOUND ALARM
82
LIGHT ALARM
74
40
CPU
84
READINGS
86
RESET
78
SENSING MODE
STOP

Fig. 11



76
88
AGENT DETECTED?
NO
YES
82
LIGHT ALARM
80
SOUND ALARM
84
READINGS
90
DETECTOR RESET
78
SENSING MODE
STOP
76
46
DETECTOR
40
12
CASE
92
94
LOCK/DISABLE LOCK SIGNAL
96
DISARM AND RESET
98
DETECTION MODE

Fig. 12

Fig. 13



46
DETECTOR
100
40
CASE
12
DISABLER
62
102
AUTHORIZED FINGERPRINT?
NO
YES
104
DISABLE AND DISARM
ACCESS DENIED
RESET
106
101
DETECTION MODE
108
110
112
WATCHTOWER
116
DETECTION MODE
118
NO
AGENT DETECTED?
YES
LIGHT ALARM INDICATOR
42
114
MONITORING TERMINAL
120
LOCK/DISABLE SIGNAL
122
CLEANUP MEASURES
RESET
124
116
DETECTION MODE

Fig. 14

Fig. 15



Fig. 16

U.S. Patent Dec. 25, 2018 Sheet 11 of 13 US 10,163,287 B2

152
158
154
156
170
INTERNET CONNECTION
172
GPS CONNECTION
150
164
POWER SOURCE
174
160
186
168
166
162
176
184
178
180
182

Fig. 17

SAppx138

U.S. Patent Dec. 25, 2018 Sheet 12 of 13 US 10,163,287 B2

204
210
187a
206
187b
206
214
212
190
216
208
202
196
194
200
198
192
138
188

Fig. 18

SAppx139



204
220
187a
187b
218
224
190
222
202
196
194
200
198
192
138
188

Fig. 19

# MULTI SENSOR DETECTION, STALL TO STOP AND LOCK DISABLING SYSTEM

## CROSS REFERENCE TO RELATED APPLICATION

This application is a continuation application and claims the filing date and benefit of U.S. patent application Ser. No. 14/806,988 title "Multi Sensor Detection, Stall to Stop and Lock Disabling System" filed on Jul. 23, 2015 that issued on Mar. 7, 2017 as U.S. Pat. No. 9,589,439, the entire contents of which are incorporated by reference herein in their entirety for all purposes. U.S. Pat. No. 9,589,439 is a continuation application and claims the filing date and benefit of U.S. patent application Ser. No. 14/021,693 title "Multi Sensor Detection, Stall to Stop and Lock Disabling System" filed on Sep. 9, 2013 that issued on Aug. 4, 2015 as U.S. Pat. No. 9,096,189, the entire contents of which are incorporated by reference herein in their entirety for all purposes. U.S. Pat. No. 9,096,189 is a continuation application and claims the filing date and benefit of U.S. patent application Ser. No. 13/288,065 title "Multi Sensor Detection, Stall to Stop and Lock Disabling System" filed on Nov. 3, 2011 that issued on Sep. 10, 2013 as U.S. Pat. No. 8,531,280, the entire contents of which are incorporated by reference herein in their entirety for all purposes. U.S. patent application Ser. No. 13/288,065 that will issue as U.S. Pat. No. 8,531,280 is a divisional application and claims the filing date and benefit of U.S. patent application Ser. No. 12/802,001 title "Multi Sensor Detection, Stall to Stop and Lock Disabling System" filed on May 27, 2010, that issued on Dec. 18, 2012 as U.S. Pat. No. 8,334,761, the entire contents of which are incorporated by reference herein in their entirety for all purposes. U.S. Pat. No. 8,334,761 is a continuation application and claims the filing date and benefit of U.S. patent application Ser. No. 12/657,356 title "Multi Sensor Detection, Stall to Stop and Lock Disabling System" filed on Jan. 20, 2010 that issued on Jan. 31, 2012 as U.S. Pat. No. 8,106,752 the entire contents of which are incorporated by reference herein in their entirety for all purposes. U.S. Pat. No. 8,106,752 is a continuation of and claims priority to U.S. Pat. No. 7,636,033. U.S. Pat. No. 7,636,033 is a continuation-in-part of and claims priority to U.S. Pat. No. 7,385,497. U.S. patent application Ser. No. 13/288,065 that will issue as U.S. Pat. No. 8,531,280 also claims the filing date and benefit of and incorporates the entire contents of U.S. patent application Ser. No. 12/657,356, now U.S. Pat. No. 8,106,752 herein by reference for all purposes. The present application also claims the filing date and benefit of and incorporates the entire contents of U.S. Pat. Nos. 9,096,189; 8,531,280; 8,334,761; 8,106,752; 7,636,033; and 7,385,497 by reference herein in their entireties for all purposes.

## FIELD OF THE INVENTION

The present invention pertains to anti-terrorist detection and prevention systems, and more particularly pertains to a disabling lock mechanism combined with a chemical/biological/radiological detection system for use with products grouped together by similar characteristics in order to prevent unauthorized entry, contamination and terrorist activity.

## BACKGROUND

Terrorist activity is a continuous, daily, worldwide threat to the stability, prosperity, security and peace within nations and between and among nations. Its danger lies in its arbitrary destructiveness as much as in its unpredictability, and the constant threat of terrorist activity compels measures and actions that cause strain and contention in free, democratic societies as security concerns and civil liberty concerns must be balanced so that both public safety and civil liberties are maintained. Safety and security concerns can be addressed through numerous proactive steps and measures, many of which cause only minimal interference with and disruption of the daily routines of work, travel, commerce and entertainment. However, because modern industrial societies afford almost limitless places, locations, and opportunities for terrorist activities, no safety measure or security protocol will be foolproof, but many security measures, systems and protocols can be implemented that greatly minimize specific threats through fingerprint identification procedures, chemical, biological, and radiological hazard detections, bomb and explosive detection, and controlling the access to everything from shipping containers to school lockers. Thus, the prior art discloses a wide range of security measures and systems.

For example, the Fishbine et al. patent (U.S. Pat. No. 4,792,226) discloses an optical fingerprinting system that includes an optics/processor unit, a video monitor, a data terminal, and a printer for collecting and storing data characteristics of all ten individual fingerprints for printing demographic information and fingerprint images as desired on a standard booking or applicant card.

The Schiller patent (U.S. Pat. No. 4,544,267) discloses a finger identification unit that includes a fingerprint scanning apparatus using a collimated beam of light to interrogate the fingerprint of a finger placed against a platen so that successive scan positions produce signals containing fingerprint information.

The Fishbine et al. patent (U.S. Pat. No. 5,222,152) discloses a portable fingerprint scanning apparatus for optically scanning and recording fingerprint images and wirelessly transmitting such images to a mobile processing unit for verification and background checking.

The Lougheed et al. patent (U.S. Pat. No. 5,233,404) discloses an optical scanning apparatus that uses a linear charge coupled device (CCD) for recording the image of a fingerprint on the viewing surface.

The Groger et al. patent (U.S. Pat. No. 5,766,956) discloses a diode laser based sensor for undertaking optical, chemical, immunological or nucleic acid-based assay or other chemical analysis.

The Feldman patent (U.S. Pat. No. 5,938,706) discloses a multi element security system for preventing the unauthorized use of an automotive vehicle, and which includes numerous locking and control features interconnected to an onboard cpu.

The Bowker et al. patent (U.S. Pat. No. 5,963,657) discloses a safety access control for doors, handles, locks, etc., wherein the surface relief of a finger is read and verified to either allow or prevent access by the individual to the door, handle, lock, etc.

The Bonder et al. patent (U.S. Pat. No. 6,078,265) discloses a fingerprint identification security system wherein a key lock operated security system utilizes the fingerprint of the individual to control user access to the security system, such as the ignition system of an automotive vehicle.

The Anzai et al. patent (U.S. Pat. No. 6,271,745 B1) discloses a keyless authorization system for use of a motor vehicle that includes fingerprint reading units located on the exterior or interior of the motor vehicle and which are

coupled to a control unit for scanning, comparing and matching fingerprints to allow or disallow access to the motor vehicle.

The Hwang patent (U.S. Pat. No. 6,374,652 B1) discloses a fingerprint-activated doorknob in which a detecting sensor for a fingerprint is placed on the doorknob for measuring and searching the fingerprint against previously stored fingerprint inputs to control access to the door.

The Vor Keller et al. patent (U.S. Pat. No. 6,588,635 B2) discloses a safety holster for a firearm that includes a pivotally mounted retaining member and a fingerprint sensor for scanning fingerprint information so that only authorized users can withdraw the firearm from the holster.

The Cordery et al. patent (U.S. Pat. No. 6,613,571 B2) discloses a method and system for detecting biological and chemical hazards in the mail that includes sensors placed within the mail box for sampling and testing ambient air and so that mail can be safely transported through the mail system.

The Nagata patent (U.S. Pat. No. 6,628,213 B2) discloses a coding method for digital signal coding and decoding that includes a CMI (code-marked inversion) method of signal coding.

Nonetheless, despite the ingenuity of the above devices, methods, and systems, there remains a need for a multi-detector and disabling lock system for use with various types of products collected together by common characteristics into product groupings for detecting chemical, biological and radiological agents and compounds and for selectively disabling and activating the product locks thereby preventing unauthorized entry and further contamination and preventing and thwarting terrorist activities.

## SUMMARY

The present invention comprehends a chemical/biological/radiological detector unit with a disabling locking system for protecting products that can be grouped into several product groupings, from terrorist activity, and also for preventing unauthorized access to and tampering with the storage and transport of ordnance and weapons. The products grouped into what may be referred to as Product grouping 1 include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes and lockers; while the products grouped into what may be referred to as Product grouping 2 include, but are not limited to, chemical, biological, radiological, and nuclear detectors, motion sensors and door sensors. The multi sensor detection system includes the capability to disable an existing lock or activate a lock located inside any of the products named in the product grouping categories upon activation of a sensor or detector included in the system. This is a significant feature for the multi sensor detection system as it prevents unauthorized, unequipped and untrained entry and access to the product thus preventing further contamination of the site and to individuals in the area.

The multi sensor detection and lock disabling system includes a detector case sized to fit in, upon or adjacent any of the aforedescribed products for detecting harmful and dangerous chemical, biological, and radiological agents, compounds and elements. In addition, the multi sensor detection and lock disabling system is capable of transmitting a signal to lock or disable a lock on the product, and is also capable of transmitting signals to a monitoring computer terminal or PC so that appropriate defensive and safeguarding actions can be undertaken and an authorized individual can disarm and reset the locking system and the multi sensor detection system. The detector case includes a power source (battery or electrical), interior compartments, Internet and GPS connections and a cpu interconnected with the Internet and GPS connections, and also interconnected with one or more off site monitoring computer terminals or PCs. The detector case includes one or more light alarm indicators that are externally visible and that light up when the chemical, biological, or radiological agent or compound is detected, and the light alarm indicators (which can be indicator lights or panels on the front of the detector case) can be color coded for denoting the specific agent or compound detected, i.e., separate and distinct colors for indicating detection of the chemical, biological, or radiological agent or compound.

The detector case is designed to hold within the interior compartments one or more interchangeable detectors, and each detector is adapted and set up to sample a specific compound or agent. Each detector includes a sound alarm, a sensor, a light alarm, and a readings panel, and is electrically interconnected (either by wire or wirelessly) to the cpu of the detector case so that information regarding the detection of the particular agent or compound can be conveyed from the detectors to the detector case cpu. Each detector can also be used as a manual, stand-alone hand held scanner.

The multi sensor detection and lock disabling system can be interconnected to a surveillance watchtower, as well as monitoring computer terminals or PCs, with the watchtower scanning shipping and cargo crates and containers being prepared for shipment or sitting for extended periods of time on a dock or at a port, at a railway site, or at an industrial storage facility. The watchtower will scan the cargo and shipping crates and containers for the light alarm indicators on detector cases that are mounted in or upon the crates and containers, and thus continuous security surveillance of the crates and containers can be maintained.

An enhanced version of the multi sensor detection and lock disabling system can be employed to prevent car and vehicle bombings. Coupling the multi sensor detection and lock disabling system with satellite service will enable the detection system to detect explosives and transmit an alert signal by satellite to monitoring equipment at a monitoring site. Upon receiving the alert signal at the monitoring site the monitoring equipment activates a stall-to-stop process for disabling the air, fuel, electrical and/or computer system of the vehicle. Moreover, upon receiving the alert signal at the monitoring site the car or vehicle will be locked by transmission of a satellite signal that disables the vehicle's electrical and ignition system thereby preventing escape of the terrorist.

It is an objective of the present invention to provide a multi sensor detection and disabling lock system for securing news racks and vending machines in order to prevent theft, unauthorized use and terrorist activity.

It is another objective of the present invention to provide a multi sensor detection and disabling lock system for preventing terrorist activity by using products grouped together by common features in several product groupings such as design similarity, similarity in the presentation of security problems and similarity with regard to the presentation of solutions to preventing terrorist solutions.

It is still yet another objective of the present invention to provide a multi sensor detection and disabling lock system that is capable of disabling an existing lock or activating a lock inside any of the products of the product grouping lists when a detector or sensor of the system is activated.

It is still yet a further objective of the present invention to provide a multi sensor detection and disabling lock system

wherein the disabling lock system prevents the unauthorized entry, access and further contamination of the products included in the several product groupings.

A still further objective of the present invention is to provide a multi sensor detection and lock disabling system that utilizes a multi-task device for preventing terrorist activity to vulnerable products that are collected or arranged by product grouping categories.

Yet a further objective of the present invention is to provide a multi sensor detection and disabling lock system to secure cargos and containers, especially cargo and shipping containers, against chemical, biological, radiological and nuclear terrorist activity.

Still another objective of the present invention is to provide a multi sensor detection and disabling lock system capable of detecting chemical, biological and radiological agents and compounds.

Still yet another objective of the present invention is to provide a multi sensor detection and disabling lock system that includes interchangeable detectors that operate in conjunction to detect chemical, biological and radiological agents and compounds.

Still yet a further objective of the present invention is to provide a multi sensor detection and disabling lock system that can be implemented by business or government at a minimum cost by organizing the products to be protected into product grouping categories.

Another objective of the present invention is to provide a multi sensor detection and disabling lock system that accurately and reliably detects harmful agents, compounds and elements, and prevents the placement and storage of weapons and bombs in the range of storage containers and facilities currently available.

Still another objective of the present invention is to provide a multi sensor detection and disabling lock system wherein the interchangeable detectors that comprise part of the system can be used as stand-alone scanners.

These and other objects, features, and advantages will become apparent to those skilled in the art upon a perusal of the following detailed description read in conjunction with the accompanying drawing figures and appended claims.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the primary features of the system which include a detector case, several interchangeable detectors, an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler;

FIG. **2** is a front elevational view of the multi sensor detection and lock disabling system of the present invention illustrating one of the interchangeable detectors first shown in FIG. **1**;

FIG. **3a** is a top plan view of the multi sensor detection and lock disabling system of the present invention illustrating the mounting of one lock disabler to the lock of a product, such as a container, and disengaged from the lock of the container;

FIG. **3b** is a top plan view of the multi sensor detection and lock disabling system of the present invention illustrating the engagement of the lock disabler to the lock of the product for locking or disabling the lock of the product so that unauthorized access is prevented;

FIG. **4** is a side elevational view of the multi sensor detection and lock disabling system of the present invention illustrating the detector case mounted to the product, such as the container, with the light alarm indicators externally visible;

FIG. **5** is a schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the interconnection of detector cases with a surveillance watchtower and a monitoring PC terminal;

FIG. **6** is a schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the placement of detector cases upon containers different from the containers of FIG. **5**, and wherein the detectors case are interconnected to a surveillance watchtower and a monitoring PC terminal;

FIG. **7** is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the mounting of one automatic/mechanical lock disabler to the lock of a standalone news rack;

FIG. **8** is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating one interchangeable detector placed within the standalone news rack;

FIG. **9** is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the detector case having color coded front panels for specifically indicating the agents, compounds or elements that have been detected;

FIG. **10** is a rear elevational view of the multi sensor detection and lock disabling system of the present invention illustrating the GPS, Internet and power source connections;

FIG. **11** is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the interconnection of the detector with the detector case and the steps undertaken by the system when an agent or compound is detected;

FIG. **12** is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the sequence of steps undertaken by one detector when functioning as a stand alone scanner for detecting an agent or compound;

FIG. **13** is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the interconnection of the detector case with the automatic/mechanical lock disabler for activating the lock disabler upon detection by the system of an agent or compound;

FIG. **14** is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating interconnection of the detector case with the fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock as part of the process of detection and safeguarding the public upon detection of the agent or compound;

FIG. **15** is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the incorporation of the system with a surveillance watchtower and a monitoring PC or computer terminal for monitoring containers, such as shipping or cargo containers, that may sit for extended time periods on docks, at rail yards, and at industrial storage facilities;

FIG. **16** is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the integration of the detection system with a satellite and monitoring equipment at a monitoring site for detecting explosives placed in a vehicle and then transmitting signals to the satellite and then to the monitoring site for disabling and locking the vehicle;

FIG. 17 is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the incorporation of the features and elements of the detector case to a cell phone and cell phone case;

FIG. 18 is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the incorporation of a GPS satellite, a monitoring site and a cell phone tower for communicating to and with an electronic device such as a laptop computer or a cell phone for transmitting signals to a vehicle for activating an onboard stall-to-stop device for bringing the vehicle to a halt; and

FIG. 19 is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the use of a GPS satellite in conjunction with the monitoring site and monitoring equipment to relay commands and signals to the cpu or transceiver of the vehicle for stopping or locking the vehicle in response to a signal that a certain type of event (detection of a bomb, engine failure or malfunction or unauthorized use) has occurred or is in process.

## DETAILED DESCRIPTION OF REPRESENTATIVE EMBODIMENTS

Illustrated in FIGS. **1-19** is a multi sensor detection and lock disabling system **10** for preventing terrorist activity by monitoring, detecting, and securing those critical areas; sites, and facilities vulnerable to terrorist activity. The first step is the identification of critical areas, sites, locations and facilities that are vulnerable to terrorist activity as convenient places to store and plant explosives and bombs and spread biological, chemical or radiological agents and compounds, followed by the disposition of the multi sensor detection and lock disabling system **10** for monitoring, detecting, and securing the particular location or site. Vulnerable sites, locations, facilities and areas are nearly limitless in their variety; in order to categorize the protection the present invention provides an anti-terrorist product grouping strategy has been developed wherein products made from the same or similar material, products having the same or similar design, and products presenting the same or similar security problems are grouped together with the multi sensor detection and lock disabling system **10** for preventing terrorist activity. For example, two preferred product groupings can be Product Grouping I: cargo containers, shipping containers, cargo planes, freight train cars, tractor trailers, mail carriers (UPS, FedEx), airport lockers, news racks (coin and non-coin operated), mail drop boxes, cluster mail boxes, keyed mail boxes, min-storage houses and buildings, bicycle lockers, stadium lockers, school lockers, cars, trucks, campers, buses, vans and utility vehicles. Product Grouping II: chemical detectors, biological detectors, radiological detectors, nuclear detectors, motion sensors, glass break sensors, plastic film on glass, high security locks, tampering labels, door sensors, disabling locking systems, vehicle detectors and satellite disabling locking systems. In addition to grouping products together by features, designs and materials, the multi sensor detection system **10** includes a lock disabling capability for disabling an existing lock or activating a lock on or inside any of the aforementioned products when a detector or sensor of the system is activated. The lock disabling feature is a crucial component of the invention in so far as it prevents unauthorized, unequipped or untrained individuals from gaining access and entry to the site and causing further contamination of the site.

As shown in FIGS. **1-10**, the multi sensor detection and lock disabling system **10** includes at least one—and preferably many—detector case **12** that can be placed in, on, upon or adjacent the product, such as the shipping containers **14** of FIGS. **4** and **5** resting upon a platform **16** or the cargo container **18** of FIG. **6** sitting upon a seaport dock or pier **20**. The detector case **12** includes a top **22**, a bottom **24**, a pair of opposed sides **26** and a front side or panel **28** and an opposite rear or back side **30**. The rear side **30** has connections or contacts that can include an Internet connection **32**, a GPS connection **34** and a power connection **36** for a power source. The power source for the detector system **10** can be any conventional battery or electrical source. The detector case **12** includes an interior chamber divided into a number of compartments **38** for holding therein agent or compound detection means hereinafter further described. A cpu **40** is mounted within the detector case **12** and electrically interconnects, routes, and transmits signals among items hereinafter further described and also communicates with a monitoring site and monitoring equipment. The front side **28** of the detector case **12** includes indicator means for visually indicating that a specific agent, compound or element has been detected. The indicator means can include color coded indicator lights **42** in panel form, as shown in FIG. **9**, with each indicator light panel **42** lighting up with a specific color corresponding to the detection of a specific agent or compound; or color coded indicator lights **44**, as shown FIG. **1**, that correspond to and individually light up on the detection of a specific agent or compound (chemical, biological, or radiological).

As shown in FIGS. **1**, **2** and **9-13**, the multi sensor detection and lock disabling system **10** includes a plurality of detectors **46** with each detector **46** adapted for and set up to sample for a specific agent or compound (biological, chemical, or radiological); and the detectors **46** are interchangeable for adapting to the needs and demands of future technology. The detectors **46** can also be used as stand alone scanners. In the preferred embodiment of the invention, at least three detectors **46** are placed within the detector case **12** with one detector **46** for specifically sampling biological agents or compounds, one detector **46** for sampling chemical agents or compounds, and one detector **46** for sampling radiological agents or compounds. The detectors **46** are interconnected to the cpu **40** of the detection system **10** by conventional connections that can be wire or wireless for transmitting the appropriate signals to the cpu **40** upon detection of the particular agent or compound. As shown in FIG. **2**, each detector **46** includes on its front plate or facing surface a sound alarm indicator **48**, a readings panel **50** comprising a plastic shield and LED lights for displaying the various read-out messages, a sensor **52** for detecting the specific agent, element or compound, and a light alarm indicator **54** that can be color coded for each specific agent and which is externally visible when the detector **46** is used as a stand alone scanner. Each detector **46** includes a conventional microprocessor for controlling the various functions and generating the appropriate signals for transmission to the cpu **40** of the detector case **12**.

As shown in FIGS. **1**, **3***a*, **3***b*, **9**, and **13-15**, used in conjunction with the multi sensor detection and lock disabling system **10** is at least one automatic/mechanical lock disabler **56**—and depending upon the number of products being monitored there can be one lock disabler **56** for each product. The automatic/mechanical lock disabler **56** is physically connected to the detector case **12** by a wire or cable **58** for receiving signals therefrom for disabling an existing lock or activating a lock inside a product to prevent

access to the product. By way of example, FIG. **3***a* shows the automatic/mechanical lock disabler **56** mounted—by any conventional means—to the lock **60** of the shipping container **14** shown in FIGS. **4** and **5** and connected by wire **58** to the cpu **40** of the detector case **12**. The lock disabler **56** is in the non-activated or disengaged state in FIG. **3***a*. FIG. **3***b* shows the automatic/mechanical lock disabler **56** mounted to the lock **60** of the shipping container **14** and in the activated or engaged state after detection of an agent or compound by the system **10** thereby for locking or disabling the lock **60** of the shipping container **14** and preventing unauthorized entry and access by unauthorized, untrained and unequipped individuals. In FIGS. **3***a* and **3***b* the lock **60** secures doors of the shipping container **14** that can be slidably or pivotably opened and closed.

In addition to the automatic/mechanical lock disabler **56**, the multi sensor detection and lock disabling system **10** can also utilize a fingerprint biometric lock with disabler **62** as shown in FIGS. **1** and **14**. The fingerprint biometric lock with disabler **62** is interconnected to the cpu **40** of the detector case **12** for receiving transmissions therefrom after detection of an agent or compound has occurred so that the lock on the product can be locked or disabled. Moreover, resetting of the fingerprint biometric lock with disabler **62** occurs when the fingerprint of the individual is placed on the fingerprint-matching pad **64**, and if a match occurs with a known fingerprint stored by the cpu **40**, then the individual can reset the fingerprint biometric lock with disabler **56** by turning the manual lock disabler **66**. The fingerprint biometric lock with disabler **62** is mounted to the lock of the product in a manner similar to the mounting of the automatic/mechanical lock disabler **56** that is shown in FIGS. **3** and **3***b*.

FIGS. **4** and **5** show one manner of disposition or placement of the detector case **12** in relation to the product, i.e., the shipping container **14**, with the color coded indicator lights **42** externally viewable; FIG. **5** shows a number of shipping containers **14** each equipped with a detector case **12** and integrated with elements hereinafter further described for continuously monitoring the shipping containers **14** as they sit for an extended period of time on the truck or rail platform **16**. FIG. **6** illustrates several cargo containers **18** sitting on the shipping dock or pier **20**, with each cargo container **18** having a detector case **12** mounted thereon and integrated with and monitored by elements shown in FIG. **5** and hereinafter further described.

FIG. **7** illustrates a typical product from product grouping 1 that is monitored by the multi sensor detection and lock disabling system **10** of the present invention; specifically, FIG. **7** shows a news rack **68** with one automatic/mechanical lock disabler **56** mounted to and interconnected with the locking mechanism of the news rack **68**. As long as there is no detection of any agent or compound, the lock disabler **56** is in the disengaged state, and the individual can deposit the coin amount in the chute and then freely open the glass panel **70** by the handle **72** for removing a paper. However, the lock disabler **56** would be activated upon detection of the harmful agent or compound and receipt of a signal from the cpu **40** for locking or disabling the locking mechanism thereby denying access to the interior of the news rack **68** from all untrained, unauthorized and unequipped individuals.

FIG. **8** illustrates one detector **46** disposed within the news rack **68** and which is visible through the panel **70** for detecting one specific agent, compound or element. The detector **46** functions as a stand-alone scanner and can be wirelessly interconnected to off site monitoring equipment.

FIG. **11** illustrates a representative schematic **74** for describing the signal transmission process from the detector **46** to the cpu **40** of the detector case **12**. The external stimulus **76** would be the chemical, biological or radiological agent or compound. If there is no detection of the agent or compound, the detector **46** will stay in the sensing mode **78**. However, detection of the specific agent will trigger the sound alarm **80** and the light alarm **82**, and instant transmittal of a signal to the cpu **40**. The readings **84** can be stored by the cpu **40** for verification and future review and evaluation. After all the appropriate corrective and preventative measures have been undertaken by the trained and authorized personal, and the site has been cleansed of the contamination, authorized and equipped personal can then reset **86** the system **10**.

FIG. **12** illustrates a representative schematic **88** for the detector **46** when used as stand-alone scanner. The detector **46** undergoes the same essential steps as illustrated in FIG. **11**, with the exception of the signal transmission to the cpu **40**. The detector **46** remains in detection mode **78** until an agent is detected, and then the various functions-light alarm **82**, sound alarm **80**, storage of readings **84**, and, after the appropriate security and safety steps have been carried out by authorized personal, detector reset **90** by authorized personal can occur thereby placing the detector **46** back in detection or sensing mode **78**.

FIG. **13** is a representative schematic **92** that illustrates the steps undertaken by the system **10** to lock or disable a lock, such as the lock **60** for the shipping container **14** shown in FIGS. **3***a* and **3***b*. Upon detection of the agent (chemical, biological, radiological) the alarm light indicators **42** or **44** will light up providing external indication that an agent has been detected. In addition, the system **10**—the cpu **40**—will transmit a lock/disable lock signal **94** to the automatic/mechanical lock disabler **56** to lock or disable the lock on the product, such as the lock **60** on the shipping container **14** of FIGS. **3***a*-**5**. This prevents unauthorized, unequipped, or untrained individuals from entering or gaining access to the product for which a dangerous and perhaps lethal agent has been detected. After the proper authorities and authorized personal have been notified and all the appropriate security, preventative and clean up measures have been undertaken, the authorized individual can perform the disarm and reset function **96** for the system **10** placing the system **10** in back in the detection mode **98**.

FIG. **14** is a representative schematic **100** illustrating the use of the fingerprint biometric lock with disabler **62** with the system **10**. Upon detection of the agent or compound by the detector, the various alarms would sound and light up (shown in previous figures), and the cpu **40** would then transmit a signal to the fingerprint biometric lock with disabler **62** to lock or disable the lock on the product, such as the lock **60** on the shipping containers **14** shown in FIGS. **3***a*-**5**. The shipping containers **60** would remain locked and in an access denied mode **101** should an attempt be made to gain access to the container **60** by opening the lock **60** with an unauthorized fingerprint. However, a fingerprint that matches stored and authorized fingerprints **102** would indicate an authorized individual, and would allow the individual to disable and disarm **104** the lock **60** of the shipping container **14**. The fingerprint biometric lock with disabler **62** would then be reset **106** after the appropriate safety, cleanup, and protection measures are completed, and the system **10** would be reset and placed back in the detection mode **108**.

FIG. **15** is a schematic representation **110** that illustrates the integration of a surveillance watchtower **112** and a monitoring terminal or PC **114** for monitoring products such

as the shipping containers **14** or cargo containers **16** that sit for extended periods of time of docks, piers **20**, truck terminals, rail yards, shipping platforms **16** and industrial sites as shown in FIGS. **5** and **6**. The watchtower **112** would maintain continuous surveillance over a number of shipping containers **60**, for example, with detector cases **12** mounted in or on each container **14** and set in detection mode **116** with one or more detectors **46** disposed in each detector case **12**. The watchtower **112** would continuously scan for light alarm indicators **42** and **44** on the products, such as the containers **14** or **18**, and the watchtower **112** would be interconnected and integrated with the monitoring terminal or PC **114**. Upon detection **118** of an agent or compound in one or more of the shipping containers **14**, the appropriate light alarm indicators **42** or **44** would light providing visible confirmation of the detection of the specific agent or compound. The cpu **40** would transmit a lock/disable signal **120** to the lock **60** on each respective shipping container **14** to lock or disable the lock **60** thus preventing access to that respective shipping container **14**. In addition, signal transmissions would be sent to the monitoring terminal or PC **114** (which could be off site) thereby alerting authorized security personal of the contamination event. With the infonnation received at the monitoring terminal **114**, authorized personal would then be notified and dispatched to the area to undertake the appropriate safety and cleanup measures **122**. Such measures would also include disarming the lock disabling system in order to gain access to the shipping container **14**. After all the cleanup and security measures are completed by the trained and properly equipped authorities, the detection system and the lock disabling feature would reset **124** and the detection system would again be placed in detection mode **116**.

FIG. **16** is a schematic representation **126** that illustrates an enhanced version of the multi sensor detection and lock disabling system **10** for preventing car and vehicle attacks and bombings. The lock disabling system **10** would be interconnected to the locking system and mechanism **128** of the vehicle **130**. In addition, a stall to stop disabling link **132** can be made with the fuel, air, and electrical system **134** of the vehicle **130**. The enhanced version incorporates a satellite **136** for signal receipt and transmission from the vehicle **130** in which the detector system **10** is placed to a monitoring site and monitoring equipment **138**. As shown in FIG. **16**, a detection signal **140** would be sent to the satellite **136** by the detection system **10** upon detection of a bomb or explosive **142** hidden in the vehicle **130**. The satellite **136** would then transmit an alert signal **144** to the monitoring site **138** with the signal **144** containing the relevant data to evaluate the nature of the threat. The monitoring site **138** would then transmit a stall to stop signal **146** to the detection system **10** to lock the vehicle **130** and/or disable the electrical system of the vehicle **130** thereby disabling the vehicle **130**, preventing access to the vehicle **130** by locking the vehicle **130**, and preventing any terrorist in the vehicle **130** from escaping.

The detector case **12** can be modified and adapted for inclusion with cell phone cases, satellite cell phone cases, laptop cases, notebook PC cases, PDA cases, carry-on cases, suitcases; and briefcases. In addition, the basic monitoring terminal or PC **114**, as shown in FIGS. **5** and **15**, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring.

The system **10** and the watchtower **112**, along with the satellite **136** and the monitoring site **138** can be adapted or incorporated with cell phone towers and satellites for use with satellite communication and/or a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu **40**, or a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween. The aforementioned telecommunication and radio communication means can be interactive with any type of motive vehicle that includes but is not limited to cars, trucks, vans, SUVs, trains, subways, boats, ships and airplanes, and which is reported stolen, experiences a loss of brakes, or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted to the vehicle and which detection causes an automatic signal transmission or a signal transmission is activated when a call is made to the monitoring station by an authorized person. The authorized individual includes but is not limited to the owner, pilot, conductor, captain, police highway patrol, security guard and military personnel to the monitoring equipment for activating a vehicle slowdown or stall-to-stop disabling system that similar to the disabling system **126** shown in FIG. **16**, or incorporating features of the system **126** shown in FIG. **16**, from the monitoring equipment to the vehicle. The activation of the stall-to-stop disabling means or the vehicle slowdown disables or engages the computer, electrical, fuel and air systems of the vehicle or a combination of the computer, electrical, fuel and air systems that include but are not limited to the brakes, foot peddle, lights, speed controls, ignition, steering, transmission, and the horsepower of the motor.

In addition, the basic stall-to-stop disabling means or the vehicle slowdown means and device can be adapted, modified or designed to include: an open bust or open platform for integrating any new and innovative technology; warning lights indicators; sound alarm indicators; voice alarm indicators; a cell phone to transmit to the vehicle a signal for slowing and halting the vehicle; and a lock disabling system or means to lock a thief or terrorist inside the vehicle after a transmission is received or sent. Open bust or open platform also refers to the compatibility of the detector case **12**, or the incorporation of its features in cell phone cases, satellite cell phone cases, laptop cases, notebook PC cases, PDA cases, carry-on cases, briefcases, and suitcases, etc., with other communication, transmission and surveillance systems whereupon the detector case **12**, and its features, can be seamlessly integrated with other new and emerging systems and technologies.

Thus, as shown more specifically in FIG. **17**, by way of a representative example the features and elements of the detector case **12** are shown as being incorporated into cell phone detector case **150** and associated cell phone monitor **152**. The cell phone monitor **152** includes the standard keypad functions **154** and more specialized system use (ring tone, email, photos, texting) functions **156** as well as a viewing screen **158**. The cell phone detector case **150** includes a recharging cradle or seat **160**, a front side **162**, a top **164**, a bottom **166**, and a pair of opposed sides **168**. At the back of the cell phone detector case **150** are connections, contacts, and ports for at least an Internet connection **170**, a GPS connection **172**, and a contact, plug, or port for a power source **174**. The power source for the cell phone detector case **150** can be any conventional rechargeable battery source or standard electrical power from a standard electrical receptacle or outlet.

As shown in FIG. **17**, the cell phone detector case **150** includes one or more sensor/detector units, cells, or com-

ponents **176** built into and incorporated into the case **150**. The detector **176** includes generally disposed at the front **162** of the case **150** the following types of indicators: a sound alarm indicator **178**, a readings panel **180**, a sensor **182** for detecting one or more specific types of agents, elements, chemicals, compounds, etc., and a light alarm indicator **184**. The sensor/detector **176** will be interconnected to the power source **174**. In addition, mounted on and externally visible on the sides **168** or front **162** of the case **150** are a plurality of color coded indicator lights **186** with each light **186** corresponding to a specific agent, element, chemical, compound, etc., and lighting up when that agent is detected by the sensor/detector **176**. The color coded indicator lights **186** will be electrically interconnected to the sensor/detectors **176** via any standard microprocessor. The cell phone detector case **150** and cell phone monitor **152** thus comprise a hand-held, easily portable and transportable detection means that is both effective and unobtrusive in its disposition and use.

FIGS. **18** and **19** illustrate representative examples of the integration of portable electronic communication or telecommunication devices such as a cell phone **187***a* and/or a laptop computer **187***b* with the monitoring equipment **138** located at a predesignated monitoring site **188**, and operating in conjunction with either a satellite and/or a cell phone tower **190** to transmit and receive signals and commands among each other and to a vehicle **192**, such as a truck, as part of a stall-to-stop disabling system for slowing and stopping the vehicle **192** and locking a thief, terrorist, or unauthorized individual in the vehicle **192** if needed. A wide range of events can trigger and initiate the stall-to-stop system and the locking or lock disabling system and mechanism, and the event doesn't have to be limited to the detection of a bomb or a chemical, biological, or radiological agent, element, or compound. The events can include, but is not limited to, detection of an engine problem to engine failure to the unauthorized use (stealing) of the vehicle **192**. The vehicle **192** includes an electromotive system **194** that comprises, among other components, an onboard computer(s), electrical, fuel and air systems, as well as brakes, ignition, steering, and transmission. Also integrated with and capable of communicating with the vehicle's **192** electromotive system **194** is a stall-to-stop system while a lock disabling mechanism **196** is able to engage and disengage or disable the vehicle's **192** locking mechanism **198** upon receipt of the appropriate commands via a lock disabling communication channel or link **200**. This link **200** can also accommodate the stall-to-stop system commands and signals, and thus is a multi-channel communication link. A CPU or a transceiver **202** is programmed to receive signals from the cell phone tower **190** and/or to a GPS satellite **204** and is interconnected with the stall-to-stop system and the lock disabling system **196** via link **200** for engaging the electromotive system **194** and actuating the lock disabling system **196** to stop the vehicle **192** and lock inside the vehicle **192** anyone such as a thief, terrorist or other unauthorized individual.

A representative example for stopping, disabling, and locking the vehicle **192** that utilizes the cell phone tower **190** wherein the activation and/or distress signal **206** originates from the cell phone **187***a* or the laptop **187***b* and such activation signal **206** travels to the cell phone tower **190** that is nearest the current location of the vehicle **192**. A signal **208** is then transmitted to the monitoring site **188** and specific monitoring equipment **138** that can also include but is not limited to cell phones, laptops, desktop PC's, notebook PC's and LCD monitors. The monitoring site **138** then communicates by signal **210** to the GPS satellite **204** that an original or activation signal has been received and then the GPS satellite **204** locates and communicates by multiplex signal **212** with the CPU or transceiver **202** on the vehicle **192** and exchanges information on the type of problem, situation, location, and vehicle speed. The monitoring equipment **138** then transmits a signal **214** to the cell phone tower **190** that communicates with the transceiver **202** and/or CPU of the vehicle **192** to initiate or execute any commands that will actuate the stall-to-stop disabling link **200** and lock disabling system **196** for bringing the vehicle **192** to a halt and actuating the vehicle's **192** locking mechanism **198** for locking the thief, terrorist, or other unauthorized person inside the vehicle **192** if needed.

FIG. **19** illustrates a representative example wherein the stall-to-stop system and the lock disabling system **196** are utilized in conjunction with the GPS satellite **204**. In FIG. **19** a signal has traveled to the satellites nearest the vehicle's **192** current location and then the signal **218** has traveled to the monitoring equipment **138** and monitoring site **188** which can include but is not limited to satellite cell phones, satellite monitors, cell phones, laptops, desktop PC's, notebook PC's, and LCD monitors. The GPS satellite **204** then locates and communicates with the CPU and/or transceiver **202** on the vehicle **192** via a multiplex (two-way) signal **220** in order to exchange information on such distress and danger event parameters as the specific problem situation, location, and vehicle speed. The monitoring equipment **138** then transmits a signal **222** back to the GPS satellite **204** that in turn communicates via another signal **224** with the CPU and/or transceiver **202** to execute any commands to the stall-to-stop system for executing the disengagement of the vehicle's **192** electromotive system **194** for bringing the vehicle **192** to a halt and for actuating the lock disabling system **196** to direct the lock disabling link **200** to actuate the locking mechanism **198** thereby locking the vehicle **192** and anyone inside the vehicle **192**.

The present invention comprehends a chemical/biological/radiological/nuclear/explosive/human/contraband detector unit with a disabling locking system for protecting products that can be grouped into several product groupings, from terrorist activity, and also for preventing unauthorized access to and tampering with the storage and transport of ordnance and weapons. The products grouped into what may be referred to as Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars, United Parcel Services™ (UPS™), Federal Express™ (FedEx™), airport lockers, news racks (coin and non-coin operated), mail drop boxes, cluster mail boxes, keyed mail boxes, min-storage houses and buildings, bicycle lockers, stadium lockers, school lockers, cars, trucks, campers, buses, vans, unmanned aerial vehicles (UAVs), unmanned ground vehicles (UGVs), and utility vehicles; the products grouped into what may be referred to as Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, door sensors, speed sensors, biometric sensors, glass break sensors, plastic film on glass, high security locks, tampering labels, door sensors, disabling locking systems, vehicle detectors and satellite disabling locking systems, detection of humans, detection of contraband, temperature, and shock levels; the products grouped into what may be referred to as Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, satellite cell phone cases, laptop cases, notebook PC cases,

PDA cases, carry-on cases, suitcases, eyeglass, briefcases, detector cases of locks, detector cases of tags, detector cases that is mounted to, detector cases that is affixed to, detector cases that is outside of, detector cases that is inside of, and detector cases that is adjacent to; the products grouped into what may be referred to as Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, web servers, desktop personal computers (PCs), notebook personal computers (PCs), laptops, satellite cell phones, cell phones, Universal Mobile Telecommunications System (UMTS) phones, personal digital assistants (PDAs), liquid crystal display (LCD) monitors, and satellite monitoring, remote control key fobs, two-way communication key fobs, handhelds; the products grouped into what may be referred to as Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, Cellular, Satellite, Telematics, Wide Area Network (WAN), Wireless Wide Area Network (WWAN), Local Area Network (LAN), Radio Frequency (RF), Broadband Wireless Access (BWA), Global Positioning System (GPS), General Packet Radio Services (GPRS), Global System for Mobile (GSM), Wideband Code Division Multiple Access (W-CDMA), Universal Mobile Telecommunications System (UMTS), Short Message Service (SMS); the products grouped into what may be referred to as Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature. the products grouped into what may be referred to as Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel. The multi sensor detection system includes the capability to disable an existing lock or activate a lock located inside or outside any of the products named in the product grouping categories upon activation of a sensor or detector included in the system. This is a significant feature for the multi sensor detection system as it prevents unauthorized, unequipped and untrained entry and access to the product thus preventing further contamination of the site and to individuals in the area.

While the invention has been shown and described in a preferred embodiment, it will be apparent to those skilled in the art that numerous alterations, modifications, and variations will possible and practicable without departing from the spirit and scope of the invention as set forth by the appended claims.

What is claimed:

1. Monitoring equipment that is at least one of products grouped together by common features of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone interconnected to a lock for communication therebetween; the monitoring equipment comprising:

at least one of a central processing unit (CPU), a network processor, or a front end processor for communication between the monitoring equipment and the lock;

a transmitter for transmitting signals and messages to at least one of a remote lock, an electrical lock, a mechanical lock, or automatic lock;

a receiver for receiving signals from at least one of a remote lock, an electrical lock, a mechanical lock, or automatic lock;

a lock disabling mechanism that is able to engage (lock), or disengage (unlock), or disable (make unavailable) the monitoring equipment after a specific number of tries;

a short-range radio frequency (RF) connection that is near-field communication (NFC);

at least one of the satellite connection, Bluetooth connection, WiFi connection, Internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection that is capable of signal communication with the transmitter or the receiver,

at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature recognition system; and

the monitoring equipment being capable of sending signals to engage (lock), disengage (unlock), or disable (make unavailable) at least one of a remote lock, an electrical lock, a mechanical lock, or automatic lock, whereupon a signal is sent to the receiver of the monitoring equipment from at least one of the remote lock, electrical lock, mechanical lock, or automatic lock, the signal comprising at least one of location data or lock status data to be sent to the monitoring equipment.

2. Monitoring equipment that is at least one of products grouped together by common features of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone interconnected to at least one of a home lock, a building lock, or a cargo container lock for communication therebetween; the monitoring equipment comprising:

at least one of a central processing unit (CPU), a network processor, or a front end processor for communication between the monitoring equipment and the lock;

a transmitter for transmitting signals and messages to at least one of a home lock, a building lock, or a cargo container lock;

a receiver for receiving signals from at least one of a home lock, a building lock, or a cargo container lock;

a lock disabling mechanism that is able to engage (lock), or disengage (unlock), or disable (make unavailable) the monitoring equipment after a specific number of tries;

a short-range radio frequency (RE) connection that is near-field communication (NFC);

at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RE) connection, or GPS connection that is capable of signal communication with the transmitter or the receiver;

at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature recognition system; and

the monitoring equipment being capable of sending signals to engage (lock), disengage (unlock), or disable (make unavailable) at least one of a home lock, a building lock, or a cargo container lock whereupon a

signal is sent to the receiver of the monitoring equipment from at least one of the home lock, building lock, or cargo container lock, the signal comprising at least one of location data or lock status data to be sent to the monitoring equipment.

3. Monitoring equipment that is at least one of products grouped together by common features of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal, digital assistant (PDA) or smart phone interconnected to a vehicle lock for communication therebetween; the monitoring equipment comprising:

at least one of a central processing unit (CPU), a network processor, or a front end processor for communication between the monitoring equipment and the lock;

a transmitter for transmitting signals and messages to at least one of a manned or unmanned aerial vehicle lock, a manned or unmanned ground vehicle lock, or a manned or unmanned sea vehicle lock;

a receiver for receiving signals from at least one of a manned or unmanned aerial vehicle lock, a manned or unmanned ground vehicle lock, or a manned or unmanned sea vehicle lock;

a lock disabling mechanism that is able to engage (lock), or disengage (unlock), or disable (make unavailable) the monitoring equipment after a specific number of tries;

a short-range radio frequency (RF) connection that is near-field communication (NFC);

at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection that is capable of signal communication with the transmitter or the receiver;

at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature recognition system; and

the monitoring equipment being capable of sending signals to engage (lock), disengage (unlock), or disable (make unavailable) at least one of a manned or unmanned aerial vehicle lock, a manned or unmanned ground vehicle lock, or a manned or unmanned sea vehicle lock, whereupon a signal is sent to the receiver of the monitoring equipment from at least one of the manned or unmanned aerial vehicle lock, manned or unmanned ground vehicle lock, or manned or unmanned sea vehicle lock, the signal comprising at least one of location data or lock status data to be sent to the monitoring equipment.

4. A communication device comprising:

at least one central processing unit (CPU);

at least one motion sensor in communication with the at least one CPU;

at least one viewing screen for monitoring in communication with the at least one CPU;

at least one global positioning system (GPS) connection in communication with the at least one CPU;

at least one of an internet connection Wi-Fi connection in communication with the at least one CPU;

at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU;

at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device;

at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device;

at least one biometric sensor in communication with the at least one CPU for providing biometric authentication to access the communication device;

at least one or more detectors in communication with the art least one CPU for detecting at least one of a chemical, biological, radiological, or explosive agents;

at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU; and

at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or send signals to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling.

5. A monitoring device, comprising:

at least one central processing unit (CPU);

at least one temperature sensor in communication with the at least one CPU for monitoring temperature;

at least one motion sensor in communication with the at least one CPU;

at least one viewing screen for monitoring in communication with the at least one CPU;

at least one global positioning system (GPS) connection in communication with the at least one CPU;

at least one of an internet connection or a Wi-Fi connection in communication with the at least one CPU;

at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU;

at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device;

at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device;

at least one biometric sensor in communication with the at least once CPU for providing biometric authentication to access the communication device;

at least one sensor for chemical, biological, or human detection in communication with the at least one CPU;

one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents;

at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU; and

at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or send signals to

detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling.

6. A monitoring equipment, comprising:

at least one central processing unit (CPU);

at least one motion sensor in communication with the at least one CPU;

at least one light indicator in communication with the at least one CPU;

at least one viewing screen for monitoring in communication with the at least one CPU;

at least one global positioning system (GPS) connection in communication with the at least one CPU;

at least one of an internet connection Wi-Fi connection in communication with the at least one CPU;

at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU;

at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device;

at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device;

at least one biometric sensor in communication with the at least one CPU for providing biometric authentication to access the communication device;

at least one or more detectors in communication with the art least one CPU for detecting at least one of a chemical, biological, radiological, or explosive agents;

at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU; and

at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or send signals to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling.

* * * * *

# EXHIBIT D



US009096189B2

(12) **United States Patent**
**Golden**

(10) **Patent No.: US 9,096,189 B2**
(45) **Date of Patent: Aug. 4, 2015**

(54) **MULTI SENSOR DETECTION, STALL TO STOP AND LOCK DISABLING SYSTEM**

(71) Applicant: **Larry Golden**, Mauldin, SC (US)

(72) Inventor: **Larry Golden**, Mauldin, SC (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **14/021,693**

(22) Filed: **Sep. 9, 2013**

(65) **Prior Publication Data**

US 2014/0071274 A1 Mar. 13, 2014

**Related U.S. Application Data**

(60) Continuation of application No. 13/288,065, filed on Nov. 3, 2011, now Pat. No. 8,531,280, which is a division of application No. 12/802,001, filed on May 27, 2010, now Pat. No. 8,334,761, which is a continuation of application No. 12/657,356, filed on Jan. 20, 2010, now Pat. No. 8,106,752.

(51) **Int. Cl.**

*B60R 25/10* (2013.01)
*B60R 25/102* (2013.01)
*B60R 25/01* (2013.01)
*B60R 25/04* (2013.01)
*G07C 9/00* (2006.01)
*G08B 15/00* (2006.01)
*G08B 21/12* (2006.01)

(52) **U.S. Cl.**

CPC ............ ***B60R 25/102*** (2013.01); ***B60R 25/018*** (2013.01); ***B60R 25/04*** (2013.01); ***G07C 9/00912*** (2013.01); ***G08B 15/00*** (2013.01); ***G08B 21/12*** (2013.01); *B60R 2325/205* (2013.01); *B60R 2325/304* (2013.01); *G07C 2009/0092* (2013.01)

(58) **Field of Classification Search**

CPC ... B60R 2325/00; G08B 21/12; G08B 25/009

USPC .............. 340/539.1, 539.11, 539.13, 539.16, 340/539.17, 539.22, 539.25, 539.26, 540, 340/573.1, 574; 348/143; 380/228, 229, 380/232; 382/103, 115; 702/32

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,385,469 A 5/1983 Scheuerpflug
4,544,267 A 10/1985 Schiller
4,586,441 A 5/1986 Zekich
4,792,226 A 12/1988 Fishbine
5,222,152 A 6/1993 Fishbine

(Continued)

OTHER PUBLICATIONS

United States Patent and Trademark Office; Office Action from U.S. Appl. No. 11/397,118; mailed Nov. 14, 2007; Alexandria, Virginia, USA; pp. 1-12; parent U.S. Appl. No. 13/288,065 (12 pages).

(Continued)

*Primary Examiner* — Van Trieu

(57) **ABSTRACT**

A multi sensor detection and disabling lock system includes detector cases for holding interchangeable detectors that sample for chemical, biological and radiological compounds, agents and elements, with each detector case disposed in or upon the monitored product. The detector case transmits detection information to a monitoring computer terminal and transmits a signal to a lock disabler engaged to the product to lock or disable the product's lock thereby preventing untrained, unauthorized and unequipped individual's from gaining access and entry to the product, and also preventing further contamination of the area. The detection system can be interconnected to surveillance towers scanning detector cases disposed at seaport docks, freight depots and rail terminals for monitoring containers being prepared for shipment or sitting on docks for long periods of time.

**9 Claims, 13 Drawing Sheets**



(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 5,223,844 A | | 6/1993 | Mansell et al. | |
| 5,233,404 A | | 8/1993 | Lougheed | |
| 5,557,254 A | | 9/1996 | Johnson | |
| 5,682,133 A | | 10/1997 | Johnson | |
| 5,766,956 A | | 6/1998 | Groger | |
| 5,938,706 A | | 8/1999 | Feldman | |
| 5,959,529 A | | 9/1999 | Kail, IV | |
| 5,963,657 A | | 10/1999 | Bowker | |
| 5,986,543 A | | 11/1999 | Johnson | |
| 5,990,785 A | * | 11/1999 | Suda | 340/426.21 |
| 6,049,269 A | | 4/2000 | Byrd | |
| 6,078,265 A | | 6/2000 | Bonder | |
| 6,262,656 B1 | | 7/2001 | Byrd | |
| 6,271,745 B1 | | 8/2001 | Arizal | |
| 6,374,652 B1 | | 4/2002 | Hwang | |
| 6,411,887 B1 | | 6/2002 | Martens | |
| 6,470,260 B2 | | 10/2002 | Martens | |
| 6,542,076 B1 | | 4/2003 | Joao | |
| 6,542,077 B2 | | 4/2003 | Joao | |
| 6,588,635 B2 | | 7/2003 | Vor Keller | |
| 6,610,977 B2 | | 8/2003 | Megerle | |
| 6,613,571 B2 | | 9/2003 | Cordery | |
| 6,628,813 B2 | | 9/2003 | Scott | |
| 6,647,328 B2 | | 11/2003 | Walker | |
| 6,738,697 B2 | | 5/2004 | Breed | |
| 6,923,509 B1 | | 8/2005 | Barnett | |
| 6,980,092 B2 | | 12/2005 | Turnbull | |
| 6,988,026 B2 | | 1/2006 | Breed et al. | |
| 7,005,982 B1 | | 2/2006 | Frank | |
| 7,034,677 B2 | * | 4/2006 | Steinthal et al. | 340/539.12 |
| 7,034,683 B2 | | 4/2006 | Ghazarian | |
| 7,103,460 B1 | | 9/2006 | Breed | |
| 7,109,859 B2 | | 9/2006 | Peeters | |
| 7,116,798 B1 | | 10/2006 | Chawla | |
| 7,148,484 B2 | | 12/2006 | Craig et al. | |
| 7,164,117 B2 | | 1/2007 | Breed et al. | |
| 7,171,312 B2 | * | 1/2007 | Steinthal et al. | 702/32 |
| 7,243,945 B2 | | 7/2007 | Breed et al. | |
| 7,339,469 B2 | | 3/2008 | Braun | |
| 7,346,439 B2 | | 3/2008 | Bodin | |
| 7,385,497 B2 | | 6/2008 | Golden | |
| 7,397,363 B2 | | 7/2008 | Joao | |
| 7,636,033 B2 | | 12/2009 | Golden | |
| 7,647,180 B2 | | 1/2010 | Breed | |
| 7,844,505 B1 | | 11/2010 | Arneson et al. | |
| 7,868,912 B2 | * | 1/2011 | Venetianer et al. | 348/143 |
| 7,872,575 B2 | | 1/2011 | Tabe | |
| 7,880,767 B2 | * | 2/2011 | Chinigo | 348/148 |
| 7,961,094 B2 | | 6/2011 | Breed | |
| 8,274,377 B2 | | 9/2012 | Smith et al. | |
| 8,531,521 B2 | * | 9/2013 | Romanowich | 348/143 |
| 8,564,661 B2 | * | 10/2013 | Lipton et al. | 348/143 |
| 2002/0145666 A1 | * | 10/2002 | Scaman et al. | 348/148 |
| 2003/0063004 A1 | * | 4/2003 | Anthony et al. | 340/574 |
| 2003/0137426 A1 | * | 7/2003 | Anthony et al. | 340/574 |
| 2003/0206102 A1 | | 11/2003 | Joao | |
| 2004/0107028 A1 | | 6/2004 | Catalano | |
| 2004/0222092 A1 | | 11/2004 | Musho | |
| 2005/0195069 A1 | | 9/2005 | Dunand | |
| 2006/0164239 A1 | | 7/2006 | Loda | |
| 2006/0176169 A1 | * | 8/2006 | Doolin et al. | 340/521 |
| 2006/0181413 A1 | | 8/2006 | Mostov | |
| 2006/0250235 A1 | | 11/2006 | Astrin | |
| 2007/0171042 A1 | | 7/2007 | Metes et al. | |
| 2008/0045156 A1 | | 2/2008 | Sakhpara | |
| 2008/0122595 A1 | | 5/2008 | Yamamichi | |
| 2008/0234907 A1 | | 9/2008 | Labuhn | |
| 2010/0159983 A1 | | 6/2010 | Golden | |
| 2011/0178655 A1 | | 7/2011 | Golden | |

OTHER PUBLICATIONS

United States Patent and Trademark Office; Office Action from U.S. 12/155,573; mailed Apr. 9, 2009; Alexandria, Virginia, USA; pp. 1-7; parent U.S. Appl. No. 13/288,065 (7 pages).

United States Patent and Trademark Office; Office Action from U.S. 12/155,573; mailed Jul. 30, 2009; Alexandria, Virginia, USA; pp. 1-9; parent U.S. Appl. No. 13/288,065 (9 pages).

United States Patent and Trademark Office; Notice of Allowability from U.S. 12/155,573; mailed Oct. 28, 2009; Alexandria, Virginia, USA; pp. 1-5; parent U.S. Appl. No. 13/288,065 (5 pages).

United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/657,356; mailed Jul. 12, 2010; Alexandria, Virginia, USA; pp. 1-14; parent U.S. Appl. No. 13/288,065 (14 pages).

United States Patent and Trademark Office; Notice of Allowability from U.S. 12/657,356; mailed Mar. 10, 2011; Alexandria, Virginia, USA; pp. 1-4; parent U.S. Appl. No. 13/288,065 (4 pages).

United States Patent and Trademark Office; Office Action from U.S. Appl. No. 13/065,837; mailed Jul. 18, 2011; Alexandria, Virginia, USA, pp. 1-9; parent U.S. Appl. No. 13/288,065 (4 pages).

A newspaper article of Mr. Melvin Sullivan and his family that references the date, Mar. 6, 2001; parent U.S. Appl. No. 13/288,065.

A letter of response Mr. Sullivan received from Pfeiffer & Gantt, PA, dated Sep. 16, 2002; parent U.S. Appl. No. 13/288,065.

A "Certificate of Existance" Bright Idea Inventor, LLC. Nov. 6, 2002; parent U.S. Appl. No. 13/288,065.

Operating Agreement of Bright Idea Inventor, LLC received from Pfeiffer & Gantt, PA, dated Nov. 13, 2002; parent U.S. Appl. No. 13/288,065.

A letter of response Golden received from the Honorable Congressman from Maryland, Elijah E. Cummings, dated Dec. 16, 2002; parent U.S. Appl. No. 13/288,065.

A newspaper article of Mr. Melvin Sullivan and Mr. Larry Golden, dated, Feb. 27-Mar. 5, 2003; parent U.S. Appl. No. 13/288,065.

A letter of response Golden received from the Honorable Senator from South Carolina, Ernest F. Hollings, dated May 21, 2003; parent U.S. Appl. No. 13/288,065.

A letter of response Golden received from the Office of the Vice President, Dick Cheney, dated Jun. 3, 2003; parent U.S. Appl. No. 13/288,065.

A letter of response Golden received from the Honorable Senator from South Carolina, Ernest F. Hollings, dated Oct. 1, 2003; parent U.S. Appl. No. 13/288,065.

A letter of response Golden received from the Honorable Senator from South Carolina, Lindsey O. Graham, dated Oct. 21, 2003; parent U.S. Appl. No. 13/288,065.

A letter sent to the President of the United States George W Bush, the President's Cabinet, the United States Senate and the Congressional Black Caucus, dated May 23, 2005; parent U.S. Appl. No. 13/288,065.

On Nov. 17, 2005, an "Inventor's Official Record of Invention", was filed in my name (Golden) at "The Law Office of David P. Gaudio, P.C.; the Inventors Network."; parent U.S. Appl. No. 13/288,065.

On Aug. 23, 2005, the "Disclosure Document Registration"; parent U.S. Appl. No. 13/288,065.

On Apr. 5, 2006, the "Patent Application" was filed in my name (Golden) at the United Staets Patent & Trademark Office in Washington, D.C.; parent U.S. Appl. No. 13/288,065.

On Jun. 6, 2008, the "Continuance-In-Part, (CIP) Application" was filed in my name (Golden) at the United States Patent & Trademark Office in Washington, D.C.; parent U.S. Appl. No. 13/288,065.

On Jan. 20, 2010, a "Continuation Application" (U.S. Appl. No. 12/657,356) was filed in my name (Golden) at the United States Patent & Trademark Office in Washington, D.C.; parent U.S. Appl. No. 13/288,065.

Reissue of U.S. Pat. No. 7,636,033;"Swear Back"; in accordance to Title 37—Code of Federal Regulations Patents, Trademarks, and Copyrights; Apr. 8, 2011; parent U.S. Appl. No. 13/288,065

Reissue of U.S. Pat. No. 7,636,033; "Swearback—History of Work"; Apr. 8, 2011; parent U.S. Appl. No. 13/288,065

United States Patent and Trademark Office; Office Action from U.S. 12/802,001; mailed Apr. 14, 2011; Alexandria, Virginia, USA; pp. 1-16; parent U.S. Appl. No. 13/288,065 (16 pages)

United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/802,001; mailed Oct. 20, 2011; Alexandria, Virginia, USA; pp. 1-5; parent U.S. Appl. No. 13/288,065 (5 pages).

(56) **References Cited**

OTHER PUBLICATIONS

United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/802,001; mailed May 27, 2011; Alexandria, Virginia, USA; pp. 1-14; parent U.S. Appl. No. 13/288,065 (14 pages)

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 12/802,001; copyright and mailing date Dec. 12, 2011, pp. 1-9, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 13/288,065 (9 pages).

United States Patent and Trademark Office; Office Action, Office Action from U.S. Appl. No. 13/065,837; copyright and mailing date Dec. 2, 2011, pp. 1-27, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 13/288,065 (27 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/065,837; copyright and mailing date Nov. 1, 2011, pp. 1-18, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 13/288,065 (18 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/199,853; copyright and mailing date Jan. 13, 2012, pp. 1-34, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 13/288,065 (34 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 12/802,001; copyright and mailing date Mar. 26, 2012, pp. 1-12, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 13/288,065 (12 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/199,853; copyright and mailing date Feb. 22, 2012, pp. 1-38, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 13/288,065 (38 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/065,837; copyright and mailing date Feb. 22, 2012, pp. 1-25, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 13/288,065 (25 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/288,065; copyright and mailing date Aug. 24, 2012, pp. 1-4, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 13/288,065 (4 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/288,065; copyright and mailing date Nov. 28, 2012, pp. 1-11, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 13/288,065 (11 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/288,065; copyright and mailing date Apr. 16, 2013, pp. 1-9, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 13/288,065 (9 pages).

United States Department of Homeland Security; Petition for Inter Partes Review of U.S. Pat. No. Re. 43,990 Under 35 U.S.C. §312 and 37 C.F.R. §42.104; Case IP2014-00714 for U.S. Pat. No. Re. 43,990; Filed Apr. 30, 2014; Washington, D.C., USA; pp. 1-57; (57 pages).

United States Department of Homeland Security; Declaration of Dr. Sriram Vishwanath; Case IPR2014-00714 for U.S. Pat No. Re. 43,990; Filed Apr. 30, 2014; Washington, D.C., USA; pp. 1-44; (44 pages).

Richard R Brooks and S.S. Iyengar; Multi-Sensor Fusion Fundamentals and Applications with Software; pubished 1998; Copyright Prentice Hall PTR; Upper Saddle River, New Jersey, USA; pp. 1-20; (20 pages).

Ramanarayanan Viswanathan and Pramod K Varshney; Distributed Detection with Multiple Sensors; Part I—Fundamentals; Proceedings of the IEEE; Jan. 1, 1997; pp. 1-11; vol. 85; No. 1; Southern Illinois University Carbondale OpenSIUC; Illinois, USA; pp. 1-11; (11 pages).

Blum; Distributed with Multiple Sensors: Part II—Advanced Topics; Proceedings of the IEEE; Jan. 1, 1997; pp. 1-16; vol. 85, No. 1; Southern Illinois University Carbondale Open SIUC; Illinois, USA, pp. 1-11; (16 pages).

Victor Lesser; Distributed Sensor Networks a Multiagent Perspective; 2003; pp. 1, 2, 5, 6, 22, 26, 27, 36, 275, 320; copyright 2003 Kluwer Academic Publishers: AH Dordrecht, The Netherlands; (10 pages).

Samuel Blackman and Robert Popoli; Design and Analysis of Modern Tracking Systems; 1999; pp. 1, 2, 6, 472; copyright 1999 Artech House; Norwood, Massachusetts, USA; (4 pages).

Jean-Francois Chamberland; Decentralized Detection in Sensor Networks; 2003; pp. 407-416; IEEE Transactions on SIgnal Processingl vol. 51, No. 2; Urbana, Illinois, USA; (10 pages).

Oleg Kachirski and Ratan Guha; Effective instrusion Detection Using Multiple Sensors in Wireless Ad Hoc Networks; pp. 1-8; Proceedings of the 36th Hawaii International Conference on System Sciences; copyright 2003; Orlando, Florida, USA; (8 pages).

Lawrence A Klein; Sensor and Data Fusion a Tool for Information Assessment and Decision Making; 2004; pp. 1-4, 6, 81, 87-89; copyright 2004 The Society of Photo-Optical Instrumentation Engineers; Publisher is SPIE—the International Society for Optical Engineering; Bellingham, Washington, USA; (12 pages).

Dale Ferriere and Khrystyna Pysareva and Andrezej Rucinski; Using Technology to Bridge Maritime Security Gaps; Aug. 1, 2005; Sea Technology; pp. 1-6; copyright Compass Publications, Inc. Jan. 2009; Portsmouth, New Hampshire, USA; (6 pages).

Corie Lok; Cargo Security; MIT Technology Review; Jun. 2004; No. 107; pp. 74-75; publisher is Massachusetts Institute of Technology; Cambridge, Massachusetts, USA; (2 pages).

Thomas C Chen; RFID and Sensor-based Container Content Visbility and Seaport Monitoring system; Proceedings of SPIE, vol. 5778; pp. 151-159; Mar. 28, 2005; Publisher is SPIE—the International Society for Optical Engineering; Bellingham, Washington, USA; (10 pages).

United States Department of Homeland Security; The University of Texas at Austin College of Engineering Standard Resume of Sriram Vishwanath; Case IPR2014-00714 for U.S. Pat. No. Re. 43,990; Filed Apr. 30, 2014; Washington, D.C., USA; pp. 1-21; (21 pages).

* cited by examiner

U.S. Patent Aug. 4, 2015 Sheet 1 of 13 US 9,096,189 B2

32
INTERNET CONNECTION
34
GPS CONNECTION
36
POWER SOURCE
10
22
44
58
62
64
66
44
56
44
28
12
26
52
48
46
54
54
46
52
46
50

Fig. 1

52
50
46
48

Fig. 2

SAppx155



**Fig. 3a**



**Fig. 3b**

U.S. Patent Aug. 4, 2015 Sheet 3 of 13 US 9,096,189 B2

14
16
12
44
44

**Fig. 4**

14
12
42
112
42
16
12
12
42
12
POWER SOURCE
114

**Fig. 5**

SAppx157



Fig. 6

Fig. 7

U.S. Patent Aug. 4, 2015 Sheet 5 of 13 US 9,096,189 B2

68
72
70
56

Fig. 8

SAppx159



32
INTERNET CONNECTION
34
GPS CONNECTION
36
POWER SOURCE
10
22
42
58
62
64
66
44
44
28
12
26
56
52
48
46
54
54
46
50
46
52

Fig. 9



U.S. Patent Aug. 4, 2015 Sheet 7 of 13 US 9,096,189 B2

38
22
12
26
30
26
32
34
36
38
24

Fig. 10

76
AGENT DETECTED?
NO
YES
80
SOUND ALARM
82
LIGHT ALARM
74
40
CPU
84
READINGS
86
RESET
78
SENSING MODE
STOP

Fig. 11

SAppx161



U.S. Patent Aug. 4, 2015 Sheet 8 of 13 US 9,096,189 B2

76
AGENT DETECTED?
NO
88
YES
82
LIGHT ALARM
80
SOUND ALARM
84
READINGS
90
DETECTOR RESET
78
SENSING MODE
STOP
76
46
DETECTOR
40
12
CASE
92
94
LOCK/DISABLE LOCK SIGNAL
96
DISARM AND RESET
98
DETECTION MODE

Fig. 12

Fig. 13

SAppx162



U.S. Patent Aug. 4, 2015 Sheet 9 of 13 US 9,096,189 B2

46
DETECTOR
100
40
CASE
12
DISABLER
62
102
AUTHORIZED FINGERPRINT?
NO
YES
104
DISABLE AND DISARM
ACCESS DENIED
RESET
106
101
DETECTION MODE
108
110
112
WATCHTOWER
116
DETECTION MODE
118
NO
AGENT DETECTED?
YES
LIGHT ALARM INDICATOR
42
114
MONITORING TERMINAL
120
LOCK/DISABLE SIGNAL
122
CLEANUP MEASURES
124
RESET
116
DETECTION MODE

Fig. 14

Fig. 15

SAppx163



Fig. 16



152
158
154
156
170
INTERNET CONNECTION
172
GPS CONNECTION
150
164
POWER SOURCE
160
174
186
168
166
162
176
184
178
180
182

Fig. 17

U.S. Patent Aug. 4, 2015 Sheet 12 of 13 US 9,096,189 B2

204
187a
206
187b
210
206
214
212
216
190
208
202
196
194
200
198
192
138
188

Fig. 18

SAppx166

U.S. Patent Aug. 4, 2015 Sheet 13 of 13 US 9,096,189 B2

204
220
187a
187b
218
224
190
222
202
196
194
200
198
192
138
188

Fig. 19

SAppx167

## MULTI SENSOR DETECTION, STALL TO STOP AND LOCK DISABLING SYSTEM

This application is a continuation application and claims the filing date and benefit of U.S. patent application Ser. No. 13/288,065 titled "Multi Sensor Detection, Stall to Stop and Lock Disabling System" filed on Nov. 3, 2011 and that will issue on Sep. 10, 2013 as U.S. Pat. No. 8,531,280, the entire contents of which are incorporated by reference herein in their entirety for all purposes. U.S. patent application Ser. No. 13/288,065 that will issue as U.S. Pat. No. 8,531,280 is a divisional application and claims the filing date and benefit of U.S. patent application Ser. No. 12/802,001 titled "Multi Sensor Detection, Stall to Stop, and Lock Disabling System" filed on May 27, 2010, now U.S. Pat. No. 8,334,761, the entire contents and complete subject matter of which is are incorporated by reference herein in their entirety for all purposes. U.S. patent application Ser. No. 12/802,001 is a continuation application and claims the filing date and benefit of U.S. patent application Ser. No. 12/657,356 titled "Multi Sensor Detection, Stall to Stop and Lock Disabling System" filed on Jan. 20, 2010, now U.S. Pat. No. 8,106,752 and incorporates the entire contents and complete subject matter therein by reference in their entirety for all purposes. U.S. patent application Ser. No. 13/288,065 that will issues as U.S. Pat. No. 8,531,280 also claims the filing date and benefit of and incorporates the entire contents of U.S. patent application Ser. No. 12/657,356, now U.S. Pat. No. 8,106,752 herein by reference for all purposes. The present application also claims the filing date and benefit of and incorporates the entire contents of U.S. patent application Ser. No. 12/802,001, now U.S. Pat. No. 8,334,761 by reference herein for all purposes. The present application also claims the filing date and benefit of and incorporates the entire contents of U.S. patent application Ser. No. 12/657,356, now U.S. Pat. No. 8,106,752 herein by reference for all purposes.

### FIELD OF THE INVENTION

The present invention pertains to anti-terrorist detection and prevention systems, and more particularly pertains to a disabling lock mechanism combined with a chemical/biological/radiological detection system for use with products grouped together by similar characteristics in order to prevent unauthorized entry, contamination and terrorist activity.

### BACKGROUND OF THE INVENTION

Terrorist activity is a continuous, daily, worldwide threat to the stability, prosperity, security and peace within nations and between and among nations. Its danger lies in its arbitrary destructiveness as much as in its unpredictability, and the constant threat of terrorist activity compels measures and actions that cause strain and contention in free, democratic societies as security concerns and civil liberty concerns must be balanced so that both public safety and civil liberties are maintained. Safety and security concerns can be addressed through numerous proactive steps and measures, many of which cause only minimal interference with and disruption of the daily routines of work, travel, commerce and entertainment. However, because modern industrial societies afford almost limitless places, locations, and opportunities for terrorist activities, no safety measure or security protocol will be foolproof, but many security measures, systems and protocols can be implemented that greatly minimize specific threats through fingerprint identification procedures, chemical, biological, and radiological hazard detections, bomb and explosive detection, and controlling the access to everything from shipping containers to school lockers. Thus, the prior art discloses a wide range of security measures and systems.

For example, the Fishbine et al. patent (U.S. Pat. No. 4,792,226) discloses an optical fingerprinting system that includes an optics/processor unit, a video monitor, a data terminal, and a printer for collecting and storing data characteristics of all ten individual fingerprints for printing demographic information and fingerprint images as desired on a standard booking or applicant card.

The Schiller patent (U.S. Pat. No. 4,544,267) discloses a finger identification unit that includes a fingerprint scanning apparatus using a collimated beam of light to interrogate the fingerprint of a finger placed against a platen so that successive scan positions produce signals containing fingerprint information.

The Fishbine et al. patent (U.S. Pat. No. 5,222,152) discloses a portable fingerprint scanning apparatus for optically scanning and recording fingerprint images and wirelessly transmitting such images to a mobile processing unit for verification and background checking.

The Lougheed et al. patent (U.S. Pat. No. 5,233,404) discloses an optical scanning apparatus that uses a linear charge coupled device (CCD) for recording the image of a fingerprint on the viewing surface.

The Groger et al. patent (U.S. Pat. No. 5,766,956) discloses a diode laser based sensor for undertaking optical, chemical, immunological or nucleic acid-based assay or other chemical analysis.

The Feldman patent (U.S. Pat. No. 5,938,706) discloses a multi element security system for preventing the unauthorized use of an automotive vehicle, and which includes numerous locking and control features interconnected to an onboard cpu.

The Bowker et al. patent (U.S. Pat. No. 5,963,657) discloses a safety access control for doors, handles, locks, etc., wherein the surface relief of a finger is read and verified to either allow or prevent access by the individual to the door, handle, lock, etc.

The Bonder et al. patent (U.S. Pat. No. 6,078,265) discloses a fingerprint identification security system wherein a key lock operated security system utilizes the fingerprint of the individual to control user access to the security system, such as the ignition system of an automotive vehicle.

The Anzai et al. patent (U.S. Pat. No. 6,271,745 B1) discloses a keyless authorization system for use of a motor vehicle that includes fingerprint reading units located on the exterior or interior of the motor vehicle and which is coupled to a control unit for scanning, comparing and matching fingerprints to allow or disallow access to the motor vehicle.

The Hwang patent (U.S. Pat. No. 6,374,652 B1) discloses a fingerprint-activated doorknob in which a detecting sensor for a fingerprint is placed on the doorknob for measuring and searching the fingerprint against previously stored fingerprint inputs to control access to the door.

The Vor Keller et al. patent (U.S. Pat. No. 6,588,635 B2) discloses a safety holster for a firearm that includes a pivotally mounted retaining member and a fingerprint sensor for scanning fingerprint information so that only authorized users can withdraw the firearm from the holster.

The Cordery et al. patent (U.S. Pat. No. 6,613,571 B2) discloses a method and system for detecting biological and chemical hazards in the mail that includes sensors placed within the mail box for sampling and testing ambient air and so that mail can be safely transported through the mail system.

The Nagata patent (U.S. Pat. No. 6,628,213 B2) discloses a coding method for digital signal coding and decoding that includes a CMI (code-marked inversion) method of signal coding.

Nonetheless, despite the ingenuity of the above devices, methods, and systems, there remains a need for a multi-detector and disabling lock system for use with various types of products collected together by common characteristics into product groupings for detecting chemical, biological and radiological agents and compounds and for selectively disabling and activating the product locks thereby preventing unauthorized entry and further contamination and preventing and thwarting terrorist activities.

## SUMMARY OF THE INVENTION

The present invention comprehends a chemical/biological/radiological detector unit with a disabling locking system for protecting products that can be grouped into several product groupings, from terrorist activity, and also for preventing unauthorized access to and tampering with the storage and transport of ordnance and weapons. The products grouped into what may be referred to as Product grouping 1 include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes and lockers; while the products grouped into what may be referred to as Product grouping 2 include, but are not limited to, chemical, biological, radiological, and nuclear detectors, motion sensors and door sensors. The multi sensor detection system includes the capability to disable an existing lock or activate a lock located inside any of the products named in the product grouping categories upon activation of a sensor or detector included in the system. This is a significant feature for the multi sensor detection system as it prevents unauthorized, unequipped and untrained entry and access to the product thus preventing further contamination of the site and to individuals in the area.

The multi sensor detection and lock disabling system includes a detector case sized to fit in, upon or adjacent any of the aforedescribed products for detecting harmful and dangerous chemical, biological, and radiological agents, compounds and elements. In addition, the multi sensor detection and lock disabling system is capable of transmitting a signal to lock or disable a lock on the product, and is also capable of transmitting signals to a monitoring computer terminal or PC so that appropriate defensive and safeguarding actions can be undertaken and an authorized individual can disarm and reset the locking system and the multi sensor detection system. The detector case includes a power source (battery or electrical), interior compartments, Internet and GPS connections and a cpu interconnected with the Internet and GPS connections, and also interconnected with one or more off site monitoring computer terminals or PCs. The detector case includes one or more light alarm indicators that are externally visible and that light up when the chemical, biological, or radiological agent or compound is detected, and the light alarm indicators (which can be indicator lights or panels on the front of the detector case) can be color coded for denoting the specific agent or compound detected, i.e., separate and distinct colors for indicating detection of the chemical, biological, or radiological agent or compound.

The detector case is designed to hold within the interior compartments one or more interchangeable detectors, and each detector is adapted and set up to sample a specific compound or agent. Each detector includes a sound alarm, a sensor, a light alarm, and a readings panel, and is electrically interconnected (either by wire or wirelessly) to the cpu of the detector case so that information regarding the detection of the particular agent or compound can be conveyed from the detectors to the detector case cpu. Each detector can also be used as a manual, stand-alone hand held scanner.

The multi sensor detection and lock disabling system can be interconnected to a surveillance watchtower, as well as monitoring computer terminals or PCs, with the watchtower scanning shipping and cargo crates and containers being prepared for shipment or sitting for extended periods of time on a dock or at a port, at a railway site, or at an industrial storage facility. The watchtower will scan the cargo and shipping crates and containers for the light alarm indicators on detector cases that are mounted in or upon the crates and containers, and thus continuous security surveillance of the crates and containers can be maintained.

An enhanced version of the multi sensor detection and lock disabling system can be employed to prevent car and vehicle bombings. Coupling the multi sensor detection and lock disabling system with satellite service will enable the detection system to detect explosives and transmit an alert signal by satellite to monitoring equipment at a monitoring site. Upon receiving the alert signal at the monitoring site the monitoring equipment activates a stall-to-stop process for disabling the air, fuel, electrical and/or computer system of the vehicle. Moreover, upon receiving the alert signal at the monitoring site the car or vehicle will be locked by transmission of a satellite signal that disables the vehicle's electrical and ignition system thereby preventing escape of the terrorist.

It is an objective of the present invention to provide a multi sensor detection and disabling lock system for securing news racks and vending machines in order to prevent theft, unauthorized use and terrorist activity.

It is another objective of the present invention to provide a multi sensor detection and disabling lock system for preventing terrorist activity by using products grouped together by common features in several product groupings such as design similarity, similarity in the presentation of security problems and similarity with regard to the presentation of solutions to preventing terrorist solutions.

It is still yet another objective of the present invention to provide a multi sensor detection and disabling lock system that is capable of disabling an existing lock or activating a lock inside any of the products of the product grouping lists when a detector or sensor of the system is activated.

It is still yet a further objective of the present invention to provide a multi sensor detection and disabling lock system wherein the disabling lock system prevents the unauthorized entry, access and further contamination of the products included in the several product groupings.

A still further objective of the present invention is to provide a multi sensor detection and lock disabling system that utilizes a multi-task device for preventing terrorist activity to vulnerable products that are collected or arranged by product grouping categories.

Yet a further objective of the present invention is to provide a multi sensor detection and disabling lock system to secure cargos and containers, especially cargo and shipping containers, against chemical, biological, radiological and nuclear terrorist activity.

Still another objective of the present invention is to provide a multi sensor detection and disabling lock system capable of detecting chemical, biological and radiological agents and compounds.

Still yet another objective of the present invention is to provide a multi sensor detection and disabling lock system that includes interchangeable detectors that operate in conjunction to detect chemical, biological and radiological agents and compounds.

Still yet a further objective of the present invention is to provide a multi sensor detection and disabling lock system that can be implemented by business or government at a minimum cost by organizing the products to be protected into product grouping categories.

Another objective of the present invention is to provide a multi sensor detection and disabling lock system that accurately and reliably detects harmful agents, compounds and elements, and prevents the placement and storage of weapons and bombs in the range of storage containers and facilities currently available.

Still another objective of the present invention is to provide a multi sensor detection and disabling lock system wherein the interchangeable detectors that comprise part of the system can be used as stand-alone scanners.

These and other objects, features, and advantages will become apparent to those skilled in the art upon a perusal of the following detailed description read in conjunction with the accompanying drawing figures and appended claims.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the primary features of the system which include a detector case, several interchangeable detectors, an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler;

FIG. **2** is a front elevation view of the multi sensor detection and lock disabling system of the present invention illustrating one of the interchangeable detectors first shown in FIG. **1**;

FIG. **3***a* is a top plan view of the multi sensor detection and lock disabling system of the present invention illustrating the mounting of one lock disabler to the lock of a product, such as a container, and disengaged from the lock of the container;

FIG. **3***b* is a top plan view of the multi sensor detection and lock disabling system of the present invention illustrating the engagement of the lock disabler to the lock of the product for locking or disabling the lock of the product so that unauthorized access is prevented;

FIG. **4** is a side elevation view of the multi sensor detection and lock disabling system of the present invention illustrating the detector case mounted to the product, such as the container, with the light alarm indicators externally visible;

FIG. **5** is a schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the interconnection of detector cases with a surveillance watchtower and a monitoring PC terminal;

FIG. **6** is a schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the placement of detector cases upon containers different from the containers of FIG. **5**, and wherein the detectors case are interconnected to a surveillance watchtower and a monitoring PC terminal;

FIG. **7** is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the mounting of one automatic/mechanical lock disabler to the lock of a standalone news rack;

FIG. **8** is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating one interchangeable detector placed within the standalone news rack;

FIG. **9** is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the detector case having color coded front panels for specifically indicating the agents, compounds or elements that have been detected;

FIG. **10** is a rear elevation view of the multi sensor detection and lock disabling system of the present invention illustrating the GPS, Internet and power source connections;

FIG. **11** is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the interconnection of the detector with the detector case and the steps undertaken by the system when an agent or compound is detected;

FIG. **12** is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the sequence of steps undertaken by one detector when functioning as a standalone scanner for detecting an agent or compound;

FIG. **13** is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the interconnection of the detector case with the automatic/mechanical lock disabler for activating the lock disabler upon detection by the system of an agent or compound;

FIG. **14** is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating interconnection of the detector case with the fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock as part of the process of detection and safeguarding the public upon detection of the agent or compound;

FIG. **15** is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the incorporation of the system with a surveillance watchtower and a monitoring PC or computer terminal for monitoring containers, such as shipping or cargo containers, that may sit for extended time periods on docks, at rail yards, and at industrial storage facilities;

FIG. **16** is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the integration of the detection system with a satellite and monitoring equipment at a monitoring site for detecting explosives placed in a vehicle and then transmitting signals to the satellite and then to the monitoring site for disabling and locking the vehicle;

FIG. **17** is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the incorporation of the features and elements of the detector case to a cell phone and cell phone case;

FIG. **18** is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the incorporation of a GPS satellite, a monitoring site and a cell phone tower for communicating to and with an electronic device such as a laptop computer or a cell phone for transmitting signals to a vehicle for activating an onboard stall-to-stop device for bringing the vehicle to a halt; and

FIG. **19** is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the use of a GPS satellite in conjunction with the monitoring site and monitoring equipment to relay commands and signals to the cpu or transceiver of the vehicle for stopping or locking the vehicle in response to a signal that a certain type of event (detection of a bomb, engine failure or malfunction or unauthorized use) has occurred or is in process

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

Illustrated in FIGS. **1-19** is a multi sensor detection and lock disabling system **10** for preventing terrorist activity by monitoring, detecting, and securing those critical areas, sites, and facilities vulnerable to terrorist activity. The first step is

the identification of critical areas, sites, locations and facilities that are vulnerable to terrorist activity as convenient places to store and plant explosives and bombs and spread biological, chemical or radiological agents and compounds, followed by the disposition of the multi sensor detection and lock disabling system **10** for monitoring, detecting, and securing the particular location or site. Vulnerable sites, locations, facilities and areas are nearly limitless in their variety; in order to categorize the protection the present invention provides an anti-terrorist product grouping strategy has been developed wherein products made from the same or similar material, products having the same or similar design, and products presenting the same or similar security problems are grouped together with the multi sensor detection and lock disabling system **10** for preventing terrorist activity. For example, two preferred product groupings can be Product Grouping I: cargo containers, shipping containers, cargo planes, freight train cars, tractor trailers, mail carriers (UPS, FedEx), airport lockers, news racks (coin and non-coin operated), mail drop boxes, cluster mail boxes, keyed mail boxes, min-storage houses and buildings, bicycle lockers, stadium lockers, school lockers, cars, trucks, campers, buses, vans and utility vehicles. Product Grouping II: chemical detectors, biological detectors, radiological detectors, nuclear detectors, motion sensors, glass break sensors, plastic film on glass, high security locks, tampering labels, door sensors, disabling locking systems, vehicle detectors and satellite disabling locking systems. In addition to grouping products together by features, designs and materials, the multi sensor detection system **10** includes a lock disabling capability for disabling an existing lock or activating a lock on or inside any of the aforementioned products when a detector or sensor of the system is activated. The lock disabling feature is a crucial component of the invention in so far as it prevents unauthorized, unequipped or untrained individuals from gaining access and entry to the site and causing further contamination of the site.

As shown in FIGS. **1-10**, the multi sensor detection and lock disabling system **10** includes at least one—and preferably many—detector case **12** that can be placed in, on, upon or adjacent the product, such as the shipping containers **14** of FIGS. **4** and **5** resting upon a platform **16** or the cargo container **18** of FIG. **6** sitting upon a seaport dock or pier **20**. The detector case **12** includes a top **22**, a bottom **24**, a pair of opposed sides **26** and a front side or panel **28** and an opposite rear or back side **30**. The rear side **30** has connections or contacts that can include an Internet connection **32**, a GPS connection **34** and a power connection **36** for a power source. The power source for the detector system **10** can be any conventional battery or electrical source. The detector case **12** includes an interior chamber divided into a number of compartments **38** for holding therein agent or compound detection means hereinafter further described. A cpu **40** is mounted within the detector case **12** and electrically interconnects, routes, and transmits signals among items hereinafter further described and also communicates with a monitoring site and monitoring equipment. The front side **28** of the detector case **12** includes indicator means for visually indicating that a specific agent, compound or element has been detected. The indicator means can include color coded indicator lights **42** in panel form, as shown in FIG. **9**, with each indicator light panel **42** lighting up with a specific color corresponding to the detection of a specific agent or compound; or color coded indicator lights **44**, as shown FIG. **1**, that correspond to and individually light up on the detection of a specific agent or compound (chemical, biological, or radiological).

As shown in FIGS. **1, 2** and **9-13**, the multi sensor detection and lock disabling system **10** includes a plurality of detectors **46** with each detector **46** adapted for and set up to sample for a specific agent or compound (biological, chemical, or radiological); and the detectors **46** are interchangeable for adapting to the needs and demands of future technology. The detectors **46** can also be used as standalone scanners. In the preferred embodiment of the invention, at least three detectors **46** are placed within the detector case **12** with one detector **46** for specifically sampling biological agents or compounds, one detector **46** for sampling chemical agents or compounds, and one detector **46** for sampling radiological agents or compounds. The detectors **46** are interconnected to the cpu **40** of the detection system **10** by conventional connections that can be wire or wireless for transmitting the appropriate signals to the cpu **40** upon detection of the particular agent or compound. As shown in FIG. **2**, each detector **46** includes on its front plate or facing surface a sound alarm indicator **48**, a readings panel **50** comprising a plastic shield and LED lights for displaying the various read-out messages, a sensor **52** for detecting the specific agent, element or compound, and a light alarm indicator **54** that can be color coded for each specific agent and which is externally visible when the detector **46** is used as a stand alone scanner. Each detector **46** includes a conventional microprocessor for controlling the various functions and generating the appropriate signals for transmission to the cpu **40** of the detector case **12**.

As shown in FIGS. **1**, **3***a*, **3***b*, **9**, and **13-15**, used in conjunction with the multi sensor detection and lock disabling system **10** is at least one automatic/mechanical lock disabler **56**—and depending upon the number of products being monitored there can be one lock disabler **56** for each product. The automatic/mechanical lock disabler **56** is physically connected to the detector case **12** by a wire or cable **58** for receiving signals therefrom for disabling an existing lock or activating a lock inside a product to prevent access to the product. By way of example, FIG. **3***a* shows the automatic/mechanical lock disabler **56** mounted—by any conventional means—to the lock **60** of the shipping container **14** shown in FIGS. **4** and **5** and connected by wire **58** to the cpu **40** of the detector case **12**. The lock disabler **56** is in the non-activated or disengaged state in FIG. **3***a*. FIG. **3***b* shows the automatic/mechanical lock disabler **56** mounted to the lock **60** of the shipping container **14** and in the activated or engaged state after detection of an agent or compound by the system **10** thereby for locking or disabling the lock **60** of the shipping container **14** and preventing unauthorized entry and access by unauthorized, untrained and unequipped individuals. In FIGS. **3***a* and **3***b* the lock **60** secures doors of the shipping container **14** that can be slidably or pivotably opened and closed.

In addition to the automatic/mechanical lock disabler **56**, the multi sensor detection and lock disabling system **10** can also utilize a fingerprint biometric lock with disabler **62** as shown in FIGS. **1** and **14**. The fingerprint biometric lock with disabler **62** is interconnected to the cpu **40** of the detector case **12** for receiving transmissions therefrom after detection of an agent or compound has occurred so that the lock on the product can be locked or disabled. Moreover, resetting of the fingerprint biometric lock with disabler **62** occurs when the fingerprint of the individual is placed on the fingerprint-matching pad **64**, and if a match occurs with a known fingerprint stored by the cpu **40**, then the individual can reset the fingerprint biometric lock with disabler **56** by turning the manual lock disabler **66**. The fingerprint biometric lock with disabler **62** is mounted to the lock of the product in a manner

similar to the mounting of the automatic/mechanical lock disabler **56** that is shown in FIGS. **3** and **3b**.

FIGS. **4** and **5** show one manner of disposition or placement of the detector case **12** in relation to the product, i.e., the shipping container **14**, with the color coded indicator lights **42** externally viewable; FIG. **5** shows a number of shipping containers **14** each equipped with a detector case **12** and integrated with elements hereinafter further described for continuously monitoring the shipping containers **14** as they sit for an extended period of time on the truck or rail platform **16**. FIG. **6** illustrates several cargo containers **18** sitting on the shipping dock or pier **20**, with each cargo container **18** having a detector case **12** mounted thereon and integrated with and monitored by elements shown in FIG. **5** and hereinafter further described.

FIG. **7** illustrates a typical product from product grouping 1 that is monitored by the multi sensor detection and lock disabling system **10** of the present invention; specifically, FIG. **7** shows a news rack **68** with one automatic/mechanical lock disabler **56** mounted to and interconnected with the locking mechanism of the news rack **68**. As long as there is no detection of any agent or compound, the lock disabler **56** is in the disengaged state, and the individual can deposit the coin amount in the chute and then freely open the glass panel **70** by the handle **72** for removing a paper. However, the lock disabler **56** would be activated upon detection of the harmful agent or compound and receipt of a signal from the cpu **40** for locking or disabling the locking mechanism thereby denying access to the interior of the news rack **68** from all untrained, unauthorized and unequipped individuals.

FIG. **8** illustrates one detector **46** disposed within the news rack **68** and which is visible through the panel **70** for detecting one specific agent, compound or element. The detector **46** functions as a stand-alone scanner and can be wirelessly interconnected to offsite monitoring equipment.

FIG. **11** illustrates a representative schematic **74** for describing the signal transmission process from the detector **46** to the cpu **40** of the detector case **12**. The external stimulus **76** would be the chemical, biological or radiological agent or compound. If there is no detection of the agent or compound, the detector **46** will stay in the sensing mode **78**. However, detection of the specific agent will trigger the sound alarm **80** and the light alarm **82**, and instant transmittal of a signal to the cpu **40**. The readings **84** can be stored by the cpu **40** for verification and future review and evaluation. After all the appropriate corrective and preventative measures have been undertaken by the trained and authorized personal, and the site has been cleansed of the contamination, authorized and equipped personal can then reset **86** the system **10**.

FIG. **12** illustrates a representative schematic **88** for the detector **46** when used as stand-alone scanner. The detector **46** undergoes the same essential steps as illustrated in FIG. **11**, with the exception of the signal transmission to the cpu **40**. The detector **46** remains in detection mode **78** until an agent is detected, and then the various functions—light alarm **82**, sound alarm **80**, storage of readings **84**, and, after the appropriate security and safety steps have been carried out by authorized personal, detector reset **90** by authorized personal can occur thereby placing the detector **46** back in detection or sensing mode **78**.

FIG. **13** is a representative schematic **92** that illustrates the steps undertaken by the system **10** to lock or disable a lock, such as the lock **60** for the shipping container **14** shown in FIGS. **3a** and **3b**. Upon detection of the agent (chemical, biological, radiological) the alarm light indicators **42** or **44** will light up providing external indication that an agent has been detected. In addition, the system **10**—the cpu **40**—will transmit a lock/disable lock signal **94** to the automatic/mechanical lock disabler **56** to lock or disable the lock on the product, such as the lock **60** on the shipping container **14** of FIGS. **3a-5**. This prevents unauthorized, unequipped, or untrained individuals from entering or gaining access to the product for which a dangerous and perhaps lethal agent has been detected. After the proper authorities and authorized personal have been notified and all the appropriate security, preventative and clean up measures have been undertaken, the authorized individual can perform the disarm and reset function **96** for the system **10** placing the system **10** in back in the detection mode **98**.

FIG. **14** is a representative schematic **100** illustrating the use of the fingerprint biometric lock with disabler **62** with the system **10**. Upon detection of the agent or compound by the detector, the various alarms would sound and light up (shown in previous figures), and the cpu **40** would then transmit a signal to the fingerprint biometric lock with disabler **62** to lock or disable the lock on the product, such as the lock **60** on the shipping containers **14** shown in FIGS. **3a-5**. The shipping containers **60** would remain locked and in an access denied mode **101** should an attempt be made to gain access to the container **60** by opening the lock **60** with an unauthorized fingerprint. However, a fingerprint that matches stored and authorized fingerprints **102** would indicate an authorized individual, and would allow the individual to disable and disarm **104** the lock **60** of the shipping container **14**. The fingerprint biometric lock with disabler **62** would then be reset **106** after the appropriate safety, cleanup, and protection measures are completed, and the system **10** would be reset and placed back in the detection mode **108**.

FIG. **15** is a schematic representation **110** that illustrates the integration of a surveillance watchtower **112** and a monitoring terminal or PC **114** for monitoring products such as the shipping containers **14** or cargo containers **16** that sit for extended periods of time of docks, piers **20**, truck terminals, mil yards, shipping platforms **16** and industrial sites as shown in FIGS. **5** and **6**. The watchtower **112** would maintain continuous surveillance over a number of shipping containers **60**, for example, with detector cases **12** mounted in or on each container **14** and set in detection mode **116** with one or more detectors **46** disposed in each detector case **12**. The watchtower **112** would continuously scan for light alarm indicators **42** and **44** on the products, such as the containers **14** or **18**, and the watchtower **112** would be interconnected and integrated with the monitoring terminal or PC **114**. Upon detection **118** of an agent or compound in one or more of the shipping containers **14**, the appropriate light alarm indicators **42** or **44** would light providing visible confirmation of the detection of the specific agent or compound. The cpu **40** would transmit a lock/disable signal **120** to the lock **60** on each respective shipping container **14** to lock or disable the lock **60** thus preventing access to that respective shipping container **14**. In addition, signal transmissions would be sent to the monitoring terminal or PC **114** (which could be off site) thereby alerting authorized security personal of the contamination event. With the information received at the monitoring terminal **114**, authorized personal would then be notified and dispatched to the area to undertake the appropriate safety and cleanup measures **122**. Such measures would also include disarming the lock disabling system in order to gain access to the shipping container **14**. After all the cleanup and security measures are completed by the trained and properly equipped authorities, the detection system and the lock disabling feature would reset **124** and the detection system would again be placed in detection mode **116**.

FIG. 16 is a schematic representation 126 that illustrates an enhanced version of the multi sensor detection and lock disabling system 10 for preventing car and vehicle attacks and bombings. The lock disabling system 10 would be interconnected to the locking system and mechanism 128 of the vehicle 130. In addition, a stall to stop disabling link 132 can be made with the fuel, air, and electrical system 134 of the vehicle 130. The enhanced version incorporates a satellite 136 for signal receipt and transmission from the vehicle 130 in which the detector system 10 is placed to a monitoring site and monitoring equipment 138. As shown in FIG. 16, a detection signal 140 would be sent to the satellite 136 by the detection system 10 upon detection of a bomb or explosive 142 hidden in the vehicle 130. The satellite 136 would then transmit an alert signal 144 to the monitoring site 138 with the signal 144 containing the relevant data to evaluate the nature of the threat. The monitoring site 138 would then transmit a stall to stop signal 146 to the detection system 10 to lock the vehicle 130 and/or disable the electrical system of the vehicle 130 thereby disabling the vehicle 130, preventing access to the vehicle 130 by locking the vehicle 130, and preventing any terrorist in the vehicle 130 from escaping.

The detector case 12 can be modified and adapted for inclusion with cell phone cases, satellite cell phone cases, laptop cases, notebook PC cases, PDA cases, carry-on cases, suitcases, and briefcases. In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring.

The system 10 and the watchtower 112, along with the satellite 136 and the monitoring site 138 can be adapted or incorporated with cell phone towers and satellites for use with satellite communication and/or a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween. The aforementioned telecommunication and radio communication means can be interactive with any type of motive vehicle that includes but is not limited to cars, trucks, vans, SUVs, trains, subways, boats, ships and airplanes, and which is reported stolen, experiences a loss of brakes, or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted to the vehicle and which detection causes an automatic signal transmission or a signal transmission is activated when a call is made to the monitoring station by an authorized person. The authorized individual includes but is not limited to the owner, pilot, conductor, captain, police highway patrol, security guard and military personnel to the monitoring equipment for activating a vehicle slowdown or stall-to-stop disabling system that similar to the disabling system 126 shown in FIG. 16, or incorporating features of the system 126 shown in FIG. 16, from the monitoring equipment to the vehicle. The activation of the stall-to-stop disabling means or the vehicle slowdown disables or engages the computer, electrical, fuel and air systems of the vehicle or a combination of the computer, electrical, fuel and air systems that include but are not limited to the brakes, foot peddle, lights, speed controls, ignition, steering, transmission, and the horsepower of the motor.

In addition, the basic stall-to-stop disabling means or the vehicle slowdown means and device can be adapted, modified or designed to include: an open bust or open platform for integrating any new and innovative technology; warning lights indicators; sound alarm indicators; voice alarm indicators; a cell phone to transmit to the vehicle a signal for slowing and halting the vehicle; and a lock disabling system or means to lock a thief or terrorist inside the vehicle after a transmission is received or sent. Open bust or open platform also refers to the compatibility of the detector case 12, or the incorporation of its features in cell phone cases, satellite cell phone cases, laptop cases, notebook PC cases, PDA cases, carry-on cases, briefcases, and suitcases, etc., with other communication, transmission and surveillance systems whereupon the detector case 12, and its features, can be seamlessly integrated with other new and emerging systems and technologies.

Thus, as shown more specifically in FIG. 17, by way of a representative example the features and elements of the detector case 12 are shown as being incorporated into cell phone detector case 150 and associated cell phone monitor 152. The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174. The power source for the cell phone detector case 150 can be any conventional rechargeable battery source or standard electrical power from a standard electrical receptacle or outlet.

As shown in FIG. 17, the cell phone detector case 150 includes one or more sensor/detector units, cells, or components 176 built into and incorporated into the case 150. The detector 176 includes generally disposed at the front 162 of the case 150 the following types of indicators: a sound alarm indicator 178, a readings panel 180, a sensor 182 for detecting one or more specific types of agents, elements, chemicals, compounds, etc., and a light alarm indicator 184. The sensor/detector 176 will be interconnected to the power source 174. In addition, mounted on and externally visible on the sides 168 or front 162 of the case 150 are a plurality of color coded indicator lights 186 with each light 186 corresponding to a specific agent, element, chemical, compound, etc., and lighting up when that agent is detected by the sensor/detector 176. The color coded indicator lights 186 will be electrically interconnected to the sensor/detectors 176 via any standard microprocessor. The cell phone detector case 150 and cell phone monitor 152 thus comprise a hand-held, easily portable and transportable detection means that is both effective and unobtrusive in its disposition and use.

FIGS. 18 and 19 illustrate representative examples of the integration of portable electronic communication or telecommunication devices such as a cell phone 187*a* and/or a laptop computer 187*b* with the monitoring equipment 138 located at a predesignated monitoring site 188, and operating in conjunction with either a satellite and/or a cell phone tower 190 to transmit and receive signals and commands among each other and to a vehicle 192, such as a truck, as part of a stall-to-stop disabling system for slowing and stopping the vehicle 192 and locking a thief, terrorist, or unauthorized individual in the vehicle 192 if needed. A wide range of events can trigger and initiate the stall-to-stop system and the locking or lock disabling system and mechanism, and the event doesn't have to be limited to the detection of a bomb or a chemical, biological, or radiological agent, element, or compound. The events can include, but is not limited to, detection of an engine problem to engine failure to the unauthorized use (stealing) of the vehicle 192. The vehicle 192 includes an electromotive system 194 that comprises, among other com-

ponents, an onboard computer(s), electrical, fuel and air systems, as well as brakes, ignition, steering, and transmission. Also integrated with and capable of communicating with the vehicle's **192** electromotive system **194** is a stall-to-stop system while a lock disabling mechanism **196** is able to engage and disengage or disable the vehicle's **192** locking mechanism **198** upon receipt of the appropriate commands via a lock disabling communication channel or link **200**. This link **200** can also accommodate the stall-to-stop system commands and signals, and thus is a multi-channel communication link. A CPU or a transceiver **202** is programmed to receive signals from the cell phone tower **190** and/or to a GPS satellite **204** and is interconnected with the stall-to-stop system and the lock disabling system **196** via link **200** for engaging the electromotive system **194** and actuating the lock disabling system **196** to stop the vehicle **192** and lock inside the vehicle **192** anyone such as a thief, terrorist or other unauthorized individual.

A representative example for stopping, disabling, and locking the vehicle **192** that utilizes the cell phone tower **190** wherein the activation and/or distress signal **206** originates from the cell phone **187***a* or the laptop **187***b* and such activation signal **206** travels to the cell phone tower **190** that is nearest the current location of the vehicle **192**. A signal **208** is then transmitted to the monitoring site **188** and specific monitoring equipment **138** that can also include but is not limited to cell phones, laptops, desktop PC's, notebook PC's and LCD monitors. The monitoring site **138** then communicates by signal **210** to the GPS satellite **204** that an original or activation signal has been received and then the GPS satellite **204** locates and communicates by multiplex signal **212** with the CPU or transceiver **202** on the vehicle **192** and exchanges information on the type of problem, situation, location, and vehicle speed. The monitoring equipment **138** then transmits a signal **214** to the cell phone tower **190** that communicates with the transceiver **202** and/or CPU of the vehicle **192** to initiate or execute any commands that will actuate the stall-to-stop disabling link **200** and lock disabling system **196** for bringing the vehicle **192** to a halt and actuating the vehicle's **192** locking mechanism **198** for locking the thief, terrorist, or other unauthorized person inside the vehicle **192** if needed.

FIG. **19** illustrates a representative example wherein the stall-to-stop system and the lock disabling system **196** are utilized in conjunction with the GPS satellite **204**. In FIG. **19** a signal has traveled to the satellites nearest the vehicle's **192** current location and then the signal **218** has traveled to the monitoring equipment **138** and monitoring site **188** which can include but is not limited to satellite cell phones, satellite monitors, cell phones, laptops, desktop PC's, notebook PC's, and LCD monitors. The GPS satellite **204** then locates and communicates with the CPU and/or transceiver **202** on the vehicle **192** via a multiplex (two-way) signal **220** in order to exchange information on such distress and danger event parameters as the specific problem situation, location, and vehicle speed. The monitoring equipment **138** then transmits a signal **222** back to the GPS satellite **204** that in turn communicates via another signal **224** with the CPU and/or transceiver **202** to execute any commands to the stall-to-stop system for executing the disengagement of the vehicle's **192** electromotive system **194** for bringing the vehicle **192** to a halt and for actuating the lock disabling system **196** to direct the lock disabling link **200** to actuate the locking mechanism **198** thereby locking the vehicle **192** and anyone inside the vehicle **192**.

While the invention has been shown and described in a preferred embodiment, it will be apparent to those skilled in the art that numerous alterations, modifications, and variations will possible and practicable without departing from the spirit and scope of the invention as set forth by the appended claims.

The present invention comprehends a chemical/biological/radiological/nuclear/explosive/human/contraband detector unit with a disabling locking system for protecting products that can be grouped into several product groupings, from terrorist activity, and also for preventing unauthorized access to and tampering with the storage and transport of ordnance and weapons. The products grouped into what may be referred to as Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars, (UPS, FedEx), airport lockers, news racks (coin and non-coin operated), mail drop boxes, cluster mail boxes, keyed mail boxes, min-storage houses and buildings, bicycle lockers, stadium lockers, school lockers, cars, trucks, campers, buses, vans, UAVs, UGVs, and utility vehicles; the products grouped into what may be referred to as Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, door sensors, speed sensors, biometric sensors, glass break sensors, plastic film on glass, high security locks, tampering labels, door sensors, disabling locking systems, vehicle detectors and satellite disabling locking systems, detection of humans, detection of contraband, temperature, and shock levels; the products grouped into what may be referred to as Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, satellite cell phone cases, laptop cases, notebook PC cases, PDA cases, carry-on cases, suitcases, eyeglass, briefcases, detector cases of locks, detector cases of tags, detector cases that is mounted to, detector cases that is affixed to, detector cases that is outside of, detector cases that is inside of, and detector cases that is adjacent to; the products grouped into what may be referred to as Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, web servers, desktop PCs, notebook PCs, laptops, satellite cell phones, cell phones, UMTS phones, PDAs, LCD monitors, and satellite monitoring, remote control key fobs, two-way communication key fobs, handhelds; the products grouped into what may be referred to as Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, Cellular, Satellite, Telematics, Wide Area Network (WAN), Wireless Wide Area Network (WWAN), Local Area Network (LAN), Radio Frequency (RF), Broadband Wireless Access (BWA), Global Positioning System (GPS), General Packet Radio Services (GPRS), Global System for Mobile (GSM), Wideband Code Division Multiple Access (W-CDMA), Universal Mobile Telecommunications System (UMTS), Short Message Service (SMS); the products grouped into what may be referred to as Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature. the products grouped into what may be referred to as Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, HAZMAT, CIA, FBI, Secret Service, port security personnel,

border security personnel, first responders, monitoring sites and terminal personnel. The multi sensor detection system includes the capability to disable an existing lock or activate a lock located inside or outside any of the products named in the product grouping categories upon activation of a sensor or detector included in the system. This is a significant feature for the multi sensor detection system as it prevents unauthorized, unequipped and untrained entry and access to the product thus preventing further contamination of the site and to individuals in the area.

The invention claimed is:

1. A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, comprising:

at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or a front end processor for communication between a host computer and other devices;

a transmitter for transmitting signals and messages to at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device;

a receiver for receiving signals, data or messages from at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device;

at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short range radio frequency (RF) connection, or GPS connection;

the communication device is at least a fixed, portable or mobile communication device interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween; and

whereupon the communication device, is interconnected to a product equipped to receive signals from or send signals to lock or unlock doors, activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems;

wherein the communication device receives a signal via any of one or more products listed in any of the plurality of product grouping categories;

wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short range radio frequency (RF) connection is capable of signal communication with the transmitter and the receiver of the communication device and transceivers of the products;

wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature such that the communication device that is at least one of the cell phone, the smart phone, the desktop, the handheld, the PDA, the laptop or the computer terminal is locked by the biometric lock disabler to prevent unauthorized use;

wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, and long and short range radio frequency (RF).

2. Monitoring equipment of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e. computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone) interconnected to a product for communication therebetween, comprising:

at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or a front end processor for communication between a host computer and other devices;

a transmitter for transmitting signals and messages to at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device;

a receiver for receiving signals, data or messages from at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device;

a lock disabling mechanism that is able to engage (lock) and disengage (unlock) and disable (make unavailable) a product's lock, wherein the lock disabling mechanism disables the product's lock after a specific number of tries by an unauthorized user to disengage the lock by maintaining the product's lock in the current state of the product's lock regardless of input entered to change the state of the product's lock by the unauthorized user;

at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short range radio frequency (RF) connection, or GPS connection;

monitoring equipment of at least a fixed, portable or mobile monitoring equipment interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween; and

whereupon the monitoring equipment, is interconnected to a product equipped to receive signals from or send signals to the lock disabling mechanism that is able to engage and disengage or disable the lock, activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems;

wherein the monitoring equipment is implemented by business or government at a minimum cost by products grouped together by common features in at least one of several product groupings of design similarity;

wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, or long and short range radio frequency (RF) connection is in signal communication with the transmitter and the receiver of the monitoring equipment and transceivers of the products.

3. Monitoring equipment of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e. computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone) interconnected to a product for communication therebetween, comprising:

at least one of a central processing unit (CPU), a network processor, or a microprocessor for executing and carrying out the instructions of a computer program or application which is specifically targeted at the networking application domain, for communication between the monitoring equipment and any of a plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container device, or a locking device;

a transmitter for transmitting signals and messages to at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container device, or a locking device;

a receiver for receiving signals, data or messages from at least one of plurality of product groups based on the categories of a multi-sensor detection device, a maritime cargo container device or a locking device, wherein the signals, data or messages are of agents of an item of interest (IOI);

at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, or GPS connection;

the monitoring equipment is at least a fixed, portable or mobile monitoring equipment interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween; and

whereupon the monitoring equipment, is capable of the activation or deactivation of at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container device or a locking device;

wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, for signal communication with the transmitter and the receiver of the monitoring equipment and transceivers of the products;

at least one tag that is read by the monitoring equipment that is capable of wireless near-field communication to achieve detection of at least one of a chemical agent, a biological agent, a radiological agent, a nuclear agent, or an explosive agent which allows radio frequency (RF) data to be received and transferred between the tag and the monitoring equipment.

4. A built-in, embedded multi sensor detection system for monitoring products with a plurality of sensors detecting at least two agents selected from the group consisting of chemical, biological, radiological, explosive, human, and contraband agents;

comprising a built-in sensor array or fixed detection device into the product that detects agents by means of two or more sensors combined from the following list of sensors: a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, and a radiological sensor;

comprising a communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal for monitoring products, interconnected to a built-in sensor array or fixed detection device for communication therebetween,

wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature such that the communication device that is at least one of the cell phone, the smart phone, the desktop, the handheld, the PDA, the laptop or the computer terminal is locked by the biometric lock disabler to prevent unauthorized use;

wherein the built-in embedded multi sensor detection device receives a signal via any of one or more products listed in any of the plurality of product grouping categories; and

wherein, when an alarm occurs, the built-in, embedded multi sensor detection system communicates the alarm by way of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e. product-to-product, product-to-satellite, product-to-cellular, product-to-long or short range radio frequency, product-to-radio frequency (RF), product-to-internet, product-to-broadband, product-to-smartphone or cell phone, product-to-computer at monitoring site, product-to-WiFi, product-to-handheld, or product-to-laptop or desktop) for communication therebetween;

wherein the built-in embedded multi sensor detection device is implemented by business or government at a minimum cost by products grouped together by common features in at least one of several product groupings of design similarity.

5. A built-in multi sensor detection system for monitoring products with a plurality of sensors detecting at least two agents selected from the group consisting of chemical, biological, radiological, explosive, human, and contraband agents, comprising:

a built-in sensor array or fixed detection device into the product that detects agents by means of two or more sensors combined from the following list of sensors: a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, and a radiological sensor;

monitoring equipment of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e. computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone) for the receipt and transmission of signals therebetween;

wherein the built-in multi sensor detection device is built in any of one or more products listed in any of the plurality of product grouping categories to include but not limited to a maritime cargo container, a lock, or monitoring equipment (i.e., a computer terminal, personal computer (PC), a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop);

wherein the built-in multi sensor detection device is implemented by business or government at a minimum cost by products grouped together by common features in at least one of several product groupings of design similarity;

a light alarm indicator that has a plurality of colored lights that correspond to specific ones of the at least two agent;

wherein, when the light alarm indicator lights to indicate an alarm occurs, the built-in multi sensor detection system communicates the alarm by way of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e. product-to-product, product-to-satellite, product-to-cellular, product-to-radio frequency (RF), product-to-internet, product-to-broadband, product-to-smartphone or cell phone, product-to-computer at monitoring site, product-to-WiFi, product-to-handheld, or product-to-laptop or desktop) for the receipt and transmission of signals therebetween.

6. A built-in multi sensor detection system for detecting at least two items selected from the group consisting of chemical agent, biological agent, radiological agent, explosive agent, human agent, contraband agent, motion, perimeter, temperature, tampering, theft, and breach, comprising:

a built-in sensor array or fixed detection device into a product that detects items by means of at least two sensors from the following list of sensors: a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, and a radiological sensor;

monitoring equipment of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e. computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone) for the receipt and transmission of signals therebetween;

wherein the built-in, multi sensor detection device is built in any of one or more products listed in any of the plurality of product grouping categories to include but not limited to a maritime cargo container, a lock, or monitoring equipment (i.e., a computer terminal, personal computer (PC), a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop);

wherein, when an alarm occurs, the built-in multi sensor detection system communicates the alarm by way of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e. product-to-product, product-to-satellite, product-to-cellular, product-to-radio frequency (RF), product-to-internet, product-to-broadband, product-to-smartphone or cell phone, product-to-computer at monitoring site, product-to-WiFi, product-to-handheld, or product-to-laptop or desktop) for the receipt and transmission of signals therebetween,

at least one tag that is read by the monitoring equipment that is capable of wireless near-field communication to achieve detection of at least one of the chemical agent, the biological agent, the radiological agent, the explosive agent, the human agent, the contraband agent, the motion, the perimeter, the temperature, the tampering, the theft, and the breach which allows radio frequency (RF) data to be received and transferred between the tag and the monitoring equipment.

7. A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, or radiological agents and compounds, comprising:

a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human or contraband agents and compounds and capable of being disposed within, on, upon or adjacent a multi sensor detection device;

monitoring equipment comprising at least one of plurality product groups based on the categories of a computer, laptop, notebook, PC, handheld, cell phone, PDA or smart phone for the receipt and transmission of signals therebetween;

at least one cell phone tower interconnected to the monitoring equipment for sending signals thereto and receiving signals therefrom or at least one satellite capable of transmitting signals to the monitoring equipment;

at least one satellite or at least one cell phone tower capable of signal communication between the multi sensor detection device and the monitoring equipment;

at least one internet connection capable of communication between the multi sensor detection device and the monitoring equipment;

whereupon a signal sent to a receiver of the multi sensor detection device from a satellite; or to a cell phone tower; or through short and/or long range radio frequency; causes a signal to be sent to the monitoring equipment that includes location data and sensor data;

wherein the monitoring equipment or multi sensor detection device receives a signal via any of one or more products listed in any of the plurality of product grouping categories;

wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short range radio frequency (RF) connection is capable of signal communication with the transmitter and the receiver of the monitoring equipment or multi sensor detection device and transceivers of the products;

wherein the monitoring equipment is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature such that the monitoring device that is at least one of the computer, the laptop, the notebook, the PC, the handheld, the cell phone, the PDA, or the smart phone is locked by the biometric lock disabler to prevent unauthorized use;

wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, and long and short range radio frequency (RF).

8. A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, or radiological agents and compounds, comprising:

a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human or contraband agents and compounds and capable of being disposed within, on, upon or adjacent a multi sensor detection device;

monitoring equipment of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e. computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone) for the receipt and transmission of signals therebetween, wherein the monitoring equipment is equipped with a lock disabling mechanism that is able to engage (lock) and disengage (unlock) and disable (to make unavailable) a product's lock, wherein the lock disabling mechanism disables the product's lock after a specific number of tries by an unauthorized user to disengage the lock by maintaining the product's lock in the current state of the product's lock regardless of input entered to change the state of the product's lock by the unauthorized user;

at least one cell phone tower interconnected to the monitoring equipment for sending signals thereto and receiving signals therefrom; or at least one satellite capable of transmitting signals to the monitoring equipment;

at least one satellite or at least one cell phone tower capable of signal communication between the multi sensor detection device and the monitoring equipment;

at least one internet connection capable of communication between the multi sensor detection device and the monitoring equipment; and

whereupon a signal sent to a receiver of the multi sensor detection device from a satellite; or to a cell phone tower; or through short and/or long range radio frequency; causes a signal to be sent to the monitoring equipment that includes location data and sensor data;

wherein the multi sensor detection device is implemented by business or government at a minimum cost by products grouped together by common features in at least one of several product groupings of design similarity;

wherein the multi sensor detection device for any of one or more products listed in any of the plurality of product grouping categories to include but not limited to a maritime cargo container, a lock, or monitoring equipment (i.e., a computer terminal, personal computer (PC), a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop);

wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, or long and short range radio frequency (RF) connection is in signal communication with the transmitter and the receiver of the monitoring equipment or multi sensor detection device and transceivers of the products.

**9**. A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, or radiological agents and compounds, comprising:

a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human or contraband agents and compounds and capable of being disposed within, on, upon or adjacent a multi sensor detection device, wherein at least one of the sensors is capable of detecting agents of an item of interest (IOI);

monitoring equipment of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e. computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone) for the receipt and transmission of signals therebetween;

at least one satellite or at least one cell phone tower capable of signal communication between the multi sensor detection device and the monitoring equipment;

at least one internet connection capable of communication between the multi sensor detection device and the monitoring equipment;

whereupon a signal sent to a receiver of the multi sensor detection device from a satellite; or from a cell phone tower; or through short and/or long range radio frequency; causes a signal to be sent to the monitoring equipment that includes location data and sensor data;

wherein the multi sensor detection device for any of one or more products listed in any of the plurality of product grouping categories to include but not limited to a maritime cargo container, a lock, or monitoring equipment (i.e., a computer terminal, personal computer (PC), a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop);

wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, or broadband connection, is in signal communication with the transmitter and the receiver of the monitoring equipment and transceivers of the products;

at least one tag that is read by the monitoring equipment that is capable of wireless near-field communication to achieve detection of at least one of the explosive agent, the nuclear agent, the contraband agent, the chemical agent, the biological agent, the human agent, or the radiological agent which allows radio frequency (RF) data to be received and transferred between the tag and the monitoring equipment.

* * * * *

# EXHIBIT E



US009589439B2

(12) **United States Patent**
**Golden**

(10) **Patent No.: US 9,589,439 B2**
(45) **Date of Patent: *Mar. 7, 2017**

(54) **MULTI SENSOR DETECTION, STALL TO STOP AND LOCK DISABLING SYSTEM**

(71) Applicant: **Larry Golden**, Mauldin, SC (US)

(72) Inventor: **Larry Golden**, Mauldin, SC (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 81 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **14/806,988**

(22) Filed: **Jul. 23, 2015**

(65) **Prior Publication Data**

US 2016/0027273 A1 Jan. 28, 2016

**Related U.S. Application Data**

(60) Continuation of application No. 14/021,693, filed on Sep. 9, 2013, now Pat. No. 9,096,189, which is a (Continued)

(51) **Int. Cl.**

| | |
|---|---|
| ***B60R 25/102*** | (2013.01) |
| ***G08B 13/24*** | (2006.01) |
| ***B60R 25/01*** | (2013.01) |
| ***B60R 25/04*** | (2013.01) |
| ***G07C 9/00*** | (2006.01) |

(Continued)

(52) **U.S. Cl.**
CPC ........ ***G08B 13/2491*** (2013.01); ***B60R 25/018*** (2013.01); ***B60R 25/04*** (2013.01); ***B60R 25/102*** (2013.01); ***G07C 9/00912*** (2013.01); ***G08B 15/00*** (2013.01); ***G08B 21/12*** (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC .... G08B 15/00; G08B 15/001; G08B 15/004; G08B 25/009; B60R 25/102; B60R 25/01; B60R 25/018; B60R 25/04; B60R 25/0405; B60R 25/0415; B60R 25/10
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 4,385,469 A | 5/1983 | Scheuerpflug |
| 4,544,267 A | 10/1985 | Schiller |

(Continued)

OTHER PUBLICATIONS

United States Department of Homeland Security; Petition for Inter Partes Review of U.S. Pat. No. Re. 43,990 Under 35 U.S.C. §312 and 37 C.F.R. §42.104; Case IPR2014-00714 for U.S. Pat. No. Re. 43,990; Filed Apr. 30, 2014; Washington, D.C., USA; pp. 1-57; copy enclosed (57 pages)

(Continued)

*Primary Examiner* — Van Trieu

(57) **ABSTRACT**

A multi sensor detection and disabling lock system includes detector cases for holding interchangeable detectors that sample for chemical, biological and radiological compounds, agents and elements, with each detector case disposed in or upon the monitored product. The detector case transmits detection information to a monitoring computer terminal and transmits a signal to a lock disabler engaged to the product to lock or disable the product's lock thereby preventing untrained, unauthorized and unequipped individual's from gaining access and entry to the product, and also preventing further contamination of the area. The detection system can be interconnected to surveillance towers scanning detector cases disposed at seaport docks, freight depots and rail terminals for monitoring containers being prepared for shipment or sitting on docks for long periods of time.

**23 Claims, 13 Drawing Sheets**



**Related U.S. Application Data**

continuation of application No. 13/288,065, filed on Nov. 3, 2011, now Pat. No. 8,531,280, which is a division of application No. 12/802,001, filed on May 27, 2010, now Pat. No. 8,334,761, which is a continuation of application No. 12/657,356, filed on Jan. 20, 2010, now Pat. No. 8,106,752, which is a continuation of application No. 12/155,573, filed on Jun. 6, 2008, now Pat. No. 7,636,033, which is a continuation-in-part of application No. 11/397,118, filed on Apr. 5, 2006, now Pat. No. 7,385,497.

(51) **Int. Cl.**
*G08B 15/00* (2006.01)
*G08B 21/12* (2006.01)

(52) **U.S. Cl.**
CPC ... *B60R 2325/205* (2013.01); *B60R 2325/304* (2013.01); *G07C 2009/0092* (2013.01)

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,586,441 A 5/1986 Zekich
4,792,226 A 12/1988 Fishbine
5,222,152 A 6/1993 Fishbine
5,223,844 A 6/1993 Mansell et al.
5,233,404 A 8/1993 Lougheed
5,557,254 A 9/1996 Johnson
5,682,133 A 10/1997 Johnson
5,766,956 A 6/1998 Groger
5,938,706 A 8/1999 Feldman
5,959,529 A 9/1999 Kail, IV
5,963,657 A 10/1999 Bowker
5,986,543 A 11/1999 Johnson
5,990,785 A 11/1999 Suda
6,049,269 A 4/2000 Byrd
6,078,265 A 6/2000 Bonder
6,262,656 B1 7/2001 Byrd
6,271,745 B1 8/2001 Arizal
6,374,652 B1 4/2002 Hwang
6,411,887 B1 6/2002 Martens
6,470,260 B2 10/2002 Martens
6,542,076 B1 4/2003 Joao
6,542,077 B2 4/2003 Joao
6,588,635 B2 7/2003 Vor Keller
6,610,977 B2 8/2003 Megerie
6,613,571 B2 9/2003 Cordery
6,628,813 B2 9/2003 Scott
6,647,328 B2 11/2003 Walker
6,738,697 B2 5/2004 Breed
6,923,509 B1 8/2005 Barnett
6,980,092 B2 12/2005 Turnbull
6,988,026 B2 1/2006 Breed et al.
7,005,982 B1 2/2006 Frank
7,034,677 B2 4/2006 Steinthal et al.
7,034,683 B2 4/2006 Ghazarian
7,103,460 B1 9/2006 Breed
7,109,859 B2 9/2006 Peeters
7,116,798 B1 10/2006 Chawla
7,148,484 B2 12/2006 Craig et al.
7,164,117 B2 1/2007 Breed et al.
7,171,312 B2 1/2007 Steinthal et al.
7,243,945 B2 7/2007 Breed et al.
7,339,469 B2 3/2008 Braun
7,346,439 B2 3/2008 Bodin
7,385,497 B2 6/2008 Golden
7,397,363 B2 7/2008 Joao
7,636,033 B2 12/2009 Golden
7,647,180 B2 1/2010 Breed
7,844,505 B1 11/2010 Arneson et al.
7,868,912 B2 1/2011 Venetianer et al.
7,872,575 B2 1/2011 Tabe
7,880,767 B2 2/2011 Chinigo
7,961,094 B2 6/2011 Breed
8,274,377 B2 9/2012 Smith et al.
8,531,521 B2 9/2013 Romanowich
8,564,661 B2 10/2013 Lipton
2002/0145666 A1 10/2002 Scaman
2003/0063004 A1 4/2003 Anthony et al.
2003/0137426 A1 7/2003 Anthony et al.
2003/0206102 A1 11/2003 Joao
2004/0107028 A1 6/2004 Catalano
2004/0222092 A1 11/2004 Musho
2005/0195069 A1 9/2005 Dunand
2006/0164239 A1 7/2006 Loda
2006/0176169 A1 8/2006 Doolin et al.
2006/0181413 A1 8/2006 Mostov
2006/0250235 A1 11/2006 Astrin
2007/0171042 A1 7/2007 Metes et al.
2008/0045156 A1 2/2008 Sakhpara
2008/0122595 A1 5/2008 Yamamichi
2008/0234907 A1 9/2008 Labuhn
2010/0159983 A1 6/2010 Golden
2011/0178655 A1 7/2011 Golden

OTHER PUBLICATIONS

United States Department of Homeland Security; Declaration of Dr. Sriram Vishwanath; Case IPR2014-00714 for U.S. Pat. No. Re. 43,990; Filed Apr. 30, 2014; Washington, D.C., USA; pp. 1-44; copy enclosed (44 pages).

Richard R Brooks and S.S. Iyengar; Multi-Sensor Fusion Fundamentals and Applications with Software; published 1998; Copyright Prentice Hall PTR; Upper Saddle River, New Jersey, USA; pp. 1-20; copy enclosed (20 pages).

Ramanarayanan Viswanathan and Pramod K Varshney; Distriubted Detection with Multiple Sensors: Part I—Fundamentals; Proceedings of the IEEE; Jan. 1, 1997; pp. 1-11; vol. 85; No. 1; Southern Illinois University Carbondale OpenSIUC; Illinois, USA; pp. 1-11; copy enclosed (11 pages).

Blum; Distributed Detection with Multiple Sensors: Part II—Advanced Topics; Proceedings of the IEEE; Jan. 1, 1997; pp. 1-16; vol. 85, No. 1; Southern Illinois University Carbondale OpenSIUC; Illinois, USA; pp. 1-11; copy enclosed (16 pages).

Victor Lesser; Distributed Sensor Networks a Multiagent Perspective; 2003; pp. 1, 2, 5, 6, 22, 26, 27, 36, 275, 320; copyright 2003 Kluwer Academic Publishers; AH Dordrecht, The Netherlands; copy enclosed (10 pages).

Samuel Blackman and Robert Popoli; Design and Analysis of Modern Tracking Systems; 1999; pp. 1, 2, 6, 472; copyright 1999 Artech House; Norwood, Massachusetts, USA; copy enclosed (4 pages).

Jean-Francois Chamberland; Decentralized Detection in Sensor Networks; 2003; pp. 407-416; IEEE Transactions on Signal Processing; vol. 51, No. 2; Urbana, Illinois, USA; copy enclosed (10 pages).

Oleg Kachirski and Ratan Guha; Effective Intrusion Detection Using Multiple Sensors in Wireless Ad Hoc Networks; pp. 1-8; Proceedings of the 36th Hawaii International Conference on System Sciences; copyright 2003; Orlando, Florida, USA; copy enclosed (8 pages).

Lawrence A Klein; Sensor and Data Fusion A Tool for Information Assessment and Decision Making; 2004; pp. 1-4, 6, 81, 87-89; copyright 2004 The Society of Photo-Optical Instrumentation Engineers; Publisher is SPIE—the International Society for Optical Engineering; Bellingham, Washington, USA; copy enclosed (12 pages).

Dale Ferriere and Khrystyna Pysareva and Andrzej Rucinski; Using Technology to Bridge Maritime Security Gaps; Aug. 1, 2005; Sea Technology; pp. 1-6; copyright Compass Publications, Inc. Jan. 2009; Portsmouth, New Hampshire, USA; copy enclosed (6 pages).

Corie Lok; Cargo Security; MIT Technology Review; Jun. 2004; No. 107; pp. 74-75; publisher is Massachusetts Institute of Technology; Cambridge, Massachusetts, USA; copy enclosed (2 pages).

Thomas C Chen; RFID and Sensor-based Container Content Visibility and Seaport Security Monitoring system; Proceedings of SPIE, vol. 5778; pp. 151-159; Mar. 28, 2005; Publisher is SPIE—

(56) **References Cited**

OTHER PUBLICATIONS

the International Society for Optical Engineering; Bellingham, Washington, USA; copy enclosed (10 pages).

United States Department of Homeland Security; The University of Texas at Austin College of Engineering Standard Resume of Sriram Vishwanath; Case IPR2014-00714 for U.S. Pat. No. Re. 43,990; Filed Apr. 30, 2014; Washington, D.C., USA; pp. 1-21; copy enclosed (21 pages).

United States Patent and Trademark Office; Office Action from U.S. Appl. No. 11/397,118; mailed Nov. 14, 2007; Alexandria, Virginia, USA; pp. 1-12; parent U.S. Appl. No. 13/288,065 (12 pages).

United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/155,573; mailed Apr. 9, 2009; Alexandria, Virginia, USA; pp. 1-7; parent U.S. Appl. No. 13/288,065 (7 pages).

United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/155,573; mailed Jul. 30, 2009; Alexandria, Virginia, USA; pp. 1-9; parent U.S. Appl. No. 13/288,065 (9 pages).

United States Patent and Trademark Office; Notice of Allowability from U.S. Appl. No. 12/155,573; mailed Oct. 28, 2009; Alexandria, Virginia, USA; pp. 1-5; parent U.S. Appl. No. 13/288,065 (5 pages).

United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/657,356; mailed Jul. 12, 2010; Alexandria, Virginia, USA; pp. 1-14; parent U.S. Appl. No. 13/288,065 (14 pages).

United States Patent and Trademark Office; Notice of Allowability from U.S. Appl. No. 12/657,356; mailed Mar. 10, 2011; Alexandria, Virginia, USA; pp. 1-4; parent U.S. Appl. No. 13/288,065 (4 pages).

United States Patent and Trademark Office; Office Action from U.S. Appl. No. 13/065,837; mailed Jul. 18, 2011; Alexandria, Virginia, USA, pp. 1-9; parent U.S. Appl. No. 13/288,065 (4 pages).

A newspaper article of Mr. Melvin Sullivan and his family that references the date, Mar. 6, 2001; parent U.S. Appl. No. 13/288,065.

A letter of response Mr. Sullivan received from Pfeiffer & Gantt, PA, dated Sep. 16, 2002; parent U.S. Appl. No. 13/288,065.

A "Certificate of Existance" Bright Idea Inventor, LLC. Nov. 6, 2002; parent U.S. Appl. No. 13/288,065.

Operating Agreement of Bright Idea Inventor, LLC received from Pfeiffer & Gantt, PA, dated Nov. 13, 2002; parent U.S. Appl. No. 13/288,065.

A letter of response Golden received from the Honorable Congressman from Maryland, Elijah E. Cummings, dated Dec. 16, 2002; parent U.S. Appl. No. 13/288,065.

A newspaper article of Mr. Melvin Sullivan and Mr. Larry Golden, dated, Feb. 27-Mar. 5, 2003; parent U.S. Appl. No. 13/288,065.

A letter of response Golden received from the Honorable Senator from South Carolina, Ernest F. Hollings, dated May 21, 2003; parent U.S. Appl. No. 13/288,065.

A letter of response Golden received from the Office of the Vice President, Dick Cheney, dated Jun. 3, 2003; parent U.S. Appl. No. 13/288,065.

A letter of response Golden received from the Honorable Senator from South Carolina, Ernest F. Hollings, dated Oct. 1, 2003; parent U.S. Appl. No. 13/288,065.

A letter of response Golden received from the Honorable Senator from South Carolina, Lindsey O. Graham, dated Oct. 21, 2003; parent U.S. Appl. No. 13/288,065.

A letter sent to the President of the United States George W Bush, the President's Cabinet, the United States Senate and the Congressional Black Caucus, dated May 23, 2005; parent U.S. Appl. No. 13/288,065.

On Nov. 17, 2005, an "Inventor's Official Record of Invention", was filed in my name (Golden) at "The Law Office of David P. Gaudio, P.C.; the Inventors Network."; parent U.S. Appl. No. 13/288,065.

On Aug. 23, 2005, the "Disclosure Document Registration"; parent U.S. Appl. No. 13/288,065.

On Apr. 5, 2006, the "Patent Application" was filed in my name (Golden) at the United Staets Patent & Trademark Office in Washington, D.C.; parent U.S. Appl. No. 13/288,065.

On Jun. 6, 2008, the "Continuance-In-Part, (CIP) Application" was filed in my name (Golden) at the United States Patent & Trademark Office in Washington, D.C.; parent U.S. Appl. No. 13/288,065.

On Jan. 20, 2010, a "Continuation Application" (U.S. Appl. No. 12/657,356) was filed in my name (Golden) at the United States Patent & Trademark Office in Washington, D.C.; parent U.S. Appl. No. 13/288,065.

Reissue of U.S. Pat. No. 7,636,033;"Swear Back"; in accordance to Title 37—Code of Federal Regulations Patents, Trademarks, and Copyrights; Apr. 8, 2011; parent U.S. Appl. No. 13/288,065.

Reissue of U.S. Pat. No. 7,636,033; "Swearback—History of Work"; Apr. 8, 2011; parent U.S. Appl. No. 13/288,065.

United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/802,001; mailed Apr. 14, 2011; Alexandria, Virginia, USA; pp. 1-16; parent U.S. Appl. No. 13/288,065 (16 pages).

United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/802,001; mailed Oct. 20, 2011; Alexandria, Virginia, USA; pp. 1-5; parent U.S. Appl. No. 13/288,065 (5 pages).

United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/802,001; mailed May 27, 2011; Alexandria, Virginia, USA; pp. 1-14; parent U.S. Appl. No. 13/288,065 (14 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 12/802 001; copyright and mailing date Dec. 12, 2011, pp. 1-9, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 13/288,065 (9 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/065,837; copyright and mailing date Dec. 2, 2011, pp. 1-27, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 13/288,065 (27 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/065,837; copyright and mailing date Nov. 1, 2011, pp. 1-18, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 13/288,065 (18 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/199,853; copyright and mailing date Jan. 13, 2012, pp. 1-34, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 13/288,065 (34 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 12/802,001; copyright and mailing date Mar. 26, 2012, pp. 1-12, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 13/288,065 (12 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/199,853; copyright and mailing date Feb. 22, 2012, pp. 1-38, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 13/288,065 (38 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/065,837; copyright and mailing date Feb. 22, 2012, pp. 1-25, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 13/288,065 (25 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/288,065; copyright and mailing date Aug. 24, 2012, pp. 1-4, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 13/288,065 (4 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/288,065; copyright and mailing date Nov. 28, 2012, pp. 1-11, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 13/288,065 (11 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/288,065; copyright and mailing date Apr. 16, 2013, pp. 1-9, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 13/288,065 (9 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 14/021,693; copyright and mailing date Apr. 20, 2015, pp. 1-20, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 14/021,693 (20 pages).

(56) **References Cited**

OTHER PUBLICATIONS

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 14/021,693; copyright and mailing date Jan. 20, 2015, pp. 1-17, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 14/021,693 (17 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 14/021,693; copyright and mailing date Sep. 5, 2015, pp. 1-12, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 14/021,693 (12 pages).

U.S. Patent Mar. 7, 2017 Sheet 1 of 13 US 9,589,439 B2

INTERNET CONNECTION
GPS CONNECTION
POWER SOURCE
32
34
36
10
22
44
58
62
64
66
56
26
12
28
52
48
46
54
50

Fig. 1

Fig. 2

SAppx184

U.S. Patent Mar. 7, 2017 Sheet 2 of 13 US 9,589,439 B2

14
60
58
56

Fig. 3a

14
60
58
56

Fig. 3b

SAppx185



U.S. Patent Mar. 7, 2017 Sheet 3 of 13 US 9,589,439 B2

14
16
12
44
44

Fig. 4

14
12
42
112
42
16
12
12
42
12
POWER SOURCE
114

Fig. 5

SAppx186

U.S. Patent Mar. 7, 2017 Sheet 4 of 13 US 9,589,439 B2

18
12
44
12
44
12
44
20
112
POWER SOURCE
114
68
70
72
56

Fig. 6

Fig. 7

SAppx187



Fig. 8



32
INTERNET CONNECTION
34
GPS CONNECTION
36
POWER SOURCE
10
22
42
58
64
62
66
44
26
56
44
12
28
52
48
52
46
54
46
54
50
46

Fig. 9

U.S. Patent Mar. 7, 2017 Sheet 7 of 13 US 9,589,439 B2

38
22
12
26
30
26
32
34
36
38
24

Fig. 10

76
AGENT DETECTED?
NO
YES
80
SOUND ALARM
82
LIGHT ALARM
74
40
CPU
84
READINGS
86
RESET
78
SENSING MODE
STOP

Fig. 11

SAppx190



76
AGENT DETECTED?
NO
88
YES
82
LIGHT ALARM
80
SOUND ALARM
84
READINGS
90
DETECTOR RESET
78
SENSING MODE
STOP
76
46
DETECTOR
40
12
CASE
92
94
LOCK/DISABLE LOCK SIGNAL
96
DISARM AND RESET
98
DETECTION MODE

Fig. 12

Fig. 13



46
DETECTOR
100
40
12
CASE
DISABLER
62
102
AUTHORIZED FINGERPRINT?
NO
YES
104
DISABLE AND DISARM
ACCESS DENIED
RESET
106
101
DETECTION MODE
108
110
112
WATCHTOWER
116
DETECTION MODE
118
NO
AGENT DETECTED?
YES
LIGHT ALARM INDICATOR
42
114
MONITORING TERMINAL
120
LOCK/DISABLE SIGNAL
122
CLEANUP MEASURES
124
RESET
116
DETECTION MODE

Fig. 14

Fig. 15



Fig. 16



152
158
154
156
170
INTERNET CONNECTION
172
GPS CONNECTION
POWER SOURCE
174
150
164
160
186
168
166
162
176
184
178
180
182

Fig. 17

U.S. Patent Mar. 7, 2017 Sheet 12 of 13 US 9,589,439 B2

204
187a
208
187b
210
206
214
212
190
216
208
202
196
194
200
198
192
138
188

Fig. 18

SAppx195



204
220
187a
187b
218
224
190
222
202
196
194
200
198
192
138
188

Fig. 19

# MULTI SENSOR DETECTION, STALL TO STOP AND LOCK DISABLING SYSTEM

This application is a continuation application and claims the filing date and benefit of U.S. patent application Ser. No. 14/021,693 titled "Multi Sensor Detection, Stall to Stop and Lock Disabling System" filed on Sep. 9, 2013 that issued on Aug. 4, 2015 as U.S. Pat. No. 9,096,189, the entire contents of which are incorporated by reference herein in their entirety for all purposes. U.S. Pat. No. 9,096,189 is a continuation application and claims the filing date and benefit of U.S. patent application Ser. No. 13/288,065 titled "Multi Sensor Detection, Stall to Stop and Lock Disabling System" filed on Nov. 3, 2011 and that issued on Sep. 10, 2013 as U.S. Pat. No. 8,531,280, the entire contents of which are incorporated by reference herein in their entirety for all purposes. U.S. patent application Ser. No. 13/288,065 that will issue as U.S. Pat. No. 8,531,280 is a divisional application and claims the filing date and benefit of U.S. patent application Ser. No. 12/802,001 titled "Multi Sensor Detection, Stall to Stop, and Lock Disabling System" filed on May 27, 2010, now U.S. Pat. No. 8,334,761, the entire contents and complete subject matter of which are incorporated by reference herein in their entirety for all purposes. U.S. patent application Ser. No. 12/802,001 is a continuation application and claims the filing date and benefit of U.S. patent application Ser. No. 12/657,356 titled "Multi Sensor Detection, Stall to Stop and Lock Disabling System" filed on Jan. 20, 2010, now U.S. Pat. No. 8,106,752 and incorporates the entire contents and complete subject matter therein by reference in their entirety for all purposes. U.S. Pat. No. 8,106,752 is a continuation of and claims priority to U.S. Pat. No. 7,636,033. U.S. Pat. No. 7,636,033 is a continuation-in-part of and claims priority to U.S. Pat. No. 7,385,497. U.S. patent application Ser. No. 13/288,065 that issued as U.S. Pat. No. 8,531,280 also claims the filing date and benefit of and incorporates the entire contents of U.S. patent application Ser. No. 12/657,356, now U.S. Pat. No. 8,106,752 herein by reference for all purposes. The present application also claims the filing date and benefit of and incorporates the entire contents of U.S. Pat. Nos. 8,531,280; 8,334,761; 8,106,752; 7,636,033; and 7,385,497 by reference herein in their entireties for all purposes.

## FIELD OF THE INVENTION

The present invention pertains to anti-terrorist detection and prevention systems, and more particularly pertains to a disabling lock mechanism combined with a chemical/biological/radiological detection system for use with products grouped together by similar characteristics in order to prevent unauthorized entry, contamination and terrorist activity.

## BACKGROUND OF THE INVENTION

Terrorist activity is a continuous, daily, worldwide threat to the stability, prosperity, security and peace within nations and between and among nations. Its danger lies in its arbitrary destructiveness as much as in its unpredictability, and the constant threat of terrorist activity compels measures and actions that cause strain and contention in free, democratic societies as security concerns and civil liberty concerns must be balanced so that both public safety and civil liberties are maintained. Safety and security concerns can be addressed through numerous proactive steps and measures, many of which cause only minimal interference with and disruption of the daily routines of work, travel, commerce and entertainment. However, because modern industrial societies afford almost limitless places, locations, and opportunities for terrorist activities, no safety measure or security protocol will be foolproof, but many security measures, systems and protocols can be implemented that greatly minimize specific threats through fingerprint identification procedures, chemical, biological, and radiological hazard detections, bomb and explosive detection, and controlling the access to everything from shipping containers to school lockers. Thus, the prior art discloses a wide range of security measures and systems.

For example, the Fishbine et al. patent (U.S. Pat. No. 4,792,226) discloses an optical fingerprinting system that includes an optics/processor unit, a video monitor, a data terminal, and a printer for collecting and storing data characteristics of all ten individual fingerprints for printing demographic information and fingerprint images as desired on a standard booking or applicant card.

The Schiller patent (U.S. Pat. No. 4,544,267) discloses a finger identification unit that includes a fingerprint scanning apparatus using a collimated beam of light to interrogate the fingerprint of a finger placed against a platen so that successive scan positions produce signals containing fingerprint information.

The Fishbine et al, patent (U.S. Pat. No. 5,222,152) discloses a portable fingerprint scanning apparatus for optically scanning and recording fingerprint images and wirelessly transmitting such images to a mobile processing unit for verification and background checking.

The Lougheed at al. patent (U.S. Pat. No. 5,233,404) discloses an optical scanning apparatus that uses a linear charge coupled device (CCD) for recording the image of a fingerprint on the viewing surface.

The Groger et al. patent (U.S. Pat. No. 5,766,956) discloses a diode laser based sensor for undertaking optical, chemical, immunological or nucleic acid-based assay or other chemical analysis.

The Feldman patent (U.S. Pat. No. 5,938,706) discloses a multi element security system for preventing the unauthorized use of an automotive vehicle, and which includes numerous locking and control features interconnected to an onboard cpu.

The Bowker et al. patent (U.S. Pat. No. 5,963,657) discloses a safety access control for doors, handles, locks, etc., wherein the surface relief of a finger is read and verified to either allow or prevent access by the individual to the door, handle, lock, etc.

The Bonder et al. patent (U.S. Pat. No. 6,078,265) discloses a fingerprint identification security system wherein a key lock operated security system utilizes the fingerprint of the individual to control user access to the security system, such as the ignition system of an automotive vehicle.

The Anzai et al. patent (U.S. Pat. No. 6,271,745 B1) discloses a keyless authorization system for use of a motor vehicle that includes fingerprint reading units located on the exterior or interior of the motor vehicle and which is coupled to a control unit for scanning, comparing and matching fingerprints to allow or disallow access to the motor vehicle.

The Hwang patent (U.S. Pat. No. 6,374,652 B1) discloses a fingerprint-activated doorknob in which a detecting sensor for a fingerprint is placed on the doorknob for measuring and searching the fingerprint against previously stored fingerprint inputs to control access to the door.

The Vor Keller et al. patent (U.S. Pat. No. 6,588,635 B2) discloses a safety holster for a firearm that includes a pivotally mounted retaining member and a fingerprint sensor

for scanning fingerprint information so that only authorized users can withdraw the firearm from the holster.

The Cordery et al. patent (U.S. Pat. No. 6,613,571 B2) discloses a method and system for detecting biological and chemical hazards in the mail that includes sensors placed within the mail box for sampling and testing ambient air and so that mail can be safely transported through the mail system.

The Nagata patent (U.S. Pat. No. 6,628,213 B2) discloses a coding method for digital signal coding and decoding that includes a CMI (code-marked inversion) method of signal coding.

Nonetheless, despite the ingenuity of the above devices, methods, and systems, there remains a need for a multi-detector and disabling lock system for use with various types of products collected together by common characteristics into product groupings for detecting chemical, biological and radiological agents and compounds and for selectively disabling and activating the product locks thereby preventing unauthorized entry and further contamination and preventing and thwarting terrorist activities.

## SUMMARY OF THE INVENTION

The present invention comprehends a chemical/biological/radiological detector unit with a disabling locking system for protecting products that can be grouped into several product groupings, from terrorist activity, and also for preventing unauthorized access to and tampering with the storage and transport of ordnance and weapons. The products grouped into what may be referred to as Product grouping 1 include, but are not limited to, cargo containers, shipping containers, tractor trailers, snail carriers, mail boxes and lockers; while the products grouped into what may be referred to as Product grouping 2 include, but are not limited to, chemical, biological, radiological, and nuclear detectors, motion sensors and door sensors. The multi sensor detection system includes the capability to disable an existing lock or activate a lock located inside any of the products named in the product grouping categories upon activation of a sensor or detector included in the system. This is a significant feature for the multi sensor detection system as it prevents unauthorized, unequipped and untrained entry and access to the product thus preventing further contamination of the site and to individuals in the area.

The multi sensor detection and lock disabling system includes a detector case sized to fit in, upon or adjacent any of the aforedescribed products for detecting harmful and dangerous chemical, biological, and radiological agents, compounds and elements. In addition, the multi sensor detection and lock disabling system is capable of transmitting a signal to lock or disable a lock on the product, and is also capable of transmitting signals to a monitoring computer terminal or PC so that appropriate defensive and safeguarding actions can be undertaken and an authorized individual can disarm and reset the locking system and the multi sensor detection system. The detector case includes a power source (battery or electrical), interior compartments, Internet and GPS connections and a cpu interconnected with the Internet and GPS connections, and also interconnected with one or more off site monitoring computer terminals or PCs. The detector case includes one or more light alarm indicators that are externally visible and that light up when the chemical, biological, or radiological agent or compound is detected, and the light alarm indicators (which can be indicator lights or panels on the front of the detector case) can be color coded for denoting the specific agent or compound detected, i.e., separate and distinct colors for indicating detection of the chemical, biological, or radiological agent or compound.

The detector case is designed to hold within the interior compartments one or more interchangeable detectors, and each detector is adapted and set up to sample a specific compound or agent. Each detector includes a sound alarm, a sensor, a light alarm, and a readings panel, and is electrically interconnected (either by wire or wirelessly) to the cpu of the detector case so that information regarding the detection of the particular agent or compound can be conveyed from the detectors to the detector case cpu. Each detector can also be used as a manual, stand-alone hand held scanner.

The multi sensor detection and lock disabling system can be interconnected to a surveillance watchtower, as well as monitoring computer terminals or PCs, with the watchtower scanning shipping and cargo crates and containers being prepared for shipment or sitting for extended periods of time on a dock or at a port, at a railway site, or at an industrial storage facility. The watchtower will scan the cargo and shipping crates and containers for the light alarm indicators on detector cases that are mounted in or upon the crates and containers, and thus continuous security surveillance of the crates and containers can be maintained.

An enhanced version of the multi sensor detection and lock disabling system can be employed to prevent car and vehicle bombings. Coupling the multi sensor detection and lock disabling system with satellite service will enable the detection system to detect explosives and transmit an alert signal by satellite to monitoring equipment at a monitoring site. Upon receiving the alert signal at the monitoring site the monitoring equipment activates a stall-to-stop process for disabling the air, fuel, electrical and/or computer system of the vehicle. Moreover, upon receiving the alert signal at the monitoring site the car or vehicle will be locked by transmission of a satellite signal that disables the vehicle's electrical and ignition system thereby preventing escape of the terrorist.

It is an objective of the present invention to provide a multi sensor detection and disabling lock system for securing news racks and vending machines in order to prevent theft, unauthorized use and terrorist activity.

It is another objective of the present invention to provide a multi sensor detection and disabling lock system for preventing terrorist activity by using products grouped together by common features in several product groupings such as design similarity, similarity in the presentation of security problems and similarity with regard to the presentation of solutions to preventing terrorist solutions.

It is still yet another objective of the present invention to provide a multi sensor detection and disabling lock system that is capable of disabling an existing lock or activating a lock inside any of the products of the product grouping lists when a detector or sensor of the system is activated.

It is still yet a further objective of the present invention to provide a multi sensor detection and disabling lock system wherein the disabling lock system prevents the unauthorized entry, access and further contamination of the products included in the several product groupings.

A still further objective of the present invention is to provide a multi sensor detection and lock disabling system that utilizes a multi-task device for preventing terrorist activity to vulnerable products that are collected or arranged by product grouping categories.

Yet a further objective of the present invention is to provide a multi sensor detection and disabling lock system

to secure cargos and containers, especially cargo and shipping containers, against chemical, biological, radiological and nuclear terrorist activity.

Still another objective of the present invention is to provide a multi sensor detection and disabling lock system capable of detecting chemical, biological and radiological agents and compounds.

Still yet another objective of the present invention is to provide a multi sensor detection and disabling lock system that includes interchangeable detectors that operate in conjunction to detect chemical, biological and radiological agents and compounds.

Still yet a further objective of the present invention is to provide a multi sensor detection and disabling lock system that can be implemented by business or government at a minimum cost by organizing the products to be protected into product grouping categories.

Another objective of the present invention is to provide a multi sensor detection and disabling lock system that accurately and reliably detects harmful agents, compounds and elements, and prevents the placement and storage of weapons and bombs in the range of storage containers and facilities currently available.

Still, another objective of the present invention is to provide a multi sensor detection and disabling lock system wherein the interchangeable detectors that comprise part of the system can be used as stand-alone scanners.

These and other objects, features, and advantages will become apparent to those skilled in the art upon a perusal of the following detailed description read in conjunction with the accompanying drawing figures and appended claims.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the primary features of the system which include a detector case, several interchangeable detectors, an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler;

FIG. **2** is a front elevation view of the multi sensor detection and lock disabling system of the present invention illustrating one of the interchangeable detectors first shown in FIG. **1**;

FIG. **3***a* is a top plan view of the multi sensor detection and lock disabling system of the present invention illustrating the mounting of one lock disabler to the lock of a product, such as a container, and disengaged from the lock of the container;

FIG. **3***b* is a top plan view of the multi sensor detection and lock disabling system of the present invention illustrating the engagement of the lock disabler to the lock of the product for locking or disabling the lock of the product so that unauthorized access is prevented;

FIG. **4** is a side elevation view of the multi sensor detection and lock disabling system of the present invention illustrating the detector case mounted to the product, such as the container, with the light alarm indicators externally visible;

FIG. **5** is a schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the interconnection of detector cases with a surveillance watchtower and a monitoring PC terminal;

FIG. **6** is a schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the placement of detector cases upon containers different from the containers of FIG. **5**, and wherein the detectors case are interconnected to a surveillance watchtower and a monitoring PC terminal;

FIG. **7** is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the mounting of one automatic/mechanical lock disabler to the lock of a standalone news rack;

FIG. **8** is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating one interchangeable detector placed within the standalone news rack;

FIG. **9** is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the detector case having color coded front panels for specifically indicating the agents, compounds or elements that have been detected;

FIG. **10** is a rear elevation view of the multi sensor detection and lock disabling system of the present invention illustrating the GPS, Internet and power source connections;

FIG. **11** is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the interconnection of the detector with the detector case and the steps undertaken by the system when an agent or compound is detected;

FIG. **12** is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the sequence of steps undertaken by one detector when functioning as a standalone scanner for detecting an agent or compound;

FIG. **13** is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the interconnection of the detector case with the automatic/mechanical lock disabler for activating the lock disabler upon detection by the system of an agent or compound;

FIG. **14** is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating interconnection of the detector case with the fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock as part of the process of detection and safeguarding the public upon detection of the agent or compound;

FIG. **15** is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the incorporation of the system with a surveillance watchtower and a monitoring PC or computer terminal for monitoring containers, such as shipping or cargo containers, that may sit for extended time periods on docks, at rail yards, and at industrial storage facilities;

FIG. **16** is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the integration of the detection system with a satellite and monitoring equipment at a monitoring site for detecting explosives placed in a vehicle and then transmitting signals to the satellite and then to the monitoring site for disabling and locking the vehicle;

FIG. **17** is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the incorporation of the features and elements of the detector case to a cell phone and cell phone case;

FIG. **18** is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the incorporation of a OPS satellite, a monitoring site and a cell phone tower for communicating to and with an electronic device such as a laptop computer or a cell phone

for transmitting signals to a vehicle for activating an onboard stall-to-stop device for bringing the vehicle to a halt; and

FIG. 19 is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the use of a GPS satellite in conjunction with the monitoring site and monitoring equipment to relay commands and signals to the cpu or transceiver of the vehicle for stopping or locking the vehicle in response to a signal that a certain type of event (detection of a bomb, engine failure or malfunction or unauthorized use) has occurred or is in process

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

Illustrated in FIGS. **1-19** is a multi sensor detection and lock disabling system **10** for preventing terrorist activity by monitoring, detecting, and securing those critical areas, sites, and facilities vulnerable to terrorist activity. The first step is the identification of critical areas, sites, locations and facilities that are vulnerable to terrorist activity as convenient places to store and plant explosives and bombs and spread biological, chemical or radiological agents and compounds, followed by the disposition of the multi sensor detection and lock disabling system **10** for monitoring, detecting, and securing the particular location or site. Vulnerable sites, locations, facilities and areas are nearly limitless in their variety; in order to categorize the protection the present invention provides an anti-terrorist product grouping strategy has been developed wherein products made from the same or similar material, products having the same or similar design, and products presenting the same or similar security problems are grouped together with the multi sensor detection and lock disabling system **10** for preventing terrorist activity. For example, two preferred product groupings can be Product Grouping I: cargo containers, shipping containers, cargo planes, freight train cars, tractor trailers, mail carriers (UPS, FedEx), airport lockers, news racks (coin and non-coin operated), mail drop boxes, cluster mail boxes, keyed mail boxes, min-storage houses and buildings, bicycle lockers, stadium lockers, school lockers, cars, trucks, campers, buses, vans and utility vehicles. Product Grouping II: chemical detectors, biological detectors, radiological detectors, nuclear detectors, motion sensors, glass break sensors, plastic film on glass, high security locks, tampering labels, door sensors, disabling locking systems, vehicle detectors and satellite disabling locking systems. In addition to grouping products together by features, designs and materials, the multi sensor detection system **10** includes a lock disabling capability for disabling an existing lock or activating a lock on or inside any of the aforementioned products when a detector or sensor of the system is activated. The lock disabling feature is a crucial component of the invention in so far as it prevents unauthorized, unequipped or untrained individuals from gaining access and entry to the site and causing further contamination of the site.

As shown in FIGS. **1-10**, the multi sensor detection and lock disabling system **10** includes at least one—and preferably many—detector case **12** that can be placed in, on, upon or adjacent the product, such as the shipping containers **14** of FIGS. **4** and **5** resting upon a platform **16** or the cargo container **18** of FIG. **6** sitting upon a seaport dock or pier **20**. The detector case **12** includes a top **22**, a bottom **24**, a pair of opposed sides **26** and a front side or panel **28** and an opposite rear or back side **30**. The rear side **30** has connections or contacts that can include an Internet connection **32**, a GPS connection **34** and a power connection **36** for a power source. The power source for the detector system **10** can be any conventional battery or electrical source. The detector case **12** includes an interior chamber divided into a number of compartments **38** for holding therein agent or compound detection means hereinafter further described. A cpu **40** is mounted within the detector case **12** and electrically interconnects, routes, and transmits signals among items hereinafter further described and also communicates with a monitoring site and monitoring equipment. The front side **28** of the detector case **12** includes indicator means for visually indicating that a specific agent, compound or element has been detected. The indicator means can include color coded indicator lights **42** in panel form, as shown in FIG. **9**, with each indicator light panel **42** lighting up with a specific color corresponding to the detection of a specific agent or compound; or color coded indicator lights **44**, as shown FIG. **1**, that correspond to and individually light up on the detection of a specific agent or compound (chemical, biological, or radiological).

As shown in FIGS. **1**, **2** and **9-13**, the multi sensor detection and lock disabling system **10** includes a plurality of detectors **46** with each detector **46** adapted for and set up to sample for a specific agent or compound (biological, chemical, or radiological); and the detectors **46** are interchangeable for adapting to the needs and demands of future technology. The detectors **46** can also be used as standalone scanners. In the preferred embodiment of the invention, at least three detectors **46** are placed within the detector case **12** with one detector **46** for specifically sampling biological agents or compounds, one detector **46** for sampling chemical agents or compounds, and one detector **46** for sampling radiological agents or compounds. The detectors **46** are interconnected to the cpu **40** of the detection system **10** by conventional connections that can be wire or wireless for transmitting the appropriate signals to the cpu **40** upon detection of the particular agent or compound. As shown in FIG. **2**, each detector **46** includes on its front plate or facing surface a sound alarm indicator **48**, a readings panel **50** comprising a plastic shield and LED lights for displaying the various read-out messages, a sensor **52** for detecting the specific agent, element or compound, and a light alarm indicator **54** that can be color coded for each specific agent and which is externally visible when the detector **46** is used as a stand alone scanner. Each detector **46** includes a conventional microprocessor for controlling the various functions and generating the appropriate signals for transmission to the cpu **40** of the detector case **12**.

As shown in FIGS. **1**, **3***a*, **3***b*, **9**, and **13-15**, used in conjunction with the multi sensor detection and lock disabling system **10** is at least one automatic/mechanical lock disabler **56**—and depending upon the number of products being monitored there can be one lock disabler **56** for each product. The automatic/mechanical lock disabler **56** is physically connected to the detector case **12** by a wire or cable **58** for receiving signals therefrom for disabling an existing lock or activating a lock inside a product to prevent access to the product. By way of example, FIG. **3***a* shows the automatic/mechanical lock disabler **56** mounted—by any conventional means—to the lock **60** of the shipping container **14** shown in FIGS. **4** and **5** and connected by wire **58** to the cpu **40** of the detector case **12**. The lock disabler **56** is in the non-activated or disengaged state in FIG. **3***a*. FIG. **3***b* shows the automatic/mechanical lock disabler **56** mounted to the lock **60** of the shipping container **14** and in the activated or engaged state after detection of an agent or compound by the system **10** thereby for locking or disabling

the lock **60** of the shipping container **14** and preventing unauthorized entry and access by unauthorized, untrained and unequipped individuals. In FIGS. **3***a* and **3***b* the lock **60** secures doors of the shipping container **14** that can be slidably or pivotably opened and closed.

In addition to the automatic/mechanical lock disabler **56**, the multi sensor detection and lock disabling system **10** can also utilize a fingerprint biometric lock with disabler **62** as shown in FIGS. **1** and **14**. The fingerprint biometric lock with disabler **62** is interconnected to the cpu **40** of the detector case **12** for receiving transmissions therefrom after detection of an agent or compound has occurred so that the lock on the product can be locked or disabled. Moreover, resetting of the fingerprint biometric lock with disabler **62** occurs when the fingerprint of the individual is placed on the fingerprint-matching pad **64**, and if a match occurs with a known fingerprint stored by the cpu **40**, then the individual can reset the fingerprint biometric lock with disabler **56** by turning the manual lock disabler **66**. The fingerprint biometric lock with disabler **62** is mounted to the lock of the product in a manner similar to the mounting of the automatic/mechanical lock disabler **56** that is shown in FIGS. **3** and **3***b*.

FIGS. **4** and **5** show one manner of disposition or placement of the detector case **12** in relation to the product, i.e., the shipping container **14**, with the color coded indicator lights **42** externally viewable; FIG. **5** shows a number of shipping containers **14** each equipped with a detector case **12** and integrated with elements hereinafter further described for continuously monitoring the shipping containers **14** as they sit for an extended period of time on the truck or rail platform **16**. FIG. **6** illustrates several cargo containers **18** sitting on the shipping dock or pier **20**, with each cargo container **18** having a detector case **12** mounted thereon and integrated with and monitored by elements shown in FIG. **5** and hereinafter further described.

FIG. **7** illustrates a typical product from product grouping **1** that is monitored by the multi sensor detection and lock disabling system **10** of the present invention; specifically, FIG. **7** shows a news rack **68** with one automatic/mechanical lock disabler **56** mounted to and interconnected with the locking mechanism of the news rack **68**. As long as there is no detection of any agent or compound, the lock disabler **56** is in the disengaged state, and the individual can deposit the coin amount in the chute and then freely open the glass panel **70** by the handle **72** for removing a paper. However, the lock disabler **56** would be activated upon detection of the harmful agent or compound and receipt of a signal from the cpu **40** for locking or disabling the locking mechanism thereby denying access to the interior of the news rack **68** from all untrained, unauthorized and unequipped individuals.

FIG. **8** illustrates one detector **46** disposed within the news rack **68** and which is visible through the panel **70** for detecting one specific agent, compound or element. The detector **46** functions as a stand-alone scanner and can be wirelessly interconnected to offsite monitoring equipment.

FIG. **11** illustrates a representative schematic **74** for describing the signal transmission process from the detector **46** to the cpu **40** of the detector case **12**. The external stimulus **76** would be the chemical, biological or radiological agent or compound. If there is no detection of the agent or compound, the detector **46** will stay in the sensing mode **78**. However, detection of the specific agent will trigger the sound alarm **80** and the light alarm **82**, and instant transmittal of a signal to the cpu **40**. The readings **84** can be stored by the cpu **40** for verification and future review and evaluation. After all the appropriate corrective and preventative measures have been undertaken by the trained and authorized personal, and the site has been cleansed of the contamination, authorized and equipped personal can then reset **86** the system **10**.

FIG. **12** illustrates a representative schematic **88** for the detector **46** when used as stand-alone scanner. The detector **46** undergoes the same essential steps as illustrated in FIG. **11**, with the exception of the signal transmission to the cpu **40**. The detector **46** remains in detection mode **78** until an agent is detected, and then the various functions—light alarm **82**, sound alarm **80**, storage of readings **84**, and, after the appropriate security and safety steps have been carried out by authorized personal, detector reset **90** by authorized personal can occur thereby placing the detector **46** back in detection or sensing mode **78**.

FIG. **13** is a representative schematic **92** that illustrates the steps undertaken by the system **10** to lock or disable a lock, such as the lock **60** for the shipping container **14** shown in FIGS. **3***a* and **3***b*. Upon detection of the agent (chemical, biological, radiological) the alarm light indicators **42** or **44** will light up providing external indication that an agent has been detected. In addition, the system **10**—the cpu **40**—will transmit a lock/disable lock signal **94** to the automatic/mechanical lock disabler **56** to lock or disable the lock on the product, such as the lock **60** on the shipping container **14** of FIGS. **3***a*-**5**. This prevents unauthorized, unequipped, or untrained individuals from entering or gaining access to the product for which a dangerous and perhaps lethal agent has been detected. After the proper authorities and authorized personal have been notified and all the appropriate security, preventative and clean up measures have been undertaken, the authorized individual can perform the disarm and reset function **96** for the system **10** placing the system **10** in back in the detection mode **98**.

FIG. **14** is a representative schematic **100** illustrating the use of the fingerprint biometric lock with disabler **62** with the system **10**. Upon detection of the agent or compound by the detector, the various alarms would sound and light up (shown in previous figures), and the cpu **40** would then transmit a signal to the fingerprint biometric lock, with disabler **62** to lock or disable the lock on the product, such as the lock **60** on the shipping containers **14** shown in FIGS. **3***a*-**5**. The shipping containers **60** would remain locked and in an access denied mode **101** should an attempt be made to gain access to the container **60** by opening the lock **60** with an unauthorized fingerprint. However, a fingerprint that matches stored and authorized fingerprints **102** would indicate an authorized individual, and would allow the individual to disable and disarm **104** the lock **60** of the shipping container **14**. The fingerprint biometric lock with disabler **62** would then be reset **106** after the appropriate safety, cleanup, and protection measures are completed, and the system **10** would be reset and placed back in the detection mode **108**.

FIG. **15** is a schematic representation **110** that illustrates the integration of a surveillance watchtower **112** and a monitoring terminal or PC **114** for monitoring products such as the shipping containers **14** or cargo containers **16** that sit for extended periods of time of docks, piers **20**, truck terminals, rail yards, shipping platforms **16** and industrial sites as shown in FIGS. **5** and **6**. The watchtower **112** would maintain continuous surveillance over a number of shipping containers **60**, for example, with detector cases **12** mounted in or on each container **14** and set in detection mode **116** with one or more detectors **46** disposed in each detector case **12**. The watchtower **112** would continuously scan for light alarm indicators **42** and **44** on the products, such as the containers **14** or **18**, and the watchtower **112** would be interconnected

and integrated with the monitoring terminal or PC **114**. Upon detection **118** of an agent or compound in one or more of the shipping containers **14**, the appropriate light alarm indicators **42** or **44** would light providing visible confirmation of the detection of the specific agent or compound. The cpu **40** would transmit a lock/disable signal **120** to the lock **60** on each respective shipping container **14** to lock or disable the lock **60** thus preventing access to that respective shipping container **14**. In addition, signal transmissions would be sent to the monitoring terminal or PC **114** (which could be off site) thereby alerting authorized security personal of the contamination event. With the information received at the monitoring terminal **114**, authorized personal would then be notified and dispatched to the area to undertake the appropriate safety and cleanup measures **122**. Such measures would also include disarming the lock disabling system in order to gain access to the shipping container **14**. After all the cleanup and security measures are completed by the trained and properly equipped authorities, the detection system and the lock disabling feature would reset **124** and the detection system would again be placed in detection mode **116**.

FIG. **16** is a schematic representation **126** that illustrates an enhanced version of the multi sensor detection and lock disabling system **10** for preventing car and vehicle attacks and bombings. The lock disabling system **10** would be interconnected to the locking system and mechanism **128** of the vehicle **130**. In addition, a stall to stop disabling link **132** can be made with the fuel, air, and electrical system **134** of the vehicle **130**. The enhanced version incorporates a satellite **136** for signal receipt and transmission from the vehicle **130** in which the detector system **10** is placed to a monitoring site and monitoring equipment **138**. As shown in FIG. **16**, a detection signal **140** would be sent to the satellite **136** by the detection system **10** upon detection of a bomb or explosive **142** hidden in the vehicle **130**. The satellite **136** would then transmit an alert signal **144** to the monitoring site **138** with the signal **144** containing the relevant data to evaluate the nature of the threat. The monitoring site **138** would then transmit a stall to stop signal **146** to the detection system **10** to lock the vehicle **130** and/or disable the electrical system of the vehicle **130** thereby disabling the vehicle **130**, preventing access to the vehicle **130** by locking the vehicle **130**, and preventing any terrorist in the vehicle **130** from escaping.

The detector case **12** can be modified and adapted for inclusion with cell phone cases, satellite cell phone cases, laptop cases, notebook PC cases, PDA cases, carry-on cases, suitcases, and briefcases. In addition, the basic monitoring terminal or PC **114**, as shown in FIGS. **5** and **15**, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring.

The system **10** and the watchtower **112**, along with the satellite **136** and the monitoring site **138** can be adapted or incorporated with cell phone towers and satellites for use with satellite communication and/or a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu **40**, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween. The aforementioned telecommunication and radio communication means can be interactive with any type of motive vehicle that includes but is not limited to cars, trucks, vans, SUVs, trains, subways, boats, ships and airplanes, and which is reported stolen, experiences a loss of brakes, or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted to the vehicle and which detection causes an automatic signal transmission or a signal transmission is activated when a call is made to the monitoring station by an authorized person. The authorized individual includes but is not limited to the owner, pilot, conductor, captain, police highway patrol, security guard and military personnel to the monitoring equipment for activating a vehicle slowdown or stall-to-stop disabling system that similar to the disabling system **126** shown in FIG. **16**, or incorporating features of the system **126** shown in FIG. **16**, from the monitoring equipment to the vehicle. The activation of the stall-to-stop disabling means or the vehicle slowdown disables or engages the computer, electrical, fuel and air systems of the vehicle or a combination of the computer, electrical, fuel and air systems that include but are not limited to the brakes, foot peddle, lights, speed controls, ignition, steering, transmission, and the horsepower of the motor.

In addition, the basic stall-to-stop disabling means or the vehicle slowdown means and device can be adapted, modified or designed to include: an open bust or open platform for integrating any new and innovative technology; warning lights indicators; sound alarm indicators; voice alarm indicators; a cell phone to transmit to the vehicle a signal for slowing and halting the vehicle; and a lock disabling system or means to lock a thief or terrorist inside the vehicle after a transmission is received or sent. Open bust or open platform also refers to the compatibility of the detector case **12**, or the incorporation of its features in cell phone cases, satellite cell phone cases, laptop cases, notebook PC cases, PDA cases, carry-on cases, briefcases, and suitcases, etc., with other communication, transmission and surveillance systems whereupon the detector case **12**, and its features, can be seamlessly integrated with other new and emerging systems and technologies.

Thus, as shown more specifically in FIG. **17**, by way of a representative example the features and elements of the detector case **12** are shown as being incorporated into cell phone detector case **150** and associated cell phone monitor **152**. The cell phone monitor **152** includes the standard keypad functions **154** and more specialized system use (ring tone, email, photos, texting) functions **156** as well as a viewing screen **158**. The cell phone detector case **150** includes a recharging cradle or seat **160**, a front side **162**, a top **164**, a bottom **166**, and a pair of opposed sides **168**. At the back of the cell phone detector case **150** are connections, contacts, and ports for at least an Internet connection **170**, a GPS connection **172**, and a contact, plug, or port for a power source **174**. The power source for the cell phone detector case **150** can be any conventional rechargeable battery source or standard electrical power from a standard electrical receptacle or outlet.

As shown in FIG. **17**, the cell phone detector case **150** includes one or more sensor/detector units, cells, or components **176** built into and incorporated into the case **150**. The detector **176** includes generally disposed at the front **162** of the case **150** the following types of indicators: a sound alarm indicator **178**, a readings panel **180**, a sensor **182** for detecting one or more specific types of agents, elements, chemicals, compounds, etc., and a light alarm indicator **184**. The sensor/detector **176** will be interconnected to the power source **174**. In addition, mounted on and externally visible on the sides **168** or front **162** of the case **150** are a plurality of color coded indicator lights **186** with each light **186** corresponding to a specific agent, element, chemical, compound, etc., and lighting up when that agent

is detected by the sensor/detector **176**. The color coded indicator lights **186** will be electrically interconnected to the sensor/detectors **176** via any standard microprocessor. The cell phone detector case **150** and cell phone monitor **152** thus comprise a hand-held, easily portable and transportable detection means that is both effective and unobtrusive in its disposition and use.

FIGS. **18** and **19** illustrate representative examples of the integration of portable electronic communication or telecommunication devices such as a cell phone **187***a* and/or a laptop computer **187***b* with the monitoring equipment **138** located at a predesignated monitoring site **188**, and operating in conjunction with either a satellite and/or a cell phone tower **190** to transmit and receive signals and commands among each other and to a vehicle **192**, such as a truck, as part of a stall-to-stop disabling system for slowing and stopping the vehicle **192** and locking a thief, terrorist, or unauthorized individual in the vehicle **192** if needed. A wide range of events can trigger and initiate the stall-to-stop system and the locking or lock disabling system and mechanism, and the event doesn't have to be limited to the detection of a bomb or a chemical, biological, or radiological agent, element, or compound. The events can include, but is not limited to, detection of an engine problem to engine failure to the unauthorized use (stealing) of the vehicle **192**. The vehicle **192** includes an electromotive system **194** that comprises, among other components, an onboard computer(s), electrical, fuel and air systems, as well as brakes, ignition, steering, and transmission. Also integrated with and capable of communicating with the vehicle's **192** electromotive system **194** is a stall-to-stop system while a lock disabling mechanism **196** is able to engage and disengage or disable the vehicle's **192** locking mechanism **198** upon receipt of the appropriate commands via a lock disabling communication channel or link **200**. This link **200** can also accommodate the stall-to-stop system commands and signals, and thus is a multi-channel communication link. A CPU or a transceiver **202** is programmed to receive signals from the cell phone tower **190** and/or to a GPS satellite **204** and is interconnected with the stall-to-stop system and the lock disabling system **196** via link **200** for engaging the electromotive system **194** and actuating the lock disabling system **196** to stop the vehicle **192** and lock inside the vehicle **192** anyone such as a thief, terrorist or other unauthorized individual.

A representative example for stopping, disabling, and locking the vehicle **192** that utilizes the cell phone tower **190** wherein the activation and/or distress signal **206** originates from the cell phone **187***a* or the laptop **187***b* and such activation signal **206** travels to the cell phone tower **190** that is nearest the current location of the vehicle **192**. A signal **208** is then transmitted to the monitoring site **188** and specific monitoring equipment **138** that can also include but is not limited to cell phones, laptops, desktop PC's, notebook PC's and LCD monitors. The monitoring site **138** then communicates by signal **210** to the GPS satellite **204** that an original or activation signal has been received and then the GPS satellite **204** locates and communicates by multiplex signal **212** with the CPU or transceiver **202** on the vehicle **192** and exchanges information on the type of problem, situation, location, and vehicle speed. The monitoring equipment **138** then transmits a signal **214** to the cell phone tower **190** that communicates with the transceiver **202** and/or CPU of the vehicle **192** to initiate or execute any commands that will actuate the stall-to-stop disabling link **200** and lock disabling system **196** for bringing the vehicle **192** to a halt and actuating the vehicle's **192** locking mechanism **198** for locking the thief, terrorist, or other unauthorized person inside the vehicle **192** if needed.

FIG. **19** illustrates a representative example wherein the stall-to-stop system and the lock disabling system **196** are utilized in conjunction with the GPS satellite **204**. In FIG. **19** a signal has traveled to the satellites nearest the vehicle's **192** current location and then the signal **218** has traveled to the monitoring equipment **138** and monitoring site **188** which can include but is not limited to satellite cell phones, satellite monitors, cell phones, laptops, desktop PC's, notebook PC's, and LCD monitors. The UPS satellite **204** then locates and communicates with the CPU and/or transceiver **202** on the vehicle **192** via a multiplex (two-way) signal **220** in order to exchange information on such distress and danger event parameters as the specific problem situation, location, and vehicle speed. The monitoring equipment **138** then transmits a signal **222** back to the GPS satellite **204** that in turn communicates via another signal **224** with the CPU and/or transceiver **202** to execute any commands to the stall-to-stop system for executing the disengagement of the vehicle's **192** electromotive system **194** for bringing the vehicle **192** to a halt and for actuating the lock disabling system **196** to direct the lock disabling link **200** to actuate the locking mechanism **198** thereby locking the vehicle **192** and anyone inside the vehicle **192**.

The present invention comprehends a chemical/biological/radiologicai/nuclearlexplosive/human/contraband detector unit with a disabling locking system for protecting products that can be grouped into several product groupings, from terrorist activity, and also for preventing unauthorized access to and tampering with the storage and transport of ordnance and weapons. The products grouped into what may be referred to as Product grouping **1** (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars, United Parcel Services™ (UPS™), Federal Express™ (FedEx™), airport lockers, news racks (coin and non-coin operated), mail drop boxes, cluster mail boxes, keyed mail boxes, min-storage houses and buildings, bicycle lockers, stadium lockers, school lockers, cars, trucks, campers, buses, vans, unmanned aerial vehicles (UAVs), unmanned ground vehicles (UGVs), and utility vehicles; the products grouped into what may be referred to as Product grouping **2** (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, door sensors, speed sensors, biometric sensors, glass break sensors, plastic film on glass, high security locks, tampering labels, door sensors, disabling locking systems, vehicle detectors and satellite disabling locking systems, detection of humans, detection of contraband, temperature, and shock levels; the products grouped into what may be referred to as Product grouping **3** (detector case; modified and adapted) include, but are not limited to, cell phone cases, satellite cell phone cases, laptop cases, notebook PC cases, PDA cases, carry-on cases, suitcases, eyeglass, briefcases, detector cases of locks, detector cases of tags, detector cases that is mounted to, detector cases that is affixed to, detector cases that is outside of, detector cases that is inside of, and detector cases that is adjacent to; the products grouped into what may be referred to as Product grouping **4** (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, web servers, desktop personal computers (PCs), note-

book personal computers (PCs), laptops, satellite cell phones, cell phones, Universal Mobile Telecommunications System (UMTS) phones, personal digital assistants (PDAs), liquid crystal display (LCD) monitors, and satellite monitoring, remote control key fobs, two-way communication key fobs, handhelds; the products grouped into what may be referred to as Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, Cellular, Satellite, Telematics, Wide Area Network (WAN). Wireless Wide Area Network (WWAN), Local Area Network (LAN), Radio Frequency (RF), Broadband Wireless Access (BWA), Global Positioning System (GPS), General Packet Radio Services (GPRS). Global System for Mobile (GSM), Wideband Code Division Multiple Access (W-CDMA), Universal Mobile Telecommunications System (UMTS), Short Message Service (SMS); the products grouped into what may be referred to as Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, band geometry, retina scan, iris scan and signature, the products grouped into what may be referred to as Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel. The multi sensor detection system includes the capability to disable an existing lock or activate a lock located inside or outside any of the products named in the product grouping categories upon activation of a sensor or detector included in the system. This is a significant feature for the multi sensor detection system as it prevents unauthorized, unequipped and untrained entry and access to the product thus preventing further contamination of the site and to individuals in the area.

While the invention has been shown and described in a preferred embodiment, it will be apparent to those skilled in the art that numerous alterations, modifications, and variations will possible and practicable without departing from the spirit and scope of the invention as set forth by the appended claims.

The invention claimed is:

1. A multi sensor detection system capable of identifying, monitoring, detecting, and securing those critical areas (e.g., U.S. borders), sites, locations and facilities vulnerable to terrorist activity that can be integrated with and interconnected to watchtowers to form a network, comprising:

at least one of an integrated watchtower, a fixed watchtower, a surveillance watchtower, a watchtower capable of scanning, a watchtower capable of monitoring, a watchtower equipped with sensors or a watchtower interconnected to a central monitoring terminal for sending signals thereto and receiving signals therefrom;

wherein the at least one watchtower is equipped with a remote video surveillance camera that provides at least one night vision means of surveillance or an infrared human detection means of surveillance capability and is integrated into a watchtower's remotely controlled system that can monitor, detect, track, and identify humans;

a communication device of at least one of a mobile communication device, a mobile communication unit, a portable communication device, portable communication equipment, a wired communication device, a wireless communication device, a monitoring site, a monitoring terminal, a web server, a desktop personal computer (PC), a notebook personal computer (PC), a laptop, a satellite phone, a smart phone, a cell phone, a Universal Mobile Telecommunications System (UMTS) phone, a personal digital assistant (PDA), a liquid crystal display (LCD) monitor, a satellite, or a handheld, interconnected to a monitoring equipment for sending signals thereto and receiving signals therefrom;

a communication method of at least one of a Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, Cellular, Satellite, Telematics, Wide Area Network (WAN), Wireless Wide Area Network (WWAN), Local Area Network (LAN), Radio Frequency (RF), Broadband Wireless Access (BWA), Global Positioning System (GPS), or central processing unit (CPU), used to interconnect the communication device to the monitoring equipment for sending signals thereto and receiving signals therefrom;

a plurality of sensors for detecting or sensing humans that is at least one of a chemical human sensor, biological human sensor, radiological human sensor, infrared human detector, motion human detector, or image human detector, interconnected to or disposed within the multi-sensor detection system for sending signals thereto and receiving signals therefrom;

a mobile multi-sensor detection device that is at least one of a ground surveillance sensor, a surveillance radar sensor, a surveillance camera, or a stand-alone surveillance scanner, that is mounted in, on, or upon at least one of a car, a truck, a camper, a bus, a van, an unmanned aerial vehicle (UAV), an unmanned ground vehicle (UGV), or a utility vehicle, interconnected to the monitoring equipment for sending signals thereto and receiving signals therefrom;

a hand-held multi-sensor detection device that is capable of at least one of thermal imaging or infrared imaging for monitoring, detecting, tracking and identifying humans, that is controlled or operated by at least one authorized person who is an owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, Central Intelligence Agency (CIA), Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, or monitoring site and terminal personnel, interconnected to the monitoring equipment for sending signals thereto and receiving signals therefrom, wherein the authorized person manually initiates the signal to the monitoring equipment to alert upon the monitoring, detecting, tracking and identifying of the human;

whereupon, detection by the mobile multi-sensor detection device causes an automatic signal transmission to be sent to, or received from, any products in product grouping categories of storage and transportation, sensors, detector case; modified and adapted, monitoring and communication devices, communication methods, biometrics;

whereupon, detection of an unauthorized vehicle, an unauthorized driver or operator of a vehicle or mobile

unit, a signal is sent from the communication device to the vehicle or mobile unit to stop, stall or slowdown the vehicle;

wherein, a communication device of at least one of a mobile communication device, a mobile communication unit, a portable communication device, portable communication equipment, a wired communication device, a wireless communication device, a monitoring site, a monitoring terminal, a web server, a desktop PC, a notebook PC, a laptop, a satellite phone, a smart phone, a cell phone, a UMTS phone, a PDA, a LCD monitor, a satellite, or a handheld, interconnected to the monitoring equipment for sending signals thereto and receiving signals therefrom, comprising a lock disabling mechanism that is able to engage (lock), and disengage (unlock) and disable (make unavailable) after a specific number of tries.

2. The multi sensor detection system of claim 1, capable of identifying, monitoring, detecting, and securing those critical areas (e.g., U.S. borders), sites, locations and facilities, further includes the identifying, monitoring, and detecting of terrorist, that is at least one of an illegal, radical, fanatic, activist, revolutionist or rebel.

3. The multi-sensor detection system of claim 1, further includes a global positioning system (GPS) receiver adapted for communication with at least one satellite.

4. The multi-sensor detection system of claim 1, further includes a navigation system adapted for communication with at least one of the surveillance watchtowers.

5. The multi-sensor detection system of claim 1, capable of forming a wired or wireless sensor network.

6. The multi-sensor detection system of claim 1, capable of forming a mesh network for redundancy.

7. The multi-sensor detection system of claim 1, capable of transmitting identification data, location data, power source data, and sensor data.

8. The multi-sensor detection system of claim 1, capable of being embedded into; placed in, on, or adjacent to at least one of the products in the product grouping categories or an area targeted for monitoring.

9. The multi-sensor detection system of claim 1, capable of sending signals thereto and receiving signals therefrom to engage (lock), disengage (unlock) and disable (make unavailable) a lock after a specific number of tries that is interconnected to the multi sensor detection system or monitoring equipment.

10. The multi-sensor detection system of claim 1, capable of transmitting biometric and authentication data include, but is not limited to, at least one of fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, heart rate, pulse and signature.

11. The multi-sensor detection system of claim 1, interconnected with a camera to view the environment in real-time or to store the data for transmission and review at a later time.

12. The multi-sensor detection system of claim 1, interconnected with a camera; light and video sensors to allow the user to view the environment from at least one of a cell phone, smart phone, PDA, handheld, laptop, desktop, workstation or monitoring site.

13. A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a personal digital assistant (PDA), a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, comprising:

at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; that is wired or wireless, capable of being disposed within, on, upon or adjacent the communication device;

at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or a front end processor for communication between a host computer and other devices;

a transmitter for transmitting signals and messages to at least one of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device;

a receiver for receiving signals, data or messages from at least one of the multi-sensor detection device, the maritime cargo container, the cell phone detection device, or the locking device;

at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection;

the communication device is at least a fixed, portable or mobile communication device interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween; and

whereupon the communication device, is interconnected to a product equipped to receive signals from or send signals to lock or unlock locking devices, activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems;

wherein the communication device receives a signal via any of one or more products in any product grouping categories;

wherein the at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, or short range radio frequency (RF) connection is capable of signal communication with the transmitter, the receiver of the communication device, or transceivers of the products;

wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature such that the communication device that is at least one of the cell phone, the smart phone, the desktop, the handheld, the PDA, the laptop or the computer terminal is locked by the biometric lock disabler to prevent unauthorized use;

wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, long range radio frequency (RF), and short range radio frequency (RF).

14. Monitoring equipment of at least one of products grouped together by common features in a product groupings category of design similarity comprising a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone interconnected to a product for communication therebetween, the monitoring equipment comprising:

at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; that is wired or wireless, capable of being disposed within, on, upon or adjacent the monitoring equipment;

at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or a front end processor for communication between a host computer and other devices;

a transmitter for transmitting signals and messages to at least one of a multi-sensor detection device, a maritime cargo container, a cell phone detection device;

a receiver for receiving signals, data or messages from at least one of the multi-sensor detection device, maritime cargo container, the cell phone detection device;

a lock disabling mechanism that is able to engage (lock), or disengage (unlock), or disable (make unavailable) a product's lock, wherein the lock disabling mechanism disables the product's lock after a specific number of tries by an unauthorized user to disengage the lock by maintaining the product's lock in the current state of the product's lock regardless of input entered to change the state of the product's lock by the unauthorized user;

at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection;

monitoring equipment of at least a fixed, portable or mobile monitoring equipment interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween; and

whereupon the monitoring equipment, is interconnected to a product equipped to receive signals from or send signals to the lock disabling mechanism that is able to engage, disengage, or disable the lock, activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems;

wherein the monitoring equipment is implemented by business or government at a minimum cost by products grouped together by common features in at least one of several product groupings of design similarity;

wherein the at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, or short range radio frequency (RF) connection is in signal communication with the transmitter, the receiver of the monitoring equipment, or transceivers of the products.

15. Monitoring equipment of at least one of the products grouped together by common features in a product groupings category of design similarity comprising a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone interconnected to a product for communication therebetween, the monitoring equipment comprising:

at least one of a central processing unit (CPU), a network processor, or a microprocessor for executing and carrying out the instructions of a computer program or application which is specifically targeted at the networking application domain, for communication between the monitoring equipment and at least one of a multi-sensor detection device, a maritime cargo container device, or a locking device;

a transmitter for transmitting signals and messages to at least one of the multi-sensor detection device, the maritime cargo container device, or the locking device;

a receiver for receiving signals, data or messages from at least one of the multi-sensor detection device, the maritime cargo container device or the locking device, wherein the signals, data or messages are of agents of an item of interest (IOI);

at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, or GPS connection;

the monitoring equipment is at least a fixed, portable or mobile monitoring equipment interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween; and

whereupon the monitoring equipment, is capable of the activation or deactivation of at least one of the multi-sensor detection device, the maritime cargo container device or the locking device;

wherein the at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, for signal communication with the transmitter, the receiver of the monitoring equipment, or transceivers of the products;

at least one tag that is read by the monitoring equipment that is capable of wireless near-field communication to achieve detection of at least one of a chemical agent, a biological agent, a radiological agent, a nuclear agent, or an explosive agent which allows radio frequency (RF) data to be at least one of received or transmitted between the tag and the monitoring equipment.

16. A built-in, embedded multi sensor detection system for monitoring products with a plurality of sensors detecting at least two agents selected from the group consisting of chemical, biological, radiological, explosive, human, and contraband agents;

comprising a built-in sensor array or fixed detection device into the product that detects agents by means of two or more sensors combined from the following list of sensors: a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor;

comprising a communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a personal digital assistant (PDA), a laptop, or a computer terminal for monitoring products, interconnected to a built-in sensor array or fixed detection device for communication therebetween;

wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan or signature such that the communication device that is at least one of the cell phone, the smart phone, the desktop, the handheld, the PDA, the laptop or the computer terminal is locked by the biometric lock disabler to prevent unauthorized use;

wherein the built-in embedded multi-sensor detection device receives a signal via any of one or more products in any product grouping categories; and

wherein, when an alarm occurs, the built-in, embedded multi sensor detection system communicates the alarm by way of at least one of the products grouped together

by common features in a product groupings category of design similarity comprising at least one of product-to-product, product-to-satellite, product-to-cellular, product-to-long range radio frequency, product-to-short range radio frequency, product-to-radio frequency (RF), product-to-internet, product-to-broadband, product-to-smartphone or cell phone, product-to-computer at monitoring site, product-to-WiFi, product-to-handheld, or product-to-laptop or desktop for communication therebetween;

wherein the built-in embedded multi-sensor detection device is implemented by business or government at a minimum cost by products grouped together by common features in at least one of the several product groupings of design similarity.

17. A built-in multi sensor detection system for monitoring products with a plurality of sensors detecting at least two agents selected from the group consisting of chemical, biological, radiological, explosive, human, and contraband agents, comprising:

a built-in sensor array or fixed detection device into the product that detects agents by means of two or more sensors combined from the following list of sensors: a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor;

monitoring equipment of at least one of products grouped together by common features in a product groupings category of design similarity comprising at least one of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone for the receipt and transmission of signals therebetween;

wherein the built-in multi-sensor detection device is built in any of one or more products comprising a maritime cargo container, a lock, or the monitoring equipment;

wherein the built-in multi-sensor detection device is implemented by business or government by products grouped together by common features in at least one of several product groupings of design similarity;

a light alarm indicator that has a plurality of colored lights that correspond to specific agents of the at least two agents;

wherein, when the light alarm indicator lights to indicate an alarm occurs, the built-in multi sensor detection system communicates the alarm by way of at least one of the products grouped together by common features in the product groupings category of design similarity comprising at least one of product-to-product, product-to-satellite, product-to-cellular, product-to-radio frequency (RF), product-to-internet, product-to-broadband, product-to-smartphone or cell phone, product-to-computer at monitoring site, product-to-WiFi, product-to-handheld, or product-to-laptop or desktop for at least one of a receipt or transmission of signals therebetween.

18. A built-in multi sensor detection system for detecting at least two items selected from the group consisting of chemical agent, biological agent, radiological agent, explosive agent, human agent, contraband agent, motion, perimeter, temperature, tampering, theft, or breach, comprising:

a built-in sensor array or fixed detection device into a product that detects items by means of at least two sensors from the following list of sensors: a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor;

monitoring equipment of at least one of the products grouped together by common features in a product groupings category of design similarity comprising at least one of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone for the receipt and transmission of signals therebetween;

wherein the built-in, multi-sensor detection device is built in any of one or more products comprising a maritime cargo container, a lock, or the monitoring equipment;

wherein, when an alarm occurs, the built-in multi sensor detection system communicates the alarm by way of at least one of the products grouped together by common features in a product groupings category of design similarity comprising at least one of product-to-product, product-to-satellite, product-to-cellular, product-to-radio frequency (RF), product-to-internet, product-to-broadband, product-to-smartphone or cell phone, product-to-computer at monitoring site, product-to-WiFi, product-to-handheld, or product-to-laptop or desktop for the receipt and transmission of signals therebetween;

at least one tag that is read by the monitoring equipment that is capable of wireless near-field communication to achieve detection of at least one of the chemical agent, the biological agent, the radiological agent, the explosive agent, the human agent, the contraband agent, the motion, the perimeter, the temperature, the tampering, the theft, and the breach which allows radio frequency (RF) data to be received and/or transferred between the tag and the monitoring equipment.

19. A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, radiological agent, or compound, comprising:

a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human, or contraband agent or compound, capable of being disposed within, on, upon or adjacent a multi-sensor detection device;

monitoring equipment comprising at least one of a computer, personal computer (PC), laptop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone for at least one of a receipt or transmission of signals therebetween;

at least one cell phone tower interconnected to the monitoring equipment for sending signals thereto and receiving signals therefrom or at least one satellite capable of transmitting signals to the monitoring equipment;

at least one satellite or at least one cell phone tower capable of signal communication between the multi-sensor detection device and the monitoring equipment;

at least one internet connection capable of communication between the multi-sensor detection device and the monitoring equipment;

whereupon a signal sent to a receiver of the multi-sensor detection device from a satellite; or to a cell phone tower; or through at least one of a short range radio frequency or a long range radio frequency; causes a signal to be sent to the monitoring equipment that includes at least one of location data or sensor data;

wherein the monitoring equipment or multi-sensor detection device receives a signal via any of one or more products of any product grouping categories;

wherein at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection,

radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency connection, or short range radio frequency (RF) connection is capable of signal communication with the transmitter, a receiver of the monitoring equipment, the multi-sensor detection device, or transceivers of the products;

wherein the monitoring equipment is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan or signature such that the monitoring device that is at least one of the computer, the laptop, the notebook, the PC, the handheld, the cell phone, the PDA, or the smart phone is locked by the biometric lock disabler to prevent unauthorized use;

wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, long range radio frequency, and short range radio frequency (RF).

20. A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, radiological agents or compound, comprising:

a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human, or contraband agent or compound, capable of being disposed within, on, upon or adjacent a multi-sensor detection device;

monitoring equipment of at least one of products grouped together by common features in a product groupings category of design similarity comprising at least one of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA), or smart phone for at least one of a receipt or transmission of signals therebetween,

wherein the monitoring equipment is equipped with a lock disabling mechanism that is able to engage (lock), or disengage (unlock), or disable (to make unavailable) a product's lock, wherein the lock disabling mechanism disables the product's lock after a specific number of tries by an unauthorized user to disengage the lock by maintaining the product's lock in the current state of the product's lock regardless of input entered to change the state of the product's lock by the unauthorized user;

at least one cell phone tower interconnected to the monitoring equipment for sending signals thereto and receiving signals therefrom; or at least one satellite capable of transmitting signals to the monitoring equipment;

at least one satellite or at least one cell phone tower capable of signal communication between the multi-sensor detection device and the monitoring equipment;

at least one internet connection capable of communication between the multi-sensor detection device and the monitoring equipment; and

whereupon a signal sent to a receiver of the multi-sensor detection device from a satellite; or to a cell phone tower; or through at least one of a short range radio frequency or a long range radio frequency; causes a signal to be sent to the monitoring equipment that includes location data and/or sensor data;

wherein the multi-sensor detection device is implemented by business or government by products grouped together by common features in at least one of several product groupings of design similarity;

wherein the multi-sensor detection device is for any of one or more products comprising a maritime cargo container, a lock, or the monitoring equipment;

wherein at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency connection, or short range radio frequency connection is in signal communication with a transmitter and a receiver of the monitoring equipment or multi-sensor detection device and transceivers of the products.

21. A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, or radiological agents and compounds, comprising:

a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human, or contraband agent or compound, capable of being disposed within, on, upon or adjacent a multi-sensor detection device, wherein at least one of the sensors is capable of detecting agents of an item of interest (IOI);

monitoring equipment of at least one of the products grouped together by common features in a product groupings category of design similarity comprising at least one of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA), or smart phone for at least one of a receipt or transmission of signals therebetween;

at least one satellite or at least one cell phone tower capable of signal communication between the multi-sensor detection device and the monitoring equipment;

at least one internet connection capable of communication between the multi-sensor detection device and the monitoring equipment;

whereupon a signal sent to a receiver of the multi-sensor detection device for detecting the agents of the item of interest causes a signal that includes at least one of location data or sensor data to be sent to the monitoring equipment;

wherein the multi-sensor detection device for any of one or more products comprising a maritime cargo container, a lock, or the monitoring equipment;

wherein at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, or broadband connection, is in signal communication with a transmitter, a receiver of the monitoring equipment, or transceivers of the products;

at least one tag that is read by the monitoring equipment that is capable of wireless near-field communication to achieve detection of at least one of the explosive agent, the nuclear agent, the contraband agent, the chemical agent, the biological agent, the human agent, or the radiological agent which allows radio frequency (RF) data to be received and/or transferred between the tag and the monitoring equipment.

22. A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a personal digital assistant (PDA), a laptop, or a computer terminal, comprising:

at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; that is wired or wireless, capable of being disposed within, on, upon or adjacent the communication device;

at least one of a central processing unit (CPU), a network processor, or a front end processor for communication between a host computer and other devices;

a transmitter for transmitting signals and messages to at least one of a multi-sensor detection device, a cell phone detection device, or a locking device;

a receiver for receiving signals, data or messages from at least one of a multi-sensor detection device, a cell phone detection device, or a locking device;

at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, cellular connection, long and/or short range radio frequency (RF) connection, or GPS connection;

the communication device being at least a fixed, portable or mobile communication device, equipped with at least one wired or wireless sensor for the detection of humans;

the communication device being equipped to receive signals from or send signals to engage (lock), disengage (unlock), or disable (make unavailable) locks;

the communication device being equipped with biometrics that incorporates at least one of a fingerprint recognition or a face recognition to at least one of gain access to the device or to prevent unauthorized use;

the communication device being capable of wireless near-field communication (NFC) which allows radio frequency (RF) data to be at least one of received or transferred between the communication device and at least one tag that is read by the communication device;

whereupon a signal sent to the receiver of at least one of a multi-sensor detection device, a cell phone detection device, or a locking device from a satellite or a cell phone tower or through at least one of a Bluetooth connection, a WiFi connection, an internet connection, a cellular connection, a GPS connection, a short range radio frequency (RF) connection, or a long range radio frequency (RF) connection, causes a signal that includes at least one of location data or sensor data to be sent to the communication device; and

wherein at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, cellular connection, long range radio frequency (RF) connection, or short range radio frequency (RF) connection, capable of signal communication with the transmitter of the communication device, the receiver of the communication device, or the central processing unit (CPU).

23. A cell phone comprising:

a central processing unit (CPU) for executing and carrying out the instructions of a computer program;

a transmitter for transmitting signals and messages to a cell phone detection device;

a receiver for receiving signals from the cell phone detection device;

at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection;

the cell phone is at least a fixed, portable or mobile communication device interconnected to the cell phone detection device, capable of wired or wireless communication therebetween; and

whereupon the cell phone is interconnected to the cell phone detection device to receive signals or send signals to lock or unlock doors, to activate or deactivate security systems, to activate or deactivate multi-sensor detection systems, or to activate or deactivate the cell phone detection device;

at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone;

wherein at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection is capable of signal communication with the transmitter or the receiver;

wherein the cell phone is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature such that the cell phone is locked by the biometric lock disabler to prevent unauthorized use; and

whereupon a signal sent to the receiver of the cell phone detection device from at least one of the chemical sensor, the biological sensor, the explosive sensor, the human sensor, the contraband sensor, or the radiological sensor, causes a signal that includes at least one of location data or sensor data to be sent to the cell phone.

* * * * *

JS-CAND 44 (Rev. 10/2020)

# CIVIL COVER SHEET

The JS-CAND 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved in its original form by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

**I. (a) PLAINTIFFS**
Larry Golden

**(b)** County of Residence of First Listed Plaintiff Greenville, South Carolina
*(EXCEPT IN U.S. PLAINTIFF CASES)*

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*
740 Woodruff Rd., #1102, Greenville, SC 29607

**DEFENDANTS**
Google LLC

County of Residence of First Listed Defendant Santa Clara, California
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

Attorneys *(If Known)*
1600 Amphitheatre Parkway, Mountain View, California, 94043

FILED SEP 14 2022 CLERK, U.S. DISTRICT COURT NORTHERN DISTRICT OF CALIFORNIA

**II. BASIS OF JURISDICTION** *(Place an "X" in One Box Only)*

- 1 U.S. Government Plaintiff
- X 3 Federal Question *(U.S. Government Not a Party)*
- 2 U.S. Government Defendant
- 4 Diversity *(Indicate Citizenship of Parties in Item III)*

**III. CITIZENSHIP OF PRINCIPAL PARTIES** *(Place an "X" in One Box for Plaintiff and One Box for Defendant)* *(For Diversity Cases Only)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | 1 | X 1 | Incorporated *or* Principal Place of Business In This State | 4 | X 4 |
| Citizen of Another State | X 2 | 2 | Incorporated *and* Principal Place of Business In Another State | X 5 | 5 |
| Citizen or Subject of a Foreign Country | 3 | 3 | Foreign Nation | 6 | 6 |

C 22 5246

**IV. NATURE OF SUIT** *(Place an "X" in One Box Only)*

**CONTRACT**
- 110 Insurance
- 120 Marine
- 130 Miller Act
- 140 Negotiable Instrument
- 150 Recovery of Overpayment Of Veteran's Benefits
- 151 Medicare Act
- 152 Recovery of Defaulted Student Loans (Excludes Veterans)
- 153 Recovery of Overpayment of Veteran's Benefits
- 160 Stockholders' Suits
- 190 Other Contract
- 195 Contract Product Liability
- 196 Franchise

**REAL PROPERTY**
- 210 Land Condemnation
- 220 Foreclosure
- 230 Rent Lease & Ejectment
- 240 Torts to Land
- 245 Tort Product Liability
- 290 All Other Real Property

**TORTS**

PERSONAL INJURY
- 310 Airplane
- 315 Airplane Product Liability
- 320 Assault, Libel & Slander
- 330 Federal Employers' Liability
- 340 Marine
- 345 Marine Product Liability
- 350 Motor Vehicle
- 355 Motor Vehicle Product Liability
- 360 Other Personal Injury
- 362 Personal Injury -Medical Malpractice

PERSONAL INJURY
- 365 Personal Injury – Product Liability
- 367 Health Care/ Pharmaceutical Personal Injury Product Liability
- 368 Asbestos Personal Injury Product Liability

PERSONAL PROPERTY
- 370 Other Fraud
- 371 Truth in Lending
- 380 Other Personal Property Damage
- 385 Property Damage Product Liability

**CIVIL RIGHTS**
- 440 Other Civil Rights
- 441 Voting
- 442 Employment
- 443 Housing/ Accommodations
- 445 Amer. w/Disabilities–Employment
- 446 Amer. w/Disabilities–Other
- 448 Education

**PRISONER PETITIONS**

HABEAS CORPUS
- 463 Alien Detainee
- 510 Motions to Vacate Sentence
- 530 General
- 535 Death Penalty

OTHER
- 540 Mandamus & Other
- 550 Civil Rights
- 555 Prison Condition
- 560 Civil Detainee– Conditions of Confinement

**FORFEITURE/PENALTY**
- 625 Drug Related Seizure of Property 21 USC § 881
- 690 Other

**LABOR**
- 710 Fair Labor Standards Act
- 720 Labor/Management Relations
- 740 Railway Labor Act
- 751 Family and Medical Leave Act
- 790 Other Labor Litigation
- 791 Employee Retirement Income Security Act

**IMMIGRATION**
- 462 Naturalization Application
- 465 Other Immigration Actions

**BANKRUPTCY**
- 422 Appeal 28 USC § 158
- 423 Withdrawal 28 USC § 157

**PROPERTY RIGHTS**
- 820 Copyrights
- X 830 Patent
- 835 Patent—Abbreviated New Drug Application
- 840 Trademark
- 880 Defend Trade Secrets Act of 2016

14

**SOCIAL SECURITY**
- 861 HIA (1395ff)
- 862 Black Lung (923)
- 863 DIWC/DIWW (405(g))
- 864 SSID Title XVI
- 865 RSI (405(g))

**FEDERAL TAX SUITS**
- 870 Taxes (U.S. Plaintiff or Defendant)
- 871 IRS–Third Party 26 USC § 7609

**OTHER STATUTES**
- 375 False Claims Act
- 376 Qui Tam (31 USC § 3729(a))
- 400 State Reapportionment
- 410 Antitrust
- 430 Banks and Banking
- 450 Commerce
- 460 Deportation
- 470 Racketeer Influenced & Corrupt Organizations
- 480 Consumer Credit
- 485 Telephone Consumer Protection Act
- 490 Cable/Sat TV
- 850 Securities/Commodities/ Exchange
- 890 Other Statutory Actions
- 891 Agricultural Acts
- 893 Environmental Matters
- 895 Freedom of Information Act
- 896 Arbitration
- 899 Administrative Procedure Act/Review or Appeal of Agency Decision
- 950 Constitutionality of State Statutes

HSG

**V. ORIGIN** *(Place an "X" in One Box Only)*

- 1 Original Proceeding
- 2 Removed from State Court
- X 3 Remanded from Appellate Court
- 4 Reinstated or Reopened
- 5 Transferred from Another District *(specify)*
- 6 Multidistrict Litigation–Transfer
- 8 Multidistrict Litigation–Direct File

**VI. CAUSE OF ACTION**
Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
35 U.S.C. 271
Brief description of cause:
Direct, Joint, Contributory Patent Infringement; Patent Infringement under the Doctrine of Equivalents

**VII. REQUESTED IN COMPLAINT:**
CHECK IF THIS IS A CLASS ACTION UNDER RULE 23, Fed. R. Civ. P.
**DEMAND $** 25,000,000,000.00
CHECK YES only if demanded in complaint:
**JURY DEMAND:** X Yes No

**VIII. RELATED CASE(S), IF ANY** *(See instructions)*:
JUDGE Haywood Gilliam, Jr; Nathanael Cousins; Vince Chhabria
DOCKET NUMBER 4:2022cv03283; 5:2022cv03828; 3:2022cv04152

**IX. DIVISIONAL ASSIGNMENT (Civil Local Rule 3-2)**
**(Place an "X" in One Box Only)** SAN FRANCISCO/OAKLAND X SAN JOSE EUREKA-MCKINLEYVILLE

**DATE** 09/08/2022 **SIGNATURE OF ATTORNEY OF RECORD** Larry Golden

JS-CAND 44 (rev. 10/2020)

# INSTRUCTIONS FOR ATTORNEYS COMPLETING CIVIL COVER SHEET FORM JS-CAND 44

**Authority For Civil Cover Sheet.** The JS-CAND 44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleading or other papers as required by law, except as provided by local rules of court. This form, approved in its original form by the Judicial Conference of the United States in September 1974, is required for the Clerk of Court to initiate the civil docket sheet. Consequently, a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. The attorney filing a case should complete the form as follows:

I. a) **Plaintiffs-Defendants.** Enter names (last, first, middle initial) of plaintiff and defendant. If the plaintiff or defendant is a government agency, use only the full name or standard abbreviations. If the plaintiff or defendant is an official within a government agency, identify first the agency and then the official, giving both name and title.

b) **County of Residence.** For each civil case filed, except U.S. plaintiff cases, enter the name of the county where the first listed plaintiff resides at the time of filing. In U.S. plaintiff cases, enter the name of the county in which the first listed defendant resides at the time of filing. (NOTE: In land condemnation cases, the county of residence of the "defendant" is the location of the tract of land involved.)

c) **Attorneys.** Enter the firm name, address, telephone number, and attorney of record. If there are several attorneys, list them on an attachment, noting in this section "(see attachment)."

II. **Jurisdiction.** The basis of jurisdiction is set forth under Federal Rule of Civil Procedure 8(a), which requires that jurisdictions be shown in pleadings. Place an "X" in one of the boxes. If there is more than one basis of jurisdiction, precedence is given in the order shown below.

(1) United States plaintiff. Jurisdiction based on 28 USC §§ 1345 and 1348. Suits by agencies and officers of the United States are included here.

(2) United States defendant. When the plaintiff is suing the United States, its officers or agencies, place an "X" in this box.

(3) Federal question. This refers to suits under 28 USC § 1331, where jurisdiction arises under the Constitution of the United States, an amendment to the Constitution, an act of Congress or a treaty of the United States. In cases where the U.S. is a party, the U.S. plaintiff or defendant code takes precedence, and box 1 or 2 should be marked.

(4) Diversity of citizenship. This refers to suits under 28 USC § 1332, where parties are citizens of different states. When Box 4 is checked, the citizenship of the different parties must be checked. (See Section III below; **NOTE: federal question actions take precedence over diversity cases.**)

III. **Residence (citizenship) of Principal Parties.** This section of the JS-CAND 44 is to be completed if diversity of citizenship was indicated above. Mark this section for each principal party.

IV. **Nature of Suit.** Place an "X" in the appropriate box. If the nature of suit cannot be determined, be sure the cause of action, in Section VI below, is sufficient to enable the deputy clerk or the statistical clerk(s) in the Administrative Office to determine the nature of suit. If the cause fits more than one nature of suit, select the most definitive.

V. **Origin.** Place an "X" in one of the six boxes.

(1) Original Proceedings. Cases originating in the United States district courts.

(2) Removed from State Court. Proceedings initiated in state courts may be removed to the district courts under Title 28 USC § 1441. When the petition for removal is granted, check this box.

(3) Remanded from Appellate Court. Check this box for cases remanded to the district court for further action. Use the date of remand as the filing date.

(4) Reinstated or Reopened. Check this box for cases reinstated or reopened in the district court. Use the reopening date as the filing date.

(5) Transferred from Another District. For cases transferred under Title 28 USC § 1404(a). Do not use this for within district transfers or multidistrict litigation transfers.

(6) Multidistrict Litigation Transfer. Check this box when a multidistrict case is transferred into the district under authority of Title 28 USC § 1407. When this box is checked, do not check (5) above.

(8) Multidistrict Litigation Direct File. Check this box when a multidistrict litigation case is filed in the same district as the Master MDL docket.

Please note that there is no Origin Code 7. Origin Code 7 was used for historical records and is no longer relevant due to changes in statute.

VI. **Cause of Action.** Report the civil statute directly related to the cause of action and give a brief description of the cause. **Do not cite jurisdictional statutes unless diversity.** Example: U.S. Civil Statute: 47 USC § 553. Brief Description: Unauthorized reception of cable service.

VII. **Requested in Complaint.** Class Action. Place an "X" in this box if you are filing a class action under Federal Rule of Civil Procedure 23.

Demand. In this space enter the actual dollar amount being demanded or indicate other demand, such as a preliminary injunction.

Jury Demand. Check the appropriate box to indicate whether or not a jury is being demanded.

VIII. **Related Cases.** This section of the JS-CAND 44 is used to identify related pending cases, if any. If there are related pending cases, insert the docket numbers and the corresponding judge names for such cases.

IX. **Divisional Assignment.** If the Nature of Suit is under Property Rights or Prisoner Petitions or the matter is a Securities Class Action, leave this section blank. For all other cases, identify the divisional venue according to Civil Local Rule 3-2: "the county in which a substantial part of the events or omissions which give rise to the claim occurred or in which a substantial part of the property that is the subject of the action is situated."

**Date and Attorney Signature.** Date and sign the civil cover sheet.

Court Name: U.S. District Court, NDCA
Division: [illegible]
Receipt Number: [illegible]
Cashier ID: [illegible]
Transaction Date: 09/14/2022
Payer Name: ATPG Technology LLC

CIVIL FILING FEE- NON-PRISONER
For: Larry Golden
Case/Party: D-CAN-4-22-CV-005246-001
Amount: $402.00

PAPER CHECK CONVERSION
Remitter: ATPG Technology LLC
Check/Money Order Num: [illegible]
Amt Tendered: $402.00

Total Due: $402.00
Total Tendered: $402.00
Change Amt: $0.00

[illegible]

Checks and drafts are accepted subject to collections and full credit will only be given when the check or draft has been accepted by the financial institution on which it was drawn.

Court Name: U.S. District Court, NDCS
Division: 5
Receipt Number: 54611010898
Cashier ID: waltonb
Transaction Date: 09/14/2022
Payer Name: ATPG Technology LLC

---

CIVIL FILING FEE- NON-PRISONER
For: Larry Golden
Case/Party: D-CAN-4-22-CV-005246-001
Amount: $402.00

---

PAPER CHECK CONVERSION
Remitter: ATPG Technology LLC
Check/Money Order Num: 1009ASTPF Te
Amt Tendered: $402.00

---

Total Due: $402.00
Total Tendered: $402.00
Change Amt: $0.00

HSG

Checks and drafts are accepted subject to collections and full credit will only be given when the check or draft has been accepted by the financial institution on which it was drawn.

Matthew S. Warren (State Bar No. 230565)
Sachli Balazadeh-Nayeri (State Bar No. 341885)
22-5246@cases.warrenlex.com
WARREN LEX LLP
2261 Market Street, No. 606
San Francisco, California, 94114
+1 (415) 895-2940
+1 (415) 895-2964 facsimile

*Attorneys for Defendant Google LLC*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| LARRY GOLDEN, | ) Case No. 4:22-cv-05246-HSG |
| Plaintiff, | ) |
| v. | ) **NOTICE OF MOTION AND MOTION TO DISMISS COMPLAINT BY DEFENDANT GOOGLE LLC** |
| GOOGLE LLC, | ) Date: December 1, 2022 <br> ) Time: 2:00 p.m. <br> ) Place: Courtroom 2 |
| Defendant. | ) Judge: Hon. Haywood S. Gilliam, Jr. |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT on December 1, 2022, at 2:00 p.m., or as soon thereafter as the matter may be heard before Judge Haywood S. Gilliam, Jr. of the United States District Court for the Northern District of California, located at 1301 Clay Street, Oakland, California, 94612, defendant Google LLC will move and hereby does move for an order dismissing plaintiff Larry Golden's complaint for failure to state a claim upon which relief may be granted under Federal Rule of Civil Procedure 12(b)(6). This motion is based on this Notice, the attached Memorandum of Points and Authorities, and all matters of record filed with the Court in this case, and such other evidence as may be submitted.

Google seeks an Order dismissing the complaint without leave to amend under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which this Court may grant relief.

Date: October 26, 2022

Respectfully submitted,

Matthew S. Warren (State Bar No. 230565)
Sachli Balazadeh-Nayeri (State Bar No. 341885)
WARREN LEX LLP
2261 Market Street, No. 606
San Francisco, California, 94114
+1 (415) 895-2940
+1 (415) 895-2964 facsimile
22-5246@cases.warrenlex.com

*Attorneys for Defendant Google LLC*

# TABLE OF CONTENTS

Introduction . . . . . 1

Background . . . . . 1

A. Mr. Golden's Patents . . . . . 1

B. Mr. Golden's Litigation Campaign . . . . . 1

1. Court of Federal Claims . . . . . 1

2. District of South Carolina . . . . . 2

3. This Court . . . . . 3

C. Mr. Golden's South Carolina Litigation Against Google and Resulting Appeal . . . . . 4

D. Mr. Golden's Allegations in This Action . . . . . 5

Argument . . . . . 6

I. The Complaint Fails to Allege Direct Infringement by Google . . . . . 6

II. The Complaint Fails to Allege Indirect Infringement . . . . . 8

III. The Court Should Deny Leave to Amend . . . . . 8

Conclusion . . . . . 9

## TABLE OF AUTHORITIES

*Cases* **Pages**

*Alfasigma USA, Inc. v. First Databank, Inc.*,
398 F. Supp. 578 (N.D. Cal. 2019) . . . . . 7

*Anderson v. Google Inc.*,
No. 12-6573, 2013 WL 1285516 (N.D. Cal. Mar. 27, 2013). . . . . 7

*Artrip v. Ball Corp.*
735 Fed. App'x 708 (Fed. Cir. 2018) . . . . . 6

*Arunchalam v. Apple, Inc.*,
No. 18-1250, 2018 WL 5023378 (N.D. Cal. Oct. 16, 2018), *aff'd*, 806 F. App'x 977 (Fed. Cir. 2020) . . . . . 7

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) . . . . . 6

*Bell Atl. Corp. v. Twombly*,
550 U.S. 544 (2007) . . . . . 6

*Bonin v. Calderon*,
59 F.3d 815 (9th Cir. 1995) . . . . . 8

*Bot M8 LLC v. Sony Corp. of Am.*,
4 F.4th 1342 (Fed Cir. 2021) . . . . . 6

*Cyph, Inc. v. Zoom Video Commc'ns, Inc.*,
No. 22-0561, 2022 WL 1556417 (N.D. Cal. May 17, 2022) . . . . . 6

*Davis v. Pinterest, Inc.*,
No. 19-7650, 2020 WL 6342936 (N.D. Cal. Oct. 29, 2020) . . . . . 8

*Demos v. Google*,
No. 19-4433, 2019 WL 6341318 (N.D. Cal. Nov. 27, 2019) . . . . . 6

*Erickson v. Pardus*,
551 U.S. 89 (2007) . . . . . 7

*Fantasy Sports Props., Inc. v. Sportsline.com, Inc.*,
46 F.3d 1108 (Fed Cir. 2002) . . . . . 7

*Ghazali v. Moran*,
No. 22-0561, 2022 WL 1556417 (N.D. Cal. May 17, 2022) . . . . . 7

*Golden v. Apple Inc.*,
Nos. 22-1229, 22-1267, 2022 WL 4103285 (Fed. Cir. Sept. 8, 2022) . . . . . 2, 4, 5, 8

**TABLE OF AUTHORITIES**
*(continued)*

*Cases* **Pages**

*Golden v. Apple Inc.*, No. 21-2160, 2022 WL 986984 (4th Cir. Mar. 31, 2022) . . . . . . . . . . 3

*Golden v. Apple Inc.*, 819 F. App'x 930 (Fed. Cir. 2020), *cert. denied*, 141 S. Ct. 1067 (2021). . . . . . . . . . 2

*Golden v. Apple Inc.*, No. 20-4353, 2021 WL 5074739 (D.S.C. Nov. 2, 2021), *aff'd* Nos. 22-1229, 22-1267, 2022 WL 4103285 (Fed. Cir. Sept. 8, 2022) . . . . . . . . . . 2

*Golden v. Apple Inc.*, No. 20-2270, 2021 WL 4260782 (D.S.C. Sept. 20, 2021), *aff'd* No. 21-2160, 2022 WL 986984 (4th Cir. Mar. 31, 2022). . . . . . . . . . 3

*Golden v. United States*, No. 22-1196, 2022 WL 4103287 (Fed. Cir. Sept. 8, 2022) . . . . . . . . . . 2

*Golden v. United States*, 156 Fed. Cl. 623 (Fed. Cl. Nov. 10, 2021) . . . . . . . . . . 2

*Hantz Software, LLC v. Sage Intacct, Inc.*, 576 F. Supp. 3d 677 (N.D. Cal. 2021) . . . . . . . . . . 6

*High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*, 49 F. 3d 1551 (Fed. Cir. 1995) . . . . . . . . . . 7

*Ivey v. Bd. of Regents of Univ. of Alaska*, 673 F.2d 266 (9th Cir. 1982) . . . . . . . . . . 7

*Laguna Hermosa Corp. v. United States*, 671 F.3d 1284 (Fed. Cir. 2012) . . . . . . . . . . 6

*Lifetime Indus., Inc. v. Trim-Lok, Inc.*, 869 F.3d 1372 (Fed. Cir. 2017) . . . . . . . . . . 6

*Lindsay v. United States*, 295 F.3d 1252 (Fed. Cir. 2002) . . . . . . . . . . 6

*Linear Tech Corp. v. Impala Linear Corp.*, 379 F. 3d 1311 (Fed Cir. 2004) . . . . . . . . . . 8

*Mylviya v. City of San Jose*, No. 5-5427, 2006 WL 2529511 (N.D. Cal. Aug. 31, 2006) . . . . . . . . . . 7

*Redd Grp., LLC v. Glass Guru Franchise Sys., Inc.*, No. 12-4070, 2013 WL 3462078 (N.D. Cal. Jul. 8, 2013) . . . . . . . . . . 8

**TABLE OF AUTHORITIES**
*(continued)*

*Cases* — **Pages**

*Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F. 3d 1316 (Fed. Cir. 2001) . . . . . 7

*Townsend v. Univ. of Alaska*, 543 F.3d 478 (9th Cir. 2008) . . . . . 8

*Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F. 3d 137 (Fed. Cir. 2011) . . . . . 7

*Weisbuch v. Cty. of Los Angeles*, 119 F.3d 778 (9th Cir. 1997) . . . . . 7

*Zeiny v. United States*, No. 19-5806, 2020 WL 496076 (N.D. Cal. Jan. 30, 2020) . . . . . 7

*Rules*

Fed. R. Civ. P. 12(b)(6) . . . . . 7

Fed. R. Civ. P. 15(a) . . . . . 8

*Other Proceedings*

*Golden v. Apple Inc.*, No. 22-4152 (N.D. Cal. Jul. 15, 2022) . . . . . 3, 4, 9

*Golden v. Apple Inc.*, No. 20-4353 (D.S.C. Jan. 5, 2021) . . . . . 2

*Golden v. Apple Inc.*, No. 20-2270 (D.S.C. Jun. 16, 2020) . . . . . 3

*Golden v. Apple Inc.*, No. 19-2557 (D.S.C. Sept. 11, 2019) . . . . . 2

*Golden v. Google LLC*, No. 21-244 (D.S.C. Jan. 26, 2021) . . . . . 4

*Golden v. Intel Corporation*, No. 22-3828 (N.D. Cal. Jun. 28, 2022) . . . . . 3

*Golden v. Qualcomm Inc.*, No. 22-3283 (N.D. Cal. Jun. 6, 2022) . . . . . 3

**TABLE OF AUTHORITIES**
*(continued)*

*Other Proceedings* **Pages**

*Golden v. United States,*
No. 13-307 (Fed. Cl. May 1, 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1, 2

– v – Case No. 4:22-cv-05246-HSG
MOTION TO DISMISS COMPLAINT BY DEFENDANT GOOGLE LLC

SAppx220

## INTRODUCTION

Plaintiff's complaint accuses Google of patent infringement by making and selling Pixel devices, but admits on its face that the accused Pixel devices cannot infringe without adding an additional application, called Android Team Awareness Kit or "ATAK," that the plaintiff concedes Google does not make or sell. The complaint thus does not actually allege that Google infringes; it claims only that Google makes devices that someone else could modify, by installing additional software, into an allegedly infringing device. But as courts have long held, a device that requires modification to infringe is by definition a non-infringing device. The complaint thus admits that Google makes and sells non-infringing devices, and therefore fails to state a claim on which this Court can grant relief. The Court should therefore dismiss it in its entirety.

## BACKGROUND

### A. Mr. Golden's Patents

Plaintiff Larry Golden holds at least ten patents including the three at issue here, United States Patent Nos. 9,096,189, 9,589,439, and 10,163,287. The patents-in-suit address "anti-terrorist detection and prevention systems," specifically, "a chemical/biological/radiological detector unit with a disabling locking system for protecting products that can be grouped into several product groupings, from terrorist activity, and also for preventing unauthorized access to and tampering with the storage and transport of ordnance and weapons." '189 patent at 1:40-45, 3:16-22; '439 patent at 1:47-52, 3:25-30; '287 patent at 1:57-63, 3:35-41. The patents disclose a "multi sensor detection and disabling lock system" which includes "detectors that sample for chemical, biological and radiological compounds, agents and elements," that can be connected to "surveillance towers scanning detector cases disposed at seaport docks, freight depots and rail terminals for monitoring containers being prepared for shipment or sitting on docks for long periods of time." '189 patent at Abstract; '439 patent at Abstract; '287 patent at Abstract.

### B. Mr. Golden's Litigation Campaign

#### 1. Court of Federal Claims

Shortly after the Patent and Trademark Office issued the patents-in-suit, Mr. Golden asserted them as part of his long-running litigation campaign against various defendants. First, he filed *Golden v. United States* in the Court of Federal Claims, alleging that the United States infringed the patents-in-suit by

"award[ing] and fund[ing] third-party government contractors for research and development, manufacture, and commercialization of Plaintiff's CMDC devices through various government agencies," including "at least" the Department of Homeland Security and the National Aeronautics and Space Administration. No. 13-307, Docket No. 195 at ¶¶ 2, 7 (Fed. Cl. Nov. 3, 2020). Mr. Golden claimed $90 billion in damages in his original complaint. *Id.*, Docket No. 1 at 10 (Fed. Cl. May 1, 2013). After eight years of litigation and six chances to amend the complaint, the court dismissed the action with prejudice, noting that "[e]nough time and resources have been expended by the court and the Department of Justice dealing with these allegations." *Golden v. United States*, 156 Fed. Cl. 623, 632 (Nov. 10, 2021). Mr. Golden appealed, but the Court of Appeals affirmed. *Golden v. United States*, No. 22-1196, 2022 WL 4103287 at *2 (Fed. Cir. Sept. 8, 2022).

**2. District of South Carolina**

Mr. Golden filed another case, *Golden v. Apple*, in which he alleged that sixteen defendants including Apple, Samsung, General Motors Company, and car dealers including Big 'O' Dodge Chrysler Jeep Ram and Fairway Ford Lincoln of Greenville, each infringed the patents-in-suit. No. 19-2557, Docket No. 16, (D.S.C. Oct. 15, 2019). After allowing two iterations of the complaint, the court dismissed Mr. Golden's case without leave to amend. *Id.*, Docket No. 32 (D.S.C. Jan. 27, 2020). Mr. Golden again appealed; the Federal Circuit again affirmed. *Golden v. Apple Inc.*, 819 F. App'x 930, 931 (Fed. Cir. 2020), *cert. denied*, 141 S. Ct. 1067 (2021).

Shortly thereafter, Mr. Golden filed another infringement complaint, again in the District of South Carolina, again alleging infringement of the patents-in-suit against several tech companies, network providers such as T-Mobile and AT&T, car manufacturers, and three local car dealerships. *Golden v. Apple*, No. 20-4353, Docket No. 10 (D.S.C. Jan. 5, 2021). The Court dismissed the case, noting that "[i]n light of the vague conclusory allegations in the complaint in this action, and Golden's attempt to circumvent the prior dismissals of his patent infringement claims, the instant matter is subject to summary dismissal as frivolous." *Golden v. Apple Inc.*, No. 20-4353, 2021 WL 5074739, at *2 (D.S.C. Nov. 2, 2021). Mr. Golden appealed; the Federal Circuit again affirmed. *Golden v. Apple Inc.*, Nos. 22-1229, 22-1267, 2022 WL 4103285 at *2 (Fed. Cir. Sept. 8, 2022).

In a third action before the District of South Carolina, Mr. Golden brought claims seeking more than $1 trillion against many of the same defendants, claiming that, by using the patents-in-suit, they violated various laws including the Sherman Act and the South Carolina Consumer Protection and Unfair Competition Laws, and were part of a "secret conspiracy" to "develop the intellectual property technology as their own private property," and to "hinder trade," which "destroyed all possibilities for the Plaintiff to receive royalty compensation and for the Class to eliminate its South Carolina taxpayer debt." *Golden v. Apple*, No. 20-2270, Docket No. 1 at 1, ¶¶ 14, 48 (D.S.C. Jun. 16, 2020). The Court found that "the claims appear patently frivolous" and, in any event, "the plaintiff cannot circumvent the court's prior ruling by labeling substantially similar allegations as seeking damages under the Sherman/Clayton Acts instead of for patent infringement." *Id.*, Docket No. 16, slip op. at 7-9 (D.S.C. Sept. 11, 2020). The District Court dismissed the complaint. *Golden v. Apple Inc.,* No. 20-2270, 2021 WL 4260782, at *3 (D.S.C. Sept. 20, 2021), *aff'd*, No. 21-2160, 2022 WL 986984 (4th Cir. Mar. 31, 2022). Mr. Golden appealed; the Fourth Circuit affirmed. *Golden,* 2022 WL 986984 at *1.

**3. This Court**

On June 6, 2022, Mr. Golden sued Qualcomm in this Court, asserting that Qualcomm infringed the patents-in-suit, resulting in violations of the Sherman and Clayton Acts, and that Qualcomm is involved in a "secret conspiracy," "under the protection of a Government contract to develop Plaintiff's 'new and improved cell phone' (i.e., smartphone)." *Golden v. Qualcomm, Inc.*, No. 22-3283, Docket No. 1 at 1, ¶ 28 (N.D. Cal. Jun. 6, 2022). That case remains pending.

On June 28, 2022, Mr. Golden sued Intel in this Court, alleging infringement of the '189 and '287 patents, and asserting that Intel is also involved in a "secret conspiracy." *Golden v. Intel Corp.*, No. 22-3828, Docket No. 1 at 1 (N.D. Cal. Jun. 28, 2022). That case remains pending.

On July 15, 2022, Mr. Golden sued Apple in this Court, alleging infringement of the '439 and '287 patents, that Apple had "monopoly power while working for the Government, that likely resulted in secret conspiracies," and that Apple is working to "prevent Plaintiff's market entry." *Golden v. Apple*, No. 22-4152, Docket No. 1 at 1-2, ¶ 83. (N.D. Cal. Jul. 15, 2022). This Court dismissed the complaint without leave to amend, noting "Golden has been pressing these frivolous claims (or some variation

thereof) for nearly 10 years in multiple jurisdictions. This is the rare case where dismissal without leave to amend is appropriate at the outset." *Id.*, Docket No. 29 at 1 (N.D. Cal. Oct. 20, 2022).

**C. Mr. Golden's South Carolina Litigation Against Google and Resulting Appeal**

On January 26, 2021, Mr. Golden sued Google in the District of South Carolina, alleging infringement of the patents-in-suit. *Golden v. Google*, No. 21-244, Docket No. 1 at 1 (D.S.C. Jan. 26, 2021). The District of South Carolina, under "established local procedure" and its "inherent authority to review the *pro se* complaint to ensure that subject matter jurisdiction exists and that a case is not frivolous," undertook a "careful review" of Mr. Golden's complaint, after which the Magistrate Judge recommended dismissal. *Id.*, Docket No. 14, slip op. at 2, 10 (D.S.C. Apr. 9, 2021). Mr. Golden objected to the report and recommendation, but the District Court entered judgment of dismissal without leave to amend. *Id.*, Docket No. 18 (D.S.C. Apr. 22, 2021); Docket No. 21, slip op. at 5 (D.S.C. Nov. 2, 2021).

Mr. Golden appealed. The Court of Appeals vacated the District Court's dismissal, holding that Mr. Golden's complaint was intelligible, if not necessarily meritorious:

> In the Google case, the district court again concluded that Mr. Golden's complaint was frivolous. Here, however, Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the Google Pixel 5 Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,096,189. The district court discounted this claim chart because it 'contains the exact same language as the claim charts previously rejected by the Federal Circuit [in the 2019 case], although Google Pixel 5 Smartphone appears in the far left column instead of Apple.' But to the extent that the chart includes the 'exact same language' as previously rejected charts, it is simply the language of the independent claims being mapped to. The key column describing the infringing nature of the accused products is not the same as the complaint held frivolous in the 2019 case. It attempts—whether successfully or not—to map claim limitations to infringing product features, and it does so in a relatively straightforward manner.
>
> We conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart. Mr. Golden has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart. On remand, the district court should allow the complaint to be filed and request service of process. Our decision does not preclude subsequent motions to dismiss by the defendant for failure to state a claim or for summary judgment. We express no opinion as to the adequacy of the complaint or claim chart except that it is not facially frivolous.

*Golden*, 2022 WL 4103285 at *2 (citing *Golden*, No. 21-244, Docket No. 21, slip op. at 4 (D.S.C. Nov. 2, 2021)) (alteration in original) (internal citations omitted). Mr. Golden has not effected service in the South Carolina action, evidently electing instead to proceed in this Court.

**D.     Mr. Golden's Allegations in This Action**

On September 14, 2022, Mr. Golden filed this action.  Compl. at 1.  On October 5, 2022, Mr. Golden effected service of this action on Google.  His infringement claims echo his South Carolina complaint, alleging that Google infringes U.S. Patent Nos. 9,096,189, 9,589,439, and 10,163,287 because it "makes, uses, offer [sic] to sell, or sells Google Pixel smartphones 3, 3XL, 3aXL, 4a, 4a(5G), and 5." Compl. at 2.  But Mr. Golden does not allege that Google Pixel devices themselves infringe—instead he alleges that Google Pixel devices could infringe his patents if a user added another application, "ATAK," made not by Google, but by the U.S. military:

> Through collaboration and innovation, the Defense Threat Reduction Agency has integrated its powerful, hazard-awareness-and-response tools into the *Android Tactical Assault Kit (or the Android Team Awareness Kit, ATAK)*.  ATAK is a digital application available to warfighters throughout the DoD.  Built on the Android operating system, ATAK offers warfighters geospatial mapping for situational awareness during combat — on an end-user device such as a smartphone or a tablet.  With DTRA's contribution, ATAK now includes chemical, biological, radiological, and nuclear (CBRN) plug-ins.

Compl. ¶ 18 at 13 (emphasis in original).  Mr. Golden does not allege that Google makes or sells ATAK, or makes or sells devices with ATAK installed; instead he admits that ATAK comes from the "Defense Threat Reduction Agency," an agency of the U.S. Government; is "available to warfighters throughout the DoD" or Department of Defense; and is merely "[b]uilt on the Android operating system"—as must be all Android applications, whether or not made by Google.  *Id.*  The claim chart in the complaint—which the Court of Appeals noted "attempts—whether successfully or not—to map claim limitations to infringing product features, and it does so in a relatively straightforward manner"—identifies the non-Google ATAK application as the sole functionality infringing at least two elements of each asserted claim, thus admitting that infringement requires the non-Google ATAK application and cannot occur without it.  *Golden*, 2022 WL 4103285 at *2; *see* Compl. ¶ 53 at 26 ('189, '439, '287 patents), at 27 ('189, '439, '287 patents), at 28 ('189 and '439 patents), and at 29 ('439 patent).  Each time the chart references ATAK, it states again that ATAK is "built on the Android Operating System," not shipped with any Google Pixel device.  *See id.* The complaint thus repeatedly and consistently alleges that infringement cannot occur without ATAK, that ATAK does not come from Google, and that Google does not ship any devices (Pixel or otherwise) including ATAK.

## ARGUMENT

### I. The Complaint Fails to Allege Direct Infringement by Google

A complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 697 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)); *see, e.g., Hantz Software, LLC v. Sage Intacct, Inc.*, 576 F. Supp. 3d 677, 682 (N.D. Cal. 2021). The "plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Demos v. Google*, No. 19-4433, 2019 WL 6341318 at *1 (N.D. Cal. Nov. 27, 2019) (alterations in original) (citing *Twombly*, 550 U.S. at 555). Under this standard, courts dismiss claims "when the facts asserted do not give rise to a legal remedy," or "do not elevate a claim for relief to the realm of plausibility." *Laguna Hermosa Corp. v. United States*, 671 F.3d 1284, 1288 (Fed. Cir. 2012) (citing *Lindsay v. United States*, 295 F.3d 1252, 1257 (Fed. Cir. 2002)). The *Twombly/Iqbal* "plausibility standard applies to direct infringement claims." *Artrip v. Ball Corp.*, 735 Fed. App'x 708, 715 n.4 (Fed. Cir. 2018) (citing *Lifetime Indus., Inc. v. Trim-Lok, Inc.*, 869 F.3d 1372, 1376-77 (Fed. Cir. 2017)). In pleading direct patent infringement, a plaintiff cannot satisfy "the pleading standards set forth in *Twombly* and *Iqbal* 'by reciting the claim elements and merely concluding that the accused protect [sic] has those elements. There must be some factual allegations that, when taken as true, articulate why it is plausible that the accused product infringes the patent claim.'" *Cyph, Inc. v. Zoom Video Commc'ns, Inc.*, No. 22-0561, 2022 WL 1556417, at *2 (N.D. Cal. May 17, 2022) (quoting *Bot M8 LLC v. Sony Corp. of Am.*, 4 F.4th 1342, 1353 (Fed. Cir. 2021)); *see also Artrip*, 735 Fed. App'x at 715 n.4; *Lifetime Indus., Inc.*, 869 F.3d at 1376-77.

Mr. Golden's allegations fail to clear the *Twombly/Iqbal* bar; instead, they confirm that Google's products do not infringe any asserted claim. Mr. Golden alleges that some Google Pixel devices *could* infringe his asserted patents *if* a user were to add an additional application, ATAK, which Mr. Golden admits that Google does not make or sell. Mr. Golden thus alleges not that Google sells infringing Pixel devices, but that *someone else* could modify Google's Pixel devices, by adding non-Google software, to make them allegedly infringing. But, as courts have repeatedly found, alleging "that a device is capable of being modified to operate in an infringing manner is not sufficient, by itself, to support a finding of

infringement." *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F. 3d 1316, 1330 (Fed. Cir. 2001) (citation omitted); *see also Typhoon Touch Techs., Inc. v. Dell, Inc.*, 659 F. 3d 1376, 1380 (Fed. Cir. 2011) (rejecting infringement claim where accused product is "merely capable of being modified in a manner that infringes the claims of a patent"); *Fantasy Sports Props., Inc. v. Sportsline.com, Inc.*, 287 F. 3d 1108, 1117-18 (Fed. Cir. 2002); *High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*, 49 F. 3d 1551, 1555 (Fed. Cir. 1995) ("[A] device does not infringe simply because it is possible to alter it in a way that would satisfy all the limitations of a patent claim.").

Although Mr. Golden has elected to proceed *pro se*, his decision to do so does not change the result this Court should reach. "[P]ro se litigants are bound by the rules of procedure," which "require a short and plain statement of the claim showing that the pleader is entitled to relief." *Zeiny v. United States*, No. 19-5806, 2020 WL 496076, at *2 (N.D. Cal. Jan. 30, 2020) (quoting *Ghazali v. Moran*, 46 F.3d 52, 54 (9th Cir. 1995)). "Complaints by *pro se* plaintiffs must be 'liberally construed,'" but a *pro se* plaintiff "must still allege facts sufficient to allow a reviewing court to determine that a claim has been stated." *Anderson v. Google Inc.*, No. 12-6573, 2013 WL 1285516, at *1 (N.D. Cal. Mar. 27, 2013) (citing *Ivey v. Bd. of Regents of Univ. of Alaska*, 673 F.2d 266, 268 (9th Cir. 1982)). "Although complaints filed by a *pro se* plaintiff are held to less stringent standards than formal pleadings drafted by lawyers, Plaintiff is not excused from alleging sufficient facts on which a recognized legal claim could be based." *Arunachalam v. Apple, Inc.*, No. 18-1250, 2018 WL 5023378, at *2 (N.D. Cal. Oct. 16, 2018), *aff'd*, 806 F. App'x 977 (Fed. Cir. 2020) (citing *Mylviya v. City of San Jose*, No. 5-5427, 2006 WL 2529511, at *2 (N.D. Cal. Aug. 31, 2006)). Even when read in the light most favorable to Mr. Golden—and with the understanding that a "*pro se* complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers"—the complaint itself confirms that Google's accused products do not infringe, and thus fails to state a claim on which this Court can grant relief. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007); *see also* Fed. R. Civ. P. 12(b)(6). A plaintiff "'may plead [him]self out of court' if he 'plead[s] facts which establish that he cannot prevail on his . . . claim.'" *Alfasigma USA, Inc. v. First Databank, Inc.*, 398 F. Supp. 3d 578, 589 (N.D. Cal. 2019) (alterations in original) (quoting *Weisbuch v. Cty. of Los Angeles*, 119 F.3d 778, 783 n.1 (9th Cir. 1997)). That is precisely what happened here.

**II. The Complaint Fails to Allege Indirect Infringement**

"There can be no inducement or contributory infringement without an underlying act of direct infringement." *Redd Grp., LLC v. Glass Guru Franchise Sys., Inc.*, No. 12-4070, 2013 WL 3462078, at *4 (N.D. Cal. Jul. 8, 2013) (quoting *Linear Tech Corp. v. Impala Linear Corp.*, 379 F. 3d 1311, 1326 (Fed Cir. 2004)). Because Mr. Golden has failed to allege direct infringement of the patents-in-suit, he has also failed to allege indirect infringement. *See Redd Grp.*, 2013 WL 3462078, at *4. The Court should therefore dismiss the complaint in its entirety.

**III. The Court Should Deny Leave to Amend**

Although Google recognizes that this is an unusual request, and particularly so against a *pro se* plaintiff, Google respectfully submits that under the circumstances of this case, the Court should deny leave to amend, because Mr. Golden's infringement theory confirms that amendment would be futile. As this Court has explained:

> Under Federal Rule of Procedure 15(a)(2), "leave to amend shall be freely granted when justice so requires." Despite the liberality with which Rule 15(a) is applied, the Court may exercise its discretion to deny leave to amend due to factors such as (1) bad faith, (2) undue delay, (3) prejudice to the opposing party, (4) futility of amendment, and (5) previous amendments.

*Davis v. Pinterest, Inc.*, No. 19-7650, 2020 WL 6342936, at *2 (N.D. Cal. Oct. 29, 2020) (quoting *Townsend v. Univ. of Alaska*, 543 F.3d 478, 485 (9th Cir. 2008)). As the complaint admits in detail, Mr. Golden's infringement theory makes any amendment futile. The complaint alleges that Google's Pixel devices, *when modified by installing ATAK*, infringe the patents-in-suit—thus necessarily admitting that *unmodified* Pixel devices do not infringe those patents. *See supra* § I. As the Court of Appeals noted, the complaint "attempts—whether successfully or not—to map claim limitations to infringing product features, and it does so in a relatively straightforward manner." *Golden*, 2022 WL 4103285 at *2. The complaint does not suffer from a drafting deficiency; instead, its theory of infringement contains the seeds of its own demise, a problem no amount of amendment can cure.

"Futility of amendment can, by itself, justify the denial of a motion for leave to amend." *Bonin v. Calderon*, 59 F.3d 815, 845 (9th Cir. 1995). Mr. Golden has litigated these patents for almost a decade, *see supra* § B; he has had time to develop his best theory of infringement, and even that best theory falls well short. As a result, as this Court recently decided in other litigation brought by Mr. Golden, "[t]his is

the rare case where dismissal without leave to amend is appropriate at the outset." *Golden*, No. 22-4152, Docket No. 29 at 1 (N.D. Cal. Oct. 20, 2022). Google respectfully requests the Court reach the same result here.

**CONCLUSION**

For the reasons set forth above, the Court should dismiss the complaint in its entirety without leave to amend.

Date: October 26, 2022

Respectfully submitted,

Matthew S. Warren (State Bar No. 230565)
Sachli Balazadeh-Nayeri (State Bar No. 341885)
WARREN LEX LLP
2261 Market Street, No. 606
San Francisco, California, 94114
+1 (415) 895-2940
+1 (415) 895-2964 facsimile
22-5246@cases.warrenlex.com

*Attorneys for Defendant Google LLC*

**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF CALIFORNIA – OAKLAND**

Larry Golden, *Pro Se* Plaintiff
740 Woodruff Rd., #1102
Greenville, SC 29607
Phone (864) 288-5605
Email: atpg-tech@charter.net

FILED
NOV 01 2022
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

LARRY GOLDEN,

Plaintiff,

V.

GOOGLE LLC

Defendants.

CIVIL CASE NO: 4:22-cv-05246-HSG

**JURY TRIAL DEMANDED**

**(Direct Patent Infringement),**
**(Contributory Patent Infringement),**
**(Joint Patent Infringement)**

October 29, 2022

## PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS AND CROSS-MOTION FOR SUMMARY JUDGEMENT

Google's Motion to Dismiss Plaintiff's Complaint (Dkt. 11) for failure to state a claim upon which relief may be granted under Federal Rule of Civil Procedure 12(b)(6), is barred by "issue preclusion" because the factual allegations submitted by Plaintiff, have been fully litigated and decided on Appeal by a Three-Judge Panel, at the United States Court of Appeals for the Federal Circuit in *Larry Golden v. Google LLC*; Case No. 22-1267.

> Three-Judge Panel: "DISCUSSION. 'Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal,* 556 U.S. 662 (2009), a court must dismiss a complaint if it fails to allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570 … '[W]e review the

district court's dismissal of the complaint *de novo* '" [without reference to any legal conclusion or assumption made by the previous court to hear the case], *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014).

## REVIEW OF RELEVANT FACTS

United States District Court for the District of South Carolina in *Larry Golden v. Google LLC*; No. 6:21-cv-00244-JD, Magistrate Judge Keven F. McDonald "Report and Recommendations" ***Exhibit A***

> " … [T]he plaintiff has sued Google, LLC ("Google") which he asserts has infringed on the following patents: 10,163,287 ('287 patent); 9,589,439 ('439 patent); 9,096,189 ('189 patent) … [t]he plaintiff's complaint alleges infringement of each patent by the defendant in vague formulaic terms and includes various excerpts from a claim chart … ("Section 1915(d) . . . authorizes courts to dismiss a 'frivolous or malicious' action, but there is little doubt they would have power to do so even in the absence of this statutory provision.") … Accordingly, "[t]he present Complaint is subject to review pursuant to the inherent authority of this Court to ensure that subject matter jurisdiction exists and that the case is not frivolous." … In reviewing a complaint for frivolousness or malice, the Court looks to see whether the Complaint raises an indisputably meritless legal theory or is founded upon clearly baseless factual contentions, such as fantastic or delusional scenarios … plaintiff's complaint contains a lengthy history of his prior actions in this court, various cell phone statistics, a description of the development of the android operating system, and specifications for various Google phones, but contains few factual allegations relating to the alleged infringement [] … the majority of the plaintiff's allegations are vague and conclusory, referencing just the alleged infringing devices and the alleged infringed-upon patents … [t]he plaintiff does include a claim chart in his complaint; however, upon review, the chart contains the exact same language as the claim charts previously rejected … by the Federal Circuit, although Google Pixel 5 Smartphone appears in the far left column instead of Apple … [t]hese charts and allegations of infringement were specifically rejected by the Federal Circuit Court of Appeals, because they contained "a dizzying array of disorganized assertions" "disingenuously using the words of the claims to generally describe cryptically identified structures … RECOMMENDATION … [T]he undersigned is of the opinion that the plaintiff cannot cure the defects identified above by amending his complaint … [a]dditionally, based upon the foregoing, the Court recommends that the District Court dismiss this action with prejudice…"

United States District Court for the District of South Carolina in *Larry Golden v. Google LLC* No. 6:21-cv-00244-JD, Judge Joseph Dawson, III "Opinion

and Order" adopting the "Report and Recommendations" of Magistrate Judge Keven F. McDonald ***Exhibit B***

> "[T]he recommendation has no presumptive weight, and the responsibility for making a final determination remains with the United States District Court. See *Mathews v. Weber*, 423 U.S. 261, 270- 71 (1976). The Court is charged with making a de novo determination of those portions of the Report and Recommendation to which specific objection is made. The Court may accept, reject, or modify, in whole or in part, the recommendation made by the magistrate judge or recommit the matter with instructions. 28 U.S.C. § 636(b)(1) … "[t]his Court possesses the inherent authority to review the pro se complaint to ensure that subject matter jurisdiction exists and that a case is not frivolous, even if the pleading is not subject to the pre-screening provisions of 28 U.S.C. § 1915 … ("Section 1915(d) . . . authorizes courts to dismiss a 'frivolous or malicious' action, but there is little doubt they would have power to do so even in the absence of this statutory provision.") … on April 9, 2021, the Magistrate Judge issued the Report given his initial review of the pleadings …[t]he Report recommended summary dismissal of the complaint with prejudice and without issuance of service of process or leave to amend his complaint … [t]he instant complaint seeks damages against Google for the same allegations that were dismissed as frivolous … it appears that this action represents Golden's attempt to re-litigate claims against Apple and/or Qualcomm and now asserts the same claims against Google … the Report recommend dismissal of Plaintiff's complaint because inter alia the Plaintiff's complaint contains a lengthy history of his prior actions in this Court, various cell phone statistics, a description of the development of the android operating system, and specifications for various Google phones, but contains few factual allegations relating to the alleged infringement … [P]laintiff makes the following "objections"3 to the Report, which the Court will discuss seriatim. *First*, Golden objects to the Report's recommendation of dismissal of the action in light of the claim charts he has provided in the Complaint … [F]or example, the chart copies previously submitted charts alleging patent infringement (albeit by Google in lieu of other defendants) of independent claim 5 of the '287 patent; independent claim 23 of the '439 patent; and independent claim 1 of the '189 patent … [t]hese charts and allegations of infringement were specifically rejected by the Federal Circuit Court of Appeals because they contained "a dizzying array of disorganized assertions" "disingenuously using the words of the claims to generally describe cryptically identified structures … [I]n light of the foregoing, this Court overrules this objection … Golden's amended complaint does not (among other things) describe specific systems developed and manufactured by Google that are like the subject patents and how the systems perform the same unique function as Golden's system or assert facts regarding the availability of his technology prior to his invention. In light of the vague conclusory allegations in the complaint in this action and Golden's attempt to circumvent the prior dismissals of his patent infringement claims, the instant matter is subject to summary dismissal as frivolous."

On Appeal from the United States District Court for the District of South Carolina in No. 6:21-cv-00244-JD, Judge Joseph Dawson, III. The United States

Court of Appeals for the Federal Circuit in *Larry Golden v. Google LLC*; Case No. 22-1267; Before *Circuit Judges* DYK, TARANTO, and STOLL ***Exhibit C***

> "[W]e … vacate the dismissal in Case No. 22-1267 and remand for further proceedings consistent with this opinion … On January 26, 2021, in Case No. 22-1267, Mr. Golden separately sued Google LLC for patent infringement ("the Google case") … [t]he magistrate judge reviewed the complaints in both cases and recommended summary dismissal with prejudice without issuance of service of process or leave to amend and monetary sanctions for the filing of frivolous litigation … DISCUSSION 'Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), a court must dismiss a complaint if it fails to allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. This standard "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (citation omitted). A plaintiff must allege facts that give rise to "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). In the patent context, this court has explained that a plaintiff need not "plead facts establishing that each element of an asserted claim is met," *In re Bill of Lading Transmission and Processing Sys. Pat. Litig.*, 681 F.3d 1323, 1335 (Fed. Cir. 2012) (citing *McZeal v. Sprint Nextel Corp.*, 501 F.3d 1354, 1357 (Fed. Cir. 2007)), but must plead "'enough fact[s] to raise a reasonable expectation that discovery will reveal' that the defendant is liable for the misconduct alleged." *Id.* at 1341 (alteration in original) (quoting *Twombly*, 550 U.S. at 556). We review the district court's dismissal of the complaint *de novo*. *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014).' …
>
> "[I]n the Google case, the district court again concluded that Mr. Golden's complaint was frivolous. Here, however, Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the Google Pixel 5 Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189. The district court discounted this claim chart because it "contains the exact same language as the claim charts previously rejected by the Federal Circuit [in the 2019 case], although Google Pixel 5 Smartphone appears in the far-left column instead of Apple." Dist. Ct. Op. at 4. But to the extent that the chart includes the "exact same language" as previously rejected charts, it is simply the language of the independent claims being mapped to. The key column describing the infringing nature of the accused products is not the same as the complaint held frivolous in the 2019 case. It attempts—whether successfully or not—to map claim limitations to infringing product features, and it does so in a relatively straightforward manner …[W]e conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart. Mr. Golden has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart. On remand, the district court should allow the complaint to be filed and request service of process. Our decision does not preclude subsequent motions to dismiss by the defendant for failure to state a claim or for summary judgment. We express no opinion as to the adequacy of the complaint or claim chart except that it is not facially frivolous."

With respect to "issue preclusion", all of the elements are present: "(1) [a] final adjudication (2) of an identical issue (3) actually litigated and necessarily decided in the first suit and (4) asserted against one who was a party in the first suit." *Abe v. AFCH, Inc.*, No. 2:20-cv-08193-ODW (PVCx), 2021 WL 2209309, at *4 (C.D. Cal. June 1, 2021).

With respect to vertical *stare decisis*, all tribunals exercising inferior jurisdiction are required to follow decisions of courts exercising superior jurisdiction. (*Auto Equity*, supra, 57 Cal.2d at p. 455.)

The Court of Appeals for the Federal Circuit (the Federal Circuit) is unique among the circuit courts of appeals because it has nationwide jurisdiction over certain subject matter, including patents. 28 U.S.C. § 1295(a)(1) (2006). See *Holmes Group, Inc. v. Vornado Air Circulation Systems, Inc.*, 535 U.S. 826 (2002); http://www.cafc.uscourts.gov/about.html. The Federal Circuit Court of Appeals hears appeals from patent cases, but does not oversee its own district courts.

Regardless of the district court in which the Plaintiff in a patent case files suit, under federal law, the Federal Circuit Court of Appeals, in Washington, D.C., has exclusive jurisdiction over appeals if the case "arises under" any federal law related to patents [28 U.S.C. §1295(a)(1)].

The court sits primarily in Washington, DC. and is different from the other US federal appeals courts in that it hears cases based upon subject matter versus those matters brought in a specific geographic location. The decisions of the court, in particular in regard to cases involving patents are unique in that they are binding precedent. Decisions of this circuit are only superseded by changes in specific law, or from decisions rendered by the US Supreme Court. https://law.justia.com/cases/federal/appellate-courts/cafc/

The litigation and resolution of Plaintiff's infringement allegations against Google products in the United States District Court for the District of South Carolina in *Larry Golden v. Google LLC* No. 6:21-cv-00244-JD case; and, the United States Court of Appeals for the Federal Circuit in *Larry Golden v. Google LLC*; Case No. 22-1267 precludes re-litigation of the infringement claims under both the "Issue Preclusion" doctrine, and the doctrine of "Vertical *Stare Decisis*".

**SUMMARY JUDGEMENT: PURSUANT TO FRCP RULE 56**

Plaintiff has shown that there is no genuine dispute as to any material fact; no reason to challenge Plaintiff's direct, joint, or contributory infringement claims; no genuine dispute that Plaintiff owns the patent rights for the smartphone; no genuine dispute to the validity of Plaintiff's patents; and, no genuine dispute to the Federal Circuit's decisions made in this case. This case is ripe for summary judgement, and Plaintiff is entitled to judgment as a matter of law.

Sincerely,

Larry Golden, *Pro Se* Plaintiff
740 Woodruff Rd., #1102
Greenville, SC 29607
(H) 8642885605
(M) 8649927104
Email: atpg-tech@charter.net

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this 29nd day of October, 2022, a true and correct copy of the foregoing "Plaintiff's Response to Defendant's Motion to Dismiss and Cross-Motion for Summary Judgement", was served upon the following Defendant by priority "express" mail:

Matthew S. Warren
WARREN LEX LLP
2261 Market Street, No. 606
San Francisco, California, 94114
Phone: (415) 895-2940
Fax: (415) 895-2964
Email: 22-5246@cases.warrenlex.com

Larry Golden, Pro Se
740 Woodruff Rd., #1102
Greenville, South Carolina 29607
atpg-tech@charter.net
864-288-5605

# EXHIBIT A

IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | |
|---|---|
| Larry Golden, Plaintiff, vs. Google, LLC, Defendant. | C/A No. 6:21-cv-00244-JD-KFM **REPORT OF MAGISTRATE JUDGE** |

The plaintiff, proceeding *pro se*, brings this action asserting patent infringement by the defendant. Pursuant to the provisions of 28 U.S.C. § 636(b), and Local Civil Rule 73.02(B)(2) (D.S.C.), this magistrate judge is authorized to review all pretrial matters in this case and submit findings and recommendations to the district court.

The plaintiff's complaint was entered on the docket on January 26, 2021 (doc. 1). By order dated February 16, 2021, the plaintiff was given a specific time frame in which to bring his case into proper form for judicial screening (doc. 8). The plaintiff complied with the court's order, bringing his case into proper form. Nevertheless, upon review, the plaintiff's complaint is subject to summary dismissal.

**FACTS PRESENTED**

In the instant action, the plaintiff has sued Google, LLC ("Google") which he asserts has infringed on the following patents: 10,163,287 ('287 patent); 9,589,439 ('439 patent); 9,096,189 ('189 patent) (docs. 1; 1-1; 1-2; 1-3). These patents are entitled "multi sensor detection, stall to stop and lock disabling system" (docs. 1; 1-1; 1-2; 1-3). The plaintiff contends that the defendant has infringed on his patents based upon "product grouping" strategy (doc. 1 at 9). He further contends that the defendant is infringing on his patents in concert with Apple and Qualcomm, both of which he has sued in separate

actions (*id.* at 13–18). The plaintiff's complaint alleges infringement of each patent by the defendant in vague formulaic terms and includes various excerpts from a claim chart (doc. 1 at 19–29). For relief, the plaintiff seeks a declaratory judgment that the defendant has infringed on his patents, a permanent injunction enjoining the infringing activity by the defendant, and money damages (doc. 1 at 29–30).

**STANDARD OF REVIEW**

As a *pro se* litigant, the plaintiff's pleadings are accorded liberal construction and held to a less stringent standard than formal pleadings drafted by attorneys. *See Erickson v. Pardus*, 551 U.S. 89 (2007) (*per curiam*). The requirement of liberal construction does not mean that the Court can ignore a clear failure in the pleading to allege facts which set forth a claim cognizable in a federal district court. *See Weller v. Dep't of Soc. Servs.*, 901 F.2d 387, 391 (4th Cir. 1990).

Under established local procedure in this judicial district, a careful review has been made of the *pro se* pleadings. This court possesses the inherent authority to review the *pro se* complaint to ensure that subject matter jurisdiction exists and that a case is not frivolous, even if the pleading is not subject to the pre-screening provisions of 28 U.S.C. § 1915.[1] *See Mallard v. U.S. Dist. Ct.*, 490 U.S. 296, 307–08 (1989) ("Section 1915(d) . . . authorizes courts to dismiss a 'frivolous or malicious' action, but there is little doubt they would have power to do so even in the absence of this statutory provision."); *Ross v. Baron*, 493 F. App'x 405, 406 (4th Cir. 2012) (unpublished) (finding that "frivolous complaints are subject to dismissal pursuant to the inherent authority of the court, even when the filing fee has been paid . . . [and] because a court lacks subject matter jurisdiction over an obviously frivolous complaint, dismissal prior to service of process is permitted." (citations omitted)); *see also Fitzgerald v. First E. Seventh St. Tenants Corp.*, 221 F.3d 362,

[1] The plaintiff paid the full filing fee; thus, this case is not subject to the pre-screening provisions of 28 U.S.C. § 1915. Additionally, the plaintiff is not a prisoner; thus, the case is not subject to the screening provided for in 28 U.S.C. § 1915A.

364 (2d Cir. 2000) (finding that "district courts may dismiss a frivolous complaint *sua sponte* even when the plaintiff has paid the required filing fee"). Accordingly, "[t]he present Complaint is subject to review pursuant to the inherent authority of this Court to ensure that subject matter jurisdiction exists and that the case is not frivolous." *Trawick v. Med. Univ. of S.C.*, C/A No. 2:16-cv-730-DCN-MGB, 2016 WL 8650132, at *4 (D.S.C. June 28, 2016), *Report and Recommendation adopted by* 2016 WL 8650131 (D.S.C. July 7, 2016), *aff'd* 671 F. App'x 85 (4th Cir. 2016) (mem).

**DISCUSSION**

Here, the plaintiff returns to this court seeking damages for infringement of three patents he holds, this time naming Google as the infringing defendant (*see generally* doc. 1). This is the plaintiff's sixth action regarding the patents (and infringing actions) at issue herein.[2] *See Golden v. Apple, Inc., et al.*, C/A No. 6:20-cv-04353-JD (D.S.C.) (Report and Recommendation pending recommending summary dismissal as frivolous and that the plaintiff be sanctioned) ("Case Number 5"); *See Golden v. Apple, Inc., et al.*, C/A No. 6:20-cv-02270-JD (D.S.C.) (Report and Recommendation pending recommending summary dismissal as frivolous) ("Case Number 4"); *Golden v. Apple Inc., et al.*, C/A No. 6:19-cv-02557-DCC, 2020 WL 415896 (D.S.C. Jan. 27, 2020), *aff'd* 819 F. App'x 930 (Fed. Cir. 2020), *petition for cert. denied*, 141 S.Ct. 1067 (2021) ("Case Number 3"); *Golden v. United States*, C/A No. 1:19-cv-00104-EGB (Fed. Cl.), *dismissal aff'd* 955 F.3d 981 (Fed. Cir. 2020) ("Case Number 2"); *Golden v. United States*, C/A No 1:13-cv-00307-EGB (Fed. Cl.) (pending) ("Case Number 1").

Two of the plaintiff's actions, Case Number 1 and Case Number 2, were brought in the Court of Federal Claims. *See Golden*, C/A No. 1:19-cv-00104-EGB; *Golden*,

---

[2] *Phillips v. Pitt Cnty. Mem. Hosp.*, 572 F.3d 176, 180 (4th Cir. 2009) (courts "may properly take judicial notice of matters of public record."); *Colonial Penn Ins. Co. v. Coil*, 887 F.2d 1236, 1239 (4th Cir. 1989) ("We note that '[t]he most frequent use of judicial notice . . . is in noticing the content of court records.'").

C/A No 1:13-cv-00307-EGB. The plaintiff filed Case Number 1 on May 1, 2013. *Golden*, C/A No. 1:13-cv-00307-EGB at doc. 1. In Case Number 1, the plaintiff alleged patent infringement and takings clause violations by the United States Government pursuant to 28 U.S.C. § 1498(a). *Id.* Case Number 1 has a lengthy docket, and during the eight year course of litigation, the plaintiff has filed six amended pleadings and the defendant has filed several substantive motions. *See Golden*, C/A No. 1:13-cv-00307-EBG. Of note, the operative pleading in that action is the sixth amended complaint, which that court authorized following a partial grant of a motion to dismiss the plaintiff's fifth amended complaint. *Golden v. United States*, 137 Fed. Cl. 155 (Fed. Cl. Mar. 29, 2018). In that order, the Honorable Susan G. Braden referenced correspondence by the plaintiff, which noted that the plaintiff would file a separate action in order to:

> force Apple, Samsung, and LG to decide between one or two choices: (1) In an effort to avoid any responsibility for infringement or liability of paying hundreds of billions of dollars in damages, the companies cho[o]se to throw the Government under the bus by presenting evidence that they were under contract to develop and manufacture devices that infringes my communication/monitoring device. If they cho[o]se this option it makes them a witness for me in my current case (*Larry Golden v. The United States*; Case # 13–307 C). (2) Deny the allegations of infringement. In this case I will present evidence to support the fact that the companies were under contract with the Government to develop and manufacture devices that infringe[ ] my communication / monitoring device, but that the companies decided to continue to develop and manufacture my communication / monitoring device beyond the specifications agreed upon with the Government, even after I notified the companies in 2010 to stop their manufacturing. If they chos[o]e this option it opens the companies up to willful infringement and the possibility of a temporary injunction to stop the manufacturing and development of my communication / monitoring device. If you were Apple, Samsung, and LG which option would you cho[o]se?

*Golden v. United States*, 137 Fed. Cl. at 168 (alterations in original). After his appeal of the partial dismissal order was denied, the plaintiff filed a motion to stay Case Number 1 because he was seeking additional *inter partes* review of some of the claims of his '990 Patent. *Golden*, C/A No. 1:13-cv-00307-SGB, at doc. 182. The plaintiff's motion was

granted on July 18, 2019, and Case Number 1 was stayed. *Id.* at doc. 186. The stay was lifted on October 26, 2020, after the plaintiff's *inter partes* review petition was denied. *Id.* at doc. 193. On February 26, 2021, a motion to dismiss by the defendants (in response to the plaintiff's sixth amended complaint) was granted in part and denied in part. *Id.* at doc. 215. The order dismissed patent infringement claims relating to two pending patent applications, but denied the motion in all other respects. *Id.* Based upon the allegations contained in the plaintiff's sixth amended complaint, the court on March 29, 2021, granted the defendants' motion to issue notice to Apple, LG, and Samsung since those entities may have an interest to assert in Case Number 1. *Id.* at docs. 222; 224. Based upon the issued notice, the court issued a scheduling order for claims construction, with the plaintiff's preliminary disclosure of infringement contentions due on or before May 7, 2021. *Id.* at doc. 221.

The plaintiff filed Case Number 2 in the United States Court of Federal Claims on January 17, 2019 during the pendency of Case Number 1. *Golden v. United States*, C/A No. 1:19-cv-00104-EGB, at doc. 1 (Fed. Cl.). Case Number 2 asserted Fifth Amendment takings clause claims against the government for the same patents and infringing actions as in Case Number 1. *Id.* The government moved to dismiss Case Number 2, arguing that the complaint in Case Number 2 was duplicative of the takings clause claims asserted in Case Number 1. *Id.* at doc. 6. On May 14, 2019, the government's motion was granted and Case Number 2 dismissed. *Id.* at doc. 12. The dismissal was affirmed by the United States Court of Appeals for the Federal Circuit. *Golden v. United States*, 955 F.3d 981 (Fed. Cir. 2020).

On July 2, 2019, through counsel, the plaintiff filed a petition with the United States Patent and Trademark Office ("USPTO") seeking to "Strike *Ultra Vires* Inter Partes Review Certificate from the Prosecution File of RE43,990 Based on *Return Mail v. U.S. Postal Service*." *In re Patent Number* RE 43,990, https://portal.uspto.gov/pair/PublicPair#

(choose patent number, enter RE43990, and then click Image File Wrapper) (last visited April 8, 2021). On June 25, 2020, the USPTO issued a decision denying the plaintiff's petition. *Id.*

During this same time, on September 11, 2019, the plaintiff filed Case Number 3 in this court, seeking damages from various third-party companies for patent infringement. *See Golden v. Apple, Inc., et al.*, C/A No. 6:19-cv-02557-DCC (D.S.C.). In that action, the plaintiff sought damages based upon the same patents and infringing actions as in Case Number 1 and Case Number 2, but sought the damages against the third-party companies instead of the government. *Id.* at doc. 1. Case Number 3 was dismissed as being duplicative of Case Number 1. *Id.* at doc. 32. The dismissal was affirmed as modified by the United States Court of Appeals for the Federal Circuit as frivolous. *Golden*, 819 F. App'x 930 (Fed. Cir. 2020), *petition for cert. denied*, 141 S.Ct. 1067 (2021). In the order, the Court of Appeals noted:

> Golden's amended complaint here, like his initial complaint, even if not duplicative of the earlier filed action against the government, "contains only conclusory formulaic recitations of the elements of patent infringement as to each defendant." Magistrate Judge Initial Order at 5, *Golden v. Apple Inc.*, No. 6:19-cv-02557 (D.S.C. Oct. 1, 2019), ECF No. 12. Count I of Golden's Amended Complaint, for example, merely states that "at least one of the defendants named in this complaint has infringed at least independent claim 4 & 5 of the '287 patent," Complaint at ¶ 156, *Golden v. Apple Inc.*, No. 6:19-cv-02557 (D.S.C. Oct. 15, 2019), ECF No. 16-1, followed by generalized statements of infringement by each defendant, *id.* at ¶¶ 157–204, and similar broad infringement allegations for each of Golden's other patents, *id.* at ¶¶ 205–384. The complaint itself offers only vague generalities and block quotes of statutes, cases and treatises, but nowhere points us to any nonfrivolous allegations of infringement of any claim by any actual product made, used, or sold by any defendant.
>
> The complaint also references "claim charts" for each defendant and each patent. *E.g.*, *id.*, ECF No. 16-14. These claim charts present a dizzying array of disorganized assertions over several hundred pages, disingenuously using the words of the claims to generally describe cryptically identified structures. Although Golden appeals pro se and is therefore entitled to a certain leeway in interpreting his complaint, we agree with the magistrate judge's conclusion that "the plaintiff's vague and

> conclusory allegations fail to state a claim for relief." Magistrate Judge Initial Order at 5.

*Id.* at 931.

The plaintiff then filed Case Number 4 in this court, seeking damages against many of the same defendants as named in Case Number 3. *See Golden v. Apple, Inc., et al.*, C/A No. 6:20-cv-02270-JD (D.S.C.). Having unsuccessfully sought patent infringement damages against these defendants in Case Number 3, the plaintiff's Case Number 4 sought relief for patent infringement and failure to pay royalties, and the plaintiff attempted to circumvent the court's prior ruling by asserting that the defendants' actions violated the Sherman Act, the Clayton Act, and various South Carolina Laws. *Id.* at doc. 1. On September 11, 2020, the undersigned issued a Report and Recommendation which recommended that Case Number 4 be dismissed as frivolous. *Id.* at doc. 16. The Report and Recommendation remains pending at this time.

The plaintiff then filed Case Number 5 in this court, again seeking damages against many of the same defendants as in Case Number 3 and Case Number 4. *See Golden v. Apple, Inc., et al.*, C/A No. 6:20-cv-04353-JD (D.S.C.). In that case, the plaintiff was informed that his complaint as submitted (totaling more than 300 pages excluding exhibits) did not comply with Rule 8 of the Federal Rules of Civil Procedure and the plaintiff was instructed to submit a complaint in compliance with the order, totaling no more than 35 pages. *Id.* at doc. 1. On February 5, 2021, the undersigned issued a Report and Recommendation which recommended that Case Number 5 be dismissed as frivolous and that the plaintiff be sanctioned for his continued filing of frivolous litigation. *Id.* at doc. 20. The Report and Recommendation remains pending at this time.

**Frivolousness**

Here, the plaintiff's complaint is subject to dismissal as frivolous. In reviewing a complaint for frivolousness or malice, the Court looks to see whether the Complaint raises

an indisputably meritless legal theory or is founded upon clearly baseless factual contentions, such as fantastic or delusional scenarios. *Harley v. United States*, 349 F. Supp. 2d 980, 981 (M.D.N.C. 2004) (citing *Neitzke v. Williams*, 490 U.S. 319 (1989)); *see also Feurtado v. McNair*, No. 3:05-cv-1933-SB, 2006 WL 1663792, at *2 (D.S.C. Jun. 15, 2006) (noting that frivolousness encompasses inarguable legal conclusions and fanciful factual allegations), *aff'd*, 227 F. App'x 303 (4th Cir. 2007), *petition for cert. dismissed*, 553 U.S. 1029 (2008).

Here, although the plaintiff has made allegations against a new alleged infringer, Google, his allegations are still frivolous and thus subject to summary dismissal. As an initial matter, to the extent the plaintiff alleges joint infringement by Google and Apple and/or Qualcomm, such allegations may not be used in this action to circumvent prior rulings by this court that infringement allegations against Apple/Qualcomm are frivolous. *See Golden v. Apple, Inc., et al.*, C/A No. 6:20-cv-04353-JD, at doc. 20; *Golden v. Apple, Inc., et al.*, C/A No. 6:19-cv-02557-DCC, at doc. 16; *Golden*, 819 F. App'x 930. Additionally, in the instant matter, the plaintiff's complaint contains a lengthy history of his prior actions in this court, various cell phone statistics, a description of the development of the android operating system, and specifications for various Google phones, but contains few factual allegations relating to the alleged infringement (*see generally* doc. 1). Indeed, the majority of the plaintiff's allegations are vague and conclusory, referencing just the alleged infringing devices and the alleged infringed-upon patents (*see generally* doc. 1). *See Golden v. Apple, Inc., et al.*, 819 F. App'x at 931 (affirming in Case Number 3 the dismissal of patent infringement claims because the complaint contained only "vague generalities and block quotes of statutes, cases, and treatises, but nowhere points us to any nonfrivolous allegations of infringement of any claim by any actual product made, used, or sold by any defendant"). The plaintiff does include a claim chart in his complaint; however, upon review, the chart contains the exact same language as the claim charts previously rejected

by the Federal Circuit, although Google Pixel 5 Smartphone appears in the far left column instead of Apple. For example, the chart copies previously submitted charts alleging patent infringement (albeit by Google in lieu of other defendants) of independent claim 5 of the '287 patent; independent claim 23 of the '439 patent; and independent claim 1 of the '189 patent (doc. 1 at 23–29). *See Golden*, C/A No. 6:19-cv-02557, at doc. 16-14. These charts and allegations of infringement were specifically rejected by the Federal Circuit Court of Appeals, because they contained "a dizzying array of disorganized assertions" "disingenuously using the words of the claims to generally describe cryptically identified structures." *Golden*, 819 F. App'x at 931 (citing *Golden*, C/A No. 6:19-cv-02557, at doc. 16-14). As such, the plaintiff's complaint in this matter is subject to summary dismissal as frivolous.

The plaintiff cannot cure the frivolousness of this action by arguing that he was not allowed to submit a complaint long enough to include the necessary factual allegations. In Case Number 3, the plaintiff's complaint numbered more than 150 pages (not counting exhibits) and his amended complaint numbered more than 250 pages (not counting exhibits), but the matter was still dismissed as frivolous. *See Golden, Apple, Inc., et al.*, C/A No. 6:19-cv-02557-DCC, at docs. 1; 16. Likewise, Case Number 4, arising from a complaint that numbers more than 80 pages, has a Report and Recommendation pending that recommends it be dismissed as frivolous. *See Golden v. Apple, Inc., et al.*, C/A No. 6:20-cv-02270-JD, at doc. 1. As recognized by courts in this district, the filing of excessive and unnecessary documents impedes judicial efficiency and the administration of justice. *See Spencer v. Hedges*, 838 F.2d 1210, 1988 WL 9621, at *1 (4th Cir. 1988) (unpublished table decision) (affirming dismissal of a complaint where a plaintiff failed to provide a short and plain statement of a claim under Rule 8); *Hearn v. United States*, C/A No. 3:11-cv-00330, 2011 WL 9378210, at *1 (E.D. Va. June 13, 2011) (memorandum order) (recognizing a prior case where a plaintiff had unduly burdened the court with the filing of

excessive and unnecessary frivolous documents); *see also Noonsab v. U.S. Dist. Ct. for the E. Dist. of N.C.*, C/A No. 5:16-CT-3112-FL, 2016 WL 9077878, at *2 (E.D.N.C. June 27, 2016) (warning a *pro se* plaintiff that unnecessary and excessive filings impede judicial efficiency and the administration of justice); *United States ex rel. Garst v. Lockheed-Martin Corp.*, 328 F.3d 374, 379 (7th Cir. 2003) (affirming dismissal of complaint consisting of 155 pages and 99 attachments). As such, the page limit imposed in this case did not affect the plaintiff's ability to state a non-frivolous patent infringement claim. As such, this case is subject to summary dismissal for frivolousness.

**RECOMMENDATION**

The undersigned is of the opinion that the plaintiff cannot cure the defects identified above by amending his complaint. *See Bing v. Brivo Sys., LLC*, 959 F.3d 605 (4th Cir. 2020) (citing *Goode v. Cent. Va. Legal Aid Soc'y*, 807 F.3d 619 (4th Cir. 2015); *In re GNC Corp.*, 789 F.3d 505 (4th Cir. 2015); *Chao v. Rivendell Woods, Inc.*, 415 F.3d 342 (4th Cir. 2005); *Domino Sugar Corp. v. Sugar Workers Local Union 392 of United Food and Commercial Workers Int'l Union*, 10 F.3d 1064 (4th Cir. 1993)). As noted in more detail above, the present action by the plaintiff utilizes allegations already rejected by this court and the Federal Circuit Court of Appeals, except for the fact that the plaintiff has named a new defendant in this action; thus, this action is frivolous. Accordingly, the undersigned recommends that the court decline to automatically give the plaintiff leave to amend his complaint. Additionally, based upon the foregoing, the Court recommends that the District Court dismiss this action *with* prejudice and without issuance and service of process.

Additionally, because this action represents the plaintiff's fourth frivolous action in this court based upon alleged patent infringement (and sixth case overall), the undersigned further recommends that the assigned United States District Judge sanction the petitioner $400.00, payable to the Clerk of Court at 300 East Washington Street, Greenville, SC 29601. It is further recommended that in the event the plaintiff attempts to

file another action in this Court before payment of the sanction, the Clerk of Court be authorized to assign civil action numbers (for docket control purposes) so that the undersigned may (1) instruct the plaintiff to pay the sanctions (and if the sanctions are not paid, dismiss the action without prejudice and without issuance and service of process) or (2) certify that the action is not frivolous. **The attention of the parties is directed to the important notice on the next page.**

**IT IS SO RECOMMENDED.**

s/Kevin F. McDonald
United States Magistrate Judge

April 9, 2021
Greenville, South Carolina

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a *de novo* review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
300 East Washington Street, Room 239
Greenville, South Carolina 29601

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).

# EXHIBIT B

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

Larry Golden,

Plaintiff,

vs.

Google, LLC

Defendant.

Case No.: 6:21-cv-00544-JD-KFM

**OPINION & ORDER**

This matter is before the Court with the Report and Recommendation of United States Magistrate Kevin F. McDonald ("Report and Recommendation" or "Report"), made in accordance with 28 U.S.C. § 636(b) and Local Civil Rule 73.02(B)(2) of the District of South Carolina.[1] Plaintiff Larry Golden ("Golden" or "Plaintiff"), proceeding *pro se*, filed this Complaint alleging patent infringement claims against Google, LLC ("Google" or "Defendant"). (DE 1.)

Specifically, Golden asserts that Google has infringed on the following patents: 10,163,287 ('287 patent); 9,589,439 ('439 patent); 9,096,189 ('189 patent). (DE 1; 1-1; 1-2, 1-3.) These patents are entitled "multi sensor detection, stall to stop and lock disabling system" (DE 1; 1-1; 1-2; 1-3.) The patents appear to involve technology that can be used to detect explosives/radiation and then disable vehicles or other equipment wherein the explosives/radiation are detected. The Plaintiff's complaint alleges infringement of each patent by Google in formulaic recitations of the elements of patent infringement. (DE 1.) For relief, Golden seeks a declaratory judgment that

[1] The recommendation has no presumptive weight, and the responsibility for making a final determination remains with the United States District Court. See Mathews v. Weber, 423 U.S. 261, 270-71 (1976). The Court is charged with making a de novo determination of those portions of the Report and Recommendation to which specific objection is made. The Court may accept, reject, or modify, in whole or in part, the recommendation made by the magistrate judge or recommit the matter with instructions. 28 U.S.C. § 636(b)(1).

Google has infringed on his patents, a permanent injunction enjoining the infringing activity, as well as money damages. (DE 1, p. 29.)

This Court possesses the inherent authority to review the *pro se* complaint to ensure that subject matter jurisdiction exists and that a case is not frivolous, even if the pleading is not subject to the pre-screening provisions of 28 U.S.C. § 1915. See Mallard v. U.S. Dist. Ct., 490 U.S. 296, 307–08 (1989) ("Section 1915(d) . . . authorizes courts to dismiss a 'frivolous or malicious' action, but there is little doubt they would have power to do so even in the absence of this statutory provision."); Ross v. Baron, 493 F. App'x 405, 406 (4th Cir. 2012) (unpublished) (finding that "frivolous complaints are subject to dismissal pursuant to the inherent authority of the court, even when the filing fee has been paid . . . [and] because a court lacks subject matter jurisdiction over an obviously frivolous complaint, dismissal prior to service of process is permitted." (citations omitted)).

Accordingly, on April 9, 2021, the Magistrate Judge issued the Report given his initial review of the pleadings. The Report recommended summary dismissal of the complaint with prejudice and without issuance of service of process or leave to amend his complaint. The Report further recommended that this Court consider the entry of sanctions in the amount of $400.00 against Golden because he has continued to file frivolous litigation in this Court.[2] (DE 14.) In support of the Magistrate's recommendation, the Report took judicial notice that the instant matter represents Golden's sixth unsuccessful action regarding his patents (and infringing actions). See Golden v. Apple, Inc., et al., C/A No. 6:20-cv-04353-JD (D.S.C.) ("Case Number 5"); Golden v. Apple, Inc., et al., C/A No. 6:20-cv-02270-JD (D.S.C.) ("Case Number 4"); Golden v. Apple Inc.,

2 Although this action represents Golden's fourth frivolous action based upon alleged patent infringement (and sixth case overall) and the Report recommends that this Court sanction Golden $400.00, this Court declines to order sanctions at this time. However, in the event Golden attempts to file another frivolous action in this Court, the Court will consider the imposition of sanctions as warranted.

et al., C/A No. 6:19-cv-02557-DCC, 2020 WL 415896 (D.S.C. Jan. 27, 2020), aff'd C/A No. 20-1508, --- F. App'x ---, 2020 WL 5240656 (Fed. Cir. Sept. 3, 2020) ("Case Number 3"); Golden v. United States, C/A No. 1:19-cv-00104-EGB (Fed. Cl.), dismissal aff'd 955 F.3d 981 (Fed. Cir. 2020) ("Case Number 2"); Golden v. United States, C/A No 1:13-cv-00307- SGB, stayed pending patent review, at doc. 186 (Fed. Cl.) ("Case Number 1"); and In re Patent Number RE 43,990, https://portal.uspto.gov/pair/PublicPair# (choose patent number, enter RE43990, and then click Image File Wrapper) (last visited September 26, 2021), petition denied June 25, 2020. The instant complaint seeks damages against Google for the same allegations that were dismissed as frivolous in Case Number 3, Case Number 4, and Case Number 5; however, it appears that this action represents Golden's attempt to re-litigate claims against Apple and/or Qualcomm and now asserts the same claims against Google.

Accordingly, the Report recommend dismissal of Plaintiff's complaint because *inter alia* the Plaintiff's complaint contains a lengthy history of his prior actions in this Court, various cell phone statistics, a description of the development of the android operating system, and specifications for various Google phones, but contains few factual allegations relating to the alleged infringement. (See DE 14, p. 8.) Golden filed an objection to the Report on April 22, 2021 (DE 18); however, to be actionable, objections to the Report and Recommendation must be specific. Failure to file specific objections constitutes a waiver of a party's right to further judicial review, including appellate review, if the recommendation is accepted by the district judge. See United States v. Schronce, 727 F.2d 91, 94 & n.4 (4th Cir. 1984). "The Supreme Court has expressly upheld the validity of such a waiver rule, explaining that 'the filing of objections to a magistrate's report enables the district judge to focus attention on those issues -- factual and legal -- *that are at the heart of the parties' dispute*.'" Diamond v. Colonial Life & Accident Ins. Co.,

416 F.3d 310, 315 (2005) (citing Thomas v. Arn, 474 U.S. 140 (1985) (emphasis added)). In the absence of specific objections to the Report and Recommendation of the magistrate judge, this Court is not required to give any explanation for adopting the recommendation. See Camby v. Davis, 718 F.2d 198, 199 (4th Cir. 1983).

Plaintiff makes the following "objections"[3] to the Report, which the Court will discuss *seriatim*. First, Golden objects to the Report's recommendation of dismissal of the action in light of the claim charts he has provided in the Complaint. Upon review, however, the Report thoroughly addressed Golden's claim chart. The chart contains the exact same language as the claim charts previously rejected by the Federal circuit, although Google Pixel 5 Smartphone appears in the far left column instead of Apple. (DE 14, p. 8.) For example, the chart copies previously submitted charts alleging patent infringement (albeit by Google in lieu of other defendants) of independent claim 5 of the '287 patent; independent claim 23 of the '439 patent; and independent claim 1 of the '189 patent. (DE 1, pp. 23-29.) These charts and allegations of infringement were specifically rejected by the Federal Circuit Court of Appeals because they contained "a dizzying array of disorganized assertions" "disingenuously using the words of the claims to generally describe cryptically identified structures." Golden, 819 F. App'x at 931 (citing Golden, C/A No. 6:19-cv-02557, at DE 16-14). In light of the foregoing, this Court overrules this objection.

Next, Golden objects to the Report's finding that the Complaint does not include a short and plain statement of his claims in light of InCom Corp. v. Walt Disney Co., No. CV15-3011 PSG (MRWx), 2016 U.S. Dist. LEXIS 71319, at *8 (C.D. Cal. Feb. 4, 2016), because Golden

[3] Golden purportedly objects to the Court's lack of consideration of two (2) DVD's included with his Complaint and five (5) response letters from members of the Executive and Legislative branches of government. (DE 18, p. 7.) However, there do not appear to be any such attachments to the Complaint; and therefore, the Court overrules this "objection."

6:21-cv-00244-JD Date Filed 11/02/21 Entry Number 21 Page 5 of 6

included claim charts that illustrate the infringing devices, provide notice to the Defendant, and provide enough factual allegations. (DE 18, p. 8.) However, Golden offers no additional facts regarding the same. Simply naming a product and providing a conclusory statement that it infringes a patent is insufficient to meet the "plausibility" standard set forth in Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). Although Golden cites a district court opinion in the Central District of California (albeit not binding precedence) to support his claim that his pleadings are sufficient because he attached his patents just as the plaintiff in that case, his reliance and application of this authority misses the mark. See InCom Corp. v. Walt Disney Co., No. CV15-3011 PSG (MRWx), 2016 U.S. Dist. LEXIS 71319, at *8 (C.D. Cal. Feb. 4, 2016) (where the district court found that plaintiff's amended complaint did more than name a product and baldly conclude that it infringes plaintiff's patent, but that plaintiff attached the patents and described *inter alia* how "its Attendance Tracking System uses RFID technology and ID badges to track human presence in large volumes."). Even applying InCom as purported by Golden, Golden's amended complaint does not (among other things) describe specific systems developed and manufactured by Google that are like the subject patents and how the systems perform the same unique function as Golden's system or assert facts regarding the availability of his technology prior to his invention. In light of the vague conclusory allegations in the complaint in this action and Golden's attempt to circumvent the prior dismissals of his patent infringement claims, the instant matter is subject to summary dismissal as frivolous.

Although this Court agrees with the Report that Plaintiff's amended complaint should be dismissed with prejudice because it is frivolous, the Court declines to impose sanctions at this time. Furthermore, the Court finds Golden's remaining objections to be non-specific and/or moot and, therefore, overrules them.

Accordingly, after a thorough review of the Report and Recommendation and the record in this case, the Court adopts the Report and Recommendation as modified and incorporates it herein.

**IT IS, THEREFORE, ORDERED** that Plaintiff's Complaint is dismissed with prejudice and without the issuance of service of process.

**AND IT IS SO ORDERED.**

Joseph Dawson, **III**
United States District Judge

Greenville, South Carolina
November 2, 2021

**NOTICE OF RIGHT TO APPEAL**

Plaintiff is hereby notified that he has the right to appeal this order within thirty (30) days from the date hereof, pursuant to Rules 3 and 4 of the Federal Rules of Appellate Procedure.

# EXHIBIT C

# United States Court of Appeals for the Federal Circuit

---

**LARRY GOLDEN,**
*Plaintiff-Appellant*

**v.**

**GOOGLE LLC,**
*Defendant*

---

2022-1267

---

Appeal from the United States District Court for the District of South Carolina in No. 6:21-cv-00244-JD, Judge Joseph Dawson, III.

---

## JUDGMENT

---

THIS CAUSE having been considered, it is

ORDERED AND ADJUDGED:

**VACATED AND REMANDED**

FOR THE COURT

September 8, 2022
Date

/s/ Peter R. Marksteiner
Peter R. Marksteiner
Clerk of Court

NOTE: This disposition is nonprecedential.

# United States Court of Appeals for the Federal Circuit

---

**LARRY GOLDEN,**
*Plaintiff-Appellant*

**v.**

**APPLE INC., SAMSUNG ELECTRONICS USA, LG ELECTRONICS USA, INC., QUALCOMM INCORPORATED, MOTOROLA SOLUTIONS, INC., PANASONIC CORPORATION, AT&T INC., VERIZON CORPORATION SERVICE GROUP, SPRINT CORPORATION, T-MOBILE USA, INC., FORD GLOBAL TECHNOLOGIES, LLC, FAIRWAY FORD LINCOLN OF GREENVILLE, GENERAL MOTORS COMPANY, KEVIN WHITAKER CHEVROLET, FCA US LLC, BIG O DODGE CHRYSLER JEEP RAM,**
*Defendants*

---

2022-1229

---

Appeal from the United States District Court for the District of South Carolina in No. 6:20-cv-04353-JD, Judge Joseph Dawson, III.

-----------------------------------------------

**LARRY GOLDEN,**
*Plaintiff-Appellant*

v.

**GOOGLE LLC,**
*Defendant*

---

2022-1267

---

Appeal from the United States District Court for the District of South Carolina in No. 6:21-cv-00244-JD, Judge Joseph Dawson, III.

---

Decided: September 8, 2022

---

LARRY GOLDEN, Greenville, SC, pro se.

---

Before DYK, TARANTO, and STOLL, *Circuit Judges*.

PER CURIAM

Larry Golden appeals two orders of the United States District Court for the District of South Carolina ("district court") dismissing his patent infringement claims against various defendants. We *affirm* the dismissal in Case No. 22-1229 but *vacate* the dismissal in Case No. 22-1267 and *remand* for further proceedings consistent with this opinion.

BACKGROUND

Mr. Golden owns a family of patents concerning a system for locking, unlocking, or disabling a lock upon the

detection of chemical, radiological, and biological hazards.[1] In 2019, he sued sixteen defendants in the district court, alleging patent infringement by their development and manufacturing of certain devices. The district court dismissed the suit without prejudice, and this court affirmed the dismissal "on the ground of frivolousness" because Mr. Golden's complaint "offer[ed] only vague generalities and block quotes of statutes, cases and treatises, but nowhere point[ed] us to any nonfrivolous allegations of infringement of any claim by any actual product made, used, or sold by any defendant." *Golden v. Apple Inc.*, 819 F. App'x 930, 931 (Fed. Cir. 2020).

On January 5, 2021, in Case No. 22-1229, Mr. Golden again sued the same sixteen defendants from the 2019 case for patent infringement ("the Apple case"). He initially filed the same over-300-page complaint held to be frivolous in the 2019 case. After the magistrate judge imposed a 35 page limit on the complaint, Mr. Golden filed a shortened complaint complying with the restriction. On January 26, 2021, in Case No. 22-1267, Mr. Golden separately sued Google LLC for patent infringement ("the Google case"). The magistrate judge reviewed the complaints in both cases and recommended summary dismissal with prejudice without issuance of service of process or leave to amend and monetary sanctions for the filing of frivolous litigation.

In both cases, the district court adopted the magistrate judge's recommendations in part. In the Apple case, the district court dismissed the complaint as frivolous without the issuance of service of process but declined to dismiss with prejudice. Additionally, the district court lifted the page restriction for an amended complaint. In the Google case, the district court dismissed the complaint with

---

[1] The patents at issue in these cases are U.S. Patent Nos. 7,385,497; 9,096,189; 9,589,439; 10,163,287 and Reissue Patent Nos. RE43,891 and RE43,990.

prejudice and without the issuance of service of process. Mr. Golden appeals the district court decisions in both cases. We have jurisdiction under 28 U.S.C. § 1295(a)(1). On appeal, Mr. Golden has filed briefs, while the defendants have not filed responsive briefs.

## DISCUSSION

Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), a court must dismiss a complaint if it fails to allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570. This standard "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (citation omitted). A plaintiff must allege facts that give rise to "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted). In the patent context, this court has explained that a plaintiff need not "plead facts establishing that each element of an asserted claim is met," *In re Bill of Lading Transmission and Processing Sys. Pat. Litig.*, 681 F.3d 1323, 1335 (Fed. Cir. 2012) (citing *McZeal v. Sprint Nextel Corp.*, 501 F.3d 1354, 1357 (Fed. Cir. 2007)), but must plead "'enough fact[s] to raise a reasonable expectation that discovery will reveal' that the defendant is liable for the misconduct alleged." *Id.* at 1341 (alteration in original) (quoting *Twombly*, 550 U.S. at 556). We review the district court's dismissal of the complaint de novo. *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195, 198 (4th Cir. 2014).

In the Apple case, the district court dismissed the docketed complaint as frivolous after finding that Mr. Golden "failed to include factual allegations beyond the identities of the Defendants, reference to the alleged infringing devices, and the alleged infringed-upon patents." Dist. Ct. Op. at 4–5. We agree with the district court: the docketed complaint is nothing more than a list of patent claims and

accused products manufactured by each defendant for each asserted patent. Mr. Golden contends that his original complaint contained sufficient factual allegations to support his claims. However, he concedes that the rejected original complaint was identical to the one that this court deemed frivolous in the 2019 case. His effort to relitigate the sufficiency of the original complaint is precluded under the doctrine of res judicata. *See Arizona v. California*, 530 U.S. 392, 412 (2000) ("[I]f a court is on notice that it has previously decided the issue presented, the court may dismiss the action *sua sponte*, even though [a preclusion] defense has not been raised."). Mr. Golden does not argue that the docketed complaint contains factual allegations beyond those contained in his original complaint or that the allegations in the docketed complaint do anything beyond listing the alleged infringed-upon patent claims and the alleged infringing devices. This is plainly insufficient. We see no error in the district court's without prejudice dismissal of the Apple case.

In the Google case, the district court again concluded that Mr. Golden's complaint was frivolous. Here, however, Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the Google Pixel 5 Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189. The district court discounted this claim chart because it "contains the exact same language as the claim charts previously rejected by the Federal Circuit [in the 2019 case], although Google Pixel 5 Smartphone appears in the far left column instead of Apple." Dist. Ct. Op. at 4. But to the extent that the chart includes the "exact same language" as previously rejected charts, it is simply the language of the independent claims being mapped to. The key column describing the infringing nature of the accused products is not the same as the complaint held frivolous in the 2019 case. It attempts—whether successfully or not—to map claim

limitations to infringing product features, and it does so in a relatively straightforward manner.

We conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart. Mr. Golden has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart. On remand, the district court should allow the complaint to be filed and request service of process. Our decision does not preclude subsequent motions to dismiss by the defendant for failure to state a claim or for summary judgment. We express no opinion as to the adequacy of the complaint or claim chart except that it is not facially frivolous.

## CONCLUSION

For the foregoing reasons, we affirm the district court's dismissal in Case No. 22-1229, vacate the dismissal in Case No. 22-1267, and remand for further proceedings consistent with this opinion.

**CASE NO. 22-1229 AFFIRMED**

**CASE NO. 22-1267 VACATED AND REMANDED**

## COSTS

No costs.

Matthew S. Warren (State Bar No. 230565)
Sachli Balazadeh-Nayeri (State Bar No. 341885)
22-5246@cases.warrenlex.com
WARREN LEX LLP
2261 Market Street, No. 606
San Francisco, California, 94114
+1 (415) 895-2940
+1 (415) 895-2964 facsimile

*Attorneys for Defendant Google LLC*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| LARRY GOLDEN,<br><br>Plaintiff,<br><br>v.<br><br>GOOGLE LLC,<br><br>Defendant. | Case No. 4:22-cv-05246-HSG<br><br>**REPLY IN SUPPORT OF MOTION TO DISMISS BY DEFENDANT GOOGLE LLC**<br><br>Date: February 16, 2023<br>Time: 2:00 p.m.<br>Place: Courtroom 2<br>Judge: Hon. Haywood S. Gilliam, Jr. |

**TABLE OF CONTENTS**

Introduction . . . . . . . . 1

Argument . . . . . . . . 1

I. Issue Preclusion Does Not Bar Google's Motion to Dismiss . . . . . . . . 1

A. No Court Has Actually Litigated or Resolved the Issues in Google's Motion. . . . . . . . 2

B. Google Did Not Have a Full and Fair Opportunity to Litigate Any Issues. . . . . . . . 3

II. 'Vertical *Stare Decisis*' Has No Bearing on Google's Motion to Dismiss . . . . . . . . 3

III. Google's Motion, Which Mr. Golden Does Not Address, Requires Dismissal. . . . . . . . 4

IV. Mr. Golden Did Not Seek Leave to Amend, Instead Doubling Down on His Existing Claims. . . 4

Conclusion . . . . . . . . 5

# TABLE OF AUTHORITIES

*Cases* **Pages**

*Aniel v. PHH Mortgage Corp.*, No. 21-6071, 2022 WL 1601405 (N.D. Cal. Jan. 13, 2022) . . . 1, 2, 3

*Beacon Oil Co. v. O'Leary*, 71 F.3d 391 (Fed. Cir. 1995) . . . 3

*Blonder-Tongue Labs, Inc. v. Univ. of Illinois Found.*, 402 U.S. 313 (1971) . . . 3

*City of Arcadia v. U.S. Envtl. Protection Agency*, 265 F. Supp. 2d 1142 (N.D. Cal. 2003) . . . 4

*Cobarrubia v. Edwards*, No. 19-7899, 2021 WL 4846948 (N.D. Cal. Jun. 4, 2021) . . . 4

*Elohim EPF USA, Inc. v. Total Music Connection, Inc.*, No. 14-2496, 2015 WL 12655536 (C.D. Cal. Dec. 7, 2015) . . . 3

*Golden v. Apple*, Nos. 22-1229, 22-1267, 2022 WL 4103285 (Fed. Cir. 2022) . . . 3

*Hansberry v. Lee*, 311 U.S. 32 (1940) . . . 3

*Hardwick v. County of Orange*, 980 F.3d 733 (9th Cir. 2020) . . . 2

*Jackson v. Fischer*, No. 11-2753, 2015 WL 5569133 (N.D. Cal. Sept. 21, 2015) . . . 1

*Janjua v. Neufeld*, 933 F.3d 1061 (9th Cir. 2019) . . . 2

*Jenkins v. County of Riverside*, 398 F.3d 1093 (9th Cir. 2005) . . . 4

*In re Koninklijke Philips Pat. Litig.*, No. 18-1885, 2020 WL 2733931 (N.D. Cal. May 26, 2020) . . . 3, 4

*In re Online DVD Rental Antitrust Litig.*, No. 09-2029, 2011 WL 5883772 (N.D. Cal. Nov. 23, 2011) . . . 4

*Oyeniran v. Holder*, 672 F.3d 800 (9th Cir. 2012) . . . 1

**TABLE OF AUTHORITIES**

*(continued)*

*Cases* **Pages**

*Pandkhou v. Prudential Ins. Co. of Am.*, No. 21-700, 2022 WL 2716519 (N.D. Cal. July 13, 2022) . . . . 2

*Parklane Hosiery Co. v. Shore*, 439 U.S. 322 (1979) . . . . 3

*Shakur v. Schriro*, 514 F.3d 878 (9th Cir. 2008) . . . . 4

*Taylor v. Sturgell*, 553 U.S. 880 (2008) . . . . 1

*U.S. v. Reunion Mortg., Inc.*, No. 13-2340, 2013 WL 5944252 (N.D. Cal. Nov. 5, 2013) . . . . 4

*Wolfson v. Brammer*, 616 F.3d 1045 (9th Cir. 2010) . . . . 1

*Other Proceedings*

*Golden v. Apple Inc.*, No. 22-4152 (N.D. Cal. Jul. 15, 2022) . . . . 5

*Golden v. Google,* No. 21-244 (D.S.C. Nov. 2, 2021) . . . . 2, 3

## INTRODUCTION

Plaintiff's opposition to Google's motion to dismiss serves only to confirm that Google's arguments are correct. Google's motion explained that the complaint does not actually allege that Google infringes, but rather claims only that Google makes devices that someone else could modify, by installing additional third-party software, into an allegedly infringing device. Plaintiff's opposition does not contest or even address this point, thus conceding it. And Google's motion requested that the Court deny plaintiff leave to amend, as he has had time to develop his best theory of infringement, and that best theory falls well short. Again, plaintiff does not contest this point, but instead now seeks summary judgment on his current claims. For the reasons set forth in Google's motion and confirmed by plaintiff's opposition, the Court should grant Google's motion to dismiss without leave to amend, mooting all other motions before it and closing this case.

## ARGUMENT

### I. Issue Preclusion Does Not Bar Google's Motion to Dismiss

In his opposition to Google's motion, plaintiff Larry Golden does not respond to Google's arguments, but contends only that Google cannot raise those—or apparently any other—arguments "under both the 'Issue Preclusion' doctrine, and the doctrine of 'Vertical *Stare Decisis*'." Docket No. 18 at 6. Mr. Golden is incorrect. "Issue preclusion bars 'successive litigation of an issue of fact or law actually litigated and resolved in a valid court determination essential to the prior judgment, even if the issue recurs in the context of a different claim.'" *Aniel v. PHH Mortgage Corp.*, No. 21-6071, 2022 WL 1601405, at *4 (N.D. Cal. Jan. 13, 2022) (quoting *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008)). Given issue preclusion's ability to remove issues from dispute, courts carefully apply collateral estoppel only when a case passes all four of the applicable tests:

> Issue preclusion applies to a question, issue, or fact when (1) there was a full and fair opportunity to litigate the issue in the previous action; (2) the issue was actually litigated; (3) there was final judgment on the merits; and (4) the person against whom [issue preclusion] is asserted was a party to or in privity with a party in the previous action.

*Jackson v. Fischer*, No. 11-2753, 2015 WL 5569133 at *17 (N.D. Cal. Sept. 21, 2015) (alteration in original) (citing *Wolfson v. Brammer*, 616 F.3d 1045, 1064 (9th Cir. 2010); *Oyeniran v. Holder*, 672 F.3d 800, 806 (9th Cir. 2012)). "The party arguing for preclusion has the burden of demonstrating that each

requirement is met." *Pandkhou v. Prudential Ins. Co. of Am.*, No. 21-700, 2022 WL 2716519, at *1 (N.D. Cal. July 13, 2022) (citing *Hardwick v. County of Orange*, 980 F.3d 733, 740 (9th Cir. 2020)). Mr. Golden does not and cannot meet the high burden set by law.

**A. No Court Has Actually Litigated or Resolved the Issues in Google's Motion**

As Google's motion explained, Mr. Golden previously sued Google in the District of South Carolina. Mr. Golden never served Google with that complaint, and Google never appeared in that action. Instead, the District of South Carolina followed its "established local procedure" for reviewing *pro se* complaints to merely confirm "that subject matter jurisdiction exists and that a case is not frivolous." *Golden v. Google*, No. 21-244, Docket No. 14, slip op. at 2 (D.S.C. Apr. 9, 2021). That court found that Mr. Golden's complaint failed this test and dismissed it. *See id.* at 10; *see* Docket No. 11 § C (N.D. Cal. Oct. 26, 2022). Mr. Golden appealed; the Court of Appeals vacated the District Court's ruling and remanded to "allow the complaint to be filed and request service of process." *Golden v. Apple*, Nos. 22-1229, 22-1267, 2022 WL 4103285, at *2 (Fed. Cir. 2022); *see* Docket No. 11 § C. The Court of Appeals carefully limited the scope of its ruling to the District of South Carolina's pre-service review procedure, confirming that "[o]ur decision does *not preclude subsequent motions to dismiss by the defendant for failure to state a claim or for summary judgment*. We express *no opinion as to the adequacy of the complaint* or claim chart except that it is not facially frivolous." *Id.* (emphasis added). The Court of Appeals thus explicitly disclaimed any ruling on the issues Google raised in its motion to dismiss. *See id.*

"'An issue is actually litigated when an issue is raised, contested, and submitted for determination.'" *Aniel,* 2022 WL 1601405, at *4 (quoting *Janjua v. Neufeld*, 933 F.3d 1061, 1066 (9th Cir. 2019)). The only issue before the Court of Appeals—and, as its opinion was careful to note, the only issue on which it ruled—was whether the District of South Carolina's pre-service review procedure should bar Mr. Golden from serving his complaint. *See Golden v. Apple*, 2022 WL 4103285, at *1. The Court of Appeals concluded that it should not, and that Mr. Golden could serve his complaint. *See id.* at *2. Mr. Golden has now done so—in this Court rather than in the District of South Carolina—and the Court of Appeals' ruling provides no further relief. *See id.* For this reason alone, the Court can and should dispense with plaintiff's claim of collateral estoppel.

**B. Google Did Not Have a Full and Fair Opportunity to Litigate Any Issues**

Mr. Golden's issue preclusion argument fails for another, independent reason: Google never appeared as a party to the previous action. Issue preclusion bars a "party who has had one fair and full opportunity to prove a claim and has failed in that effort" from going "to trial on the merits of that claim a second time." *Blonder-Tongue Labs., Inc. v. Univ. of Illinois Found.*, 402 U.S. 313, 324 (1971). But Google has litigated nothing, because the District of South Carolina prevented service of the complaint. *Golden v. Google*, No. 21-244, Docket No. 21, slip op. at 6 (D.S.C. Nov. 2, 2021); *see generally Golden v. Google*, No. 21-244 (D.S.C. Jan. 26, 2021). As a result, Google has never "raised, contested," or "submitted for determination" any issue. *Aniel,* 2022 WL 1601405 at *4. Due process thus bars collateral estoppel:

> Some litigants—those who never appeared in a prior action—may not be collaterally estopped without litigating the issue. They have never had a chance to present their evidence and arguments on the claim. Due process prohibits estopping them despite one or more existing adjudications of the identical issue which stand squarely against their position.

*Blonder-Tongue Labs.*, 402 U.S. at 329 (citing *Hansberry v. Lee*, 311 U.S. 32, 40 (1940)); *see Parklane Hosiery Co. v. Shore*, 439 U.S. 322, 327 n.7 (1979) ("It is a violation of due process for a judgment to be binding on a litigant who was not a party or a privy and therefore has never had an opportunity to be heard"); *Elohim EPF USA, Inc. v. Total Music Connection, Inc.*, No. 14-2496, 2015 WL 12655536, at *6 (C.D. Cal. Dec. 7, 2015). Because Google did not have any opportunity to appear before the District of South Carolina or the Federal Circuit, due process prohibits issue preclusion against Google, and the Court can dispense with plaintiff's claim for this reason as well.

**II. 'Vertical *Stare Decisis*' Has No Bearing on Google's Motion to Dismiss**

Mr. Golden argues that "the doctrine of 'Vertical *Stare Decisis*'" also "precludes re-litigation of the infringement claims." Docket No. 18 at 6. Again, Mr. Golden is incorrect. "'*[S]tare decisis* applies only to legal issues that were actually decided in a prior action.'" *In re Koninklijke Philips Pat. Litig.*, No. 18-1885, 2020 WL 2733931, at *1 (N.D. Cal. May 26, 2020) (quoting *Beacon Oil Co. v. O'Leary*, 71 F.3d 391, 395 (Fed. Cir. 1995)). But the Court of Appeals expressly limited its ruling to the District of South Carolina's pre-service review, and noted that "[o]ur decision *does not preclude* subsequent motions to dismiss by the defendant for failure to state a claim or for summary judgment." *Golden v.*

*Apple,* 2022 WL 4103285, at *2 (emphasis added); *see supra* § I.A. The Court of Appeals' ruling thus has no bearing on Google's motion, which did not address the issues Google now raises; it cannot and does not constrain this Court's ruling on those issues. Where, as here, "the Federal Circuit expressly declined to address" a question, no *stare decisis* applies or binds this Court. *In re Koninklijke Philips*, 2020 WL 2733931, at *1.

**III. Google's Motion, Which Mr. Golden Does Not Address, Requires Dismissal**

Google's motion explained that the complaint does not actually allege that Google infringes, but claims only that Google makes devices that someone else could modify, by installing additional software made by someone else, into an allegedly infringing device. *See generally* Docket No. 11. Plaintiff's opposition does not contest or even address this point, thus conceding it. Where a plaintiff "does not address, let alone dispute" an argument, it is "an acknowledgement that Defendants' argument has merit." *U.S. v. Reunion Mortg., Inc.*, No. 13-2340, 2013 WL 5944252, at *6 (N.D. Cal. Nov. 5, 2013) (citing *In re Online DVD Rental Antitrust Litig.*, No. 09-2029, 2011 WL 5883772, at *12 (N.D. Cal. Nov. 23, 2011)); *see, e.g.*, *Jenkins v. County of Riverside*, 398 F.3d 1093, 1095 n.4 (9th Cir. 2005)) (plaintiff "abandoned her other two claims by not raising them in opposition to the County's motion for summary judgment"); *City of Arcadia v. U.S. Envtl. Protection Agency*, 265 F. Supp. 2d 1142, 1154 n.16 (N.D. Cal. 2003)) (the "implication of this lack of response is that any opposition to this argument is waived"); *Cobarrubia v. Edwards*, No. 19-7899, 2021 WL 4846948, at *3 (N.D. Cal. Jun. 4, 2021) (finding plaintiff abandoned or waived her legal argument "due to the failure to address the issue in her opposition."). Courts have found that even *pro se* plaintiffs have "abandoned" their "claims by not raising them in opposition" to a motion. *Shakur v. Schriro*, 514 F.3d 878, 892 (9th Cir. 2008). Mr. Golden's failure to address Google's arguments concedes their merit; the Court should grant the motion for this reason as well.

**IV. Mr. Golden Did Not Seek Leave to Amend, Instead Doubling Down on His Existing Claims**

Google's motion requested that, under the circumstances of this case, this Court should deny leave to amend, because Mr. Golden's infringement theory confirms that amendment would be futile. Docket No. 11 § III. Mr. Golden did not address this point, thus waiving any arguments against it. *See supra,* § III. But Mr. Golden did not merely waive opposition on this point; as part of his

opposition, he filed a motion for summary judgment on the current claims, thus confirming his desire to proceed to resolution on his current theory. Docket No. 18 at 6. "This is the rare case where dismissal without leave to amend is appropriate at the outset." *Golden v. Apple*, No. 22-4152, Docket No. 29, slip op. at 1 (N.D. Cal. Oct. 20, 2022). It is even more so now that Mr. Golden has failed to dispute, and has thus conceded, that the Court should not grant leave to amend.

**CONCLUSION**

For the reasons set forth above and in Google's motion, the Court should dismiss the complaint in its entirety without leave to amend.

Date: November 15, 2022

Respectfully submitted,

Matthew S. Warren (State Bar No. 230565)
Sachli Balazadeh-Nayeri (State Bar No. 341885)
WARREN LEX LLP
2261 Market Street, No. 606
San Francisco, California, 94114
+1 (415) 895-2940
+1 (415) 895-2964 facsimile
22-5246@cases.warrenlex.com

*Attorneys for Defendant Google LLC*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

LARRY GOLDEN,

Plaintiff,

v.

GOOGLE LLC,

Defendant.

Case No. 22-cv-05246-HSG

**ORDER GRANTING MOTION TO DISMISS WITH LEAVE TO AMEND**

Re: Dkt. No. 11

Pending before the Court is Google's motion to dismiss. Dkt. No. 11 ("MTD"). In response to the motion, pro se plaintiff Larry Golden filed a "Response to Defendant's Motion to Dismiss and Cross-Motion for Summary Judgment." Dkt. No. 18 ("MTD Opp. and Cross-MSJ"). Google filed a reply to its motion to dismiss (Dkt. No. 20) and an opposition to Plaintiff's cross-motion for summary judgment (Dkt. No. 22). Plaintiff filed a reply to his cross-motion for summary judgment. Dkt. No. 26. The Court finds this matter appropriate for disposition without oral argument and the matter is deemed submitted. *See* Civil L.R. 7-1(b). For the reasons discussed below the Court **GRANTS WITH LEAVE TO AMEND** Google's motion to dismiss and **DENIES AS MOOT** Plaintiff's cross-motion for summary judgment **WITHOUT PREJUDICE.**[1]

[1] Also pending before the Court are Google's motion to strike (Dkt. No. 12) and Mr. Golden's motion for permanent injunctive relief (Dkt. No. 17) and cross-motion to strike (Dkt. No. 19). Because this order dismisses the complaint with leave to amend, these motions are deemed submitted and are **DENIED AS MOOT WITHOUT PREJUDICE**. The Court suggests that Defendant carefully consider whether to renew the motion to strike if an amended complaint is filed, as such motions are often a poor use of judicial and party resources. *See Z.A. ex rel. K.A. v. St. Helena Unified Sch. Dist.*, No. C 09-03557 JSW, 2010 WL 370333, at *2 (N.D. Cal. Jan. 25, 2010) (explaining that "[m]otions to strike are regarded with disfavor because they are often used as delaying tactics and because of the limited importance of pleadings in federal practice").

United States District Court
Northern District of California

## I. FACTUAL BACKGROUND

In 2021, Mr. Golden filed a similar case against Google in South Carolina concerning the same patents-in-suit. *See Golden v. Google*, No, 21-244, Dkt. No. 1 (D.S.C. Jan 26, 2021).[2] The district court dismissed without leave to amend. *Golden v. Google, LLC*, No. 6:21-CV-00244-JD-KFM, 2021 WL 5083804, at *3 (D.S.C. Nov. 2, 2021), *vacated and remanded sub nom. Golden v. Apple Inc.*, No. 2022-1229, 2022 WL 4103285 (Fed. Cir. Sept. 8, 2022). The Federal Circuit vacated the dismissal, stating that its decision "[did] not preclude subsequent motions to dismiss by the defendant for failure to state a claim or for summary judgment," and "expresse[d] no opinion as to the adequacy of the complaint or claim chart except that it is not facially frivolous." *Golden v. Apple Inc.*, No. 2022-1229, 2022 WL 4103285, at *2 (Fed. Cir. Sept. 8, 2022).

Within a week of the Federal Circuit's decision, Plaintiff filed this case.[3] Plaintiff brings three counts of patent infringement, alleging that Google infringed U.S. Patent Nos. 10,163,287 ("'287 Patent"), 9,589,439 ("'439 Patent"), and 9,096,189 ("'189 Patent"). *See generally* Dkt. No. 1 ("Compl."). The Complaint alleges that several Google smartphones infringe the patents and that Google sells a "material component of something that is patented (i.e., Plaintiff's CMDC devices)."[4] *See* Compl. at 2; *id.* ¶¶ 13-14. Plaintiff further alleges that "Google and Apple are jointly infringing Plaintiff's patented CMDC devices by offering for use, using, offering for sale, selling and/or importing as essential, Google's Search for use with Google and Apple smartphones," in a manner that directly infringes several claims of each of the patents-in-suit. *See id.* ¶ 24. Plaintiff makes similar claims of joint infringement regarding Google and Qualcomm. *See id.* ¶ 35.

Google now moves to dismiss, arguing that Plaintiff fails to allege direct or indirect infringement. *See generally* MTD.

---

[2] This Court has previously described Mr. Golden's extensive litigation history and will not repeat it here. *See Golden v. Qualcomm, Inc.*, No. 22-CV-03283-HSG, 2023 WL 2530857, at *1 (N.D. Cal. Mar. 15, 2023).

[3] In April 2023, the District of South Carolina dismissed the case before it without prejudice because it was duplicative of this case. *See Golden v.* Google, No, 21-244, Dkt. No. 44 (D.S.C. April 19, 2023).

[4] Plaintiff defines "CMDC devices" as "communicating, monitoring, detecting, and controlling" devices. *See* Compl. at 7.

United States District Court
Northern District of California

## II. LEGAL STANDARD

Federal Rule of Civil Procedure 8(a) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A defendant may move to dismiss a complaint for failing to state a claim upon which relief can be granted under Rule 12(b)(6). "Dismissal under Rule 12(b)(6) is appropriate only where the complaint lacks a cognizable legal theory or sufficient facts to support a cognizable legal theory." *Mendiondo v. Centinela Hosp. Med. Ctr.*, 521 F.3d 1097, 1104 (9th Cir. 2008). To survive a Rule 12(b)(6) motion, a plaintiff need only plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). A claim is facially plausible when a plaintiff pleads "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

In reviewing the plausibility of a complaint, courts "accept factual allegations in the complaint as true and construe the pleadings in the light most favorable to the nonmoving party." *Manzarek v. St. Paul Fire & Marine Ins. Co.*, 519 F.3d 1025, 1031 (9th Cir. 2008). Nevertheless, courts do not "accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." *In re Gilead Scis. Secs. Litig.*, 536 F.3d 1049, 1055 (9th Cir. 2008) (quoting *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001)).

The Court also need not accept as true allegations that contradict matter properly subject to judicial notice or allegations contradicting the exhibits attached to the complaint. *Sprewell*, 266 F.3d at 988. And even where facts are accepted as true, "a plaintiff may plead [him]self out of court" if he "plead[s] facts which establish that he cannot prevail on his ... claim." *Weisbuch v. Cty. of Los Angeles*, 119 F.3d 778, 783 n.1 (9th Cir. 1997) (quotation omitted).

Additionally, "[p]leadings must be construed so as to do justice." Fed. R. Civ. P. 8(e). "[A] pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers." *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (quotation omitted). However, even a "liberal interpretation of a . . . complaint may not supply essential elements of the claim that were not initially pled." *See Ivey v. Bd. of Regents of Univ. of Alaska*, 673 F.2d 266, 268 (9th Cir. 1982). "[P]ro se litigants are bound by the rules of procedure,"

*Ghazali v. Moran*, 46 F.3d 52, 54 (9th Cir. 1995), which require "a short and plain statement of the claim showing that the pleader is entitled to relief," Fed. R. Civ. P. 8(a).

Even if the court concludes that a 12(b)(6) motion should be granted, the "court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (quotation omitted).

## III. DISCUSSION

### A. Direct Infringement

Google argues that "Mr. Golden alleges that some Google Pixel devices *could* infringe his asserted patents *if* a user were to add an additional application, ATAK, which Mr. Golden admits that Google does not make or sell." MTD at 6 (emphasis in original). Google contends that "Mr. Golden thus alleges not that Google sells infringing Pixel devices, but that *someone else* could modify Google's Pixel devices, by adding non-Google software, to make them allegedly infringing." *Id.* (emphasis in original). Google argues that these allegations are not sufficient to support an infringement claim. *Id.* The Court agrees.

"[T]hat a device is capable of being modified to operate in an infringing manner is not sufficient, by itself, to support a finding of infringement." *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1330 (Fed. Cir. 2001). The Federal Circuit has made it clear that its precedent "does not stand for the proposition . . . that infringement may be based upon a finding that an accused product is merely capable of being modified in a manner that infringes the claims of a patent." *Fantasy Sports Properties, Inc. v. Sportsline.com, Inc.*, 287 F.3d 1108, 1117–18 (Fed. Cir. 2002). At bottom, "a device does not infringe simply because it is possible to alter it in a way that would satisfy all the limitations of a patent claim." *High Tech Med. Instrumentation, Inc. v. New Image Indus., Inc.*, 49 F.3d 1551, 1555 (Fed. Cir. 1995). The Federal Circuit has applied this principle in cases involving the modification of hardware through the addition of software. *See Nazomi Commc'ns, Inc. v. Nokia Corp.*, 739 F.3d 1339, 1346 (Fed. Cir. 2014) (finding that the defendants' products "do not infringe without modification—the modification of installing the required software").

United States District Court
Northern District of California

Even under the "less stringent standards" afforded pro se plaintiffs, *Erickson*, 551 U.S. at 94 (quotation omitted), Plaintiff's claims, as pled, only allege that Google's devices infringe the patents in issue if the end user downloads a particular application. Plaintiff includes a claim chart purporting to describe the components of the Google Pixel 5 (which Plaintiff asserts is "representative of all the alleged infringing products of Google asserted in this complaint") that allegedly map onto the elements of an independent claim for each of the asserted patents.[5] *See* Compl. ¶ 53. As the below excerpt of Plaintiff's chart indicates, however, at least two elements of each independent claim included in the chart are allegedly satisfied only when the phone has the Android Team Awareness Kit (ATAK) downloaded.

| **Google Pixel 5 Smartphone** | **Patent #: 10,163,287; Independent Claim 5** | **Patent #: 9,589,439; Independent Claim 23** | **Patent # 9,096,189; Independent Claim 1** |
|---|---|---|---|
| *Android Team Awareness Kit*, ATAK (built on the Android operating system) provides for a single interface for viewing and controlling different CBRN-sensing technologies, whether that is a wearable smartwatch that measures a warfighter's vitals (e.g., heart rate) or a device mounted on a drone to detect chemical warfare agents. | at least one sensor for chemical, biological, or human detection in communication with the at least one CPU; | the cell phone is at least a fixed, portable or mobile communication device interconnected to the cell phone detection device, capable of wired or wireless communication therebetween; and | the communication device is at least a fixed, portable or mobile communication device interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween . . . |
| *Android Team Awareness Kit*, ATAK (built on the Android operating system) is a digital application available to warfighters | one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, | at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, | wherein the communication device receives a signal via any of one or more products listed in |

[5] In addition to the independent claims included in the claim chart, Plaintiff also alleges infringement of independent claims 4 and 6 of the '287 patent, 13, 14, and 15 of the '439 patent, and 2 and 3 of the '189 patent. *See* Compl. ¶¶ 42, 46, 50. But he provides no detail whatsoever about his theory of infringement for these claims.

United States District Court Northern District of California

| throughout the DoD. ATAK offers warfighters geospatial mapping for situational awareness during combat—on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK now includes chemical, biological, radiological, and nuclear (CBRN) plug-ins. | radiological, or explosive agents; | or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone; | any of the plurality of product grouping categories; |
|---|---|---|---|

*See* Compl. ¶ 53 at 23, 26-27.

Even affording Plaintiff the benefit of the doubt, his own claim chart makes it clear that Defendant's products purportedly infringe because of the characteristics of the ATAK application. But Plaintiff's complaint alleges that ATAK is not made by Google, and he does not allege that ATAK comes pre-loaded on Google phones:

> Through collaboration and innovation, the Defense Threat Reduction Agency has integrated its powerful, hazard-awareness-and-response tools into the *Android Tactical Assault Kit (or the Android Team Awareness Kit, ATAK)*. ATAK is a digital application available to warfighters throughout the DoD. Built on the Android operating system, ATAK offers warfighters geospatial mapping for situational awareness during combat — on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK now includes chemical, biological, radiological, and nuclear (CBRN) plug-ins.

*See* Compl. ¶ 18 at 13 (emphasis in original). Accordingly, the Court finds that Plaintiff fails to adequately allege direct infringement by Google.[6]

**B. Indirect Infringement**

"There are two types of indirect patent infringement: inducement and contributory infringement." *Redd Grp., LLC v. Glass Guru Franchise Sys., Inc.*, No. 12-CV-04070-JST, 2013

[6] Plaintiff does not engage directly with Google's argument in his opposition. Instead, he argues that Google's motion to dismiss is barred by "issue preclusion" as a result of the 2022 appeal to the Federal Circuit (and the underlying South Carolina case). *See* MTD Opp. and Cross-MSJ at 1, 5-6. In its opinion, however, the Federal Circuit specifically stated that its "decision does not preclude subsequent motions to dismiss by the defendant for failure to state a claim." *Golden v. Apple Inc.*, No. 2022-1229, 2022 WL 4103285, at *2 (Fed. Cir. Sept. 8, 2022). Issue preclusion does not bar Google's motion to dismiss.

United States District Court
Northern District of California

WL 3462078, at *4 (N.D. Cal. July 8, 2013) (citing 35 U.S.C. §§ 271(b)-(c)). "Liability for either active inducement of infringement or for contributory infringement is dependent upon the existence of direct infringement," and "[t]here can be no inducement or contributory infringement without an underlying act of direct infringement." *Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1326 (Fed. Cir. 2004) (quotations omitted).

Because Plaintiff fails to allege direct infringement, the Court finds that he also fails to allege indirect infringement. *Id.*

### C. Leave to Amend

Google asks the Court to deny leave to amend "because Mr. Golden's infringement theory confirms that amendment would be futile." MTD at 8. The Court cannot say at this stage that amendment necessarily would be futile, and so follows the standard course of granting leave for Plaintiff to amend to correct the identified deficiencies, if he can truthfully do so.

## IV. CONCLUSION

Google's motion to dismiss (Dkt. No. 11) is **GRANTED WITH LEAVE TO AMEND**. Any amended complaint must be filed within 28 days from the date of this Order.

Google's motion to strike (Dkt. No. 12), and Mr. Golden's cross-motion for summary judgment (Dkt. No. 18), motion for permanent injunctive relief (Dkt. No. 17), and cross-motion to strike (Dkt. No. 19) are **DENIED AS MOOT WITHOUT PREJUDICE** to being re-filed if the case proceeds beyond the motion to dismiss stage.

//

//

//

//

//

//

//

//

//

United States District Court
Northern District of California

The Court further **STRIKES** Dkt. No. 36, styled as Plaintiffs' objection to Defendants' requests regarding case management conference scheduling, and Dkt. Nos. 39 and 40, Plaintiffs' purported "supplemental authority," for failure to comply with Civil L.R. 7-3 (directing that, with limited exceptions, "[o]nce a reply is filed, no additional memoranda, papers or letters may be filed without prior Court approval").

Finally, in light of the number and length of Plaintiff's filings that have not complied with this District's Local Rules, it is further **ORDERED** that unless and until otherwise ordered, Plaintiff may not file any document other than the amended complaint discussed above without advance leave of Court.

**IT IS SO ORDERED.**

Dated: 8/10/2023

Haywood S. Gill Jr.

HAYWOOD S. GILLIAM, JR.
United States District Judge

United States District Court
Northern District of California

**UNITED STATES DISTRICT COURT**

**FOR THE NORTHERN DISTRICT OF CALIFORNIA – OAKLAND**

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

Phone (864) 288-5605

Email: atpg-tech@charter.net

LARRY GOLDEN,

Plaintiff,

V.

GOOGLE LLC

Defendants.

CASE NO: 4:22-cv-05246-HSG

**JURY TRIAL DEMANDED**

(Direct Patent Infringement), (Induced and Contributory Patent Infringement), (Joint Infringement, (Willful Infringement)

# PLAINTIFF'S AMENDED COMPLAINT FOR PATENT INFRINGEMENT

FILED

Aug 22 2023

Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

August 21, 2023

Pursuant to the Court Order filed on 08/10/23 Dkt. 41 in *Larry Golden v, Google LLC,* Case No. 4:22-cv-05246-HSG, Plaintiff is submitting this amended complaint against Google LLC for alleged direct infringement, induced and contributory infringement, joint infringement, and willful infringement of Plaintiff's United States Patent Nos. 10,984,619 ('619 Patent), 10,163,287 ('287 Patent), 9,589,439 ('439 Patent), and 9,096,189 ('189 Patent).

This amended complaint is necessary because after the Federal Circuit's order on 09/08/2022, in *Larry Golden v. Google LLC*; Case No. 22-1267, to "VACATE AND REMAND" the relevant Case No: 22-1267 Document 15; back to the District Court "to be filed and request service of process", Google has discontinued the making, offering for sell, and selling the Google Pixel 5 Smartphone; discontinued the use of Qualcomm's Snapdragon chipset, thereby eliminating Plaintiff's "joint infringement" claim; and discontinued offering for sell, and selling, the ATAK-Military on Google Play, to avoid liability for the actions brought against them.

This is an action of patent infringement in which plaintiff, Larry Golden ("Golden", "Plaintiff" or "Patent Owner"), hereby asserts the following claims for patent infringement of United States Patent Nos. 10,984,619 ('619 Patent), 10,163,287 ('287 Patent), 9,589,439 ('439 Patent), and 9,096,189 ('189 Patent) ("patents-in-suit"), against Defendant GOOGLE LLC ("Google" or "Defendant"), and alleges as follows:

Upon information and belief, Plaintiff alleges the patents-in-suit, that were issued with the presumption of validity, under 35 U.S. Code § 282 – "Presumption of validity; (a) In General", is Plaintiff's evidence that Plaintiff is the inventor of the Communicating, Monitoring, Detecting, and Controlling (CMDC) device(s) i.e., smartphones, laptops, tablets, etc.

Upon information and belief, Plaintiff alleges that the defendant Google, has in the past and continues to do so, make, use, offer to sell, or sell the Google Pixel 6a, 7, 7a, 7pro, and fold

smartphones, that Plaintiff believes infringes at least one of the claims in the patents-in-suit under 35 U.S.C. § 271(a), "anyone who makes, uses, offers to sell, or sells any patented invention domestically, or imports a patented invention into the United States during the term of the patent, is infringing the patent."

Upon information and belief, Plaintiff alleges that the defendant Google, has induced infringement, thereby causing direct infringement with its Android Open-Source Operating System under 35 U.S.C. § 271(b). Plaintiff alleges Google actively encouraged the DoD/DTRA and Draper Laboratory Inc.'s infringement, knowing that the acts they induced constituted patent infringement, and their encouraging acts actually ***resulted*** in direct patent infringement.

In *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, the Federal Circuit considered whether proof of induced infringement requires proof that the encouragement of infringement was successfully communicated to the direct infringer and actually ***resulted*** in direct infringement. However, Fairchild claimed there was no evidence that it encouraged its accused chips to be incorporated into products … with the specific intent to induce infringement.

The court disagreed, noting that Fairchild was involved in activities related to the use of its products … Fairfield [Google] designed its products [same as Google Android Open-Source Operating System] to meet certain [] standards, provided demonstration boards containing the infringing chips [open-source platform] to customers and potential customers in the United States, and maintained a technical support center in the United States that provided support to customers based in the United States." Plaintiff must prove the inducement ***resulted*** in direct infringement, not that the inducement was of a product that already directly infringes.

Similarly, under 35 U.S.C. § 271(c), "anyone who offers to sell, sells, or imports a material component of something that is patented, knowing that the component was especially

made for use in an infringement and is not a commodity suitable for a substantial non-infringing use, is also liable as a contributory infringer". Plaintiff is alleging the defendant Google, has in the past and continues to *contribute* the Google Tensor i.e., Central Processing Unit (CPU), Processor, System-on-a-Chip (SoC), Chipset; a material component of Plaintiff's patented Communicating, Monitoring, Detecting, and Controlling (CMDC) device, with knowledge that the Google Tensor Chipset is especially made for use in an infringement and is not a commodity suitable for a substantial non-infringing use.

Upon information and belief, Plaintiff alleges that the defendant Google is liable for "joint infringement". In United States patent law, joint infringement is a form of patent infringement liability that occurs when multiple actors [Google LLC and Draper Laboratory Inc.] are involved in carrying out the claimed infringement of a patent and no single accused infringer has performed all of the steps of the method. In a 2015 decision of the United States Court of Appeals for the Federal Circuit, *Akamai Techs., Inc. v. Limelight Networks, Inc.*

Upon information and belief, Plaintiff alleges that the defendant Google is liable under the doctrine of willful blindness. Willful Blindness applies when Google seeks to avoid civil liability for the wrongful acts by intentionally keeping itself unaware of facts that would render Google liable or implicated. In the Eastern District of Texas, the Chief District Judge Rodney Gilstrap issued an opinion in the case (*Motiva Patents LLC v. HTC Corporation*) in which he wrote, "A well-pled claim for willful blindness is sufficient to state a claim for willful infringement."

## THE PARTIES

1. Plaintiff Larry Golden is a citizen of South Carolina and has a principal place of business and residence at 740 Woodruff Road, #1102, Greenville, S.C. 29607.

2. On information and belief, Google is incorporated in the State of Delaware with a principal place of business at 1600 Amphitheatre Parkway, Mountain View, CA 94043 and does business in this judicial district by, among other things, committing jointly, directly, and/or indirectly the tort of literal patent infringement or infringement under the "doctrine of equivalents" giving rise to this complaint. Google may be served at its principal place of business at 1600 Amphitheatre Parkway, Mountain View, CA 94043.

3. Google LLC is one of the largest technology companies in the world and conducts product sales, and online search operations in the District of South Carolina. Google LLC directly, jointly, and/or indirectly distributes, markets, offers to sell, sells, and/or imports the infringing Google Pixel Series of smartphones, Google Tensor CPU, and Google Android Operating Systems.

## STANDARD FOR REVIEW

4. Plaintiff has attached a copy of the asserted patents as **Exhibits I-L**. The attached patents satisfy the requirement of "enough factual allegations. For example, in *Incom Corp. v. Walt Disney Co.*, No. 2:15-cv-03011-PSG-MRW, Dkt. 39, at *4 (C.D. Cal. Feb. 4, 2016) the Central District of California declined to dismiss a complaint that attached the asserted patent, identified the accused products by name, and generally compared the technology disclosed in the patents to the accused products.

## JURISDICTION AND VENUE

5. This is a civil action for patent infringement arising under the patent laws of the United States, Title 35 of the United States Code. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§§ 1331, 1332(a) and 1338(a).

6. On May 22, 2017, the U.S. Supreme Court narrowed the scope of proper venue for patent infringement actions for domestic corporations. *See TC Heartland LLC v. Kraft Foods Grp. Brands LLC*, No. 16-341 (May 22, 2017). The *TC Heartland* decision reverses the approach to venue previously adopted by the U.S. Court of Appeals for the Federal Circuit, which had held for 27 years that a domestic corporation can be sued for patent infringement anywhere that corporation was subject to personal jurisdiction.

7. The special venue statute for patent infringement actions, 28 U.S.C. § 1400(b), has two provisions permitting venue: "[1] where the defendant resides, or [2] where the defendant has committed acts of infringement and has a regular and established place of business."

8. Since the enactment of that statute, the Supreme Court consistently has interpreted Section 1400(b)'s first provision of proper venue— "where the defendant resides". *E.g., Fourco Glass Co. v. Transmirra Prods. Corp.*, 353 U.S. 222, 226 (1957). As a result, a domestic corporation may now be sued for patent infringement only in its state of incorporation or where it has committed acts of infringement and has a regular and established place of business.

## THE U.S. DISTRICT COURT FOR THE DISTRICT OF NORTHERN CALIFORNIA IS BOUND BY THE DECISIONS OF THE U.S. COURT OF APPEALS FOR THE FEDERAL CIRCUIT

### *Vertical Stare Decisis*

9. The United States Court of Appeals for the Federal Circuit is a federal court that has special importance in patent law. The Federal Circuit does not have jurisdiction over a particular region. Instead, it has jurisdiction over all appeals in cases that "arise under" the

patent laws. The Federal Circuit's jurisdiction over appeals in patent cases is exclusive. Other circuit courts cannot review decisions in those cases.

10. Congress created the Federal Circuit in 1982 to be a court with specialized expertise in patent law. In giving it exclusive jurisdiction over patent cases, Congress aimed to ensure that the interpretation of the patent laws, and applicable legal precedent, would be uniform throughout the nation, and not vary among regional circuits.

11. Consistent with that, the Federal Circuit has developed a large body of precedent governing patent cases: how to interpret patent claims, how infringement must be proved, how invalidity must be established, and how damages must be calculated. Successful patent litigation in the district courts requires diligently the following of the Federal Circuit's pronouncements on those issues.

12. Vertical stare decisis binds lower courts to follow strictly the decisions of higher courts within the same jurisdiction (e.g., the Northern District of California Court must follow the decisions of the U.S. Court of Appeals for the Federal Circuit). The Supreme Court defines vertical stare decisis as the doctrine, "a lower court must strictly follow the decision(s) handed down by a higher court within the same jurisdiction". **(Exhibit A)**

13. A court engages in vertical stare decisis when it applies precedent from a higher court. For example, if the Northern District of California Court adhered to a previous ruling from the United States Court of Appeals for the Federal Circuit, in *Larry Golden v. Google LLC*; Case No. 22-1267, that would be vertical stare decisis.

14. The Federal Circuit on 09/08/2022, in *Larry Golden v. Google LLC*; Case No. 22-1267 — "VACATED AND REMANDED" the relevant Case No: 22-1267 Document 15; back to the District Court "to be filed and request service of process". The Federal Circuit determined

the complaint, "includes a detailed claim chart mapping features of an accused product, the Google Pixel 5 Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189" ... "in a relatively straightforward manner" ... and that the [Circuit] "express no opinion as to the adequacy of the complaint or claim chart except that it is not facially frivolous."

> In a Three-Judge Panel DISCUSSION: "Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal,* 556 U.S. 662 (2009), a court must dismiss a complaint if it fails to allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570 ... [T]his standard "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (citation omitted). A plaintiff must allege facts that give rise to "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted) ... this court has explained that a plaintiff ... must plead "'enough fact[s] to raise a reasonable expectation that discovery will reveal' that the defendant is liable for the misconduct alleged."
>
> "Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the Google Pixel 5 Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189 ... It [claim chart] attempts [] to map claim limitations to infringing product features, and it does so in a relatively straightforward manner ...[W]e conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart. Mr. Golden has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart...."

15. Vertical Stare Decisis bars Google from challenging whether Plaintiff has pled enough facts and provided sufficient notice to the Defendant Google. The Federal Circuit's ruling: "the complaint includes a detailed claim chart mapping features of an accused product, the Google Pixel 5 Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189" ... 'in a relatively straightforward manner'".

16. Vertical stare decisis, or vertical precedent, is the obligation of the Northern District of California Court to follow the decisions of the United States Court of Appeals for the Federal Circuit that falls within the hierarchical structure. Vertical stare decisis and precedent, are a matter of hard law, not a matter of policy.

17. Something analogous happens with vertical stare decisis: it is not hard law because it sanctions departure; rather it is because of its hard nature that vertical stare decisis brings with it, or needs, a sanction against non-compliance.

18. So, with vertical stare decisis it is true that in the absence of compliance by the Northern District of California Court, the Federal Circuit will likely overturn the Northern District of California Court's decision. This works as a kind of sanction against the non-complying court. Vertical stare decisis is, indeed, afforded binding weight.

19. The alleged facts were included in the original complaint because Plaintiff knew and understood he "must allege facts that give rise to "more than a sheer possibility that the Defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted).

20. On appeal in *Larry Golden v. Google LLC*; Case No. 22-1267, the Federal Circuit determined Plaintiff has "pled enough fact[s] to raise a reasonable expectation that discovery will reveal that the Defendant is liable for the misconduct alleged."

21. Therefore, according to the doctrine of "*Vertical Stare Decisis*" Google is barred from challenging, and this Court is barred from relitigating the specifications of the Google Pixel 5 and the Android Team Awareness Kit (ATAK), that was decided as being nonfrivolous in U.S. Court of Appeals for the Federal Circuit:

22. The Federal Circuit has determined Golden has alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570 … pled "'enough fact[s] to

raise a reasonable expectation that discovery will reveal' that the defendant is liable for the misconduct alleged". The decision cannot be overturned by the lower Northern District of California Court.

23. In the Federal Circuit's language, "a detailed claim chart mapping features of an accused product, the Google Pixel 5 Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189", indicates a determination has been made on direct infringement, either literally or under the doctrine of equivalents.

***"Doctrine of Equivalents"***

24. When the Federal Circuit states, ""express no opinion as to the adequacy [the state or quality of being adequate] of the complaint or claim chart except that it is not facially frivolous", means the Circuit is not expressing an opinion on whether the direct infringement is literal direct infringement or direct infringement under the doctrine of equivalents.

25. "Literal infringement" means that each and every element recited in a claim has identical correspondence in the allegedly infringing device or process. "Under the doctrine of equivalents, a product or process that does not literally infringe . . . the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention.'" *Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 149 F.3d 1309, 1315 (Fed. Cir. 1998)

26. In *Graver Tank & Mfg. Co. v. Linde Air Prods., Inc.*, the U.S. Supreme Court held that Plaintiff, the patent owner, may invoke the doctrine of equivalents to proceed against Google if the Google Pixel smartphones performs substantially the same function in substantially the same way to obtain the same result.

27. The Doctrine of Equivalents was established in the United States with the case of *Winans v. Denmead*, which dealt with changing a part of the construction of the patented invention to avoid infringement. Setting a precedent, the court held that infringement may be claimed even if the same literal legal patent language was not used. A mere change in form while retaining the rest from the patented claim is still considered infringement.

28. The doctrine is explained in the words of Judge Curtis for the case as, "the patentee, having described his invention, and shown its principles, and claimed it in that form which most perfectly embodies it, is, in contemplation of law, *deemed to claim every form in which his invention may be copied*, **(Exhibit B)** unless he manifests an intention to disclaim some of those forms."

29. Under this doctrine, Plaintiff can argue infringement even if each and every claim element of the patent is not completely or identically present in the infringed invention. The purpose of the doctrine is to ensure that Google does not benefit from minor or insubstantial changes that may escape literal infringement.

30. If the accused Google Pixel products or process does not literally infringe Plaintiff's patented invention, the accused Google Pixel products or process may be found to infringe under the doctrine of equivalents. The essential objective inquiry is: "Does the accused Google Pixel products or process contain elements identical or equivalent to each claimed element of the patented invention?" *Warner-Jenkinson Co. v. Hilton Davis Chemical Co.*, 520 U.S. 17, 41 USPQ2d 1865, 1875 (1997).

31. In determining equivalence, "an analysis of the role played by each element in the context of the specific patent claim will thus inform the inquiry as to whether a substitute

element matches the function, way, and result of the claimed element, or whether the substitute plays a role substantially different from the claimed element." **(Exhibit B)**

32. For an infringement analysis & litigation, claim charts help confirm or dis-confirm that each and every limitation of the claim is present in a product, service, or standard. **(Exhibit B)** An Evidence-of-Use (EoU) or Infringement Chart shows how a product or process accused of infringement contains each claim element to satisfy the 'all elements test' for infringement.

## DOUBLE STANDARD

33. A double standard is defined as a rule or principle which is unfairly applied in different ways to different people or groups, and is a concept that can still be heavily applied to the history of the United States. The topics of racism, discrimination, and prejudice make many individuals uncomfortable, furious, or indifferent. Since humans began developing social classes, racial division has been a key factor in how societies organize - however, it's important to note that race is simply a social construction. Clark0, Anthony. *"Double standards are stunting America's growth."* UWIRE Text, 8 May 2020, p. 1. Gale Academic OneFile, link.gale.com/apps/doc/A623469076/AONE?u=anon~18e9207f&sid=googleScholar&xid=3bcd7ca9. Accessed 17 Aug. 2023.

34. Qualcomm announced it was developing the Scorpion central processing unit (CPU) for mobile devices in November 2005. This was followed by the first shipments of the Snapdragon system-on-chip product, which includes a CPU, camera support and other software and semiconductors, in November 2007.

35. Qualcomm is the world's biggest provider of mobile chips, and it created technology that's essential for connecting phones to cellular networks. The company derives a

significant portion of its revenue from licensing those inventions to hundreds of device makers, with the fee based on the value of the phone, not the components.

36. Because Qualcomm owns patents related to 3G, 4G and 5G networking technology, as well as other features like *software*, all handset makers [i.e., Google] building a device that connects to cellular networks have to pay it a licensing fee, even if they don't use Qualcomm's [*software*] chips. https://www.cnet.com/tech/mobile/qualcomm-settles-huawei-patent-spat-warns-of-5g-flagship-phone-delay-likely-the-iphone/

37. Qualcomm receives a licensing fee on the price of handsets (i.e., smartphones) that Plaintiff, an African American inventor, owns the patent rights for. Qualcomm receives the royalty fee even if Google don't use Qualcomm's *software* chips. Google's Pixel devices are "capable of" being modified by Qualcomm's Snapdragon X65 5G Modem-RF *software* to operate in an infringing manner is not sufficient, by itself, to support a finding of infringement." *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1330 (Fed. Cir. 2001).

38. The Federal Circuit has applied this principle in cases involving the modification of hardware through the addition of *software*. See *Nazomi Commc'ns, Inc. v. Nokia Corp.*, 739 F.3d 1339, 1346 (Fed. Cir. 2014) (finding that the defendants' products "do not infringe without modification—the modification of installing the required software").

39. Based on the Federal Circuit's principles, Qualcomm should not be receiving royalties because the infringement only occurs with the *software* modification of the smartphone. Qualcomm is especially privileged because Qualcomm collects royalties on the price of the smartphone, even when the *software* modification is made by someone other than Qualcomm. Following is a comparison of Qualcomm's Snapdragon X65 5G Modem-RF [*software]* System and Ind. Claim 1 of Plaintiff's '189 patent asserted in this case.



| **Patent #: 9,096,189; Independent Claim 1 [Asserted in Complaint]** |
|---|
| A communication device of at least one of a cell phone, ***a smart phone***, a desktop, a handheld, a PDA, a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, ***comprising***: |
| at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or ***a front-end processor*** for communication between a host computer and other devices; |
| whereupon the communication device, is ***interconnected to a product equipped to receive signals from or send signals to*** lock or unlock doors, activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems |
| wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, ***radio frequency (RF) connection***, cellular connection, broadband connection… ***short range radio frequency (RF) connection*** is capable of signal communication with the transmitter and the receiver of the communication device and ***transceivers*** of the products; |

40. When Plaintiff, an African American inventor, attempts to prove infringement in this case, Plaintiff case is dismissed because "Google contends that "Mr. Golden thus alleges not that Google sells infringing Pixel devices, but that someone else could modify Google's Pixel devices, by adding non-Google software, to make them allegedly infringing'."

41. Upon information and belief, Google pays Qualcomm a royalty fee on the price of each smartphone sold if Google uses Qualcomm's software, or chose not to use Qualcomm's software; Qualcomm's infringement theory of "software modification" still stands.

42. Upon information and belief, a double standard is applied in this case because Plaintiff is an African American inventor.

## GOOGLE, NOT PLAINTIFF, IS RESPONSIBLE FOR THE MODIFICATIONS OF GOOGLE'S PRODUCTS TO OPERATE IN AN INFRINGING MANNER

43. Many inventions are not entirely new but instead build upon previous inventions and provide meaningful improvements. This might involve adding an element to an existing invention, putting an existing invention to a new and unexpected use, or invigorating an old product with a new form of technology. For example, adding a new technology to an old product occurred when companies started using *microprocessors to control devices* that had been controlled by analog circuitry. These companies succeeded in obtaining patents for the improved devices, which covered the differences between the original version and the new version.

44. There are two main types of improvement patents, which are known as addition inventions and substitution inventions. An addition invention adds a component that previously was not present in a product or process. A substitution invention replaces a certain product or process with a new product or process that is more efficient in accomplishing the same purpose.

45. Below, are a list of modifications Google has made to the cell phone that's covered by Plaintiff's patents. **(Exhibit C)** The individual inventions describe each patented limitation that forms Plaintiff's Communicating, Monitoring, Detecting, and Controlling (CMDC) device. [i.e., Google's modified Pixel 6a, 7, 7a, 7 Pro & Fold smartphones]

46. Google's open-source architecture allow scientist, engineers, developers, manufacturers, etc. to designed products, devices, and apparatuses to be integrated with and configured to operate and function with the CMDC host device:

I. Communicating, Monitoring, Detecting, and Controlling (CMDC) Device (i.e., smartphone) – Claim 23 of the '439 Patent

II. Central Processing Units for CMDC Device – Claim 5 of the '287 Patent

III. Camera CBR Sensor(s) for CMDC Device – Claim 4 of the '189 Patent

IV. Smartwatch CBR Detector for CMDC Device – Claim 19 of the '439 Patent

V. Embedded CBRN Sensors for CMDC Device – Claim 16 of the '439 Patent

VI. Interchangeable Sensors for CMDC Device – Claim 20 of the '439 Patent

VII. NFC CBR Tag for CMDC Device – Claim 21 of the '439 Patent

VIII. Remote/Electrical Lock for CMDC Device – Claim 125 of the '990 Patent

IX. Pre-Programmed Lock for CMDC Device – Claim 1 of the '287 Patent

X. Fingerprint / Face Recognition for CMDC Device – Claim 1 of the '619 Patent

XI. Stall, Stop, Slowdown for CMDC Device – Claim 11 of the '891 Patent

XII. Vehicle Monitoring with CMDC Device – Claim 44 of the '891 Patent

XIII. Connect Vehicle with CMDC Device – Claim 4 of the '287 Patent

XIV. Internet-of-Things (IoTs) with CMDC Device – Claim 11 of the '619 Patent

47. Google's "capable of", "possible to alter", "modification of hardware", "do not infringe without modification", theories are without merit because Plaintiff's patent specifications and patent claims cover communication methods [software] for the integration of a detection means that is either in, on, upon, or adjacent to the Google smartphone.

48. According to Google's theories, tens of thousands of issued patents are considered indefinite or unenforceable because hardware is being modified with the use of Bluetooth software, radio frequency (RF) software, Wi-Fi software, wireless cellular modem software, GPS software, software for the internet-of-things, software for controlling vehicle components, software for locking and unlocking locks, software for controlling drones, etc.; the list goes on.

49. Example: Plaintiff owns three (3) of the four (4) essential components for Google's smartphone sensing device. The host device smartphone; the central processing unit (CPU), and the smartphones camera used for CBR sensing. The only component Plaintiff have not directly written a patent claim on, but is covered in Plaintiff's patent specifications as a "transceiver" is the operating system.

50. The ATAK-CBRN plugins software is built on Google's Android Open-Source Operating System (OS). The OS is responsible for managing both software and hardware components. All computer programs and apps require an operating system to do any work. Yet the OS is not the central processing unit (CPU). Plaintiff's patented CPU serves as the smartphones brain, and the OS serves as the brain's conscience.

> "Independent claims 4, 5, & 6 of Plaintiff's Patent No. 10163287 ('287 patent): at least one of ... ***a transceiver in communication with the at least one CPU*** configured to send signals to ... detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling."

## GOOGLE CAUSED THE INFRINGEMENT OF PLAINTIFF'S PATENTS

51. Android is an open-source operating system for mobile devices and a corresponding open-source project led by Google. The Android Open-Source Project (AOSP) repository offer the information and source code needed to create custom variants (i.e., ATAK is built on the Android operating system) of the Android OS, port devices and accessories to the Android platform, and ensure devices meet the compatibility requirements that keep the Android ecosystem a healthy and stable environment for millions of users.

52. Google oversees the development of the core Android open-source platform and works to create robust developer and user communities. For the most part, the Android source code is licensed under the permissive Apache License 2.0. Google chose the Apache 2.0 license because it encourages widespread Android software adoption. Google has committed the professional engineering resources necessary to ensure that Android is a fully competitive *software* platform.

53. Each platform version of Android (such as 1.5 or 8.1) has a corresponding branch in the open-source tree. The most recent branch is considered the current stable branch version. This is the branch that manufacturers port to their devices.

54. The Google Android *software* is first built into a system image for a device and put through various forms of certification, including government regulatory certification for the regions the phones will be deployed.

55. When the release is approved by the regulators and operators, the manufacturer begins mass producing devices, and Google begin releasing the source code. Simultaneous to mass production, the Google team kicks off several efforts to prepare the open-source release, that include making final API changes and updating documentation to reflect any modifications

that were made during qualification testing. Google's legal team does a final sign-off to release the code into open source.

56. The Android Open-Source Project maintains Android software, and develops new versions. Because it's open source, this software can be used for any purpose. The function of the Android Compatibility Program is to define a baseline implementation of Android that is compatible with third-party apps [DoD/DTRA/ATAK apps] written by developers. Devices that are Android compatible are eligible to participate in the Android ecosystem.

57. Google APIs are mechanisms that enable two software components [Google Android operating system software and the ATAK software that is built on the Android operating system] to communicate with each other using a set of definitions and protocols.

58. API stands for Application Programming Interface. In the context of APIs, the word Application refers to any software with a distinct function. Interface can be thought of as a contract of service between two applications. This contract defines how the two communicate with each other using requests and responses.

59. *Android Team Awareness Kit*, ATAK (built on the Android operating system) is a digital application available to warfighters throughout the DoD. ATAK offers warfighters geospatial mapping for situational awareness during combat — on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK now includes chemical, biological, radiological, and nuclear (CBRN) plug-ins.

60. *Android Team Awareness Kit*, ATAK (built on the Android operating system) provides a single interface for viewing and controlling different CBRN-sensing technologies, whether that is a wearable smartwatch that measures a warfighter's vitals (e.g., heart rate) or a device mounted on a drone to detect chemical warfare agents.



61. The TAK suite of tools uses plugins, allowing users to design applications specific to their mission needs. For example, ATAK can connect to sensors, satellites, drones, and smartwatches, enabling integration of valuable data from operators and team members and the environment.

62. Draper Laboratory, Inc. designed a CBRN Plugin to enable users to integrate CBRN sensors into TAK, collect CBRN sensor data, display it on a map and livestream it across the TAK network to other users. CBRN plugins for ATAK, are operational in the field.

## GOOGLE SELLS THE "SOFTWARE" THAT ENABLES THE INFRINGEMENT OF PLAINTIFF'S PATENTS

### *Google Play Apps for CBRNE Sensing and Detection* — (Exhibit D & D1)

63. **ATAK-CIV (CBRN)**: "The Tactical Assault Kit is DoD nomenclature for the Team Awareness Kit (TAK) application: a mission planning, geospatial, Full Motion Video (FMV), and system administrator tool that reduces the operational footprint from a tactical laptop, to a commercial mobile device. The geospatial engine and communications component support Department of Defense (DoD) and commercial sector standards. Extensibility of the core platform is supported by the Software Development Kit (https://tak.gov), which enables any partner to develop mission-specific capability or contribute to the advancement of the baseline. Data can be pre-loaded into ATAK or downloaded from the network when available." https://play.google.com/store/apps/details?id=com.atakmap.app.civ&hl=en_US&gl=US

64. "CivTAK 4.0.7 has been released. This is the enterprise-quality, "F-35 of Geospatial Collaboration" official, [CBRN] plugin-capable release of CivTAK. You can get it here. It's the most capable geospatial collaboration tool out there at any price." T-Rex recommended that iPhone users go buy an Android to try it out it is so powerful. https://www.civtak.org/2020/06/ 25/civtak-4-0-7-has-been-released/

65. **CBRNResponder [CBRN]**: "CBRNResponder provides free software tools for logging, transmitting, storing, analyzing, and presenting environmental radiological, chemical, and biological monitoring data. Data is stored in a secure cloud environment accessible only by the user. To register for an account and to obtain further information, please go to www.cbrnresponder.net. The application has a Responder Tracking feature that allows a responder to track and share their location path with participants on an event." Retrieved from:

https://play.google.com/store/apps/details?id=com.chainbridgetech.cbrnresponder&hl=en_US&gl=US

66. CBRNResponder is a cloud-based database that can be accessed on smartphones, tablets, specially designed instruments and via the web, allowing it to be employed at all levels of government during a response to a radiological or nuclear emergency. The CBRNResponder links to the CBRNResponder database and user interface including CBRNResponder App. https://www.nnss.gov/docs/docs_FRMAC/FAM%20Vol%201%20-%20Operations%20-%20FINAL%20May2023.pdf

67. **Chemical Detectives [Chemical]**: "Determining the molecular structure of organic molecules experimentally can be a tricky challenge! Chemists do this by taking a number of different types measurements, and solving the puzzle a bit like solving a jigsaw puzzle. We use techniques such as: • microanalysis • mass spectrometry • infrared spectroscopy" https://play.google.com/store/apps/details?id=com.chemicaldetectives&hl=en_US&gl=US

68. **USAMRIID's Biodefense Tool [Biological]**: "The United States Army Medical Research Institute of Infectious Diseases (USAMRIID) is the Department of Defense's lead laboratory for medical biological defense research; with a mission to provide leading edge medical capabilities to deter and defend against current and emerging biological threat agents. A key component of this mission is the training of military and civilian medical and public health professionals to become proficient in recognizing early warning signs that a biological attack has occurred, activating the appropriate agencies and personnel to investigate the event, treating casualties, and preventing spread of disease. This application distills key information presented in USAMRIID's training and education courses on biological threat agents of concern and serves as a…" https://play.google.com/store/apps/details?id=com.tradocmobile.bio&hl=en_IE&gl=US

69. **GammaPix Lite-Gamma Rad Detect [Radiation]**: "Developed initially for several federal agencies, turns your phone into a detector of ionizing radiation. The GammaPix technology has been successfully tested at independent labs with calibrated sources. It was developed with support from the U.S. Department of Defense, the Domestic Nuclear Detection Office (U.S. Department of Homeland Security), and the Transportation Research Board (U.S. National Academy of Sciences). We were encouraged by them to bring this technology to the public. Worried about accidental exposure to radioactive material or acts of terrorism? The GammaPix App can provide timely warning of the…" https://play.google.com/store/apps/details?id=com.ImageInsightInc.GammaPixLite&hl=en_US&gl=US

70. **Explosives Identification [Explosives]**: The Explosives Identification Guide Second Edition has been the guide of choice for multiple federal law enforcement agencies for over 10 years. This application was created so that First Responders from all disciplines have the key info they need in the palm of their hand should they come across an explosive device. In the current threat environment, the information in this application can save lives. https://play.google.com/store/apps/details?id=com.edpreparedness.explosives.android&hl=en_NZ&gl=US

71. **Hazardous material (HazMat)**: A CBRNE mobile app is developed for a mobile device operating system (OS) such as Android… apps integrate with mobile devices' GPS technology, built-in camera, WiFi… Android Apps available on Google Play for download are **FiRST**; **Navfree**; **ERG**; **REMM**; and, **HazMasterG3**. Software applications installed on mobile devices, such as smartphones and tablets, are useful to emergency responders during a HazMat/CBRNE incident. The transition to this new network will require modifications to existing communication devices, such as smartphones and tablets. https://play.google.com/store/apps?hl=en. **(Exhibit E)**

## PLAINTIFF'S TWO ELEMENTS REQUIRING CBRNE SENSING ARE SATISTIED WITH GOOGLE'S "BUILT IN, EMBEDDED" COMPONENTS

72. "*Inter Partes Review* (IPR): *Department of Homeland Security vs. Larry Golden;* Case No.: IPR2014-00454 (Patent RE43,990; Claims 11, 74, & 81); Final Written Decision entered on October 1, 2015. "In the 'Decision to Institute', we construed certain claim terms. Those constructions are reproduced in the chart below:

| Claim Term | Construction |
|---|---|
| "built in, embedded" (claim 74) | "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device" |
| "communication device" (claim 81) | "monitoring equipment" |

Dec. to Inst. 11-16

73. "No party challenges these constructions. Both of these terms were modified or removed in the amendment. To the extent that any of these constructions remain relevant after the amendment, we see no reason to modify them… [w]e further determined that no explicit construction was necessary for any other claim terms. Dec. to Inst. 10-11. Based on the record adduces during trial, we see no need to construe any other terms…"

74. "Beginning with the claim preamble amendment, the preamble of claim 11 originally read: "A communication device of at least one of *a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal at a monitoring site* for monitoring products for communication therebetween, comprising…." In claim 154, the language in italics has been eliminated and replaced with "the products grouped together by common features in the product grouping category of design similarity (e.g., computer terminal,

personal computer (PC)) …" Patent Owner contends that this new language is consistent with words found in the disclosure of the '118 application. Mot. To Amend 4. Patent Owner further contends that this new language is broad enough to include the removed items, such as cell phones and smart phones, because those items are "species terms" that are "included in the genus 'monitoring equipment' and 'communication device' when the clause 'products grouped together by common features in the product groupings category of design similarity' is included." *Id.*

75. Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart phones would be recognized by one of ordinary skill in the art as a type of communication device or monitoring equipment because cell phones and smartphones are devices that are capable of communication and are capable of receiving signals." "*Inter Partes Review* (IPR): *Department of Homeland Security vs. Larry Golden;* Case No.: IPR2014-00454 (Patent RE43,990; Claims 11, 74, & 81); Final Written Decision entered on October 1, 2015.

| **Google's "Built In, Embedded" CBRNE Components** | |
|---|---|
| **ATAK-CIV (CBRN)**: "The Tactical Assault Kit is DoD nomenclature for the Team Awareness Kit (TAK) application: a mission planning, geospatial, Full Motion Video (FMV), and system administrator tool that reduces the operational footprint from a tactical laptop, to a commercial mobile device. Data can be pre-loaded into ATAK or downloaded from the network when available." https://play.google.com/store/apps/details?id=com.atakmap.app.civ&hl=en_US&gl=US<br><br>Google's "built-in, embedded" Android open-source operating system, enable the infringement of Plaintiff's patents. |   |

**Near-Field Communication (NFC) Smartphone Sensor:** Nascent technology embedded in modern smartphones—near-field communication (NFC)—for wireless electronic, portable, non-line-of-sight selective detection of gas-phase chemicals ***(Fig. 1)***

National Institutes of Health (NIH). *"Wireless gas detection with a smartphone via rf nfc communication"* Published online 2014 Dec 8. doi: 10.1073/pnas. 1415403111 Retrieved from: https://www.ncbi.nlm.nih.gov/pmc/ articles/PMC4280584/

***Figure 1***

Conversion of an NFC tag into a CARD enables wireless rf detection of chemical analytes with a smartphone. NFC-enabled smartphones communicate with NFC tags by simultaneously energizing the NFC tag with an alternating magnetic field (f = 13.56 MHz) through inductive coupling and transferring data by signal modulation.

**Camera Sensor**: Camera lens in cell phone with microfluidic lens functions as camera; uses microscope to focus on a chemical sensor. A ***megapixel*** camera captures the image from the array of nanopores uses fluid rather than bulky moving parts. The sensors contained in one array is determined by the ***pixel*** resolution phone camera. ***Megapixel*** resolution in cell phone cameras; probe a million different spots on the sensor simultaneously. *Tiny sensors tucked into cell phones could map airborne toxins in real time*. Source: https:// www.understanding nano.com/cell-phone-sensors-toxins.html

Hyperspectral imaging scans for light frequencies that humans can't see in order to identify the unique chemical signatures of different substances. They say their device, which can be mass produced, is compatible with all standard smartphone cameras. *These New Smartphone Cameras Could Tell You What an Object Is Made of* https://www.sciencealert.com/new-smartphone-cameras-

Smartphones provide hardware and software capability which can be incorporated with [CBR] sensors, enabling accurate on-site portable sensing. The camera, screen, and LED flashlight of the smartphone can be employed as components of the sensor. https://link. springer.com/article/10. 1007/s11468-022-01672-1

<table>
<tr>
<td>

**Smartphone Biosensors**:

1. Ambient light sensor: Cancer biomarkers; Toxic metals; Pathogens
2. Capillary inlet: (Air analysis). Airborne Pathogens; Aerosols
3. Capillary inlet: (Fluid analysis). Blood analysis; Biomarkers
4. Microfluidic cassette: Interchangeable cassettes with varying assays
5. VIS-NIR spectrometer: Food freshness; Melanoma
6. NNAP Electrodes: Toxic metals and Organic pollutants in water
7. Optical Waveguide: Pathogens in water and food
8. Back and front camera: Colorimetric analysis; Image analysis
9. Microphone: Voice recording stress levels

</td>
<td>

</td>
</tr>
<tr>
<td>

**Google Beacon: Bluetooth; GPS; Wi-Fi**
Google Android smart phones and WiFi/Bluetooth beacons as detectors and sources. Google smart phone sensors (GPS, WiFi, Bluetooth) and beacon signals to calculate distance between detector and source. Filtering WiFi/ Bluetooth ranging functions and GPS location data. Filtering GPS derived distances based on jump in calculated position or when GPS reports jump in position but phone accelerometer sensors do not show rapid acceleration. Specific models in different categories of radiation instruments (dosimeters, survey meters, personal radiation detectors, backpacks, nuclide identifiers, and mobile systems). **(Exhibit F)**

</td>
<td>

Google Beacon is a type of Bluetooth technology with proximity-based triggers. These triggers affect both the physical and digital world. Using Bluetooth low energy (BLE) hardware technology, beacons communicate with nearby smart devices like smartphones, tablets, etc. Different types of beacons that perform different tasks.

</td>
</tr>
</table>

## COUNT I

### (Infringement of the '619 Patent)

76. Golden realleges; incorporates herein the allegations set forth in Paragraphs 1-75.

77. On information and belief, Google is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing at least independent claim 11 of the '619 patent. The alleged infringing products are: Google Pixel 6a, 7, 7a, 7 Pro & Fold smartphones.

78. As set forth in Golden's preliminary infringement contentions, Google is making, using, offering for sale, selling and/or importing Plaintiff's CMDC device have at a minimum directly infringed the '619 patent and Google is thereby liable for infringement of the '619 patent pursuant to 35 U.S.C. § 271. Google have caused damage to Golden, which infringement and damage will continue unless and until Google is enjoined.

79. The alleged infringement of Golden identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

## COUNT II

### (Infringement of the '287 Patent)

80. Golden realleges; incorporates herein the allegations set forth in Paragraphs 1-79.

81. On information and belief, Google is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing at least independent claim 5 of the '287 patent. The alleged infringing products are: Google Pixel 6a, 7, 7a, 7 Pro & Fold smartphones.

82. As set forth in Golden's preliminary infringement contentions, Google is making, using, offering for sale, selling and/or importing Plaintiff's CMDC device have at a minimum

directly infringed the ‘287 patent and Google is thereby liable for infringement of the ‘287 patent pursuant to 35 U.S.C. § 271. Google have caused damage to Golden, which infringement and damage will continue unless and until Google is enjoined.

83. The alleged infringement of Golden identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

## COUNT III

**(Infringement of the ‘439 Patent)**

84. Golden realleges; incorporates herein the allegations set forth in Paragraphs 1-83.

85. On information and belief, Google is jointly, directly, indirectly and/or under the ‘doctrine of equivalents’, infringing at least independent claims 19 and 23 of the ‘439 patent. The alleged infringing products are: Google Pixel 6a, 7, 7a, 7 Pro & Fold smartphones.

86. As set forth in Golden’s preliminary infringement contentions, Google is making, using, offering for sale, selling and/or importing Plaintiff's CMDC device have at a minimum directly infringed the ‘439 patent and Google is thereby liable for infringement of the ‘439 patent pursuant to 35 U.S.C. § 271. Google have caused damage to Golden, which infringement and damage will continue unless and until Google is enjoined.

87. The alleged infringement of Google identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

## COUNT IV

### (Infringement of the '189 Patent)

88. Golden realleges; incorporates herein the allegations set forth in Paragraphs 1-87.

89. On information and belief, Google is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing claims 1 & 7 of the '189 patent. The alleged infringing products are: Google Pixel 6a, 7, 7a, 7 Pro & Fold smartphones.

90. As set forth in Golden's preliminary infringement contentions that Google is making, using, offering for sale, selling and/or importing Plaintiff's CMDC device have at a minimum directly infringed the '189 patent and Google is thereby liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271. Google have caused damage to Golden, which infringement and damage will continue unless and until Google is enjoined.

91. The alleged infringement of Google identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

## EXHIBITS OF CLAIM CHARTS AND PATENTS

**Exhibit G** is an element-by-element claim chart of Plaintiff's alleged literal, infringement under the doctrine of equivalents, and contributory infringement claims.

**Exhibit H** is an element-by-element claim chart of Plaintiff's alleged induced, contributory, and joint infringement claims.

**Exhibits I-L** are copies of Plaintiff's United States Patent Nos. 10,984,619 ('619), 10,163,287 ('287 Patent), 9,589,439 ('439 Patent), and 9,096,189 ('189 Patent).

## PRAYER FOR RELIEF

Wherefore, Golden respectfully requests that this Court enter:

A. A judgment in favor of Golden that the defendant has infringed claims of the '619 Patent, the '287 Patent, the '439 Patent, and the '189 Patent as aforesaid;

B. A permanent injunction enjoining the defendant, its officers, directors, agents, servants, affiliates, employees, divisions, branches, subsidiaries, and all others acting in active concert or privity therewith from direct, indirect and/or joint infringement of the '619, '287, '439, and '189 patents as aforesaid pursuant to 35 U.S.C. § 283;

C. A judgment and order requiring the defendant to pay Golden its damages with pre- and post-judgment interest thereon pursuant to 35 U.S.C. § 284;

D. As set forth in Golden's preliminary infringement contentions that the Defendant in this case is making, using, offering for sale, selling and/or importing the aforementioned alleged infringing devices that have at a minimum, directly infringed the '619, '287, '439, and '189 patents. The Defendant is thereby liable for infringement of the '619, '287, '439, and '189 patents pursuant to 35 U.S.C. § 271. The Defendant has caused damage to Golden, which infringement and damage will continue unless and until the Defendant is enjoined.

E. Any and all further relief to which the Court may deem Golden entitled.

## DEMAND FOR JURY TRIAL

Golden requests a trial by jury on all issues so triable by right pursuant to Fed. R. Civ. P. 38. A right guaranteed under the Seventh Amendment of the Constitution.

Sincerely,

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

(H) 8642885605

(M) 8649927104

Email: atpg-tech@charter.net

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this 21st day of August, 2023, a true and correct copy of the foregoing "Plaintiff's Amended Complaint for Patent Infringement", was served upon the following Defendant by priority "express" mail:

Matthew S. Warren
WARREN LEX LLP
2261 Market Street, No. 606
San Francisco, California, 94114
Phone: (415) 895-2940
Fax: (415) 895-2964
Email: 22-5246@cases.warrenlex.com

Larry Golden, Pro Se
740 Woodruff Rd., #1102
Greenville, South Carolina 29607
atpg-tech@charter.net
864-288-5605

# Exhibit A

## VERTICAL STARE DECISIS CHART OF EACH LIMITATION

According to the doctrine of "*Vertical Stare Decisis*" Google is barred from challenging, and this Court is barred from relitigating the specifications of the Google Pixel 5 and the Android Team Awareness Kit (ATAK), that was decided as being nonfrivolous in U.S. Court of Appeals for the Federal Circuit: See the sensor types for "Android" listed below:

---

### SENSOR TYPES SUPPORTED BY THE "*ANDROID*" PLATFORM

- **BIOMETRICS**: Biometric factors allow for secure authentication on the Android platform. The Android framework includes face and fingerprint biometric authentication. Android can be customized to support other forms of biometric authentication (such as Iris).

- **DISABLING LOCK MECHANISM:** Google's Android operating system features a lock mechanism to secure your phone, known as pattern lock. When setting the pattern, you must drag your finger along lines on the screen between different nodes. Afterward, to unlock the phone, you'll need to replicate the pattern drawn. If you fail to solve the pattern too many times, the phone locks and cannot be unlocked without logging into the associated Google account. If you can't log in, you'll have to employ some other methods to restore control of your phone.

- **CHEMICAL, BIOLOGICAL, RADIOLOGICAL, AND NUCLEAR (CBRN) DETECTION:** Through collaboration and innovation, the Defense Threat Reduction Agency has integrated its powerful, hazard-awareness-and-response tools into the *Android Tactical Assault Kit (or the Android Team Awareness Kit, ATAK)*. ATAK is a digital application available to warfighters throughout the DoD. Built on the Android operating system, ATAK offers warfighters geospatial mapping for situational awareness during combat — on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK now includes chemical, biological, radiological, and nuclear (CBRN) plug-ins.

- **HEART RATE**: *Android Team Awareness Kit, ATAK* provides a single interface for viewing and controlling different CBRN-sensing technologies, whether that is a wearable smartwatch that measures a warfighter's vitals (e.g., heart rate) or a device mounted on a drone to detect chemical warfare agents.

- **NEAR FIELD COMMUNICATION (NFC):** Pixel™, Phone by Google - Turn NFC on/off. Near Field Communication (NFC) allows the transfer of data between devices that are a few centimeters apart, typically back-to-back. NFC must be turned on for NFC-based apps (e.g., Tap to Pay) to function correctly. NFC is a set of short-range wireless technologies, typically requiring a distance of 4cm or less to initiate a connection. NFC allows you to share small payloads of data between an NFC tag and an Android-powered device, or between two Android-powered devices. Tags can range in complexity.

- **WARFIGHTERS:** The U.S. armed forces and their interagency and coalition partners value *Android Team Awareness Kit, ATAK* and the common operating picture it provides. DTRA continues to develop CBRN-specific plug-in capabilities to support warfighters on the battlefield.

---

Below, (***Figure 1***) illustrates how the Federal Circuit in *Golden v. Google* examined each and every product element of the Google Pixel 5 smartphone to the claim limitations of claim 5 of the '287 patent; claim 23 of the '439 patent; and claim 1 of the '189 patent. The chart below is a comparison of a *smartphone* elements evaluated by the Federal Circuit in *Golden v. Google*.

***Figure 1***

| **Google Pixel 5 Smartphone** | **Vertical Stare Decisis (Federal Circuit)** |
|---|---|
| **Smartphone**<br>[A] portable computer device that combines mobile telephone functions and computing functions [H]ave central processing units (CPUs), similar to those in computers. The CPU is typically integrated in a system-on-a-chip (SoC) application processor. | *Golden v. Google* Case No. 22-1267 the complaint includes a detailed claim chart mapping features of an accused product, [] **Smartphone**, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189" … 'in a relatively straightforward manner'" |

| | |
|---|---|
| CPU: Octa-core (1 × 2.4 GHz Kryo 475 Prime & 1 × 2.2 GHz Kryo 475 Gold & 6 × 1.8 GHz Kryo 475 Silver) System-on-a-chip: Qualcomm Snapdragon 765G | *Golden v. Google* Case No. 22-1267 the complaint includes a detailed claim chart mapping features of an accused product, [] **Smartphone CPU (Qualcomm Snapdragon (SoC))**, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189" … 'in a relatively straightforward manner'" |
| Ambient Temperature sensor supported by the Android platform. Measures the ambient room temperature in degrees Celsius (°C). Monitoring air temperatures. Monitoring air temperatures. | *Golden v. Google* Case No. 22-1267 the complaint includes a detailed claim chart mapping features of an accused product, [] **Smartphone Temperature Sensor**, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189" … 'in a relatively straightforward manner'" |
| Gravity sensor supported by the Android platform. Measures the force of gravity in m/s2 that is applied to a device on all three physical axes (x, y, z). Motion detection (shake, tilt, etc.). | *Golden v. Google* Case No. 22-1267 the complaint includes a detailed claim chart mapping features of an accused product, [] **Smartphone Gravity Sensor**, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189" … 'in a relatively straightforward manner'" |
| Light sensor supported by the Android platform. Measures the ambient light level (illumination) in lx. Controlling screen brightness. Screen: 6-inch flexible OLED display at 432 ppi | *Golden v. Google* Case No. 22-1267 the complaint includes a detailed claim chart mapping features of an accused product, [] **Smartphone Light Sensor**, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189" … 'in a relatively straightforward manner'" |

| | |
|---|---|
| Connectivity: Wi-Fi 5 (a/b/g/n/ac) 2.4 + 5.0 GHz, Bluetooth 5.0 + LE, NFC, GPS (GLONASS, Galileo, BeiDou), eSIM capable | *Golden v. Google* Case No. 22-1267 the complaint includes a detailed claim chart mapping features of an accused product, [] **Smartphone Bluetooth Sensor**, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189" … 'in a relatively straightforward manner'" |
| Connectivity: Wi-Fi 5 (a/b/g/n/ac) 2.4 + 5.0 GHz, Bluetooth 5.0 + LE, NFC, GPS (GLONASS, Galileo, BeiDou), eSIM capable | *Golden v. Google* Case No. 22-1267 the complaint includes a detailed claim chart mapping features of an accused product, [] **Smartphone NFC Sensor**, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189" … 'in a relatively straightforward manner'" |
| Connectivity: Wi-Fi 5 (a/b/g/n/ac) 2.4 + 5.0 GHz, Bluetooth 5.0 + LE, NFC, GPS (GLONASS, Galileo, BeiDou), eSIM capable | *Golden v. Google* Case No. 22-1267 the complaint includes a detailed claim chart mapping features of an accused product, [] **Smartphone GPS Connection**, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189" … 'in a relatively straightforward manner'" |
| Google's Android operating system features a lock mechanism to secure your phone, known as pattern lock. To set, drag your finger along lines on the screen. To unlock the phone, replicate the pattern drawn. If you fail to solve the pattern too many times, the phone locks and cannot be unlocked without logging into the associated Google account.<br><br>Google Nest × Yale Lock is connected to the Nest app; you can lock or unlock your door from your phone. | *Golden v. Google* Case No. 22-1267 the complaint includes a detailed claim chart mapping features of an accused product, [] **Smartphone Locking Mechanism for Lock, Unlock, Disabling Lock** to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189 … 'in a relatively straightforward manner'" |

| | |
|---|---|
| Pixel phones use USB-C with USB 2.0 power adapters and cables. To charge your phone with a USB-A power adapter, use a USB-C to USB-A cable. | *Golden v. Google* Case No. 22-1267 the complaint includes a detailed claim chart mapping features of an accused product, [] **Smartphone Power Source** to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189 … 'in a relatively straightforward manner'" |
| BIOMETRICS: Biometric factors allow for secure authentication on the Android platform. The Android framework includes face and fingerprint biometric authentication. Android can be customized to support other forms of biometric authentication (such as Iris). | *Golden v. Google* Case No. 22-1267 the complaint includes a detailed claim chart mapping features of an accused product, [] **Smartphone Biometric Authentication** to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189 … 'in a relatively straightforward manner'" |
| *Android Team Awareness Kit*, ATAK (built on the Android operating system) provides a single interface for viewing and controlling different CBRN-sensing technologies, whether that is a wearable smartwatch that measures a warfighter's vitals (e.g., heart rate) or a device mounted on a drone to detect chemical warfare agents. | *Golden v. Google* Case No. 22-1267 the complaint includes a detailed claim chart mapping features of an accused product, [] **Smartphone Android Operating System** to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189 … 'in a relatively straightforward manner'" |
| *Android Team Awareness Kit*, ATAK (built on the Android operating system) is a digital application available to warfighters throughout the DoD. ATAK offers warfighters geospatial mapping for situational awareness during combat — on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK now includes chemical, biological, radiological, and nuclear (CBRN) plug-ins. | *Golden v. Google* Case No. 22-1267 the complaint includes a detailed claim chart mapping features of an accused product, [] **Smartphone ATAK for CBRN Plug-ins** to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189 … 'in a relatively straightforward manner'" |

| | |
|---|---|
| Connectivity: Wi-Fi 5 (a/b/g/n/ac) 2.4 + 5.0 GHz, Bluetooth 5.0 + LE, NFC, GPS (GLONASS, Galileo, BeiDou), eSIM capable | *Golden v. Google* Case No. 22-1267 the complaint includes a detailed claim chart mapping features of an accused product, [] **Smartphone Wi-Fi Connection** to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189 … 'in a relatively straightforward manner'" |
| Google Nest × Yale Lock is connected to the Nest app; you can lock or unlock your door from your phone.<br><br>*Android Team Awareness Kit*, ATAK (built on the Android operating system) provides a single interface for viewing and controlling different CBRN-sensing technologies | *Golden v. Google* Case No. 22-1267 the complaint includes a detailed claim chart mapping features of an accused product, [] **Smartphone Lock/Unlock Mechanism and Smartphone ATAK for CBRN Plug-ins** to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189 … 'in a relatively straightforward manner'" |
| Google Nest × Yale Lock is connected to the Nest app; you can lock or unlock your door from your phone.<br><br>*Android Team Awareness Kit*, ATAK (built on the Android operating system) provides a single interface for viewing and controlling different CBRN-sensing technologies | *Golden v. Google* Case No. 22-1267 the complaint includes a detailed claim chart mapping features of an accused product, [] **Smartphone Lock/Unlock Mechanism and Smartphone ATAK for CBRN Plug-ins** to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189 … 'in a relatively straightforward manner'" |
| *Android Team Awareness Kit*, ATAK (built on the Android operating system) is a digital application available to warfighters throughout the DoD. ATAK offers warfighters geospatial mapping for situational awareness during combat — on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK now includes chemical, biological, radiological, and nuclear (CBRN) plug-ins. | *Golden v. Google* Case No. 22-1267 the complaint includes a detailed claim chart mapping features of an accused product, [] **Smartphone ATAK for CBRN Plug-ins** to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189 … 'in a relatively straightforward manner'" |

| *Android Team Awareness Kit*, ATAK (built on the Android operating system) is a digital application available to warfighters throughout the DoD. ATAK offers warfighters geospatial mapping for situational awareness during combat — on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK now includes chemical, biological, radiological, and nuclear (CBRN) plug-ins. | *Golden v. Google* Case No. 22-1267 the complaint includes a detailed claim chart mapping features of an accused product, [] **Smartphone ATAK for CBRN Plug-ins** to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189 … 'in a relatively straightforward manner'" |
|---|---|

Vertical stare decisis, or vertical precedent, is the obligation of the Northern District of California Court to follow the decisions of the United States Court of Appeals for the Federal Circuit that falls within the hierarchical structure. Vertical stare decisis and precedent, are a matter of hard law, not a matter of policy.

Something analogous happens with vertical stare decisis: it is not hard law because it sanctions departure; rather it is because of its hard nature that vertical stare decisis brings with it, or needs, a sanction against non-compliance. So, with vertical stare decisis it is true that in the absence of compliance by the Northern District of California Court, the Federal Circuit will likely overturn the Northern District of California Court's decision. This works as a kind of sanction against the non-complying court. Vertical stare decisis is, indeed, afforded binding weight.

# Exhibit B

**DUPLICATE OF THE CLAIM CHART SUBMITTED IN GOLDEN v. GOOGLE, LLC**

The Federal Circuit on 09/08/2022, in *Larry Golden v. Google LLC*; Case No. 22-1267 — "VACATED AND REMANDED" the relevant Case No: 22-1267 Document 15; back to the District Court "to be filed and request service of process".

The Federal Circuit determined the complaint, "includes a detailed claim chart mapping features of an accused product, the Google Pixel 5 Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189" … "in a relatively straightforward manner" … and that the [Circuit] "express no opinion as to the adequacy of the complaint or claim chart except that it is not facially frivolous."

> Three-Judge Panel: "DISCUSSION. 'Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal,* 556 U.S. 662 (2009), a court must dismiss a complaint if it fails to allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570 … [T]his standard "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (citation omitted). A plaintiff must allege facts that give rise to "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted) … this court has explained that a plaintiff … must plead "'enough fact[s] to raise a reasonable expectation that discovery will reveal' that the defendant is liable for the misconduct alleged."
>
> "Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the Google Pixel 5 Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189 … It [claim chart] attempts [] to map claim limitations to infringing product features, and it does so in a relatively straightforward manner …[W]e conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart. Mr. Golden has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart…."

## CLAIM CHART FOR GOOGLE PRODUCTS

The following Claim Chart is an illustration of literal infringement. At least one of the alleged infringing products of Google (i.e., Google Pixel smartphones 4a, 4a(5G), 5, 6, 6a, 7, & 7a) are representative of all the alleged infringing products of Google asserted in this complaint. At least one of the alleged infringing products of Google (Google Pixel 5) is illustrated to show how the Google Pixel 5 allegedly infringes on at least one of the asserted independent claims of each of the patents-in-suit ('287, '439, and '189 patents).

| | Patent #: 10,163,287; Independent Claim 5 | Patent #: 9,589,439; Independent Claim 23 | Patent #: 9,096,189; Independent Claim 1 |
|---|---|---|---|
| | A monitoring device, comprising: | A cell phone comprising: | A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, comprising: |
| CPU: Octa-core (1 × 2.4 GHz Kryo 475 Prime & 1 × 2.2 GHz Kryo 475 Gold & 6 × 1.8 GHz Kryo 475 Silver) System-on-a-chip: Qualcomm Snapdragon 765G | at least one central processing unit (CPU); | a central processing unit (CPU) for executing and carrying out the instructions of a computer program; | at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or a front-end processor for communication between a host computer and other devices; |

| | | | |
|---|---|---|---|
| Ambient Temperature sensor supported by the Android platform. Measures the ambient room temperature in degrees Celsius (°C). Monitoring air temperatures. Monitoring air temperatures. | at least one temperature sensor in communication with the at least one CPU for monitoring temperature; | X | X |
| Gravity sensor supported by the Android platform. Measures the force of gravity in m/s2 that is applied to a device on all three physical axes (x, y, z). Motion detection (shake, tilt, etc.). | at least one motion sensor in communication with the at least one CPU; | X | X |
| Light sensor supported by the Android platform. Measures the ambient light level (illumination) in lx. Controlling screen brightness. Screen: 6-inch flexible OLED display at 432 ppi | at least one viewing screen for monitoring in communication with the at least one CPU; | X | X |
| Connectivity: Wi-Fi 5 (a/b/g/n/ac) 2.4 + 5.0 GHz, Bluetooth 5.0 + LE, NFC, GPS (GLONASS, Galileo, BeiDou), eSIM capable | at least one global positioning system (GPS) connection in communication with the at least one CPU; | at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; | at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection; |

| | | | |
|---|---|---|---|
| Connectivity: Wi-Fi 5 (a/b/g/n/ac) 2.4 + 5.0 GHz, Bluetooth 5.0 + LE, NFC, GPS (GLONASS, Galileo, BeiDou), eSIM capable | at least one of an internet connection or a Wi-Fi connection in communication with the at least one CPU; | wherein at least one of… WiFi connection, internet connection, radio frequency (RF) connection, cellular connection… capable of signal communication with the transmitter or the receiver; | wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group… of satellite, Bluetooth, WiFi… |
| Connectivity: Wi-Fi 5 (a/b/g/n/ac) 2.4 + 5.0 GHz, Bluetooth 5.0 + LE, NFC, GPS (GLONASS, Galileo, BeiDou), eSIM capable | at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; | at least one of a… Bluetooth connection, WiFi connection, internet connection… cellular connection… short range radio frequency (RF) connection, or GPS connection; | X |
| Google's Android operating system features a lock mechanism to secure your phone, known as pattern lock. To set, drag your finger along lines on the screen. To unlock the phone, replicate the pattern drawn. If you fail to solve the pattern too many times, the phone locks and cannot be unlocked without logging into the associated Google account.<br><br>Google Nest × Yale Lock is connected to the Nest app; you can lock or unlock your door from your phone. | at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device; | whereupon the cell phone is interconnected to the cell phone detection device to receive signals or send signals to lock or unlock doors, to activate or deactivate security systems, to activate or deactivate multi-sensor detection systems, or to activate or deactivate the cell phone detection device; | X |

| | | | |
|---|---|---|---|
| Pixel phones use USB-C with USB 2.0 power adapters and cables. To charge your phone with a USB-A power adapter, use a USB-C to USB-A cable. | at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device; | X | X |
| BIOMETRICS: Biometric factors allow for secure authentication on the Android platform. The Android framework includes face and fingerprint biometric authentication. Android can be customized to support other forms of biometric authentication (such as Iris). | at least one biometric sensor in communication with the at least once CPU for providing biometric authentication to access the communication device; | wherein the cell phone is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature such that the cell phone is locked by the biometric lock disabler to prevent unauthorized use; and | wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature such that the communication device that is at least one of the cell phone, the smart phone, the desktop, the handheld, the PDA, the laptop or the computer terminal is locked by the biometric lock disabler to prevent unauthorized use |
| *Android Team Awareness Kit*, ATAK (built on the Android operating system) provides a single interface for viewing and controlling different CBRN-sensing technologies, whether that is a wearable smartwatch that measures a warfighter's vitals (e.g., heart rate) or a device mounted on a drone to detect chemical warfare agents. | at least one sensor for chemical, biological, or human detection in communication with the at least one CPU; | the cell phone is at least a fixed, portable or mobile communication device interconnected to the cell phone detection device, capable of wired or wireless communication therebetween; and | the communication device is at least a fixed, portable or mobile communication device interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween… |

| | | | |
|---|---|---|---|
| *Android Team Awareness Kit*, ATAK (built on the Android operating system) is a digital application available to warfighters throughout the DoD. ATAK offers warfighters geospatial mapping for situational awareness during combat — on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK now includes chemical, biological, radiological, and nuclear (CBRN) plug-ins. | one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents; | at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone; | wherein the communication device receives a signal via any of one or more products listed in any of the plurality of product grouping categories; |
| Connectivity: Wi-Fi 5 (a/b/g/n/ac) 2.4 + 5.0 GHz, Bluetooth 5.0 + LE, NFC, GPS (GLONASS, Galileo, BeiDou), eSIM capable | at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU… | X | X |
| Google Nest × Yale Lock is connected to the Nest app; you can lock or unlock your door from your phone.<br><br>*Android Team Awareness Kit*, ATAK (built on the Android operating system) provides a single interface for viewing and controlling different CBRN-sensing technologies | at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or… detect at least one of a chemical biological… agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. | a transmitter for transmitting signals and messages to a cell phone detection device; a receiver for receiving signals from the cell phone detection device; | a transmitter for transmitting signals and messages to at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device;<br><br>a receiver for receiving signals, data or messages from at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device; |

| | | | |
|---|---|---|---|
| Google Nest × Yale Lock is connected to the Nest app; you can lock or unlock your door from your phone.<br><br>*Android Team Awareness Kit*, ATAK (built on the Android operating system) provides a single interface for viewing and controlling different CBRN-sensing technologies | X | X | whereupon the communication device, is interconnected to a product equipped to receive signals from or send signals to lock or unlock doors, activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems |
| *Android Team Awareness Kit*, ATAK (built on the Android operating system) is a digital application available to warfighters throughout the DoD. ATAK offers warfighters geospatial mapping for situational awareness during combat — on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK now includes chemical, biological, radiological, and nuclear (CBRN) plug-ins. | X | a transmitter for transmitting signals and messages to a cell phone detection device; a receiver for receiving signals from the cell phone detection device; | wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection… short range radio frequency (RF) connection is capable of signal communication with the transmitter and the receiver of the communication device and transceivers of the products; |

| | | | |
|---|---|---|---|
| *Android Team Awareness Kit*, ATAK (built on the Android operating system) is a digital application available to warfighters throughout the DoD. ATAK offers warfighters geospatial mapping for situational awareness during combat — on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK now includes chemical, biological, radiological, and nuclear (CBRN) plug-ins. | X | whereupon a signal sent to the receiver of the cell phone detection device from at least one of the chemical sensor, the biological sensor, the explosive sensor, the human sensor, the contraband sensor, or the radiological sensor, causes a signal that includes at least one of location data or sensor data to be sent to the cell phone. | X |

**DoD DTRA ATAK Smartphone Port for CBRN Plug-Ins**



**Google Android and Apple iOS are "Native" to the OEMs (i.e., Google, Samsung, LG, Qualcomm, and Apple) manufacture of the smartphones.**

**Blueforce Plugin Series: CBRNE and HAZMAT Response**

The DuraForce Ultra 5G
(CBRN purpose-built *plugins* for smartphones)
WILCOX
PATRIOT
85
3620
SCBA
The ALTAIR 5X Gas Detector
(Google Android and Apple iOS)
MSA
The MSA Altair 4XR Multi-Gas Detector
(Google Android and Apple iOS)
The Thermo RadEye™ PRD Radiation Detector
(Google Android only)
RADEYE PRD
Menu
Dose
On

# Exhibit C

# GOOGLE, NOT PLAINTIFF, IS RESPONSIBLE FOR THE MODIFICATIONS OF ITS PRODUCTS TO OPERATE IN AN INFRINGING MANNER

Google's "capable of", "possible to alter", "modification of hardware", "do not infringe without modification", theories are without merit because Plaintiff's patent specifications and patent claims cover communication methods [software] for the integration of a detection means that is either in, on, upon, or adjacent the Google smartphone.

According to Google's theories, tens of thousands of issued patents are considered indefinite or unenforceable because hardware is being modified with the use of Bluetooth software, radio frequency (RF) software, Wi-Fi software, wireless cellular modem software, GPS software, software for the internet-of-things, software for controlling vehicle components, software for locking and unlocking locks, software for controlling drones, etc.; the list goes on.

Example: Plaintiff owns three (3) of the four (4) essential components for Google's smartphone sensing device. The host device smartphone; the central processing unit (CPU), and the smartphones camera used for CBR sensing. The only component Plaintiff have not directly written a patent claim on, but is covered in Plaintiff's patent specifications as a "transceiver" is the operating system.

Many inventions are not entirely new but instead build upon previous inventions and provide meaningful improvements. This might involve adding an element to an existing invention, putting an existing invention to a new and unexpected use, or invigorating an old product with a new form of technology. For example, adding a new technology to an old product occurred when companies started using microprocessors to control devices that had been controlled by analog circuitry. These companies succeeded in obtaining patents for the improved devices, which covered the differences between the original version and the new version.

There are two main types of improvement patents, which are known as addition inventions and substitution inventions. An addition invention adds a component that previously was not present in a product or process. A substitution invention replaces a certain product or process with a new product or process that is more efficient in accomplishing the same purpose.

Below, are a list of modifications Google has made to its 2008 cell phone that's covered by Plaintiff's patents. The individual charts describe each patented limitation that forms Plaintiff's Communicating, Monitoring, Detecting, and Controlling (CMDC) device. [i.e., Google's modified Pixel 6a, 7, 7a, 7pro & fold smartphones]

Google's open-source architecture allow scientist, engineers, developers, manufacturers, etc. to designed products, devices, and apparatuses to be integrated with and configured to operate and function with the host device.

I. Communicating, Monitoring, Detecting, and Controlling (CMDC) Device (i.e., smartphone) – Claim 23 of the '439 Patent

II. Central Processing Units for CMDC Device – Claim 5 of the '287 Patent

III. Camera CBR Sensor(s) for CMDC Device – Claim 4 of the '189 Patent

IV. Smartwatch CBR Detector for CMDC Device – Claim 19 of the '439 Patent

V. Embedded CBRN Sensors for CMDC Device – Claim 16 of the '439 Patent

VI. Interchangeable Sensors for CMDC Device – Claim 20 of the '439 Patent

VII. NFC CBR Tag for CMDC Device – Claim 21 of the '439 Patent

VIII. Remote/Electrical Lock for CMDC Device – Claim 125 of the '990 Patent

IX. Pre-Programmed Lock for CMDC Device – Claim 1 of the '287 Patent

X. Fingerprint / Face Recognition for CMDC Device – Claim 1 of the '619 Patent

XI. Stall, Stop, Slowdown for CMDC Device – Claim 11 of the '891 Patent

XII. Vehicle Monitoring with CMDC Device – Claim 44 of the '891 Patent

XIII. Connect Vehicle with CMDC Device – Claim 4 of the '287 Patent

XIV. Internet-of-Things (IoTs) with CMDC Device – Claim 11 of the '619 Patent

## I. Communicating, Monitoring, Detecting, and Controlling (CMDC) Device (i.e., smartphone) – Claim 23 of the '439 Patent

<table>
<tr>
<td>

**Claim 14 of the '439 Patent** "Monitoring equipment of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone) interconnected to a product for communication therebetween …
</td>
<td>
Communicating, Monitoring, Detecting, and Controlling (CMDC) Device (i.e., smartphone)<br><br>
Claim 23 of the '439 Patent: "A cell phone comprising: a central processing unit (CPU) for executing and carrying out the instructions; … whereupon the cell phone is interconnected to the cell phone detection device to receive signals or send signals to lock or unlock doors, to activate or deactivate security systems … multi-sensor detection systems, or to activate or deactivate the cell phone detection device;<br><br>
"In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals<br><br>
Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, …, wireless communication devices, monitoring sites, monitoring terminals, web servers, desktop personal computers (PCs), notebook personal computers (PCs), laptops, satellite phones, cell phones, … handhelds;
</td>
</tr>
</table>

## II. Central Processing Units (CPUs) for CMDC Device – Claim 5 of the '287 Patent

<table>
<tr>
<td>

Example: Google Tensor G2 uses the same 2+2+4 configuration that the Tensor G1 came with, but with a different set of mid-range cores. Thus, the Tensor G2 now comes with dual high-performance ARM Cortex-X1 cores, two mid-range Cortex-A78 cores, and finally, quad Cortex-A55 efficiency cores
</td>
<td>
Central Processing Units (CPUs) for Smartphone<br><br>
Claim 5 of the '287 Patent: A monitoring device, comprising: at least one central processing unit (CPU) … at least one of a transmitter or a transceiver in communication with the at least one CPU configured to … send signals to control components of a vehicle, … or send signals to detect … chemical, biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. [See also claims 4 & 6 of the '287 patent; and, claims 1 & 11 of the '619 patent].<br><br>
The "smartphone processor (CPU), also known as chipset, is a component that controls everything going on in your smart-phone and ensures it functions correctly. You can compare it to the brain of the human body. Every action you perform on your smartphone goes straight to the processor." https://www.coolblue.nl/en/advice/smartphone-processors. html. "[T]oday's smartphones all have processors or CPUs. A smartphone CPU (central processing unit) is the brains of the entire device. Without one, no smartphone would be able to function" (smartphonedomain.com., 2021).
</td>
</tr>
</table>

## III. Camera CBR Sensor(s) for CMDC Device – Claim 4 of the '189 Patent

**Camera CBR Sensor(s) for Smartphone**

Camera Sensor for Radiological Detection: How can a cell phone detect radioactivity? Cell phones have cameras and camera sensors react to radioactivity. High energy particles strike a sensor array and register as small bright pinpoints or thin streaks of light. An app … works well enough to alert users to dangerous levels of radiation.

Camera Sensor for Biological Detection: "In the diagnostic test, a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. Coronavirus RNA present, CRISPR proteins snip the molecular probes, whole sample to emit light. Fluorescence detected with a cell phone camera." (Image: Science at Cal).

Camera Sensor for Chemical Detection: The sensor ***Rhevision*** and UC San Diego responds to different chemicals by changing color; a single chip with many tiny pores, each respond to a different chemical; a standard cell-phone camera can detect them; the phone's camera watches the chip for color changes.

**Claim 4 of the '189 Patent**: A built-in, embedded multi sensor detection system … sensor array or fixed detection device into the product that detects agents …

## IV. Smartwatch CBR Detector for CMDC Device – Claim 19 of the '439 Patent

Homeland Security's Smartwatch Will Detect Nuclear Bombs https://www.popular-mechanics.com/military/research/a18161/homeland-security -smartwatch-detect-nuclear-bombs/

**Smartwatch CBR Detector for Smartphone**

**Claim 19 of the '439 Patent**: A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, radiological agent, or compound, comprising: a plurality of sensors … capable of being disposed within, on, upon or adjacent a multi-sensor detection device.

The US Military's Latest Wearables [Smart Watch] Can Detect Illness Two Days Before You Get Sick https://www.defenseone.com/technology/2020/09/militarys-latest-wearables-can-detect-illness-two-days-you-get-sick/168664/

Studies reveal smartwatch biometrics can detect COVID-19: "smartwatches and other wearables measuring biometrics like heart-rate variability have the ability to detect if a person is COVID-19 positive" https://www.biometricupdate.com/202101/studies-reveal-smartwatch-biometrics-can-detect-covid-19-before-symptoms-surface

## V. Embedded CBRN Nanosensors for CMDC Device – Claim 16 of the '439 Patent

**Embedded CBRN Sensors for Smartphone (NASA)**

**Claim 16 of the '439 Patent**: A built-in, embedded multi sensor detection system … a cell phone, a smart phone

A silicon-based sensing chip, which consists of 64 nanosensors can turn a cell phone into a *portable poison detector.* (NASA). "can turn your cellphone into a *portable "silent killer" detector* https://www. foxnews.com/tech/smartphones-take-on-silent-killers-as-portable-danger-detectors & Nuclear Radiation Nanosensors and Nanosensory Systems https://link.springer. com/book/10.1007/978-94-017-7468-0

## VI. Interchangeable Sensor Device for CMDC Device – Claim 20 of the '439 Patent

**Plurality of Interchangeable Sensor Device for Smartphone: (NASA & Subtractor George Yu)**

**Claim 20 of the '439 Patent:** A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, radiological agents…

The system he developed with NASA for the DHS Cell-All project, George Yu of Genel Systems Inc., created his NODE+ platform. A cylinder that transmits data from sensors to smart-phone. The NODE+ is compatible with Google Android smart devices.

## VII. NFC CBR Tag for CMDC Device – Claim 21 of the '439 Patent

MIT-- wirelessly detect hazardous gases by using a simple sensor made from near-field communication (NFC) tags that can be read by a smartphone… detect gaseous ammonia, hydrogen peroxide, and cyclohexanone, and other gases… Sensors. Retrieved from: https://phys.org/news/ 2014-12-cheap-sensor-transmit-hazardous-chemicals.html

**Near-Field Communication (NFC) CBR Tag for Smartphone (Safer than RFID tag)**

**Claim 21 of the '439 Patent**: A multi-sensor detection system … at least one tag that is read by the monitoring equipment that is capable of wireless near-field communication

In November 2007, two Defense Department contractors, and a U.S. city's bomb squad demonstrated how an RFID tag could send a signal to … detonated a small amount of explosives in a container a simple emission of a radio signal traveling on the approved RFID 433 MHz frequency. Officials from the Defense Department and DHS observed the demonstration. https://www.nationaldefense-magazine.org/articles/2011 /2/1/2011february-military-supply-chain-tracking-system-both-inefficient-and-dangerous

## VIII. Remote/Electrical Lock Disabler for CMDC Device – Claim 125 of the '990 Patent

**Remote/Electrical Lock Disabler for Smartphone (Gov. Contractor iControl's MATTs & mLOCK)**

**Claim 125 of the '990 Patent**: A multi-sensor detection system ... whereupon detection causes a signal to be sent to the at least one communication device followed by communicating with the internal or external remote/electrical lock disabler.

Marine Asset Tag Tracking System (MATTS) is a DHS initiative for "Smart Container". MATTS "gateway": a wireless electronic device that communicates with a sensor array; the communication device; and locking mechanism for locking status and GPS location. Internal /external sensors are interconnected to operate with the MATTS device and can detect gas concentrations, radiation, humidity and moisture, atmospheric pressure, etc. The mLOCK communicates bi-directionally using encrypted messages between the lock and the MATTs readers or mobile devices (i.e., smartphone)

## IX. Pre-Programmed Lock Disabler for CMDC Device – Claim 1 of the '287 Patent

"Monitoring equipment being capable of sending signals to engage (lock), disengage (unlock), or disable (make unavailable) at least one of a remote lock, an electrical lock, a mechanical lock, or automatic lock..."

**Pre-Programmed Lock Disabler for Smartphone**

Security feature: After several unsuccessful log-in attempts using a passcode or fingerprint, an Android or iOS device automatically locks itself up. If unable to log in after the security layers, the only option is to have the device unlocked. The wrong pin will launch to Account Login. On an Google Android or Apple Phone, multiple attempts (usually five attempts or more) with an unknown or a wrong pin will go either into a delay before further attempts are allowed ...

FBI Failed Attempts to Unlock Phone: The FBI recovered an Apple iPhone 5C—owned by the San Bernardino County, California government—that had been issued to its employee Syed Rizwan Farook, one of the shooters involved in the December 2015 San Bernardino attack. The attack killed 14 people and seriously injured 22. The two attackers died four hours after the attack in a shootout with police ... Authorities were able to recover Farook's work phone, but could not unlock its four-digit passcode, and the phone was programmed to automatically delete all its data after ten failed password attempts (an anti-theft measure on smartphones).

**Claim 1 of the '287 Patent**: Monitoring equipment that is at least one ... a lock disabling mechanism that is able to engage (lock), or disengage (unlock), or disable (make unavailable) the monitoring equipment after a specific number of tries;

## X. Fingerprint and Face Recognition for CMDC Device – Claim 1 of the '619 Patent

**Fingerprint and Face Recognition for Smartphone**

**Claim 1 of the '619 Patent**: A communication device that is at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, comprising at least a central processing unit (CPU), capable of: processing instructions to authenticate or identify a user by at least one of biometric fingerprint recognition, biometric facial recognition, biometric iris recognition, or biometric retina recognition

## XI. Stall, Stop, or Vehicle Slowdown for CMDC Device – Claim 11 of the '891 Patent

Driverless car smartphones, authorizes the phone to control functions. Smartphones and driverless technology: instant braking for autonomous cars; sensors detect interference, obstacles and oncoming cars; instant breaks to avoid collisions.

**Stall, Stop, or Vehicle Slowdown for Smartphone**

**Claim 11 of the '891 Patent**: A vehicle adapted for receipt of a signal from a remote location to control the vehicle's stall-to-stop means or vehicle slowdown means, comprising: at least one of a brake, a foot peddle, a radar, a camera, a navigational system, a light, a speed control, an ignition system, a steering wheel, a transmission, a fuel system, and a motor;

Remote Vehicle Shutdown is a system of remotely shutting down the connected vehicle, using radio pulses; intended for police, military and security use. Remotely find and disable stolen vehicles; ability to prevent engine start; prevent movement of a vehicle; stop or slow an operating vehicle; gradually decelerate a vehicle by downshifting, limiting the throttle capability; and, improve security of carriers of high-risk cargo, like hazardous materials. Security features that Remote Vehicle Shutdown provides. https://www.globenewswire.com/en/news-release/2019/12/17/1961557/0/en/Remote-Vehicle-Shutdown

## XII. Vehicle Monitoring with CMDC Device – Claim 44 of the '891 Patent

**Autonomous and Driverless Vehicle Monitoring with Smartphone**

**Claim 44 of the '891 Patent**: A vehicles' stall-to-stop system or vehicle slowdown system in signal communication with a pre-programmed automated system is adapted, modified, or designed to control the vehicles' stall-to-stop means or vehicle slowdown means … (Dep. 55) … 44, further can be adapted, modified or designed to include a vehicle designed to perform as a driverless or autonomous vehicle … in operation with or without a user, driver or operator inside the vehicle.

**XIII. Connect Vehicle with CMDC Device – Claim 4 of the '287 Patent**

| | |
|---|---|
| <br> | **Connect Vehicle with Smartphone**<br><br>**Claim 4 of the '287 Patent**: A monitoring device, comprising: at least one central processing unit (CPU) … at least one of a transmitter or a transceiver in communication with the at least one CPU configured to … send signals to lock or unlock doors, send signals to control components of a vehicle, … or send signals to detect … chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling.<br><br>**CarLink™** is a Smartphone interface that allows you to start your vehicle, unlock your doors or pop the trunk from virtually any distance, or help you find your car in a large garage after a sporting event or a trip to the mall. *Compatible with iPhone, BlackBerry and Android *Remote Start Compatible *Door lock and unlock *Car find feature (horn honk and/or flashing lights) *Control trunk release or sliding door open) |

**XIV. Internet-of-Things (IoTs) with CMDC Device – Claim 11 of the '619 Patent**

| | |
|---|---|
| <br><br>The smartphone can be used as an IoT device for Personal emergency response, fitness tracking, location-based asset tracking, natural vision processing, and a Bluetooth gateway for wearable Bluetooth devices that enable many IoT monitoring apps. Also, identity verification, GPS based guidance, position/orientation awareness apps for smartphone-based implementation. | **Internet-of-Things (IoTs) with Smartphone**<br><br>**Claim 11 of the '619 Patent**: A central processing unit (CPU) of at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, capable of: processing instructions to connect the communication device to the internet or internet-of-things (IoTs) platform to sync, to at least one of a building's computer or security system, a vehicle's computer or security system, a lock, a detection device, or another communication device<br><br>The Internet-connected smartphones, can directly capture and compile data from as many as 14 different sensors:<br>Accelerometer, GPS, Gyroscope, Magnetometer, Biometrics, Camera, Barometer, Proximity Sensors, Bluetooth connectivity, Barcode readers, Touchscreen sensors, Heart rate monitor, ECG, Haptic feedback sensors<br><br>The IoTs contain computing hardware, including processors with embedded programming telling them what to do, sensors that gather various sorts of readings (such as temperature, motion, chemical levels, heart rate and body movement) and communication hardware that can send and receive signals. |

The ATAK-CBRN plugins software is built on Google's Android Open-Source Operating System (OS). The OS is responsible for managing both software and hardware

components. All computer programs and apps require an operating system to do any work. Yet the OS is not the central processing unit (CPU). Plaintiff's patented CPU serves as the smartphones brain, and the OS serves as the brain's conscience. Which means the OS is inferior to the CPU and cannot function without Plaintiff's patented CPU.

> "Independent claims 4, 5, & 6 of Plaintiff's Patent No. 10163287 ('287 patent): at least one of … ***a transceiver in communication with the at least one CPU*** configured to send signals to … detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling."

# Exhibit D

## GOOGLE SELLS THE "SOFTWARE" THAT ENABLES THE INFRINGEMENT OF PLAINTIFF'S PATENTS

### *Google Play Apps for CBRNE Sensing and Detection*

**ATAK-CIV (CBRN)**: "The Tactical Assault Kit is DoD nomenclature for the Team Awareness Kit (TAK) application: a mission planning, geospatial, Full Motion Video (FMV), and system administrator tool that reduces the operational footprint from a tactical laptop, to a commercial mobile device. The geospatial engine and communications component support Department of Defense (DoD) and commercial sector standards. Extensibility of the core platform is supported by the Software Development Kit (https://tak.gov), which enables any partner to develop mission-specific capability or contribute to the advancement of the baseline. Data can be pre-loaded into ATAK or downloaded from the network when available." https://play.google.com/store/apps/details?id=com.atakmap.app.civ&hl=en_US&gl=US

"CivTAK 4.0.7 has been released. This is the enterprise-quality, "F-35 of Geospatial Collaboration" official, [CBRN] plugin-capable release of CivTAK. You can get it here. It's the most capable geospatial collaboration tool out there at any price." T-Rex recommended that iPhone users go buy an Android to try it out it is so powerful. https://www.civtak.org/2020/06/25/civtak-4-0-7-has-been-released/

**CBRNResponder [CBRN]**: "CBRNResponder provides free software tools for logging, transmitting, storing, analyzing, and presenting environmental radiological, chemical, and biological monitoring data. Data is stored in a secure cloud environment accessible only by the user. To register for an account and to obtain further information, please go to www.cbrnresponder.net. The application has a Responder Tracking feature that allows a responder to track and share their location path with participants on an event." Retrieved from:

https://play.google.com/store/apps/details?id=com.chainbridgetech.cbrnresponder&hl=en_US&gl=US

CBRNResponder is a cloud-based database that can be accessed on smartphones, tablets, specially designed instruments and via the web, allowing it to be employed at all levels of government during a response to a radiological or nuclear emergency. The CBRNResponder links to the CBRNResponder database and user interface including CBRNResponder App. https://www.nnss.gov/docs/docs_FRMAC/FAM%20Vol%201%20-%20Operations%20-%20FINAL%20May2023.pdf

**Chemical Detectives [Chemical]**: "Determining the molecular structure of organic molecules experimentally can be a tricky challenge! Chemists do this by taking a number of different types measurements, and solving the puzzle a bit like solving a jigsaw puzzle. We use techniques such as: • microanalysis • mass spectrometry • infrared spectroscopy" https://play.google.com/store/apps/details?id=com.chemicaldetectives&hl=en_US&gl=US

**USAMRIID's Biodefense Tool [Biological]**: "The United States Army Medical Research Institute of Infectious Diseases (USAMRIID) is the Department of Defense's lead laboratory for medical biological defense research; with a mission to provide leading edge medical capabilities to deter and defend against current and emerging biological threat agents. A key component of this mission is the training of military and civilian medical and public health professionals to become proficient in recognizing early warning signs that a biological attack has occurred, activating the appropriate agencies and personnel to investigate the event, treating casualties, and preventing spread of disease. This application distills key information presented in USAMRIID's training and education courses on biological threat agents of concern and serves as a…" https://play.google.com/store/apps/details?id=com.tradocmobile.bio&hl=en_IE&gl=US

**GammaPix Lite-Gamma Rad Detect [Radiation]**: "Developed initially for several federal agencies, turns your phone into a detector of ionizing radiation. The GammaPix technology has been successfully tested at independent labs with calibrated sources. It was developed with support from the U.S. Department of Defense, the Domestic Nuclear Detection Office (U.S. Department of Homeland Security), and the Transportation Research Board (U.S. National Academy of Sciences). We were encouraged by them to bring this technology to the public. Worried about accidental exposure to radioactive material or acts of terrorism? The GammaPix App can provide timely warning of the…" https://play.google.com/store/apps/details?id=com.ImageInsightInc.GammaPixLite&hl=en_US&gl=US

**Nuclear Warfare [Nuclear]**: "Nuclear Warfare! is an all-in-one App containing a Nuclear Weapon Blast Simulator, Comprehensive military encyclopedia, and Nuke Weapons recognition game focused on the evolving Nuclear Warfare concepts of the post-World War II period. If you want to distinguish a DF-31 ICBM from a Trident II SLBM, Nuclear Warfare! supplies you with the information that Nuclear Weapons enthusiasts need to know. The Simulator section of the app allows you to pick any spot-on earth and detonate a number of historically accurate nuclear weapons…" https://play.google.com/store/apps/details?id=com.scientific.nuclear&hl=en_US&gl=US

**Explosives Identification [Explosives]**: The Explosives Identification Guide Second Edition has been the guide of choice for multiple federal law enforcement agencies for over 10 years. This application was created so that First Responders from all disciplines have the key info they need in the palm of their hand should they come across an explosive device. In the current threat environment, the information in this application can save lives. https://play.google.com/store/apps/details?id=com.edpreparedness.explosives.android&hl=en_NZ&gl=US

## ATAK IS A SOFTWARE/PROGRAMMING INTERFACE

Software interfaces (programming interfaces) are the languages, codes and messages that programs use to communicate with each other and to the hardware. Example is the ATAK, that is built on the Android operating systems, and the software drivers that activate the CBRN plugins (peripheral devices).

*Android Team Awareness Kit*, ATAK (built on the Android operating system) is a digital application available to warfighters throughout the DoD. ATAK offers warfighters geospatial mapping for situational awareness during combat — on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK now includes chemical, biological, radiological, and nuclear (CBRN) plug-ins.

*Android Team Awareness Kit*, ATAK (built on the Android operating system) provides a single interface for viewing and controlling different CBRN-sensing technologies, whether that is a wearable smartwatch that measures a warfighter's vitals (e.g., heart rate) or a device mounted on a drone to detect chemical warfare agents.

Most of the time, there are several different programs running at the same time, and they all need to access the central processing unit (CPU), memory and storage. The operating system coordinates all of this to make sure each program gets what it needs. Essentially, the CPU is the brain of the smartphone that handles the Google Android operating system. Google's operating system manages the hardware and software resources of smartphones.

## PLAINTIFF'S "TRANSCEIVER" IS EQUIVALENT TO GOOGLE'S OPERATING SYSTEM

Plaintiff's software/programming interface is described in his patent specifications as "the cpu or transceiver":

"FIG. 19 … a GPS satellite in conjunction with the monitoring site and monitoring equipment to relay commands and signals to ***the cpu or transceiver*** of the vehicle … in response to a signal that a certain type of event … detection of a bomb…"

"The system 10 … can be adapted or incorporated with cell phone towers and satellites for use with satellite communication and/or a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such ***as cpu 40, or a transceiver*** and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween."

"***[a] CPU or a transceiver*** 202 is programmed to receive signals from the cell phone tower 190 and/or to a GPS satellite 204 … the monitoring equipment 138 … which can include but is not limited to … cell phones, laptops, desktop PC's, notebook PC's, and LCD monitors."

"[t]he GPS satellite 204 that an original or activation signal has been received and then the GPS satellite 204 locates and communicates by multiplex signal 212 with ***the CPU or transceiver*** 202 on the vehicle 192 and exchanges information on the type of problem, situation, location … The monitoring equipment 138 then transmits a signal 214 to the cell phone tower 190 that communicates with ***the transceiver 202 and/or CPU*** …"

"Independent claims 4, 5, & 6 of Plaintiff's Patent No. 10163287 ('287 patent): at least one of … ***a transceiver in communication with the at least one CPU*** configured to send signals to … detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling."

Plaintiff has clearly defined Plaintiff's "transceiver" in the patents' specifications as an "operating system" interconnected to Plaintiff's patented central processing units (CPUs).

Independent Claim 5 of the '287 patent, and Independent Claim 11 of the '619 patent, asserted in this complaint as two of Plaintiff's patent claims that are allegedly being infringed by certain Google smartphone products, illustrates the combined integration:

***Claim 5 ('287 patent).*** A monitoring device, comprising:

at least one central processing unit (CPU);

at least one temperature sensor in communication with the at least one CPU for monitoring temperature;

at least one motion sensor in communication with the at least one CPU;

at least one viewing screen for monitoring in communication with the at least one CPU;

at least one global positioning system (GPS) connection in communication with the at least one CPU;

at least one of an internet connection or a Wi-Fi connection in communication with the at least one CPU;

at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU;

at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device;

at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device;

at least one biometric sensor in communication with the at least once CPU for providing biometric authentication to access the communication device;

at least one sensor for chemical, biological, or human detection in communication with the at least one CPU;

one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents;

at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU; and,

at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or send signals to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling.

***Claim 11 ('619 patent).*** A central processing unit (CPU) of at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, capable of:

processing instructions to lock, unlock, or disable the lock of the communication device;

processing instructions to activate a lock, unlock, or disabling lock means by engaging a vehicle with a two-way communication key-fob;

processing instructions to activate a start, stall, stop, or disabling means by engaging a vehicle's ignition system;

processing instructions to activate a lock, unlock, or disabling lock means; a start, stall, stop, or disabling vehicle means by engaging the operational systems of the unmanned aerial vehicle;

processing instructions to authenticate or identify a user by at least one of biometric fingerprint recognition, biometric facial recognition, biometric iris recognition, or biometric retina recognition;

processing instructions to scan a senor or tag using the short-range wireless technology of radio frequency near-field communication (NFC);

processing instructions to monitor or detect at least one of a chemical sensor, a biological sensor, a motion sensor, a biometric sensor, a signature sensor, or a human sensor;

processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs);

processing instructions received through at least one of a Bluetooth, a Wi-Fi, a satellite, a global positioning system (GPS), or a cellular transmission;

processing instructions to connect the communication device to the internet or internet-of-things (IoTs) platform to sync, to at least one of a building's computer or security system, a vehicle's computer or security system, a lock, a detection device, or another communication device; and,

whereupon, the central processing unit (CPU) of the communication device is capable of processing instructions for operational and functional execution, and is capable of providing feedback of the execution, and storing the feedback into memory.

A transceiver or transmitter/receiver is a device which combines transmission and reception capability on shared circuitry. There are a number of different types of transceivers designed for an assortment of uses, and the transceiver is the cornerstone of wireless communication. One common example of a transceiver is a cellular phone, which is capable of sending and receiving data, unlike a basic radio, which can only receive signals.

The Mobile phone transceiver connects the Visit system to your mobile phone, tablet, or smartwatch via Bluetooth. Once you have installed the Visit app, you will start to receive Visit notifications on your mobile device. In addition, your Visit receiver will alert you to incoming calls and messages.

| | Patent # 10,163,287; Indep. Claim 5 | Patent # 9,589,439; Indep. Claim 23 | Patent # 9,096,189; Indep. Claim 1 | Patent # 9,589,439; Indep. Claim 19 | Patent# 10,984,619; Indep. Claim 11 |
|---|---|---|---|---|---|
| **Google Pixels 6a, 7, 7a, 7pro, & fold Smartphones** | A monitoring device, comprising: | A cell phone comprising | A communication device of at least one of a cell phone, a smart phone… | A multi-sensor detection system | A central processing unit (CPU) of at least a personal computer (PC), a cellphone, a smartphone… |
| **Google Tensor G1 & G2 i.e., Central Processing Unit (CPU) Processor, SoC, Chipset** | at least one central processing unit (CPU); | a central processing unit (CPU) for executing and carrying out the instructions of a computer program | at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program … | X | the central processing unit (CPU) of the communication device is capable of processing instructions for operational and functional execution |
| **Google Android Open-Source Operating System** **"Transceiver" is Equivalent to Operating System** | a transceiver in communication with the at least one CPU configured to send signals… | X | the transmitter and the receiver of the communication device and transceivers of the products | communication with the transmitter, a receiver of the monitoring equipment, the multi-sensor detection device, or transceivers of the products | X |
| **Draper Laboratory, Inc. ATAK-CIV CBRN Plugins** Sold at Google Play | to detect at least one of a chemical biological, radiological, or explosive agent | a chemical sensor, a biological sensor, an explosive sensor … or a radiological sensor… being disposed within, on, upon or adjacent the cell phone; | interconnected to a product… receive signals … send signals to … activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems | sensors detecting … chemical, biological, radiological, explosive, nuclear… disposed within, on, upon or adjacent a … device; | processing instructions to … detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent |

| | **Patent # 10,163,287; Indep. Claim 5** | **Patent # 9,589,439; Indep. Claim 23** | **Patent # 9,096,189; Indep. Claim 1** | **Patent # 9,589,439; Indep. Claim 19** | **Patent# 10,984,619; Indep. Claim 11** |
|---|---|---|---|---|---|
| **Google Pixels 6a, 7, 7a, 7pro, & fold Smartphones** | A monitoring device, comprising: | A cell phone comprising | . A communication device of at least one of a cell phone, a smart phone… | A multi-sensor detection system | A central processing unit (CPU) of at least a personal computer (PC), a cellphone, a smartphone… |
| **Google Tensor G1 & G2 i.e., Central Processing Unit (CPU) Processor, SoC, Chipset** | at least one central processing unit (CPU); | a central processing unit (CPU) for executing and carrying out the instructions of a computer program | at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program … | X | the central processing unit (CPU) of the communication device is capable of processing instructions for operational and functional execution |
| **Google Android Open-Source Operating System**<br><br>**"Transceiver" is Equivalent to Operating System** | a transceiver in communication with the at least one CPU configured to send signals… | X | the transmitter and the receiver of the communication device and transceivers of the products | communication with the transmitter, a receiver of the monitoring equipment, the multi-sensor detection device, or transceivers of the products | X |
| **Google Megapixel Camera for CBR Detection**<br><br>Native to Phone | to detect at least one of a chemical biological, radiological, or explosive agent | a chemical sensor, a biological sensor, an explosive sensor … or a radiological sensor… being disposed within, on, upon or adjacent the cell phone; | interconnected to a product… receive signals … send signals to … activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems | sensors detecting … chemical, biological, radiological, explosive, nuclear… disposed within, on, upon or adjacent a … device; | processing instructions to … detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent |

| | **Patent # 10,163,287; Indep. Claim 5** | **Patent # 9,589,439; Indep. Claim 23** | **Patent # 9,096,189; Indep. Claim 1** | **Patent # 9,589,439; Indep. Claim 19** | **Patent# 10,984,619; Indep. Claim 11** |
|---|---|---|---|---|---|
| **Google Pixels 6a, 7, 7a, 7pro, & fold Smartphones** | A monitoring device, comprising: | A cell phone comprising | A communication device of at least one of a cell phone, a smart phone… | A multi-sensor detection system | A central processing unit (CPU) of at least a personal computer (PC), a cellphone, a smartphone… |
| **Google Tensor G1 & G2 i.e., Central Processing Unit (CPU) Processor, SoC, Chipset** | at least one central processing unit (CPU); | a central processing unit (CPU) for executing and carrying out the instructions of a computer program | at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program … | X | the central processing unit (CPU) of the communication device is capable of processing instructions for operational and functional execution |
| **Google Android Open-Source Operating System**<br>**"Transceiver" is Equivalent to Operating System** | a transceiver in communication with the at least one CPU configured to send signals… | X | the transmitter and the receiver of the communication device and transceivers of the products | communication with the transmitter, a receiver of the monitoring equipment, the multi-sensor detection device, or transceivers of the products | X |
| **Biosensors: Ambient light sensor: Cancer biomarkers; Toxic metals; Pathogens Capillary inlet: (Air analysis). Airborne Pathogens; Aerosols**<br>Native Sensors | to detect at least one of a chemical biological, radiological, or explosive agent | a chemical sensor, a biological sensor, an explosive sensor … or a radiological sensor… being disposed within, on, upon or adjacent the cell phone; | interconnected to a product… receive signals … send signals to … activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems | sensors detecting … chemical, biological, radiological, explosive, nuclear… disposed within, on, upon or adjacent a … device; | processing instructions to … detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent |

| | **Patent # 10,163,287; Indep. Claim 5** | **Patent # 9,589,439; Indep. Claim 23** | **Patent # 9,096,189; Indep. Claim 1** | **Patent # 9,589,439; Indep. Claim 19** | **Patent# 10,984,619; Indep. Claim 11** |
|---|---|---|---|---|---|
| **Google Pixels 6a, 7, 7a, 7pro, & fold Smartphones** | A monitoring device, comprising: | A cell phone comprising | A communication device of at least one of a cell phone, a smart phone… | A multi-sensor detection system | A central processing unit (CPU) of at least a personal computer (PC), a cellphone, a smartphone… |
| **Google Tensor G1 & G2 i.e., Central Processing Unit (CPU) Processor, SoC, Chipset** | at least one central processing unit (CPU); | a central processing unit (CPU) for executing and carrying out the instructions of a computer program | at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program … | X | the central processing unit (CPU) of the communication device is capable of processing instructions for operational and functional execution |
| **Google Android Open-Source Operating System**<br>**"Transceiver" is Equivalent to Operating System** | a transceiver in communication with the at least one CPU configured to send signals… | X | the transmitter and the receiver of the communication device and transceivers of the products | communication with the transmitter, a receiver of the monitoring equipment, the multi-sensor detection device, or transceivers of the products | X |
| **Google Beacon: Bluetooth; GPS; Wi-Fi**<br>Native to Phone | to detect at least one of a chemical biological, radiological, or explosive agent | a chemical sensor, a biological sensor, an explosive sensor … or a radiological sensor… being disposed within, on, upon or adjacent the cell phone; | interconnected to a product… receive signals … send signals to … activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems | sensors detecting … chemical, biological, radiological, explosive, nuclear… disposed within, on, upon or adjacent a … device; | processing instructions to … detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent |

# Exhibit D1

 Google Play

Games Apps Movies & TV Books Kids

Trailer

TAK

# ATAK-CIV (Civil Use)

TAK Product Center

3.5★
887 reviews

100K+
Downloads

Everyone

Install

Share Add to wishlist

Google Play

Games Apps Movies & TV Books Kids

## About this app

The Tactical Assault Kit is DoD nomenclature for the Team Awareness Kit (TAK) application: a mission planning, geospatial, Full Motion Video (FMV), and system administrator tool that reduces the operational footprint from a tactical laptop, to a commercial mobile device. The geospatial engine and communications component support Department of Defense (DoD) and commercial sector standards. Extensibility of the core platform is supported by the Software Development Kit (https://tak.gov), which enables any partner to develop mission-specific capability or contribute to the advancement of the baseline. Data can be pre-...

Updated on
Aug 9, 2023

Maps & Navigation

## Data safety

Safety starts with understanding how developers collect and share your data. Data privacy and security practices may vary based on your use, region, and age. The developer provided this information and may update it over time.

No data shared with third parties
Learn more about how developers declare sharing

No data collected
Learn more about how developers declare collection

See details

## Ratings and reviews

Ratings and reviews are verified



Google Play
Games
Apps
Movies & TV
Books
Kids
CBRNResponder
Chainbridge Tech
1K+
Downloads
Everyone

Install

Share Add to wishlist

CBRN
Responder
SIGN IN
ABOUT
CBRN
Responder
LOGIN
CANCEL

## About this app

CBRNResponder provides free software tools for logging, transmitting, storing, analyzing, and presenting environmental radiological, chemical, and biological monitoring data. Data is stored in a secure cloud environment accessible only by the user. To register for an account and to obtain further information, please go to www.cbrnresponder.net

The application has a Responder Tracking feature that allows a responder to track and share their location...

**Updated on**

Jul 20, 2023

Google Play

Games Apps Movies & TV Books Kids

Safety starts with understanding how developers collect and share your data. Data privacy and security practices may vary based on your use, region, and age. The developer provided this information and may update it over time.

This app may share these data types with third parties
Personal info, App activity and 2 others

This app may collect these data types
Location, Personal info and 5 others

Data is encrypted in transit

Data can't be deleted

See details

## What's new

Sample Check In - Version One of the Mobile Sample Check In Feature
Bug Fixes and Improvements

## App support

## Similar apps

PrivacyStar: SCAM protection
PrivacyStar
3.7 ★

Safer Web - online protection
ReasonLabs

Zoho Connect
Zoho Corporation
4.0 ★

OnMail - Encrypted email
Edison Software
4.2 ★

COGITO (MCT)
Bücker, Borsutzky, Grzella, Jäger, Pult & Moritz

Flag as inappropriate



Google Play
Games
Apps
Movies & TV
Books
Children
Chemical Detectives
Space Dog Studios

5.0★
103 reviews
10K+
Downloads
Everyone

Install

Share
Add to wishlist

Chemical Detectives
Question 1
SELECT AN ANSWER
13C NMR Spectrum
1H NMR Spectrum
IR Spectrum
Mass Spectrum

## About this app

Determining the molecular structure of organic molecules experimentally can be a tricky challenge! Chemists do this by taking a number of different types measurements, and solving the puzzle a bit like solving a jigsaw puzzle. We use techniques such as:

- microanalysis
- mass spectrometry...

Updated on
29 Aug 2022

SAppx361

Google Play

Games Apps Movies & TV Books Children

Safety starts with understanding how developers collect and share your data. Data privacy and security practices may vary based on your use, region and age The developer provided this information and may update it over time.

No data shared with third parties
Learn more about how developers declare sharing

No data collected
Learn more about how developers declare collection

See details

## What's new

Minor bug fixes

## App support

## Similar apps

Learn Biochemistry (PRO)
CODE WORLD
$1.49

ReactionFlash
Elsevier Limited
4.7 ★

Learn IUPAC Nomenclature
Paul Schwind

Learn Chemistry Pro
Magic4Studio
$0.99

Chemistry Lab
Electrolytic Earth
4.3 ★

Flag as inappropriate

Google Play

Play Pass

Play Points



Google Play
Games
Apps
Movies & TV
Books
Kids

# USAMRIID's Biodefense Tool

TRADOC Mobile

4.4★
7 reviews
500+
Downloads

Everyone

Install

Share
Add to wishlist

USAMRIID
Viral Diseases
Bacterial Agents
Toxins
Text search
Image search

## About this app

The United States Army Medical Research Institute of Infectious Diseases (USAMRIID) is the Department of Defense's lead laboratory for medical biological defense research; with a mission to provide leading edge medical capabilities to deter and defend against current and emerging biological threat agents. A key component of this mission is the training of military and civilian medical and public health professionals to become proficient in recognizing early warning signs that a biological attack has occurred, activating the appropriate agencies and personnel to investigate the event, treating casualties, and preventing spread of...

Updated on

Nov 23, 2020

 Games Apps Movies & TV Books Kids

Developers can show information here about how their app collects and uses your data. Learn more about data safety

No information available

## Ratings and reviews

Ratings and reviews are verified

Phone

4.4

5
4
3
2
1

7 reviews

Mohamed Mohy (DR)

February 19, 2023

Didnt work

Did you find this helpful? Yes No

See all reviews

## App support

## More by TRADOC Mobile

IPPS-A Launch Platform
TRADOC Mobile
1.4 ★

Army MobileConnect
TRADOC Mobile
3.7 ★


Google Play

Games Apps Movies & TV Books Kids

Trailer

# GammaPix - Gamma Rad Detection

Image Insight, Inc.

3.7★ 51 reviews | 1K+ Downloads | Everyone

$14.99 Buy

Share Add to wishlist



Google Play

Games Apps Movies & TV Books Kids

## About this app

Unlike the Lite version, this App only require a network connection to operate after several days. We recommend you update GammaPix from time to time to check for new calibrations.

Developed initially for several federal agencies, turns your phone into a detector of ionizing radiation. The GammaPix technology has been successfully tested at independent labs with calibrated sources. It was developed with support from the U.S. Department of Defense, the Domestic Nuclear Detection Office (U.S....

**Updated on**

Mar 29, 2023

Tools

## Data safety

Safety starts with understanding how developers collect and share your data. Data privacy and security practices may vary based on your use, region, and age. The developer provided this information and may update it over time.

No data shared with third parties
Learn more about how developers declare sharing

This app may collect these data types
Location, App info and performance, and Device or other IDs

Data is encrypted in transit

Data can't be deleted

See details

## Ratings and reviews

 Games Apps Movies & TV Books Kids

# Explosives Identification and

EMERGENCY AND DISASTER PREPAREDNESS SOLUTIONS, LLC

10+ Downloads

Everyone

$7.99 Buy

Share

Add to wishlist

## About this app

The Explosives Identification Guide Second Edition has been the guide of choice for multiple federal law enforcement agencies for over 10 years being issued to graduates of the respective academies. The information provided in this application reflects an updated and revised version of the information presented in the original book. This application was created so that First Responders from all disciplines have the key info they need in the palm of their hand should they come across an explosive device. In the current threat environment, the information in this application can save lives.

Updated on

Oct 11, 2016

 Games Apps Movies & TV Books Kids

Developers can show information here about how their app collects and uses your data. Learn more about data safety

No information available

## App support

## More by EMERGENCY AND DISASTER PREPAREDNESS SOLUTIONS, LLC

Police Officers Handbook: Inst
EMERGENCY AND DISASTER PREPAREDNESS S
$8.99

WMD Decontamination Guide for
EMERGENCY AND DISASTER PREPAREDNESS S
$4.99

Surviving a Terrorist Attack:
EMERGENCY AND DISASTER PREPAREDNESS S
$5.99

Flag as inappropriate

Google Play
Play Pass
Play Points
Gift cards
Redeem
Refund policy

Kids & family
Parent Guide
Family sharing

 Games Apps Movies & TV Books Kids

# HazMat for First Responders 5

IFSTA - International Fire Service Training Assoc.

In-app purchases

3.7★ 78 reviews | 10K+ Downloads |  Everyone ⓘ

Install

Share Add to wishlist

## About this app

*NEW* AUDIOBOOK

Listen to all 15 chapters of Hazardous Materials for First Responders on the go with our new audiobook!

SKILL VIDEOS...

Updated on

May 2, 2023

# Exhibit E



*System Assessment and Validation for Emergency Responders (SAVER)*

# HazMat/CBRNE Mobile Apps Application Note

*July 2013*





*Prepared by Space and Naval Warfare Systems Center Atlantic*

Approved for public release, distribution is unlimited.

The *HazMat/CBRNE Mobile Apps Application Note* was funded under Interagency Agreement No. HSHQPM-12-X-00031 from the U.S. Department of Homeland Security, Science and Technology Directorate.

The views and opinions of authors expressed herein do not necessarily reflect those of the U.S. Government.

Reference herein to any specific commercial products, processes, or services by trade name, trademark, manufacturer, or otherwise does not necessarily constitute or imply its endorsement, recommendation, or favoring by the U.S. Government.

The information and statements contained herein shall not be used for the purposes of advertising, nor to imply the endorsement or recommendation of the U.S. Government.

With respect to documentation contained herein, neither the U.S. Government nor any of its employees make any warranty, express or implied, including but not limited to the warranties of merchantability and fitness for a particular purpose. Further, neither the U.S. Government nor any of its employees assume any legal liability or responsibility for the accuracy, completeness, or usefulness of any information, apparatus, product, or process disclosed; nor do they represent that its use would not infringe privately owned rights.

Approved for public release, distribution is unlimited.

## FOREWORD

The U.S. Department of Homeland Security (DHS) established the System Assessment and Validation for Emergency Responders (SAVER) Program to assist emergency responders making procurement decisions. Located within the Science and Technology Directorate (S&T) of DHS, the SAVER Program conducts objective assessments and validations on commercial equipment and systems and provides those results along with other relevant equipment information to the emergency response community in an operationally useful form. SAVER provides information on equipment that falls within the categories listed in the DHS Authorized Equipment List (AEL). The SAVER Program mission includes:

- Conducting impartial, practitioner-relevant, operationally oriented assessments and validations of emergency responder equipment; and
- Providing information, in the form of knowledge products, that enables decision-makers and emergency responders to better select, procure, use, and maintain emergency responder equipment.

Information provided by the SAVER Program will be shared nationally with the responder community, providing a life- and cost-saving asset to DHS, as well as to Federal, state, and local responders.

The SAVER Program is supported by a network of Technical Agents who perform assessment and validation activities. Further, SAVER focuses primarily on two main questions for the emergency responder community: "What equipment is available?" and "How does it perform?"

As a SAVER Program Technical Agent, the Space and Naval Warfare Systems Center (SPAWARSYSCEN) Atlantic has been tasked to provide expertise and analysis on key subject areas, including communications, sensors, security, weapon detection, and surveillance, among others. In support of this tasking, SPAWARSYSCEN Atlantic developed this application note to provide emergency responders with information on commercially available HazMat/CBRNE mobile apps. HazMat/CBRNE mobile apps fall under AEL reference number 04AP-06-CBRN: Software, CBRNE/Commercial Chemical/Hazard.

Visit the SAVER section of the DHS S&T website for more information on the SAVER Program or to view additional reports on mobile apps or other technologies.

## POINTS OF CONTACT

**National Urban Security Technology Laboratory**
U.S. Department of Homeland Security
Science and Technology Directorate
201 Varick Street
New York, NY 10014
E-mail: nustl.saver@hq.dhs.gov
Website: https://www.dhs.gov/science-and-technology/saver

**Space and Naval Warfare Systems Center Atlantic**
Advanced Technology and Assessments Branch
P.O. Box 190022
North Charleston, SC 29419-9022
E-mail: ssc_lant_saver_program.fcm@navy.mil

## TABLE OF CONTENTS

Foreword ..... i
Points of Contact ..... ii
1. Introduction ..... 1
2. Technology Overview ..... 1
3. Emerging Technology ..... 2
4. Standards and Regulations ..... 2
5. Applications ..... 2
 5.1 Information Management Tools ..... 3
 5.2 Mapping Tools and Applications ..... 3
 5.3 Global Positioning System ..... 4
 5.4 Meteorological Data ..... 4
 5.5 HazMat/CBRNE References ..... 4
  5.5.1 Biological Agents ..... 5
  5.5.2 Chemical Warfare Agents ..... 5
  5.5.3 Explosives ..... 5
  5.5.4 Toxic Industrial Chemicals/Toxic Industrial Materials ..... 5
  5.5.5 Radiological Materials ..... 5
 5.6 HazMat/CBRNE Tools ..... 6
  5.6.1 Radiological Tools ..... 6
  5.6.2 Nuclear Tools ..... 6
  5.6.3 Chemical Tools ..... 6
  5.6.4 Biological Tools ..... 6
  5.6.5 Explosives Tools ..... 7
6. Operational Considerations ..... 7
7. Implementation Issues ..... 8
8. Conclusion ..... 8
9. References ..... 9

## LIST OF FIGURES

Figure 2-1. Sample of Disaster Related Mobile Apps ..... 1
Figure 5-1. HazMat Cargo Classification Signage ..... 4
Figure 5-2. ERG 2012 Guide ..... 5
Figure 5-3. Mobile REMM Search ..... 6

# 1. INTRODUCTION

Hazardous material (HazMat) and chemical, biological, radiological, nuclear, and explosive (CBRNE) incidents occur when substances such as toxic chemicals, biological agents, radiological or nuclear materials, or explosives pose a threat to life, property, and/or the environment. These two types of incidents are differentiated by the fact that a CBRNE incident is considered to be a deliberate, malicious act with the intention to maim, kill, and disrupt, whereas a HazMat incident is accidental.

Software applications installed on mobile devices, such as smartphones and tablets, can be useful to emergency responders, humanitarian groups, and the public. The use of these software applications, commonly called mobile apps, can improve situational awareness for the emergency responder during a HazMat/CBRNE incident by quickly providing critical information, such as emergency response procedures, identification and treatment of medical hazards, identification of protective zones, and exposure limits.

This application note provides information about the capabilities and operational considerations related to HazMat/CBRNE mobile apps.

# 2. TECHNOLOGY OVERVIEW

A mobile app is similar to software installed on a personal computer, but it is developed for a mobile device operating system (OS) such as Android, Apple® iOS®, BlackBerry®, or Windows® Mobile. These apps are able to integrate with other features of a mobile device, enabling them to capitalize on the functionality of global positioning system (GPS) technology, e-mail, a built-in camera, and a notification system.

Many mobile apps require an Internet connection to maximize their operational capabilities. These apps access the Internet by using a cellular service plan or Wi-Fi.

**Figure 2-1. Sample of Disaster Related Mobile Apps**

*Image courtesy of Scientific Research Corporation*

Wi-Fi usually provides fast access; however, the user must be near a wireless router or hotspot to connect. Since public Wi-Fi is an open network, it is more prone to virus, malware, and security attacks, which pose a security risk. Some mobile apps, such as reference guides, may be self-contained and thus do not require an Internet connection.

Mobile apps can be downloaded from a digital distribution website such as an app store, a government website, or directly from a mobile app developer. For example, the U.S. Department of Health and Human Services (HHS) website provides direct access to their recommended disaster related mobile apps, some of which are shown in Figure 2-1. Many mobile apps are available at no cost or can be purchased for much less than software developed for personal computers.

## 3. EMERGING TECHNOLOGY

In 2012, Congress passed legislation for the creation of a nationwide interoperable broadband network that will help police, firefighters, emergency medical service professionals, and other public safety officials communicate over a single, national wireless network. This network, called FirstNet, will enable agencies to communicate using standard smartphones on a dedicated public service frequency.

NG9-1-1 is an initiative to update the 9-1-1 service infrastructure in the U.S. and Canada to improve mobile public emergency communication services. This initiative will enable call connectivity for a wide range of new communication technologies. NG9-1-1 will enable the public, using mobile apps, to transmit text, images, and video data to a 9-1-1 call center. The transition to this new network will require modifications to existing communication devices, such as smartphones and tablets, which may result in modifications to the mobile apps that reside on affected devices.

The Association of Public-Safety Communications Officials International (APCO) is an organization that provides expertise, professional development, and technical assistance in the area of communications to the emergency responder community. With the introduction of FirstNet and NG9-1-1 services, APCO announced its plans to collaborate with the public safety and app developer community for the benefit of public safety.

Hybrid mobile apps, another emerging technology, combine a mobile app built to run on a specific OS, with a web-based mobile app, built to run on any OS. Hybrid mobile apps are developed using the HTML5 markup language, which incorporates HTML, CSS, and JavaScript, and uses the device browser engine but not the browser itself, thereby effectively enabling the app to run on any OS.

## 4. STANDARDS AND REGULATIONS

Currently, no universally recognized standards or regulations exist that cover the development of mobile apps. However, guidelines and best practices have been independently established by mobile app vendors and government agencies. The World Wide Web Consortium, an international group that develops web standards, has developed the *Mobile Web Application Best Practices* which includes:

- Advice on using the appropriate web protocol to reduce network loading;
- Collection and use of personal information;
- Ensuring consistent user experience across devices; and
- Design of a more flexible application that can run across multiple operating systems.

## 5. APPLICATIONS

Mobile apps offer a variety of analytical tools that can enhance decision-making for the emergency responder. The implementation of plans and procedures, as well as the allocation of critical resources, are areas that mobile apps can support during HazMat/CBRNE incidents.

While some mobile apps are developed specifically for HazMat/CBRNE incidents, many HazMat/CBRNE needs can be satisfied by mobile apps not originally developed for this purpose. These mobile apps may still be useful to the emergency responder community and should be considered an additional resource.

### 5.1 Information Management Tools

The ability for emergency responders to effectively manage multiple sources of information during and after a HazMat/CBRNE incident is important. Many of the available HazMat/CBRNE mobile apps provide information management tools that help formulate the response and record the results after an incident. For example, the National Incident Management System (NIMS) Incident Command System (ICS), developed by Informed® Publishing Group, is a mobile app which provides emergency responders access to the NIMS Incident Command Field Guide. NIMS ICS provides a section on the operational planning process, standard operating procedures, dynamic checklists for all functional command positions, integrated ICS forms and templates, and import of address book information.

Information management tools can provide emergency responders with checklists, forms, data sharing, and incident action logs, as described below.

- Checklists provide relevant, hazard-specific information used by emergency responders to ensure that necessary tasks supporting the incident are completed at appropriate and specified times.
- Integrated forms are used to report critical information and data related to an incident. These forms can be customized for specific local requirements and are designed to automatically prefill common data into other forms.
- Texting and other messaging capabilities allow responders to communicate and share data during an emergency incident. These communication capabilities can be used to transmit incident data, provide personnel and equipment status, and dispatch resources.
- Incident action logs are used to enter information to record all users' actions during an incident. This log can be combined with images, forms, and other accessed information to produce an incident report. Logs can then be submitted electronically to higher levels of authority and maintained as a legal account of actions taken during an incident response.

### 5.2 Mapping Tools and Applications

HazMat/CBRNE mobile apps may incorporate mapping capabilities or can integrate with a commercial mapping application, such as Google Maps™. Mapping tools and applications aid emergency responders by delivering on-scene, street-level geographic displays that can enhance situational awareness. HazMat/CBRNE incidents and plume models can be plotted using mapping tools. Plume models displayed on mobile apps provide information that can be analyzed, identified, recorded, and shared among decision-makers to define exclusion zones or safe standoff distances. For example, the First Responder Support Tools (FiRST) mobile app provides access to map-based evacuation and consequence information related to improvised explosive devices (IEDs) and HazMat incidents. It integrates with other mobile apps to retrieve

current wind information, HazMat reference data, and data related to the effective range of an IED. FiRST is available for Apple iOS and Android.

### 5.3 Global Positioning System

GPS integration in mobile apps provides the ability to obtain current location, speed, and heading information, and may also support the reporting of this information in incident report logs. HazMat/CBRNE mobile apps can use GPS data to help responders identify access routes to an incident. An example of this type of GPS mobile app is Navfree, which allows users to access maps with or without a data connection. Other features include turn-by-turn directions, spoken instructions, and address search. Navfree is available for Apple iOS, Android, and Windows.

### 5.4 Meteorological Data

Factors such as wind speed and direction, precipitation, and other weather factors can have a great effect on HazMat/CBRNE response efforts. Mobile apps interface with the mobile device's GPS software to identify the user's location and deliver up-to-date local weather information. Some mobile apps, such as the Weather Channel®, can be customized to display specific weather conditions such as wind gust speed, wind direction, ultraviolet index, humidity, dew point, cloud cover, and visibility. Many weather apps provide hourly updates and detailed forecasts extending out several days.

The Weather Channel app is available for Apple iOS, Android, Blackberry, and Windows. Mobile apps that provide meteorological data are one example of a common-use mobile app that has direct applications in support of HazMat/CBRNE operations.

### 5.5 HazMat/CBRNE References

Timely identification of HazMat/CBRNE hazards during response operations is dependent on many factors, and the availability of reference material is critical. HazMat/CBRNE references are searchable documents, guides, or databases. These references contain information used by the emergency responder to quickly identify specific or generic hazards caused by the materials involved in an incident. Rapid access to the appropriate information is enhanced with the electronic search capabilities provided by mobile apps.

**Figure 5-1. HazMat Cargo Classification Signage**

*Image courtesy of the Department of Transportation*

Reference databases may interface with other public or private databases to provide immediate hazard information. The Emergency Response Guide (ERG) 2012 mobile app provides information to help manage a HazMat/CBRNE incident. With searchable features, users can find relevant data for many hazards, including health risks to victims, equipment for response, and recommended first aid for victims of exposure. For example, Figure 5-1 shows standard HazMat cargo signage that can be quickly identified with the aid of the ERG mobile app. The ERG mobile app is available for Apple iOS and Android.

### 5.5.1 Biological Agents

This type of reference provides emergency responders with information on biological agents including diseases and toxins used as weapons of mass destruction (WMD). Information relating to diseases may include the physical form, type of organism, incubation period, natural hosts, symptoms, treatment options, and mortality rate if not treated. For toxins, the reference may include the physical form, the most likely form when used as a weapon, lethal dose, and method of exposure.

### 5.5.2 Chemical Warfare Agents

This type of reference includes information specific to chemical warfare agents and their precursors. Some industrial chemicals (e.g., phosgene, hydrogen cyanide) are also considered chemical warfare agents, are highly toxic, and are key ingredients in numerous commercial products.

### 5.5.3 Explosives

An explosives reference includes information on explosive materials found in IEDs. Individual explosive materials may be displayed by proper chemical name, chemical abstract service (CAS) number, or United Nations/North America (UN/NA) number and information may include appearance, possible precursors, formula, molecular weight, and trinitrotoluene (TNT) equivalency.

### 5.5.4 Toxic Industrial Chemicals/Toxic Industrial Materials

A toxic industrial chemical or toxic industrial material is any substance that, because of its chemical, physical, or biological properties, poses a potential risk to life, health, the environment, and/or property when not properly contained. Figure 5-2 shows an example of this type of reference which provides the emergency responder with HazMat/CBRNE information on the hazards and behaviors of any gases or vapors released during an incident. Specific information on personal protective equipment, respirator requirements, and symptoms of exposure may also be included.

**Figure 5-2. ERG 2012 Guide**

*Image courtesy of FEMA*

### 5.5.5 Radiological Materials

This type of reference provides responders with information on radioactive isotopes. Information may include the half-life, atomic weight, inhalation and ingestion exposure limits, and symptoms of exposure at various levels.

## 5.6 HazMat/CBRNE Tools

Some HazMat/CBRNE mobile apps provide tools that perform complicated calculations related to hazards, such as radiation exposure, chemical reactivity, and blast calculators. These tools save the responder valuable time during response operations and improve the accuracy of the data that emergency responders depend on during a HazMat/CBRNE incident.

### 5.6.1 Radiological Tools

Radiological tools can perform several functions such as: calculating the activity of an unstable product given either the mass or volume and the purity; calculating the mass and volume of radiological material based on its corresponding activity; and calculating the number of minutes a responder can be exposed before exceeding the National Research Council/Occupational Safety and Health Administration exposure standards.

Mobile radiation emergency medical management (Mobile REMM) is an example of a radiological mobile app tool that helps diagnose radiation exposure and determines the proper treatment during radiological or nuclear emergencies. It contains algorithms for radiation exposure, a dose estimator, adult and pediatric triage assistance, and emergency contacts, as seen in Figure 5-3. Mobile REMM is available for Apple iOS and Android.

**Figure 5-3. Mobile REMM Search**

*Image courtesy of NLM*

### 5.6.2 Nuclear Tools

Nuclear tools provided by mobile apps include calculations of fireball radius, radiation fallout, decay levels over time, and the decrease in radioactivity over its half-life. Some nuclear tools calculate the total dose for each hour as a function of the distance from the source while others may calculate the gamma radiation dose.

### 5.6.3 Chemical Tools

Chemical tools provide a wide range of information on hazardous chemical substances, identification support, physical characteristics, human health information, and containment and suppression advice. Wireless Information System for Emergency Responders (WISER) is a mobile app developed by the National Library of Medicine (NLM) and has access to 460 substances from the Hazardous Substance Data Bank by NLM. This mobile app has radiological and biological detail information, integrates with Chemical Hazards Emergency Medical Management (CHEMM) content, and updates to the searchable version of ERG 2012.

### 5.6.4 Biological Tools

Biological tools provide the emergency responder with comprehensive information about protective clothing, respirators, exposure hazards, isolation zones, and first aid during biological threats. The WISER mobile app provides biological support that consists of a substance list and

data for the Category A biological agents, the highest priority agents that pose a risk to national security. These agents include anthrax, botulism, plague, smallpox, tularemia, viral hemorrhagic fevers, and arenaviruses.

### 5.6.5 Explosives Tools

Explosives tools can provide information that is helpful to emergency responders in an IED or homemade explosive (HME) incident. These tools can include powder factor, air blast prediction, ground vibration, unit conversions, and blast calculators.

As previously mentioned, the mobile app FiRST provides access to map-based IED standoff data, which is based on criteria set by the U.S. Department of Homeland Security (DHS) Office for Bombing Prevention. Some of the capabilities are: display of shelter-in-place zones; isolation and down-wind protection zones; roadblock analysis; calculation of distance to glass breakage, injury, and structural damage based upon bomb size; and retrieval of current wind direction.

Alluviam LLC's HazMasterG3® mobile app provides tactical decision support for threat identification and response. Capabilities include: identification of unknown threats whether chemical, radiation or IED/HME; calculation of standoff distances and blast effects; location of hidden labs; and calculation of improvised nuclear device stand-off distances, stay-times, and fatalities. HazMasterG3 is available for Apple iOS, Android, Blackberry, and Windows.

## 6. OPERATIONAL CONSIDERATIONS

Incorporating mobile apps into an agency's operations requires the adoption of new strategies, policies and procedures regarding communication and security of data transmission methods. U.S. government agencies and private industry organizations have developed guidelines and recommendations for mobile app use, as discussed below.

The U.S. Government's Chief Information Office Council (CIO Council) has developed a guide to assist agencies in establishing policies for defining a strategy for bring your own device (BYOD). This guide, *Government Use of Mobile Technology*, lists the top mobile policy challenges as mobile device management, properly vetting third-party mobile apps distributed through app stores, proper implementation and support for user authentication tools, and improved governance and standards.

BYOD is a policy gaining popularity in the private and government sectors that allows employees to use their own personal mobile devices to access the organization's information and applications. Many organizations are adopting this policy to promote employee productivity; however, it does introduce security and network concerns which should be addressed before implementation. The CIO Council produced the document *Bring Your Own Device Toolkit* as a guide for implementing Federal BYOD programs. It outlines key considerations from managing devices that contain different levels of data sensitivity, to security, privacy, and legal challenges. BYOD should fit the agency's environment, support mission requirements, and meet the needs of staff. A BYOD security policy should be implemented which provides detailed security requirements and procedures for each type of personal device that will be used in the workplace and connected to the network.

## 7. IMPLEMENTATION ISSUES

In order to implement a mobile app policy, it is important to understand how mobile apps may compromise user privacy, network security, and data integrity. The use of mobile apps in the workplace introduces new threats, vulnerabilities and risks to network security and data integrity. Organizations must understand how mobile apps work in order to build effective mobile use and access policies for their network. Mobile risk management products are available that analyze mobile apps, determine the associated risks to the network, and report how to best manage mobile app security.

Typically, when downloading a mobile app, the user is required to provide certain personal information and grant access to the information that resides on the mobile device. This may include phone and email contacts, call logs, internet browser data, device unique identification number, and location of the device. Some mobile apps may share this personal data regularly with other organizations.

Some mobile apps display a permission banner before the app is installed, indicating the information that will be accessed on the device. Users should thoroughly read the permissions and make sure they understand the risks involved prior to downloading the app. Organizations should determine if the security features offered with the mobile app support their agency's information security policies and protocols.

## 8. CONCLUSION

Mobile apps can provide emergency responders with information useful in assisting with decision-making during a HazMat/CBRNE incident. These mobile apps can be used during all phases of an incident starting with the preparedness phase, when responders and emergency managers develop plans and procedures, to the response phase, when users track the hazard and determine courses of action for the current and subsequent operational periods. While some mobile apps have been developed specifically for HazMat/CBRNE incidents, other mobile apps can provide capabilities useful to emergency responders regardless of the incident type.

Currently, there are no universally recognized standards and regulations governing mobile app development. However, best practices and guidelines that have been independently established by mobile app vendors and government agencies are a good source of reference.

Challenges such as lack of standards, security of information, and lack of agency policies and procedures apply to all mobile apps. Organizations should determine if the security features offered with the mobile app support their information security policies and protocols prior to authorizing their use.

## 9. REFERENCES

Internet research can be conducted to find more information on mobile apps available for the emergency responder. Below are some online mobile app reference sites, but it should be noted that these references may change as technology evolves.

Disaster Apps for Apple iOS is a community online discussion board that requests input from emergency responders on recommended mobile apps for the iPhone and iPad. http://ios-disasterapps.ideascale.com.

Decisions [D4H]™ has a website that lists favorite iPhone and Android mobile apps for fire and HazMat responders. http://www.d4h.org/blog/post/20121017-Best-Phone-Apps-for-Fire-and-Hazmat-Responders.

APCO International's Application Community (AppComm) website provides a list of public safety and emergency response related apps. http://appcomm.org.

Safety Awakenings, an online resource for the health and safety community, has published a page of safety apps. http://www.safetyawakenings.com/apps.

MissionMode, an emergency notification and incident management application provider, has published a list of the top 15 disaster and crisis apps for iPhone and iPad. http://blog.missionmode.com/blog/15-disaster-and-crisis-apps-for-iphone-and-ipad.html.

HHS Disaster Information Management Research Center (DIMRC) provides online access to disaster mobile apps and mobile optimized web pages for mobile device users. Users can install apps on their mobile device or access the mobile web page from the site. http://sis.nlm.nih.gov/dimrc/disasterapps.html.

USA.gov, the U.S. government's official web portal, offers a Mobile Apps Gallery for Apple iOS, Android and Blackberry apps. Users can install apps on their mobile device or access the mobile web page from the site. http://apps.usa.gov.

The Apple App Store contains apps developed specifically for Apple iOS. http://www.apple.com/iphone/from-the-app-store.

Android Apps are available on the Google Play Shop for download. https://play.google.com/store/apps?hl=en.

BlackBerry® World™ is the storefront for mobile apps for BlackBerry. http://us.blackberry.com/apps/blackberry-world.html#tab-1.

The Windows Phone app store contains mobile apps for Windows. http://www.windowsphone.com/en-us/store/overview.

# Exhibit F

# Flexible, Intelligent, Multi-Node CBRN Environment Simulator (FIMCES)

## NLV-028-17, Year 1 of 3

Richard Hansen
Gerald Newman
Yvonne Hendricks
Larry Platte
Henry Holstein, Navarro
MAJ Matt Dorsey, USA, DTRA J9
MAJ James Warren, USA, DTRA J9

Acknowledgments
Timothy Leong, DTRA J9
Hilda Hernández, NNSA/NFO

This work was done by National Security Technologies, LLC, under Contract No. DE-AC52-06NA25946 with the U.S. Department of Energy and supported by the Site-Directed Research and Development Program.





# Challenge

- Develop a low-cost, versatile Chemical, Biological, Radiological, Nuclear, and Explosive (CBRNE) simulation system for hands-on training and exercises for prevention and response operations.
- State, Territorial, Tribal, Tribal, and Local (STTL) responders need to train and practice
  - Detecting, locating, and identifying hidden nuclear material in public venues
  - Safely operating in high radiation levels
  - Surveying large areas for plume deposition
  - Scanning people for contamination
- Typical training and exercise activities utilize
  - Low activity radiation point sources
  - Highly restrictive environments
  - Specialized training instruments with limited threat selections

SDRD
SITE-DIRECTED RESEARCH & DEVELOPMENT

NEVADA NATIONAL
NNSS
SECURITY SITE

# Innovation

- Use Commercial Off-the-Shelf (COTS) Android smart phones and WiFi/Bluetooth beacons as detectors and sources.
- Use Government Off-the-Shelf (GOTS) modelling software
    - Characterize the emissions from shielded nuclear and other radioactive materials in unclassified configurations
    - Characterize the radiation detector response of suite of specific instrument
- Use smart phone sensors (GPS, WiFi, Bluetooth) and beacon signals to calculate distance between detector and source.
- VIRTUS app calculates detector response and emulates instrument user interface.





# Technical Approach – Point Sources

- **Virtual Radioactive Source Object (VRSO)**
  Nuclear or Radioactive Material (amount and shape) plus Shielding/Moderator Material.

- GOTS modeling software SWORD
  Monte Carlo calculation of average gamma spectrum, gamma and neutron emission rate.

- Industrial Materials (2700 Ci Cs-137 on Explosives)
- Nuclear Material (2 x HEU 28.6 kg in Alum. tube)
- Medical (15 Ci I-131 in thyroid in human body)

- Point source may be assigned to a fixed GPS location or a mobile device (smart phone in WiFi network, or Bluetooth beacon, or WiFi beacon).

NEVADA NATIONAL NNSS SECURITY SITE

# Technical Approach – Plume Deposition

- Map Tool App allows trainer to “finger paint” gamma radiation dose rate fields on Google Map of exercise area.
- Point sources can be selected and positioned at fixed GPS locations using Map Tool.
- Nuclear detonation fallout plume from ORNL software DELFIC/FPTool can be converted to scenario file

NEVADA NATIONAL NNSS SECURITY SITE



# Technical Approach – Detectors

- Specific models in different categories of radiation instruments (dosimeters, survey meters, personal radiation detectors, backpacks, nuclide identifiers, and mobile systems).
- Detector responses modelled in SWORD and combined with manufacturer specifications. (e.g., sensitivity and relative energy response)
- VIRTUS detector app calculates distance from source to detector using GPS location or radio frequency beacon signal strength.
- Every second, detector response calculated from each source and plume and summed together.
- Instrument response (audio, tactile, lights, text) displayed on simulation of instrument user interface on smart phone.

SDRD SITE-DIRECTED RESEARCH & DEVELOPMENT

# Results – V&V Testing at RNCTEC

- Validation and Verification (V&V) testing at NNSS Radiological/Nuclear Countermeasure Test and Evaluation Complex (RNCTEC)
- Real instruments place side-by-side with VIRTUS simulation of same instrument
- Real source on cart with Bluetooth beacon simulating same nuclide(s) with similar activity
- Source cart moved from 50 m to 1 m away, pausing every 5 m
- Positive results: User interfaces of closely matched real instruments, simulated readings increased as sources got closer, and more sensitive detectors detecting source from greater distance.

SDRD
SITE-DIRECTED RESEARCH & DEVELOPMENT

# Results – Bluetooth-Based Source

- The simulated detector response increased less than the desired $1/R^2$ over range of 30 m to 50 m and more than $1/R^2$ at 1 m to 10 m.
- Simulated detectors experienced random spikes or drop offs in count rates/radiation level. Measured Bluetooth signal strength had momentary step functions to increase (resulting in smaller calculated range) or drop to almost zero for about a second (resulting in a calculated range of thousands of km).
- A one second glitch causes several seconds of erroneous (simulated) instrument readings, as the instrument algorithms include some averaging.
- Currently investigating filtering algorithms to replace 1 to 2 second anomalies that significantly vary from recent signal strength readings.

# Results – GPS-Based Source

- The simulated detector response closely matched real detector and desired $1/R^2$ over range of 10 m to 50 m from point source.
- At about 3 m to 5 m and closer to point source, the detector response occasionally jumps to new value. When the distance is less than the error in the GPS calculation and GPS-calculated location jumps around the actual location.
- Currently investigating filtering GPS derived distances based on jump in calculated position or when GPS reports jump in position but phone accelerometer sensors do not show rapid acceleration.
- Will work with STL to implement or expand upon solutions they have already developed.



# Results – Plumes

- Field test of VIRTUS App with staff of Defense Nuclear Weapon School
- DELFIC/FPTool fallout model for nuclear detonation near DNWS load into phones simulating dosimeters, survey meters, and nuclide identifiers.
- Staff drove assigned routes to determine extent/boundaries of fallout.
- Team that drove through hotter area higher dose rate readings, rate alarms, and higher accumulated doses.
- Because minor changes in the GPS location does not have impact the calculated readings in fields that do not vary drastically over 10 m, the GPS drift issue was not noticed during drill.
- DNWS staff stated this drill more effective simulation and training than drills with WiFi beacon sources.

SDRD SITE-DIRECTED RESEARCH & DEVELOPMENT

# Summary

- FIMCES/VIRTUS app effectively simulates a variety of radiation detection instruments and radioactive and nuclear materials, but needs improvements in stability and accuracy of distance determinations for point sources.
- Investigating filtering WiFi/Bluetooth ranging functions and GPS location data.
- Simulating plume depositions works well with current version as small location errors do not result in large jumps in instrument readings.

# Impacts

- National Guard Bureau (NGB) discussing adopting FIMCES/VIRTUS to training, exercise, and evaluation of CBRN response units in Improvised Nuclear Device response tasks
  - Low-cost, low-infrastructure tool for individual and Collective "Hip Pocket" training
  - Set up scenarios for training without using actual equipment—detectors or sources
- NBG offered use at no no-cost Homeland Response Force (HRF) and CBRNE Enhanced Response Force Package (CERFP) units for testing of FIMCES/VIRTUS
- Counterterrorism Operations Support program at NNSS for training first responders at NNSS to conduct 10-point surveys of RDD detonation plumes in urban environment (Mercury).

# Exhibit G

# Claim Chart of Direct Infringement [Google Smartphones 6a, 7, 7a, 7 Pro and Fold]; and, Contributory Infringement [Google Tensor Chipset-CPU]

| | Patent #: 10,163,287; Indep. Claim 5 | Patent #: 9,589,439; Indep. Claim 23 | Patent #: 9,096,189; Indep. Claim 1 | Patent #: 10,984,619; Indep. Claim 11 |
|---|---|---|---|---|
| | A monitoring device, comprising: | A cell phone comprising: | A communication device … a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal …interconnected to a product for communication therebetween, comprising: | A central processing unit (CPU) of at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, capable of: |
| **CPU**: Octa-core (2x2.80 GHz Cortex X1 & 2x2.25 GHz Cortex-A76 & 4x1.80 GHz Cortex-A55) **Chipset**: Google Tensor. **OS:** Android 12, Upgrade to 13 | at least one central processing unit (CPU); | a central processing unit (CPU) for executing and carrying out the instructions of a computer program; | at least one of a central processing unit (CPU) for executing and carrying out the instructions … a network processor … specifically targeted at the networking application domain, or a front-end processor … | whereupon, the central processing unit (CPU) of the communication device is capable of processing instructions for operational and functional execution, … capable of feedback… and storing the feedback … |
| Ambient Temperature sensor supported by the Android platform. Measures the ambient room temperature in degrees Celsius (°C). Monitoring air temperatures. Monitoring air temperatures. | at least one temperature sensor in communication with the at least one CPU for monitoring temperature; | X | X | X |

| | | | | |
|---|---|---|---|---|
| Gravity sensor supported by the Android platform. Measures the force of gravity in m/s2 that is applied to a device on all three physical axes (x, y, z). Motion detection (shake, tilt, etc.). | at least one motion sensor in communication with the at least one CPU; | X | X | X |
| Light sensor supported by the Android platform. Measures the ambient light level (illumination) in lx. Controlling screen brightness. | at least one viewing screen for monitoring in communication with the at least one CPU; | X | X | X |
| Connectivity: Wi-Fi 802.11 a/b/g/n/ac/6e, dual-band, Wi-Fi Direct Bluetooth 5.2, A2DP, LE NFC, GPS, GLONASS, GALILEO, QZSS | at least one global positioning system (GPS) connection in communication with the at least one CPU; | at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; | at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection; | processing instructions received through at least one of a Bluetooth, a Wi-Fi, a satellite, a global positioning system (GPS), or a cellular transmission; |

| | | | | |
|---|---|---|---|---|
| Connectivity: Wi-Fi 802.11 a/b/g/n/ac/6e, dual-band, Wi-Fi Direct Bluetooth 5.2, A2DP, LE NFC, GPS, GLONASS, GALILEO, QZSS | at least one of an internet connection or a Wi-Fi connection in communication with the at least one CPU; | one of… WiFi connection, internet connection, radio frequency (RF) connection, cellular connection… signal communication with the transmitter or the receiver; | at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection; | processing instructions received through at least one of a Bluetooth, a Wi-Fi, a satellite, a global positioning system (GPS), or a cellular transmission; |
| Connectivity: Wi-Fi 802.11 a/b/g/n/ac/6e, dual-band, Wi-Fi Direct Bluetooth 5.2, A2DP, LE NFC, GPS, GLONASS, GALILEO, QZSS | at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; | at least one of a… Bluetooth connection, WiFi connection, internet connection… cellular connection… radio frequency (RF) connection, or GPS …; | X | processing instructions received through at least one of a Bluetooth, a Wi-Fi, a satellite, a global positioning system (GPS), or a cellular transmission; |
| Googles Android operating system …lock mechanism to secure [] phone, known as pattern lock. To set, drag your finger along lines on the screen. To unlock … replicate the pattern drawn. If [] fail … too many times… phone locks… cannot be unlocked without logging into the … Google account.<br><br>Google Nest × Yale Lock is connected to the Nest app; you can lock or unlock your door from your phone. | at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device; | whereupon the cell phone is interconnected to the cell phone detection device to receive signals or send signals to lock or unlock doors, to activate or deactivate security systems, to activate or deactivate multi-sensor detection systems, or to activate or deactivate the cell phone detection device; | X | processing instructions to lock, unlock, or disable the lock of the communication device;<br><br>processing instructions to activate a lock, unlock, or disabling lock means by engaging a vehicle with a two-way communication key-fob; |

| | | | | |
|---|---|---|---|---|
| Pixel phones use USB Type C 3.1 USB 2.0 power adapters and cables. Charge phone with a USB-A power adapter; USB-C to USB-A cable. | at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to [] communication device; | X | X | X |
| BIOMETRICS: Biometric factors allow for secure authentication on the Android platform. The Android framework includes face and fingerprint biometric authentication. Android can be customized to support other forms of biometric authentication (such as Iris).<br><br>On the phone, open the Google Fit app; tap Home.; scroll to "Heart rate" and tap Add; touch, hold finger on the back camera lens; follow the on-screen instructions | at least one biometric sensor in communication with the at least once CPU for providing biometric authentication to access the communication device; | wherein the cell phone is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature such that the cell phone is locked by the biometric lock disabler to prevent unauthorized use; and | wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature such that the communication device that is at least one of the cell phone, the smart phone, the desktop, the handheld, the PDA, the laptop or the computer terminal is locked by the biometric lock disabler to prevent unauthorized use | processing instructions to authenticate or identify a user by at least one of biometric fingerprint recognition, biometric facial recognition, biometric iris recognition, or biometric retina recognition;<br><br>processing instructions to monitor or detect at least one of a chemical sensor, a biological sensor, a motion sensor, a biometric sensor, a signature sensor, or a human sensor; |

| | | | | |
|---|---|---|---|---|
| ATAK-CIVILIAN *Android Team Awareness Kit*, ATAK (built on the Android operating system) on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK-CIV now includes chemical, biological, radiological, and nuclear (CBRN) plug-ins. | at least one sensor for chemical, biological, or human detection in communication with the at least one CPU; | the cell phone is at least a fixed, portable or mobile communication device interconnected to the cell phone detection device, capable of wired or wireless communication therebetween; and | the communication device is at least a fixed, portable or mobile communication device interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween… | processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs); |
| ATAK-CIVILIAN *Android Team Awareness Kit*, ATAK (built on the Android operating system) on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK-CIV now includes chemical, biological, radiological, and nuclear (CBRN) plug-ins. | one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents; | at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone; | wherein the communication device receives a signal via any of one or more products listed in any of the plurality of product grouping categories; | processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs); |
| Connectivity: Wi-Fi 802.11 a/b/g/n/ac/6e, dual-band, Wi-Fi Direct Bluetooth 5.2, A2DP, LE NFC, GPS, GLONASS, GALILEO, QZSS | at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU… | X | X | processing instructions to scan a senor or tag using the short-range wireless technology of radio frequency near-field communication (NFC) |

| | | | | |
|---|---|---|---|---|
| Google Nest × Yale Lock is connected to the Nest app; you can lock or unlock your door from your phone.<br><br>ATAK-CIVILIAN *Android Team Awareness Kit*, ATAK (built on the Android operating system) provides a single interface for viewing and controlling different CBRN-sensing technologies | at least one of a transmitter or a transceiver in communication with the at least one CPU configured …to monitor … a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, … detect at least one of a chemical biological… agent such that the communication device capable of communicating, monitoring, detecting, and controlling. | a transmitter for transmitting signals and messages to a cell phone detection device; a receiver for receiving signals from the cell phone detection device; | a transmitter for transmitting signals and messages to at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device;<br><br>a receiver for receiving signals, data or messages from … product groups … of a multi-sensor detection device, …, a cell phone detection device, or a locking device; | processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs); |
| Google Nest × Yale Lock is connected to the Nest app; you can lock or unlock your door from your phone.<br><br>ATAK-CIVILIAN *Android Team Awareness Kit*, ATAK (built on the Android operating system) provides a single interface for viewing and controlling different CBRN-sensing technologies | X | X | whereupon the communication device, is interconnected to a product equipped to receive signals from or send signals to lock or unlock doors, activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems | processing instructions to connect the communication device to the internet or internet-of-things (IoTs) platform to sync, to at least one of a building's computer or security system, a vehicle's computer or security system, a lock, a detection device, or another communication device; |

| | | | | |
|---|---|---|---|---|
| ATAK-CIVILIAN *Android Team Awareness Kit*, ATAK (built on the Android operating system) on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK-CIV now includes chemical, biological, radiological, and nuclear (CBRN) plug-ins. | X | a transmitter for transmitting signals and messages to a cell phone detection device; a receiver for receiving signals from the cell phone detection device; | wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection … short range radio frequency (RF) connection is capable of signal communication with the transmitter and the receiver of the communication device and transceivers of the products; | processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs); |
| ATAK-CIVILIAN *Android Team Awareness Kit*, ATAK (built on the Android operating system) on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK-CIV now includes chemical, biological, radiological, and nuclear (CBRN) plug-ins. | X | whereupon a signal sent to the receiver of the cell phone detection device from at least one of the chemical sensor, the biological sensor, the explosive sensor, the human sensor, the contraband sensor, or the radiological sensor, causes a signal that includes at least one of location data or sensor data to be sent to the cell phone. | X | processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs); |

| | | | | |
|---|---|---|---|---|
| Google Play: The Google android device as a quadcopter drone remote. Quadcopter Drone Remote Control for All Drones, and start to remote control easily all quadcopter drones with a Google android smartphone https://play.google.com/store/apps/ | X | X | X | processing instructions to activate a start, stall, stop, or disabling means by engaging a vehicle's ignition system;<br><br>processing instructions to activate a lock, unlock, or disabling lock means; a start, stall, stop, or disabling vehicle means by engaging the operational systems of the unmanned aerial vehicle; |

| Google Pixel 7 Smartphone | [redacted] | [redacted] | [redacted] | [redacted] |
|---|---|---|---|---|
|  | A monitoring device, comprising: | A cell phone comprising: | A communication device … a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal …interconnected to a product for communication therebetween, comprising: | A central processing unit (CPU) of at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, capable of: |
| CPU: Octa-core (2x2.85 GHz Cortex X1 & 2x2.35 GHz Cortex-A78 & 4x1.80 GHz Cortex-A55) Chipset: Google Tensor G2. OS: Android 13 | at least one central processing unit (CPU); | a central processing unit (CPU) for executing and carrying out the instructions of a computer program; | at least one of a central processing unit (CPU) for executing and carrying out the instructions … a network processor … specifically targeted at the networking application domain, or a front-end processor … | whereupon, the central processing unit (CPU) of the communication device is capable of processing instructions for operational and functional execution, … capable of feedback… and storing the feedback … |
| Ambient Temperature sensor supported by the Android platform. Measures the ambient room temperature in degrees Celsius (°C). Monitoring air temperatures. Monitoring air temperatures. | at least one temperature sensor in communication with the at least one CPU for monitoring temperature; | X | X | X |

10

SAppx408

| | | | | |
|---|---|---|---|---|
| Gravity sensor supported by the Android platform. Measures the force of gravity that is applied to a device on all three physical axes (x, y, z). Motion detection (shake, tilt, etc.). | at least one motion sensor in communication with the at least one CPU; | X | X | X |
| Light sensor supported by the Android platform. Measures the ambient light level (illumination) in lx. Controlling screen brightness. | at least one viewing screen for monitoring in communication with the at least one CPU; | X | X | X |
| Connectivity: Wi-Fi 802.11 a/b/g/n/ac/6e, tri-band, Wi-Fi Direct Bluetooth 5.2, A2DP, LE NFC, GPS, GLONASS, BDS GALILEO, QZSS | at least one global positioning system (GPS) connection in communication with the at least one CPU; | at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; | at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection; | processing instructions received through at least one of a Bluetooth, a Wi-Fi, a satellite, a global positioning system (GPS), or a cellular transmission; |

| | | | | |
|---|---|---|---|---|
| Connectivity: Wi-Fi 802.11 a/b/g/n/ac/6e, tri-band, Wi-Fi Direct Bluetooth 5.2, A2DP, LE NFC, GPS, GLONASS, BDS GALILEO, QZSS | at least one of an internet connection or a Wi-Fi connection in communication with the at least one CPU; | one of… WiFi connection, internet connection, radio frequency (RF) connection, cellular connection… signal communication with the transmitter or the receiver; | at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection; | processing instructions received through at least one of a Bluetooth, a Wi-Fi, a satellite, a global positioning system (GPS), or a cellular transmission; |
| Connectivity: Wi-Fi 802.11 a/b/g/n/ac/6e, tri-band, Wi-Fi Direct Bluetooth 5.2, A2DP, LE NFC, GPS, GLONASS, BDS GALILEO, QZSS | at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; | at least one of a… Bluetooth connection, WiFi connection, internet connection… cellular connection… radio frequency (RF) connection, or GPS …; | X | processing instructions received through at least one of a Bluetooth, a Wi-Fi, a satellite, a global positioning system (GPS), or a cellular transmission; |
| Googles Android operating system …lock mechanism to secure [] phone, known as pattern lock. To set, drag your finger along lines on the screen. To unlock … replicate the pattern drawn. If [] fail … too many times… phone locks… cannot be unlocked without logging into the … Google account.<br><br>Google Nest × Yale Lock is connected to the Nest app; you can lock or unlock your door from your phone. | at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device; | whereupon the cell phone is interconnected to the cell phone detection device to receive signals or send signals to lock or unlock doors, to activate or deactivate security systems, to activate or deactivate multi-sensor detection systems, or to activate or deactivate the cell phone detection device; | X | processing instructions to lock, unlock, or disable the lock of the communication device;<br><br>processing instructions to activate a lock, unlock, or disabling lock means by engaging a vehicle with a two-way communication key-fob; |

| | | | | |
|---|---|---|---|---|
| Pixel phones use USB Type-C 3.2 USB 2.0 power adapters and cables. Charge phone with a USB-A power adapter; USB-C to USB-A cable. | at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to [] communication device; | X | X | X |
| BIOMETRICS: Biometric factors allow for secure authentication on the Android platform. The Android framework includes face and fingerprint biometric authentication. Android can be customized to support other forms of biometric authentication (such as Iris).<br><br>On the phone, open the Google Fit app;<br>tap Home.; scroll to "Heart rate" and tap Add;<br>touch, hold finger on the back camera lens;<br>follow the on-screen instructions | at least one biometric sensor in communication with the at least once CPU for providing biometric authentication to access the communication device; | wherein the cell phone is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature such that the cell phone is locked by the biometric lock disabler to prevent unauthorized use; and | wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature such that the communication device that is at least one of the cell phone, the smart phone, the desktop, the handheld, the PDA, the laptop or the computer terminal is locked by the biometric lock disabler to prevent unauthorized use | processing instructions to authenticate or identify a user by at least one of biometric fingerprint recognition, biometric facial recognition, biometric iris recognition, or biometric retina recognition;<br><br>processing instructions to monitor or detect at least one of a chemical sensor, a biological sensor, a motion sensor, a biometric sensor, a signature sensor, or a human sensor; |

| | | | | |
|---|---|---|---|---|
| Google's NFC Sensor: Nascent tech embedded in the phone. NFC for wireless electronic, portable selective detection of gas-phase chemicals. Conversion of an NFC tag enables wireless rf detection of chemical analytes with smartphone. Google NFC smartphones communicate with NFC tags | at least one sensor for chemical, biological, or human detection in communication with the at least one CPU; | the cell phone is at least a fixed, portable or mobile communication device interconnected to the cell phone detection device, capable of wired or wireless communication therebetween; and | the communication device is at least a fixed, portable or mobile communication device interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween… | processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs); |
| Google's NFC Sensor: Nascent tech embedded in the phone. NFC for wireless electronic, portable selective detection of gas-phase chemicals. Conversion of an NFC tag enables wireless rf detection of chemical analytes with smartphone. Google NFC smartphones communicate with NFC tags | one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents; | at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone; | wherein the communication device receives a signal via any of one or more products listed in any of the plurality of product grouping categories; | processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs); |
| Connectivity: Wi-Fi 802.11 a/b/g/n/ac/6e, tri-band, Wi-Fi Direct Bluetooth 5.2, A2DP, LE NFC, GPS, GLONASS, BDS GALILEO, QZSS | at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU… | X | X | processing instructions to scan a senor or tag using the short-range wireless technology of radio frequency near-field communication (NFC) |

| | | | | |
|---|---|---|---|---|
| Google Nest × Yale Lock is connected to the Nest app; you can lock or unlock your door from your phone.<br><br>Google's NFC Sensor: Nascent tech embedded in phone. NFC for wireless electronic portable selective detection of gas-phase chemicals. Converted NFC tag enables wireless rf detection of chemicals with smartphone. Google NFC smartphones communicate with NFC tags | at least one of a transmitter or a transceiver in communication with the at least one CPU configured …to monitor … a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, … detect at least one of a chemical biological… agent such that the communication device capable of communicating, monitoring, detecting, and controlling. | a transmitter for transmitting signals and messages to a cell phone detection device; a receiver for receiving signals from the cell phone detection device; | a transmitter for transmitting signals and messages to at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device;<br><br>a receiver for receiving signals, data or messages from … product groups … of a multi-sensor detection device, …, a cell phone detection device, or locking device; | processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs); |
| Google Nest × Yale Lock is connected to the Nest app; you can lock or unlock your door from your phone.<br><br>Google's NFC Sensor: Nascent tech embedded in phone. NFC for wireless electronic portable selective detection of gas-phase chemicals. Converted NFC tag enables wireless rf detection of chemicals with smartphone. Google NFC smartphones communicate with NFC tags | X | X | whereupon the communication device, is interconnected to a product equipped to receive signals from or send signals to lock or unlock doors, activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems | processing instructions to connect the communication device to the internet or internet-of-things (IoTs) platform to sync, to at least one of a building's computer or security system, a vehicle's computer or security system, a lock, a detection device, or another communication device; |

| | | | | |
|---|---|---|---|---|
| Google's NFC Sensor: Nascent tech embedded in the phone. NFC for wireless electronic, portable selective detection of gas-phase chemicals. Conversion of an NFC tag enables wireless rf detection of chemical analytes with smartphone. Google NFC smartphones communicate with NFC tags | X | a transmitter for transmitting signals and messages to a cell phone detection device; a receiver for receiving signals from the cell phone detection device; | wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection … short range radio frequency (RF) connection is capable of signal communication with the transmitter and the receiver of the communication device and transceivers of the products; | processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs); |
| Google's NFC Sensor: Nascent tech embedded in the phone. NFC for wireless electronic, portable selective detection of gas-phase chemicals. Conversion of an NFC tag enables wireless rf detection of chemical analytes with smartphone. Google NFC smartphones communicate with NFC tags | X | whereupon a signal sent to the receiver of the cell phone detection device from at least one of the chemical sensor, the biological sensor, the explosive sensor, the human sensor, the contraband sensor, or the radiological sensor, causes a signal that includes at least one of location data or sensor data to be sent to the cell phone. | X | processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs); |

| | | | | |
|---|---|---|---|---|
| Google Play: The Google android device as a quadcopter drone remote. Quadcopter Drone Remote Control for All Drones, and start to remote control easily all quadcopter drones with a Google android smartphone https://play.google.com/store/apps/ | X | X | X | processing instructions to activate a start, stall, stop, or disabling means by engaging a vehicle's ignition system;<br><br>processing instructions to activate a lock, unlock, or disabling lock means; a start, stall, stop, or disabling vehicle means by engaging the operational systems of the unmanned aerial vehicle; |

| Google Pixel 7 Specification | Patent #: 10,163,287; Indep. Claim 5 | Patent #: 9,489,839; Indep. Claim 23 | Patent #: 9,096,189; Indep. Claim 1 | Patent# 10,984,619; Indep. Claim 11 |
|---|---|---|---|---|
| | A monitoring device, comprising: | A cell phone comprising: | A communication device … a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal …interconnected to a product for communication therebetween, comprising: | A central processing unit (CPU) of at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, capable of: |
| **CPU**: Octa-core (2x2.85 GHz Cortex-X1 & 2x2.35 GHz Cortex-A78 & 4x1.80 GHz Cortex-A55) **Chipset**: Google Tensor G2. **OS:** Android 13 | at least one central processing unit (CPU); | a central processing unit (CPU) for executing and carrying out the instructions of a computer program; | at least one of a central processing unit (CPU) for executing and carrying out the instructions … a network processor … specifically targeted at the networking application domain, or a front-end processor … | whereupon, the central processing unit (CPU) of the communication device is capable of processing instructions for operational and functional execution, … capable of feedback… and storing the feedback … |
| Ambient Temperature sensor supported by the Android platform. Measures the ambient room temperature in degrees Celsius (°C). Monitoring air temperatures. Monitoring air temperatures. | at least one temperature sensor in communication with the at least one CPU for monitoring temperature; | X | X | X |

| | | | | |
|---|---|---|---|---|
| Gravity sensor supported by the Android platform. Measures the force of gravity that is applied to a device on all three physical axes (x, y, z). Motion detection (shake, tilt, etc.). | at least one motion sensor in communication with the at least one CPU; | X | X | X |
| Light sensor supported by the Android platform. Measures the ambient light level (illumination) in lx. Controlling screen brightness. | at least one viewing screen for monitoring in communication with the at least one CPU; | X | X | X |
| Connectivity: Wi-Fi 802.11 a/b/g/n/ac/6e, tri-band, Wi-Fi Direct Bluetooth 5.3, A2DP, LE NFC, GPS, GLONASS, BDS GALILEO, QZSS, NavIC | at least one global positioning system (GPS) connection in communication with the at least one CPU; | at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; | at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection; | processing instructions received through at least one of a Bluetooth, a Wi-Fi, a satellite, a global positioning system (GPS), or a cellular transmission; |

| | | | | |
|---|---|---|---|---|
| Connectivity: Wi-Fi 802.11 a/b/g/n/ac/6e, tri-band, Wi-Fi Direct Bluetooth 5.3, A2DP, LE NFC, GPS, GLONASS, BDS GALILEO, QZSS, NavIC | at least one of an internet connection or a Wi-Fi connection in communication with the at least one CPU; | one of… WiFi connection, internet connection, radio frequency (RF) connection, cellular connection… signal communication with the transmitter or the receiver; | at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection; | processing instructions received through at least one of a Bluetooth, a Wi-Fi, a satellite, a global positioning system (GPS), or a cellular transmission; |
| Connectivity: Wi-Fi 802.11 a/b/g/n/ac/6e, tri-band, Wi-Fi Direct Bluetooth 5.3, A2DP, LE NFC, GPS, GLONASS, BDS GALILEO, QZSS, NavIC | at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; | at least one of a… Bluetooth connection, WiFi connection, internet connection… cellular connection… radio frequency (RF) connection, or GPS …; | X | processing instructions received through at least one of a Bluetooth, a Wi-Fi, a satellite, a global positioning system (GPS), or a cellular transmission; |
| Googles Android operating system …lock mechanism to secure [] phone, known as pattern lock. To set, drag your finger along lines on the screen. To unlock … replicate the pattern drawn. If [] fail … too many times… phone locks… cannot be unlocked without logging into the … Google account.<br><br>Google Nest × Yale Lock is connected to the Nest app; you can lock or unlock your door from your phone. | at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device; | whereupon the cell phone is interconnected to the cell phone detection device to receive signals or send signals to lock or unlock doors, to activate or deactivate security systems, to activate or deactivate multi-sensor detection systems, or to activate or deactivate the cell phone detection device; | X | processing instructions to lock, unlock, or disable the lock of the communication device;<br><br>processing instructions to activate a lock, unlock, or disabling lock means by engaging a vehicle with a two-way communication key-fob; |

| | | | | |
|---|---|---|---|---|
| Pixel phones use USB Type-C 3.2 USB 2.0 power adapters and cables. Charge phone with a USB-A power adapter; USB-C to USB-A cable. | at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to [] communication device; | X | X | X |
| BIOMETRICS: Biometric factors allow for secure authentication on the Android platform. The Android framework includes face and fingerprint biometric authentication. Android can be customized to support other forms of biometric authentication (such as Iris).<br><br>On the phone, open the Google Fit app; tap Home.; scroll to "Heart rate" and tap Add; touch, hold finger on the back camera lens; follow the on-screen instructions | at least one biometric sensor in communication with the at least once CPU for providing biometric authentication to access the communication device; | wherein the cell phone is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature such that the cell phone is locked by the biometric lock disabler to prevent unauthorized use; and | wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature such that the communication device that is at least one of the cell phone, the smart phone, the desktop, the handheld, the PDA, the laptop or the computer terminal is locked by the biometric lock disabler to prevent unauthorized use | processing instructions to authenticate or identify a user by at least one of biometric fingerprint recognition, biometric facial recognition, biometric iris recognition, or biometric retina recognition;<br><br>processing instructions to monitor or detect at least one of a chemical sensor, a biological sensor, a motion sensor, a biometric sensor, a signature sensor, or a human sensor; |

| | | | | |
|---|---|---|---|---|
| Google's camera lens with microfluidic lens functions as camera; uses microscope to focus on a chemical sensor. Google's megapixel camera captures the image from the array of nanopores uses fluid. Sensors in one array is determined by the pixel resolution phone camera. | at least one sensor for chemical, biological, or human detection in communication with the at least one CPU; | the cell phone is at least a fixed, portable or mobile communication device interconnected to the cell phone detection device, capable of wired or wireless communication therebetween; and | the communication device is at least a fixed, portable or mobile communication device interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween… | processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs); |
| Google's camera lens with microfluidic lens functions as camera; uses microscope to focus on a chemical sensor. Google's megapixel camera captures the image from the array of nanopores uses fluid. Sensors in one array is determined by the pixel resolution phone camera. | one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents; | at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone; | wherein the communication device receives a signal via any of one or more products listed in any of the plurality of product grouping categories; | processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs); |
| Connectivity: Wi-Fi 802.11 a/b/g/n/ac/6e, tri-band, Wi-Fi Direct Bluetooth 5.3, A2DP, LE NFC, GPS, GLONASS, BDS GALILEO, QZSS, NavIC | at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU… | X | X | processing instructions to scan a senor or tag using the short-range wireless technology of radio frequency near-field communication (NFC) |

| | | | | |
|---|---|---|---|---|
| Google Nest × Yale Lock is connected to the Nest app; you can lock or unlock your door from your phone.<br><br>Google's camera lens with microfluidic lens functions as camera; uses microscope to focus on a chemical sensor. Google's megapixel camera captures the image from the array of nanopores uses fluid. Sensors in one array is determined by the pixel resolution phone camera. | at least one of a transmitter or a transceiver in communication with the at least one CPU configured …to monitor … a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, … detect at least one of a chemical biological… agent such that the communication device capable of communicating, monitoring, detecting, and controlling. | a transmitter for transmitting signals and messages to a cell phone detection device; a receiver for receiving signals from the cell phone detection device; | a transmitter for transmitting signals and messages to at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device;<br><br>a receiver for receiving signals, data or messages from … product groups … of a multi-sensor detection device, …, a cell phone detection device, or locking device; | processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs); |
| Google Nest × Yale Lock is connected to the Nest app; you can lock or unlock your door from your phone.<br><br>Google's camera lens with microfluidic lens functions as camera; uses microscope to focus on a chemical sensor. Google's megapixel camera captures the image from the array of nanopores uses fluid. Sensors in one array is determined by the pixel resolution phone camera. | X | X | whereupon the communication device, is interconnected to a product equipped to receive signals from or send signals to lock or unlock doors, activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems | processing instructions to connect the communication device to the internet or internet-of-things (IoTs) platform to sync, to at least one of a building's computer or security system, a vehicle's computer or security system, a lock, a detection device, or another communication device; |

| | | | | |
|---|---|---|---|---|
| Google's camera lens with microfluidic lens functions as camera; uses microscope to focus on a chemical sensor. Google's megapixel camera captures the image from the array of nanopores uses fluid. Sensors in one array is determined by the pixel resolution phone camera. | X | a transmitter for transmitting signals and messages to a cell phone detection device; a receiver for receiving signals from the cell phone detection device; | wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection … short range radio frequency (RF) connection is capable of signal communication with the transmitter and the receiver of the communication device and transceivers of the products; | processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs); |
| Google's camera lens with microfluidic lens functions as camera; uses microscope to focus on a chemical sensor. Google's megapixel camera captures the image from the array of nanopores uses fluid. Sensors in one array is determined by the pixel resolution phone camera. | X | whereupon a signal sent to the receiver of the cell phone detection device from at least one of the chemical sensor, the biological sensor, the explosive sensor, the human sensor, the contraband sensor, or the radiological sensor, causes a signal that includes at least one of location data or sensor data to be sent to the cell phone. | X | processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs); |

| | | | | |
|---|---|---|---|---|
| Google Play: The Google android device as a quadcopter drone remote. Quadcopter Drone Remote Control for All Drones, and start to remote control easily all quadcopter drones with a Google android smartphone https://play.google.com/store/apps/ | X | X | X | processing instructions to activate a start, stall, stop, or disabling means by engaging a vehicle's ignition system;<br><br>processing instructions to activate a lock, unlock, or disabling lock means; a start, stall, stop, or disabling vehicle means by engaging the operational systems of the unmanned aerial vehicle; |

| Google Pixel 7 Pro Smartphone | Patent #: 10,163,284; Indep. Claim 5 | Patent #: 9,589,439; Indep. Claim 23 | Patent #: 9,096,189; Indep. Claim 1 | Patent #: 10,984,619; Indep. Claim 11 |
|---|---|---|---|---|
| | A monitoring device, comprising: | A cell phone comprising: | A communication device … a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal …interconnected to a product for communication therebetween, comprising: | A central processing unit (CPU) of at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, capable of: |
| **CPU**: Octa-core (2x2.85 GHz Cortex-X1 & 2x2.35 GHz Cortex-A78 & 4x1.80 GHz Cortex-A55) **Chipset**: Google Tensor G2. **OS**: Android 13 | at least one central processing unit (CPU); | a central processing unit (CPU) for executing and carrying out the instructions of a computer program; | at least one of a central processing unit (CPU) for executing and carrying out the instructions … a network processor … specifically targeted at the networking application domain, or a front-end processor … | whereupon, the central processing unit (CPU) of the communication device is capable of processing instructions for operational and functional execution, … capable of feedback… and storing the feedback … |
| Ambient Temperature sensor supported by the Android platform. Measures the ambient room temperature in degrees Celsius (°C). Monitoring air temperatures. Monitoring air temperatures. | at least one temperature sensor in communication with the at least one CPU for monitoring temperature; | X | X | X |

| | | | | |
|---|---|---|---|---|
| Gravity sensor supported by the Android platform. Measures the force of gravity that is applied to a device on all three physical axes (x, y, z). Motion detection (shake, tilt, etc.). | at least one motion sensor in communication with the at least one CPU; | X | X | X |
| Light sensor supported by the Android platform. Measures the ambient light level (illumination) in lx. Controlling screen brightness. | at least one viewing screen for monitoring in communication with the at least one CPU; | X | X | X |
| Connectivity: Wi-Fi 802.11 a/b/g/n/ac/6e, tri-band, Wi-Fi Direct, Bluetooth 5.3, A2DP, LE NFC, GPS, GLONASS, BDS GALILEO, QZSS | at least one global positioning system (GPS) connection in communication with the at least one CPU; | at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; | at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection; | processing instructions received through at least one of a Bluetooth, a Wi-Fi, a satellite, a global positioning system (GPS), or a cellular transmission; |

| | | | | |
|---|---|---|---|---|
| Connectivity: Wi-Fi 802.11 a/b/g/n/ac/6e, tri-band, Wi-Fi Direct, Bluetooth 5.3, A2DP, LE NFC, GPS, GLONASS, BDS GALILEO, QZSS | at least one of an internet connection or a Wi-Fi connection in communication with the at least one CPU; | one of… WiFi connection, internet connection, radio frequency (RF) connection, cellular connection… signal communication with the transmitter or the receiver; | at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection; | processing instructions received through at least one of a Bluetooth, a Wi-Fi, a satellite, a global positioning system (GPS), or a cellular transmission; |
| Connectivity: Wi-Fi 802.11 a/b/g/n/ac/6e, tri-band, Wi-Fi Direct, Bluetooth 5.3, A2DP, LE NFC, GPS, GLONASS, BDS GALILEO, QZSS | at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; | at least one of a… Bluetooth connection, WiFi connection, internet connection… cellular connection… radio frequency (RF) connection, or GPS …; | X | processing instructions received through at least one of a Bluetooth, a Wi-Fi, a satellite, a global positioning system (GPS), or a cellular transmission; |
| Googles Android operating system …lock mechanism to secure [] phone, known as pattern lock. To set, drag your finger along lines on the screen. To unlock … replicate the pattern drawn. If [] fail … too many times… phone locks… cannot be unlocked without logging into the … Google account.<br><br>Google Nest × Yale Lock is connected to the Nest app; you can lock or unlock your door from your phone. | at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device; | whereupon the cell phone is interconnected to the cell phone detection device to receive signals or send signals to lock or unlock doors, to activate or deactivate security systems, to activate or deactivate multi-sensor detection systems, or to activate or deactivate the cell phone detection device; | X | processing instructions to lock, unlock, or disable the lock of the communication device;<br><br>processing instructions to activate a lock, unlock, or disabling lock means by engaging a vehicle with a two-way communication key-fob; |

| | | | | |
|---|---|---|---|---|
| Pixel phones use USB Type-C 3.2 USB 2.0 power adapters and cables. Charge phone with a USB-A power adapter; USB-C to USB-A cable. | at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to [] communication device; | X | X | X |
| BIOMETRICS: Biometric factors allow for secure authentication on the Android platform. The Android framework includes face and fingerprint biometric authentication. Android can be customized to support other forms of biometric authentication (such as Iris).<br><br>On the phone, open the Google Fit app; tap Home.; scroll to "Heart rate" and tap Add; touch, hold finger on the back camera lens; follow the on-screen instructions | at least one biometric sensor in communication with the at least once CPU for providing biometric authentication to access the communication device; | wherein the cell phone is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature such that the cell phone is locked by the biometric lock disabler to prevent unauthorized use; and | wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature such that the communication device that is at least one of the cell phone, the smart phone, the desktop, the handheld, the PDA, the laptop or the computer terminal is locked by the biometric lock disabler to prevent unauthorized use | processing instructions to authenticate or identify a user by at least one of biometric fingerprint recognition, biometric facial recognition, biometric iris recognition, or biometric retina recognition;<br><br>processing instructions to monitor or detect at least one of a chemical sensor, a biological sensor, a motion sensor, a biometric sensor, a signature sensor, or a human sensor; |

| | | | | |
|---|---|---|---|---|
| Google Smartphone Biosensors: Ambient light sensor; Capillary inlet: (Air analysis); Capillary inlet: (Fluid analysis); Microfluidic cassette; VIS-NIR spectrometer; NNAP Electrodes; Optical Waveguide; Back and front camera; and, Microphone | at least one sensor for chemical, biological, or human detection in communication with the at least one CPU; | the cell phone is at least a fixed, portable or mobile communication device interconnected to the cell phone detection device, capable of wired or wireless communication therebetween; and | the communication device is at least a fixed, portable or mobile communication device interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween… | processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs); |
| Google Smartphone Biosensors: Ambient light sensor; Capillary inlet: (Air analysis); Capillary inlet: (Fluid analysis); Microfluidic cassette; VIS-NIR spectrometer; NNAP Electrodes; Optical Waveguide; Back and front camera; and, Microphone | one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents; | at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone; | wherein the communication device receives a signal via any of one or more products listed in any of the plurality of product grouping categories; | processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs); |
| Connectivity: Wi-Fi 802.11 a/b/g/n/ac/6e, tri-band, Wi-Fi Direct, Bluetooth 5.3, A2DP, LE NFC, GPS, GLONASS, BDS GALILEO, QZSS | at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU… | X | X | processing instructions to scan a senor or tag using the short-range wireless technology of radio frequency near-field communication (NFC) |

| | | | | |
|---|---|---|---|---|
| Google Nest × Yale Lock is connected to the Nest app; you can lock or unlock your door from your phone.<br><br>Google Smartphone Biosensors: Ambient light sensor; Capillary inlet: (Air analysis); Capillary inlet: (Fluid analysis); Microfluidic cassette; VIS-NIR spectrometer; NNAP Electrodes; Optical Waveguide; Back and front camera; and, Microphone | at least one of a transmitter or a transceiver in communication with the at least one CPU configured …to monitor … a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, … detect at least one of a chemical biological… agent such that the communication device capable of communicating, monitoring, detecting, and controlling. | a transmitter for transmitting signals and messages to a cell phone detection device; a receiver for receiving signals from the cell phone detection device; | a transmitter for transmitting signals and messages to at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device;<br><br>a receiver for receiving signals, data or messages from … product groups … of a multi-sensor detection device, …, a cell phone detection device, or locking device; | processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs); |
| Google Nest × Yale Lock is connected to the Nest app; you can lock or unlock your door from your phone.<br><br>Google Smartphone Biosensors: Ambient light sensor; Capillary inlet: (Air analysis); Capillary inlet: (Fluid analysis); Microfluidic cassette; VIS-NIR spectrometer; NNAP Electrodes; Optical Waveguide; Back and front camera; and, Microphone | X | X | whereupon the communication device, is interconnected to a product equipped to receive signals from or send signals to lock or unlock doors, activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems | processing instructions to connect the communication device to the internet or internet-of-things (IoTs) platform to sync, to at least one of a building's computer or security system, a vehicle's computer or security system, a lock, a detection device, or another communication device; |

| | | | | |
|---|---|---|---|---|
| Google Smartphone Biosensors: Ambient light sensor; Capillary inlet: (Air analysis); Capillary inlet: (Fluid analysis); Microfluidic cassette; VIS-NIR spectrometer; NNAP Electrodes; Optical Waveguide; Back and front camera; and, Microphone | X | a transmitter for transmitting signals and messages to a cell phone detection device; a receiver for receiving signals from the cell phone detection device; | wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection … short range radio frequency (RF) connection is capable of signal communication with the transmitter and the receiver of the communication device and transceivers of the products; | processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs); |
| Google Smartphone Biosensors: Ambient light sensor; Capillary inlet: (Air analysis); Capillary inlet: (Fluid analysis); Microfluidic cassette; VIS-NIR spectrometer; NNAP Electrodes; Optical Waveguide; Back and front camera; and, Microphone | X | whereupon a signal sent to the receiver of the cell phone detection device from at least one of the chemical sensor, the biological sensor, the explosive sensor, the human sensor, the contraband sensor, or the radiological sensor, causes a signal that includes at least one of location data or sensor data to be sent to the cell phone. | X | processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs); |

| | | | | |
|---|---|---|---|---|
| Google Play: The Google android device as a quadcopter drone remote. Quadcopter Drone Remote Control for All Drones, and start to remote control easily all quadcopter drones with a Google android smartphone https://play.google.com/store/apps/ | X | X | X | processing instructions to activate a start, stall, stop, or disabling means by engaging a vehicle's ignition system;<br><br>processing instructions to activate a lock, unlock, or disabling lock means; a start, stall, stop, or disabling vehicle means by engaging the operational systems of the unmanned aerial vehicle; |

| [illegible] | Patent #: 10,163,287; Indep. Claim 5 | Patent #: 9,589,439; Indep. Claim 23 | Patent #: 9,096,189; Indep. Claim 1 | Patent#: 10,984,619; Indep. Claim [illegible] |
|---|---|---|---|---|
| | A monitoring device, comprising: | A cell phone comprising: | A communication device … a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal …interconnected to a product for communication therebetween, comprising: | A central processing unit (CPU) of at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, capable of: |
| **CPU**: Octa-core (2x2.85 GHz Cortex-X1 & 2x2.35 GHz Cortex-A78 & 4x1.80 GHz Cortex-A55) **Chipset**: Google Tensor G2. **OS**: Android 13 | at least one central processing unit (CPU); | a central processing unit (CPU) for executing and carrying out the instructions of a computer program; | at least one of a central processing unit (CPU) for executing and carrying out the instructions … a network processor … specifically targeted at the networking application domain, or a front-end processor … | whereupon, the central processing unit (CPU) of the communication device is capable of processing instructions for operational and functional execution, … capable of feedback… and storing the feedback … |
| Ambient Temperature sensor supported by the Android platform. Measures the ambient room temperature in degrees Celsius (°C). Monitoring air temperatures. Monitoring air temperatures. | at least one temperature sensor in communication with the at least one CPU for monitoring temperature; | X | X | X |

| | | | | |
|---|---|---|---|---|
| Gravity sensor supported by the Android platform. Measures the force of gravity that is applied to a device on all three physical axes (x, y, z). Motion detection (shake, tilt, etc.). | at least one motion sensor in communication with the at least one CPU; | X | X | X |
| Light sensor supported by the Android platform. Measures the ambient light level (illumination) in lx. Controlling screen brightness. | at least one viewing screen for monitoring in communication with the at least one CPU; | X | X | X |
| Connectivity: Wi-Fi 802.11 a/b/g/n/ac/6e, tri-band, Wi-Fi Direct, Bluetooth 5.2, A2DP, LE NFC, GPS, GLONASS, BDS GALILEO | at least one global positioning system (GPS) connection in communication with the at least one CPU; | at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; | at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection; | processing instructions received through at least one of a Bluetooth, a Wi-Fi, a satellite, a global positioning system (GPS), or a cellular transmission; |

| | | | | |
|---|---|---|---|---|
| Connectivity: Wi-Fi 802.11 a/b/g/n/ac/6e, tri-band, Wi-Fi Direct, Bluetooth 5.2, A2DP, LE NFC, GPS, GLONASS, BDS GALILEO | at least one of an internet connection or a Wi-Fi connection in communication with the at least one CPU; | one of… WiFi connection, internet connection, radio frequency (RF) connection, cellular connection… signal communication with the transmitter or the receiver; | at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection; | processing instructions received through at least one of a Bluetooth, a Wi-Fi, a satellite, a global positioning system (GPS), or a cellular transmission; |
| Connectivity: Wi-Fi 802.11 a/b/g/n/ac/6e, tri-band, Wi-Fi Direct, Bluetooth 5.2, A2DP, LE NFC, GPS, GLONASS, BDS GALILEO | at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; | at least one of a… Bluetooth connection, WiFi connection, internet connection… cellular connection… radio frequency (RF) connection, or GPS …; | X | processing instructions received through at least one of a Bluetooth, a Wi-Fi, a satellite, a global positioning system (GPS), or a cellular transmission; |
| Googles Android operating system …lock mechanism to secure [] phone, known as pattern lock. To set, drag your finger along lines on the screen. To unlock … replicate the pattern drawn. If [] fail … too many times… phone locks… cannot be unlocked without logging into the … Google account.<br><br>Google Nest × Yale Lock is connected to the Nest app; you can lock or unlock your door from your phone. | at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device; | whereupon the cell phone is interconnected to the cell phone detection device to receive signals or send signals to lock or unlock doors, to activate or deactivate security systems, to activate or deactivate multi-sensor detection systems, or to activate or deactivate the cell phone detection device; | X | processing instructions to lock, unlock, or disable the lock of the communication device;<br><br>processing instructions to activate a lock, unlock, or disabling lock means by engaging a vehicle with a two-way communication key-fob; |

| | | | | |
|---|---|---|---|---|
| Pixel phones use USB Type-C 3.2 OTG, USB 2.0 power adapters and cables. Charge phone with a USB-A power adapter; USB-C to USB-A cable. | at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to [] communication device; | X | X | X |
| BIOMETRICS: Biometric factors allow for secure authentication on the Android platform. The Android framework includes face and fingerprint biometric authentication. Android can be customized to support other forms of biometric authentication (such as Iris). On the phone, open the Google Fit app; tap Home.; scroll to "Heart rate" and tap Add; touch, hold finger on the back camera lens; follow the on-screen instructions | at least one biometric sensor in communication with the at least once CPU for providing biometric authentication to access the communication device; | wherein the cell phone is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature such that the cell phone is locked by the biometric lock disabler to prevent unauthorized use; and | wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature such that the communication device that is at least one of the cell phone, the smart phone, the desktop, the handheld, the PDA, the laptop or the computer terminal is locked by the biometric lock disabler to prevent unauthorized use | processing instructions to authenticate or identify a user by at least one of biometric fingerprint recognition, biometric facial recognition, biometric iris recognition, or biometric retina recognition; processing instructions to monitor or detect at least one of a chemical sensor, a biological sensor, a motion sensor, a biometric sensor, a signature sensor, or a human sensor; |

| | | | | |
|---|---|---|---|---|
| Google Beacon: Bluetooth; GPS; Wi-Fi. Google Android smart phones and WiFi/Bluetooth beacons as detectors and sources. Google's GPS, WiFi, Bluetooth phone [CBRNE] sensors and beacon signals to calculate distance. Filtering WiFi/ Bluetooth ranging and GPS location data. | at least one sensor for chemical, biological, or human detection in communication with the at least one CPU; | the cell phone is at least a fixed, portable or mobile communication device interconnected to the cell phone detection device, capable of wired or wireless communication therebetween; and | the communication device is at least a fixed, portable or mobile communication device interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween… | processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs); |
| Google Beacon: Bluetooth; GPS; Wi-Fi. Google Android smart phones and WiFi/Bluetooth beacons as detectors and sources. Google's GPS, WiFi, Bluetooth phone [CBRNE] sensors and beacon signals to calculate distance. Filtering WiFi/ Bluetooth ranging and GPS location data. | one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents; | at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone; | wherein the communication device receives a signal via any of one or more products listed in any of the plurality of product grouping categories; | processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs); |
| Connectivity: Wi-Fi 802.11 a/b/g/n/ac/6e, tri-band, Wi-Fi Direct, Bluetooth 5.2, A2DP, LE NFC, GPS, GLONASS, BDS GALILEO | at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU… | X | X | processing instructions to scan a senor or tag using the short-range wireless technology of radio frequency near-field communication (NFC) |

| | | | | |
|---|---|---|---|---|
| Google Nest × Yale Lock is connected to the Nest app; you can lock or unlock your door from your phone.<br><br>Google Beacon: Bluetooth; GPS; Wi-Fi. Google Android smart phones and WiFi/Bluetooth beacons as detectors and sources. Google's GPS, WiFi, Bluetooth phone [CBRNE]sensors and beacon signals to calculate distance. Filtering WiFi/ Bluetooth ranging and GPS location data. | at least one of a transmitter or a transceiver in communication with the at least one CPU configured …to monitor … a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, … detect at least one of a chemical biological… agent such that the communication device capable of communicating, monitoring, detecting, and controlling. | a transmitter for transmitting signals and messages to a cell phone detection device; a receiver for receiving signals from the cell phone detection device; | a transmitter for transmitting signals and messages to at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device;<br><br>a receiver for receiving signals, data or messages from … product groups … of a multi-sensor detection device, …, a cell phone detection device, or locking device; | processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs); |
| Google Nest × Yale Lock is connected to the Nest app; you can lock or unlock your door from your phone.<br><br>Google Beacon: Bluetooth; GPS; Wi-Fi. Google Android smart phones and WiFi/Bluetooth beacons as detectors and sources. Google's GPS, WiFi, Bluetooth phone [CBRNE] sensors and beacon signals to calculate distance. Filtering WiFi/ Bluetooth ranging and GPS location data. | X | X | whereupon the communication device, is interconnected to a product equipped to receive signals from or send signals to lock or unlock doors, activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems | processing instructions to connect the communication device to the internet or internet-of-things (IoTs) platform to sync, to at least one of a building's computer or security system, a vehicle's computer or security system, a lock, a detection device, or another communication device; |

| | | | | |
|---|---|---|---|---|
| Google Beacon: Bluetooth; GPS; Wi-Fi. Google Android smart phones and WiFi/Bluetooth beacons as detectors and sources. Google's GPS, WiFi, Bluetooth phone [CBRNE] sensors and beacon signals to calculate distance. Filtering WiFi/ Bluetooth ranging and GPS location data. | X | a transmitter for transmitting signals and messages to a cell phone detection device; a receiver for receiving signals from the cell phone detection device; | wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection … short range radio frequency (RF) connection is capable of signal communication with the transmitter and the receiver of the communication device and transceivers of the products; | processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs); |
| Google Beacon: Bluetooth; GPS; Wi-Fi. Google Android smart phones and WiFi/Bluetooth beacons as detectors and sources. Google's GPS, WiFi, Bluetooth phone [CBRNE] sensors and beacon signals to calculate distance. Filtering WiFi/ Bluetooth ranging and GPS location data. | X | whereupon a signal sent to the receiver of the cell phone detection device from at least one of the chemical sensor, the biological sensor, the explosive sensor, the human sensor, the contraband sensor, or the radiological sensor, causes a signal that includes at least one of location data or sensor data to be sent to the cell phone. | X | processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs); |

| | | | | |
|---|---|---|---|---|
| Google Play: The Google android device as a quadcopter drone remote. Quadcopter Drone Remote Control for All Drones, and start to remote control easily all quadcopter drones with a Google android smartphone https://play.google.com/store/apps/ | X | X | X | processing instructions to activate a start, stall, stop, or disabling means by engaging a vehicle's ignition system;<br><br>processing instructions to activate a lock, unlock, or disabling lock means; a start, stall, stop, or disabling vehicle means by engaging the operational systems of the unmanned aerial vehicle; |

# Exhibit H

## Claim Chart of Induced Infringement [DTRA ATAK-MILITARY and Draper's ATAK-CIVILIAN]; Contributory Infringement of Google's Pixel 6a, 7, 7a, 7 Pro, and Fold; and Joint Infringement

| DRAPER'S ATAK-CIVILIAN & DoD/DTRA ATAK-MILITARY | Patent #: 9,589,439; Independent Claim 19 | Patent #: 9,096,189; Independent Claim 7 |
|---|---|---|
| MOVE, SHOOT & COMMUNICATE WITH ATAK (AND ALTERNATIVES)<br><br>Both Draper ATAK-CIV and DoD DTRA ATAK-MIL include chemical, biological, radiological, and nuclear (CBRN) plug-ins. Plaintiff has demonstrated throughout the complaint how Google actively encouraged the infringement; and how Google knew that the acts they were doing constituted infringement; and as a result, Google actuated direct patent infringement by those encouraging acts. Plaintiff's evidence proves the inducement ***resulted*** in dirent infringement, not that the inducement was of a product that already directly infringes. | A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, radiological agent, or compound, comprising: | A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, or radiological agents and compounds, comprising: |
| **ATAK-CIVILIAN**<br>Draper Laboratory, Inc. designed a CBRN Plugin to enable users to integrate CBRN sensors into TAK, collect CBRN sensor data, display it on a map and livestream it across the TAK network to other users. CBRN plugins for ATAK, are operational in the field.<br><br>**ATAK-MILITARY**<br>ATAK (built on the Android operating system) With DTRA … ATAK includes chemical, biological, radiological, and nuclear (CBRN) plug-ins. The Defense Threat Reduction Agency (DTRA) CBRN ISA: Seamlessly integrates information and control of multiple sensors into a single dashboard, making it easier to detect CBRN threats and monitor a warfighter's vitals https://thelastmile. gotennapro.com/four-useful-atak-app-plugins/ | a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human, or contraband agent or compound, capable of being disposed within, on, upon or adjacent a multi-sensor detection device; | a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human or contraband agents and compounds and capable of being disposed within, on, upon or adjacent a multi sensor detection device; |

| | | |
|---|---|---|
| Pursuant to 35 U.S.C. § 271(c), Google has contributed an element(s) [ at least that of Google Pixel 6a, 7, 7a, 7 Pro, or Fold] to the alleged infringing ATAK CBRNE Plugins of Draper Laboratory, Inc. and the Defense Threat Reduction Agency (DTRA).<br><br>Google is contributing to the infringement of independent claim 19 of Plaintiff's '439 patent, and independent claim 7 of Plaintiff's '189 patent.<br><br>ATAK (including CivTAK) is an Android smartphone [i.e., Google smartphone] geospatial infrastructure and situational awareness app https://www.civtak.org/atak-about/. ATAK can be downloaded to a phone, tablet, or handheld device.<br><br>ATAK-MIL is a government-off-the-shelf app for Android smartphones. The mobile broadband 4G LTE connection is able to facilitate the data throughput required for the operation of the ATAK. https://apps. dtic.mil/sti/pdfs/ AD1069441.pdf<br><br>Plaintiff has alleged Joint or Divided infringement between Google and Draper; and, Google and DTRA, because no single party carried out all the steps of Plaintiff's patented inventions, that would constitute infringement. | monitoring equipment comprising at least one of a computer, personal computer (PC), laptop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone for at least one of a receipt or transmission of signals therebetween; | monitoring equipment comprising at least one of plurality product groups based on the categories of a computer, laptop, notebook, PC, handheld, cell phone, PDA or smart phone for the receipt and transmission of signals therebetween; |
| Google Pixel 6a, 7, 7a, 7 Pro, and Fold smartphones connects to a cell tower or base station via radio waves, and that tower is usually physically connected to the infrastructure to send that data wherever it needs to go.<br><br>Draper designed a chemical, biological, radiological and nuclear (CBRN) Plugin to enable users to integrate CBRN sensors into TAK, collect CBRN sensor data, display it on a map and livestream it across the TAK network to other users. CBRN plugins for ATAK, WinTAK and WebTAK are operational in the field. https://www.draper.com/explore-solutions/tak | at least one cell phone tower interconnected to the monitoring equipment for sending signals thereto and receiving signals therefrom or at least one satellite capable of transmitting signals to the monitoring equipment; | at least one cell phone tower interconnected to the monitoring equipment for sending signals thereto and receiving signals therefrom or at least one satellite capable of transmitting signals to the monitoring equipment; |

| | | |
|---|---|---|
| The Android-based Google Pixel 6a, 7, 7a, 7 Pro, and Fold smartphones now contained integrated satellite on-the move capability, on-the-move mapping solutions, and a commercial laser range finder that significantly expanded the end-user range data flow and functionality. The Primary, Alternate, Contingency, and Emergency (PACE) communications architectures established was: • Primary communications structure (P): ATAK—4G/LTE; Antenna: international [] satellite (INMARSAT) https://apps. dtic.mil/sti/pdfs/ AD1069441.pdf | at least one satellite or at least one cell phone tower capable of signal communication between the multi-sensor detection device and the monitoring equipment; | at least one satellite or at least one cell phone tower capable of signal communication between the multi sensor detection device and the monitoring equipment; |
| The internet connection is shared by many ATAK functions on the Google Pixel 6a, 7, 7a, 7 Pro, and Fold smartphone such as internet browsing, receiving email messages and installing apps. Wi-Fi is a method for devices such as the Google Pixel 6a, 7, 7a, 7 Pro, or Fold smartphones to connect wirelessly to the Internet using radio waves. | at least one internet connection capable of communication between the multi-sensor detection device and the monitoring equipment; | at least one internet connection capable of communication between the multi sensor detection device and the monitoring equipment; |
| Sit(x) is a commercial Server-as-a-Service solution based on the TAK platform developed by PAR Government for the U.S. Defense & Intelligence Community. Sit(x) has real-time communication and information sharing. With Sit(x), individuals and teams can communicate via personal computers and handheld mobile [Google smartphone] devices by voice or text. They can share real-time full-motion video (FMV), airborne/drone imagery, GPS locations, photos, and satellite imagery. Fully secure and compatible with ATAK, WinTAK, and iTAK. Sit(x) accessed via free downloadable gateway apps. | whereupon a signal sent to a receiver of the multi-sensor detection device from a satellite; or to a cell phone tower; or through at least one of a short-range radio frequency or a long-range radio frequency; causes a signal to be sent to the monitoring equipment that includes at least one of location data or sensor data; | whereupon a signal sent to a receiver of the multi sensor detection device from a satellite; or to a cell phone tower; or through short and/or long-range radio frequency; causes a signal to be sent to the monitoring equipment that includes location data and sensor data; |

| | | |
|---|---|---|
| The '439 & '189 patent specs: Product grouping (PG) 1 (storage & transportation); PG 2 (sensors); PG 3 (detector case; modified and adapted); PG 4 (monitoring & communication devices); PG 5 (communication methods); PG 6 (biometrics); and, PG 7 (authorized person) | wherein the monitoring equipment or multi-sensor detection device receives a signal via any of one or more products of any product grouping categories; | wherein the monitoring equipment or multi sensor detection device receives a signal via any of one or more products listed in any of the plurality of product grouping categories; |
| The Android-based [Google] Google Pixel 6a, 7, 7a, 7 Pro, and Fold smartphones now contained integrated satellite …<br><br>Wi-Fi is a method for devices such as the Google Pixel 6a, 7, 7a, 7 Pro, or Fold smartphone to connect wirelessly to the Internet using radio waves…<br><br>The internet connection is shared by many ATAK functions on the Google Pixel 6a, 7, 7a, 7 Pro, or Fold smartphone such as internet browsing, receiving email messages; installing apps…<br><br>The Google Pixel 6a, 7, 7a, 7 Pro, or Fold smartphone connects to a cell tower or base station via radio waves, and that tower is usually physically connected to the infrastructure to send that data wherever it needs to go. | wherein at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency connection, or short-range radio frequency (RF) connection is capable of signal communication with the transmitter, a receiver of the monitoring equipment, the multi-sensor detection device, or transceivers of the products; | wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection is capable of signal communication with the transmitter and the receiver of the monitoring equipment or multi sensor detection device and transceivers of the products; |
| BIOMETRICS: Biometric factors allow for secure authentication on the Android platform. The Android framework includes face and fingerprint biometric authentication. Android can be customized to support other forms of biometric authentication (such as Iris).<br><br>ATAK (including CivTAK) is an Android smartphone [i.e., Google smartphone] geospatial infrastructure and situational awareness app https://www.civtak.org/atak-about/. ATAK can be downloaded to a phone, tablet, or handheld device. (Google Pixel 6a, 7, 7a, 7 Pro, or Fold smartphones) | wherein the monitoring equipment is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan or signature such that the monitoring device that is at least one of the computer, the laptop, the notebook, the PC, the handheld, the cell phone, the PDA, or the smart phone is locked by the biometric lock disabler to prevent unauthorized use; | wherein the monitoring equipment is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature such that the monitoring device that is at least one of the computer, the laptop, the notebook, the PC, the handheld, the cell phone, the PDA, or the smart phone is locked by the biometric lock disabler to prevent unauthorized use; |

| | | |
|---|---|---|
| The Android-based [Google] Google Pixel 6a, 7, 7a, 7 Pro, and Fold smartphones now contained integrated satellite …<br><br>Wi-Fi is a method for devices such as the Google Pixel 6a, 7, 7a, 7 Pro, or Fold smartphone to connect wirelessly to the Internet using radio waves…<br><br>The internet connection is shared by many ATAK functions on the Google Pixel 6a, 7, 7a, 7 Pro, or Fold smartphone such as internet browsing, receiving email messages; installing apps…<br><br>The Google Pixel 6a, 7, 7a, 7 Pro, or Fold smartphone connects to a cell tower or base station via radio waves, and that tower is usually physically connected to the infrastructure to send that data wherever it needs to go. | wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, long range radio frequency, and short-range radio frequency (RF). | wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, and long and short-range radio frequency (RF). |

# Exhibit I



(12) **United States Patent**
**Golden**

(10) **Patent No.: US 10,984,619 B2**
(45) **Date of Patent: *Apr. 20, 2021**

(54) **MULTI SENSOR DETECTION, STALL TO STOP, AND LOCK DISABLING SYSTEM**

(71) Applicant: **Golden Larry**, Greenville, SC (US)

(72) Inventor: **Larry Golden**, Greenville, SC (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/350,683**

(22) Filed: **Dec. 19, 2018**

(65) **Prior Publication Data**

US 2019/0130679 A1 May 2, 2019

**Related U.S. Application Data**

(60) Continuation of application No. 15/530,839, filed on Mar. 6, 2017, now Pat. No. 10,163,287,. which is a (Continued)

(51) **Int. Cl.**
***G07C 9/00*** (2020.01)
***B60R 25/04*** (2013.01)
(Continued)

(52) **U.S. Cl.**
CPC .......... ***G07C 9/00563*** (2013.01); ***B60R 25/01*** (2013.01); ***B60R 25/04*** (2013.01); (Continued)

(58) **Field of Classification Search**
CPC .... G07C 9/00; G07C 9/0007; G07C 9/00174; G07C 9/00309; G07C 9/00388; (Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,385,469 A 5/1983 Scheuerpflug et al.
4,544,267 A 10/1985 Schiller
(Continued)

OTHER PUBLICATIONS

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/199,853; copyright dated Jan. 13, 2012, pp. 1-34, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; U.S. Appl. No. 13/288,065 (34 pages).
(Continued)

*Primary Examiner* — Van T Trieu

(57) **ABSTRACT**

A multi sensor detection and disabling lock system includes detector cases for holding interchangeable detectors that sample for chemical, biological and radiological compounds, agents and elements, with each detector case disposed in or upon the monitored product. The detector case transmits detection information to a monitoring computer terminal and transmits a signal to a lock disabler engaged to the product to lock or disable the product's lock thereby preventing untrained, unauthorized and unequipped individuals from gaining access and entry to the product, and also preventing further contamination of the area. The detection system can be interconnected to surveillance towers scanning detector cases disposed at seaport docks, freight depots and rail terminals for monitoring containers being prepared for shipment or sitting on docks for long periods of time.

**20 Claims, 13 Drawing Sheets**

### Related U.S. Application Data

continuation of application No. 14/806,988, filed on Jul. 23, 2015, now Pat. No. 9,589,439, which is a continuation of application No. 14/021,693, filed on Sep. 9, 2013, now Pat. No. 9,096,189, which is a continuation of application No. 13/288,065, filed on Nov. 3, 2011, now Pat. No. 8,531,280, which is a division of application No. 12/802,001, filed on May 27, 2010, now Pat. No. 8,334,761, which is a continuation of application No. 12/657,356, filed on Jan. 20, 2010, now Pat. No. 8,106,752, which is a continuation of application No. 12/155,573, filed on Jun. 6, 2008, now Pat. No. 7,636,033, which is a continuation-in-part of application No. 11/397,118, filed on Apr. 5, 2006, now Pat. No. 7,385,497.

(51) **Int. Cl.**

| | |
|---|---|
| *B60R 25/01* | (2013.01) |
| *B60R 25/102* | (2013.01) |
| *G08B 13/24* | (2006.01) |
| *B60R 25/104* | (2013.01) |
| *G08B 25/00* | (2006.01) |
| *H04W 4/80* | (2018.01) |
| *G07C 9/20* | (2020.01) |
| *G08B 15/00* | (2006.01) |
| *G08B 21/12* | (2006.01) |
| *B60R 25/24* | (2013.01) |

(52) **U.S. Cl.**
CPC ........ ***B60R 25/102*** (2013.01); ***G08B 13/2491*** (2013.01); ***B60R 25/018*** (2013.01); ***B60R 25/104*** (2013.01); ***B60R 25/24*** (2013.01); ***G07C 9/00912*** (2013.01); ***G07C 9/00174*** (2013.01); ***G07C 9/20*** (2020.01); ***G08B 15/00*** (2013.01); ***G08B 21/12*** (2013.01); ***G08B 25/009*** (2013.01); ***H04W 4/80*** (2018.02)

(58) **Field of Classification Search**
CPC .. G07C 9/00563; G08B 27/00; G08B 27/005; G08B 27/006; G08B 15/00; G08B 15/001; G08B 15/004; G08B 15/009; B60R 25/018; B60R 25/04; B60R 25/10; B60R 25/102; B60R 25/0405; B60R 25/104

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,586,441 A 5/1986 Zekich
4,792,226 A 12/1988 Fishbine et al.
5,222,152 A 6/1993 Fishbine et al.
5,223,844 A 6/1993 Mansell et al.
5,233,404 A 8/1993 Lougheed et al.
5,557,254 A 9/1996 Johnson et al.
5,682,133 A 10/1997 Johnson et al.
5,766,956 A 6/1998 Groger et al.
5,938,706 A 8/1999 Feldman
5,959,529 A 9/1999 Kail
5,963,657 A 10/1999 Bowker et al.
5,986,543 A 11/1999 Johnson
5,990,785 A 11/1999 Suda
6,049,269 A 4/2000 Byrd et al.
6,078,265 A 6/2000 Bonder et al.
6,236,365 B1 * 5/2001 LeBlanc .............. G01C 21/206 342/457
6,262,656 B1 7/2001 Byrd et al.
6,271,745 B1 8/2001 Anzai et al.
6,374,652 B1 4/2002 Hwang
6,411,887 B1 6/2002 Martens et al.
6,470,260 B2 10/2002 Martens et al.
6,542,076 B1 4/2003 Joao
6,542,077 B2 4/2003 Joao
6,588,635 B2 7/2003 Vor Keller et al.
6,610,977 B2 8/2003 Megerle
6,613,571 B2 9/2003 Cordery et al.
6,628,813 B2 9/2003 Scott et al.
6,647,328 B2 10/2003 Walker
6,738,697 B2 5/2004 Breed
6,923,509 B1 8/2005 Barnett
6,980,092 B2 12/2005 Turnbull et al.
6,988,026 B2 1/2006 Breed et al.
7,005,982 B1 2/2006 Frank
7,034,677 B2 4/2006 Steinthal et al.
7,034,683 B2 4/2006 Ghazarian
7,103,460 B1 9/2006 Breed
7,116,798 B1 10/2006 Chawla
7,148,484 B2 12/2006 Craig et al.
7,164,117 B2 1/2007 Breed et al.
7,171,312 B2 1/2007 Steinthal et al.
7,243,945 B2 6/2007 Breed et al.
7,339,469 B2 3/2008 Braun
7,346,439 B2 3/2008 Bodin
7,350,608 B2 4/2008 Fernandez
7,385,497 B2 6/2008 Golden
7,397,363 B2 7/2008 Joao
7,636,033 B2 12/2009 Golden
7,647,180 B2 1/2010 Breed
7,844,505 B1 11/2010 Arneson et al.
7,868,912 B2 1/2011 Venetianer et al.
7,872,575 B2 1/2011 Tabe
7,880,767 B2 2/2011 Chinigo
7,961,094 B2 6/2011 Breed
8,120,459 B2 2/2012 Kwak
8,274,377 B2 9/2012 Smith et al.
8,531,521 B2 9/2013 Romanowich
8,564,661 B2 10/2013 Lipton et al.
8,615,290 B2 12/2013 Lin et al.
2002/0145666 A1 10/2002 Scaman
2003/0063004 A1 4/2003 Anthony et al.
2003/0093187 A1 * 5/2003 Walker .................... B64C 13/20 701/1
2003/0137426 A1 7/2003 Anthony et al.
2003/0179073 A1 9/2003 Ghazarian
2003/0206102 A1 11/2003 Joao
2004/0107028 A1 6/2004 Catalano
2004/0222092 A1 11/2004 Musho
2005/0195069 A1 9/2005 Dunand
2006/0164239 A1 7/2006 Loda
2006/0176169 A1 8/2006 Doolin et al.
2006/0181413 A1 8/2006 Mostov
2006/0250235 A1 11/2006 Astrin
2006/0261931 A1 * 11/2006 Cheng .................. B60R 25/102 340/426.1
2007/0093200 A1 4/2007 Dobosz
2007/0171042 A1 7/2007 Metes et al.
2007/0257774 A1 11/2007 Stumpert et al.
2008/0045156 A1 2/2008 Sakhpara
2008/0122595 A1 5/2008 Yamamichi et al.
2008/0234907 A1 9/2008 Labuhn et al.
2009/0289780 A1 * 11/2009 Tenorio-Fox .......... B60R 25/04 340/425.5
2010/0159983 A1 5/2010 Golden
2010/0265068 A1 * 10/2010 Brackmann ............... B60P 3/14 340/572.1
2011/0178655 A1 6/2011 Golden

OTHER PUBLICATIONS

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/065,837; copyright dated Dec. 2, 2011, pp. 1-27, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; U.S. Appl. No. 13/288,065 (27 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/065,837; copyright dated Nov. 1, 2011, pp. 1-18, publisher United States Patent and Trademark

(56) **References Cited**

OTHER PUBLICATIONS

Office, Alexandria, Virginia, USA; U.S. Appl. No. 13/288,065 (18 pages).
United States Patent and Trademark Office; Office Action from U.S. Appl. No. 11/397,118; dated Nov. 14, 2007; Alexandria, Virginia, USA; pp. 1-12; U.S. Appl. No. 13/288,065 (12 pages).
United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/155,573; dated Apr. 9, 2009; Alexandria, Virginia, USA; pp. 1-7; U.S. Appl. No. 13/288,065 (7 pages).
United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/155,573; dated Jul. 30, 2009; Alexandria, Virginia, USA; pp. 1-9; U.S. Appl. No. 13/288,065 (9 pages).
United States Patent and Trademark Office; Notice of Allowability from U.S. Appl. No. 12/155,573; dated Oct. 28, 2009; Alexandria, Virginia, USA; pp. 1-5; U.S. Appl. No. 13/288,065 (5 pages).
United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/657,356; dated Jul. 12, 2010; Alexandria, Virginia, USA; pp. 1-14; U.S. Appl. No. 13/288,065 (14 pages).
United States Patent and Trademark Office; Notice of Allowability from U.S. Appl. No. 12/657,356; dated Mar. 10, 2011; Alexandria, Virginia, USA; pp. 1-4; U.S. Appl. No. 13/288,065 (4 pages).
United States Patent and Trademark Office; Office Action from U.S. Appl. No. 13/065,837; dated Jul. 18, 2011; Alexandria, Virginia, USA, pp. 1-9; U.S. Appl. No. 13/288,065 (9 pages).
A newspaper article of Mr. Melvin Sullivan and his family that references the date, Mar. 6, 2001. U.S. Appl. No. 13/288,065.
A letter of response Mr. Sullivan received from Pfeiffer & Gantt, PA, dated Sep. 16, 2002. U.S. Appl. No. 13/288,065.
A "Certificate of Existance" Bright Idea Inventor, LLC. Nov. 6, 2002. U.S. Appl. No. 13/288,065.
A letter of response Golden received from the Honorable Congressman from Maryland, Elijah E. Cummings, dated Dec. 16, 2002; U.S. Appl. No. 13/288,065.
A newspaper article of Mr. Melvin Sullivan and Mr. Larry Golden, dated, Feb. 27-Mar. 5, 2003; U.S. Appl. No. 13/288,065.
A letter of response Golden received from the Honorable Senator from South Carolina, Ernest F. Hollings, dated May 21, 2003; U.S. Appl. No. 13/288,065.
A letter of response Golden received from the Office of the Vice President, Dick Cheney, dated Jun. 3, 2003; U.S. Appl. No. 13/288,065.
A letter of response Golden received from the Honorable Senator from South Carolina, Ernest F. Hollings, dated Oct. 1, 2003; U.S. Appl. No. 13/288,065.
A letter of response Golden received from the Honorable Senator from South Carolina, Lindsey O. Graham, dated Oct. 21, 2003; U.S. Appl. No. 13/288,065.
A letter sent to the President of the United States George W Bush, the President's Cabinet, the United States Senate and the Congressional Black Caucus, dated May 23, 2005; U.S. Appl. No. 13/288,065.
On Nov. 17, 2005, an "Inventor's Official Record of Invention", was filed in my name (Golden) at "The Law Office of David P. Gaudio, P.C.; the Inventors Network."; U.S. Appl. No. 13/288,065.
On Aug. 23, 2005, the "Disclosure Document Registration"; U.S. Appl. No. 13/288,065.
On Apr. 5, 2006, the "Patent Application" was filed in my name (Golden) at the United Staets Patent & Trademark Office in Washington, D.C.; U.S. Appl. No. 13/288,065.
On Jun. 6, 2008, the "Continuance-In-Part, (CIP) Application" was filed in my name (Golden) at the United States Patent & Trademark Office in Washington, D.C.; U.S. Appl. No. 13/288,065.
On Jan. 20, 2010, a "Continuation Application" (U.S. Appl. No. 12/657,356) was filed in my name (Golden) at the United States Patent & Trademark Office in Washington, D.C.; U.S. Appl. No. 13/288,065.
Reissue of U.S. Pat. No. 7,636,033;"Swear Back"; in accordance to Title 37—Code of Federal Regulations Patents, Trademarks, and Copyrights; Apr. 8, 2011; U.S. Appl. No. 13/288,065.
Reissue of U.S. Pat. No. 7,636,033; "Swearback—History of Work"; Apr. 8, 2011; U.S. Appl. No. 13/288,065.
United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/802,001; dated Apr. 14, 2011, 2011; Alexandria, Virginia, USA; pp. 1-16; U.S. Appl. No. 13/288,065 (16 pages).
United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/802,001; dated May 27, 2011; Alexandria, Virginia, USA; pp. 1-14; U.S. Appl. No. 13/288,065 (14 pages).
United States Department of Homeland Security; Petition for Inter Partes Review of U.S. Pat. No. Re. 43,990 Under 35 U.S.C. §312 and 37 C.F.R. §42.104; Case IPR2014-00714 for U.S. Pat. No. Re. 43,990; Filed Apr. 30, 2014; Washington, D.C., USA; pp. 1-57, U.S. Appl. No. 14/806,988 (57 pages).
United States Department of Homeland Security; Declaration of Dr. Sriram Vishwanath; Case IPR2014-00714 for U.S. Pat. No. Re. 43,990; Filed Apr. 30, 2014; Washington, D.C., USA; pp. 1-44; U.S. Appl. No. 14/806,988 (44 pages).
Richard R Brooks and S.S. Iyengar; Multi-Sensor Fusion Fundamentals and Applications with Software; published 1998; Copyright Prentice Hall PTR; Upper Saddle River, New Jersey, USA; pp. 1-20; (20 pages). U.S. Appl. No. 14/806,988 (20 pages).
Ramanarayanan Viswanathan and Pramod K Varshney; Distriubted Detection with Multiple Sensors: Part 1—Fundamentals; Proceedings of the IEEE; Jan. 1, 1997; pp. 1-11; vol. 85; No. 1; Southern Illinois University Carbondale OpenSIUC; Illinois, USA; pp. 1-11; U.S. Appl. No. 14/806,988 (11 pages).
Blum; Distributed Detection with Multiple Sensors: Part II—Advanced Topics; Proceedings of the IEEE; Jan. 1, 1997; pp. 1-16; vol. 85, No. 1; Southern Illinois University Carbondale OpenSIUC; Illinois, USA; U.S. Appl. No. 14/806,988 (16 pages).
Victor Lesser; Distributed Sensor Networks a Multiagent Perspective; 2003; pp. 1, 2, 5, 6, 22, 26, 27, 36, 275, 320; copyright 2003 Kluwer Academic Publishers; AH Dordrecht, The Netherlands; U.S. Appl. No. 14/806,988 (10 pages).
Samuel Blackman and Robert Popoli; Design and Analysis of Modern Tracking Systems; 1999; pp. 1, 2, 6, 472; copyright 1999 Artech House; Norwood, Massachusetts, USA; U.S. Appl. No. 14/806,988 (4 pages).
Jean-Francois Chamberland; Decentralized Detection in Sensor Networks; 2003; pp. 407-416; IEEE Transactions on Signal Processing; vol. 51, No. 2; Urbana, Illinois, USA; U.S. Appl. No. 14/806,988 (10 pages).
Oleg Kachirski and Ratan Guha; Effective Intrusion Detection Using Multiple Sensors in Wireless Ad Hoc Networks; pp. 1-8; Proceedings of the 36.sup.th Hawaii International Conference on System Sciences; copyright 2003; Orlando, Florida, USA; U.S. Appl. No. 14/806,988 (8 pages).
Lawrence A Klein; Sensor and Data Fusion A Tool for Information Assessment and Decision Making; 2004; pp. 1-4, 6, 81, 87-89; copyright 2004 The Society of Photo-Optical Instrumentation Engineers; Publisher is SPIE—the International Society for Optical Engineering; Bellingham, Washington, USA; U.S. Appl. No. 14/806,988 (12 pages).
Dale Ferriere and Khrystyna Pysareva and Andrzej Rucinski; Using Technology to Bridge Maritime Security Gaps; Aug. 1, 2005; Sea Technology; pp. 1-6; copyright Compass Publications, Inc. Jan. 2009; Portsmouth, New Hampshire, USA; U.S. Appl. No. 14/806,988 (6 pages).
Corie Lok; Cargo Security; MIT Technology Review; Jun. 2004; No. 107; pp. 74-75; publisher is Massachusetts Institute of Technology; Cambridge, Massachusetts, USA; U.S. Appl. No. 14/806,988 (2 pages).
Thomas C Chen; RFID and Sensor-based Container Content Visibility and Seaport Security Monitoring system; Proceedings of SPIE, vol. 5778; pp. 151-159; Mar. 28, 2005; Publisher is SPIE—the International Society for Optical Engineering; Bellingham, Washington, USA; U.S. Appl. No. 14/806,988 (10 pages).
United States Department of Homeland Security; The University of Texas at Austin College of Engineering Standard Resume of Sriram Vishwanath; Case IPR2014-00714 for U.S. Pat. No. Re. 43,990; Filed Apr. 30, 2014; Washington, D.C., USA; pp. 1-21; U.S. Appl. No. 14/806,988 (21 pages).
Operating Agreement of Bright Idea Inventor, LLC received from Pfeiffer & Gantt, PA, dated Nov. 13, 2002; U.S. Appl. No. 13/288,065.

(56) **References Cited**

OTHER PUBLICATIONS

United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/802,001; dated Oct. 20, 2011; Alexandria, Virginia, USA; pp. 1-5; parent U.S. Appl. No. 13/288,065 (5 pages); U.S. Appl. No. 13/288,065 (5 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 12/802 001; copyright dated Dec. 12, 2011, pp. 1-9, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 13/288,065 (9 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 12/802,001; copyright dated Mar. 26, 2012, pp. 1-12, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; U.S. Appl. No. 13/288,065 (12 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/199,853; copyright datcd Feb. 22, 2012, pp. 1-38, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; U.S. Appl. No. 13/288,065 (38 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/065,837; copyright dated Feb. 22, 2012, pp. 1-25, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; U.S. Appl. No. 13/288,065 (25 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/288,065; copyright dated Aug. 24, 2012, pp. 1-4, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; U.S. Appl. No. 13/288,065 (4 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/288,065; copyright dated Nov. 28, 2012, pp. 1-11, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; U.S. Appl. No. 13/288,065 (11 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/288,065; copyright dated Apr. 16, 2013, pp. 1-9, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; U.S. Appl. No. 13/288,065 (9 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 14/021,693; copyright dated Apr. 20, 2015, pp. 1-20, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; U.S. Appl. No. 14/021,693 (20 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 14/021,693; copyright dated Jan. 20, 2015, pp. 1-17, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; U.S. Appl. No. 14/021,693 (17 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 14/021,693; copyright dated Sep. 5, 2014, pp. 1-12, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; U.S. Appl. No. 14/021,693 (12 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 14/806,988; copyright dated Jul. 5, 2015, pp. 1-5, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 14/806,988 (5 pages).

United States Patent and Trademark Office; Notice of Allowance from U.S. Appl. No. 14/806,988; dated Jan. 3, 2017; Alexandria, Virginia, USA; pp. 1-8; U.S. Appl. No. 14/806,988 (8 pages).

United States Patent and Trademark Office; Notice of Allowance from U.S. Appl. No. 14/021,693; dated Jun. 19, 2015; Alexandria, Virginia, USA; pp. 1-8; U.S. Appl. No. 14/021,693 (8 pages).

United States Patent and Trademark Office; Notice of Allowance from U.S. Appl. No. 13/288,065; dated May 24, 2013; Alexandria, Virginia, USA; pp. 1-8; U.S. Appl. No. 13/288,065 (8 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 15/530,839; copyright dated Sep. 26, 2018, pp. 1-9, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 15/530,839 (9 pages).

United States Patent and Trademark Office; Notice of Allowance from U.S. Appl. No. 15/530,839; copyrighted dated May 16, 2018; Alexandria, Virginia, USA; pp. 1-7; U.S. Appl. No. 15/530,839 (7 pages).

Letter from Applicant, Larry Golden regarding Written Description dated Dec. 3, 2019.

Deignan, abstract,Wearable Chemical Sensors: Characterization of Heart Rate Electrodes Using Electrochemical Impedance Spectroscopy,12th Ann. BodySensor Network Con. Jun. 9-12, 2015.

My Tutor website, "How does the body increase heart rate in response to exercise?" https://www.mytutor.co.uk/answers/8802/A-Level/Biology, printed Dec. 3, 2019.

Portions of Moore, Jason, "HRV Demographics: Part 1—Age & Gender," HRVcourse.com, https://hrvcourse.com/hrv-demographics-age-gender/, copyright 2017, portion printed Dec. 2, 2019.

Hernandez, et al., abstract, "Wearable Motion-Based Heart Rate at Rest: A Workplace Evaluation," IEEE J BiomedHealth Inform, Sep. 2019; pp. 1920-1927.

Kalnoskas, A.,Biometric Sensors Include Advanced Heart Monitoring & ECG, Nov. 30, 2017, www.microcontrollertips.com/biometric-sensors-include-advanced-heart-monitoring-and-ecg/.

Holder, et al., pportions of "Using What You Get: Dynamic Physiologic Signatures of Critical Illness," Crit Care Clin, Jan. 2015: 31 (1): 133-164, p. 1 of 35

Brain Signs website,webpage entitled: "ElectroCardioGaphy(ECG) & Heart Rate (HR)," copyrighted 2018, printed Dec. 2, 2019, www.brainsigns.com/en/science/s2/technologies/hr.

Johnson,Carolyn Y., "Spotting a Terrorist," article, Boston Globe, pub. Sep. 18, 2009.

Letter, from applicant, Larry Golden, ATPG Technology, LLC, to Bruce Sewell, • SVP 7 General Counsel, Apple. Inc. dated Nov. 11, 2010.

* cited by examiner

U.S. Patent Apr. 20, 2021 Sheet 1 of 13 US 10,984,619 B2

32
INTERNET CONNECTION
34
GPS CONNECTION
36
POWER SOURCE
10
22
44
58
64
62
66
44
26
56
44
28
12
52
48
52
46
46
54
54
46
50
52
50
46
48

Fig. 1

Fig. 2

Page 5 of

8/20/2023 11:48:52

SAppx451

U.S. Patent Apr. 20, 2021 Sheet 2 of 13 US 10,984,619 B2

60
14
58
56

Fig. 3a

60
14
58
56

Fig. 3b

Page 6 of

8/20/2023 11:48:52

SAppx452

U.S. Patent Apr. 20, 2021 Sheet 3 of 13 US 10,984,619 B2

14
16
12
44
44

Fig. 4

14
12
42
112
42
16
12
12
42
12
POWER SOURCE
114

Fig. 5

Page 7 of

8/20/2023 11:48:52

SAppx453

U.S. Patent Apr. 20, 2021 Sheet 4 of 13 US 10,984,619 B2

18
12
44
12
44
12
44
112
20
POWER SOURCE
114
68
70
72
56

Fig. 6

Fig. 7

Page 8 of

8/20/2023 11:48:52

SAppx454

U.S. Patent Apr. 20, 2021 Sheet 5 of 13 US 10,984,619 B2

68
72
70
56

Fig. 8

Page 9 of

8/20/2023 11:48:52

SAppx455

U.S. Patent Apr. 20, 2021 Sheet 6 of 13 US 10,984,619 B2

32
INTERNET CONNECTION
34
GPS CONNECTION
36
POWER SOURCE
10
22
42
58
62
64
66
44
44
28
12
26
56
52
48
46
54
54
46
50
52
46

Fig. 9

Page 10 of

8/20/2023 11:48:52

SAppx456

U.S. Patent Apr. 20, 2021 Sheet 7 of 13 US 10,984,619 B2

38
22
12
26
30
26
32
34
36
38
24
76
AGENT DETECTED?
NO
YES
80
SOUND ALARM
82
LIGHT ALARM
74
40
CPU
84
READINGS
86
RESET
78
SENSING MODE
STOP

Fig. 10

Fig. 11

Page 11 of

8/20/2023 11:48:52

SAppx457



U.S. Patent Apr. 20, 2021 Sheet 8 of 13 US 10,984,619 B2

76
88
AGENT DETECTED?
NO
YES
82
LIGHT ALARM
80
SOUND ALARM
84
READINGS
90
DETECTOR RESET
78
SENSING MODE
STOP
Fig. 12
76
46
DETECTOR
40
12
CASE
92
94
LOCK/DISABLE LOCK SIGNAL
96
DISARM AND RESET
98
DETECTION MODE
Fig. 13

Page 12 of

8/20/2023 11:48:52

SAppx458

U.S. Patent Apr. 20, 2021 Sheet 9 of 13 US 10,984,619 B2

46
DETECTOR
100
40
CASE
12
DISABLER
62
102
AUTHORIZED FINGERPRINT?
NO
YES
104
DISABLE AND DISARM
ACCESS DENIED
RESET
106
101
DETECTION MODE
108
110
112
WATCHTOWER
116
DETECTION MODE
118
NO
AGENT DETECTED?
YES
LIGHT ALARM INDICATOR
42
114
MONITORING TERMINAL
120
LOCK/DISABLE SIGNAL
122
CLEANUP MEASURES
124
RESET
116
DETECTION MODE

Fig. 14

Fig. 15

Page 13 o

8/20/2023 11:48:52

SAppx459

U.S. Patent Apr. 20, 2021 Sheet 10 of 13 US 10,984,619 B2

136
126
140
144
128
146
134
132
142
130
138

Fig. 16

Page 14 of

8/20/2023 11:48:52

SAppx460



152
158
154
156
170
INTERNET CONNECTION
172
GPS CONNECTION
150
164
POWER SOURCE
174
160
186
168
166
162
176
184
178
180
182

Fig. 17



U.S. Patent Apr. 20, 2021 Sheet 12 of 13 US 10,984,619 B2

204
210
187b
206
187a
214
206
212
190
216
208
202
196
194
200
198
192
138
188

Fig. 18

Page 16 (

8/20/2023 11:48:52

SAppx462

U.S. Patent Apr. 20, 2021 Sheet 13 of 13 US 10,984,619 B2

204
220
187a
187b
218
190
224
222
202
196
194
200
198
192
138
188

Fig. 19

Page 17 of 26

8/20/2023 11:48:52

SAppx463

# MULTI SENSOR DETECTION, STALL TO STOP, AND LOCK DISABLING SYSTEM

## CROSS REFERENCE TO RELATED APPLICATION

This application is a continuation application and claims the filing date and benefit of U.S. patent application Ser. No. 15/530,839 titled "Multi Sensor Detection, Stall to Stop, and Lock Disabling System" filed on Mar. 6, 2017, the entire contents and complete subject matter of which is incorporated by reference herein in its entirety for all purposes. U.S. patent application Ser. No. 15/530,839 issued as U.S. Pat. No. 10,163,287, is a continuation application and claims the filing date and benefit of U.S. patent application Ser. No. 14/806,988 filed on Jul. 23, 2015, issued as U.S. Pat. No. 9,589,439, and incorporates the entire contents and complete subject matter therein by reference in their entirety for all purposes. U.S. patent application Ser. No. 14/806,988 is a continuation application and claims the filing date and benefit of U.S. patent application Ser. No. 14/021,693 filed on Sep. 9, 2013, issued as U.S. Pat. No. 9,096,189, and incorporates the entire contents and complete subject matter therein by reference in their entirety for all purposes. U.S. patent application Ser. No. 14/021,693 is a continuation application and claims the filing date and benefit of U.S. patent application Ser. No. 13/288,065 filed on Nov. 3, 2011, issued as U.S. Pat. No. 8,531,280, and incorporates the entire contents and complete subject matter therein by reference in their entirety for all purposes. U.S. patent application Ser. No. 13/288,065 is a divisional application and claims the filing date and benefit of U.S. patent application Ser. No. 12/802,001 filed on May 27, 2010, issued as U.S. Pat. No. 8,334,761, and incorporates the entire contents and complete subject matter therein by reference in their entirety for all purposes. U.S. patent application Ser. No. 12/802,001 is a continuation application and claims the filing date and benefit of U.S. patent application Ser. No. 12/657,357 filed on Jan. 20, 2010, issued as U.S. Pat. No. 8,106,752, and incorporates the entire contents and complete subject matter therein by reference in their entirety for all purposes. The present application also claims the filing dates and benefits of and incorporates the entire contents of U.S. patent application Ser. Nos. 14/806,988; 14/021,693; 13/288,065; 12/802,001; 12/657,356, 12/155,573, issued as U.S. Pat. No. 7,636,033, and Ser. No. 11/397,118, issued as U.S. Pat. No. 7,385,497, herein by reference for all purposes.

## FIELD OF THE INVENTION

The present invention pertains to anti-terrorist detection and prevention systems, and more particularly pertains to a disabling lock mechanism combined with a chemical/biological/radiological detection system for use with products grouped together by similar characteristics in order to prevent unauthorized entry, contamination and terrorist activity.

## BACKGROUND

Terrorist activity is a continuous, daily, worldwide threat to the stability, prosperity, security and peace within nations and between and among nations. Its danger lies in its arbitrary destructiveness as much as in its unpredictability, and the constant threat of terrorist activity compels measures and actions that cause strain and contention in free, democratic societies as security concerns and civil liberty con-

cerns must be balanced so that both public safety and civil liberties are maintained. Safety and security concerns can be addressed through numerous proactive steps and measures, many of which cause only minimal interference with and disruption of the daily routines of work, travel, commerce and entertainment. However, because modern industrial societies afford almost limitless places, locations, and opportunities for terrorist activities, no safety measure or security protocol will be foolproof, but many security measures, systems and protocols can be implemented that greatly minimize specific threats through fingerprint identification procedures, chemical, biological, and radiological hazard detections, bomb and explosive detection, and controlling the access to everything from shipping containers to school lockers. Thus, the prior art discloses a wide range of security measures and systems.

For example, the Fishbine et al. patent (U.S. Pat. No. 4,792,226) discloses an optical fingerprinting system that includes an optics/processor unit, a video monitor, a data terminal, and a printer for collecting and storing data characteristics of all ten individual fingerprints for printing demographic information and fingerprint images as desired on a standard booking or applicant card.

The Schiller patent (U.S. Pat. No. 4,544,267) discloses a finger identification unit that includes a fingerprint scanning apparatus using a collimated beam of light to interrogate the fingerprint of a finger placed against a platen so that successive scan positions produce signals containing fingerprint information.

The Fishbine et al. patent (U.S. Pat. No. 5,222,152) discloses a portable fingerprint scanning apparatus for optically scanning and recording fingerprint images and wirelessly transmitting such images to a mobile processing unit for verification and background checking.

The Lougheed et al. patent (U.S. Pat. No. 5,233,404) discloses an optical scanning apparatus that uses a linear charge coupled device (CCD) for recording the image of a fingerprint on the viewing surface.

The Groger et al. patent (U.S. Pat. No. 5,766,956) discloses a diode laser based sensor for undertaking optical, chemical, immunological or nucleic acid-based assay or other chemical analysis.

The Feldman patent (U.S. Pat. No. 5,938,706) discloses a multi element security system for preventing the unauthorized use of an automotive vehicle, and which includes numerous locking and control features interconnected to an onboard cpu.

The Bowker et al. patent (U.S. Pat. No. 5,963,657) discloses a safety access control for doors, handles, locks, etc., wherein the surface relief of a finger is read and verified to either allow or prevent access by the individual to the door, handle, lock, etc.

The Bonder et al. patent (U.S. Pat. No. 6,078,265) discloses a fingerprint identification security system wherein a key lock operated security system utilizes the fingerprint of the individual to control user access to the security system, such as the ignition system of an automotive vehicle.

The Anzai et al. patent (U.S. Pat. No. 6,271,745 B1) discloses a keyless authorization system for use of a motor vehicle that includes fingerprint reading units located on the exterior or interior of the motor vehicle and which are coupled to a control unit for scanning, comparing and matching fingerprints to allow or disallow access to the motor vehicle.

The Hwang patent (U.S. Pat. No. 6,374,652 B1) discloses a fingerprint-activated doorknob in which a detecting sensor for a fingerprint is placed on the doorknob for measuring and

searching the fingerprint against previously stored fingerprint inputs to control access to the door.

The Vor Keller et al. patent (U.S. Pat. No. 6,588,635 B2) discloses a safety holster for a firearm that includes a pivotally mounted retaining member and a fingerprint sensor for scanning fingerprint information so that only authorized users can withdraw the firearm from the holster.

The Cordery et al. patent (U.S. Pat. No. 6,613,571 B2) discloses a method and system for detecting biological and chemical hazards in the mail that includes sensors placed within the mail box for sampling and testing ambient air and so that mail can be safely transported through the mail system.

The Nagata patent (U.S. Pat. No. 6,628,213 B2) discloses a coding method for digital signal coding and decoding that includes a CMI (code-marked inversion) method of signal coding.

Nonetheless, despite the ingenuity of the above devices, methods, and systems, there remains a need for a multi-detector and disabling lock system for use with various types of products collected together by common characteristics into product groupings for detecting chemical, biological and radiological agents and compounds and for selectively disabling and activating the product locks thereby preventing unauthorized entry and further contamination and preventing and thwarting terrorist activities.

## SUMMARY

The present invention comprehends a chemical/biological/radiological detector unit with a disabling locking system for protecting products that can be grouped into several product groupings, from terrorist activity, and also for preventing unauthorized access to and tampering with the storage and transport of ordnance and weapons. The products grouped into what may be referred to as Product grouping 1 include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes and lockers; while the products grouped into what may be referred to as Product grouping 2 include, but are not limited to, chemical, biological, radiological, and nuclear detectors, motion sensors and door sensors. The multi sensor detection system includes the capability to disable an existing lock or activate a lock located inside any of the products named in the product grouping categories upon activation of a sensor or detector included in the system. This is a significant feature for the multi sensor detection system as it prevents unauthorized, unequipped and untrained entry and access to the product thus preventing further contamination of the site and to individuals in the area.

The multi sensor detection and lock disabling system includes a detector case sized to fit in, upon or adjacent any of the aforedescribed products for detecting harmful and dangerous chemical, biological, and radiological agents, compounds and elements. In addition, the multi sensor detection and lock disabling system is capable of transmitting a signal to lock or disable a lock on the product, and is also capable of transmitting signals to a monitoring computer terminal or PC so that appropriate defensive and safeguarding actions can be undertaken and an authorized individual can disarm and reset the locking system and the multi sensor detection system. The detector case includes a power source (battery or electrical), interior compartments, Internet and GPS connections and a cpu interconnected with the Internet and GPS connections, and also interconnected with one or more off site monitoring computer terminals or PCs. The detector case includes one or more light alarm indicators that are externally visible and that light up when the chemical, biological, or radiological agent or compound is detected, and the light alarm indicators (which can be indicator lights or panels on the front of the detector case) can be color coded for denoting the specific agent or compound detected, i.e., separate and distinct colors for indicating detection of the chemical, biological, or radiological agent or compound.

The detector case is designed to hold within the interior compartments one or more interchangeable detectors, and each detector is adapted and set up to sample a specific compound or agent. Each detector includes a sound alarm, a sensor, a light alarm, and a readings panel, and is electrically interconnected (either by wire or wirelessly) to the cpu of the detector case so that information regarding the detection of the particular agent or compound can be conveyed from the detectors to the detector case cpu. Each detector can also be used as a manual, stand-alone hand held scanner.

The multi sensor detection and lock disabling system can be interconnected to a surveillance watchtower, as well as monitoring computer terminals or PCs, with the watchtower scanning shipping and cargo crates and containers being prepared for shipment or sitting for extended periods of time on a dock or at a port, at a railway site, or at an industrial storage facility. The watchtower will scan the cargo and shipping crates and containers for the light alarm indicators on detector cases that are mounted in or upon the crates and containers, and thus continuous security surveillance of the crates and containers can be maintained.

An enhanced version of the multi sensor detection and lock disabling system can be employed to prevent car and vehicle bombings. Coupling the multi sensor detection and lock disabling system with satellite service will enable the detection system to detect explosives and transmit an alert signal by satellite to monitoring equipment at a monitoring site. Upon receiving the alert signal at the monitoring site the monitoring equipment activates a stall-to-stop process for disabling the air, fuel, electrical and/or computer system of the vehicle. Moreover, upon receiving the alert signal at the monitoring site the car or vehicle will be locked by transmission of a satellite signal that disables the vehicle's electrical and ignition system thereby preventing escape of the terrorist.

It is an objective of the present invention to provide a multi sensor detection and disabling lock system for securing news racks and vending machines in order to prevent theft, unauthorized use and terrorist activity.

It is another objective of the present invention to provide a multi sensor detection and disabling lock system for preventing terrorist activity by using products grouped together by common features in several product groupings such as design similarity, similarity in the presentation of security problems and similarity with regard to the presentation of solutions to preventing terrorist solutions.

It is still yet another objective of the present invention to provide a multi sensor detection and disabling lock system that is capable of disabling an existing lock or activating a lock inside any of the products of the product grouping lists when a detector or sensor of the system is activated.

It is still yet a further objective of the present invention to provide a multi sensor detection and disabling lock system wherein the disabling lock system prevents the unauthorized entry, access and further contamination of the products included in the several product groupings.

A still further objective of the present invention is to provide a multi sensor detection and lock disabling system that utilizes a multi-task device for preventing terrorist

activity to vulnerable products that are collected or arranged by product grouping categories.

Yet a further objective of the present invention is to provide a multi sensor detection and disabling lock system to secure cargos and containers, especially cargo and shipping containers, against chemical, biological, radiological and nuclear terrorist activity.

Still another objective of the present invention is to provide a multi sensor detection and disabling lock system capable of detecting chemical, biological and radiological agents and compounds.

Still yet another objective of the present invention is to provide a multi sensor detection and disabling lock system that includes interchangeable detectors that operate in conjunction to detect chemical, biological and radiological agents and compounds.

Still yet a further objective of the present invention is to provide a multi sensor detection and disabling lock system that can be implemented by business or government at a minimum cost by organizing the products to be protected into product grouping categories.

Another objective of the present invention is to provide a multi sensor detection and disabling lock system that accurately and reliably detects harmful agents, compounds and elements, and prevents the placement and storage of weapons and bombs in the range of storage containers and facilities currently available.

Still another objective of the present invention is to provide a multi sensor detection and disabling lock system wherein the interchangeable detectors that comprise part of the system can be used as stand-alone scanners.

These and other objects, features, and advantages will become apparent to those skilled in the art upon a perusal of the following detailed description read in conjunction with the accompanying drawing figures and appended claims.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the primary features of the system which include a detector case, several interchangeable detectors, an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler;

FIG. **2** is a front elevational view of the multi sensor detection and lock disabling system of the present invention illustrating one of the interchangeable detectors first shown in FIG. **1**;

FIG. **3***a* is a top plan view of the multi sensor detection and lock disabling system of the present invention illustrating the mounting of one lock disabler to the lock of a product, such as a container, and disengaged from the lock of the container;

FIG. **3***b* is a top plan view of the multi sensor detection and lock disabling system of the present invention illustrating the engagement of the lock disabler to the lock of the product for locking or disabling the lock of the product so that unauthorized access is prevented;

FIG. **4** is a side elevational view of the multi sensor detection and lock disabling system of the present invention illustrating the detector case mounted to the product, such as the container, with the light alarm indicators externally visible;

FIG. **5** is a schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the interconnection of detector cases with a surveillance watchtower and a monitoring PC terminal;

FIG. **6** is a schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the placement of detector cases upon containers different from the containers of FIG. **5**, and wherein the detectors case are interconnected to a surveillance watchtower and a monitoring PC terminal;

FIG. **7** is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the mounting of one automatic/mechanical lock disabler to the lock of a standalone news rack;

FIG. **8** is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating one interchangeable detector placed within the standalone news rack;

FIG. **9** is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the detector case having color coded front panels for specifically indicating the agents, compounds or elements that have been detected;

FIG. **10** is a rear elevational view of the multi sensor detection and lock disabling system of the present invention illustrating the GPS, Internet and power source connections;

FIG. **11** is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the interconnection of the detector with the detector case and the steps undertaken by the system when an agent or compound is detected;

FIG. **12** is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the sequence of steps undertaken by one detector when functioning as a stand-alone scanner for detecting an agent or compound;

FIG. **13** is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the interconnection of the detector case with the automatic/mechanical lock disabler for activating the lock disabler upon detection by the system of an agent or compound;

FIG. **14** is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating interconnection of the detector case with the fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock as part of the process of detection and safeguarding the public upon detection of the agent or compound;

FIG. **15** is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the incorporation of the system with a surveillance watchtower and a monitoring PC or computer terminal for monitoring containers, such as shipping or cargo containers, that may sit for extended time periods on docks, at rail yards, and at industrial storage facilities;

FIG. **16** is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the integration of the detection system with a satellite and monitoring equipment at a monitoring site for detecting explosives placed in a vehicle and then transmitting signals to the satellite and then to the monitoring site for disabling and locking the vehicle;

FIG. **17** is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the incorporation of the features and elements of the detector case to a cell phone and cell phone case;

FIG. **18** is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the incorporation of a GPS satellite, a monitoring site and a cell phone tower for communicating to and with an

electronic device such as a laptop computer or a cell phone for transmitting signals to a vehicle for activating an onboard stall-to-stop device for bringing the vehicle to a halt; and

FIG. **19** is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the use of a GPS satellite in conjunction with the monitoring site and monitoring equipment to relay commands and signals to the cpu or transceiver of the vehicle for stopping or locking the vehicle in response to a signal that a certain type of event (detection of a bomb, engine failure or malfunction or unauthorized use) has occurred or is in process.

## DETAILED DESCRIPTION OF REPRESENTATIVE EMBODIMENTS

Illustrated in FIGS. **1-19** is a multi-sensor detection and lock disabling system **10** for preventing terrorist activity by monitoring, detecting, and securing those critical areas; sites, and facilities vulnerable to terrorist activity. The first step is the identification of critical areas, sites, locations and facilities that are vulnerable to terrorist activity as convenient places to store and plant explosives and bombs and spread biological, chemical or radiological agents and compounds, followed by the disposition of the multi sensor detection and lock disabling system **10** for monitoring, detecting, and securing the particular location or site. Vulnerable sites, locations, facilities and areas are nearly limitless in their variety; in order to categorize the protection the present invention provides an anti-terrorist product grouping strategy has been developed wherein products made from the same or similar material, products having the same or similar design, and products presenting the same or similar security problems are grouped together with the multi sensor detection and lock disabling system **10** for preventing terrorist activity. For example, two preferred product groupings can be Product Grouping I: cargo containers, shipping containers, cargo planes, freight train cars, tractor trailers, mail carriers (UPS, FedEx), airport lockers, news racks (coin and non-coin operated), mail drop boxes, cluster mail boxes, keyed mail boxes, min-storage houses and buildings, bicycle lockers, stadium lockers, school lockers, cars, trucks, campers, buses, vans and utility vehicles. Product Grouping II: chemical detectors, biological detectors, radiological detectors, nuclear detectors, motion sensors, glass break sensors, plastic film on glass, high security locks, tampering labels, door sensors, disabling locking systems, vehicle detectors and satellite disabling locking systems. In addition to grouping products together by features, designs and materials, the multi sensor detection system **10** includes a lock disabling capability for disabling an existing lock or activating a lock on or inside any of the aforementioned products when a detector or sensor of the system is activated. The lock disabling feature is a crucial component of the invention in so far as it prevents unauthorized, unequipped or untrained individuals from gaining access and entry to the site and causing further contamination of the site.

As shown in FIGS. **1-10**, the multi sensor detection and lock disabling system **10** includes at least one—and preferably many—detector case **12** that can be placed in, on, upon or adjacent the product, such as the shipping containers **14** of FIGS. **4** and **5** resting upon a platform **16** or the cargo container **18** of FIG. **6** sitting upon a seaport dock or pier **20**. The detector case **12** includes a top **22**, a bottom **24**, a pair of opposed sides **26** and a front side or panel **28** and an opposite rear or back side **30**. The rear side **30** has connections or contacts that can include an Internet connection **32**, a GPS connection **34** and a power connection **36** for a power source. The power source for the detector system **10** can be any conventional battery or electrical source. The detector case **12** includes an interior chamber divided into a number of compartments **38** for holding therein agent or compound detection means hereinafter further described. A cpu **40** is mounted within the detector case **12** and electrically interconnects, routes, and transmits signals among items hereinafter further described and also communicates with a monitoring site and monitoring equipment. The front side **28** of the detector case **12** includes indicator means for visually indicating that a specific agent, compound or element has been detected. The indicator means can include color coded indicator lights **42** in panel form, as shown in FIG. **9**, with each indicator light panel **42** lighting up with a specific color corresponding to the detection of a specific agent or compound; or color coded indicator lights **44**, as shown FIG. **1**, that correspond to and individually light up on the detection of a specific agent or compound (chemical, biological, or radiological).

As shown in FIGS. **1**, **2** and **9-13**, the multi sensor detection and lock disabling system **10** includes a plurality of detectors **46** with each detector **46** adapted for and set up to sample for a specific agent or compound (biological, chemical, or radiological); and the detectors **46** are interchangeable for adapting to the needs and demands of future technology. The detectors **46** can also be used as stand-alone scanners. In the preferred embodiment of the invention, at least three detectors **46** are placed within the detector case **12** with one detector **46** for specifically sampling biological agents or compounds, one detector **46** for sampling chemical agents or compounds, and one detector **46** for sampling radiological agents or compounds. The detectors **46** are interconnected to the cpu **40** of the detection system **10** by conventional connections that can be wire or wireless for transmitting the appropriate signals to the cpu **40** upon detection of the particular agent or compound. As shown in FIG. **2**, each detector **46** includes on its front plate or facing surface a sound alarm indicator **48**, a readings panel **50** comprising a plastic shield and LED lights for displaying the various read-out messages, a sensor **52** for detecting the specific agent, element or compound, and a light alarm indicator **54** that can be color coded for each specific agent and which is externally visible when the detector **46** is used as a stand-alone scanner. Each detector **46** includes a conventional microprocessor for controlling the various functions and generating the appropriate signals for transmission to the cpu **40** of the detector case **12**.

As shown in FIGS. **1**, **3*a***, **3*b***, **9**, and **13-15**, used in conjunction with the multi sensor detection and lock disabling system **10** is at least one automatic/mechanical lock disabler **56**—and depending upon the number of products being monitored there can be one lock disabler **56** for each product. The automatic/mechanical lock disabler **56** is physically connected to the detector case **12** by a wire or cable **58** for receiving signals therefrom for disabling an existing lock or activating a lock inside a product to prevent access to the product. By way of example, FIG. **3*a*** shows the automatic/mechanical lock disabler **56** mounted—by any conventional means—to the lock **60** of the shipping container **14** shown in FIGS. **4** and **5** and connected by wire **58** to the cpu **40** of the detector case **12**. The lock disabler **56** is in the non-activated or disengaged state in FIG. **3*a***. FIG. **3*b*** shows the automatic/mechanical lock disabler **56** mounted to the lock **60** of the shipping container **14** and in the activated or engaged state after detection of an agent or

compound by the system **10** thereby for locking or disabling the lock **60** of the shipping container **14** and preventing unauthorized entry and access by unauthorized, untrained and unequipped individuals. In FIGS. **3***a* and **3***b* the lock **60** secures doors of the shipping container **14** that can be slidably or pivotably opened and closed.

In addition to the automatic/mechanical lock disabler **56**, the multi sensor detection and lock disabling system **10** can also utilize a fingerprint biometric lock with disabler **62** as shown in FIGS. **1** and **14**. The fingerprint biometric lock with disabler **62** is interconnected to the cpu **40** of the detector case **12** for receiving transmissions therefrom after detection of an agent or compound has occurred so that the lock on the product can be locked or disabled. Moreover, resetting of the fingerprint biometric lock with disabler **62** occurs when the fingerprint of the individual is placed on the fingerprint-matching pad **64**, and if a match occurs with a known fingerprint stored by the cpu **40**, then the individual can reset the fingerprint biometric lock with disabler **56** by turning the manual lock disabler **66**. The fingerprint biometric lock with disabler **62** is mounted to the lock of the product in a manner similar to the mounting of the automatic/mechanical lock disabler **56** that is shown in FIGS. **3** and **3***b*.

FIGS. **4** and **5** show one manner of disposition or placement of the detector case **12** in relation to the product, i.e., the shipping container **14**, with the color coded indicator lights **42** externally viewable; FIG. **5** shows a number of shipping containers **14** each equipped with a detector case **12** and integrated with elements hereinafter further described for continuously monitoring the shipping containers **14** as they sit for an extended period of time on the truck or rail platform **16**. FIG. **6** illustrates several cargo containers **18** sitting on the shipping dock or pier **20**, with each cargo container **18** having a detector case **12** mounted thereon and integrated with and monitored by elements shown in FIG. **5** and hereinafter further described.

FIG. **7** illustrates a typical product from product grouping I that is monitored by the multi sensor detection and lock disabling system **10** of the present invention; specifically, FIG. **7** shows a news rack **68** with one automatic/mechanical lock disabler **56** mounted to and interconnected with the locking mechanism of the news rack **68**. As long as there is no detection of any agent or compound, the lock disabler **56** is in the disengaged state, and the individual can deposit the coin amount in the chute and then freely open the glass panel **70** by the handle **72** for removing a paper. However, the lock disabler **56** would be activated upon detection of the harmful agent or compound and receipt of a signal from the cpu **40** for locking or disabling the locking mechanism thereby denying access to the interior of the news rack **68** from all untrained, unauthorized and unequipped individuals.

FIG. **8** illustrates one detector **46** disposed within the news rack **68** and which is visible through the panel **70** for detecting one specific agent, compound or element. The detector **46** functions as a stand-alone scanner and can be wirelessly interconnected to offsite monitoring equipment.

FIG. **11** illustrates a representative schematic **74** for describing the signal transmission process from the detector **46** to the cpu **40** of the detector case **12**. The external stimulus **76** would be the chemical, biological or radiological agent or compound. If there is no detection of the agent or compound, the detector **46** will stay in the sensing mode **78**. However, detection of the specific agent will trigger the sound alarm **80** and the light alarm **82**, and instant transmittal of a signal to the cpu **40**. The readings **84** can be stored by the cpu **40** for verification and future review and evaluation. After all the appropriate corrective and preventative measures have been undertaken by the trained and authorized personal, and the site has been cleansed of the contamination, authorized and equipped personal can then reset **86** the system **10**.

FIG. **12** illustrates a representative schematic **88** for the detector **46** when used as stand-alone scanner. The detector **46** undergoes the same essential steps as illustrated in FIG. **11**, with the exception of the signal transmission to the cpu **40**. The detector **46** remains in detection mode **78** until an agent is detected, and then the various functions-light alarm **82**, sound alarm **80**, storage of readings **84**, and, after the appropriate security and safety steps have been carried out by authorized personal, detector reset **90** by authorized personal can occur thereby placing the detector **46** back in detection or sensing mode **78**.

FIG. **13** is a representative schematic **92** that illustrates the steps undertaken by the system **10** to lock or disable a lock, such as the lock **60** for the shipping container **14** shown in FIGS. **3***a* and **3***b*. Upon detection of the agent (chemical, biological, radiological) the alarm light indicators **42** or **44** will light up providing external indication that an agent has been detected. In addition, the system **10**—the cpu **40**—will transmit a lock/disable lock signal **94** to the automatic/mechanical lock disabler **56** to lock or disable the lock on the product, such as the lock **60** on the shipping container **14** of FIGS. **3***a*-**5**. This prevents unauthorized, unequipped, or untrained individuals from entering or gaining access to the product for which a dangerous and perhaps lethal agent has been detected. After the proper authorities and authorized personal have been notified and all the appropriate security, preventative and clean up measures have been undertaken, the authorized individual can perform the disarm and reset function **96** for the system **10** placing the system **10** in back in the detection mode **98**.

FIG. **14** is a representative schematic **100** illustrating the use of the fingerprint biometric lock with disabler **62** with the system **10**. Upon detection of the agent or compound by the detector, the various alarms would sound and light up (shown in previous figures), and the cpu **40** would then transmit a signal to the fingerprint biometric lock with disabler **62** to lock or disable the lock on the product, such as the lock **60** on the shipping containers **14** shown in FIGS. **3***a*-**5**. The shipping containers **60** would remain locked and in an access denied mode **101** should an attempt be made to gain access to the container **60** by opening the lock **60** with an unauthorized fingerprint. However, a fingerprint that matches stored and authorized fingerprints **102** would indicate an authorized individual, and would allow the individual to disable and disarm **104** the lock **60** of the shipping container **14**. The fingerprint biometric lock with disabler **62** would then be reset **106** after the appropriate safety, cleanup, and protection measures are completed, and the system **10** would be reset and placed back in the detection mode **108**.

FIG. **15** is a schematic representation **110** that illustrates the integration of a surveillance watchtower **112** and a monitoring terminal or PC **114** for monitoring products such as the shipping containers **14** or cargo containers **16** that sit for extended periods of time of docks, piers **20**, truck terminals, rail yards, shipping platforms **16** and industrial sites as shown in FIGS. **5** and **6**. The watchtower **112** would maintain continuous surveillance over a number of shipping containers **60**, for example, with detector cases **12** mounted in or on each container **14** and set in detection mode **116** with one or more detectors **46** disposed in each detector case **12**. The watchtower **112** would continuously scan for light alarm indicators **42** and **44** on the products, such as the containers

14 or 18, and the watchtower 112 would be interconnected and integrated with the monitoring terminal or PC 114. Upon detection 118 of an agent or compound in one or more of the shipping containers 14, the appropriate light alarm indicators 42 or 44 would light providing visible confirmation of the detection of the specific agent or compound. The cpu 40 would transmit a lock/disable signal 120 to the lock 60 on each respective shipping container 14 to lock or disable the lock 60 thus preventing access to that respective shipping container 14. In addition, signal transmissions would be sent to the monitoring terminal or PC 114 (which could be off site) thereby alerting authorized security personal of the contamination event. With the information received at the monitoring terminal 114, authorized personal would then be notified and dispatched to the area to undertake the appropriate safety and cleanup measures 122. Such measures would also include disarming the lock disabling system in order to gain access to the shipping container 14. After all the cleanup and security measures are completed by the trained and properly equipped authorities, the detection system and the lock disabling feature would reset 124 and the detection system would again be placed in detection mode 116.

FIG. 16 is a schematic representation 126 that illustrates an enhanced version of the multi sensor detection and lock disabling system 10 for preventing car and vehicle attacks and bombings. The lock disabling system 10 would be interconnected to the locking system and mechanism 128 of the vehicle 130. In addition, a stall to stop disabling link 132 can be made with the fuel, air, and electrical system 134 of the vehicle 130. The enhanced version incorporates a satellite 136 for signal receipt and transmission from the vehicle 130 in which the detector system 10 is placed to a monitoring site and monitoring equipment 138. As shown in FIG. 16, a detection signal 140 would be sent to the satellite 136 by the detection system 10 upon detection of a bomb or explosive 142 hidden in the vehicle 130. The satellite 136 would then transmit an alert signal 144 to the monitoring site 138 with the signal 144 containing the relevant data to evaluate the nature of the threat. The monitoring site 138 would then transmit a stall to stop signal 146 to the detection system 10 to lock the vehicle 130 and/or disable the electrical system of the vehicle 130 thereby disabling the vehicle 130, preventing access to the vehicle 130 by locking the vehicle 130, and preventing any terrorist in the vehicle 130 from escaping.

The detector case 12 can be modified and adapted for inclusion with cell phone cases, satellite cell phone cases, laptop cases, notebook PC cases, PDA cases, carry-on cases, suitcases; and briefcases. In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring.

The system 10 and the watchtower 112, along with the satellite 136 and the monitoring site 138 can be adapted or incorporated with cell phone towers and satellites for use with satellite communication and/or a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, or a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween. The aforementioned telecommunication and radio communication means can be interactive with any type of motive vehicle that includes but is not limited to cars, trucks, vans, SUVs, trains, subways, boats, ships and airplanes, and which is reported stolen, experiences a loss of brakes, or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted to the vehicle and which detection causes an automatic signal transmission or a signal transmission is activated when a call is made to the monitoring station by an authorized person. The authorized individual includes but is not limited to the owner, pilot, conductor, captain, police highway patrol, security guard and military personnel to the monitoring equipment for activating a vehicle slowdown or stall-to-stop disabling system that similar to the disabling system 126 shown in FIG. 16, or incorporating features of the system 126 shown in FIG. 16, from the monitoring equipment to the vehicle. The activation of the stall-to-stop disabling means or the vehicle slowdown disables or engages the computer, electrical, fuel and air systems of the vehicle or a combination of the computer, electrical, fuel and air systems that include but are not limited to the brakes, foot peddle, lights, speed controls, ignition, steering, transmission, and the horsepower of the motor.

In addition, the basic stall-to-stop disabling means or the vehicle slowdown means and device can be adapted, modified or designed to include: an open bust or open platform for integrating any new and innovative technology; warning lights indicators; sound alarm indicators; voice alarm indicators; a cell phone to transmit to the vehicle a signal for slowing and halting the vehicle; and a lock disabling system or means to lock a thief or terrorist inside the vehicle after a transmission is received or sent. Open bust or open platform also refers to the compatibility of the detector case 12, or the incorporation of its features in cell phone cases, satellite cell phone cases, laptop cases, notebook PC cases, PDA cases, carry-on cases, briefcases, and suitcases, etc., with other communication, transmission and surveillance systems whereupon the detector case 12, and its features, can be seamlessly integrated with other new and emerging systems and technologies.

Thus, as shown more specifically in FIG. 17, by way of a representative example the features and elements of the detector case 12 are shown as being incorporated into cell phone detector case 150 and associated cell phone monitor 152. The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174. The power source for the cell phone detector case 150 can be any conventional rechargeable battery source or standard electrical power from a standard electrical receptacle or outlet.

As shown in FIG. 17, the cell phone detector case 150 includes one or more sensor/detector units, cells, or components 176 built into and incorporated into the case 150. The detector 176 includes generally disposed at the front 162 of the case 150 the following types of indicators: a sound alarm indicator 178, a readings panel 180, a sensor 182 for detecting one or more specific types of agents, elements, chemicals, compounds, etc., and a light alarm indicator 184. The sensor/detector 176 will be interconnected to the power source 174. In addition, mounted on and externally visible on the sides 168 or front 162 of the case 150 are a plurality of color coded indicator lights 186 with

each light **186** corresponding to a specific agent, element, chemical, compound, etc., and lighting up when that agent is detected by the sensor/detector **176**. The color coded indicator lights **186** will be electrically interconnected to the sensor/detectors **176** via any standard microprocessor. The cell phone detector case **150** and cell phone monitor **152** thus comprise a hand-held, easily portable and transportable detection means that is both effective and unobtrusive in its disposition and use.

FIGS. **18** and **19** illustrate representative examples of the integration of portable electronic communication or telecommunication devices such as a cell phone **187***a* and/or a laptop computer **187***b* with the monitoring equipment **138** located at a predesignated monitoring site **188**, and operating in conjunction with either a satellite and/or a cell phone tower **190** to transmit and receive signals and commands among each other and to a vehicle **192**, such as a truck, as part of a stall-to-stop disabling system for slowing and stopping the vehicle **192** and locking a thief, terrorist, or unauthorized individual in the vehicle **192** if needed. A wide range of events can trigger and initiate the stall-to-stop system and the locking or lock disabling system and mechanism, and the event doesn't have to be limited to the detection of a bomb or a chemical, biological, or radiological agent, element, or compound. The events can include, but is not limited to, detection of an engine problem to engine failure to the unauthorized use (stealing) of the vehicle **192**. The vehicle **192** includes an electromotive system **194** that comprises, among other components, an onboard computer(s), electrical, fuel and air systems, as well as brakes, ignition, steering, and transmission. Also integrated with and capable of communicating with the vehicle's **192** electromotive system **194** is a stall-to-stop system while a lock disabling mechanism **196** is able to engage and disengage or disable the vehicle's **192** locking mechanism **198** upon receipt of the appropriate commands via a lock disabling communication channel or link **200**. This link **200** can also accommodate the stall-to-stop system commands and signals, and thus is a multi-channel communication link. A CPU or a transceiver **202** is programmed to receive signals from the cell phone tower **190** and/or to a GPS satellite **204** and is interconnected with the stall-to-stop system and the lock disabling system **196** via link **200** for engaging the electromotive system **194** and actuating the lock disabling system **196** to stop the vehicle **192** and lock inside the vehicle **192** anyone such as a thief, terrorist or other unauthorized individual.

A representative example for stopping, disabling, and locking the vehicle **192** that utilizes the cell phone tower **190** wherein the activation and/or distress signal **206** originates from the cell phone **187***a* or the laptop **187***b* and such activation signal **206** travels to the cell phone tower **190** that is nearest the current location of the vehicle **192**. A signal **208** is then transmitted to the monitoring site **188** and specific monitoring equipment **138** that can also include but is not limited to cell phones, laptops, desktop PC's, notebook PCs and LCD monitors. The monitoring site **138** then communicates by signal **210** to the GPS satellite **204** that an original or activation signal has been received and then the GPS satellite **204** locates and communicates by multiplex signal **212** with the CPU or transceiver **202** on the vehicle **192** and exchanges information on the type of problem, situation, location, and vehicle speed. The monitoring equipment **138** then transmits a signal **214** to the cell phone tower **190** that communicates with the transceiver **202** and/or CPU of the vehicle **192** to initiate or execute any commands that will actuate the stall-to-stop disabling link **200** and lock disabling system **196** for bringing the vehicle **192** to a halt and actuating the vehicle's **192** locking mechanism **198** for locking the thief, terrorist, or other unauthorized person inside the vehicle **192** if needed.

FIG. **19** illustrates a representative example wherein the stall-to-stop system and the lock disabling system **196** are utilized in conjunction with the GPS satellite **204**. In FIG. **19** a signal has traveled to the satellites nearest the vehicle's **192** current location and then the signal **218** has traveled to the monitoring equipment **138** and monitoring site **188** which can include but is not limited to satellite cell phones, satellite monitors, cell phones, laptops, desktop PC's, notebook PC's, and LCD monitors. The GPS satellite **204** then locates and communicates with the CPU and/or transceiver **202** on the vehicle **192** via a multiplex (two-way) signal **220** in order to exchange information on such distress and danger event parameters as the specific problem situation, location, and vehicle speed. The monitoring equipment **138** then transmits a signal **222** back to the GPS satellite **204** that in turn communicates via another signal **224** with the CPU and/or transceiver **202** to execute any commands to the stall-to-stop system for executing the disengagement of the vehicle's **192** electromotive system **194** for bringing the vehicle **192** to a halt and for actuating the lock disabling system **196** to direct the lock disabling link **200** to actuate the locking mechanism **198** thereby locking the vehicle **192** and anyone inside the vehicle **192**.

The present invention comprehends a chemical/biological/radiological/nuclear/explosive/human/contraband detector unit with a disabling locking system for protecting products that can be grouped into several product groupings, from terrorist activity, and also for preventing unauthorized access to and tampering with the storage and transport of ordnance and weapons. The products grouped into what may be referred to as Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars, United Parcel Services™ (UPS™), Federal Express™ (FedEx™), airport lockers, news racks (coin and non-coin operated), mail drop boxes, cluster mail boxes, keyed mail boxes, min-storage houses and buildings, bicycle lockers, stadium lockers, school lockers, cars, trucks, campers, buses, vans, unmanned aerial vehicles (UAVs), unmanned ground vehicles (UGVs), and utility vehicles; the products grouped into what may be referred to as Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, door sensors, speed sensors, biometric sensors, glass break sensors, plastic film on glass, high security locks, tampering labels, door sensors, disabling locking systems, vehicle detectors and satellite disabling locking systems, detection of humans, detection of contraband, temperature, and shock levels; the products grouped into what may be referred to as Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, satellite cell phone cases, laptop cases, notebook PC cases, PDA cases, carry-on cases, suitcases, eyeglass, briefcases, detector cases of locks, detector cases of tags, detector cases that is mounted to, detector cases that is affixed to, detector cases that is outside of, detector cases that is inside of, and detector cases that is adjacent to; the products grouped into what may be referred to as Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless

communication devices, monitoring sites, monitoring terminals, web servers, desktop personal computers (PCs), notebook personal computers (PCs), laptops, satellite cell phones, cell phones, Universal Mobile Telecommunications System (UMTS) phones, personal digital assistants (PDAs), liquid crystal display (LCD) monitors, and satellite monitoring, remote control key fobs, two-way communication key fobs, handhelds; the products grouped into what may be referred to as Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, Cellular, Satellite, Telematics, Wide Area Network (WAN), Wireless Wide Area Network (WWAN), Local Area Network (LAN), Radio Frequency (RF), Broadband Wireless Access (BWA), Global Positioning System (GPS), General Packet Radio Services (GPRS), Global System for Mobile (GSM), Wideband Code Division Multiple Access (W-CDMA), Universal Mobile Telecommunications System (UMTS), Short Message Service (SMS); the products grouped into what may be referred to as Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature. the products grouped into what may be referred to as Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel. The multi sensor detection system includes the capability to disable an existing lock or activate a lock located inside or outside any of the products named in the product grouping categories upon activation of a sensor or detector included in the system. This is a significant feature for the multi sensor detection system as it prevents unauthorized, unequipped and untrained entry and access to the product thus preventing further contamination of the site and to individuals in the area.

While the invention has been shown and described in a preferred embodiment, it will be apparent to those skilled in the art that numerous alterations, modifications, and variations will possible and practicable without departing from the spirit and scope of the invention as set forth by the appended claims.

What is claimed:

1. A communication device that is at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, comprising at least a central processing unit (CPU), capable of:

processing instructions to lock, unlock, or disable the lock of the communication device;

processing instructions to activate a lock, unlock, or disabling lock means by engaging a vehicle with a two-way communication key-fob;

processing instructions to activate a start, stall, stop, or disabling means by engaging a vehicle's ignition system;

processing instructions to activate a lock, unlock, or disabling lock means; a start, stall, stop, or disabling vehicle means by engaging the operational systems of the unmanned aerial vehicle;

processing instructions to authenticate or identify a user by at least one of biometric fingerprint recognition, biometric facial recognition, biometric iris recognition, or biometric retina recognition;

processing instructions to scan a senor or tag using the short-range wireless technology of radio frequency near-field communication (NFC);

processing instructions to monitor or detect at least one of a chemical sensor, a biological sensor, a motion sensor, a biometric sensor, a signature sensor, or a human sensor;

processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs);

processing instructions received through at least one of a Bluetooth, a Wi-Fi, a satellite, a global positioning system (GPS), or a cellular transmission;

processing instructions to connect the communication device to the internet or internet-of-things (IoTs) platform to sync, to at least one of a building's computer or security system, a vehicle's computer or security system, a lock, a detection device, or another communication device; and,

whereupon, the communication device is capable of processing instructions for operational and functional execution, and is capable of providing feedback of the execution, and storing the feedback into memory.

2. The communication device of claim 1, comprising at least a central processing unit (CPU), capable of processing operational instructions for at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner.

3. The communication device of claim 1, comprising at least a central processing unit (CPU), capable of receiving a signal to lock, unlock, or disable the lock of the communication device.

4. The communication device of claim 1, comprising at least a central processing unit (CPU), capable of receiving a signal of at least fingerprint recognition, facial recognition, iris recognition, or retina recognition.

5. The communication device of claim 1, comprising at least a central processing unit (CPU), capable of receiving a signal of at least short-range wireless radio frequency near-field communication (NFC).

6. The communication device of claim 1, comprising at least a central processing unit (CPU), capable of receiving a signal from at least chemical sensor, biological sensor, motion sensor, biometric sensor, signature sensor, or human sensor.

7. The communication device of claim 1, comprising at least a central processing unit (CPU), capable of receiving a signal from at least one of chemical, biological, radiological, nuclear, or explosives detection.

8. The communication device of claim 1, comprising at least a central processing unit (CPU), capable of receiving a signal through at least a Bluetooth, a Wi-Fi, a satellite, a cellular, or GPS connection.

9. The communication device of claim 1, comprising at least a central processing unit (CPU), capable of receiving a signal of the communication device connection to the internet or internet-of-things (IoTs) platform to sync at least a building's computer or security system, a vehicle's computer or security system, a lock, a detection device, or another communication device.

10. The communication device of claim 1, comprising at least a central processing unit (CPU), capable of receiving a signal of the operational and functional execution of instruc-

tions; capable of providing feedback of the execution; and, capable of storing the feedback into memory.

11. A central processing unit (CPU) of at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, capable of:

processing instructions to lock, unlock, or disable the lock of the communication device;

processing instructions to activate a lock, unlock, or disabling lock means by engaging a vehicle with a two-way communication key-fob;

processing instructions to activate a start, stall, stop, or disabling means by engaging a vehicle's ignition system;

processing instructions to activate a lock, unlock, or disabling lock means; a start, stall, stop, or disabling vehicle means by engaging the operational systems of the unmanned aerial vehicle;

processing instructions to authenticate or identify a user by at least one of biometric fingerprint recognition, biometric facial recognition, biometric iris recognition, or biometric retina recognition;

processing instructions to scan a senor or tag using the short-range wireless technology of radio frequency near-field communication (NFC);

processing instructions to monitor or detect at least one of a chemical sensor, a biological sensor, a motion sensor, a biometric sensor, a signature sensor, or a human sensor;

processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs);

processing instructions received through at least one of a Bluetooth, a Wi-Fi, a satellite, a global positioning system (GPS), or a cellular transmission;

processing instructions to connect the communication device to the internet or internet-of-things (IoTs) platform to sync, to at least one of a building's computer or security system, a vehicle's computer or security system, a lock, a detection device, or another communication device; and,

whereupon, the central processing unit (CPU) of the communication device is capable of processing instructions for operational and functional execution, and is capable of providing feedback of the execution, and storing the feedback into memory.

12. The central processing unit (CPU) of claim **11**, capable of processing operational instructions for at least one of a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner.

13. The central processing unit (CPU) of claim **11**, capable of processing operational instructions to lock, unlock, or disable the lock of the communication device.

14. The central processing unit (CPU) of claim **11**, capable of processing operational instructions of at least fingerprint recognition, facial recognition, iris recognition, or retina recognition.

15. The central processing unit (CPU) of claim **11**, capable of processing operational instructions from short-range wireless radio frequency near-field communication (NFC).

16. The central processing unit (CPU) of claim **11**, capable of processing operational instructions from at least chemical sensor, biological sensor, motion sensor, biometric sensor, signature sensor, or human sensor.

17. The central processing unit (CPU) of claim **11**, capable of processing operational instructions from at least chemical, biological, radiological, nuclear, or explosives detection.

18. The central processing unit (CPU) of claim **11**, capable of processing operational instructions through at least a Bluetooth, a Wi-Fi, a satellite, a cellular, or GPS connection.

19. The central processing unit (CPU) of claim **11**, capable of processing operational instructions of the communication device connection to the internet or internet-of-things (IoTs) platform to sync at least a building's computer or security system, a vehicle's computer or security system, a lock, a detection device, or another communication device.

20. The central processing unit (CPU) of claim **11**, capable of processing operational instructions of functional execution of instructions; capable of providing feedback of the execution; and, capable of storing the feedback into memory.

* * * * *

# Exhibit J



US010163287B2

(12) **United States Patent**
**Golden**

(10) **Patent No.:** **US 10,163,287 B2**
(45) **Date of Patent:** **Dec. 25, 2018**

(54) **MULTI SENSOR DETECTION, STALL TO STOP AND LOCK DISABLING SYSTEM**

(71) Applicant: **Larry Golden**, Greenville, SC (US)

(72) Inventor: **Larry Golden**, Greenville, SC (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **15/530,839**

(22) Filed: **Mar. 6, 2017**

(65) **Prior Publication Data**

US 2017/0186259 A1 Jun. 29, 2017

**Related U.S. Application Data**

(60) Continuation of application No. 14/806,988, filed on Jul. 23, 2015, now Pat. No. 9,589,439, which is a continuation of application No. 14/021,693, filed on Sep. 9, 2013, now Pat. No. 9,096,189, which is a continuation of application No. 13/288,065, filed on Nov. 3, 2011, now Pat. No. 8,531,280, which is a (Continued)

(51) **Int. Cl.**
***G08B 27/00*** (2006.01)
***G07C 9/00*** (2006.01)
***B60R 25/24*** (2013.01)
***B60R 25/04*** (2013.01)

(52) **U.S. Cl.**
CPC .......... ***G07C 9/00174*** (2013.01); ***B60R 25/04*** (2013.01); ***B60R 25/24*** (2013.01); ***G07C 9/00007*** (2013.01); ***G07C 9/00563*** (2013.01)

(58) **Field of Classification Search**
CPC .. G07C 9/00; G07C 9/00007; G07C 9/00174; G07C 9/00309; G07C 9/00388; G07C 9/00563; G08B 27/00; G08B 27/005; G08B 27/006; B60R 25/018; B60R 25/04; B60R 25/10; B50R 25/102
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,385,469 A 5/1983 Scheuerpflug et al.
4,544,267 A 10/1985 Schiller
(Continued)

OTHER PUBLICATIONS

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/199,853; copyright and dated Jan. 13, 2012, pp. 1-34, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; U.S. Appl. No. 13/288,065 (34 pages).
(Continued)

*Primary Examiner* — Van Trieu

(57) **ABSTRACT**

A multi sensor detection and disabling lock system includes detector cases for holding interchangeable detectors that sample for chemical, biological and radiological compounds, agents and elements, with each detector case disposed in or upon the monitored product. The detector case transmits detection information to a monitoring computer terminal and transmits a signal to a lock disabler engaged to the product to lock or disable the product's lock thereby preventing untrained, unauthorized and unequipped individuals from gaining access and entry to the product, and also preventing further contamination of the area. The detection system can be interconnected to surveillance towers scanning detector cases disposed at seaport docks, freight depots and rail terminals for monitoring containers being prepared for shipment or sitting on docks for long periods of time.

**6 Claims, 13 Drawing Sheets**

**Related U.S. Application Data**

division of application No. 12/802,001, filed on May 27, 2010, now Pat. No. 8,334,761, which is a continuation of application No. 12/657,356, filed on Jan. 20, 2010, now Pat. No. 8,106,752, which is a continuation of application No. 12/155,573, filed on Jun. 6, 2008, now Pat. No. 7,636,033, which is a continuation-in-part of application No. 11/397,118, filed on Apr. 5, 2006, now Pat. No. 7,385,497.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,586,441 A 5/1986 Zekich
4,792,226 A 12/1988 Fishbine et al.
5,222,152 A 6/1993 Fishbine et al.
5,223,844 A 6/1993 Mansell et al.
5,233,404 A 8/1993 Lougheed et al.
5,557,254 A 9/1996 Johnson et al.
5,682,133 A 10/1997 Johnson et al.
5,766,956 A 6/1998 Groger et al.
5,938,706 A 8/1999 Feldman
5,959,529 A 9/1999 Kail
5,963,657 A 10/1999 Bowker et al.
5,986,543 A 11/1999 Johnson
5,990,785 A 11/1999 Suda
6,049,269 A 4/2000 Byrd et al.
6,078,265 A 6/2000 Bonder et al.
6,262,656 B1 7/2001 Byrd et al.
6,271,745 B1 8/2001 Anzai et al.
6,374,652 B1 4/2002 Hwang
6,411,887 B1 6/2002 Martens et al.
6,470,260 B2 10/2002 Martens et al.
6,542,076 B1 4/2003 Joao
6,542,077 B2 4/2003 Joao
6,588,635 B2 7/2003 Vor Keller et al.
6,610,977 B2 8/2003 Megerle
6,613,571 B2 9/2003 Cordery et al.
6,628,813 B2 9/2003 Scott et al.
6,647,328 B2 10/2003 Walker
6,738,697 B2 5/2004 Breed
6,923,509 B1 8/2005 Barnett
6,980,092 B2 12/2005 Turnbull et al.
6,988,026 B2 1/2006 Breed et al.
7,005,982 B1 2/2006 Frank
7,034,677 B2 4/2006 Steinthal et al.
7,034,683 B2 4/2006 Ghazarian
7,103,460 B1 9/2006 Breed
7,116,798 B1 10/2006 Chawla
7,148,484 B2 12/2006 Craig et al.
7,171,312 B2 1/2007 Steinthal et al.
7,184,117 B2 1/2007 Breed et al.
7,243,945 B2 7/2007 Breed et al.
7,339,469 B2 3/2008 Braun
7,346,439 B2 3/2008 Bodin
7,350,608 B2 * 4/2008 Fernandez ................ B60L 1/00 180/65.1
7,385,497 B2 6/2008 Golden
7,397,363 B2 7/2008 Joao
7,636,033 B2 12/2009 Golden
7,647,180 B2 1/2010 Breed
7,844,505 B1 11/2010 Arneson et al.
7,868,912 B2 1/2011 Venetianer et al.
7,872,575 B2 1/2011 Tabe
7,880,767 B2 2/2011 Chinigo
7,961,094 B2 6/2011 Breed
8,120,459 B2 * 2/2012 Kwak ................ G07C 9/00309 340/5.2
8,274,377 B2 9/2012 Smith et al.
8,531,521 B2 9/2013 Romanowich
8,564,661 B2 10/2013 Lipton et al.
2002/0145666 A1 10/2002 Scaman
2003/0063004 A1 4/2003 Anthony et al.
2003/0137426 A1 7/2003 Anthony et al.
2003/0179073 A1 * 9/2003 Ghazarian .............. E05B 47/00 340/5.6
2003/0206102 A1 11/2003 Joao
2004/0107028 A1 6/2004 Catalano
2004/0222092 A1 11/2004 Musho
2005/0195069 A1 9/2005 Dunand
2006/0164239 A1 7/2006 Loda
2006/0176169 A1 8/2006 Doolin et al.
2006/0181413 A1 8/2006 Mostov
2006/0250235 A1 11/2006 Astrin
2007/0093200 A1 * 4/2007 Dobosz .............. H04B 7/18565 455/3.02
2007/0171042 A1 7/2007 Metes et al.
2007/0257774 A1 * 11/2007 Stumpert .............. G06Q 10/08 340/7.1
2008/0045156 A1 2/2008 Sakhpara
2008/0122595 A1 5/2008 Yamamichi et al.
2008/0234907 A1 9/2008 Labuhn et al.
2010/0159983 A1 5/2010 Golden
2011/0178655 A1 6/2011 Golden

OTHER PUBLICATIONS

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/065,837; copyright and dated Dec. 2, 2011, pp. 1-27, publisher United States and Trademark Office, Alexandria, Virginia, USA; U.S. Appl. No. 13/288,065 (27 pages).

United States Patent and Trademark Office; Office Action, Office Action from U.S. Appl. No. 13/065,837; copyright and dated Nov. 1, 2011, pp. 1-18, publisher United States Patent and Trademark Office, Alexandria, Virgina, USA; U.S. Appl. No. 13/288,065 (18 pages).

United States Patent and Trademark Office; Office Action from U.S. Appl. No. 11/397,118; dated Nov. 14, 2007; Alexandria, Virgina, USA; pp. 1-12; U.S. Appl. No. 13/288,065 (12 pages).

United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/155,573; dated Apr. 9, 2009; Alexandria, Virgina, USA; pp. 1-7; U.S. Appl. No. 13/288,065 (7 pages).

United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/155,573; dated Jul. 30, 2009; Alexandria, Virgina, USA; pp. 1-9; U.S. Appl. No. 13/288,065 (9 pages).

United States Patent and Trademark Office; Notice of Allowability from U.S. Appl. No. 12/155,573; dated Oct. 28, 2009; Alexandria, Virgina, USA; pp. 1-5; U.S. Appl. No. 13/288,065 (5 pages).

United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/657,356; dated Jul. 12, 2010; Alexandria, Virgina, USA; pp. 1-14; U.S. Appl. No. 13/288,065 (14 pages).

United States Patent and Trademark Office; Notice of Allowability from U.S. Appl. No. 12/657,356; dated Mar. 10, 2011; Alexandria, Virginia, USA; pp. 1-4; U.S. Appl. No. 13/288,065 (4 pages).

United States Patent and Trademark Office; Office Action from U.S. Appl. No. 13/065,837; dated Jul. 18, 2011; Alexandria, Virgina, USA, pp. 1-9; U.S. Appl. No. 13/288,065 (9 pages).

A newspaper article of Mr. Melvin Sullivan and his family that references the date, Mar. 5, 2001, U.S. Appl. No. 13/288,065.

A letter of response Mr. Sullivan received from Pfeiffer & Gantt, PA, dated Sep. 16, 2002, U.S. Appl. No. 13/288,065.

A "Certificate of Existance" Bright Idea Inventor, LLC. Nov. 6, 2002, U.S. Appl. No. 13/288,065.

A letter of response Golden received from the Honorable Congressman from Maryland, Elijah E. Cummings, dated Dec. 16, 2002; U.S. Appl. No. 13/288,065.

A newspaper article of Mr. Melvin Sullivan and Mr. Larry Golden, dated Feb. 27-Mar. 5, 2003; U.S. Appl. No. 13/288,065.

A letter of response Golden received from the Honorable Senator from South Carolina, Ernest F. Hollings, dated May 21, 2003; U.S. Appl. No. 13/288,065.

A letter of response Golden received from the Office of the Vice President, Dick Cheney, dated Jun. 3, 2003; U.S. Appl. No. 13/288,065.

A letter of response Golden received from the Honorable Senator from South Carolina, Ernest F. Hollings, dated Oct. 1, 2003; U.S. Appl. No. 13/288,065.

A letter of response Golden received from the Honorable Senator from South Carolina, Lindsey O. Graham, dated Oct. 21, 2003; U.S. Appl. No. 13/288,065.

(56) **References Cited**

OTHER PUBLICATIONS

A letter sent to the President of the United States George W Bush, the President's Cabinet, the United States Senate and the Congressional Black Caucus, dated May 23, 2005; U.S. Appl. No. 13/288,065.
On Nov. 17, 2005, an "Inventor's Office Record of Invention", was filed in my name (Golden) at "The Law Office of David P. Gaudio,P.C.; the Inventors Network."; U.S. Appl. No. 13/288,065.
On Aug. 23, 2005, the "Disclosure Document Registration"; U.S. Appl. No. 13/288,065.
On Apr. 5, 2006, the "Patent Application" was filed in my name (Golden) at the United Staets Patent & Trademark Office in Washington, D.C.; U.S. Appl. No. 13/288,065.
On Jun. 6, 2008, the "Continuance-In-Part, (CIP) Application" was filed in my name (Golden) at the United States Patent & Trademark Office in Washington, D.C.; U.S. Appl. No. 13/288,065.
On Jan. 20, 2010, a "Continuation Application" (U.S. Appl. No. 12/657,356) was filed in my name (Golden) at the United States Patent & Trademark Office in Washington, D.C.; U.S. Appl. No. 13/288,065.
Reissue of U.S. Pat. No. 7,636,033,"Swear Back"; in accordance to Title 37—Code of Federal Regulations Patents, Trademarks, and Copyrights; Apr. 8, 2011; U.S. Appl. No. 13/288,065.
Reissue of U.S. Pat. No. 7,636,033; "Swearback-History of Work"; Apr. 8, 2011; U.S. Appl. No. 13/288,065.
United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/802,001, dated Apr. 14, 2011, 2011; Alexandria, Virginia, USA; pp. 1-16; U.S. Appl. No. 13/288,065 (16 pages).
United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/802,001; dated May 27, 2011; Alexandria, Virginia, USA; pp. 1-14, U.S. Appl. No. 13/288,065 (14 pages).
United States Department of Homeland Security: Petition for Inter Partes Review of U.S. Pat. No. Re. 43,990 Under 35 U.S.C. §312 and 37 C.F.R. §42.104; Case IPR2014-00714 for U.S. Pat. No. Re. 43,990; Filed Apr. 30, 2014; Washington, D.C., USA: pp. 1-57; U.S. Appl. No. 14/806,988 (57 pages).
United States Department of Homeland Security; Declaration of Dr. Sriram Vishwanath; Case IPR2014-00714 for U.S. Pat. No. Re. 43,990; Filed Apr. 30, 2014; Washington D.C., USA; pp. 1-44; U.S. Appl. No. 14/806,988 (44 pages).
Richard R Brooks and S.S. Iyengar; Multi-Sensor Fusion Fundamentals and Applications with Software; published 1998; Copyright Prentice Hall PTR; Upper Saddle River, New Jersey, USA; pp. 1-20; copy enclosed (20 pages), U.S. Appl. No. 14/806,988 (20 pages).
Ramanarayanan Viswanathan and Pramod K Varshney; Distriubted Detection with Multiple Sensors: Part 1—Fundamentals; Proceedings of the IEEE; Jan. 1, 1997; pp. 1-11; vol. 85; No. 1; Southern Illinois University Carbondale OpenSIUC: Illinois. USA; pp. 1-11; U.S. Appl. No. 14/806,988 (11 pages).
Blum; Distributed Detection with Multiple Sensors: Part II—Advanced Topics: Proceedings of the IEEE; Jan. 1, 1997; pp. 1-16; vol. 85, No. 1; Southern Illinois University Carbondale OpenSIUC; Illinois, USA; U.S. Appl. No. 14/806,988 (16 pages).
Victor Lesser; Distributed Sensor Networks a Multiagent Perspective; 2003; pp. 1, 2, 5, 6322, 26, 27, 36, 275, 320: copyright 2003 Kluwer Academic Publishers; AH Dordrecht, The Netherlands; U.S. Appl. No. 14/806,988 (10 pages).
Samuel Blackman and Robert Popoli; Design and Analysis of Modern Tracking Systems; 1999; pp. 1, 2, 6, 472; copyright 1999 Artech House; Norwood, Massachusetts, USA; U.S. Appl. No. 14/806,988 (4 pages).
Jean-Francois Chamberland; Decentralized Detection in Sensor Networks; 2003; pp. 407-416 IEEE Transactions on Signal Processing; vol. 51, No. 2; Urbana, Illinois, USA; U.S. Appl. No. 14/806,988 (10 pages).
Oleg Kachirski and Ratan Guha; Effective Intrusion Detection Using Multiple Sensors in Wireless Ad Hoc Networks; pp. 1-8; Proceedings of the 36.sup.th Hawaii International Conference on System Sciences; copyright 2003; Orlando, Florida. USA; U.S. Appl. No. 14/806,988 (8 pages).
Lawrence A Klein; Sensor and Data Fusion a Tool for Information Assessment and Decision Making; 2004; pp. 1-4, 6, 81, 87-89; copyright 2004 The Society of Photo-Optical Instrumentation Engineers; Publisher is SPIE—the International Society for Optical Engineering; Bellingham, Waehington, USA; U.S. Appl. No. 14/806,988.
Dale Ferriere and Khrystyna Pysareva and Andrzej Rucinski; Using Technology to Bridge Maritime Security Gaps; Aug. 1, 2005; Sea Technology; pp. 1-6; copyright Compass Publications, Inc. Jan. 2009; Portsmouth, New Hampshire. USA; U.S. Appl. No. 14/806,988 (6 pages).
Corie Lok; Cargo Security; MIT Technology Review; Jun. 2004; No. 107; pp. 74-75; publisher is Massachusetts institute of Technology; Cambridge, Massachusetts, USA; USPASN14/806988 (2 pages).
Thomas C Chen; RFID and Sensor-based Container Content Visibility and Seaport Security Monitoring system; Proceedings of SPIE, vol. 5778; pp. 151-159; Mar. 28, 2005; Publisher is SPIE—the International Society for Optical Engineering; Bellingham, Washington, USA; USPASN14/806988 (10 pages).
United States Department of Homeland Security; The University of Texas at Austin College of Engineering Standard Resume of Sriram Vishwanath; CaseIPR2014-00714 for U.S. Pat. No. Re. 43,990; Filed Apr, 30, 2014; Washington, D.C., USA; pp. 1-21; USPASN14/806988 (21 pages).
Operating Agreement of Bright Idea Inventor, LLC received from Pfeiffer & Gantt, PA, dated Nov. 13, 2002; U.S. Appl. No. 13/288,065.
United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/802,001; dated Oct. 20, 2011; Alexandria, Virginia, USA; pp. 1-5; parent U.S. Appl. No. 13/288,065 (5 pages); U.S. Appl. No. 13/288,065 (5 pages).
United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 12/802,001; copyright and dated Dec. 12, 2011, pp. 1-9, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA, parent U.S. Appl. No. 13/288,065 (9 pages).
United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 12/802,001; copyright and dated Mar. 26, 2012, pp. 1-12, publisher United States Patent and Trademark Office; Alexandria, Virginia, USA; U.S. Appl. No. 13/288,065 (12 pages).
United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/199,853; copyright and dated Feb. 22, 2012, pp. 1-38, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; U.S. Appl. No. 13/288,065 (38 pages).
United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/065,837; copyright and dated Feb. 22, 2012, pp. 1-25, publisher United States Patent and Trademark office, Alexandria, Virginia, USA, U.S. Appl. No. 13/288,065 (25 pages).
United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/288,065; copyright and dated Aug. 24, 2012, pp. 1-4, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; U.S. Appl. No. 13/288,065 (4 pages).
United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/288,065; copyright and dated Nov. 28, 2012, pp. 1-11, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; U.S. Appl. No. 13/288,065 (11 pages).
United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/288,065; copyright and dated Apr. 16, 2013, pp. 1-9, publisher United States Patent and Trademark Office, Alexandria, Virgina, USA; U.S. Appl. No. 13/288,065 (9 pages).
United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 14/021,693; copyright and dated Apr. 20, 2015, pp. 1-20, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; U.S. Appl. No. 14/021,693 (20 pages).
United States Patent and Trademark Office, Office Action; Office Action from U.S. Appl. No. 14/021,693; copyright and dated Jan.

(56) **References Cited**

OTHER PUBLICATIONS

20, 2015, pp. 1-17, publisher United States Patent and Trademark Office, Alexandria, Virgina, USA; U.S. Appl. No. 14/021,693 (17 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 14/021,693; copyright and dated Sep. 5, 2014, pp. 1-12, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; U.S. Appl. No. 14/021,693 (12 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 14/806,988; copyright and dated Jul. 5, 2015, pp. 1-5, publisher United States Patent and Trademark Office, Alexandria, Virgina, USA; parent U.S. Appl. No. 14/806,988 (5 pages).

United States Patent and Trademark Office; Notice of Allowance from U.S. Appl. No. 14/806,988; dated Jan. 3, 2017; Alexandria, Virgina, USA; pp. 1-8; U.S. Appl. No. 14/806,988 (8 pages).

United States Patent and Trademark Office; Notice of Allowaance from U.S. Appl. No. 14/021,693; dated Jun. 19, 2015; Alexandria, Virginia, USA; pp. 1-8; U.S. Appl. No. 14/021,693 (8 pages).

United States Patent and Trademark Office; Notice of Allowaance from U.S. Appl. No. 13/288,065; dated May 24, 2013; Alexandria, Virgina, USA; pp. 1-8; U.S. Appl. No. 13/288,065 (8 pages).

* cited by examiner



U.S. Patent Dec. 25, 2018 Sheet 1 of 13 US 10,163,287 B2

32
INTERNET CONNECTION
34
GPS CONNECTION
36
POWER SOURCE
10
22
44
58
64
62
66
44
26
56
44
28
12
52
48
46
52
54
54
46
46
50
Fig. 1
52
50
46
48
Fig. 2

Page 5 of

8/20/2023 11:54:43

SAppx478

U.S. Patent Dec. 25, 2018 Sheet 2 of 13 US 10,163,287 B2

60
14
58
56

Fig. 3a

60
14
58
56

Fig. 3b

Page 6 c

8/20/2023 11:54:43

SAppx479

U.S. Patent Dec. 25, 2018 Sheet 3 of 13 US 10,163,287 B2

14
16
12
44
44

Fig. 4

14
12
112
42
42
16
12
12
42
12
POWER SOURCE
114

Fig. 5

Page 7 (

8/20/2023 11:54:43

SAppx480

U.S. Patent Dec. 25, 2018 Sheet 4 of 13 US 10,163,287 B2

18
12
44
12
44
12
112
44
20
POWER SOURCE
114
68
70
72
56

Fig. 6

Fig. 7

Page 8 of

8/20/2023 11:54:43

SAppx481

U.S. Patent Dec. 25, 2018 Sheet 5 of 13 US 10,163,287 B2

68
72
70
56

Fig. 8

Page 9 of

8/20/2023 11:54:43

SAppx482

U.S. Patent Dec. 25, 2018 Sheet 6 of 13 US 10,163,287 B2

32
INTERNET CONNECTION
34
GPS CONNECTION
36
POWER SOURCE
10
22
42
58
62
64
66
44
44
28
12
26
56
52
48
46
54
54
46
50
46
52

Fig. 9

Page 10 c

8/20/2023 11:54:43

SAppx483

U.S. Patent Dec. 25, 2018 Sheet 7 of 13 US 10,163,287 B2

38
22
12
26
30
26
32
34
36
38
24

Fig. 10

76
AGENT DETECTED?
NO
YES
80
SOUND ALARM
82
LIGHT ALARM
74
40
CPU
84
READINGS
86
RESET
78
SENSING MODE
STOP

Fig. 11

Page 11

8/20/2023 11:54:43

SAppx484



76
AGENT DETECTED?
NO
88
YES
82
LIGHT ALARM
80
SOUND ALARM
84
READINGS
90
DETECTOR RESET
78
SENSING MODE
STOP
Fig. 12
76
46
DETECTOR
40
12
CASE
92
94
LOCK/DISABLE LOCK SIGNAL
96
DISARM AND RESET
98
DETECTION MODE
Fig. 13

U.S. Patent Dec. 25, 2018 Sheet 9 of 13 US 10,163,287 B2

46
DETECTOR
100
40
CASE
12
DISABLER
62
102
AUTHORIZED FINGERPRINT?
NO
YES
104
DISABLE AND DISARM
ACCESS DENIED
RESET
101
106
DETECTION MODE
108
110
112
WATCHTOWER
116
DETECTION MODE
118
NO
AGENT DETECTED?
YES
LIGHT ALARM INDICATOR
42
114
MONITORING TERMINAL
120
LOCK/DISABLE SIGNAL
122
CLEANUP MEASURES
RESET
124
116
DETECTION MODE

Fig. 14

Fig. 15

Page 13 o

8/20/2023 11:54:43

SAppx486



U.S. Patent Dec. 25, 2018 Sheet 10 of 13 US 10,163,287 B2

136
126
144
140
128
146
134
132
142
130
138

Fig. 16

Page 14

8/20/2023 11:54:43

SAppx487



U.S. Patent Dec. 25, 2018 Sheet 11 of 13 US 10,163,287 B2

152
158
154
156
170
INTERNET CONNECTION
172
GPS CONNECTION
150
164
POWER SOURCE
174
160
186
168
166
162
176
184
178
180
182

Fig. 17

Page 15

8/20/2023 11:54:43

SAppx488

U.S. Patent Dec. 25, 2018 Sheet 12 of 13 US 10,163,287 B2

204
210
187a
206
187b
206
214
212
190
216
208
202
196
194
200
198
192
138
188

Fig. 18

Page 16 c

8/20/2023 11:54:43

SAppx489

U.S. Patent Dec. 25, 2018 Sheet 13 of 13 US 10,163,287 B2

204
220
187a
187b
218
224
190
222
202
196
194
200
198
192
138
188

Fig. 19

Page 17 of

8/20/2023 11:54:43

SAppx490

# MULTI SENSOR DETECTION, STALL TO STOP AND LOCK DISABLING SYSTEM

## CROSS REFERENCE TO RELATED APPLICATION

This application is a continuation application and claims the filing date and benefit of U.S. patent application Ser. No. 14/806,988 title "Multi Sensor Detection, Stall to Stop and Lock Disabling System" filed on Jul. 23, 2015 that issued on Mar. 7, 2017 as U.S. Pat. No. 9,589,439, the entire contents of which are incorporated by reference herein in their entirety for all purposes. U.S. Pat. No. 9,589,439 is a continuation application and claims the filing date and benefit of U.S. patent application Ser. No. 14/021,693 title "Multi Sensor Detection, Stall to Stop and Lock Disabling System" filed on Sep. 9, 2013 that issued on Aug. 4, 2015 as U.S. Pat. No. 9,096,189, the entire contents of which are incorporated by reference herein in their entirety for all purposes. U.S. Pat. No. 9,096,189 is a continuation application and claims the filing date and benefit of U.S. patent application Ser. No. 13/288,065 title "Multi Sensor Detection, Stall to Stop and Lock Disabling System" filed on Nov. 3, 2011 that issued on Sep. 10, 2013 as U.S. Pat. No. 8,531,280, the entire contents of which are incorporated by reference herein in their entirety for all purposes. U.S. patent application Ser. No. 13/288,065 that will issue as U.S. Pat. No. 8,531,280 is a divisional application and claims the filing date and benefit of U.S. patent application Ser. No. 12/802,001 title "Multi Sensor Detection, Stall to Stop and Lock Disabling System" filed on May 27, 2010, that issued on Dec. 18, 2012 as U.S. Pat. No. 8,334,761, the entire contents of which are incorporated by reference herein in their entirety for all purposes. U.S. Pat. No. 8,334,761 is a continuation application and claims the filing date and benefit of U.S. patent application Ser. No. 12/657,356 title "Multi Sensor Detection, Stall to Stop and Lock Disabling System" filed on Jan. 20, 2010 that issued on Jan. 31, 2012 as U.S. Pat. No. 8,106,752 the entire contents of which are incorporated by reference herein in their entirety for all purposes. U.S. Pat. No. 8,106,752 is a continuation of and claims priority to U.S. Pat. No. 7,636,033. U.S. Pat. No. 7,636,033 is a continuation-in-part of and claims priority to U.S. Pat. No. 7,385,497. U.S. patent application Ser. No. 13/288,065 that will issue as U.S. Pat. No. 8,531,280 also claims the filing date and benefit of and incorporates the entire contents of U.S. patent application Ser. No. 12/657,356, now U.S. Pat. No. 8,106,752 herein by reference for all purposes. The present application also claims the filing date and benefit of and incorporates the entire contents of U.S. Pat. Nos. 9,096,189; 8,531,280; 8,334,761; 8,106,752; 7,636,033; and 7,385,497 by reference herein in their entireties for all purposes.

## FIELD OF THE INVENTION

The present invention pertains to anti-terrorist detection and prevention systems, and more particularly pertains to a disabling lock mechanism combined with a chemical/biological/radiological detection system for use with products grouped together by similar characteristics in order to prevent unauthorized entry, contamination and terrorist activity.

## BACKGROUND

Terrorist activity is a continuous, daily, worldwide threat to the stability, prosperity, security and peace within nations and between and among nations. Its danger lies in its arbitrary destructiveness as much as in its unpredictability, and the constant threat of terrorist activity compels measures and actions that cause strain and contention in free, democratic societies as security concerns and civil liberty concerns must be balanced so that both public safety and civil liberties are maintained. Safety and security concerns can be addressed through numerous proactive steps and measures, many of which cause only minimal interference with and disruption of the daily routines of work, travel, commerce and entertainment. However, because modern industrial societies afford almost limitless places, locations, and opportunities for terrorist activities, no safety measure or security protocol will be foolproof, but many security measures, systems and protocols can be implemented that greatly minimize specific threats through fingerprint identification procedures, chemical, biological, and radiological hazard detections, bomb and explosive detection, and controlling the access to everything from shipping containers to school lockers. Thus, the prior art discloses a wide range of security measures and systems.

For example, the Fishbine et al. patent (U.S. Pat. No. 4,792,226) discloses an optical fingerprinting system that includes an optics/processor unit, a video monitor, a data terminal, and a printer for collecting and storing data characteristics of all ten individual fingerprints for printing demographic information and fingerprint images as desired on a standard booking or applicant card.

The Schiller patent (U.S. Pat. No. 4,544,267) discloses a finger identification unit that includes a fingerprint scanning apparatus using a collimated beam of light to interrogate the fingerprint of a finger placed against a platen so that successive scan positions produce signals containing fingerprint information.

The Fishbine et al. patent (U.S. Pat. No. 5,222,152) discloses a portable fingerprint scanning apparatus for optically scanning and recording fingerprint images and wirelessly transmitting such images to a mobile processing unit for verification and background checking.

The Lougheed et al. patent (U.S. Pat. No. 5,233,404) discloses an optical scanning apparatus that uses a linear charge coupled device (CCD) for recording the image of a fingerprint on the viewing surface.

The Groger et al. patent (U.S. Pat. No. 5,766,956) discloses a diode laser based sensor for undertaking optical, chemical, immunological or nucleic acid-based assay or other chemical analysis.

The Feldman patent (U.S. Pat. No. 5,938,706) discloses a multi element security system for preventing the unauthorized use of an automotive vehicle, and which includes numerous locking and control features interconnected to an onboard cpu.

The Bowker et al. patent (U.S. Pat. No. 5,963,657) discloses a safety access control for doors, handles, locks, etc., wherein the surface relief of a finger is read and verified to either allow or prevent access by the individual to the door, handle, lock, etc.

The Bonder et al. patent (U.S. Pat. No. 6,078,265) discloses a fingerprint identification security system wherein a key lock operated security system utilizes the fingerprint of the individual to control user access to the security system, such as the ignition system of an automotive vehicle.

The Anzai et al. patent (U.S. Pat. No. 6,271,745 B1) discloses a keyless authorization system for use of a motor vehicle that includes fingerprint reading units located on the exterior or interior of the motor vehicle and which are

coupled to a control unit for scanning, comparing and matching fingerprints to allow or disallow access to the motor vehicle.

The Hwang patent (U.S. Pat. No. 6,374,652 B1) discloses a fingerprint-activated doorknob in which a detecting sensor for a fingerprint is placed on the doorknob for measuring and searching the fingerprint against previously stored fingerprint inputs to control access to the door.

The Vor Keller et al. patent (U.S. Pat. No. 6,588,635 B2) discloses a safety holster for a firearm that includes a pivotally mounted retaining member and a fingerprint sensor for scanning fingerprint information so that only authorized users can withdraw the firearm from the holster.

The Cordery et al. patent (U.S. Pat. No. 6,613,571 B2) discloses a method and system for detecting biological and chemical hazards in the mail that includes sensors placed within the mail box for sampling and testing ambient air and so that mail can be safely transported through the mail system.

The Nagata patent (U.S. Pat. No. 6,628,213 B2) discloses a coding method for digital signal coding and decoding that includes a CMI (code-marked inversion) method of signal coding.

Nonetheless, despite the ingenuity of the above devices, methods, and systems, there remains a need for a multi-detector and disabling lock system for use with various types of products collected together by common characteristics into product groupings for detecting chemical, biological and radiological agents and compounds and for selectively disabling and activating the product locks thereby preventing unauthorized entry and further contamination and preventing and thwarting terrorist activities.

## SUMMARY

The present invention comprehends a chemical/biological/radiological detector unit with a disabling locking system for protecting products that can be grouped into several product groupings, from terrorist activity, and also for preventing unauthorized access to and tampering with the storage and transport of ordnance and weapons. The products grouped into what may be referred to as Product grouping 1 include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes and lockers; while the products grouped into what may be referred to as Product grouping 2 include, but are not limited to, chemical, biological, radiological, and nuclear detectors, motion sensors and door sensors. The multi sensor detection system includes the capability to disable an existing lock or activate a lock located inside any of the products named in the product grouping categories upon activation of a sensor or detector included in the system. This is a significant feature for the multi sensor detection system as it prevents unauthorized, unequipped and untrained entry and access to the product thus preventing further contamination of the site and to individuals in the area.

The multi sensor detection and lock disabling system includes a detector case sized to fit in, upon or adjacent any of the aforedescribed products for detecting harmful and dangerous chemical, biological, and radiological agents, compounds and elements. In addition, the multi sensor detection and lock disabling system is capable of transmitting a signal to lock or disable a lock on the product, and is also capable of transmitting signals to a monitoring computer terminal or PC so that appropriate defensive and safeguarding actions can be undertaken and an authorized individual can disarm and reset the locking system and the multi sensor detection system. The detector case includes a power source (battery or electrical), interior compartments, Internet and GPS connections and a cpu interconnected with the Internet and GPS connections, and also interconnected with one or more off site monitoring computer terminals or PCs. The detector case includes one or more light alarm indicators that are externally visible and that light up when the chemical, biological, or radiological agent or compound is detected, and the light alarm indicators (which can be indicator lights or panels on the front of the detector case) can be color coded for denoting the specific agent or compound detected, i.e., separate and distinct colors for indicating detection of the chemical, biological, or radiological agent or compound.

The detector case is designed to hold within the interior compartments one or more interchangeable detectors, and each detector is adapted and set up to sample a specific compound or agent. Each detector includes a sound alarm, a sensor, a light alarm, and a readings panel, and is electrically interconnected (either by wire or wirelessly) to the cpu of the detector case so that information regarding the detection of the particular agent or compound can be conveyed from the detectors to the detector case cpu. Each detector can also be used as a manual, stand-alone hand held scanner.

The multi sensor detection and lock disabling system can be interconnected to a surveillance watchtower, as well as monitoring computer terminals or PCs, with the watchtower scanning shipping and cargo crates and containers being prepared for shipment or sitting for extended periods of time on a dock or at a port, at a railway site, or at an industrial storage facility. The watchtower will scan the cargo and shipping crates and containers for the light alarm indicators on detector cases that are mounted in or upon the crates and containers, and thus continuous security surveillance of the crates and containers can be maintained.

An enhanced version of the multi sensor detection and lock disabling system can be employed to prevent car and vehicle bombings. Coupling the multi sensor detection and lock disabling system with satellite service will enable the detection system to detect explosives and transmit an alert signal by satellite to monitoring equipment at a monitoring site. Upon receiving the alert signal at the monitoring site the monitoring equipment activates a stall-to-stop process for disabling the air, fuel, electrical and/or computer system of the vehicle. Moreover, upon receiving the alert signal at the monitoring site the car or vehicle will be locked by transmission of a satellite signal that disables the vehicle's electrical and ignition system thereby preventing escape of the terrorist.

It is an objective of the present invention to provide a multi sensor detection and disabling lock system for securing news racks and vending machines in order to prevent theft, unauthorized use and terrorist activity.

It is another objective of the present invention to provide a multi sensor detection and disabling lock system for preventing terrorist activity by using products grouped together by common features in several product groupings such as design similarity, similarity in the presentation of security problems and similarity with regard to the presentation of solutions to preventing terrorist solutions.

It is still yet another objective of the present invention to provide a multi sensor detection and disabling lock system that is capable of disabling an existing lock or activating a lock inside any of the products of the product grouping lists when a detector or sensor of the system is activated.

It is still yet a further objective of the present invention to provide a multi sensor detection and disabling lock system

wherein the disabling lock system prevents the unauthorized entry, access and further contamination of the products included in the several product groupings.

A still further objective of the present invention is to provide a multi sensor detection and lock disabling system that utilizes a multi-task device for preventing terrorist activity to vulnerable products that are collected or arranged by product grouping categories.

Yet a further objective of the present invention is to provide a multi sensor detection and disabling lock system to secure cargos and containers, especially cargo and shipping containers, against chemical, biological, radiological and nuclear terrorist activity.

Still another objective of the present invention is to provide a multi sensor detection and disabling lock system capable of detecting chemical, biological and radiological agents and compounds.

Still yet another objective of the present invention is to provide a multi sensor detection and disabling lock system that includes interchangeable detectors that operate in conjunction to detect chemical, biological and radiological agents and compounds.

Still yet a further objective of the present invention is to provide a multi sensor detection and disabling lock system that can be implemented by business or government at a minimum cost by organizing the products to be protected into product grouping categories.

Another objective of the present invention is to provide a multi sensor detection and disabling lock system that accurately and reliably detects harmful agents, compounds and elements, and prevents the placement and storage of weapons and bombs in the range of storage containers and facilities currently available.

Still another objective of the present invention is to provide a multi sensor detection and disabling lock system wherein the interchangeable detectors that comprise part of the system can be used as stand-alone scanners.

These and other objects, features, and advantages will become apparent to those skilled in the art upon a perusal of the following detailed description read in conjunction with the accompanying drawing figures and appended claims.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the primary features of the system which include a detector case, several interchangeable detectors, an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler;

FIG. **2** is a front elevational view of the multi sensor detection and lock disabling system of the present invention illustrating one of the interchangeable detectors first shown in FIG. **1**;

FIG. **3*a*** is a top plan view of the multi sensor detection and lock disabling system of the present invention illustrating the mounting of one lock disabler to the lock of a product, such as a container, and disengaged from the lock of the container;

FIG. **3*b*** is a top plan view of the multi sensor detection and lock disabling system of the present invention illustrating the engagement of the lock disabler to the lock of the product for locking or disabling the lock of the product so that unauthorized access is prevented;

FIG. **4** is a side elevational view of the multi sensor detection and lock disabling system of the present invention illustrating the detector case mounted to the product, such as the container, with the light alarm indicators externally visible;

FIG. **5** is a schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the interconnection of detector cases with a surveillance watchtower and a monitoring PC terminal;

FIG. **6** is a schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the placement of detector cases upon containers different from the containers of FIG. **5**, and wherein the detectors case are interconnected to a surveillance watchtower and a monitoring PC terminal;

FIG. **7** is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the mounting of one automatic/mechanical lock disabler to the lock of a standalone news rack;

FIG. **8** is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating one interchangeable detector placed within the standalone news rack;

FIG. **9** is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the detector case having color coded front panels for specifically indicating the agents, compounds or elements that have been detected;

FIG. **10** is a rear elevational view of the multi sensor detection and lock disabling system of the present invention illustrating the GPS, Internet and power source connections;

FIG. **11** is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the interconnection of the detector with the detector case and the steps undertaken by the system when an agent or compound is detected;

FIG. **12** is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the sequence of steps undertaken by one detector when functioning as a stand alone scanner for detecting an agent or compound;

FIG. **13** is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the interconnection of the detector case with the automatic/mechanical lock disabler for activating the lock disabler upon detection by the system of an agent or compound;

FIG. **14** is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating interconnection of the detector case with the fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock as part of the process of detection and safeguarding the public upon detection of the agent or compound;

FIG. **15** is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the incorporation of the system with a surveillance watchtower and a monitoring PC or computer terminal for monitoring containers, such as shipping or cargo containers, that may sit for extended time periods on docks, at rail yards, and at industrial storage facilities;

FIG. **16** is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the integration of the detection system with a satellite and monitoring equipment at a monitoring site for detecting explosives placed in a vehicle and then transmitting signals to the satellite and then to the monitoring site for disabling and locking the vehicle;

FIG. **17** is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the incorporation of the features and elements of the detector case to a cell phone and cell phone case;

FIG. **18** is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the incorporation of a GPS satellite, a monitoring site and a cell phone tower for communicating to and with an electronic device such as a laptop computer or a cell phone for transmitting signals to a vehicle for activating an onboard stall-to-stop device for bringing the vehicle to a halt; and

FIG. **19** is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the use of a GPS satellite in conjunction with the monitoring site and monitoring equipment to relay commands and signals to the cpu or transceiver of the vehicle for stopping or locking the vehicle in response to a signal that a certain type of event (detection of a bomb, engine failure or malfunction or unauthorized use) has occurred or is in process.

## DETAILED DESCRIPTION OF REPRESENTATIVE EMBODIMENTS

Illustrated in FIGS. **1-19** is a multi sensor detection and lock disabling system **10** for preventing terrorist activity by monitoring, detecting, and securing those critical areas; sites, and facilities vulnerable to terrorist activity. The first step is the identification of critical areas, sites, locations and facilities that are vulnerable to terrorist activity as convenient places to store and plant explosives and bombs and spread biological, chemical or radiological agents and compounds, followed by the disposition of the multi sensor detection and lock disabling system **10** for monitoring, detecting, and securing the particular location or site. Vulnerable sites, locations, facilities and areas are nearly limitless in their variety; in order to categorize the protection the present invention provides an anti-terrorist product grouping strategy has been developed wherein products made from the same or similar material, products having the same or similar design, and products presenting the same or similar security problems are grouped together with the multi sensor detection and lock disabling system **10** for preventing terrorist activity. For example, two preferred product groupings can be Product Grouping I: cargo containers, shipping containers, cargo planes, freight train cars, tractor trailers, mail carriers (UPS, FedEx), airport lockers, news racks (coin and non-coin operated), mail drop boxes, cluster mail boxes, keyed mail boxes, min-storage houses and buildings, bicycle lockers, stadium lockers, school lockers, cars, trucks, campers, buses, vans and utility vehicles. Product Grouping II: chemical detectors, biological detectors, radiological detectors, nuclear detectors, motion sensors, glass break sensors, plastic film on glass, high security locks, tampering labels, door sensors, disabling locking systems, vehicle detectors and satellite disabling locking systems. In addition to grouping products together by features, designs and materials, the multi sensor detection system **10** includes a lock disabling capability for disabling an existing lock or activating a lock on or inside any of the aforementioned products when a detector or sensor of the system is activated. The lock disabling feature is a crucial component of the invention in so far as it prevents unauthorized, unequipped or untrained individuals from gaining access and entry to the site and causing further contamination of the site.

As shown in FIGS. **1-10**, the multi sensor detection and lock disabling system **10** includes at least one—and preferably many—detector case **12** that can be placed in, on, upon or adjacent the product, such as the shipping containers **14** of FIGS. **4** and **5** resting upon a platform **16** or the cargo container **18** of FIG. **6** sitting upon a seaport dock or pier **20**. The detector case **12** includes a top **22**, a bottom **24**, a pair of opposed sides **26** and a front side or panel **28** and an opposite rear or back side **30**. The rear side **30** has connections or contacts that can include an Internet connection **32**, a GPS connection **34** and a power connection **36** for a power source. The power source for the detector system **10** can be any conventional battery or electrical source. The detector case **12** includes an interior chamber divided into a number of compartments **38** for holding therein agent or compound detection means hereinafter further described. A cpu **40** is mounted within the detector case **12** and electrically interconnects, routes, and transmits signals among items hereinafter further described and also communicates with a monitoring site and monitoring equipment. The front side **28** of the detector case **12** includes indicator means for visually indicating that a specific agent, compound or element has been detected. The indicator means can include color coded indicator lights **42** in panel form, as shown in FIG. **9**, with each indicator light panel **42** lighting up with a specific color corresponding to the detection of a specific agent or compound; or color coded indicator lights **44**, as shown FIG. **1**, that correspond to and individually light up on the detection of a specific agent or compound (chemical, biological, or radiological).

As shown in FIGS. **1**, **2** and **9-13**, the multi sensor detection and lock disabling system **10** includes a plurality of detectors **46** with each detector **46** adapted for and set up to sample for a specific agent or compound (biological, chemical, or radiological); and the detectors **46** are interchangeable for adapting to the needs and demands of future technology. The detectors **46** can also be used as stand alone scanners. In the preferred embodiment of the invention, at least three detectors **46** are placed within the detector case **12** with one detector **46** for specifically sampling biological agents or compounds, one detector **46** for sampling chemical agents or compounds, and one detector **46** for sampling radiological agents or compounds. The detectors **46** are interconnected to the cpu **40** of the detection system **10** by conventional connections that can be wire or wireless for transmitting the appropriate signals to the cpu **40** upon detection of the particular agent or compound. As shown in FIG. **2**, each detector **46** includes on its front plate or facing surface a sound alarm indicator **48**, a readings panel **50** comprising a plastic shield and LED lights for displaying the various read-out messages, a sensor **52** for detecting the specific agent, element or compound, and a light alarm indicator **54** that can be color coded for each specific agent and which is externally visible when the detector **46** is used as a stand alone scanner. Each detector **46** includes a conventional microprocessor for controlling the various functions and generating the appropriate signals for transmission to the cpu **40** of the detector case **12**.

As shown in FIGS. **1**, **3***a*, **3***b*, **9**, and **13-15**, used in conjunction with the multi sensor detection and lock disabling system **10** is at least one automatic/mechanical lock disabler **56**—and depending upon the number of products being monitored there can be one lock disabler **56** for each product. The automatic/mechanical lock disabler **56** is physically connected to the detector case **12** by a wire or cable **58** for receiving signals therefrom for disabling an existing lock or activating a lock inside a product to prevent

access to the product. By way of example, FIG. **3a** shows the automatic/mechanical lock disabler **56** mounted—by any conventional means—to the lock **60** of the shipping container **14** shown in FIGS. **4** and **5** and connected by wire **58** to the cpu **40** of the detector case **12**. The lock disabler **56** is in the non-activated or disengaged state in FIG. **3a**. FIG. **3b** shows the automatic/mechanical lock disabler **56** mounted to the lock **60** of the shipping container **14** and in the activated or engaged state after detection of an agent or compound by the system **10** thereby for locking or disabling the lock **60** of the shipping container **14** and preventing unauthorized entry and access by unauthorized, untrained and unequipped individuals. In FIGS. **3a** and **3b** the lock **60** secures doors of the shipping container **14** that can be slidably or pivotably opened and closed.

In addition to the automatic/mechanical lock disabler **56**, the multi sensor detection and lock disabling system **10** can also utilize a fingerprint biometric lock with disabler **62** as shown in FIGS. **1** and **14**. The fingerprint biometric lock with disabler **62** is interconnected to the cpu **40** of the detector case **12** for receiving transmissions therefrom after detection of an agent or compound has occurred so that the lock on the product can be locked or disabled. Moreover, resetting of the fingerprint biometric lock with disabler **62** occurs when the fingerprint of the individual is placed on the fingerprint-matching pad **64**, and if a match occurs with a known fingerprint stored by the cpu **40**, then the individual can reset the fingerprint biometric lock with disabler **56** by turning the manual lock disabler **66**. The fingerprint biometric lock with disabler **62** is mounted to the lock of the product in a manner similar to the mounting of the automatic/mechanical lock disabler **56** that is shown in FIGS. **3** and **3b**.

FIGS. **4** and **5** show one manner of disposition or placement of the detector case **12** in relation to the product, i.e., the shipping container **14**, with the color coded indicator lights **42** externally viewable; FIG. **5** shows a number of shipping containers **14** each equipped with a detector case **12** and integrated with elements hereinafter further described for continuously monitoring the shipping containers **14** as they sit for an extended period of time on the truck or rail platform **16**. FIG. **6** illustrates several cargo containers **18** sitting on the shipping dock or pier **20**, with each cargo container **18** having a detector case **12** mounted thereon and integrated with and monitored by elements shown in FIG. **5** and hereinafter further described.

FIG. **7** illustrates a typical product from product grouping **1** that is monitored by the multi sensor detection and lock disabling system **10** of the present invention; specifically, FIG. **7** shows a news rack **68** with one automatic/mechanical lock disabler **56** mounted to and interconnected with the locking mechanism of the news rack **68**. As long as there is no detection of any agent or compound, the lock disabler **56** is in the disengaged state, and the individual can deposit the coin amount in the chute and then freely open the glass panel **70** by the handle **72** for removing a paper. However, the lock disabler **56** would be activated upon detection of the harmful agent or compound and receipt of a signal from the cpu **40** for locking or disabling the locking mechanism thereby denying access to the interior of the news rack **68** from all untrained, unauthorized and unequipped individuals.

FIG. **8** illustrates one detector **46** disposed within the news rack **68** and which is visible through the panel **70** for detecting one specific agent, compound or element. The detector **46** functions as a stand-alone scanner and can be wirelessly interconnected to off site monitoring equipment.

FIG. **11** illustrates a representative schematic **74** for describing the signal transmission process from the detector **46** to the cpu **40** of the detector case **12**. The external stimulus **76** would be the chemical, biological or radiological agent or compound. If there is no detection of the agent or compound, the detector **46** will stay in the sensing mode **78**. However, detection of the specific agent will trigger the sound alarm **80** and the light alarm **82**, and instant transmittal of a signal to the cpu **40**. The readings **84** can be stored by the cpu **40** for verification and future review and evaluation. After all the appropriate corrective and preventative measures have been undertaken by the trained and authorized personal, and the site has been cleansed of the contamination, authorized and equipped personal can then reset **86** the system **10**.

FIG. **12** illustrates a representative schematic **88** for the detector **46** when used as stand-alone scanner. The detector **46** undergoes the same essential steps as illustrated in FIG. **11**, with the exception of the signal transmission to the cpu **40**. The detector **46** remains in detection mode **78** until an agent is detected, and then the various functions-light alarm **82**, sound alarm **80**, storage of readings **84**, and, after the appropriate security and safety steps have been carried out by authorized personal, detector reset **90** by authorized personal can occur thereby placing the detector **46** back in detection or sensing mode **78**.

FIG. **13** is a representative schematic **92** that illustrates the steps undertaken by the system **10** to lock or disable a lock, such as the lock **60** for the shipping container **14** shown in FIGS. **3a** and **3b**. Upon detection of the agent (chemical, biological, radiological) the alarm light indicators **42** or **44** will light up providing external indication that an agent has been detected. In addition, the system **10**—the cpu **40**—will transmit a lock/disable lock signal **94** to the automatic/mechanical lock disabler **56** to lock or disable the lock on the product, such as the lock **60** on the shipping container **14** of FIGS. **3a-5**. This prevents unauthorized, unequipped, or untrained individuals from entering or gaining access to the product for which a dangerous and perhaps lethal agent has been detected. After the proper authorities and authorized personal have been notified and all the appropriate security, preventative and clean up measures have been undertaken, the authorized individual can perform the disarm and reset function **96** for the system **10** placing the system **10** in back in the detection mode **98**.

FIG. **14** is a representative schematic **100** illustrating the use of the fingerprint biometric lock with disabler **62** with the system **10**. Upon detection of the agent or compound by the detector, the various alarms would sound and light up (shown in previous figures), and the cpu **40** would then transmit a signal to the fingerprint biometric lock with disabler **62** to lock or disable the lock on the product, such as the lock **60** on the shipping containers **14** shown in FIGS. **3a-5**. The shipping containers **60** would remain locked and in an access denied mode **101** should an attempt be made to gain access to the container **60** by opening the lock **60** with an unauthorized fingerprint. However, a fingerprint that matches stored and authorized fingerprints **102** would indicate an authorized individual, and would allow the individual to disable and disarm **104** the lock **60** of the shipping container **14**. The fingerprint biometric lock with disabler **62** would then be reset **106** after the appropriate safety, cleanup, and protection measures are completed, and the system **10** would be reset and placed back in the detection mode **108**.

FIG. **15** is a schematic representation **110** that illustrates the integration of a surveillance watchtower **112** and a monitoring terminal or PC **114** for monitoring products such

as the shipping containers **14** or cargo containers **16** that sit for extended periods of time of docks, piers **20**, truck terminals, rail yards, shipping platforms **16** and industrial sites as shown in FIGS. **5** and **6**. The watchtower **112** would maintain continuous surveillance over a number of shipping containers **60**, for example, with detector cases **12** mounted in or on each container **14** and set in detection mode **116** with one or more detectors **46** disposed in each detector case **12**. The watchtower **112** would continuously scan for light alarm indicators **42** and **44** on the products, such as the containers **14** or **18**, and the watchtower **112** would be interconnected and integrated with the monitoring terminal or PC **114**. Upon detection **118** of an agent or compound in one or more of the shipping containers **14**, the appropriate light alarm indicators **42** or **44** would light providing visible confirmation of the detection of the specific agent or compound. The cpu **40** would transmit a lock/disable signal **120** to the lock **60** on each respective shipping container **14** to lock or disable the lock **60** thus preventing access to that respective shipping container **14**. In addition, signal transmissions would be sent to the monitoring terminal or PC **114** (which could be off site) thereby alerting authorized security personal of the contamination event. With the information received at the monitoring terminal **114**, authorized personal would then be notified and dispatched to the area to undertake the appropriate safety and cleanup measures **122**. Such measures would also include disarming the lock disabling system in order to gain access to the shipping container **14**. After all the cleanup and security measures are completed by the trained and properly equipped authorities, the detection system and the lock disabling feature would reset **124** and the detection system would again be placed in detection mode **116**.

FIG. **16** is a schematic representation **126** that illustrates an enhanced version of the multi sensor detection and lock disabling system **10** for preventing car and vehicle attacks and bombings. The lock disabling system **10** would be interconnected to the locking system and mechanism **128** of the vehicle **130**. In addition, a stall to stop disabling link **132** can be made with the fuel, air, and electrical system **134** of the vehicle **130**. The enhanced version incorporates a satellite **136** for signal receipt and transmission from the vehicle **130** in which the detector system **10** is placed to a monitoring site and monitoring equipment **138**. As shown in FIG. **16**, a detection signal **140** would be sent to the satellite **136** by the detection system **10** upon detection of a bomb or explosive **142** hidden in the vehicle **130**. The satellite **136** would then transmit an alert signal **144** to the monitoring site **138** with the signal **144** containing the relevant data to evaluate the nature of the threat. The monitoring site **138** would then transmit a stall to stop signal **146** to the detection system **10** to lock the vehicle **130** and/or disable the electrical system of the vehicle **130** thereby disabling the vehicle **130**, preventing access to the vehicle **130** by locking the vehicle **130**, and preventing any terrorist in the vehicle **130** from escaping.

The detector case **12** can be modified and adapted for inclusion with cell phone cases, satellite cell phone cases, laptop cases, notebook PC cases, PDA cases, carry-on cases, suitcases; and briefcases. In addition, the basic monitoring terminal or PC **114**, as shown in FIGS. **5** and **15**, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring.

The system **10** and the watchtower **112**, along with the satellite **136** and the monitoring site **138** can be adapted or incorporated with cell phone towers and satellites for use with satellite communication and/or a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu **40**, or a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween. The aforementioned telecommunication and radio communication means can be interactive with any type of motive vehicle that includes but is not limited to cars, trucks, vans, SUVs, trains, subways, boats, ships and airplanes, and which is reported stolen, experiences a loss of brakes, or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted to the vehicle and which detection causes an automatic signal transmission or a signal transmission is activated when a call is made to the monitoring station by an authorized person. The authorized individual includes but is not limited to the owner, pilot, conductor, captain, police highway patrol, security guard and military personnel to the monitoring equipment for activating a vehicle slowdown or stall-to-stop disabling system that similar to the disabling system **126** shown in FIG. **16**, or incorporating features of the system **126** shown in FIG. **16**, from the monitoring equipment to the vehicle. The activation of the stall-to-stop disabling means or the vehicle slowdown disables or engages the computer, electrical, fuel and air systems of the vehicle or a combination of the computer, electrical, fuel and air systems that include but are not limited to the brakes, foot peddle, lights, speed controls, ignition, steering, transmission, and the horsepower of the motor.

In addition, the basic stall-to-stop disabling means or the vehicle slowdown means and device can be adapted, modified or designed to include: an open bust or open platform for integrating any new and innovative technology; warning lights indicators; sound alarm indicators; voice alarm indicators; a cell phone to transmit to the vehicle a signal for slowing and halting the vehicle; and a lock disabling system or means to lock a thief or terrorist inside the vehicle after a transmission is received or sent. Open bust or open platform also refers to the compatibility of the detector case **12**, or the incorporation of its features in cell phone cases, satellite cell phone cases, laptop cases, notebook PC cases, PDA cases, carry-on cases, briefcases, and suitcases, etc., with other communication, transmission and surveillance systems whereupon the detector case **12**, and its features, can be seamlessly integrated with other new and emerging systems and technologies.

Thus, as shown more specifically in FIG. **17**, by way of a representative example the features and elements of the detector case **12** are shown as being incorporated into cell phone detector case **150** and associated cell phone monitor **152**. The cell phone monitor **152** includes the standard keypad functions **154** and more specialized system use (ring tone, email, photos, texting) functions **156** as well as a viewing screen **158**. The cell phone detector case **150** includes a recharging cradle or seat **160**, a front side **162**, a top **164**, a bottom **166**, and a pair of opposed sides **168**. At the back of the cell phone detector case **150** are connections, contacts, and ports for at least an Internet connection **170**, a GPS connection **172**, and a contact, plug, or port for a power source **174**. The power source for the cell phone detector case **150** can be any conventional rechargeable battery source or standard electrical power from a standard electrical receptacle or outlet.

As shown in FIG. **17**, the cell phone detector case **150** includes one or more sensor/detector units, cells, or com-

ponents **176** built into and incorporated into the case **150**. The detector **176** includes generally disposed at the front **162** of the case **150** the following types of indicators: a sound alarm indicator **178**, a readings panel **180**, a sensor **182** for detecting one or more specific types of agents, elements, chemicals, compounds, etc., and a light alarm indicator **184**. The sensor/detector **176** will be interconnected to the power source **174**. In addition, mounted on and externally visible on the sides **168** or front **162** of the case **150** are a plurality of color coded indicator lights **186** with each light **186** corresponding to a specific agent, element, chemical, compound, etc., and lighting up when that agent is detected by the sensor/detector **176**. The color coded indicator lights **186** will be electrically interconnected to the sensor/detectors **176** via any standard microprocessor. The cell phone detector case **150** and cell phone monitor **152** thus comprise a hand-held, easily portable and transportable detection means that is both effective and unobtrusive in its disposition and use.

FIGS. **18** and **19** illustrate representative examples of the integration of portable electronic communication or telecommuncation devices such as a cell phone **187***a* and/or a laptop computer **187***b* with the monitoring equipment **138** located at a predesignated monitoring site **188**, and operating in conjunction with either a satellite and/or a cell phone tower **190** to transmit and receive signals and commands among each other and to a vehicle **192**, such as a truck, as part of a stall-to-stop disabling system for slowing and stopping the vehicle **192** and locking a thief, terrorist, or unauthorized individual in the vehicle **192** if needed. A wide range of events can trigger and initiate the stall-to-stop system and the locking or lock disabling system and mechanism, and the event doesn't have to be limited to the detection of a bomb or a chemical, biological, or radiological agent, element, or compound. The events can include, but is not limited to, detection of an engine problem to engine failure to the unauthorized use (stealing) of the vehicle **192**. The vehicle **192** includes an electromotive system **194** that comprises, among other components, an onboard computer(s), electrical, fuel and air systems, as well as brakes, ignition, steering, and transmission. Also integrated with and capable of communicating with the vehicle's **192** electromotive system **194** is a stall-to-stop system while a lock disabling mechanism **196** is able to engage and disengage or disable the vehicle's **192** locking mechanism **198** upon receipt of the appropriate commands via a lock disabling communication channel or link **200**. This link **200** can also accommodate the stall-to-stop system commands and signals, and thus is a multi-channel communication link. A CPU or a transceiver **202** is programmed to receive signals from the cell phone tower **190** and/or to a GPS satellite **204** and is interconnected with the stall-to-stop system and the lock disabling system **196** via link **200** for engaging the electromotive system **194** and actuating the lock disabling system **196** to stop the vehicle **192** and lock inside the vehicle **192** anyone such as a thief, terrorist or other unauthorized individual.

A representative example for stopping, disabling, and locking the vehicle **192** that utilizes the cell phone tower **190** wherein the activation and/or distress signal **206** originates from the cell phone **187***a* or the laptop **187***b* and such activation signal **206** travels to the cell phone tower **190** that is nearest the current location of the vehicle **192**. A signal **208** is then transmitted to the monitoring site **188** and specific monitoring equipment **138** that can also include but is not limited to cell phones, laptops, desktop PC's, notebook PC's and LCD monitors. The monitoring site **138** then communicates by signal **210** to the GPS satellite **204** that an original or activation signal has been received and then the GPS satellite **204** locates and communicates by multiplex signal **212** with the CPU or transceiver **202** on the vehicle **192** and exchanges information on the type of problem, situation, location, and vehicle speed. The monitoring equipment **138** then transmits a signal **214** to the cell phone tower **190** that communicates with the transceiver **202** and/or CPU of the vehicle **192** to initiate or execute any commands that will actuate the stall-to-stop disabling link **200** and lock disabling system **196** for bringing the vehicle **192** to a halt and actuating the vehicle's **192** locking mechanism **198** for locking the thief, terrorist, or other unauthorized person inside the vehicle **192** if needed.

FIG. **19** illustrates a representative example wherein the stall-to-stop system and the lock disabling system **196** are utilized in conjunction with the GPS satellite **204**. In FIG. **19** a signal has traveled to the satellites nearest the vehicle's **192** current location and then the signal **218** has traveled to the monitoring equipment **138** and monitoring site **188** which can include but is not limited to satellite cell phones, satellite monitors, cell phones, laptops, desktop PC's, notebook PC's, and LCD monitors. The GPS satellite **204** then locates and communicates with the CPU and/or transceiver **202** on the vehicle **192** via a multiplex (two-way) signal **220** in order to exchange information on such distress and danger event parameters as the specific problem situation, location, and vehicle speed. The monitoring equipment **138** then transmits a signal **222** back to the GPS satellite **204** that in turn communicates via another signal **224** with the CPU and/or transceiver **202** to execute any commands to the stall-to-stop system for executing the disengagement of the vehicle's **192** electromotive system **194** for bringing the vehicle **192** to a halt and for actuating the lock disabling system **196** to direct the lock disabling link **200** to actuate the locking mechanism **198** thereby locking the vehicle **192** and anyone inside the vehicle **192**.

The present invention comprehends a chemical/biological/radiological/nuclear/explosive/human/contraband detector unit with a disabling locking system for protecting products that can be grouped into several product groupings, from terrorist activity, and also for preventing unauthorized access to and tampering with the storage and transport of ordnance and weapons. The products grouped into what may be referred to as Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars, United Parcel Services™ (UPS™), Federal Express™ (FedEx™), airport lockers, news racks (coin and non-coin operated), mail drop boxes, cluster mail boxes, keyed mail boxes, min-storage houses and buildings, bicycle lockers, stadium lockers, school lockers, cars, trucks, campers, buses, vans, unmanned aerial vehicles (UAVs), unmanned ground vehicles (UGVs), and utility vehicles; the products grouped into what may be referred to as Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, door sensors, speed sensors, biometric sensors, glass break sensors, plastic film on glass, high security locks, tampering labels, door sensors, disabling locking systems, vehicle detectors and satellite disabling locking systems, detection of humans, detection of contraband, temperature, and shock levels; the products grouped into what may be referred to as Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, satellite cell phone cases, laptop cases, notebook PC cases,

PDA cases, carry-on cases, suitcases, eyeglass, briefcases, detector cases of locks, detector cases of tags, detector cases that is mounted to, detector cases that is affixed to, detector cases that is outside of, detector cases that is inside of, and detector cases that is adjacent to; the products grouped into what may be referred to as Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, web servers, desktop personal computers (PCs), notebook personal computers (PCs), laptops, satellite cell phones, cell phones, Universal Mobile Telecommunications System (UMTS) phones, personal digital assistants (PDAs), liquid crystal display (LCD) monitors, and satellite monitoring, remote control key fobs, two-way communication key fobs, handhelds; the products grouped into what may be referred to as Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, Cellular, Satellite, Telematics, Wide Area Network (WAN), Wireless Wide Area Network (WWAN), Local Area Network (LAN), Radio Frequency (RF), Broadband Wireless Access (BWA), Global Positioning System (GPS), General Packet Radio Services (GPRS), Global System for Mobile (GSM), Wideband Code Division Multiple Access (W-CDMA), Universal Mobile Telecommunications System (UMTS), Short Message Service (SMS); the products grouped into what may be referred to as Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature. the products grouped into what may be referred to as Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel. The multi sensor detection system includes the capability to disable an existing lock or activate a lock located inside or outside any of the products named in the product grouping categories upon activation of a sensor or detector included in the system. This is a significant feature for the multi sensor detection system as it prevents unauthorized, unequipped and untrained entry and access to the product thus preventing further contamination of the site and to individuals in the area.

While the invention has been shown and described in a preferred embodiment, it will be apparent to those skilled in the art that numerous alterations, modifications, and variations will possible and practicable without departing from the spirit and scope of the invention as set forth by the appended claims.

What is claimed:

1. Monitoring equipment that is at least one of products grouped together by common features of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone interconnected to a lock for communication therebetween; the monitoring equipment comprising:

at least one of a central processing unit (CPU), a network processor, or a front end processor for communication between the monitoring equipment and the lock;

a transmitter for transmitting signals and messages to at least one of a remote lock, an electrical lock, a mechanical lock, or automatic lock;

a receiver for receiving signals from at least one of a remote lock, an electrical lock, a mechanical lock, or automatic lock;

a lock disabling mechanism that is able to engage (lock), or disengage (unlock), or disable (make unavailable) the monitoring equipment after a specific number of tries;

a short-range radio frequency (RF) connection that is near-field communication (NFC);

at least one of the satellite connection, Bluetooth connection, WiFi connection, Internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection that is capable of signal communication with the transmitter or the receiver,

at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature recognition system; and

the monitoring equipment being capable of sending signals to engage (lock), disengage (unlock), or disable (make unavailable) at least one of a remote lock, an electrical lock, a mechanical lock, or automatic lock, whereupon a signal is sent to the receiver of the monitoring equipment from at least one of the remote lock, electrical lock, mechanical lock, or automatic lock, the signal comprising at least one of location data or lock status data to be sent to the monitoring equipment.

2. Monitoring equipment that is at least one of products grouped together by common features of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone interconnected to at least one of a home lock, a building lock, or a cargo container lock for communication therebetween; the monitoring equipment comprising:

at least one of a central processing unit (CPU), a network processor, or a front end processor for communication between the monitoring equipment and the lock;

a transmitter for transmitting signals and messages to at least one of a home lock, a building lock, or a cargo container lock;

a receiver for receiving signals from at least one of a home lock, a building lock, or a cargo container lock;

a lock disabling mechanism that is able to engage (lock), or disengage (unlock), or disable (make unavailable) the monitoring equipment after a specific number of tries;

a short-range radio frequency (RE) connection that is near-field communication (NFC);

at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RE) connection, or GPS connection that is capable of signal communication with the transmitter or the receiver;

at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature recognition system; and

the monitoring equipment being capable of sending signals to engage (lock), disengage (unlock), or disable (make unavailable) at least one of a home lock, a building lock, or a cargo container lock whereupon a

signal is sent to the receiver of the monitoring equipment from at least one of the home lock, building lock, or cargo container lock, the signal comprising at least one of location data or lock status data to be sent to the monitoring equipment.

3. Monitoring equipment that is at least one of products grouped together by common features of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal, digital assistant (PDA) or smart phone interconnected to a vehicle lock for communication therebetween; the monitoring equipment comprising:

at least one of a central processing unit (CPU), a network processor, or a front end processor for communication between the monitoring equipment and the lock;

a transmitter for transmitting signals and messages to at least one of a manned or unmanned aerial vehicle lock, a manned or unmanned ground vehicle lock, or a manned or unmanned sea vehicle lock;

a receiver for receiving signals from at least one of a manned or unmanned aerial vehicle lock, a manned or unmanned ground vehicle lock, or a manned or unmanned sea vehicle lock;

a lock disabling mechanism that is able to engage (lock), or disengage (unlock), or disable (make unavailable) the monitoring equipment after a specific number of tries;

a short-range radio frequency (RF) connection that is near-field communication (NFC);

at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection that is capable of signal communication with the transmitter or the receiver;

at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature recognition system; and

the monitoring equipment being capable of sending signals to engage (lock), disengage (unlock), or disable (make unavailable) at least one of a manned or unmanned aerial vehicle lock, a manned or unmanned ground vehicle lock, or a manned or unmanned sea vehicle lock, whereupon a signal is sent to the receiver of the monitoring equipment from at least one of the manned or unmanned aerial vehicle lock, manned or unmanned ground vehicle lock, or manned or unmanned sea vehicle lock, the signal comprising at least one of location data or lock status data to be sent to the monitoring equipment.

4. A communication device comprising:

at least one central processing unit (CPU);

at least one motion sensor in communication with the at least one CPU;

at least one viewing screen for monitoring in communication with the at least one CPU;

at least one global positioning system (GPS) connection in communication with the at least one CPU;

at least one of an internet connection Wi-Fi connection in communication with the at least one CPU;

at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU;

at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication

device, disengage (unlock) the communication device, or disable (make unavailable) the communication device;

at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device;

at least one biometric sensor in communication with the at least one CPU for providing biometric authentication to access the communication device;

at least one or more detectors in communication with the art least one CPU for detecting at least one of a chemical, biological, radiological, or explosive agents;

at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU; and

at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or send signals to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling.

5. A monitoring device, comprising:

at least one central processing unit (CPU);

at least one temperature sensor in communication with the at least one CPU for monitoring temperature;

at least one motion sensor in communication with the at least one CPU;

at least one viewing screen for monitoring in communication with the at least one CPU;

at least one global positioning system (GPS) connection in communication with the at least one CPU;

at least one of an internet connection or a Wi-Fi connection in communication with the at least one CPU;

at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU;

at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device;

at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device;

at least one biometric sensor in communication with the at least once CPU for providing biometric authentication to access the communication device;

at least one sensor for chemical, biological, or human detection in communication with the at least one CPU;

one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents;

at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU; and

at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or send signals to

detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling.

6. A monitoring equipment, comprising:

at least one central processing unit (CPU);

at least one motion sensor in communication with the at least one CPU;

at least one light indicator in communication with the at least one CPU;

at least one viewing screen for monitoring in communication with the at least one CPU;

at least one global positioning system (GPS) connection in communication with the at least one CPU;

at least one of an internet connection Wi-Fi connection in communication with the at least one CPU;

at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU;

at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device;

at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device;

at least one biometric sensor in communication with the at least one CPU for providing biometric authentication to access the communication device;

at least one or more detectors in communication with the art least one CPU for detecting at least one of a chemical, biological, radiological, or explosive agents;

at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU; and

at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or send signals to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling.

* * * * *

# Exhibit K



(12) **United States Patent**
**Golden**

(10) **Patent No.:** **US 9,589,439 B2**
(45) **Date of Patent:** ***Mar. 7, 2017**

(54) **MULTI SENSOR DETECTION, STALL TO STOP AND LOCK DISABLING SYSTEM**

(71) Applicant: **Larry Golden**, Mauldin, SC (US)

(72) Inventor: **Larry Golden**, Mauldin, SC (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 81 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **14/806,988**

(22) Filed: **Jul. 23, 2015**

(65) **Prior Publication Data**

US 2016/0027273 A1 Jan. 28, 2016

**Related U.S. Application Data**

(60) Continuation of application No. 14/021,693, filed on Sep. 9, 2013, now Pat. No. 9,096,189, which is a (Continued)

(51) **Int. Cl.**
*B60R 25/102* (2013.01)
*G08B 13/24* (2006.01)
*B60R 25/01* (2013.01)
*B60R 25/04* (2013.01)
*G07C 9/00* (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC ........ ***G08B 13/2491*** (2013.01); ***B60R 25/018*** (2013.01); ***B60R 25/04*** (2013.01); ***B60R 25/102*** (2013.01); ***G07C 9/00912*** (2013.01); ***G08B 15/00*** (2013.01); ***G08B 21/12*** (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC .... G08B 15/00; G08B 15/001; G08B 15/004; G08B 25/009; B60R 25/102; B60R 25/01; B60R 25/018; B60R 25/04; B60R 25/0405; B60R 25/0415; B60R 25/10
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,385,469 A 5/1983 Scheuerpflug
4,544,267 A 10/1985 Schiller
(Continued)

OTHER PUBLICATIONS

United States Department of Homeland Security; Petition for Inter Partes Review of U.S. Pat. No. Re. 43,990 Under 35 U.S.C. §312 and 37 C.F.R. §42.104; Case IPR2014-00714 for U.S. Pat. No. Re. 43,990; Filed Apr. 30, 2014; Washington, D.C., USA; pp. 1-57; copy enclosed (57 pages)
(Continued)

*Primary Examiner* — Van Trieu

(57) **ABSTRACT**

A multi sensor detection and disabling lock system includes detector cases for holding interchangeable detectors that sample for chemical, biological and radiological compounds, agents and elements, with each detector case disposed in or upon the monitored product. The detector case transmits detection information to a monitoring computer terminal and transmits a signal to a lock disabler engaged to the product to lock or disable the product's lock thereby preventing untrained, unauthorized and unequipped individual's from gaining access and entry to the product, and also preventing further contamination of the area. The detection system can be interconnected to surveillance towers scanning detector cases disposed at seaport docks, freight depots and rail terminals for monitoring containers being prepared for shipment or sitting on docks for long periods of time.

**23 Claims, 13 Drawing Sheets**



**Related U.S. Application Data**

continuation of application No. 13/288,065, filed on Nov. 3, 2011, now Pat. No. 8,531,280, which is a division of application No. 12/802,001, filed on May 27, 2010, now Pat. No. 8,334,761, which is a continuation of application No. 12/657,356, filed on Jan. 20, 2010, now Pat. No. 8,106,752, which is a continuation of application No. 12/155,573, filed on Jun. 6, 2008, now Pat. No. 7,636,033, which is a continuation-in-part of application No. 11/397,118, filed on Apr. 5, 2006, now Pat. No. 7,385,497.

(51) **Int. Cl.**
*G08B 15/00* (2006.01)
*G08B 21/12* (2006.01)

(52) **U.S. Cl.**
CPC ... *B60R 2325/205* (2013.01); *B60R 2325/304* (2013.01); *G07C 2009/0092* (2013.01)

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 4,586,441 A | 5/1986 | Zekich |
| 4,792,226 A | 12/1988 | Fishbine |
| 5,222,152 A | 6/1993 | Fishbine |
| 5,223,844 A | 6/1993 | Mansell et al. |
| 5,233,404 A | 8/1993 | Lougheed |
| 5,557,254 A | 9/1996 | Johnson |
| 5,682,133 A | 10/1997 | Johnson |
| 5,766,956 A | 6/1998 | Groger |
| 5,938,706 A | 8/1999 | Feldman |
| 5,959,529 A | 9/1999 | Kail, IV |
| 5,963,657 A | 10/1999 | Bowker |
| 5,986,543 A | 11/1999 | Johnson |
| 5,990,785 A | 11/1999 | Suda |
| 6,049,269 A | 4/2000 | Byrd |
| 6,078,265 A | 6/2000 | Bonder |
| 6,262,656 B1 | 7/2001 | Byrd |
| 6,271,745 B1 | 8/2001 | Arizal |
| 6,374,652 B1 | 4/2002 | Hwang |
| 6,411,887 B1 | 6/2002 | Martens |
| 6,470,260 B2 | 10/2002 | Martens |
| 6,542,076 B1 | 4/2003 | Joao |
| 6,542,077 B2 | 4/2003 | Joao |
| 6,588,635 B2 | 7/2003 | Vor Keller |
| 6,610,977 B2 | 8/2003 | Megerle |
| 6,613,571 B2 | 9/2003 | Cordery |
| 6,628,813 B2 | 9/2003 | Scott |
| 6,647,328 B2 | 11/2003 | Walker |
| 6,738,697 B2 | 5/2004 | Breed |
| 6,923,509 B1 | 8/2005 | Barnett |
| 6,980,092 B2 | 12/2005 | Turnbull |
| 6,988,026 B2 | 1/2006 | Breed et al. |
| 7,005,982 B1 | 2/2006 | Frank |
| 7,034,677 B2 | 4/2006 | Steinthal et al. |
| 7,034,683 B2 | 4/2006 | Ghazarian |
| 7,103,460 B1 | 9/2006 | Breed |
| 7,109,859 B2 | 9/2006 | Peeters |
| 7,116,798 B1 | 10/2006 | Chawla |
| 7,148,484 B2 | 12/2006 | Craig et al. |
| 7,164,117 B2 | 1/2007 | Breed et al. |
| 7,171,312 B2 | 1/2007 | Steinthal et al. |
| 7,243,945 B2 | 7/2007 | Breed et al. |
| 7,339,469 B2 | 3/2008 | Braun |
| 7,346,439 B2 | 3/2008 | Bodin |
| 7,385,497 B2 | 6/2008 | Golden |
| 7,397,363 B2 | 7/2008 | Joao |
| 7,636,033 B2 | 12/2009 | Golden |
| 7,647,180 B2 | 1/2010 | Breed |
| 7,844,505 B1 | 11/2010 | Arneson et al. |
| 7,868,912 B2 | 1/2011 | Venetianer et al. |
| 7,872,575 B2 | 1/2011 | Tabe |
| 7,880,767 B2 | 2/2011 | Chinigo |
| 7,961,094 B2 | 6/2011 | Breed |
| 8,274,377 B2 | 9/2012 | Smith et al. |
| 8,531,521 B2 | 9/2013 | Romanowich |
| 8,564,661 B2 | 10/2013 | Lipton |
| 2002/0145666 A1 | 10/2002 | Scaman |
| 2003/0063004 A1 | 4/2003 | Anthony et al. |
| 2003/0137426 A1 | 7/2003 | Anthony et al. |
| 2003/0206102 A1 | 11/2003 | Joao |
| 2004/0107028 A1 | 6/2004 | Catalano |
| 2004/0222092 A1 | 11/2004 | Musho |
| 2005/0195069 A1 | 9/2005 | Dunand |
| 2006/0164239 A1 | 7/2006 | Loda |
| 2006/0176169 A1 | 8/2006 | Doolin et al. |
| 2006/0181413 A1 | 8/2006 | Mostov |
| 2006/0250235 A1 | 11/2006 | Astrin |
| 2007/0171042 A1 | 7/2007 | Metes et al. |
| 2008/0045156 A1 | 2/2008 | Sakhpara |
| 2008/0122595 A1 | 5/2008 | Yamamichi |
| 2008/0234907 A1 | 9/2008 | Labuhn |
| 2010/0159983 A1 | 6/2010 | Golden |
| 2011/0178655 A1 | 7/2011 | Golden |

OTHER PUBLICATIONS

United States Department of Homeland Security; Declaration of Dr. Sriram Vishwanath; Case IPR2014-00714 for U.S. Pat. No. Re. 43,990; Filed Apr. 30, 2014; Washington, D.C., USA; pp. 1-44; copy enclosed (44 pages).

Richard R Brooks and S.S. Iyengar; Multi-Sensor Fusion Fundamentals and Applications with Software; published 1998; Copyright Prentice Hall PTR; Upper Saddle River, New Jersey, USA; pp. 1-20; copy enclosed (20 pages).

Ramanarayanan Viswanathan and Pramod K Varshney; Distriubted Detection with Multiple Sensors: Part I—Fundamentals; Proceedings of the IEEE; Jan. 1, 1997; pp. 1-11; vol. 85; No. 1; Southern Illinois University Carbondale OpenSIUC; Illinois, USA; pp. 1-11; copy enclosed (11 pages).

Blum; Distributed Detection with Multiple Sensors: Part II—Advanced Topics; Proceedings of the IEEE; Jan. 1, 1997; pp. 1-16; vol. 85, No. 1; Southern Illinois University Carbondale OpenSIUC; Illinois, USA; pp. 1-11; copy enclosed (16 pages).

Victor Lesser; Distributed Sensor Networks a Multiagent Perspective; 2003; pp. 1, 2, 5, 6, 22, 26, 27, 36, 275, 320; copyright 2003 Kluwer Academic Publishers; AH Dordrecht, The Netherlands; copy enclosed (10 pages).

Samuel Blackman and Robert Popoli; Design and Analysis of Modern Tracking Systems; 1999; pp. 1, 2, 6, 472; copyright 1999 Artech House; Norwood, Massachusetts, USA; copy enclosed (4 pages).

Jean-Francois Chamberland; Decentralized Detection in Sensor Networks; 2003; pp. 407-416; IEEE Transactions on Signal Processing; vol. 51, No. 2; Urbana, Illinois, USA; copy enclosed (10 pages).

Oleg Kachirski and Ratan Guha; Effective Intrusion Detection Using Multiple Sensors in Wireless Ad Hoc Networks; pp. 1-8; Proceedings of the 36th Hawaii International Conference on System Sciences; copyright 2003; Orlando, Florida, USA; copy enclosed (8 pages).

Lawrence A Klein; Sensor and Data Fusion A Tool for Information Assessment and Decision Making; 2004; pp. 1-4, 6, 81, 87-89; copyright 2004 The Society of Photo-Optical Instrumentation Engineers; Publisher is SPIE—the International Society for Optical Engineering; Bellingham, Washington, USA; copy enclosed (12 pages).

Dale Ferriero and Khrystyna Pysareva and Andrzej Rucinski; Using Technology to Bridge Maritime Security Gaps; Aug. 1, 2005; Sea Technology; pp. 1-6; copyright Compass Publications, Inc. Jan. 2009; Portsmouth, New Hampshire, USA; copy enclosed (6 pages).

Corie Lok; Cargo Security; MIT Technology Review; Jun. 2004; No. 107; pp. 74-75; publisher is Massachusetts Institute of Technology; Cambridge, Massachusetts, USA; copy enclosed (2 pages).

Thomas C Chen; RFID and Sensor-based Container Content Visibility and Seaport Security Monitoring system; Proceedings of SPIE, vol. 5778; pp. 151-159; Mar. 28, 2005; Publisher is SPIE—

(56) **References Cited**

OTHER PUBLICATIONS

the International Society for Optical Engineering; Bellingham, Washington, USA; copy enclosed (10 pages).
United States Department of Homeland Security; The University of Texas at Austin College of Engineering Standard Resume of Sriram Vishwanath; Case IPR2014-00714 for U.S. Pat. No. Re. 43,990; Filed Apr. 30, 2014; Washington, D.C., USA; pp. 1-21; copy enclosed (21 pages).
United States Patent and Trademark Office; Office Action from U.S. Appl. No. 11/397,118; mailed Nov. 14, 2007; Alexandria, Virginia, USA; pp. 1-12; parent U.S. Appl. No. 13/288,065 (12 pages).
United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/155,573; mailed Apr. 9, 2009; Alexandria, Virginia, USA; pp. 1-7; parent U.S. Appl. No. 13/288,065 (7 pages).
United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/155,573; mailed Jul. 30, 2009; Alexandria, Virginia, USA; pp. 1-9; parent U.S. Appl. No. 13/288,065 (9 pages).
United States Patent and Trademark Office; Notice of Allowability from U.S. Appl. No. 12/155,573; mailed Oct. 28, 2009; Alexandria, Virginia, USA; pp. 1-5; parent U.S. Appl. No. 13/288,065 (5 pages).
United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/657,356; mailed Jul. 12, 2010; Alexandria, Virginia, USA; pp. 1-14; parent U.S. Appl. No. 13/288,065 (14 pages).
United States Patent and Trademark Office; Notice of Allowability from U.S. Appl. No. 12/657,356; mailed Mar. 10, 2011; Alexandria, Virginia, USA; pp. 1-4; parent U.S. Appl. No. 13/288,065 (4 pages).
United States Patent and Trademark Office; Office Action from U.S. Appl. No. 13/065,837; mailed Jul. 18, 2011; Alexandria, Virginia, USA, pp. 1-9; parent U.S. Appl. No. 13/288,065 (4 pages).
A newspaper article of Mr. Melvin Sullivan and his family that references the date, Mar. 6, 2001; parent U.S. Appl. No. 13/288,065.
A letter of response Mr. Sullivan received from Pfeiffer & Gantt, PA, dated Sep. 16, 2002; parent U.S. Appl. No. 13/288,065.
A "Certificate of Existance" Bright Idea Inventor, LLC. Nov. 6, 2002; parent U.S. Appl. No. 13/288,065.
Operating Agreement of Bright Idea Inventor, LLC received from Pfeiffer & Gantt, PA, dated Nov. 13, 2002; parent U.S. Appl. No. 13/288,065.
A letter of response Golden received from the Honorable Congressman from Maryland, Elijah E. Cummings, dated Dec. 16, 2002; parent U.S. Appl. No. 13/288,065.
A newspaper article of Mr. Melvin Sullivan and Mr. Larry Golden, dated, Feb. 27-Mar. 5, 2003; parent U.S. Appl. No. 13/288,065.
A letter of response Golden received from the Honorable Senator from South Carolina, Ernest F. Hollings, dated May 21, 2003; parent U.S. Appl. No. 13/288,065.
A letter of response Golden received from the Office of the Vice President, Dick Cheney, dated Jun. 3, 2003; parent U.S. Appl. No. 13/288,065.
A letter of response Golden received from the Honorable Senator from South Carolina, Ernest F. Hollings, dated Oct. 1, 2003; parent U.S. Appl. No. 13/288,065.
A letter of response Golden received from the Honorable Senator from South Carolina, Lindsey O. Graham, dated Oct. 21, 2003; parent U.S. Appl. No. 13/288,065.
A letter sent to the President of the United States George W Bush, the President's Cabinet, the United States Senate and the Congressional Black Caucus, dated May 23, 2005; parent U.S. Appl. No. 13/288,065.
On Nov. 17, 2005, an "Inventor's Official Record of Invention", was filed in my name (Golden) at "The Law Office of David P. Gaudio, P.C.; the Inventors Network."; parent U.S. Appl. No. 13/288,065.
On Aug. 23, 2005, the "Disclosure Document Registration"; parent U.S. Appl. No. 13/288,065.
On Apr. 5, 2006, the "Patent Application" was filed in my name (Golden) at the United Staets Patent & Trademark Office in Washington, D.C.; parent U.S. Appl. No. 13/288,065.
On Jun. 6, 2008, the "Continuance-In-Part, (CIP) Application" was filed in my name (Golden) at the United States Patent & Trademark Office in Washington, D.C.; parent U.S. Appl. No. 13/288,065.
On Jan. 20, 2010, a "Continuation Application" (U.S. Appl. No. 12/657,356) was filed in my name (Golden) at the United States Patent & Trademark Office in Washington, D.C.; parent U.S. Appl. No. 13/288,065.
Reissue of U.S. Pat. No. 7,636,033;"Swear Back"; in accordance to Title 37—Code of Federal Regulations Patents, Trademarks, and Copyrights; Apr. 8, 2011; parent U.S. Appl. No. 13/288,065.
Reissue of U.S. Pat. No. 7,636,033; "Swearback—History of Work"; Apr. 8, 2011; parent U.S. Appl. No. 13/288,065.
United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/802,001; mailed Apr. 14, 2011; Alexandria, Virginia, USA; pp. 1-16; parent U.S. Appl. No. 13/288,065 (16 pages).
United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/802,001; mailed Oct. 20, 2011; Alexandria, Virginia, USA; pp. 1-5; parent U.S. Appl. No. 13/288,065 (5 pages).
United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/802,001; mailed May 27, 2011; Alexandria, Virginia, USA; pp. 1-14; parent U.S. Appl. No. 13/288,065 (14 pages).
United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 12/802 001; copyright and mailing date Dec. 12, 2011, pp. 1-9, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 13/288,065 (9 pages).
United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/065,837; copyright and mailing date Dec. 2, 2011, pp. 1-27, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 13/288,065 (27 pages).
United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/065,837; copyright and mailing date Nov. 1, 2011, pp. 1-18, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 13/288,065 (18 pages).
United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/199,853; copyright and mailing date Jan. 13, 2012, pp. 1-34, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 13/288,065 (34 pages).
United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 12/802,001; copyright and mailing date Mar. 26, 2012, pp. 1-12, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 13/288,065 (12 pages).
United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/199,853; copyright and mailing date Feb. 22, 2012, pp. 1-38, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 13/288,065 (38 pages).
United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/065,837; copyright and mailing date Feb. 22, 2012, pp. 1-25, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 13/288,065 (25 pages).
United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/288,065; copyright and mailing date Aug. 24, 2012, pp. 1-4, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 13/288,065 (4 pages).
United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/288,065; copyright and mailing date Nov. 28, 2012, pp. 1-11, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 13/288,065 (11 pages).
United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/288,065; copyright and mailing date Apr. 16, 2013, pp. 1-9, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 13/288,065 (9 pages).
United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 14/021,693; copyright and mailing date Apr. 20, 2015, pp. 1-20, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 14/021,693 (20 pages).

(56) **References Cited**

OTHER PUBLICATIONS

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 14/021,693; copyright and mailing date Jan. 20, 2015, pp. 1-17, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 14/021,693 (17 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 14/021,693; copyright and mailing date Sep. 5, 2015, pp. 1-12, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 14/021,693 (12 pages).

U.S. Patent Mar. 7, 2017 Sheet 1 of 13 US 9,589,439 B2

32
INTERNET CONNECTION
34
GPS CONNECTION
36
POWER SOURCE
10
22
44
58
64
62
66
44
26
56
44
28
12
52
48
46
52
54
54
46
46
50
52
50
46
48

Fig. 1

Fig. 2

SAppx506

U.S. Patent Mar. 7, 2017 Sheet 2 of 13 US 9,589,439 B2

14
60
58
56

Fig. 3a

14
60
58
56

Fig. 3b

SAppx507

U.S. Patent Mar. 7, 2017 Sheet 3 of 13 US 9,589,439 B2

14
16
12
44
44

Fig. 4

14
12
42
42
16
112
12
12
42
12
POWER SOURCE
114

Fig. 5

SAppx508

U.S. Patent Mar. 7, 2017 Sheet 4 of 13 US 9,589,439 B2

18
12
44
12
44
12
44
112
20
POWER SOURCE
114
68
70
72
56

Fig. 6

Fig. 7

SAppx509

U.S. Patent Mar. 7, 2017 Sheet 5 of 13 US 9,589,439 B2

68
72
70
56

Fig. 8

SAppx510

U.S. Patent Mar. 7, 2017 Sheet 6 of 13 US 9,589,439 B2

32
INTERNET CONNECTION
34
GPS CONNECTION
36
POWER SOURCE
10
22
42
58
62
64
66
44
44
28
12
26
56
52
48
46
54
54
46
50
52
46

Fig. 9

SAppx511

U.S. Patent Mar. 7, 2017 Sheet 7 of 13 US 9,589,439 B2

38
22
12
26
30
26
32
34
36
38
24

Fig. 10

76
AGENT DETECTED?
NO
YES
80
SOUND ALARM
82
LIGHT ALARM
74
40
CPU
84
READINGS
86
RESET
78
SENSING MODE
STOP

Fig. 11

SAppx512

U.S. Patent Mar. 7, 2017 Sheet 8 of 13 US 9,589,439 B2

76
AGENT DETECTED?
NO
88
YES
82
LIGHT ALARM
80
SOUND ALARM
84
READINGS
90
DETECTOR RESET
78
SENSING MODE
STOP
76
46
DETECTOR
40
12
CASE
92
94
LOCK/DISABLE LOCK SIGNAL
96
DISARM AND RESET
98
DETECTION MODE

Fig. 12

Fig. 13

SAppx513

U.S. Patent Mar. 7, 2017 Sheet 9 of 13 US 9,589,439 B2

46
DETECTOR
100
40
CASE
12
DISABLER
62
102
AUTHORIZED FINGERPRINT?
NO
YES
104
DISABLE AND DISARM
ACCESS DENIED
RESET
101
106
DETECTION MODE
108
110
112
WATCHTOWER
116
DETECTION MODE
118
NO
AGENT DETECTED?
YES
LIGHT ALARM INDICATOR
42
114
MONITORING TERMINAL
120
LOCK/DISABLE SIGNAL
122
CLEANUP MEASURES
124
RESET
116
DETECTION MODE

Fig. 14

Fig. 15

SAppx514

U.S. Patent Mar. 7, 2017 Sheet 10 of 13 US 9,589,439 B2

136
126
140
144
128
134
146
132
142
130
138

Fig. 16

SAppx515

U.S. Patent Mar. 7, 2017 Sheet 11 of 13 US 9,589,439 B2

162
158
154
156
170
INTERNET CONNECTION
172
GPS CONNECTION
150
164
POWER SOURCE
174
160
186
168
166
162
176
184
178
180
182

Fig. 17

SAppx516

U.S. Patent Mar. 7, 2017 Sheet 12 of 13 US 9,589,439 B2

204
210
187a
187b
206
206
214
212
190
216
208
202
196
194
200
198
192
138
188

Fig. 18

SAppx517

U.S. Patent Mar. 7, 2017 Sheet 13 of 13 US 9,589,439 B2

204
220
187a
187b
218
224
190
222
202
196
138
194
200
198
192
188

Fig. 19

SAppx518

# MULTI SENSOR DETECTION, STALL TO STOP AND LOCK DISABLING SYSTEM

This application is a continuation application and claims the filing date and benefit of U.S. patent application Ser. No. 14/021,693 titled "Multi Sensor Detection, Stall to Stop and Lock Disabling System" filed on Sep. 9, 2013 that issued on Aug. 4, 2015 as U.S. Pat. No. 9,096,189, the entire contents of which are incorporated by reference herein in their entirety for all purposes. U.S. Pat. No. 9,096,189 is a continuation application and claims the filing date and benefit of U.S. patent application Ser. No. 13/288,065 titled "Multi Sensor Detection, Stall to Stop and Lock Disabling System" filed on Nov. 3, 2011 and that issued on Sep. 10, 2013 as U.S. Pat. No. 8,531,280, the entire contents of which are incorporated by reference herein in their entirety for all purposes. U.S. patent application Ser. No. 13/288,065 that will issue as U.S. Pat. No. 8,531,280 is a divisional application and claims the filing date and benefit of U.S. patent application Ser. No. 12/802,001 titled "Multi Sensor Detection, Stall to Stop, and Lock Disabling System" filed on May 27, 2010, now U.S. Pat. No. 8,334,761, the entire contents and complete subject matter of which are incorporated by reference herein in their entirety for all purposes. U.S. patent application Ser. No. 12/802,001 is a continuation application and claims the filing date and benefit of U.S. patent application Ser. No. 12/657,356 titled "Multi Sensor Detection, Stall to Stop and Lock Disabling System" filed on Jan. 20, 2010, now U.S. Pat. No. 8,106,752 and incorporates the entire contents and complete subject matter therein by reference in their entirety for all purposes. U.S. Pat. No. 8,106,752 is a continuation of and claims priority to U.S. Pat. No. 7,636,033. U.S. Pat. No. 7,636,033 is a continuation-in-part of and claims priority to U.S. Pat. No. 7,385,497. U.S. patent application Ser. No. 13/288,065 that issued as U.S. Pat. No. 8,531,280 also claims the filing date and benefit of and incorporates the entire contents of U.S. patent application Ser. No. 12/657,356, now U.S. Pat. No. 8,106,752 herein by reference for all purposes. The present application also claims the filing date and benefit of and incorporates the entire contents of U.S. Pat. Nos. 8,531,280; 8,334,761; 8,106,752; 7,636,033; and 7,385,497 by reference herein in their entireties for all purposes.

## FIELD OF THE INVENTION

The present invention pertains to anti-terrorist detection and prevention systems, and more particularly pertains to a disabling lock mechanism combined with a chemical/biological/radiological detection system for use with products grouped together by similar characteristics in order to prevent unauthorized entry, contamination and terrorist activity.

## BACKGROUND OF THE INVENTION

Terrorist activity is a continuous, daily, worldwide threat to the stability, prosperity, security and peace within nations and between and among nations. Its danger lies in its arbitrary destructiveness as much as in its unpredictability, and the constant threat of terrorist activity compels measures and actions that cause strain and contention in free, democratic societies as security concerns and civil liberty concerns must be balanced so that both public safety and civil liberties are maintained. Safety and security concerns can be addressed through numerous proactive steps and measures, many of which cause only minimal interference with and disruption of the daily routines of work, travel, commerce

and entertainment. However, because modern industrial societies afford almost limitless places, locations, and opportunities for terrorist activities, no safety measure or security protocol will be foolproof, but many security measures, systems and protocols can be implemented that greatly minimize specific threats through fingerprint identification procedures, chemical, biological, and radiological hazard detections, bomb and explosive detection, and controlling the access to everything from shipping containers to school lockers. Thus, the prior art discloses a wide range of security measures and systems.

For example, the Fishbine et al. patent (U.S. Pat. No. 4,792,226) discloses an optical fingerprinting system that includes an optics/processor unit, a video monitor, a data terminal, and a printer for collecting and storing data characteristics of all ten individual fingerprints for printing demographic information and fingerprint images as desired on a standard booking or applicant card.

The Schiller patent (U.S. Pat. No. 4,544,267) discloses a finger identification unit that includes a fingerprint scanning apparatus using a collimated beam of light to interrogate the fingerprint of a finger placed against a platen so that successive scan positions produce signals containing fingerprint information.

The Fishbine et al, patent (U.S. Pat. No. 5,222,152) discloses a portable fingerprint scanning apparatus for optically scanning and recording fingerprint images and wirelessly transmitting such images to a mobile processing unit for verification and background checking.

The Lougheed at al. patent (U.S. Pat. No. 5,233,404) discloses an optical scanning apparatus that uses a linear charge coupled device (CCD) for recording the image of a fingerprint on the viewing surface.

The Groger et al. patent (U.S. Pat. No. 5,766,956) discloses a diode laser based sensor for undertaking optical, chemical, immunological or nucleic acid-based assay or other chemical analysis.

The Feldman patent (U.S. Pat. No. 5,938,706) discloses a multi element security system for preventing the unauthorized use of an automotive vehicle, and which includes numerous locking and control features interconnected to an onboard cpu.

The Bowker et al. patent (U.S. Pat. No. 5,963,657) discloses a safety access control for doors, handles, locks, etc., wherein the surface relief of a finger is read and verified to either allow or prevent access by the individual to the door, handle, lock, etc.

The Bonder et al. patent (U.S. Pat. No. 6,078,265) discloses a fingerprint identification security system wherein a key lock operated security system utilizes the fingerprint of the individual to control user access to the security system, such as the ignition system of an automotive vehicle.

The Anzai et al. patent (U.S. Pat. No. 6,271,745 B1) discloses a keyless authorization system for use of a motor vehicle that includes fingerprint reading units located on the exterior or interior of the motor vehicle and which is coupled to a control unit for scanning, comparing and matching fingerprints to allow or disallow access to the motor vehicle.

The Hwang patent (U.S. Pat. No. 6,374,652 B1) discloses a fingerprint-activated doorknob in which a detecting sensor for a fingerprint is placed on the doorknob for measuring and searching the fingerprint against previously stored fingerprint inputs to control access to the door.

The Vor Keller et al. patent (U.S. Pat. No. 6,588,635 B2) discloses a safety holster for a firearm that includes a pivotally mounted retaining member and a fingerprint sensor

for scanning fingerprint information so that only authorized users can withdraw the firearm from the holster.

The Cordery et al. patent (U.S. Pat. No. 6,613,571 B2) discloses a method and system for detecting biological and chemical hazards in the mail that includes sensors placed within the mail box for sampling and testing ambient air and so that mail can be safely transported through the mail system.

The Nagata patent (U.S. Pat. No. 6,628,213 B2) discloses a coding method for digital signal coding and decoding that includes a CMI (code-marked inversion) method of signal coding.

Nonetheless, despite the ingenuity of the above devices, methods, and systems, there remains a need for a multi-detector and disabling lock system for use with various types of products collected together by common characteristics into product groupings for detecting chemical, biological and radiological agents and compounds and for selectively disabling and activating the product locks thereby preventing unauthorized entry and further contamination and preventing and thwarting terrorist activities.

## SUMMARY OF THE INVENTION

The present invention comprehends a chemical/biological/radiological detector unit with a disabling locking system for protecting products that can be grouped into several product groupings, from terrorist activity, and also for preventing unauthorized access to and tampering with the storage and transport of ordnance and weapons. The products grouped into what may be referred to as Product grouping 1 include, but are not limited to, cargo containers, shipping containers, tractor trailers, snail carriers, mail boxes and lockers; while the products grouped into what may be referred to as Product grouping 2 include, but are not limited to, chemical, biological, radiological, and nuclear detectors, motion sensors and door sensors. The multi sensor detection system includes the capability to disable an existing lock or activate a lock located inside any of the products named in the product grouping categories upon activation of a sensor or detector included in the system. This is a significant feature for the multi sensor detection system as it prevents unauthorized, unequipped and untrained entry and access to the product thus preventing further contamination of the site and to individuals in the area.

The multi sensor detection and lock disabling system includes a detector case sized to fit in, upon or adjacent any of the aforedescribed products for detecting harmful and dangerous chemical, biological, and radiological agents, compounds and elements. In addition, the multi sensor detection and lock disabling system is capable of transmitting a signal to lock or disable a lock on the product, and is also capable of transmitting signals to a monitoring computer terminal or PC so that appropriate defensive and safeguarding actions can be undertaken and an authorized individual can disarm and reset the locking system and the multi sensor detection system. The detector case includes a power source (battery or electrical), interior compartments, Internet and GPS connections and a cpu interconnected with the Internet and GPS connections, and also interconnected with one or more off site monitoring computer terminals or PCs. The detector case includes one or more light alarm indicators that are externally visible and that light up when the chemical, biological, or radiological agent or compound is detected, and the light alarm indicators (which can be indicator lights or panels on the front of the detector case) can be color coded for denoting the specific agent or compound detected, i.e., separate and distinct colors for indicating detection of the chemical, biological, or radiological agent or compound.

The detector case is designed to hold within the interior compartments one or more interchangeable detectors, and each detector is adapted and set up to sample a specific compound or agent. Each detector includes a sound alarm, a sensor, a light alarm, and a readings panel, and is electrically interconnected (either by wire or wirelessly) to the cpu of the detector case so that information regarding the detection of the particular agent or compound can be conveyed from the detectors to the detector case cpu. Each detector can also be used as a manual, stand-alone hand held scanner.

The multi sensor detection and lock disabling system can be interconnected to a surveillance watchtower, as well as monitoring computer terminals or PCs, with the watchtower scanning shipping and cargo crates and containers being prepared for shipment or sitting for extended periods of time on a dock or at a port, at a railway site, or at an industrial storage facility. The watchtower will scan the cargo and shipping crates and containers for the light alarm indicators on detector cases that are mounted in or upon the crates and containers, and thus continuous security surveillance of the crates and containers can be maintained.

An enhanced version of the multi sensor detection and lock disabling system can be employed to prevent car and vehicle bombings. Coupling the multi sensor detection and lock disabling system with satellite service will enable the detection system to detect explosives and transmit an alert signal by satellite to monitoring equipment at a monitoring site. Upon receiving the alert signal at the monitoring site the monitoring equipment activates a stall-to-stop process for disabling the air, fuel, electrical and/or computer system of the vehicle. Moreover, upon receiving the alert signal at the monitoring site the car or vehicle will be locked by transmission of a satellite signal that disables the vehicle's electrical and ignition system thereby preventing escape of the terrorist.

It is an objective of the present invention to provide a multi sensor detection and disabling lock system for securing news racks and vending machines in order to prevent theft, unauthorized use and terrorist activity.

It is another objective of the present invention to provide a multi sensor detection and disabling lock system for preventing terrorist activity by using products grouped together by common features in several product groupings such as design similarity, similarity in the presentation of security problems and similarity with regard to the presentation of solutions to preventing terrorist solutions.

It is still yet another objective of the present invention to provide a multi sensor detection and disabling lock system that is capable of disabling an existing lock or activating a lock inside any of the products of the product grouping lists when a detector or sensor of the system is activated.

It is still yet a further objective of the present invention to provide a multi sensor detection and disabling lock system wherein the disabling lock system prevents the unauthorized entry, access and further contamination of the products included in the several product groupings.

A still further objective of the present invention is to provide a multi sensor detection and lock disabling system that utilizes a multi-task device for preventing terrorist activity to vulnerable products that are collected or arranged by product grouping categories.

Yet a further objective of the present invention is to provide a multi sensor detection and disabling lock system

to secure cargos and containers, especially cargo and shipping containers, against chemical, biological, radiological and nuclear terrorist activity.

Still another objective of the present invention is to provide a multi sensor detection and disabling lock system capable of detecting chemical, biological and radiological agents and compounds.

Still yet another objective of the present invention is to provide a multi sensor detection and disabling lock system that includes interchangeable detectors that operate in conjunction to detect chemical, biological and radiological agents and compounds.

Still yet a further objective of the present invention is to provide a multi sensor detection and disabling lock system that can be implemented by business or government at a minimum cost by organizing the products to be protected into product grouping categories.

Another objective of the present invention is to provide a multi sensor detection and disabling lock system that accurately and reliably detects harmful agents, compounds and elements, and prevents the placement and storage of weapons and bombs in the range of storage containers and facilities currently available.

Still, another objective of the present invention is to provide a multi sensor detection and disabling lock system wherein the interchangeable detectors that comprise part of the system can be used as stand-alone scanners.

These and other objects, features, and advantages will become apparent to those skilled in the art upon a perusal of the following detailed description read in conjunction with the accompanying drawing figures and appended claims.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. **1** is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the primary features of the system which include a detector case, several interchangeable detectors, an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler;

FIG. **2** is a front elevation view of the multi sensor detection and lock disabling system of the present invention illustrating one of the interchangeable detectors first shown in FIG. **1**;

FIG. **3*a*** is a top plan view of the multi sensor detection and lock disabling system of the present invention illustrating the mounting of one lock disabler to the lock of a product, such as a container, and disengaged from the lock of the container;

FIG. **3*b*** is a top plan view of the multi sensor detection and lock disabling system of the present invention illustrating the engagement of the lock disabler to the lock of the product for locking or disabling the lock of the product so that unauthorized access is prevented;

FIG. **4** is a side elevation view of the multi sensor detection and lock disabling system of the present invention illustrating the detector case mounted to the product, such as the container, with the light alarm indicators externally visible;

FIG. **5** is a schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the interconnection of detector cases with a surveillance watchtower and a monitoring PC terminal;

FIG. **6** is a schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the placement of detector cases upon containers different from the containers of FIG. **5**, and wherein the detectors case are interconnected to a surveillance watchtower and a monitoring PC terminal;

FIG. **7** is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the mounting of one automatic/mechanical lock disabler to the lock of a standalone news rack;

FIG. **8** is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating one interchangeable detector placed within the standalone news rack;

FIG. **9** is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the detector case having color coded front panels for specifically indicating the agents, compounds or elements that have been detected;

FIG. **10** is a rear elevation view of the multi sensor detection and lock disabling system of the present invention illustrating the GPS, Internet and power source connections;

FIG. **11** is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the interconnection of the detector with the detector case and the steps undertaken by the system when an agent or compound is detected;

FIG. **12** is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the sequence of steps undertaken by one detector when functioning as a standalone scanner for detecting an agent or compound;

FIG. **13** is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the interconnection of the detector case with the automatic/mechanical lock disabler for activating the lock disabler upon detection by the system of an agent or compound;

FIG. **14** is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating interconnection of the detector case with the fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock as part of the process of detection and safeguarding the public upon detection of the agent or compound;

FIG. **15** is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the incorporation of the system with a surveillance watchtower and a monitoring PC or computer terminal for monitoring containers, such as shipping or cargo containers, that may sit for extended time periods on docks, at rail yards, and at industrial storage facilities;

FIG. **16** is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the integration of the detection system with a satellite and monitoring equipment at a monitoring site for detecting explosives placed in a vehicle and then transmitting signals to the satellite and then to the monitoring site for disabling and locking the vehicle;

FIG. **17** is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the incorporation of the features and elements of the detector case to a cell phone and cell phone case;

FIG. **18** is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the incorporation of a OPS satellite, a monitoring site and a cell phone tower for communicating to and with an electronic device such as a laptop computer or a cell phone

for transmitting signals to a vehicle for activating an onboard stall-to-stop device for bringing the vehicle to a halt; and

FIG. 19 is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the use of a GPS satellite in conjunction with the monitoring site and monitoring equipment to relay commands and signals to the cpu or transceiver of the vehicle for stopping or locking the vehicle in response to a signal that a certain type of event (detection of a bomb, engine failure or malfunction or unauthorized use) has occurred or is in process

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

Illustrated in FIGS. 1-19 is a multi sensor detection and lock disabling system 10 for preventing terrorist activity by monitoring, detecting, and securing those critical areas, sites, and facilities vulnerable to terrorist activity. The first step is the identification of critical areas, sites, locations and facilities that are vulnerable to terrorist activity as convenient places to store and plant explosives and bombs and spread biological, chemical or radiological agents and compounds, followed by the disposition of the multi sensor detection and lock disabling system 10 for monitoring, detecting, and securing the particular location or site. Vulnerable sites, locations, facilities and areas are nearly limitless in their variety; in order to categorize the protection the present invention provides an anti-terrorist product grouping strategy has been developed wherein products made from the same or similar material, products having the same or similar design, and products presenting the same or similar security problems are grouped together with the multi sensor detection and lock disabling system 10 for preventing terrorist activity. For example, two preferred product groupings can be Product Grouping I: cargo containers, shipping containers, cargo planes, freight train cars, tractor trailers, mail carriers (UPS, FedEx), airport lockers, news racks (coin and non-coin operated), mail drop boxes, cluster mail boxes, keyed mail boxes, min-storage houses and buildings, bicycle lockers, stadium lockers, school lockers, cars, trucks, campers, buses, vans and utility vehicles. Product Grouping II: chemical detectors, biological detectors, radiological detectors, nuclear detectors, motion sensors, glass break sensors, plastic film on glass, high security locks, tampering labels, door sensors, disabling locking systems, vehicle detectors and satellite disabling locking systems. In addition to grouping products together by features, designs and materials, the multi sensor detection system 10 includes a lock disabling capability for disabling an existing lock or activating a lock on or inside any of the aforementioned products when a detector or sensor of the system is activated. The lock disabling feature is a crucial component of the invention in so far as it prevents unauthorized, unequipped or untrained individuals from gaining access and entry to the site and causing further contamination of the site.

As shown in FIGS. 1-10, the multi sensor detection and lock disabling system 10 includes at least one—and preferably many—detector case 12 that can be placed in, on, upon or adjacent the product, such as the shipping containers 14 of FIGS. 4 and 5 resting upon a platform 16 or the cargo container 18 of FIG. 6 sitting upon a seaport dock or pier 20. The detector case 12 includes a top 22, a bottom 24, a pair of opposed sides 26 and a front side or panel 28 and an opposite rear or back side 30. The rear side 30 has connections or contacts that can include an Internet connection 32, a GPS connection 34 and a power connection 36 for a power source. The power source for the detector system 10 can be any conventional battery or electrical source. The detector case 12 includes an interior chamber divided into a number of compartments 38 for holding therein agent or compound detection means hereinafter further described. A cpu 40 is mounted within the detector case 12 and electrically interconnects, routes, and transmits signals among items hereinafter further described and also communicates with a monitoring site and monitoring equipment. The front side 28 of the detector case 12 includes indicator means for visually indicating that a specific agent, compound or element has been detected. The indicator means can include color coded indicator lights 42 in panel form, as shown in FIG. 9, with each indicator light panel 42 lighting up with a specific color corresponding to the detection of a specific agent or compound; or color coded indicator lights 44, as shown FIG. 1, that correspond to and individually light up on the detection of a specific agent or compound (chemical, biological, or radiological).

As shown in FIGS. 1, 2 and 9-13, the multi sensor detection and lock disabling system 10 includes a plurality of detectors 46 with each detector 46 adapted for and set up to sample for a specific agent or compound (biological, chemical, or radiological); and the detectors 46 are interchangeable for adapting to the needs and demands of future technology. The detectors 46 can also be used as standalone scanners. In the preferred embodiment of the invention, at least three detectors 46 are placed within the detector case 12 with one detector 46 for specifically sampling biological agents or compounds, one detector 46 for sampling chemical agents or compounds, and one detector 46 for sampling radiological agents or compounds. The detectors 46 are interconnected to the cpu 40 of the detection system 10 by conventional connections that can be wire or wireless for transmitting the appropriate signals to the cpu 40 upon detection of the particular agent or compound. As shown in FIG. 2, each detector 46 includes on its front plate or facing surface a sound alarm indicator 48, a readings panel 50 comprising a plastic shield and LED lights for displaying the various read-out messages, a sensor 52 for detecting the specific agent, element or compound, and a light alarm indicator 54 that can be color coded for each specific agent and which is externally visible when the detector 46 is used as a stand alone scanner. Each detector 46 includes a conventional microprocessor for controlling the various functions and generating the appropriate signals for transmission to the cpu 40 of the detector case 12.

As shown in FIGS. 1, 3*a*, 3*b*, 9, and 13-15, used in conjunction with the multi sensor detection and lock disabling system 10 is at least one automatic/mechanical lock disabler 56—and depending upon the number of products being monitored there can be one lock disabler 56 for each product. The automatic/mechanical lock disabler 56 is physically connected to the detector case 12 by a wire or cable 58 for receiving signals therefrom for disabling an existing lock or activating a lock inside a product to prevent access to the product. By way of example, FIG. 3*a* shows the automatic/mechanical lock disabler 56 mounted—by any conventional means—to the lock 60 of the shipping container 14 shown in FIGS. 4 and 5 and connected by wire 58 to the cpu 40 of the detector case 12. The lock disabler 56 is in the non-activated or disengaged state in FIG. 3*a*. FIG. 3*b* shows the automatic/mechanical lock disabler 56 mounted to the lock 60 of the shipping container 14 and in the activated or engaged state after detection of an agent or compound by the system 10 thereby for locking or disabling

the lock 60 of the shipping container 14 and preventing unauthorized entry and access by unauthorized, untrained and unequipped individuals. In FIGS. 3a and 3b the lock 60 secures doors of the shipping container 14 that can be slidably or pivotably opened and closed.

In addition to the automatic/mechanical lock disabler 56, the multi sensor detection and lock disabling system 10 can also utilize a fingerprint biometric lock with disabler 62 as shown in FIGS. 1 and 14. The fingerprint biometric lock with disabler 62 is interconnected to the cpu 40 of the detector case 12 for receiving transmissions therefrom after detection of an agent or compound has occurred so that the lock on the product can be locked or disabled. Moreover, resetting of the fingerprint biometric lock with disabler 62 occurs when the fingerprint of the individual is placed on the fingerprint-matching pad 64, and if a match occurs with a known fingerprint stored by the cpu 40, then the individual can reset the fingerprint biometric lock with disabler 56 by turning the manual lock disabler 66. The fingerprint biometric lock with disabler 62 is mounted to the lock of the product in a manner similar to the mounting of the automatic/mechanical lock disabler 56 that is shown in FIGS. 3 and 3b.

FIGS. 4 and 5 show one manner of disposition or placement of the detector case 12 in relation to the product, i.e., the shipping container 14, with the color coded indicator lights 42 externally viewable; FIG. 5 shows a number of shipping containers 14 each equipped with a detector case 12 and integrated with elements hereinafter further described for continuously monitoring the shipping containers 14 as they sit for an extended period of time on the truck or rail platform 16. FIG. 6 illustrates several cargo containers 18 sitting on the shipping dock or pier 20, with each cargo container 18 having a detector case 12 mounted thereon and integrated with and monitored by elements shown in FIG. 5 and hereinafter further described.

FIG. 7 illustrates a typical product from product grouping 1 that is monitored by the multi sensor detection and lock disabling system 10 of the present invention; specifically, FIG. 7 shows a news rack 68 with one automatic/mechanical lock disabler 56 mounted to and interconnected with the locking mechanism of the news rack 68. As long as there is no detection of any agent or compound, the lock disabler 56 is in the disengaged state, and the individual can deposit the coin amount in the chute and then freely open the glass panel 70 by the handle 72 for removing a paper. However, the lock disabler 56 would be activated upon detection of the harmful agent or compound and receipt of a signal from the cpu 40 for locking or disabling the locking mechanism thereby denying access to the interior of the news rack 68 from all untrained, unauthorized and unequipped individuals.

FIG. 8 illustrates one detector 46 disposed within the news rack 68 and which is visible through the panel 70 for detecting one specific agent, compound or element. The detector 46 functions as a stand-alone scanner and can be wirelessly interconnected to offsite monitoring equipment.

FIG. 11 illustrates a representative schematic 74 for describing the signal transmission process from the detector 46 to the cpu 40 of the detector case 12. The external stimulus 76 would be the chemical, biological or radiological agent or compound. If there is no detection of the agent or compound, the detector 46 will stay in the sensing mode 78. However, detection of the specific agent will trigger the sound alarm 80 and the light alarm 82, and instant transmittal of a signal to the cpu 40. The readings 84 can be stored by the cpu 40 for verification and future review and evaluation. After all the appropriate corrective and preventative

measures have been undertaken by the trained and authorized personal, and the site has been cleansed of the contamination, authorized and equipped personal can then reset 86 the system 10.

FIG. 12 illustrates a representative schematic 88 for the detector 46 when used as stand-alone scanner. The detector 46 undergoes the same essential steps as illustrated in FIG. 11, with the exception of the signal transmission to the cpu 40. The detector 46 remains in detection mode 78 until an agent is detected, and then the various functions—light alarm 82, sound alarm 80, storage of readings 84, and, after the appropriate security and safety steps have been carried out by authorized personal, detector reset 90 by authorized personal can occur thereby placing the detector 46 back in detection or sensing mode 78.

FIG. 13 is a representative schematic 92 that illustrates the steps undertaken by the system 10 to lock or disable a lock, such as the lock 60 for the shipping container 14 shown in FIGS. 3a and 3b. Upon detection of the agent (chemical, biological, radiological) the alarm light indicators 42 or 44 will light up providing external indication that an agent has been detected. In addition, the system 10—the cpu 40—will transmit a lock/disable lock signal 94 to the automatic/mechanical lock disabler 56 to lock or disable the lock on the product, such as the lock 60 on the shipping container 14 of FIGS. 3a-5. This prevents unauthorized, unequipped, or untrained individuals from entering or gaining access to the product for which a dangerous and perhaps lethal agent has been detected. After the proper authorities and authorized personal have been notified and all the appropriate security, preventative and clean up measures have been undertaken, the authorized individual can perform the disarm and reset function 96 for the system 10 placing the system 10 in back in the detection mode 98.

FIG. 14 is a representative schematic 100 illustrating the use of the fingerprint biometric lock with disabler 62 with the system 10. Upon detection of the agent or compound by the detector, the various alarms would sound and light up (shown in previous figures), and the cpu 40 would then transmit a signal to the fingerprint biometric lock, with disabler 62 to lock or disable the lock on the product, such as the lock 60 on the shipping containers 14 shown in FIGS. 3a-5. The shipping containers 60 would remain locked and in an access denied mode 101 should an attempt be made to gain access to the container 60 by opening the lock 60 with an unauthorized fingerprint. However, a fingerprint that matches stored and authorized fingerprints 102 would indicate an authorized individual, and would allow the individual to disable and disarm 104 the lock 60 of the shipping container 14. The fingerprint biometric lock with disabler 62 would then be reset 106 after the appropriate safety, cleanup, and protection measures are completed, and the system 10 would be reset and placed back in the detection mode 108.

FIG. 15 is a schematic representation 110 that illustrates the integration of a surveillance watchtower 112 and a monitoring terminal or PC 114 for monitoring products such as the shipping containers 14 or cargo containers 16 that sit for extended periods of time of docks, piers 20, truck terminals, rail yards, shipping platforms 16 and industrial sites as shown in FIGS. 5 and 6. The watchtower 112 would maintain continuous surveillance over a number of shipping containers 60, for example, with detector cases 12 mounted in or on each container 14 and set in detection mode 116 with one or more detectors 46 disposed in each detector case 12. The watchtower 112 would continuously scan for light alarm indicators 42 and 44 on the products, such as the containers 14 or 18, and the watchtower 112 would be interconnected

and integrated with the monitoring terminal or PC **114**. Upon detection **118** of an agent or compound in one or more of the shipping containers **14**, the appropriate light alarm indicators **42** or **44** would light providing visible confirmation of the detection of the specific agent or compound. The cpu **40** would transmit a lock/disable signal **120** to the lock **60** on each respective shipping container **14** to lock or disable the lock **60** thus preventing access to that respective shipping container **14**. In addition, signal transmissions would be sent to the monitoring terminal or PC **114** (which could be off site) thereby alerting authorized security personal of the contamination event. With the information received at the monitoring terminal **114**, authorized personal would then be notified and dispatched to the area to undertake the appropriate safety and cleanup measures **122**. Such measures would also include disarming the lock disabling system in order to gain access to the shipping container **14**. After all the cleanup and security measures are completed by the trained and properly equipped authorities, the detection system and the lock disabling feature would reset **124** and the detection system would again be placed in detection mode **116**.

FIG. **16** is a schematic representation **126** that illustrates an enhanced version of the multi sensor detection and lock disabling system **10** for preventing car and vehicle attacks and bombings. The lock disabling system **10** would be interconnected to the locking system and mechanism **128** of the vehicle **130**. In addition, a stall to stop disabling link **132** can be made with the fuel, air, and electrical system **134** of the vehicle **130**. The enhanced version incorporates a satellite **136** for signal receipt and transmission from the vehicle **130** in which the detector system **10** is placed to a monitoring site and monitoring equipment **138**. As shown in FIG. **16**, a detection signal **140** would be sent to the satellite **136** by the detection system **10** upon detection of a bomb or explosive **142** hidden in the vehicle **130**. The satellite **136** would then transmit an alert signal **144** to the monitoring site **138** with the signal **144** containing the relevant data to evaluate the nature of the threat. The monitoring site **138** would then transmit a stall to stop signal **146** to the detection system **10** to lock the vehicle **130** and/or disable the electrical system of the vehicle **130** thereby disabling the vehicle **130**, preventing access to the vehicle **130** by locking the vehicle **130**, and preventing any terrorist in the vehicle **130** from escaping.

The detector case **12** can be modified and adapted for inclusion with cell phone cases, satellite cell phone cases, laptop cases, notebook PC cases, PDA cases, carry-on cases, suitcases, and briefcases. In addition, the basic monitoring terminal or PC **114**, as shown in FIGS. **5** and **15**, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring.

The system **10** and the watchtower **112**, along with the satellite **136** and the monitoring site **138** can be adapted or incorporated with cell phone towers and satellites for use with satellite communication and/or a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu **40**, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween. The aforementioned telecommunication and radio communication means can be interactive with any type of motive vehicle that includes but is not limited to cars, trucks, vans, SUVs, trains, subways, boats, ships and airplanes, and which is reported stolen, experiences a loss of brakes, or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted to the vehicle and which detection causes an automatic signal transmission or a signal transmission is activated when a call is made to the monitoring station by an authorized person. The authorized individual includes but is not limited to the owner, pilot, conductor, captain, police highway patrol, security guard and military personnel to the monitoring equipment for activating a vehicle slowdown or stall-to-stop disabling system that similar to the disabling system **126** shown in FIG. **16**, or incorporating features of the system **126** shown in FIG. **16**, from the monitoring equipment to the vehicle. The activation of the stall-to-stop disabling means or the vehicle slowdown disables or engages the computer, electrical, fuel and air systems of the vehicle or a combination of the computer, electrical, fuel and air systems that include but are not limited to the brakes, foot peddle, lights, speed controls, ignition, steering, transmission, and the horsepower of the motor.

In addition, the basic stall-to-stop disabling means or the vehicle slowdown means and device can be adapted, modified or designed to include: an open bust or open platform for integrating any new and innovative technology; warning lights indicators; sound alarm indicators; voice alarm indicators; a cell phone to transmit to the vehicle a signal for slowing and halting the vehicle; and a lock disabling system or means to lock a thief or terrorist inside the vehicle after a transmission is received or sent. Open bust or open platform also refers to the compatibility of the detector case **12**, or the incorporation of its features in cell phone cases, satellite cell phone cases, laptop cases, notebook PC cases, PDA cases, carry-on cases, briefcases, and suitcases, etc., with other communication, transmission and surveillance systems whereupon the detector case **12**, and its features, can be seamlessly integrated with other new and emerging systems and technologies.

Thus, as shown more specifically in FIG. **17**, by way of a representative example the features and elements of the detector case **12** are shown as being incorporated into cell phone detector case **150** and associated cell phone monitor **152**. The cell phone monitor **152** includes the standard keypad functions **154** and more specialized system use (ring tone, email, photos, texting) functions **156** as well as a viewing screen **158**. The cell phone detector case **150** includes a recharging cradle or seat **160**, a front side **162**, a top **164**, a bottom **166**, and a pair of opposed sides **168**. At the back of the cell phone detector case **150** are connections, contacts, and ports for at least an Internet connection **170**, a GPS connection **172**, and a contact, plug, or port for a power source **174**. The power source for the cell phone detector case **150** can be any conventional rechargeable battery source or standard electrical power from a standard electrical receptacle or outlet.

As shown in FIG. **17**, the cell phone detector case **150** includes one or more sensor/detector units, cells, or components **176** built into and incorporated into the case **150**. The detector **176** includes generally disposed at the front **162** of the case **150** the following types of indicators: a sound alarm indicator **178**, a readings panel **180**, a sensor **182** for detecting one or more specific types of agents, elements, chemicals, compounds, etc., and a light alarm indicator **184**. The sensor/detector **176** will be interconnected to the power source **174**. In addition, mounted on and externally visible on the sides **168** or front **162** of the case **150** are a plurality of color coded indicator lights **186** with each fight **186** corresponding to a specific agent, element, chemical, compound, etc., and lighting up when that agent

is detected by the sensor/detector **176**. The color coded indicator lights **186** will be electrically interconnected to the sensor/detectors **176** via any standard microprocessor. The cell phone detector case **150** and cell phone monitor **152** thus comprise a hand-held, easily portable and transportable detection means that is both effective and unobtrusive in its disposition and use.

FIGS. **18** and **19** illustrate representative examples of the integration of portable electronic communication or telecommunication devices such as a cell phone **187***a* and/or a laptop computer **187***b* with the monitoring equipment **138** located at a predesignated monitoring site **188**, and operating in conjunction with either a satellite and/or a cell phone tower **190** to transmit and receive signals and commands among each other and to a vehicle **192**, such as a truck, as part of a stall-to-stop disabling system for slowing and stopping the vehicle **192** and locking a thief, terrorist, or unauthorized individual in the vehicle **192** if needed. A wide range of events can trigger and initiate the stall-to-stop system and the locking or lock disabling system and mechanism, and the event doesn't have to be limited to the detection of a bomb or a chemical, biological, or radiological agent, element, or compound. The events can include, but is not limited to, detection of an engine problem to engine failure to the unauthorized use (stealing) of the vehicle **192**. The vehicle **192** includes an electromotive system **194** that comprises, among other components, an onboard computer(s), electrical, fuel and air systems, as well as brakes, ignition, steering, and transmission. Also integrated with and capable of communicating with the vehicle's **192** electromotive system **194** is a stall-to-stop system while a lock disabling mechanism **196** is able to engage and disengage or disable the vehicle's **192** locking mechanism **198** upon receipt of the appropriate commands via a lock disabling communication channel or link **200**. This link **200** can also accommodate the stall-to-stop system commands and signals, and thus is a multi-channel communication link. A CPU or a transceiver **202** is programmed to receive signals from the cell phone tower **190** and/or to a GPS satellite **204** and is interconnected with the stall-to-stop system and the lock disabling system **196** via link **200** for engaging the electromotive system **194** and actuating the lock disabling system **196** to stop the vehicle **192** and lock inside the vehicle **192** anyone such as a thief, terrorist or other unauthorized individual.

A representative example for stopping, disabling, and locking the vehicle **192** that utilizes the cell phone tower **190** wherein the activation and/or distress signal **206** originates from the cell phone **187***a* or the laptop **187***b* and such activation signal **206** travels to the cell phone tower **190** that is nearest the current location of the vehicle **192**. A signal **208** is then transmitted to the monitoring site **188** and specific monitoring equipment **138** that can also include but is not limited to cell phones, laptops, desktop PC's, notebook PC's and LCD monitors. The monitoring site **138** then communicates by signal **210** to the GPS satellite **204** that an original or activation signal has been received and then the GPS satellite **204** locates and communicates by multiplex signal **212** with the CPU or transceiver **202** on the vehicle **192** and exchanges information on the type of problem, situation, location, and vehicle speed. The monitoring equipment **138** then transmits a signal **214** to the cell phone tower **190** that communicates with the transceiver **202** and/or CPU of the vehicle **192** to initiate or execute any commands that will actuate the stall-to-stop disabling link **200** and lock disabling system **196** for bringing the vehicle **192** to a halt and actuating the vehicle's **192** locking mechanism **198** for locking the thief, terrorist, or other unauthorized person inside the vehicle **192** if needed.

FIG. **19** illustrates a representative example wherein the stall-to-stop system and the lock disabling system **196** are utilized in conjunction with the GPS satellite **204**. In FIG. **19** a signal has traveled to the satellites nearest the vehicle's **192** current location and then the signal **218** has traveled to the monitoring equipment **138** and monitoring site **188** which can include but is not limited to satellite cell phones, satellite monitors, cell phones, laptops, desktop PC's, notebook PC's, and LCD monitors. The UPS satellite **204** then locates and communicates with the CPU and/or transceiver **202** on the vehicle **192** via a multiplex (two-way) signal **220** in order to exchange information on such distress and danger event parameters as the specific problem situation, location, and vehicle speed. The monitoring equipment **138** then transmits a signal **222** back to the GPS satellite **204** that in turn communicates via another signal **224** with the CPU and/or transceiver **202** to execute any commands to the stall-to-stop system for executing the disengagement of the vehicle's **192** electromotive system **194** for bringing the vehicle **192** to a halt and for actuating the lock disabling system **196** to direct the lock disabling link **200** to actuate the locking mechanism **198** thereby locking the vehicle **192** and anyone inside the vehicle **192**.

The present invention comprehends a chemical/biological/radiological/nuclear/explosive/human/contraband detector unit with a disabling locking system for protecting products that can be grouped into several product groupings, from terrorist activity, and also for preventing unauthorized access to and tampering with the storage and transport of ordnance and weapons. The products grouped into what may be referred to as Product grouping **1** (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars, United Parcel Services™ (UPS™), Federal Express™ (FedEx™), airport lockers, news racks (coin and non-coin operated), mail drop boxes, cluster mail boxes, keyed mail boxes, min-storage houses and buildings, bicycle lockers, stadium lockers, school lockers, cars, trucks, campers, buses, vans, unmanned aerial vehicles (UAVs), unmanned ground vehicles (UGVs), and utility vehicles; the products grouped into what may be referred to as Product grouping **2** (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, door sensors, speed sensors, biometric sensors, glass break sensors, plastic film on glass, high security locks, tampering labels, door sensors, disabling locking systems, vehicle detectors and satellite disabling locking systems, detection of humans, detection of contraband, temperature, and shock levels; the products grouped into what may be referred to as Product grouping **3** (detector case; modified and adapted) include, but are not limited to, cell phone cases, satellite cell phone cases, laptop cases, notebook PC cases, PDA cases, carry-on cases, suitcases, eyeglass, briefcases, detector cases of locks, detector cases of tags, detector cases that is mounted to, detector cases that is affixed to, detector cases that is outside of, detector cases that is inside of, and detector cases that is adjacent to; the products grouped into what may be referred to as Product grouping **4** (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, web servers, desktop personal computers (PCs), note-

book personal computers (PCs), laptops, satellite cell phones, cell phones, Universal Mobile Telecommunications System (UMTS) phones, personal digital assistants (PDAs), liquid crystal display (LCD) monitors, and satellite monitoring, remote control key fobs, two-way communication key fobs, handhelds; the products grouped into what may be referred to as Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, Cellular, Satellite, Telematics, Wide Area Network (WAN). Wireless Wide Area Network (WWAN), Local Area Network (LAN), Radio Frequency (RF), Broadband Wireless Access (BWA), Global Positioning System (GPS), General Packet Radio Services (GPRS). Global System for Mobile (GSM), Wideband Code Division Multiple Access (W-CDMA), Universal Mobile Telecommunications System (UMTS), Short Message Service (SMS); the products grouped into what may be referred to as Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature, the products grouped into what may be referred to as Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel. The multi sensor detection system includes the capability to disable an existing lock or activate a lock located inside or outside any of the products named in the product grouping categories upon activation of a sensor or detector included in the system. This is a significant feature for the multi sensor detection system as it prevents unauthorized, unequipped and untrained entry and access to the product thus preventing further contamination of the site and to individuals in the area.

While the invention has been shown and described in a preferred embodiment, it will be apparent to those skilled in the art that numerous alterations, modifications, and variations will possible and practicable without departing from the spirit and scope of the invention as set forth by the appended claims.

The invention claimed is:

1. A multi sensor detection system capable of identifying, monitoring, detecting, and securing those critical areas (e.g., U.S. borders), sites, locations and facilities vulnerable to terrorist activity that can be integrated with and interconnected to watchtowers to form a network, comprising:

at least one of an integrated watchtower, a fixed watchtower, a surveillance watchtower, a watchtower capable of scanning, a watchtower capable of monitoring, a watchtower equipped with sensors or a watchtower interconnected to a central monitoring terminal for sending signals thereto and receiving signals therefrom;

wherein the at least one watchtower is equipped with a remote video surveillance camera that provides at least one night vision means of surveillance or an infrared human detection means of surveillance capability and is integrated into a watchtower's remotely controlled system that can monitor, detect, track, and identify humans;

a communication device of at least one of a mobile communication device, a mobile communication unit, a portable communication device, portable communication equipment, a wired communication device, a wireless communication device, a monitoring site, a monitoring terminal, a web server, a desktop personal computer (PC), a notebook personal computer (PC), a laptop, a satellite phone, a smart phone, a cell phone, a Universal Mobile Telecommunications System (UMTS) phone, a personal digital assistant (PDA), a liquid crystal display (LCD) monitor, a satellite, or a handheld, interconnected to a monitoring equipment for sending signals thereto and receiving signals therefrom;

a communication method of at least one of a Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, Cellular, Satellite, Telematics, Wide Area Network (WAN), Wireless Wide Area Network (WWAN), Local Area Network (LAN), Radio Frequency (RF), Broadband Wireless Access (BWA), Global Positioning System (GPS), or central processing unit (CPU), used to interconnect the communication device to the monitoring equipment for sending signals thereto and receiving signals therefrom;

a plurality of sensors for detecting or sensing humans that is at least one of a chemical human sensor, biological human sensor, radiological human sensor, infrared human detector, motion human detector, or image human detector, interconnected to or disposed within the multi-sensor detection system for sending signals thereto and receiving signals therefrom;

a mobile multi-sensor detection device that is at least one of a ground surveillance sensor, a surveillance radar sensor, a surveillance camera, or a stand-alone surveillance scanner, that is mounted in, on, or upon at least one of a car, a truck, a camper, a bus, a van, an unmanned aerial vehicle (UAV), an unmanned ground vehicle (UGV), or a utility vehicle, interconnected to the monitoring equipment for sending signals thereto and receiving signals therefrom;

a hand-held multi-sensor detection device that is capable of at least one of thermal imaging or infrared imaging for monitoring, detecting, tracking and identifying humans, that is controlled or operated by at least one authorized person who is an owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, Central Intelligence Agency (CIA), Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, or monitoring site and terminal personnel, interconnected to the monitoring equipment for sending signals thereto and receiving signals therefrom, wherein the authorized person manually initiates the signal to the monitoring equipment to alert upon the monitoring, detecting, tracking and identifying of the human;

whereupon, detection by the mobile multi-sensor detection device causes an automatic signal transmission to be sent to, or received from, any products in product grouping categories of storage and transportation, sensors, detector case; modified and adapted, monitoring and communication devices, communication methods, biometrics;

whereupon, detection of an unauthorized vehicle, an unauthorized driver or operator of a vehicle or mobile

unit, a signal is sent from the communication device to the vehicle or mobile unit to stop, stall or slowdown the vehicle;

wherein, a communication device of at least one of a mobile communication device, a mobile communication unit, a portable communication device, portable communication equipment, a wired communication device, a wireless communication device, a monitoring site, a monitoring terminal, a web server, a desktop PC, a notebook PC, a laptop, a satellite phone, a smart phone, a cell phone, a UMTS phone, a PDA, a LCD monitor, a satellite, or a handheld, interconnected to the monitoring equipment for sending signals thereto and receiving signals therefrom, comprising a lock disabling mechanism that is able to engage (lock), and disengage (unlock) and disable (make unavailable) after a specific number of tries.

**2.** The multi sensor detection system of claim **1**, capable of identifying, monitoring, detecting, and securing those critical areas (e.g., U.S. borders), sites, locations and facilities, further includes the identifying, monitoring, and detecting of terrorist, that is at least one of an illegal, radical, fanatic, activist, revolutionist or rebel.

**3.** The multi-sensor detection system of claim **1**, further includes a global positioning system (GPS) receiver adapted for communication with at least one satellite.

**4.** The multi-sensor detection system of claim **1**, further includes a navigation system adapted for communication with at least one of the surveillance watchtowers.

**5.** The multi-sensor detection system of claim **1**, capable of forming a wired or wireless sensor network.

**6.** The multi-sensor detection system of claim **1**, capable of forming a mesh network for redundancy.

**7.** The multi-sensor detection system of claim **1**, capable of transmitting identification data, location data, power source data, and sensor data.

**8.** The multi-sensor detection system of claim **1**, capable of being embedded into; placed in, on, or adjacent to at least one of the products in the product grouping categories or an area targeted for monitoring.

**9.** The multi-sensor detection system of claim **1**, capable of sending signals thereto and receiving signals therefrom to engage (lock), disengage (unlock) and disable (make unavailable) a lock after a specific number of tries that is interconnected to the multi sensor detection system or monitoring equipment.

**10.** The multi-sensor detection system of claim **1**, capable of transmitting biometric and authentication data include, but is not limited to, at least one of fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, heart rate, pulse and signature.

**11.** The multi-sensor detection system of claim **1**, interconnected with a camera to view the environment in real-time or to store the data for transmission and review at a later time.

**12.** The multi-sensor detection system of claim **1**, interconnected with a camera; light and video sensors to allow the user to view the environment from at least one of a cell phone, smart phone, PDA, handheld, laptop, desktop, workstation or monitoring site.

**13.** A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a personal digital assistant (PDA), a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, comprising:

at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; that is wired or wireless, capable of being disposed within, on, upon or adjacent the communication device;

at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or a front end processor for communication between a host computer and other devices;

a transmitter for transmitting signals and messages to at least one of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device;

a receiver for receiving signals, data or messages from at least one of the multi-sensor detection device, the maritime cargo container, the cell phone detection device, or the locking device;

at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection;

the communication device is at least a fixed, portable or mobile communication device interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween; and

whereupon the communication device, is interconnected to a product equipped to receive signals from or send signals to lock or unlock locking devices, activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems;

wherein the communication device receives a signal via any of one or more products in any product grouping categories;

wherein the at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, or short range radio frequency (RF) connection is capable of signal communication with the transmitter, the receiver of the communication device, or transceivers of the products;

wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature such that the communication device that is at least one of the cell phone, the smart phone, the desktop, the handheld, the PDA, the laptop or the computer terminal is locked by the biometric lock disabler to prevent unauthorized use;

wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, long range radio frequency (RF), and short range radio frequency (RF).

**14.** Monitoring equipment of at least one of products grouped together by common features in a product groupings category of design similarity comprising a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone interconnected to a product for communication therebetween, the monitoring equipment comprising:

at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; that is wired or wireless, capable of being disposed within, on, upon or adjacent the monitoring equipment;

at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or a front end processor for communication between a host computer and other devices;

a transmitter for transmitting signals and messages to at least one of a multi-sensor detection device, a maritime cargo container, a cell phone detection device;

a receiver for receiving signals, data or messages from at least one of the multi-sensor detection device, maritime cargo container, the cell phone detection device;

a lock disabling mechanism that is able to engage (lock), or disengage (unlock), or disable (make unavailable) a product's lock, wherein the lock disabling mechanism disables the product's lock after a specific number of tries by an unauthorized user to disengage the lock by maintaining the product's lock in the current state of the product's lock regardless of input entered to change the state of the product's lock by the unauthorized user;

at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection;

monitoring equipment of at least a fixed, portable or mobile monitoring equipment interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween; and

whereupon the monitoring equipment, is interconnected to a product equipped to receive signals from or send signals to the lock disabling mechanism that is able to engage, disengage, or disable the lock, activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems;

wherein the monitoring equipment is implemented by business or government at a minimum cost by products grouped together by common features in at least one of several product groupings of design similarity;

wherein the at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, or short range radio frequency (RF) connection is in signal communication with the transmitter, the receiver of the monitoring equipment, or transceivers of the products.

15. Monitoring equipment of at least one of the products grouped together by common features in a product groupings category of design similarity comprising a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone interconnected to a product for communication therebetween, the monitoring equipment comprising:

at least one of a central processing unit (CPU), a network processor, or a microprocessor for executing and carrying out the instructions of a computer program or application which is specifically targeted at the networking application domain, for communication between the monitoring equipment and at least one of a multi-sensor detection device, a maritime cargo container device, or a locking device;

a transmitter for transmitting signals and messages to at least one of the multi-sensor detection device, the maritime cargo container device, or the locking device;

a receiver for receiving signals, data or messages from at least one of the multi-sensor detection device, the maritime cargo container device or the locking device, wherein the signals, data or messages are of agents of an item of interest (IOI);

at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, or GPS connection;

the monitoring equipment is at least a fixed, portable or mobile monitoring equipment interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween; and

whereupon the monitoring equipment, is capable of the activation or deactivation of at least one of the multi-sensor detection device, the maritime cargo container device or the locking device;

wherein the at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, for signal communication with the transmitter, the receiver of the monitoring equipment, or transceivers of the products;

at least one tag that is read by the monitoring equipment that is capable of wireless near-field communication to achieve detection of at least one of a chemical agent, a biological agent, a radiological agent, a nuclear agent, or an explosive agent which allows radio frequency (RF) data to be at least one of received or transmitted between the tag and the monitoring equipment.

16. A built-in, embedded multi sensor detection system for monitoring products with a plurality of sensors detecting at least two agents selected from the group consisting of chemical, biological, radiological, explosive, human, and contraband agents;

comprising a built-in sensor array or fixed detection device into the product that detects agents by means of two or more sensors combined from the following list of sensors: a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor;

comprising a communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a personal digital assistant (PDA), a laptop, or a computer terminal for monitoring products, interconnected to a built-in sensor array or fixed detection device for communication therebetween;

wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan or signature such that the communication device that is at least one of the cell phone, the smart phone, the desktop, the handheld, the PDA, the laptop or the computer terminal is locked by the biometric lock disabler to prevent unauthorized use;

wherein the built-in embedded multi-sensor detection device receives a signal via any of one or more products in any product grouping categories; and

wherein, when an alarm occurs, the built-in, embedded multi sensor detection system communicates the alarm by way of at least one of the products grouped together

by common features in a product groupings category of design similarity comprising at least one of product-to-product, product-to-satellite, product-to-cellular, product-to-long range radio frequency, product-to-short range radio frequency, product-to-radio frequency (RF), product-to-internet, product-to-broadband, product-to-smartphone or cell phone, product-to-computer at monitoring site, product-to-WiFi, product-to-handheld, or product-to-laptop or desktop for communication therebetween;

wherein the built-in embedded multi-sensor detection device is implemented by business or government at a minimum cost by products grouped together by common features in at least one of the several product groupings of design similarity.

17. A built-in multi sensor detection system for monitoring products with a plurality of sensors detecting at least two agents selected from the group consisting of chemical, biological, radiological, explosive, human, and contraband agents, comprising:

a built-in sensor array or fixed detection device into the product that detects agents by means of two or more sensors combined from the following list of sensors: a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor;

monitoring equipment of at least one of products grouped together by common features in a product groupings category of design similarity comprising at least one of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone for the receipt and transmission of signals therebetween;

wherein the built-in multi-sensor detection device is built in any of one or more products comprising a maritime cargo container, a lock, or the monitoring equipment;

wherein the built-in multi-sensor detection device is implemented by business or government by products grouped together by common features in at least one of several product groupings of design similarity;

a light alarm indicator that has a plurality of colored lights that correspond to specific agents of the at least two agents;

wherein, when the light alarm indicator lights to indicate an alarm occurs, the built-in multi sensor detection system communicates the alarm by way of at least one of the products grouped together by common features in the product groupings category of design similarity comprising at least one of product-to-product, product-to-satellite, product-to-cellular, product-to-radio frequency (RF), product-to-internet, product-to-broadband, product-to-smartphone or cell phone, product-to-computer at monitoring site, product-to-WiFi, product-to-handheld, or product-to-laptop or desktop for at least one of a receipt or transmission of signals therebetween.

18. A built-in multi sensor detection system for detecting at least two items selected from the group consisting of chemical agent, biological agent, radiological agent, explosive agent, human agent, contraband agent, motion, perimeter, temperature, tampering, theft, or breach, comprising:

a built-in sensor array or fixed detection device into a product that detects items by means of at least two sensors from the following list of sensors: a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor;

monitoring equipment of at least one of the products grouped together by common features in a product groupings category of design similarity comprising at least one of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone for the receipt and transmission of signals therebetween;

wherein the built-in, multi-sensor detection device is built in any of one or more products comprising a maritime cargo container, a lock, or the monitoring equipment;

wherein, when an alarm occurs, the built-in multi sensor detection system communicates the alarm by way of at least one of the products grouped together by common features in a product groupings category of design similarity comprising at least one of product-to-product, product-to-satellite, product-to-cellular, product-to-radio frequency (RF), product-to-internet, product-to-broadband, product-to-smartphone or cell phone, product-to-computer at monitoring site, product-to-WiFi, product-to-handheld, or product-to-laptop or desktop for the receipt and transmission of signals therebetween;

at least one tag that is read by the monitoring equipment that is capable of wireless near-field communication to achieve detection of at least one of the chemical agent, the biological agent, the radiological agent, the explosive agent, the human agent, the contraband agent, the motion, the perimeter, the temperature, the tampering, the theft, and the breach which allows radio frequency (RF) data to be received and/or transferred between the tag and the monitoring equipment.

19. A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, radiological agent, or compound, comprising:

a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human, or contraband agent or compound, capable of being disposed within, on, upon or adjacent a multi-sensor detection device;

monitoring equipment comprising at least one of a computer, personal computer (PC), laptop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone for at least one of a receipt or transmission of signals therebetween;

at least one cell phone tower interconnected to the monitoring equipment for sending signals thereto and receiving signals therefrom or at least one satellite capable of transmitting signals to the monitoring equipment;

at least one satellite or at least one cell phone tower capable of signal communication between the multi-sensor detection device and the monitoring equipment;

at least one internet connection capable of communication between the multi-sensor detection device and the monitoring equipment;

whereupon a signal sent to a receiver of the multi-sensor detection device from a satellite; or to a cell phone tower; or through at least one of a short range radio frequency or a long range radio frequency; causes a signal to be sent to the monitoring equipment that includes at least one of location data or sensor data;

wherein the monitoring equipment or multi-sensor detection device receives a signal via any of one or more products of any product grouping categories;

wherein at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection,

radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency connection, or short range radio frequency (RF) connection is capable of signal communication with the transmitter, a receiver of the monitoring equipment, the multi-sensor detection device, or transceivers of the products;

wherein the monitoring equipment is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan or signature such that the monitoring device that is at least one of the computer, the laptop, the notebook, the PC, the handheld, the cell phone, the PDA, or the smart phone is locked by the biometric lock disabler to prevent unauthorized use;

wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, long range radio frequency, and short range radio frequency (RF).

20. A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, radiological agents or compound, comprising:

a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human, or contraband agent or compound, capable of being disposed within, on, upon or adjacent a multi-sensor detection device;

monitoring equipment of at least one of products grouped together by common features in a product groupings category of design similarity comprising at least one of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA), or smart phone for at least one of a receipt or transmission of signals therebetween,

wherein the monitoring equipment is equipped with a lock disabling mechanism that is able to engage (lock), or disengage (unlock), or disable (to make unavailable) a product's lock, wherein the lock disabling mechanism disables the product's lock after a specific number of tries by an unauthorized user to disengage the lock by maintaining the product's lock in the current state of the product's lock regardless of input entered to change the state of the product's lock by the unauthorized user;

at least one cell phone tower interconnected to the monitoring equipment for sending signals thereto and receiving signals therefrom; or at least one satellite capable of transmitting signals to the monitoring equipment;

at least one satellite or at least one cell phone tower capable of signal communication between the multi-sensor detection device and the monitoring equipment;

at least one internet connection capable of communication between the multi-sensor detection device and the monitoring equipment; and

whereupon a signal sent to a receiver of the multi-sensor detection device from a satellite; or to a cell phone tower; or through at least one of a short range radio frequency or a long range radio frequency; causes a signal to be sent to the monitoring equipment that includes location data and/or sensor data;

wherein the multi-sensor detection device is implemented by business or government by products grouped together by common features in at least one of several product groupings of design similarity;

wherein the multi-sensor detection device is for any of one or more products comprising a maritime cargo container, a lock, or the monitoring equipment;

wherein at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency connection, or short range radio frequency connection is in signal communication with a transmitter and a receiver of the monitoring equipment or multi-sensor detection device and transceivers of the products.

21. A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, or radiological agents and compounds, comprising:

a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human, or contraband agent or compound, capable of being disposed within, on, upon or adjacent a multi-sensor detection device, wherein at least one of the sensors is capable of detecting agents of an item of interest (IOI);

monitoring equipment of at least one of the products grouped together by common features in a product groupings category of design similarity comprising at least one of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA), or smart phone for at least one of a receipt or transmission of signals therebetween;

at least one satellite or at least one cell phone tower capable of signal communication between the multi-sensor detection device and the monitoring equipment;

at least one internet connection capable of communication between the multi-sensor detection device and the monitoring equipment;

whereupon a signal sent to a receiver of the multi-sensor detection device for detecting the agents of the item of interest causes a signal that includes at least one of location data or sensor data to be sent to the monitoring equipment;

wherein the multi-sensor detection device for any of one or more products comprising a maritime cargo container, a lock, or the monitoring equipment;

wherein at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, or broadband connection, is in signal communication with a transmitter, a receiver of the monitoring equipment, or transceivers of the products;

at least one tag that is read by the monitoring equipment that is capable of wireless near-field communication to achieve detection of at least one of the explosive agent, the nuclear agent, the contraband agent, the chemical agent, the biological agent, the human agent, or the radiological agent which allows radio frequency (RF) data to be received and/or transferred between the tag and the monitoring equipment.

22. A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a personal digital assistant (PDA), a laptop, or a computer terminal, comprising:

at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; that is wired or wireless, capable of being disposed within, on, upon or adjacent the communication device;

at least one of a central processing unit (CPU), a network processor, or a front end processor for communication between a host computer and other devices;

a transmitter for transmitting signals and messages to at least one of a multi-sensor detection device, a cell phone detection device, or a locking device;

a receiver for receiving signals, data or messages from at least one of a multi-sensor detection device, a cell phone detection device, or a locking device;

at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, cellular connection, long and/or short range radio frequency (RF) connection, or GPS connection;

the communication device being at least a fixed, portable or mobile communication device, equipped with at least one wired or wireless sensor for the detection of humans;

the communication device being equipped to receive signals from or send signals to engage (lock), disengage (unlock), or disable (make unavailable) locks;

the communication device being equipped with biometrics that incorporates at least one of a fingerprint recognition or a face recognition to at least one of gain access to the device or to prevent unauthorized use;

the communication device being capable of wireless near-field communication (NFC) which allows radio frequency (RF) data to be at least one of received or transferred between the communication device and at least one tag that is read by the communication device;

whereupon a signal sent to the receiver of at least one of a multi-sensor detection device, a cell phone detection device, or a locking device from a satellite or a cell phone tower or through at least one of a Bluetooth connection, a WiFi connection, an internet connection, a cellular connection, a GPS connection, a short range radio frequency (RF) connection, or a long range radio frequency (RF) connection, causes a signal that includes at least one of location data or sensor data to be sent to the communication device; and

wherein at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, cellular connection, long range radio frequency (RF) connection, or short range radio frequency (RF) connection, capable of signal communication with the transmitter of the communication device, the receiver of the communication device, or the central processing unit (CPU).

23. A cell phone comprising:

a central processing unit (CPU) for executing and carrying out the instructions of a computer program;

a transmitter for transmitting signals and messages to a cell phone detection device;

a receiver for receiving signals from the cell phone detection device;

at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection;

the cell phone is at least a fixed, portable or mobile communication device interconnected to the cell phone detection device, capable of wired or wireless communication therebetween; and

whereupon the cell phone is interconnected to the cell phone detection device to receive signals or send signals to lock or unlock doors, to activate or deactivate security systems, to activate or deactivate multi-sensor detection systems, or to activate or deactivate the cell phone detection device;

at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone;

wherein at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection is capable of signal communication with the transmitter or the receiver;

wherein the cell phone is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature such that the cell phone is locked by the biometric lock disabler to prevent unauthorized use; and

whereupon a signal sent to the receiver of the cell phone detection device from at least one of the chemical sensor, the biological sensor, the explosive sensor, the human sensor, the contraband sensor, or the radiological sensor, causes a signal that includes at least one of location data or sensor data to be sent to the cell phone.

* * * * *

# Exhibit L



US009096189B2

(12) **United States Patent**
**Golden**

(10) **Patent No.:** **US 9,096,189 B2**
(45) **Date of Patent:** **Aug. 4, 2015**

(54) **MULTI SENSOR DETECTION, STALL TO STOP AND LOCK DISABLING SYSTEM**

(71) Applicant: **Larry Golden**, Mauldin, SC (US)

(72) Inventor: **Larry Golden**, Mauldin, SC (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **14/021,693**

(22) Filed: **Sep. 9, 2013**

(65) **Prior Publication Data**

US 2014/0071274 A1 Mar. 13, 2014

**Related U.S. Application Data**

(60) Continuation of application No. 13/288,065, filed on Nov. 3, 2011, now Pat. No. 8,531,280, which is a division of application No. 12/802,001, filed on May 27, 2010, now Pat. No. 8,334,761, which is a continuation of application No. 12/657,356, filed on Jan. 20, 2010, now Pat. No. 8,106,752.

(51) **Int. Cl.**

| | |
|---|---|
| *B60R 25/10* | (2013.01) |
| *B60R 25/102* | (2013.01) |
| *B60R 25/01* | (2013.01) |
| *B60R 25/04* | (2013.01) |
| *G07C 9/00* | (2006.01) |
| *G08B 15/00* | (2006.01) |
| *G08B 21/12* | (2006.01) |

(52) **U.S. Cl.**
CPC ............ ***B60R 25/102*** (2013.01); ***B60R 25/018*** (2013.01); ***B60R 25/04*** (2013.01); ***G07C 9/00912*** (2013.01); ***G08B 15/00*** (2013.01); ***G08B 21/12*** (2013.01); ***B60R 2325/205*** (2013.01); ***B60R 2325/304*** (2013.01); ***G07C 2009/0092*** (2013.01)

(58) **Field of Classification Search**
CPC ... B60R 2325/00; G08B 21/12; G08B 25/009
USPC .............. 340/539.1, 539.11, 539.13, 539.16, 340/539.17, 539.22, 539.25, 539.26, 540, 340/573.1, 574; 348/143; 380/228, 229, 380/232; 382/103, 115; 702/32
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 4,385,469 A | 5/1983 | Scheuerpflug |
| 4,544,267 A | 10/1985 | Schiller |
| 4,586,441 A | 5/1986 | Zekich |
| 4,792,226 A | 12/1988 | Fishbine |
| 5,222,152 A | 6/1993 | Fishbine |

(Continued)

OTHER PUBLICATIONS

United States Patent and Trademark Office; Office Action from U.S. Appl. No. 11/397,118; mailed Nov. 14, 2007; Alexandria, Virginia, USA; pp. 1-12; parent U.S. Appl. No. 13/288,065 (12 pages).

(Continued)

*Primary Examiner* — Van Trieu

(57) **ABSTRACT**

A multi sensor detection and disabling lock system includes detector cases for holding interchangeable detectors that sample for chemical, biological and radiological compounds, agents and elements, with each detector case disposed in or upon the monitored product. The detector case transmits detection information to a monitoring computer terminal and transmits a signal to a lock disabler engaged to the product to lock or disable the product's lock thereby preventing untrained, unauthorized and unequipped individual's from gaining access and entry to the product, and also preventing further contamination of the area. The detection system can be interconnected to surveillance towers scanning detector cases disposed at seaport docks, freight depots and rail terminals for monitoring containers being prepared for shipment or sitting on docks for long periods of time.

**9 Claims, 13 Drawing Sheets**



(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,223,844 A | 6/1993 | Mansell et al. | |
| 5,233,404 A | 8/1993 | Lougheed | |
| 5,557,254 A | 9/1996 | Johnson | |
| 5,682,133 A | 10/1997 | Johnson | |
| 5,766,956 A | 6/1998 | Groger | |
| 5,938,706 A | 8/1999 | Feldman | |
| 5,959,529 A | 9/1999 | Kail, IV | |
| 5,963,657 A | 10/1999 | Bowker | |
| 5,986,543 A | 11/1999 | Johnson | |
| 5,990,785 A * | 11/1999 | Suda | 340/426.21 |
| 6,049,269 A | 4/2000 | Byrd | |
| 6,078,265 A | 6/2000 | Bonder | |
| 6,262,656 B1 | 7/2001 | Byrd | |
| 6,271,745 B1 | 8/2001 | Anzai | |
| 6,374,652 B1 | 4/2002 | Hwang | |
| 6,411,887 B1 | 6/2002 | Martens | |
| 6,470,260 B2 | 10/2002 | Martens | |
| 6,542,076 B1 | 4/2003 | Joao | |
| 6,542,077 B2 | 4/2003 | Joao | |
| 6,588,635 B2 | 7/2003 | Vor Keller | |
| 6,610,977 B2 | 8/2003 | Megerle | |
| 6,613,571 B2 | 9/2003 | Cordery | |
| 6,628,813 B2 | 9/2003 | Scott | |
| 6,647,328 B2 | 11/2003 | Walker | |
| 6,738,697 B2 | 5/2004 | Breed | |
| 6,923,509 B1 | 8/2005 | Barnett | |
| 6,980,092 B2 | 12/2005 | Turnbull | |
| 6,988,026 B2 | 1/2006 | Breed et al. | |
| 7,005,982 B1 | 2/2006 | Frank | |
| 7,034,677 B2 * | 4/2006 | Steinthal et al. | 340/539.12 |
| 7,034,683 B2 | 4/2006 | Ghazarian | |
| 7,103,460 B1 | 9/2006 | Breed | |
| 7,109,859 B2 | 9/2006 | Peeters | |
| 7,116,798 B1 | 10/2006 | Chawla | |
| 7,148,484 B2 | 12/2006 | Craig et al. | |
| 7,164,117 B2 | 1/2007 | Breed et al. | |
| 7,171,312 B2 * | 1/2007 | Steinthal et al. | 702/32 |
| 7,243,945 B2 | 7/2007 | Breed et al. | |
| 7,339,469 B2 | 3/2008 | Braun | |
| 7,346,439 B2 | 3/2008 | Bodin | |
| 7,385,497 B2 | 6/2008 | Golden | |
| 7,397,363 B2 | 7/2008 | Joao | |
| 7,636,033 B2 | 12/2009 | Golden | |
| 7,647,180 B2 | 1/2010 | Breed | |
| 7,844,505 B1 | 11/2010 | Arneson et al. | |
| 7,868,912 B2 * | 1/2011 | Venetianer et al. | 348/143 |
| 7,872,575 B2 | 1/2011 | Tabe | |
| 7,880,767 B2 * | 2/2011 | Chinigo | 348/148 |
| 7,961,094 B2 | 6/2011 | Breed | |
| 8,274,377 B2 | 9/2012 | Smith et al. | |
| 8,531,521 B2 * | 9/2013 | Romanowich | 348/143 |
| 8,564,661 B2 * | 10/2013 | Lipton et al. | 348/143 |
| 2002/0145666 A1 * | 10/2002 | Scaman et al. | 348/148 |
| 2003/0063004 A1 * | 4/2003 | Anthony et al. | 340/574 |
| 2003/0137426 A1 * | 7/2003 | Anthony et al. | 340/574 |
| 2003/0206102 A1 | 11/2003 | Joao | |
| 2004/0107028 A1 | 6/2004 | Catalano | |
| 2004/0222092 A1 | 11/2004 | Musho | |
| 2005/0195069 A1 | 9/2005 | Dunand | |
| 2006/0164239 A1 | 7/2006 | Loda | |
| 2006/0176169 A1 * | 8/2006 | Doolin et al. | 340/521 |
| 2006/0181413 A1 | 8/2006 | Mostov | |
| 2006/0250235 A1 | 11/2006 | Astrin | |
| 2007/0171042 A1 | 7/2007 | Metes et al. | |
| 2008/0045156 A1 | 2/2008 | Sakhpara | |
| 2008/0122595 A1 | 5/2008 | Yamamichi | |
| 2008/0234907 A1 | 9/2008 | Labuhn | |
| 2010/0159983 A1 | 6/2010 | Golden | |
| 2011/0178655 A1 | 7/2011 | Golden | |

OTHER PUBLICATIONS

United States Patent and Trademark Office; Office Action from U.S. 12/155,573; mailed Apr. 9, 2009; Alexandria, Virginia, USA; pp. 1-7; parent U.S. Appl. No. 13/288,065 (7 pages).

United States Patent and Trademark Office; Office Action from U.S. 12/155,573; mailed Jul. 30, 2009; Alexandria, Virginia, USA; pp. 1-9; parent U.S. Appl. No. 13/288,065 (9 pages).

United States Patent and Trademark Office; Notice of Allowability from U.S. 12/155,573; mailed Oct. 28, 2009; Alexandria, Virginia, USA; pp. 1-5; parent U.S. Appl. No. 13/288,065 (5 pages).

United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/657,356; mailed Jul. 12, 2010; Alexandria, Virginia, USA; pp. 1-14; parent U.S. Appl. No. 13/288,065 (14 pages).

United States Patent and Trademark Office; Notice of Allowability from U.S. 12/657,356; mailed Mar. 10, 2011; Alexandria, Virginia, USA; pp. 1-4; parent U.S. Appl. No. 13/288,065 (4 pages).

United States Patent and Trademark Office; Office Action from U.S. Appl. No. 13/065,837; mailed Jul. 18, 2011; Alexandria, Virginia, USA, pp. 1-9; parent U.S. Appl. No. 13/288,065 (4 pages).

A newspaper article of Mr. Melvin Sullivan and his family that references the date, Mar. 6, 2001; parent U.S. Appl. No. 13/288,065.

A letter of response Mr. Sullivan received from Pfeiffer & Gantt, PA, dated Sep. 16, 2002; parent U.S. Appl. No. 13/288,065.

A "Certificate of Existance" Bright Idea Inventor, LLC. Nov. 6, 2002; parent U.S. Appl. No. 13/288,065.

Operating Agreement of Bright Idea Inventor, LLC received from Pfeiffer & Gantt, PA, dated Nov. 13, 2002; parent U.S. Appl. No. 13/288,065.

A letter of response Golden received from the Honorable Congressman from Maryland, Elijah E. Cummings, dated Dec. 16, 2002; parent U.S. Appl. No. 13/288,065.

A newspaper article of Mr. Melvin Sullivan and Mr. Larry Golden, dated, Feb. 27-Mar. 5, 2003; parent U.S. Appl. No. 13/288,065.

A letter of response Golden received from the Honorable Senator from South Carolina, Ernest F. Hollings, dated May 21, 2003; parent U.S. Appl. No. 13/288,065.

A letter of response Golden received from the Office of the Vice President, Dick Cheney, dated Jun. 3, 2003; parent U.S. Appl. No. 13/288,065.

A letter of response Golden received from the Honorable Senator from South Carolina, Ernest F. Hollings, dated Oct. 1, 2003; parent U.S. Appl. No. 13/288,065.

A letter of response Golden received from the Honorable Senator from South Carolina, Lindsey O. Graham, dated Oct. 21, 2003; parent U.S. Appl. No. 13/288,065.

A letter sent to the President of the United States George W Bush, the President's Cabinet, the United States Senate and the Congressional Black Caucus, dated May 23, 2005; parent U.S. Appl. No. 13/288,065.

On Nov. 17, 2005, an "Inventor's Official Record of Invention", was filed in my name (Golden) at "The Law Office of David P. Gaudio, P.C.; the Inventors Network."; parent U.S. Appl. No. 13/288,065.

On Aug. 23, 2005, the "Disclosure Document Registration"; parent U.S. Appl. No. 13/288,065.

On Apr. 5, 2006, the "Patent Application" was filed in my name (Golden) at the United Staets Patent & Trademark Office in Washington, D.C.; parent U.S. Appl. No. 13/288,065.

On Jun. 6, 2008, the "Continuance-In-Part, (CIP) Application" was filed in my name (Golden) at the United States Patent & Trademark Office in Washington, D.C.; parent U.S. Appl. No. 13/288,065.

On Jan. 20, 2010, a "Continuation Application" (U.S. Appl. No. 12/657,356) was filed in my name (Golden) at the United States Patent & Trademark Office in Washington, D.C.; parent U.S. Appl. No. 13/288,065.

Reissue of U.S. Pat. No. 7,636,033;"Swear Back"; in accordance to Title 37—Code of Federal Regulations Patents, Trademarks, and Copyrights; Apr. 8, 2011; parent U.S. Appl. No. 13/288,065

Reissue of U.S. Pat. No. 7,636,033; "Swearback—History of Work"; Apr. 8, 2011; parent U.S. Appl. No. 13/288,065

United States Patent and Trademark Office; Office Action from U.S. 12/802,001; mailed Apr. 14, 2011; Alexandria, Virginia, USA; pp. 1-16; parent U.S. Appl. No. 13/288,065 (16 pages)

United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/802,001; mailed Oct. 20, 2011; Alexandria, Virginia, USA; pp. 1-5; parent U.S. Appl. No. 13/288,065 (5 pages).

(56) **References Cited**

OTHER PUBLICATIONS

United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/802,001; mailed May 27, 2011; Alexandria, Virginia, USA; pp. 1-14; parent U.S. Appl. No. 13/288,065 (14 pages)
United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 12/802,001; copyright and mailing date Dec. 12, 2011, pp. 1-9, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 13/288,065 (9 pages).
United States Patent and Trademark Office; Office Action, Office Action from U.S. Appl. No. 13/065,837; copyright and mailing date Dec. 2, 2011, pp. 1-27, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 13/288,065 (27 pages).
United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/065,837; copyright and mailing date Nov. 1, 2011, pp. 1-18, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 13/288,065 (18 pages).
United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/199,853; copyright and mailing date Jan. 13, 2012, pp. 1-34, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 13/288,065 (34 pages).
United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 12/802,001; copyright and mailing date Mar. 26, 2012, pp. 1-12, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 13/288,065 (12 pages).
United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/199,853; copyright and mailing date Feb. 22, 2012, pp. 1-38, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 13/288,065 (38 pages).
United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/065,837; copyright and mailing date Feb. 22, 2012, pp. 1-25, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 13/288,065 (25 pages).
United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/288,065; copyright and mailing date Aug. 24, 2012, pp. 1-4, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 13/288,065 (4 pages).
United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/288,065; copyright and mailing date Nov. 28, 2012, pp. 1-11, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 13/288,065 (11 pages).
United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/288,065; copyright and mailing date Apr. 16, 2013, pp. 1-9, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 13/288,065 (9 pages).
United States Department of Homeland Security; Petition for Inter Partes Review of U.S. Pat. No. Re. 43,990 Under 35 U.S.C. §312 and 37 C.F.R. §42.104; Case IP2014-00714 for U.S. Pat. No. Re. 43,990; Filed Apr. 30, 2014; Washington, D.C., USA; pp. 1-57; (57 pages).
United States Department of Homeland Security; Declaration of Dr. Sriram Vishwanath; Case IPR2014-00714 for U.S. Pat No. Re. 43,990; Filed Apr. 30, 2014; Washington, D.C., USA; pp. 1-44; (44 pages).
Richard R Brooks and S.S. Iyengar; Multi-Sensor Fusion Fundamentals and Applications with Software; pubished 1998; Copyright Prentice Hall PTR; Upper Saddle River, New Jersey, USA; pp. 1-20; (20 pages).
Ramanarayanan Viswanathan and Pramod K Varshney; Distributed Detection with Multiple Sensors; Part 1—Fundamentals; Proceedings of the IEEE; Jan. 1, 1997; pp. 1-11; vol. 85; No. 1; Southern Illinois University Carbondale OpenSIUC; Illinois, USA; pp. 1-11; (11 pages).
Blum; Distributed with Multiple Sensors: Part II—Advanced Topics; Proceedings of the IEEE; Jan. 1, 1997; pp. 1-16; vol. 85, No. 1; Southern Illinois University Carbondale Open SIUC; Illinois, USA, pp. 1-11; (16 pages).
Victor Lesser; Distributed Sensor Networks a Multiagent Perspective; 2003; pp. 1, 2, 5, 6, 22, 26, 27, 36, 275, 320; copyright 2003 Kluwer Academic Publishers: AH Dordrecht, The Netherlands; (10 pages).
Samuel Blackman and Robert Popoli; Design and Analysis of Modern Tracking Systems; 1999; pp. 1, 2, 6, 472; copyright 1999 Artech House; Norwood, Massachusetts, USA; (4 pages).
Jean-Francois Chamberland; Decentralized Detection in Sensor Networks; 2003; pp. 407-416; IEEE Transactions on SIgnal Processingl vol. 51, No. 2; Urbana, Illinois, USA; (10 pages).
Oleg Kachirski and Ratan Guha; Effective instrusion Detection Using Multiple Sensors in Wireless Ad Hoc Networks; pp. 1-8; Proceedings of the 36th Hawaii International Conference on System Sciences; copyright 2003; Orlando, Florida, USA; (8 pages).
Lawrence A Klein; Sensor and Data Fusion a Tool for Information Assessment and Decision Making; 2004; pp. 1-4, 6, 81, 87-89; copyright 2004 The Society of Photo-Optical Instrumentation Engineers; Publisher is SPIE—the International Society for Optical Engineering; Bellingham, Washington, USA; (12 pages).
Dale Ferriere and Khrystyan Pysareva and Andrezej Rucinski; Using Technology to Bridge Maritime Security Gaps; Aug. 1, 2005; Sea Technology; pp. 1-6; copyright Compass Publications, Inc. Jan. 2009; Portsmouth, New Hampshire, USA; (6 pages).
Corie Lok; Cargo Security; MIT Technology Review; Jun. 2004; No. 107; pp. 74-75; publisher is Massachusetts Institute of Technology; Cambridge, Massachusetts, USA; (2 pages).
Thomas C Chen; RFID and Sensor-based Container Content Visibility and Seaport Monitoring system; Proceedings of SPIE, vol. 5778; pp. 151-159; Mar. 28, 2005; Publisher is SPIE—the International Society for Optical Engineering; Bellingham, Washington, USA; (10 pages).
United States Department of Homeland Security; The University of Texas at Austin College of Engineering Standard Resume of Sriram Vishwanath; Case IPR2014-00714 for U.S. Pat. No. Re. 43,990; Filed Apr. 30, 2014; Washington, D.C., USA; pp. 1-21; (21 pages).

* cited by examiner

U.S. Patent Aug. 4, 2015 Sheet 1 of 13 US 9,096,189 B2

INTERNET CONNECTION
GPS CONNECTION
POWER SOURCE

Fig. 1

Fig. 2

SAppx536



Fig. 3a

Fig. 3b

U.S. Patent Aug. 4, 2015 Sheet 3 of 13 US 9,096,189 B2

14
16
12
44
44

Fig. 4

14
12
42
112
42
16
12
12
42
12
POWER SOURCE
114

Fig. 5

SAppx538

U.S. Patent Aug. 4, 2015 Sheet 4 of 13 US 9,096,189 B2

18
12
44
12
44
12
44
112
20
POWER SOURCE
114
66
70
72
56

Fig. 6

Fig. 7

SAppx539

U.S. Patent Aug. 4, 2015 Sheet 5 of 13 US 9,096,189 B2

68
72
70
56

Fig. 8

SAppx540

U.S. Patent Aug. 4, 2015 Sheet 6 of 13 US 9,096,189 B2

32
INTERNET CONNECTION
34
GPS CONNECTION
36
POWER SOURCE
10
22
42
58
62
64
66
44
26
56
44
28
12
52
48
52
46
46
54
54
50
46

Fig. 9

SAppx541

U.S. Patent Aug. 4, 2015 Sheet 7 of 13 US 9,096,189 B2

38
22
12
26
30
26
32
34
36
38
24

Fig. 10

76
AGENT DETECTED?
NO
YES
80
SOUND ALARM
82
LIGHT ALARM
74
40
CPU
84
READINGS
86
RESET
78
SENSING MODE
STOP

Fig. 11

SAppx542

U.S. Patent Aug. 4, 2015 Sheet 8 of 13 US 9,096,189 B2

76
AGENT DETECTED?
NO
88
YES
82
LIGHT ALARM
80
SOUND ALARM
84
READINGS
90
DETECTOR RESET
78
SENSING MODE
STOP
76
46
DETECTOR
40
12
CASE
92
94
LOCK/DISABLE LOCK SIGNAL
96
DISARM AND RESET
98
DETECTION MODE

Fig. 12

Fig. 13

SAppx543

U.S. Patent Aug. 4, 2015 Sheet 9 of 13 US 9,096,189 B2

46
DETECTOR
100
40
12
CASE
DISABLER
62
102
AUTHORIZED FINGERPRINT?
NO
YES
104
DISABLE AND DISARM
ACCESS DENIED
RESET
106
101
DETECTION MODE
108
110
112
WATCHTOWER
116
DETECTION MODE
118
NO
AGENT DETECTED?
YES
LIGHT ALARM INDICATOR
42
114
MONITORING TERMINAL
120
LOCK/DISABLE SIGNAL
122
CLEANUP MEASURES
124
RESET
116
DETECTION MODE

Fig. 14

Fig. 15

SAppx544

U.S. Patent Aug. 4, 2015 Sheet 10 of 13 US 9,096,189 B2

136
126
140
144
128
146
134
132
142
130
138

Fig. 16

SAppx545

U.S. Patent Aug. 4, 2015 Sheet 11 of 13 US 9,096,189 B2

152
158
154
156
170
INTERNET CONNECTION
172
GPS CONNECTION
150
164
POWER SOURCE
174
160
186
168
166
162
176
184
178
180
182

Fig. 17

SAppx546

U.S. Patent Aug. 4, 2015 Sheet 12 of 13 US 9,096,189 B2

204
210
187a
187b
206
206
214
212
190
216
208
202
196
194
200
198
192
138
188

Fig. 18

SAppx547

U.S. Patent Aug. 4, 2015 Sheet 13 of 13 US 9,096,189 B2

204
220
187a
187b
218
190
224
222
202
196
194
200
198
192
138
188

Fig. 19

SAppx548

1

# MULTI SENSOR DETECTION, STALL TO STOP AND LOCK DISABLING SYSTEM

This application is a continuation application and claims the filing date and benefit of U.S. patent application Ser. No. 13/288,065 titled "Multi Sensor Detection, Stall to Stop and Lock Disabling System" filed on Nov. 3, 2011 and that will issue on Sep. 10, 2013 as U.S. Pat. No. 8,531,280, the entire contents of which are incorporated by reference herein in their entirety for all purposes. U.S. patent application Ser. No. 13/288,065 that will issue as U.S. Pat. No. 8,531,280 is a divisional application and claims the filing date and benefit of U.S. patent application Ser. No. 12/802,001 titled "Multi Sensor Detection, Stall to Stop, and Lock Disabling System" filed on May 27, 2010, now U.S. Pat. No. 8,334,761, the entire contents and complete subject matter of which is are incorporated by reference herein in their entirety for all purposes. U.S. patent application Ser. No. 12/802,001 is a continuation application and claims the filing date and benefit of U.S. patent application Ser. No. 12/657,356 titled "Multi Sensor Detection, Stall to Stop and Lock Disabling System" filed on Jan. 20, 2010, now U.S. Pat. No. 8,106,752 and incorporates the entire contents and complete subject matter therein by reference in their entirety for all purposes. U.S. patent application Ser. No. 13/288,065 that will issues as U.S. Pat. No. 8,531,280 also claims the filing date and benefit of and incorporates the entire contents of U.S. patent application Ser. No. 12/657,356, now U.S. Pat. No. 8,106,752 herein by reference for all purposes. The present application also claims the filing date and benefit of and incorporates the entire contents of U.S. patent application Ser. No. 12/802,001, now U.S. Pat. No. 8,334,761 by reference herein for all purposes. The present application also claims the filing date and benefit of and incorporates the entire contents of U.S. patent application Ser. No. 12/657,356, now U.S. Pat. No. 8,106,752 herein by reference for all purposes.

## FIELD OF THE INVENTION

The present invention pertains to anti-terrorist detection and prevention systems, and more particularly pertains to a disabling lock mechanism combined with a chemical/biological/radiological detection system for use with products grouped together by similar characteristics in order to prevent unauthorized entry, contamination and terrorist activity.

## BACKGROUND OF THE INVENTION

Terrorist activity is a continuous, daily, worldwide threat to the stability, prosperity, security and peace within nations and between and among nations. Its danger lies in its arbitrary destructiveness as much as in its unpredictability, and the constant threat of terrorist activity compels measures and actions that cause strain and contention in free, democratic societies as security concerns and civil liberty concerns must be balanced so that both public safety and civil liberties are maintained. Safety and security concerns can be addressed through numerous proactive steps and measures, many of which cause only minimal interference with and disruption of the daily routines of work, travel, commerce and entertainment. However, because modern industrial societies afford almost limitless places, locations, and opportunities for terrorist activities, no safety measure or security protocol will be foolproof, but many security measures, systems and protocols can be implemented that greatly minimize specific threats through fingerprint identification procedures, chemical, biological, and radiological hazard detections, bomb and

2

explosive detection, and controlling the access to everything from shipping containers to school lockers. Thus, the prior art discloses a wide range of security measures and systems.

For example, the Fishbine et al. patent (U.S. Pat. No. 4,792,226) discloses an optical fingerprinting system that includes an optics/processor unit, a video monitor, a data terminal, and a printer for collecting and storing data characteristics of all ten individual fingerprints for printing demographic information and fingerprint images as desired on a standard booking or applicant card.

The Schiller patent (U.S. Pat. No. 4,544,267) discloses a finger identification unit that includes a fingerprint scanning apparatus using a collimated beam of light to interrogate the fingerprint of a finger placed against a platen so that successive scan positions produce signals containing fingerprint information.

The Fishbine et al. patent (U.S. Pat. No. 5,222,152) discloses a portable fingerprint scanning apparatus for optically scanning and recording fingerprint images and wirelessly transmitting such images to a mobile processing unit for verification and background checking.

The Lougheed et al. patent (U.S. Pat. No. 5,233,404) discloses an optical scanning apparatus that uses a linear charge coupled device (CCD) for recording the image of a fingerprint on the viewing surface.

The Groger et al. patent (U.S. Pat. No. 5,766,956) discloses a diode laser based sensor for undertaking optical, chemical, immunological or nucleic acid-based assay or other chemical analysis.

The Feldman patent (U.S. Pat. No. 5,938,706) discloses a multi element security system for preventing the unauthorized use of an automotive vehicle, and which includes numerous locking and control features interconnected to an onboard cpu.

The Bowker et al. patent (U.S. Pat. No. 5,963,657) discloses a safety access control for doors, handles, locks, etc., wherein the surface relief of a finger is read and verified to either allow or prevent access by the individual to the door, handle, lock, etc.

The Bonder et al. patent (U.S. Pat. No. 6,078,265) discloses a fingerprint identification security system wherein a key lock operated security system utilizes the fingerprint of the individual to control user access to the security system, such as the ignition system of an automotive vehicle.

The Anzai et al. patent (U.S. Pat. No. 6,271,745 B1) discloses a keyless authorization system for use of a motor vehicle that includes fingerprint reading units located on the exterior or interior of the motor vehicle and which is coupled to a control unit for scanning, comparing and matching fingerprints to allow or disallow access to the motor vehicle.

The Hwang patent (U.S. Pat. No. 6,374,652 B1) discloses a fingerprint-activated doorknob in which a detecting sensor for a fingerprint is placed on the doorknob for measuring and searching the fingerprint against previously stored fingerprint inputs to control access to the door.

The Vor Keller et al. patent (U.S. Pat. No. 6,588,635 B2) discloses a safety holster for a firearm that includes a pivotally mounted retaining member and a fingerprint sensor for scanning fingerprint information so that only authorized users can withdraw the firearm from the holster.

The Cordery et al. patent (U.S. Pat. No. 6,613,571 B2) discloses a method and system for detecting biological and chemical hazards in the mail that includes sensors placed within the mail box for sampling and testing ambient air and so that mail can be safely transported through the mail system.

The Nagata patent (U.S. Pat. No. 6,628,213 B2) discloses a coding method for digital signal coding and decoding that includes a CMI (code-marked inversion) method of signal coding.

Nonetheless, despite the ingenuity of the above devices, methods, and systems, there remains a need for a multi-detector and disabling lock system for use with various types of products collected together by common characteristics into product groupings for detecting chemical, biological and radiological agents and compounds and for selectively disabling and activating the product locks thereby preventing unauthorized entry and further contamination and preventing and thwarting terrorist activities.

## SUMMARY OF THE INVENTION

The present invention comprehends a chemical/biological/radiological detector unit with a disabling locking system for protecting products that can be grouped into several product groupings, from terrorist activity, and also for preventing unauthorized access to and tampering with the storage and transport of ordnance and weapons. The products grouped into what may be referred to as Product grouping 1 include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes and lockers; while the products grouped into what may be referred to as Product grouping 2 include, but are not limited to, chemical, biological, radiological, and nuclear detectors, motion sensors and door sensors. The multi sensor detection system includes the capability to disable an existing lock or activate a lock located inside any of the products named in the product grouping categories upon activation of a sensor or detector included in the system. This is a significant feature for the multi sensor detection system as it prevents unauthorized, unequipped and untrained entry and access to the product thus preventing further contamination of the site and to individuals in the area.

The multi sensor detection and lock disabling system includes a detector case sized to fit in, upon or adjacent any of the aforedescribed products for detecting harmful and dangerous chemical, biological, and radiological agents, compounds and elements. In addition, the multi sensor detection and lock disabling system is capable of transmitting a signal to lock or disable a lock on the product, and is also capable of transmitting signals to a monitoring computer terminal or PC so that appropriate defensive and safeguarding actions can be undertaken and an authorized individual can disarm and reset the locking system and the multi sensor detection system. The detector case includes a power source (battery or electrical), interior compartments, Internet and GPS connections and a cpu interconnected with the Internet and GPS connections, and also interconnected with one or more off site monitoring computer terminals or PCs. The detector case includes one or more light alarm indicators that are externally visible and that light up when the chemical, biological, or radiological agent or compound is detected, and the light alarm indicators (which can be indicator lights or panels on the front of the detector case) can be color coded for denoting the specific agent or compound detected, i.e., separate and distinct colors for indicating detection of the chemical, biological, or radiological agent or compound.

The detector case is designed to hold within the interior compartments one or more interchangeable detectors, and each detector is adapted and set up to sample a specific compound or agent. Each detector includes a sound alarm, a sensor, a light alarm, and a readings panel, and is electrically interconnected (either by wire or wirelessly) to the cpu of the detector case so that information regarding the detection of

the particular agent or compound can be conveyed from the detectors to the detector case cpu. Each detector can also be used as a manual, stand-alone hand held scanner.

The multi sensor detection and lock disabling system can be interconnected to a surveillance watchtower, as well as monitoring computer terminals or PCs, with the watchtower scanning shipping and cargo crates and containers being prepared for shipment or sitting for extended periods of time on a dock or at a port, at a railway site, or at an industrial storage facility. The watchtower will scan the cargo and shipping crates and containers for the light alarm indicators on detector cases that are mounted in or upon the crates and containers, and thus continuous security surveillance of the crates and containers can be maintained.

An enhanced version of the multi sensor detection and lock disabling system can be employed to prevent car and vehicle bombings. Coupling the multi sensor detection and lock disabling system with satellite service will enable the detection system to detect explosives and transmit an alert signal by satellite to monitoring equipment at a monitoring site. Upon receiving the alert signal at the monitoring site the monitoring equipment activates a stall-to-stop process for disabling the air, fuel, electrical and/or computer system of the vehicle. Moreover, upon receiving the alert signal at the monitoring site the car or vehicle will be locked by transmission of a satellite signal that disables the vehicle's electrical and ignition system thereby preventing escape of the terrorist.

It is an objective of the present invention to provide a multi sensor detection and disabling lock system for securing news racks and vending machines in order to prevent theft, unauthorized use and terrorist activity.

It is another objective of the present invention to provide a multi sensor detection and disabling lock system for preventing terrorist activity by using products grouped together by common features in several product groupings such as design similarity, similarity in the presentation of security problems and similarity with regard to the presentation of solutions to preventing terrorist solutions.

It is still yet another objective of the present invention to provide a multi sensor detection and disabling lock system that is capable of disabling an existing lock or activating a lock inside any of the products of the product grouping lists when a detector or sensor of the system is activated.

It is still yet a further objective of the present invention to provide a multi sensor detection and disabling lock system wherein the disabling lock system prevents the unauthorized entry, access and further contamination of the products included in the several product groupings.

A still further objective of the present invention is to provide a multi sensor detection and lock disabling system that utilizes a multi-task device for preventing terrorist activity to vulnerable products that are collected or arranged by product grouping categories.

Yet a further objective of the present invention is to provide a multi sensor detection and disabling lock system to secure cargos and containers, especially cargo and shipping containers, against chemical, biological, radiological and nuclear terrorist activity.

Still another objective of the present invention is to provide a multi sensor detection and disabling lock system capable of detecting chemical, biological and radiological agents and compounds.

Still yet another objective of the present invention is to provide a multi sensor detection and disabling lock system that includes interchangeable detectors that operate in conjunction to detect chemical, biological and radiological agents and compounds.

Still yet a further objective of the present invention is to provide a multi sensor detection and disabling lock system that can be implemented by business or government at a minimum cost by organizing the products to be protected into product grouping categories.

Another objective of the present invention is to provide a multi sensor detection and disabling lock system that accurately and reliably detects harmful agents, compounds and elements, and prevents the placement and storage of weapons and bombs in the range of storage containers and facilities currently available.

Still another objective of the present invention is to provide a multi sensor detection and disabling lock system wherein the interchangeable detectors that comprise part of the system can be used as stand-alone scanners.

These and other objects, features, and advantages will become apparent to those skilled in the art upon a perusal of the following detailed description read in conjunction with the accompanying drawing figures and appended claims.

## BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the primary features of the system which include a detector case, several interchangeable detectors, an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler;

FIG. 2 is a front elevation view of the multi sensor detection and lock disabling system of the present invention illustrating one of the interchangeable detectors first shown in FIG. 1;

FIG. 3*a* is a top plan view of the multi sensor detection and lock disabling system of the present invention illustrating the mounting of one lock disabler to the lock of a product, such as a container, and disengaged from the lock of the container;

FIG. 3*b* is a top plan view of the multi sensor detection and lock disabling system of the present invention illustrating the engagement of the lock disabler to the lock of the product for locking or disabling the lock of the product so that unauthorized access is prevented;

FIG. 4 is a side elevation view of the multi sensor detection and lock disabling system of the present invention illustrating the detector case mounted to the product, such as the container, with the light alarm indicators externally visible;

FIG. 5 is a schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the interconnection of detector cases with a surveillance watchtower and a monitoring PC terminal;

FIG. 6 is a schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the placement of detector cases upon containers different from the containers of FIG. 5, and wherein the detectors case are interconnected to a surveillance watchtower and a monitoring PC terminal;

FIG. 7 is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the mounting of one automatic/mechanical lock disabler to the lock of a standalone news rack;

FIG. 8 is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating one interchangeable detector placed within the standalone news rack;

FIG. 9 is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the detector case having color coded front panels for specifically indicating the agents, compounds or elements that have been detected;

FIG. 10 is a rear elevation view of the multi sensor detection and lock disabling system of the present invention illustrating the GPS, Internet and power source connections;

FIG. 11 is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the interconnection of the detector with the detector case and the steps undertaken by the system when an agent or compound is detected;

FIG. 12 is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the sequence of steps undertaken by one detector when functioning as a standalone scanner for detecting an agent or compound;

FIG. 13 is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the interconnection of the detector case with the automatic/mechanical lock disabler for activating the lock disabler upon detection by the system of an agent or compound;

FIG. 14 is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating interconnection of the detector case with the fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock as part of the process of detection and safeguarding the public upon detection of the agent or compound;

FIG. 15 is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the incorporation of the system with a surveillance watchtower and a monitoring PC or computer terminal for monitoring containers, such as shipping or cargo containers, that may sit for extended time periods on docks, at rail yards, and at industrial storage facilities;

FIG. 16 is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the integration of the detection system with a satellite and monitoring equipment at a monitoring site for detecting explosives placed in a vehicle and then transmitting signals to the satellite and then to the monitoring site for disabling and locking the vehicle;

FIG. 17 is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the incorporation of the features and elements of the detector case to a cell phone and cell phone case;

FIG. 18 is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the incorporation of a GPS satellite, a monitoring site and a cell phone tower for communicating to and with an electronic device such as a laptop computer or a cell phone for transmitting signals to a vehicle for activating an onboard stall-to-stop device for bringing the vehicle to a halt; and

FIG. 19 is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the use of a GPS satellite in conjunction with the monitoring site and monitoring equipment to relay commands and signals to the cpu or transceiver of the vehicle for stopping or locking the vehicle in response to a signal that a certain type of event (detection of a bomb, engine failure or malfunction or unauthorized use) has occurred or is in process

## DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

Illustrated in FIGS. 1-19 is a multi sensor detection and lock disabling system 10 for preventing terrorist activity by monitoring, detecting, and securing those critical areas, sites, and facilities vulnerable to terrorist activity. The first step is

the identification of critical areas, sites, locations and facilities that are vulnerable to terrorist activity as convenient places to store and plant explosives and bombs and spread biological, chemical or radiological agents and compounds, followed by the disposition of the multi sensor detection and lock disabling system **10** for monitoring, detecting, and securing the particular location or site. Vulnerable sites, locations, facilities and areas are nearly limitless in their variety; in order to categorize the protection the present invention provides an anti-terrorist product grouping strategy has been developed wherein products made from the same or similar material, products having the same or similar design, and products presenting the same or similar security problems are grouped together with the multi sensor detection and lock disabling system **10** for preventing terrorist activity. For example, two preferred product groupings can be Product Grouping I: cargo containers, shipping containers, cargo planes, freight train cars, tractor trailers, mail carriers (UPS, FedEx), airport lockers, news racks (coin and non-coin operated), mail drop boxes, cluster mail boxes, keyed mail boxes, mini-storage houses and buildings, bicycle lockers, stadium lockers, school lockers, cars, trucks, campers, buses, vans and utility vehicles. Product Grouping II: chemical detectors, biological detectors, radiological detectors, nuclear detectors, motion sensors, glass break sensors, plastic film on glass, high security locks, tampering labels, door sensors, disabling locking systems, vehicle detectors and satellite disabling locking systems. In addition to grouping products together by features, designs and materials, the multi sensor detection system **10** includes a lock disabling capability for disabling an existing lock or activating a lock on or inside any of the aforementioned products when a detector or sensor of the system is activated. The lock disabling feature is a crucial component of the invention in so far as it prevents unauthorized, unequipped or untrained individuals from gaining access and entry to the site and causing further contamination of the site.

As shown in FIGS. **1-10**, the multi sensor detection and lock disabling system **10** includes at least one—and preferably many—detector case **12** that can be placed in, on, upon or adjacent the product, such as the shipping containers **14** of FIGS. **4** and **5** resting upon a platform **16** or the cargo container **18** of FIG. **6** sitting upon a seaport dock or pier **20**. The detector case **12** includes a top **22**, a bottom **24**, a pair of opposed sides **26** and a front side or panel **28** and an opposite rear or back side **30**. The rear side **30** has connections or contacts that can include an Internet connection **32**, a GPS connection **34** and a power connection **36** for a power source. The power source for the detector system **10** can be any conventional battery or electrical source. The detector case **12** includes an interior chamber divided into a number of compartments **38** for holding therein agent or compound detection means hereinafter further described. A cpu **40** is mounted within the detector case **12** and electrically interconnects, routes, and transmits signals among items hereinafter further described and also communicates with a monitoring site and monitoring equipment. The front side **28** of the detector case **12** includes indicator means for visually indicating that a specific agent, compound or element has been detected. The indicator means can include color coded indicator lights **42** in panel form, as shown in FIG. **9**, with each indicator light panel **42** lighting up with a specific color corresponding to the detection of a specific agent or compound; or color coded indicator lights **44**, as shown FIG. **1**, that correspond to and individually light up on the detection of a specific agent or compound (chemical, biological, or radiological).

As shown in FIGS. **1**, **2** and **9-13**, the multi sensor detection and lock disabling system **10** includes a plurality of detectors **46** with each detector **46** adapted for and set up to sample for a specific agent or compound (biological, chemical, or radiological); and the detectors **46** are interchangeable for adapting to the needs and demands of future technology. The detectors **46** can also be used as standalone scanners. In the preferred embodiment of the invention, at least three detectors **46** are placed within the detector case **12** with one detector **46** for specifically sampling biological agents or compounds, one detector **46** for sampling chemical agents or compounds, and one detector **46** for sampling radiological agents or compounds. The detectors **46** are interconnected to the cpu **40** of the detection system **10** by conventional connections that can be wire or wireless for transmitting the appropriate signals to the cpu **40** upon detection of the particular agent or compound. As shown in FIG. **2**, each detector **46** includes on its front plate or facing surface a sound alarm indicator **48**, a readings panel **50** comprising a plastic shield and LED lights for displaying the various read-out messages, a sensor **52** for detecting the specific agent, element or compound, and a light alarm indicator **54** that can be color coded for each specific agent and which is externally visible when the detector **46** is used as a stand alone scanner. Each detector **46** includes a conventional microprocessor for controlling the various functions and generating the appropriate signals for transmission to the cpu **40** of the detector case **12**.

As shown in FIGS. **1**, **3a**, **3b**, **9**, and **13-15**, used in conjunction with the multi sensor detection and lock disabling system **10** is at least one automatic/mechanical lock disabler **56**—and depending upon the number of products being monitored there can be one lock disabler **56** for each product. The automatic/mechanical lock disabler **56** is physically connected to the detector case **12** by a wire or cable **58** for receiving signals therefrom for disabling an existing lock or activating a lock inside a product to prevent access to the product. By way of example, FIG. **3a** shows the automatic/mechanical lock disabler **56** mounted—by any conventional means—to the lock **60** of the shipping container **14** shown in FIGS. **4** and **5** and connected by wire **58** to the cpu **40** of the detector case **12**. The lock disabler **56** is in the non-activated or disengaged state in FIG. **3a**. FIG. **3b** shows the automatic/mechanical lock disabler **56** mounted to the lock **60** of the shipping container **14** and in the activated or engaged state after detection of an agent or compound by the system **10** thereby for locking or disabling the lock **60** of the shipping container **14** and preventing unauthorized entry and access by unauthorized, untrained and unequipped individuals. In FIGS. **3a** and **3b** the lock **60** secures doors of the shipping container **14** that can be slidably or pivotably opened and closed.

In addition to the automatic/mechanical lock disabler **56**, the multi sensor detection and lock disabling system **10** can also utilize a fingerprint biometric lock with disabler **62** as shown in FIGS. **1** and **14**. The fingerprint biometric lock with disabler **62** is interconnected to the cpu **40** of the detector case **12** for receiving transmissions therefrom after detection of an agent or compound has occurred so that the lock on the product can be locked or disabled. Moreover, resetting of the fingerprint biometric lock with disabler **62** occurs when the fingerprint of the individual is placed on the fingerprint-matching pad **64**, and if a match occurs with a known fingerprint stored by the cpu **40**, then the individual can reset the fingerprint biometric lock with disabler **56** by turning the manual lock disabler **66**. The fingerprint biometric lock with disabler **62** is mounted to the lock of the product in a manner

similar to the mounting of the automatic/mechanical lock disabler **56** that is shown in FIGS. **3** and **3***b*.

FIGS. **4** and **5** show one manner of disposition or placement of the detector case **12** in relation to the product, i.e., the shipping container **14**, with the color coded indicator lights **42** externally viewable; FIG. **5** shows a number of shipping containers **14** each equipped with a detector case **12** and integrated with elements hereinafter further described for continuously monitoring the shipping containers **14** as they sit for an extended period of time on the truck or rail platform **16**. FIG. **6** illustrates several cargo containers **18** sitting on the shipping dock or pier **20**, with each cargo container **18** having a detector case **12** mounted thereon and integrated with and monitored by elements shown in FIG. **5** and hereinafter further described.

FIG. **7** illustrates a typical product from product grouping **1** that is monitored by the multi sensor detection and lock disabling system **10** of the present invention; specifically, FIG. **7** shows a news rack **68** with one automatic/mechanical lock disabler **56** mounted to and interconnected with the locking mechanism of the news rack **68**. As long as there is no detection of any agent or compound, the lock disabler **56** is in the disengaged state, and the individual can deposit the coin amount in the chute and then freely open the glass panel **70** by the handle **72** for removing a paper. However, the lock disabler **56** would be activated upon detection of the harmful agent or compound and receipt of a signal from the cpu **40** for locking or disabling the locking mechanism thereby denying access to the interior of the news rack **68** from all untrained, unauthorized and unequipped individuals.

FIG. **8** illustrates one detector **46** disposed within the news rack **68** and which is visible through the panel **70** for detecting one specific agent, compound or element. The detector **46** functions as a stand-alone scanner and can be wirelessly interconnected to offsite monitoring equipment.

FIG. **11** illustrates a representative schematic **74** for describing the signal transmission process from the detector **46** to the cpu **40** of the detector case **12**. The external stimulus **76** would be the chemical, biological or radiological agent or compound. If there is no detection of the agent or compound, the detector **46** will stay in the sensing mode **78**. However, detection of the specific agent will trigger the sound alarm **80** and the light alarm **82**, and instant transmittal of a signal to the cpu **40**. The readings **84** can be stored by the cpu **40** for verification and future review and evaluation. After all the appropriate corrective and preventative measures have been undertaken by the trained and authorized personal, and the site has been cleansed of the contamination, authorized and equipped personal can then reset **86** the system **10**.

FIG. **12** illustrates a representative schematic **88** for the detector **46** when used as stand-alone scanner. The detector **46** undergoes the same essential steps as illustrated in FIG. **11**, with the exception of the signal transmission to the cpu **40**. The detector **46** remains in detection mode **78** until an agent is detected, and then the various functions—light alarm **82**, sound alarm **80**, storage of readings **84**, and, after the appropriate security and safety steps have been carried out by authorized personal, detector reset **90** by authorized personal can occur thereby placing the detector **46** back in detection or sensing mode **78**.

FIG. **13** is a representative schematic **92** that illustrates the steps undertaken by the system **10** to lock or disable a lock, such as the lock **60** for the shipping container **14** shown in FIGS. **3***a* and **3***b*. Upon detection of the agent (chemical, biological, radiological) the alarm light indicators **42** or **44** will light up providing external indication that an agent has been detected. In addition, the system **10**—the cpu **40**—will transmit a lock/disable lock signal **94** to the automatic/mechanical lock disabler **56** to lock or disable the lock on the product, such as the lock **60** on the shipping container **14** of FIGS. **3***a*-**5**. This prevents unauthorized, unequipped, or untrained individuals from entering or gaining access to the product for which a dangerous and perhaps lethal agent has been detected. After the proper authorities and authorized personal have been notified and all the appropriate security, preventative and clean up measures have been undertaken, the authorized individual can perform the disarm and reset function **96** for the system **10** placing the system **10** in back in the detection mode **98**.

FIG. **14** is a representative schematic **100** illustrating the use of the fingerprint biometric lock with disabler **62** with the system **10**. Upon detection of the agent or compound by the detector, the various alarms would sound and light up (shown in previous figures), and the cpu **40** would then transmit a signal to the fingerprint biometric lock with disabler **62** to lock or disable the lock on the product, such as the lock **60** on the shipping containers **14** shown in FIGS. **3***a*-**5**. The shipping containers **60** would remain locked and in an access denied mode **101** should an attempt be made to gain access to the container **60** by opening the lock **60** with an unauthorized fingerprint. However, a fingerprint that matches stored and authorized fingerprints **102** would indicate an authorized individual, and would allow the individual to disable and disarm **104** the lock **60** of the shipping container **14**. The fingerprint biometric lock with disabler **62** would then be reset **106** after the appropriate safety, cleanup, and protection measures are completed, and the system **10** would be reset and placed back in the detection mode **108**.

FIG. **15** is a schematic representation **110** that illustrates the integration of a surveillance watchtower **112** and a monitoring terminal or PC **114** for monitoring products such as the shipping containers **14** or cargo containers **16** that sit for extended periods of time of docks, piers **20**, truck terminals, mil yards, shipping platforms **16** and industrial sites as shown in FIGS. **5** and **6**. The watchtower **112** would maintain continuous surveillance over a number of shipping containers **60**, for example, with detector cases **12** mounted in or on each container **14** and set in detection mode **116** with one or more detectors **46** disposed in each detector case **12**. The watchtower **112** would continuously scan for light alarm indicators **42** and **44** on the products, such as the containers **14** or **18**, and the watchtower **112** would be interconnected and integrated with the monitoring terminal or PC **114**. Upon detection **118** of an agent or compound in one or more of the shipping containers **14**, the appropriate light alarm indicators **42** or **44** would light providing visible confirmation of the detection of the specific agent or compound. The cpu **40** would transmit a lock/disable signal **120** to the lock **60** on each respective shipping container **14** to lock or disable the lock **60** thus preventing access to that respective shipping container **14**. In addition, signal transmissions would be sent to the monitoring terminal or PC **114** (which could be off site) thereby alerting authorized security personal of the contamination event. With the information received at the monitoring terminal **114**, authorized personal would then be notified and dispatched to the area to undertake the appropriate safety and cleanup measures **122**. Such measures would also include disarming the lock disabling system in order to gain access to the shipping container **14**. After all the cleanup and security measures are completed by the trained and properly equipped authorities, the detection system and the lock disabling feature would reset **124** and the detection system would again be placed in detection mode **116**.

FIG. 16 is a schematic representation 126 that illustrates an enhanced version of the multi sensor detection and lock disabling system 10 for preventing car and vehicle attacks and bombings. The lock disabling system 10 would be interconnected to the locking system and mechanism 128 of the vehicle 130. In addition, a stall to stop disabling link 132 can be made with the fuel, air, and electrical system 134 of the vehicle 130. The enhanced version incorporates a satellite 136 for signal receipt and transmission from the vehicle 130 in which the detector system 10 is placed to a monitoring site and monitoring equipment 138. As shown in FIG. 16, a detection signal 140 would be sent to the satellite 136 by the detection system 10 upon detection of a bomb or explosive 142 hidden in the vehicle 130. The satellite 136 would then transmit an alert signal 144 to the monitoring site 138 with the signal 144 containing the relevant data to evaluate the nature of the threat. The monitoring site 138 would then transmit a stall to stop signal 146 to the detection system 10 to lock the vehicle 130 and/or disable the electrical system of the vehicle 130 thereby disabling the vehicle 130, preventing access to the vehicle 130 by locking the vehicle 130, and preventing any terrorist in the vehicle 130 from escaping.

The detector case 12 can be modified and adapted for inclusion with cell phone cases, satellite cell phone cases, laptop cases, notebook PC cases, PDA cases, carry-on cases, suitcases, and briefcases. In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring.

The system 10 and the watchtower 112, along with the satellite 136 and the monitoring site 138 can be adapted or incorporated with cell phone towers and satellites for use with satellite communication and/or a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween. The aforementioned telecommunication and radio communication means can be interactive with any type of motive vehicle that includes but is not limited to cars, trucks, vans, SUVs, trains, subways, boats, ships and airplanes, and which is reported stolen, experiences a loss of brakes, or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted to the vehicle and which detection causes an automatic signal transmission or a signal transmission is activated when a call is made to the monitoring station by an authorized person. The authorized individual includes but is not limited to the owner, pilot, conductor, captain, police highway patrol, security guard and military personnel to the monitoring equipment for activating a vehicle slowdown or stall-to-stop disabling system that similar to the disabling system 126 shown in FIG. 16, or incorporating features of the system 126 shown in FIG. 16, from the monitoring equipment to the vehicle. The activation of the stall-to-stop disabling means or the vehicle slowdown disables or engages the computer, electrical, fuel and air systems of the vehicle or a combination of the computer, electrical, fuel and air systems that include but are not limited to the brakes, foot peddle, lights, speed controls, ignition, steering, transmission, and the horsepower of the motor.

In addition, the basic stall-to-stop disabling means or the vehicle slowdown means and device can be adapted, modified or designed to include: an open bust or open platform for integrating any new and innovative technology; warning lights indicators; sound alarm indicators; voice alarm indicators; a cell phone to transmit to the vehicle a signal for slowing and halting the vehicle; and a lock disabling system or means to lock a thief or terrorist inside the vehicle after a transmission is received or sent. Open bust or open platform also refers to the compatibility of the detector case 12, or the incorporation of its features in cell phone cases, satellite cell phone cases, laptop cases, notebook PC cases, PDA cases, carry-on cases, briefcases, and suitcases, etc., with other communication, transmission and surveillance systems whereupon the detector case 12, and its features, can be seamlessly integrated with other new and emerging systems and technologies.

Thus, as shown more specifically in FIG. 17, by way of a representative example the features and elements of the detector case 12 are shown as being incorporated into cell phone detector case 150 and associated cell phone monitor 152. The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174. The power source for the cell phone detector case 150 can be any conventional rechargeable battery source or standard electrical power from a standard electrical receptacle or outlet.

As shown in FIG. 17, the cell phone detector case 150 includes one or more sensor/detector units, cells, or components 176 built into and incorporated into the case 150. The detector 176 includes generally disposed at the front 162 of the case 150 the following types of indicators: a sound alarm indicator 178, a readings panel 180, a sensor 182 for detecting one or more specific types of agents, elements, chemicals, compounds, etc., and a light alarm indicator 184. The sensor/detector 176 will be interconnected to the power source 174. In addition, mounted on and externally visible on the sides 168 or front 162 of the case 150 are a plurality of color coded indicator lights 186 with each light 186 corresponding to a specific agent, element, chemical, compound, etc., and lighting up when that agent is detected by the sensor/detector 176. The color coded indicator lights 186 will be electrically interconnected to the sensor/detectors 176 via any standard microprocessor. The cell phone detector case 150 and cell phone monitor 152 thus comprise a hand-held, easily portable and transportable detection means that is both effective and unobtrusive in its disposition and use.

FIGS. 18 and 19 illustrate representative examples of the integration of portable electronic communication or telecommunication devices such as a cell phone 187*a* and/or a laptop computer 187*b* with the monitoring equipment 138 located at a predesignated monitoring site 188, and operating in conjunction with either a satellite and/or a cell phone tower 190 to transmit and receive signals and commands among each other and to a vehicle 192, such as a truck, as part of a stall-to-stop disabling system for slowing and stopping the vehicle 192 and locking a thief, terrorist, or unauthorized individual in the vehicle 192 if needed. A wide range of events can trigger and initiate the stall-to-stop system and the locking or lock disabling system and mechanism, and the event doesn't have to be limited to the detection of a bomb or a chemical, biological, or radiological agent, element, or compound. The events can include, but is not limited to, detection of an engine problem to engine failure to the unauthorized use (stealing) of the vehicle 192. The vehicle 192 includes an electromotive system 194 that comprises, among other com-

ponents, an onboard computer(s), electrical, fuel and air systems, as well as brakes, ignition, steering, and transmission. Also integrated with and capable of communicating with the vehicle's **192** electromotive system **194** is a stall-to-stop system while a lock disabling mechanism **196** is able to engage and disengage or disable the vehicle's **192** locking mechanism **198** upon receipt of the appropriate commands via a lock disabling communication channel or link **200**. This link **200** can also accommodate the stall-to-stop system commands and signals, and thus is a multi-channel communication link. A CPU or a transceiver **202** is programmed to receive signals from the cell phone tower **190** and/or to a GPS satellite **204** and is interconnected with the stall-to-stop system and the lock disabling system **196** via link **200** for engaging the electromotive system **194** and actuating the lock disabling system **196** to stop the vehicle **192** and lock inside the vehicle **192** anyone such as a thief, terrorist or other unauthorized individual.

A representative example for stopping, disabling, and locking the vehicle **192** that utilizes the cell phone tower **190** wherein the activation and/or distress signal **206** originates from the cell phone **187*a*** or the laptop **187*b*** and such activation signal **206** travels to the cell phone tower **190** that is nearest the current location of the vehicle **192**. A signal **208** is then transmitted to the monitoring site **188** and specific monitoring equipment **138** that can also include but is not limited to cell phones, laptops, desktop PC's, notebook PC's and LCD monitors. The monitoring site **138** then communicates by signal **210** to the GPS satellite **204** that an original or activation signal has been received and then the GPS satellite **204** locates and communicates by multiplex signal **212** with the CPU or transceiver **202** on the vehicle **192** and exchanges information on the type of problem, situation, location, and vehicle speed. The monitoring equipment **138** then transmits a signal **214** to the cell phone tower **190** that communicates with the transceiver **202** and/or CPU of the vehicle **192** to initiate or execute any commands that will actuate the stall-to-stop disabling link **200** and lock disabling system **196** for bringing the vehicle **192** to a halt and actuating the vehicle's **192** locking mechanism **198** for locking the thief, terrorist, or other unauthorized person inside the vehicle **192** if needed.

FIG. **19** illustrates a representative example wherein the stall-to-stop system and the lock disabling system **196** are utilized in conjunction with the GPS satellite **204**. In FIG. **19** a signal has traveled to the satellites nearest the vehicle's **192** current location and then the signal **218** has traveled to the monitoring equipment **138** and monitoring site **188** which can include but is not limited to satellite cell phones, satellite monitors, cell phones, laptops, desktop PC's, notebook PC's, and LCD monitors. The GPS satellite **204** then locates and communicates with the CPU and/or transceiver **202** on the vehicle **192** via a multiplex (two-way) signal **220** in order to exchange information on such distress and danger event parameters as the specific problem situation, location, and vehicle speed. The monitoring equipment **138** then transmits a signal **222** back to the GPS satellite **204** that in turn communicates via another signal **224** with the CPU and/or transceiver **202** to execute any commands to the stall-to-stop system for executing the disengagement of the vehicle's **192** electromotive system **194** for bringing the vehicle **192** to a halt and for actuating the lock disabling system **196** to direct the lock disabling link **200** to actuate the locking mechanism **198** thereby locking the vehicle **192** and anyone inside the vehicle **192**.

While the invention has been shown and described in a preferred embodiment, it will be apparent to those skilled in the art that numerous alterations, modifications, and variations will possible and practicable without departing from the spirit and scope of the invention as set forth by the appended claims.

The present invention comprehends a chemical/biological/radiological/nuclear/explosive/human/contraband detector unit with a disabling locking system for protecting products that can be grouped into several product groupings, from terrorist activity, and also for preventing unauthorized access to and tampering with the storage and transport of ordnance and weapons. The products grouped into what may be referred to as Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars, (UPS, FedEx), airport lockers, news racks (coin and non-coin operated), mail drop boxes, cluster mail boxes, keyed mail boxes, min-storage houses and buildings, bicycle lockers, stadium lockers, school lockers, cars, trucks, campers, buses, vans, UAVs, UGVs, and utility vehicles; the products grouped into what may be referred to as Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, door sensors, speed sensors, biometric sensors, glass break sensors, plastic film on glass, high security locks, tampering labels, door sensors, disabling locking systems, vehicle detectors and satellite disabling locking systems, detection of humans, detection of contraband, temperature, and shock levels; the products grouped into what may be referred to as Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, satellite cell phone cases, laptop cases, notebook PC cases, PDA cases, carry-on cases, suitcases, eyeglass, briefcases, detector cases of locks, detector cases of tags, detector cases that is mounted to, detector cases that is affixed to, detector cases that is outside of, detector cases that is inside of, and detector cases that is adjacent to; the products grouped into what may be referred to as Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, web servers, desktop PCs, notebook PCs, laptops, satellite cell phones, cell phones, UMTS phones, PDAs, LCD monitors, and satellite monitoring, remote control key fobs, two-way communication key fobs, handhelds; the products grouped into what may be referred to as Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, Cellular, Satellite, Telematics, Wide Area Network (WAN), Wireless Wide Area Network (WWAN), Local Area Network (LAN), Radio Frequency (RF), Broadband Wireless Access (BWA), Global Positioning System (GPS), General Packet Radio Services (GPRS), Global System for Mobile (GSM), Wideband Code Division Multiple Access (W-CDMA), Universal Mobile Telecommunications System (UMTS), Short Message Service (SMS); the products grouped into what may be referred to as Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature. the products grouped into what may be referred to as Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, HAZMAT, CIA, FBI, Secret Service, port security personnel,

border security personnel, first responders, monitoring sites and terminal personnel. The multi sensor detection system includes the capability to disable an existing lock or activate a lock located inside or outside any of the products named in the product grouping categories upon activation of a sensor or detector included in the system. This is a significant feature for the multi sensor detection system as it prevents unauthorized, unequipped and untrained entry and access to the product thus preventing further contamination of the site and to individuals in the area.

The invention claimed is:

1. A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, comprising:

at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or a front end processor for communication between a host computer and other devices;

a transmitter for transmitting signals and messages to at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device;

a receiver for receiving signals, data or messages from at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device;

at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short range radio frequency (RF) connection, or GPS connection;

the communication device is at least a fixed, portable or mobile communication device interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween; and

whereupon the communication device, is interconnected to a product equipped to receive signals from or send signals to lock or unlock doors, activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems;

wherein the communication device receives a signal via any of one or more products listed in any of the plurality of product grouping categories;

wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short range radio frequency (RF) connection is capable of signal communication with the transmitter and the receiver of the communication device and transceivers of the products;

wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature such that the communication device that is at least one of the cell phone, the smart phone, the desktop, the handheld, the PDA, the laptop or the computer terminal is locked by the biometric lock disabler to prevent unauthorized use;

wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, and long and short range radio frequency (RF).

2. Monitoring equipment of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e. computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone) interconnected to a product for communication therebetween, comprising:

at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or a front end processor for communication between a host computer and other devices;

a transmitter for transmitting signals and messages to at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device;

a receiver for receiving signals, data or messages from at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device;

a lock disabling mechanism that is able to engage (lock) and disengage (unlock) and disable (make unavailable) a product's lock, wherein the lock disabling mechanism disables the product's lock after a specific number of tries by an unauthorized user to disengage the lock by maintaining the product's lock in the current state of the product's lock regardless of input entered to change the state of the product's lock by the unauthorized user;

at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short range radio frequency (RF) connection, or GPS connection;

monitoring equipment of at least a fixed, portable or mobile monitoring equipment interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween; and

whereupon the monitoring equipment, is interconnected to a product equipped to receive signals from or send signals to the lock disabling mechanism that is able to engage and disengage or disable the lock, activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems;

wherein the monitoring equipment is implemented by business or government at a minimum cost by products grouped together by common features in at least one of several product groupings of design similarity;

wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, or long and short range radio frequency (RF) connection is in signal communication with the transmitter and the receiver of the monitoring equipment and transceivers of the products.

3. Monitoring equipment of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e. computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone) interconnected to a product for communication therebetween, comprising:

at least one of a central processing unit (CPU), a network processor, or a microprocessor for executing and carrying out the instructions of a computer program or application which is specifically targeted at the networking application domain, for communication between the monitoring equipment and any of a plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container device, or a locking device;

a transmitter for transmitting signals and messages to at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container device, or a locking device;

a receiver for receiving signals, data or messages from at least one of plurality of product groups based on the categories of a multi-sensor detection device, a maritime cargo container device or a locking device, wherein the signals, data or messages are of agents of an item of interest (IOI);

at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, or GPS connection;

the monitoring equipment is at least a fixed, portable or mobile monitoring equipment interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween; and

whereupon the monitoring equipment, is capable of the activation or deactivation of at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container device or a locking device;

wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, for signal communication with the transmitter and the receiver of the monitoring equipment and transceivers of the products;

at least one tag that is read by the monitoring equipment that is capable of wireless near-field communication to a achieve detection of at least one of a chemical agent, a biological agent, a radiological agent, a nuclear agent, or an explosive agent which allows radio frequency (RF) data to be received and transferred between the tag and the monitoring equipment.

4. A built-in, embedded multi sensor detection system for monitoring products with a plurality of sensors detecting at least two agents selected from the group consisting of chemical, biological, radiological, explosive, human, and contraband agents;

comprising a built-in sensor array or fixed detection device into the product that detects agents by means of two or more sensors combined from the following list of sensors: a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, and a radiological sensor;

comprising a communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal for monitoring products, interconnected to a built-in sensor array or fixed detection device for communication therebetween,

wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature such that the communication device that is at least one of the cell phone, the smart phone, the desktop, the handheld, the PDA, the laptop or the computer terminal is locked by the biometric lock disabler to prevent unauthorized use;

wherein the built-in embedded multi sensor detection device receives a signal via any of one or more products listed in any of the plurality of product grouping categories; and

wherein, when an alarm occurs, the built-in, embedded multi sensor detection system communicates the alarm by way of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e. product-to-product, product-to-satellite, product-to-cellular, product-to-long or short range radio frequency, product-to-radio frequency (RF), product-to-internet, product-to-broadband, product-to-smartphone or cell phone, product-to-computer at monitoring site, product-to-WiFi, product-to-handheld, or product-to-laptop or desktop) for communication therebetween;

wherein the built-in embedded multi sensor detection device is implemented by business or government at a minimum cost by products grouped together by common features in at least one of several product groupings of design similarity.

5. A built-in multi sensor detection system for monitoring products with a plurality of sensors detecting at least two agents selected from the group consisting of chemical, biological, radiological, explosive, human, and contraband agents, comprising:

a built-in sensor array or fixed detection device into the product that detects agents by means of two or more sensors combined from the following list of sensors: a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, and a radiological sensor;

monitoring equipment of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e. computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone) for the receipt and transmission of signals therebetween;

wherein the built-in multi sensor detection device is built in any of one or more products listed in any of the plurality of product grouping categories to include but not limited to a maritime cargo container, a lock, or monitoring equipment (i.e., a computer terminal, personal computer (PC), a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop);

wherein the built-in multi sensor detection device is implemented by business or government at a minimum cost by products grouped together by common features in at least one of several product groupings of design similarity;

a light alarm indicator that has a plurality of colored lights that correspond to specific ones of the at least two agent;

wherein, when the light alarm indicator lights to indicate an alarm occurs, the built-in multi sensor detection system communicates the alarm by way of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e. product-to-product, product-to-satellite, product-to-cellular, product-to-radio frequency (RF), product-to-internet, product-to-broadband, product-to-smartphone or cell phone, product-to-computer at monitoring site, product-to-WiFi, product-to-handheld, or product-to-laptop or desktop) for the receipt and transmission of signals therebetween.

6. A built-in multi sensor detection system for detecting at least two items selected from the group consisting of chemical agent, biological agent, radiological agent, explosive agent, human agent, contraband agent, motion, perimeter, temperature, tampering, theft, and breach, comprising:

a built-in sensor array or fixed detection device into a product that detects items by means of at least two sensors from the following list of sensors: a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, and a radiological sensor;

monitoring equipment of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e. computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone) for the receipt and transmission of signals therebetween;

wherein the built-in, multi sensor detection device is built in any of one or more products listed in any of the plurality of product grouping categories to include but not limited to a maritime cargo container, a lock, or monitoring equipment (i.e., a computer terminal, personal computer (PC), a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop);

wherein, when an alarm occurs, the built-in multi sensor detection system communicates the alarm by way of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e. product-to-product, product-to-satellite, product-to-cellular, product-to-radio frequency (RF), product-to-internet, product-to-broadband, product-to-smartphone or cell phone, product-to-computer at monitoring site, product-to-WiFi, product-to-handheld, or product-to-laptop or desktop) for the receipt and transmission of signals therebetween,

at least one tag that is read by the monitoring equipment that is capable of wireless near-field communication to achieve detection of at least one of the chemical agent, the biological agent, the radiological agent, the explosive agent, the human agent, the contraband agent, the motion, the perimeter, the temperature, the tampering, the theft, and the breach which allows radio frequency (RF) data to be received and transferred between the tag and the monitoring equipment.

7. A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, or radiological agents and compounds, comprising:

a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human or contraband agents and compounds and capable of being disposed within, on, upon or adjacent a multi sensor detection device;

monitoring equipment comprising at least one of plurality product groups based on the categories of a computer, laptop, notebook, PC, handheld, cell phone, PDA or smart phone for the receipt and transmission of signals therebetween;

at least one cell phone tower interconnected to the monitoring equipment for sending signals thereto and receiving signals therefrom or at least one satellite capable of transmitting signals to the monitoring equipment;

at least one satellite or at least one cell phone tower capable of signal communication between the multi sensor detection device and the monitoring equipment;

at least one internet connection capable of communication between the multi sensor detection device and the monitoring equipment;

whereupon a signal sent to a receiver of the multi sensor detection device from a satellite; or to a cell phone tower; or through short and/or long range radio frequency; causes a signal to be sent to the monitoring equipment that includes location data and sensor data;

wherein the monitoring equipment or multi sensor detection device receives a signal via any of one or more products listed in any of the plurality of product grouping categories;

wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short range radio frequency (RF) connection is capable of signal communication with the transmitter and the receiver of the monitoring equipment or multi sensor detection device and transceivers of the products;

wherein the monitoring equipment is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature such that the monitoring device that is at least one of the computer, the laptop, the notebook, the PC, the handheld, the cell phone, the PDA, or the smart phone is locked by the biometric lock disabler to prevent unauthorized use;

wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, and long and short range radio frequency (RF).

8. A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, or radiological agents and compounds, comprising:

a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human or contraband agents and compounds and capable of being disposed within, on, upon or adjacent a multi sensor detection device;

monitoring equipment of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e. computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone) for the receipt and transmission of signals therebetween, wherein the monitoring equipment is equipped with a lock disabling mechanism that is able to engage (lock) and disengage (unlock) and disable (to make unavailable) a product's lock, wherein the lock disabling mechanism disables the product's lock after a specific number of tries by an unauthorized user to disengage the lock by maintaining the product's lock in the current state of the product's lock regardless of input entered to change the state of the product's lock by the unauthorized user;

at least one cell phone tower interconnected to the monitoring equipment for sending signals thereto and receiving signals therefrom; or at least one satellite capable of transmitting signals to the monitoring equipment;

at least one satellite or at least one cell phone tower capable of signal communication between the multi sensor detection device and the monitoring equipment;

at least one internet connection capable of communication between the multi sensor detection device and the monitoring equipment; and

whereupon a signal sent to a receiver of the multi sensor detection device from a satellite; or to a cell phone tower; or through short and/or long range radio frequency; causes a signal to be sent to the monitoring equipment that includes location data and sensor data;

wherein the multi sensor detection device is implemented by business or government at a minimum cost by products grouped together by common features in at least one of several product groupings of design similarity;

wherein the multi sensor detection device for any of one or more products listed in any of the plurality of product grouping categories to include but not limited to a maritime cargo container, a lock, or monitoring equipment (i.e., a computer terminal, personal computer (PC), a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop);

wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, or long and short range radio frequency (RF) connection is in signal communication with the transmitter and the receiver of the monitoring equipment or multi sensor detection device and transceivers of the products.

9. A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, or radiological agents and compounds, comprising:

a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human or contraband agents and compounds and capable of being disposed within, on, upon or adjacent a multi sensor detection device, wherein at least one of the sensors is capable of detecting agents of an item of interest (IOI);

monitoring equipment of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e. computer

terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone) for the receipt and transmission of signals therebetween;

at least one satellite or at least one cell phone tower capable of signal communication between the multi sensor detection device and the monitoring equipment;

at least one internet connection capable of communication between the multi sensor detection device and the monitoring equipment;

whereupon a signal sent to a receiver of the multi sensor detection device from a satellite; or from a cell phone tower; or through short and/or long range radio frequency; causes a signal to be sent to the monitoring equipment that includes location data and sensor data;

wherein the multi sensor detection device for any of one or more products listed in any of the plurality of product grouping categories to include but not limited to a maritime cargo container, a lock, or monitoring equipment (i.e., a computer terminal, personal computer (PC), a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop);

wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, or broadband connection, is in signal communication with the transmitter and the receiver of the monitoring equipment and transceivers of the products;

at least one tag that is read by the monitoring equipment that is capable of wireless near-field communication to achieve detection of at least one of the explosive agent, the nuclear agent, the contraband agent, the chemical agent, the biological agent, the human agent, or the radiological agent which allows radio frequency (RF) data to be received and transferred between the tag and the monitoring equipment.

* * * * *



Retail

UNITED STATES POSTAL SERVICE

94612

RDC 07

U.S. POSTAGE PAID
PME 1-Day
GREENVILLE, SC 29606
AUG 21, 2023

**$75.60**

R2304N117418-7

EXPRESS MAIL UNITED STATES POSTAL SERVICE

LABEL 11-B www.usps.gov

UNITED STATES POSTAL SERVICE® | PRIORITY MAIL EXPRESS®

EJ 772 065 455 US

**CUSTOMER USE ONLY**

FROM: (PLEASE PRINT) PHONE (864) 288-5605

LARRY GOLDEN
740 WOODRUFF RD,
#1102
GREENVILLE, SC 29607

**DELIVERY OPTIONS (Customer Use Only)**

☒ **SIGNATURE REQUIRED** *Note:* The mailer must check the "Signature Required" box if the mailer: 1) Requires the addressee's signature; OR 2) Purchases additional insurance; OR 3) Purchases COD service; OR 4) Purchases Return Receipt service. If the box is not checked, the Postal Service will leave the item in the addressee's mail receptacle or other secure location without attempting to obtain the addressee's signature on delivery.

Delivery Options

- ☐ No Saturday Delivery (delivered next business day)
- ☐ Sunday/Holiday Delivery Required (additional fee, where available*)
- ☐ 10:30 AM Delivery Required (additional fee, where available*)

*Refer to USPS.com® or local Post Office™ for availability.

TO: (PLEASE PRINT) PHONE (510) 637-3530

U.S. DISTRICT COURT FOR THE NDC-OAKLAND
CASE NO: 4:22-CV-05246-HSG
1301 CLAY STREET, SUITE 400S
OAKLAND, CA

ZIP + 4® (U.S. ADDRESSES ONLY)

9 4 6 1 2 - _ _ _ _

**PAYMENT BY ACCOUNT (if applicable)**

| USPS® Corporate Acct. No. | Federal Agency Acct. No. or Postal Service™ Acct. No. |
|---|---|
| | |

**ORIGIN (POSTAL SERVICE USE ONLY)**

☑ 1-Day ☐ 2-Day ☐ Military ☐ DPO

| | | | |
|---|---|---|---|
| PO ZIP Code: 29606 | Scheduled Delivery Date (MM/DD/YY): 8/22/23 | Postage: $ 75.60 | |
| Date Accepted (MM/DD/YY): 8/21/23 | Scheduled Delivery Time: ☐ 10:30 AM ☐ 3:00 PM ☐ 12 NOON 6PM | Insurance Fee: $ | COD Fee: $ |
| Time Accepted: 10:22 ☑ AM ☐ PM | 10:30 AM Delivery Fee: $ | Return Receipt Fee: $ | Live Animal Transportation Fee: $ |
| Special Handling/Fragile: $ | Sunday/Holiday Premium Fee: $ | Total Postage & Fees: $ 75.60 | |
| Weight: 3 lbs. 8.6 ozs. ☐ Flat Rate | Acceptance Employee Initials: [signature] | | |

**DELIVERY (POSTAL SERVICE USE ONLY)**

| Delivery Attempt (MM/DD/YY) | Time | ☐ AM ☐ PM | Employee Signature |
|---|---|---|---|
| Delivery Attempt (MM/DD/YY) | Time | ☐ AM ☐ PM | Employee Signature |

EXPRESS MAIL UNITED STATES POSTAL SERVICE

Case 4:22-cv-05246-HSG   Document 42-3   Filed 08/23/23   Page 2 of 2

SAppx561

Matthew S. Warren (State Bar No. 230565)
Virginia G. Kain (State Bar No. 344545)
22-5246@cases.warrenlex.com
WARREN LEX LLP
2261 Market Street, No. 606
San Francisco, California, 94114
+1 (415) 895-2940
+1 (415) 895-2964 facsimile

*Attorneys for Defendant Google LLC*

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

OAKLAND DIVISION

| | |
|---|---|
| LARRY GOLDEN,<br><br>Plaintiff,<br><br>v.<br><br>GOOGLE LLC,<br><br>Defendant. | Case No. 4:22-cv-05246-HSG<br><br>**NOTICE OF MOTION AND MOTION TO DISMISS THE AMENDED COMPLAINT BY DEFENDANT GOOGLE LLC**<br><br>Date: December 7, 2023<br>Time: 2:00 p.m.<br>Place: Courtroom 2<br>Judge: Hon. Haywood S. Gilliam, Jr. |

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT on December 7, 2023, at 2:00 p.m. Pacific Standard Time or as soon thereafter as the matter may be heard, before Judge Haywood S. Gilliam, Jr. of the United States District Court for the Northern District of California, located at 1301 Clay Street, Oakland, California, 94612, defendant Google LLC will move and hereby does move for an order dismissing plaintiff Larry Golden's amended complaint without leave to amend for failure to state a claim upon which relief may be granted under Federal Rule of Civil Procedure 12(b)(6). This motion is based on this Notice, the attached Memorandum of Points and Authorities, all matters of record filed with the Court in this case, any argument at hearing of this matter, and such other materials the Court may consider.

Google seeks an Order dismissing the amended complaint without leave to amend under Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which this Court may grant relief.

Date: September 7, 2023

Respectfully submitted,

Matthew S. Warren (State Bar No. 230565)
Virginia G. Kain (State Bar No. 344545)
WARREN LEX LLP
2261 Market Street, No. 606
San Francisco, California, 94114
+1 (415) 895-2940
+1 (415) 895-2964 facsimile
22-5246@cases.warrenlex.com

*Attorneys for Defendant Google LLC*

**TABLE OF CONTENTS**

INTRODUCTION. . . . . 1

BACKGROUND. . . . . 1

A. The Asserted Patents . . . . . 1

B. The Original Complaint and Google's Motion to Dismiss . . . . . 1

C. The Amended Complaint . . . . . 2

ARGUMENT. . . . . 2

I. The Amended Complaint Fails to State Claims of Direct Infringement . . . . . 2

A. ATAK-CIVILIAN is a Third-Party Application, Not a Google Product . . . . . 3

B. The Complaint Admits That Google Does Not Sell Converted NFC Tags . . . . . 3

C. The Complaint Admits That Google Does Not Sell Devices With a Microfluidic Lens . . 3

D. The Complaint Admits That Google Does Not Sell Devices Designed to Go to Mars . . . 4

E. The Complaint Admits That Google Beacon is Separate From the Accused Devices . . . . 5

II. The Amended Complaint Fails to Allege Indirect Infringement . . . . . 6

A. Indirect Infringement Requires Direct Infringement . . . . . 6

B. Assuming Direct Infringement, the Complaint Fails to Allege Indirect Infringement . . . . 6

1. The Amended Complaint Fails to Allege Induced Infringement . . . . . 6

2. The Amended Complaint Fails to Allege Contributory Infringement . . . . . 9

III. The Amended Complaint Fails to Allege Joint Infringement . . . . . 11

IV. The Amended Complaint Fails to Allege Willful Infringement . . . . . 12

V. The Court Should Deny Leave to Amend . . . . . 13

CONCLUSION . . . . . 13

# TABLE OF AUTHORITIES

*Cases* **Pages**

*Akamai Techs., Inc. v. Limelight Networks, Inc.*,
797 F.3d 1020 (Fed. Cir. 2015) . . . . . 11, 12

*Apple Inc. v. AliveCor, Inc.*,
No. 22-7608, 2023 WL 4091287 (N.D. Cal. Jun. 20, 2023) . . . . . 9, 10

*Aro Mfg. Co. v. Convertible Top Replacement Co.*,
377 U.S. 476 (1964) . . . . . 9

*Artrip v. Ball Corp.*,
735 F. App'x 708 (Fed. Cir. 2018), *aff'd,* 735 F. App'x 708 (Fed. Cir. 2018) . . . . . 2, 9, 10

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) . . . . . 9, 12

*Bell Atlantic Corp. v. Twombly*,
550 U.S. 544 (2007) . . . . . 9

*Bot M8 LLC v. Sony Corp. of Am.*,
4 F.4th 1342 (Fed. Cir. 2021) . . . . . 2

*Commil USA, LLC v. Cisco Sys., Inc.*,
575 U.S. 632 (2015) . . . . . 7, 9

*Cyph, Inc. v. Zoom Video Commc'ns., Inc.*,
No. 22-561, 2022 WL 1556417 (N.D. Cal. May 17, 2022) . . . . . 2

*DSU Med. Corp. v. JMS Co., Ltd.*,
471 F.3d 1293 (Fed. Cir. 2006) . . . . . 8

*Erickson v. Pardus*,
551 U.S. 89 (2007) . . . . . 6

*Ghazali v. Moran*,
46 F.3d 52 (9th Cir. 1995) . . . . . 10

*Glob.-Tech Appliances, Inc. v. SEB S.A.*,
563 U.S. 754 (2011) . . . . . 8

*Golden v. Qualcomm*,
No. 22-3283, 2023 WL 2530857 (N.D. Cal. Mar. 15, 2023) . . . . . 7

*Hitachi Kokusai Elec. Inc. v. ASM Int'l, N.V.*,
No. 17-6880, 2018 WL 3537166 (N.D. Cal. Jul. 23, 2018) . . . . . 10

*Hypermedia Navigation LLC v. Google LLC*,
No. 18-6137, 2019 WL 1455336 (N.D. Cal. Apr. 2, 2019) . . . . . 6, 7, 12

**TABLE OF AUTHORITIES**

*(continued)*

*Cases* — **Pages**

*In re Bill of Lading Transmission & Processing Sys. Pat. Litig.*, 681 F.3d 1323 (Fed. Cir. 2012) . . . . . 9, 10, 11

*Info-Hold, Inc. v. Muzak LLC*, 783 F.3d 1365 (Fed. Cir. 2015) . . . . . 8

*Lifetime Indus., Inc. v. Trim-Lok, Inc.*, 869 F.3d 1372 (Fed. Cir. 2017) . . . . . 2, 7

*Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311 (Fed. Cir. 2004) . . . . . 6

*Lyda v. CBS Corp.*, 838 F.3d 1331 (Fed. Cir. 2016) . . . . . 11, 12

*Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544 (Fed. Cir. 1990) . . . . . 8

*McRee v. Goldman*, No. 11-991, 2012 WL 929825 (N.D. Cal. Mar. 19, 2012) . . . . . 8

*Mejia v. JPMorgan Chase Bank, N.A.*, No. 21-1351, 2021 WL 6498762 (N.D. Cal. Sept. 8, 2021), *aff'd*, No. 21-16550, 2022 WL 1154762 (9th Cir. Apr. 19, 2022) . . . . . 13

*Metro-Goldwyn-Mayer Studios Inc. v. Grokster*, 545 U.S. 913 (2005) . . . . . 8

*OpenTV, Inc. v. Apple, Inc.*, No. 14-1622, 2015 WL 1535328 (N.D. Cal. Apr. 6, 2015) . . . . . 12

*Redd Grp., LLC v. Glass Guru Franchise Sys., Inc.*, No. 12-4070, 2013 WL 3462078 (N.D. Cal. Jul. 8, 2013) . . . . . 6

*Roche Diagnostics Corp. v. Meso Scale Diagnostics, LLC*, 30 F.4th 1109 (Fed. Cir. 2022) . . . . . 8

*Sentry Prot. Prods., Inc. v. Eagle Mfg. Co.*, 400 F.3d 910 (Fed. Cir. 2005) . . . . . 12

*Splunk Inc. v. Cribl, Inc.*, No. 22-7611, 2023 WL 2562875 (N.D. Cal. Mar. 17, 2023) . . . . . 12

*Synopsys, Inc. v. ATopTech, Inc.*, No. 13-2965, 2013 WL 5770542 (N.D. Cal. Oct. 24, 2013) . . . . . 12

**TABLE OF AUTHORITIES**

*(continued)*

*Cases* **Pages**

*Takeda Pharms. U.S.A., Inc. v. West-Ward Pharm. Corp.*, 785 F.3d 625 (Fed. Cir. 2015) . . . . . 7

*TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278 (Fed. Cir. 2020) . . . . . 8

*Telemac Cell. Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316 (Fed. Cir. 2001) . . . . . 2

*Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317 (Fed. Cir. 2009) . . . . . 7

*Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348 (Fed. Cir. 2003) . . . . . 7

*Windy City Innovations, LLC v. Microsoft Corp.*, 193 F. Supp. 3d 1109 (N.D. Cal. 2016) . . . . . 7

*Zeiny v. United States*, No. 19-5806, 2020 WL 496076 (Jan. 30, 2020) . . . . . 10

*Statutes & Rules*

35 U.S.C. § 271(b) . . . . . 7, 8

Fed. R. Civ. P. 8(a) . . . . . 10

*Treatises*

Restatement (Second) of Torts . . . . . 12

## INTRODUCTION

The Court should dismiss the amended complaint. Plaintiff's direct infringement theories require modification of Google's products to show infringement, and thus confirm that Google's products themselves do not infringe—the same failure that doomed plaintiff's original complaint. Because claims of indirect and joint infringement require direct infringement, those allegations fail as well. But those allegations also fail on their own, as the amended complaint fails to allege knowledge of the patents-in-suit or knowledge of infringement, which prevents any allegation of indirect or willful infringement. And the amended complaint fails to allege any other elements of induced infringement, contributory infringement, joint infringement, or willful infringement. The Court should therefore dismiss the amended complaint. Since the plaintiff has shown he cannot redraft the claims, it should do so without leave to amend.

## BACKGROUND

### A. The Asserted Patents

Plaintiff Larry Golden holds several patents including the four he asserts in this action, U.S. Patent Nos. 9,096,189, 9,589,439, 10,163,287, and 10,984,619. These patents share the title "Multi sensor detection, stall to stop and lock disabling system," and pertain to "anti-terrorist detection and prevention systems," specifically "a disabling lock mechanism combined with a chemical/biological/radiological detection system for use with products grouped together by similar characteristics in order to prevent unauthorized entry, contamination and terrorist activity." '189 Patent at 1:40-45; '439 Patent at 1:47-52; '287 Patent at 1:57-62; '619 Patent at 1:52-57.

### B. The Original Complaint and Google's Motion to Dismiss

On September 14, 2022, Mr. Golden filed this action, alleging that Google infringed the '189, '439, and '287 patents because it "makes, uses, offer [sic] to sell, or sells Google Pixel smartphones 3, 3XL, 3a, 3aXL, 4a, 4a(5G), and 5." Compl. at 2; *see id.* at 23-29. On October 26, 2022, Google moved to dismiss, explaining that the complaint did not "allege that Google Pixel devices themselves infringe," but claimed only that "Google Pixel devices could infringe his patents if a user added another application, 'ATAK,' made not by Google, but by the U.S. military." Docket No. 11 at 5:6-8; *see generally id.* On August 10, 2023, the Court granted Google's motion, holding that the complaint failed

to state a claim because "at least two elements of each independent claim included in the chart are allegedly satisfied only when the phone has the Android Team Awareness Kit (ATAK) downloaded," and thus the "claims, as pled, only allege that Google's devices infringe the patents in issue if the end user downloads a particular application." Docket No. 41 at 5:2-3, 5:7-9; *see id.* at 4-7.

**C. The Amended Complaint**

On August 21, 2023, Mr. Golden served by mail his amended complaint, alleging five theories of infringement by Google's "Pixel 6a, 7, 7a, 7pro, and fold smartphones." Am. Compl. at 2-4; *see id.* Exhibit G. All five theories of infringement require additional components such as ATAK, *see* Am. Compl. Ex. G, rendering them defective for the same reasons as the original complaint. The amended complaint also asserts indirect and joint infringement of the asserted patents, naming other agencies and companies allegedly participating in infringement, including the Department of Defense, the Defense Threat Reduction Agency, Qualcomm and Draper Laboratory—but fails to make the specific allegations required to support those claims. *See generally* Am. Compl.

**ARGUMENT**

**I. The Amended Complaint Fails to State Claims of Direct Infringement**

In pleading direct patent infringement, a plaintiff cannot satisfy "the pleading standards set forth in *Twombly* and *Iqbal* 'by reciting the claim elements and merely concluding that the accused protect [sic] has those elements. There must be some factual allegations that, when taken as true, articulate why it is plausible that the accused product infringes the patent claim.'" *Cyph, Inc. v. Zoom Video Commc'ns, Inc.*, No. 22-561, 2022 WL 1556417, at *2 (N.D. Cal. May 17, 2022) (quoting *Bot M8 LLC v. Sony Corp. of Am.*, 4 F.4th 1342, 1353 (Fed. Cir. 2021)); *see also Artrip v. Ball Corp.*, 735 Fed. App'x 708, 715 n.4 (Fed. Cir. 2018); *Lifetime Indus., Inc. v. Trim-Lok, Inc.*, 869 F.3d 1372, 1376-77 (Fed. Cir. 2017). As this Court ruled in granting Google's previous motion to dismiss, "'[t]hat a device is capable of being modified to operate in an infringing manner is not sufficient, by itself, to support a finding of infringement.'" Docket No. 41 at 4:16-18 (quoting *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1330 (Fed. Cir. 2001)). The amended complaint includes five separate infringement theories, shown in five sets of infringement charts in Exhibit G. All five theories fail this test.

//

**A. ATAK-CIVILIAN is a Third-Party Application, Not a Google Product**

Mr. Golden's first theory of infringement, set forth on pages 2-9 of Exhibit G, requires the use of "ATAK-CIVILIAN" for at least two elements of each asserted claim. Am. Compl., Ex. G at 6. Mr. Golden admits in his amended complaint that ATAK-CIVILIAN, a "digital application available to warfighters throughout the DoD," is a "third-party" application, which a user must choose to install. Am. Compl. ¶¶ 56, 59; *see, e.g., id.* at 21 ("Google Play Apps for CBRNE Sensing and Detection"); Docket No. 42-1 at 38 (ATAK-CIV is "[s]old at Google Play"); *id.* at 43 (showing "TAK Product Center" as the developer of ATAK-CIV); Docket No. 42-2 at 2 ("DTRA ATAK-MILITARY and Draper's ATAK-CIVILIAN").[1] The complaint admits that Google's products can infringe only if modified by the addition of an application, and thus confirms that Google's products do not infringe at all. *See* Docket No. 41. As a result, Mr. Golden's first theory of infringement fails for the same reason as his original complaint.

**B. The Complaint Admits That Google Does Not Sell Converted NFC Tags**

Mr. Golden's second theory of infringement, set forth on pages 10-17 of Exhibit G, requires "Google's NFC Sensor," which is "embedded in the phone," and the "[c]onversion of an NFC tag" to enable "wireless rf detection of chemical analytes." *Id.*, Ex. G at 14. Mr. Golden admits that "Google NFC smartphones communicate with NFC tags," confirming that the "NFC tags" are external to Google products. *Id.* Mr. Golden does not allege that Google sells or converts NFC tags, let alone that it sells the converted NFC tags he claims are required for infringement. The complaint admits that Google's products can infringe only if modified by addition of a converted NFC tag, and thus confirms that Google's products do not infringe at all. *See* Docket No. 41. Mr. Golden's second theory of infringement fails for the same reason as his original complaint.

**C. The Complaint Admits That Google Does Not Sell Devices With a Microfluidic Lens**

Mr. Golden's third theory of infringement, set forth on pages 18-25 of Exhibit G, requires "Google's camera lens with microfluidic lens," which "uses microscope to focus on a chemical sensor" and "captures the image from the array of nanopores us[ing] fluid." *Id.*, Ex. G at 22. But the complaint

---

[1] Google uses the documents' page numbers when available; some of the documents have no page numbers, and there Google uses the PDF page numbers added by PACER.

admits that Google's Pixel devices do not include a "microfluidic lens," cannot use a "microscope to focus on a chemical sensor," and cannot "capture[] the image from the array of nanopores us[ing] fluid." *Id.* On page 26, following paragraph 75, the complaint first references an article entitled *Cell Phone Sensors for Toxins Developed at UC San Diego*, Understanding Nanotechnology (May 13, 2010), https://www.understandingnano.com/cell-phone-sensors-toxins.html, archived at https://archive.is/iJ2UN, which discusses a research project but nowhere indicates that anyone, let alone Google, has used this project on a commercial device. *See id.* The complaint next cites *These New Smartphone Cameras Could Tell You What an Object is Made of*, ScienceAlert (Apr. 7, 2015), https://www.sciencealert.com/new-smartphone-cameras-could-tell-you-what-an-object-is-made-of, archived at https://archive.is/S6Ivr, which discusses a Tel Aviv University project to develop a "device that could transform smartphone cameras into hyperspectral sensors, capable of detecting the chemical ingredients of an object or fluid simply by analysing a photo or video of it," and states that "such a camera is on the horizon" but does not exist yet. *Id.* Finally, Mr. Golden includes an image, shown at right, without citation or explanation. Am. Compl. at 26. That image appears in an article about a camera under development by Qualcomm—not by Google—in 2019. Subhrojit Mallick, *Qualcomm expects smartphones with 100MP camera sensors later this year*, Digit (Mar. 14, 2019), https://www.digit.in/news/mobile-phones/qualcomm-reveals-100mp-camera-sensors-on-their-way-to-market-later-this-year-46972.html, archived at https://archive.is/UwHT4. Again, the complaint admits that Google's products can infringe only if modified by addition of a microfluidic lens, and thus confirms that Google's products do not infringe at all. *See* Docket No. 41. Mr. Golden's third theory of infringement fails for the same reason as his original complaint.

**D. The Complaint Admits That Google Does Not Sell Devices Designed to Go to Mars**

Mr. Golden's fourth theory of infringement, set forth on pages 26-33 of Exhibit G, requires a list of "Smartphone Biosensors" that the complaint confirms do not appear in Google's accused devices. *Id.*, Ex. G at 30. Exhibit G says little about this list, but Mr. Golden explains further on page 27 of the

amended complaint, which lists the "Smartphone Biosensors," describes them further, and includes a picture showing them. That picture comes from a Queen's University Belfast paper which discusses hypothetical technology for hypothetical smartphones for use in a hypothetical expedition to Mars. Joost Nelis et al., *"The Smartphone's Guide to the Galaxy": In Situ Analysis in Space*, 8 BIOSENSORS 96 (2018), https://doi.org/10.3390/bios8040096, archived at https://archive.is/8nk1J. The paper

describes Figure 4, which is the image in the complaint, as "a futuristic SBD [smartphone-based sensing device] that incorporates novel sensing technology with synthetic REs [Recognition Elements] directly into the smartphone as well as using an add-on device equipped with interchangeable microfluidic cassettes." *Id.* at 21; Am. Compl. at 26. Again, the amended complaint admits that Google's products can infringe only if modified by addition of hypothetical technology, and thus confirms that Google's products do not infringe at all. *See* Docket No. 41. Mr. Golden's fourth theory of infringement fails for the same reason as his original complaint.

**E. The Complaint Admits That Google Beacon is Separate From the Accused Devices**

Mr. Golden's fifth theory of infringement, set forth on pages 34-41 of Exhibit G, requires "Google Beacon." *Id.*, Ex. G at 38. Again, the amended complaint itself admits that Google Beacon is separate from the accused Pixel devices. The amended complaint notes that Exhibit F provides information about Google Beacon, *see id.* at 27, but the information it provides shows that Google Beacon and the accused devices are not the same. Exhibit F suggests "[u]s[ing] smart phone sensors (GPS, WiFi, Bluetooth) and beacon signals to calculate distance between detector and source"—which would only work if the "beacon signals" were separate and independent from the "smart phone." *Id.* at 3. Exhibit F reconfirms this separation by noting that a "[p]oint source may be assigned to a fixed GPS location or a mobile device," which could include a "smart phone in WiFi network, or Bluetooth beacon,

or WiFi beacon." *Id.* at 4. Again, the complaint admits that Google's products can infringe only if modified by the addition of a remote beacon, and thus confirms that Google's products do not infringe at all. *See* Docket No. 41. Mr. Golden's fifth theory of infringement fails for the same reason as his original complaint.

## II. The Amended Complaint Fails to Allege Indirect Infringement

### A. Indirect Infringement Requires Direct Infringement

"'There are two types of indirect patent infringement: inducement and contributory infringement.'" Docket No. 41 at 6:22 to 7:1 (quoting *Redd Grp., LLC v. Glass Guru Franchise Sys., Inc.*, No. 12-4070, 2013 WL 3462078, at *4 (N.D. Cal. Jul. 8, 2013)). "'Liability for either active inducement of infringement or for contributory infringement is dependent upon the existence of direct infringement,'" and "'[t]here can be no inducement or contributory infringement without an underlying act of direct infringement.'" *Id.* (quoting *Linear Tech. Corp. v. Impala Linear Corp.*, 379 F.3d 1311, 1326 (Fed. Cir. 2004)) (alteration in original). Because Mr. Golden has failed to allege direct infringement of the patents-in-suit, he has also failed to allege indirect infringement. *See Redd Grp.*, 2013 WL 3462078, at *4; Docket No. 41 at 7:6-7 ("Because Plaintiff fails to allege direct infringement, the Court finds that he also fails to allege indirect infringement.") The Court should therefore dismiss the amended complaint in its entirety.

### B. Assuming Direct Infringement, the Complaint Fails to Allege Indirect Infringement

Even assuming direct infringement, the complaint fails to properly allege indirect infringement, and the Court should therefore dismiss the plaintiff's indirect infringement allegations. Although the amended complaint often uses non-standard language such as "caused" or "encouraged," Google is mindful that a "'pro se complaint, however inartfully pleaded, must be held to less stringent standards than formal pleadings drafted by lawyers,'" Docket No. 41 at 3 (quoting *Erickson v. Pardus*, 551 U.S. 89, 94 (2007)), and therefore assumes that the complaint seeks to assert claims of both induced and contributory infringement. The amended complaint fails, however, to make those claims successfully.

#### 1. The Amended Complaint Fails to Allege Induced Infringement

"'Whoever actively induces infringement of a patent shall be liable as an infringer.'" *Hypermedia Navigation LLC v. Google LLC*, No. 18-6137, 2019 WL 1455336, at *2 (N.D. Cal. Apr. 2,

2019) (quoting 35 U.S.C. § 271(b)).  But "[t]he accused infringer must have 'knowingly aided and abetted' direct infringement," *Takeda Pharms. U.S.A., Inc. v. W.-Ward Pharm. Corp.*, 785 F.3d 625, 630 (Fed. Cir. 2015) (quoting *Warner-Lambert Co. v. Apotex Corp.*, 316 F.3d 1348, 1363 (Fed. Cir. 2003)), and so "[l]iability under Section 271(b) 'only attach[es] if the defendant knew of the patent and knew as well that 'the induced acts constitute patent infringement.'" *Hypermedia*, 2019 WL 1455336, at *2 (quoting *Commil USA, LLC v. Cisco Sys., Inc.*, 575 U.S. 632, 640 (2015)) (alteration in original).  At the pleading stage, "'[i]nducement requires a showing that the alleged inducer knew of the patent, knowingly induced the infringing acts, and possessed a specific intent to encourage another's infringement of the patent.'" *Windy City Innovations, LLC v. Microsoft Corp.*, 193 F. Supp. 3d 1109, 1115 (N.D. Cal. 2016) (quoting *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1328 (Fed. Cir. 2009)).  Where a plaintiff "fails to allege facts plausibly supporting an inference that [the defendant] purposely induced another party to infringe any patent," courts dismiss claims of induced infringement. *Golden v. Qualcomm, Inc.*, No. 22-3283, 2023 WL 2530857, at *3 (N.D. Cal. Mar. 15, 2023) (citing *Lifetime Indus., Inc. v. Trim-Lok, Inc.*, 869 F.3d 1372, 1379 (Fed. Cir. 2017)); *see Hypermedia*, 2019 WL 1455336, at *3 (dismissing induced infringement where plaintiff "failed to plead specific intent").

The amended complaint fails this test, relying on general statements that do not show either knowledge of the patents-in-suit or any other aspect of the required specific intent.  For example, in a section entitled "Google Caused the Infringement of Plaintiff's Patents" (Am. Compl. ¶¶ 51-62), the amended complaint alleges that Google "oversees the development of the core Android open-source platform and works to create robust developer and user communities" (*id.* ¶ 52), that "[t]he function of the Android Compatibility Program is to define a baseline interpretation of Android that is compatible with third-party apps" (*id.* ¶ 56), and that "ATAK" is "built on the Android operating system" (*id.* ¶¶ 59-60).  None of these statements "plead specific intent" as required by law.  *Hypermedia*, 2019 WL 1455336, at *3; *see* Am. Compl. ¶¶ 51-62.  Similarly, in Exhibit H, entitled "Claim Chart of Induced Infringement," Mr. Golden alleges no specific "facts plausibly supporting an inference that [Google] purposely induced another party to infringe any patent," *Golden v. Qualcomm*, 2023 WL 2530857, at *3, but instead claims to do so elsewhere:  "Plaintiff has demonstrated throughout the complaint how Google actively encouraged the infringement; and how Google knew that the acts they were doing

constituted infringement; and as a result, Google actuated direct patent infringement by those encouraging acts." Am. Compl., Ex. H at 2. But even a detailed review of the amended complaint and its accompanying materials finds no such allegations. *See generally* Am. Compl., Exs. The amended complaint thus fails to allege either knowledge of the patents themselves or the specific intent to induce infringement, which is "evidence of culpable conduct, directed to encouraging another's infringement, not merely that the inducer had knowledge of the direct infringer's activities." *DSU Med. Corp. v. JMS Co., Ltd.*, 471 F.3d 1293, 1306 (Fed. Cir. 2006) (citing *Metro-Goldwyn-Mayer Studios Inc. v. Grokster, Ltd.*, 545 U.S. 913 (2005) and *Manville Sales Corp. v. Paramount Sys., Inc.*, 917 F.2d 544, 553 (Fed. Cir. 1990)).

Seeking to fill this hole, Mr. Golden also asserts that "Google is liable under the doctrine of willful blindness." Am. Compl. at 4. In considering claims of induced infringement, "[t]he intent element requires 'knowledge that the induced acts constitute patent infringement,' which can be established by a proper finding of 'willful blindness.'" *Roche Diagnostics Corp. v. Meso Scale Diagnostics, LLC*, 30 F.4th 1109, 1118 (Fed. Cir. 2022) (quoting *TecSec, Inc. v. Adobe Inc.*, 978 F.3d 1278, 1286 (Fed. Cir. 2020)). Again, however, the amended complaint does not provide the allegations required to support this claim. "Willful blindness is a high standard, requiring that the alleged inducer (1) subjectively believe that there is a high probability that a fact exists and (2) take deliberate actions to avoid learning of that fact." *Info-Hold, Inc. v. Muzak LLC*, 783 F.3d 1365, 1373 (Fed. Cir. 2015) (citing *Glob.-Tech Appliances, Inc. v. SEB S.A.*, 563 U.S. 754, 769 (2011)). "[P]utting *Global-Tech* together with *Iqbal*, the question before the Court" at the pleading stage is whether a plaintiff has pleaded "sufficient facts . . . for the Court to *infer*" willful blindness. *McRee v. Goldman*, No. 11-991, 2012 WL 929825, at *4 (N.D. Cal. Mar. 19, 2012) (alteration, omission, and emphasis original). Plaintiff here has not. The amended complaint contains no allegations either that Google "subjectively believe[d] that there is a high probability that a fact exists" or that Google took any "deliberate actions to avoid learning of that fact." *Info-Hold*, 783 F.3d at 1373. Indeed, it addresses the concept only briefly and without any specifics. *See* Am. Compl. at 4. Nowhere in the complaint does Mr. Golden plead "the concurrence of knowledge and action necessary to establish [defendant's] liability under § 271(b) for induced infringement." *McRee*, 2012 WL 929825, at *5.

**2.     The Amended Complaint Fails to Allege Contributory Infringement**

"'Contributory infringement occurs if a party sells or offers to sell, a material or apparatus for use in practicing a patented process, and that material or apparatus is material to practicing the invention, has no substantial non-infringing uses, and is known by the party to be especially made or especially adapted for use in an infringement of such patent.'" *Apple Inc. v. AliveCor, Inc.*, No. 22-7608, 2023 WL 4091287, at *3-*4 (N.D. Cal. June 20, 2023) (quoting *In re Bill of Lading Transmission & Processing Sys. Pat. Litig.*, 681 F.3d 1323, 1337 (Fed. Cir. 2012)). The complaint does not make these allegations, and indeed admits that it cannot do so.

As an initial matter, like induced infringement, contributory infringement "requires knowledge of the patent in suit and knowledge of patent infringement." *Commil USA, LLC v. Cisco Sys., Inc.*, 575 U.S. at 639 (citing *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476 (1964)). The complaint alleges neither. *See supra* § II.A. Without these allegations, no claims of contributory infringement can survive.

In addition, "[t]o adequately plead contributory infringement, a plaintiff must tie the specific infringing components of the allegedly infringing products to an infringing use and, relatedly, plausibly allege that the component has no substantial non-infringing uses." *Apple v. AliveCor*, 2023 WL 4091287, at *3. Here, the complaint not only fails to clear this bar, it confirms there is no way to do so. Mr. Golden's allegations of contributory infringement accuse the "Google Tensor":

> Plaintiff is alleging the defendant Google, has in the past and continues to *contribute* the Google Tensor i.e., Central Processing Unit (CPU), Processor, System-on-a-Chip (SoC), Chipset; a material component of Plaintiffs patented Communicating, Monitoring, Detecting, and Controlling (CMDC) device, with knowledge that the Google Tensor Chipset is especially made for use in an infringement and is not a commodity suitable for a substantial non-infringing use.

Am. Compl. at 4 (emphasis in original). Such "bare-bones allegations are insufficient to sustain a claim for contributory infringement under *Twombly* and *Iqbal*." *Artrip v. Ball Corp.*, No. 14-14, 2017 WL 3669518, at *8 (W.D. Va. Aug. 24, 2017), *aff'd*, 735 F. App'x 708 (Fed. Cir. 2018). For example, in *Artip v. Ball Corp.*, the District of West Virginia considered a *pro se* plaintiff's allegations of contributory infringement, where plaintiff alleged only that defendant:

> supplied "food grade coiled aluminum sheets with special coating," that these aluminum sheets were supplied "for use in practicing the patented invention[s]," that the aluminum sheets "meet required specifications for said invention," that the aluminum sheets "constitut[e] a material part

> of the invention," that [defendant] knew the aluminum sheets were "especially made or especially adapted for use in an infringement of such patent[s]," and that the aluminum sheets were "not a staple article or commodity of commerce suitable for substantial noninfringing use."

*Artrip*, 2017 WL 3669518, at *8. The court granted the defendant's motion to dismiss, noting that plaintiff "alleges no facts supporting an inference" regarding any of his claims, and thus "his allegations as to the elements are purely conclusory, and as such, insufficient to survive a Motion to Dismiss." *Id.* at *8; *see Hitachi Kokusai Elec. Inc. v. ASM International, N.V.*, No. 17-6880, 2018 WL 3537166, at *5 (N.D. Cal. Jul. 23, 2018) (citation omitted) (granting motion to dismiss where plaintiff's first amended complaint "falls short of alleging sufficient factual content that would support a reasonable inference that the accused products have no substantial non-infringing uses," because "the mere recitation of elements of a contributory infringement claim is 'not entitled to the presumption of truth.'"). The same is true here: Mr. Golden merely asserts that Google contributes its Google Tensor Chipset, but does not allege to whom Google contributes the Tensor Chipset, nor any factual allegations supporting his threadbare claims that Google is liable for contributory infringement. Am. Compl. at 4. "'[P]ro se litigants are bound by the rules of procedure,'" which "require 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Zeiny v. United States*, No. 19-5806, 2020 WL 496076, at *2 (N.D. Cal. Jan. 30, 2020) (quoting *Ghazali v. Moran*, 46 F.3d 52, 54 (9th Cir. 1995) and Fed. R. Civ. P. 8(a)) (alteration in original). Mr. Golden fails to meet even this low bar. The Court should thus dismiss Mr. Golden's claims of contributory infringement.

Even if the Court were inclined to credit these bare-bones allegations, however, the amended complaint establishes that they cannot proceed, by pleading "itself out of its contributory infringement claim by alleging substantial non-infringing uses of the Accused Products." *Apple v. AliveCor*, 2023 WL 4091287, at *3 (citing *In re Bill of Lading*, 681 F.3d at 1338). For purposes of contributory infringement, the amended complaint accuses "the Google Tensor i.e., Central Processing Unit (CPU), Processor, System-on-a-Chip (SoC), Chipset," which it claims is "a material component of Plaintiffs patented Communicating, Monitoring, Detecting, and Controlling (CMDC) device." Am. Compl. at 4. But in alleging direct infringement, the same complaint acknowledges that the Tensor chipset is a general-purpose computer, using it to allege infringement of claims requiring a central processing unit:

//

| | | | | |
|---|---|---|---|---|
| **CPU**: Octa-core (2x2.80 GHz Cortex X1 & 2x2.25 GHz Cortex-A76 & 4x1.80 GHz Cortex-A55) **Chipset**: Google Tensor. **OS**: Android 12. Upgrade to 13 | at least one central processing unit (CPU): | a central processing unit (CPU) for executing and carrying out the instructions of a computer program: | at least one of a central processing unit (CPU) for executing and carrying out the instructions … a network processor … specifically targeted at the networking application domain, or a front-end processor … | whereupon, the central processing unit (CPU) of the communication device is capable of processing instructions for operational and functional execution, … capable of feedback… and storing the feedback … |

Am. Compl. Ex. G. at 2. The amended complaint itself thus admits that the Tensor chipset is a general-purpose computer "for executing and carrying out the instructions of a computer program," which could or could not infringe any of the patents-in-suit. *Id.* "Where the product is equally capable of, and interchangeably capable of both infringing and substantial non-infringing uses, a claim for contributory infringement does not lie." *In re Bill of Lading*, 681 F.3d at 1338. Here, just as in *Bill of Lading*, the complaint "supplies the very facts which defeat its claims of contributory infringement." *Id.* The Court should dismiss these allegations for this reason as well.

**III. The Amended Complaint Fails to Allege Joint Infringement**

"While a typical claim of direct infringement requires proof that a defendant performs each step of the claimed method, joint infringement requires more." *Lyda v. CBS Corp.*, 838 F.3d 1331, 1338 (Fed. Cir. 2016). "To prove joint infringement, where multiple actors are involved in practicing the claim steps, the patent owner must show that the acts of one party are attributable to the other such that a single entity is responsible for the infringement. This court has held that an entity will be responsible for others' performance of method steps in two circumstances: (1) where that entity directs or controls others' performance, and (2) where the actors form a joint enterprise.'" *Id.* at 1338-39 (quoting *Akamai Techs., Inc. v. Limelight Networks, Inc.*, 797 F.3d 1020, 1022 (Fed. Cir. 2015)). To claim a joint enterprise, plaintiff must allege "(1) an agreement, express or implied, among the members of the group; (2) a common purpose to be carried out by the group; (3) a community of pecuniary interest in that purpose, among the members; and (4) an equal right to a voice in the direction of the enterprise, which

gives an equal right of control." *Akamai,* 797 F.3d at 1023 (citing Restatement (Second) of Torts § 491 cmt. c). The complaint alleges neither type of joint infringement.

Indeed, the amended complaint barely addresses joint infringement at all. It claims that "the defendant Google is liable for "'joint infringement'" because "multiple actors [Google LLC and Draper Laboratory Inc.] are involved in carrying out the claimed infringement of a patent and no single accused infringer has performed all of the steps of the method." Am. Compl. at 4 (brackets in original) (citing *Akamai,* 797 F.3d 1020). The amended complaint references Qualcomm in a section entitled "Double Standard," Am. Compl. ¶¶ 33-42, but does not allege that Qualcomm and Google jointly infringe, and states to the contrary that Google "discontinued the use of Qualcomm's Snapdragon chipset, thereby eliminating Plaintiff's 'joint infringement' claim." *Id.* at 2. Finally, Exhibit H claims to be a chart showing, among other things, "Joint Infringement." *Id.*, Ex. H. But neither Exhibit H, the amended complaint, nor anything else attached to it alleges any specifics regarding how anyone "directs or controls others' performance," or how "the actors form a joint enterprise." *Lyda*, 838 F.3d at 1338-39. Mr. Golden's joint infringement claims are, at most, "'[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements,'" which "'do not suffice.'" *Synopsys, Inc. v. ATopTech, Inc.*, No. 13-2965, 2013 WL 5770542, at *3 (N.D. Cal. Oct. 24, 2013) (quoting *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009)). The Court should therefore dismiss Mr. Golden's allegations of joint infringement.

**IV. The Amended Complaint Fails to Allege Willful Infringement**

"To state a claim for willful infringement, the plaintiff must plead that the defendant acted with knowledge of the patent and of his alleged infringement, or equivalent facts." *OpenTV, Inc. v. Apple, Inc.*, No. 14-1622, 2015 WL 1535328, at *7 (N.D. Cal. Apr. 6, 2015) (citing *Sentry Prot. Prods., Inc. v. Eagle Mfg. Co.*, 400 F.3d 910, 918 (Fed. Cir. 2005)). "Although the jury decides willfulness, willfulness only goes to the jury if it was properly framed by the pleadings." *Splunk Inc. v. Cribl, Inc.*, No. 22-7611, 2023 WL 2562875, at *2 (N.D. Cal. Mar. 17, 2023); *see, e.g., Hypermedia*, 2019 WL 1455336, at *4 (citation omitted) (granting Google's motion to dismiss where "[n]othing in the complaint provides specific factual allegations about Google's subjective intent or details about the nature of Google's conduct to render a claim of willfulness plausible, and not merely possible."). Again, the amended

complaint fails this test. As Google has already explained in the context of indirect infringement, the amended complaint does not allege either knowledge of the patents or knowledge of infringement. *See supra* § II. It therefore fails to allege willful infringement, and the Court should dismiss these claims.

**V. The Court Should Deny Leave to Amend**

In its motion to dismiss, Google asked this Court to dismiss Mr. Golden's original complaint without leave to amend, because the "complaint does not suffer from a drafting deficiency; instead, its theory of infringement contains the seeds of its own demise, a problem no amount of amendment can cure." Docket No. 11 at 8:23-24. This Court granted leave to amend, noting that "[t]he Court cannot say at this stage that amendment necessarily would be futile, and so follows the standard course of granting leave for Plaintiff to amend to correct the identified deficiencies, if he can truthfully do so." Docket No. 41 at 7:10-12. But Mr. Golden's amended complaint suffers from the same deficiencies as his original complaint, *see supra* § I, and adds many more. *See supra* §§ II, III, IV.

"Because Plaintiff was previously granted an opportunity to remedy these flaws but has proven unable to do so, further leave to amend would be futile." *Mejia v. JPMorgan Chase Bank, N.A.*, No. 21-1351, 2021 WL 6498762, at *3 (N.D. Cal. Sept. 8, 2021), *aff'd*, No. 21-16550, 2022 WL 1154762 (9th Cir. Apr. 19, 2022) (citation omitted). This Court should dismiss the amended complaint without leave to amend.

**CONCLUSION**

For the reasons set forth above, the Court should dismiss the amended complaint in its entirety without leave to amend.

Date: September 7, 2023

Respectfully submitted,

Matthew S. Warren (State Bar No. 230565)
Virginia G. Kain (State Bar No. 344545)
WARREN LEX LLP
2261 Market Street, No. 606
San Francisco, California, 94114
+1 (415) 895-2940
+1 (415) 895-2964 facsimile
22-5246@cases.warrenlex.com

*Attorneys for Defendant Google LLC*