**2024-2024**
**VOLUME II OF II (SAppx581-987)**

# United States Court of Appeals
# for the Federal Circuit

LARRY GOLDEN,

*Plaintiff-Appellant,*

*v.*

GOOGLE LLC,

*Defendant-Appellee.*

*Appeal from the United States District Court for the District of the
Northern District of California, in Case No. 3:22-cv-05246-RFL
(Hon. Rita F. Lin, Judge)*

## APPELLEE'S SUPPLEMENTAL APPENDIX

Matthew S. Warren
WARREN KASH WARREN LLP
2261 Market Street, Suite 606
San Francisco, California, 94114
(415) 895-2940
matt@warrenkashwarren.com

*Counsel for Defendant-Appellee*

NOVEMBER 18, 2024

## TABLE OF CONTENTS
## APPELLEE'S APPENDIX

| Docket No. | Document Description | Filed | Appendix Pages |
|---|---|---|---|
| **VOLUME I** | | | |
| 68 | Order Granting Motion to Dismiss and Denying Leave to File a Surreply | 04/03/2024 | SAppx1 |
| 68 | Exhibit A. Journal Article | 04/03/2024 | SAppx9 |
| 72 | Order Denying Motion for Reconsideration and Disqualification | 05/28/2024 | SAppx41 |
| | Docket Entries | | SAppx44 |
| 1 | Complaint | 09/14/2022 | SAppx54 |
| 1-1 | A. Judgment | 09/14/2022 | SAppx84 |
| 1-2 | B. Complaint for Patent Infringement | 09/14/2022 | SAppx92 |
| 1-3 | C. U.S. Patent No. US 10,163,287 | 09/14/2022 | SAppx123 |
| 1-4 | D. U.S. Patent No. US 9,096,189 B2 | 09/14/2022 | SAppx151 |
| 1-5 | E. U.S. Patent No. US 9,589,439 B2 | 09/14/2022 | SAppx179 |
| 1-6 | Civil Cover Sheet | 09/14/2022 | SAppx210 |
| 1-7 | Receipt | 09/14/2022 | SAppx212 |
| 11 | Defendant's Notice of Motion and Motion to Dismiss Complaint | 10/26/2022 | SAppx214 |
| 18 | Plaintiff's Response to Defendant's Motion to Dismiss and Cross-Motion for Summary Judgment | 11/01/2022 | SAppx230 |
| 18 | A. Report of Magistrate Judge | 11/01/2022 | SAppx237 |
| 18 | B. Opinion and Order | 11/01/2022 | SAppx250 |
| 18 | C. Judgment | 11/01/2022 | SAppx257 |
| 20 | Defendant's Reply in Support of Motion to Dismiss | 11/15/2022 | SAppx265 |
| 41 | Order Granting Motion to Dismiss with Leave to Amend | 08/10/2023 | SAppx274 |
| 42 | Plaintiff's Amended Complaint for Patent Infringement | 08/23/2023 | SAppx282 |
| 42-1 | A. Vertical Stare Decisis Chart | 08/23/2023 | SAppx315 |
| 42-1 | B. Duplicate of the Claim Chart | 08/23/2023 | SAppx323 |

i

| Docket No. | Document Description | Filed | Appendix Pages |
|---|---|---|---|
| 42-1 | C. Google, Not Plaintiff, is Responsible For The Modifications of Its Products to Operate In An Infringing Manner | 08/23/2023 | SAppx333 |
| 42-1 | D. Google Sells The "Software" That Enables The Infringement of Plaintiff's Patents | 08/23/2023 | SAppx343 |
| 42-1 | E. HazMat/CBRNE Mobile Apps Application Note | 08/23/2023 | SAppx370 |
| 42-1 | F. Flexible, Intelligent, Multi-Node CBRN Environment Simulator Slide show | 08/23/2023 | SAppx386 |
| 42-1 | G. Claim Chart of Direct Infringement | 08/23/2023 | SAppx399 |
| 42-2 | H. Claim Chart of Induced Infringement | 08/23/2023 | SAppx440 |
| 42-2 | I. U.S. Patent No. US 10,984,619 B2 | 08/23/2023 | SAppx446 |
| 42-2 | J. U.S. Patent No. US 10,163,287 B2 | 08/23/2023 | SAppx473 |
| 42-2 | K. U.S. Patent No. US9,589,439 B2 | 08/23/2023 | SAppx501 |
| 42-2 | L. U.S. Patent No. US9,096,189 B2 | 08/23/2023 | SAppx532 |
| 42-3 | Shipping Envelope | 08/23/2023 | SAppx560 |
| 44 | Defendant's Notice of Motion and Motion to Dismiss the Amended Complaint | 09/07/2023 | SAppx562 |
| **VOLUME II** | | | |
| 46 | Plaintiff's Response to Defendant's Motion to Dismiss Plaintiff's Amended Complaint for Patent Infringement | 09/13/2023 | SAppx581 |
| 46 | A. Original Complaint for Patent Infringement | 09/13/2023 | SAppx612 |
| 46 | B. Defendant's Answer to the Original Complaint for Patent Infringement | 09/13/2023 | SAppx645 |
| 46-1 | C. Judgment on Jury Verdict | 09/13/2023 | SAppx669 |
| 46-1 | D. Opinion | 09/13/2023 | SAppx672 |
| 46-1 | E. Complaint | 09/13/2023 | SA679 |

| Docket No. | Document Description | Filed | Appendix Pages |
|---|---|---|---|
| 46-1 | F. Informal Brief of Appellant | 09/13/2023 | SAppx710 |
| 46-2 | Shipping Envelope | 09/13/2023 | SAppx750 |
| 47 | Reply in Support of Motion to Dismiss the Amended Complaint | 09/28/2023 | SAppx751 |
| 48 | Plaintiff's Motion for Leave to File Sur-Reply in Opposition to Defendant's Reply to Motion to Dismiss Plaintiff's Amended Complaint | 10/03/2023 | SAppx765 |
| 49 | Plaintiff's Sur-Reply in Opposition to Defendant's Reply to Motion to Dismiss Plaintiff's Amended Complaint | 10/03/2023 | SAppx770 |
| 69 | Judgment in a Civil Case | 04/03/2024 | SAppx785 |
| 70 | Jury Trial Demanded | 04/10/2024 | SAppx786 |
| 70 | A. Plaintiff's Motion for Disqualification | 04/10/2024 | SAppx818 |
| 70 | B. Plaintiff's Reply in Support of Plaintiff's Motion for Disqualification | 04/10/2024 | SAppx839 |
| 70 | C. Defendant's Notice Regarding Related Proceedings | 04/10/2024 | SAppx857 |
| 70 | D. Jury Trial Demanded | 04/10/2024 | SAppx868 |
| 73 | Plaintiff's Notice of Appeal | 06/21/2024 | SAppx876 |
|  | U.S. Patent No. US 9,096,189 B2 | 08/04/2015 | SAppx878 |
|  | U.S. Patent No. US 9,589,439 B2 | 03/07/2017 | SAppx905 |
|  | U.S. Patent No. US 10,1063,287 B2 | 12/25/2018 | SAppx935 |
|  | U.S. Patent No. US 10,984, 619 B2 | 04/20/2021 | SAppx962 |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA – OAKLAND

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

Phone (864) 288-5605

Email: atpg-tech@charter.net

**FILED**

SEP 13 2023

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

---

LARRY GOLDEN,

   Plaintiff,

    V.

GOOGLE LLC

   Defendants.

---

CASE NO: <u>4:22-cv-05246-HSG</u>

**JURY TRIAL DEMANDED**

(Direct Patent Infringement),
(Induced and Contributory Patent
Infringement), (Joint Infringement,
(Willful Infringement)

**PLAINTIFF'S RESPONSE TO DEFENDANT'S MOTION TO DISMISS
PLAINTIFF'S AMENDED COMPLAINT
FOR PATENT INFRINGEMENT**

September 12, 2023

## GOOGLE'S NON-INFRINGEMENT THEORY THAT THE INFRINGEMENT ONLY OCCURS WITH SOFTWARE MODIFICATION IS INSUFFICIENT

Google openly admits the company sells and uses *software* to modify products to function and/or operate in an infringing manor. In a recent case decided by jury in the Western District of Texas Court; in *Touchstream Technologies Inc. v. Google LLC*, Case No. 6:21-cv-00569-ADA (Dkt. 73) **(Exhibit A)** Google claimed as its Fourteenth Affirmative Defense "Use by the United States": "Plaintiff's [*Touchstream*] claims for relief against Google are barred by 28 U.S.C. § 1498 in whole or in part, in that, upon information and belief, the accused subject matter is used or manufactured by or for the United States." **(Exhibit B)**

In a lawsuit between private parties [*Touchstream v. Google*], 28 U.S.C. § 1498 (a) operates as an affirmative defense, and where a private party's use of a patented invention is "for the Government" and with the "authorization and consent of the Government," that private party cannot be held liable for patent infringement.

Alphabet's Google violated the *software* developer's patent rights with its remote-streaming technology and must pay $338.7 million in damages, a federal jury in Waco, Texas decided on July 23, 2023. The jury found that Google's Chromecast and other devices infringe patents owned by Touchstream Technologies related to streaming videos.

The New York-based Touchstream, which does business as Shodogg, said in its 2021 lawsuit that founder David Strober invented technology in 2010 to "move" videos from a small device like a Google smartphone to a larger device like a television.

According to the complaint, Google met with Touchstream about its technology in December 2011 but said it was not interested two months later. Google introduced its Chromecast media-streaming devices in 2013. Touchstream said in the complaint that Google's

SAppx582

Chromecast copied its innovations and infringed three of its patents. It also said its patents were infringed by Google's Home *software for modifications* and Nest smart speakers' *software* and third-party televisions not sold by Google, with Chromecast *software* capabilities.

Google's Chromecast is designed to let devices, such as the Google smartphone, easily mirror their content onto a screen or a smart speaker. Announced back in 2013, Google Cast has since been integrated into nearly every major app i.e., *software application*, and platform.

Whenever there's a Cast-enabled receiver like Chromecast on the same Wi-Fi network as the phone or computer, the compatible *software* app will show a Cast icon. A user can tap the icon and beam the content they're watching directly to the Chromecast. Since the Chromecast itself is also paired with the internet connection, the user's phone shares the URL of the content.

Cast icon is found on Google's YouTube irrespective of whether the user is browsing the website on a computer through Google Chrome or the *software* app on the Google smartphone. Many other platforms have Cast compatibility, including Netflix, Spotify, Facebook, and more.

Three things transpired from the case that are directly related to this current case *Golden v. Google*: (1) It is a practice throughout this, and other countries, to develop, sell, and use *software*, such as the "Google Android Open-Source Operating System" to modify products to perform in an infringing manor; (2) Google's development, sell, and use of the android operating system *software* was "for or by the Government," and with the "authorization and consent of the Government," as an affirmative defense, was rejected by the Western District of Texas Court; and, (3) Google is "precluded" from relitigating whether or not the Google Android Open-Source Operating System *software* can be used to modify products to function or operate in an infringing manor. Google was found liable for the *software* modification of products to operate in an infringing manor in *Touchstream Technologies Inc. v. Google LLC.* **(Exhibit C)**

3

## THE U.S. DISTRICT COURT FOR THE DISTRICT OF NORTHERN CALIFORNIA IS BOUND BY THE DECISIONS OF THE U.S. COURT OF APPEALS FOR THE FEDERAL CIRCUIT

### *Vertical Stare Decisis*

The United States Court of Appeals for the Federal Circuit is a federal court that has special importance in patent law. The Federal Circuit does not have jurisdiction over a particular region. Instead, it has jurisdiction over all appeals in cases that "arise under" the patent laws. The Federal Circuit's jurisdiction over appeals in patent cases is exclusive. Other circuit courts cannot review decisions in those cases.

Congress created the Federal Circuit in 1982 to be a court with specialized expertise in patent law. In giving it exclusive jurisdiction over patent cases, Congress aimed to ensure that the interpretation of the patent laws, and applicable legal precedent, would be uniform throughout the nation, and not vary among regional circuits.

Consistent with that, the Federal Circuit has developed a large body of precedent governing patent cases: how to interpret patent claims, how infringement must be proved, how invalidity must be established, and how damages must be calculated. Successful patent litigation in the district courts requires diligently the following of the Federal Circuit's pronouncements on those issues.

Vertical stare decisis binds lower courts to follow strictly the decisions of higher courts within the same jurisdiction (e.g., the Northern District of California Court must follow the decisions of the U.S. Court of Appeals for the Federal Circuit). The Supreme Court defines vertical stare decisis as the doctrine, "a lower court must strictly follow the decision(s) handed down by a higher court within the same jurisdiction".

SAppx584

This court engages in vertical stare decisis when it applies precedent from the higher court. For example, if the Northern District of California Court adhered to a previous ruling from the United States Court of Appeals for the Federal Circuit, in *Larry Golden v. Google LLC*; Case No. 22-1267, that would be vertical stare decisis.

The Federal Circuit on 09/08/2022, in *Larry Golden v. Google LLC*; Case No. 22-1267 — "VACATED AND REMANDED" the relevant Case No: 22-1267 Document 15; back to the District Court "to be filed and request service of process". The Federal Circuit determined the complaint, "includes a detailed claim chart mapping features of an accused product, the Google Pixel 5 Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189" … "in a relatively straightforward manner" … and that the [Circuit] "express no opinion as to the adequacy of the complaint or claim chart except that it is not facially frivolous."

In a Three-Judge Panel DISCUSSION: "Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), a court must dismiss a complaint if it fails to allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570 … [T]his standard "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (citation omitted). A plaintiff must allege facts that give rise to "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted) … this court has explained that a plaintiff … must plead "'enough fact[s] to raise a reasonable expectation that discovery will reveal' that the defendant is liable for the misconduct alleged."

"Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the Google Pixel 5 Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189 … It [claim chart] attempts [] to map claim limitations to infringing product features, and it does so in a relatively straightforward manner …[W]e conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart. Mr. Golden

SAppx585

has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart....."

Vertical Stare Decisis bars Google from challenging whether Plaintiff has pled enough facts and provided sufficient notice to the Defendant Google. The Federal Circuit's ruling: "the complaint includes a detailed claim chart mapping features of an accused product, the Google Pixel 5 Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189" ... 'in a relatively straightforward manner'". **(Exhibit D)**

Vertical stare decisis, or vertical precedent, is the obligation of the Northern District of California Court to follow the decisions of the United States Court of Appeals for the Federal Circuit that falls within the hierarchical structure. Vertical stare decisis and precedent, are a matter of hard law, not a matter of policy.

Something analogous happens with vertical stare decisis: it is not hard law because it sanctions departure; rather it is because of its hard nature that vertical stare decisis brings with it, or needs, a sanction against non-compliance.

So, with vertical stare decisis it is true that in the absence of compliance by the Northern District of California Court, the Federal Circuit will likely overturn the Northern District of California Court's decision. This works as a kind of sanction against the non-complying court. Vertical stare decisis is, indeed, afforded binding weight.

The alleged facts were included in the original complaint because Plaintiff knew and understood he "must allege facts that give rise to "more than a sheer possibility that the Defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted).

On appeal in *Larry Golden v. Google LLC*; Case No. 22-1267, the Federal Circuit determined Plaintiff has "pled enough fact[s] to raise a reasonable expectation that discovery will reveal that the Defendant is liable for the misconduct alleged."

6

Therefore, according to the doctrine of "*Vertical Stare Decisis*" Google is barred from challenging, and this Court is barred from relitigating the specifications of the Google Pixel 5 and the Android Team Awareness Kit (ATAK), that was decided as being nonfrivolous in the U.S. Court of Appeals for the Federal Circuit:

The Federal Circuit has determined Golden has alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570 … pled "'enough fact[s] to raise a reasonable expectation that discovery will reveal' that the defendant is liable for the misconduct alleged". The decision cannot be overturned by the lower Northern District of California Court.

In the Federal Circuit's language, "a detailed claim chart mapping features of an accused product, the [] Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189", indicates a determination has been made on direct infringement, either literally or under the doctrine of equivalents.

The next seven pages are the illustrative claim charts of specific claim limitations the Federal Circuit determined on 09/08/2022, in *Larry Golden v. Google LLC*; Case No. 22-1267 "map[ped] claim limitations to infringing product features … in a relatively straightforward manner". **(Exhibits E & F)** Also, included on the bottom half of each page are portions of the illustrative claim charts of specific claim limitations submitted in Plaintiff's amended complaint.

The two charts per page are featured together to show the illustrative claim charts of the specific claim limitation in Plaintiff's amended complaint "*mirrors*" the subject matter of the illustrative claim charts of specific claim limitations the Federal Circuit determined on 09/08/2022, in *Larry Golden v. Google LLC*; Case No. 22-1267 "map[ped] claim limitations to infringing product features … in a relatively straightforward manner".

Therefore, the Defendant is "precluded" from relitigating the same issues of fact.

SAppx587

The Federal Circuit's Opinion in *Golden v. Google* CAFC Case No. 22-1267, "claim chart ... map claim limitations to infringing product features ... in a relatively straightforward manner"



**Communicating, Monitoring, Detecting, and Controlling (CMDC) Device (i.e., smartphone)**

**Asserted Patent Specifications:**

"In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring... computers, laptops, notebooks, PCs, and cell phones for the receipt and transmission of signals"

"Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, web servers, desktop personal computers (PCs), notebook personal computers (PCs), laptops, satellite phones, cell phones, Universal Mobile Telecommunications System (UMTS) phones, personal digital assistants (PDAs), liquid crystal display (LCD) monitors, and satellite monitoring, remote control key fobs, two-way communication key fobs, handhelds;"

Monitoring equipment of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone) interconnected to a product for communication therebetween, comprising...

*Chart 2-A*

Google is "precluded" from relitigating the Federal Circuit's Opinion in *Golden v. Google* CAFC Case No. 22-1267, "complaint includes a detailed claim chart mapping features of an accused product, the ... Smartphone"

| Elements | Patent # 10,163,287; Indep. Claim 5 | Patent # 9,589,439; Indep. Claim 23 | Patent # 9,096,189; Indep. Claim 1 | Patent # 9,589,439; Indep. Claim 19 | Patent# 10,984,619; Indep. Claim 11 |
|---|---|---|---|---|---|
| **Google Pixels 6a, 7, 7a, 7pro, & fold Smartphones** | A monitoring device, comprising: | A cell phone comprising | A communication device of at least one of a cell phone, a smart phone... | A multi-sensor detection system | A central processing unit (CPU) of at least a personal computer (PC), a cellphone, a smartphone... |

8

The Federal Circuit's Opinion in *Golden v. Google* CAFC Case No. 22-1267, "claim chart … map claim limitations to infringing product features … in a relatively straightforward manner"

| | Central Processing Units (CPUs) for Smartphone |
|---|---|
|  Example: Qualcomm often refers to the Snapdragon as a "mobile platform" (e.g., Snapdragon 865 5G Mobile Platform). Snapdragon semiconductors are embedded in devices of various systems, including Android devices (i.e., Samsung & LG). They are also used in cars and wearable devices such as Smart Watches. | The "smartphone processor (CPU), also known as chipset, is a component that controls everything going on in your smartphone and ensures it functions correctly. You can compare it to the brain of the human body. Every action you perform on your smartphone goes straight to the processor." https://www.coolblue.nl/en/advice/smartphone-processors. html. "Unlike simpler mobile phones of the past, today's smartphones all have processors or CPUs. A smartphone CPU (central processing unit) is the brains of the entire device. Without one, no smartphone would be able to function" (smartphonedomain.com., 2021).

Example: Qualcomm Technologies Inc. Qualcomm announced it was developing the Scorpion central processing unit (CPU) in November 2007. The Snapdragon's central processing unit (CPU) uses the ARM architecture. A single SoC may include multiple CPU cores; a Snapdragon wireless modem; and, other software and hardware to support a smartphone's global positioning system (GPS), camera, video, and audio. |

*Chart 3-A*

Google is "precluded" from relitigating the Federal Circuit's Opinion in *Golden v. Google* CAFC Case No. 22-1267, "complaint includes a detailed claim chart mapping features of an accused product, the … Smartphone" [Central Processing Unit (CPU)]

| Elements | Patent # 10,163,287; Indep. Claim 5 | Patent # 9,589,439; Indep. Claim 23 | Patent # 9,096,189; Indep. Claim 1 | Patent # 9,589,439; Indep. Claim 19 | Patent# 10,984,619; Indep. Claim 11 |
|---|---|---|---|---|---|
| **Google Tensor G1 & G2 i.e., Central Processing Unit (CPU) Processor, SoC, Chipset** | at least one central processing unit (CPU); | a central processing unit (CPU) for executing and carrying out the instructions of a computer program | at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program … | X | the central processing unit (CPU) of the communication device is capable of processing instructions for operational and functional execution |

SAppx589

The Federal Circuit's Opinion in *Golden v. Google* CAFC Case No. 22-1267, "claim chart … map claim limitations to infringing product features … in a relatively straightforward manner"

**ATAK-MILITARY & ATAK-CIV (CBRN):** "The Tactical Assault Kit is DoD nomenclature for the Team Awareness Kit (TAK) application: a mission planning, geospatial, Full Motion Video (FMV), and system administrator tool that reduces the operational footprint from a tactical laptop, to a commercial mobile device. Data can be pre-loaded into ATAK or downloaded from the network when available." https://play.google. com/store/apps/details?id=com.atakmap. app.civ&hl=en_US&gl=US

Google's pre-loaded "built-in, embedded" Android open-source operating system software, enable the infringement of Plaintiff's patents.



*Google Complaint*

Google is "precluded" from relitigating the Federal Circuit's Opinion in *Golden v. Google* CAFC Case No. 22-1267, "complaint includes a detailed claim chart mapping features of an accused product, the … Smartphone" [Transceiver]

| Elements | Patent # 10,163,287; Indep. Claim 5 | Patent # 9,589,439; Indep. Claim 23 | Patent # 9,096,189; Indep. Claim 1 | Patent # 9,589,439; Indep. Claim 19 | Patent# 10,984,619; Indep. Claim 11 |
|---|---|---|---|---|---|
| **Google Android Open-Source Operating System** <br><br> **"Transceiver" is Equivalent to Google's Operating System** | a transceiver in communication with the at least one CPU configured to send signals… | X | the transmitter and the receiver of the communication device and transceivers of the products | communication with the transmitter, a receiver of the monitoring equipment, the multi-sensor detection device, or transceivers of the products | X |

SAppx590

The Federal Circuit's Opinion in *Golden v. Google* CAFC Case No. 22-1267, "claim chart …
map claim limitations to infringing product features … in a relatively straightforward manner"



| | **Camera C/B/R Sensor(s) for Smartphone** |
|---|---|
| | Camera Sensor for Radiological Detection: How can a cell phone detect radioactivity? Cell phones have cameras and camera sensors react to radioactivity. High energy particles strike a sensor array and register as small bright pinpoints or thin streaks of light. An app … works well enough to alert users to dangerous levels of radiation. |
| | Camera Sensor for Biological Detection: "In the diagnostic test, a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. Coronavirus RNA present, CRISPR proteins snip the molecular probes, whole sample to emit light. Fluorescence detected with a cell phone camera." (Image: Science at Cal). |
| | Camera Sensor for Chemical Detection: The sensor that Rhevision and the University of California at San Diego responds to different chemicals by changing color; a single chip with many tiny pores, each respond to a different chemical; a standard cell-phone camera can resolve a picture finely enough to detect them; system relies on the phone's camera to watch the chip for color changes. |

*Chart 4-A*

Google is "precluded" from relitigating the Federal Circuit's Opinion in *Golden v. Google* CAFC
Case No. 22-1267, "a detailed claim chart mapping features of an accused product, …"

| | |
|---|---|
| **Camera Sensor**: Camera lens in cell phone with microfluidic lens functions as camera; uses microscope to focus on a chemical sensor. A *megapixel* camera captures the image from the array of nanopores uses fluid rather than bulky moving parts. The sensors contained in one array is determined by the *pixel* resolution phone camera. *Megapixel* resolution in cell phone cameras; probe a million different spots on the sensor simultaneously. *Tiny sensors tucked into cell phones could map airborne toxins in real time.* Source: https://www.understanding nano.com/cell-phone-sensors-toxins.html |  |
| Hyperspectral imaging scans for light frequencies that humans can't see in order to identify the unique chemical signatures of different substances. The [] device, can be mass produced, is compatible with all standard smartphone cameras. *These New Smartphone Cameras Could Tell You What an Object Is Made of* https://www. sciencealert.com/new-smartphone-cameras- | Smartphones provide hardware and software capability which can be incorporated with [CBR] sensors, enabling accurate on-site portable sensing. The camera, screen, and LED flashlight of the smartphone can be employed as components of the sensor. https://link. springer.com/article/10. 1007/s11468-022-01672-1 |

11

The Federal Circuit's Opinion in *Golden v. Google* CAFC Case No. 22-1267, "claim chart … map claim limitations to infringing product features … in a relatively straightforward manner"

| | |
|---|---|
| <br><br>MIT chemists devised a new way to wirelessly detect hazardous gases with a sensor that can be read by a smartphone… [T]he researchers have demonstrated that they can detect gaseous ammonia, hydrogen peroxide, and cyclohexanone, among other gases… The new sensors are made from modified near-field communication (NFC) tags. NFC tags can be read by any smartphone that has NFC capability. Retrieved from: https://phys.org/news/2014-12-cheap-sensor-transmit-hazardous-chemicals.html | **Near-Field Communication (NFC) CBR Tag for Smartphone**<br>In November 2007, … two Defense Department contractors, a container retailer, a university, and a U.S. city's bomb squad demonstrated how an RFID tag could send a signal to a detonator built from widely available, over-the-counter components. An undergraduate student spent about $20 to make the detonator. The RFID signal detonated a small amount of explosives in a container by means of a simple emission of a radio signal traveling on the approved RFID 433 MHz frequency. Officials from the Defense Department, Government Accountability Office, Department of Homeland Security and Coast Guard observed the demonstration. In the Defense Department's own words, the "Army representatives examined the device and wiring and confirm that a commercial RFID interrogator was used to 'wake up' a commercial RFID tag. When the RFID tag responded on the 433 MHz frequency, the relay closed and the blasting cap set off the explosive charge." https://www.nationaldefensemagazine.org/articles/2011/2/1/2011february-military-supply-chain-tracking-system-both-inefficient-and-dangerous |

*Chart 6-A*

Google is "precluded" from relitigating the Federal Circuit's Opinion in *Golden v. Google* CAFC Case No. 22-1267, "a detailed claim chart mapping features of an accused product, …"

| | |
|---|---|
| **Near-Field Communication (NFC) Smartphone Sensor:** Nascent technology embedded in modern smartphones—near-field communication (NFC)—for wireless electronic, portable, non-line-of-sight selective detection of gas-phase chemicals *(Fig. 1)*<br><br>National Institutes of Health (NIH). *"Wireless gas detection with a smartphone via rf nfc communication"* Published online 2014 Dec 8. doi: 10.1073/pnas. 1415403111 Retrieved from: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4280584/ | <br><br>*Figure 1*<br><br>Conversion of an NFC tag into a CARD enables wireless rf detection of chemical analytes with a smartphone. NFC-enabled smartphones communicate with NFC tags by simultaneously energizing the NFC tag with an alternating magnetic field (f = 13.56 MHz) through inductive coupling and transferring data by signal modulation. |

SAppx592

The Federal Circuit's Opinion in *Golden v. Google* CAFC Case No. 22-1267, "claim chart … map claim limitations to infringing product features … in a relatively straightforward manner"



**Internet-of-Things (IoTs)**
The Internet-connected smartphones, can directly capture and compile data from as many as 14 different sensors:

1. Accelerometer
2. GPS
3. Gyroscope
4. Magnetometer
5. Biometrics
6. Camera
7. Barometer
8. Proximity Sensors
9. Bluetooth connectivity
10. Barcode readers
11. Touchscreen sensors
12. Heart rate monitor
13. ECG
14. Haptic feedback sensors

The IoTs contain computing hardware, including processors with embedded programming … sensors that gather … readings of (temperature, motion, *chemical levels*, heart rate and body movement) and communication hardware that can send and receive signals.

The smartphone can be used as an IoT device for Personal emergency response, fitness tracking, location-based asset tracking, natural vision processing, and a Bluetooth gateway for wearable Bluetooth devices that enable many IoT monitoring *software* apps. Also, identity verification, GPS based guidance, position/orientation awareness *software* apps and games are well suited for smartphone-based implementation.

*Chart 8-A*

Google is "precluded" from relitigating the Federal Circuit's Opinion in *Golden v. Google* CAFC Case No. 22-1267, "a detailed claim chart mapping features of an accused product, …"

**Smartphone Biosensors:**

1. Ambient light sensor: Cancer biomarkers; Toxic metals; Pathogens
2. Capillary inlet: (Air analysis). Airborne Pathogens; Aerosols
3. Capillary inlet: (Fluid analysis). Blood analysis; Biomarkers
4. Microfluidic cassette: Interchangeable cassettes with varying assays
5. VIS-NIR spectrometer: Food freshness; Melanoma
6. NNAP Electrodes: Toxic metals and Organic pollutants in water
7. Optical Waveguide: Pathogens in water and food
8. Back and front camera: Colorimetric analysis; Image analysis
9. Microphone: Voice recording stress levels



SAppx593

The Federal Circuit's Opinion in *Golden v. Google* CAFC Case No. 22-1267, "claim chart … map claim limitations to infringing product features … in a relatively straightforward manner"



**Internet-of-Things (IoTs)**
The Internet-connected smartphones, can directly capture and compile data from as many as 14 different sensors:
15. Accelerometer
16. GPS
17. Gyroscope
18. Magnetometer
19. Biometrics
20. Camera
21. Barometer
22. Proximity Sensors
23. Bluetooth connectivity
24. Barcode readers
25. Touchscreen sensors
26. Heart rate monitor
27. ECG
28. Haptic feedback sensors

The smartphone can be used as an IoT device for Personal emergency response, fitness tracking, location-based asset tracking, natural vision processing, and a Bluetooth gateway for wearable Bluetooth devices that enable many IoT monitoring *software* apps. Also, identity verification, GPS based guidance, position/orientation awareness *software* apps and games are well suited for smartphone-based implementation.

The IoTs contain computing hardware, including processors with embedded programming … sensors that gather … readings of (temperature, motion, *chemical levels*, heart rate and body movement) and communication hardware that can send and receive signals.

*Chart 8-A*

Google is "precluded" from relitigating the Federal Circuit's Opinion in *Golden v. Google* CAFC Case No. 22-1267, "a detailed claim chart mapping features of an accused product, …"

**Google Beacon: Bluetooth; GPS; Wi-Fi**
Google Android smart phones and WiFi/Bluetooth beacons as detectors and sources. Google smart phone sensors (GPS, WiFi, Bluetooth) and beacon signals to calculate distance between detector and source. Filtering WiFi/ Bluetooth ranging functions and GPS location data. Filtering GPS derived distances based on jump in calculated position or when GPS reports jump in position but phone accelerometer sensors do not show rapid acceleration. Specific models in different categories of radiation instruments (dosimeters, survey meters, personal radiation detectors, backpacks, nuclide identifiers, and mobile systems).



Google Beacon is a type of Bluetooth technology with proximity-based triggers. These triggers affect both the physical and digital world. Using Bluetooth low energy (BLE) hardware technology, beacons communicate with nearby smart devices like smartphones, tablets, etc. Different types of beacons that perform different tasks.

14

SAppx594

***"Doctrine of Equivalents"***

When the Federal Circuit states, ""express no opinion as to the adequacy [the state or quality of being adequate] of the complaint or claim chart except that it is not facially frivolous", means the Circuit is not expressing an opinion on whether the direct infringement is literal direct infringement or direct infringement under the doctrine of equivalents.

"Literal infringement" means that each and every element recited in a claim has identical correspondence in the allegedly infringing device or process. "Under the doctrine of equivalents, a product or process that does not literally infringe . . . the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention.'" *Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 149 F.3d 1309, 1315 (Fed. Cir. 1998)

In *Graver Tank & Mfg. Co. v. Linde Air Prods., Inc.*, the U.S. Supreme Court held that Plaintiff, the patent owner, may invoke the doctrine of equivalents to proceed against Google if the Google Pixel smartphones performs substantially the same function in substantially the same way to obtain the same result.

The Doctrine of Equivalents was established in the United States with the case of *Winans v. Denmead*, which dealt with changing a part of the construction of the patented invention to avoid infringement. Setting a precedent, the court held that infringement may be claimed even if the same literal legal patent language was not used. A mere change in form while retaining the rest from the patented claim is still considered infringement.

The doctrine is explained in the words of Judge Curtis for the case as, "the patentee, having described his invention, and shown its principles, and claimed it in that form which most

15

perfectly embodies it, is, in contemplation of law, *deemed to claim every form in which his invention may be copied*, unless he manifests an intention to disclaim some of those forms."

Under this doctrine, Plaintiff can argue infringement even if each and every claim element of the patent is not completely or identically present in the infringed invention. The purpose of the doctrine is to ensure that Google does not benefit from minor or insubstantial changes that may escape literal infringement.

If the accused Google Pixel products or process does not literally infringe Plaintiff's patented invention, the accused Google Pixel products or process may be found to infringe under the doctrine of equivalents. The essential objective inquiry is: "Does the accused Google Pixel products or process contain elements identical or equivalent to each claimed element of the patented invention?" *Warner-Jenkinson Co. v. Hilton Davis Chemical Co.*, 520 U.S. 17, 41 USPQ2d 1865, 1875 (1997).

In determining equivalence, "an analysis of the role played by each element in the context of the specific patent claim will thus inform the inquiry as to whether a substitute element matches the function, way, and result of the claimed element, or whether the substitute plays a role substantially different from the claimed element."

For an infringement analysis & litigation, claim charts help confirm or dis-confirm that each and every limitation of the claim is present in a product, service, or standard. An Evidence-of-Use (EoU) or Infringement Chart shows how a product or process accused of infringement contains each claim element to satisfy the 'all elements test' for infringement.

Following are illustrative claim charts of how the doctrine of equivalent applies to the alleged infringing processes of Google for CBRNE detection that are equivalent to the specifications and requirements of Plaintiff's patent claims asserted in this case.

16

| | |
|---|---|
| **Independent Claim 4 of Plaintiff's '287 Patent:**<br><br>"A communication device comprising: at least one central processing unit (CPU); at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or send signals to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling."<br><br>The CPU(s) are included in the chipset and is therefore equivalent to the chipset. | <br><br>Google's pre-loaded "built-in, embedded" Android Tensor G1 & G2 Chipset-CPU, enable the infringement of Plaintiff's patents. |
| **Independent Claim 5 of Plaintiff's '287 Patent:**<br><br>"A monitoring device, comprising: at least one central processing unit (CPU); at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or send signals to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling."<br><br>The "transceiver" is equivalent to the Google Android operating system (OS). | <br><br>Google's pre-loaded "built-in, embedded" Android open-source operating system (OS) software, enable the infringement of Plaintiff's patents. |

SAppx597

| **Independent Claim 1 of Plaintiff's '619 Patent:** | |
| --- | --- |
| "A communication device that is at least a personal computer (PC), a cellphone, a smartphone, a laptop, …, comprising at least a central processing unit (CPU), capable of: processing instructions to scan a senor or tag using the short-range wireless technology of radio frequency near-field communication (NFC); processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs); processing instructions received through at least one of a Bluetooth, a Wi-Fi, a satellite, a global positioning system (GPS), or a cellular transmission…"<br><br>The NFC detection: Performs substantially the same function in substantially the same way to obtain the same result. | <br><br>Conversion of an NFC tag into a CARD enables wireless rf detection of chemical analytes with a smartphone. NFC-enabled smartphones communicate with NFC tags by simultaneously energizing the NFC tag with an alternating magnetic field (f = 13.56 MHz) through inductive coupling and transferring data by signal modulation. |
| **Independent Claim 11 of Plaintiff's '619 Patent:** | |
| "A central processing unit (CPU) of at least a personal computer (PC), a cellphone, a smartphone, a laptop, … capable of: processing instructions to scan a senor or tag using the short-range wireless technology of radio frequency near-field communication (NFC); processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs); processing instructions received through at least one of a Bluetooth, a Wi-Fi, a satellite, a global positioning system (GPS), or a cellular transmission…"<br><br>The Bluetooth, WiFi, and GPS detection means: Performs substantially the same function in substantially the same way to obtain the same result. | <br><br>**Google Beacon: Bluetooth; GPS; Wi-Fi**<br>Google Android smart phones and WiFi/Bluetooth beacons as smart phone detectors and sensors. Google smart phone sensors (GPS, WiFi, Bluetooth) and beacon signals. Filtering WiFi/ Bluetooth ranging functions and GPS location data. Filtering GPS derived distances on jump in calculated position or when GPS reports jump in position but phone accelerometer sensors ... Specific models in different categories of radiation instruments |

18

SAppx598

### THE TABLE OF CONTENTS "OUTLINE" OF DEFENDANT'S MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT: ANSWERED

**INTRODUCTION**

It is the belief of Plaintiff that Google is making, using, offering for sell, and selling products [i.e., Google Pixel 6a, 7, 7a, 7 Pro, and Fold smartphones] that directly infringes Plaintiff's patented communicating, monitoring, detecting, and controlling (CMDC) devices. It is the belief of Plaintiff that Google is making, using, offering for sell, and selling products [i.e., Google Tensor G1 and G2 Chipset-CPUs] that directly infringes Plaintiff's patented central processing unit (CPU) devices. 35 USC 271(a)

**BACKGROUND**

**A. The Asserted Patents**

A patent claim defines the boundaries of an invention, and therefore lays down what the patent does and does not cover. A patent claim is the most important thing in a patent application, for it defines the subject matter that is sought to be protected. A patent claim is usually expressed as a statement of technical facts in legal terms.

In the Federal Circuit's language, "a detailed claim chart mapping features of an accused product, the Google [] **Smartphone**, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189", indicates a determination has been made on direct infringement, either literally or under the doctrine of equivalents.

**B. The Original Complaint and Google's Motion to Dismiss**

The doctrine of equivalents is explained in the words of Judge Curtis [] as, "the patentee, having described his invention, and shown its principles, and claimed it in that form which most perfectly embodies it, is, in contemplation of law [with specific regard to the possibility of], *deemed to claim every form in which his invention may be copied,* unless he manifests an intention to disclaim some of those forms."

**C. The Amended Complaint**

The amended complaint is necessary because after the Federal Circuit's order on 09/08/2022, in *Larry Golden v. Google LLC*; Case No. 22-1267, to "VACATE AND REMAND" the relevant Case No: 22-1267 Document 15; back to the District Court "to

SAppx599

be filed and request service of process", Google has discontinued the making, offering for sell, and selling of the Google Pixel 5 Smartphone; discontinued the use of Qualcomm's Snapdragon chipset, thereby eliminating Plaintiff's "joint infringement" claim; and discontinued offering for sell, and selling, the ATAK-Military on Google Play, to avoid liability for the actions brought against them.

## ARGUMENT

## I. The Amended Complaint Fails to State Claims of Direct Infringement

It is the belief of Plaintiff that Google is making, using, offering for sell, and selling products [i.e., Google Pixel 6a, 7, 7a, 7 Pro, and Fold smartphones] that directly infringes Plaintiff's patented communicating, monitoring, detecting, and controlling (CMDC) devices. It is further the belief of Plaintiff that Google is making, using, offering for sell, and selling products [i.e., Google Tensor G1 and G2 Chipset-CPUs] that directly infringes Plaintiff's patented central processing unit (CPU) devices. 35 USC 271(a)

### A. ATAK-CIVILIAN is a Third-Party Application, Not a Google Product

The alleged infringing Google Pixel 6a, 7, 7a, 7 Pro, and Fold smartphones [Plaintiff's patented CMDC devices]; that comprises the Google Tensor Chipset-CPUs [Plaintiff's patented CPU devices], for carrying out operational and functional instructions; that comprises the pre-loaded Google Android Open-Source Operating System (OS) [Equivalent to Plaintiff's patented "transceivers"], which is the software that allows the Google Pixel 6a, 7, 7a, 7 Pro, and Fold smartphones to run the ATAK-CIV *software* application that enables the CBRNE sensors to monitor, detect, and relay data. See the complaint (Exhibit A) filed by *Touchstream Technologies Inc. v. Google LLC*

### B. The Complaint Admits That Google Does Not Sell Converted NFC Tags

The alleged infringing Google Pixel 6a, 7, 7a, 7 Pro, and Fold smartphones [Plaintiff's patented CMDC devices]; that embeds Google's Near-Field Communication (NFC) technology [Plaintiff's patented short-range radio-frequency (RF) technology]; that is interconnected to the pre-loaded Google Android Open-Source Operating System (OS) [Equivalent to Plaintiff's patented "transceivers"], which allows the NFC enabled Google Pixel 6a, 7, 7a, 7 Pro, and Fold smartphones to share payloads of data between the NFC tags and the Android-powered Google Pixel 6a, 7, 7a, 7 Pro, and Fold

SAppx600

smartphones for wireless electronic, portable, non-line-of-sight selective detection of gas-phase chemicals. A Google Android converter *software* app, converts an NFC tag into a CARD; enables wireless rf detection of chemical analytes with a smartphone. NFC-enabled smartphones communicate with NFC tags by simultaneously energizing the NFC tag with an alternating magnetic field (f = 13.56 MHz) through inductive coupling and transferring data by signal modulation.

**C. The Complaint Admits That Google Does Not Sell Devices With a Microfluidic Lens**

The alleged infringing Google Pixel 6a, 7, 7a, 7 Pro, and Fold smartphones [Plaintiff's patented CMDC devices]; that comprises the Google Tensor Chipset-CPUs [Plaintiff's patented CPU devices]; that comprises the Google Pixel Camera [Plaintiff's patented Multi-Sensor Detection Device or Plaintiff's Cell Phone Detection Device], that is used to detect for chemical, biological, and radiological (CBR) agents; that comprises the pre-loaded Google Android Open-Source Operating System (OS) [Equivalent to Plaintiff's patented "transceivers"], which is the *software* that allows the Google Pixel 6a, 7, 7a, 7 Pro, and Fold smartphones to run the *software* application that enables the Google Pixel camera to analyze certain microscopic nanopores The Google pixel camera, screen, and LED flashlight of the Google Pixel 6a, 7, 7a, 7 Pro, and Fold smartphones can be employed as components of the sensor. https://link. springer.com/article/10. 1007/s11468-022-01672-1

**D. The Complaint Admits That Google Does Not Sell Devices Designed to Go to Mars**

Google design their Google Pixel 6a, 7, 7a, 7 Pro, and Fold smartphones to align with its competitors (i.e., Apple; Samsung; LG) devices, who designed their devices in accordance with the Government's first solicitation in 2007 [DHS S&T BAA-07-10 *Cell-All Ubiquitous Biological & Chemical Sensing*] for a new, improved upon, and useful cell phone or mobile device capable of sensing for chemical, biological, radiological, and explosive substances. Phase I of the initiative call for the CBR sensors to be embedded inside the cell phone or mobile device; Phase II of the initiative call for the sensors, detection devices, or detection means to be remote the cell phone or mobile device.

21

Technically, the first Google phone was not the Google Pixel but the Nexus One. It was manufactured by HTC in 2010. In fact, the whole Nexus series was made in collaboration with other brands such as HTC, Samsung, LG, Motorola, and Huawei.

In 2010, Apple, Samsung, and LG were still under an expressed contract to develop and commercialize for the Government, the *Cell-All Ubiquitous Biological & Chemical Sensing* new, improved upon, and useful cell phone or mobile device capable of sensing for chemical, biological, radiological, and explosive substances. During the same period [2010], the Google Nexus series of phones was being manufactured and commercialized under the implied authorization and consent of the Government, to avoid personable liability for patent infringement.

In a recent case decided by jury in the Western District of Texas Court; in *Touchstream Technologies Inc. v. Google LLC*, Case No. 6:21-cv-00569-ADA (Dkt. 73) (Exhibit A) Google claimed as its Fourteenth Affirmative Defense "Use by the United States": "Plaintiff's [*Touchstream*] claims for relief against Google are barred by 28 U.S.C. § 1498 in whole or in part, in that, upon information and belief, the accused subject matter is used or manufactured by or for the United States." (Exhibit B)

In a lawsuit between private parties [*Touchstream v. Google*], 28 U.S.C. § 1498 (a) operates as an affirmative defense, and where a private party's use of a patented invention is "for the Government" and with the "authorization and consent of the Government," that private party cannot be held liable for patent infringement.

Google is "precluded" from relitigating whether or not the Google Android Open-Source Operating System *software* can be used to modify products to function or operate in an infringing manor. Google was found liable for the *software* modification of products [i.e., smartphones and TVs not sold by Google] to operate in an infringing manor in *Touchstream Technologies Inc. v. Google LLC*. (Exhibit C)

**E. The Complaint Admits That Google Beacon is Separate From the Accused Devices**

The Google Beacon is considered an integral part of the Google Pixel 6a, 7, 7a, 7 Pro, and Fold smartphone devices

22

In *DHS v. Larry Golden* IPR2014-00714 Patent RE43,990 E: "In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced in the chart below. Claim Term Construction "built in, embedded" (claim 74) [is construed to mean] "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device".

Google Android smart phones and WiFi/Bluetooth beacons as smart phone detectors and sensors. Google smart phone sensors (GPS, WiFi, Bluetooth) and beacon signals. Filtering WiFi/ Bluetooth ranging functions and GPS location data. Filtering GPS derived distances on jump in calculated position or when GPS reports jump in position but phone accelerometer sensors ... Specific models in different categories of radiation instruments.

## II. The Amended Complaint Fails to Allege Indirect Infringement

### A. Indirect Infringement Requires Direct Infringement

Plaintiff alleges that the defendant Google, has induced infringement, thereby causing direct infringement with its Android Open-Source Operating System under 35 U.S.C. § 271(b). Plaintiff alleges Google actively encouraged the DoD/DTRA and Draper Laboratory Inc.'s infringement, knowing that the acts they induced constituted patent infringement, and their encouraging acts actually *resulted* in direct patent infringement.

In *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, the Federal Circuit considered whether proof of induced infringement requires proof that the encouragement of infringement was successfully communicated to the direct infringer and actually *resulted* in direct infringement. However, Fairchild claimed there was no evidence that it encouraged its accused chips to be incorporated into products ... with the specific intent to induce infringement.

The court disagreed, noting that Fairchild [Google]  was involved in activities related to the use of its products ... Fairfield designed its products [same as Google Android Open-Source Operating System] to meet certain [] standards, provided demonstration boards containing the infringing chips [open-source platform] to customers and potential customers in the United States, and maintained a technical support center in the United States that provided support to customers based in the United

SAppx603

States." Plaintiff must prove the inducement *resulted* in direct infringement, not that the inducement was of a product that already directly infringes.

**B. Assuming Direct Infringement, the Complaint Fails to Allege Indirect Infringement**

Because the Google Nexus series was made in collaboration with at least other brands such as Samsung, and LG, Plaintiff believes Google's knowledge of Plaintiff's intellectual property and Google's intent to encourage another's infringement of Plaintiff's patents begin in 2010. Google's knowledge of Plaintiff's patents—2010.

Google design their Google Pixel 6a, 7, 7a, 7 Pro, and Fold smartphones to align with its competitors (i.e., Apple; Samsung; LG) devices, who designed their devices in accordance with the Government's first solicitation in 2007 [DHS S&T BAA-07-10 *Cell-All Ubiquitous Biological & Chemical Sensing*] for a new, improved upon, and useful cell phone or mobile device capable of sensing for chemical, biological, radiological, and explosive substances. Phase I of the initiative call for the CBR sensors to be embedded inside the cell phone or mobile device; Phase II of the initiative call for the sensors, detection devices, or detection means to be remote the cell phone or mobile device.

Technically, the first Google phone was not the Google Pixel but the Nexus One. It was manufactured by HTC in 2010. In fact, the whole Nexus series was made in collaboration with other brands such as HTC, Samsung, LG, Motorola, and Huawei.

In 2010, Apple, Samsung, and LG were still under an expressed contract to develop and commercialize for the Government, the *Cell-All Ubiquitous Biological & Chemical Sensing* new, improved upon, and useful cell phone or mobile device capable of sensing for chemical, biological, radiological, and explosive substances. During the same period [2010], the Google Nexus series of phones was being manufactured and commercialized under the implied authorization and consent of the Government, to avoid personable liability for patent infringement.

Google was able to shelter its alleged infringing activities under the "implied" provision of performing work for the United States until year 2012, when the Courts closed the loop hole in *Zoltek V.*

SAppx604

Google also lost its Government protection in 2021 when the CFC Court in *Golden v. US* Case No. 13-307C declared Apple, Samsung, and LG [and all OEMs manufacturing smartphones under an implied contract] was never performing work for the Government to develop a new, improved upon, and useful cell phone or mobile device capable of chemical, biological, radiological, and explosive sensing.

Google further lost its Government protection in *Touchstream Technologies Inc. v. Google LLC*, Case No. 6:21-cv-00569-ADA (Dkt. 73) (Exhibit A) when Google claimed as its Fourteenth Affirmative Defense "Use by the United States": "Plaintiff's [*Touchstream*] claims for relief against Google are barred by 28 U.S.C. § 1498 in whole or in part, in that, upon information and belief, the accused subject matter is used or manufactured by or for the United States." The Texas Court rejected Google's claim.

**1. The Amended Complaint Fails to Allege Induced Infringement**

Google "knowingly induced the infringing acts, and possessed [a] specific intent to encourage another's infringement of Plaintiff's Patents" *Windy City Innovations, LLC v. Microsoft Corp.*, 193 F. Supp. 3d 1109, 1115 (N.D. Cal.2016).

Android is an open-source operating system for mobile devices and a corresponding open-source project led by Google. The Android Open-Source Project (AOSP) repository offer the information and source code needed to create custom variants (i.e., ATAK is built on the Android operating system) of the Android OS, port devices and accessories to the Android platform, and ensure devices meet the compatibility requirements that keep the Android ecosystem a healthy and stable environment for millions of users.

Google oversees the development of the core Android open-source platform and works to create robust developer and user communities. Google has committed the professional engineering resources necessary to ensure that Android is a fully competitive software platform.

Plaintiff alleges Google actively encouraged a number of various Government Agencies infringement, knowing that the acts Google induced constituted patent infringement, and their encouraging acts actually *resulted* in direct patent infringement. Google encouraged the Government Agencies to build

SAppx605

on its Google Android Open-Source Operating platform to develop the following software apps for CBRNE detection: ATAK-CIV (CBRN); CBRNResponder [CBRN]; Chemical Detectives [Chemical]; USAMRIID's Biodefense Tool [Biological]; GammaPix Lite-Gamma Rad Detect [Radiation]; Explosives Identification [Explosives]; Hazardous material (HazMat); FiRST; Navfree; ERG; REMM; and, HazMasterG3. All the listed *software* apps are sold or offered by Google on Google Play.

**2. The Amended Complaint Fails to Allege Contributory Infringement**

Under 35 U.S.C. § 271(c), "anyone who offers to sell, sells, or imports a material component of something that is patented, knowing that the component was especially made for use in an infringement and is not a commodity suitable for a substantial non-infringing use, is also liable as a contributory infringer".

Plaintiff is alleging the defendant Google, has in the past and continues to *contribute* the Google Tensor i.e., Central Processing Unit (CPU), Processor, System-on-a-Chip (SoC), Chipset; a material component of Plaintiff's patented Communicating, Monitoring, Detecting, and Controlling (CMDC) device, with knowledge that the Google Tensor Chipset is especially made for use in an alleged infringement of Google Pixel 6a, 7, 7a, 7 Pro, and Fold smartphones and is not a commodity suitable for a substantial non-infringing use.

**III. The Amended Complaint Fails to Allege Joint Infringement**

Plaintiff alleges that the defendant Google is liable for "joint infringement". In United States patent law, joint infringement is a form of patent infringement liability that occurs when multiple actors [Google LLC and Draper Laboratory Inc.] are involved in carrying out the claimed infringement of a patent and no single accused infringer has performed all of the steps of the method. In a 2015 decision of the United States Court of Appeals for the Federal Circuit, *Akamai Techs., Inc. v. Limelight Networks, Inc.*

**IV. The Amended Complaint Fails to Allege Willful Infringement**

Plaintiff alleges that the defendant Google is liable under the doctrine of willful blindness. Willful Blindness applies when Google seeks to avoid civil liability for the wrongful

SAppx606

acts by intentionally keeping itself unaware of facts that would render Google liable or implicated. In the Eastern District of Texas, the Chief District Judge Rodney Gilstrap issued an opinion in the case (*Motiva Patents LLC v. HTC Corporation*) in which he wrote, "A well-pled claim for willful blindness is sufficient to state a claim for willful infringement."

**V. The Court Should Deny Leave to Amend**

If this Court finds Plaintiff's complaint inadequate, Plaintiff is seeking leave to amend.

The Rule 12(b)(6) test has been revised in recent years. In *Conley v. Gibson*, 355 U.S. 41 (1957), the Supreme Court stated the interplay between Rule 8 (pleading) and Rule 12(b)(6) as follows: "[T]he accepted rule [is] that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 355 U.S. at 45-46.

In *Bell Atlantic Corporation v. Twombly*, 55 U.S. 544 (2007), the Court noted questions raised regarding the "no set of facts" test and clarified that "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563. It continued: "*Conley*, then, described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival." *Id.*

In *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Court further elaborated on the test, including this statement: "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face." *Id.* at 1949 (citation omitted). Where a complaint is inadequate, leave to amend the complaint is common. See, e.g., *Butt v. United Brotherhood of Carpenters & Joiners of America*, No. 09–4285, 2010 WL 2080034 (E.D. Pa. May 19, 2010).

# CONCLUSION

Google's "infringing use" refers to the unauthorized utilization or exploitation of Plaintiff's intellectual property rights. It occurs when Google uses, replicates, or modifies a

SAppx607

product or design that is protected by Plaintiff's patents, without obtaining the necessary permissions or licenses.

As the Federal Circuit made clear a few years ago in *Nalco Co. v. Chem-Mod, LLC*, a plaintiff "need not 'prove its case at the pleading stage.'" The Federal Rules of Civil Procedure do not require a plaintiff to plead facts establishing that each element of an asserted claim is met. Indeed, the Federal Circuit previously explained in *Disc Disease Sols. Inc. v. VGH Sols.*, Inc. that a plaintiff must only give the alleged infringer fair notice of infringement.

In a more general comment, a Federal Circuit's panel cautioned that "[t]o the extent this district court and others have adopted a blanket element-by-element pleading standard for patent infringement, that approach is unsupported and goes beyond the standard the Supreme Court articulated in *Iqbal and Twombly*."

The Federal Circuit on 09/08/2022, in *Larry Golden v. Google LLC*; Case No. 22-1267 — "VACATED AND REMANDED" the relevant Case No: 22-1267 Document 15; back to the District Court "to be filed and request service of process". The Federal Circuit determined the complaint, "includes a detailed claim chart mapping features of an accused product, the [] Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189" … "in a relatively straightforward manner" … and that the [Circuit] "express no opinion as to the adequacy of the complaint or claim chart except that it is not facially frivolous."

> "Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the Google Pixel 5 Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189 … It [claim chart] attempts [] to map claim limitations to infringing product features, and it does so in a relatively straightforward manner …[W]e conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart. Mr. Golden

28

has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart.…"

Vertical Stare Decisis bars Google from challenging whether Plaintiff has pled enough facts and provided sufficient notice to the Defendant Google.

Vertical stare decisis, or vertical precedent, is the obligation of the Northern District of California Court to follow the decisions of the United States Court of Appeals for the Federal Circuit that falls within the hierarchical structure. Vertical stare decisis and precedent, are a matter of hard law, not a matter of policy.

The Federal Circuit emphasized that "patentees need not prove their case at the pleading stage" and thus found that the district court had erred by misapplying *Iqbal and Twombly*. Apparently exasperated by the need to reiterate the proper pleading standard, the Court emphasized "[a] plaintiff is not required to plead infringement on an element-by-element basis."

Therefore, in the first instance, Plaintiff has given the Defendant sufficient notice of the claims asserted by the Plaintiff so that they can provide an appropriate answer. *Monroe v. Owens*, 38 F. App'x 510, 515 (10th Cir. 2002).

In the second instance, the Federal Rules of Civil Procedure do not require a plaintiff to plead facts establishing that each element of an asserted claim is met. A blanket element-by-element pleading standard is unsupported by the Supreme Court.

In the third instance, Google is "precluded" from challenging the Federal Circuit's infringement analysis and opinion in *Larry Golden v. Google LLC*; Case No. 22-1267. Further, under the *Vertical Stare Decisis* doctrine, this Court is bound by the Federal Circuit's infringement analysis and opinion in *Larry Golden v. Google LLC*; Case No. 22-1267.

In the fourth instance, the Rule 12(b)(6) test has been revised in recent years. In *Conley v. Gibson*, 355 U.S. 41 (1957), the Supreme Court stated the interplay between Rule 8 (pleading)

29

SAppx609

and Rule 12(b)(6) as follows: "[T]he accepted rule [is] that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." 355 U.S. at 45-46.

In *Bell Atlantic Corporation v. Twombly*, 55 U.S. 544 (2007) the Court noted questions raised regarding the "no set of facts" test and clarified that "once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint," *id.* at 563. It continued: "*Conley*, then, described the breadth of opportunity to prove what an adequate complaint claims, not the minimum standard of adequate pleading to govern a complaint's survival." *Id.*

In *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Court further elaborated on the test, including this statement: "To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to "state a claim to relief that is plausible on its face."" *Id.* at 1949 (citation omitted). <u>Where a complaint is inadequate, leave to amend the complaint is common</u>. *See, e.g., Butt v. United Brotherhood of Carpenters & Joiners of America*, No. 09–4285, 2010 WL 2080034 (E.D. Pa. May 19, 2010).

Sincerely,

Larry Golden, *Pro Se* Plaintiff
740 Woodruff Rd., #1102
Greenville, SC 29607
(H) 8642885605
(M) 8649927104
Email: atpg-tech@charter.net

SAppx610

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 12th day of September, 2023, a true and correct copy of the foregoing "Plaintiff's Response to Defendant's Motion to Dismiss Plaintiff's Amended Complaint for Patent Infringement", was served upon the following Defendant by priority "express" mail:


Matthew S. Warren

WARREN LEX LLP

2261 Market Street, No. 606

San Francisco, California, 94114

Phone: (415) 895-2940

Fax: (415) 895-2964

Email: 22-5246@cases.warrenlex.com


_Larry Golden_

Larry Golden, Pro Se

740 Woodruff Rd., #1102

Greenville, South Carolina 29607

atpg-tech@charter.net

864-288-5605

SAppx611

Exhibit A

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | |
|---|---|
| **TOUCHSTREAM TECHNOLOGIES, INC.**<br><br>Plaintiff,<br><br>v.<br><br>**GOOGLE LLC**<br><br>Defendant. | Civil Action No. 6:21-cv- 569<br><br>**JURY TRIAL DEMANDED** |

## ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT

Plaintiff Touchstream Technologies, Inc., hereby files this Original Complaint for Patent Infringement against Google LLC and alleges, upon information and belief, as follows:

### THE PARTIES

1.     Plaintiff Touchstream Technologies, Inc., d/b/a Shodogg ("Touchstream" or "Plaintiff") is a New York corporation with its principal place of business in New York, New York.

2.     Defendant Google LLC ("Google" or "Defendant") is a Delaware limited liability corporation with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, CA 94043. Google maintains a permanent physical presence within the Western District of Texas, conducting business from its offices at 500 West 2nd Street, Austin, Texas, 78701. Google may be served with process through its registered agent CSC – Lawyers Incorporating Service Company, at 211 E. 7th Street, Suite 620, Austin, Texas 78701. Google is currently registered to do business in the State of Texas, and has been since at least November 17, 2006.

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                        Page 1

SAppx613

Case: 24-2024     Document: 23-2     Page: 38     Filed: 11/18/2024

Case 4:22-cv-05246-HSG   Document 46   Filed 09/13/23   Page 34 of 88
Case 6:21-cv-00569-ADA   Document 1   Filed 06/04/21   Page 2 of 32

## NATURE OF THE ACTION

3.      This is a civil action against Google for patent infringement arising under the patent statutes of the United States, 35 U.S.C. § 271 *et seq.* for the infringement of United States Patent Nos. 8,356,251 (the "'251 patent"), 8,782,528 (the "'528 patent"), and 8,904,289 (the "'289 patent") (collectively, "the Touchstream Patents"). True and correct copies of the '251 patent, the '528 patent, and the '289 patent are attached as Exhibits 1, 2, and 3, respectively, to this Complaint.

## JURISDICTION AND VENUE

4.      This action arises under the patent laws of the United States, Title 35 of the United States Code. This Court has subject matter jurisdiction over the subject matter of this action under 28 U.S.C. §§ 1331 and 1338(a).

5.      This Court has personal jurisdiction over Google in this action because Google has committed acts within the Western District of Texas giving rise to this action and has established minimum contacts with this forum such that the exercise of jurisdiction over Google would not offend traditional notions of fair play and substantial justice. Google has engaged in continuous, systematic, and substantial activities within this State, including substantial marketing and sales of products—including the Chromecast products[1] that are used by Google in connection with performing the accused Chromecast functionalities[2]—within this State and this District. Furthermore, Google—directly and/or through subsidiaries or intermediaries—has committed and continues to commit acts of infringement in this District by, among other things, using and providing the Chromecast service.

6.      Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and (c) and/or 1400(b). As discussed above, Google currently has a regular and established place of business in

---

[1] The term "the Chromecast products" is defined at ¶ 48, *infra.*
[2] The term "accused Chromecast functionalities" is defined at ¶ 48, *infra.*

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                    Page 2

this District, and has committed and continues to commit acts of patent infringement in this District.

7.      Google maintains a regular and established place of business within the Western District of Texas, conducting business from its offices at 500 West 2nd Street, Austin, Texas, 78701.

8.      Public reporting indicates that Google has maintained an office in Austin since 2007.[3]

9.      Additionally, reporting indicates that Google currently owns or leases over 500,000 square feet of office space in downtown Austin across at least three locations: 100 Congress Ave., 901 E. Fifth St., and 500 W. Second St.  Google has also indicated that it is scheduled to open another 750,000 square feet of office space in Austin, at 601 W. Second St.[4]

10.     Google currently employs over 1,100 persons in Austin and—as of June 2019—Austin was Google's seventh-largest office outside of the San Francisco Bay Area.[5]  As of June 1, 2021, Google had job postings for 219 positions in Austin, Texas.[6]

11.     Google directly and/or indirectly develops, designs, tests, distributes, markets, offers to sell, sells, and/or utilizes the Chromecast products that Google uses to perform the accused Chromecast functionalities in the Western District of Texas, and otherwise purposefully directs infringing activities to this District in connection with its Chromecast products.

---

[3] *See, e.g.,* https://www.builtinaustin.com/2019/06/17/google-new-offices-austin-data-center-midlothian.
[4] *See, e.g.,* https://www.kvue.com/article/money/economy/boomtown-2040/google-austin-texas-real-estate-report/269-2ce6e60e-e8c3-46f5-aca6-864175e67950.
[5] *See, e.g.,* https://austonia.com/technology/google-austin-office, citing https://www.statesman.com/news/20190614/google-says-it-plans-significant-expansion-in-austin.
[6] Search conducted via https://careers.google.com/locations/austin/?src=Online%2FHouse%20Ads%2FAdSitelinks.

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                              Page 3

Case: 24-2024     Document: 23-2     Page: 40     Filed: 11/18/2024

Case 4:22-cv-05246-HSG   Document 46   Filed 09/13/23   Page 36 of 88
Case 6:21-cv-00569-ADA   Document 1   Filed 06/04/21   Page 4 of 32

12.     On information and belief, the Chromecast products are sold at a variety of retailers in Austin and/or Waco, Texas—including Walmart, Target, Best Buy, Sam's Club, Lowes, and Office Depot.

13.     According to Google, its network infrastructure consists of three elements: data centers, Edge Points of Presence ("PoPs"), and Edge Nodes ("Google Global Cache," or "CGC").[7]

14.     According to Google, its data centers "are the heart of Google content and services."[8]  Google purportedly owns and operates a $600 million data center in Midlothian, Texas, which is located in Ellis County, within the Northern District of Texas.[9]  According to Google, such data centers "keep all of Google's products and services up and running around the clock and around the world."[10]

15.     According to Google, it operates "a large, global meshed network that connects our Edge PoPs to our data centers."[11]  Google purports to operate two points of presence ("PoPs") in Dallas and/or Fort Worth, Texas.

16.     According to Google, it operates Edge Nodes that are used by network operators to "deploy Google supplied servers" within their networks, and some nodes are used "to support the delivery of . . . Google services."[12]  According to Google, it currently operates three "network

---

[7] *See, e.g.,* https://peering.google.com/#/infrastructure.
[8] *Id.*
[9] *See, e.g.,*
https://www.google.com/about/datacenters/locations/midlothian/#:~:text=Google%20is%20proud%20to%20call,data%20center%20in%20Midlothian,%20Texas.
https://www.kvue.com/article/money/economy/boomtown-2040/google-austin-texas-real-estate-report/269-2ce6e60e-e8c3-46f5-aca6-864175e67950.
[10] *See, e.g.,* https://www.google.com/about/datacenters/faq/.
[11] *See, e.g.,* https://peering.google.com/#/infrastructure.
[12] *Id.*

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                              Page 4

Case: 24-2024     Document: 23-2     Page: 41     Filed: 11/18/2024

Case 4:22-cv-05246-HSG   Document 46   Filed 09/13/23   Page 37 of 88
Case 6:21-cv-00569-ADA   Document 1   Filed 06/04/21   Page 5 of 32

edge locations" in Dallas, Texas.[13]  According to Google, at least one Edge Node (GGC) is located in or close to Austin, Texas.[14]

17.     On information and belief, the team lead or "director" responsible for the development and execution of Google's initial go-to-market strategy, global retail sales strategy, and hardware distribution for Chromecast, as well as the development of partnerships for Chromecast, currently resides in or around Austin, Texas, and is currently employed by Google.

18.     On information and belief, at least one person involved in the discussion between Touchstream and Google regarding a potential partnership related to the technology invented by Touchstream, as described further below, currently resides in Texas.

19.     On information and belief, at least one Chromecast "partner" who produces video content that can be streamed via a Chromecast enabled application is located in Austin, Texas.

20.     On information and belief, at least one Chromecast "partner" live-streams sports matches from Austin (as well as other locations) for a sports team located in Austin, Texas, via a Chromecast enabled application.

**TOUCHSTREAM'S PATENTS**

21.     In 2010, David Strober, the inventor of the Touchstream Patents and the original founder of Touchstream, was working at Westchester Community College as a Program Manager and e-learning instructional designer.  At this job Mr. Strober facilitated the development of online college courses, developing software as needed to support those efforts.

22.     At least as early as mid-2010, Mr. Strober perceived the need to be able to take videos that could be viewed on a smaller device, like a smartphone, and "move" them to a larger screen, like a computer monitor or television.  In working to bring his idea to fruition, Mr. Strober

---

[13] *See, e.g.,* https://cloud.google.com/vpc/docs/edge-locations.
[14] *See, e.g.,* https://peering.google.com/#/infrastructure.

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                    Page 5

expanded his work by using a device like a smartphone to cause a video to play on a second screen, even if that video resided elsewhere (like the public internet). Near the end of 2010, Mr. Strober had developed a working prototype that demonstrated his groundbreaking concept. Recognizing that that his invention could revolutionize how people located, viewed, and shared media, Mr. Strober filed his first patent application in April 2011.

23.    Each of the Touchstream Patents, which are each entitled "Play Control of Content on a Display Device," claims priority to U.S. Provisional Patent Application No. 61/477,998 (filed on April 21, 2011).

24.    On January 15, 2013, the U.S. Patent and Trademark Office duly and legally issued the '251 patent to inventor David Strober.

25.    Touchstream is the owner, by assignment, of all rights, title, and interest in the '251 patent.

26.    On July 15, 2014, the U.S. Patent and Trademark Office duly and legally issued the '528 patent to inventor David Strober.

27.    Touchstream is the owner, by assignment, of all rights, title, and interest in the '528 patent.

28.    On December 2, 2014, the U.S. Patent and Trademark Office duly and legally issued the '289 patent to inventor David Strober.

29.    Touchstream is the owner, by assignment, of all rights, title, and interest in the '289 patent.

## BACKGROUND OF THE DISPUTE

### TOUCHSTREAM REVOLUTIONIZES VIDEO STREAMING

30.    In 2011, inventor David Strober officially incorporated Touchstream to share his inventions with the world.

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                    Page 6

31.     In the following years, Touchstream raised millions of dollars in investments.

32.     Since 2011, Touchstream, d/b/a "Shodogg," developed software that enables content to be wirelessly cast (e.g., accessed, displayed, and controlled) from a mobile device to a second display screen (e.g., TV, computer, tablet, etc.).   Touchstream has been a leader in developing casting technology and has received numerous awards and recognition.

33.     Unfortunately, the efforts of Touchstream and Touchstream's partners to appropriately monetize Mr. David Strober's inventions were significantly hindered by infringement of the Touchstream Patents, including by Google.  The timing and scope of Google's infringement is discussed in more detail below.

**GOOGLE MEETS WITH TOUCHSTREAM IN 2011-2012 TO LEARN ABOUT THE PATENTED TOUCHSTREAM TECHNOLOGY**

34.     Since at least December 14, 2011, Touchstream has made clear that its revolutionary product offerings were "patent-pending."[15]

35.     Just days after the first Touchstream Patent issued on January 15, 2013, Touchstream issued a press release announcing this patent award.[16]

---

[15] *See e.g.*, Sean Ludwig, *Shodogg will let you pause and restart video from any device (exclusive)*, VentureBeat (Dec. 14, 2011 7:00 AM), https://venturebeat.com/2011/12/14/shodogg-video-sharing-phones-tvs-exclusive/; Shodogg, *Shodogg Launches at CES and Transforms Streaming Video Delivery by Fueling Industry Expansion with Content Providers*, Cision PR Newswire (Jan. 10, 2012, 9:43 ET), https://www.prnewswire.com/news-releases/shodogg-launches-at-ces-and-transforms-streaming-video-delivery-by-fueling-industry-expansion-with-content-providers-137010098.html;                                *see                    also* https://web.archive.org/web/20111003131546/http://shodogg.com/ (archived snapshot of Shodogg website from October 3, 2011) ("Shodogg is a patent-pending technology that allows viewers to access online streaming content from any smartphone and display it to any larger connected screen, such as a laptop, tablet, or TV.").

[16] Shodogg, *Shodogg announces the release of ScreenDirect a business-to-business solution enabling companies to seamlessly direct digital content across screens*, Cision PR Newswire (Jan. 17, 2013 9:15 ET) https://www.prnewswire.com/news-releases/shodogg-announces-the-release-of-screendirect-a-business-to-business-solution-enabling-companies-to-seamlessly-direct-digital-content-across-screens-187284641.html; *See also, e.g., Meet Shodogg Who Won this Year's Techweek       NYC       Launch       Competition*,       AlleyWatch       (12/2014),

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                    Page 7

36.     In December 2011, Touchstream and Google began discussing a potential partnership concerning the technology invented by Touchstream.

37.     Touchstream signed Google's Non-Disclosure Agreement, which provided that neither company would get rights to the other company's intellectual property as a result of the meeting.

38.     Google and Touchstream held a video conference by Skype on December 22, 2011.

39.     At this meeting, the attendees for Touchstream informed the attendees for Google that Touchstream had filed for a patent on the Touchstream technology being discussed and demonstrated in the meeting.

40.     In February of 2012, Google informed Touchstream that it did not want to pursue any business partnership with Touchstream in connection with the presented technology.

41.     One or more of the Touchstream Patents (or their underlying applications) were cited to or by Google in connection with the following patents and patent applications filed by Google:

(i) U.S. Patent No. 9,841,939B2, filed December 18, 2014, titled "Methods, systems, and media for presenting requested content on public display devices" ('251 patent cited on face of the issued Google patent);

(ii) U.S. Patent No. 9,916,122B2, filed December 18, 2014, titled "Methods, systems, and media for launching a mobile application using a public display device" ('251 patent cited on face of the issued Google patent);

---

https://www.alleywatch.com/2014/12/meet-shodogg-who-won-this-years-techweek-nyc-launch-competition/.

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                    Page 8

(iii) U.S. Patent No. 9,967,320B2, filed December 18, 2014, titled "Methods, systems, and media for controlling information used to present content on a public display device" (the '251 patent is cited on face of the issued Google patent);

(iv) U.S. Patent No. 9,367,144B2, filed March 13, 2013, titled "Methods, systems, and media for providing a remote control interface for a media playback device" (Published Application No. 2012/0272148, which later issued as the '251 patent, is cited on face of the issued Google patent);

(v) U.S. Patent Application Pub. No. 2015/0046812 A1, filed August 11, 2014, titled "Dynamic resizable media item player" (Published Application No. 2012/0027214[8], which later issued as the '251 patent, was one of three references identified by Google on December 4, 2017) (this patent application was later abandoned by Google);

(vi) U.S. Patent No. 10,873,616B1, filed December 10, 2013, titled "Providing content to co-located devices with enhanced presentation characteristics" (Published Application No. 2012/0272147, which later issued as the '289 patent, and Published Application No. 2013/0124759, which later issued as the '528 patent, is cited on the face of the issued Google patent);

(vii) U.S. Patent No. 10,412,143B2, filed June 24, 2015, titled "Methods, systems, and media for presenting content based on user preferences of multiple users in the presence of a media presentation device" (Published Application No. 2012/0272147, which later issued as the '289 patent, is cited on the face of the issued Google patent);

(viii) U.S. Patent No. 10,306,323B2, filed December 7, 2016, titled "Fast television channel change initiated from a second screen device" (the '528 patent is cited on the face of the issued Google patent);

(ix) U.S. Patent No. 9,712,776B2, filed March 15, 2013, titled "Interfacing a television with a second device" (the '251 patent is cited on the face of the issued Google patent);

(x) U.S. Patent No. 9,992,307B2, filed February 3, 2015, titled "Interoperability of discovery and connection protocols between client devices and first screen devices" (the '251 patent and Published Application No. 2012/0272148, which later issued as the '251 patent, are both cited on face of the issued Google patent);

(xi) U.S. Patent No. 10,659,518B2, filed March 18, 2019, titled "Contextual Remote Control" (Published Application No. 2012/0272148, which later issued as the '251 patent, is cited on face of the issued Google patent);

(xii) U.S. Patent No. 10,969,950B2, filed May 19, 2015, titled "Dynamic Resizable Media Item Player" (Published Application No. 2012/0272148, which later issued as the '251 patent, is cited on face of the issued Google patent)

(xiii) International Application Publication No. WO 2015/200531, filed June 24, 2015, titled "Methods, Systems and Media for Presenting Content Based on User Preferences of Multiple Users in the Presence of a Media Presentation Device" (Published Application No. 2012/0272147, which later issued as the '289 patent, was cited to Google in a September 25, 2015 International Search Report);

SAppx622

Case: 24-2024    Document: 23-2    Page: 47    Filed: 11/18/2024

Case 4:22-cv-05246-HSG    Document 46    Filed 09/13/23    Page 43 of 88
Case 6:21-cv-00569-ADA    Document 1    Filed 06/04/21    Page 11 of 32

(xiv) U.S. Patent Application Pub. No. 2016/0149982 A1, filed May 19, 2015, titled "Dynamic resizable media item player" (Published Application No. 2012/00272148, which later issued as the '251 patent, was identified by Google on July 17, 2018) (this patent application was later abandoned by Google).

42.    As such, Google knew about the patent applications leading to the Touchstream Patents by no later than December 2011.

43.    Google also knew, or at the very least should have known, of the issued Touchstream Patents on or shortly after the date each such patent was issued, beginning with the '251 Patent that issued in January 2013.

44.    At no point in 2011, 2012, or 2013 did Google reach out to Touchstream about potentially acquiring a license to Touchstream's pending or awarded patents, and to this day Google has not requested or received a license to any of the Touchstream Patents.

**GOOGLE UNVEILS ITS INFRINGING CHROMECAST SERVICES**

45.    Google unveiled its Chromecast product—which performs the infringing Chromecast functionalities—in July 2013 at a price of $35 per unit.[17]

46.    As of October 4, 2017, Google announced it had sold 55 million Chromecast units.[18]

---

[17] Matt Burns, *Google Launches The $35 Chromecast Streaming Device To Bring Chrome To The Living Room*, Tech Crunch (July 24, 2013, 11:51 AM CDT) https://techcrunch.com/2013/07/24/google-chromecast/?_ga=2.60674024.478449141.1620755451-2045144417.1620755450.
[18] Emil Protalinski, *Google has sold 55 million Chromecasts, up from 30 million in July 2016*, VentureBeat (Oct. 4, 2017) https://venturebeat.com/2017/10/04/google-has-sold-55-million-chromecasts-up-from-30-million-in-july-2016/.

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                    Page 11

Case: 24-2024      Document: 23-2      Page: 48      Filed: 11/18/2024

Case 4:22-cv-05246-HSG   Document 46   Filed 09/13/23   Page 44 of 88
Case 6:21-cv-00569-ADA   Document 1   Filed 06/04/21   Page 12 of 32

47.     Google's financial benefit from its Chromecast product is not, however, limited to revenue from the sale Chromecast units.  For instance, the accused Chromecast functionalities also increase ad revenue to Google and support the collection of data that is valuable to Google.

## THE ACCUSED CHROMECAST FUNCTIONALITIES

48.     The accused Chromecast functionalities comprise the methods performed through operation of at least the standalone Chromecast devices (e.g., the Chromecast 1st Generation, Chromecast 2nd Generation, Chromecast 3rd Generation, Chromecast Ultra, and Chromecast with Google TV), as well as devices implementing Chromecast built-in (collectively, "Chromecast" or "the Chromecast products") described in ¶¶ 49-62, *infra*.  The Chromecast products did provide in the past, and continue to provide, functionality and structure that facilitates the controlling of presentation content, such as audio and/or video content, on a content presentation device that loads any one of a plurality of different media players (YouTube, e.g.), for instance as illustrated below.



*Source: https://www.youtube.com/watch?v=GbXeZ16FoCY (2013 Google presentation on Chromecast functionality).*

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                    Page 12

49.     Upon initial operation, the Chromecast is connected to a device having a screen (e.g., a television).  The Chromecast may prompt the user, via the screen, to download and open the Google Home application (or "app") on the user's mobile device (e.g., a smartphone or tablet).  Upon opening the Google Home application on the mobile device, the user is shown the option to "Set up Chromecast."  Upon choosing this option, the Google Home application searches for devices and locates the Chromecast.  The application then prompts the user to set up the Chromecast device.  The mobile device and the Chromecast may be linked via a display of matching alphanumeric codes on the mobile device and display screen.  The Google Home application running on the mobile device prompts for confirmation that the alphanumeric codes match.  Upon receiving confirmation, the Google Home app and Chromecast are linked.

50.     The Chromecast prompts the user to specify the Chromecast's location (e.g., bedroom or living room) via the Google Home app.  Upon receiving location information, the Chromecast further prompts for a "custom room name" (or "friendly name") (e.g., "Master Bedroom" or "Living Room"), which the user provides.  An example of this is provided below.

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                    Page 13

SAppx625




*Exemplary assignment of custom room name on Chromecast 3rd Generation.*

That friendly name is then assigned to the Chromecast device by Google for future reference. Next, the Chromecast prompts for internet connection information (such as the user's preferred Wi-Fi network) and connects to the internet.

51.    Once connected to the internet, the Chromecast may present a tutorial screen from which the user can, for instance, choose a sample video clip and learn how to cast it for playback on the display screen via the Chromecast. When the user touches a video clip on the mobile device, a prompt appears on the mobile device screen instructing the user to tap the "Cast" button and select the Chromecast to be used for casting (e.g., "Master Bedroom"). An example of this is provided below.

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                Page 14

Case: 24-2024      Document: 23-2      Page: 51      Filed: 11/18/2024

Case 4:22-cv-05246-HSG   Document 46   Filed 09/13/23   Page 47 of 88
Case 6:21-cv-00569-ADA   Document 1   Filed 06/04/21   Page 15 of 32

 

*Exemplary tutorial screens on Chromecast 3rd Generation*

Upon touching cast, a casting session is established and the video clip begins playback on the display screen via the Chromecast.

52.   The Chromecast is enabled to cast content from a mobile device to a display screen for thousands of both Android and iPhone applications, including video streaming services such as YouTube, Google Play, Netflix, Hulu, Prime Video, Disney Plus, as well as audio streaming services such as Spotify and Pandora, as indicated e.g. on the cover of the box in which the Chromecast 3rd Generation is packaged and sold:

SAppx627

Case: 24-2024     Document: 23-2     Page: 52     Filed: 11/18/2024

Case 4:22-cv-05246-HSG   Document 46   Filed 09/13/23   Page 48 of 88
Case 6:21-cv-00569-ADA   Document 1   Filed 06/04/21   Page 16 of 32



By pressing the "Cast" button in any Chromecast-compatible app running on a user's mobile device, the user can stream content from the app to a selected Chromecast device and view the content on a television or other display screen connected to the Chromecast.

53.     Following initial setup, Google periodically pushes software and firmware updates for the Chromecast products, which are downloaded and installed automatically by the Chromecast when it is powered on and connected to the internet.[19]  Google also requires Chromecast users and developers to abide by Google's terms of service.[20]

54.     At the outset of a casting session, the Chromecast-compatible app running on the mobile device (e.g., YouTube or Netflix) causes messages to be sent from the mobile device and

---

[19] *See* https://support.google.com/chromecast/answer/6292664?hl=en.
[20] *See* https://support.google.com/cast-developer/answer/4513288?hl=en;
https://developers.google.com/cast/docs/terms; https://developers.google.com/terms/;
https://policies.google.com/terms?hl=en-US;

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                              Page 16

received by a server system implemented by Google.   These messages relate generally to authentication, selection of the device to cast to, and selection of the casting content.

55.    The messages sent from the mobile device and received by the server system include a "networkAddress," such as an IP address of the Chromecast device, which is assigned to and uniquely identifies the equipment.   The messages also include the Chromecast's user-assignable "friendlyName," such as "Living Room" or "Master Bedroom."   The "networkAddress" and "friendlyName" are locally unique to the particular Chromecast within the user's local access network.   See example, below.   On information and belief, the server system stores a record based on these messages associating the mobile device with the Chromecast, for instance so that an app running on the mobile device continually recognizes which Chromecast device (e.g., "Living Room") is currently casting and can be controlled.



*Source: https://support.google.com/chromecast/answer/2995235?hl=en.*

56.    The messages sent from the mobile device and received by the server system include messaging that specifies a media file (e.g., audio or video) to be acted upon.   The media

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                    Page 17

Case: 24-2024    Document: 23-2    Page: 54    Filed: 11/18/2024

Case 4:22-cv-05246-HSG   Document 46   Filed 09/13/23   Page 50 of 88
Case 6:21-cv-00569-ADA   Document 1   Filed 06/04/21   Page 18 of 32

file to be acted upon may be specified by providing, for instance, the uniform resource locator (URL) of the media file, for instance as specified by the contentURL property of the GCKMediaInformationBuilder class in the iOS Sender API,[21] which class is further used to build GCKMediaInformation instances that describe a media item to load.[22]

57.    The messages sent from the mobile device and received by the server system further include messaging that identifies an application for playing content from the specified media file. The appropriate application may be identified by providing, for instance, information about the MIME type of the content to be played or by providing an app ID ("applicationID") corresponding to a particular receiver application to be used to play back the content from the media file. Google uses the app ID to locate the appropriate receiver application, for example via a "resolved URL associated with the app ID."[23] The receiver application may then be "downloaded from the network" and loaded onto the Chromecast via the resolved URL.[24] The receiver application "provides an interface to display the app's content on the TV" or other display device, and "handles messages from the sender application to control content on the receiver device."[25] The messages sent from the mobile device and received by the server system also specify the accompanying media codecs needed for playback of different types of content (audio, video, etc.) such as mp3, HE-AAC, h.264, or VP9, as described at https://developers.google.com/cast/docs/media. On information and belief, loading the receiver app includes loading one or more corresponding

---

[21] *See* https://developers.google.com/cast/docs/reference/ios/interface_g_c_k_media_information_build er.
[22] https://developers.google.com/cast/docs/reference/ios/interface_g_c_k_remote_media_client
[23] *See* https://developers.google.com/cast/docs/caf_receiver/basic.
[24] *Id.*
[25] *See* https://developers.google.com/cast/docs/web_receiver.

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                    Page 18

SAppx630

Case: 24-2024    Document: 23-2    Page: 55    Filed: 11/18/2024

Case 4:22-cv-05246-HSG    Document 46    Filed 09/13/23    Page 51 of 88
Case 6:21-cv-00569-ADA    Document 1    Filed 06/04/21    Page 19 of 32

application programming interfaces (APIs) such as the "Web Receiver API" accessed by a reference in the app.[26]

58.    The Chromecast-compatible app running on the mobile device allows the user to touch "Play," "Resume," or equivalent on the mobile device screen so as to cast the media to the Chromecast and control playback.  An example is shown below.



Source: https://support.google.com/chromecast/answer/2995235?hl=en.

_____

[26] *See* https://developers.google.com/cast/docs/web_receiver/basic ("Your Web Receiver app accesses the Web Receiver API with the following reference: <script src="//www.gstatic.com/cast/sdk/libs/caf_receiver/v3/cast_receiver_framework.js"></script>"); *see also id.* at discussion of "major classes" associated with the Web Receiver SDK framework, including cast.framework.CastReceiverContext which "manages overall framework and loads any necessary libraries.")

SAppx631

Case: 24-2024     Document: 23-2     Page: 56     Filed: 11/18/2024

Case 4:22-cv-05246-HSG   Document 46   Filed 09/13/23   Page 52 of 88
Case 6:21-cv-00569-ADA   Document 1   Filed 06/04/21   Page 20 of 32



*Source: https://support.google.com/chromecast/answer/2995235?hl=en.*



*Source: https://support.google.com/chromecast/answer/2995235?hl=en.*

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                    Page 20

Case: 24-2024     Document: 23-2     Page: 57     Filed: 11/18/2024

Case 4:22-cv-05246-HSG     Document 46     Filed 09/13/23     Page 53 of 88
Case 6:21-cv-00569-ADA     Document 1     Filed 06/04/21     Page 21 of 32



*Source: https://support.google.com/chromecast/answer/2995235?hl=en.*

The class GCKUIMediaController is "a controller for UI views that are used to control or display the status of media playback on a Cast receiver" such as the receiver application running on the Chromecast.[27] The controller "responds to touch events on the controls [e.g., on the mobile device] by issuing the appropriate media commands to the receiver."[28] Among the controls associated with the controller are "a 'play' button" (playButton) and "a 'pause' button" (pauseButton).[29] Further, "Google Cast sender applications control the playback on the receiver device by sending messages in JSON format to the receiver application."[30] Among the JSON messages are "commands from the sender that change the player state," including "Play" ("Begins playback of the content that was loaded with the load call, playback is continued from the current time

---

[27] *See*
https://developers.google.com/cast/docs/reference/ios/interface_g_c_k_u_i_media_controller.
[28] *Id.*
[29] *Id.*
[30] *See* https://developers.google.com/cast/docs/reference/messages,

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                          Page 21

Case: 24-2024      Document: 23-2      Page: 58      Filed: 11/18/2024

Case 4:22-cv-05246-HSG   Document 46   Filed 09/13/23   Page 54 of 88
Case 6:21-cv-00569-ADA   Document 1   Filed 06/04/21   Page 22 of 32

position), "Pause" ("Pauses playback of the current content"), "Seek" ("Sets the current position in the stream"), and "Stop" ("Stops playback of the current content").[31]

59.     According to the Google Cast SDK Additional Developer Terms of Service, "Cast media application[s] must use these messages as defined here"—e.g., "Play," "Pause," "Seek," and "Stop"—to control media playback on the receiver application running on the Chromecast.[32] "Doing so provides the media app with a consistent user experience across platforms and it ensures that a Cast application will support new and future use cases."[33]

60.     On information and belief, the server system receives text-based JSON commands and converts them into code that can be executed by the Chromecast devices.  The Chromecast then executes the retrieved programming code so as to control playback of the specified media file—that is, to play, pause, or stop, e.g., playback of the audio or video streaming on the Chromecast in response to user commands sent from the Chromecast-compatible app running on the mobile device.

61.     Further, during a cast session, on information and belief, Google stores information relating to the source of the media file, the media file itself, the particular receiver app, and playback control commands for statistical purposes, so that playback can be resumed in the event of a crash, and for purposes of allowing another user to take over and control the content streaming on the Chromecast from a separate mobile device.  The Cast receiver API development framework includes the class PlayerData, whose variables include "applicationData," "media" ("current media information"), "metadata" ("media metadata"), "state" ("current player state"), and

---

[31] *Id.*
[32] *Id.*
[33] *Id.*

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                    Page 22

Case: 24-2024    Document: 23-2    Page: 59    Filed: 11/18/2024

Case 4:22-cv-05246-HSG    Document 46    Filed 09/13/23    Page 55 of 88
Case 6:21-cv-00569-ADA    Document 1    Filed 06/04/21    Page 23 of 32

"supportedMediaCommands" ("the commands supported by this player").[34] The Cast receiver API development framework also includes a state object, cast.framework.messages.SessionState, which "contain[s] all data to be stored in StoreSession and to be recovered in ResumeSession."[35] On information and belief, a receiver application running on the Chromecast retrieves the information associated with these classes from a database to restore content when playback resumes.

62.    Through the managing of the Chromecast by the server, and through the Chromecast's processing of messaging sent by the Chromecast-compatible app running on the mobile device—as described at ¶¶ 54-61, *supra*—the Chromecast allows the user to consume media content on a remote device, separate from the user's mobile device, where the app for playing the media and the media content may further be downloaded from the user's content delivery network (CDN) rather than from the mobile device itself.  The user is therefore free to use his or her mobile device for other purposes during playback of the media on the remote device via the Chromecast.  See example below.

---

[34] *See*
https://developers.google.com/cast/docs/reference/web_receiver/cast.framework.ui.PlayerData.
[35] *See*
https://developers.google.com/cast/docs/reference/web_receiver/cast.framework.messages.SessionState.

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                    Page 23





ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                    Page 24

SAppx636





*Source: https://www.youtube.com/watch?v=GbXeZ16FoCY (2013 Google demonstration of Chromecast functionality).*

63.    Each of the steps discussed above is either performed by or otherwise attributable to Google.  To the extent another actor performs any of these steps, Google directs or controls that performance, conditioning participation in the activity or the receipt of a benefit upon performance of the patented method steps, and establishing the manner or timing of that performance. Additionally, Google profits from its infringement and has the right and ability to stop or limit the infringement.  For instance, Google tests and demonstrates the accused functionality, including in

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                    Page 25

Case: 24-2024     Document: 23-2     Page: 62     Filed: 11/18/2024

Case 4:22-cv-05246-HSG   Document 46   Filed 09/13/23   Page 58 of 88
Case 6:21-cv-00569-ADA   Document 1   Filed 06/04/21   Page 26 of 32

advertisements.   Further, Google advertises and demonstrates to customers, and directs to Chromecast developers, that the infringing method steps will be performed, as shown above. Further, Google causes automatic updates to the Chromecast.   As discussed below, the functionality advertised and directed by Google infringes the Touchstream Patents, and on information or belief, is known by Google to do so.

## COUNT I: INFRINGEMENT OF THE '251 PATENT

64.     Touchstream adopts and incorporates by reference the allegations set forth in ¶¶ 1-63, *supra*.

65.     Google directly infringes at least claim 1 of the '251 patent by performing the methods described in ¶¶ 48-63, *supra*.

66.     For example, Google performs the machine-implemented method of controlling presentation of video content on a display device that loads any one of a plurality of different media players. *See, e.g.*, ¶¶ 54-62, *supra*.   Google further assigns, by a server system, a synchronization code to the display device. *See, e.g.*, ¶ 50, *supra*.   Google further receives, in the server system, a message from a personal computing device that is separate from the server system and separate from the display device, wherein the message includes the synchronization code. *See, e.g.*, ¶¶ 54-55, *supra*.   Google further stores, by the server system, a record establishing an association between the personal computing device and the display device based on the synchronization code. *See, e.g.*, ¶ 55, *supra*.  Google further receives, in the server system, one or more signals from the personal computing device, the one or more signals specifying a video file to be acted upon and identifying a particular media player for playing the video content, the one or more signals further including a universal playback control command for controlling playing of the video content on the display device by the particular media player. *See, e.g.*, ¶¶ 56-60, *supra*. Google further converts, by the server system, the universal playback control command into

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                               Page 26

Case: 24-2024　　Document: 23-2　　Page: 63　　Filed: 11/18/2024

Case 4:22-cv-05246-HSG　Document 46　Filed 09/13/23　Page 59 of 88
Case 6:21-cv-00569-ADA　Document 1　Filed 06/04/21　Page 27 of 32

corresponding programming code to control playing of the video content on the display device by the particular media player, wherein converting the universal playback control command includes selecting from among a plurality of specific commands, each of which represents a corresponding playback control command for a respective media player. *See, e.g.*, ¶ 60, *supra*. Google further stores, in a database associated with the server system, information for transmission to or retrieval by the display device, wherein the information specifies the video file to be acted upon, identifies the particular media player for playing the video content, and includes the corresponding programming code to control playing of the video content on the display device by the particular media player in accordance with the universal playback control command. *See, e.g.*, ¶ 61, *supra*.

67. Google's infringement of the '251 patent has been, is, and continues to be willful, including Google's infringement of at least claim 1, as described at ¶¶ 34-44, *supra*.

68. Touchstream has been and will continue to be irreparably harmed by Google's infringing acts, requiring the entry of a permanent injunction to prevent Google's further infringement of the '251 patent because Touchstream does not have another adequate remedy at law.

## COUNT II: INFRINGEMENT OF THE '528 PATENT

69. Touchstream adopts and incorporates by reference the allegations set forth in ¶¶ 1-68, *supra*.

70. Google directly infringes at least claim 1 of the '528 patent by performing the methods described in ¶¶ 48-63, *supra*.

71. For example, Google performs the method of controlling presentation of content on a content presentation device that loads any one of a plurality of different media players. *See, e.g.*, ¶¶ 54-62, *supra*. Google further receives, in a server system, one or more messages from a personal computing device that is separate from the server system and separate from the content

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT　　　　　　　　　　　Page 27

Case: 24-2024     Document: 23-2     Page: 64     Filed: 11/18/2024

Case 4:22-cv-05246-HSG   Document 46   Filed 09/13/23   Page 60 of 88
Case 6:21-cv-00569-ADA   Document 1   Filed 06/04/21   Page 28 of 32

presentation device, wherein the one or more messages, taken together, include information associated with a synchronization code assigned to the content presentation device, specify a file to be acted upon, identify a particular media player for playing content from the file, identify a location of the particular media player, and include an action control command for presentation of the content on the content presentation device by the particular media player, the action control command being independent of the particular media player. *See, e.g.,* ¶¶ 54-60, *supra.* Google further uses the information associated with the synchronization code to store a record establishing an association between the personal computing device and the content presentation device. *See, e.g.,* ¶ 55, *supra.* Google further identifies, by the server system, programming code corresponding to the action control command, wherein the programming code is for controlling presentation of the content by the content presentation device using the particular media player. *See, e.g.,* ¶ 60, *supra.* Google further obtains, by the content presentation device, the particular media player, wherein the particular media player is obtained over a network from a content provider. *See, e.g.,* ¶ 57, *supra.* Google further loads the particular media player in the content presentation device. *See, e.g.,* ¶ 57, *supra.* Google further uses the particular media player to execute the programming code with respect to the file. *See, e.g.,* ¶ 57, *supra.*

72.     Google's infringement of the '528 patent has been, is, and continues to be willful, including Google's infringement of at least claim 1, as described at ¶¶ 34-44, *supra.*

73.     Touchstream has been and will continue to be irreparably harmed by Google's infringing acts, requiring the entry of a permanent injunction to prevent Google's further infringement of the '528 patent because Touchstream does not have another adequate remedy at law.

Case: 24-2024     Document: 23-2     Page: 65     Filed: 11/18/2024

Case 4:22-cv-05246-HSG    Document 46    Filed 09/13/23    Page 61 of 88
Case 6:21-cv-00569-ADA    Document 1    Filed 06/04/21    Page 29 of 32

## COUNT III: INFRINGEMENT OF THE '289 PATENT

74.     Touchstream adopts and incorporates by reference the allegations set forth in ¶¶ 1-73, *supra.*

75.     Google directly infringes at least claims 1 and 6 of the '289 patent by performing the methods described in ¶¶ 48-63, *supra.*

76.     For example, Google performs the method of controlling presentation of content on a content presentation device that loads any one of a plurality of different media players. *See, e.g.,* ¶¶ 54-62, *supra.* Google further receives, in a server system, one or more messages from a personal computing device that is separate from the server system and separate from the content presentation device, wherein the one or more messages, taken together, (i) include information associated with a unique identification code assigned to the content presentation device, (ii) specify a file to be acted upon, (iii) identify a particular media player for playing content from the specified file, wherein the media player is a computer application operable to present content and control presentation of the content, (iv) identify a location of the particular media player, and (v) include an action control command for presentation of the content on the content presentation device by the particular media player, the action control command being independent of the particular media player. *See, e.g.,* ¶¶ 54-60, *supra.* Google further uses the information associated with the unique identification code to store a record establishing an association between the personal computing device and the content presentation device. *See, e.g.,* ¶ 55, *supra.* Google further identifies, by the server system, programming code corresponding to the action control command, wherein the programming code is for controlling presentation of the content by the content presentation device using the particular media player, wherein, based on information received or retrieved from the server system, the content presentation device uses the particular media player to execute the programming code with respect to the file. *See, e.g.,* ¶ 60, *supra.* Google further loads, by the

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT        Page 29

server system, a set of protocols or application programming interfaces from a library based on the identity of the particular media player. *See, e.g.*, ¶ 57, *supra*. Google further identifies, based on the set of protocols or application programming interfaces, programming code corresponding to the action control command, wherein the programming code is for controlling presentation of the content by the content presentation device using the particular media player, wherein, based on information received or retrieved from the server system, the content presentation device uses the particular media player to execute the programming code with respect to the file. *See, e.g.*, ¶ 60, *supra*.

77.    Google's infringement of the '289 patent has been, is, and continues to be willful, including Google's infringement of at least claims 1 and 6, as described at ¶¶ 34-44, *supra*.

78.    Touchstream has been and will continue to be irreparably harmed by Google's infringing acts, requiring the entry of a permanent injunction to prevent Google's further infringement of the '289 patent because Touchstream does not have another adequate remedy at law.

## JURY DEMAND

79.    Touchstream demands a trial by jury on all issues.

## PRAYER FOR RELIEF

WHEREFORE, Touchstream requests entry of a judgment in its favor and against Google as follows:

a)    Judgment that Google has directly infringed one or more claims of the Touchstream Patents;

b)    An award of damages to compensate for Google's infringement, including damages pursuant to 35 U.S.C. § 284, as well as prejudgment and post-judgment interest.

ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT                                         Page 30

Case: 24-2024    Document: 23-2    Page: 67    Filed: 11/18/2024

Case 4:22-cv-05246-HSG    Document 46    Filed 09/13/23    Page 63 of 88
Case 6:21-cv-00569-ADA    Document 1    Filed 06/04/21    Page 31 of 32

c)    An award of costs and expenses in this action, including an award of Touchstream's reasonable attorneys' fees pursuant to 35 U.S.C. § 285;

d)    A permanent injunction restraining and enjoining Google, and its respective officers, agents, servants, employees, attorneys, and those persons in active concert or participation with Google who receive actual notice of the order by personal service or otherwise, from any further sales or use of their infringing products and/or services and any other infringement of the Touchstream Patents;

e)    A finding that Google has willfully infringed and is willfully infringing one or more claims of one or more of the Touchstream Patents;

f)    A finding that this case is an exceptional case, and awarding treble damages due to Google's deliberate and willful conduct, and ordering Google to pay Touchstream's costs of suit and attorneys' fees; and

g)    For such other and further relief as the Court may deem just, proper, and equitable under the circumstances.

SAppx643

Case: 24-2024     Document: 23-2     Page: 68     Filed: 11/18/2024

Case 4:22-cv-05246-HSG   Document 46   Filed 09/13/23   Page 64 of 88
Case 6:21-cv-00569-ADA   Document 1   Filed 06/04/21   Page 32 of 32

Dated: June 4, 2021

/s/ Fiona A. Bell
Fiona A. Bell (TX Bar No. 24052288)
**SHOOK, HARDY & BACON L.L.P.**
600 Travis Street, Suite 3400
Houston, TX 77002
(713) 227-2008
Fax: 713-227-9508
Email: fbell@shb.com

***Counsel for Plaintiff***
***Touchstream Technologies, Inc.***

SAppx644

# Exhibit B

Case: 24-2024     Document: 23-2     Page: 70     Filed: 11/18/2024

Case 4:22-cv-05246-HSG    Document 46    Filed 09/13/23    Page 66 of 88
Case 6:21-cv-00569-ADA    Document 73    Filed 06/29/22    Page 1 of 23

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**WACO DIVISION**

| | | |
|---|---|---|
| **TOUCHSTREAM TECHNOLOGIES, INC.,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| v. | § | Civil Case No. 6:21-cv-569-ADA |
| | § | |
| **GOOGLE LLC,** | § | **JURY TRIAL DEMANDED** |
| | § | |
| *Defendant.* | § | |
| | § | |

**DEFENDANT GOOGLE LLC'S ANSWER TO**
**THE ORIGINAL COMPLAINT FOR PATENT INFRINGEMENT**

Defendant Google LLC ("Google") hereby responds to the Original Complaint (Dkt. No. 1) of Plaintiff Touchstream Technologies, Inc. d/b/a Shodogg ("Plaintiff" or "Touchstream") with the following Answer and Affirmative Defenses. Google denies the allegations and characterizations in Touchstream's Complaint unless expressly admitted in the following numbered paragraphs, which correspond to the numbered paragraphs in the Complaint.

**THE PARTIES**

1.      Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

2.      Google admits that Google LLC is a Delaware limited liability company with its principal place of business at 1600 Amphitheatre Parkway, Mountain View, CA 94043. Google admits that it maintains an office located at 500 West 2nd Street, Austin, Texas 78701 that is within the Western District of Texas. Google admits that it may be served with process through its registered agent CSC – Lawyers Incorporating Service Company, at 211 E. 7th Street, Suite 620, Austin, Texas 78701. Google admits that it is currently registered to do business in the State of Texas since at least November 17, 2006. Google denies any remaining allegations of this

Case: 24-2024    Document: 23-2    Page: 71    Filed: 11/18/2024

Case 4:22-cv-05246-HSG    Document 46    Filed 09/13/23    Page 67 of 88
Case 6:21-cv-00569-ADA    Document 73    Filed 06/29/22    Page 2 of 23

paragraph.

## NATURE OF THE ACTION

3.      Google admits that this action invokes the United States patent laws, 35 U.S.C. §§ 271, *et seq.* for the purported infringement of United States Patent Nos. 8,356,251 (the "'251 patent"), 8,782,528 (the "'528 patent"), and 8,904,289 (the "'289 patent") (collectively, "the Touchstream Patents"). Google admits that Exhibits 1, 2, and 3 of the Complaint appear to be copies of the Touchstream Patents, but Google lacks sufficient information to verify their authenticity. Google denies any remaining allegations in this paragraph.

## JURISDICTION AND VENUE

4.      Google admits that this action invokes the United States patent laws, 35 U.S.C. §§ 1, *et seq*. To the extent Touchstream has standing to bring this suit, Google admits that this Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a) over patent law claims. Google denies any remaining allegations of this paragraph.

5.      This paragraph sets forth argument and legal conclusions to which no response is required. To the extent this paragraph includes any allegations to which a response is required, Google denies them, and specifically denies that it has committed acts of infringement in this District or any other district.

6.      Google admits that venue is proper in this District for purposes of this particular action but not convenient or in the interests of justice under 28 U.S.C. § 1404(a). *See generally* Dkt. 26, 27, 50, 51. Google admits that it maintains an office in this District and is registered to do business in the State of Texas. Google admits that it offers products and services in this District. Any remaining allegations in this paragraph consist of argument and legal conclusions, to which no response is required, but to the extent a response is required, Google denies the allegations, and

SAppx647

Case: 24-2024      Document: 23-2      Page: 72      Filed: 11/18/2024

Case 4:22-cv-05246-HSG    Document 46    Filed 09/13/23    Page 68 of 88
Case 6:21-cv-00569-ADA    Document 73    Filed 06/29/22    Page 3 of 23

specifically denies that it has committed acts of infringement in this District or any other district.

7.      Google admits that it has an office in this District at 500 West 2nd Street, Austin, Texas 78701 and is registered to do business in the State of Texas. Any remaining allegations in this paragraph consist of argument and legal conclusions, to which no response is required, but to the extent a response is required, Google denies the allegations.

8.      To the extent the allegations in paragraph 8 purport to describe or quote one or more documents or webpages, Google states that those documents or webpages are the best source of their full content and context. Google denies any remaining allegations in this paragraph.

9.      To the extent the allegations in paragraph 9 purport to describe or quote one or more documents or webpages, Google states that those documents or webpages are the best source of their full content and context. Google admits that as of the filing of the Original Complaint, it owned or leased office space in Austin at 100 Congress Ave., 901 E. Fifth St., and 500 W. Second St. Google denies any remaining allegations in this paragraph.

10.     To the extent the allegations in paragraph 10 purport to describe or quote one or more documents or webpages, Google states that those documents or webpages are the best source of their full content and context. Google admits that as of the filing of the Original Complaint, Google employed over 1,100 persons in Austin. Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph relating to job postings, and therefore denies them. Google denies any remaining allegations in this paragraph.

11.     This paragraph sets forth argument and legal conclusions to which no response is required. To the extent this paragraph includes any allegations to which a response is required, Google denies them, and specifically denies that it has committed acts of infringement in this District or any other district.

3

Case: 24-2024    Document: 23-2    Page: 73    Filed: 11/18/2024

Case 4:22-cv-05246-HSG    Document 46    Filed 09/13/23    Page 69 of 88
Case 6:21-cv-00569-ADA    Document 73    Filed 06/29/22    Page 4 of 23

12.    Google admits that certain Chromecast products are sold in this District including at one or more of the retailers named in paragraph 12. Google is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of this paragraph, and therefore denies them.

13.    To the extent the allegations in paragraph 13 purport to describe or quote one or more documents or webpages, Google states that those documents or webpages are the best source of their full content and context. Google states the following: Google uses a tiered network to deliver content to its users. The core of the network is Google's data centers which provide computation and backend storage. The next tier of Google's network infrastructure is known as "Edge Points of Presence" ("PoPs"), which connects Google's network to the rest of the internet. The last tier of the network is the "Google Global Cache" ("GGC") servers or "edge nodes." GGC servers are off-the-shelf computers hosted in the facilities of a local Internet Service Provider ("ISP"), at the request of the ISP. If an ISP chooses to host a GGC server and a copy of portions of certain digital content is temporarily stored or "cached" on the GGC server, content requested by an end user can be fetched from the GGC within the ISPs network, so the request does not use long haul capacity to do so. GGC servers, though, are not necessary for the delivery of Google content. Google denies any remaining allegations in this paragraph.

14.    To the extent the allegations in paragraph 14 purport to describe or quote one or more documents or webpages, Google states that those documents or webpages are the best source of their full content and context. Google states the following: Google uses a tiered network to deliver content to its users. The core of the network is Google's data centers which provide computation and backend storage. Google admits that a Google data center is located in Midlothian, Texas, which is within the Northern District of Texas. Google denies any remaining

4

Case: 24-2024     Document: 23-2     Page: 74     Filed: 11/18/2024

Case 4:22-cv-05246-HSG     Document 46     Filed 09/13/23     Page 70 of 88
Case 6:21-cv-00569-ADA     Document 73     Filed 06/29/22     Page 5 of 23

allegations in this paragraph.

15.     To the extent the allegations in paragraph 15 purport to describe or quote one or more documents or webpages, Google states that those documents or webpages are the best source of their full content and context. Google states the following: Google uses a tiered network to deliver content to its users. The core of the network is Google's data centers which provide computation and backend storage. The next tier of Google's network infrastructure, the PoPs, connects Google's network to the rest of the internet. Google admits that the webpage in Paragraph 15 purports to identify at least one PoP in or around Dallas and/or Fort Worth, Texas. Google denies any remaining allegations in this paragraph.

16.     To the extent the allegations in paragraph 16 purport to describe or quote one or more documents or webpages, Google states that those documents or webpages are the best source of their full content and context. Google states the following: Google uses a tiered network to deliver content to its users. The last tier of the network, the GGC servers or edge nodes, are off-the-shelf computers hosted in the facilities of a local ISP, at the request of the ISP. If an ISP chooses to host a GGC server and a copy of portions of certain digital content is temporarily stored or "cached" on the GGC server, content requested by an end user can be fetched from the GGC within the ISPs network, so the request does not use long haul capacity to do so. GGC servers, though, are not necessary for the delivery of Google content. Google admits that the webpages in Paragraph 16 purport to identify at least one ISP-hosted GGC server in or around Dallas, Texas and Austin, Texas. Google denies any remaining allegations in this paragraph.

17.     Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

18.     Google is without knowledge or information sufficient to form a belief as to the

SAppx650

truth of the allegations of this paragraph, and therefore denies them.

19.    Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

20.    Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

**TOUCHSTREAM'S PATENTS**

21.    Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

22.    Google is without knowledge or information sufficient to form a belief as to the truth of the allegations of this paragraph, and therefore denies them.

23.    Google admits that, on their face, the Touchstream Patents are each titled "Play Control of Content on a Display Device" and purport to claim priority to U.S. Provisional Patent Application No. 61/477,998, filed on April 21, 2011. Google lacks knowledge or information sufficient to form a belief as to the truth of any remaining allegations in this paragraph, and therefore denies them.

24.    Google admits that, on its face, the '251 patent lists an issue date of January 15, 2013 and David Strober as its inventor. Google denies that the '251 patent was duly and legally issued. Google denies any remaining allegations in this paragraph.

25.    Google lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore denies them.

26.    Google admits that, on its face, the '528 patent lists an issue date of July 15, 2014 and David Strober as its inventor. Google denies that the '528 patent was duly and legally issued. Google denies any remaining allegations in this paragraph.

SAppx651

Case: 24-2024    Document: 23-2    Page: 76    Filed: 11/18/2024

Case 4:22-cv-05246-HSG    Document 46    Filed 09/13/23    Page 72 of 88
Case 6:21-cv-00569-ADA    Document 73    Filed 06/29/22    Page 7 of 23

27.     Google lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore denies them.

28.     Google admits that, on its face, the '289 patent lists an issue date of December 2, 2014 and David Strober as its inventor. Google denies that the '289 patent was duly and legally issued. Google denies any remaining allegations in this paragraph.

29.     Google lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore denies them.

## BACKGROUND

30.     Google lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore denies them.

31.     Google lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore denies them.

32.     Google lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore denies them.

33.     Google denies the allegations in paragraph 33 as they relate to Google, and specifically denies that it has committed any acts of infringement. Google is without knowledge or information sufficient to form a belief as to the truth of the remaining allegations of paragraph 33, and therefore denies them.

34.     Google lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore denies them.

35.     Google lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore denies them.

36.     Google admits that in December 2011, certain Google employees met one or more

SAppx652

Case: 24-2024     Document: 23-2     Page: 77     Filed: 11/18/2024

Case 4:22-cv-05246-HSG   Document 46   Filed 09/13/23   Page 73 of 88
Case 6:21-cv-00569-ADA   Document 73   Filed 06/29/22   Page 8 of 23

times with representatives of Touchstream. Google denies Touchstream's characterizations of those meetings in this paragraph. Google denies any remaining allegations in this paragraph.

37.     Google admits that Touchstream signed a Non-Disclosure Agreement before any meetings discussed in paragraph 36 took place. To the extent the allegations in paragraph 37 purport to describe the terms of the Non-Disclosure Agreement, Google states that the Non-Disclosure Agreement is the best source of its full content and context. Google denies any remaining allegations in this paragraph.

38.     Google admits that certain Google employees met with representatives of Touchstream over a video conference on Skype on December 22, 2011. Google denies any remaining allegations in this paragraph.

39.     Google lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore denies them.

40.     Google lacks knowledge or information sufficient to form a belief as to the truth of the allegations in this paragraph, and therefore denies them.

41.     Google admits that the '251 patent is cited on the face of U.S. Patent No. 9,841,939, which is issued to Google, was filed December 18, 2014, and is titled "Methods, systems, and media for presenting requested content on public display devices." Google admits that the '251 patent is cited on the face of U.S. Patent No. 9,916,122, which is issued to Google, was filed on December 18, 2014, and is titled "Methods, systems, and media for launching a mobile application using a public display device." Google admits that the '251 patent is cited on the face of U.S. Patent No. 9,967,320, which is issued to Google, was filed on filed December 18, 2014, and is titled "Methods, systems, and media for controlling information used to present content on a public display device." Google admits that Published Application No. 2012/0272148 is cited on the face

8

Case: 24-2024    Document: 23-2    Page: 78    Filed: 11/18/2024

Case 4:22-cv-05246-HSG    Document 46    Filed 09/13/23    Page 74 of 88
Case 6:21-cv-00569-ADA    Document 73    Filed 06/29/22    Page 9 of 23

of U.S. Patent No. 9,367,144, which is issued to Google, was filed on filed March 13, 2013, and is titled "Methods, systems, and media for providing a remote control interface for a media playback device." Google admits that Published Application No. 2012/0027214 was identified by Google on December 4, 2017 during prosecution of U.S. Patent Application Pub. No. 2015/0046812, which was filed on August 11, 2014 and is titled "Dynamic resizable media item player. Google admits that U.S. Patent Application Pub. No. 2015/0046812 was abandoned by Google. Google admits that Published Application No. 2012/0272147 and Published Application No. 2013/0124759 are cited on the face of U.S. Patent No. 10,873,616, which is issued to Google, was filed December 10, 2013, and is titled "Providing content to co-located devices with enhanced presentation characteristics." Google admits that Published Application No. 2012/0272147 is cited on the face of U.S. Patent No. 10,412,143, which is issued to Google, was filed on June 24, 2015, and is titled "Methods, systems, and media for presenting content based on user preferences of multiple users in the presence of a media presentation device." Google admits that the '528 patent is cited on the face of U.S. Patent No. 10,306,323, which is issued to Google, was filed on December 7, 2016, and is titled "Fast television channel change initiated from a second screen device." Google admits that the '251 patent is cited on the face of U.S. Patent No. 9,712,776, which is issued to Google, was filed on March 15, 2013, and is titled "Interfacing a television with a second device." Google admits that the '251 patent and Published Application No. 2012/0272148 are cited on the face of U.S. Patent No. 9,992,307, which is issued to Google, was filed on February 3, 2015, and is titled "Interoperability of discovery and connection protocols between client devices and first screen devices." Google admits that Published Application No. 2012/0272148 is cited on the face of U.S. Patent No. 10,659,518, which is issued to Google, was filed on March 18, 2019, and is titled "Contextual Remote Control." Google admits that Published Application No.

9

Case: 24-2024    Document: 23-2    Page: 79    Filed: 11/18/2024

Case 4:22-cv-05246-HSG   Document 46   Filed 09/13/23   Page 75 of 88
Case 6:21-cv-00569-ADA   Document 73   Filed 06/29/22   Page 10 of 23

2012/0272148 is cited on the face of U.S. Patent No. 10,969,950, which is issued to Google, was filed on May 19, 2015, and is titled "Dynamic Resizable Media Item Player." Google admits that Published Application No. 2012/0272147 was cited in a September 25, 2015 International Search Report for International Application Publication No. WO 2015/200531, which was filed on June 24, 2015 and is titled "Methods, Systems and Media for Presenting Content Based on User Preferences of Multiple Users in the Presence of a Media Presentation Device." Google admits that Published Application No. 2012/00272148 was identified by Google during prosecution of U.S. Patent Application Pub. No. 2016/0149982, which was filed on May 19, 2015 and is titled "Dynamic resizable media item player." Google admits that U.S. Patent Application Pub. No. 2016/0149982 was abandoned by Google. Google denies any remaining allegations in this paragraph.

42.    This paragraph sets forth argument and legal conclusions to which no response is required. To the extent this paragraph includes any allegations to which a response is required, Google denies them.

43.    This paragraph sets forth argument and legal conclusions to which no response is required. To the extent this paragraph includes any allegations to which a response is required, Google denies them.

44.    Google admits that as of the filing of the Complaint, Google had not reached out to Touchstream regarding licensing any of the Touchstream patents. Google admits that as of the filing of the Complaint, Google had not requested or received a license to any of the Touchstream patents. Google denies any remaining allegations in this paragraph.

45.    To the extent the allegations in paragraph 45 purport to describe or quote one or more documents or webpages, Google states that those documents or webpages are the best source

SAppx655

Case: 24-2024    Document: 23-2    Page: 80    Filed: 11/18/2024

Case 4:22-cv-05246-HSG    Document 46    Filed 09/13/23    Page 76 of 88
Case 6:21-cv-00569-ADA    Document 73    Filed 06/29/22    Page 11 of 23

of their full content and context. Google admits that it released a Chromecast device in July 2013. Google denies any remaining allegations in this paragraph and specifically denies that it has committed acts of infringement in this District or any other district.

46.    To the extent the allegations in paragraph 46 purport to describe or quote one or more documents or webpages, Google states that those documents or webpages are the best source of their full content and context. Google denies any remaining allegations in this paragraph.

47.    This paragraph sets forth argument and legal conclusions to which no response is required. To the extent this paragraph includes any allegations to which a response is required, Google denies them, and specifically denies that it has committed acts of infringement in this District or any other district.

## THE ACCUSED CHROMECAST FUNCTIONALITIES

48.    To the extent the allegations of this paragraph concern Touchstream's definition of the terms "accused Chromecast functionalities," "Chromecast," and "the Chromecast products," they state no facts for Google to admit or deny. To the extent the allegations in paragraph 48 purport to describe or quote one or more documents or webpages, Google states that those documents or webpages are the best source of their full content and context. Google denies any remaining allegations in this paragraph and specifically denies that it has committed acts of infringement in this District or any other district.

49.    To the extent the allegations in paragraph 49 purport to describe or quote one or more documents, webpages, or application screens, Google states that those documents or webpages are the best source of their full content and context. This paragraph further sets forth argument and legal conclusions to which no response is required. To the extent this paragraph includes any allegations to which a response is required, Google denies them, and specifically

11

Case: 24-2024     Document: 23-2     Page: 81     Filed: 11/18/2024

Case 4:22-cv-05246-HSG   Document 46   Filed 09/13/23   Page 77 of 88
Case 6:21-cv-00569-ADA   Document 73   Filed 06/29/22   Page 12 of 23

denies that it has committed acts of infringement in this District or any other district.

50. To the extent the allegations in paragraph 50 purport to describe or quote one or more documents, webpages, or application screens, Google states that those documents or webpages are the best source of their full content and context. Google denies any remaining allegations in this paragraph and specifically denies that it has committed acts of infringement in this District or any other district.

51. To the extent the allegations in paragraph 51 purport to describe or quote one or more documents, webpages, or application screens, Google states that those documents or webpages are the best source of their full content and context. Google denies any remaining allegations in this paragraph and specifically denies that it has committed acts of infringement in this District or any other district.

52. To the extent the allegations in paragraph 52 purport to describe or quote one or more documents, webpages, or application screens, Google states that those documents or webpages are the best source of their full content and context. Google denies any remaining allegations in this paragraph and specifically denies that it has committed acts of infringement in this District or any other district.

53. To the extent the allegations in paragraph 53 purport to describe or quote one or more documents or webpages, Google states that those documents or webpages are the best source of their full content and context. Google denies any remaining allegations in this paragraph and specifically denies that it has committed acts of infringement in this District or any other district.

54. This paragraph sets forth argument and legal conclusions to which no response is required. To the extent this paragraph includes any allegations to which a response is required, Google denies them, and specifically denies that it has committed acts of infringement in this

12

District or any other district.

55.     To the extent the allegations in paragraph 55 purport to describe or quote one or more documents or webpages, Google states that those documents or webpages are the best source of their full content and context. This paragraph further sets forth argument and legal conclusions to which no response is required. To the extent this paragraph includes any allegations to which a response is required, Google denies them, and specifically denies that it has committed acts of infringement in this District or any other district.

56.     To the extent the allegations in paragraph 56 purport to describe or quote one or more documents or webpages, Google states that those documents or webpages are the best source of their full content and context. This paragraph further sets forth argument and legal conclusions to which no response is required. To the extent this paragraph includes any allegations to which a response is required, Google denies them, and specifically denies that it has committed acts of infringement in this District or any other district.

57.     To the extent the allegations in paragraph 57 purport to describe or quote one or more documents or webpages, Google states that those documents or webpages are the best source of their full content and context. This paragraph further sets forth argument and legal conclusions to which no response is required. To the extent this paragraph includes any allegations to which a response is required, Google denies them, and specifically denies that it has committed acts of infringement in this District or any other district.

58.     To the extent the allegations in paragraph 58 purport to describe or quote one or more documents or webpages, Google states that those documents or webpages are the best source of their full content and context. Google denies any remaining allegations in this paragraph and specifically denies that it has committed acts of infringement in this District or any other district.

SAppx658

59.     To the extent the allegations in paragraph 59 purport to describe or quote one or more documents or webpages, Google states that those documents or webpages are the best source of their full content and context. Google denies any remaining allegations in this paragraph and specifically denies that it has committed acts of infringement in this District or any other district.

60.     This paragraph sets forth argument and legal conclusions to which no response is required. To the extent this paragraph includes any allegations to which a response is required, Google denies them, and specifically denies that it has committed acts of infringement in this District or any other district.

61.     To the extent the allegations in paragraph 61 purport to describe or quote one or more documents or webpages, Google states that those documents or webpages are the best source of their full content and context. This paragraph further sets forth argument and legal conclusions to which no response is required. To the extent this paragraph includes any allegations to which a response is required, Google denies them, and specifically denies that it has committed acts of infringement in this District or any other district.

62.     To the extent the allegations in paragraph 62 purport to describe or quote one or more documents or webpages, Google states that those documents or webpages are the best source of their full content and context. This paragraph further sets forth argument and legal conclusions to which no response is required. To the extent this paragraph includes any allegations to which a response is required, Google denies them, and specifically denies that it has committed acts of infringement in this District or any other district.

63.     This paragraph sets forth argument and legal conclusions to which no response is required. To the extent this paragraph includes any allegations to which a response is required, Google denies them, and specifically denies that it has committed acts of infringement in this

Case: 24-2024    Document: 23-2    Page: 84    Filed: 11/18/2024

Case 4:22-cv-05246-HSG    Document 46    Filed 09/13/23    Page 80 of 88
Case 6:21-cv-00569-ADA    Document 73    Filed 06/29/22    Page 15 of 23

District or any other district.

## COUNT I – INFRINGEMENT OF THE '251 PATENT

64.     Google repeats and re-alleges its answers to the preceding paragraphs as if fully set forth here, as its response to paragraph 64 of Plaintiff's Complaint.

65.     This paragraph sets forth argument and legal conclusions to which no response is required. To the extent this paragraph includes any allegations to which a response is required, Google denies them, and specifically denies that it has committed any acts of infringement.

66.     This paragraph sets forth argument and legal conclusions to which no response is required. To the extent this paragraph includes any allegations to which a response is required, Google denies them, and specifically denies that it has committed acts of infringement in this District or any other district.

67.     This paragraph sets forth argument and legal conclusions to which no response is required. To the extent this paragraph includes any allegations to which a response is required, Google denies them, specifically denies that it has committed any acts of infringement, and specifically denies that Google's alleged infringement of the '251 patent has been, is, or continues to be willful.

68.     This paragraph sets forth argument and legal conclusions to which no response is required. This paragraph sets forth a statement of relief requested by Plaintiff to which no response is required. Google denies that Plaintiff is entitled to any of the requested relief and denies any allegations. To the extent this paragraph includes any allegations to which a response is required, Google denies them, and specifically denies that it has committed any acts of infringement.

## COUNT II – INFRINGEMENT OF THE '528 PATENT

69.     Google repeats and re-alleges its answers to the preceding paragraphs as if fully set

15

SAppx660

Case: 24-2024     Document: 23-2     Page: 85     Filed: 11/18/2024

Case 4:22-cv-05246-HSG     Document 46     Filed 09/13/23     Page 81 of 88
Case 6:21-cv-00569-ADA     Document 73     Filed 06/29/22     Page 16 of 23

forth here, as its response to paragraph 69 of Plaintiff's Complaint.

70.     This paragraph sets forth argument and legal conclusions to which no response is required. To the extent this paragraph includes any allegations to which a response is required, Google denies them, and specifically denies that it has committed any acts of infringement.

71.     This paragraph sets forth argument and legal conclusions to which no response is required. To the extent this paragraph includes any allegations to which a response is required, Google denies them, and specifically denies that it has committed acts of infringement in this District or any other district.

72.     This paragraph sets forth argument and legal conclusions to which no response is required. To the extent this paragraph includes any allegations to which a response is required, Google denies them, specifically denies that it has committed any acts of infringement, and specifically denies that Google's alleged infringement of the '528 patent has been, is, or continues to be willful.

73.     This paragraph sets forth argument and legal conclusions to which no response is required. This paragraph sets forth a statement of relief requested by Plaintiff to which no response is required. Google denies that Plaintiff is entitled to any of the requested relief and denies any allegations. To the extent this paragraph includes any allegations to which a response is required, Google denies them, and specifically denies that it has committed any acts of infringement.

## COUNT III – INFRINGEMENT OF THE '289 PATENT

74.     Google repeats and re-alleges its answers to the preceding paragraphs as if fully set forth here, as its response to paragraph 74 of Plaintiff's Complaint.

75.     This paragraph sets forth argument and legal conclusions to which no response is required. To the extent this paragraph includes any allegations to which a response is required,

16

Case: 24-2024    Document: 23-2    Page: 86    Filed: 11/18/2024

Case 4:22-cv-05246-HSG    Document 46    Filed 09/13/23    Page 82 of 88
Case 6:21-cv-00569-ADA    Document 73    Filed 06/29/22    Page 17 of 23

Google denies them, and specifically denies that it has committed any acts of infringement.

76.     This paragraph sets forth argument and legal conclusions to which no response is required. To the extent this paragraph includes any allegations to which a response is required, Google denies them, and specifically denies that it has committed acts of infringement in this District or any other district.

77.     This paragraph sets forth argument and legal conclusions to which no response is required. To the extent this paragraph includes any allegations to which a response is required, Google denies them, specifically denies that it has committed any acts of infringement, and specifically denies that Google's alleged infringement of the '289 patent has been, is, or continues to be willful.

78.     This paragraph sets forth argument and legal conclusions to which no response is required. This paragraph sets forth a statement of relief requested by Plaintiff to which no response is required. Google denies that Plaintiff is entitled to any of the requested relief and denies any allegations. To the extent this paragraph includes any allegations to which a response is required, Google denies them, and specifically denies that it has committed any acts of infringement.

### RESPONSE TO TOUCHSTREAM'S DEMAND FOR JURY TRIAL

79.     Plaintiff's demand for a trial by jury for all issues triable to a jury does not state any allegation, and Google is not required to respond. To the extent that any allegations are included in the demand, Google denies these allegations. Google likewise demands a trial by jury on all issues so triable.

### RESPONSE TO TOUCHSTREAM'S REQUEST FOR RELIEF

These paragraphs set forth the statement of relief requested by Plaintiff to which no response is required. Google denies the underlying allegations of Touchstream's Prayer for Relief against Google, denies that Touchstream is entitled to any relief whatsoever, and requests that the Court

17

Case: 24-2024    Document: 23-2    Page: 87    Filed: 11/18/2024

Case 4:22-cv-05246-HSG    Document 46    Filed 09/13/23    Page 83 of 88
Case 6:21-cv-00569-ADA    Document 73    Filed 06/29/22    Page 18 of 23

deny all relief to Touchstream, enter judgment in favor of Google, and award Google its attorneys' fees as the prevailing party in the action.

## GOOGLE'S AFFIRMATIVE DEFENSES

Subject to the responses above, Google alleges and asserts the following defenses in response to the allegations, undertaking the burden of proof only as to those defenses deemed affirmative defenses by law, regardless of how such defenses are denominated herein. Google further reserves the right to amend this Answer to add affirmative defenses, including allegations of inequitable conduct, and/or any other defenses currently unknown to Google, as they become known throughout the course of discovery in this action. Assertion of a defense is not a concession that Google has the burden of proving the matter asserted.

## FIRST AFFIRMATIVE DEFENSE – NON-INFRINGEMENT

Touchstream is not entitled to any relief against Google because Google does not and has not directly or indirectly infringed (not directly, contributorily, or by inducement), either literally or under the doctrine of equivalents, any valid and enforceable claim of the '251 patent, '528 patent, or '289 patent (the "Patents-in-Suit").

## SECOND AFFIRMATIVE DEFENSE – PROSECUTION HISTORY ESTOPPEL

Touchstream is estopped from construing or interpreting any claims of the '251 patent, '528 patent, or '289 patent in such a way as may cover and/or include, either literally or under the doctrine of equivalents, Google's products, processes, services, and/or activities, and/or has waived any right to do so by reason of cancellation, limitation, or abandonment of claims, admissions, arguments, amendments, and/or representations made by or on behalf of the applicants in any proceedings before the United States Patent and Trademark Office.

18

Case: 24-2024      Document: 23-2      Page: 88      Filed: 11/18/2024

Case 4:22-cv-05246-HSG   Document 46   Filed 09/13/23   Page 84 of 88
Case 6:21-cv-00569-ADA   Document 73   Filed 06/29/22   Page 19 of 23

### THIRD AFFIRMATIVE DEFENSE – INVALIDITY

Each and every asserted claim of the '251 patent, '528 patent, and '289 patent is invalid for failure to meet the requirements of Title 35, United States Code, including but not limited to, 35 U.S.C. §§ 101, 102, 103, and/or 112 thereof, and the rules, regulations, and laws pertaining thereto, and/or obviousness -type double patenting.

The asserted claims of the Patents-in-Suit are invalid and unenforceable under 35 U.S.C. § 101 because the claims are directed to abstract ideas or other non-statutory subject matter.

The asserted claims of the Patents-in-Suit are invalid and unenforceable under 35 U.S.C. § 102 because the claims lack novelty, and are taught and suggested by the prior art.

The asserted claims of the Patents-in-Suit are invalid and unenforceable under 35 U.S.C. § 103 because the claims are obvious in view of the prior art.

The asserted claims of the Patents-in-Suit are invalid and unenforceable for failure to satisfy the conditions set forth in 35 U.S.C. § 112, including failure of written description, lack of enablement, and claim indefiniteness.

### FOURTH AFFIRMATIVE DEFENSE – EQUITABLE DOCTRINES

Touchstream's claims against Google regarding the '251 patent, '528 patent, and '289 patent are barred by the equitable doctrines of waiver, estoppel, unclean hands, and/or acquiescence.

### FIFTH AFFIRMATIVE DEFENSE – LIMITATION OF DAMAGES

Touchstream's claim for damages, if any, against Google for alleged infringement of the Patents-in-Suit is barred or limited by 35 U.S.C. §§ 286, 287, and/or 288.

### SIXTH AFFIRMATIVE DEFENSE – LACK OF STANDING

Touchstream lacks standing to bring this suit to the extent that Touchstream and/or its

19

SAppx664

Case: 24-2024     Document: 23-2     Page: 89     Filed: 11/18/2024

Case 4:22-cv-05246-HSG   Document 46   Filed 09/13/23   Page 85 of 88
Case 6:21-cv-00569-ADA   Document 73   Filed 06/29/22   Page 20 of 23

predecessors-in-interest lacked sufficient chain of title to the '251 patent, '528 patent, and/or '289 patent. In addition, Touchstream lacks standing to bring this suit to the extent that Touchstream lacks substantial rights to the '251 patent, '528 patent, and/or '289 patent.

### SEVENTH AFFIRMATIVE DEFENSE – LICENSE; PATENT EXHAUSTION

On information and belief, Touchstream's claims for relief are barred in whole or in part by an express or implied license, and/or the patent exhaustion doctrine.

### EIGHTH AFFIRMATIVE DEFENSE – NO WILLFUL INFRINGEMENT

Touchstream is not entitled to a finding of willful infringement with a corresponding increase in damages under 35 U.S.C. § 284.

### NINTH AFFIRMATIVE DEFENSE – NOT EXCEPTIONAL CASE

Touchstream is not entitled to a finding that this case is exceptional warranting attorneys' fees under 35 U.S.C. § 285, or pursuant to the Court's inherent power.

### TENTH AFFIRMATIVE DEFENSE – ENSNAREMENT

Touchstream's claims for infringement are barred by the doctrine of ensnarement.

### ELEVENTH AFFIRMATIVE DEFENSE – FAILURE TO STATE A CLAIM

The Complaint fails to state a claim upon which relief can be granted, including, but not limited to, failure of Plaintiff's Complaint to meet the standard for pleading set by the Supreme Court in *Ashcroft v. Iqbal*, 129 S. Ct. 1937 (2009) and *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007).

### TWELFTH AFFIRMATIVE DEFENSE – INJUNCTION NOT WARRANTED

Touchstream is not entitled to a permanent injunction because: (1) Touchstream has not suffered, nor will it suffer, irreparable harm because of Google's conduct; (2) any harm to Touchstream would be outweighed by the harm to Google if an injunction were entered; (3) Touchstream has an adequate remedy at law even if Touchstream were to prevail in this action; and

20

(4) the public interest would not be served by an injunction.

### THIRTEENTH AFFIRMATIVE DEFENSE – SUBSTANTIAL NON-INFRINGING USES

Any and all products or actions accused of infringement have substantial uses that do not infringe and do not induce or contribute to the alleged infringement of the claims of the Patents-in-Suit.

### FOURTEENTH AFFIRMATIVE DEFENSE – USE BY THE UNITED STATES

Plaintiff's claims for relief against Google are barred by 35 U.S.C. § 1498 in whole or in part, in that, upon information and belief, the accused subject matter is used or manufactured by or for the United States.

### EXCEPTIONAL CASE

On information and belief, this is an exceptional case entitling Google to an award of its attorneys' fees incurred in connection with defending and prosecuting this action pursuant to 35 U.S.C. § 285, as a result of, *inter alia*, Plaintiff's assertion of the Patents-in-Suit against Google with the knowledge that Google does not infringe any valid or enforceable claim of the Patents-in-Suit and/or that the Patents-in-Suit are invalid and/or unenforceable.

### REQUEST FOR RELIEF

WHEREFORE, Google respectfully requests that the Court:

(A)    Enter judgment that Google does not infringe any claims of the '251 patent, '528 patent, or '289 patent literally and/or under the doctrine of equivalents;

(B)    Enter judgment that the '251 patent, '528 patent, and '289 patent are invalid;

(C)    Declare that this case is exceptional pursuant to 35 U.S.C. §285; and

(D)    Award Google its reasonable costs and expenses of litigation, including attorneys' fees and expert witness fees; and

21

Case: 24-2024     Document: 23-2     Page: 91     Filed: 11/18/2024

Case 4:22-cv-05246-HSG     Document 46     Filed 09/13/23     Page 87 of 88
Case 6:21-cv-00569-ADA     Document 73     Filed 06/29/22     Page 22 of 23

(E)     Such further and additional relief as is deemed appropriate by this Court.

## **DEMAND FOR JURY TRIAL**

In accordance with Fed. R. Civ. P. 38(b), Google demands a trial by jury on all issues so triable.

22

Case: 24-2024     Document: 23-2     Page: 92     Filed: 11/18/2024

Case 4:22-cv-05246-HSG   Document 46   Filed 09/13/23   Page 88 of 88
Case 6:21-cv-00569-ADA   Document 73   Filed 06/29/22   Page 23 of 23

Dated: June 29, 2022

By: */s/ Tharan Gregory Lanier, with*
*permission by Michael E. Jones*
Tharan Gregory Lanier
JONES DAY
Tharan Gregory Lanier (*Admitted pro hac vice*)
CA State Bar No. 138784
E-mail: tglanier@jonesday.com
Michael C. Hendershot (*Admitted pro hac vice*)
CA State Bar No. 211830
E-mail: mhendershot@jonesday.com
Evan M. McLean (*Admitted pro hac vice*)
CA State Bar No. 280660
E-mail: emclean@jonesday.com
1755 Embarcadero Road
Palo Alto, CA  94303
Telephone:   (650) 739-3939
Facsimile:    (650) 739-3900

POTTER MINTON PC
Michael E. Jones
TX State Bar No. 10929400
E-mail:  mikejones@potterminton.com
Shaun W. Hassett
TX State Bar No. 24074372
E-mail:  shaunhassett@potterminton.com
110 N. College Ave., Suite 500
Tyler, TX 75702
Telephone:    (903) 597-8311
Facsimile:     (903) 593-0846

***Attorneys for Defendant***
***GOOGLE LLC***

SAppx668

# Exhibit C

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## WACO DIVISION

| | |
|---|---|
| **TOUCHSTREAM TECHNOLOGIES, INC.,** | |
| *Plaintiff,* | Civil Case No. 6:21-cv-569-ADA |
| v. | U.S. District Judge Alan Albright |
| **GOOGLE LLC,** | |
| *Defendant.* | |

### JUDGMENT ON JURY VERDICT

This action came before the Court for a trial by jury commencing on July 17, 2023, between Plaintiff Touchstream Technologies, Inc. ("Touchstream") and Defendant Google LLC ("Google"). The issues have been tried and the jury rendered its unanimous verdict on July 21, 2023 (ECF No. 247). Pursuant to Rule 58 of the Federal Rules of Civil Procedure and in accordance with the jury's verdict, the Court hereby **ORDERS** and **ENTERS JUDGMENT** on the jury verdict as follows:

1.  Defendant has infringed claims 1 and 2 of Patent No. 8,904,289 (the "'289 patent"), claims 1 and 14 of Patent No. 8,782,528 (the "'528 patents"), and claims 1 and 8 of U.S. Patent No. 8,356,251 (the "'251 patent") (collectively, the "Asserted Claims").

2.  The Asserted Claims are not invalid.

3.  Judgment is hereby entered in favor of Touchstream and against Google in the sum of $338,760,000 U.S. Dollars for Google's infringement of the Asserted Claims.

4.  This Judgment starts the time for filing any post-trial motions or appeal, including but not limited to: renewed motions for judgment as a matter of law and/or new

trial under Fed. R. Civ. P. 50(b) and 59; motions to amend the judgment; motion for entry of a permanent injunction and/or an ongoing royalty; a motion for the award of supplemental damages, prejudgment interest, and postjudgment interest; and any other motions for equitable relief that may be just and proper. To the extent not expressly provided by the rules, all such motions shall be filed within 28 days of entry of this Judgment.

5.    Any other relief requested by either party which is now pending before the Court and not specifically awarded or addressed herein is **DENIED**.

**So ORDERED and SIGNED this 23rd day of August, 2023.**

ALAN D ALBRIGHT
UNITED STATES DISTRICT JUDGE

Exhibit D

NOTE: This disposition is nonprecedential.

# United States Court of Appeals
# for the Federal Circuit

**LARRY GOLDEN,**
*Plaintiff-Appellant*

v.

**APPLE INC., SAMSUNG ELECTRONICS USA, LG
ELECTRONICS USA, INC., QUALCOMM
INCORPORATED, MOTOROLA SOLUTIONS, INC.,
PANASONIC CORPORATION, AT&T INC.,
VERIZON CORPORATION SERVICE GROUP,
SPRINT CORPORATION, T-MOBILE USA, INC.,
FORD GLOBAL TECHNOLOGIES, LLC, FAIRWAY
FORD LINCOLN OF GREENVILLE, GENERAL
MOTORS COMPANY, KEVIN WHITAKER
CHEVROLET, FCA US LLC, BIG O DODGE
CHRYSLER JEEP RAM,**
*Defendants*

2022-1229

Appeal from the United States District Court for the
District of South Carolina in No. 6:20-cv-04353-JD, Judge
Joseph Dawson, III.

------------------------------------------------

**LARRY GOLDEN,**
*Plaintiff-Appellant*

SAppx673

2                                          GOLDEN v. APPLE INC.

v.

**GOOGLE LLC,**
*Defendant*

———————————

2022-1267

———————————

Appeal from the United States District Court for the District of South Carolina in No. 6:21-cv-00244-JD, Judge Joseph Dawson, III.

———————————

Decided: September 8, 2022

———————————

LARRY GOLDEN, Greenville, SC, pro se.

———————————

Before DYK, TARANTO, and STOLL, *Circuit Judges.*

PER CURIAM

Larry Golden appeals two orders of the United States District Court for the District of South Carolina ("district court") dismissing his patent infringement claims against various defendants. We *affirm* the dismissal in Case No. 22-1229 but *vacate* the dismissal in Case No. 22-1267 and *remand* for further proceedings consistent with this opinion.

BACKGROUND

Mr. Golden owns a family of patents concerning a system for locking, unlocking, or disabling a lock upon the

GOLDEN v. APPLE INC.                                    3

detection of chemical, radiological, and biological hazards.[1]
In 2019, he sued sixteen defendants in the district court,
alleging patent infringement by their development and
manufacturing of certain devices. The district court dis-
missed the suit without prejudice, and this court affirmed
the dismissal "on the ground of frivolousness" because Mr.
Golden's complaint "offer[ed] only vague generalities and
block quotes of statutes, cases and treatises, but nowhere
point[ed] us to any nonfrivolous allegations of infringement
of any claim by any actual product made, used, or sold by
any defendant." *Golden v. Apple Inc.*, 819 F. App'x 930, 931
(Fed. Cir. 2020).

On January 5, 2021, in Case No. 22-1229, Mr. Golden
again sued the same sixteen defendants from the 2019 case
for patent infringement ("the Apple case"). He initially
filed the same over-300-page complaint held to be frivolous
in the 2019 case. After the magistrate judge imposed a 35
page limit on the complaint, Mr. Golden filed a shortened
complaint complying with the restriction. On January 26,
2021, in Case No. 22-1267, Mr. Golden separately sued
Google LLC for patent infringement ("the Google case").
The magistrate judge reviewed the complaints in both
cases and recommended summary dismissal with prejudice
without issuance of service of process or leave to amend
and monetary sanctions for the filing of frivolous litigation.

In both cases, the district court adopted the magistrate
judge's recommendations in part. In the Apple case, the
district court dismissed the complaint as frivolous without
the issuance of service of process but declined to dismiss
with prejudice. Additionally, the district court lifted the
page restriction for an amended complaint. In the Google
case, the district court dismissed the complaint with

---

[1]    The patents at issue in these cases are U.S. Patent
Nos. 7,385,497; 9,096,189; 9,589,439; 10,163,287 and Reis-
sue Patent Nos. RE43,891 and RE43,990.

4                                    GOLDEN v. APPLE INC.

prejudice and without the issuance of service of process.
Mr. Golden appeals the district court decisions in both
cases. We have jurisdiction under 28 U.S.C. § 1295(a)(1).
On appeal, Mr. Golden has filed briefs, while the defend-
ants have not filed responsive briefs.

DISCUSSION

Under the pleading standards set forth in *Bell Atlantic
Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iq-
bal*, 556 U.S. 662 (2009), a court must dismiss a complaint
if it fails to allege "enough facts to state a claim to relief
that is plausible on its face." *Twombly*, 550 U.S. at 570.
This standard "requires more than labels and conclusions,
and a formulaic recitation of the elements of a cause of ac-
tion will not do." *Id.* at 555 (citation omitted). A plaintiff
must allege facts that give rise to "more than a sheer pos-
sibility that a defendant has acted unlawfully." *Iqbal*, 556
U.S. at 678 (citation omitted). In the patent context, this
court has explained that a plaintiff need not "plead facts
establishing that each element of an asserted claim is met,"
*In re Bill of Lading Transmission and Processing Sys. Pat.
Litig.*, 681 F.3d 1323, 1335 (Fed. Cir. 2012) (citing *McZeal
v. Sprint Nextel Corp.*, 501 F.3d 1354, 1357 (Fed. Cir.
2007)), but must plead "'enough fact[s] to raise a reasona-
ble expectation that discovery will reveal' that the defend-
ant is liable for the misconduct alleged." *Id.* at 1341
(alteration in original) (quoting *Twombly*, 550 U.S. at 556).
We review the district court's dismissal of the complaint de
novo. *Anand v. Ocwen Loan Servicing, LLC*, 754 F.3d 195,
198 (4th Cir. 2014).

In the Apple case, the district court dismissed the dock-
eted complaint as frivolous after finding that Mr. Golden
"failed to include factual allegations beyond the identities
of the Defendants, reference to the alleged infringing de-
vices, and the alleged infringed-upon patents." Dist. Ct.
Op. at 4–5. We agree with the district court: the docketed
complaint is nothing more than a list of patent claims and

GOLDEN v. APPLE INC.                                          5

accused products manufactured by each defendant for each
asserted patent. Mr. Golden contends that his original
complaint contained sufficient factual allegations to sup-
port his claims. However, he concedes that the rejected
original complaint was identical to the one that this court
deemed frivolous in the 2019 case. His effort to relitigate
the sufficiency of the original complaint is precluded under
the doctrine of res judicata. *See Arizona v. California*, 530
U.S. 392, 412 (2000) ("[I]f a court is on notice that it has
previously decided the issue presented, the court may dis-
miss the action *sua sponte*, even though [a preclusion] de-
fense has not been raised."). Mr. Golden does not argue
that the docketed complaint contains factual allegations
beyond those contained in his original complaint or that
the allegations in the docketed complaint do anything be-
yond listing the alleged infringed-upon patent claims and
the alleged infringing devices. This is plainly insufficient.
We see no error in the district court's without prejudice dis-
missal of the Apple case.

In the Google case, the district court again concluded
that Mr. Golden's complaint was frivolous. Here, however,
Mr. Golden's complaint includes a detailed claim chart
mapping features of an accused product, the Google Pixel 5
Smartphone, to independent claims from U.S. Patent Nos.
10,163,287, 9,589,439, and 9,069,189. The district court
discounted this claim chart because it "contains the exact
same language as the claim charts previously rejected by
the Federal Circuit [in the 2019 case], although Google
Pixel 5 Smartphone appears in the far left column instead
of Apple." Dist. Ct. Op. at 4. But to the extent that the
chart includes the "exact same language" as previously re-
jected charts, it is simply the language of the independent
claims being mapped to. The key column describing the
infringing nature of the accused products is not the same
as the complaint held frivolous in the 2019 case. It at-
tempts—whether successfully or not—to map claim

6                                          GOLDEN v. APPLE INC.

limitations to infringing product features, and it does so in
a relatively straightforward manner.

We conclude that the district court's decision in the
Google case is not correct with respect to at least the three
claims mapped out in the claim chart. Mr. Golden has
made efforts to identify exactly how the accused products
meet the limitations of his claims in this chart. On remand,
the district court should allow the complaint to be filed and
request service of process. Our decision does not preclude
subsequent motions to dismiss by the defendant for failure
to state a claim or for summary judgment. We express no
opinion as to the adequacy of the complaint or claim chart
except that it is not facially frivolous.

CONCLUSION

For the foregoing reasons, we affirm the district court's
dismissal in Case No. 22-1229, vacate the dismissal in
Case No. 22-1267, and remand for further proceedings con-
sistent with this opinion.

**CASE NO. 22-1229 AFFIRMED**

**CASE NO. 22-1267 VACATED AND REMANDED**

COSTS

No costs.

Exhibit E

# UNITED STATES DISTRICT COURT
## FOR THE
## DISTRICT OF SOUTH CAROLINA – GREENVILLE

RECEIVED
USDC CLERK, GREENVILLE, SC
2021 JAN 26  AM 10: 13

|  |  |
|---|---|
| LARRY GOLDEN,<br><br>             Plaintiff,<br><br>                    V.<br><br>GOOGLE LLC<br><br>             Defendants. | CIVIL CASE NO: _____<br><br>**JURY TRIAL DEMANDED**<br><br>January 25, 2021 |

## COMPLAINT FOR PATENT INFRINGEMENT

This is an action of patent infringement in which plaintiff, Larry Golden ("Golden", "Plaintiff" or "Patent Owner"), hereby asserts the following claims for patent infringement of United States Patent Nos. 10,163,287 ('287 Patent), 9,589,439 ('439 Patent), and 9,096,189 ('189 Patent) ("patents-in-suit": attached hereto as Exhibits A-C respectively) against Defendant GOOGLE LLC ("Google" or "Defendant"), and alleges as follows:

Upon information and belief, Plaintiff alleges the patents-in-suit, that were issued with the presumption of validity, "[a] patent shall be presumed valid. Each claim of a patent (whether in independent, dependent, or multiple dependent form) shall be presumed valid independently of the validity of other claims; dependent or multiple dependent claims shall be presumed valid even though dependent upon an invalid claim. 35 U.S. Code § 282 - Presumption of validity; (a)

Case: 24-2024     Document: 23-2     Page: 105     Filed: 11/18/2024

Case 4:22-cv-05246-HSG   Document 46-1   Filed 09/13/23   Page 13 of 81
6:21-cv-00244-JD     Date Filed 01/26/21   Entry Number 1     Page 2 of 30

In General" is Plaintiff's evidence that the Plaintiff is the inventor of the Communicating,

Monitoring, Detecting, and Controlling (CMDC) device(s) i.e., products grouped and

commercialized today as smartphones, laptops, tablets, smartwatches, etc.

Upon information and belief, Plaintiff alleges that the defendant Google, has in the past

and continues to do so, makes, uses, offer to sell, or sells Google Pixel smartphones 3, 3XL, 3a,

3aXL, 4a, 4a(5G), and 5, that Plaintiff believes infringes at least one of the claims in the patents-

in-suit under 35 U.S.C. § 271, "anyone who makes, uses, offers to sell, or sells any patented

invention domestically, or imports a patented invention into the United States during the term of

the patent, is infringing the patent. Anyone who actively induces someone else

to infringe the patent is also liable as an infringer."

Similarly, under 35 U.S.C. § 271, "anyone who offers to sell, sells, or imports a material

component of something that is patented, knowing that the component was especially made for

use in an infringement and is not a commodity suitable for a substantial non-infringing use, is

also liable as a contributory infringer" Plaintiff is alleging that the defendant Google, has in the

past and continues to do so, offer to sell, sells (i.e., to other smartphone and mobile device

manufacturers; "Google Search", "Google Fi", "Google Android Operating Systems", "Google

Cloud", etc.) or imports a material component of something that is patented (i.e., Plaintiff's

CMDC devices). For example, "market.us" has published the following information on Google:

**2018?**
- On January 2018, Alphabet, Inc. acquired Redux – smartphone technology, which is
  specialized in turning smartphone screens into speakers.
- In October 2018, Google LLC to shut down Google+ after failing to disclose user data
  leak
- In November 2018, Google LLC acquired Workbench, which is a US-based company,
  that offers an online library of projects and lessons.

2

- Under this acquisition, the company focuses on integrating the Workbench tool with Google Classroom. In addition, currently, Google Classroom is one of the most widely used online educational tools, which lets parents, teachers, and students manage class discussions, assignments, and quizzes.
- In 2018, Google Search and Advertising tools helped generating **$335 billion** in economic activity for **more than 1.3 billion millions** of businesses, website publishers, and nonprofits across the United States.
- Many website publishers, non-profit organizations and 40,000 companies in the country benefited from the use of Google Ads and AdSense advertising tools.
- In 2018, Google had sent more than 14 billion dollars to music publishers around the world.
- As of November, 2018, in US, Google connects people to businesses nearby more than **9 billion times**, including over 1 billion phone calls and 3 billion direction requests to stores every month.

**Usage Statistics**

- In a minute on the Internet in 2020, there are **4.1 million search queries**, **230 million per hour** and **6 Billion per day** that is **more than 2.5 Trillion searches per year** worldwide.
- Till July 2020, Google has 95.6% share of worldwide mobile search traffic.
- In April 2020, Google processed **12.7 billion** search queries in US, accounting **62.3 percent** of the US total desktop search queries and leading mobile search provider in the US with 95.04% market share
- Daily visitors to Google are **approximately 620 Mn**.
- According to the Datareportal, in June 2020, the top 10 search queries on Google were: Google, Facebook, Youtube, You, Weather, News, Amazon, Coronavirus, Translate and Instagram.
- In July 2019, Google accounted for **95 percent** of US mobile search visits and **93 percent** of overall U.S. organic search engine visits.
- As of May 2019, Gmail is a product that **1.5 billion users** rely on, to get things done every day.
- As of September 2019, People have already asked **Google Lens more than a billion questions** about things they see.

3

SAppx682

Case: 24-2024    Document: 23-2    Page: 107    Filed: 11/18/2024

Case 4:22-cv-05246-HSG   Document 46-1   Filed 09/13/23   Page 15 of 81
6:21-cv-00244-JD    Date Filed 01/26/21    Entry Number 1    Page 4 of 30

- Google sends **10 billion+ clicks per month** to news publishers' websites.
- As of May 2019, **2.5 million** web publishers use AdSense to make money through their content on the web.
- According to a survey, in Europe the news content linked through Google were **clicked more than 8 billion times a month** that is **3,000 clicks per second** to the publishers' websites in Europe resulting to each click between 4-6 euro cents.
- In the US, Google helps drive over **1 billion direct connections**, like calls and online reservations, for businesses nationwide every month.
- Google owns its **own common misspellings domains** such as www.gooogle.com, www.googlr.com, and www.gogle.com
- Google runs **over 1 Mn computer servers** in data centers around the world.
- Last year, Google **rejected more than 10 million ads** that we suspected of copyright infringement.
- Around **35% of clicks** for U.S. businesses, advertising on Google, came from outside the country.
- As of May 2019, about **80% of traffic** from Google's Showcase Shopping ads to retailer sites are from new visitors discovering the brands.
- Till date, Google has over **2 billion store** offers mapped to physical store locations globally, discoverable by their current local ad formats like local inventory ads.
- Google Station serves more than **10 million people in 1,300 locations** across India, Indonesia, Mexico, Nigeria, the Philippines, Thailand, Vietnam and Brazil.
- Google Assistant is now on **more than one billion devices**, available in more than 30 languages across 80 countries.
- As of 2019, **more than 20 million people visit Google Account every day** to review their settings, using Privacy Checkup.
- As of 2019, **90 million** teachers and students are using G Suite for Education worldwide.
- Google has a database of over 4 billion credentials that have been compromised through various data breaches
- According to a 2018 Survey, around **72% of consumers in Indonesia** see Google Search as the online gateway for personal loan information and the second most helpful source for Financial Services information, after the bank branches

4

SAppx683

## THE PARTIES

1.      Plaintiff Larry Golden is a citizen of South Carolina and has a principal place of business and residence at 740 Woodruff Road, #1102, Greenville, S.C. 29607.

2.      On information and belief, Google is incorporated in the State of Delaware with a principal place of business at 1600 Amphitheatre Parkway, Mountain View, CA 94043 and does business in this judicial district by, among other things, committing jointly, directly, and/or indirectly the tort of literal patent infringement or infringement under the "doctrine of equivalents" giving rise to this complaint. Google may be served at its principal place of business at 1600 Amphitheatre Parkway, Mountain View, CA 94043.

3.      Google LLC is one of the largest technology companies in the world and conducts product sales, and online search operations in the District of South Carolina. Google LLC directly and/or indirectly distributes, markets, offers to sell, sells, and/or imports the infringing Google Pixel Series of smartphones and Google Android Operating Systems.

## STANDARD FOR REVIEW

4.      Pursuant to the order of Magistrate Judge Kevin McDonald in United States District Court for the District of South Carolina; filed 12/17/2020; Case No. 6:20-cv-04353-BHH-KFM, Plaintiff was ordered to file "a short and plain statement of the claim showing that the pleader [Plaintiff] is entitled to relief." Fed. R. Civ. P. 8(a).

5.      Plaintiff has attached a copy of the asserted patents as **Exhibits A, B, & C**. The attached patents satisfy the requirement of "enough factual allegations. For example, in *Incom Corp. v. Walt Disney Co.,* No. 2:15-cv-03011-PSG-MRW, Dkt. 39, at *4 (C.D. Cal. Feb. 4, 2016) the Central District of California declined to dismiss a complaint that attached the asserted

5

SAppx684

Case: 24-2024     Document: 23-2     Page: 109     Filed: 11/18/2024

Case 4:22-cv-05246-HSG   Document 46-1   Filed 09/13/23   Page 17 of 81
6:21-cv-00244-JD     Date Filed 01/26/21   Entry Number 1   Page 6 of 30

patent, identified the accused products by name, and generally compared the technology

disclosed in the patents to the accused products. The complaint *did not identify any specific*

*asserted claim*, but the court found that: "Plaintiff has stated a plausible claim for direct

infringement by specifically identifying the Defendant's products and alleging that they perform

the same unique function as Plaintiff's patented system." The Defendant in this case is allegedly

liable for infringement of the asserted patents-in-suit under 35 U.S.C. § 271.

6.     Plaintiff maintains he has additional factual allegations to support his claim in the

form claim charts readily available by order of this Court.


## JURISDICTION AND VENUE

7.     This is a civil action for patent infringement arising under the patent laws of the

United States, Title 35 of the United States Code. This Court has subject matter jurisdiction

pursuant to 28 U.S.C. §§§ 1331, 1332(a) and 1338(a).

8.     Venue is proper in this judicial district pursuant to 28 U.S.C. §§ 1391(c) and

1400(b). On information and belief, the defendant has purposely transacted business in this

judicial district and has committed acts of joint, direct and/or indirect infringement in this

judicial district.

9.     On information and belief, the defendant is subject to this Court's specific and

general personal jurisdiction, due at least to the defendant's substantial business in this forum,

including: (A) at least part of the defendant's infringing activities alleged herein, and (B)

regularly doing or soliciting business, engaging in others persistent causes of conduct, and/or

deriving substantial revenue from goods and services provided to persons and other entities in

SAppx685

South Carolina and this judicial district. The defendant has allegedly used, sold, and/or offered products for sale in South Carolina and is licensed to do business in this state.

     10.     This Court has specific jurisdiction over the defendant because the defendant has committed acts giving rise to this action and has established minimum contacts within this judicial district such that the exercise of jurisdiction over the defendant would not offend traditional notions of fair play and justice.

## RELATED CASES

     11.     Plaintiff has alleged that Apple is infringing Plaintiff's communicating, monitoring, detecting, and controlling (CMDC) device in a related case *Larry Golden v. Apple, Inc. et al* filed on 12/16/2020 at the United States District Court for the District of South Carolina; Greenville Division (Case No. 6:20-cv-04353) against defendants, Apple Inc. ("Apple"), Samsung Electronics, USA ("Samsung"), LG Electronics, USA, Inc. ("LG"), Qualcomm Inc. ("Qualcomm"), Motorola Solutions Inc. ("Motorola"), Panasonic Corporation ("Panasonic"), AT&T Inc. ("AT&T"), Verizon Corporation Services Group ("Verizon"), Sprint Corporation ("Sprint"), T-Mobile USA, Inc. ("T-Mobile"), Ford Global Technologies, LLC ("Ford"), Fairway Ford Lincoln of Greenville ("Fairway Ford"), General Motors Company ("GM"), Kevin Whitaker Chevrolet ("Whitaker Chevrolet"), FCA US LLC ("FCA"), and Big O Dodge Chrysler Jeep Ram ("Big O").

     12.     Plaintiff has filed an action of Antitrust Law violations *Larry Golden v. Apple, Inc. et al* on June 16, 2020, at the United States District Court for the District of South Carolina; Greenville Division (Case No. 6:20-cv-02270) against defendants, Apple Inc. ("Apple"), Samsung Electronics, USA ("Samsung"), LG Electronics, USA, Inc. ("LG"), Qualcomm Inc.

SAppx686

Case: 24-2024     Document: 23-2     Page: 111     Filed: 11/18/2024

Case 4:22-cv-05246-HSG   Document 46-1   Filed 09/13/23   Page 19 of 81
6:21-cv-00244-JD   Date Filed 01/26/21   Entry Number 1   Page 8 of 30

("Qualcomm"), Ford Global Technologies, LLC ("Ford"), General Motors Company ("GM"), and, FCA US LLC ("FCA").

## GOOGLE SMARTPHONE SPECIFICATIONS / ANDROID PLATFORM

13. Upon information and belief, Google is directly infringing Plaintiff's patented CMDC devices by making, using, offering for sale, selling and/or importing the aforementioned alleged infringing devices that have at a minimum, directly infringed Plaintiff's '287, '439, and '189 patents. to unjustly enrich itself.

14. Upon information and belief, Google is jointly infringing Plaintiff's patented CMDC devices by offering for use, using, offering for sale, selling and/or importing as essential, Google's Android platform for use with Google's smartphones, and other Android smartphone devices i.e., Samsung, LG, Motorola, etc., that have at a minimum, directly infringed Plaintiff's '287, '439, and '189 patents. Android smartphones have permanent default Google-owned apps like Google search, Google Play, YouTube, Maps etc. The main Android framework is signed in through a Google account too. So, you need to have a Google account to use Android.

15. The smartphone has come a long way since the first iPhone launched in 2007. While Apple's iOS is arguably the world's first smartphone operating system, Google's Android is by far the most popular. Android has evolved significantly since first being released on an HTC-made T-Mobile device in 2008.

16. It wasn't until 2005 that Google purchased Android, Inc., and while there wasn't much info about Android at the time, many took it as a signal that Google would use the platform to enter the phone business. Eventually, Google did enter the smartphone business — but not as a hardware manufacturer. Instead, it marketed Android to other manufacturers, first

8

catching the eye of HTC, which used the platform for the first Android phone, the HTC Dream,

in 2008.

17.     Upon information and belief, Google has copied the "product grouping" strategy

of the Plaintiff (Golden) for a communicating, monitoring, detecting, and controlling (CMDC)

device, i.e., Google's smartphone products are grouped together by "common features of design

similarities". As illustrated below, Google's smartphones are basically the same.

18.     Therefore, when analyzing the specifications, features, and functionality of

Google's smartphones as a complete product, and not merely identifying the individual

infringing processes; there is a strong likelihood that if one of Google's smartphones infringes

Plaintiff's claimed invention of a CMDC device; it can be perceived that all of Google's

smartphones infringes Plaintiff's claimed invention of a CMDC device as a 'whole' product.

**GOOGLE PIXEL 5 VS. PIXEL 4A WITH 5G VS. PIXEL 4**

| Category | Pixel 5 | Pixel 4A with 5G | Pixel 4A |
|---|---|---|---|
| Network | 5G | 5G | 4G |
| Screen | 6-inch flexible OLED display at 432 ppi | 6.2-inch OLED display at 413 ppi | 5.8-inch OLED display at 443 ppi |
| Refresh Rate | 90 Hz | 60 Hz | 60 Hz |
| Resolution | 1080 x 2340 | 1080 x 2340 | 1080 x 2340 |
| Battery | 4080 mAh | 3885 mAh | 3140 mAh |
| Front Camera | 8 megapixels | 8 megapixels | 8 megapixels |
| Rear Camera | 12.2-megapixel dual-pixel (16-megapixel ultrawide) | 12.2-megapixel dual-pixel (16-megapixel ultrawide) | 12.2-megapixel dual-pixel |
| Camera Features | Night Sight, Portrait Light, Cinematic Pan, Live HDR+ | Night Sight, Portrait Light, Cinematic Pan, Live HDR+ | Night Sight, Live HDR+ |
| RAM | 8GB | 6GB | 6GB |

9

SAppx688

Case: 24-2024    Document: 23-2    Page: 113    Filed: 11/18/2024

Case 4:22-cv-05246-HSG   Document 46-1   Filed 09/13/23   Page 21 of 81
6:21-cv-00244-JD   Date Filed 01/26/21   Entry Number 1   Page 10 of 30

| Category | Pixel 5 | Pixel 4A with 5G | Pixel 4A |
|---|---|---|---|
| Processor | Qualcomm Snapdragon 765G | Qualcomm Snapdragon 765G | Qualcomm Snapdragon 730G |
| Storage | 128GB | 128GB | 128GB |
| Audio | Stereo speakers, USB-C audio | Stereo speakers, USB-C audio, 3.5mm headphone jack | USB-C audio, 3.5mm headphone jack |
| Price | $699 | $499 | $349 |
| Wireless Charging | Yes | No | No |
| Water Resistant | Yes | No | No |
| Colors | Green, Black | White, Black | Black |
| Operating System | Pre-loaded with Android 11 | Pre-loaded with Android 11 | Pre-loaded with Android 10 |

**GOOGLE PIXEL 3 SERIES SPEC COMPARISON**

| Specification | Pixel 3A | Pixel 3A XL | Pixel 3 | Pixel 3 XL |
|---|---|---|---|---|
| Display | 5.6 inches | 6.0 inches | 5.5 inches | 6.3 inches |
| Resolution | 2220 x 1080 | 2160 x 1080 | 2160 x 1080 | 2960 x 1440 |
| Processor | Snapdragon 670 (2.0GHz and 1.7GHz, octa-core) | Snapdragon 670 (2.0GHz and 1.7GHz, octa-core) | Snapdragon 845 (2.5GHz and 1.6GHz, octa-core) | Snapdragon 845 (2.5GHz and 1.6GHz, octa-core) |
| RAM | 4GB | 4GB | 4GB | 4GB |
| Storage | 64GB | 64GB | 64GB, 128GB | 64GB, 128GB |
| Rear camera | 12 megapixels | 12 megapixels | 12 megapixels | 12 megapixels |
| Front camera | 8 megapixels | 8 megapixels | 8 megapixels, 8 megapixels(wide) | 8 megapixels, 8 megapixels(wide) |

10

SAppx689

| Specification | Pixel 3A | Pixel 3A XL | Pixel 3 | Pixel 3 XL |
|---|---|---|---|---|
| Battery | 3,000mAh | 3,700mAh | 2,915mAh | 3,430mAh |
| Water protection | N/A | N/A | IPX8 | IPX8 |
| Wireless charging? | No | No | Yes | Yes |
| Ports? | USB-C, 3.5mm headphone jack | USB-C, 3.5mm headphone jack | USB-C | USB-C |
| Weight | 0.32 pounds | 0.37 pounds | 0.33 pounds | 0.4 pounds |
| Dimensions (in.) | 6.0 x 2.80 x 0.30 | 6.30 x 3.00 x 0.30 | 5.70 x 2.70 x 0.30 | 6.20 x 3.00 x 0.30 |
| Starting price | $399.00 | $479.00 | $799.00 | $899.00 |
| Operating System | Pre-loaded Android | Pre-loaded Android | Pre-loaded Android | Pre-loaded Android |

## SENSOR TYPES SUPPORTED BY THE "*ANDROID*" PLATFORM

| Type Accelerometer | Hardware | Measures the acceleration force in m/s$^2$ that is applied to a device on all three physical axes (x, y, and z), including the force of gravity. | Motion detection (shake, tilt, etc.). |
|---|---|---|---|
| Type Ambient Temperature | Hardware | Measures the ambient room temperature in degrees Celsius (°C). See note below. | Monitoring air temperatures. |
| Type Gravity | Software or Hardware | Measures the force of gravity in m/s$^2$ that is applied to a device on all three physical axes (x, y, z). | Motion detection (shake, tilt, etc.). |
| Type Gyroscope | Hardware | Measures a device's rate of rotation in rad/s around each of the three physical axes (x, y, and z). | Rotation detection (spin, turn, etc.). |
| Type Light | Hardware | Measures the ambient light level (illumination) in lx. | Controlling screen brightness. |

11

SAppx690

Case: 24-2024    Document: 23-2    Page: 115    Filed: 11/18/2024

Case 4:22-cv-05246-HSG    Document 46-1    Filed 09/13/23    Page 23 of 81
6:21-cv-00244-JB    Date Filed 01/20/21    Entry Number 2    Page 23 of 81

| | | | |
|---|---|---|---|
| **Type** **Linear** **Acceleration** | Software or Hardware | Measures the acceleration force in m/s$^2$ that is applied to a device on all three physical axes (x, y, and z), excluding the force of gravity. | Monitoring acceleration along a single axis. |
| **Type** **Magnetic Field** | Hardware | Measures the ambient geomagnetic field for all three physical axes (x, y, z) in µT. | Creating a compass. |
| **Type** **Orientation** | Software | Measures degrees of rotation that a device makes around all three physical axes (x, y, z). As of API level 3 you can obtain the inclination matrix and rotation matrix for a device by using the gravity sensor and the geomagnetic field sensor in conjunction with the get Rotation Matric () method. | Determining device position. |
| **Type** **Pressure** | Hardware | Measures the ambient air pressure in hPa or mbar. | Monitoring air pressure changes. |
| **Type** **Proximity** | Hardware | Measures the proximity of an object in cm relative to the view screen of a device. This sensor is typically used to determine whether a handset is being held up to a person's ear. | Phone position during a call. |
| **Type** **Relative Humidity** | Hardware | Measures the relative ambient humidity in percent (%). | Monitoring dewpoint, absolute, and relative humidity. |
| **Type** **Rotation Vector** | Software or Hardware | Measures the orientation of a device by providing the three elements of the device's rotation vector. | Motion detection and rotation detection. |
| **Type** **Temperature** | Hardware | Measures the temperature of the device in degrees Celsius (°C). This sensor implementation varies across devices and this sensor was replaced with the **Type— Ambient Temperature** sensor in API Level 14 | Monitoring temperatures. |

❖ **BIOMETRICS:** Biometric factors allow for secure authentication on the Android platform. The Android framework includes face and fingerprint biometric authentication. Android can be customized to support other forms of biometric authentication (such as Iris).

❖ **DISABLING LOCK MECHANISM:** Google's Android operating system features a lock mechanism to secure your phone, known as pattern lock. When setting the pattern, you must drag your finger along lines on the screen between different nodes. Afterward, to unlock the phone, you'll need to replicate the pattern drawn. If you fail to solve the

12

Case: 24-2024     Document: 23-2     Page: 116     Filed: 11/18/2024

Case 4:22-cv-05246-HSG   Document 46-1   Filed 09/13/23   Page 24 of 81
6:21-cv-00244-JD     Date Filed 01/26/21   Entry Number 1     Page 13 of 30

pattern too many times, the phone locks and cannot be unlocked without logging into the associated Google account. If you can't log in, you'll have to employ some other methods to restore control of your phone.

❖ **CHEMICAL, BIOLOGICAL, RADIOLOGICAL, AND NUCLEAR (CBRN) DETECTION:** Through collaboration and innovation, the Defense Threat Reduction Agency has integrated its powerful, hazard-awareness-and-response tools into the *Android Tactical Assault Kit (or the Android Team Awareness Kit, ATAK)*. ATAK is a digital application available to warfighters throughout the DoD. Built on the Android operating system, ATAK offers warfighters geospatial mapping for situational awareness during combat — on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK now includes chemical, biological, radiological, and nuclear (CBRN) plug-ins.

❖ **HEART RATE:** *Android Team Awareness Kit, ATAK* provides a single interface for viewing and controlling different CBRN-sensing technologies, whether that is a wearable smartwatch that measures a warfighter's vitals (e.g., heart rate) or a device mounted on a drone to detect chemical warfare agents.

❖ **NEAR FIELD COMMUNICATION (NFC):** Pixel™, Phone by Google - Turn NFC on/off. Near Field Communication (NFC) allows the transfer of data between devices that are a few centimeters apart, typically back-to-back. NFC must be turned on for NFC-based apps (e.g., Tap to Pay) to function correctly. NFC is a set of short-range wireless technologies, typically requiring a distance of 4cm or less to initiate a connection. NFC allows you to share small payloads of data between an NFC tag and an Android-powered device, or between two Android-powered devices. Tags can range in complexity.

❖ **WARFIGHTERS:** The U.S. armed forces and their interagency and coalition partners value *Android Team Awareness Kit, ATAK* and the common operating picture it provides. DTRA continues to develop CBRN-specific plug-in capabilities to support warfighters on the battlefield.

---

## GOOGLE'S JOINT INFRINGEMENT WITH APPLE INC.

19.     According to Gurman, 2020, "The U.S. government's antitrust assault against Google reveals new details about a secretive, multibillion-dollar deal between the internet giant and Apple Inc., the world's largest technology company. The Justice Department's lawsuit, filed Tuesday, targets paid deals Google negotiates to get its search engine to be the default on browsers, phones and other devices. The biggest of these is an agreement that makes Google search the default on iPhones and other Apple devices."

SAppx692

Case: 24-2024     Document: 23-2     Page: 117     Filed: 11/18/2024

Case 4:22-cv-05246-HSG   Document 46-1   Filed 09/13/23   Page 25 of 81
6:21-cv-00244-JD     Date Filed 01/26/21   Entry Number 1   Page 14 of 30

20.     The U.S. government said Apple Chief Executive Officer Tim Cook and Google CEO Sundar Pichai met in 2018 to discuss the deal. After that, an unidentified senior Apple employee wrote to a Google counterpart that "our vision is that we work as if we are one company."

21.     The DOJ also cited internal Google documents that call the Apple search deal a "significant revenue channel" for the search giant and one that, if lost, would result in a "Code Red" scenario. That's because nearly half of Google search traffic in 2019 came from Apple products, according to the lawsuit.

22.     Google pays Apple billions of dollars a year to make its search product the default option, according to analyst estimates. That means when a user buys a new iPhone or other Apple device, the built-in search engine in the Safari browser is Google.

23.     The DOJ suit cited estimates that Apple gets $8 billion to $12 billion annually from Google through the agreement. Apple's income from the search deal is believed to be part of the company's growing Services segment, a key metric Apple has highlighted to investors and analysts in recent years.

> Gurman, Mark (2020, Oct. 20). *Apple, Google worked as 'one company' on search deal, U.S. says*. https://www.bloomberg.com/news/articles/2020-10-20/apple-google-worked-as-one-company-on-search-deal-u-s-says

**Joint Infringement**

24.     Upon information and belief, Google and Apple are jointly infringing Plaintiff's patented CMDC devices by offering for use, using, offering for sale, selling and/or importing as essential, Google's Search for use with Google and Apple smartphones, that have at a minimum, directly infringed independent claims 1, 2, and 3 of the '189 patent; independent claims 13, 14, 15, and 23 of the '439 patent; and, independent claims 4, 5, and 6 of the '287 patent.

14

SAppx693

25.    Plaintiff has alleged that Apple is infringing Plaintiff's communicating, monitoring, detecting, and controlling (CMDC) device in a related case *Larry Golden v. Apple, Inc. et al* filed on 12/16/2020 at the United States District Court for the District of South Carolina; Greenville Division (Case No. 6:20-cv-04353) against defendants, Apple Inc. et al.

26.    Plaintiff has also filed a case *Larry Golden v. Apple, Inc. et al* on 06/16/2020 at the United States District Court for the District of South Carolina; Greenville Division (Case No. 6:20-cv-02270) against defendants, Apple Inc. et al. for Antitrust Law Violations.

## GOOGLE'S JOINT INFRINGEMENT WITH QUALCOMM INC.

27.    According to a Qualcomm press release (2020), "Qualcomm Technologies, Inc. and Google announced their collaboration to enhance and extend Project Treble with the goal of enabling more devices with Qualcomm® Snapdragon™ mobile platforms to run the latest Android OS.  The enhancements are intended to enable Original Equipment Manufacturers (OEMs) to upgrade their Snapdragon based devices to the latest Android OS without modifying Qualcomm Technologies' chipset-specific software and to use a common Android software branch to upgrade devices based on a wide range of Snapdragon mobile platforms across Qualcomm Technologies' portfolio.  These enhancements are designed to reduce the time and resources required to upgrade Snapdragon based devices to the latest Android OS version."

28.    As part of this collaboration with Google, Qualcomm Technologies will now support four Android OS versions and four years of security updates for all Snapdragon platforms utilizing the Project Treble enhancements, starting with the new Snapdragon 888 Mobile Platform. These initiatives are designed to enable faster Android OS upgrades with fewer resources and a predictable software lifecycle for Snapdragon based devices, which together are

15

Case: 24-2024     Document: 23-2     Page: 119     Filed: 11/18/2024

Case 4:22-cv-05246-HSG   Document 46-1   Filed 09/13/23   Page 27 of 81
6:21-cv-00244-JD     Date Filed 01/26/21   Entry Number 1   Page 16 of 30

expected to result in more consumers with Snapdragon based devices running the latest Android OS version.

29.    "Google continues to work closely with our technology partners to increase the freshness of the Android ecosystem. Through this collaboration with Qualcomm Technologies, we expect that Android users will have the latest OS upgrades and greater security on their devices," said David Burke, vice president of Android engineering, Google.

30.    "We are excited to work with Google to extend our support for Android OS and security updates on future Snapdragon mobile platforms utilizing the Project Treble enhancements," said Kedar Kondap, vice president, product management, Qualcomm Technologies, Inc.

**Terminology**

- Google's android operating system; same as "operating system".
- Google's android operating system; same as "computer program".
- Google's android operating system; same as "software".
- Qualcomm's chipset; used interchangeably as "processor".
- Qualcomm's chipset; used interchangeably as "central processing unit".
- Qualcomm's chipset; used interchangeably as "wireless technology" (WiFi, 3G, 4G, 5G, LTE, and so on).

31.    An operating system is a computer program, works as interface between user and hardware and provides common services for computer programs. The entire process or functionality of computer system depends on the operating system. An operating system is a computer program that controls the execution of application programs and acts as an interface between the user of a computer and the computer hardware. The purpose of an operating system

Case: 24-2024     Document: 23-2     Page: 120     Filed: 11/18/2024

Case 4:22-cv-05246-HSG    Document 46-1    Filed 09/13/23    Page 28 of 81
6:21-cv-00244-JD    Date Filed 01/26/21    Entry Number 1    Page 17 of 58

is to provide an environment in which a user can execute programs in a convenient and efficient manner. https://www.geeksforgeeks.org/introduction-of-operating-system-set-1/

32.     A Central Processing Unit (CPU) is a machine that can execute computer programs. This broad definition can easily be applied to many early computers that existed long before the term "CPU" ever came into widespread usage. The term itself and its initialism have been in use in the computer industry at least since the early 1960s (Weik 1961). The form, design and implementation of CPUs have changed dramatically since the earliest examples, but their fundamental operation has remained much the same.

33.     An Operating System is the core software that allows applications to interface with the hardware. Operating Systems control the specific details of your system, presenting a more manageable interface for applications (and the user) to make use of. To use an analogy, the CPU is the brain, the OS is the mind. The mind cannot exist without a brain to store it, and the brain is just a useless lump without a mind to control it. https://answers.yahoo.com/question/index?qid=20090927101607AAiAJ42

34.     An SoC, or system-on-a-chip to give its full name, integrates almost all of these components into a single silicon chip. Along with a CPU, an SoC usually contains a GPU (a graphics processor), memory, USB controller, power management circuits, and wireless radios (WiFi, 3G, 4G LTE, and so on). Whereas a CPU cannot function without dozens of other chips, it's possible to build complete computers with just a single SoC. The number one advantage of an SoC is its size: An SoC is only a little bit larger than a CPU, and yet it contains a lot more functionality. If you use a CPU, it's very hard to make a computer that's smaller than 10cm (4 inches) squared, purely because of the number of individual chips that you need to squeeze in. Using SoCs, we can put complete computers in smartphones and tablets, and still have plenty of

SAppx696

Case: 24-2024   Document: 23-2   Page: 121   Filed: 11/18/2024

Case 4:22-cv-05246-HSG   Document 46-1   Filed 09/13/23   Page 29 of 81
6:21-cv-00244-JD   Date Filed 01/20/21   Entry Number 1   Page 18 of 81

space for batteries. https://www.extremetech.com/computing/126235-soc-vs-cpu-the-battle-for-the-future-of-computing.

**Joint Infringement**

35.   Upon information and belief, Google and Qualcomm are jointly infringing Plaintiff's patented CMDC devices by offering for use, using, offering for sale, selling and/or importing as essential, Google's Android platform for use with Qualcomm's SoCs, CPUs, etc. for smartphones that have at a minimum, directly infringed independent claims 1, 2, and 3 of the '189 patent; independent claims 13, 14, 15, and 23 of the '439 patent; and, independent claims 4, 5, and 6 of the '287 patent.

36.   Google developing its own phone processor would mean dumping the Qualcomm SoCs it usually uses. Of course, you can never truly be rid of Qualcomm: Google would presumably still need to use Qualcomm modems, something that even Apple still needs to do. There are other modem manufacturers out there—Samsung, Huawei, Mediatek—but Qualcomm's combination of patents and strong-arm licensing techniques has effectively locked its competitors out of the US and other markets.

37.   Plaintiff has alleged that Qualcomm is infringing Plaintiff's communicating, monitoring, detecting, and controlling (CMDC) device in a related case *Larry Golden v. Apple, Inc. et al.* filed on 12/16/2020 at the United States District Court for the District of South Carolina; Greenville Division (Case No. 6:20-cv-04353) against defendants, *Apple Inc. et al.*

38.   Plaintiff has also filed a case *Larry Golden v. Apple, Inc. et al* on 06/16/2020 at the United States District Court for the District of South Carolina; Greenville Division (Case No. 6:20-cv-02270) against defendants, *Apple Inc. et al.* for Antitrust Law Violations.

18

## CLAIM CONSTRUCTION

"*Inter Partes Review* (IPR): *Department of Homeland Security vs. Larry Golden;* Case No.:

IPR2014-00454 (Patent RE43,990; Claims 11, 74, & 81); Final Written Decision entered on

October 1, 2015. "In the 'Decision to Institute', we construed certain claim terms. Those

constructions are reproduced in the chart below:

| Claim Term | Construction |
|---|---|
| "built in, embedded" (claim 74) | "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device" |
| "communication device" (claim 81) | "monitoring equipment" |

Dec. to Inst. 11-16

    39.    "No party challenges these constructions. Both of these terms were modified or

removed in the amendment. To the extent that any of these constructions remain relevant after

the amendment, we see no reason to modify them... [w]e further determined that no explicit

construction was necessary for any other claim terms. Dec. to Inst. 10-11. Based on the record

adduces during trial, we see no need to construe any other terms..."

    40.    "Beginning with the claim preamble amendment, the preamble of claim 11

originally read: "A communication device of at least one of *a cell phone, a smart phone, a*

*desktop, a handheld, a PDA, a laptop, or a computer terminal at a monitoring site* for

monitoring products for communication therebetween, comprising...." In claim 154, the

language in italics has been eliminated and replaced with "the products grouped together by

common features in the product grouping category of design similarity (e.g., computer terminal,

personal computer (PC)) ..." Patent Owner contends that this new language is consistent with

19

Case: 24-2024     Document: 23-2     Page: 123     Filed: 11/18/2024

Case 4:22-cv-05246-HSG   Document 46-1   Filed 09/13/23   Page 31 of 81
6:21-cv-00244-JD     Date Filed 01/26/21   Entry Number 1     Page 20 of 30

words found in the disclosure of the '118 application. Mot. To Amend 4. Patent Owner further

contends that this new language is broad enough to include the removed items, such as cell

phones and smart phones, because those items are "species terms" that are "included in the genus

'monitoring equipment' and 'communication device' when the clause 'products grouped together

by common features in the product groupings category of design similarity' is included." *Id.*

Patent Owner argues that "[t]he specific devices removed, such as the cell phones and smart

phones would be recognized by one of ordinary skill in the art as a type of communication

device or monitoring equipment because cell phones and smartphones are devices that are

capable of communication and are capable of receiving signals." *"Inter Partes Review* (IPR):

*Department of Homeland Security vs. Larry Golden;* Case No.: IPR2014-00454 (Patent

RE43,990; Claims 11, 74, & 81); Final Written Decision entered on October 1, 2015.


## COUNT I

### (Infringement of the '287 Patent)

41.     Golden realleges and incorporates herein the allegations set forth in Paragraphs 1-

40.

42.     On information and belief, Google is jointly, directly, indirectly and/or under the

'doctrine of equivalents', infringing at least independent claims 4, 5, and 6 of the '287 patent.

The alleged infringing products are: Google Pixel smartphones 3, 3XL, 3a, 3aXL, 4a, 4a(5G),

and 5.

43.     As set forth in Golden's preliminary infringement contentions that Google is

making, using, offering for sale, selling and/or importing Plaintiff's CMDC device have at a

minimum directly infringed the '287 patent and Google is thereby liable for infringement of the

20

'287 patent pursuant to 35 U.S.C. § 271. Google have caused damage to Golden, which

infringement and damage will continue unless and until Google is enjoined.

44.     The alleged infringement of Golden identified in this Count has caused

irreparable injury to Golden for which remedies at law are inadequate. Considering the balance

of the hardships between the parties, a remedy in equity, such as a permanent injunction is

warranted and such a remedy would be in the public interest.

## COUNT II

### (Infringement of the '439 Patent)

45.     Golden realleges and incorporates herein the allegations set forth in Paragraphs 1-
44.

46.     On information and belief, Google is jointly, directly, indirectly and/or under the

'doctrine of equivalents', infringing at least independent claims 13, 14, 15, and 23 of the '439

patent. The alleged infringing products are: Google Pixel smartphones 3, 3XL, 3a, 3aXL, 4a,

4a(5G), and 5.

47.     As set forth in Golden's preliminary infringement contentions that Google is

making, using, offering for sale, selling and/or importing Plaintiff's CMDC device have at a

minimum directly infringed the '439 patent and Google is thereby liable for infringement of the

'439 patent pursuant to 35 U.S.C. § 271. Google have caused damage to Golden, which

infringement and damage will continue unless and until Google is enjoined.

48.     The alleged infringement of Google identified in this Count has caused

irreparable injury to Golden for which remedies at law are inadequate. Considering the balance

of the hardships between the parties, a remedy in equity, such as a permanent injunction is

warranted and such a remedy would be in the public interest.

21

Case: 24-2024     Document: 23-2     Page: 125     Filed: 11/18/2024

Case 4:22-cv-05246-HSG   Document 46-1   Filed 09/13/23   Page 33 of 81
6:21-cv-00244-JD   Date Filed 03/26/21   Entry Number 1   Page 22 of 81

## COUNT III

### (Infringement of the '189 Patent)

49.     Golden realleges and incorporates herein the allegations set forth in Paragraphs 1-48.

50.     On information and belief, Google is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing claims 1, 2 & 3 of the '189 patent. The alleged infringing products are: Google Pixel smartphones 3, 3XL, 3a, 3aXL, 4a, 4a(5G), and 5.

51.     As set forth in Golden's preliminary infringement contentions that Google is making, using, offering for sale, selling and/or importing Plaintiff's CMDC device have at a minimum directly infringed the '189 patent and Google is thereby liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271. Google have caused damage to Golden, which infringement and damage will continue unless and until Google is enjoined.

52.     The alleged infringement of Google identified in this Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a permanent injunction is warranted and such a remedy would be in the public interest.

## CLAIM CHART

53.     The following Claim Chart is an illustration of literal infringement. At least one of the alleged infringing products of Google (i.e., Google Pixel smartphones 3, 3XL, 3a, 3aXL, 4a, 4a(5G), or 5) is representative of all the alleged infringing products of Google asserted in this complaint. At least one of the alleged infringing products of Google (Google Pixel 5) is illustrated to show how the Google Pixel 5 allegedly infringes on at least one of the asserted independent claims of each of the patents-in-suit ('287, '439, and '189 patents).

SAppx701

Case: 24-2024     Document: 23-2     Page: 126     Filed: 11/18/2024

Case 4:22-cv-05246-HSG    Document 46-1    Filed 09/13/23    Page 34 of 81
6:21-cv-00244-JD    Date Filed 01/26/21    Entry Number 1    Page 23 of 58

| Google Pixel 5 Smartphone | Patent #: 10,163,287; Independent Claim 5 | Patent #: 9,589,439; Independent Claim 23 | Patent #: 9,096,189; Independent Claim 1 |
|---|---|---|---|
| | A monitoring device, comprising: | A cell phone comprising: | A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, comprising: |
| CPU: Octa-core (1 × 2.4 GHz Kryo 475 Prime & 1 × 2.2 GHz Kryo 475 Gold & 6 × 1.8 GHz Kryo 475 Silver) System-on-a-chip: Qualcomm Snapdragon 765G | at least one central processing unit (CPU); | a central processing unit (CPU) for executing and carrying out the instructions of a computer program; | at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or a front-end processor for communication between a host computer and other devices; |
| Ambient Temperature sensor supported by the Android platform. Measures the ambient room temperature in degrees Celsius (°C). Monitoring air temperatures. Monitoring air temperatures. | at least one temperature sensor in communication with the at least one CPU for monitoring temperature; | X | X |

23

SAppx702

Case: 24-2024    Document: 23-2    Page: 127    Filed: 11/18/2024

Case 4:22-cv-05246-HSG    Document 46-1    Filed 09/13/23    Page 35 of 81
6:21-cv-00244-JD    Date Filed 01/26/21    Entry Number 1    Page 24 of 30

| | | | |
|---|---|---|---|
| Gravity sensor supported by the Android platform. Measures the force of gravity in m/s2 that is applied to a device on all three physical axes (x, y, z). Motion detection (shake, tilt, etc.). | at least one motion sensor in communication with the at least one CPU; | X | X |
| Light sensor supported by the Android platform. Measures the ambient light level (illumination) in lx. Controlling screen brightness. Screen: 6-inch flexible OLED display at 432 ppi | at least one viewing screen for monitoring in communication with the at least one CPU; | X | X |
| Connectivity: Wi-Fi 5 (a/b/g/n/ac) 2.4 + 5.0 GHz, Bluetooth 5.0 + LE, NFC, GPS (GLONASS, Galileo, BeiDou), eSIM capable | at least one global positioning system (GPS) connection in communication with the at least one CPU; | at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; | at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection; |
| Connectivity: Wi-Fi 5 (a/b/g/n/ac) 2.4 + 5.0 GHz, Bluetooth 5.0 + LE, NFC, GPS (GLONASS, Galileo, BeiDou), eSIM capable | at least one of an internet connection or a Wi-Fi connection in communication with the at least one CPU; | wherein at least one of… WiFi connection, internet connection, radio frequency (RF) connection, cellular connection… capable of signal communication with the transmitter or the receiver; | wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group… of satellite, Bluetooth, WiFi… |

24

SAppx703

Case: 24-2024    Document: 23-2    Page: 128    Filed: 11/18/2024

Case 4:22-cv-05246-HSG    Document 46-1    Filed 09/13/23    Page 36 of 81
6:21-cv-00244-JD    Date Filed 01/26/21    Entry Number 1    Page 25 of 30

| | | | |
|---|---|---|---|
| Connectivity: Wi-Fi 5 (a/b/g/n/ac) 2.4 + 5.0 GHz, Bluetooth 5.0 + LE, NFC, GPS (GLONASS, Galileo, BeiDou), eSIM capable | at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; | at least one of a… Bluetooth connection, WiFi connection, internet connection… cellular connection… short range radio frequency (RF) connection, or GPS connection; | X |
| Google's Android operating system features a lock mechanism to secure your phone, known as pattern lock. To set, drag your finger along lines on the screen. To unlock the phone, replicate the pattern drawn. If you fail to solve the pattern too many times, the phone locks and cannot be unlocked without logging into the associated Google account.<br><br>Google Nest × Yale Lock is connected to the Nest app; you can lock or unlock your door from your phone. | at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device; | whereupon the cell phone is interconnected to the cell phone detection device to receive signals or send signals to lock or unlock doors, to activate or deactivate security systems, to activate or deactivate multi-sensor detection systems, or to activate or deactivate the cell phone detection device; | X |
| Pixel phones use USB-C with USB 2.0 power adapters and cables. To charge your phone with a USB-A power adapter, use a USB-C to USB-A cable. | at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device; | X | X |

25

SAppx704

| | | | |
|---|---|---|---|
| BIOMETRICS: Biometric factors allow for secure authentication on the Android platform. The Android framework includes face and fingerprint biometric authentication. Android can be customized to support other forms of biometric authentication (such as Iris). | at least one biometric sensor in communication with the at least one CPU for providing biometric authentication to access the communication device; | wherein the cell phone is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature such that the cell phone is locked by the biometric lock disabler to prevent unauthorized use; and | wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature such that the communication device that is at least one of the cell phone, the smart phone, the desktop, the handheld, the PDA, the laptop or the computer terminal is locked by the biometric lock disabler to prevent unauthorized use |
| *Android Team Awareness Kit*, ATAK (built on the Android operating system) provides a single interface for viewing and controlling different CBRN-sensing technologies, whether that is a wearable smartwatch that measures a warfighter's vitals (e.g., heart rate) or a device mounted on a drone to detect chemical warfare agents. | at least one sensor for chemical, biological, or human detection in communication with the at least one CPU; | the cell phone is at least a fixed, portable or mobile communication device interconnected to the cell phone detection device, capable of wired or wireless communication therebetween; and | the communication device is at least a fixed, portable or mobile communication device interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween… |

26

SAppx705

| | | | |
|---|---|---|---|
| *Android Team Awareness Kit*, ATAK (built on the Android operating system) is a digital application available to warfighters throughout the DoD. ATAK offers warfighters geospatial mapping for situational awareness during combat — on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK now includes chemical, biological, radiological, and nuclear (CBRN) plug-ins. | one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents; | at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone; | wherein the communication device receives a signal via any of one or more products listed in any of the plurality of product grouping categories; |
| Connectivity: Wi-Fi 5 (a/b/g/n/ac) 2.4 + 5.0 GHz, Bluetooth 5.0 + LE, NFC, GPS (GLONASS, Galileo, BeiDou), eSIM capable | at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU... | X | X |
| Google Nest × Yale Lock is connected to the Nest app; you can lock or unlock your door from your phone.<br><br>*Android Team Awareness Kit*, ATAK (built on the Android operating system) provides a single interface for viewing and controlling different CBRN-sensing technologies | at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or... detect at least one of a chemical biological... agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. | a transmitter for transmitting signals and messages to a cell phone detection device; a receiver for receiving signals from the cell phone detection device; | a transmitter for transmitting signals and messages to at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device;<br><br>a receiver for receiving signals, data or messages from at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device; |

27

SAppx706

| | | | |
|---|---|---|---|
| Google Nest × Yale Lock is connected to the Nest app; you can lock or unlock your door from your phone.<br><br>*Android Team Awareness Kit*, ATAK (built on the Android operating system) provides a single interface for viewing and controlling different CBRN-sensing technologies | X | X | whereupon the communication device, is interconnected to a product equipped to receive signals from or send signals to lock or unlock doors, activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems |
| *Android Team Awareness Kit*, ATAK (built on the Android operating system) is a digital application available to warfighters throughout the DoD. ATAK offers warfighters geospatial mapping for situational awareness during combat — on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK now includes chemical, biological, radiological, and nuclear (CBRN) plug-ins. | X | a transmitter for transmitting signals and messages to a cell phone detection device; a receiver for receiving signals from the cell phone detection device; | wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection... short range radio frequency (RF) connection is capable of signal communication with the transmitter and the receiver of the communication device and transceivers of the products; |

28

| | | | |
|---|---|---|---|
| *Android Team Awareness Kit*, ATAK (built on the Android operating system) is a digital application available to warfighters throughout the DoD. ATAK offers warfighters geospatial mapping for situational awareness during combat — on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK now includes chemical, biological, radiological, and nuclear (CBRN) plug-ins. | X | whereupon a signal sent to the receiver of the cell phone detection device from at least one of the chemical sensor, the biological sensor, the explosive sensor, the human sensor, the contraband sensor, or the radiological sensor, causes a signal that includes at least one of location data or sensor data to be sent to the cell phone. | X |

## PRAYER FOR RELIEF

Wherefore, Golden respectfully requests that this Court enter:

A.     A judgment in favor of Golden that the defendant has infringed at least one or more claims of the '287 Patent, the '439 Patent, and the '189 Patent as aforesaid;

B.     A permanent injunction enjoining the defendant, its officers, directors, agents, servants, affiliates, employees, divisions, branches, subsidiaries, parents and all others acting in active concert or privity therewith from direct, indirect and/or joint infringement of the '287, '439, and '189 patents as aforesaid pursuant to 35 U.S.C. § 283;

C.     A judgment and order requiring the defendant to pay Golden its damages with pre- and post-judgment interest thereon pursuant to 35 U.S.C. § 284;

D.     As set forth in Golden's preliminary infringement contentions that the Defendant in this case is making, using, offering for sale, selling and/or importing the aforementioned

29

alleged infringing devices that have at a minimum, directly infringed the '287, '439, and '189 patents. The Defendant is thereby liable for infringement of the '287, '439, and '189 patents pursuant to 35 U.S.C. § 271. The Defendant has caused damage to Golden, which infringement and damage will continue unless and until the Defendant is enjoined.

      E.     Any and all further relief to which the Court may deem Golden entitled.


## DEMAND FOR JURY TRIAL

Golden requests a trial by jury on all issues so triable by right pursuant to Fed. R. Civ. P. 38. A right guaranteed under the Seventh Amendment of the Constitution.



Respectfully submitted,


S/ _Larry Golden_____     Date: 01 /25 /2021

Larry Golden, Petitioner, Pro Se

740 Woodruff Rd., #1102

Greenville, South Carolina 29607

(H) 864-288-5605 / (M) 864-992-7104

atpg-tech@charter.net

# Exhibit F

FORM 12. Informal Opening Brief (District Court, Court of International Trade, and Court of Federal Claims)

Form 12 (p. 1)
July 2020

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

### INFORMAL BRIEF OF APPELLANT

Case Number: __2022-1267__

Short Case Caption: __Golden v. Google LLC__

Name of Appellant: __Larry Golden__

**Instructions:** Read the Guide for Unrepresented Parties before completing this form. Answer the questions as best as you can. Attach additional pages as needed to answer the questions. This form and continuation pages may not exceed 30 pages.

Attach a copy of the trial court's opinion, order, and/or judgment. You may also attach other record material as an appendix. Any attached material should be referenced in answer to the below questions. Please redact (erase, cover, or otherwise make unreadable) social security numbers or comparable private personal identifiers that appear in any attachments you submit.

1. Have you ever had another case before this court?   ☑ Yes   ☐ No
   If yes, state the name and number of each case.

   Case No. 2022-1196 Golden v. US
   Case No. 2022-1229; Golden v. Apple Inc.

2. Did the trial court incorrectly decide or fail to take into account any facts?
   ☑ Yes   ☐ No
   If yes, what facts?

   35 U.S.C. 281. REMEDY FOR INFRINGEMENT OF PATENT. "A patentee shall have remedy by civil action for infringement of his patent."

   35 U.S. Code § 271. (a)-[W]hoever without authority makes, uses, offers to sell or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent. (b)-Whoever actively induces infringement of a patent shall be liable as an infringer. (c)-Whoever offers to sell or sells within the United States or imports into the United States a component of a patented machine, manufacture, combination or composition, or a material or apparatus for use in practicing a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent ...

RECEIVED

MAR 03 2022

United States Court of Appeals
For The Federal Circuit

FORM 12. Informal Opening Brief (District Court, Court of International Trade, and Court of Federal Claims)

Form 12 (p. 2)
July 2020

3. Did the trial court apply the wrong law? ☑ Yes   ☐ No

If yes, what law should be applied?

> According to the United States District Court District of South Carolina, if the pro se plaintiff fails to procedurally state a claim, it is the responsibility of the Judges of this court [to] outline proper procedure so that the pro se party will not be deprived of a fair opportunity to present his or her case", See Roseboro v. Garrison, 528 F.2d 309, 310 (4th Cir. 1975)
>
> Even after Twombly and Iqbal, "in determining whether a complaint states a claim that is plausible, the court is required to proceed 'on the assumption that all the [factual] allegations in the complaint are true,' [e]ven if their truth seems doubtful." (quoting Twombly, 550 U.S. at 556).
>
> At the pleading stage, "Plaintiff is not required to plead 'direct infringement of each and every element of the allegedly infringed claim'." (quoting Crypto Res., LLC v. Assa Abloy, Inc., 236 F. Supp. 3d 671, 686 (E.D.N.Y. 2017))
>
> In Nalco Co. v. Chem-Mod, LLC, 883 F.3d 1337 (Fed. Cir. 2018), the Federal Circuit expressly stated: "the FRCP do not require a plaintiff in plead facts establishing that each element of an asserted claim is met." Id. at 1350 (quoting In re Bill of Lading, 681 F.3d 1323, 1339 (Fed. Cir. 2012).
>
> "In light of his pro se status, we cannot say that he has failed to allege a patent infringement claim as a matter of law on the face of the complaint ... See McZeal v. Sprint Nextel Corp., 501 F.3d 1354, 1356-58 (Fed. Cir. 2007)."

4. Did the trial court fail to consider important grounds for relief?

☑ Yes   ☐ No

If yes, what grounds?

> 35 U.S.C. § 282 establishes a presumption of patent validity that an alleged patent infringer must overcome by clear and convincing evidence in all circumstances.
>
> On June 9, 2011, the U.S. Supreme Court issued its much-anticipated decision in Microsoft v. i4i. At issue was whether patents would continue to enjoy a strong presumption of validity during litigation. More specifically, whether the clear and convincing evidence standard necessary to invalidate a patent would be overturned.
>
> Microsoft had challenged that standard, arguing that a lower standard of "preponderance of the evidence" should be sufficient. The Supreme Court unanimously rejected Microsoft's argument and affirmed the Federal Circuit's long-standing strong presumption of proof. As a result, the clear and convincing evidence standard remains.
>
> The Trial Court fail to consider the presumption of validity of Plaintiff-Appellant's patents.

5. Are there other reasons why the trial court's decision was wrong?

☑ Yes   ☐ No

If yes, what reasons?

> All of Plaintiff-Appellant's inventions has "use" and are not frivolous. "A frivolous invention is an invention with no use. U.S. patents are only granted for a "new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof" (35 USC 101).
>
> Plaintiff-Appellant's fourteen (14) inventions assembled as a CMDC Device (i.e., smartphone, laptop, smartwatch, new and improved cell phone, etc.); with the "secondary" inventions designed and developed to be integrated with the CMDC any.
>
> 1-Communicating, Monitoring, Detecting and Controlling (CMDC) Device (i.e., smartphone) – Claim 93 of the '439 Patent. 2-Central Processing Units for CMDC Device – Claim 5 of the '287 Patent. 3-Camera CBR Sensor(s) for CMDC Device – Claim 4 of the '189 Patent. 4-Smartwatch CBR Detector for CMDC Device – Claim 19 of the '439 Patent. 5-Embedded CBRN Sensors for CMDC Device – Claim 16 of the '439 Patent. 6-Interchangeable Sensors for CMDC Device – Claim 20 of the '439 Patent. 7-NFC CBR Tag for CMDC Device – Claim 21 of the '439 Patent. 8-Remote/Electrical Lock for CMDC Device – Claim 125 of the '990 Patent 9-Pre-Programmed Lock for CMDC Device – Claim 1 of the '287 Patent. 10-Fingerprint/Face Recognition for CMDC Device – Claim 1 of the '619 Patent. 11-Stall, Stop, Slowdown for CMDC Device – Claim 11 of the '801 Patent. 12-Vehicle Monitoring with CMDC Device – Claim 44 of the '801 Patent. 13-Connect Vehicle with CMDC Device – Claim 4 of the '287 Patent. 14-Internet-of-Things with CMDC Device – Claim 11 of the '619 Patent.

FORM 12. Informal Opening Brief (District Court, Court of International Trade,          Form 12 (p. 3)
and Court of Federal Claims)                                                                July 2020

6.  What action do you want this court to take in this case?

> Plaintiff-Appellant has stated a plausible claim for direct infringement by specifically identifying the Defendant's products and alleging that they perform the same unique function as Plaintiff-Appellant's patented inventions. The Defendant in this case is allegedly liable for infringement of the asserted patents-in-suit under 35 U.S.C. § 371.
>
> As set forth in Plaintiff-Appellant's preliminary infringement contentions that Google is making, using, offering for sale, selling and/or importing Plaintiff-Appellant's CMDC device have at a minimum directly infringed the '287, '439, & '189 patents and Google is thereby liable for infringement of the '287, '439, & '189 patents pursuant to 35 U.S.C. § 371. Google have caused damage to Plaintiff-Appellant, which infringement and damage will continue unless and until Google is enjoined.
>
> The alleged infringement of Google identified in the Trial Court has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a preliminary injunction is warranted and such a remedy would be in the public interest.

Date:  03/02/2022                     Signature:  *Larry Golden*

                                       Name:  Larry Golden

Pursuant to the Federal Circuit's "ORDER", in *Golden v. Google LLC.*, Case No. 22-1267; Dkt. No. 8; filed 02/17/2022, Plaintiff-Appellant is submitting this corrected informal brief, not to exceed 30 pages.

This Motion is in compliance with FEDERAL RULE OF APPELLATE PROCEDURE 32: Briefs: (a)(4)(5)(6) & (7)(A) not to exceed 30 pages.

This dismissal is in favor of the Defendant, Google LLC; on grounds independent of the underlying merits of the action (e.g., the Plaintiff-Appellant's infringement claims; the validity of Plaintiff-Appellant's asserted patents and patent claims; and, the Defendant's merits-based defenses).

"Accordingly, the Report recommend dismissal of Plaintiff's complaint because *inter alia* the Plaintiff's complaint contains a lengthy history of his prior actions in this Court… but contains few factual allegations relating to the alleged infringement [1] …

---

[1] Case 6:21-cv-00244-JD in *Golden v. Google LLC* "OBJECTION TO THE MAGISTRATE'S REPORT AND RECOMMENDATION: HISTORY OF PLAINTIFF'S RELATED CASES" Date Filed 04/22/21 Dkt. No. 18 "The purpose of Plaintiff's claim charts is to determine if any infringement has occurred. For infringement analysis & litigation, Plaintiff's claim charts are designed to help confirm that each and every limitation of the claim is present in a product, service, or standard. For validity analysis in litigation, Plaintiff's claim charts are designed to help confirm the novelty of a claim relative to prior art. Plaintiff's claim construction and claim interpretation charts included in this Complaint, shows patent specifications and/or technical literature citations with proper interpretations of the language of a claim."

4

RECEIVED
MAR 0 3 2022
United States Court of Appeals
For The Federal Circuit

"[I]n the absence of specific objections to the Report and Recommendation of the magistrate judge, this Court is not required to give any explanation for adopting the recommendation … In light of the vague conclusory allegations in the complaint in this action and Golden's attempt to circumvent the prior dismissals of his patent infringement claims, the instant matter is subject to summary dismissal as frivolous." "IT IS, THEREFORE, ORDERED that Plaintiff's Complaint is dismissed with prejudice and without the issuance of service of process." In the United States District Court for the District of South Carolina—Greenville Division, in *Larry Golden v. Google LLC*, Case 6:21-cv-00244-JD Date Filed 11/02/21 Entry Number 21.

## STATEMENT MADE TO THE APPELLATE COURT

Plaintiff-Appellate has devoted 20 years to servicing his country by way of offering strategics in the form of economic stimulus packages to restore our Nation's economy after the 9/11 attacks.

Plaintiff-Appellate spent 5 years (2002-2007) describing and explaining to government the technology [products] needed for assembly [product grouping]; to successfully achieve the desired outcome of the economic stimulus packages. (e.g., through e-mail correspondence, read-ahead documents, request for information,

5

request for proposals, DHS visits, SBIR road tours, industry day conference, symposiums, phone conversations, letters, implied-in-fact contracts, etc.)

The Department of Homeland Security issued its first 'request for proposal' for the assembly of Plaintiff-Appellant's technology in 2007 (*DHS S&T Cell-All Ubiquitous Biological & Chemical Sensing; BAA07-10*).

Plaintiff-Appellant responded to the request for proposal and reminded the DHS that Plaintiff-Appellant has the technology they were seeking patented. The DHS awarded contracts to Apple, Samsung, LG, & Qualcomm in 2008 for the assembly of Plaintiff-Appellant's inventions covered in United States patents.

Plaintiff-Appellant initially intended to file the first case against the government in 2013 under Section 1491 Tucker Act; "Government "Taking" of Private Property Under the Fifth Amendment Clause of the United States Constitution, without paying just compensation.[2] In 2014 the COFC stayed the "takings" claim and ordered the parties to move forward on the infringement.

---

[2] *Supreme Court opinion from the late nineteenth century: Nothing in this history suggests that personal property was any less protected against physical appropriation than real property. As this Court summed up in James v. Campbell, 104 U.S. 356, 358 (1882), a case concerning the alleged appropriation of a patent by the Government: "[A patent] confers upon the patentee an exclusive property in the patented invention which cannot be appropriated or used by the government itself, without just compensation, any more than it can appropriate or use without compensation land which has been patented to a private purchaser."*

SAppx716

Plaintiff-Appellant won't go into all of dirty and under handed things the COFC, DHS, DOJ, and SCDC has done, and is still doing to prejudice my cases, because it is known, or should be known, their behavior is most likely because Plaintiff-Appellant is an African American Inventor.

Plaintiff-Appellant claims he is the Inventor of the CMDC device (i.e., smartphone or new and improved cell phone). Plaintiff-Appellant believes the Courts are basing their "frivolous" theory on *"Blacks are only two-third human beings and is therefore incapable of inventing"*.

Plaintiff-Appellant's cases could have been settled years ago. All the government and any of the defendants in any of the cases pending needed to do is present evidence that any one of them invented the smartphone or new and improved cell phone.

Instead of the government and the defendants in the cases pending, fail to present evidence that at least one of them holds the patent(s) for the smartphone or new and improved cell phone. The Trial Court and government have spent years accusing Plaintiff-Appellant of presenting complaints that exceeds the page limit, enhancing the complaints, disobeying court orders, not presenting enough factual allegations, an antitrust case that is really an infringement case, an infringement case that is duplicative of a pending case, trying to circumvent previous dismissals, government agencies (DHS & DOJ) not *persons* qualified to petition the PTAB for

*inter pates review*, presenting references in an IPR trial that do not antedate

Plaintiff-Appellant's patents; and, of course, the case is *frivolous* because no

African American could have possibly invented the smartphone.

It is not by chance the government and third-party contractors (Apple, LG,

Samsung, & Qualcomm) developed and assembled the smartphone. They followed

my instructions and specifications for the CMDC device (smartphone) to the letter.

Google duplicated the process and is now being protected from liability.

We all know that the likelihood of the government and any of the defendants

in any of the cases pending can present evidence that any one of them invented the

smartphone or new and improved cell phone, is highly improbable because the

defendants are paying Qualcomm 5% royalty on each smartphone sold. Charging

royalties based on the price of a handset is unreasonable and contrary to US law. [3]

---

[3] Judge Lucy Koh of the US District Court of the Northern District of California in her
decision in *Federal Trade Commission v Qualcomm Incorporated* (5:17-cv-0220); determined
that charging royalties based on the price of a handset was unreasonable and contrary to US
law... Under the supply agreement, the handset makers pay a per-chip price to buy the chips, but
under the SULA, the handset makers pay royalties of 5% on the price of each phone sold,
regardless of whether a Qualcomm chip is used. Plaintiff-Appellant believes Qualcomm's 5%
royalty rate on the price of each phone sold is a species of unfair competition... The Federal
Trade Commission Act bans "unfair methods of competition" and "unfair or deceptive acts or
practices." The Supreme Court has said that all violations of the Sherman Act also violate the
FTC Act. (Qualcomm does not own the patent(s) for the smartphone or improved cell phone)

SAppx718

## THE PARTIES

Plaintiff-Appellant Larry Golden is a citizen of South Carolina and has a principal place of business and residence at 740 Woodruff Road, #1102, Greenville, S.C. 29607.

On information and belief, the Defendant-Appellee Google is incorporated in the State of Delaware with a principal place of business at 1600 Amphitheatre Parkway, Mountain View, CA 94043 and does business in this judicial district by, among other things, committing jointly, directly, and/or indirectly the tort of literal patent infringement or infringement under the "doctrine of equivalents" giving rise to this complaint. Google may be served at its principal place of business at 1600 Amphitheatre Parkway, Mountain View, CA 94043.

Google LLC is one of the largest technology companies in the world and conducts product sales, and online search operations in the District of South Carolina. Google LLC directly and/or indirectly distributes, markets, offers to sell, sells, and/or imports the infringing Google Pixel Series of smartphones and Google Android Operating Systems.

## HISTORY

According to the United States District Court—District of South Carolina: Information on Representing Yourself in a Civil Action (Non-Prisoner) Revised

SAppx719

December 1, 2020; Notice to *Pro Se* Parties; "[w]henever a civil case is brought by a prose party, the judges of this court outline proper procedure so that the *pro se* party will not be deprived of a fair opportunity to present his or her case", *See Roseboro v. Garrison*, 528 F.2d 309, 310 (4ᵗʰ Cir. 1975).

From the very first filings in the Trial Court, the Judges' intent was to dismiss Plaintiff-Appellant's case(s). The Court erred in dismissing Plaintiff-Appellant's initial complaint three times as a duplicate of a related case filed in the Court of Federal Claims. The CAFC determined the Case was not a duplicate.

When the Plaintiff-Appellant amended and refiled in the same case in the SCDC court. The SCDC & CAFC dismissed the case without prejudice. The Court erred in rejecting Plaintiff-Appellant's amended complaint.

When the Plaintiff-Appellant filed a new case against the same defendant's, the Court erred in not allowing Plaintiff-Appellant's complaint to be docketed, because the Court determined the complaint exceeded the minimum page count of 35 pages.

When Plaintiff-Appellant submitted the 34-page complaint, the Court dismissed the case for not alleging enough factual allegations. The District Judge overturned the 35-page requirement, but did nothing to help Plaintiff-Appellant before dismissing the case. *See Platsky v. C.I.A.* 953 F.2d. 25, "[c]ourt errs if court

10

dismisses the *pro se* litigant pleadings without instruction of how pleadings are deficient and how to repair pleadings".

When the Plaintiff-Appellant filed a cause of action of "Antitrust Law Violations", the case was changed by the Court to "patent infringement" and dismissed for the same reasons the Court dismissed the previously filed patent infringement case. The District Judge overturned the patent infringement cause of action, but did nothing to help Plaintiff-Appellant before dismissing the case; "[t]he plaintiff may combine as many claims as the plaintiff has against a defendant in one case and may sue more than one defendant in one case if the claim involves all of the defendants…" *South Carolina Judicial Branch: C. Civil Procedure in Magistrates' Courts 1. The Pleadings …*

The Court erred in dismissing Plaintiff-Appellant's case against Google as frivolous, "[t]he instant complaint seeks damages against Google for the same allegations that were dismissed as *frivolous* in Case Number 3, Case Number 4, and Case Number 5; however, it appears that this action represents Golden's attempt to re-litigate claims against Apple and/or Qualcomm and now asserts the same claims against Google."

The Court, in this current case, and all of the before mentioned cases, fail to state what makes Plaintiff-Appellant's cases "*fanciful and delusional*". A frivolous claim, often called a bad faith claim, refers to a lawsuit, motion or appeal that is

11

intended to harass, delay or embarrass the opposition, "[a] claim is frivolous when the claim lacks any arguable basis either in law or in fact", *Neitze v. Williams*, 490 U.S. 319, 325 (1989).

Even after *Twombly and Iqbal*, "in determining whether a complaint states a claim that is plausible, the court is required to proceed 'on the assumption that all the [factual] allegations in the complaint are true', [e]ven if their truth seems doubtful." (quoting *Twombly*, 550 U.S. at 556).

Plaintiff-Appellant believes this case should be remanded back to the SCDC court for trial by jury. Plaintiff-Appellant also believes that because he is an African-American Inventor, who is representing himself *Pro Se*, the SCDC court judges will not allow a Black, to defend his property against Whites, in their Court.

"Malicious intent refers to the intent, without just cause or reason, to commit a wrongful act that will result in harm to another. It is the intent to harm or do some evil purpose" https://definitions.uslegal.com/m/malicious-intent/


**STANDARDS FOR REVIEW**

Although Plaintiff-Appellant did not file a "Judicial Notice" during the pleading stage at the Trial Court in the following way, it is still relevant to this case:

SAppx723

"All officers of the court for the United States District Court for the District of South Carolina, are hereby placed on notice under authority of the supremacy and equal protection clauses of the United States Constitution and the common law authorities of *Haines v Kerner*, 404 U.S. 519, *Platsky v. C.I.A.* 953 F.2d. 25, and *Anastasoff v. United States*, 223 F.3d 898 (8th Cir. 2000) relying on *Willy v. Coastal Corp.*, 503 U.S. 131, 135 (1992), "*United States v. International Business Machines Corp.*, 517 U.S. 843, 856 (1996), quoting *Payne v. Tennessee*, 501 U.S. 808, 842 (1991) (Souter, J., concurring). *Trinsey v. Pagliaro*, D.C. Pa. 1964, 229 F. Supp. 647, *American Red Cross v. Community Blood Center of the Ozarks*, 257 F.3d 859 (8th Cir. 07/25/2001).

*In re Haines*: pro se litigants (Plaintiff is a pro se litigant) are held to less stringent pleading standards than BAR registered attorneys. Regardless of the deficiencies in their pleadings, pro se litigants are entitled to the opportunity to submit evidence in support of their claims.

*In re Platsky*: court errs if court dismisses the pro se litigant pleadings (Plaintiff is a pro se litigant) without instruction of how pleadings are deficient and how to repair pleadings.

*In re Anastasoff*: litigants' constitutional rights are violated when courts depart from precedent where parties are similarly situated. All litigants have a

13

constitutional right to have their claims adjudicated according the rule of precedent.

See *Anastasoff v. United States*, 223 F.3d 898 (8th Cir. 2000). Statements of counsel, in their briefs or their arguments are not sufficient for a motion to dismiss or for summary judgment, *Trinsey v. Pagliaro*, D.C. Pa. 1964, 229 F. Supp. 647.

See *Haines v. Kerner, Et Al*, 404 U.S. 519 (1972), which states a *Pro Se* litigant's complaint cannot be dismissed for failure to state a claim upon which relief can be granted. *Haines v. Kerner, et al* – Court's Opinion:

"...allegations such as those asserted by petitioner, however inartfully pleaded, are sufficient to call for the opportunity to offer supporting evidence. We cannot say with assurance that under the allegations of the pro se complaint, which we hold to less stringent standards than formal pleadings drafted by lawyers, it appears "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). *See Dioguardi v. Durning*, 139 F.2d 774 (CA2 1944), "...we conclude that he is entitled to an opportunity to offer proof."

Notice to *Pro Se* Parties: You are not Entitled to have Counsel Appointed to Represent You in a Civil Action ... "[w]henever a civil case is brought by a pro se party, the judges of this court outline proper procedure so that the *pro se* party will

14

not be deprived of a fair opportunity to present his or her case." *See Roseboro v. Garrison*, 528 F.2d 309, 310 (4th Cir. 1975)"

## SCDC "OPINION & ORDER" in *Larry Golden v. Google, LLC*, Case No: 6:21-cv-00244-JD, Date Filed 11/02/21, Entry Number 21

*OPINION*: "Although Golden cites a district court opinion in the Central District of California (albeit not binding precedence) to support his claim that his pleadings are sufficient because he attached his patents just as the plaintiff in that case, his reliance and application of this authority misses the mark."

*ANSWER*: "Plaintiff attached a copy of the asserted patents as Exhibits A, B, & C. The attached patents satisfy the requirement of "enough factual allegations. For example, *in Incom Corp. v. Walt Disney Co.*, No. 2:15-cv-03011-PSG-MRW, Dkt. 39, at *4 (C.D. Cal. Feb. 4, 2016) the Central District of California declined to dismiss a complaint that attached the asserted patent, identified the accused products by name, and generally compared the technology disclosed in the patents to the accused products. The complaint *did not identify any specific asserted claim*, but the court found that: "Plaintiff has stated a plausible claim for direct infringement by specifically identifying the Defendant's products and alleging that they perform the same unique function as Plaintiff 's patented system." The Defendant in this case is allegedly liable for infringement of the asserted patents-in-suit under 35 U.S.C. § 271.

*OPINION*: "Golden objects to the Report's recommendation of dismissal of the action in light of the claim charts he has provided in the Complaint. Upon review, however, the Report thoroughly addressed Golden's claim chart."

*ANSWER*: The Trial Court erred when the Court dismissed Plaintiff-Appellant's claim charts as being insufficient. The Charts submitted are "demonstrative charts", that when combined with the complaint and patents, are "enough factual allegations that, when taken as true, articulate why it is plausible that the accused product infringes the patent claim." (*Twombly and Iqbal*). The Court erred because the Plaintiff-Appellant is not required to plead 'direct infringement of each and every element at the pleading stage.

At the pleading stage, "Plaintiff is not required to plead 'direct infringement of each and every element of the allegedly infringed claim.'" (*quoting Crypto Res., LLC v. Assa Abloy, Inc.*, 236 F. Supp. 3d 671, 686 (E.D.N.Y. 2017)).

In *Nalco Co. v. Chem-Mod, LLC*, 883 F.3d 1337 (Fed. Cir. 2018), the Federal Circuit expressly stated: "'the Federal Rules of Civil Procedure do not require a plaintiff to plead facts establishing that each element of an asserted claim is met.'" *Id.* at 1350 (quoting *In re Bill of Lading*, 681 F.3d 1323, 1339 (Fed. Cir. 2012).

The U.S. Court of Appeals for the Federal Circuit addressed the pleading requirements for patent infringement claims in *Bot M8 LLC v. Sony Corp. of Am.*,

16

SAppx727

4 F.4th 1342 (Fed. Cir. July 13, 2021) … "patentees are not required to prove their case at the pleading stage … patentees are not required to plead infringement on an element-by-element basis … a blanket element-by-element pleading standard for patent infringement, "that approach is unsupported and goes beyond the standard the Supreme Court articulated in *Iqbal and Twombly*." *Id*. at 1352.

OPINION: "The chart contains the exact same language as the claim charts previously rejected by the Federal circuit, although Google Pixel 5 Smartphone appears in the far-left column instead of Apple."

ANSWER: Not true. The issue, is whether Plaintiff-Appellant's infringement contentions charts comply with the Court's Patent Rule 4(c):

(b) for each asserted claim, each product, process, or method that allegedly infringes the identified claim. This identification must include the name and model number, if known, of the accused product, process, or method;

**(c) a chart identifying where each element of each asserted claim is found within each accused product, process, or method, including the name and model number, if known**;

It doesn't matter if the alleged infringing product is in the far-left column (Charts 1 & 1-A), or in any of the columns right of the far-left column (Charts 2 thru 8). What matters is where the element is found; name & model, if known.

| Apple iPhone 12 Smartphone | Patent #: 10,163,287; Ind. Claim 5 | Patent #: 9,589,439; Ind. Claim 23 | Patent #: 9,096,189; Ind. Claim 1 |
|---|---|---|---|
| | A monitoring device comprising: | A cell phone comprising: | A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, comprising: |
| CPU: Hexa-core (2x3.22 GHz Avalanche + 4xX.X GHz Blizzard). Chipset: Apple A14 Bionic (5nm). Apple iOS 14.1 Operating System (OS) | at least one central processing unit (CPU); | a central processing unit (CPU) for executing and carrying out the instructions of a computer program; | at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or a front-end processor for communication between a host computer and other devices; |
| Connectivity: Wi-Fi 802.11 a/b/g/n/ac/6, dual-band, hotspot. Bluetooth 5.0 A2DP, LE. NFC, GPS, A-GPS, GLONASS, Galileo, OZSS | at least one of an internet connection or a Wi-Fi connection in communication with the at least one CPU; | wherein at least one of... WiFi connection, internet connection, radio frequency (RF) connection, cellular connection... capable of signal communication with the transmitter or the receiver; | wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group... of satellite, Bluetooth, WiFi... |
| Face ID & Lock Disables after multiple failed attempts to open | at least one biometric sensor in communication with the at least once CPU for providing biometric authentication to access the communication device; | wherein the cell phone is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition | wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition... |

*Chart 1*

18

SAppx729

| Google Pixel 5 Smartphone | Patent #: 10,163,287; Ind. Claim 5 | Patent #: 9,589,439; Ind. Claim 23 | Patent #: 9,096,189; Ind. Claim 1 |
|---|---|---|---|
| | A monitoring device comprising: | A cell phone comprising: | A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, comprising: |
| CPU: Octa-core (1 × 2.4 GHz Kryo 475 Prime & 1 × 2.2 GHz Kryo 475 Gold & 6 × 1.8 GHz Kryo 475 Silver). Chipset: Qualcomm Snapdragon 765G. Google Android 11 Operating System (OS) | at least one central processing unit (CPU); | a central processing unit (CPU) for executing and carrying out the instructions of a computer program; | at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program which is specifically targeted at the networking application domain, or a front-end processor for communication between a host computer and other devices; |
| Connectivity: Wi-Fi 5 (a/b/g/n/ac) 2.4 + 5.0 GHz, Bluetooth 5.0 + LE, NFC, GPS (GLONASS, Galileo, BeiDou), eSIM capable | at least one of an internet connection or a Wi-Fi connection in communication with the at least one CPU; | wherein at least one of... WiFi connection, internet connection, radio frequency (RF) connection, cellular connection... capable of signal communication with the transmitter or the receiver; | wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group... of satellite, Bluetooth, WiFi... |
| Fingerprint ID (rear-mounted) & Lock Disables after multiple failed attempts to open | at least one biometric sensor in communication with the at least once CPU for providing biometric authentication to access the communication device; | wherein the cell phone is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition... | wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition... |

*Chart 1-A*

19

SAppx730

| Plaintiff-Appellant's \|Smartphone\| | Google Pixel 5 Smartphone | Apple iPhone 13 Smartphone | Samsung Galaxy S20 Smartphone |
|---|---|---|---|
|  |  |  |  |
| Communication, Monitoring, Detecting, & Controlling (CMDC) Device | Electronic Device | Mobile Device | Consumer Device |

*Chart 2*



Monitoring equipment of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone) interconnected to a product for communication therebetween, comprising...

**Communicating, Monitoring, Detecting, and Controlling (CMDC) Device (i.e., smartphone)**

**Asserted Patent Specifications:**

"In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring... computers, laptops, notebooks, PCs, and cell phones for the receipt and transmission of signals"

"Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, web servers, desktop personal computers (PCs), notebook personal computers (PCs), laptops, satellite phones, cell phones, Universal Mobile Telecommunications System (UMTS) phones, personal digital assistants (PDAs), liquid crystal display (LCD) monitors, and satellite monitoring, remote control key fobs, two-way communication key fobs, handhelds;"

*Chart 2-A*

SAppx731

| Plaintiff-Appellant's CMDC Device | Google Pixel 5 Smartphone | Apple iPhone 13 Smartphone | Samsung Galaxy S20 Smartphone |
|---|---|---|---|
| | | | |
| Central Processing Unit (CPU) | CPU: Octa-core (1x2.4 GHz Kryo 475 Prime & 1x2.2 GHz Kryo 475 Gold & 6x1.8 GHz Kryo 475 Silver). Chipset: Qualcomm SM7250 Snapdragon 765G 5G. Google Android 11 OS | CPU: Hexa-core (2x3.22 GHz Avalanche + 4xX.X GHz Blizzard). Chipset: Apple A14 Bionic (5nm) iOS 14.1 Operating System (OS) | CPU: Octa-core (2x2.73 GHz Mongoose M5 & 2x2.50 GHz Cortex-A76 & 4x2.0 GHz Cortex-A55) – Global. Chipset: Qualcomm SM8250 Snapdragon 865 5G. Google Android 10 OS |

*Chart 3*



**Central Processing Units (CPUs) for Smartphone**

The "smartphone processor (CPU), also known as chipset, is a component that controls everything going on in your smartphone and ensures it functions correctly. You can compare it to the brain of the human body. Every action you perform on your smartphone goes straight to the processor." https://www.coolblue.nl/en/advice/smartphone-processors. html. "Unlike simpler mobile phones of the past, today's smartphones all have processors or CPUs. A smartphone CPU (central processing unit) is the brains of the entire device. Without one, no smartphone would be able to function" (smartphonedomain.com., 2021).

Example: Qualcomm often refers to the Snapdragon as a "mobile platform" (e.g., Snapdragon 865 5G Mobile Platform). Snapdragon semiconductors are embedded in devices of various systems, including Android devices (i.e., Samsung & LG). They are also used in cars and wearable devices such as Smart Watches.

Example: Qualcomm Technologies Inc. Qualcomm announced it was developing the Scorpion central processing unit (CPU) in November 2007. The Snapdragon system on chip (SoC) was announced in November 2006 and included the Scorpion processor. The Snapdragon's central processing unit (CPU) uses the ARM architecture. A single SoC may include multiple CPU cores; a Snapdragon wireless modem; and, other software and hardware to support a smartphone's global positioning system (GPS), camera, video, and audio.

*Chart 3-A*

SAppx732

| Plaintiff-Appellant's CMDC Device | Google Pixel 5 Smartphone | Apple iPhone 13 Smartphone | Samsung Galaxy S20 Smartphone |
|---|---|---|---|
| | | | |
| Sensor for C/B/R detection | Dual cameras: 12.2 MP, f/1.7, 27mm (wide), 1/2.55", 1.4µm, dual pixel PDAF, OIS 16 MP, f/2.2, 117° (ultrawide), 1.0µm | Dual cameras: 12 MP, f/1.6, 26mm (wide), 1.7µm, dual pixel PDAF, sensor-shift OIS 12 MP, f/2.4, 120°, 13mm (ultrawide) | Triple cameras: 12 MP, f/1.8, 26mm (wide), 1/1.76", 1.8µm, Dual Pixel PDAF, OIS 64 MP, f/2.0, 29mm (telephoto), 1/1.72", 0.8µm, PDAF, OIS, 1.1x optical zoom, 3x hybrid zoom |

*Chart 4*



**Camera C/B/R Sensor(s) for Smartphone**

Camera Sensor for Radiological Detection: How can a cell phone detect radioactivity? Cell phones have cameras and camera sensors react to radioactivity. High energy particles strike a sensor array and register as small bright pinpoints or thin streaks of light. An app may not be as sensitive as a dedicated radiation detector, but it works well enough to alert users to dangerous levels of radiation.

Camera Sensor for Biological Detection: "In the diagnostic test, a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. Coronavirus RNA present, CRISPR proteins snip the molecular probes, whole sample to emit light. Fluorescence detected with a cell phone camera." (Image: Science at Cal).

Camera Sensor for Chemical Detection: The sensor that Rhevision and the University of California at San Diego responds to different chemicals by changing color; a single chip with many tiny pores, each respond to a different chemical; a standard cell-phone camera can resolve a picture finely enough to detect them; system relies on the phone's camera to watch the chip for color changes.

*Chart 4-A*

22

SAppx733

| Plaintiff-Appellant's CMDC Device | Google Pixel 5 Smartphone | Apple iPhone 13 Smartphone | Samsung Galaxy S20 Smartphone |
|---|---|---|---|
| | | | |
| Detector for C/B/R/N detection | Best watches for the Google Pixel 5: Samsung Galaxy Watch 3 and Fitbit Sense. | Apple Watch Series 7 | Samsung Galaxy Watch4 |

*Chart 5*



### Smartwatch CBR Detector for Smartphone

To use a smartwatch as a stand-alone detection device, you need a smartphone. On the smartphone, the user installs the app that comes with the smartwatch stand-alone detection device, such as Android Wear or Apple WatchOS. By opening the accompanying app on the smartphone and turning on Bluetooth, the user can synchronize the smartwatch to function as a stand-alone detection device with the smartphone.

The US Military's Latest Wearables [Smart Watch] Can Detect Illness Two Days Before You Get Sick https://www.defenscone.com/technology/2020/09/militarys-latest-wearables-can-detect-illness-two-days-you-get-sick/168664/

Studies reveal smartwatch biometrics can detect COVID-19 before symptoms surface: "smartwatches and other wearables measuring biometrics like heart-rate variability have the ability to detect if a person is COVID-19 positive" https://www.biometricupdate.com/202101/studies-reveal-smartwatch-biometrics-can-detect-covid-19-before-symptoms-surface

Homeland Security's Smartwatch Will Detect Nuclear Bombs https://www.popularmechanics.com/ military/research/a18161/homeland-security - smartwatch-detect-nuclear-bombs/

*Chart 5-A*

23

SAppx734

| Plaintiff-Appellant's CMDC Device | Google Pixel 5 Smartphone | Apple iPhone 13 Smartphone | Samsung Galaxy S20 Smartphone |
|---|---|---|---|
| | | | |
| Radio-Frequency Near-Field Communications (NFC) | Near-Field Communications (NFC) | Near-Field Communications (NFC) | Near-Field Communications (NFC) |

*Chart 6*



MIT chemists devised a new way to wirelessly detect hazardous gases by using a simple sensor that can be read by a smartphone… [T]he researchers have demonstrated that they can detect gaseous ammonia, hydrogen peroxide, and cyclohexanone, among other gases… The new sensors are made from modified near-field communication (NFC) tags. NFC tags can be read by any smartphone that has near-field communication capability. Retrieved from: https://phys.org/news/2014-12-cheap-sensor-transmit-hazardous-chemicals.html

**Near-Field Communication (NFC) CBR Tag for Smartphone**

In November 2007, an international transportation security company, two Defense Department contractors, a container retailer, a university, and a U.S. city's bomb squad demonstrated how an RFID tag could send a signal to a detonator built from widely available, over-the-counter components. An undergraduate student spent about $20 to make the detonator. The RFID signal detonated a small amount of explosives in a container by means of a simple emission of a radio signal traveling on the approved RFID 433 MHz frequency. Officials from the Defense Department, Government Accountability Office, Department of Homeland Security and Coast Guard observed the demonstration. The office of the secretary of defense sent two observers. In the Defense Department's own words, the "Army representatives examined the device and wiring and confirm that a commercial RFID interrogator was used to 'wake up' a commercial RFID tag. When the RFID tag responded on the 433 MHz frequency, the relay closed and the blasting cap set off the explosive charge." https://www.nationaldefensemagazine.org/articles/2011/2/1/2011february-military-supply-chain-tracking-system-both-inefficient-and-dangerous

*Chart 6-A*

24

SAppx735

| Plaintiff-Appellant's CMDC Device | Google Pixel 5 Smartphone | Apple iPhone 13 Smartphone | Samsung Galaxy S20 Smartphone |
|---|---|---|---|
| Biometrics & Lock Disabling Mechanism | Fingerprint ID (rear-mounted) & Lock Disables after multiple failed attempts to open | Face ID & Lock Disables after multiple failed attempts to open | Fingerprint (under display, ultrasonic) & Lock Disables after multiple failed attempts to open |

*Chart 7*



**Fingerprint Biometric Lock Disabler for Smartphone**

Security feature: After several unsuccessful log-in attempts using a passcode or fingerprint, an Android or iOS device automatically locks itself up. If unable to log in after the security layers, the only option is to have the device unlocked. The wrong pin will launch to Account Login. On an Android or Apple Phone, multiple attempts (usually five attempts or more) with an unknown or a wrong pin will go either into a delay before further attempts are allowed or the phone will allow entry using the account to unlock

**FBI Failed Attempts to Unlock Phone**

The FBI recovered an Apple iPhone 5C—owned by the San Bernardino County, California government—that had been issued to its employee, Syed Rizwan Farook, one of the shooters involved in the December 2015 San Bernardino attack. The attack killed 14 people and seriously injured 22. The two attackers died four hours after the attack in a shootout with police, having previously destroyed their personal phones. Authorities were able to recover Farook's work phone, but could not unlock its four-digit passcode, and the phone was programmed to automatically delete all its data after ten failed password attempts (an anti-theft measure on smartphones).

*Chart 7-A*

| Plaintiff-Appellant's CMDC Device | Google Pixel 5 Smartphone | Apple iPhone 13 Smartphone | Samsung Galaxy S20 Smartphone |
|---|---|---|---|
| | | | |
| Internet | Wi-Fi 802.11 a/b/g/n/ac, dual-band, Wi-Fi Direct, hotspot | Wi-Fi 802.11 a/b/g/n/ac/6, dual-band, hotspot | Wi-Fi 802.11 a/b/g/n/ac/6, dual-band, Wi-Fi Direct, hotspot |

*Chart 8*



**Internet-of-Things (IoTs)**

The Internet-connected smartphones, can directly capture and compile data from as many as 14 different sensors:
1. Accelerometer
2. GPS
3. Gyroscope
4. Magnetometer
5. Biometrics
6. Camera
7. Barometer
8. Proximity Sensors
9. Bluetooth connectivity
10. Barcode readers
11. Touchscreen sensors
12. Heart rate monitor
13. ECG
14. Haptic feedback sensors

The smartphone can be used as an IoT device for Personal emergency response, fitness tracking, location-based asset tracking, natural vision processing, and a Bluetooth gateway for wearable Bluetooth devices that enable many IoT monitoring apps. Also, identity verification, GPS based guidance, position/orientation awareness apps and games are well suited for smartphone-based implementation.

The IoTs contain computing hardware, including processors with embedded programming telling them what to do, sensors that gather various sorts of readings (such as temperature, motion, chemical levels, heart rate and body movement) and communication hardware that can send and receive signals.

*Chart 8-A*

SAppx737

Charts 3-A thru 8-A are Plaintiff-Appellant's claimed inventions used to
form Plaintiff-Appellant's communicating, monitoring, detecting, and controlling,
(CMDC) device (Chart 2-A).

Patent Rule 4(c) does not ask for anything more than "a ***chart***
identifying where each element [limitation] of each asserted claim is found within
each accused product, process, or method, including the name and model number,
if known".

If the patent claim reads: "A CMDC device comprising: at least one
central processing unit (CPU)". According to Patent Rule 4(c), the only thing
Plaintiff-Appellant is required to do is identify where the CPU is found within each
accused product, and include the name and model number if known (i.e., Google
Pixel 5, CPU: Octa-core (1x2.4 GHz Kryo 475). Chipset: Qualcomm SM7250
Snapdragon 765G 5G; Apple iPhone 12, CPU: Hexa-core (2x3.22 GHz Avalanche
+ 4xX.X GHz Blizzard), Chipset: Apple A14 Bionic (5nm))

## COUNT I

### (Infringement of the '287 Patent)

Golden realleges and incorporates herein the allegations set forth in this
corrected informal brief.

On information and belief, Google is jointly, directly, indirectly and/or under
the 'doctrine of equivalents', infringing at least independent claims 4, 5, and 6 of

27

the '287 patent. The alleged infringing products are: Google Pixel smartphones 3, 3XL, 3a, 3aXL, 4a, 4a(5G), and 5.

As set forth in Golden's preliminary infringement contentions that Google is making, using, offering for sale, selling and/or importing Plaintiff's CMDC device have at a minimum directly infringed the '287 patent and Google is thereby liable for infringement of the '287 patent pursuant to 35 U.S.C. § 271. Google have caused damage to Golden, which infringement and damage will continue unless and until Google is enjoined.

The alleged infringement of Google identified in the Trial Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a preliminary injunction is warranted and such a remedy would be in the public interest.

## COUNT II

### (Infringement of the '439 Patent)

Golden realleges and incorporates herein the allegations set forth in this corrected informal brief.

On information and belief, Google is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing at least independent claims 13, 14, 15, and

SAppx739

23 of the '439 patent. The alleged infringing products are: Google Pixel smartphones 3, 3XL, 3a, 3aXL, 4a, 4a(5G), and 5.

As set forth in Golden's preliminary infringement contentions that Google is making, using, offering for sale, selling and/or importing Plaintiff's CMDC device have at a minimum directly infringed the '439 patent and Google is thereby liable for infringement of the '439 patent pursuant to 35 U.S.C. § 271. Google have caused damage to Golden, which infringement and damage will continue unless and until Google is enjoined.

The alleged infringement of Google identified in the Trial Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a preliminary injunction is warranted and such a remedy would be in the public interest.

## COUNT III

### (Infringement of the '189 Patent)

Golden realleges and incorporates herein the allegations set forth in this corrected informal brief.

On information and belief, Google is jointly, directly, indirectly and/or under the 'doctrine of equivalents', infringing claims 1, 2 & 3 of the '189 patent. The

29

SAppx740

alleged infringing products are: Google Pixel smartphones 3, 3XL, 3a, 3aXL, 4a, 4a(5G), and 5.

As set forth in Golden's preliminary infringement contentions that Google is making, using, offering for sale, selling and/or importing Plaintiff's CMDC device have at a minimum directly infringed the '189 patent and Google is thereby liable for infringement of the '189 patent pursuant to 35 U.S.C. § 271. Google have caused damage to Golden, which infringement and damage will continue unless and until Google is enjoined.

The alleged infringement of Google identified in the Trial Count has caused irreparable injury to Golden for which remedies at law are inadequate. Considering the balance of the hardships between the parties, a remedy in equity, such as a preliminary injunction is warranted and such a remedy would be in the public interest.

Respectfully submitted,

*Larry Golden*

Larry Golden, Plaintiff, Pro Se
740 Woodruff Rd., #1102
Greenville, South Carolina 29607
atpg-tech@charter.net
864-288-5605

30

SAppx741

AO 450 (SCD) 04/2010) Judgment in a Civil Action

# UNITED STATES DISTRICT COURT
for the

District of South Carolina

| | | |
|---|---|---|
| Larry Golden, | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.    6:21-cv-00244-JD |
| Google LLC, | ) | |
| *Defendant* | ) | |

## JUDGMENT IN A CIVIL ACTION

The court has ordered that *(check one)*:

■ the Court adopts the Report and Recommendation. Plaintiff's Complaint is dismissed with prejudice and without the issuance of service of process.

This action was *(check one)*:
☐ tried by a jury, the Honorable _____ presiding, and the jury has rendered a verdict.

☐ tried by the Honorable _____ presiding, without a jury and the above decision was reached.

■ decided by the Honorable Joseph Dawson, III

Date:   November 3, 2021

*ROBIN L. BLUME, CLERK OF COURT*

s/Rob Weber
*Signature of Clerk or Deputy Clerk*

Case: 24-2024    Document: 23-2    Page: 167    Filed: 11/18/2024

Case 4:22-cv-05246-HSG    Document 46-1    Filed 09/13/23    Page 75 of 81
6:21-cv-00544-JD    Date Filed 11/02/21    Entry Number 33    Page 1 of 6

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
GREENVILLE DIVISION

| | | |
|---|---|---|
| Larry Golden, | ) | Case No.: 6:21-cv-00544-JD-KFM |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | **OPINION & ORDER** |
| | ) | |
| Google, LLC | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This matter is before the Court with the Report and Recommendation of United States Magistrate Kevin F. McDonald ("Report and Recommendation" or "Report"), made in accordance with 28 U.S.C. § 636(b) and Local Civil Rule 73.02(B)(2) of the District of South Carolina.[1] Plaintiff Larry Golden ("Golden" or "Plaintiff"), proceeding *pro se*, filed this Complaint alleging patent infringement claims against Google, LLC ("Google" or "Defendant"). (DE 1.)

Specifically, Golden asserts that Google has infringed on the following patents: 10,163,287 ('287 patent); 9,589,439 ('439 patent); 9,096,189 ('189 patent). (DE 1; 1-1; 1-2, 1-3.) These patents are entitled "multi sensor detection, stall to stop and lock disabling system" (DE 1; 1-1; 1-2; 1-3.) The patents appear to involve technology that can be used to detect explosives/radiation and then disable vehicles or other equipment wherein the explosives/radiation are detected. The Plaintiff's complaint alleges infringement of each patent by Google in formulaic recitations of the elements of patent infringement. (DE 1.) For relief, Golden seeks a declaratory judgment that

---

[1]    The recommendation has no presumptive weight, and the responsibility for making a final determination remains with the United States District Court. See Mathews v. Weber, 423 U.S. 261, 270-71 (1976). The Court is charged with making a de novo determination of those portions of the Report and Recommendation to which specific objection is made. The Court may accept, reject, or modify, in whole or in part, the recommendation made by the magistrate judge or recommit the matter with instructions. 28 U.S.C. § 636(b)(1).

1

RECEIVED
MAR 03 2022
United States Court of Appeals
For The Federal Circuit

Case: 24-2024     Document: 23-2     Page: 168     Filed: 11/18/2024

Case 4:22-cv-05246-HSG   Document 46-1   Filed 09/13/23   Page 76 of 81
6:21-cv-02247   Document 9-2   Page 34   Filed 03/08/2022 of 6

Google has infringed on his patents, a permanent injunction enjoining the infringing activity, as well as money damages.  (DE 1, p. 29.)

This Court possesses the inherent authority to review the *pro se* complaint to ensure that subject matter jurisdiction exists and that a case is not frivolous, even if the pleading is not subject to the pre-screening provisions of 28 U.S.C. § 1915.  See Mallard v. U.S. Dist. Ct., 490 U.S. 296, 307–08 (1989) ("Section 1915(d) . . . authorizes courts to dismiss a 'frivolous or malicious' action, but there is little doubt they would have power to do so even in the absence of this statutory provision."); Ross v. Baron, 493 F. App'x 405, 406 (4th Cir. 2012) (unpublished) (finding that "frivolous complaints are subject to dismissal pursuant to the inherent authority of the court, even when the filing fee has been paid . . . [and] because a court lacks subject matter jurisdiction over an obviously frivolous complaint, dismissal prior to service of process is permitted." (citations omitted)).

Accordingly, on April 9, 2021, the Magistrate Judge issued the Report given his initial review of the pleadings.  The Report recommended summary dismissal of the complaint with prejudice and without issuance of service of process or leave to amend his complaint.  The Report further recommended that this Court consider the entry of sanctions in the amount of $400.00 against Golden because he has continued to file frivolous litigation in this Court.[2]  (DE 14.)  In support of the Magistrate's recommendation, the Report took judicial notice that the instant matter represents Golden's sixth unsuccessful action regarding his patents (and infringing actions).  See Golden v. Apple, Inc., et al., C/A No. 6:20-cv-04353-JD (D.S.C.) ("Case Number 5"); Golden v. Apple, Inc., et al., C/A No. 6:20-cv-02270-JD (D.S.C.) ("Case Number 4"); Golden v. Apple Inc.,

---

[2]     Although this action represents Golden's fourth frivolous action based upon alleged patent infringement (and sixth case overall) and the Report recommends that this Court sanction Golden $400.00, this Court declines to order sanctions at this time.  However, in the event Golden attempts to file another frivolous action in this Court, the Court will consider the imposition of sanctions as warranted.

2

SAppx744

Case: 24-2024     Document: 23-2     Page: 169     Filed: 11/18/2024

Case 4:22-cv-05246-HSG   Document 46-1   Filed 09/13/23   Page 77 of 81
6:21-cv-02441-JB7   Document 12/21   Page 35   Filed 03/03/2022   of 6

et al., C/A No. 6:19-cv-02557-DCC, 2020 WL 415896 (D.S.C. Jan. 27, 2020), aff'd C/A No. 20-1508, --- F. App'x ---, 2020 WL 5240656 (Fed. Cir. Sept. 3, 2020) ("Case Number 3"); <u>Golden v. United States</u>, C/A No. 1:19-cv-00104-EGB (Fed. Cl.), dismissal aff'd 955 F.3d 981 (Fed. Cir. 2020) ("Case Number 2"); <u>Golden v. United States</u>, C/A No 1:13-cv-00307- SGB, stayed pending patent review, at doc. 186 (Fed. Cl.) ("Case Number 1"); and <u>In re Patent Number RE 43,990</u>, https://portal.uspto.gov/pair/PublicPair# (choose patent number, enter RE43990, and then click Image File Wrapper) (last visited September 26, 2021), petition denied June 25, 2020.  The instant complaint seeks damages against Google for the same allegations that were dismissed as frivolous in Case Number 3, Case Number 4, and Case Number 5; however, it appears that this action represents Golden's attempt to re-litigate claims against Apple and/or Qualcomm and now asserts the same claims against Google.

Accordingly, the Report recommend dismissal of Plaintiff's complaint because *inter alia* the Plaintiff's complaint contains a lengthy history of his prior actions in this Court, various cell phone statistics, a description of the development of the android operating system, and specifications for various Google phones, but contains few factual allegations relating to the alleged infringement. (<u>See</u> DE 14, p. 8.) Golden filed an objection to the Report on April 22, 2021 (DE 18); however, to be actionable, objections to the Report and Recommendation must be specific.  Failure to file specific objections constitutes a waiver of a party's right to further judicial review, including appellate review, if the recommendation is accepted by the district judge.  <u>See</u> <u>United States v. Schronce</u>, 727 F.2d 91, 94 & n.4 (4th Cir. 1984).  "The Supreme Court has expressly upheld the validity of such a waiver rule, explaining that 'the filing of objections to a magistrate's report enables the district judge to focus attention on those issues -- factual and legal -- *that are at the heart of the parties' dispute.*'"  <u>Diamond v. Colonial Life & Accident Ins. Co.,</u>

3

Case: 24-2024     Document: 23-2     Page: 170     Filed: 11/18/2024

Case 4:22-cv-05246-HSG   Document 46-1   Filed 09/13/23   Page 78 of 81
6:21-cv-01387   Document 32-2   Page 36   Filed 03/03/2022 of 6

416 F.3d 310, 315 (2005) (citing Thomas v. Arn, 474 U.S. 140 (1985) (emphasis added)). In the absence of specific objections to the Report and Recommendation of the magistrate judge, this Court is not required to give any explanation for adopting the recommendation. See Camby v. Davis, 718 F.2d 198, 199 (4th Cir. 1983).

Plaintiff makes the following "objections"[3] to the Report, which the Court will discuss seriatim. First, Golden objects to the Report's recommendation of dismissal of the action in light of the claim charts he has provided in the Complaint. Upon review, however, the Report thoroughly addressed Golden's claim chart. The chart contains the exact same language as the claim charts previously rejected by the Federal circuit, although Google Pixel 5 Smartphone appears in the far left column instead of Apple. (DE 14, p. 8.) For example, the chart copies previously submitted charts alleging patent infringement (albeit by Google in lieu of other defendants) of independent claim 5 of the '287 patent; independent claim 23 of the '439 patent; and independent claim 1 of the '189 patent. (DE 1, pp. 23-29.) These charts and allegations of infringement were specifically rejected by the Federal Circuit Court of Appeals because they contained "a dizzying array of disorganized assertions" "disingenuously using the words of the claims to generally describe cryptically identified structures." Golden, 819 F. App'x at 931 (citing Golden, C/A No. 6:19-cv-02557, at DE 16-14). In light of the foregoing, this Court overrules this objection.

Next, Golden objects to the Report's finding that the Complaint does not include a short and plain statement of his claims in light of InCom Corp. v. Walt Disney Co., No. CV15-3011 PSG (MRWx), 2016 U.S. Dist. LEXIS 71319, at *8 (C.D. Cal. Feb. 4, 2016), because Golden

---

[3]     Golden purportedly objects to the Court's lack of consideration of two (2) DVD's included with his Complaint and five (5) response letters from members of the Executive and Legislative branches of government. (DE 18, p. 7.) However, there do not appear to be any such attachments to the Complaint; and therefore, the Court overrules this "objection."

4

Case: 24-2024     Document: 23-2     Page: 171     Filed: 11/18/2024

Case 4:22-cv-05246-HSG     Document 46-1     Filed 09/13/23     Page 79 of 81
6:21-cv-01287     Document 9     Page: 37     Filed: 03/03/2022     of 6

included claim charts that illustrate the infringing devices, provide notice to the Defendant, and provide enough factual allegations. (DE 18, p. 8.) However, Golden offers no additional facts regarding the same. Simply naming a product and providing a conclusory statement that it infringes a patent is insufficient to meet the "plausibility" standard set forth in Ashcroft v. Iqbal, 556 U.S. 662, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009). Although Golden cites a district court opinion in the Central District of California (albeit not binding precedence) to support his claim that his pleadings are sufficient because he attached his patents just as the plaintiff in that case, his reliance and application of this authority misses the mark. See InCom Corp. v. Walt Disney Co., No. CV15-3011 PSG (MRWx), 2016 U.S. Dist. LEXIS 71319, at *8 (C.D. Cal. Feb. 4, 2016) (where the district court found that plaintiff's amended complaint did more than name a product and baldly conclude that it infringes plaintiff's patent, but that plaintiff attached the patents and described *inter alia* how "its Attendance Tracking System uses RFID technology and ID badges to track human presence in large volumes."). Even applying InCom as purported by Golden, Golden's amended complaint does not (among other things) describe specific systems developed and manufactured by Google that are like the subject patents and how the systems perform the same unique function as Golden's system or assert facts regarding the availability of his technology prior to his invention. In light of the vague conclusory allegations in the complaint in this action and Golden's attempt to circumvent the prior dismissals of his patent infringement claims, the instant matter is subject to summary dismissal as frivolous.

Although this Court agrees with the Report that Plaintiff's amended complaint should be dismissed with prejudice because it is frivolous, the Court declines to impose sanctions at this time. Furthermore, the Court finds Golden's remaining objections to be non-specific and/or moot and, therefore, overrules them.

5

Case: 24-2024     Document: 23-2     Page: 172     Filed: 11/18/2024

Case 4:22-cv-05246-HSG   Document 46-1   Filed 09/13/23   Page 80 of 81
6:21-cv-02241-JD   Document 92-2   Page 38 Number 203/03/2022 of 6

Accordingly, after a thorough review of the Report and Recommendation and the record in this case, the Court adopts the Report and Recommendation as modified and incorporates it herein.

**IT IS, THEREFORE, ORDERED** that Plaintiff's Complaint is dismissed with prejudice and without the issuance of service of process.

**AND IT IS SO ORDERED.**

_____
Joseph Dawson, III
United States District Judge

Greenville, South Carolina
November 2, 2021

### NOTICE OF RIGHT TO APPEAL

Plaintiff is hereby notified that he has the right to appeal this order within thirty (30) days from the date hereof, pursuant to Rules 3 and 4 of the Federal Rules of Appellate Procedure.

SAppx748










PRESS FIRMLY TO SEAL

PRESS FIRMLY TO SEAL

PRIORITY MAIL EXPRESS
FLAT RATE ENVELOPE
POSTAGE REQUIRED

PRIORITY
MAIL
EXPRESS®

FLAT RATE
ENVELOPE
ONE RATE ■ ANY WEIGHT

To schedule free Package Pickup,
scan the QR code.

USPS.COM/PICKUP

PS10001000006

EP13F ?
OD: 12 1

U.S. POSTAGE PAID
PME 1-Day
GREENVILLE, SC
29605
MAR 06, 22
AMOUNT
$26.95
R2304S10230-09

1607

20439

EI 036 964 514 US

UNITED STATES
POSTAL SERVICE®

FOR DOMESTIC AND
PLACE MAILING LABEL HERE

PRIORITY
MAIL
EXPRESS®

CUSTOMER USE ONLY
FROM: (PLEASE PRINT)   PHONE ( 864 288 - 5405 )

LARRY GOLDEN
740 WOODCRAFT ROAD
#1102
GREENVILLE, SC 29607

DELIVERY OPTIONS (Customer Use Only)
☒ SIGNATURE REQUIRED
□ No Saturday Delivery (delivered next business day)
□ Sunday/Holiday Delivery Required (additional fee, where available)

TO: (PLEASE PRINT)   PHONE ( )

UNITED STATES COURT OF APPEALS FOR
THE FEDERAL CIRCUIT
CASE No: 22-1267
717 MADISON PLACE, NW
WASHINGTON, DC 20439

2 0 4 3 9

■ For pickup or USPS Tracking™, visit USPS.com or call 800-222-1811.
■ $100.00 insurance included.

PEEL FROM THIS CORNER

PAYMENT BY ACCOUNT (If applicable)

ORIGIN (POSTAL SERVICE USE ONLY)

PO ZIP Code
29606

Scheduled Delivery Date
(MM/DD/YY)
03 0322

Postage
$ 26 95

Day Accepted (MM/DD/YY)
03 05

Scheduled Delivery Time
☒ 12:00 PM

Return Receipt Fee
$

Live Animal
Transportation Fee
$

Time Accepted
442
□ AM
□ PM

Special Handling/Fragile
$

Sunday/Holiday Premium Fee
$

Total Postage & Fees
$ 26 95

Weight

Flat Rate

Acceptance Employee Initials

DELIVERY (POSTAL SERVICE USE ONLY)

Delivery Attempt (MM/DD/YY)   Time
□ AM
□ PM

Employee Signature

Delivery Attempt (MM/DD/YY)   Time
□ AM
□ PM

Employee Signature

LABEL 11-B, MAY 2021

SAppx749



Misuses may be a violation of federal law. This package is not for resale. EP13F © U.S. Postal Service; July 2022. All rights reserved.

PRIORITY MAIL EXPRESS

U.S. POSTAGE PAID
PME 1-Day
GREENVILLE, SC 29606
SEP 12, 2023
$28.75
R2304H108690-09

Retail
94612
RDC 07

UNITED STATES POSTAL SERVICE®

PRIORITY MAIL EXPRESS™

EL624216144US

ORIGIN (POSTAL SERVICE USE ONLY)

PO ZIP Code: 216 06
Scheduled Delivery Date (MM/DD/YY): 0913 23
Postage: $28.75

Date Accepted (MM/DD/YY): 09 12 23
Scheduled Delivery Time: ☐ 10:30 AM ☐ 3:00 PM ☐ 12 NOON
Insurance Fee: $

Time Accepted: 9:36 ☐ AM ☐ PM
10:30 AM Delivery Fee: $
Return Receipt Fee: $

Special Handling/Fragile: $
Sunday/Holiday Premium Fee: $
Total Postage & Fees: $28.75

Weight: lb. oz.
☐ Flat Rate
Acceptance Employee Initials:

DELIVERY (POSTAL SERVICE USE ONLY)

LABEL 11-B, OCTOBER 2016

3-ADDRESSEE COPY

POSTAL SERVICE®

CUSTOMER USE ONLY
FROM: (PLEASE PRINT)    PHONE ( )
LARRY GOLDEN
THE WOODRUFF RD.
GREENVILLE, SC 29607

PAYMENT BY ACCOUNT (if applicable)

DELIVERY OPTIONS (Customer Use Only)
☐ SIGNATURE REQUIRED Note: The mailer must check the "Signature Required" box if the mailer: 1) Requires the addressee's signature; OR 2) Purchases additional insurance; OR 3) Purchases COD service; OR 4) Purchases Return Receipt service. If the box is not checked, the Postal Service will leave the item in the addressee's mail receptacle or other secure location without attempting to obtain the addressee's signature on delivery.
Delivery Options
☐ No Saturday Delivery (delivered next business day)
☐ Sunday/Holiday Delivery Required (additional fee, where available*)
*Refer to USPS.com® or local Post Office™ for availability.

TO: (PLEASE PRINT)    PHONE ( )
CLERK OF COURT FOR THE FED-TAXKLINE - HSA
CASE NO: 4122-OV-05246 - HSA
1301 CLAY STREET
OAKLAND, CA
94612 1

For pickup or USPS Tracking™, visit USPS.com or call 800-222-1811.
$100.00 insurance included.

EP13F July 2022
OD: 12 1/2 x 9 1/2

PS10001000006

PRIORITY MAIL EXPRESS

FLAT RATE ENVELOPE

ANY WEIGHT

Schedule free Package Pickup,
scan the QR code.

USPS.COM/PICKUP

1  Matthew S. Warren (State Bar No. 230565)
   Virginia G. Kain (State Bar No. 344545)
2  22-5246@cases.warrenlex.com
   WARREN KASH WARREN LLP
3  2261 Market Street, No. 606
   San Francisco, California, 94114
4  +1 (415) 895-2940
   +1 (415) 895-2964 facsimile
5  22-5246@cases.warrenlex.com
6
   *Attorneys for Defendant Google LLC*
7

8                    UNITED STATES DISTRICT COURT

9                  NORTHERN DISTRICT OF CALIFORNIA

10                        OAKLAND DIVISION

11

12
   LARRY GOLDEN,                    )  Case No. 4:22-cv-05246-HSG
13                                  )
          Plaintiff,                )  **REPLY IN SUPPORT OF MOTION TO**
14                                  )  **DISMISS THE AMENDED COMPLAINT**
   v.                               )  **BY DEFENDANT GOOGLE LLC**
15                                  )
   GOOGLE LLC,                      )
16                                  )  Date:      December 7, 2023
          Defendant.               )  Time:      2:00 p.m.
17                                  )  Place:     Courtroom 2
   _____ )  Judge:     Hon. Haywood S. Gilliam, Jr.
18

19

20

21

22

23

24

25

26

27

28

                                              Case No. 4:22-cv-05246-HSG
──────────────────────────────────────────────────────────────────────
REPLY IN SUPPORT OF MOTION TO DISMISS THE AMENDED COMPLAINT BY DEFENDANT GOOGLE

SAppx751

**TABLE OF CONTENTS**

INTRODUCTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.    The Opposition Confirms that the Amended Complaint Fails to Plead Direct Infringement . . . . 1

    A.    The Opposition Admits that ATAK-CIVILIAN is a Third-Party Application . . . . . . . . . 1

    B.    The Opposition Admits that Google Does Not Sell Converted NFC Tags . . . . . . . . . . . 2

    C.    The Opposition Admits that Google Does Not Sell Devices With a Microfluidic Lens . . 2

    D.    The Opposition Admits that Google Does Not Sell Devices Designed to Go to Mars . . . 3

    E.    The Opposition Admits that Google Beacon is Separate From the Accused Devices . . . . 4

II.    The Amended Complaint Fails to Plead Indirect Infringement . . . . . . . . . . . . . . . . . . . . . . . . . . 5

    A.    The Opposition Admits the Complaint Fails to Plead Induced Infringement . . . . . . . . . 5

    B.    The Opposition Admits the Complaint Fails to Plead Contributory Infringement. . . . . . 5

III.    The Opposition Admits the Amended Complaint Fails to Plead Joint Infringement . . . . . . . . . . 6

IV.    Neither Issue Preclusion nor "Vertical *Stare Decisis*" Bar Google's Motion to Dismiss. . . . . . . 7

    A.    Google's Arguments Are Not Precluded. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

    B.    "Vertical *Stare Decisis*" Does Not Bar Google's Motion. . . . . . . . . . . . . . . . . . . . . . . . 7

V.    The Court Should Deny Leave to Amend . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

REPLY IN SUPPORT OF MOTION TO DISMISS THE AMENDED COMPLAINT BY DEFENDANT GOOGLE

SAppx752

## **TABLE OF AUTHORITIES**

*Cases*             **Pages**

*Adams v. Johnson,*
    355 F.3d 1179 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Aiello v. BAC Home Loan Servicing, LP,*
    No. 11-3655, 2012 WL 174808 (N.D. Cal. Jan. 20, 2012) . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Apple Inc. v. AliveCor, Inc.,*
    No. 22-7608, 2023 WL 4091287 (N.D. Cal. Jun. 20, 2023) . . . . . . . . . . . . . . . . . . . . . 5, 6

*Armstrong-Harris v. Wells Fargo Bank, N.A.,*
    No. 21-7637, 2023 WL 2918740 (N.D. Cal. Apr. 11, 2023) . . . . . . . . . . . . . . . . . . . . . . . 8

*Ashcroft v. Iqbal,*
    556 U.S. 662 (2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Beacon Oil Co. v. O'Leary,*
    71 F.3d 391 (Fed. Cir. 1995) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Bell Atlantic Corp. v. Twombly,*
    550 U.S. 544 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Belli v. Nestlé USA, Inc.,*
    No. 14-286, 2015 WL 4197045 (N.D. Cal. Jul. 10, 2015) . . . . . . . . . . . . . . . . . . . . . . . . 4

*Costabile v. Natus Med. Inc.,*
    293 F. Supp. 3d 994 (N.D. Cal. 2018) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Eng v. Washington Mut. Bank, FA,*
    No. 12-5062, 2013 WL 622363 (N.D. Cal. Feb. 14, 2013), *aff'd,* 586 F. App'x 376 (9th Cir. 2014),
    and *aff'd,* 586 F. App'x 376 (9th Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Erickson v. Pardus,*
    551 U.S. 89 (2007) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

*Frenken v. Hunter,*
    No. 17-2667, 2018 WL 6737448 (N.D. Cal. Dec. 24, 2018) . . . . . . . . . . . . . . . . . . . . . . . 8

*Golden v. Apple Inc.,*
    No. 2022-1229, 2022 WL 4103285 (Fed. Cir. Sept. 8, 2022) . . . . . . . . . . . . . . . . . . . . . . 7

*Golden v. Qualcomm,*
    No. 22-3283, 2023 WL 2530857 (N.D. Cal. Mar. 15, 2023) . . . . . . . . . . . . . . . . . . . . . . . 5

*Homsy v. Bank of Am., N.A.,*
    No. 13-1608, 2013 WL 2422781 (N.D. Cal. Jun. 3, 2018) . . . . . . . . . . . . . . . . . . . . . . . . 4

*In re Adobe Sys., Inc. Priv. Litig.,*
    66 F. Supp. 3d 1197 (N.D. Cal. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

SAppx753

**<u>TABLE OF AUTHORITIES</u>**

*(continued)*

*Cases*                                                                                                    **Pages**

*In re Koninkl.jke Philips Pat. Litig.*,
   No. 18-1885, 2020 WL 2733931 (N.D. Cal. May 26, 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*In re Online DVD Rental Antitrust Litig.*,
   No. 09-2029, 2011 WL 5883772 (N.D. Cal. Nov. 23, 2011), *a.f'd*, 779 F.3d 914 (9th Cir. 2015) . . . 6

*Lyda v. CBS Corp.*,
   838 F.3d 1331 (Fed. Cir. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Mejia v. JPMorgan Chase Bank, N.A.*,
   No. 21-1351, 2021 WL 6498762 (N.D. Cal. Sept. 8, 2021), *a.f'd*, No. 21-16550,
   2022 WL 1154762 (9th Cir. Apr. 19, 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Nazomi Commc'ns, Inc. v. Nokia Corp.*,
   739 F.3d 1339 (Fed. Cir. 2014) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

*Redd Grp., LLC v. Glass Guru Franchise Sys., Inc.*,
   No. 12-4070, 2013 WL 3462078 (N.D. Cal. Jul. 8, 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Reilly v. Recreational Equip., Inc.*,
   No. 18-7385, 2019 WL 1024960 (N.D. Cal. Mar. 4, 2019) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Ridgway v. Phillips*,
   No. 18-7822, 2020 WL 1288464 (N.D. Cal. Mar. 18, 2020) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

*Shakur v. Schriro*,
   514 F.3d 878 (9th Cir. 2008) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Sprewell v. Golden State Warriors*,
   266 F.3d 979 (9th Cir. 2001), *opinion amended on denial of reh'g*,
   275 F.3d 1187 (9th Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

*Synopsys, Inc. v. ATopTech, Inc.*,
   No. 13-2965, 2013 WL 5770542 (N.D. Cal. Oct. 24, 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Talada v. City of Martinez, Cal.*,
   No. 08-2771, 2009 WL 382758 (N.D. Cal. Feb. 12, 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Telemac Cell. Corp. v. Topp Telecom, Inc.*,
   247 F.3d 1316 (Fed. Cir. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . .. . . . . . . . . . . . . . . . . . . 1, 2, 3

*U.S. v. Reunion Mortg., Inc.*,
   No. 13-2340, 2013 WL 5944252 (N.D. Cal. Nov. 5, 2013) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Vita-Mix Corp. v. Basic Holding, Inc.*,
   581 F.3d 1317 (Fed. Cir. 2009) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

– iii –                                                     Case No. 4:22-cv-05246-HSG

## **TABLE OF AUTHORITIES**

*(continued)*

|                                          | *Cases* |                                          | **Pages** |

*Wagner v. Safeway, Inc.,*
  No. 21-8903, 2022 WL 279231 (N.D. Cal. Jan. 31, 2022) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8

*Weisbuch v. Cnty. of L.A.,*
  119 F.3d 778 (9th Cir. 1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Windy City Innovations, LLC v. Microsoft Corp.,*
  193 F. Supp. 3d 1109 (N.D. Cal. 2016) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

SAppx755

## INTRODUCTION

This Court dismissed plaintiff Larry Golden's original complaint because it alleged only that someone could modify Google's products to infringe the patents-in-suit, and thus admitted that Google's unmodified products could not infringe. Granted leave to amend, Mr. Golden submitted a first amended complaint that suffers from the same deficiency and adds several more. Google explained these failures in its motion to dismiss the amended complaint, and Mr. Golden's opposition confirms that Google's motion was correct: the opposition reaffirms plaintiff's infringement theories, reconfirms that those theories require modification of Google's products to infringe the patents-in-suit, and thus readmits that Google's unmodified products do not infringe.

The amended complaint also fails to allege either indirect or joint infringement. Although Google explained as much in its motion to dismiss, Mr. Golden's opposition does not respond to these points, instead repeating, verbatim, allegations from the amended complaint. And Mr. Golden's opposition, like the amended complaint, again claims that the Court of Appeals' prior ruling controls this Court's ruling here, despite this Court's previous ruling that it does not. The opposition thus further confirms what the amended complaint first showed: no version of Mr. Golden's claims can survive *Twombly* and *Iqbal*. This Court should dismiss the amended complaint without leave to amend.

## ARGUMENT

### I.   The Opposition Confirms that the Amended Complaint Fails to Plead Direct Infringement

As Google explained in its motion, Mr. Golden's five infringement theories allege only that the accused devices are "'capable of being modified to operate in an infringing manner,'" Docket No. 41 at 4:16 (quoting *Telemac Cellular Corp. v. Topp Telecom, Inc.*, 247 F.3d 1316, 1330 (Fed. Cir. 2001)), thus confirming that they "'do not infringe without modification.'" Docket No. 41 at 4:26-28 (quoting *Nazomi Commc'ns, Inc. v. Nokia Corp.*, 739 F.3d 1339, 1346 (Fed. Cir. 2014)); *see* Mot. § I. The opposition does not "engage directly with Google's argument[s]," Docket No. 41 at 6 n.6, but it does confirm that Google is correct regarding each of plaintiff's five infringement theories.

#### A.   The Opposition Admits that ATAK-CIVILIAN is a Third-Party Application

Mr. Golden's first infringement theory requires the third-party application ATAK-CIVILIAN, *see* Mot. § I.A, and thus his "claims, as pled, only allege that Google's devices infringe the patents in issue if

REPLY IN SUPPORT OF MOTION TO DISMISS THE AMENDED COMPLAINT BY DEFENDANT GOOGLE

SAppx756

the end user downloads a particular application." Docket No. 41 at 5:1-3 (citing *Erickson v. Pardus*, 551

U.S. 89, 94 (2007)). Mr. Golden alleges "that Defendant's products purportedly infringe because of the

characteristics of the ATAK application," and further "alleges that ATAK is not made by Google" but

"does not allege that ATAK comes pre-loaded on Google phones." *Id.* at 6:9-13. In his opposition, Mr.

Golden repeats his allegations that the accused devices "run the ATAK-CIV *software* application that

enables the CBRNE sensors to monitor, detect, and relay data," and reconfirms that "the ATAK-CIV

*software* application" is separate from Google's accused devices. Opp. at 20 (emphasis in original); *see,*

*e.g., id.* at 25 ("ATAK is built on the Android operating system"); *id.* at 25-26 (claiming that

"Government Agencies" developed "software apps for CBRNE detection" including "ATAK-CIV

(CBRN)"). As with the previous complaint, "Plaintiff fails to adequately allege direct infringement by

Google." Docket No. 41 at 6:19-20.

**B.    The Opposition Admits that Google Does Not Sell Converted NFC Tags**

Mr. Golden's second infringement theory alleges infringement "only if modified by addition of a

converted NFC tag, and thus confirms that Google's products do not infringe at all." Mot. at 3:19-21;

*see id.* § I.B. Mr. Golden's opposition admits that he alleges infringement only upon transmission of

"payloads of data between the NFC tags and the Android-powered Google Pixel 6a, 7, 7a, 7 Pro, and

Fold smartphones," reconfirming that the "NFC tags" are both necessary for infringement and separate

from the accused devices. Opp. at 20-21; *see, e.g., id.* at 12 ("MIT chemists devised a new way to

wirelessly detect hazardous gases with a sensor that can be read by a smartphone . . . The new sensors

are made from modified near-field communication (NFC) tags," and "can be read by any smartphone

that has NFC capability"). The second infringement theory thus alleges only that Google's accused

devices are "'capable of being modified to operate in an infringing manner,'" by combining them with

the alleged modified NFC tags, which is insufficient "'to support a finding of infringement.'" Docket

No. 41 at 4:16-18 (quoting *Telemac Cellular Corp.*, 247 F.3d at 1330).

**C.    The Opposition Admits that Google Does Not Sell Devices With a Microfluidic Lens**

Mr. Golden's third infringement theory "admits that Google's products can infringe only if

modified by addition of a microfluidic lens, and thus confirms that Google's products do not infringe at

all." Mot. at 4:21-23; *see id.* § I.C. In his opposition, Mr. Golden repeats a sentence from the complaint,

REPLY IN SUPPORT OF MOTION TO DISMISS THE AMENDED COMPLAINT BY DEFENDANT GOOGLE

SAppx757

stating that the "Google pixel camera, screen, and LED flashlight of the Google Pixel 6a, 7, 7a, 7 Pro, and Fold smartphones can be employed as *components* of the sensor," Opp. at 21 (emphasis added), *see* Am. Compl. at 26, but does not include the immediately preceding sentence from the complaint, which states that the accused "Smartphones provide hardware and software capability which can be incorporated with [CBR] sensors, enabling accurate on-site portable sensing," thus confirming that the "sensors" include at least some separate functionality which must be "incorporated" with smartphones to complete plaintiff's allegations of infringement. Am. Compl. at 26 (brackets in original). Mr. Golden's opposition, like the amended complaint, then cites to G. Singh & N. Sardana, *Smartphone-based Surface Plasmon Resonance Sensors: a Review*, 17 PLASMONICS 1869 (Jun. 10, 2022), which states that "surface plasmon resonance" or "SPR" sensors "are being developed for real-time and label-free detection of water pollutants, toxins, disease biomarkers, etc.," that "[s]martphones provide hardware and software capability which can be incorporated into SPR sensors," and that "[t]he camera, screen, and LED flashlight of the smartphone can be employed as components of the sensor." *Id.* at Abstract; https://link.springer.com/article/10.1007/s11468-022-01672-1, archived at https://archive.ph/9tLKD; *see* Opp at 11 (citing Singh & Sardana); Am. Compl. at 26 (same). The amended complaint and opposition's reliance on the Singh & Sardana paper, including their use of phrases from it, *compare* Am. Compl. at 26 & Opp. at 11 *with* Singh & Sardana at Abstract, further confirms the separation of the sensors from the accused smartphone devices. Mr. Golden's opposition thus reconfirms the allegation in the amended complaint that the accused microfluidic lens must be separate from the accused Pixel devices, which "'is not sufficient, by itself, to support a finding of infringement.'" Docket No. 41 at 4:16-18 (quoting *Telemac Cellular Corp.*, 247 F.3d at 1330). The complaint thus pleads itself out of a claim. *See In re Adobe Sys., Inc. Priv. Litig.*, 66 F. Supp. 3d 1197, 1209 (N.D. Cal. 2014) (quoting *Weisbuch v. Cnty. of L.A.*, 119 F.3d 778, 783 n.1 (9th Cir. 1997)).

**D.      The Opposition Admits that Google Does Not Sell Devices Designed to Go to Mars**

Mr. Golden's fourth infringement theory "admits that Google's product can infringe only if modified by addition of hypothetical technology, and thus confirms that Google's products do not infringe at all." Mot. at 5:15-17; *see id.* § I.D. Again, the opposition does not "engage directly with Google's argument[s]," Docket No. 41 at 6 n.6, ignoring them entirely in favor of irrelevancies. Under

REPLY IN SUPPORT OF MOTION TO DISMISS THE AMENDED COMPLAINT BY DEFENDANT GOOGLE

the section header responding to this argument, Opp. at 21-22, Mr. Golden submits only general

allegations about the history of smartphones, a description of unaccused Google devices, a recent case in

the Western District of Texas, and Mr. Golden's previous argument that Google is "precluded" from

making its arguments—an argument that this Court has already rejected. Opp. at 21-22; *see* Docket No.

41 at 6 n.6.[1] Nor does Mr. Golden address this argument anywhere else in his opposition—although he

does repeat elements of his amended complaint that confirm Google's accused devices cannot infringe

the claims. *E.g.*, Opp. at 13. "Plaintiff has abandoned this theory by failing to respond to Defendants'

arguments regarding it in his opposition to the motion to dismiss." *Costabile v. Natus Med. Inc.*, 293 F.

Supp. 3d 994, 1014 (N.D. Cal. 2018) (citing *Homsy v. Bank of Am., N.A.*, No. 13-1608, 2013 WL

2422781, at *5 (N.D. Cal. Jun. 3, 2018) ("[W]here a plaintiff simply fails to address a particular claim in

its opposition to a motion to dismiss that claim, courts generally dismiss it with prejudice.")); *see, e.g.,*

*Ridgway v. Phillips*, No. 18-7822, 2020 WL 1288464, at *9 (N.D. Cal. Mar. 18, 2020).

      **E.**      **The Opposition Admits that Google Beacon is Separate From the Accused Devices**

      Mr. Golden's fifth infringement theory "admits that Google's products can infringe only if

modified by the addition of a remote beacon, and thus confirms that Google's products do not infringe at

all." Mot. at 6:1-3; *see id.* § I.E. In his opposition, Mr. Golden asserts that "[t]he Google Beacon is

considered an integral part" of the accused Pixel devices, but provides nothing to support this claim, or

to rebut the contrary admissions in the complaint. Opp. at 22; *see* Mot. § I.E. Instead, he relies on a

claim construction by the Patent & Trademark Office of a claim from a patent not in suit, which has no

relevance here, and concludes with additional irrelevant allegations regarding smartphones in general.

*See* Opp. at 23. Again, plaintiff "has abandoned this theory by failing to respond to Defendants'

arguments." *Costabile*, 293 F. Supp. 3d at 1014 (citing *Homsy*, 2013 WL 2422781, at *5); *see Ridgway*,

2020 WL 1288464, at *9.

//

---

[1] Throughout his opposition, Mr. Golden refers to *Touchstream Technologies Inc. v. Google LLC*, No. 21-569 (W.D. Tex.). *E.g.*, Opp. at 2, 3; *id.* Exs. A-C. Neither the allegations in nor the outcome of *Touchstream Technologies* has any bearing on the claims before this Court. *E.g., Reilly v. Recreational Equip., Inc.*, No. 18-7385, 2019 WL 1024960, at *5 n.11 (N.D. Cal. Mar. 4, 2019) ("wholly unrelated cases [have] no bearing on the sufficiency of Ms. Reilly's allegations here"); *Belli v. Nestlé USA, Inc.*, No. 14-286, 2015 WL 4197045, at *3 n.35 (N.D. Cal. Jul. 10, 2015) ("prior defeats . . . in unrelated cases have no bearing on the immediate motion").

REPLY IN SUPPORT OF MOTION TO DISMISS THE AMENDED COMPLAINT BY DEFENDANT GOOGLE

## II.     The Amended Complaint Fails to Plead Indirect Infringement

Even assuming direct infringement, the amended complaint fails to properly allege indirect infringement, and the Court should therefore dismiss the plaintiff's indirect infringement allegations.[2]

### A.     The Opposition Admits the Complaint Fails to Plead Induced Infringement

At the pleading stage, "'[i]nducement requires a showing that the alleged inducer knew of the patent, knowingly induced the infringing acts, and possessed a specific intent to encourage another's infringement of the patent.'" *Windy City Innovations, LLC v. Microsoft Corp.*, 193 F. Supp. 3d 1109, 1115 (N.D. Cal. 2016) (quoting *Vita-Mix Corp. v. Basic Holding, Inc.*, 581 F.3d 1317, 1328 (Fed. Cir. 2009)).  As Google noted in its motion, "[t]he amended complaint fails this test, relying on general statements that do not show either knowledge of the patents-in-suit or any other aspect of the required specific intent."  Mot. at 7:16-17; *see id.* § II.B.1; *see, e.g.,* Am. Compl. ¶¶ 51-62.  In his opposition, Mr. Golden supplies only general statements that show neither knowledge of the patents-in-suit nor any other aspect of the required specific intent.  Opp. at 25-26.  But "conclusory allegations of law and unwarranted inferences are insufficient to defeat a motion to dismiss."  *Adams v. Johnson*, 355 F.3d 1179, 1183 (9th Cir. 2004) (citing *Sprewell v. Golden State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001), *opinion amended on denial of reh'g*, 275 F.3d 1187 (9th Cir. 2001)); *see Golden v. Qualcomm, Inc.*, No. 22-3283, 2023 WL 2530857, at *3 (N.D. Cal. Mar. 15, 2023) (dismissing claims of induced infringement where plaintiff "fails to allege facts plausibly supporting an inference that [the defendant] purposely induced another party to infringe any patent").

### B.     The Opposition Admits the Complaint Fails to Plead Contributory Infringement

"To adequately plead contributory infringement, a plaintiff must tie the specific infringing components of the allegedly infringing products to an infringing use and, relatedly, plausibly allege that the component has no substantial non-infringing uses."  *Apple Inc. v. AliveCor, Inc.*, No. 22-7608, 2023

---

[2] Because the amended complaint fails to allege direct infringement, it cannot succeed at alleging indirect infringement.  Mot. § II; *see* Docket No. 41 at 7:6-7 ("Because Plaintiff fails to allege direct infringement, the Court finds that he also fails to allege indirect infringement."); *Redd Grp. v. Glass Guru Franchise Sys., Inc.,* No. 12-4070, 2013 WL 3462078, at *4 (N.D. Cal. Jul. 8, 2013).  The Court should therefore dismiss the amended complaint in its entirety.  The opposition appears to contest this bedrock principle, but provides only irrelevancies in doing so.  *See* Opp. at 23-24.  The Court correctly ruled on this issue in its order dismissing the original complaint, and that ruling should apply to the amended complaint as well.  *See* Docket No. 41 at 7:6-7.

Case No. 4:22-cv-05246-HSG

SAppx760

WL 4091287, at *3 (N.D. Cal. Jun. 20, 2023). In its motion, Google explained that "Mr. Golden merely asserts that Google contributes its Google Tensor Chipset, but does not allege to whom Google contributes the Tensor Chipset, nor any factual allegations supporting his threadbare claims that Google is liable for contributory infringement." Mot. at 10:11-13 (citing Am. Compl. at 4); *see id.* § II.B.2. Mr. Golden does not "engage directly with Google's argument[s]," Docket No. 41 at 6 n.6, opting instead to reproduce verbatim the allegations in the amended complaint. *Compare* Opp. at 26 *with* Am. Compl. at 3-4. Where a plaintiff "does not address, let alone dispute" an argument, it is "an acknowledgement that Defendants' argument has merit." *U.S. v. Reunion Mortg., Inc.*, No. 13-2340, 2013 WL 5944252, at *6 (N.D. Cal. Nov. 5, 2013) (citing *In re Online DVD Rental Antitrust Litig.*, No. 09-2029, 2011 WL 5883772, at *12 (N.D. Cal. Nov. 23, 2011), *a'f'd*, 779 F.3d 914 (9th Cir. 2015)). Even *pro se* plaintiffs "abandon[]" their "claims by not raising them in opposition" to a motion. *Shakur v. Schriro*, 514 F.3d 878, 892 (9th Cir. 2008). The amended complaint fails on this ground, and the plaintiff has failed to defend it.

### III.   The Opposition Admits the Amended Complaint Fails to Plead Joint Infringement

"[L]ike claims of induced or contributory infringement, allegations of joint infringement require elements beyond those for the more typical act of direct infringement." *Lyda v. CBS Corp.*, 838 F.3d 1331, 1339 (Fed. Cir. 2016). "To prove joint infringement, where multiple actors are involved in practicing the claim steps, the patent owner must show that the acts of one party are attributable to the other such that a single entity is responsible for the infringement." *Id.* at 1338. Mr. Golden's joint infringement claims are, at best, mere unsupported "recitals of the elements" of the cause of action, and should therefore be dismissed. *See* Mot. at 12:14-17 (quoting *Synopsys, Inc. v. ATopTech, Inc.*, No. 13-2965, 2013 WL 5770542, at *3 (N.D. Cal. Oct. 24, 2013)); Mot. § III. In his opposition, Mr. Golden does not "engage directly with Google's argument[s]," Docket No. 41 at 6 n.6, but rather repeats word-for-word allegations from the amended complaint. *Compare* Opp. at 26 *with* Am. Compl. at 4. For the reasons explained in Google's motion and unrebutted by Mr. Golden, these joint infringement claims fail, and require dismissal of the amended complaint. *Shakur*, 514 F.3d at 892.

//

//

SAppx761

IV.   **Neither Issue Preclusion nor "Vertical *Stare Decisis*" Bar Google's Motion to Dismiss**

   A.   **Google's Arguments Are Not Precluded**

   Mr. Golden repeatedly argues that "Google is 'precluded'" from raising various arguments. *E.g.,*
Opp. at 3 ("Google is 'precluded' from relitigating whether or not the Google Android Open-Source
Operating System *software* can be used to modify products to function or operate in an infringing manor
[sic]") (emphasis in original); *id.* at 7 ("Therefore, the Defendant is 'precluded' from relitigating the
same issues of fact"); *id.* at 8 ("Google is 'precluded' from relitigating the Federal Circuit's Opinion in
*Golden v. Google* CAFC Case No. 22-1267, 'complaint includes a detailed claim chart mapping features
of an accused product, the . . . Smartphone'") (alterations in original); *see, e.g., id.* at 9, 10, 11, 12, 13,
14, 22, 29.  As this Court recognized, this argument is without merit:

> Plaintiff does not engage directly with Google's argument in his opposition.  Instead, he argues
> that Google's motion to dismiss is barred by "issue preclusion" as a result of the 2022 appeal to
> the Federal Circuit (and the underlying South Carolina case).  *See* MTD Opp. and Cross-MSJ at
> 1, 5-6.  In its opinion, however, the Federal Circuit specifically stated that its "decision does not
> preclude subsequent motions to dismiss by the defendant for failure to state a claim."  *Golden v.
> Apple Inc.*, No. 2022-1229, 2022 WL 4103285, at *2 (Fed. Cir. Sept. 8, 2022).  Issue preclusion
> does not bar Google's motion to dismiss.

Docket No. 41 at 6 n.6.  So too here.

   B.   **"Vertical *Stare Decisis*" Does Not Bar Google's Motion**

   Mr. Golden also argues that "Vertical Stare Decisis bars Google from challenging whether
Plaintiff has pled enough facts and provided sufficient notice to the Defendant Google," Opp. at 6, and
that "under the *Vertical Stare Decisis* doctrine, this Court is bound by the Federal Circuit's infringement
analysis and opinion in *Larry Golden v. Google LLC*."  *Id.* at 29 (emphasis in original).  But "'*stare
decisis* applies only to legal issues that were actually decided in a prior action.'"  *In re Koninklijke
Philips Pat. Litig.*, No. 18-1885, 2020 WL 2733931, at *1 (N.D. Cal. May 26, 2020) (quoting *Beacon
Oil Co. v. O'Leary*, 71 F.3d 391, 395 (Fed. Cir. 1995)).  As this Court recognized in granting Google's
previous motion, "the Federal Circuit specifically stated that its 'decision does not preclude subsequent
motions to dismiss by the defendant for failure to state a claim.'"  Docket No. 41 at 6 n.6 (quoting
*Golden v. Apple Inc.*, 2022 WL 4103285, at *2).  Mr. Golden's contrary claims are incorrect.

//

//

SAppx762

**V.    The Court Should Deny Leave to Amend**

Where a "[p]laintiff was previously granted an opportunity to remedy these flaws but has proven unable to do so, further leave to amend would be futile." *Mejia v. JPMorgan Chase Bank, N.A.*, No. 21-1351, 2021 WL 6498762, at *3 (N.D. Cal. Sept. 8, 2021), *aff'd*, No. 21-16550, 2022 WL 1154762 (9th Cir. Apr. 19, 2022); *see, e.g.*, *Armstrong-Harris v. Wells Fargo Bank, N.A.*, No. 21-7637, 2023 WL 2918740, at *3 (N.D. Cal. Apr. 11, 2023) (citations omitted) ("The Court is aware of Plaintiff's pro se status and continues to construe his complaint liberally. However, given Plaintiff's failure to address any of the identified deficiencies in the complaint for a single claim, respond to Wells Fargo's arguments, or follow the Court's instructions, the Court is convinced that further attempt to amend would be futile."); *Wagner v. Safeway, Inc.*, No. 21-8903, 2022 WL 279231, at *1 (N.D. Cal. Jan. 31, 2022) (dismissing *pro se* litigant's amended complaint without leave to amend); *Frenken v. Hunter*, No. 17-2667, 2018 WL 6737448, at *2 (N.D. Cal. Dec. 24, 2018) (citations omitted) ("having previously afforded Plaintiff leave to amend to address the same deficiencies present in this complaint, the Court finds that permitting leave to amend again would be futile"); *Eng v. Washington Mut. Bank, FA*, No. 12-5062, 2013 WL 622363, at *2 (N.D. Cal. Feb. 14, 2013), *aff'd*, 586 F. App'x 376 (9th Cir. 2014), and *aff'd*, 586 F. App'x 376 (9th Cir. 2014) ("Allowing plaintiff to further amend his complaint will not cure this problem. Accordingly, all complaints are dismissed without leave to amend"); *Aiello v. BAC Home Loan Servicing, LP*, No. 11-3655, 2012 WL 174808, at *4 (N.D. Cal. Jan. 20, 2012) (granting motion to dismiss without leave to amend where *pro se* "[p]laintiff does not state facts sufficient" to support claims); *Talada v. City of Martinez, Cal.*, No. 08-2771, 2009 WL 382758, at *5 (N.D. Cal. Feb. 12, 2009) (dismissing without leave to amend claims where "plaintiff fails to allege facts to support a claim," and "wholly fails to revive any claim on the opposition").

Finally, where, as here, an opposition "appears to comprise nonresponsive copy-and-pasted arguments," and the "Plaintiff has not even hinted at facts that would fix the problems the Court identified last time," this Court should dismiss the amended complaint without leave to amend, even in the case of a *pro se* litigant. *Armstrong-Harris*, 2023 WL 2918740, at *3. Further amendment would prove futile. This Court should dismiss the amended complaint without leave to amend.

//

## CONCLUSION

For the reasons set forth above, and in Google's Motion to Dismiss the Amended Complaint, the Court should dismiss the amended complaint in its entirety without leave to amend.

Date:  September 28, 2023                    Respectfully submitted,

Matthew S. Warren (State Bar No. 230565)
Virginia G. Kain (State Bar No. 344545)
WARREN KASH WARREN LLP
2261 Market Street, No. 606
San Francisco, California, 94114
+1 (415) 895-2940
+1 (415) 895-2964 facsimile
22-5246@cases.warrenlex.com

*Attorneys for Defendant Google LLC*

## CERTIFICATE OF SERVICE

I, Virginia G. Kain, certify as follows under 28 U.S.C. § 1746:

I am an attorney at Warren Kash Warren LLP and admitted to practice before this Court.  My business address is 2261 Market Street, No. 606, San Francisco, California, 94114.  On September 28, 2023, I served the foregoing Reply in Support of Motion to Dismiss the Amended Complaint by Defendant Google LLC on the plaintiff by First Class Mail at the following address:

    Larry Golden
    740 Woodruff Road, No. 1102
    Greenville, South Carolina, 29607

by placing it in a sealed envelope with postage paid and placing the envelope in the exclusive custody of the United States Postal Service.

On the same day, I also sent a courtesy copy of the foregoing document by electronic mail to Mr. Golden at atpg-tech@charter.net.

I certify under penalty of perjury that the foregoing is true and correct.  Executed on September 28, 2023, at San Francisco, California.

Virginia G. Kain

REPLY IN SUPPORT OF MOTION TO DISMISS THE AMENDED COMPLAINT BY DEFENDANT GOOGLE

SAppx764

# UNITED STATES DISTRICT COURT

# FOR THE NORTHERN DISTRICT OF CALIFORNIA – OAKLAND

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

Phone (864) 288-5605

Email: atpg-tech@charter.net

**F I L E D**

OCT 0 3 2023

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

---

LARRY GOLDEN,

          Plaintiff,

          V.

GOOGLE LLC

          Defendants.

CASE NO: 4:22-cv-05246-HSG

**JURY TRIAL DEMANDED**

(Direct Patent Infringement),
(Induced and Contributory Patent
Infringement), (Joint Infringement,
(Willful Infringement)

---

**PLAINTIFF'S MOTION FOR LEAVE TO FILE SUR-REPLY IN OPPOSITION TO DEFENDANT'S REPLY TO MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT**

October 2, 2023

Plaintiff is seeking leave of this Court to file Sur-Reply to the Defendant's Reply in Support of Defendant's Motion to Dismiss Plaintiff's Amended Complaint (Dkt. 47). "A district court may allow a Sur-reply to be filed, "where a valid reason for such additional briefing exists, such as where the movant raises new arguments in its reply brief." *Hill v. England*, 2005 WL 3031136, *1 (E.D. Cal. Nov. 8, 2005).

Plaintiff argues that he should be permitted to file a Sur-reply because Defendants' Reply to the Motion to Dismiss, (Dkt. 47), raises arguments not previously presented in the Motion to Dismiss, (Dkt. 47). Google's motion to dismiss and reply in support, places Google in violation of Rule 8 of the Federal Rules of Civil Procedure. Failure to put forth a sufficient affirmative defense.

"Rule 8 prescribes the rules of pleading. Defenses are subject to three provisions with[in] Rule 8: 1) the defense must be stated "in short and plain terms" (Rule 8(b)(1)(A)); 2) "any avoidance or affirmative defense" must be affirmatively stated (Rule 8(c)(1)); and 3) the defense "must be simple, concise, and direct" (Rule 8(d)(1))."

Google's "*ENTIRE*" defense of a "single entity" performance has already been litigated and decided by the Federal Circuit in *Syngenta Crop Protection, LLC v. Willowood LLC*, et al (Fed. Cir. Dec. 18, 2019). Willowood's direct infringement liability under 35 U.S.C. § 271(a) and 35 U.S.C. § 271(g) for the *use* of a "patented process" has already been litigated and decided by the Federal Circuit in *Syngenta Crop Protection, LLC v. Willowood LLC*, et al.

Sincerely,

Larry Golden, *Pro Se* Plaintiff
740 Woodruff Rd., #1102
Greenville, SC 29607
(H) 8642885605
(M) 8649927104
Email: atpg-tech@charter.net

2

SAppx766

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on this 2nd day of October, 2023, a true and correct copy of the foregoing "Plaintiff's Motion to File Sur-Reply in Opposition to Defendant's Reply to Dismiss Plaintiff's Amended Complaint", was served upon the following Defendant by priority "express" mail:


Matthew S. Warren

WARREN LEX LLP

2261 Market Street, No. 606

San Francisco, California, 94114

Phone: (415) 895-2940

Fax: (415) 895-2964

Email: 22-5246@cases.warrenlex.com


Larry Golden, Pro Se

740 Woodruff Rd., #1102

Greenville, South Carolina 29607

atpg-tech@charter.net

864-288-5605

SAppx767

PRESS FIRMLY TO SEAL

**UNITED STATES POSTAL SERVICE®**

**PRIORITY MAIL EXPRESS®**

CUSTOMER USE ONLY
FROM: (PLEASE PRINT)   PHONE ( )

LARRY GOLDICH
740 WOODRUFF RD.
#1102
GREENVILLE, SC 29607

SIGNATURE REQUIRED

DELIVERY OPTIONS (Customer Use Only)
☐ No Saturday Delivery
☐ Sunday/Holiday Delivery Required
*Refer to USPS.com® or local Post Office™ for availability.

TO: (PLEASE PRINT)   PHONE ( )

U.S. DISTRICT COURT-NDC-OAKLAND
CASE NO: 4:22-CV-05246-HSG
1301 CLAY STREET
OAKLAND, CA
94612

■ For pickup or USPS Tracking™, visit USPS.com or call 800-222-1811.
■ $100.00 insurance included.

PEEL FROM THIS CORNER

USPS.COM/PICKUP

PS10001000006

EP13F July 2022
OD: 12 1/2 x 9 1/2

PRESS FIRMLY TO SEAL

USPS TRACKING #

EI 647 647 039 US

PAYMENT BY ACCOUNT (if applicable)
USPS® Corporate Acct No.   Federal Agency Acct No. or Postal Service™ Acct No.

ORIGIN (POSTAL SERVICE USE ONLY)

☑ Day   ☐ Date   ☐ Military   ☐ DPO
PO ZIP Code    Scheduled Delivery Date (MM/DD/YY)    Postage

29615    10/2/23    $ 2.875

Date Accepted (MM/DD/YY)   Scheduled Delivery Time   Insurance Fee   COD Fee
  ☐ 10:30 AM   ☐ 12 NOON   ☐ 3 PM

10/2/23    Time Accepted    ☐ AM   ☐ PM    Return Receipt Fee   Live Animal Transportation Fee

1110

Weight   Acceptance Employee Initials   Total Postage & Fees
lb.   oz.    $ 29.75

DELIVERY (POSTAL SERVICE USE ONLY)
Delivery Attempt (MM/DD/YY)   Time   ☐ AM ☐ PM   Employee Signature
Delivery Attempt (MM/DD/YY)   Time   ☐ AM ☐ PM   Employee Signature

LABEL 11-B, JULY 2023    PSN 7690-02-000-9996

Comer

---

PRIORITY MAIL EXPRESS™

Retail

RDC 07

**U.S. POSTAGE PAID**
PME 1-DAY
GREENVILLE, SC 29616
OCT 02, 2023

**$28.75**

94612   R2304M113457-33

**INTERNATIONAL USE**

**IG LABEL HERE**

...ate*

...ne†

...e included for domestic
...destinations.

...clude $100 of insurance

...n request.

...select APO/FPO/DPO and
...om for complete details.
...destinations only.

...n items. For details regarding claims exclusions see the
...ational Mail Manual at http://pe.usps.com.

WHEN USED INTERNATIONALLY, A CUSTOMS DECLARATION LABEL MAY BE REQUIRED.

Domestic Mail Manual at http://pe.usps.com.

Comer

**UNITED STATES POSTAL SERVICE®**

This packaging is the property of the U.S. Postal Service® and is provided solely for use in sending Priority Mail Express® shipments. Misuses may be a violation of federal law. This package is not for resale. EP13F © U.S. Postal Service; July 2022; All rights reserved.

This package is made from post-consumer waste. Please recycle - again.



**UNITED STATES POSTAL SERVICE**®

**PRIORITY MAIL EXPRESS**®



*EMS*

## FLAT RATE ENVELOPE

ONE RATE ■ ANY WEIGHT

To schedule free Package Pickup,
scan the QR code.



USPS.COM/PICKUP

**VISIT US AT USPS.COM**®
ORDER FREE SUPPLIES ONLINE



EP13F July 2022
OD: 12 1/2 x 9 1/2

PS10001000006

For Domestic shipments, the maximum weight is 70 lbs. For international shipments, the maximum weight is 20 lbs.

**GUARANTEED\* ▪ TRACKED ▪ INSURED**

SAppx769

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA – OAKLAND

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

Phone (864) 288-5605

Email: atpg-tech@charter.net

**RECEIVED**

OCT 03 2023

CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| LARRY GOLDEN, <br><br> Plaintiff, <br><br> V. <br><br> GOOGLE LLC <br><br> Defendants. | CASE NO: <u>4:22-cv-05246-HSG</u> <br><br> **JURY TRIAL DEMANDED** <br><br> (Direct Patent Infringement), (Induced and Contributory Patent Infringement), (Joint Infringement, (Willful Infringement) |

## PLAINTIFF'S SUR-REPLY IN OPPOSITION TO DEFENDANT'S REPLY TO MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT

October 2, 2023

SAppx770

Plaintiff is seeking leave of this Court to file Sur-Reply to the Defendant's Reply in Support of Defendant's Motion to Dismiss Plaintiff's Amended Complaint (Dkt. 47). "A district court may allow a Sur-reply to be filed, "where a valid reason for such additional briefing exists, such as where the movant raises new arguments in its reply brief." *Hill v. England*, 2005 WL 3031136, *1 (E.D. Cal. Nov. 8, 2005).

Plaintiff argues that he should be permitted to file a Sur-reply because Defendants' Reply to the Motion to Dismiss, (Dkt. 47), raises arguments not previously presented in the Motion to Dismiss, (Dkt. 47). Google's motion to dismiss and reply in support, places Google in violation of Rule 8 of the Federal Rules of Civil Procedure. Failure to put forth a sufficient affirmative defense.

> "Rule 8 prescribes the rules of pleading. Defenses are subject to three provisions with[in] Rule 8: 1) the defense must be stated "in short and plain terms" (Rule 8(b)(1)(A)); 2) "any avoidance or affirmative defense" must be affirmatively stated (Rule 8(c)(1)); and 3) the defense "must be simple, concise, and direct" (Rule 8(d)(1))."

Google's "*ENTIRE*" defense of a "single entity" performance has already been litigated and decided by the Federal Circuit in *Syngenta Crop Protection, LLC v. Willowood LLC*, et al (Fed. Cir. Dec. 18, 2019). Willowood's direct infringement liability under 35 U.S.C. § 271(a) and 35 U.S.C. § 271(g) for the *use* of a "patented process" has already been litigated and decided by the Federal Circuit in *Syngenta Crop Protection, LLC v. Willowood LLC*, et al.

Google never argued that the android open-source operating system; the megapixel camera sensor; the near-field communication sensor; the ambient light and spectrometer sensors; and the GPS, WiFi, and Bluetooth sensors are not "*native*" to the manufacture of the Google Pixel 6a, 7, 7a, 7 Pro, and Fold smartphones.

Google never argued the Google Pixel 6a, 7, 7a, 7 Pro, and Fold smartphones that comprises or includes the android open-source operating system; the megapixel camera sensor; the near-field communication sensor; the ambient light and spectrometer sensors; and the GPS, WiFi, and Bluetooth sensors, were not assembled together under the brand name of Google, and *sold* as a consolidated unit (i.e., the Google Pixel 6a, 7, 7a, 7 Pro, or Fold smartphone).

Google never argued that when the android open-source operating system; the megapixel camera sensor; the near-field communication sensor; the ambient light and spectrometer sensors;

SAppx771

and the GPS, WiFi, and Bluetooth sensors, working together collectively or separate; does not enable CBRNE detection, and is not covered under Plaintiff's patents as a patented process.

Google's defense argues against the Federal Circuit findings "that §271(a) covers all patented processes, whether the processes end up with a product or not", and under §271(g), "whether that process is practiced by a single entity is immaterial to the infringement analysis under that section".

Section § 271(g) provides that "[w]hoever without authority [] offers to sell, sells, or uses within the United States a product which is made by a *process* patented in the United States shall be liable as an infringer." In *Syngenta Crop Protection, LLC v. Willowood LLC*, et al (Fed. Cir. Dec. 18, 2019), the Federal Circuit considered whether 35 U.S.C. § 271(g) requires that every step of a claimed process be performed by a single entity.

The Federal Circuit finding that "the statutory language as a whole is clear that under §271(g), [] 'whether that process is practiced by a single entity is immaterial to the infringement analysis under that section'."

On appeal, *Willowood* argued that the single-entity requirement under §271(a), in which all steps of a claimed method are performed by or attributable to a single entity, should be applied to §271(g) as well since it is simply another form of direct infringement. The Federal Circuit disagreed, and in view of another subsection of the statute, namely §271(f), stated that if Congress intended to limit liability under §271(g) to instances where the infringing patented process was entirely practiced by a single entity, then Congress "kn[ew] precisely how to do so."

In the Defendant's reply (Dkt. 47), Google admits to the *use* of the various means of CBRNE detection, "ATAK is built on the Android operating system"; "[t]he new sensors are made from modified near-field communication (NFC) tags," and "can be read by any smartphone that has NFC capability"; that "[s]martphones provide hardware and software capability which can be incorporated into SPR sensors," and that "[t]he camera, screen, and LED flashlight of the smartphone can be employed as components of the sensor"; "Google's product can infringe [] if modified" (modified embedded ambient light sensor, spectrometer, camera, etc.); and, "Google's products can infringe only if modified by the addition of a remote beacon".

*Willowood* also argued that "because direct infringement of a process patent under §271(a) requires the same entities to perform all of the claimed steps, the same must be true

3

under §271(g) …". The Federal Circuit disagreed, finding that §271(a) covers all patented processes, whether the processes end up with a product or not.

On the other hand, §271(g) requires [] use within the US of a product made by a patented process. "The different scope of protection offered under §271(a) and §271(g) demonstrates that there is no inconsistency between the two sections… Congress made clear that §271(g) 'is prompted by the use of patented processes [] and simply extend[s] protection to the products' made by such processes."

*Syngenta Crop Protection, LLC v. Willowood LLC* appears to demonstrably expand the range of [] activities that may constitute infringement under 35 U.S.C. § 271(g), in that the section does not require a single entity to perform, direct, or control all of the steps of a patented process for infringement liability to arise from the [] sale of products made by a process patented in the US.

Google is in Violation of Rule 8 of the Federal Rules of Civil Procedure for Failure to Put Forth a Sufficient Affirmative Defense.


## Direct Infringement Under the "*Doctrine of Equivalents*"

This Sur-Reply is necessary to show how Google has completely ignored Plaintiff's allegations of direct infringement under the doctrine of equivalents. Plaintiff alleged direct infringement under the doctrine of equivalents in Plaintiff's Amended Complaint (Dkt. 42) and Plaintiff's Response to Defendant's Motion to Dismiss (Dkt.46).

"Rule 8 prescribes the rules of pleading. Defenses are subject to three provisions with[in] Rule 8: 1) the defense must be stated "in short and plain terms" (Rule 8(b)(1)(A)); 2) "any avoidance or affirmative defense" must be affirmatively stated (Rule 8(c)(1)); and 3) the defense "must be simple, concise, and direct" (Rule 8(d)(1))."

When the Federal Circuit states, ""express no opinion as to the adequacy [the state or quality of being adequate] of the complaint or claim chart except that it is not facially frivolous", means the Circuit is not expressing an opinion on whether the direct infringement is literal direct infringement or direct infringement under the doctrine of equivalents.

4

In the Federal Circuit's language, "a detailed claim chart mapping features of an accused product, the [] Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189", indicates a determination has been made on direct infringement, either literally or under the doctrine of equivalents.

"Literal infringement" means that each and every element recited in a claim has identical correspondence in the allegedly infringing device or [patented] process. "Under the doctrine of equivalents, a product or [patented] process that does not literally infringe . . . the express terms of a patent claim may nonetheless be found to infringe if there is 'equivalence' between the elements of the accused product or process and the claimed elements of the patented invention.'" *Ethicon Endo-Surgery, Inc. v. U.S. Surgical Corp.*, 149 F.3d 1309, 1315 (Fed. Cir. 1998)

In *Graver Tank & Mfg. Co. v. Linde Air Prods., Inc.*, the U.S. Supreme Court held that Plaintiff, the patent owner, may invoke the doctrine of equivalents to proceed against [Google] if the [Google Pixel] smartphones perform substantially the same function in substantially the same way to obtain the same result.

The Doctrine of Equivalents was established in the United States with the case of *Winans v. Denmead*, which dealt with changing a part of the construction of the patented invention to avoid infringement. Setting a precedent, the court held that infringement may be claimed even if the same literal legal patent language was not used. A mere change in form while retaining the rest from the patented claim is still considered infringement.

The doctrine is explained in the words of Judge Curtis for the case as, "the patentee, having described his invention, and shown its principles, and claimed it in that form which most perfectly embodies it, is, in contemplation of law, *deemed to claim every form in which his invention may be copied*, unless he manifests an intention to disclaim some of those forms."

Under this doctrine, Plaintiff can argue infringement even if each and every claim element of the patent is not completely or identically present in the infringed invention. The purpose of the doctrine is to ensure that Google does not benefit from minor or insubstantial changes that may escape literal infringement.

If the accused Google Pixel products or [patented] process does not literally infringe Plaintiff's patented invention, the accused Google Pixel products or [patented] process may be found to infringe under the doctrine of equivalents. The essential objective inquiry is: "Does the accused Google Pixel products or [patented] process contain elements identical or equivalent to

5

SAppx774

each claimed element of the patented invention?" *Warner-Jenkinson Co. v. Hilton Davis Chemical Co.*, 520 U.S. 17, 41 USPQ2d 1865, 1875 (1997).

In determining equivalence, "an analysis of the role played by each element in the context of the specific patent claim will thus inform the inquiry as to whether a substitute element matches the function, way, and result of the claimed element, or whether the substitute plays a role substantially different from the claimed element."

A common method used to determine whether the equivalent of a claim limitation is present in the accused product or process is the function-way-result test. This test asks whether an element of an accused product or process "performs substantially the same function in substantially the same way to obtain the same result" as an element of the patented invention (*Siemens Med. Solutions USA, Inc. v. Saint-Gobain Ceramics & Plastics, Inc.*, 637 F.3d 1269, 1279 (Fed. Cir. 2011)). All the elements in this case meets at least this standard.

For an infringement analysis & litigation, claim charts help confirm or dis-confirm that each and every limitation of the claim is present in a product, service, or standard. An Evidence-of-Use (EoU) or Infringement Chart shows how a product or [patented] process accused of infringement contains each claim element to satisfy the 'all elements test' for infringement.


## Google's Failed Attempt at "Reverse Engineering" Plaintiff's Communicating, Monitoring, Detecting, and Controlling (CMDC) Device

To this point Plaintiff has presented in this case a preponderance of evidence to show at least Google's Pixel 6a is capable of CBRNE sensing. Plaintiff has also presented in this case a preponderance of evidence to show at least Google's Pixel 6a, that is capable of CBRNE sensing, infringes Plaintiff's patented communicating, monitoring, detecting, and controlling (CMDC) device that is interconnected with Plaintiff's patented multi-sensor detection device.

Below is the image of a mobile device with a chemical sensor plugin. Appropriate for this case, we can say it is at least a Google 6a with a DTRA ATAK chemical sensor plugin. More appropriately stated it is an image of Plaintiff's patented communicating, monitoring, detecting, and controlling (CMDC) device interconnected with Plaintiff's patented multi-sensor detection device [chemical sensor plugin]. All scenarios include Plaintiff's patented central processing unit(s) for carrying out the operational and functional instructions for the device.

6

SAppx775



NASA Ames Chemical Sensor

Google's strategy in this case is to reverse engineer the smartphone sensing device away from the at least Google Pixel 6a to that of who does or does not *sell* the CBRNE detection means [i.e., DTRA ATAK CBRNE Sensor Plugins].

Google's reverse engineering strategy creates a new liability of indirect "contributory" infringement for Google. Under Plaintiff's patented process (i.e., standard engineering), the Google Pixel 6a, 7, 7a, 7 Pro, or Fold smartphones were alleged as directly infringing Plaintiff's patented communicating, monitoring, detecting, and controlling (CMDC) device.

Under Google's reverse engineering strategy, the Google Pixel 6a, 7, 7a, 7 Pro, or Fold smartphones only use is in practicing the Plaintiff's patented process (35 U.S.C. § 271(c); and the Google Pixel 6a, 7, 7a, 7 Pro, and Fold smartphone has a substantial "non-infringing" use. This standard inherently requires knowledge of the patent.

Google's reverse engineering strategy confirms Google's liability for indirect "inducement" infringement. Under Plaintiff's patented process (i.e., standard engineering), and under Google reverse engineering strategy, Google induced infringement with advertisements, promotions, and publications of Google's android open-source operating system platform.

The reason Google's reverse engineering strategy has fail is illustrated in the chart below. The strategy fails because when Google reverse engineer it starts with the CBRNE plugins. The plugins are described in Plaintiff's patents as multi-sensor detection devices. In other words, it does not matter if Google starts with the smartphone that comprises a CBRNE detection means, or with the detection means that comprises a smartphone; both are Plaintiff's patented inventions.

SAppx776

**Claim Chart of Induced Infringement [DTRA ATAK-MILITARY and Draper's ATAK-CIVILIAN]; Contributory Infringement with the Google Pixel 6a, 7, 7a, 7 Pro, and Fold smartphones; and Joint Infringement**

| DRAPER'S ATAK-CIVILIAN & DoD/DTRA ATAK-MILITARY | Patent #: 9,589,439; Independent Claim 19 | Patent #: 9,096,189; Independent Claim 7 |
|---|---|---|
| Both Draper ATAK-CIV and DoD DTRA ATAK-MIL include chemical, biological, radiological, and nuclear (CBRN) plug-ins. Plaintiff has demonstrated throughout the complaint how Google actively encouraged the infringement; and how Google knew that the acts they were doing constituted infringement; and as a result, Google actuated induced patent infringement by those encouraging acts. Plaintiff's evidence proves the inducement *resulted* in direct infringement, not that the inducement was of a product that already directly infringes. | A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, radiological agent, or compound, comprising: | A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, or radiological agents and compounds, comprising: |
| **ATAK-CIVILIAN** Draper Laboratory, Inc. designed a CBRN Plugin to enable users to integrate CBRN sensors into TAK, collect CBRN sensor data, display it on a map and livestream it across the TAK network to other users. CBRN plugins for ATAK, are operational in the field.<br><br>**ATAK-MILITARY** ATAK (built on the Android operating system) With DTRA … ATAK includes chemical, biological, radiological, and nuclear (CBRN) plug-ins. The Defense Threat Reduction Agency (DTRA) CBRN ISA: Seamlessly integrates information and control of multiple sensors into a single dashboard, making it easier to detect CBRN threats and monitor a warfighter's vitals https://thelastmile.gotennapro.com/four-useful-atak-app-plugins/ | a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human, or contraband agent or compound, capable of being disposed within, on, upon or adjacent a multi-sensor detection device; | a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human or contraband agents and compounds and capable of being disposed within, on, upon or adjacent a multi sensor detection device; |

8

SAppx777

| | | |
|---|---|---|
| Pursuant to 35 U.S.C. § 271(c), Google has contributed an element(s) [ at least that of Google Pixel 6a, 7, 7a, 7 Pro, or Fold] to the alleged infringing ATAK CBRNE Plugins of Draper Laboratory, Inc. and the Defense Threat Reduction Agency (DTRA).<br><br>Google is contributing to the infringement of independent claim 19 of Plaintiff's '439 patent, and independent claim 7 of Plaintiff's '189 patent.<br><br>ATAK (including CivTAK) is an Android smartphone [i.e., Google smartphone] geospatial infrastructure and situational awareness app https://www.civtak.org/atak-about/. ATAK can be downloaded to a phone, tablet, or handheld device.<br><br>ATAK-MIL is a government-off-the-shelf app for Android smartphones. The mobile broadband 4G LTE connection is able to facilitate the data throughput required for the operation of the ATAK. https://apps. dtic.mil/sti/pdfs/ AD1069441.pdf<br><br>Plaintiff has alleged Joint or Divided infringement between Google and Draper; and, Google and DTRA, because no single party carried out all the steps of Plaintiff's patented inventions, that would constitute infringement. | monitoring equipment comprising at least one of a computer, personal computer (PC), laptop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone for at least one of a receipt or transmission of signals therebetween; | monitoring equipment comprising at least one of plurality product groups based on the categories of a computer, laptop, notebook, PC, handheld, cell phone, PDA or smart phone for the receipt and transmission of signals therebetween; |
| Google Pixel 6a, 7, 7a, 7 Pro, and Fold smartphones connects to a cell tower or base station via radio waves, and that tower is usually physically connected to the infrastructure to send that data wherever it needs to go.<br><br>Draper designed a chemical, biological, radiological and nuclear (CBRN) Plugin to enable users to integrate CBRN sensors into TAK, collect CBRN sensor data, display it on a map and livestream it across the TAK network to other users. CBRN plugins for ATAK, WinTAK and WebTAK are operational in the field. https://www.draper.com/explore-solutions/tak | at least one cell phone tower interconnected to the monitoring equipment for sending signals thereto and receiving signals therefrom or at least one satellite capable of transmitting signals to the monitoring equipment; | at least one cell phone tower interconnected to the monitoring equipment for sending signals thereto and receiving signals therefrom or at least one satellite capable of transmitting signals to the monitoring equipment; |

SAppx778

| | | |
|---|---|---|
| The Android-based Google Pixel 6a, 7, 7a, 7 Pro, and Fold smartphones now contained integrated satellite on-the move capability, on-the-move mapping solutions, and a commercial laser range finder that significantly expanded the end-user range data flow and functionality. The Primary, Alternate, Contingency, and Emergency (PACE) communications architectures established was: • Primary communications structure (P): ATAK—4G/LTE; Antenna: international [] satellite (INMARSAT) https://apps. dtic.mil/sti/pdfs/ AD1069441.pdf | at least one satellite or at least one cell phone tower capable of signal communication between the multi-sensor detection device and the monitoring equipment; | at least one satellite or at least one cell phone tower capable of signal communication between the multi sensor detection device and the monitoring equipment; |
| The internet connection is shared by many ATAK functions on the Google Pixel 6a, 7, 7a, 7 Pro, and Fold smartphone such as internet browsing, receiving email messages and installing apps. Wi-Fi is a method for devices such as the Google Pixel 6a, 7, 7a, 7 Pro, or Fold smartphones to connect wirelessly to the Internet using radio waves. | at least one internet connection capable of communication between the multi-sensor detection device and the monitoring equipment; | at least one internet connection capable of communication between the multi sensor detection device and the monitoring equipment; |
| Sit(x) is a commercial Server-as-a-Service solution based on the TAK platform developed by PAR Government for the U.S. Defense & Intelligence Community. Sit(x) has real-time communication and information sharing. With Sit(x), individuals and teams can communicate via personal computers and handheld mobile [Google smartphone] devices by voice or text. They can share real-time full-motion video (FMV), airborne/drone imagery, GPS locations, photos, and satellite imagery. Fully secure and compatible with ATAK, WinTAK, and iTAK. Sit(x) accessed via free downloadable gateway apps. | whereupon a signal sent to a receiver of the multi-sensor detection device from a satellite; or to a cell phone tower; or through at least one of a short-range radio frequency or a long-range radio frequency; causes a signal to be sent to the monitoring equipment that includes at least one of location data or sensor data; | whereupon a signal sent to a receiver of the multi sensor detection device from a satellite; or to a cell phone tower; or through short and/or long-range radio frequency; causes a signal to be sent to the monitoring equipment that includes location data and sensor data; |

10

SAppx779

| The '439 & '189 patent specs: Product grouping (PG) 1 (storage & transportation); PG 2 (sensors); PG 3 (detector case; modified and adapted); PG 4 (monitoring & communication devices); PG 5 (communication methods); PG 6 (biometrics); and, PG 7 (authorized person) | wherein the monitoring equipment or multi-sensor detection device receives a signal via any of one or more products of any product grouping categories; | wherein the monitoring equipment or multi sensor detection device receives a signal via any of one or more products listed in any of the plurality of product grouping categories; |
|---|---|---|
| The Android-based [Google] Google Pixel 6a, 7, 7a, 7 Pro, and Fold smartphones now contained integrated satellite …<br><br>Wi-Fi is a method for devices such as the Google Pixel 6a, 7, 7a, 7 Pro, or Fold smartphone to connect wirelessly to the Internet using radio waves…<br><br>The internet connection is shared by many ATAK functions on the Google Pixel 6a, 7, 7a, 7 Pro, or Fold smartphone such as internet browsing, receiving email messages; installing apps…<br><br>The Google Pixel 6a, 7, 7a, 7 Pro, or Fold smartphone connects to a cell tower or base station via radio waves, and that tower is usually physically connected to the infrastructure to send that data wherever it needs to go. | wherein at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency connection, or short-range radio frequency (RF) connection is capable of signal communication with the transmitter, a receiver of the monitoring equipment, the multi-sensor detection device, or transceivers of the products; | wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection is capable of signal communication with the transmitter and the receiver of the monitoring equipment or multi sensor detection device and transceivers of the products; |
| BIOMETRICS: Biometric factors allow for secure authentication on the Android platform. The Android framework includes face and fingerprint biometric authentication. Android can be customized to support other forms of biometric authentication (such as Iris).<br><br>ATAK (including CivTAK) is an Android smartphone [i.e., Google smartphone] geospatial infrastructure and situational awareness app https://www.civtak.org/atak-about/. ATAK can be downloaded to a phone, tablet, or handheld device. (Google Pixel 6a, 7, 7a, 7 Pro, or Fold smartphones) | wherein the monitoring equipment is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan or signature such that the monitoring device that is at least one of the computer, the laptop, the notebook, the PC, the handheld, the cell phone, the PDA, or the smart phone is locked by the biometric lock disabler to prevent unauthorized use; | wherein the monitoring equipment is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature such that the monitoring device that is at least one of the computer, the laptop, the notebook, the PC, the handheld, the cell phone, the PDA, or the smart phone is locked by the biometric lock disabler to prevent unauthorized use; |

11

SAppx780

| | | |
|---|---|---|
| The Android-based [Google] Google Pixel 6a, 7, 7a, 7 Pro, and Fold smartphones now contained integrated satellite …<br><br>Wi-Fi is a method for devices such as the Google Pixel 6a, 7, 7a, 7 Pro, or Fold smartphone to connect wirelessly to the Internet using radio waves…<br><br>The internet connection is shared by many ATAK functions on the Google Pixel 6a, 7, 7a, 7 Pro, or Fold smartphone such as internet browsing, receiving email messages; installing apps…<br><br>The Google Pixel 6a, 7, 7a, 7 Pro, or Fold smartphone connects to a cell tower or base station via radio waves, and that tower is usually physically connected to the infrastructure to send that data wherever it needs to go. | wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, long range radio frequency, and short-range radio frequency (RF). | wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, and long and short-range radio frequency (RF). |

## Google "Avoided" Plaintiff's Patented Central Processing Unit

Plaintiff's patented central processing units for smartphone devices are not only patented devices of Plaintiff use by Google; it is also the most significant patented process of Plaintiff's communicating, monitoring, detecting, and controlling (CMDC) device (i.e., smartphone) invention. Plaintiff alleged Google directly infringes his patented central processing units (CPUs)

Google never defends or argues against Plaintiff's alleged infringement of Plaintiff's patented central processing units (CPUs), used with the Google Pixel 6a, 7, 7a, 7 Pro, and Fold smartphones. Ignoring Plaintiff's allegations and Plaintiff's patents are not the same as the Defendant Google denying the allegations.

"Rule 8 prescribes the rules of pleading. Defenses are subject to three provisions with[in] Rule 8: 1) the defense must be stated "in short and plain terms" (Rule 8(b)(1)(A)); 2) "any avoidance or affirmative defense" must be affirmatively stated (Rule 8(c)(1)); and 3) the defense "must be simple, concise, and direct" (Rule 8(d)(1))."

"Similarly, under 35 U.S.C. § 271(c), "anyone who offers to sell, sells, or imports a material component of something that is patented, knowing that the component was especially made for use in an infringement and is not a commodity suitable for a substantial non-infringing use, is also liable as a contributory infringer".

12

Plaintiff has alleged the defendant Google, "has in the past and continues to contribute the Google Tensor i.e., Central Processing Unit (CPU), Processor, System-on-a-Chip (SoC), Chipset; a material component of Plaintiff's patented Communicating, Monitoring, Detecting, and Controlling (CMDC) device, with knowledge that the Google Tensor Chipset is especially made for use in an infringement and is not a commodity suitable for a substantial non-infringing use." Plaintiff's Amended Complaint (Dkt. 42)

Claim 11 of Plaintiff's '619 patent covers both the standard engineering patented process and Google's attempted reverse engineering:

> "*A central processing unit (CPU) of at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, capable of*"

> "*processing instructions to scan a senor or tag using the short-range wireless technology of radio frequency near-field communication (NFC)*"

> "*processing instructions to monitor or detect at least one of a chemical sensor, a biological sensor, a motion sensor, a biometric sensor, a signature sensor, or a human sensor*"

> "*processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs)*"

> "*processing instructions received through at least one of a Bluetooth, a Wi-Fi, a satellite, a global positioning system (GPS), or a cellular transmission*"

> "*processing instructions to connect the communication device to the internet or internet-of-things (IoTs) platform to sync, to at least one of ... a detection device, or another communication device*"

> "*whereupon, the central processing unit (CPU) of the communication device is capable of processing instructions for operational and functional execution, and is capable of providing feedback of the execution, and storing the feedback into memory.*"

It is the belief of Plaintiff that Google is making, using, offering for sell, and selling products [i.e., Google Pixel 6a, 7, 7a, 7 Pro, and Fold smartphones] that directly infringes Plaintiff's patented communicating, monitoring, detecting, and controlling (CMDC) devices.

It is further the belief of Plaintiff that Google is making, using, offering for sell, and selling products [i.e., Google Tensor G1 and G2 Chipset-CPUs] that directly infringes Plaintiff's

SAppx782

patented central processing unit (CPU) devices. 35 USC 271(a)" Plaintiff's Response to
Defendant's Motion (Dkt. 46).

A Utility patent may be granted to anyone who invents or discovers any new and useful
*process*...". Plaintiff has clearly identified what the Google Pixel 6a, 7, 7a, 7 Pro, & Fold's role
is in accomplishing the patented process and how they function to implement the patented
process. This case is about Google selling smartphones and CPUs that Plaintiff allege infringes
Plaintiff's patents, patent claims, patented inventions, and patented processes.

Plaintiff has also identified what the Google Pixel 6a, 7, 7a, 7 Pro, & Fold's android
open-source operating system; megapixel camera sensor; near-field communication sensor;
ambient light and spectrometer sensors; and GPS, WiFi, and Bluetooth sensors role is in
accomplishing the patented process of enabling CBRNE detection and how they function to
implement the patented process of enabling CBRNE detection (i.e., ATAK DTRA CBRNE
Plugins; megapixel camera sensor for CBR; near-field communication tags for CBRN; ambient
light – spectrometer biosensors; and, beacons for radiation alerts and signaling).

"The court may strike from a pleading an insufficient defense or any redundant,
immaterial, impertinent or scandalous matter." Fed. R. Civ. P. 12(f). Plaintiff argues the
challenged affirmative defenses are insufficient defenses because they do not address the
patented processes that describes Plaintiff's inventions as set forth in Plaintiff's patent
claims.

Sincerely,

Larry Golden, *Pro Se* Plaintiff
740 Woodruff Rd., #1102
Greenville, SC 29607
(H) 8642885605
(M) 8649927104
Email: atpg-tech@charter.net

SAppx783

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 2nd day of October, 2023, a true and correct copy of the foregoing "Plaintiff's Sur-Reply in Opposition to Defendant's Reply to Dismiss Plaintiff's Amended Complaint", was served upon the following Defendant by priority "express" mail:

Matthew S. Warren

WARREN LEX LLP

2261 Market Street, No. 606

San Francisco, California, 94114

Phone: (415) 895-2940

Fax: (415) 895-2964

Email: 22-5246@cases.warrenlex.com

Larry Golden, Pro Se

740 Woodruff Rd., #1102

Greenville, South Carolina 29607

atpg-tech@charter.net

864-288-5605

15

SAppx784

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| LARRY GOLDEN,<br><br>                Plaintiff,<br><br>    v.<br><br>GOOGLE LLC,<br><br>                Defendant. | Case No.  22-cv-05246-RFL<br><br>**JUDGMENT IN A CIVIL CASE** |

Pursuant to the Court's order granting Defendant's Motion to Dismiss (Dkt. No. 68), judgment is entered in favor of Defendant, and against Plaintiff.

Dated: April 3, 2024

Mark B. Busby
Clerk, United States District Court

By: _____
Melinda K. Lock, Deputy Clerk to
the Honorable Rita F. Lin

1

SAppx785

# UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

Phone (864) 288-5605

Email: atpg-tech@charter.net



FILED

APR 10 2024

CLERK, U.S. DISTRICT COURT
NORTH DISTRICT OF CALIFORNIA

| | |
|---|---|
| LARRY GOLDEN,<br><br>         *Plaintiff,*<br><br>            V.<br><br>GOOGLE LLC<br><br>         *Defendant.* | CASE NO: <u>4:22-cv-05246-RFL</u><br><br>**JURY TRIAL DEMANDED**<br><br>(Direct Patent Infringement),<br>(Induced and Contributory Patent<br>Infringement), (Joint Infringement,<br>(Willful Infringement) |

## PLAINTIFF'S MOTION FOR RECONSIDERATION AND PLAINTIFF'S MOTION FOR DISQUALIFICATION

April 9, 2024

SAppx786

The Code of Conduct for United States Judges applies to United States circuit judges, district judges, Court of International Trade judges, Court of Federal Claims judges, bankruptcy judges, and magistrate judges.

See Rules for Judicial-Conduct and Judicial-Disability Proceedings, Rule 4(a)(2) (providing that "cognizable misconduct includes: (B) treating litigants [], or others in a demonstrably egregious and hostile manner... and Rule 4(a)(3) (providing that "cognizable misconduct includes intentional discrimination on the basis of race..."). The duties of judicial office take precedence over all other activities. The judge should perform those duties with respect for others, and should not engage in behavior that is harassing, abusive, prejudiced, or biased. The judge should adhere to the following standards: (C) Disqualification. (1) A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited to instances in which: (a) the judge has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts ...

Not until 1911, was a provision enacted requiring a district-judge recusal for bias in general. In its current form, codified at 28 U. S. C. § 144, that provision reads as follows:

"Whenever a party to any proceeding in a district court makes and files a timely and sufficient affidavit that the judge before whom the matter is pending has a personal bias or prejudice either against him or in favor of any adverse party, such judge shall proceed no further therein, but another judge shall be assigned to hear such proceeding."

Not until the Judge in this current case, *Larry Golden v. Google LLC*; U.S. District Court for the Northern District of California—San Francisco; Case No. 3:22-cv-05246-RFL, issued the "Opinion Granting Defendant's Motion to Dismiss"; Dkt. 68, Filed 04/03/24, did Plaintiff realize the Judge presiding over the case has a personal bias or prejudice against Plaintiff, a Black and/or African American inventor, and is judicially bias in favor of Google, another multi-billion-dollar corporation accused of stealing the intellectual property of the little guy.

2

SAppx787

28 U.S. Code § 455(a): Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned. (b)He shall also disqualify himself in the following circumstances: (1) Where he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

## PLAINTIFF IS ASKING THE JUDGE TO DISQUALIFY HERSELF

## The Judge Deprived Plaintiff of his Seventh Amendment Right of a Jury Trial

The Judge deprived Plaintiff of his Seventh Amendment right to a trial by jury for patent infringement claims that are issues of fact tried by a jury. The Federal Circuit in *Golden v. Google LLC* Case No. 22-1267 reviewed the case "*de novo*", which means the Circuit referred to the lower Court's record to determine the facts, but ruled on the evidence and matters of law without deferring to that Court's finding.

The Federal Circuit in *Golden v. Google LLC* Case No. 22-1267 disclosed in "Discussion" that the Circuit reviewed the case "under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), [a court must dismiss a complaint if it fails to allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; and, "plaintiff must allege facts that give rise to "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted)

The Federal Circuit in *Golden v. Google LLC* Case No. 22-1267 took notice that "in the patent context, th[e] court has explained that a plaintiff need not "plead facts establishing that each element of an asserted claim is met," *In re Bill of Lading Transmission and Processing Sys. Pat. Litig.*, 681 F.3d 1323, 1335 (Fed. Cir. 2012) (citing *McZeal v. Sprint Nextel Corp.*, 501 F.3d 1354, 1357 (Fed. Cir. 2007)), but must plead "'enough fact[s] to raise a reasonable expectation

3

that discovery will reveal' that the defendant is liable for the misconduct alleged." Id. at 1341 (alteration in original) (quoting *Twombly*, 550 U.S. at 556)".

The Federal Circuit in *Golden v. Google LLC* Case No. 22-1267 goes on to say: "In the Google case, the district court again concluded that Mr. Golden's complaint was frivolous. Here, however, Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the Google [Pixel 5] Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189" … "to the extent that the chart includes the "exact same language" as previously rejected charts, it is simply the language of the independent claims being mapped to" … "[i]t attempts—whether successfully or not—to map claim limitations to infringing product features, and it does so in a relatively straightforward manner. We conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart. Mr. Golden has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart."

Plaintiff believe the Judge to be "judicially bias" in favor of Google because the Judge allowed Google the opportunity to relitigate the very same alleged facts, causes of action, asserted patent claims, and alleged infringing products the Federal Circuit had just ruled on, and determined "the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart".

The Judge's actions are further magnified because the Judge didn't allow the same duplicative case to be presented to a jury, but decided the duplicative case can best to handle by depriving Plaintiff of his Seventh Amendment right to a jury trial on Plaintiff's patent infringement claims that are issues of fact tried by a jury.

4

Petitioner, an African American inventor, has the constitutional right to sue Google, a White-owned company, in Federal Court. The question of whether Google's alleged infringing devices, methods or products are covered by the Plaintiff's patent claims is a question of fact to be resolved by the jury. *See*, e.g., *Oakley, Inc. v. Int'l Tropic-Cal, Inc.*, 923 F.2d 167, 169 (Fed. Cir. 1991) ("Infringement is a question of fact"); *SRI v. Matsushita Electronic Corp.*, 775 F.2d 1107, 1125, 227 USPQ 577, ___ (Fed. Cir. 1985) ("It is settled that the question of infringement (literal or by equivalents) is factual").

Patent infringement claims are issues-of-fact tried by a jury under the Seventh Amendment. No particular form for a jury trial demand is prescribed by California statute or court rule. (See Code Civ. Proc. § 631(a): "[t]he right to a trial by jury as declared by Section 16 of Article I of the California Constitution shall be preserved to the parties inviolate"; "[t]rial by jury is an inviolate right—not to be violated or broken—and shall be secured to all").

It has been over twenty-five years since the Supreme Court last assessed the scope of the constitutional right to a jury in a patent-infringement case. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996). More remarkable, that decision has been its only direct pronouncement on the matter in the 230 years that patent infringement has been actionable [Act of Apr. 10, 1790, ch. 7, §§ 1, 4, 1 Stat. 109, 110, 111 (first federal patent act)].

The Seventh Amendment requires juries in "Suits at common law"; [U.S. CONST. amend. VII]. Law courts always offered juries; and early juries tried nearly all infringement and validity issues.

Long-standing equity principles, according to the Supreme Court, dictated that "only under the most imperative circumstances which in view of the flexible procedures of the Federal

5

SAppx790

Rules we cannot now anticipate, can the right to a jury trial of legal issues be lost through prior determination of equity principles."

For the foregoing reasons stated above, Plaintiff is asking the Judge to disqualify herself, and reconsider granting Plaintiff's demand for a jury trial.

### The Judge Forced Plaintiff to Again Prove His Case at the Pleading Stage

The Federal Circuit made clear a few years ago in *Nalco Co. v. Chem-Mod, LLC*, a Plaintiff "need not 'prove its case at the pleading stage.'" The Federal Rules of Civil Procedure do not require a Plaintiff to plead facts establishing that each element of an asserted claim is met. Indeed, the Federal Circuit previously explained in *Disc Disease Sols. Inc. v. VGH Sols., Inc.* that a Plaintiff must only give the alleged infringer fair notice of infringement. Nothing much has changed with the Federal Circuit's approach to pleading infringement since these two 2018 decisions.

The Federal Circuit in *Golden v. Google LLC* Case No. 22-1267 took notice that "in the patent context, th[e] court has explained that a plaintiff need not "plead facts establishing that each element of an asserted claim is met," *In re Bill of Lading Transmission and Processing Sys. Pat. Litig.*, 681 F.3d 1323, 1335 (Fed. Cir. 2012) (citing *McZeal v. Sprint Nextel Corp.*, 501 F.3d 1354, 1357 (Fed. Cir. 2007)), but the Judge in this current case decided the Federal Circuit's opinion is irrelevant in this current case. The Judge ignored the fact that Plaintiff has "alleged enough facts to state a claim to relief that is plausible on its face]." *Twombly*, 550 U.S. at 570, and proceeded to have Plaintiff prove his case at the pleading stage.

The Federal Circuit in *Larry Golden v. Google LLC*; Case No. 22-1267 first, examined and determined Golden has allege "enough facts to state a claim to relief that is plausible on its

6

face." *Twombly*, 550 U.S. at 570 and that Golden has alleged facts that give rise to "more than a sheer possibility that the defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. The Federal Circuit explained how Golden has pled enough fact[s] to raise a reasonable expectation that discovery will reveal' that the defendant is liable for the misconduct alleged.

The Federal Circuit in *Larry Golden v. Google LLC*; Case No. 22-1267 also examined and determined Golden has described how the Google "smartphone" literally infringes at least claim 5 of Golden's '287 U.S. Patent; claim 23 of Golden's '439 U.S. Patent; and claim 1 of Golden's '189 U.S. Patent. See the chart below:

| Literal Infringement (Precedence) | Literal Infringement (Fed. Cir. *Golden v. Google*) |
|---|---|
| Literal infringement means that each and every element recited in a claim has identical correspondence in the allegedly infringing device or process. To literally infringe a patent, the accused system, method, etc. must include each limitation of a claim. E.g., *Southwall* (Fed. Cir. 05/10/95) To establish literal infringement, every limitation set forth in a claim must be found in an accused product, exactly. *Becton Dickinson* (Fed. Cir. 12/13/90). "Infringement, both literal and under the doctrine of equivalents, is an issue of fact."); *Cobalt Boats* (Fed. Cir. 05/31/19) "patent infringement is an issue of fact, tried by a jury" [U.S. CONST. amend. VII] | "Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the [] Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189 … It [claim chart] attempts [] to map claim limitations to infringing product features, and it does so in a relatively straightforward manner …[W]e conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart. Mr. Golden has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart.…" |

Although the Federal Circuit did not specifically say "without a doubt, Google's smartphone products are literally and/or under the doctrine of equivalents, infringing Plaintiff's patents asserted in the case", the Federal Circuit imply to say under the "clear and convincing evidence" standard, Google's smartphone products are more likely than not literally and/or under the doctrine of equivalents, infringing Plaintiff's patents asserted in the case.

7

The Judge tried to lead Plaintiff down the path of rejecting what the Federal Circuit had already determined by attacking the structure and functionality of the sensing and detecting components; rather than "simply [accepting] the language of the independent claims being mapped to" *See Larry Golden v. Google LLC*; CAFC Case No. 22-1267.

The Judge stated Plaintiff is without leave to amend the complaint to cure the deficiencies of the complaint, something Plaintiff did not ask for with the first amendment, because Plaintiff never believed, after the decision in *Larry Golden v. Google LLC*; CAFC Case No. 22-1267, that there were deficiencies.

How can Plaintiff improve upon what the Federal Circuit has already determined to be "enough factual evidence" without trying to prove direct infringement again, at the pleading stage?

For the foregoing reasons, Plaintiff believe this Judge to be incompetent to adjudicate claims of patent infringement or one that is judicially bias in Google's favor or lack the ability to be impartial. Either, or both are reasons for disqualification.

## The Judge Fail to Strictly Follow the Decision(S) Handed Down by the Higher Court within the Same Jurisdiction

The District Court is in violation of the doctrine of *vertical stare decisis* for not honoring the decision of the higher Appellate Court in *Larry Golden v. Google LLC*; Case No. 22-1267:

The Northern District of California Court, who is bound by and must follow the decisions of the U.S. Court of Appeals for the Federal Circuit [*vertical stare decisis*] fail to abide by the Circuit's decision in *Larry Golden v. Google LLC* Case No. 22-1267, that Google's "smartphone" literally and/or under the doctrine of equivalents infringes Petitioner's "independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189 … and it does so in a relatively

8

straightforward manner". the District Court was bound by the doctrine of *vertical stare decisis*, to uphold the CAFC's decision.

*Vertical stare decisis* binds lower courts to follow strictly the decisions of higher courts within the same jurisdiction (e.g., the Northern District of California Court must follow the decisions of the U.S. Court of Appeals for the Federal Circuit). The Supreme Court defines *vertical stare decisis* as the doctrine, "a lower court must strictly follow the decision(s) handed down by a higher court within the same jurisdiction".

A court engages in *vertical stare decisis* when it applies precedent from a higher court. For example, if the Northern District of California Court in *Golden v. Golden* adhered to a previous ruling from the United States Court of Appeals for the Federal Circuit, in *Larry Golden v. Google LLC*; Case No. 22-1267, that would be *vertical stare decisis*.

The Judge gives more influence on the decisions from previous cases that victimized Plaintiff in a judicial system of systemic and structural racism, judicial bias in favor of white-owned corporations, and the deprivation of a Seventh Amendment right to a trial by jury, than to honor the decision handed down by a higher Federal Circuit court within the same jurisdiction.


### The Judge "Personal Bias" in Favor of Google is Why the Judge Ignored Plaintiff's "Reversed Engineer" of Google's Alleged Infringing Products and Granted Google's Insufficient and Irrelevant Defense Theory

Although the Judge overreached when she decided to replace the responsibility of a jury, with herself, the Judge fail to realize this is not a case about the infringement of the ATAK software. The alleged infringement of the DoD DTRA ATAK CBRNE Sensors is pending in another case filed at the United States Court of Federal Claims in *Golden v. US* Case No. 23-811C.

SAppx794

Plaintiff never presented patent claims in this case to show how the DoD DTRA (the Government) ATAK CBRNE Sensors allegedly infringes every element recited in Plaintiff's patent claims. Which means the Judge is outside her jurisdiction to adjudicate an alleged patent infringement claim against the Government for money damages.

The defense theory of "modification of government products by third parties" does not apply too, nor is it relevant to the Plaintiff's burden of proving "literal patent infringement" and/or proving "infringement under the doctrine of equivalents" of Google products.

Literal infringement means that each and every element recited in a claim has identical correspondence in the allegedly infringing device or process. To literally infringe a patent, the accused system, method, etc. must include each limitation of a claim. E.g., *Southwall* (Fed. Cir. 05/10/95) To establish literal infringement, every limitation set forth in a claim must be found in an accused product, exactly. *Becton Dickinson* (Fed. Cir. 12/13/90). "Infringement, both literal and under the doctrine of equivalents, is an issue of fact."); *Cobalt Boats* (Fed. Cir. 05/31/19).

The Federal Circuit in *Larry Golden v. Google LLC*; Case No. 22-1267 examined the "***reversed engineered***" claim charts and determined Golden has described how the Google "smartphone" literally infringes at least claim 5 of Golden's '287 U.S. Patent; claim 23 of Golden's '439 U.S. Patent; and claim 1 of Golden's '189 U.S. Patent.

Reverse engineering is when you start with a specific product and work your way backward to figure out the process used to manufacture or develop it. Identifying patent infringement involves mapping relevant patent claims to the results of reverse engineering, which is exactly what Plaintiff did in *Larry Golden v. Google LLC*; Case No. 22-1267, and this case.

SAppx795

Reverse engineering can be used to prove evidence of use when a Plaintiff is trying to assert patent infringement, however, it is best to prove evidence of use with publicly available information and use reverse engineering during discovery to ensure the proof will be accepted in court.

Case law appears obvious: "[T]he use of a patented invention, without either manufacture or sale, is actionable." *Roche Prods., Inc. v. Bolar Pharm. Co., Inc.*, 733 F.2d 858, 861 (Fed. Cir. 1984). The Federal Circuit's definition of use is "to put into action or service." *NTP, Inc. v. Research in Motion, Ltd.*, 418 F.3d 1282, 1316-17 (Fed. Cir. 2005).

Historically, the courts have interpreted use broadly. *See Bauer & Cie. v. O'Donnell*, 229 U.S. 1 (1913); *Centillion Data Sys., LLC v. Qwest Commc'ns Int'l, Inc.*, 631 F.3d 1279, 1283-84 (Fed. Cir. 2011); *NTP, Inc.*, 418 F.3d at 1316; *Renhcol Inc. v. Don Best Sports*, 548 F. Supp. 2d 356, 360 (E.D. Tex. 2008). "'The inventor of a machine is entitled to the benefit of all the *uses* to which it can be put, no matter whether he had conceived the idea of the use or not.'" *Paragon Solutions, LLC v. Timex Corp.*, 566 F.3d 1075, 1091 (Fed. Cir. 2009) (citing *Roberts v. Ryer*, 91 U.S. 150, 157 (1875))

Therefore, Google in theory, basically put their foots in their mouths when they decided to challenge the use of the government's ATAK software and Draper's CBRNE sensors in this jurisdiction. There is generally no reason to differentiate between the legal definition of "use" relating to a system as opposed to "use" when it relates to a device/apparatus [Google's smartphones] with components [government's ATAK software and CBRNE sensors] used as a whole. See *Renhcol Inc. v. Don Best Sports*, 548 F. Supp. 2d 356, 361 n.3 (E.D. Tex. 2008).

An accused device may infringe if it is reasonably capable of satisfying claim limitations, even though it may also be capable of non-infringing modes of operation. *Hilgreave Corp. v.*

SAppx796

*Symantec Corp.*, 265 F.3d 1336, 1343 (Fed. Cir. 2001) (citations omitted), cert. denied, 535 U.S. 906 (2002).

Reverse engineering, also called "tear down", is a method or process to discover how a Google smartphone product functions with the DTRA ATAK software and/or its Draper CBRNE Plug-in Sensors architecture.

The Federal Circuit in *Larry Golden v. Google LLC*; Case No. 22-1267 accepted the "reversed engineered" claim charts and determined Golden has described how the Google "smartphone" literally infringes at least claim 5 of Golden's '287 U.S. Patent; claim 23 of Golden's '439 U.S. Patent; and claim 1 of Golden's '189 U.S. Patent.

## The Judge is Unfamiliar with the Concept of Modifications, and therefore Cannot Adjudicate this Case

Modifications are appropriate if the modifications do not affect the intended use of the patented device or alter the fundamental scientific technology of the patented device.

The Judge fail to understand that a significant change or modification in design, components, method of manufacture, or intended use is enough to qualify for a new patent. Significant changes or modifications are those that could significantly affect the effectiveness of the device, or major changes or modifications in the intended use of the device.

The Judge can't seem to understand or accept the fact that Plaintiff is not making changes to a Google patented smartphone device to make it infringe; Plaintiff is alleging Google has duplicated his patented smartphone invention in its entirety, and any "modifications" to an already existing device (i.e., cell phone) was significant enough that the USPTO granted Golden patents [see claim 23 of Plaintiff's '439 patent]. Plaintiff is not making additional modifications.

If Google's non-infringement theory of "add-ons that are modified to function" is allowed to stand against the only Black and/or African American inventor who owns the patent rights to the smartphone; under the rule of law Google' smartphone add-ons patents should be invalidated by this Court and the USPTO. Following is a list of patented smartphone add-ons that are relevant to the functionality of Google's smartphones:

*Google Android Open-Source Operation System Patents*: The major milestone in the development of the Android system occurred on November 5th, 2007. On this day, Google unveiled the Open Handset Alliance (OHA), a consortium of technology manufacturers that would work together to create open mobile device standards. At the outset, 34 companies were involved in the consortium. The companies included in the collection at that point included wireless telecommunications providers (T-Mobil), mobile handset makers (Motorola, HTC) and chipset makers (Texas Instruments, Qualcomm). Google wouldn't be limited to simply one device from one manufacturer.

*Google's Transceiver Patent(s)*: A technology for reducing the cost of wireless communications was protected for Google by U.S. Patent No. 6982945, which is titled Baseband Direct Sequence Spread Spectrum Transceiver. This is one of Google's earlier patents in mobile technologies, issued in January 2006, and it protects a method for transmitting a radio frequency signal using the Code Division Multiple Access (CDMA) wireless standard, a mobile technology utilized by smartphones.

*Smartphone Door Lock/Unlock Patent:* A smart lock is an electromechanical lock which is designed to perform locking and unlocking operations on a door when it receives instructions from an authorized remote device, such as a smart phone, using a wireless protocol.

*Smartphone Internet of Things Patent:* IoT devices 110 may include a fitness tracker, a smart watch, smart glasses, or another peripheral and/or wearable device that may be used in connection with a user device (e.g., a smart phone). For example, certain types of IoT devices 110, such as smart phones, may include a transceiver ... In another example, various IoT devices 110 associated with a user, such as wearable devices (e.g., a

13

fitness tracker, smart glasses, smart watch, headphones, etc.) and a smartphone, [] at the user's location.

*Smartphone Disabling Lock Mechanism Patent:* It's not like Apple is unaware of the whole texting and driving scenario. In fact, the company is fully aware of all the dangers associated with it as it had previously filed a patent in 2008 that reflected the lock-out mechanism and was published back in 2014.

*Smartphone Fingerprint Identification Patent:* The present invention relates to a contactless fingerprint recognition method using a smartphone and, more particularly, to a contactless fingerprint recognition method using a smartphone…

*Smartphone GPS Navigation and Location Patent:* With mobile positioning technologies and the additional capabilities of modern mobile computing devices, the mobile devices are frequently used as mapping and navigational tools. A mobile device such as a smart phone, smart watch, or other wearable computing device may identify its current coordinates using a Global Positioning System (GPS) receiver …

*Smartphone Near-Field Communication (NFC) Patent:* The components of mobile device 100 may be a mobile computer-based system, such as, for example, cellular telephone, tablets, hand held computing devices (e.g., smart phones), tablets, laptops, and any other type of mobile computer-based system.

*Smartphone Heart-Rate Sensor Patent:* The International Trade Commission has confirmed its earlier ruling that Apple infringed on AliveCor's heart rate monitoring patents. "Today's ITC ruling is a win for innovation and consumer choice," said Priya Abani, CEO of AliveCor."

*Smartphone Control of Vehicle Patent:* Smartphone-Based Vehicle Control Methods. This present invention relates to the field of smartphones interfacing and communicating with a desired vehicle, more specifically this invention relates to a smartphone storing specific user settings, communicating that to a vehicle and providing an interface to control the vehicle using the smartphone.

*Smartphone Bluetooth Patent:* The data source device 20 may be a suitable electronic device that supports A2DP and provides one or a plurality of audio contents, for example, a smart phone, a tablet computer, an MP3 player, a personal computer, a

14

SAppx799

laptop computer, a personal audio device, a CD player, or any other smart/non-smart terminal device.

*Smartphone-Based Biosensor Patent:* Numerous smartphone-based biosensor developments were published in recent years, some highly effective and sensitive. The ubiquity of smartphones throughout the world has brought about new opportunities to bring point-of-contact (POC) devices near the patients for portable healthcare monitoring, taking advantage of the characteristics of computing power, network connectivity, battery, and cameras of these devices. Current wireless telecommunication infrastructure makes the smartphone a ubiquitous platform worthy of using in order to develop biosensing and diagnostics platforms, especially for point-of-care and telemedicine applications.

*Smartphone Camera Patent:* Canon has submitted a patent application for a smartphone camera system that will enable users to use multiple smartphone camera lenses at once. The main focus of the submitted patent is to make use of the smartphone's many lenses. Most modern phones have several different camera lenses, often of varying focal lengths, but as a rule only one is used at a time.

Plaintiff believes the Judge is aware that Google's non-infringement theory is hypocritical and two-faced to say the least. Google obtains licenses from other patent owners when they realize the "add-ons" to the smartphones as a whole, are the patented inventions of the patent holders.

This Judge obviously don't know the difference between "interconnected"; a requirement of Plaintiff's patent claims asserted in this case, and "modified"; a step Google has included in Plaintiff's patent claims in this case, *OR*, the Judge has chosen not to consider "interconnected"; the necessary requirement of Plaintiff's patent claims asserted in this case, in favor of Google's insignificant added step of "modification".

15

SAppx800

Under the first scenario the Judge needs to disqualify herself for being incompetent and in the second scenario the Judge needs to disqualify herself for having a personal bias against Plaintiff, and in favor of Google

The only reason Google is standing on such an insufficient and inadequate non-infringement theory and the Judge who mimicked the insufficient and inadequate non-infringement theory in her grant of motion to dismiss, is because they realize the Patent Owner is a Black and/or African American inventor. The Courts have a long history of systemic and structural racism; and in this case the Judge is judicially bias in favor of Google.

## For Illustrative Purposes Plaintiff Will Provide the Judge with What Literal Infringement Looks Like at the Pleading Stage

Literal infringement means that each and every element recited in a claim has identical correspondence in the allegedly infringing device or process. To literally infringe a patent, the accused system, method, etc. must include each limitation of a claim. E.g., *Southwall* (Fed. Cir. 05/10/95) To establish literal infringement, every limitation set forth in a claim must be found in an accused product, exactly. *Becton Dickinson* (Fed. Cir. 12/13/90).

With the use of a reverse engineering claim chart, the Federal Circuit in *Larry Golden v. Google LLC*; Case No. 22-1267, examined and determined Golden has described how the Google "smartphone" literally infringes at least claim 5 of Golden's '287 U.S. Patent; claim 23 of Golden's '439 U.S. Patent; and claim 1 of Golden's '189 U.S. Patent.

In the following chart: 1- Literal infringement precedence; 2- Northern District of California Patent Local Rules for proving literal infringement; and, 3- The Federal Circuit in *Larry Golden v. Google LLC*; Case No. 22-1267 decision on literal infringement.

16

| | |
|---|---|
| **Literal Infringement (Precedence)** | Literal infringement means that each and every element recited in a claim has identical correspondence in the allegedly infringing device or process. To literally infringe a patent, the accused system, method, etc. must include each limitation of a claim. E.g., *Southwall* (Fed. Cir. 05/10/95) To establish literal infringement, every limitation set forth in a claim must be found in an accused product, exactly. *Becton Dickinson* (Fed. Cir. 12/13/90). "Infringement, both literal and under the doctrine of equivalents, is an issue of fact."); *Cobalt Boats* (Fed. Cir. 05/31/19) "patent infringement is an issue of fact, tried by a jury" [U.S. CONST. amend. VII] |
| **Patent Local Rules Northern District of California 3-1.** | (a) Each claim of each patent in suit that is allegedly infringed by each opposing party, including for each claim the applicable statutory subsections of 35 U.S.C. §271 asserted; <br> (b) Separately for each asserted claim, each accused apparatus, product, device, process, method, act, or other instrumentality ("Accused Instrumentality") of each opposing party of which the party is aware. This identification shall be as specific as possible. Each product, device, and apparatus shall be identified by name or model number, if known. Each method or process shall be identified by name, if known, or by any product, device, or apparatus which, when used, allegedly results in the practice of the claimed method or process; <br> (c) A chart identifying specifically where and how each limitation of each asserted claim is found within each Accused Instrumentality, including for each limitation that such party contends is governed by 35 U.S.C. § 112(6), the identity of the structure(s), act(s), or material(s) in the Accused Instrumentality that performs the claimed function. <br> (d) For each claim which is alleged to have been indirectly infringed, an identification of any direct infringement and a description of the acts of the alleged indirect infringer that contribute to or are inducing that direct infringement. Insofar as alleged direct infringement is based on joint acts of multiple parties, the role of each such party in the direct infringement must be described. <br> (e) Whether each limitation of each asserted claim is alleged to be literally present or present under the doctrine of equivalents in the Accused Instrumentality; |
| **Literal Infringement (Fed. Cir. *Golden v. Google*)** | "Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the [] Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189 … It [claim chart] attempts [] to map claim limitations to infringing product features, and it does so in a relatively straightforward manner …[W]e conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart. Mr. Golden has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart.…" |

17

Below, Plaintiff will illustrate how each and every element recited in a claim has identical correspondence in the allegedly infringing device or process because "[I]t is a bedrock principle of patent law," says the Federal Circuit Court of Appeals, that "the claims of a patent define the invention." *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.,* 381 F.3d 1111, 1115 (Fed. Cir. 2004).

The U.S. Supreme Court agrees: "the claims made in the patent are the sole measure of the grant." *Aro Mfg. Co. v. Convertible Top Replacement Co.,* 365 U.S. 336, 339 (1961)."

In the words of Judge Giles Rich, an author of the U.S. Patent Act of 1952, "the name of the game is the claim." Giles S. Rich, *The Extent of the Protection and Interpretation of Claims—American Perspectives,* 21 Int'l Rev. Indus. Prop. & Copyright L. 497, 499 (1990).

**Patent No. 9,096,189 (claim 1 of the '189 patent)**

1.     *A communication device* of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, *comprising*: [Plaintiff has identified the Google smartphone(s) as "a communication device" and is now getting ready to outline the features or elements of the Google smartphone(s)]

at least one of *a central processing unit (CPU)* for executing and carrying out the instructions of a computer program ... or a front-end processor for communication between a host computer and other devices; [Plaintiff has identified the Google "Tensor" as the CPU/Chipset for executing and carrying out instructions]

a *transmitter* for transmitting signals and messages to at least one of plurality product groups based on the categories of a *multi-sensor detection device* ... a *cell phone detection device* ...; [Plaintiff is identifying at least that of a Shannon 5511 sub-6GHz FR1 transceiver package and the Shannon 5710 FR2 mmWave transceiver as the transmitter]

a *receiver* for receiving signals, data or messages from at least one of plurality product groups based on the categories of a *multi-sensor detection device* ... a *cell phone detection device* ...; [Plaintiff is identifying at least that of a Shannon 5511 sub-6GHz FR1

18

transceiver package and the Shannon 5710 FR2 mmWave transceiver as the receiver]

the communication device is at least a … mobile communication device interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween; [Plaintiff is identifying the Google smartphone(s) as "a cell phone" or "communication device", *interconnected* to the Draper CBRNE Plug-ins as the cell phone detection devices capable of wired or wireless communication therebetween]

**Patent No. 9,589,439 (claim 23 of the '439 patent)**

23.     *A cell phone comprising*: [Plaintiff has identified the Google smartphone(s) as "a cell phone" and is now getting ready to outline the features or elements of the Google smartphone(s)]

*a central processing unit (CPU)* for executing and carrying out the instructions of a computer program; [Plaintiff has identified the Google "Tensor" as the CPU/Chipset for executing and carrying out instructions]

*a transmitter* for transmitting signals and messages to a cell phone detection device; [Plaintiff is identifying at least that of a Shannon 5511 sub-6GHz FR1 transceiver package and the Shannon 5710 FR2 mmWave transceiver as the transmitter]

*a receiver* for receiving signals from the cell phone detection device; [Plaintiff is identifying at least that of a Shannon 5511 sub-6GHz FR1 transceiver package and the Shannon 5710 FR2 mmWave transceiver as the receiver]

the cell phone is at least a fixed, portable or mobile communication device interconnected to the cell phone detection device, capable of wired or wireless communication therebetween; [Plaintiff is identifying the Google smartphone(s) as "a cell phone" or "communication device", *interconnected* to the Draper CBRNE Plug-ins as the cell phone detection devices capable of wired or wireless communication therebetween] and

whereupon the cell phone is interconnected to the cell phone detection device to receive signals or send signals to … activate or deactivate multi-sensor detection systems, or to activate or deactivate the cell phone detection device; [Plaintiff is identifying the Google smartphone(s) as "a cell phone" or "communication device", *interconnected* to the Draper CBRNE Plug-ins as the cell phone detection devices to receive signals or send signals to activate or deactivate]

at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone [Plaintiff is identifying the Google smartphone camera as the

19

biological sensor (because of its standard microscope feature of zooming); capable of being disposed within the Google smartphone(s)]

**Patent No. 10,163,287 (claim 5 of the '287 patent)**

5.     ***A monitoring device, comprising***: [Plaintiff has identified the Google smartphone(s) as "a monitoring device" and is now getting ready to outline the features or elements of the Google smartphone(s)]

     ***at least one central processing unit (CPU)***; [Plaintiff has identified the Google "Tensor" as the CPU/Chipset for executing and carrying out instructions]

     at least one of an internet connection or a Wi-Fi connection in communication with the at least one CPU; [Plaintiff has identified the Wi-Fi 7 (802.11be) with 2.4GHz+5GHz+6GHz,2x2+ 2x2 MIMO of the Google Pixel 8 smartphone as being in connection with the Google "Tensor" CPU/Chipset]

     at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; [Plaintiff has identified the Bluetooth® v5.3 with dual antennas for enhanced quality and connection of the Google Pixel 8 smartphone as being in connection with the Google "Tensor" CPU/Chipset]

     at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU; [Plaintiff has identified the Google Pixel 8 smartphone as an NFC-enabled device that communicates in one or both directions uses a frequency of 13.56 MHz in the globally available unlicensed radio frequency ISM band as being in connection with the Google "Tensor" CPU/Chipset]

     at least one sensor for chemical, biological, or human detection in communication with the at least one CPU; [Plaintiff is identifying the Google smartphone camera as the biological sensor (because of its standard microscope feature of zooming); as being in connection with the Google "Tensor" CPU/Chipset]

     one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents; [Plaintiff is identifying the Google Smartphone Beacon's NFC, WiFi, and Bluetooth detectors in communication with the Google "Tensor" CPU/Chipset]

     at least one of ***a transmitter or a transceiver*** in communication with the at least one CPU configured to send signals to monitor … or send signals to detect at least one of a chemical

SAppx805

biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. [Plaintiff is identifying at least that of a Shannon 5511 sub-6GHz FR1 transceiver package and the Shannon 5710 FR2 mmWave transceiver as the transmitter, that is in communication with the Google "Tensor" CPU/Chipset]

### The Judge Fail to Confirm in Her Decision, the Federal Circuit's Ruling that Google has at Least Literally Infringed Claim 5 of Plaintiff's '287 Patent for Plaintiff's Patented Central Processing Unit (CPU).

The Federal Circuit in *Larry Golden v. Google LLC*; Case No. 22-1267 examined the

"*reversed engineered*" claim charts and determined Golden has described how the Google

Smartphone "Tensor CPU/Chipset literally infringes at least claim 5 of Golden's '287 U.S.

Patent.

Plaintiff has also illustrated in this document how the Google Smartphone "Tensor

CPU/Chipset" literally infringes at least claim 5 of Golden's '287 U.S. Patent. Further, claim 5

of Golden's '287 U.S. Patent illustrates how each of the Google Smartphone elements are

connected to the Google "Tensor CPU/Chipset. Here's why:

- A CPU, or central processing unit, is like the brain of any computer or mobile device.
- CPUs receive data from every other part of the device, and then decide how and when to launch apps, display images, and more.
- The CPU is a critical part of any modern device. Processors are essentially the central processing units (CPUs) of smartphones. They execute instructions, perform calculations, and handle data processing tasks at an incredible speed.
- When choosing a smartphone, one of the most important things to consider is the processor or chipset it uses. The processor is like the brain of the phone, responsible for doing all the tasks and making everything run smoothly.
- The CPU act as the brains of a smartphone, responsible for carrying out tasks, managing multitasking capabilities, and optimizing various hardware components to ensure smooth operation.

21

- Smartphones have become an integral part of our lives, and their processing power has increased dramatically over the years. At the heart of every smartphone is a central processing unit, or CPU.
- The CPU is divided into two main components: the control unit and the arithmetic logic unit (ALU). The control unit fetches instructions from memory and decodes them, while the ALU performs calculations and logical operations.
- The CPU communicates with other components on the SoC through buses. The memory bus connects the CPU to the RAM, and the I/O bus connects the CPU to other hardware components such as the camera or speakers.
- Smartphone CPUs are the brain of the device and are responsible for executing all the tasks and processes that keep the device functioning. The process of execution is broken down into three main steps: fetch, decode, and execute.
- Smartphone CPUs are the brain of the device and are responsible for executing all the tasks and processes that keep the device functioning. The process of execution is broken down into three main steps: fetch, decode, and execute.
- During the fetch step, the CPU retrieves the instruction from memory, which tells the CPU what task to perform. In the decode step, the CPU interprets the instruction and converts it into an understandable format for the CPU to execute. Finally, during the execute step, the CPU performs the requested task.
- Smartphone CPUs are at the heart of modern technology, driving the development of new devices and applications. From basic tasks like making calls and sending texts to advanced applications like machine learning and virtual reality, smartphones rely on powerful CPUs to perform their functions quickly and efficiently.

As technology continues to evolve, the importance of Plaintiff's smartphone CPUs will only continue to grow, driving the development of new and innovative devices and applications that will shape the future of technology.

Plaintiff's patented smartphone CPUs have revolutionized the way we communicate, work, and entertain ourselves. With cutting-edge technologies and continuous advancements in manufacturing, these tiny CPU/Chipsets are becoming more powerful and efficient every year.

SAppx807

As the world continues to become more reliant on mobile technology, the importance of Plaintiff's patented smartphone CPUs will only increase. Understanding how they work and what they are capable of is crucial for keeping up with the ever-evolving technological landscape.

Plaintiff has asserted independent patent claims 4, 5, & 6 of Plaintiff's '287 patent; and independent claims 1 & 11, and dependent patent claims 2-10, & 11-20 of Plaintiff's '619 patent to illustrate Plaintiff owns the patent rights for the smartphone central processing unit (CPU), and the right to exclude Google from making, using, offering for sell, and selling Plaintiff's patented smartphone CPUs.

## The Judge Fail to Recognize the Legal Standard for Dismissing a Case for Failure to State a Claim—12(b)(6)

When deciding a motion to dismiss under Rule 12(b)(6), this Judge must accept as true all factual allegations in the complaint [which means all factual evidence of literal infringement determined by the Federal Circuit in *Larry Golden v. Google LLC*; Case No. 22-1267] and must draw inferences in a light most favorable to the plaintiff. *See Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974).

The Federal Circuit made clear a few years ago in *Nalco Co. v. Chem-Mod, LLC*, a Plaintiff "need not 'prove its case at the pleading stage.'" The Federal Rules of Civil Procedure do not require a Plaintiff to plead facts establishing that each element of an asserted claim is met. Indeed, the Federal Circuit previously explained in *Disc Disease Sols. Inc. v. VGH Sols., Inc.* that a Plaintiff must only give the alleged infringer fair notice of infringement.

With that being said, and because Plaintiff was pressured by the Judge to prove Plaintiff's case at the pleading stage, the Judge fail to adhere to the legal standard of pleading: A complaint

SAppx808

"should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

"The function of a motion to dismiss is 'merely to assess the legal feasibility of the complaint, not to assay [examine] the weight of the evidence which might be offered in support thereof.'" *Mytych v. May Dept. Store Co.*, 34 F. Supp. 2d 130, 131 (D. Conn. 1999) (quoting *Ryder Energy Distribution v. Merrill Lynch Commodities, Inc.*, 748 F.2d 774, 779 (2d Cir. 1984)), and certainly not to do everything, including lying, to overturn the decision of the higher United States Court of Appeals for the Federal Circuit.

"The issue on a motion to dismiss is not whether the Plaintiff will prevail, but whether the plaintiff is entitled to offer evidence to support his claims." *United States v. Yale New Haven Hosp.*, 727 F. Supp 784, 786 (D. Conn. 1990) (citing Scheuer, 416 U.S. at 232).

The doctrine of res judicata seeks "(1) to promote judicial economy by minimizing repetitive litigation; (2) to prevent inconsistent judgments which undermine the integrity of the judicial system; and (3) to provide repose by preventing a person from being harassed by vexatious litigation." *See State v. Ellis*, 466, 497 A.2d at 990

The Northern District of California Court, who is bound by and must follow the decisions of the U.S. Court of Appeals for the Federal Circuit [*vertical stare decisis*] fail to abide by the Circuit's decision in *Larry Golden v. Google LLC* Case No. 22-1267, that Google's "smartphone" literally and/or under the doctrine of equivalents infringes Petitioner's "independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189 … and it does so in a relatively straightforward manner". The District Court was bound by the doctrine of *vertical stare decisis*, to uphold the CAFC's decision.

24

Patent infringement claims are issues-of-fact tried by a jury under the Seventh Amendment of the United States Constitution. No particular form for a jury trial demand is prescribed by California statute or court rule. (See Code Civ. Proc. § 631(a): "[t]he right to a trial by jury as declared by Section 16 of Article I of the California Constitution shall be preserved to the parties inviolate"; "[t]rial by jury is an inviolate right—not to be violated or broken—and shall be secured to all").

As noted in more detail throughout this motion for reconsideration, Google's present defense utilizes allegations already rejected by the Federal Circuit Court of Appeals. A case is *NOT* remanded unless there is some error or some correction that the lower court must make.

Google never corrected the error and simply duplicated the same defense. That Plaintiff's "frivolous" case should be dismissed because Plaintiff fail to state a claim for relief. [12(b)(6)]

The Federal Circuit in *Golden v. Google LLC* Case No. 22-1267 goes on to say: "In the Google case, the district court again concluded that Mr. Golden's complaint was frivolous" … [We] "conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart" … "[we] express no opinion as to the adequacy of the complaint or claim chart except that it is not frivolous."

The Federal Circuit in *Golden v. Google LLC* Case No. 22-1267 directed the lower court to, "vacate the dismissal in Case No. 22-1267, and remand for further proceeding consistent with this opinion." Something this Court and the Judge has fail to do.

What's the purpose of having a United States Court of Appeals for the Federal Circuit (CAFC) if the lower courts continue to do as they please without considering the burden and expense placed on the Plaintiff. When the CAFC stated, "remand for further proceeding consistent with this opinion", it means just that. Not, I think I will just fly solo.

25

SAppx810

# DISQUALIFICATION

The Judge is without any right to adjudicate a device for alleged infringement that is outside the Court's jurisdiction. Plaintiff's case against Google far exceeds $10,000 in damages. Plaintiff informed the Court over and over again that this case was not about the direct infringement of the Government's DoD DTRA ATAK software and Draper (a third-party government contractor) CBRNE Plug-in sensors.

Even if the case was less than $10,000 in damages, the Government, "DoD DTRA" would have to be named as the defendant. The Judge ignored Plaintiff and allowed Google to redirect this case into a case between Plaintiff and the Government:

> "The United States Court of Federal Claims is a federal court of limited jurisdiction. The Federal Courts Improvement Act of 1982 abolished the original Court of Claims and the Court of Customs and Patent Appeals and replaced those courts with the newly created United States Court of Appeals for the Federal Circuit and the United States Court of Federal Claims. The jurisdiction of the United States Court of Federal Claims is currently codified in 28 U.S.C. § 1491. The court generally has exclusive jurisdiction over most monetary claims against the United States in excess of $10,000 and has concurrent jurisdiction with United States District Courts for all claims $10,000 and below." *United States Court of Federal Claims*

Plaintiff's case against the Government for allegedly infringing Plaintiff's multi-sensor detection device is pending at the United States Court of Federal Claims (COFC) *Golden v. US* case no. 23-811C. Google is not named as the Defendant in that case, nor is Google named as a third-party defendant in the case. But, the Department of Justice (DOJ) has entered a defense of "lack of subject matter" because they have made the case a case between the two private parties, Golden and Google, which is outside the COFC's jurisdiction. The Judge, thus far, has entertained the DOJ's defense.

Plaintiff asked the Judge in the case pending at the United States Court of Federal Claims (COFC) *Golden v. US* case no. 23-811C, (**Exhibits A & B**) as far back as July, 2023 to disqualify himself for the same reasons Plaintiff is asking the Judge in this current case to disqualify herself. They both allowed a misdirected defense brought between the wrong parties that landed both of them outside of their respective jurisdictions.

Plaintiff's request for disqualification in *Golden v. U.S.* case no. 23-811C was never responded to by the Judge in that case. Instead, the Judge and the DOJ decided to wait on a decision in this current case *Golden v. Google* on a product pending for litigation in their Court.

Proof that the DOJ believes the Judge in this current has adjudicated a case outside her jurisdiction and in favor of the Government is attached as **Exhibit C**. In the DOJ's Notice to the Court the DOJ writes:

> "In its Order, the Northern District of California observed that "Golden does not allege that" the Defense Threat Reduction Agency ("DTRA")—the Government agency accused of infringement in the present case, see Dkt. 1 — "directly infringed the patents-in-suit" in that case and the present case. Ex. 1 at 5–6. "To the contrary," the court found, "Golden concedes that there was no such direct infringement by" the DTRA. Id. (citing Mr. Golden's statement in his Golden v. Google First Amended Complaint that "no single party carried out all the steps of Plaintiff's patented inventions, that would constitute infringement"). A copy of Mr. Golden's cited filing from Golden v. Google containing that statement (at p. 3) is attached as Ex. 2.

Plaintiff will make an attempt at understanding what message the DOJ is sending both Courts. First, Plaintiff does not allege that" the Defense Threat Reduction Agency ("DTRA") directly infringe the patents-in-suit" in the *Golden v. Google* case, but do allege the Defense Threat Reduction Agency ("DTRA") directly infringe the patents-in-suit" in the *Golden v. US* case.

The question here is, to what Court did Plaintiff concede that there was no such direct infringement by the DTRA? That statement is a lie. Also, Plaintiff never made the statement in the Amended Complaint that "no single party carried out all the steps of Plaintiff's patented inventions, that would constitute infringement" because even if no single party carried out all the steps, if Plaintiff is claiming "joint infringement", multiple parties can directly infringe the patents-in-suit.

When Plaintiff looked for "the statement cited filing from Golden v. Google containing that statement (at p. 3)", Plaintiff did not find the statement on page 3, nor paragraph 3 of Plaintiff's Amended Complaint. **(Exhibit D).** The DOJ only attached a chart as Ex. 2, not evidence of a statement made by the Plaintiff.


### The Judge Needs to Understand the Difference Between "Interconnected" and "Modification" Before Issuing Opinions in the Area of Computer Science.

The Internet of Things (IoT), is where everyday objects are becoming interconnected and revolutionizing the way we live and work. The IoT is a network of physical devices, vehicles, appliances, and other objects embedded with sensors, software, and connectivity that enables them to collect and exchange data.

IoT devices can connect to the internet through wired, wireless, cellular network, Wi-Fi, Bluetooth, Zigbee, Z-Wave, Thread, NFC, and other types of connections. Each method has its own advantages and use cases, depending on factors such as range, power consumption, data transfer speed, and security requirements.

The Internet of Things (IoT) is a revolutionary concept that refers to the interconnection of everyday objects and devices with the internet, enabling them to collect and exchange data.

SAppx813

These objects, also known as "smart" devices or "connected" devices, are embedded with sensors, software, and connectivity features that allow them to communicate with each other.

The key idea behind IoT is to enable devices to seamlessly communicate and share data, creating a network of interconnected devices that can make our lives easier, more efficient, and even safer. For example, a smart home setup can enable seamless control of lights, temperature, security systems, and other appliances through a smartphone.

While it primarily serves as a communication method between nearby devices, some IoT devices can utilize Bluetooth to connect to a smartphone. While NFC is commonly used for contactless payments and data transfer between smartphones, it can also be utilized by IoT devices. IoT devices with Wi-Fi connectivity can be controlled and monitored remotely through smartphones, tablets, or other devices connected to the same network. Similar to smartphones, IoT devices can utilize cellular networks to establish a connection, for sending and receiving.

The Google operating system software of a smartphone is the backbone of the device, not the brain, the brain of the smartphone is Plaintiff's patented CPUs, that manages the basic functions of the phone and providing a platform for applications to run.

Each Google operating system software is designed to provide a user-friendly interface that makes it easy to access the phones features. Communication protocols are the software that allows the phone to connect to networks, such as the cell towers used for cellular data and voice calls. These protocols are responsible for ensuring that the phone is able to send and receive data over the network.

The Google software, in particular, is responsible for managing the phones basic functions, connecting to networks, and providing access to applications. Without the software, the Google smartphone would be nothing more than an expensive paperweight.

29

SAppx814

Smartphone patents protect the intellectual property and inventions used to develop mobile electronic devices. More than a billion people worldwide use handheld devices to access the internet and use software via either the iPhone or [Google] Android operating system platforms. https://www.upcounsel.com/smartphone-patents

The Software Components segment of Smartphone is divided into 3 sub segments Mobile Apps, Mobile OS, and UX/UI. A total of 64,331 patents are filed in Software Components for Smartphones between 2007 and 2018 at the USPTO. https://insights.greyb.com/software-patents-wireless-phones/#:

There are roughly 40,000 new software patents issued each year — and the rate of issuance is growing over time. If we estimate that the average software patent has 20 claims — which isn't a stretch given that the average software patent between 1990 – 1995 had 16.8 claims — that is nearly five million potential restrictions on smartphone innovation. https://www.project-disco.org/intellectual-property/one-in-six-active-u-s-patents-pertain-to-the-smartphone/

Some significant smartphone software patents in recent years include the following:

- A software patent granted to the University of Illinois for a biosensor that can be used to test for the presence of bacteria or viruses in an individual's bodily fluid by using a smartphone.

- An eBay software patent for a sensor that determines that a specific user has authorized an online financial transaction, serving as a virtual wallet.

- A software patent granted to an individual for a smartphone device that can lock and unlock a handgun. The program also includes automatic locking when the

gun is in prohibited areas such as in a school zone. It can also lock the gun if owner intoxication is detected.

- An Apple software patent that automatically alerts authorities if a crisis is detected, including a car accident, medical emergency, or natural disaster.

## CONCLUSION

For the foregoing reasons, Plaintiff is asking the Judge to do at least one of the following:

1. Reopen the case and grant summary judgement

2. Reopen the case and order a trial

3. Disqualify and transfer the case

Sincerely,

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

(H) 8642885605

(M) 8649927104

Email: atpg-tech@charter.net

31

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that on this 9th day of April, 2024, a true and correct copy of the foregoing "Plaintiff's Motion for Reconsideration and Motion for Disqualification", was served upon the following Defendant by priority "express" mail:

Matthew S. Warren

WARREN LEX LLP

2261 Market Street, No. 606

San Francisco, California, 94114

Phone: (415) 895-2940

Fax: (415) 895-2964

Email: 22-5246@cases.warrenlex.com

Larry Golden, Pro Se

740 Woodruff Rd., #1102

Greenville, South Carolina 29607

atpg-tech@charter.net

864-288-5605

32

SAppx817

# Exhibit A

Case No: 1:23-cv-00811-EGB

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Larry Golden, Pro Se Plaintiff

740 Woodruff Rd., #1102

Greenville, South Carolina 29607

(P) 864-992-7104 (E) atpg-tech@charter.net

| | |
|---|---|
| LARRY GOLDEN, <br> *Plaintiff*, <br><br> V. <br><br> UNITED STATES DEPARTMENT OF HOMELAND SECURITY, <br> *Defendant.* | **Patent Infringement** <br><br> July 19, 2023 |

## PLAINTIFF'S MOTION FOR DISQUALIFICATION

The Code of Conduct for United States Judges applies to United States circuit judges, district judges, Court of International Trade judges, Court of Federal Claims judges, bankruptcy judges, and magistrate judges.

See Rules for Judicial-Conduct and Judicial-Disability Proceedings, Rule 4(a)(2) (providing that "cognizable misconduct includes: (B) treating litigants [], or others in a demonstrably egregious and hostile manner… and Rule 4(a)(3) (providing that "cognizable misconduct includes intentional discrimination on the basis of race…").

The duties of judicial office take precedence over all other activities. The judge should perform those duties with respect for others, and should not engage in behavior that is harassing, abusive, prejudiced, or biased. The judge should adhere to the following standards:

(C) Disqualification. (1) A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned, including but not limited

to instances in which: (a) the judge has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding;

Plaintiff is asking the Judge to disqualify himself for the following reasons: 1- The DOJ is forcing the Judge to comply by intimidation or threats. 2- This current case is to complicated for the Judge. Exhibit A is a chart illustration of the case and should be adjudicated by someone with prior patent litigation experience. Plaintiff recommends Judge Patricia Elaine Campbell-Smith. 3- If after the Judge has read this document and see no wrong, Plaintiff is requesting the Judge disqualify himself because of a personal bias or prejudice the Judge has against Plaintiff.

| Patent #: 9,096,189; Independent Claim 1 | CMDC Devices: Specifications, Descriptions, Meanings, and Functions | Defense Presented by the DOJ & DHS in the Related Case *Golden v. US* No. 13-307C |
|---|---|---|
| A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, comprising: | Following is an example of CMDC Devices that are not limited to any particular brand, model, or type of equipment:<br><br>HP ZBook Fury 15.6 Inch G8 Mobile Workstation PC; Samsung Galaxy Book2 Pro 360 [PC Mode or Tablet Mode]; Asus/Qualcomm Smartphone for Snapdragon Insiders; LG V60 ThinQ 5G; Samsung Galaxy S21 Smartphone; Google Pixel 5 Smartphone; Apple iPhone 12 Smartphone | The DOJ/DHS made the *Golden v. US* Case No. 13-307C a case between private parties which places the case outside the COFC jurisdiction<br><br>When the DOJ/DHS stated the sensors must be "native to the manufacturing of the Apple and Samsung products, the DOJ/DHS knew they were demanding proof of direct infringement under 35 U.S.C. Sec. 271(a) as a predicated to direct infringement under 28 U.S.C. Sec. 1498(a) *Zoltek III,* that was overturned at the CAFC<br><br>The DOJ/DHS narrowed the case to that of Apple, LG, & Samsung, thereby omitting the sensors developed by Qualcomm, Synkera, NASA, SeaCoast, and the camera sensors for detecting CBR made by Rhevision. |

SAppx820

| | | |
|---|---|---|
| at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or a front-end processor for communication between a host computer and other devices; | Your smartphone processor, also known as chipset, is a component that controls everything going on in your smartphone and ensures it functions correctly. You can compare it to the brain of the human body. Every action you perform on your smartphone goes straight to the processor.  A processor, also known as CPU, consists of multiple cores: Dual, Quad, Hexa, and Octa core. What do these cores do exactly? Processor cores distribute the work that comes in when you use your phone. One core has a maximum number of instructions it can process within a certain amount of time.<br><br>A process is an operating system concept and it is the smallest unit of isolation provided by, for example, Windows operating system (OS). Application Domain or AppDomain is one of the most powerful features of the framework. AppDomain can be considered as a light-weight process. AppDomain is of great advantage for ISP (Internet Service Provider) who hosts hundreds of applications. Because each application can be contained in an application domain and a process can contain many such AppDomains.<br><br>Sensor Front-End Processors and Sensor Devices: These are processors that are designed to handle data from sensors and convert them into usable data for further processing. They are optimized for handling low-level sensor data and can perform tasks such as signal conditioning, filtering, and data acquisition. Sensor front-end processors are commonly used in sensor devices such as smartphones, wearables, and IoT (Internet of Things) devices. | The DOJ & DHS stated "Golden's patented Central Processing Units (CPUs) was an enlargement of the case.<br><br>The DOJ & DHS motioned to have the case dismissed because they believe the CPU was an enlargement of the case; which means Golden violated a Court order not to amend the case. The DOJ & DHS lied to the Court.<br><br>The DOJ & DHS also stated Golden claimed his CPU is a sensor located inside the product used for detecting.<br><br>As stated left of this column, the CPU is used for carrying out the operational and functional instructions of the devices, and that the CPU is considered by many as the brains of the devices.<br><br>No where, did Golden claim the CPU is used as a sensor for CBR detection.<br><br>Golden did not enlarge the case with the CPU. Rule 4 required Golden to identify where each element is found in the alleged infringing products. Golden located where the CPU was found, which is not an enlargement.<br><br>Further, if the products do not have CPUs, the products cannot function correctly.<br><br>The case was dismissed because the DOJ & DHS lied to the Court. |

3

SAppx821

| | | |
|---|---|---|
| a transmitter for transmitting signals and messages to at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device; | Golden's Communicating, Monitoring, Detecting, and Controlling (CMDC) devices are referred to as communication devices, monitoring devices, monitoring equipment, *multi-sensor detection devices, cell phone detection devices*, smartphones, and new and improved upon cell phones, laptops, tablets, desktop PCs, etc. | The Federal Circuit in *FastShip, LLC v. U.S.*, "[W]e interpret "manufactured" in § 1498 [] such that a product is "manufactured" when it is made to include each limitation of the thing invented and is therefore suitable for use. Without the sensors the products will never be suitable for use. |
| a receiver for receiving signals, data or messages from at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device; | Golden's Communicating, Monitoring, Detecting, and Controlling (CMDC) devices are referred to as communication devices, monitoring devices, monitoring equipment, *multi-sensor detection devices, cell phone detection devices*, smartphones, and new and improved upon cell phones, laptops, tablets, desktop PCs, etc. | The DOJ & DHS made sure the sensors and detectors required to have product "suitable for use" never happen. The DOJ & DHS blocked the sensors and detectors of Qualcomm, NASA, Synkera, SeaCoast, Rhevision, Apple, Samsung, and LG. |
| at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection; | Internet of Things (IoT) and Internet of Everything (IoE) are emerging communication concepts that will interconnect a variety of devices (including smartphones, home appliances, sensors, and other network devices), people, data, and processes and allow them to communicate with each other seamlessly. These new concepts can be applied in many application domains such as healthcare, transportation, and supply chain management (SCM), to name a few, and allow users to get real-time information such as location-based services, disease management, and tracking. The smartphone-enabling technologies such as built-in sensors, Bluetooth, radio-frequency identification (RFID) tracking, and near-field communications (NFC) | The DOJ & DHS chose not to challenge this limitation, because a challenge would verify the internet, Bluetooth, and RF connections makes the smartphones "capable of" integrating detectors and sensors remote the smartphone.<br><br>The DOJ & DHS decided to challenge the term "capable of" without a claim construction hearing because 21 of the 25 patent claims that the USPTO issued with the presumption of validity" in the related *Golden v. US* case no. 13-307C, has "capable of" in it. |

4

| | | |
|---|---|---|
| the communication device is at least a fixed, portable or mobile communication device interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween; and, | The DHS Cell-All initiative: "biological and chemical sensors could be [] integrated into common cell phone devices" … "miniaturized biological and chemical sensing with integration into common." "[] second-generation prototypes, chemical sensors were separated from the phones, allowing deployment of the sensors through third-party products, [] that could be added to existing phones (U.S. Department of Homeland Security, 2011a) | Golden made multiple repeated attempts to inform the DOJ & DHS that the sensors, according to the DHS Cell-All initiative, can be located both inside and outside the phones.<br><br>When Golden identified sensors both inside (camera sensor) the phone, and outside (NODE+) the phone, the DOJ & DHS did not accept the devices. |
| whereupon the communication device, is interconnected to a product equipped to receive signals from or send signals to lock or unlock doors, activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems | 28 U.S. Code § 1498(a): "For the purposes of this section, the use or manufacture of an invention described in and covered by a patent of the United States by a contractor, a subcontractor, or any person, firm, or corporation for the Government and with the authorization or consent of the Government, shall be [] use or manufacture for the United States."<br><br>The NODE+ was invented and produced in 2011 by George Yu, Ph.D. Yu worked as a subcontractor to NASA on the DHS Cell-All initiative. The NODE+ sensor is an interactive scanner that uses … data from NASA to give information [] using sensors on your phone NODE+ wireless sensor platform is a handheld sensor that communicates wirelessly through Bluetooth with Apple iOS devices.<br><br>The Tucker Act, is merely a jurisdictional statute and "does not create any substantive right enforceable against the United States for money damages." *United States v. Testan.* Instead, the substantive right must appear in another source of law; a "money-mandating constitutional provision, statute or regulation that has been violated…" *Loveladies Harbor, Inc. v United States* | Apple and NASA are two of the third-party contractors in the related *Golden v. US* case no. 13-307C for the DHS Cell-All initiative.<br><br>NASA's contribution to the development of the "cell phone sensing device" was not accepted or considered by the DOJ & DHS.<br><br>The DOJ & DHS pled that "to include the NODE+ is an enlargement of the case; which is a violation of the Court's order not to amend."<br><br>The DOJ & DHS created the substantive right for Golden to receive "just Compensation for the taking of Golden's property under the Fifth Amendment Clause of the U.S. Constitution when they violated 28 U.S. Code § 1498(a): "a money-mandating constitutional provision" and the "statute or regulation" of the provision. |

5

| | | |
|---|---|---|
| wherein the communication device receives a signal via any of one or more products listed in any of the plurality of product grouping categories; | **Patent Specifications:**<br>It is another objective of the present invention to provide a multi sensor detection [] system for preventing terrorist activity by using products grouped together by common features in several product groupings such as design similarity, similarity in the presentation of security problems and similarity with regard to the presentation of solutions to preventing terrorist…<br><br>Still yet a further objective of the present invention is to provide a multi sensor detection [] system that can be implemented by business or government at a minimum cost by organizing the products to be protected into product grouping categories.<br><br>Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, door sensors, [] biometric sensors, [] detection of humans…<br><br>Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, [] monitoring sites, monitoring terminals, web servers, desktop PCs, notebook PCs, laptops, satellite cell phones, cell phones, [] PDAs, [] and [] handhelds<br><br>Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, [] airport security, police, highway patrol, security guard, military personnel, HAZMAT, CIA, FBI, Secret Service, port security personnel, border security personnel, first responders, [] terminal personnel. | After the Department of Homeland Security (DHS) received information from the then President, Vice-President, three U.S. Senators from South Carolina, a DHS SBIR Program Manager, and a DHS Contracting Officer for the SafeCon initiative, the DHS in 2007 released the DHS S&T Cell-All Ubiquitous Biological and Chemical Sensing solicitation for a cell phone "capable of" detecting for CBR agents and compounds.<br><br>Using Golden's Product Grouping strategies, the DHS contracted Apple, Samsung, LG, Qualcomm, Synkera, NASA, Rhevision, and SeaCoast to assemble Golden's CMDC device in a way that will group products together by common features and design similarities.<br><br>The DOJ & DHS has continually retaliated against Golden for 10 years (2013-2023) for filing a claim in the United States Court of Federal Claims for just compensation.<br><br>It is the belief of Golden that the Trial Court Judge was acting under Duress (threats, intimidation, or some other type of coercion) to comply with the lies the DOJ & DHS has put before this Court.<br><br>The reason Golden is asking the Judge to transfer the current case, is because it is a little more complicated. |

6

SAppx824

| wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection... short range radio frequency (RF) connection is capable of signal communication with the transmitter and the receiver of the communication device and transceivers of the products; | Internet of Things (IoT) and Internet of Everything (IoE) are emerging communication concepts that will interconnect a variety of devices (including smartphones, home appliances, sensors, and other network devices), people, data, and processes and allow them to communicate with each other seamlessly. These new concepts can be applied in many application domains such as healthcare, transportation, and supply chain management (SCM), to name a few, and allow users to get real-time information such as location-based services, disease management, and tracking. The smartphone-enabling technologies such as built-in sensors, Bluetooth, radio-frequency identification (RFID) tracking, and near-field communications (NFC) | The DOJ & DHS chose not to challenge this limitation, because a challenge would verify the internet, Bluetooth, and RF connections makes the smartphones "capable of" integrating detectors and sensors remote the smartphone.<br><br>The DOJ & DHS decided to challenge the term "capable of" without a claim construction hearing because 21 of the 25 patent claims that the USPTO issued with the presumption of validity" Golden asserted in the case has "capable of" in it. |
|---|---|---|
| wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature such that the communication device that is at least one of the cell phone, the smart phone, the desktop, the handheld, the PDA, the laptop or the computer terminal is locked by the biometric lock disabler to prevent unauthorized use; | **Patent specifications:**<br>"FIG. 1 is a perspective view of the... an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler... FIG. 14 is a representative schematic view of the... lock disabling system of the present invention illustrating interconnection of the... fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock ...<br><br>The fingerprint biometric lock with disabler 62 is interconnected to the cpu 40... Moreover, resetting of the fingerprint biometric lock with disabler 62 occurs when the fingerprint of the individual is placed on the fingerprint-matching pad 64, and if a match occurs with a known fingerprint stored by the cpu 40, then the individual can reset the fingerprint biometric lock with disabler 56... a fingerprint that matches stored and authorized fingerprints 102 would indicate an authorized individual ... The fingerprint biometric lock with disabler 62 would then be reset 106 after the appropriate safety... and protection measures are completed... | Golden has two disabling locking mechanism that follows the same patterns: detection; lock; reset. The first is when a hazardous substance is detected it sends a signal to lock the device. The second is when and unauthorized attempt (fingerprint, facial, code) to unlock the device, a signal is sent to lock the device.<br><br>The first pattern was identified in claim 1 of the '497 patent and claim 10 of the '752 patent. The second pattern was identified in 11 of the remaining 23 patent claims. 12 of the patent did not call for a locking mechanism.<br><br>The DOJ & DHS repeatedly stated in signed pleadings that Golden did not identify the locking mechanism. That lie caused the case to be dismissed. |

7

| | | |
|---|---|---|
| wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, and long and short-range radio frequency (RF). | Internet of Things (IoT) and Internet of Everything (IoE) are emerging communication concepts that will interconnect a variety of devices (including smartphones, home appliances, sensors, and other network devices), people, data, and processes and allow them to communicate with each other seamlessly. These new concepts can be applied in many application domains such as healthcare, transportation, and supply chain management (SCM), to name a few, and allow users to get real-time information such as location-based services, disease management, and tracking. The smartphone-enabling technologies such as built-in sensors, Bluetooth, radio-frequency identification (RFID) tracking, and near-field communications (NFC) | The DOJ & DHS chose not to challenge this limitation, because a challenge would verify the internet, Bluetooth, and RF connections makes the smartphones "capable of" integrating detectors and sensors remote the smartphone.<br><br>The DOJ & DHS decided to challenge the term "capable of" without a claim construction hearing because 21 of the 25 patent claims that the USPTO issued with the presumption of validity" in the related *Golden v. US* case no. 13-307C, has "capable of" in it. |

## Pursuant to 37 CFR § 11.303 Candor Toward the Tribunal: The DOJ & DHS Has Failed to Meet or Comply with the Following:

(a) A practitioner shall not knowingly:

(1) Make a false statement of fact or law to a tribunal or fail to correct a false statement of material fact or law previously made to the tribunal by the practitioner;

(3) Offer evidence that the practitioner knows to be false. If a practitioner, the practitioner's client, or a witness called by the practitioner, has offered material evidence and the practitioner comes to know of its falsity, the practitioner shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal.

A practitioner may refuse to offer evidence that the practitioner reasonably believes is false.

(b) A practitioner who represents a client in a proceeding before a tribunal and who knows that a person intends to engage, is engaging or has engaged in [] fraudulent conduct related to the

8

SAppx826

proceeding shall take reasonable remedial measures, including, if necessary, disclosure to the tribunal.

(c) The duties stated in paragraphs (a) and (b) of this section continue to the conclusion of the proceeding, and apply even if compliance requires disclosure of information otherwise protected by § 11.106.

(d) In an *ex parte* proceeding, a practitioner shall inform the tribunal of all material facts known to the practitioner that will enable the tribunal to make an informed decision, whether or not the facts are adverse.

## THREE CLAIMS OF A GOVERNMENT "TAKINGS" OF GOLDEN'S PROPERTY UNDER THE FIFTH AMENDMENT CLAUSE OF THE UNITED STATES CONSTITUTION WITHOUT PAYING JUST COMPENSATION "RIPEN" WHEN A FINAL DECISION WAS MADE IN THE LEAD CASE 13-307C GOLDEN V. US, ON NOVEMBER 10, 2021 WITHOUT ADJUDICATING THE CLAIMS.

The claim of a "Government Takings of Property Under the Fifth Amendment Clause of the U.S. Constitution without paying 'Just Compensation'" proposes a framework for assessing the constitutionality of the Government's deliberate falsehoods. To this end, it builds on due process theory and doctrine, to identify when and how the Government's lies inflict the harms of deception and breach of trust in ways that endanger specific constitutional rights.

More specifically, it proposes that the Government's lies violate the Due Process Clause when they directly deprive individuals of life, liberty, or property; and in those extreme circumstances when they lack any reasonable justification and thus constitute an abuse of governmental power.

The Fifth Amendment says to the federal government that no one shall be "deprived of life, liberty or property without due process of law." These words have as their central promise an assurance that all levels of American government must operate within the law ("legality") and provide fair procedures.

As an illustration, the Model Code of Judicial Conduct and the Model Rules of Professional Conduct impose an explicit duty of truthfulness [] on government actors, and others, who are also members of the bar.

9

- MODEL CODE OF JUDICIAL CONDUCT R. 4.1(A)(11) (2007) (prohibiting judges and judicial candidates from "knowingly, or with reckless disregard for the truth, mak[ing] any false or misleading statement");
- MODEL RULES OF PROF'L CONDUCT R. 3.3(a)(1) (2014) ("A lawyer shall not knowingly [] make a false statement of fact or law to a tribunal…");
- MODEL RULES OF PROF'L CONDUCT R. 4.1(a) (2014) ("In the course of representing a client a lawyer shall not knowingly [] make a false statement of material fact or law to a third person[.]");
- MODEL RULES OF PROF'L CONDUCT R. 8.4(c) (2014) ("It is professional misconduct for a lawyer to [] engage in conduct involving dishonesty, fraud, deceit or misrepresentation[.]").

Although many disciplinary actions under these rules punish lies like fraud or perjury that violate other legal constraints, some hold lawyers and judges to higher standards of truthfulness by punishing lies that would likely not be punishable if uttered by nonattorneys. *See* In re *Pautler*, 47 P.3d 1175 (Colo. 2002); In re *Carpenter*, 95 P.3d 203 (Or. 2004).

## Standards of Review

"The Fifth Amendment prohibits the federal government from taking private property for public use without paying just compensation. U.S. Const. amend. V. "It is undisputed that the Takings Clause of the Fifth Amendment is a money-mandating source [of law] for purposes of Tucker Act jurisdiction" in the Court of Federal Claims. *Jan's Helicopter Serv., Inc. v. FAA*, 525 F.3d 1299, 1309 (Fed. Cir. 2008).

"[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Bell Atl. Corp.*, 550 U.S. at 546. Indeed, "[t]he issue is not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claims." *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974), overruled on other grounds by *Harlow v. Fitzgerald*, 457 U.S. 800, 814-19 (1982)."

"The ability of the Court of Federal Claims to entertain suits against the United States is limited. "The United States, as sovereign, is immune from suit save as it consents to be sued. "*United States v. Sherwood*, 312 U.S. 584, 586 (1941). A waiver of immunity "cannot be implied

10

but must be unequivocally expressed." *United States v. King*, 395 U.S. 1, 4 (1969). The Tucker Act, the principal statute governing the jurisdiction of this court, waives sovereign immunity for claims against the United States not sounding in tort that are founded upon the Constitution, a federal statute or regulation, or an express or implied contract with the United States. 28 U.S.C. § 1491 (2012). However, the Tucker Act is merely a jurisdictional statute and "does not create any substantive right enforceable against the United States for money damages." *United States v. Testan*, 424 U.S. 392, 398 (1976)."

"Instead, the substantive right must appear in another source of law, such as a "money-mandating constitutional provision, statute or regulation that has been violated, or an express or implied contract with the United States." *Loveladies Harbor, Inc. v. United States*, 27 F.3d 1545, 1554 (Fed. Cir. 1994) (en banc). Retrieved from: Chief Judge Margaret Sweeney; *Christy, Inc. v. The United States*; Opinion and Order; Case No. 18-657C; filed January 29, 2019: C. Tucker Act

### *"Takings" I*

As a result of the 9/11 attacks, between the years 2003-2005, Golden submitted three (3) Economic Stimulus and Terrorism Prevention Packages, that included strategies for stimulating our economy as a whole and the African-American community, to at least that of President Bush, VP Cheney, and S.C. Senators Holland, DeMint, and Graham.

President Bush, VP Cheney, and S.C. Senators Holland, DeMint, and Graham sent the *nonfrivolous* "Economic Stimulus and Terrorism Prevention Packages", that included schematics for CBRNE detection devices (the "SafeRack" package); the schematics for a new, improved upon, and useful cell phone, PC, tablet, laptop, etc. (the "ATPG" package); and the schematics for a remote stop, stall, and vehicle slow-down system, and pre-programmed stopping, stalling, and slowing down of a vehicle (the "V-Tection" package), over to the Department of Homeland Security (DHS) for development and implementation.

Golden's evidence is the response letters Golden received from the offices of President Bush, VP Cheney, and S.C. Senators Holland, DeMint, and Graham.

Golden traveled to Colorado in 2006 for the Government Agencies (DoD, DOE, DHS, etc.) SBIR Tour. Golden meet with, and left behind copies of Golden's stimulus packages with Lisa Sabolewski, DHS SBIR Program Manager, who in turn asked Golden to send the information to her via email. (E-mail correspondence available).

11

Golden responded to an RFI in 2007 to the DHS/S&T Safe Container (SafeCon) Initiative, and discussed the intellectual property subject matter of Golden's inventions with DHS Margo Graves; margaret.graves@hq.dhs.gov, 202-379-8727. (E-mail correspondence available).

Golden submitted a proposal in 2007, in response to the DHS S&T *Cell-All Ubiquitous Biological and Chemical Sensing* request for proposals, and upon request, resubmitted Golden's intellectual property directly to the Stephen Dennis, DHS Program Manager for the *Cell-All Ubiquitous Biological and Chemical Sensing* initiative in 2008. (E-mail correspondence available).

Golden traveled to Washington, DC in 2008 with his lead engineer [Harold Kimball] to discuss a "read-ahead" of Golden's intellectual property and the possibility of Golden incubating his company at the Department of Homeland Security (DHS). Golden and Mr. Kimball meet with Ed Turner, DHS/S&T Program Manager.

Golden was invited by DHS to Sacramento, CA in 2008 to attend a T.R.U.ST Industry Day Symposium. Golden discussed and left copies of his intellectual property subject matter with a selected panel. Golden was walked out by the Program Manager Dave Masters, where he promised Golden, he will release a Request for Proposal in the near future that aligns with Golden's intellectual property technological rational.

Golden's initial "takings" begin in 2008 when the DHS made a "final decision" to take and give Golden's intellectual property subject matter to Apple, Samsung, LG, NASA, Synkera, SeaCoast, Rhevision, and Qualcomm for development and commercialization. This happened two years before the DHS cause the release of the first infringing product in 2010.

Some statistics about the award: 1) Golden was the only person (African American) to hold a patent(s) for the cell phone sensing device the Government was requesting; Golden owned the only African American company (ATPG Technology, LLC) not awarded a contract, in view of the eight other white-owned companies that was awarded to develop and assemble Golden's patented devices; and, sixty millions African Americans are the only ones who are not benefitting from the three economic stimulus packages, through the not-for-profit company (ATPG Corporation) Golden established to receive funding specifically targeted for African Americans.

According to Macrotrends, between the years 2010 – 2026, Apple's total estimated revenues are $4.5T dollars; Samsung's total estimated revenues are $3.5T dollars; LG's total

estimated revenues are $.9T dollars; and, Qualcomm's total estimated revenues are $.5T dollars. The companies indirectly benefiting from the stimulus packages over the same time period is AT&T's total estimated revenues are $2.6T dollars; Verizon's total estimated revenues are $2.2T dollars; T-Mobile's total estimated revenues are $.8T dollars; and Google's total estimated revenues are $2.5T dollars.

Within the six-year statute of limitations period, in 2013 Golden filed a takings claim in the COFC. The DOJ & DHS motioned to "stay" Golden's takings claims and in 2014 the COFC court stayed Golden's takings claim until 2019.

The DOJ & DHS spent six years lying to the Court that Golden's takings claim was no different than Golden's infringement claims.

The COFC dismissed Golden takings claim because DOJ & DHS said "taking Golden's property and giving it to Apple, Samsung, LG, and Qualcomm, sounds like infringement". The takings begin in 2003 and a final decision to take Golden's property [ripeness of the takings] was made in 2008. Two years before the first infringing product that included all the inventions' elements were released.

Therefore, Golden's Takings claim, for the Government taking Golden's property and giving it to Apple, Samsung, LG, and Qualcomm, was never adjudicated before the case closed on November 10, 2021.

### *"Takings" II*

Within the six-year period from *10/01/2015*, Golden filed in the United States Court of Federal Claims, on *01/17/2019* in *Larry Golden v. United States* Case No. 1:19-cv-00104-EGB, Golden initiated the filing of an Unconstitutional IPR-Based Takings claim against the Government, the United States.

In *Larry Golden v. United States* Case No. 1:19-cv-00104-EGB *OPINION*. Document: 12 Page: 4 Filed: *05/14/2019*. The United States Court of Federal Claims responded to the Government's Motion to Dismiss for lack of jurisdiction: "Finally, as we held in the related action, plaintiff fails to state a claim to the extent that his complaint alleges a taking by the actions of this court, the Federal Circuit, or the PTAB." ... "Plaintiff appears to argue that the cancellation of his '990 independent claims in the IPR at the PTAB constitutes a taking by the PTAB." ... "In sum, plaintiff's takings claim duplicates his related patent action in Docket No.

13-307C, asserts claims over which this court does not have jurisdiction, and fails to state a takings claim. Defendant's Motion is granted pursuant to Rule12(b)(1) and Rule12(b)(1)."

"On Appeal from the United States Court of Federal Claims in No. 1:19-cv-00104-EGB, Senior Judge Eric G. Bruggink, in the *OPINION* for *Larry Golden v. United States* CAFC Case No. 19-2134 Document: 37 Pages: 11-12 Filed: ***04/10/2020***. The Federal Circuit clarified the COFC's jurisdiction:

"We next turn to Golden's IPR-based takings claims. We first address whether the Claims Court had jurisdiction to hear these claims. … The government argues that the American Invents Act ("AIA")'s creation of inter partes review by the Board, followed by judicial review before this court, creates a "'self-executing remedial scheme' that 'supersedes the gap-filling role of the Tucker Act.'" Id. at 41 (quoting *United States v. Bormes*, 568 U.S. 6, 13 (2012))."

"According to the government, the AIA statutory scheme displaces Tucker Act jurisdiction because there is no procedural impediment to presentation of a takings claim to the agency and because the remedial scheme provides for judicial review of constitutional challenges to the agency's action. Id. at 43–49. The government's argument is without merit."

"In *Bormes*, the Supreme Court explained that Tucker Act jurisdiction is displaced "when a law assertedly imposing monetary liability on the United States contains its own judicial remedies." 568 U.S. at 12 (emphasis added). More recently, the Court explained that, "[t]o determine whether a statutory scheme displaces Tucker Act jurisdiction, a court must 'examin[e] the purpose of the [statute], the entirety of its text, and the structure of review that it establishes." *Horne v. Dep't of Agric.*, 569 U.S. 513, 526–27 (2013) (quoting *United States v. Fausto*, 484 U.S. 439, 444 (1988)). Thus, when there is a precisely defined statutory framework for a claim that could be brought against the United States, the Tucker Act gives way to the more specific statutory scheme. Regardless of the structure of review it establishes, the AIA is not a statute that provides for claims against the United States."

"The government is correct that, under the AIA, parties may raise constitutional challenges in our court on appeal from Board decisions. But this remedial scheme does not convert the AIA into a statutory framework for claims against the United States. The AIA is by no means "a law assertedly imposing monetary liability on the United States." Borne,

14

568 U.S. at 12. Accordingly, we reject the government's argument that the AIA displaced Tucker Act jurisdiction over Golden's IPR-based takings claims."

In Golden's Motion for Leave to File a Motion for Summary Judgement *Larry Golden v. United States*, COFC Case 1:13-cv-00307-EGB Document 196 Filed *11/03/20*, Golden continued his efforts to get the DOJ and the COFC Court to address Golden's IPR-Based Takings claims. Golden could never be time barred when the Claim was still pending in an active case.

The DOJ, the Defendant, continued to defend against Golden's "Takings" claim. In the lead case *Larry Golden v. United States*, COFC Case 1:13-cv-00307-EGB the Government ("DOJ"), on behalf of the Department of Homeland Security ("DHS"), filed Document 238 on *07/08/2021*, "Defendant the United States' Notice Regarding Service of The Government's Preliminary Invalidity Contentions", with more unqualified patent and publications' references.

When the United States causes injury to property, a property owner can sue in the Court of Federal Claims. This is a result of the Tucker Act, which waives the United States' sovereign immunity in the COFC only, *United States v. Mitchell*, 463 U.S. 206, 215-19 (1983).

Significantly, a suit alleging a compensable taking in the Court of Federal Claims is viable as soon as government invades a property interest without proving a statutory compensation guarantee. *Kirby*, 467 U.S. at 5; Dow, 357 U.S. at 22. The claimant need not sue in another court to "ripen" the takings suit. As the Court stated long ago in *Great Falls Mfg. Co.*, 112 U.S. at 656.

Unless proven otherwise, Golden is the only African American Patent Owner that has ever been petitioned for *Inter Partes Review* at the PTAB by two Government agencies [the Department of Justice (DOJ) and the Department of Homeland Security (DHS)], who are not "persons" authorized to petition the PTAB to invalidate Golden's patents.

Unless proven otherwise, the DHS & DOJ has never petitioned the PTAB for *Inter Partes Review* of patent(s) owned by a White(s).

Unless proven otherwise, Golden is the only African American Patent Owner that has ever been petitioned for *Inter Partes Review* at the PTAB by two Government agencies [the Department of Justice (DOJ) and the Department of Homeland Security (DHS)], who are not "persons" authorized to petition the PTAB to invalidate patents; with three unqualified patent references [Astrin, Breed, and Mostov] that does not antedate Golden's patents.

15

Unless proven otherwise, the DHS & DOJ has never petitioned the PTAB for *Inter Partes Review* of patent(s) owned by a White(s) with any number of unqualified references.

The Trial Court dismissed the lead case COFC 13-307C, without adjudicating Golden's "Unconstitutional IPR-Based "Takings" claim on ***11/10/2021***, which "ripen" the takings claim.

### *"Takings" III*

When the DOJ & DHS insisted on a dismissal in their favor *Golden v. US* Case No. 13-307C; dismissed 11/10/2021, without proving non-infringement or that the patents are invalided, it left the patents with the "presumption of validity". Which means the government cannot appropriate or use Golden's patents without paying "just compensation".

The Supreme Court explicitly recognized that patents are property secured by the Fifth Amendment Takings Clause. In *Horne v. Department of Agriculture* 569 U.S. 513 (2013) ("Horne I"); 576 U.S. 350, 135 S. Ct. 2419 (2015) ("Horne II"), the Court held that the Takings Clause imposes a "categorical duty" on the government to pay just compensation whether it takes personal or real property.

Chief Justice Roberts, writing for the Court, noted the long history of private property being secured against uncompensated takings by the government, beginning with the Magna Carta some 800 years ago. In further support, Roberts cited a Supreme Court opinion from the late nineteenth century:

Nothing in this history suggests that personal property was any less protected against physical appropriation than real property. As this Court summed up in *James v. Campbell*, 104 U.S. 356, 358 (1882), a case concerning the alleged appropriation of a patent by the Government:

"*[A patent] confers upon the patentee an exclusive property in the patented invention which cannot be appropriated or used by the government itself, without just compensation, any more than it can appropriate or use without compensation land which has been patented to a private purchaser.*"

James Madison, the author of the Takings Clause, once wrote: "Government is instituted to protect property of every sort." The Court's decision vindicates Madison's intent to limit the government's power to take property, both personal and real, without just compensation. And it

extends a long line of cases recognizing that "property" in the constitutional sense subsumes all things arising from labor and invention.

The DOJ & DHS never proved Golden's patents are invalid, and yet, continues to used them without paying just compensation. The only thing the DOJ & DHS proved in the *Golden v. US* Case No. 13-307C is how much of massive liars they are. Examples of their falsehoods are:

The DOJ/DHS made the *Golden v. US* Case No. 13-307C a case between private parties which placed the case outside the COFC jurisdiction.

When the DOJ/DHS stated the sensors must be "native to the manufacturing of the Apple and Samsung products, the DOJ/DHS knew they were demanding proof of direct infringement under 35 U.S.C. Sec. 271(a) as a predicate to direct infringement under 28 U.S.C. Sec. 1498(a) *Zoltek III,* that was overturned at the CAFC.

The DOJ/DHS narrowed the case to that of Apple, LG, & Samsung, thereby omitting the sensors developed by Qualcomm, Synkera, NASA, SeaCoast, and the camera sensors for detecting CBR developed by Rhevision.

The DOJ & DHS stated "Golden's patented Central Processing Units (CPUs) was an enlargement of the case. The DOJ & DHS motioned to have the case dismissed because they believe the CPU was an enlargement of the case; which means Golden violated a Court order not to amend the case. The DOJ & DHS lied to the Court.

The DOJ & DHS also stated Golden claimed his CPU is a sensor located inside the product used for detecting. As stated in the chart above, the CPU is used for carrying out the operational and functional instructions of the devices, and that the CPU is considered by many as the brains of the devices.

No where, did Golden claim the CPU is used as a sensor for CBR detection. Golden did not enlarge the case with the CPU. Rule 4 required Golden to identify where each element is found in the alleged infringing products. Golden located where the CPU was found, which is not an enlargement. Further, if the products do not have CPUs, the products cannot function correctly. The case was dismissed because the DOJ & DHS lied to the Court.

The Federal Circuit in *FastShip, LLC v. U.S.*, "[W]e interpret "manufactured" in § 1498 [] such that a product is "manufactured" when it is made to include each limitation of the thing invented and is therefore suitable for use. Without the sensors the products will never be suitable for use.

17

SAppx835

The DOJ & DHS made sure the sensors and detectors required to have a product "suitable for use" never happen. The DOJ & DHS blocked the sensors and detectors of Qualcomm, NASA, Synkera, SeaCoast, Rhevision, Apple, Samsung, and LG.

The DOJ & DHS chose not to challenge the communication methods limitation, because a challenge would verify the internet, Bluetooth, and RF connections makes the smartphones "capable of" integrating detectors and sensors remote the smartphone.

The DOJ & DHS decided to challenge the term "capable of" without a claim construction hearing because 21 of the 25 patent claims that the USPTO issued with the presumption of validity" in the related *Golden v. US* case no. 13-307C, has "capable of" in it.

Golden made multiple repeated attempts to inform the DOJ & DHS that the sensors, according to the DHS Cell-All initiative, can be located both inside and outside the phones. When Golden identified sensors both inside (camera sensor) the phone, and outside (NODE+) the phone, the DOJ & DHS did not accept the devices.

Apple and NASA are two of the third-party contractors in the related *Golden v. US* case no. 13-307C for the DHS Cell-All initiative. NASA's contribution to the development of the "cell phone sensing device" was not accepted or considered by the DOJ & DHS. The DOJ & DHS pled that "to include the NODE+ is an enlargement of the case; which is a violation of the Court's order not to amend."

The DOJ & DHS created the substantive right for Golden to receive "just Compensation for the taking of Golden's property under the Fifth Amendment Clause of the U.S. Constitution when they violated 28 U.S. Code § 1498(a): "a money-mandating constitutional provision" and the "statute or regulation" of the provision.

After the Department of Homeland Security (DHS) received information from the then President, Vice-President, three U.S. Senators from South Carolina, a DHS SBIR Program Manager, and a DHS Contracting Officer for the SafeCon initiative, the DHS in 2007 released the DHS S&T Cell-All Ubiquitous Biological and Chemical Sensing solicitation for a cell phone "capable of" detecting for CBR agents and compounds.

Using Golden's Product Grouping strategies, the DHS contracted Apple, Samsung, LG, Qualcomm, Synkera, NASA, Rhevision, and SeaCoast to assemble Golden's CMDC device in a way that will group products together by common features and design similarities.

The DOJ & DHS has continually retaliated against Golden for 10 years (2013-2023) for

18

filing a claim in the United States Court of Federal Claims for just compensation.

It is the belief of Golden that the Trial Court Judge was acting under Duress (threats, intimidation, or some other type of coercion) to comply with the lies the DOJ & DHS has put before this Court.

The reason Golden is asking the Judge to transfer the current case, is because it is a little more complicated than *Golden v. US* case no. 13-307C. **Exhibit A: Claim Chart of Current Case No. 23-811C**

Golden has two disabling locking mechanism that follows the same patterns: detection; lock; reset. The first is when a hazardous substance is detected it sends a signal to lock the device. The second is when and unauthorized attempt (fingerprint, facial, code) to unlock the device, a signal is sent to lock the device.

The first pattern was identified in claim 1 of the '497 patent and claim 10 of the '752 patent. The second pattern was identified in 11 of the remaining 23 patent claims. 12 of the patent did not call for a locking mechanism.

The DOJ & DHS repeatedly stated in signed pleadings that Golden did not identify the locking mechanism. That lie caused the case to be dismissed.

**Exhibit B: Illustration of Damages**

Sincerely,

s/ *Larry Golden*

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

(H) 8642885605

(M) 8649927104

Email: atpg-tech@charter.net

19

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 19th day of July, 2023, a true and correct copy of the foregoing "Plaintiff's Motion to Disqualification", was served upon the following Defendant by priority "express" mail:

<div align="center">

Grant D. Johnson

Trial Attorney

Commercial Litigation Branch

Civil Division

Department of Justice

Washington, DC 20530

Grant.D.Johnson@usdoj.gov

(202) 305-2513

</div>

<div align="center">

*s/ Larry Golden*

Larry Golden, Pro Se

740 Woodruff Rd., #1102

Greenville, South Carolina 29607

atpg-tech@charter.net

864-288-5605

</div>

20

# Exhibit B

Case No: 1:23-cv-00811-EGB

# IN THE UNITED STATES COURT OF FEDERAL CLAIMS

Larry Golden, Pro Se Plaintiff

740 Woodruff Rd., #1102

Greenville, South Carolina 29607

(H) 864-288-5605

(M) 864-992-7104

(E) atpg-tech@charter.net

|  |  |
|---|---|
| LARRY GOLDEN,<br><br>*Plaintiff*,<br><br>V.<br><br>THE UNITED STATES,<br><br>*Defendant*. | **Patent Infringement**<br><br><br>August 4, 2023 |

## PLAINTIFF'S REPLY IN SUPPORT OF PLAINTIFF'S MOTION FOR DISQUALIFICATION

This reply, in support of Plaintiff's motion to dismiss, consist of substantial evidence that there exists such a personal bias, prejudice or interest on the part of the Judge [Bruggink] that the Judge would be unable to rule impartially." *State v. Fie*, 320 N.C. 626, 627 (1987); accord *State v. Honaker*, 111 N.C. App. 216 (1993); *In re Nakell*, 104 N.C. App. 638 (1991). Plaintiff pleadings demonstrates objectively that grounds for disqualification actually exist.

Plaintiff's allegations in this motion to disqualify and recuse are such that findings of facts will be required regarding the alleged basis of the Judge's bias or conflict, [Therefore] the

Judge should refer the matter to another Judge to conduct the hearing. See *N.C. Nat'l Bank v. Gillespie*, 291 N.C. 303 (1976) (citing *Ponder v. Davis*, 233 N.C. 699 (1951)).

Plaintiff have asked that the case be transferred to Judge Patricia Elaine Campbell-Smith because she has an undergraduate degree in electrical engineering from Duke University and extensive patent litigation experience with the law firm of Liskow & Lewis in New Orleans, Louisiana. "[T]he standard for ordering recusal is whether there are reasonable grounds to question the Judge's objectivity. The Judge is only required to order recusal (or refer the matter over to another Judge to decide whether recusal is necessary) if a reasonable person, knowing all the facts, would have doubts about the Judge's ability to be impartial in the case. See *State v. Vick*, 341 N.C. 569 (1995); *State v. Fie*, 320 N.C. 626 (1987); *State v. Poole*, 305 N.C. 308 (1982); *State v. Moffitt*, 185 N.C. App. 308 (2007); *State v. McRae*, 163 N.C. App. 359 (2004).

Plaintiff have doubts about the Judge's ability to be impartial in the case; and that the Judge would be unable to rule impartially, because Plaintiff believes Judge Bruggink is being intimidated and forced to act or decide cases under duress created by the Department of Justice (DOJ) and the Department of Homeland Security (DHS).

In certain limited circumstances, a Judge may be removed from office for "incompetency, misconduct, neglect of duty, engaging in the practice of law, or physical or mental disability" by the U.S. Court of Appeals for the Federal Circuit. 28 U.S.C. § 176(a) [1]

---

[1] 28 U.S.C. § 176 – Removal from Office

(a) Removal of a judge of the United States Court of Federal Claims during the term for which he is appointed shall be only for incompetency, misconduct, neglect of duty, engaging in the practice of law, or physical or mental disability. Removal shall be by the United States Court of Appeals for the Federal Circuit, but removal may not occur unless a majority of all the judges of such court of appeals concur in the order of removal.

(b) Before any order of removal may be entered, a full specification of the charges shall be furnished to the judge involved, and such judge shall be accorded an opportunity to be heard on the charges.

(c) Any cause for removal of any judge of the United States Court of Federal Claims coming to the knowledge of the Director of the Administrative Office of the United States Courts shall be reported by him to the chief judge of the United States Court of Appeals for the Federal Circuit, and a copy of the report shall at the same time be transmitted to the judge.

# ACTING UNDER "DURESS"; FORCE AND INTIMIDATION

## History of the Government's Intimidation and Threats

The CFC Judge in *Golden v. USA* Case No. 13-307C, was intimidated and forced to act under duress, by the Department of Justice (DOJ) and the Department of Homeland Security (DHS) to drop Plaintiff's Fifth Amendment "Takings" of Plaintiff's property claim [28 U.S.C. 1491(a)] against the DHS; in view of the fact that Plaintiff, over a four-year period, received response letters from President Bush, VP Cheney, and three South Carolina U.S. Senators Holland, DeMint, and Graham stating they sent Plaintiff's strategies and technology rational over to the DHS. The DHS in 2008 awarded eight (8) white-owned companies' [Qualcomm, Apple, Samsung, LG, NASA, Synkera, SeaCoast, and Rhevision] contracts to develop, manufacture, and commercialized the patented technology of Plaintiff. The only African American owned company [ATPG Technology, LLC], who's African American CEO [Plaintiff] hold the patent(s) on the technology the DHS requested in its DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* solicitation, never received a licensing agreement or contract. The CFC Judge, while acting under Duress, dropped the original Fifth Amendment "Takings" of Plaintiff's property claim, that ripen in 2008 when the DHS awarded eight (8) white-owned companies' contracts to develop, manufacture, and commercialized the patented technology of Plaintiff, and changed the Fifth Amendment "Takings" of Plaintiff's property claim, to a claim of "takings" that sounds in patent infringement to dismiss the case.

> "Pending before the court is defendant's March 18, 2019 motion to dismiss plaintiff's takings claims under Rules 12(b)(l) and 12(b)(6) of the Rules of the United States Court of Federal Claims. Defendant argues that plaintiffs purported takings claims are, in substance, patent infringement claims, which cannot be brought under the Tucker Act, 28 U.S.C. § 1491 (2012), but must instead be brought under the court's separate patent jurisdiction, 28 U.S.C. § 1498(a) (2012)." *Golden v. US* Case No. 13-307C Dkt. No. 171 Filed 05/08/2019

The PTAB Judges at the United States Patent and Trademark Office (USPTO) Patent Trials and Appeals Board (PTAB) in *Department of Homeland Security v. Larry Golden*, Case No. IPR2014-00714, were intimidated and forced to act under duress, by the DHS and the DOJ, who were not, and is not, "persons" authorized to petition the PTAB to invalidate the patents of

3

Plaintiff; to institute a trial to invalidate Plaintiff's '990 patent claims with the unqualified patent references of Astrin, Breed, and Mostov that does not antedate the priority date of Plaintiff's Patents. The PTAB was forced to ignore the fact that no "white" patent owner has ever had to defend his patent(s) at the PTAB against an unauthorized Government agency; and no "white" patent owner has ever had to defend his patent(s) at the PTAB against unqualified patent references that do not antedate the priority date of "white" patent owner's patents, asserted in an *Inter Partes Review* (IPR) by an unauthorized Government agency. Clearly the DOJ & DHS intimidated and forced the Judges to invalidate the Patent Owner's patent claims as a means of retaliating against Plaintiff for filing a complaint against the DHS. The Supreme Court has defined retaliation as an intentional act in response to a protected action. It carries with it the notion of "getting even." As noted in a 2011 law review article: "Retaliation is the deliberate action against African American inventors, used to send a clear message that complaining is unwelcome and risky. *Dred Scott v. Sandford* (1857). In this ruling, the U.S. Supreme Court stated that enslaved people were not citizens of the United States and, therefore, could not expect any protection from the federal government or the courts. Arguably, free blacks were precluded from patenting their inventions after *Dred Scott* because they did not have a country of citizenship and presumably could not swear to the Patent Oath. The Court viewed slaves as "property," and the Fifth Amendment forbids Congress from taking property away from individuals without just compensation.

   The PTAB Judges in *Department of Homeland Security v. Larry Golden*, Case No. IPR2014-00714, were intimidated and forced to act under duress, by the DHS and the DOJ, to ignore the multiple times the Patent Owner "begged" the DOJ, DHS, and PTAB before, during, and after the institution of the *Inter Partes Review* (IPR) to not take the Patent Owner's patent claims with unqualified patent references. *Procedural Due Process* refers to the constitutional requirement that when the federal government acts in such a way that denies a citizen [Patent Owner] of a life, liberty, or property interest, the person must be given notice, the opportunity to be heard, and a decision by a neutral decision-maker. The following is Patent Owner's evidence:

   *Patent Owner's Preliminary Response (Paper 10).* The anticipation basis describes whether the reference is being considered for by its publication date or its priority date. The Patent Owner repeated the DHS/DOJ's anticipation basis in a chart distinguishing: Reference Filing Date / Publication Date (i.e., 120(b)) / Basis for

SAppx843

anticipation—Priority Date (102(e)), for U.S. Patent Application Publication No. 2006/0250235 ("Astrin") Publication Date 11/09/2006 Basis 102(b); U.S. Patent Application Publication No. 2006/0181413 ("Mostov") Publication Date 08/17/2006 Basis 102(b); and, U.S. Patent No. 7,961,094 ("Breed") Priority Date 11/29/2007 Basis 102(e). With this disclosure in a preliminary response to the DHS/DOJ's petition for Inter Partes Review (IPR), and the DHS/DOJ's unwillingness to correct their mistake, signifies the DHS/DOJ was willfully blind by intentionally keeping themselves unaware of facts that would render them liable or implicated.

   *ORDER Conduct of the Proceeding 37 C.F.R. § 42.5 (Paper 23)*. "We noted that, while we are not constraining what Mr. Golden can argue in the Patent Owner Response, he may be best served by focusing on the challenges on which trial was instituted" [*the PO understood this to mean, the PTAB did recognize Astrin, Breed, & Mostov as being unqualified references, and that the PO had better focus on the challenge of showing how the PO's patent claims was not antedated by the unqualified references*]; "If the Motion to Amend is non-contingent, Mr. Golden is, in essence, abandoning the claims at issue, and saying that we should only look at the claims as amended in the Motion to Amend" [*if the Motion to Amend was non-contingent, and the PO was abandoning the claims at issue, and the PO's intention was to submit new substitute claims, the PO would have stated that in his Motion to Amend submitted on January 7, 2015—but he did not*]; "Mr. Golden has the burden to show a patentable distinction for each proposed substitute claim over the prior art" [*not possible, the way anticipation works is the references of Astrin, Breed, & Mostov has a priority date that antedates the PO's priority date for the RE43,990 patent asserted in the IPR, but because the references of Astrin, Breed, & Mostov priority date does not antedate the PO's priority date for the RE43,990 patent, it is procedurally impossible*]; "In addition, if Mr. Golden is relying on any priority documents to establish an effective filing date, he should also point to where support occurs in those priority documents" [*the only priority document the PO needed to show priority over Astrin, Breed, & Mostov's "basis for anticipation" was the PO's patent no. RE43,990 asserted in the IPR*] …

   *Patent Owner's Response (Paper 24)*. "The PO again presented the DHS/DOJ with an opportunity to correct their mistake in the Patent Owner's Response, "[t]hus, the

'990 patent antedates Astrin (published on 11/09/2006) and Mostov (published on 08/17/2006), thus resulting in both being ineligible as prior art under 102(b), and antedates Breed (filed on 11/29/2007), thus resulting in it being ineligible as prior art under 102(e)." With this disclosure in the Patent Owner's Response, and the DHS/DOJ's unwillingness to correct their mistake, signifies the DHS/DOJ was willfully blind by intentionally keeping themselves unaware of facts that would render them liable or implicated. It can also be said that, at this point the DHS/DOJ knew, or should have known, the references of Astrin, Breed, & Mostov does not antedate the priority date of the PO's '990 patent.

   *Patent Owner's Non-Contingent Motion to Amend Claims (Paper 25).* Again, the PO tried to get the PTAB to respond to the PO's claim that the references of Astrin, Breed, and Mostov does not antedate the PO's '990 patent, "Patent Owner's date of invention is at least as early as April 5, 2006 which is before the publication dates of Astrin and Mostov, and the filing date of Breed." With this disclosure in the Patent Owner's Non-Contingent Motion to Amend Claims, and the DHS/DOJ's unwillingness to correct their mistake, signifies the DHS/DOJ was willfully blind by intentionally keeping themselves unaware of facts that would render them liable or implicated. It can also be said that, at this point the DHS/DOJ knew, or should have known, the references of Astrin, Breed, & Mostov does not antedate the priority date of the PO's '990 patent.

   In a motion to amend, the PO bears the burden to show a patentable distinction of each proposed substitute claim over the [unqualified] prior art. See 37 C.F.R. § 42.20(c). To that end, the Patent Owner sent the references of Astrin, Breed, and Mostov over to the USPTO for examination. The Examiner writes "[t]he references of petitioner DHS such as Exhibit 1005, 1169, US patent No. 5,959,529 and 7,148,484 and US application No. 13/701,449 do not relevant to the independent claims as a whole. They just had one or more elements in the claimed limitations but do not meet as a whole invention", which means, even if the references of Astrin, Breed, and Mostov were qualified prior art to the PO's '990 patent; according to the USPTO the claims at issue and the substitute claims are patentable and allowable. The PTAB refused to acknowledge the findings of the USPTO. This too was another opportunity for the DHS/DOJ to correct their mistake, but instead they chose to continue retaliating to take the PO's property.

<div align="center">6</div>

Because the references of Astrin, Breed, and Mostov do not antedate the PO's '990 patent, the only thing that was accomplished in the DHS/DOJ's *inter partes review* is the demonstration of how the patents of Astrin, Breed, and Mostov are invalid because the subject matter is anticipated by the PO's '497 patent.

*Patent Owner's Response: "Motion to Amend" (Paper 26)*. Equally, in the Patent Owner's Response: "Motion to Amend", "Petitioner asserted that Astrin was available as prior art under 35 U.S.C. §102(b) as of November 9, 2006 upon publication. Petition for Inter Partes Review of U.S. Patent No. RE43,990 Under 35 U.S.C. §312 and 37 C.F.R. §42.104, page 2, lines 12-14. This date is after Patent Owner's priority date of April 5, 2006, and Astrin is therefore disqualified as prior art under 35 U.S.C. §102(b) and cannot be applied against claims 11, 74 or 81 because this publication date is not more than one year before Patent Owner's filing date. Petitioner asserted Mostov as prior art under 35 U.S.C. §102(b) as well and stated that this publication date was August 17, 2006. Petition, page 3, lines 1-3. As August 17, 2006 is not more than one year before, but is in fact after, Patent Owner's filing date of April 5, 2006, Mostov is likewise disqualified as prior art under 35 U.S.C. §102(b). Petitioner also asserted Breed as prior art under 35 U.S.C. §102(e) and stated that the filing date of the application of Breed was November 29, 2007. Petition, page 3, lines 4-6. Patent Owner's date of invention is at least as early as April 5, 2006 which is before the filing date of November 29, 2007 of Breed and likewise this reference is not prior art to claims 11, 74 and 81 under 35 U.S.C. §102(e). With this disclosure in the Patent Owner's Response: "Motion to Amend", and the DHS/DOJ's unwillingness to correct their mistake, signifies the DHS/DOJ was willfully blind by intentionally keeping themselves unaware of facts that would render them liable or implicated. It can also be said that, at this point the DHS/DOJ knew, or should have known, the references of Astrin, Breed, & Mostov does not antedate the priority date of the PO's '990 patent.

*ORDER Conduct of the Proceeding 37 C.F.R. § 42.5 (Paper 29)*. The PO never really understood how to amend claims to overcome 102-antipation objections when the references do not actually antedate the patent at issue: "Petitioner initiated the conference call … In its e-mail requesting the call, <u>Petitioner stated that Patent Owner filed both a contingent and a non-contingent Motion to Amend</u>, while only a single motion was

7

authorized by rule. See 37 C.F.R. § 42.121(a) (stating that a "patent owner may file one motion to amend a patent") … <u>We noted also that</u> <u>Mr. Golden had filed two papers with respect to the motion to amend—Paper 25, titled "Non-Contingent Motion to Amend," and Paper 26, titled "Motion to Amend Claims." Mr. Golden stated that he was unclear as to how the Motion to Amend should be designated as a noncontingent motion to amend</u>, and thus, in an abundance of caution, he filed a separate paper designating the motion as non-contingent … As both papers collectively appear to meet the page limit for a motion to amend, we will treat them in the collective as a single motion to amend. Petitioner does not oppose … <u>Accordingly, it is ORDERED that Papers 25 and 26 will collectively be treated as a single, non-contingent, Motion to Amend</u>, with the proposed claim amendments being set forth in Exhibit 2020". It was the Judge who decided the PO's Motion to Amend was non-contingent; not the Patent Owner. [1]

    ***Patent Owner's Reply to Petitioner's Opposition to Patent Owner's Motion to Amend Claims (Paper 33)***. I. SUBSTITUTION CLAIMS ANTEDATES THE PRIOR ART … 3 – 15. "The amendment makes the prior art of Astrin and Breed unavailable because the subject matter antedates Astrin's publication date and Breed's application filing." Therefore, it is irrelevant that the original claims at issue was cancelled; relevant is the fact that "But For" the DHS/DOJ's "willful blindness", and the multiple opportunities the DHS/DOJ had to correct their mistakes, the IPR would not have been instituted or the IPR would have been withdrawn before the "Final Written Decision".

---

[1] The Defendant ("Government") is redirecting and narrowing the IPR-Based Unconstitutional Takings to Golden's cancellation of patent claims. The Defendant's never denied petitioning the PTAB as a "person" unauthorized to do so; never denied petitioning the PTAB with unqualified references; petitioning the PTAB as a way to retaliating against Plaintiff for filing a complaint against the Government; being "willfully blind" to the many, many times the Patent Owner / Golden tried to get the Government to respond to the PO's claim that the references did not antedate, and Golden's claim of an Unconstitutional IPR-Based "Taking".

    ***Final Written Decision 35 U.S.C. § 318(A) and 37 C.F.R. § 42.73 (Paper 35)***.
First, it is recognized further that it was the PTAB Judges who selected the "Non-Contingent Motion to Amend with unqualified references that do not antedate the PO's

'990 patent, "On January 13, 2015, Patent Owner filed a Patent Owner Response (Paper 24 ("PO Resp.")), a Non-Contingent Motion to Amend (Paper 25 ("Non-Cont. Mot. to Amend")), and a Motion to Amend (Paper 26 ("Mot. to Amend"))" ... "The Patent Owner Response contains arguments directed both to claims 11, 74, and 81 and to the proposed substitute claims. To the extent Patent Owner argues the patentability of claims 11, 74, and 81, those arguments are moot because Patent Owner has cancelled those claims. To the extent that Patent Owner wishes us to apply the arguments made regarding claims 11, 74, and 81 to the patentability of the amended claims or incorporate arguments regarding claims 154–156 from the Patent Owner Response into the Motion to Amend, we decline to do so ... Patent Owner is precluded from incorporating arguments regarding the patentability of claims 11, 74, and 81 from the Patent Owner Response into the Motion to Amend to address how proposed substitute claims 154–156 are patentable". But yet, it was the PTAB Judges who combined the two motions and decided for the PO that the two motions will be considered a non-contingent motion to amend.

Second, it was only in the "Final Written Decision" that the PTAB Judges addressed the references of Astrin and Breed as unqualified references that do not antedate original claims at issue and the substitute claims of the '990 patent, "We next consider Patent Owner's argument that Astrin, Mostov, and Breed are not prior art because the amended claims are entitled to the April 5, 2006 priority date. Mot. to Amend 2–7. Even accepting, for the sake of argument, that the substitute claims are entitled to this earlier priority date, at the very least, Mostov remains prior art under 35 U.S.C. § 102(e) because Mostov's non-provisional filing date is January 30, 2006. Ex. 1003, at [22]". The DHS/DOJ should not have petitioned with Astrin and Breed, and the PTAB should not have instituted with Astrin and Breed, which resulted in the unconstitutional "takings" of the Patent Owner's property.

Third, when the PTAB changed the anticipation basis of Mostov from that of 35 U.S.C. § 102(b) to that of 35 U.S.C. § 102(e), the PTAB literally instituted a new trial, "Mostov remains prior art under 35 U.S.C. § 102(e) ... The fact that we did not institute this proceeding on Mostov does not mean it is no longer relevant to the patentability of the substitute claims". The PO demonstrated how Mostov with an anticipation basis of 102(b) do not antedate the priority date of the '990 patent. If the PTAB was interested in

9

changing the anticipation basis of Mostov, the PTAB should have done so when the PTAB instituted the case to trial. Not after the PO has defended his original claims at issue (i.e., 11, 74, & 81 of the '990 patent) against the unqualified patent references of Astrin and Breed.

   ***Patent Owner's Request for Rehearing (Paper 36)***. With the following disclosure in the Patent Owner's Request for Rehearing", and the DHS/DOJ's unwillingness to correct their mistake, signifies the DHS/DOJ was willfully blind by intentionally keeping themselves unaware of facts that would render them liable or implicated. Email sent by the PO on October 2, 2015:

   "Mostov, does not qualify as prior art to the Patent Owner's priority date of April 5, 2006 because Mostov was not made public (in a publication) until August 17, 2006. For this reason, the Patent Owner is asking the Board to reverse the 102(e)-anticipation rejection because the Petitioner never filed a 102(e) objection and the Patent Owner was never allowed to respond to a 102(e) objection."

   "On page 26 of the "Final Written Decision" Mostov was re-entered because the Board, "consider Mostov still to be relevant to the patentability of the claims". The Board also states, "at the very least, Mostov remains prior art under 35 U.S.C. 102(e). It should be noted the Petitioner entered the Mostov patent into record under 35 U.S.C. 102(b) and not under 35 U.S.C. 102(e). (IPR Petition; content page and pages 3, 4, & 29). The Patent Owner doesn't recall ever having to respond to a motion made by the Petitioner to change its objection from a 102(b) objection to a 102(e) objection. The Patent Owner is totally unaware of any PTAB rule that would allow for such a change without the Patent Owner having a chance to respond to the amendment to the Petition."

   "Mostov's patent provisional filing date is January 28, 2005. The Patent Owner's "Disclosure Document" filing date is November 26, 2004. Therefore, any subject matter Mostov has outlined in his claims, according to the Federal Circuit decision above, is anticipated by the Patent Owner because the Patent Owner's "Disclosure Document" antedates Mostov's patent provisional filing date. (Attached is a copy of the "Disclosure Document" submitted to the USPTO for the benefit of the Patent

Owner that displays a USPTO stamped filing date and a stamped document no. of 565732 used for reference."

The DHS/DOJ knew, or should have known after the Patent Owner repeatedly "begged" the Agencies not to take the property of Golden, that the references of Astrin, Breed, & Mostov do not antedate the priority date of the Patent Owner's '990 patent.

The PTAB Judges in *Department of Homeland Security v. Larry Golden*, Case No. IPR2014-00714, were intimidated and forced to act under duress, by the DHS and the DOJ, to conduct a telephone conference call without the DHS & DOJ being present in an effort to convince Patent Owner to change his current motion to amendment to that of a non-contingent motion to amend which requires the cancellation of claims. In an effort to cease the takings of Plaintiff's patent claims, the Patent Owner never decided or agreed to an amendment where the Patent Owner kept the asserted patent claims or a non-contingent amendment which requires the cancellation of the asserted patent claims. It was the Judge who was intimidated and forced to act under duress who decided the PO's Motion to Amend was non-contingent; not the Patent Owner.

> "Petitioner initiated the conference call ... In its e-mail requesting the call, Petitioner stated that Patent Owner filed both a contingent and a non-contingent Motion to Amend, while only a single motion was authorized by rule. See 37 C.F.R. § 42.121(a) (stating that a "patent owner may file one motion to amend a patent") ... We noted also that Mr. Golden had filed two papers with respect to the motion to amend—Paper 25, titled "Non-Contingent Motion to Amend," and Paper 26, titled "Motion to Amend Claims." Mr. Golden stated that he was unclear as to how the Motion to Amend should be designated as a noncontingent motion to amend, and thus, in an abundance of caution, he filed a separate paper designating the motion as non-contingent ... As both papers collectively appear to meet the page limit for a motion to amend, we will treat them in the collective as a single motion to amend. Petitioner does not oppose ... Accordingly, it is ORDERED that Papers 25 and 26 will collectively be treated as a single, non-contingent, Motion to Amend, with the proposed claim amendments being set forth in Exhibit 2020". ORDER Conduct of the Proceeding 37 C.F.R. § 42.5 (Paper 29)

Two days after the CFC Judge in *Golden v. USA* Case No. 13-307C denied on 11/30/2016 the Government's motion to dismiss under 12(b)(1) and 12(b)(6); in a telephone conference call

11

on 12/02/2016 the Judge in *Golden v. USA* Case No. 13-307C was intimidated and forced to act under duress, by three (3) attorneys representing the Department of Justice (DOJ) and three (3) attorneys representing the Department of Homeland Security (DHS) to first, drop Plaintiff's alleged infringement claim against the National Institute of Justice (NIJ) because the stated she has never heard of the NIJ [NIJ is the research, development and evaluation agency of the U.S. Department of Justice]; and second, to allow the DOJ & DHS another chance at having the same alleged infringement claims, alleged against the same government agencies, who is allegedly infringing the same patent claims, another chance at having Plaintiff's alleged government infringement claims dismissed under 12(b)(1) and 12(b)(6). The Judge was intimidated and forced to act under duress to make those decisions without a motion from the Government or explanation on why the Court's opinion on 11/30/2016 needed to be reversed.

On March 29, 2018, the CFC Judge in *Golden v. USA* Case No. 13-307C, was intimidated and forced to act under duress, by the Department of Justice (DOJ) and the Department of Homeland Security (DHS) to cancel 61 of 72 alleged infringement claims against the Government because the use of the smartphones [consumer devices] were purely incidental. When the DHS S&T Directorate released the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and Chemical Sensing* solicitation it was for the development of a mobile device [i.e., cell phone] capable of CBRNE *ubiquitous* [in all places at all times] sensing. The DHS contracted Qualcomm as the prime contractor responsible for the assembly of the new sensing device. Qualcomm was responsible for the new GPS and Tracking needed for the new device; responsible for the new safety mechanisms of a disabling lock, biometric authentication, and fear-field communication; the integration methods; the reporting methods; miniaturized sensors; and the various sensing methodology for chemical, biological, radiological, nuclear, and explosives. DHS "authorized and consented" to the devices' being manufacture by, or for the government; a new novel mobile device [i.e., cell phone] capable of CBRNE *ubiquitous* [in all places at all times] sensing. Therefore, the use by the government of the consumer devices named in Golden's alleged patent infringement claims, was not "purely incidental".

The CFC Judge in *Golden v. USA* Case No. 13-307C, was intimidated and forced to act under duress, by the Department of Justice (DOJ) and the Department of Homeland Security (DHS) to drop, without explanation, Qualcomm as a third-party contractor. Qualcomm was the prime third-party contractor for the DHS S&T BAA07-10 *Cell-All Ubiquitous Biological and*

12

*Chemical Sensing* initiative. Qualcomm was responsible for four essential components for the new cell-phone sensing device: 1- the mobile device, 2- the CBRNE detectors/sensors, 3- the central processing units (CPUs), and 4- the wireless cellular modems. The DOJ & DHS omitted Qualcomm as a third-party contractor [only after serving Qualcomm notice to appear to protect its interest] and introduced a defense that the mobile devices [without patents] are the property of the private parties, and no sensing element identified was native to the manufacture of the private parties' devices, the CPUs are sensors for CBR detection, and the essential CPUs inclusion only enlarged the case. This type of disparate treatment only happens to African American inventors.

In a related case in the Northern District of California, *Federal Trade Commission v. Qualcomm Incorporated*, NDC Case No. 17-CV-00220-LHK, the Court found that it was an anticompetitive practice for Qualcomm to collect a 5% royalty on the price of each handset, i.e., smartphone sold, without having the patent rights, a license, or authorization to do so. Qualcomm has full knowledge that the African American inventor, Golden owns the patent rights to collect a royalty on the price of each handset, i.e., smartphone sold. When the case was appealed in *FTC v. Qualcomm*, Ninth Circuit US Court of Appeals No. 19-16122 (9th Cir. 2020), the Department of Justice (DOJ) intervene by threatening the withdrawal of jurisdiction from the Northern District of California to the U.S. Court of Federal Claims. The DOJ intervened to say that Qualcomm is doing 5G work that is vital to national security [implied] under contract with the Department of Energy. The DOJ raised this issue against a sister Federal Agency in the Defense of Qualcomm and against Golden. Which means Qualcomm can commit antitrust crimes while performing work for the Government because the Government has not consented to being sued for antitrust violations:

> "The United States [Department of Energy] as a sovereign is immune from suit unless it unequivocally consents to being sued. The United States Supreme Court in *Price v. United States* observed: "It is an axiom of our jurisprudence." It makes no difference which party was successful in the district court [Federal Trade Commission], for, if timely appeal is taken [Ninth Circuit], the case remains a "pending suit" which must be dismissed upon withdrawal of jurisdiction [withdrawal of jurisdiction from the Northern District of California to the U.S. Court of Federal Claims]. See *Gulf Refining Co. v. United States*, 269 U.S. 125, 137 (1925); *Gulf, Col. & S.F. Ry. v. Dennis*, 224 U.S. 503, 506 (1912); *United States v. The Schooner Peggy*, 1 Cranch (5 U.S.) 102, 110 (1801)."

13

SAppx852

The CFC Judge in *Golden v. USA* Case No. 13-307C, was intimidated and forced to act under duress, by the Department of Justice (DOJ) and the Department of Homeland Security (DHS) to falsely apply the six-year "statute of limitations doctrine" for litigating Golden's "Unconstitutional IPR-Based "Takings" claim as being time barred.

The "Takings" of Golden's property started on *05/01/2014* when the two Defendants in the lead case, the DHS & DOJ, who are not "persons" authorized to petition for *inter partes review* (IPR) at the PTAB to invalidate patents; submitted a petition for *inter partes review* to the PTAB to invalidate Golden's patent with three unqualified patent references, eighteen unqualified publications, and one unqualified declaration. The only exception is that the Patent Owner is an African American inventor (Golden).

On *Oct. 1, 2015* the PTAB Judges in *Department of Homeland Security v. Larry Golden*, Case No. IPR2014-00714, were intimidated and forced to act under duress, to issue a Final Written Decision invalidating Golden's substitute claims 154, 155, & 156. There's no law, provision, or statute available for invalidating patent claims (i.e., independent, dependent, or substitute) under a 102-anticipation basis, with references that do not antedate the Patent Owner's patents' documented priority date. The only exception is that the Patent Owner is an African American inventor (Golden).

On *Jan. 29, 2019* the PTAB Judges in *Department of Homeland Security v. Larry Golden*, Case No. IPR2014-00714, were intimidated and forced to act under duress, to consolidate Golden's IPR-Based Unconstitutional "Takings" (Case No. 19-104C), with the lead case (Case No. 13-307C). "On January 17, 2019, plaintiff filed a complaint alleging the government has taken several patents without paying just compensation in violation of the Fifth Amendment … Because this action shares the identical questions of law and fact with Golden, No. 13-307C, and it is in the interest of judicial economy to consider them together, it is proper to consolidate the cases. *Golden v. United States, 19-104C, therefore is consolidated with Golden v. United States, 13-307C.*"

According to the Federal Circuit in *Golden v. US* CAFC Case No. 19-2134 Dkt. 37 Filed *04/10/2020*, "Golden may argue that, in view of *Return Mail*, the cancellation of the patent claims [at least the substitute claims] in an *inter partes review* initiated by the government could be considered an unconstitutional taking under the Fifth Amendment."

14

In Golden's Motion for Leave to File a Motion for Summary Judgement *Larry Golden v. United States*, COFC Case 1:13-cv-00307-EGB Document 196 Filed *11/03/20*, Golden continued his efforts to get the DOJ and the COFC Court to address Golden's Unconstitutional IPR-Based Takings claim. Golden could never be time barred when the Unconstitutional IPR-Based Takings Claim was still pending in the lead case *Golden v. US*, No. 13-307C that only ended *11/10/2021*.

The statute of limitations is being falsely applied because within the six-year period following the PTAB final written decision *(Oct. 1, 2015)*; Golden filed in the Claims Court an Unconstitutional IPR-Based "Takings" of Property claim on *01/17/2019* (Case No. 19-104C). On *01/29/2019* the Trial Court consolidated the cases in the interest of judicial economy (Case No. 19-104C and the lead Case No. 13-307C). Golden filed for Summary Judgement on the IPR-Based Unconstitutional "Takings" claim on *11/03/2020*. The Trial Court dismissed the lead case COFC 13-307C on *11/10/2021*, without adjudicating Golden's "Unconstitutional IPR-Based "Takings" claim.

The "Takings" continued up to the day the Trail Court, that included the same two Defendants (DHS & DOJ), dismissed Golden's lead case COFC 13-307C on November 10, 2021 without adjudicating Golden's "Unconstitutional IPR-Based "Takings" claim. Therefore, because this case has never been litigated, the case cannot be barred by *Jes Judicata*.

## CONCLUSION

Judicial misconduct occurs when a Judge acts in ways that are considered unethical or otherwise violate the Judge's obligations of impartial conduct. It is Plaintiff's argument that Judge Bruggink is being intimidated by the DOJ to act under duress.

Otherwise, the Judge Bruggink's actions can be classified as judicial misconduct, which include: conduct prejudicial to the effective and expeditious administration of the business of the Court (as an example: "falsification of facts" or complicit with the "falsification of facts" at summary judgment or final judgement)

Section 28 U.S.C. § 455 provides in relevant part: (a) Any justice, judge, or magistrate judge of the United States shall disqualify himself in any proceeding in which his impartiality might reasonably be questioned. (b) He shall also disqualify himself in the following circumstances: (1) [W]here he has a personal bias or prejudice concerning a party, or personal knowledge of disputed evidentiary facts concerning the proceeding … 28 U.S.C. § 455. "'[A]

15

SAppx854

judge must recuse [himself] if a reasonable, objective person, knowing all of the circumstances, would have questioned the judge's impartiality.'" *United States v. Hartsel*, 199 F.3d 812, 820 (6th Cir. 1999) (quoting *Hughes v. United States*, 899 F.2d 1495, 1501 (6th Cir. 1990)) (modifications in original).

Sincerely,

s/ *Larry Golden*

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

(H) 8642885605

Email: atpg-tech@charter.net

16

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 4th day of August, 2023, a true and correct copy of the foregoing "Plaintiff's Reply in Support of Plaintiff's Motion for Disqualification", was served upon the following Defendant by priority "express" mail and via email:

Grant D. Johnson

Trial Attorney

Commercial Litigation Branch

Civil Division

Department of Justice

Washington, DC 20530

Grant.D.Johnson@usdoj.gov

(202) 305-2513

s/ *Larry Golden*

Larry Golden, Pro Se

740 Woodruff Rd., #1102

Greenville, South Carolina 29607

atpg-tech@charter.net

864-288-5605

17

# Exhibit C

## IN THE UNITED STATES COURT OF FEDERAL CLAIMS

LARRY GOLDEN,

        Plaintiff,

    v.

THE UNITED STATES,

        Defendant.

No. 23-811 C

Senior Judge Eric G. Bruggink

### DEFENDANT THE UNITED STATES'
### NOTICE REGARDING RELATED PROCEEDINGS

As noted in the Government's currently pending Motion to Dismiss (Dkt. 10), Plaintiff Larry Golden separately filed a patent infringement suit against Google in the Northern District of California, accusing the same Google Pixel smartphone models of infringement that he accused in the present case and asserting the same patents that he asserted in the present case. *See* Dkt. 10 at 6; *compare* Dkt. 1 (Complaint) *with* Dkt. 10-4 (Complaint in *Golden v. Google* (N.D. Cal.)).

The Government respectfully submits this Notice to provide the Court with the April 3, 2024 Order of the Northern District of California, granting Google's motion to dismiss that suit and denying Mr. Golden leave to further amend his complaint. *See Golden v. Google*, Case No. 3:22-cv-05246-RFL (N.D. Cal. Apr. 3, 2024). A copy of that Order is attached as Exhibit 1.

In its Order, the Northern District of California observed that "Golden does not allege that" the Defense Threat Reduction Agency ("DTRA")—the Government agency accused of infringement in the present case, *see* Dkt. 1—"directly infringed the patents-in-suit" in that case and the present case. Ex. 1 at 5–6. "To the contrary," the court found, "Golden concedes that there was no such direct infringement by the" DTRA. *Id.* (citing Mr. Golden's statement in his

- 1 -

SAppx858

*Golden v. Google* First Amended Complaint that "no single party carried out all the steps of Plaintiff's patented inventions, that would constitute infringement"). A copy of Mr. Golden's cited filing from *Golden v. Google* containing that statement (at p. 3) is attached as Ex. 2.

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

SCOTT BOLDEN
Director


/s/ Grant D. Johnson
GRANT D. JOHNSON
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
Washington, DC 20530
*Grant.D.Johnson@usdoj.gov*
(202) 305-2513

April 4, 2024

COUNSEL FOR THE DEFENDANT,
THE UNITED STATES

SAppx859

**CERTIFICATE OF SERVICE**

I hereby certify that a true copy of the foregoing "DEFENDANT THE UNITED STATES'

NOTICE REGARDING RELATED PROCEEDINGS" was sent on April 4, 2024 via First Class

Mail and e-mail to:

<div align="center">

Larry Golden
740 Woodruff Road
#1102
Greenville, SC 29607
atpg-tech@charter.net

</div>

/s/ Grant D. Johnson
Grant D. Johnson
Department of Justice

# Exhibit 2

# Exhibit H

**Claim Chart of Induced Infringement [DTRA ATAK-MILITARY and Draper's ATAK-CIVILIAN]; Contributory Infringement of Google's Pixel 6a, 7, 7a, 7 Pro, and Fold; and Joint Infringement**

| DRAPER'S ATAK-CIVILIAN & DoD DTRA ATAK-MILITARY | Pixel 2-9,139,198; Independent Claim 89 | Pixel 2-9,098,196; Independent Claim 7 |
|---|---|---|
| <br>Both Draper ATAK-CIV and DoD DTRA ATAK-MIL include chemical, biological, radiological, and nuclear (CBRN) plug-ins. Plaintiff has demonstrated throughout the complaint how Google actively encouraged the infringement; and how Google knew that the acts they were doing constituted infringement; and as a result, Google actuated direct patent infringement by those encouraging acts. Plaintiff's evidence proves the inducement *resulted* in direct infringement, not that the inducement was of a product that already directly infringes. | A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, radiological agent, or compound, comprising: | A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, or radiological agents and compounds, comprising: |
| **ATAK-CIVILIAN**<br>Draper Laboratory, Inc. designed a CBRN Plugin to enable users to integrate CBRN sensors into TAK, collect CBRN sensor data, display it on a map and livestream it across the TAK network to other users. CBRN plugins for ATAK, are operational in the field.<br><br>**ATAK-MILITARY**<br>ATAK (built on the Android operating system) With DTRA … ATAK includes chemical, biological, radiological, and nuclear (CBRN) plug-ins. The Defense Threat Reduction Agency (DTRA) CBRN ISA: Seamlessly integrates information and control of multiple sensors into a single dashboard, making it easier to detect CBRN threats and monitor a warfighter's vitals https://thelastmile. gotennapro.com/four-useful-atak-app-plugins/ | a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human, or contraband agent or compound, capable of being disposed within, on, upon or adjacent a multi-sensor detection device; | a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human or contraband agents and compounds and capable of being disposed within, on, upon or adjacent a multi sensor detection device; |

2

Case 3:22-cv-05161-RFL Document 262-2 Filed 04/19/24 Page 61 of 70

| | | |
|---|---|---|
| Pursuant to 35 U.S.C. § 271(c), Google has contributed an element(s) [ at least that of Google Pixel 6a, 7, 7a, 7 Pro, or Fold] to the alleged infringing ATAK CBRNE Plugins of Draper Laboratory, Inc. and the Defense Threat Reduction Agency (DTRA).<br><br>Google is contributing to the infringement of independent claim 19 of Plaintiff's '439 patent, and independent claim 7 of Plaintiff's '189 patent.<br><br>ATAK (including CivTAK) is an Android smartphone [i.e., Google smartphone] geospatial infrastructure and situational awareness app https://www.civtak.org/atak-about/. ATAK can be downloaded to a phone, tablet, or handheld device.<br><br>ATAK-MIL is a government-off-the-shelf app for Android smartphones. The mobile broadband 4G LTE connection is able to facilitate the data throughput required for the operation of the ATAK. https://apps. dtic.mil/sti/pdfs/ AD1069441.pdf<br><br>Plaintiff has alleged Joint or Divided infringement between Google and Draper; and, Google and DTRA, because no single party carried out all the steps of Plaintiff's patented inventions, that would constitute infringement. | monitoring equipment comprising at least one of a computer, personal computer (PC), laptop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone for at least one of a receipt or transmission of signals therebetween; | monitoring equipment comprising at least one of plurality product groups based on the categories of a computer, laptop, notebook, PC, handheld, cell phone, PDA or smart phone for the receipt and transmission of signals therebetween; |
| Google Pixel 6a, 7, 7a, 7 Pro, and Fold smartphones connects to a cell tower or base station via radio waves, and that tower is usually physically connected to the infrastructure to send that data wherever it needs to go.<br><br>Draper designed a chemical, biological, radiological and nuclear (CBRN) Plugin to enable users to integrate CBRN sensors into TAK, collect CBRN sensor data, display it on a map and livestream it across the TAK network to other users. CBRN plugins for ATAK, WinTAK and WebTAK are operational in the field. https://www.draper.com/explore-solutions/tak | at least one cell phone tower interconnected to the monitoring equipment for sending signals thereto and receiving signals therefrom or at least one satellite capable of transmitting signals to the monitoring equipment; | at least one cell phone tower interconnected to the monitoring equipment for sending signals thereto and receiving signals therefrom or at least one satellite capable of transmitting signals to the monitoring equipment; |

3

| | | |
|---|---|---|
| The Android-based Google Pixel 6a, 7, 7a, 7 Pro, and Fold smartphones now contained integrated satellite on-the move capability, on-the-move mapping solutions, and a commercial laser range finder that significantly expanded the end-user range data flow and functionality. The Primary, Alternate, Contingency, and Emergency (PACE) communications architectures established was: • Primary communications structure (P): ATAK—4G/LTE; Antenna: international [] satellite (INMARSAT) https://apps.dtic.mil/sti/pdfs/AD1069441.pdf | at least one satellite or at least one cell phone tower capable of signal communication between the multi-sensor detection device and the monitoring equipment; | at least one satellite or at least one cell phone tower capable of signal communication between the multi sensor detection device and the monitoring equipment; |
| The internet connection is shared by many ATAK functions on the Google Pixel 6a, 7, 7a, 7 Pro, and Fold smartphone such as internet browsing, receiving email messages and installing apps. Wi-Fi is a method for devices such as the Google Pixel 6a, 7, 7a, 7 Pro, or Fold smartphones to connect wirelessly to the Internet using radio waves. | at least one internet connection capable of communication between the multi-sensor detection device and the monitoring equipment; | at least one internet connection capable of communication between the multi sensor detection device and the monitoring equipment; |
| Sit(x) is a commercial Server-as-a-Service solution based on the TAK platform developed by PAR Government for the U.S. Defense & Intelligence Community. Sit(x) has real-time communication and information sharing. With Sit(x), individuals and teams can communicate via personal computers and handheld mobile [Google smartphone] devices by voice or text. They can share real-time full-motion video (FMV), airborne/drone imagery, GPS locations, photos, and satellite imagery. Fully secure and compatible with ATAK, WinTAK, and iTAK. Sit(x) accessed via free downloadable gateway apps. | whereupon a signal sent to a receiver of the multi-sensor detection device from a satellite; or to a cell phone tower; or through at least one of a short-range radio frequency or a long-range radio frequency; causes a signal to be sent to the monitoring equipment that includes at least one of location data or sensor data; | whereupon a signal sent to a receiver of the multi sensor detection device from a satellite; or to a cell phone tower; or through short and/or long-range radio frequency; causes a signal to be sent to the monitoring equipment that includes location data and sensor data; |

4

SAppx865

| | | |
|---|---|---|
| The '439 & '189 patent specs: Product grouping (PG) 1 (storage & transportation); PG 2 (sensors); PG 3 (detector case; modified and adapted); PG 4 (monitoring & communication devices); PG 5 (communication methods); PG 6 (biometrics); and, PG 7 (authorized person) | wherein the monitoring equipment or multi-sensor detection device receives a signal via any of one or more products of any product grouping categories; | wherein the monitoring equipment or multi sensor detection device receives a signal via any of one or more products listed in any of the plurality of product grouping categories; |
| The Android-based [Google] Google Pixel 6a, 7, 7a, 7 Pro, and Fold smartphones now contained integrated satellite …<br><br>Wi-Fi is a method for devices such as the Google Pixel 6a, 7, 7a, 7 Pro, or Fold smartphone to connect wirelessly to the Internet using radio waves…<br><br>The internet connection is shared by many ATAK functions on the Google Pixel 6a, 7, 7a, 7 Pro, or Fold smartphone such as internet browsing, receiving email messages; installing apps…<br><br>The Google Pixel 6a, 7, 7a, 7 Pro, or Fold smartphone connects to a cell tower or base station via radio waves, and that tower is usually physically connected to the infrastructure to send that data wherever it needs to go. | wherein at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency connection, or short-range radio frequency (RF) connection is capable of signal communication with the transmitter, a receiver of the monitoring equipment, the multi-sensor detection device, or transceivers of the products; | wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection is capable of signal communication with the transmitter and the receiver of the monitoring equipment or multi sensor detection device and transceivers of the products; |
| BIOMETRICS: Biometric factors allow for secure authentication on the Android platform. The Android framework includes face and fingerprint biometric authentication. Android can be customized to support other forms of biometric authentication (such as Iris).<br><br>ATAK (including CivTAK) is an Android smartphone [i.e., Google smartphone] geospatial infrastructure and situational awareness app https://www.civtak.org/atak-about/. ATAK can be downloaded to a phone, tablet, or handheld device. (Google Pixel 6a, 7, 7a, 7 Pro, or Fold smartphones) | wherein the monitoring equipment is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan or signature such that the monitoring device that is at least one of the computer, the laptop, the notebook, the PC, the handheld, the cell phone, the PDA, or the smart phone is locked by the biometric lock disabler to prevent unauthorized use; | wherein the monitoring equipment is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature such that the monitoring device that is at least one of the computer, the laptop, the notebook, the PC, the handheld, the cell phone, the PDA, or the smart phone is locked by the biometric lock disabler to prevent unauthorized use; |

| | | |
|---|---|---|
| The Android-based [Google] Google Pixel 6a, 7, 7a, 7 Pro, and Fold smartphones now contained integrated satellite … <br><br> Wi-Fi is a method for devices such as the Google Pixel 6a, 7, 7a, 7 Pro, or Fold smartphone to connect wirelessly to the Internet using radio waves… <br><br> The internet connection is shared by many ATAK functions on the Google Pixel 6a, 7, 7a, 7 Pro, or Fold smartphone such as internet browsing, receiving email messages; installing apps… <br><br> The Google Pixel 6a, 7, 7a, 7 Pro, or Fold smartphone connects to a cell tower or base station via radio waves, and that tower is usually physically connected to the infrastructure to send that data wherever it needs to go. | wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, long range radio frequency, and short-range radio frequency (RF). | wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, and long and short-range radio frequency (RF). |

6

# Exhibit D

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA – OAKLAND

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

Phone (864) 288-5605

Email: atpg-tech@charter.net

---

| | |
|---|---|
| LARRY GOLDEN, <br><br> Plaintiff, <br><br> V. <br><br> GOOGLE LLC <br><br> Defendants. | CASE NO: 4:22-cv-05246-HSG <br><br> **JURY TRIAL DEMANDED** <br><br> (Direct Patent Infringement), (Induced and Contributory Patent Infringement), (Joint Infringement, (Willful Infringement) |

## PLAINTIFF'S AMENDED COMPLAINT
## FOR PATENT INFRINGEMENT

**FILED**

Aug 22 2023

Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

August 21, 2023

Pursuant to the Court Order filed on 08/10/23 Dkt. 41 in *Larry Golden v, Google LLC*, Case No. 4:22-cv-05246-HSG, Plaintiff is submitting this amended complaint against Google LLC for alleged direct infringement, induced and contributory infringement, joint infringement, and willful infringement of Plaintiff's United States Patent Nos. 10,984,619 ('619 Patent), 10,163,287 ('287 Patent), 9,589,439 ('439 Patent), and 9,096,189 ('189 Patent).

This amended complaint is necessary because after the Federal Circuit's order on 09/08/2022, in *Larry Golden v. Google LLC*; Case No. 22-1267, to "VACATE AND REMAND" the relevant Case No: 22-1267 Document 15; back to the District Court "to be filed and request service of process", Google has discontinued the making, offering for sell, and selling the Google Pixel 5 Smartphone; discontinued the use of Qualcomm's Snapdragon chipset, thereby eliminating Plaintiff's "joint infringement" claim; and discontinued offering for sell, and selling, the ATAK-Military on Google Play, to avoid liability for the actions brought against them.

This is an action of patent infringement in which plaintiff, Larry Golden ("Golden", "Plaintiff" or "Patent Owner"), hereby asserts the following claims for patent infringement of United States Patent Nos. 10,984,619 ('619 Patent), 10,163,287 ('287 Patent), 9,589,439 ('439 Patent), and 9,096,189 ('189 Patent) ("patents-in-suit"), against Defendant GOOGLE LLC ("Google" or "Defendant"), and alleges as follows:

Upon information and belief, Plaintiff alleges the patents-in-suit, that were issued with the presumption of validity, under 35 U.S. Code § 282 – "Presumption of validity; (a) In General", is Plaintiff's evidence that Plaintiff is the inventor of the Communicating, Monitoring, Detecting, and Controlling (CMDC) device(s) i.e., smartphones, laptops, tablets, etc.

Upon information and belief, Plaintiff alleges that the defendant Google, has in the past and continues to do so, make, use, offer to sell, or sell the Google Pixel 6a, 7, 7a, 7pro, and fold

2

SAppx870

smartphones, that Plaintiff believes infringes at least one of the claims in the patents-in-suit under 35 U.S.C. § 271(a), "anyone who makes, uses, offers to sell, or sells any patented invention domestically, or imports a patented invention into the United States during the term of the patent, is infringing the patent."

Upon information and belief, Plaintiff alleges that the defendant Google, has induced infringement, thereby causing direct infringement with its Android Open-Source Operating System under 35 U.S.C. § 271(b). Plaintiff alleges Google actively encouraged the DoD/DTRA and Draper Laboratory Inc.'s infringement, knowing that the acts they induced constituted patent infringement, and their encouraging acts actually *resulted* in direct patent infringement.

In *Power Integrations, Inc. v. Fairchild Semiconductor Int'l, Inc.*, the Federal Circuit considered whether proof of induced infringement requires proof that the encouragement of infringement was successfully communicated to the direct infringer and actually *resulted* in direct infringement. However, Fairchild claimed there was no evidence that it encouraged its accused chips to be incorporated into products … with the specific intent to induce infringement.

The court disagreed, noting that Fairchild was involved in activities related to the use of its products … Fairfield [Google] designed its products [same as Google Android Open-Source Operating System] to meet certain [] standards, provided demonstration boards containing the infringing chips [open-source platform] to customers and potential customers in the United States, and maintained a technical support center in the United States that provided support to customers based in the United States." Plaintiff must prove the inducement *resulted* in direct infringement, not that the inducement was of a product that already directly infringes.

Similarly, under 35 U.S.C. § 271(c), "anyone who offers to sell, sells, or imports a material component of something that is patented, knowing that the component was especially

3

made for use in an infringement and is not a commodity suitable for a substantial non-infringing use, is also liable as a contributory infringer". Plaintiff is alleging the defendant Google, has in the past and continues to *contribute* the Google Tensor i.e., Central Processing Unit (CPU), Processor, System-on-a-Chip (SoC), Chipset; a material component of Plaintiff's patented Communicating, Monitoring, Detecting, and Controlling (CMDC) device, with knowledge that the Google Tensor Chipset is especially made for use in an infringement and is not a commodity suitable for a substantial non-infringing use.

Upon information and belief, Plaintiff alleges that the defendant Google is liable for "joint infringement". In United States patent law, joint infringement is a form of patent infringement liability that occurs when multiple actors [Google LLC and Draper Laboratory Inc.] are involved in carrying out the claimed infringement of a patent and no single accused infringer has performed all of the steps of the method. In a 2015 decision of the United States Court of Appeals for the Federal Circuit, *Akamai Techs., Inc. v. Limelight Networks, Inc.*

Upon information and belief, Plaintiff alleges that the defendant Google is liable under the doctrine of willful blindness. Willful Blindness applies when Google seeks to avoid civil liability for the wrongful acts by intentionally keeping itself unaware of facts that would render Google liable or implicated. In the Eastern District of Texas, the Chief District Judge Rodney Gilstrap issued an opinion in the case (*Motiva Patents LLC v. HTC Corporation*) in which he wrote, "A well-pled claim for willful blindness is sufficient to state a claim for willful infringement."

## THE PARTIES

1.    Plaintiff Larry Golden is a citizen of South Carolina and has a principal place of business and residence at 740 Woodruff Road, #1102, Greenville, S.C. 29607.

4

2.      On information and belief, Google is incorporated in the State of Delaware with a principal place of business at 1600 Amphitheatre Parkway, Mountain View, CA 94043 and does business in this judicial district by, among other things, committing jointly, directly, and/or indirectly the tort of literal patent infringement or infringement under the "doctrine of equivalents" giving rise to this complaint. Google may be served at its principal place of business at 1600 Amphitheatre Parkway, Mountain View, CA 94043.

3.      Google LLC is one of the largest technology companies in the world and conducts product sales, and online search operations in the District of South Carolina. Google LLC directly, jointly, and/or indirectly distributes, markets, offers to sell, sells, and/or imports the infringing Google Pixel Series of smartphones, Google Tensor CPU, and Google Android Operating Systems.

## STANDARD FOR REVIEW

4.      Plaintiff has attached a copy of the asserted patents as **Exhibits I-L**. The attached patents satisfy the requirement of "enough factual allegations. For example, in *Incom Corp. v. Walt Disney Co.,* No. 2:15-cv-03011-PSG-MRW, Dkt. 39, at *4 (C.D. Cal. Feb. 4, 2016) the Central District of California declined to dismiss a complaint that attached the asserted patent, identified the accused products by name, and generally compared the technology disclosed in the patents to the accused products.

## JURISDICTION AND VENUE

5.      This is a civil action for patent infringement arising under the patent laws of the United States, Title 35 of the United States Code. This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§§ 1331, 1332(a) and 1338(a).

SAppx873

Case 3:22-cv-05246-RFL   Document 70   Filed 04/10/24   Page 82 of 321

**UNITED STATES POSTAL SERVICE®**

PRIORITY MAIL EXPRESS®

EI 935 866 400 US

**CUSTOMER USE ONLY**

**FROM** (PLEASE PRINT)   PHONE 864 288-5605

LARRY GOLDEN
740 WOODRUFF RD.
# 1102
GREENVILLE SC 29607

**DELIVERY OPTIONS** (Customer Use Only)

☐ SIGNATURE REQUIRED Note: The mailer must check the "Signature Required" box if the mailer: 1) Requires the addressee's signature; OR 2) Purchases additional insurance; OR 3) Purchases COD service; OR 4) Purchases Return Receipt service. If the box is not checked, the Postal Service will leave the item in the addressee's mail receptacle or other secure location without attempting to obtain the addressee's signature on delivery.

**Delivery Options**
☐ No Saturday Delivery (delivered next business day)
☐ Sunday/Holiday Delivery Required (additional fee, where available*)
*Refer to USPS.com® or local Post Office™ for availability.

**TO:** (PLEASE PRINT)   PHONE ( )

U.S. DISTRICT COURT - NDC - SAN FRANCISCO
CASE NO: 3:22-CV-05246-RFL
450 GOLDEN GATE AVENUE
SAN FRANCISCO, CA

**ZIP + 4®** (U.S. ADDRESSES ONLY)

9 4 1 0 2 - _ _ _ _

■ For pickup or USPS Tracking™, visit USPS.com or call 800-222-1811.
■ $100.00 Insurance Included.

⬅ **PEEL FROM THIS CORNER**

**PAYMENT BY ACCOUNT (If applicable)**
Federal Agency Acct. No. or Postal Service™ Acct. No.

**ORIGIN (POSTAL SERVICE USE ONLY)**

| PO ZIP Code | Scheduled Delivery Date (MM/DD/YY) | Postage |
|---|---|---|
| 29615 | 4-10-24 | $ 30 65 |

| Date Accepted (MM/DD/YY) | Scheduled Delivery Time | Insurance Fee | COD Fee |
|---|---|---|---|
| 4-9-24 | ☐ 6:00 PM | $ | $ |

| Time Accepted | | Return Receipt Fee | Live Animal Transportation Fee |
|---|---|---|---|
| 405 ☐ AM ☑ PM | | $ | $ |

| Special Handling/Fragile | Sunday/Holiday Premium Fee | Total Postage & Fees |
|---|---|---|
| $ | $ | $ 30 65 |

| Weight | ☐ Flat Rate | Acceptance Employee Initials |
|---|---|---|
| lbs. ozs. | | |

**DELIVERY (POSTAL SERVICE USE ONLY)**

| Delivery Attempt (MM/DD/YY) | Time | Employee Signature |
|---|---|---|
| | ☐ AM ☐ PM | |
| Delivery Attempt (MM/DD/YY) | Time | Employee Signature |
| | ☐ AM ☐ PM | |

LABEL 11-B, NOVEMBER 2023   PSN 7690-02-000-9996   COURT



**EMS**

EP13L July 2013   OD: 15 x 9.5

P S 1 0 0 0 1 0 0 0 0 5 9

✒ SIG

* Money Ba destinati

+ Money Ba

**VISIT US AT USPS.C**
ORDER FREE SUPPLIES ON

SAppx874

*Retail*



RDC 07

94102

U.S. POSTAGE PAID
PME 1-Day
GREENVILLE, SC 29
APR 09, 2024

**$30.65**

R2305M149520-33

*Retail*

RDC 07

94102

U.S. POSTAGE PA
PME 1-Day
GREENVILLE, SC 2
APR 09, 2024

**$0.00**

R2305M149520-33

ESTIC AND INTERNA
ACE MAILING LABEL

TEED DELIVERY DATE*
TEED DELIVERY TIME‡
ACKING™ INCLUDED
CE INCLUDED
VAILABLE
RE INCLUDED UPON REQUEST



INSPECTED BY

APR 10 2024

U.S. MARSHALS SERVICE

ntee to U.S., select APO/FPO/DPO, and select International
DMM and IMM at pe.usps.com for complete details.

ntee for U.S. destinations only.

  

**UNITED STATES**
**POSTAL SERVICE.**

SAppx875

# UNITED STATES DISTRICT COURT

## FOR THE NORTHERN DISTRICT OF CALIFORNIA – SAN FRANCISCO

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

Phone (864) 288-5605

Email: atpg-tech@charter.net

<table>
<tr><td>

**FILED**

Jun 21 2024

Mark B. Busby
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO

</td></tr>
</table>

| | |
|---|---|
| LARRY GOLDEN,<br><br>*Plaintiff,*<br><br>V.<br><br>GOOGLE LLC<br><br>*Defendant.* | CASE NO: <u>4:22-cv-05246-RFL</u><br><br><br>(Direct Patent Infringement),<br>(Induced and Contributory Patent<br>Infringement), (Joint Infringement,<br>(Willful Infringement) |

## PLAINTIFF'S NOTICE OF APPEAL

PLEASE TAKE NOTICE that Plaintiff Larry Golden, hereby appeals to the

United States Court of Appeals for the Federal Circuit from the dated April 3, 2024

"Order Granting the Defendant [Google, LLC] Motion to Dismiss" (Dkt. No. 68)

as well as any other rulings, orders [Dkt. 72, filed 05/28/2024 – Order: Denying

Plaintiff's Motion for Reconsideration], findings, and/or conclusions adverse to

Larry Golden.

This notice of appeal is timely under Federal Rule of Appellate Procedure 4(a)(1)(A) because it is "filed with the District Court clerk within 30 days after entry of the judgment or [toll] order appealed from."

As part of this notice of appeal, Larry Golden submits the required filing fee of $605 and respectfully requests the Northern District of California Court clerk to prepare the record on appeal pursuant to Federal Rule of Appellate Procedure 10(a).

Sincerely,

Larry Golden, *Pro Se* Plaintiff

740 Woodruff Rd., #1102

Greenville, SC 29607

(H) 8642885605

(M) 8649927104

Email: atpg-tech@charter.net

Date: 06/14/2024

2

SAppx877



US009096189B2

(12) **United States Patent**

Golden

(10) Patent No.: **US 9,096,189 B2**

(45) Date of Patent: **Aug. 4, 2015**

(54) **MULTI SENSOR DETECTION, STALL TO STOP AND LOCK DISABLING SYSTEM**

(71) Applicant: **Larry Golden**, Mauldin, SC (US)

(72) Inventor: **Larry Golden**, Mauldin, SC (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **14/021,693**

(22) Filed: **Sep. 9, 2013**

(65) **Prior Publication Data**

US 2014/0071274 A1    Mar. 13, 2014

**Related U.S. Application Data**

(60) Continuation of application No. 13/288,065, filed on Nov. 3, 2011, now Pat. No. 8,531,280, which is a division of application No. 12/802,001, filed on May 27, 2010, now Pat. No. 8,334,761, which is a continuation of application No. 12/657,356, filed on Jan. 20, 2010, now Pat. No. 8,106,752.

(51) **Int. Cl.**
| | | |
|---|---|---|
| *B60R 25/10* | (2013.01) |
| *B60R 25/102* | (2013.01) |
| *B60R 25/01* | (2013.01) |
| *B60R 25/04* | (2013.01) |
| *G07C 9/00* | (2006.01) |
| *G08B 15/00* | (2006.01) |
| *G08B 21/12* | (2006.01) |

(52) **U.S. Cl.**
CPC ............ *B60R 25/102* (2013.01); *B60R 25/018* (2013.01); *B60R 25/04* (2013.01); *G07C 9/00912* (2013.01); *G08B 15/00* (2013.01); *G08B 21/12* (2013.01); *B60R 2325/205* (2013.01); *B60R 2325/304* (2013.01); *G07C 2009/0092* (2013.01)

(58) **Field of Classification Search**
CPC ... B60R 2325/00; G08B 21/12; G08B 25/009

USPC ............... 340/539.1, 539.11, 539.13, 539.16, 340/539.17, 539.22, 539.25, 539.26, 540, 340/573.1, 574; 348/143; 380/228, 229, 380/232; 382/103, 115; 702/32
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,385,469 | A | 5/1983 | Scheuerpflug |
| 4,544,267 | A | 10/1985 | Schiller |
| 4,586,441 | A | 5/1986 | Zekich |
| 4,792,226 | A | 12/1988 | Fishbine |
| 5,222,152 | A | 6/1993 | Fishbine |

(Continued)

OTHER PUBLICATIONS

United States Patent and Trademark Office; Office Action from U.S. Appl. No. 11/397,118; mailed Nov. 14, 2007, Alexandria, Virginia, USA; pp. 1-12; parent U.S. Appl. No. 13/288,065 (12 pages).

(Continued)

*Primary Examiner* — Van Trieu

(57) **ABSTRACT**

A multi sensor detection and disabling lock system includes detector cases for holding interchangeable detectors that sample for chemical, biological and radiological compounds, agents and elements, with each detector case disposed in or upon the monitored product. The detector case transmits detection information to a monitoring computer terminal and transmits a signal to a lock disabler engaged to the product to lock or disable the product's lock thereby preventing untrained, unauthorized and unequipped individual's from gaining access and entry to the product, and also preventing further contamination of the area. The detection system can be interconnected to surveillance towers scanning detector cases disposed at seaport docks, freight depots and rail terminals for monitoring containers being prepared for shipment or sitting on docks for long periods of time.

**9 Claims, 13 Drawing Sheets**



**US 9,096,189 B2**

Page 2

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 5,223,844 A | 6/1993 | Mansell et al. | |
| 5,233,044 A | 8/1993 | Lougheed | |
| 5,557,254 A | 9/1996 | Johnson | |
| 5,682,133 A | 10/1997 | Johnson | |
| 5,766,956 A | 6/1998 | Groger | |
| 5,938,706 A | 8/1999 | Feldman | |
| 5,959,529 A | 9/1999 | Kail, IV | |
| 5,963,657 A | 10/1999 | Bowker | |
| 5,986,543 A | 11/1999 | Johnson | |
| 5,990,785 A * | 11/1999 | Suda | 340/426.21 |
| 6,049,269 A | 4/2000 | Byrd | |
| 6,078,265 A | 6/2000 | Bonder | |
| 6,262,656 B1 | 7/2001 | Byrd | |
| 6,271,745 B1 | 8/2001 | Anizal | |
| 6,374,652 B1 | 4/2002 | Hwang | |
| 6,411,887 B1 | 6/2002 | Martens | |
| 6,470,260 B2 | 10/2002 | Martens | |
| 6,542,076 B2 | 4/2003 | Joao | |
| 6,542,077 B2 | 4/2003 | Joao | |
| 6,588,635 B2 | 7/2003 | Vor Keller | |
| 6,610,977 B2 | 8/2003 | Megerle | |
| 6,613,571 B2 | 9/2003 | Cordery | |
| 6,628,813 B2 | 9/2003 | Scott | |
| 6,647,328 B2 | 11/2003 | Walker | |
| 6,738,697 B2 | 5/2004 | Breed | |
| 6,923,509 B1 | 8/2005 | Barnett | |
| 6,980,092 B2 | 12/2005 | Turnbull | |
| 6,988,026 B2 | 1/2006 | Breed et al. | |
| 7,005,982 B1 | 2/2006 | Frank | |
| 7,034,677 B2 * | 4/2006 | Steinthal et al. | 340/539.12 |
| 7,034,683 B2 | 4/2006 | Ghazarian | |
| 7,103,460 B1 | 9/2006 | Breed | |
| 7,109,859 B2 | 9/2006 | Peeters | |
| 7,116,798 B1 | 10/2006 | Chawla | |
| 7,148,484 B2 | 12/2006 | Craig et al. | |
| 7,164,117 B2 | 1/2007 | Breed et al. | |
| 7,171,312 B2 * | 1/2007 | Steinthal et al. | 702/32 |
| 7,243,945 B2 | 7/2007 | Breed et al. | |
| 7,339,469 B2 | 3/2008 | Braun | |
| 7,346,439 B2 | 3/2008 | Bodin | |
| 7,385,497 B2 | 6/2008 | Golden | |
| 7,397,363 B2 | 7/2008 | Joao | |
| 7,636,033 B2 | 12/2009 | Golden | |
| 7,647,180 B2 | 1/2010 | Breed | |
| 7,844,505 B1 | 11/2010 | Arneson et al. | |
| 7,868,912 B2 * | 1/2011 | Venetianer et al. | 348/143 |
| 7,872,575 B2 | 1/2011 | Tabe | |
| 7,880,767 B2 * | 2/2011 | Chinigo | 348/148 |
| 7,961,094 B2 | 6/2011 | Breed | |
| 8,274,377 B2 | 9/2012 | Smith et al. | |
| 8,531,521 B2 * | 9/2013 | Romanowich | 348/143 |
| 8,564,661 B2 * | 10/2013 | Lipton et al. | 348/143 |
| 2002/0145666 A1 * | 10/2002 | Scaman et al. | 348/143 |
| 2003/0063004 A1 * | 4/2003 | Anthony et al. | 340/574 |
| 2003/0137426 A1 * | 7/2003 | Anthony et al. | 340/574 |
| 2003/0206102 A1 | 11/2003 | Joao | |
| 2004/0107028 A1 | 6/2004 | Catalano | |
| 2004/0222092 A1 | 11/2004 | Musho | |
| 2005/0195069 A1 | 9/2005 | Dunand | |
| 2006/0164239 A1 | 7/2006 | Loda | |
| 2006/0176169 A1 * | 8/2006 | Doolin et al. | 340/521 |
| 2006/0181413 A1 | 8/2006 | Mostov | |
| 2006/0250235 A1 | 11/2006 | Astrin | |
| 2007/0171042 A1 | 7/2007 | Metes et al. | |
| 2008/0045156 A2 | 2/2008 | Sakhpara | |
| 2008/0122595 A1 | 5/2008 | Yamamichi | |
| 2008/0234907 A1 | 9/2008 | Labuhn | |
| 2010/0159983 A1 | 6/2010 | Golden | |
| 2011/0178655 A1 | 7/2011 | Golden | |

OTHER PUBLICATIONS

United States Patent and Trademark Office; Office Action from U.S. 12/155,573; mailed Apr. 9, 2009; Alexandria, Virginia, USA; pp. 1-7; parent U.S. Appl. No. 13/288,065 (7 pages).

United States Patent and Trademark Office; Office Action from U.S. 12/155,573; mailed Jul. 30, 2009; Alexandria, Virginia, USA; pp. 1-9; parent U.S. Appl. No. 13/288,065 (9 pages).

United States Patent and Trademark Office; Notice of Allowability from U.S. 12/155,573; mailed Oct. 28, 2009; Alexandria, Virginia, USA; pp. 1-5; parent U.S. Appl. No. 13/288,065 (5 pages).

United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/657,356; mailed Jul. 12, 2010; Alexandria, Virginia, USA; pp. 1-14; parent U.S. Appl. No. 13/288,065 (14 pages).

United States Patent and Trademark Office; Notice of Allowability from U.S. 12/657,356; mailed Mar. 10, 2011; Alexandria, Virginia, USA; pp. 1-4; parent U.S. Appl. No. 13/288,065 (4 pages).

United States Patent and Trademark Office; Office Action from U.S. Appl. No. 13/065,837; mailed Jul. 18, 2011; Alexandria, Virginia, USA; pp. 1-9; parent U.S. Appl. No. 13/288,065 (4 pages).

A newspaper article of Mr. Melvin Sullivan and his family that references the date, Mar. 6, 2001; parent U.S. Appl. No. 13/288,065. A letter of response Mr. Sullivan received from Pfeiffer & Gantt, PA, dated Sep. 16, 2002; parent U.S. Appl. No. 13/288,065.

A "Certificate of Existance" Bright Idea Inventor, LLC. Nov. 6, 2002; parent U.S. Appl. No. 13/288,065.

Operating Agreement of Bright Idea Inventor, LLC received from Pfeiffer & Gantt, PA, dated Nov. 13, 2002; parent U.S. Appl. No. 13/288,065.

A letter of response Golden received from the Honorable Congressman from Maryland, Elijah E. Cummings, dated Dec. 16, 2002; parent U.S. Appl. No. 13/288,065.

A newspaper article of Mr. Melvin Sullivan and Mr. Larry Golden, dated, Feb. 27-Mar. 5, 2003; parent U.S. Appl. No. 13/288,065.

A letter of response Golden received from the Honorable Senator from South Carolina, Ernest F. Hollings, dated May 21, 2003; parent U.S. Appl. No. 13/288,065.

A letter of response Golden received from the Office of the Vice President, Dick Cheney, dated Jun. 3, 2003; parent U.S. Appl. No. 13/288,065.

A letter of response Golden received from the Honorable Senator from South Carolina, Ernest F. Hollings, dated Oct. 1, 2003; parent U.S. Appl. No. 13/288,065.

A letter of response Golden received from the Honorable Senator from South Carolina, Lindsey O. Graham, dated Oct. 21, 2003; parent U.S. Appl. No. 13/288,065.

A letter sent to the President of the United States George W Bush, the President's Cabinet, the United States Senate and the Congressional Black Caucus, dated May 23, 2005; parent U.S. Appl. No. 13/288,065.

On Nov. 17, 2005, an "Inventor's Official Record of Invention", was filed in my name (Golden) at "The Law Office of David P. Gaudio, P.C.; the Inventors Network"; parent U.S. Appl. No. 13/288,065.

On Aug. 23, 2005, the "Disclosure Document Registration"; parent U.S. Appl. No. 13/288,065.

On Apr. 5, 2006, the "Patent Application" was filed in my name (Golden) at the United Staets Patent & Trademark Office in Washington, D.C.; parent U.S. Appl. No. 13/288,065.

On Jun. 6, 2008, the "Continuance-In-Part, (CIP) Application" was filed in my name (Golden) at the United States Patent & Trademark Office in Washington, D.C.; parent U.S. Appl. No. 13/288,065.

On Jan. 20, 2010, a "Continuation Application" (U.S. Appl. No. 12/657,356) was filed in my name (Golden) at the United States Patent & Trademark Office in Washington, D.C.; parent U.S. Appl. No. 13/288,065.

Reissue of U.S. Pat. No. 7,636,033; "Swear Back"; in accordance to Title 37—Code of Federal Regulations Patents, Trademarks, and Copyrights; Apr. 8, 2011; parent U.S. Appl. No. 13/288,065

Reissue of U.S. Pat. No. 7,636,033; "Swearback—History of Work"; Apr. 8, 2011; parent U.S. Appl. No. 13/288,065

United States Patent and Trademark Office; Office Action from U.S. 12/802,001; mailed Apr. 14, 2011; Alexandria, Virginia, USA; pp. 1-16; parent U.S. Appl. No. 13/288,065 (16 pages).

United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/802,001; mailed Oct. 20, 2011; Alexandria, Virginia, USA; pp. 1-5, parent U.S. Appl. No. 13/288,065 (5 pages).

**US 9,096,189 B2**

Page 3

(56)        **References Cited**

OTHER PUBLICATIONS

United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/802,001; mailed May 27, 2011; Alexandria, Virginia, USA; pp. 1-14; parent U.S. Appl. No. 13/288,065 (14 pages).

United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/802,001; copyright and mailing date Dec. 12, 2011, pp. 1-9, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 13/288,065 (9 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/065,837; copyright and mailing date Dec. 2, 2011, pp. 1-27, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 13/288.065 (27 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/065,837; copyright and mailing date Nov. 1, 2011, pp. 1-18, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 13/288,065 (18 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/199,853; copyright and mailing date Jan. 13, 2012, pp. 1-34, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 13/288,065 (34 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 12/802,001; copyright and mailing date Mar. 26, 2012, pp. 1-12, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 13/288,065 (12 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13 199,853; copyright and mailing date Feb. 22, 2012, pp. 1-38, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 13/288,065 (38 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/065,837; copyright and mailing date Feb. 22, 2012, pp. 1-25, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 13/288,065 (25 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/288,065; copyright and mailing date Aug. 24, 2012, pp. 1-4, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 13/288,065 (4 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/288,065; copyright and mailing date Nov. 28, 2012, pp. 1-11, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 13/288,065 (11 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/288,065; copyright and mailing date Apr. 16, 2013, pp. 1-9, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 13/288,065 (9 pages).

United States Department of Homeland Security; Petition for Inter Partes Review of U.S. Pat. No. Re. 43,990 Under 35 U.S.C. §312 and 37 C.F.R. §42.104; Case IP2014-00714 for U.S. Pat. No. Re. 43,990; Filed Apr. 30, 2014; Washington, D.C., USA; pp. 1-57; (57 pages).

United States Department of Homeland Security; Declaration of Dr. Sriram Vishwanath; Case IPR2014-00714 for U.S. Pat No. Re. 43,990; Filed Apr. 30, 2014; Washington, D.C., USA; pp. 1-44; (44 pages).

Richard R Brooks and S.S. Iyengar; Multi-Sensor Fusion Fundamentals and Applications with Software; published 1998; Copyright Prentice Hall PTR; Upper Saddle River, New Jersey, USA; pp. 1-20; (20 pages).

Ramanarayanan Viswanathan and Pramod K Varshney; Distributed Detection with Multiple Sensors; Part 1—Fundamentals; Proceedings of the IEEE; Jan. 1, 1997; pp. 1-11; vol. 85, No. 1; Southern Illinois University Carbondale OpenSIUC; Illinois, USA; pp. 1-11; (11 pages).

Blum; Distributed with Multiple Sensors: Part II—Advanced Topics; Proceedings of the IEEE; Jan. 1, 1997; pp. 1-16; vol. 85, No. 1; Southern Illinois University Carbondale Open SIUC; Illinois, USA, pp. 1-11; (16 pages).

Victor Lesser; Distributed Sensor Networks a Multiagent Perspective; 2003; pp. 1, 2, 5, 6, 22, 26, 27, 36, 275, 320; copyright 2003 Kluwer Academic Publishers: AH Dordrecht, The Netherlands; (10 pages).

Samuel Blackman and Robert Popoli; Design and Analysis of Modern Tracking Systems; 1999; pp. 1, 2, 6, 472; copyright 1999 Artech House; Norwood, Massachusetts, USA; (4 pages).

Jean-Francois Chamberland; Decentralized Detection in Sensor Networks; 2003; pp. 407-416; IEEE Transactions on SIgnal Processingl vol. 51, No. 2; Urbana, Illinois, USA; (10 pages).

Oleg Kachirski and Ratan Guha; Effective instrusion Detection Using Multiple Sensors in Wireless Ad Hoc Networks; pp. 1-8; Proceedings of the 36th Hawaii International Conference on System Sciences; copyright 2003; Orlando, Florida, USA; (8 pages).

Lawrence A Klein; Sensor and Data Fusion a Tool for Information Assessment and Decision Making; 2004; pp. 1-4, 6, 81, 87-89; copyright 2004 The Society of Photo-Optical Instrumentation Engineers; Publisher is SPIE—the International Society for Optical Engineering; Bellingham, Washington, USA; (12 pages).

Dale Ferriere and Khrystyna Pysareva and Andrezej Rucinski; Using Technology to Bridge Maritime Security Gaps; Aug. 1, 2005; Sea Technology; pp. 1-6; copyright Compass Publications, Inc. Jan. 2009; Portsmouth, New Hampshire, USA; (6 pages).

Corie Lok; Cargo Security; MIT Technology Review; Jun. 2004; No. 107; pp. 74-75; publisher is Massachusetts Institute of Technology; Cambridge, Massachusetts, USA; (2 pages).

Thomas C Chen; RFID and Sensor-based Container Content Visibility and Seaport Monitoring system; Proceedings of SPIE, vol. 5778; pp. 151-159; Mar. 28, 2005; Publisher is SPIE—the International Society for Optical Engineering; Bellingham, Washington, USA; (10 pages).

United States Department of Homeland Security; The University of Texas at Austin College of Engineering Standard Resume of Sriram Vishwanath; Case IPR2014-00714 for U.S. Pat. No. Re. 43,990; Filed Apr. 30, 2014; Washington, D.C., USA; pp. 1-21; (21 pages).

* cited by examiner



**Fig. 1**

**Fig. 2**

SAppx881



**Fig. 3a**



**Fig. 3b**



**Fig. 4**



**Fig. 5**

SAppx883



Fig. 6

POWER SOURCE

Fig. 7

SAppx884



**Fig. 8**

SAppx885



**Fig. 9**

SAppx886



**Fig. 10**



**Fig. 11**



**Fig. 12**

**Fig. 13**



Fig. 14

Fig. 15

SAppx889



**Fig. 16**

SAppx890



Fig. 17

SAppx891



**Fig. 18**

SAppx892



**Fig. 19**

US 9,096,189 B2

1

## MULTI SENSOR DETECTION, STALL TO STOP AND LOCK DISABLING SYSTEM

This application is a continuation application and claims the filing date and benefit of U.S. patent application Ser. No. 13/288,065 titled "Multi Sensor Detection, Stall to Stop and Lock Disabling System" filed on Nov. 3, 2011 and that will issue on Sep. 10, 2013 as U.S. Pat. No. 8,531,280, the entire contents of which are incorporated by reference herein in their entirety for all purposes. U.S. patent application Ser. No. 13/288,065 that will issue as U.S. Pat. No. 8,531.280 is a divisional application and claims the filing date and benefit of U.S. patent application Ser. No. 12/802,001 titled "Multi Sensor Detection, Stall to Stop, and Lock Disabling System" filed on May 27, 2010, now U.S. Pat. No. 8,334,761, the entire contents and complete subject matter of which is are incorporated by reference herein in their entirety for all purposes. U.S. patent application Ser. No. 12/802,001 is a continuation application and claims the filing date and benefit of U.S. patent application Ser. No. 12/657,356 titled "Multi Sensor Detection, Stall to Stop and Lock Disabling System" filed on Jan. 20, 2010, now U.S. Pat. No. 8,106,752 and incorporates the entire contents and complete subject matter therein by reference in their entirety for all purposes. U.S. patent application Ser. No. 13/288,065 that will issues as U.S. Pat. No. 8,531.280 also claims the filing dates and benefit of and incorporates the entire contents of U.S. patent application Ser. No. 12/657,356, now U.S. Pat. No. 8,106,752 herein by reference for all purposes. The present application also claims the filing date and benefit of and incorporates the entire contents of U.S. patent application Ser. No. 12/802,001, now U.S. Pat. No. 8.334,761 by reference herein for all purposes. The present application also claims the filing date and benefit of and incorporates the entire contents of U.S. patent application Ser. No. 12/657,356, now U.S. Pat. No. 8,106,752 herein by reference for all purposes.

### FIELD OF THE INVENTION

The present invention pertains to anti-terrorist detection and prevention systems, and more particularly pertains to a disabling lock mechanism combined with a chemical/biological/radiological detection system for use with products grouped together by similar characteristics in order to prevent unauthorized entry, contamination and terrorist activity.

### BACKGROUND OF THE INVENTION

Terrorist activity is a continuous, daily, worldwide threat to the stability, prosperity, security and peace within nations and between and among nations. Its danger lies in its arbitrary destructiveness as much as in its unpredictability, and the constant threat of terrorist activity compels measures and actions that cause strain and contention in free, democratic societies as security concerns and civil liberty concerns must be balanced so that both public safety and civil liberties are maintained. Safety and security concerns can be addressed through numerous proactive steps and measures, many of which cause only minimal interference with and disruption of the daily routines of work, travel, commerce and entertainment. However, because modern industrial societies afford almost limitless places, locations, and opportunities for terrorist activities, no safety measure or security protocol will be foolproof, but many security measures, systems and protocols can be implemented that greatly minimize specific threats through fingerprint identification procedures, chemical, biological, and radiological hazard detections, bomb and

2

explosive detection, and controlling the access to everything from shipping containers to school lockers. Thus, the prior art discloses a wide range of security measures and systems.

For example, the Fishbine et al. patent (U.S. Pat. No. 4,792, 226) discloses an optical fingerprinting system that includes an optics/processor unit, a video monitor, a data terminal, and a printer for collecting and storing data characteristics of all ten individual fingerprints for printing demographic information and fingerprint images as desired on a standard booking or applicant card.

The Schiller patent (U.S. Pat. No. 4,544,267) discloses a finger identification unit that includes a fingerprint scanning apparatus using a collimated beam of light to interrogate the fingerprint of a finger placed against a platen so that successive scan positions produce signals containing fingerprint information.

The Fishbine et al. patent (U.S. Pat. No. 5,222,152) discloses a portable fingerprint scanning apparatus for optically scanning and recording fingerprint images and wirelessly transmitting such images to a mobile processing unit for verification and background checking.

The Lougheed et al. patent (U.S. Pat. No. 5,233,404) discloses an optical scanning apparatus that uses a linear charge coupled device (CCD) for recording the image of a fingerprint on the viewing surface.

The Groger et al. patent (U.S. Pat. No. 5,766,956) discloses a diode laser based sensor for undertaking optical, chemical, immunological or nucleic acid-based assay or other chemical analysis.

The Feldman patent (U.S. Pat. No. 5,938,706) discloses a multi element security system for preventing the unauthorized use of an automotive vehicle, and which includes numerous locking and control features interconnected to an onboard cpu.

The Bowker et al. patent (U.S. Pat. No. 5,963,657) discloses a safety access control for doors, handles, locks, etc., wherein the surface relief of a finger is read and verified to either allow or prevent access by the individual to the door, handle, lock, etc.

The Bonder et al. patent (U.S. Pat. No. 6,078,265) discloses a fingerprint identification security system wherein a key lock operated security system utilizes the fingerprint of the individual to control user access to the security system, such as the ignition system of an automotive vehicle.

The Anzai et al. patent (U.S. Pat. No. 6,271,745 B1) discloses a keyless authorization system for use of a motor vehicle that includes fingerprint reading units located on the exterior or interior of the motor vehicle and which is coupled to a control unit for scanning, comparing and matching fingerprints to allow or disallow access to the motor vehicle.

The Hwang patent (U.S. Pat. No. 6,374,652 B1) discloses a fingerprint-activated doorknob in which a detecting sensor for a fingerprint is placed on the doorknob for measuring and searching the fingerprint against previously stored fingerprint inputs to control access to the door.

The Vor Keller et al. patent (U.S. Pat. No. 6,588,635 B2) discloses a safety holster for a firearm that includes a pivotally mounted retaining member and a fingerprint sensor for scanning fingerprint information so that only authorized users can withdraw the firearm from the holster.

The Cordery et al. patent (U.S. Pat. No. 6,613,571 B2) discloses a method and system for detecting biological and chemical hazards in the mail that includes sensors placed within the mail box for sampling and testing ambient air and so that mail can be safely transported through the mail system.

US 9,096,189 B2

<table>
<tr><td>3</td><td>4</td></tr>
</table>

The Nagata patent (U.S. Pat. No. 6,628,213 B2) discloses a coding method for digital signal coding and decoding that includes a CMI (code-marked inversion) method of signal coding.

Nonetheless, despite the ingenuity of the above devices, methods, and systems, there remains a need for a multi-detector and disabling lock system for use with various types of products collected together by common characteristics into product groupings for detecting chemical, biological and radiological agents and compounds and for selectively disabling and activating the product locks thereby preventing unauthorized entry and further contamination and preventing and thwarting terrorist activities.

## SUMMARY OF THE INVENTION

The present invention comprehends a chemical/biological/radiological detector unit with a disabling locking system for protecting products that can be grouped into several product groupings, from terrorist activity, and also for preventing unauthorized access to and tampering with the storage and transport of ordnance and weapons. The products grouped into what may be referred to as Product grouping 1 include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes and lockers; while the products grouped into what may be referred to as Product grouping 2 include, but are not limited to, chemical, biological, radiological, and nuclear detectors, motion sensors and door sensors. The multi sensor detection system includes the capability to disable an existing lock or activate a lock located inside any of the products named in the product grouping categories upon activation of a sensor or detector included in the system. This is a significant feature for the multi sensor detection system as it prevents unauthorized, unequipped and untrained entry and access to the product thus preventing further contamination of the site and to individuals in the area.

The multi sensor detection and lock disabling system includes a detector case sized to fit in, upon or adjacent any of the aforedescribed products for detecting harmful and dangerous chemical, biological, and radiological agents, compounds and elements. In addition, the multi sensor detection and lock disabling system is capable of transmitting a signal to lock or disable a lock on the product, and is also capable of transmitting signals to a monitoring computer terminal or PC so that appropriate defensive and safeguarding actions can be undertaken and an authorized individual can disarm and reset the locking system and the multi sensor detection system. The detector case includes a power source (battery or electrical), interior compartments, Internet and GPS connections and a cpu interconnected with the Internet and GPS connections, and also interconnected with one or more off site monitoring computer terminals or PCs. The detector case includes one or more light alarm indicators that are externally visible and that light up when the chemical, biological, or radiological agent or compound is detected, and the light alarm indicators (which can be indicator lights or panels on the front of the detector case) can be color coded for denoting the specific agent or compound detected, i.e., separate and distinct colors for indicating detection of the chemical, biological, or radiological agent or compound.

The detector case is designed to hold within the interior compartments one or more interchangeable detectors, and each detector is adapted and set up to sample a specific compound or agent. Each detector includes a sound alarm, a sensor, a light alarm, and a readings panel, and is electrically interconnected (either by wire or wirelessly) to the cpu of the detector case so that information regarding the detection of

the particular agent or compound can be conveyed from the detectors to the detector case cpu. Each detector can also be used as a manual, stand-alone hand held scanner.

The multi sensor detection and lock disabling system can be interconnected to a surveillance watchtower, as well as monitoring computer terminals or PCs, with the watchtower scanning shipping and cargo crates and containers being prepared for shipment or sitting for extended periods of time on a dock or at a port, at a railway site, or at an industrial storage facility. The watchtower will scan the cargo and shipping crates and containers for the light alarm indicators on detector cases that are mounted in or upon the crates and containers, and thus continuous security surveillance of the crates and containers can be maintained.

An enhanced version of the multi sensor detection and lock disabling system can be employed to prevent car and vehicle bombings. Coupling the multi sensor detection and lock disabling system with satellite service will enable the detection system to detect explosives and transmit an alert signal by satellite to monitoring equipment at a monitoring site. Upon receiving the alert signal at the monitoring site the monitoring equipment activates a stall-to-stop process for disabling the air, fuel, electrical and/or computer system of the vehicle. Moreover, upon receiving the alert signal at the monitoring site the car or vehicle will be locked by transmission of a satellite signal that disables the vehicle's electrical and ignition system thereby preventing escape of the terrorist.

It is an objective of the present invention to provide a multi sensor detection and disabling lock system for securing news racks and vending machines in order to prevent theft, unauthorized use and terrorist activity.

It is another objective of the present invention to provide a multi sensor detection and disabling lock system for preventing terrorist activity by using products grouped together by common features in several product groupings such as design similarity, similarity in the presentation of security problems and similarity with regard to the presentation of solutions to preventing terrorist solutions.

It is still yet another objective of the present invention to provide a multi sensor detection and disabling lock system that is capable of disabling an existing lock or activating a lock inside any of the products of the product grouping lists when a detector or sensor of the system is activated.

It is still yet a further objective of the present invention to provide a multi sensor detection and disabling lock system wherein the disabling lock system prevents the unauthorized entry, access and further contamination of the products included in the several product groupings.

A still further objective of the present invention is to provide a multi sensor detection and lock disabling system that utilizes a multi-task device for preventing terrorist activity to vulnerable products that are collected or arranged by product grouping categories.

Yet a further objective of the present invention is to provide a multi sensor detection and disabling lock system to secure cargos and containers, especially cargo and shipping containers, against chemical, biological, radiological and nuclear terrorist activity.

Still another objective of the present invention is to provide a multi sensor detection and disabling lock system capable of detecting chemical, biological and radiological agents and compounds.

Still yet another objective of the present invention is to provide a multi sensor detection and disabling lock system that includes interchangeable detectors that operate in conjunction to detect chemical, biological and radiological agents and compounds.

US 9,096,189 B2

5

6

Still yet a further objective of the present invention is to provide a multi sensor detection and disabling lock system that can be implemented by business or government at a minimum cost by organizing the products to be protected into product grouping categories.

Another objective of the present invention is to provide a multi sensor detection and disabling lock system that accurately and reliably detects harmful agents, compounds and elements, and prevents the placement and storage of weapons and bombs in the range of storage containers and facilities currently available.

Still another objective of the present invention is to provide a multi sensor detection and disabling lock system wherein the interchangeable detectors that comprise part of the system can be used as stand-alone scanners.

These and other objects, features, and advantages will become apparent to those skilled in the art upon a perusal of the following detailed description read in conjunction with the accompanying drawing figures and appended claims.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the primary features of the system which include a detector case, several interchangeable detectors, an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler;

FIG. 2 is a front elevation view of the multi sensor detection and lock disabling system of the present invention illustrating one of the interchangeable detectors first shown in FIG. 1;

FIG. 3a is a top plan view of the multi sensor detection and lock disabling system of the present invention illustrating the mounting of one lock disabler to the lock of a product, such as a container, and disengaged from the lock of the container;

FIG. 3b is a top plan view of the multi sensor detection and lock disabling system of the present invention illustrating the engagement of the lock disabler to the lock of the product for locking or disabling the lock of the product so that unauthorized access is prevented;

FIG. 4 is a side elevation view of the multi sensor detection and lock disabling system of the present invention illustrating the detector case mounted to the product, such as the container, with the light alarm indicators externally visible;

FIG. 5 is a schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the interconnection of detector cases with a surveillance watchtower and a monitoring PC terminal;

FIG. 6 is a schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the placement of detector cases upon containers different from the containers of FIG. 5, and wherein the detectors case are interconnected to a surveillance watchtower and a monitoring PC terminal;

FIG. 7 is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the mounting of one automatic/mechanical lock disabler to the lock of a standalone news rack;

FIG. 8 is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating one interchangeable detector placed within the standalone news rack;

FIG. 9 is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the detector case having color coded front panels for specifically indicating the agents, compounds or elements that have been detected;

FIG. 10 is a rear elevation view of the multi sensor detection and lock disabling system of the present invention illustrating the GPS, Internet and power source connections;

FIG. 11 is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the interconnection of the detector with the detector case and the steps undertaken by the system when an agent or compound is detected;

FIG. 12 is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the sequence of steps undertaken by one detector when functioning as a standalone scanner for detecting an agent or compound;

FIG. 13 is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the interconnection of the detector case with the automatic/mechanical lock disabler for activating the lock disabler upon detection by the system of an agent or compound;

FIG. 14 is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating interconnection of the detector case with the fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock as part of the process of detection and safeguarding the public upon detection of the agent or compound;

FIG. 15 is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the incorporation of the system with a surveillance watchtower and a monitoring PC or computer terminal for monitoring containers, such as shipping or cargo containers, that may sit for extended time periods on docks, at rail yards, and at industrial storage facilities;

FIG. 16 is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the integration of the detection system with a satellite and monitoring equipment at a monitoring site for detecting explosives placed in a vehicle and then transmitting signals to the satellite and then to the monitoring site for disabling and locking the vehicle;

FIG. 17 is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the incorporation of the features and elements of the detector case to a cell phone and cell phone case;

FIG. 18 is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the incorporation of a GPS satellite, a monitoring site and a cell phone tower for communicating to and with an electronic device such as a laptop computer or a cell phone for transmitting signals to a vehicle for activating an onboard stall-to-stop device for bringing the vehicle to a halt; and

FIG. 19 is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the use of a GPS satellite in conjunction with the monitoring site and monitoring equipment to relay commands and signals to the cpu or transceiver of the vehicle for stopping or locking the vehicle in response to a signal that a certain type of event (detection of a bomb, engine failure or malfunction or unauthorized use) has occurred or is in process

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

Illustrated in FIGS. 1-19 is a multi sensor detection and lock disabling system 10 for preventing terrorist activity by monitoring, detecting, and securing those critical areas, sites, and facilities vulnerable to terrorist activity. The first step is

US 9,096,189 B2

7

the identification of critical areas, sites, locations and facilities that are vulnerable to terrorist activity as convenient places to store and plant explosives and bombs and spread biological, chemical or radiological agents and compounds, followed by the disposition of the multi sensor detection and lock disabling system 10 for monitoring, detecting, and securing the particular location or site. Vulnerable sites, locations, facilities and areas are nearly limitless in their variety; in order to categorize the protection the present invention provides an anti-terrorist product grouping strategy has been developed wherein products made from the same or similar material, products having the same or similar design, and products presenting the same or similar security problems are grouped together with the multi sensor detection and lock disabling system 10 for preventing terrorist activity. For example, two preferred product groupings can be Product Grouping I: cargo containers, shipping containers, cargo planes, freight train cars, tractor trailers, mail carriers (UPS, FedEx), airport lockers, news racks (coin and non-coin operated), mail drop boxes, cluster mail boxes, keyed mail lockers, min-storage houses and buildings, bicycle lockers, stadium lockers, school lockers, cars, trucks, campers, buses, vans and utility vehicles. Product Grouping II: chemical detectors, biological detectors, radiological detectors, nuclear detectors, motion sensors, glass break sensors, plastic film on glass, high security locks, tampering labels, door sensors, disabling locking systems, vehicle detectors and satellite disabling locking systems. In addition to grouping products together by features, designs and materials, the multi sensor detection system 10 includes a lock disabling capability for disabling an existing lock or activating a lock on or inside any of the aforementioned products when a detector or sensor of the system is activated. The lock disabling feature is a crucial component of the invention in so far as it prevents unauthorized, unequipped or untrained individuals from gaining access and entry to the site and causing further contamination of the site.

As shown in FIGS. 1-10, the multi sensor detection and lock disabling system 10 includes at least one—and preferably many—detector case 12 that can be placed in, on, upon or adjacent the product, such as the shipping containers 14 of FIGS. 4 and 5 resting upon a platform 16 or the cargo container 18 of FIG. 6 sitting upon a seaport dock or pier 20. The detector case 12 includes a top 22, a bottom 24, a pair of opposed sides 26 and a front side or panel 28 and an opposite rear or back side 30. The rear side 30 has connections or contacts that can include an Internet connection 32, a GPS connection 34 and a power connection 36 for a power source. The power source for the detector system 10 can be any conventional battery or electrical source. The detector case 12 includes an interior chamber divided into a number of compartments 38 for holding therein agent or compound detection means hereinafter further described. A cpu 40 is mounted within the detector case 12 and electrically interconnects, routes, and transmits signals among items hereinafter further described and also communicates with a monitoring site and monitoring equipment. The front side 28 of the detector case 12 includes indicator means for visually indicating that a specific agent, compound or element has been detected. The indicator means can include color coded indicator lights 42 in panel form, as shown in FIG. 9, with each indicator light panel 42 lighting up with a specific color corresponding to the detection of a specific agent or compound; or color coded indicator lights 44, as shown FIG. 1, that correspond to and individually light up on the detection of a specific agent or compound (chemical, biological, or radiological).

8

As shown in FIGS. 1, 2 and 9-13, the multi sensor detection and lock disabling system 10 includes a plurality of detectors 46 with each detector 46 adapted for and set up to sample for a specific agent or compound (biological, chemical, or radiological); and the detectors 46 are interchangeable for adapting to the needs and demands of future technology. The detectors 46 can also be used as standalone scanners. In the preferred embodiment of the invention, at least three detectors 46 are placed within the detector case 12 with one detector 46 for specifically sampling biological agents or compounds, one detector 46 for sampling chemical agents or compounds, and one detector 46 for sampling radiological agents or compounds. The detectors 46 are interconnected to the cpu 40 of the detection system 10 by conventional connections that can be wire or wireless for transmitting the appropriate signals to the cpu 40 upon detection of the particular agent or compound. As shown in FIG. 2, each detector 46 includes on its front plate or facing surface a sound alarm indicator 48, a readings panel 50 comprising a plastic shield and LED lights for displaying the various read-out messages, a sensor 52 for detecting the specific agent, element or compound, and a light alarm indicator 54 that can be color coded for each specific agent and which is externally visible when the detector 46 is used as a stand alone scanner. Each detector 46 includes a conventional microprocessor for controlling the various functions and generating the appropriate signals for transmission to the cpu 40 of the detector case 12.

As shown in FIGS. 1, 3a, 3b. 9, and 13-15, used in conjunction with the multi sensor detection and lock disabling system 10 is at least one automatic/mechanical lock disabler 56—and depending upon the number of products being monitored there can be one lock disabler 56 for each product. The automatic/mechanical lock disabler 56 is physically connected to the detector case 12 by a wire or cable 58 for receiving signals therefrom for disabling an existing lock or activating a lock inside a product to prevent access to the product. By way of example, FIG. 3a shows the automatic/mechanical lock disabler 56 mounted—by any conventional means—to the lock 60 of the shipping container 14 shown in FIGS. 4 and 5 and connected by wire 58 to the cpu 40 of the detector case 12. The lock disabler 56 is in the non-activated or disengaged state in FIG. 3a. FIG. 3b shows the automatic/mechanical lock disabler 56 mounted to the lock 60 of the shipping container 14 and in the activated or engaged state after detection of an agent or compound by the system 10 thereby for locking or disabling the lock 60 of the shipping container 14 and preventing unauthorized entry and access by unauthorized, untrained and unequipped individuals. In FIGS. 3a and 3b the lock 60 secures doors of the shipping container 14 that can be slidably or pivotably opened and closed.

In addition to the automatic/mechanical lock disabler 56, the multi sensor detection and lock disabling system 10 can also utilize a fingerprint biometric lock with disabler 62 as shown in FIGS. 1 and 14. The fingerprint biometric lock with disabler 62 is interconnected to the cpu 40 of the detector case 12 for receiving transmissions therefrom after detection of an agent or compound has occurred so that the lock on the product can be locked or disabled. Moreover, resetting of the fingerprint biometric lock with disabler 62 occurs when the fingerprint of the individual is placed on the fingerprint-matching pad 64, and if a match occurs with a known fingerprint stored by the cpu 40, then the individual can reset the fingerprint biometric lock with disabler 56 by turning the manual lock disabler 66. The fingerprint biometric lock with disabler 62 is mounted to the lock of the product in a manner

US 9,096,189 B2

9

similar to the mounting of the automatic/mechanical lock disabler 56 that is shown in FIGS. 3 and 3b.

FIGS. 4 and 5 show one manner of disposition or placement of the detector case 12 in relation to the product, i.e., the shipping container 14, with the color coded indicator lights 42 externally viewable; FIG. 5 shows a number of shipping containers 14 each equipped with a detector case 12 and integrated with elements hereinafter further described for continuously monitoring the shipping containers 14 as they sit for an extended period of time on the truck or rail platform 16. FIG. 6 illustrates several cargo containers 18 sitting on the shipping dock or pier 20, with each cargo container 18 having a detector case 12 mounted thereon and integrated with and monitored by elements shown in FIG. 5 and hereinafter further described.

FIG. 7 illustrates a typical product from product grouping 1 that is monitored by the multi sensor detection and lock disabling system 10 of the present invention; specifically, FIG. 7 shows a news rack 68 with one automatic/mechanical lock disabler 56 mounted to and interconnected with the locking mechanism of the news rack 68. As long as there is no detection of any agent or compound, the lock disabler 56 is in the disengaged position, and the individual can deposit the coin amount in the chute and then freely open the glass panel 70 by the handle 72 for removing a paper. However, the lock disabler 56 would be activated upon detection of the harmful agent or compound and receipt of a signal from the cpu 40 for locking or disabling the locking mechanism thereby denying access to the interior of the news rack 68 from all untrained, unauthorized and unequipped individuals.

FIG. 8 illustrates one detector 46 disposed within the news rack 68 and which is visible through the panel 70 for detecting one specific agent, compound or element. The detector 46 functions as a stand-alone scanner and can be wirelessly interconnected to offsite monitoring equipment.

FIG. 11 illustrates a representative schematic 74 for describing the signal transmission process from the detector 46 to the cpu 40 of the detector case 12. The external stimulus 76 would be the chemical, biological or radiological agent or compound. If there is no detection of the agent or compound, the detector 46 will stay in the sensing mode 78. However, detection of the specific agent will trigger the sound alarm 80 and the light alarm 82, and instant transmittal of a signal to the cpu 40. The readings 84 can be stored by the cpu 40 for verification and future review and evaluation. After all the appropriate corrective and preventative measures have been undertaken by the trained and authorized personal, and the site has been cleansed of the contamination, authorized and equipped personal can then reset 86 the system 10.

FIG. 12 illustrates a representative schematic 88 for the detector 46 when used as stand-alone scanner. The detector 46 undergoes the same essential steps as illustrated in FIG. 11, with the exception of the signal transmission to the cpu 40. The detector 46 remains in detection mode 78 until an agent is detected, and then the various functions—light alarm 82, sound alarm 80, storage of readings 84, and, after the appropriate security and safety steps have been carried out by authorized personal, detector reset 90 by authorized personal can occur thereby placing the detector 46 back in detection or sensing mode 78.

FIG. 13 is a representative schematic 92 that illustrates the steps undertaken by the system 10 to lock or disable a lock, such as the lock 60 for the shipping container 14 shown in FIGS. 3a and 3b. Upon detection of the agent (chemical, biological, radiological) the alarm light indicators 42 or 44 will light up providing external indication that an agent has been detected. In addition, the system 10—the cpu 40—will

10

transmit a lock/disable lock signal 94 to the automatic/mechanical lock disabler 56 to lock or disable the lock on the product, such as the lock 60 on the shipping container 14 of FIGS. 3a-5. This prevents unauthorized, unequipped, or untrained individuals from entering or gaining access to the product for which a dangerous and perhaps lethal agent has been detected. After the proper authorities and authorized personal have been notified and all the appropriate security, preventative and clean up measures have been undertaken, the authorized individual can perform the disarm and reset function 96 for the system 10 placing the system 10 in back in the detection mode 98.

FIG. 14 is a representative schematic 100 illustrating the use of the fingerprint biometric lock with disabler 62 with the system 10. Upon detection of the agent or compound by the detector, the various alarms would sound and light up (shown in previous figures), and the cpu 40 would then transmit a signal to the fingerprint biometric lock with disabler 62 to lock or disable the lock on the product, such as the lock 60 on the shipping containers 14 shown in FIGS. 3a-5. The shipping containers 60 would remain locked and in an access denied mode 101 should an attempt be made to gain access to the container 60 by opening the lock 60 with an unauthorized fingerprint. However, a fingerprint that matches stored and authorized fingerprints 102 would indicate an authorized individual, and would allow the individual to disable and disarm 104 the lock 60 of the shipping container 14. The fingerprint biometric lock with disabler 62 would then be reset 106 after the appropriate safety, cleanup, and protection measures are completed, and the system 10 would be reset and placed back in the detection mode 108.

FIG. 15 is a schematic representation 110 that illustrates the integration of a surveillance watchtower 112 and a monitoring terminal or PC 114 for monitoring products such as the shipping containers 14 or cargo containers 16 that sit for extended periods of time of docks, piers 20, truck terminals, mil yards, shipping platforms 16 and industrial sites as shown in FIGS. 5 and 6. The watchtower 112 would maintain continuous surveillance over a number of shipping containers 60, for example, with detector cases 12 mounted in or on each container 14 and set in detection mode 116 with one or more detectors 46 disposed in each detector case 12. The watchtower 112 would continuously scan for light alarm indicators 42 and 44 on the products, such as the containers 14 or 18, and the watchtower 112 would be interconnected and integrated with the monitoring terminal or PC 114. Upon detection 118 of an agent or compound in one or more of the shipping containers 14, the appropriate light alarm indicators 42 or 44 would light providing visible confirmation of the detection of the specific agent or compound. The cpu 40 would transmit a lock/disable signal 120 to the lock 60 on each respective shipping container 14 to lock or disable the lock 60 thus preventing access to that respective shipping container 14. In addition, signal transmissions would be sent to the monitoring terminal or PC 114 (which could be off site) thereby alerting authorized security personal of the contamination event. With the information received at the monitoring terminal 114, authorized personal would then be notified and dispatched to the area to undertake the appropriate safety and cleanup measures 122. Such measures would also include disarming the lock disabling system in order to gain access to the shipping container 14. After all the cleanup and security measures are completed by the trained and properly equipped authorities, the detection system and the lock disabling feature would reset 124 and the detection system would again be placed in detection mode 116.

US 9,096,189 B2

11

FIG. 16 is a schematic representation **126** that illustrates an enhanced version of the multi sensor detection and lock disabling system **10** for preventing car and vehicle attacks and bombings. The lock disabling system **10** would be interconnected to the locking system and mechanism **128** of the vehicle **130**. In addition, a stall to stop disabling link **132** can be made with the fuel, air, and electrical system **134** of the vehicle **130**. The enhanced version incorporates a satellite **136** for signal receipt and transmission from the vehicle **130** in which the detector system **10** is placed to a monitoring site and monitoring equipment **138**. As shown in FIG. 16, a detection signal **140** would be sent to the satellite **136** by the detection system **10** upon detection of a bomb or explosive **142** hidden in the vehicle **130**. The satellite **136** would then transmit an alert signal **144** to the monitoring site **138** with the signal **144** containing the relevant data to evaluate the nature of the threat. The monitoring site **138** would then transmit a stall to stop signal **146** to the detection system **10** to lock the vehicle **130** and/or disable the electrical system of the vehicle **130** thereby disabling the vehicle **130**, preventing access to the vehicle **130** by locking the vehicle **130**, and preventing any terrorist in the vehicle **130** from escaping.

The detector case **12** can be modified and adapted for inclusion with cell phone cases, satellite cell phone cases, laptop cases, notebook PC cases, PDA cases, carry-on cases, suitcases, and briefcases. In addition, the basic monitoring terminal or PC **114**. as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring.

The system **10** and the watchtower **112**, along with the satellite **136** and the monitoring site **138** can be adapted or incorporated with cell phone towers and satellites for use with satellite communication and/or a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu **40**, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween. The aforementioned telecommunication and radio communication means can be interactive with any type of motive vehicle that includes but is not limited to cars, trucks, vans, SUVs, trains, subways, boats, ships and airplanes, and which is reported stolen, experiences a loss of brakes, or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted to the vehicle and which detection causes an automatic signal transmission or a signal transmission is activated when a call is made to the monitoring station by an authorized person. The authorized individual includes but is not limited to the owner, pilot, conductor, captain, police highway patrol, security guard and military personnel to the monitoring equipment for activating a vehicle slowdown or stall-to-stop disabling system that similar to the disabling system **126** shown in FIG. 16, or incorporating features of the system **126** shown in FIG. 16, from the monitoring equipment to the vehicle. The activation of the stall-to-stop disabling means or the vehicle slowdown disables or engages the computer, electrical, fuel and air systems of the vehicle or a combination of the computer, electrical, fuel and air systems that include but are not limited to the brakes, foot peddle, lights, speed controls, ignition, steering, transmission, and the horsepower of the motor.

In addition, the basic stall-to-stop disabling means or the vehicle slowdown means and device can be adapted, modified or designed to include: an open bust or open platform for integrating any new and innovative technology; warning lights indicators; sound alarm indicators; voice alarm indica-

12

tors; a cell phone to transmit to the vehicle a signal for slowing and halting the vehicle; and a lock disabling system or means to lock a thief or terrorist inside the vehicle after a transmission is received or sent. Open bust or open platform also refers to the compatibility of the detector case **12**, or the incorporation of its features in cell phone cases, satellite cell phone cases, laptop cases, notebook PC cases, PDA cases, carry-on cases, briefcases, and suitcases, etc., with other communication, transmission and surveillance systems whereupon the detector case **12**, and its features, can be seamlessly integrated with other new and emerging systems and technologies.

Thus, as shown more specifically in FIG. 17, by way of a representative example the features and elements of the detector case **12** are shown as being incorporated into cell phone detector case **150** and associated cell phone monitor **152**. The cell phone monitor **152** includes the standard keypad functions **154** and more specialized system use (ring tone, email, photos, texting) functions **156** as well as a viewing screen **158**. The cell phone detector case **150** includes a recharging cradle or seat **160**, a front side **162**, a top **164**, a bottom **166**, and a pair of opposed sides **168**. At the back of the cell phone detector case **150** are connections, contacts, and ports for at least an Internet connection **170**, a GPS connection **172**, and a contact, plug, or port for a power source **174**. The power source for the cell phone detector case **150** can be any conventional rechargeable battery source or standard electrical power from a standard electrical receptacle or outlet.

As shown in FIG. 17, the cell phone detector case **150** includes one or more sensor/detector units, cells, or components **176** built into and incorporated into the case **150**. The detector **176** includes generally disposed at the front **162** of the case **150** the following types of indicators: a sound alarm indicator **178**, a readings panel **180**, a sensor **182** for detecting one or more specific types of agents, elements, chemicals, compounds, etc., and a light alarm indicator **184**. The sensor/detector **176** will be interconnected to the power source **174**. In addition, mounted on and externally visible on the sides **168** or front **162** of the case **150** are a plurality of color coded indicator lights **186** with each light **186** corresponding to a specific agent, element, chemical, compound, etc., and lighting up when that agent is detected by the sensor/detector **176**. The color coded indicator lights **186** will be electrically interconnected to the sensor/detectors **176** via any standard microprocessor. The cell phone detector case **150** and cell phone monitor **152** thus comprise a hand-held, easily portable and transportable detection means that is both effective and unobtrusive in its disposition and use.

FIGS. 18 and 19 illustrate representative examples of the integration of portable electronic communication or telecommunication devices such as a cell phone **187a** and/or a laptop computer **187b** with the monitoring equipment **138** located at a predesignated monitoring site **188**, and operating in conjunction with either a satellite and/or a cell phone tower **190** to transmit and receive signals and commands among each other and to a vehicle **192**, such as a truck, as part of a stall-to-stop disabling system for slowing and stopping the vehicle **192** and locking a thief, terrorist, or unauthorized individual in the vehicle **192** if needed. A wide range of events can trigger and initiate the stall-to-stop system and the locking or lock disabling system and mechanism, and the event doesn't have to be limited to the detection of a bomb or a chemical, biological, or radiological agent, element, or compound. The events can include, but is not limited to, detection of an engine problem to engine failure to the unauthorized use (stealing) of the vehicle **192**. The vehicle **192** includes an electromotive system **194** that comprises, among other com-

SAppx899

US 9,096,189 B2

13                                                14

ponents, an onboard computer(s), electrical, fuel and air systems, as well as brakes, ignition, steering, and transmission. Also integrated with and capable of communicating with the vehicle's 192 electromotive system 194 is a stall-to-stop system while a lock disabling mechanism 196 is able to engage and disengage or disable the vehicle's 192 locking mechanism 198 upon receipt of the appropriate commands via a lock disabling communication channel or link 200. This link 200 can also accommodate the stall-to-stop system commands and signals, and thus is a multi-channel communication link. A CPU or a transceiver 202 is programmed to receive signals from the cell phone tower 190 and/or to a GPS satellite 204 and is interconnected with the stall-to-stop system and the lock disabling system 196 via link 200 for engaging the electromotive system 194 and actuating the lock disabling system 196 to stop the vehicle 192 and lock inside the vehicle 192 anyone such as a thief, terrorist or other unauthorized individual.

A representative example for stopping, disabling, and locking the vehicle 192 that utilizes the cell phone tower 190 wherein the activation and/or distress signal 206 originates from the cell phone 187a or the laptop 187b and such activation signal 206 travels to the cell phone tower 190 that is nearest the current location of the vehicle 192. A signal 208 is then transmitted to the monitoring site 188 and specific monitoring equipment 138 that can also include but is not limited to cell phones, laptops, desktop PC's, notebook PC's and LCD monitors. The monitoring site 138 then communicates by signal 210 to the GPS satellite 204 that an original or activation signal has been received and then the GPS satellite 204 locates and communicates by multiplex signal 212 with the CPU or transceiver 202 on the vehicle 192 and exchanges information on the type of problem, situation, location, and vehicle speed. The monitoring equipment 138 then transmits a signal 214 to the cell phone tower 190 that communicates with the transceiver 202 and/or CPU of the vehicle 192 to initiate or execute any commands that will actuate the stall-to-stop disabling link 200 and lock disabling system 196 for bringing the vehicle 192 to a halt and actuating the vehicle's 192 locking mechanism 198 for locking the thief, terrorist, or other unauthorized person inside the vehicle 192 if needed.

FIG. 19 illustrates a representative example wherein the stall-to-stop system and the lock disabling system 196 are utilized in conjunction with the GPS satellite 204. In FIG. 19 a signal has traveled to the satellites nearest the vehicle's 192 current location and then the signal 218 has traveled to the monitoring equipment 138 and monitoring site 188 which can include but is not limited to satellite cell phones, satellite monitors, cell phones, laptops, desktop PC's, notebook PC's, and LCD monitors. The OPS satellite 204 then locates and communicates with the CPU and/or transceiver 202 on the vehicle 192 via a multiplex (two-way) signal 220 in order to exchange information on such distress and danger event parameters as the specific problem situation, location, and vehicle speed. The monitoring equipment 138 then transmits a signal 222 back to the GPS satellite 204 that in turn communicates via another signal 224 with the CPU and/or transceiver 202 to execute any commands to the stall-to-stop system for executing the disengagement of the vehicle's 192 electromotive system 194 for bringing the vehicle 192 to a halt and for actuating the lock disabling system 196 to direct the lock disabling link 200 to actuate the locking mechanism 198 thereby locking the vehicle 192 and anyone inside the vehicle 192.

While the invention has been shown and described in a preferred embodiment, it will be apparent to those skilled in the art that numerous alterations, modifications, and variations will possible and practicable without departing from the spirit and scope of the invention as set forth by the appended claims.

The present invention comprehends a chemical/biological/radiological/nuclear/explosive/human/contraband detector unit with a disabling locking system for protecting products that can be grouped into several product groupings, from terrorist activity, and also for preventing unauthorized access to and tampering with the storage and transport of ordnance and weapons. The products grouped into what may be referred to as Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars, (UPS, FedEx), airport lockers, news racks (coin and non-coin operated), mail drop boxes, cluster mail boxes, keyed mail boxes, min-storage houses and buildings, bicycle lockers, stadium lockers, school lockers, cars, trucks, campers. buses, vans, UAVs, UGVs, and utility vehicles; the products grouped into what may be referred to as Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, door sensors, speed sensors, biometric sensors, glass break sensors, plastic film on glass, high security locks, tampering labels, door sensors, disabling locking systems, vehicle detectors and satellite disabling locking systems, detection of humans, detection of contraband, temperature, and shock levels; the products grouped into what may be referred to as Product grouping 3 (detector case) include (modified and adapted) include, but are not limited to, cell phone cases, satellite cell phone cases, laptop cases, notebook PC cases, PDA cases, carry-on cases, suitcases, eyeglass, briefcases, detector cases of locks, detector cases of tags, detector cases that is mounted to, detector cases that is affixed to, detector cases that is outside of, detector cases that is inside of, and detector cases that is adjacent to; the products grouped into what may be referred to as Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, web servers, desktop PCs, notebook PCs, laptops, satellite cell phones, cell phones, UMTS phones, PDAs, LCD monitors, and satellite monitoring, remote control key fobs, two-way communication key fobs, handhelds; the products grouped into what may be referred to as Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, Cellular, Satellite, Telematics, Wide Area Network (WAN), Wireless Wide Area Network (WWAN), Local Area Network (LAN), Radio Frequency (RF), Broadband Wireless Access (BWA), Global Positioning System (GPS), General Packet Radio Services (GPRS), Global System for Mobile (GSM), Wideband Code Division Multiple Access (W-CDMA), Universal Mobile Telecommunications System (UMTS), Short Message Service (SMS); the products grouped into what may be referred to as Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, hand geometry. retina scan, iris scan and signature. the products grouped into what may be referred to as Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, HAZMAT, CIA, FBI, Secret Service, port security personnel,

SAppx900

US 9,096,189 B2

| 15 | 16 |

border security personnel, first responders, monitoring sites and terminal personnel. The multi sensor detection system includes the capability to disable an existing lock or activate a lock located inside or outside any of the products named in the product grouping categories upon activation of a sensor or detector included in the system. This is a significant feature for the multi sensor detection system as it prevents unauthorized, unequipped and untrained entry and access to the product thus preventing further contamination of the site and to individuals in the area.

The invention claimed is:

1. A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, comprising:

at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or a front end processor for communication between a host computer and other devices;

a transmitter for transmitting signals and messages to at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device;

a receiver for receiving signals, data or messages from at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device;

at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short range radio frequency (RF) connection, or GPS connection;

the communication device is at least a fixed, portable or mobile communication device interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween; and

whereupon the communication device, is interconnected to a product equipped to receive signals from or send signals to lock or unlock doors, activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems;

wherein the communication device receives a signal via any of one or more products listed in any of the plurality of product grouping categories;

wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short range radio frequency (RF) connection is capable of signal communication with the transmitter and the receiver of the communication device and transceivers of the products;

wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature such that the communication device that is at least one of the cell phone, the smart phone, the desktop, the handheld, the PDA, the laptop or the computer terminal is locked by the biometric lock disabler to prevent unauthorized use;

wherein the only type or types of communication with the transmitter and the receiver of the communication

device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, and long and short range radio frequency (RF).

2. Monitoring equipment of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e. computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone) interconnected to a product for communication therebetween, comprising:

at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or a front end processor for communication between a host computer and other devices;

a transmitter for transmitting signals and messages to at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device;

a receiver for receiving signals, data or messages from at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device;

a lock disabling mechanism that is able to engage (lock) and disengage (unlock) and disable (make unavailable) a product's lock, wherein the lock disabling mechanism disables the product's lock after a specific number of tries by an unauthorized user to disengage the lock by maintaining the product's lock in the current state of the product's lock regardless of input entered to change the state of the product's lock by the unauthorized user;

at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short range radio frequency (RF) connection, or GPS connection;

monitoring equipment of at least a fixed, portable or mobile monitoring equipment interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween; and

whereupon the monitoring equipment, is interconnected to a product equipped to receive signals from or send signals to the lock disabling mechanism that is able to engage and disengage or disable the lock, activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems;

wherein the monitoring equipment is implemented by business or government at a minimum cost by products grouped together by common features in at least one of several product groupings of design similarity;

wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, or long and short range radio frequency (RF) connection is in signal communication with the transmitter and the receiver of the monitoring equipment and transceivers of the products.

3. Monitoring equipment of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e. computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone) interconnected to a product for communication therebetween, comprising:

US 9,096,189 B2

17

at least one of a central processing unit (CPU), a network processor, or a microprocessor for executing and carrying out the instructions of a computer program or application which is specifically targeted at the networking application domain, for communication between the monitoring equipment and any of a plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container device, or a locking device;

a transmitter for transmitting signals and messages to at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container device, or a locking device;

a receiver for receiving signals, data or messages from at least one of plurality of product groups based on the categories of a multi-sensor detection device, a maritime cargo container device or a locking device, wherein the signals, data or messages are of agents of an item of interest (IOI);

at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, or GPS connection;

the monitoring equipment is at least a fixed, portable or mobile monitoring equipment interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween; and

whereupon the monitoring equipment, is capable of the activation or deactivation of at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container device or a locking device;

wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, for signal communication with the transmitter and the receiver of the monitoring equipment and transceivers of the products;

at least one tag that is read by the monitoring equipment that is capable of wireless near-field communication to achieve detection of at least one of a chemical agent, a biological agent, a radiological agent, a nuclear agent, or an explosive agent which allows radio frequency (RF) data to be received and transferred between the tag and the monitoring equipment.

4. A built-in, embedded multi sensor detection system for monitoring products with a plurality of sensors detecting at least two agents selected from the group consisting of chemical, biological, radiological, explosive, human, and contraband agents;

comprising a built-in sensor array or fixed detection device into the product that detects agents by means of two or more sensors combined from the following list of sensors: a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, and a radiological sensor;

comprising a communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal for monitoring products, interconnected to a built-in sensor array or fixed detection device for communication therebetween,

wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature such that the communication device that is at least one of the cell phone, the smart phone, the desktop, the hand-

18

held, the PDA, the laptop or the computer terminal is locked by the biometric lock disabler to prevent unauthorized use;

wherein the built-in embedded multi sensor detection device receives a signal via any of one or more products listed in any of the plurality of product grouping categories; and

wherein, when an alarm occurs, the built-in, embedded multi sensor detection system communicates the alarm by way of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e. product-to-product, product-to-satellite, product-to-cellular, product-to-long or short range radio frequency, product-to-radio frequency (RF), product-to-internet, product-to-broadband, product-to-smartphone or cell phone, product-to-computer at monitoring site, product-to-WiFi, product-to-handheld, or product-to-laptop or desktop) for communication therebetween;

wherein the built-in embedded multi sensor detection device is implemented by business or government at a minimum cost by products grouped together by common features in at least one of several product groupings of design similarity.

5. A built-in multi sensor detection system for monitoring products with a plurality of sensors detecting at least two agents selected from the group consisting of chemical, biological, radiological, explosive, human, and contraband agents, comprising:

a built-in sensor array or fixed detection device into the product that detects agents by means of two or more sensors combined from the following list of sensors: a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, and a radiological sensor;

monitoring equipment of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e. computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone) for the receipt and transmission of signals therebetween;

wherein the built-in multi sensor detection device is built in any of one or more products listed in any of the plurality of product grouping categories to include but not limited to a maritime cargo container, a lock, or monitoring equipment (i.e., a computer terminal, personal computer (PC), a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop);

wherein the built-in multi sensor detection device is implemented by business or government at a minimum cost by products grouped together by common features in at least one of several product groupings of design similarity;

a light alarm indicator that has a plurality of colored lights that correspond to specific ones of the at least two agent;

wherein, when the light alarm indicator lights to indicate an alarm occurs, the built-in multi sensor detection system communicates the alarm by way of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e. product-to-product, product-to-satellite, product-to-cellular, product-to-radio frequency (RF), product-to-internet, product-to-broadband, product-to-smartphone or cell phone, product-to-computer at monitoring site, product-to-WiFi, product-to-handheld, or product-to-laptop or desktop) for the receipt and transmission of signals therebetween.

US 9,096,189 B2

19

20

6. A built-in multi sensor detection system for detecting at least two items selected from the group consisting of chemical agent, biological agent, radiological agent, explosive agent, human agent, contraband agent, motion, perimeter, temperature, tampering, theft, and breach, comprising:

a built-in sensor array or fixed detection device into a product that detects items by means of at least two sensors from the following list of sensors: a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, and a radiological sensor;

monitoring equipment of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e. computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone) for the receipt and transmission of signals therebetween;

wherein the built-in, multi sensor detection device is built in any of one or more products listed in any of the plurality of product grouping categories to include but not limited to a maritime cargo container, a lock, or monitoring equipment (i.e., a computer terminal, personal computer (PC), a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop);

wherein, when an alarm occurs, the built-in multi sensor detection system communicates the alarm by way of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e. product-to-product, product-to-satellite, product-to-cellular, product-to-radio frequency (RF), product-to-internet, product-to-broadband, product-to-smartphone or cell phone, product-to-computer at monitoring site, product-to-WiFi, product-to-handheld, or product-to-laptop or desktop) for the receipt and transmission of signals therebetween;

at least one tag that is read by the monitoring equipment that is capable of wireless near-field communication to achieve detection of at least one of the chemical agent, the biological agent, the radiological agent, the explosive agent, the human agent, the contraband agent, the motion, the perimeter, the temperature, the tampering, the theft, and the breach which allows radio frequency (RF) data to be received and transferred between the tag and the monitoring equipment.

7. A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, or radiological agents and compounds, comprising:

a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human or contraband agents and compounds and capable of being disposed within, on, upon or adjacent a multi sensor detection device;

monitoring equipment comprising at least one of plurality product groups based on the categories of a computer, laptop, notebook, PC, handheld, cell phone, PDA or smart phone for the receipt and transmission of signals therebetween;

at least one cell phone tower interconnected to the monitoring equipment for sending signals thereto and receiving signals therefrom or at least one satellite capable of transmitting signals to the monitoring equipment;

at least one satellite or at least one cell phone tower capable of signal communication between the multi sensor detection device and the monitoring equipment;

at least one internet connection capable of communication between the multi sensor detection device and the monitoring equipment;

whereupon a signal sent to a receiver of the multi sensor detection device from a satellite; or to a cell phone tower; or through short and/or long range radio frequency; causes a signal to be sent to the monitoring equipment that includes location data and sensor data;

wherein the monitoring equipment or multi sensor detection device receives a signal via any of one or more products listed in any of the plurality of product grouping categories;

wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short range radio frequency (RF) connection is capable of signal communication with the transmitter and the receiver of the monitoring equipment or multi sensor detection device and transceivers of the products;

wherein the monitoring equipment is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature such that the monitoring device that is at least one of the computer, the laptop, the notebook, the PC, the handheld, the cell phone, the PDA, or the smart phone is locked by the biometric lock disabler to prevent unauthorized use;

wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, and long and short range radio frequency (RF).

8. A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, or radiological agents and compounds, comprising:

a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human or contraband agents and compounds and capable of being disposed within, on, upon or adjacent a multi sensor detection device;

monitoring equipment of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e. computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone) for the receipt and transmission of signals therebetween, wherein the monitoring equipment is equipped with a lock disabling mechanism that is able to engage (lock) and disengage (unlock) and disable (to make unavailable) a product's lock, wherein the lock disabling mechanism disables the product's lock after a specific number of tries by an unauthorized user to disengage the lock by maintaining the product's lock in the current state of the product's lock regardless of input entered to change the state of the product's lock by the unauthorized user;

at least one cell phone tower interconnected to the monitoring equipment for sending signals thereto and receiving signals therefrom; or at least one satellite capable of transmitting signals to the monitoring equipment;

at least one satellite or at least one cell phone tower capable of signal communication between the multi sensor detection device and the monitoring equipment;

at least one internet connection capable of communication between the multi sensor detection device and the monitoring equipment; and

SAppx903

US 9,096,189 B2

21

whereupon a signal sent to a receiver of the multi sensor detection device from a satellite; or to a cell phone tower; or through short and/or long range radio frequency; causes a signal to be sent to the monitoring equipment that includes location data and sensor data;

wherein the multi sensor detection device is implemented by business or government at a minimum cost by products grouped together by common features in at least one of several product groupings of design similarity;

wherein the multi sensor detection device for any of one or more products listed in any of the plurality of product grouping categories to include but not limited to a maritime cargo container, a lock, or monitoring equipment (i.e., a computer terminal, personal computer (PC), a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop);

wherein at least one satellite connection. Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, or long and short range radio frequency (RF) connection is in signal communication with the transmitter and the receiver of the monitoring equipment or multi sensor detection device and transceivers of the products.

9. A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, or radiological agents and compounds, comprising:

a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human or contraband agents and compounds and capable of being disposed within, on, upon or adjacent a multi sensor detection device, wherein at least one of the sensors is capable of detecting agents of an item of interest (IOI);

monitoring equipment of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e. computer

22

terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone) for the receipt and transmission of signals therebetween;

at least one satellite or at least one cell phone tower capable of signal communication between the multi sensor detection device and the monitoring equipment;

at least one internet connection capable of communication between the multi sensor detection device and the monitoring equipment;

whereupon a signal sent to a receiver of the multi sensor detection device from a satellite; or from a cell phone tower; or through short and/or long range radio frequency; causes a signal to be sent to the monitoring equipment that includes location data and sensor data;

wherein the multi sensor detection device for any of one or more products listed in any of the plurality of product grouping categories to include but not limited to a maritime cargo container, a lock, or monitoring equipment (i.e., a computer terminal, personal computer (PC), a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop);

wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, or broadband connection, is in signal communication with the transmitter and the receiver of the monitoring equipment and transceivers of the products;

at least one tag that is read by the monitoring equipment that is capable of wireless near-field communication to achieve detection of at least one of the explosive agent, the nuclear agent, the contraband agent, the chemical agent, the biological agent, the human agent, or the radiological agent which allows radio frequency (RF) data to be received and transferred between the tag and the monitoring equipment.

\* \* \* \* \*

SAppx904



US009589439B2

(12) **United States Patent**
Golden

(10) Patent No.: **US 9,589,439 B2**
(45) Date of Patent: ***Mar. 7, 2017**

(54) **MULTI SENSOR DETECTION, STALL TO STOP AND LOCK DISABLING SYSTEM**

(71) Applicant: **Larry Golden**, Mauldin, SC (US)

(72) Inventor: **Larry Golden**, Mauldin, SC (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 81 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **14/806,988**

(22) Filed: **Jul. 23, 2015**

(65) **Prior Publication Data**

US 2016/0027273 A1    Jan. 28, 2016

**Related U.S. Application Data**

(60) Continuation of application No. 14/021,693, filed on Sep. 9, 2013, now Pat. No. 9,096,189, which is a (Continued)

(51) **Int. Cl.**
| | |
|---|---|
| *B60R 25/102* | (2013.01) |
| *G08B 13/24* | (2006.01) |
| *B60R 25/01* | (2013.01) |
| *B60R 25/04* | (2013.01) |
| *G07C 9/00* | (2006.01) |

(Continued)

(52) **U.S. Cl.**
CPC ........ *G08B 13/2491* (2013.01); *B60R 25/018* (2013.01); *B60R 25/04* (2013.01); *B60R 25/102* (2013.01); *G07C 9/00912* (2013.01); *G08B 15/00* (2013.01); *G08B 21/12* (2013.01);

(Continued)

(58) **Field of Classification Search**
CPC .... G08B 15/00; G08B 15/001; G08B 15/004;

G08B 25/009; B60R 25/102; B60R 25/01; B60R 25/018; B60R 25/04; B60R 25/0405; B60R 25/0415; B60R 25/10
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | |
|---|---|---|
| 4,385,469 A | 5/1983 | Scheuerpflug |
| 4,544,267 A | 10/1985 | Schiller |

(Continued)

OTHER PUBLICATIONS

United States Department of Homeland Security; Petition for Inter Partes Review of U.S. Pat. No. Re. 43,990 Under 35 U.S.C. §312 and 37 C.F.R. §42.104; Case IPR2014-00714 for U.S. Pat. No. Re. 43,990; Filed Apr. 30, 2014; Washington, D.C., USA; pp. 1-57; copy enclosed (57 pages)

(Continued)

*Primary Examiner* — Van Trieu

(57) **ABSTRACT**

A multi sensor detection and disabling lock system includes detector cases for holding interchangeable detectors that sample for chemical, biological and radiological compounds, agents and elements, with each detector case disposed in or upon the monitored product. The detector case transmits detection information to a monitoring computer terminal and transmits a signal to a lock disabler engaged to the product to lock or disable the product's lock thereby preventing untrained, unauthorized and unequipped individual's from gaining access and entry to the product, and also preventing further contamination of the area. The detection system can be interconnected to surveillance towers scanning detector cases disposed at seaport docks, freight depots and rail terminals for monitoring containers being prepared for shipment or sitting on docks for long periods of time.

**23 Claims, 13 Drawing Sheets**



**US 9,589,439 B2**

Page 2

### Related U.S. Application Data

continuation of application No. 13/288,065, filed on Nov. 3, 2011, now Pat. No. 8,531,280, which is a division of application No. 12/802,001, filed on May 27, 2010, now Pat. No. 8,334,761, which is a continuation of application No. 12/657,356, filed on Jan. 20, 2010, now Pat. No. 8,106,752, which is a continuation of application No. 12/155,573, filed on Jun. 6, 2008, now Pat. No. 7,636,033, which is a continuation-in-part of application No. 11/397,118, filed on Apr. 5, 2006, now Pat. No. 7,385,497.

(51) **Int. Cl.**

| | |
|---|---|
| *G08B 15/00* | (2006.01) |
| *G08B 21/12* | (2006.01) |

(52) **U.S. Cl.**

CPC ... *B60R 2325/205* (2013.01); *B60R 2325/304* (2013.01); *G07C 2009/0092* (2013.01)

(56) **References Cited**

#### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,586,441 | A | 5/1986 | Zekich |
| 4,792,226 | A | 12/1988 | Fishbine |
| 5,222,152 | A | 6/1993 | Fishbine |
| 5,223,844 | A | 6/1993 | Mansell et al. |
| 5,233,404 | A | 8/1993 | Lougheed |
| 5,557,254 | A | 9/1996 | Johnson |
| 5,682,133 | A | 10/1997 | Johnson |
| 5,766,956 | A | 6/1998 | Groger |
| 5,938,706 | A | 8/1999 | Feldman |
| 5,959,529 | A | 9/1999 | Kail, IV |
| 5,963,657 | A | 10/1999 | Bowker |
| 5,986,543 | A | 11/1999 | Johnson |
| 5,990,785 | A | 11/1999 | Suda |
| 6,049,269 | A | 4/2000 | Byrd |
| 6,078,265 | A | 6/2000 | Bonder |
| 6,262,656 | B1 | 7/2001 | Byrd |
| 6,271,745 | B1 | 8/2001 | Arizal |
| 6,374,652 | B1 | 4/2002 | Hwang |
| 6,411,887 | B1 | 6/2002 | Martens |
| 6,470,260 | B2 | 10/2002 | Martens |
| 6,542,076 | B1 | 4/2003 | Joao |
| 6,542,077 | B2 | 4/2003 | Joao |
| 6,588,635 | B2 | 7/2003 | Vor Keller |
| 6,610,977 | B2 | 8/2003 | Megerle |
| 6,613,571 | B2 | 9/2003 | Cordery |
| 6,628,813 | B2 | 9/2003 | Scott |
| 6,647,328 | B2 | 11/2003 | Walker |
| 6,738,697 | B2 | 5/2004 | Breed |
| 6,923,509 | B1 | 8/2005 | Barnett |
| 6,980,092 | B2 | 12/2005 | Turnbull |
| 6,988,026 | B2 | 1/2006 | Breed et al. |
| 7,005,982 | B1 | 2/2006 | Frank |
| 7,034,677 | B2 | 4/2006 | Steinthal et al. |
| 7,034,683 | B2 | 4/2006 | Ghazarian |
| 7,103,460 | B1 | 9/2006 | Breed |
| 7,109,859 | B2 | 9/2006 | Peeters |
| 7,116,798 | B1 | 10/2006 | Chawla |
| 7,148,484 | B2 | 12/2006 | Craig et al. |
| 7,164,117 | B2 | 1/2007 | Breed et al. |
| 7,171,312 | B2 | 1/2007 | Steinthal et al. |
| 7,243,945 | B2 | 7/2007 | Breed et al. |
| 7,339,469 | B2 | 3/2008 | Braun |
| 7,346,439 | B2 | 3/2008 | Bodin |
| 7,385,497 | B2 | 6/2008 | Golden |
| 7,397,363 | B2 | 7/2008 | Joao |
| 7,636,033 | B2 | 12/2009 | Golden |
| 7,647,180 | B2 | 1/2010 | Breed |
| 7,844,505 | B1 | 11/2010 | Arneson et al. |
| 7,868,912 | B2 | 1/2011 | Venetianer et al. |
| 7,872,575 | B2 | 1/2011 | Tabe |
| 7,880,767 | B2 | 2/2011 | Chinigo |
| 7,961,094 | B2 | 6/2011 | Breed |
| 8,274,377 | B2 | 9/2012 | Smith et al. |
| 8,531,521 | B2 | 9/2013 | Romanowich |
| 8,564,661 | B2 | 10/2013 | Lipton |
| 2002/0145666 | A1 | 10/2002 | Scaman |
| 2003/0063004 | A1 | 4/2003 | Anthony et al. |
| 2003/0137426 | A1 | 7/2003 | Anthony et al. |
| 2003/0206102 | A1 | 11/2003 | Joao |
| 2004/0107028 | A1 | 6/2004 | Catalano |
| 2004/0222092 | A1 | 11/2004 | Musho |
| 2005/0195069 | A1 | 9/2005 | Dunand |
| 2006/0164239 | A1 | 7/2006 | Loda |
| 2006/0176169 | A1 | 8/2006 | Doolin et al. |
| 2006/0181413 | A1 | 8/2006 | Mostov |
| 2006/0250235 | A1 | 11/2006 | Astrin |
| 2007/0171042 | A1 | 7/2007 | Metes et al. |
| 2008/0045156 | A1 | 2/2008 | Sakhpara |
| 2008/0122595 | A1 | 5/2008 | Yamamichi |
| 2008/0234907 | A1 | 9/2008 | Labuhn |
| 2010/0159983 | A1 | 6/2010 | Golden |
| 2011/0178655 | A1 | 7/2011 | Golden |

### OTHER PUBLICATIONS

United States Department of Homeland Security; Declaration of Dr. Sriram Vishwanath; Case 1PR2014-00714 for U.S. Pat. No. Re. 43,990; Filed Apr. 30, 2014; Washington, D.C., USA; pp. 1-44; copy enclosed (44 pages).

Richard R Brooks and S.S. Iyengar; Multi-Sensor Fusion Fundamentals and Applications with Software; published 1998; Copyright Prentice Hall PTR; Upper Saddle River, New Jersey, USA; pp. 1-20; copy enclosed (20 pages).

Ramanarayanan Viswanathan and Pramod K Varshney; Distributed Detection with Multiple Sensors: Part I—Fundamentals; Proceedings of the IEEE; Jan. 1, 1997; pp. 1-11; vol. 85; No. 1; Southern Illinois University Carbondale OpenSIUC, Illinois, USA; pp. 1-11; copy enclosed (11 pages).

Blum; Distributed Detection with Multiple Sensors: Part II—Advanced Topics; Proceedings of the IEEE; Jan. 1, 1997; pp. 1-16; vol. 85, No. 1; Southern Illinois University Carbondale OpenSIUC; Illinois, USA; pp. 1-11; copy enclosed (16 pages).

Victor Lesser; Distributed Sensor Networks a Multiagent Perspective; 2003; pp. 1, 2, 5, 6, 22, 26, 27, 36, 275, 320; copyright 2003 Kluwer Academic Publishers; AH Dordrecht, The Netherlands; copy enclosed (10 pages).

Samuel Blackman and Robert Popoli; Design and Analysis of Modern Tracking Systems; 1999; pp. 1, 2, 6, 472; copyright 1999 Artech House; Norwood, Massachusetts, USA; copy enclosed (4 pages).

Jean-Francois Chamberland; Decentralized Detection in Sensor Networks; 2003; pp. 407-416; IEEE Transactions on Signal Processing; vol. 51, No. 2; Urbana, Illinois, USA; copy enclosed (10 pages).

Oleg Kachirski and Ratan Guha; Effective Intrusion Detection Using Multiple Sensors in Wireless Ad Hoc Networks; pp. 1-8; Proceedings of the 36th Hawaii International Conference on System Sciences; copyright 2003; Orlando, Florida, USA; copy enclosed (8 pages).

Lawrence A Klein; Sensor and Data Fusion A Tool for Information Assessment and Decision Making; 2004; pp. 1-4, 6, 81, 87-89; copyright 2004 The Society of Photo-Optical Instrumentation Engineers; Publisher is SPIE—the International Society for Optical Engineering; Bellingham, Washington, USA; copy enclosed (12 pages).

Dale Ferriere and Khrystyna Pysareva and Andrzej Rucinski; Using Technology to Bridge Maritime Security Gaps; Aug. 1, 2005; Sea Technology; pp. 1-6; copyright Compass Publications, Inc. Jan. 2009; Portsmouth, New Hampshire, USA; copy enclosed (6 pages).

Corie Lok; Cargo Security; MIT Technology Review; Jun. 2004; No. 107; pp. 74-75; publisher is Massachusetts Institute of Technology; Cambridge, Massachusetts, USA; copy enclosed (2 pages).

Thomas J Chen; RFID and Sensor-based Container Content Visibility and Seaport Security Monitoring system; Proceedings of SPIE, vol. 5778; pp. 151-159; Mar. 28, 2005; Publisher is SPIE—

## US 9,589,439 B2
Page 3

(56)                    **References Cited**

OTHER PUBLICATIONS

the International Society for Optical Engineering; Bellingham, Washington, USA; copy enclosed (10 pages).

United States Department of Homeland Security; The University of Texas at Austin College of Engineering Standard Resume of Sriram Vishwanath; Case IPR2014-00714 for U.S. Pat. No. Re. 43,990; Filed Apr. 30, 2014; Washington, D.C., USA; pp. 1-21; copy enclosed (21 pages).

United States Patent and Trademark Office; Office Action from U.S. Appl. No. 11/397,118; mailed Nov. 14, 2007; Alexandria, Virginia, USA; pp. 1-12; parent U.S. Appl. No. 13/288,065 (12 pages).

United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/155,573; mailed Apr. 9, 2009; Alexandria, Virginia, USA; pp. 1-7; parent U.S. Appl. No. 13/288,065 (7 pages).

United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/155,573; mailed Jul. 30, 2009; Alexandria, Virginia, USA; pp. 1-9; parent U.S. Appl. No. 13/288,065 (9 pages).

United States Patent and Trademark Office; Notice of Allowability from U.S. Appl. No. 12/155,573; mailed Oct. 28, 2009; Alexandria, Virginia, USA; pp. 1-5; parent U.S. Appl. No. 13/288,065 (5 pages).

United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/657,356; mailed Jul. 12, 2010; Alexandria, Virginia, USA; pp. 1-14; parent U.S. Appl. No. 13/288,065 (14 pages).

United States Patent and Trademark Office; Notice of Allowability from U.S. Appl. No. 12/657,356; mailed Mar. 10, 2011; Alexandria, Virginia, USA; pp. 1-4; parent U.S. Appl. No. 13/288,065 (4 pages).

United States Patent and Trademark Office; Office Action from U.S. Appl. No. 13/065,837; mailed Jul. 18, 2011; Alexandria, Virginia, USA, pp. 1-9; parent U.S. Appl. No. 13/288,065 (4 pages).

A newspaper article of Mr. Melvin Sullivan and his family that references the date, Mar. 6, 2001; parent U.S. Appl. No. 13/288,065.

A letter of response Mr. Sullivan received from Pfeiffer & Gantt, PA, dated Sep. 16, 2002; parent U.S. Appl. No. 13/288,065.

A "Certificate of Existance" Bright Idea Inventor, LLC. Nov. 6, 2002; parent U.S. Appl. No. 13/288,065.

Operating Agreement of Bright Idea Inventor, LLC received from Pfeiffer & Gantt, PA, dated Nov. 13, 2002; parent U.S. Appl. No. 13/288,065.

A letter of response Golden received from the Honorable Congressman from Maryland, Elijah E. Cummings, dated Dec. 16, 2002; parent U.S. Appl. No. 13/288,065.

A newspaper article of Mr. Melvin Sullivan and Mr. Larry Golden, dated, Feb. 27-Mar. 5, 2003; parent U.S. Appl. No. 13/288,065.

A letter of response Golden received from the Honorable Senator from South Carolina, Ernest F. Hollings, dated May 21, 2003; parent U.S. Appl. No. 13/288,065.

A letter of response Golden received from the Office of the Vice President, Dick Cheney, dated Jun. 3, 2003; parent U.S. Appl. No. 13/288,065.

A letter of response Golden received from the Honorable Senator from South Carolina, Ernest F. Hollings, dated Oct. 1, 2003; parent U.S. Appl. No. 13/288,065.

A letter of response Golden received from the Honorable Senator from South Carolina, Lindsey O. Graham, dated Oct. 21, 2003; parent U.S. Appl. No. 13/288,065.

A letter sent to the President of the United States George W Bush, the President's Cabinet, the United States Senate and the Congressional Black Caucus, dated May 23, 2005; parent U.S. Appl. No. 13/288,065.

On Nov. 17, 2005, an "Inventor's Official Record of Invention", was filed in my name (Golden) at "The Law Office of David P. Gaudio, P.C.; the Inventors Network."; parent U.S. Appl. No. 13/288,065.

On Aug. 23, 2005, the "Disclosure Document Registration"; parent U.S. Appl. No. 13/288,065.

On Apr. 5, 2006, the "Patent Application" was filed in my name (Golden) at the United States Patent & Trademark Office in Washington, D.C.; parent U.S. Appl. No. 13/288,065.

On Jun. 6, 2008, the "Continuation-In-Part, (CIP) Application" was filed in my name (Golden) at the United States Patent & Trademark Office in Washington, D.C.; parent U.S. Appl. No. 13/288,065.

On Jan. 20, 2010, a "Continuation Application" (U.S. Appl. No. 12/657,356) was filed in my name (Golden) at the United States Patent & Trademark Office in Washington, D.C.; parent U.S. Appl. No. 13/288,065.

Reissue of U.S. Pat. No. 7,636,033; "Swear Back"; in accordance to Title 37—Code of Federal Regulations Patents, Trademarks, and Copyrights; Apr. 8, 2011; parent U.S. Appl. No. 13/288,065.

Reissue of U.S. Pat. No. 7,636,033; "Swearback—History of Work"; Apr. 8, 2011; parent U.S. Appl. No. 13/288,065.

United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/802,001; mailed Apr. 14, 2011; Alexandria, Virginia, USA; pp. 1-16; parent U.S. Appl. No. 13/288,065 (16 pages).

United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/802,001; mailed Oct. 20, 2011; Alexandria, Virginia, USA; pp. 1-5; parent U.S. Appl. No. 13/288,065 (5 pages).

United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/802,001; mailed May 27, 2011; Alexandria, Virginia, USA; pp. 1-14; parent U.S. Appl. No. 13/288,065 (14 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 12/802 001; copyright and mailing date Dec. 12, 2011; pp. 1-9, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 13/288,065 (9 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/065,837; copyright and mailing date Dec. 2, 2011, pp. 1-27, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 13/288,065 (27 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/065,837; copyright and mailing date Nov. 1, 2011, pp. 1-18, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 13/288,065 (18 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/199,853; copyright and mailing date Jan. 13, 2012, pp. 1-34, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 13/288,065 (34 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 12/802,001; copyright and mailing date Mar. 26, 2012, pp. 1-12, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 13/288,065 (12 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/199,853; copyright and mailing date Feb. 22, 2012, pp. 1-38, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 13/288,065 (38 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/065,837; copyright and mailing date Feb. 22, 2012, pp 1-25, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 13/288,065 (25 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/288,065; copyright and mailing date Aug. 24, 2012, pp. 1-4, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 13/288,065 (4 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/288,065; copyright and mailing date Nov. 28, 2012, pp. 1-11, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 13/288,065 (11 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/288,065; copyright and mailing date Apr. 16, 2013, pp. 1-9, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 13/288,065 (9 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 14/021,693; copyright and mailing date Apr. 20, 2015, pp. 1-20, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 14/021,693 (20 pages).

**US 9,589,439 B2**

Page 4

(56)        **References Cited**

OTHER PUBLICATIONS

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 14/021,693; copyright and mailing date Jan. 20, 2015, pp. 1-17, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 14/021,693 (17 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 14/021,693; copyright and mailing date Sep. 5, 2015, pp. 1-12, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 14/021,693 (12 pages).



Fig. 1

Fig. 2

SAppx909



**Fig. 3a**



**Fig. 3b**

SAppx910



**Fig. 4**



**Fig. 5**



**Fig. 6**

POWER SOURCE

**Fig. 7**

SAppx912



**Fig. 8**

SAppx913



**Fig. 9**



**Fig. 10**



**Fig. 11**



Fig. 12

Fig. 13

SAppx916



**Fig. 14**

**Fig. 15**



**Fig. 16**



Fig. 17

SAppx919



**Fig. 18**

SAppx920



**Fig. 19**

SAppx921

US 9,589,439 B2

1

# MULTI SENSOR DETECTION, STALL TO STOP AND LOCK DISABLING SYSTEM

This application is a continuation application and claims the filing date and benefit of U.S. patent application Ser. No. 14/021,693 titled "Multi Sensor Detection, Stall to Stop and Lock Disabling System" filed on Sep. 9, 2013 that issued on Aug. 4, 2015 as U.S. Pat. No. 9,096,189, the entire contents of which are incorporated by reference herein in their entirety for all purposes. U.S. Pat. No. 9,096,189 is a continuation application and claims the filing date and benefit of U.S. patent application Ser. No. 13/288,065 titled "Multi Sensor Detection, Stall to Stop and Lock Disabling System" filed on Nov. 3, 2011 and that issued on Sep. 10, 2013 as U.S. Pat. No. 8,531,280, the entire contents of which are incorporated by reference herein in their entirety for all purposes. U.S. patent application Ser. No. 13/288,065 that will issue as U.S. Pat. No. 8,531,280 is a divisional application and claims the filing date and benefit of U.S. patent application Ser. No. 12/802,001 titled "Multi Sensor Detection, Stall to Stop, and Lock Disabling System" filed on May 27, 2010, now U.S. Pat. No. 8,334,761, the entire contents and complete subject matter of which are incorporated by reference herein in their entirety for all purposes. U.S. patent application Ser. No. 12/802,001 is a continuation application and claims the filing date and benefit of U.S. patent application Ser. No. 12/657,356 titled "Multi Sensor Detection, Stall to Stop and Lock Disabling System" filed on Jan. 20, 2010, now U.S. Pat. No. 8,106,752 and incorporates the entire contents and complete subject matter therein by reference in their entirety for all purposes. U.S. Pat. No. 8,106,752 is a continuation of and claims priority to U.S. Pat. No. 7,636,033. U.S. Pat. No. 7,636,033 is a continuation-in-part of and claims priority to U.S. Pat. No. 7,385, 497. U.S. patent application Ser. No. 13/288,065 that issued as U.S. Pat. No. 8,531,280 also claims the filing date and benefit of and incorporates the entire contents of U.S. patent application Ser. No. 12/657,356, now U.S. Pat. No. 8,106, 752 herein by reference for all purposes. The present application also claims the filing date and benefit of and incorporates the entire contents of U.S. Pat. Nos. 8,531,280; 8,334,761; 8,106,752; 7,636,033: and 7,385,497 by reference herein in their entireties for all purposes.

## FIELD OF THE INVENTION

The present invention pertains to anti-terrorist detection and prevention systems, and more particularly pertains to a disabling lock mechanism combined with a chemical/biological/radiological detection system for use with products grouped together by similar characteristics in order to prevent unauthorized entry, contamination and terrorist activity.

## BACKGROUND OF THE INVENTION

Terrorist activity is a continuous, daily, worldwide threat to the stability, prosperity, security and peace within nations and between and among nations. Its danger lies in its arbitrary destructiveness as much as in its unpredictability, and the constant threat of terrorist activity compels measures and actions that cause strain and contention in free, democratic societies as security concerns and civil liberty concerns must be balanced so that both public safety and civil liberties are maintained. Safety and security concerns can be addressed through numerous proactive steps and measures, many of which cause only minimal interference with and disruption of the daily routines of work, travel, commerce

2

and entertainment. However, because modern industrial societies afford almost limitless places, locations, and opportunities for terrorist activities, no safety measure or security protocol will be foolproof, but many security measures, systems and protocols can be implemented that greatly minimize specific threats through fingerprint identification procedures, chemical, biological, and radiological hazard detections, bomb and explosive detection, and controlling the access to everything from shipping containers to school lockers. Thus, the prior art discloses a wide range of security measures and systems.

For example, the Fishbine et al. patent (U.S. Pat. No. 4,792,226) discloses an optical fingerprinting system that includes an optics/processor unit, a video monitor, a data terminal, and a printer for collecting and storing data characteristics of all ten individual fingerprints for printing demographic information and fingerprint images as desired on a standard booking or applicant card.

The Schiller patent (U.S. Pat. No. 4,544,267) discloses a finger identification unit that includes a fingerprint scanning apparatus using a collimated beam of light to interrogate the fingerprint of a finger placed against a platen so that successive scan positions produce signals containing fingerprint information.

The Fishbine et al, patent (U.S. Pat. No. 5,222,152) discloses a portable fingerprint scanning apparatus for optically scanning and recording fingerprint images and wirelessly transmitting such images to a mobile processing unit for verification and background checking.

The Lougheed at al. patent (U.S. Pat. No. 5,233,404) discloses an optical scanning apparatus that uses a linear charge coupled device (CCD) for recording the image of a fingerprint on the viewing surface.

The Groger et al. patent (U.S. Pat. No. 5,766,956) discloses a diode laser based sensor for undertaking optical, chemical, immunological or nucleic acid-based assay or other chemical analysis.

The Feldman patent (U.S. Pat. No. 5,938,706) discloses a multi element security system for preventing the unauthorized use of an automotive vehicle, and which includes numerous locking and control features interconnected to an onboard cpu.

The Bowker et al. patent (U.S. Pat. No. 5,963,657) discloses a safety access control for doors, handles, locks, etc., wherein the surface relief of a finger is read and verified to either allow or prevent access by the individual to the door, handle, lock, etc.

The Bonder et al. patent (U.S. Pat. No. 6,078,265) discloses a fingerprint identification security system wherein a key lock operated security system utilizes the fingerprint of the individual to control user access to the security system, such as the ignition system of an automotive vehicle.

The Anzai et al. patent (U.S. Pat. No. 6,271,745 B1) discloses a keyless authorization system for use of a motor vehicle that includes fingerprint reading units located on the exterior or interior of the motor vehicle and which is coupled to a control unit for scanning, comparing and matching fingerprints to allow or disallow access to the motor vehicle.

The Hwang patent (U.S. Pat. No. 6,374,652 B1) discloses a fingerprint-activated doorknob in which a detecting sensor for a fingerprint is placed on the doorknob for measuring and searching the fingerprint against previously stored fingerprint inputs to control access to the door.

The Vor Keller et al. patent (U.S. Pat. No. 6,588,635 B2) discloses a safety holster for a firearm that includes a pivotally mounted retaining member and a fingerprint sensor

SAppx922

US 9,589,439 B2

**3**

for scanning fingerprint information so that only authorized users can withdraw the firearm from the holster.

The Cordery et al. patent (U.S. Pat. No. 6,613,571 B2) discloses a method and system for detecting biological and chemical hazards in the mail that includes sensors placed within the mail box for sampling and testing ambient air and so that mail can be safely transported through the mail system.

The Nagata patent (U.S. Pat. No. 6,628,213 B2) discloses a coding method for digital signal coding and decoding that includes a CMI (code-marked inversion) method of signal coding.

Nonetheless, despite the ingenuity of the above devices, methods, and systems, there remains a need for a multi-detector and disabling lock system for use with various types of products collected together by common characteristics into product groupings for detecting chemical, biological and radiological agents and compounds and for selectively disabling and activating the product locks thereby preventing unauthorized entry and further contamination and preventing and thwarting terrorist activities.

SUMMARY OF THE INVENTION

The present invention comprehends a chemical/biological/radiological detector unit with a disabling locking system for protecting products that can be grouped into several product groupings, from terrorist activity, and also for preventing unauthorized access to and tampering with the storage and transport of ordnance and weapons. The products grouped into what may be referred to as Product grouping 1 include, but are not limited to, cargo containers, shipping containers, tractor trailers, snail carriers, mail boxes and lockers; while the products grouped into what may be referred to as Product grouping 2 include, but are not limited to, chemical, biological, radiological, and nuclear detectors, motion sensors and door sensors. The multi sensor detection system includes the capability to disable an existing lock or activate a lock located inside any of the products named in the product grouping categories upon activation of a sensor or detector included in the system. This is a significant feature for the multi sensor detection system as it prevents unauthorized, unequipped and untrained entry and access to the product thus preventing further contamination of the site and to individuals in the area.

The multi sensor detection and lock disabling system includes a detector case sized to fit in, upon or adjacent any of the aforedescribed products for detecting harmful and dangerous chemical, biological, and radiological agents, compounds and elements. In addition, the multi sensor detection and lock disabling system is capable of transmitting a signal to lock or disable a lock on the product, and is also capable of transmitting signals to a monitoring computer terminal or PC so that appropriate defensive and safeguarding actions can be undertaken and an authorized individual can disarm and reset the locking system and the multi sensor detection system. The detector case includes a power source (battery or electrical), interior compartments, Internet and GPS connections and a cpu interconnected with the Internet and GPS connections, and also interconnected with one or more off site monitoring computer terminals or PCs. The detector case includes one or more light alarm indicators that are externally visible and that light up when the chemical, biological, or radiological agent or compound is detected, and the light alarm indicators (which can be indicator lights or panels on the front of the detector case) can be color coded for denoting the specific agent or

**4**

compound detected, i.e., separate and distinct colors for indicating detection of the chemical, biological, or radiological agent or compound.

The detector case is designed to hold within the interior compartments one or more interchangeable detectors, and each detector is adapted and set up to sample a specific compound or agent. Each detector includes a sound alarm, a sensor, a light alarm, and a readings panel, and is electrically interconnected (either by wire or wirelessly) to the cpu of the detector case so that information regarding the detection of the particular agent or compound can be conveyed from the detectors to the detector case cpu. Each detector can also be used as a manual, stand-alone hand held scanner.

The multi sensor detection and lock disabling system can be interconnected to a surveillance watchtower, as well as monitoring computer terminals or PCs, with the watchtower scanning shipping and cargo crates and containers being prepared for shipment or sitting for extended periods of time on a dock or at a port, at a railway site, or at an industrial storage facility. The watchtower will scan the cargo and shipping crates and containers for the light alarm indicators on detector cases that are mounted in or upon the crates and containers, and thus continuous security surveillance of the crates and containers can be maintained.

An enhanced version of the multi sensor detection and lock disabling system can be employed to prevent car and vehicle bombings. Coupling the multi sensor detection and lock disabling system with satellite service will enable the detection system to detect explosives and transmit an alert signal by satellite to monitoring equipment at a monitoring site. Upon receiving the alert signal at the monitoring site the monitoring equipment activates a stall-to-stop process for disabling the air, fuel, electrical and/or computer system of the vehicle. Moreover, upon receiving the alert signal at the monitoring site the car or vehicle will be locked by transmission of a satellite signal that disables the vehicle's electrical and ignition system thereby preventing escape of the terrorist.

It is an objective of the present invention to provide a multi sensor detection and disabling lock system for securing news racks and vending machines in order to prevent theft, unauthorized use and terrorist activity.

It is another objective of the present invention to provide a multi sensor detection and disabling lock system for preventing terrorist activity by using products grouped together by common features in several product groupings such as design similarity, similarity in the presentation of security problems and similarity with regard to the presentation of solutions to preventing terrorist solutions.

It is still yet another objective of the present invention to provide a multi sensor detection and disabling lock system that is capable of disabling an existing lock or activating a lock inside any of the products of the product grouping lists when a detector or sensor of the system is activated.

It is still yet a further objective of the present invention to provide a multi sensor detection and disabling lock system wherein the disabling lock system prevents the unauthorized entry, access and further contamination of the products included in the several product groupings.

A still further objective of the present invention is to provide a multi sensor detection and lock disabling system that utilizes a multi-task device for preventing terrorist activity to vulnerable products that are collected or arranged by product grouping categories.

Yet a further objective of the present invention is to provide a multi sensor detection and disabling lock system

US 9,589,439 B2

5

to secure cargos and containers, especially cargo and shipping containers, against chemical, biological, radiological and nuclear terrorist activity.

Still another objective of the present invention is to provide a multi sensor detection and disabling lock system capable of detecting chemical, biological and radiological agents and compounds.

Still yet another objective of the present invention is to provide a multi sensor detection and disabling lock system that includes interchangeable detectors that operate in conjunction to detect chemical, biological and radiological agents and compounds.

Still yet a further objective of the present invention is to provide a multi sensor detection and disabling lock system that can be implemented by business or government at a minimum cost by organizing the products to be protected into product grouping categories.

Another objective of the present invention is to provide a multi sensor detection and disabling lock system that accurately and reliably detects harmful agents, compounds and elements, and prevents the placement and storage of weapons and bombs in the range of storage containers and facilities currently available.

Still, another objective of the present invention is to provide a multi sensor detection and disabling lock system wherein the interchangeable detectors that comprise part of the system can be used as stand-alone scanners.

These and other objects, features, and advantages will become apparent to those skilled in the art upon a perusal of the following detailed description read in conjunction with the accompanying drawing figures and appended claims.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the primary features of the system which include a detector case, several interchangeable detectors, an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler;

FIG. 2 is a front elevation view of the multi sensor detection and lock disabling system of the present invention illustrating one of the interchangeable detectors first shown in FIG. 1;

FIG. 3a is a top plan view of the multi sensor detection and lock disabling system of the present invention illustrating the mounting of one lock disabler to the lock of a product, such as a container, and disengaged from the lock of the container;

FIG. 3b is a top plan view of the multi sensor detection and lock disabling system of the present invention illustrating the engagement of the lock disabler to the lock of the product for locking or disabling the lock of the product so that unauthorized access is prevented;

FIG. 4 is a side elevation view of the multi sensor detection and lock disabling system of the present invention illustrating the detector case mounted to the product, such as the container, with the light alarm indicators externally visible;

FIG. 5 is a schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the interconnection of detector cases with a surveillance watchtower and a monitoring PC terminal;

FIG. 6 is a schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the placement of detector cases upon containers different

6

from the containers of FIG. 5, and wherein the detectors case are interconnected to a surveillance watchtower and a monitoring PC terminal;

FIG. 7 is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the mounting of one automatic/mechanical lock disabler to the lock of a standalone news rack;

FIG. 8 is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating one interchangeable detector placed within the standalone news rack;

FIG. 9 is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the detector case having color coded front panels for specifically indicating the agents, compounds or elements that have been detected;

FIG. 10 is a rear elevation view of the multi sensor detection and lock disabling system of the present invention illustrating the GPS, Internet and power source connections;

FIG. 11 is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the interconnection of the detector with the detector case and the steps undertaken by the system when an agent or compound is detected;

FIG. 12 is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the sequence of steps undertaken by one detector when functioning as a standalone scanner for detecting an agent or compound;

FIG. 13 is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the interconnection of the detector case with the automatic/mechanical lock disabler for activating the lock disabler upon detection by the system of an agent or compound;

FIG. 14 is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating interconnection of the detector case with the fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock as part of the process of detection and safeguarding the public upon detection of the agent or compound;

FIG. 15 is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the incorporation of the system with a surveillance watchtower and a monitoring PC or computer terminal for monitoring containers, such as shipping or cargo containers, that may sit for extended time periods on docks, at rail yards, and at industrial storage facilities;

FIG. 16 is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the integration of the detection system with a satellite and monitoring equipment at a monitoring site for detecting explosives placed in a vehicle and then transmitting signals to the satellite and then to the monitoring site for disabling and locking the vehicle;

FIG. 17 is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the incorporation of the features and elements of the detector case to a cell phone and cell phone case;

FIG. 18 is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the incorporation of a OPS satellite, a monitoring site and a cell phone tower for communicating to and with an electronic device such as a laptop computer or a cell phone

US 9,589,439 B2

7

for transmitting signals to a vehicle for activating an onboard stall-to-stop device for bringing the vehicle to a halt; and

FIG. 19 is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the use of a GPS satellite in conjunction with the monitoring site and monitoring equipment to relay commands and signals to the cpu or transceiver of the vehicle for stopping or locking the vehicle in response to a signal that a certain type of event (detection of a bomb, engine failure or malfunction or unauthorized use) has occurred or is in process

DETAILED DESCRIPTION OF THE PREFERRED EMBODIMENT

Illustrated in FIGS. 1-19 is a multi sensor detection and lock disabling system 10 for preventing terrorist activity by monitoring, detecting, and securing those critical areas, sites, and facilities vulnerable to terrorist activity. The first step is the identification of critical areas, sites, locations and facilities that are vulnerable to terrorist activity as convenient places to store and plant explosives and bombs and spread biological, chemical or radiological agents and compounds, followed by the disposition of the multi sensor detection and lock disabling system 10 for monitoring, detecting, and securing the particular location or site. Vulnerable sites, locations, facilities and areas are nearly limitless in their variety; in order to categorize the protection the present invention provides an anti-terrorist product grouping strategy have been developed wherein products made from the same or similar material, products having the same or similar design, and products presenting the same or similar security problems are grouped together with the multi sensor detection and lock disabling system 10 for preventing terrorist activity. For example, two preferred product groupings can be Product Grouping I: cargo containers, shipping containers, cargo planes, freight train cars, tractor trailers, mail carriers (UPS, FedEx), airport lockers, news racks (coin and non-coin operated), mail drop boxes, cluster mail boxes, keyed mail boxes, min-storage houses and buildings, bicycle lockers, stadium lockers, school lockers, cars, trucks, campers, buses, vans and utility vehicles. Product Grouping II: chemical detectors, biological detectors, radiological detectors, nuclear detectors, motion sensors, glass break sensors, plastic film on glass, high security locks, tampering labels, door sensors, disabling locking systems, vehicle detectors and satellite disabling locking systems. In addition to grouping products together by features, designs and materials, the multi sensor detection system 10 includes a lock disabling capability for disabling an existing lock or activating a lock on or inside any of the aforementioned products when a detector or sensor of the system is activated. The lock disabling feature is a crucial component of the invention in so far as it prevents unauthorized, unequipped or untrained individuals from gaining access and entry to the site and causing further contamination of the site.

As shown in FIGS. 1-10, the multi sensor detection and lock disabling system 10 includes at least one—and preferably many—detector case 12 that can be placed in, on, upon or adjacent the product, such as the shipping containers 14 of FIGS. 4 and 5 resting upon a platform 16 or the cargo container 18 of FIG. 6 sitting upon a seaport dock or pier 20. The detector case 12 includes a top 22, a bottom 24, a pair of opposed sides 26 and a front side or panel 28 and an opposite rear or back side 30. The rear side 30 has connections or contacts that can include an Internet connection 32,

8

a GPS connection 34 and a power connection 36 for a power source. The power source for the detector system 10 can be any conventional battery or electrical source. The detector case 12 includes an interior chamber divided into a number of compartments 38 for holding therein agent or compound detection means hereinafter further described. A cpu 40 is mounted within the detector case 12 and electrically interconnects, routes, and transmits signals among items hereinafter further described and also communicates with a monitoring site and monitoring equipment. The front side 28 of the detector case 12 includes indicator means for visually indicating that a specific agent, compound or element has been detected. The indicator means can include color coded indicator lights 42 in panel form, as shown in FIG. 9, with each indicator light panel 42 lighting up with a specific color corresponding to the detection of a specific agent or compound; or color coded indicator lights 44, as shown FIG. 1, that correspond to and individually light up on the detection of a specific agent or compound (chemical, biological, or radiological).

As shown in FIGS. 1, 2 and 9-13, the multi sensor detection and lock disabling system 10 includes a plurality of detectors 46 with each detector 46 adapted for and set up to sample for a specific agent or compound (biological, chemical, or radiological); and the detectors 46 are interchangeable for adapting to the needs and demands of future technology. The detectors 46 can also be used as standalone scanners. In the preferred embodiment of the invention, at least three detectors 46 are placed within the detector case 12 with one detector 46 for specifically sampling biological agents or compounds, one detector 46 for sampling chemical agents or compounds, and one detector 46 for sampling radiological agents or compounds. The detectors 46 are interconnected to the cpu 40 of the detection system 10 by conventional connections that can be wire or wireless for transmitting the appropriate signals to the cpu 40 upon detection of the particular agent or compound. As shown in FIG. 2, each detector 46 includes on its front plate or facing surface a sound alarm indicator 48, a readings panel 50 comprising a plastic shield and LED lights for displaying the various read-out messages, a sensor 52 for detecting the specific agent, element or compound, and a light alarm indicator 54 that can be color coded for each specific agent and which is externally visible when the detector 46 is used as a stand alone scanner. Each detector 46 includes a conventional microprocessor for controlling the various functions and generating the appropriate signals for transmission to the cpu 40 of the detector case 12.

As shown in FIGS. 1, 3a, 3b, 9, and 13-15, used in conjunction with the multi sensor detection and lock disabling system 10 is at least one automatic/mechanical lock disabler 56—and depending upon the number of products being monitored there can be one lock disabler 56 for each product. The automatic/mechanical lock disabler 56 is physically connected to the detector case 12 by a wire or cable 58 for receiving signals therefrom for disabling an existing lock or activating a lock inside a product to prevent access to the product. By way of example, FIG. 3a shows the automatic/mechanical lock disabler 56 mounted—by any conventional means—to the lock 60 of the shipping container 14 shown in FIGS. 4 and 5 and connected by wire 58 to the cpu 40 of the detector case 12. The lock disabler 56 is in the non-activated or disengaged state in FIG. 3a. FIG. 3b shows the automatic/mechanical lock disabler 56 mounted to the lock 60 of the shipping container 14 and in the activated or engaged state after detection of an agent or compound by the system 10 thereby for locking or disabling

US 9,589,439 B2

9　　　　　　　　　　　　　　　　　　　　10

the lock 60 of the shipping container 14 and preventing unauthorized entry and access by unauthorized, untrained and unequipped individuals. In FIGS. 3a and 3b the lock 60 secures doors of the shipping container 14 that can be slidably or pivotably opened and closed.

In addition to the automatic/mechanical lock disabler 56, the multi sensor detection and lock disabling system 10 can also utilize a fingerprint biometric lock with disabler 62 as shown in FIGS. 1 and 14. The fingerprint biometric lock with disabler 62 is interconnected to the cpu 40 of the detector case 12 for receiving transmissions therefrom after detection of an agent or compound has occurred so that the lock on the product can be locked or disabled. Moreover, resetting of the fingerprint biometric lock with disabler 62 occurs when the fingerprint of the individual is placed on the fingerprint-matching pad 64, and if a match occurs with a known fingerprint stored by the cpu 40, then the individual can reset the fingerprint biometric lock with disabler 56 by turning the manual lock disabler 66. The fingerprint biometric lock with disabler 62 is mounted to the lock of the product in a manner similar to the mounting of the automatic/mechanical lock disabler 56 that is shown in FIGS. 3 and 3b.

FIGS. 4 and 5 show one manner of disposition or placement of the detector case 12 in relation to the product, i.e., the shipping container 14, with the color coded indicator lights 42 externally viewable; FIG. 5 shows a number of shipping containers 14 each equipped with a detector case 12 and integrated with elements hereinafter further described for continuously monitoring the shipping containers 14 as they sit for an extended period of time on the truck or rail platform 16. FIG. 6 illustrates several cargo containers 18 sitting on the shipping dock or pier 20, with each cargo container 18 having a detector case 12 mounted thereon and integrated with and monitored by elements shown in FIG. 5 and hereinafter further described.

FIG. 7 illustrates a typical product from product grouping 1 that is monitored by the multi sensor detection and lock disabling system 10 of the present invention; specifically, FIG. 7 shows a news rack 68 with one automatic/mechanical lock disabler 56 mounted to and interconnected with the locking mechanism of the news rack 68. As long as there is no detection of any agent or compound, the lock disabler 56 is in the disengaged state, and the individual can deposit the coin amount in the chute and then freely open the glass panel 70 by the handle 72 for removing a paper. However, the lock disabler 56 would be activated upon detection of the harmful agent or compound and receipt of a signal from the cpu 40 for locking or disabling the locking mechanism thereby denying access to the interior of the news rack 68 from all untrained, unauthorized and unequipped individuals.

FIG. 8 illustrates one detector 46 disposed within the news rack 68 and which is visible through the panel 70 for detecting one specific agent, compound or element. The detector 46 functions as a stand-alone scanner and can be wirelessly interconnected to offsite monitoring equipment.

FIG. 11 illustrates a representative schematic 74 for describing the signal transmission process from the detector 46 to the cpu 40 of the detector case 12. The external stimulus 76 would be the chemical, biological or radiological agent or compound. If there is no detection of the agent or compound, the detector 46 will stay in the sensing mode 78. However, detection of the specific agent will trigger the sound alarm 80 and the light alarm 82, and instant transmittal of a signal to the cpu 40. The readings 84 can be stored by the cpu 40 for verification and future review and evaluation. After all the appropriate corrective and preventative

measures have been undertaken by the trained and authorized personal, and the site has been cleansed of the contamination, authorized and equipped personal can then reset 86 the system 10.

FIG. 12 illustrates a representative schematic 88 for the detector 46 when used as stand-alone scanner. The detector 46 undergoes the same essential steps as illustrated in FIG. 11, with the exception of the signal transmission to the cpu 40. The detector 46 remains in detection mode 78 until an agent is detected, and then the various functions—light alarm 82, sound alarm 80, storage of readings 84, and, after the appropriate security and safety steps have been carried out by authorized personal, detector reset 90 by authorized personal can occur thereby placing the detector 46 back in detection or sensing mode 78.

FIG. 13 is a representative schematic 92 that illustrates the steps undertaken by the system 10 to lock or disable a lock, such as the lock 60 for the shipping container 14 shown in FIGS. 3a and 3b. Upon detection of the agent (chemical, biological, radiological) the alarm light indicators 42 or 44 will light up providing external indication that an agent has been detected. In addition, the system 10—the cpu 40—will transmit a lock/disable lock signal 94 to the automatic/mechanical lock disabler 56 to lock or disable the lock on the product, such as the lock 60 on the shipping container 14 of FIGS. 3a-5. This prevents unauthorized, unequipped, or untrained individuals from entering or gaining access to the product for which a dangerous and perhaps lethal agent has been detected. After the proper authorities and authorized personal have been notified and all the appropriate security, preventative and clean up measures have been undertaken, the authorized individual can perform the disarm and reset function 96 for the system 10 placing the system 10 in back in the detection mode 98.

FIG. 14 is a representative schematic 100 illustrating the use of the fingerprint biometric lock with disabler 62 with the system 10. Upon detection of the agent or compound by the detector, the various alarms would sound and light up (shown in previous figures), and the cpu 40 would then transmit a signal to the fingerprint biometric lock, with disabler 62 to lock or disable the lock on the product, such as the lock 60 on the shipping containers 14 shown in FIGS. 3a-5. The shipping containers 60 would remain locked and in an access denied mode 101 should an attempt be made to gain access to the container 60 by opening the lock 60 with an unauthorized fingerprint. However, a fingerprint that matches stored and authorized fingerprints 102 would indicate an authorized individual, and would allow the individual to disable and disarm 104 the lock 60 of the shipping container 14. The fingerprint biometric lock with disabler 62 would then be reset 106 after the appropriate safety, cleanup, and protection measures are completed, and the system 10 would be reset and placed back in the detection mode 108.

FIG. 15 is a schematic representation 110 that illustrates the integration of a surveillance watchtower 112 and a monitoring terminal or PC 114 for monitoring products such as the shipping containers 14 or cargo containers 16 that sit for extended periods of time at docks, piers 20, truck terminals, rail yards, shipping platforms 16 and industrial sites as shown in FIGS. 5 and 6. The watchtower 112 would maintain continuous surveillance over a number of shipping containers 60, for example, with detector cases 12 mounted in or on each container 14 and set in detection mode 116 with one or more detectors 46 disposed in each detector case 12. The watchtower 112 would continuously scan for light alarm indicators 42 and 44 on the products, such as the containers 14 or 18, and the watchtower 112 would be interconnected

US 9,589,439 B2

11

and integrated with the monitoring terminal or PC **114**. Upon detection **118** of an agent or compound in one or more of the shipping containers **14**, the appropriate light alarm indicators **42** or **44** would light providing visible confirmation of the detection of the specific agent or compound. The cpu **40** would transmit a lock/disable signal **120** to the lock **60** on each respective shipping container **14** to lock or disable the lock **60** thus preventing access to that respective shipping container **14**. In addition, signal transmissions would be sent to the monitoring terminal or PC **114** (which could be off site) thereby alerting authorized security personal of the contamination event. With the information received at the monitoring terminal **114**, authorized personal would then be notified and dispatched to the area to undertake the appropriate safety and cleanup measures **122**. Such measures would also include disarming the lock disabling system in order to gain access to the shipping container **14**. After all the cleanup and security measures are completed by the trained and properly equipped authorities, the detection system and the lock disabling feature would reset **124** and the detection system would again be placed in detection mode **116**.

FIG. **16** is a schematic representation **126** that illustrates an enhanced version of the multi sensor detection and lock disabling system **10** for preventing car and vehicle attacks and bombings. The lock disabling system **10** would be interconnected to the locking system and mechanism **128** of the vehicle **130**. In addition, a stall to stop disabling link **132** can be made with the fuel, air, and electrical system **134** of the vehicle **130**. The enhanced version incorporates a satellite **136** for signal receipt and transmission from the vehicle **130** in which the detector system **10** is placed to a monitoring site and monitoring equipment **138**. As shown in FIG. **16**, a detection signal **140** would be sent to the satellite **136** by the detection system **10** upon detection of a bomb or explosive **142** hidden in the vehicle **130**. The satellite **136** would then transmit an alert signal **144** to the monitoring site **138** with the signal **144** containing the relevant data to evaluate the nature of the threat. The monitoring site **138** would then transmit a stall to stop signal **146** to the detection system **10** to lock the vehicle **130** and/or disable the electrical system of the vehicle **130** thereby disabling the vehicle **130**, preventing access to the vehicle **130** by locking the vehicle **130**, and preventing any terrorist in the vehicle **130** from escaping.

The detector case **12** can be modified and adapted for inclusion with cell phone cases, satellite cell phone cases, laptop cases, notebook PC cases, PDA cases, carry-on cases, suitcases, and briefcases. In addition, the basic monitoring terminal or PC **114**, as shown in FIGS. **5** and **15**, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring.

The system **10** and the watchtower **112**, along with the satellite **136** and the monitoring site **138** can be adapted or incorporated with cell phone towers and satellites for use with satellite communication and/or a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu **40**, a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween. The aforementioned telecommunication and radio communication means can be interactive with any type of motive vehicle that includes but is not limited to cars, trucks, vans, SUVs, trains, subways, boats, ships and airplanes, and which is reported stolen, experiences a loss of brakes, or a

12

bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted to the vehicle and which detection causes an automatic signal transmission or a signal transmission is activated when a call is made to the monitoring station by an authorized person. The authorized individual includes but is not limited to the owner, pilot, conductor, captain, police highway patrol, security guard and military personnel to the monitoring equipment for activating a vehicle slowdown or stall-to-stop disabling system that similar to the disabling system **126** shown in FIG. **16**, or incorporating features of the system **126** shown in FIG. **16**, from the monitoring equipment to the vehicle. The activation of the stall-to-stop disabling means or the vehicle slowdown disables or engages the computer, electrical, fuel and air systems of the vehicle or a combination of the computer, electrical, fuel and air systems that include but are not limited to the brakes, foot peddle, lights, speed controls, ignition, steering, transmission, and the horsepower of the motor.

In addition, the basic stall-to-stop disabling means or the vehicle slowdown means and device can be adapted, modified or designed to include: an open bust or open platform for integrating any new and innovative technology; warning lights indicators; sound alarm indicators; voice alarm indicators; a cell phone to transmit to the vehicle a signal for slowing and halting the vehicle; and a lock disabling system or means to lock a thief or terrorist inside the vehicle after a transmission is received or sent. Open bust or open platform also refers to the compatibility of the detector case **12**, or the incorporation of its features in cell phone cases, satellite cell phone cases, laptop cases, notebook PC cases, PDA cases, carry-on cases, briefcases, and suitcases, etc., with other communication, transmission and surveillance systems whereupon the detector case **12**, and its features, can be seamlessly integrated with other new and emerging systems and technologies.

Thus, as shown more specifically in FIG. **17**, by way of a representative example the features and elements of the detector case **12** are shown as being incorporated into cell phone detector case **150** and associated cell phone monitor **152**. The cell phone monitor **152** includes the standard keypad functions **154** and more specialized system use (ring tone, email, photos, texting) functions **156** as well as a viewing screen **158**. The cell phone detector case **150** includes a recharging cradle or seat **160**, a front side **162**, a top **164**, a bottom **166**, and a pair of opposed sides **168**. At the back of the cell phone detector case **150** are connections, contacts, and ports for at least an Internet connection **170**, a GPS connection **172**, and a contact, plug, or port for a power source **174**. The power source for the cell phone detector case **150** can be any conventional rechargeable battery source or standard electrical power from a standard electrical receptacle or outlet.

As shown in FIG. **17**, the cell phone detector case **150** includes one or more sensor/detector units, cells, or components **176** built into and incorporated into the case **150**. The detector **176** includes generally disposed at the front **162** of the case **150** the following types of indicators: a sound alarm indicator **178**, a readings panel **180**, a sensor **182** for detecting one or more specific types of agents, elements, chemicals, compounds, etc., and a light alarm indicator **184**. The sensor/detector **176** will be interconnected to the power source **174**. In addition, mounted on and externally visible on the sides **168** or front **162** of the case **150** are a plurality of color coded indicator lights **186** with each fight **186** corresponding to a specific agent, element, chemical, compound, etc., and lighting up when that agent

SAppx927

US 9,589,439 B2

**13**

is detected by the sensor/detector **176**. The color coded indicator lights **186** will be electrically interconnected to the sensor/detectors **176** via any standard microprocessor. The cell phone detector case **150** and cell phone monitor **152** thus comprise a hand-held, easily portable and transportable detection means that is both effective and unobtrusive in its disposition and use.

FIGS. **18** and **19** illustrate representative examples of the integration of portable electronic communication or tele-communication devices such as a cell phone **187a** and/or a laptop computer **187b** with the monitoring equipment **138** located at a predesignated monitoring site **188**, and operating in conjunction with either a satellite and/or a cell phone tower **190** to transmit and receive signals and commands among each other and to a vehicle **192**, such as a truck, as part of a stall-to-stop disabling system for slowing and stopping the vehicle **192** and locking a thief, terrorist, or unauthorized individual in the vehicle **192** if needed. A wide range of events can trigger and initiate the stall-to-stop system and the locking or lock disabling system and mecha-nism, and the event doesn't have to be limited to the detection of a bomb or a chemical, biological, or radiologi-cal agent, element, or compound. The events can include, but is not limited to, detection of an engine problem to engine failure to the unauthorized use (stealing) of the vehicle **192**. The vehicle **192** includes an electromotive system **194** that comprises, among other components, an onboard computer(s), electrical, fuel and air systems, as well as brakes, ignition, steering, and transmission. Also inte-grated with and capable of communicating with the vehi-cle's **192** electromotive system **194** is a stall-to-stop system while a lock disabling mechanism **196** is able to engage and disengage or disable the vehicle's **192** locking mechanism **198** upon receipt of the appropriate commands via a lock disabling communication channel or link **200**. This link **200** can also accommodate the stall-to-stop system commands and signals, and thus is a multi-channel communication link. A CPU or a transceiver **202** is programmed to receive signals from the cell phone tower **190** and/or to a GPS satellite **204** and is interconnected with the stall-to-stop system and the lock disabling system **196** via link **200** for engaging the electromotive system **194** and actuating the lock disabling system **196** to stop the vehicle **192** and lock inside the vehicle **192** anyone such as a thief, terrorist or other unau-thorized individual.

A representative example for stopping, disabling, and locking the vehicle **192** that utilizes the cell phone tower **190** wherein the activation and/or distress signal **206** originates from the cell phone **187a** or the laptop **187b** and such activation signal **206** travels to the cell phone tower **190** that is nearest the current location of the vehicle **192**. A signal **208** is then transmitted to the monitoring site **188** and specific monitoring equipment **138** that can also include but is not limited to cell phones, laptops, desktop PC's, note-book PC's and LCD monitors. The monitoring site **138** then communicates by signal **210** to the GPS satellite **204** that an original or activation signal has been received and then the GPS satellite **204** locates and communicates by multiplex signal **212** with the CPU or transceiver **202** on the vehicle **192** and exchanges information on the type of problem, situation, location, and vehicle speed. The monitoring equip-ment **138** then transmits a signal **214** to the cell phone tower **190** that communicates with the transceiver **202** and/or CPU of the vehicle **192** to initiate or execute any commands that will actuate the stall-to-stop disabling link **200** and lock disabling system **196** for bringing the vehicle **192** to a halt and actuating the vehicle's **192** locking mechanism **198** for

**14**

locking the thief, terrorist, or other unauthorized person inside the vehicle **192** if needed.

FIG. **19** illustrates a representative example wherein the stall-to-stop system and the lock disabling system **196** are utilized in conjunction with the GPS satellite **204**. In FIG. **19** a signal has traveled to the satellites nearest the vehicle's **192** current location and then the signal **218** has traveled to the monitoring equipment **138** and monitoring site **188** which can include but is not limited to satellite cell phones, satellite monitors, cell phones, laptops, desktop PC's, note-book PC's, and LCD monitors. The UPS satellite **204** then locates and communicates with the CPU and/or transceiver **202** on the vehicle **192** via a multiplex (two-way) signal **220** in order to exchange information on such distress and danger event parameters as the specific problem situation, location, and vehicle speed. The monitoring equipment **138** then transmits a signal **222** back to the GPS satellite **204** that in turn communicates via another signal **224** with the CPU and/or transceiver **202** to execute any commands to the stall-to-stop system for executing the disengagement of the vehicle's **192** electromotive system **194** for bringing the vehicle **192** to a halt and for actuating the lock disabling system **196** to direct the lock disabling link **200** to actuate the locking mechanism **198** thereby locking the vehicle **192** and anyone inside the vehicle **192**.

The present invention comprehends a chemical/biologi-cal/radiological/nuclearlexplosive/human/contraband detec-tor unit with a disabling locking system for protecting products that can be grouped into several product groupings, from terrorist activity, and also for preventing unauthorized access to and tampering with the storage and transport of ordnance and weapons. The products grouped into what may be referred to as Product grouping **1** (storage & transporta-tion) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars, United Parcel Services™ (UPS™), Federal Express™ (Fe-dEx™), airport lockers, news racks (coin and non-coin operated), mail drop boxes, cluster mail boxes, keyed mail boxes, min-storage houses and buildings, bicycle lockers, stadium lockers, school lockers, cars, trucks, campers, buses, vans, unmanned aerial vehicles (UAVs), unmanned ground vehicles (UGVs), and utility vehicles; the products grouped into what may be referred to as Product grouping **2** (sensors) include, but are not limited to, chemical, biologi-cal, radiological, explosive and nuclear detectors, motion sensors, door sensors, speed sensors, biometric sensors, glass break sensors, plastic film on glass, high security locks, tampering labels, door sensors, disabling locking systems, vehicle detectors and satellite disabling locking systems, detection of humans, detection of contraband, temperature, and shock levels; the products grouped into what may be referred to as Product grouping **3** (detector case; modified and adapted) include, but are not limited to, cell phone cases, satellite cell phone cases, laptop cases, notebook PC cases, PDA cases, carry-on cases, suitcases, eyeglass, briefcases, detector cases of locks, detector cases of tags, detector cases that is mounted to, detector cases that is affixed to, detector cases that is outside of, detector cases that is inside of, and detector cases that is adjacent to; the products grouped into what may be referred to as Product grouping **4** (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communi-cation equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring termi-nals, web servers, desktop personal computers (PCs), note-

US 9,589,439 B2

15

book personal computers (PCs), laptops, satellite cell phones, cell phones, Universal Mobile Telecommunications System (UMTS) phones, personal digital assistants (PDAs), liquid crystal display (LCD) monitors, and satellite monitoring, remote control key fobs, two-way communication key fobs, handhelds; the products grouped into what may be referred to as Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, Cellular, Satellite, Telematics, Wide Area Network (WAN). Wireless Wide Area Network (WWAN), Local Area Network (LAN), Radio Frequency (RF), Broadband Wireless Access (BWA), Global Positioning System (GPS), General Packet Radio Services (GPRS). Global System for Mobile (GSM), Wideband Code Division Multiple Access (W-CDMA), Universal Mobile Telecommunications System (UMTS), Short Message Service (SMS); the products grouped into what may be referred to as Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature, the products grouped into what may be referred to as Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel. The multi sensor detection system includes the capability to disable an existing lock or activate a lock located inside or outside any of the products named in the product grouping categories upon activation of a sensor or detector included in the system. This is a significant feature for the multi sensor detection system as it prevents unauthorized, unequipped and untrained entry and access to the product thus preventing further contamination of the site and to individuals in the area.

While the invention has been shown and described in a preferred embodiment, it will be apparent to those skilled in the art that numerous alterations, modifications, and variations will possible and practicable without departing from the spirit and scope of the invention as set forth by the appended claims.

The invention claimed is:

1. A multi sensor detection system capable of identifying, monitoring, detecting, and securing those critical areas (e.g., U.S. borders), sites, locations and facilities vulnerable to terrorist activity that can be integrated with and interconnected to watchtowers to form a network, comprising:

   at least one of an integrated watchtower, a fixed watchtower, a surveillance watchtower, a watchtower capable of scanning, a watchtower capable of monitoring, a watchtower equipped with sensors or a watchtower interconnected to a central monitoring terminal for sending signals thereto and receiving signals therefrom;

   wherein the at least one watchtower is equipped with a remote video surveillance camera that provides at least one night vision means of surveillance or an infrared human detection means of surveillance capability and is integrated into a watchtower's remotely controlled system that can monitor, detect, track, and identify humans;

   a communication device of at least one of a mobile communication device, a mobile communication unit, a

16

portable communication device, portable communication equipment, a wired communication device, a wireless communication device, a monitoring site, a monitoring terminal, a web server, a desktop personal computer (PC), a notebook personal computer (PC), a laptop, a satellite phone, a smart phone, a cell phone, a Universal Mobile Telecommunications System (UMTS) phone, a personal digital assistant (PDA), a liquid crystal display (LCD) monitor, a satellite, or a handheld, interconnected to a monitoring equipment for sending signals thereto and receiving signals therefrom;

a communication method of at least one of a Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, Cellular, Satellite, Telematics, Wide Area Network (WAN), Wireless Wide Area Network (WWAN), Local Area Network (LAN), Radio Frequency (RF), Broadband Wireless Access (BWA), Global Positioning System (GPS), or central processing unit (CPU), used to interconnect the communication device to the monitoring equipment for sending signals thereto and receiving signals therefrom;

a plurality of sensors for detecting or sensing humans that is at least one of a chemical human sensor, biological human sensor, radiological human sensor, infrared human detector, motion human detector, or image human detector, interconnected to or disposed within the multi-sensor detection system for sending signals thereto and receiving signals therefrom;

a mobile multi-sensor detection device that is at least one of a ground surveillance sensor, a surveillance radar sensor, a surveillance camera, or a stand-alone surveillance scanner, that is mounted in, on, or upon at least one of a car, a truck, a camper, a bus, a van, an unmanned aerial vehicle (UAV), an unmanned ground vehicle (UGV), or a utility vehicle, interconnected to the monitoring equipment for sending signals thereto and receiving signals therefrom;

a hand-held multi-sensor detection device that is capable of at least one of thermal imaging or infrared imaging for monitoring, detecting, tracking and identifying humans, that is controlled or operated by at least one authorized person who is an owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, Central Intelligence Agency (CIA), Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, or monitoring site and terminal personnel, interconnected to the monitoring equipment for sending signals thereto and receiving signals therefrom, wherein the authorized person manually initiates the signal to the monitoring equipment to alert upon the monitoring, detecting, tracking and identifying of the human;

whereupon, detection by the mobile multi-sensor detection device causes an automatic signal transmission to be sent to, or received from, any products in product grouping categories of storage and transportation, sensors, detector case; modified and adapted, monitoring and communication devices, communication methods, biometrics;

whereupon, detection of an unauthorized vehicle, an unauthorized driver or operator of a vehicle or mobile

US 9,589,439 B2

17

unit, a signal is sent from the communication device to the vehicle or mobile unit to stop, stall or slowdown the vehicle;

wherein, a communication device of at least one of a mobile communication device, a mobile communication unit, a portable communication device, portable communication equipment, a wired communication device, a wireless communication device, a monitoring site, a monitoring terminal, a web server, a desktop PC, a notebook PC, a laptop, a satellite phone, a smart phone, a cell phone, a UMTS phone, a PDA, a LCD monitor, a satellite, or a handheld, interconnected to the monitoring equipment for sending signals thereto and receiving signals therefrom, comprising a lock disabling mechanism that is able to engage (lock), and disengage (unlock) and disable (make unavailable) after a specific number of tries.

**2.** The multi sensor detection system of claim **1,** capable of identifying, monitoring, detecting, and securing those critical areas (e.g., U.S. borders), sites, locations and facilities, further includes the identifying, monitoring, and detecting of terrorist, that is at least one of an illegal, radical, fanatic, activist, revolutionist or rebel.

**3.** The multi-sensor detection system of claim **1,** further includes a global positioning system (GPS) receiver adapted for communication with at least one satellite.

**4.** The multi-sensor detection system of claim **1,** further includes a navigation system adapted for communication with at least one of the surveillance watchtowers.

**5.** The multi-sensor detection system of claim **1,** capable of forming a wired or wireless sensor network.

**6.** The multi-sensor detection system of claim **1,** capable of forming a mesh network for redundancy.

**7.** The multi-sensor detection system of claim **1,** capable of transmitting identification data, location data, power source data, and sensor data.

**8.** The multi-sensor detection system of claim **1,** capable of being embedded into; placed in, on, or adjacent to at least one of the products in the product grouping categories or an area targeted for monitoring.

**9.** The multi-sensor detection system of claim **1,** capable of sending signals thereto and receiving signals therefrom to engage (lock), disengage (unlock) and disable (make unavailable) a lock after a specific number of tries that is interconnected to the multi sensor detection system or monitoring equipment.

**10.** The multi-sensor detection system of claim **1,** capable of transmitting biometric and authentication data include, but is not limited to, at least one of fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, heart rate, pulse and signature.

**11.** The multi-sensor detection system of claim **1,** interconnected with a camera to view the environment in real-time or to store the data for transmission and review at a later time.

**12.** The multi-sensor detection system of claim **1,** interconnected with a camera; light and video sensors to allow the user to view the environment from at least one of a cell phone, smart phone, PDA, handheld, laptop, desktop, workstation or monitoring site.

**13.** A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a personal digital assistant (PDA), a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, comprising:

at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor,

18

or a radiological sensor; that is wired or wireless, capable of being disposed within, on, upon or adjacent the communication device;

at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or a front end processor for communication between a host computer and other devices;

a transmitter for transmitting signals and messages to at least one of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device;

a receiver for receiving signals, data or messages from at least one of the multi-sensor detection device, the maritime cargo container, the cell phone detection device, or the locking device;

at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection;

the communication device is at least a fixed, portable or mobile communication device interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween; and

whereupon the communication device, is interconnected to a product equipped to receive signals from or send signals to lock or unlock locking devices, activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems;

wherein the communication device receives a signal via any of one or more products in any product grouping categories;

wherein the at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, or short range radio frequency (RF) connection is capable of signal communication with the transmitter, the receiver of the communication device, or transceivers of the products;

wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature such that the communication device that is at least one of the cell phone, the smart phone, the desktop, the handheld, the PDA, the laptop or the computer terminal is locked by the biometric lock disabler to prevent unauthorized use;

wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, long range radio frequency (RF), and short range radio frequency (RF).

**14.** Monitoring equipment of at least one of products grouped together by common features in a product groupings category of design similarity comprising a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone interconnected to a product for communication therebetween, the monitoring equipment comprising:

US 9,589,439 B2

| 19 | 20 |
|---|---|

at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; that is wired or wireless, capable of being disposed within, on, upon or adjacent the monitoring equipment;

at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or a front end processor for communication between a host computer and other devices;

a transmitter for transmitting signals and messages to at least one of a multi-sensor detection device, a maritime cargo container, a cell phone detection device;

a receiver for receiving signals, data or messages from at least one of the multi-sensor detection device, maritime cargo container, the cell phone detection device;

a lock disabling mechanism that is able to engage (lock), or disengage (unlock), or disable (make unavailable) a product's lock, wherein the lock disabling mechanism disables the product's lock after a specific number of tries by an unauthorized user to disengage the lock by maintaining the product's lock in the current state of the product's lock regardless of input entered to change the state of the product's lock by the unauthorized user;

at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection;

monitoring equipment of at least a fixed, portable or mobile monitoring equipment interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween; and

whereupon the monitoring equipment, is interconnected to a product equipped to receive signals from or send signals to the lock disabling mechanism that is able to engage, disengage, or disable the lock, activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems;

wherein the monitoring equipment is implemented by business or government at a minimum cost by products grouped together by common features in at least one of several product groupings of design similarity;

wherein the at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, or short range radio frequency (RF) connection is in signal communication with the transmitter, the receiver of the monitoring equipment, or transceivers of the products.

**15**. Monitoring equipment of at least one of the products grouped together by common features in a product groupings category of design similarity comprising a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone interconnected to a product for communication therebetween, the monitoring equipment comprising:

at least one of a central processing unit (CPU), a network processor, or a microprocessor for executing and carrying out the instructions of a computer program or application which is specifically targeted at the networking application domain, for communication between the monitoring equipment and at least one of

a multi-sensor detection device, a maritime cargo container device, or a locking device;

a transmitter for transmitting signals and messages to at least one of the multi-sensor detection device, the maritime cargo container device, or the locking device;

a receiver for receiving signals, data or messages from at least one of the multi-sensor detection device, the maritime cargo container device or the locking device, wherein the signals, data or messages are of agents of an item of interest (IOI);

at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, or GPS connection;

the monitoring equipment is at least a fixed, portable or mobile monitoring equipment interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween; and

whereupon the monitoring equipment, is capable of the activation or deactivation of at least one of the multi-sensor detection device, the maritime cargo container device or the locking device;

wherein the at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, for signal communication with the transmitter, the receiver of the monitoring equipment, or transceivers of the products;

at least one tag that is read by the monitoring equipment that is capable of wireless near-field communication to achieve detection of at least one of a chemical agent, a biological agent, a radiological agent, a nuclear agent, or an explosive agent which allows radio frequency (RF) data to be at least one of received or transmitted between the tag and the monitoring equipment.

**16**. A built-in, embedded multi sensor detection system for monitoring products with a plurality of sensors detecting at least two agents selected from the group consisting of chemical, biological, radiological, explosive, human, and contraband agents;

comprising a built-in sensor array or fixed detection device into the product that detects agents by means of two or more sensors combined from the following list of sensors: a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor;

comprising a communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a personal digital assistant (PDA), a laptop, or a computer terminal for monitoring products, interconnected to a built-in sensor array or fixed detection device for communication therebetween;

wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan or signature such that the communication device that is at least one of the cell phone, the smart phone, the desktop, the handheld, the PDA, the laptop or the computer terminal is locked by the biometric lock disabler to prevent unauthorized use;

wherein the built-in embedded multi-sensor detection device receives a signal via any of one or more products in any product grouping categories; and

wherein, when an alarm occurs, the built-in, embedded multi sensor detection system communicates the alarm by way of at least one of the products grouped together

US 9,589,439 B2

21

by common features in a product groupings category of design similarity comprising at least one of product-to-product, product-to-satellite, product-to-cellular, product-to-long range radio frequency, product-to-short range radio frequency, product-to-radio frequency (RF), product-to-internet, product-to-broadband, product-to-smartphone or cell phone, product-to-computer at monitoring site, product-to-WiFi, product-to-handheld, or product-to-laptop or desktop for communication therebetween;

wherein the built-in embedded multi-sensor detection device is implemented by business or government at a minimum cost by products grouped together by common features in at least one of the several product groupings of design similarity.

17. A built-in multi sensor detection system for monitoring products with a plurality of sensors detecting at least two agents selected from the group consisting of chemical, biological, radiological, explosive, human, and contraband agents, comprising:

a built-in sensor array or fixed detection device into the product that detects agents by means of two or more sensors combined from the following list of sensors: a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor;

monitoring equipment of at least one of products grouped together by common features in a product groupings category of design similarity comprising at least one of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone for the receipt and transmission of signals therebetween;

wherein the built-in multi-sensor detection device is built in any of one or more products comprising a maritime cargo container, a lock, or the monitoring equipment;

wherein the built-in multi-sensor detection device is implemented by business or government by products grouped together by common features in at least one of several product groupings of design similarity;

a light alarm indicator that has a plurality of colored lights that correspond to specific agents of the at least two agents;

wherein, when the light alarm indicator lights to indicate an alarm occurs, the built-in multi sensor detection system communicates the alarm by way of at least one of the products grouped together by common features in the product groupings category of design similarity comprising at least one of product-to-product, product-to-satellite, product-to-cellular, product-to-radio frequency (RF), product-to-internet, product-to-broadband, product-to-smartphone or cell phone, product-to-computer at monitoring site, product-to-WiFi, product-to-handheld, or product-to-laptop or desktop for at least one of a receipt or transmission of signals therebetween.

18. A built-in multi sensor detection system for detecting at least two items selected from the group consisting of chemical agent, biological agent, radiological agent, explosive agent, human agent, contraband agent, motion, perimeter, temperature, tampering, theft, or breach, comprising:

a built-in sensor array or fixed detection device into a product that detects items by means of at least two sensors from the following list of sensors: a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor;

22

monitoring equipment of at least one of the products grouped together by common features in a product groupings category of design similarity comprising at least one of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone for the receipt and transmission of signals therebetween;

wherein the built-in, multi-sensor detection device is built in any of one or more products comprising a maritime cargo container, a lock, or the monitoring equipment;

wherein, when an alarm occurs, the built-in multi sensor detection system communicates the alarm by way of at least one of the products grouped together by common features in a product groupings category of design similarity comprising at least one of product-to-product, product-to-satellite, product-to-cellular, product-to-radio frequency (RF), product-to-internet, product-to-broadband, product-to-smartphone or cell phone, product-to-computer at monitoring site, product-to-WiFi, product-to-handheld, or product-to-laptop or desktop for the receipt and transmission of signals therebetween;

at least one tag that is read by the monitoring equipment that is capable of wireless near-field communication to achieve detection of at least one of the chemical agent, the biological agent, the radiological agent, the explosive agent, the human agent, the contraband agent, the motion, the perimeter, the temperature, the tampering, the theft, and the breach which allows radio frequency (RF) data to be received and/or transferred between the tag and the monitoring equipment.

19. A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, radiological agent, or compound, comprising:

a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human, or contraband agent or compound, capable of being disposed within, on, upon or adjacent a multi-sensor detection device;

monitoring equipment comprising at least one of a computer, personal computer (PC), laptop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone for at least one of a receipt or transmission of signals therebetween;

at least one cell phone tower interconnected to the monitoring equipment for sending signals thereto and receiving signals therefrom or at least one satellite capable of transmitting signals to the monitoring equipment;

at least one satellite or at least one cell phone tower capable of signal communication between the multi-sensor detection device and the monitoring equipment;

at least one internet connection capable of communication between the multi-sensor detection device and the monitoring equipment;

whereupon a signal sent to a receiver of the multi-sensor detection device from a satellite; or to a cell phone tower; or through at least one of a short range radio frequency or a long range radio frequency; causes a signal to be sent to the monitoring equipment that includes at least one of location data or sensor data;

wherein the monitoring equipment or multi-sensor detection device receives a signal via any of one or more products of any product grouping categories;

wherein at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection,

US 9,589,439 B2

23

radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency connection, or short range radio frequency (RF) connection is capable of signal communication with the transmitter, a receiver of the monitoring equipment, the multi-sensor detection device, or transceivers of the products;

wherein the monitoring equipment is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan or signature such that the monitoring device that is at least one of the computer, the laptop, the notebook, the PC, the handheld, the cell phone, the PDA, or the smart phone is locked by the biometric lock disabler to prevent unauthorized use;

wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, long range radio frequency, and short range radio frequency (RF).

20. A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, radiological agents or compound, comprising:

a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human, or contraband agent or compound, capable of being disposed within, on, upon or adjacent a multi-sensor detection device;

monitoring equipment of at least one of products grouped together by common features in a product groupings category of design similarity comprising at least one of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA), or smart phone for at least one of a receipt or transmission of signals therebetween;

wherein the monitoring equipment is equipped with a lock disabling mechanism that is able to engage (lock), or disengage (unlock), or disable (to make unavailable) a product's lock, wherein the lock disabling mechanism disables the product's lock after a specific number of tries by an unauthorized user to disengage the lock by maintaining the product's lock in the current state of the product's lock regardless of input entered to change the state of the product's lock by the unauthorized user;

at least one cell phone tower interconnected to the monitoring equipment for sending signals thereto and receiving signals therefrom; or at least one satellite capable of transmitting signals to the monitoring equipment;

at least one satellite or at least one cell phone tower capable of signal communication between the multi-sensor detection device and the monitoring equipment;

at least one internet connection capable of communication between the multi-sensor detection device and the monitoring equipment; and

whereupon a signal sent to a receiver of the multi-sensor detection device from a satellite; or to a cell phone tower; or through at least one of a short range radio frequency or a long range radio frequency; causes a signal to be sent to the monitoring equipment that includes location data and/or sensor data;

wherein the multi-sensor detection device is implemented by business or government by products grouped together by common features in at least one of several product groupings of design similarity;

24

wherein the multi-sensor detection device is for any of one or more products comprising a maritime cargo container, a lock, or the monitoring equipment;

wherein at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency connection, or short range radio frequency connection is in signal communication with a transmitter and a receiver of the monitoring equipment or multi-sensor detection device and transceivers of the products.

21. A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, or radiological agents and compounds, comprising:

a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human, or contraband agent or compound, capable of being disposed within, on, upon or adjacent a multi-sensor detection device, wherein at least one of the sensors is capable of detecting agents of an item of interest (IOI);

monitoring equipment of at least one of the products grouped together by common features in a product groupings category of design similarity comprising at least one of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA), or smart phone for at least one of a receipt or transmission of signals therebetween;

at least one satellite or at least one cell phone tower capable of signal communication between the multi-sensor detection device and the monitoring equipment;

at least one internet connection capable of communication between the multi-sensor detection device and the monitoring equipment;

whereupon a signal sent to a receiver of the multi-sensor detection device for detecting the agents of the item of interest causes a signal that includes at least one of location data or sensor data to be sent to the monitoring equipment;

wherein the multi-sensor detection device for any of one or more products comprising a maritime cargo container, a lock, or the monitoring equipment;

wherein at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, or broadband connection, is in signal communication with a transmitter, a receiver of the monitoring equipment, or transceivers of the products;

at least one tag that is read by the monitoring equipment that is capable of wireless near-field communication to achieve detection of at least one of the explosive agent, the nuclear agent, the contraband agent, the chemical agent, the biological agent, the human agent, or the radiological agent which allows radio frequency (RF) data to be received and/or transferred between the tag and the monitoring equipment.

22. A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a personal digital assistant (PDA), a laptop, or a computer terminal, comprising:

at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; that is wired or wireless, capable of being disposed within, on, upon or adjacent the communication device;

US 9,589,439 B2

25

at least one of a central processing unit (CPU), a network processor, or a front end processor for communication between a host computer and other devices;

a transmitter for transmitting signals and messages to at least one of a multi-sensor detection device, a cell phone detection device, or a locking device;

a receiver for receiving signals, data or messages from at least one of a multi-sensor detection device, a cell phone detection device, or a locking device;

at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, cellular connection, long and/or short range radio frequency (RF) connection, or GPS connection;

the communication device being at least a fixed, portable or mobile communication device, equipped with at least one wired or wireless sensor for the detection of humans;

the communication device being equipped to receive signals from or send signals to engage (lock), disengage (unlock), or disable (make unavailable) locks;

the communication device being equipped with biometrics that incorporates at least one of a fingerprint recognition or a face recognition to at least one of gain access to the device or to prevent unauthorized use;

the communication device being capable of wireless near-field communication (NFC) which allows radio frequency (RF) data to be at least one of received or transferred between the communication device and at least one tag that is read by the communication device;

whereupon a signal sent to the receiver of at least one of a multi-sensor detection device, a cell phone detection device, or a locking device from a satellite or a cell phone tower or through at least one of a Bluetooth connection, a WiFi connection, an internet connection, a cellular connection, a GPS connection, a short range radio frequency (RF) connection, or a long range radio frequency (RF) connection, causes a signal that includes at least one of location data or sensor data to be sent to the communication device; and

wherein at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, cellular connection, long range radio frequency (RF) connection, or short range radio frequency (RF) connection, capable of signal communication with the transmitter of the communication device, the receiver of the communication device, or the central processing unit (CPU).

26

23. A cell phone comprising:

a central processing unit (CPU) for executing and carrying out the instructions of a computer program;

a transmitter for transmitting signals and messages to a cell phone detection device;

a receiver for receiving signals from the cell phone detection device;

at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection;

the cell phone is at least a fixed, portable or mobile communication device interconnected to the cell phone detection device, capable of wired or wireless communication therebetween; and

whereupon the cell phone is interconnected to the cell phone detection device to receive signals or send signals to lock or unlock doors, to activate or deactivate security systems, to activate or deactivate multi-sensor detection systems, or to activate or deactivate the cell phone detection device;

at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone;

wherein at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection is capable of signal communication with the transmitter or the receiver;

wherein the cell phone is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature such that the cell phone is locked by the biometric lock disabler to prevent unauthorized use; and

whereupon a signal sent to the receiver of the cell phone detection device from at least one of the chemical sensor, the biological sensor, the explosive sensor, the human sensor, the contraband sensor, or the radiological sensor, causes a signal that includes at least one of location data or sensor data to be sent to the cell phone.

* * * * *



US010163287B2

(12) **United States Patent**
Golden

(10) Patent No.: **US 10,163,287 B2**
(45) Date of Patent:     **Dec. 25, 2018**

(54) **MULTI SENSOR DETECTION, STALL TO STOP AND LOCK DISABLING SYSTEM**

(71) Applicant: **Larry Golden**, Greenville, SC (US)

(72) Inventor: **Larry Golden**, Greenville, SC (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **15/530,839**

(22) Filed: **Mar. 6, 2017**

(65) **Prior Publication Data**

US 2017/0186259 A1     Jun. 29, 2017

**Related U.S. Application Data**

(60) Continuation of application No. 14/806,988, filed on Jul. 23, 2015, now Pat. No. 9,589,439, which is a continuation of application No. 14/021,693, filed on Sep. 9, 2013, now Pat. No. 9,096,189, which is a continuation of application No. 13/288,065, filed on Nov. 3, 2011, now Pat. No. 8,531,280, which is a
(Continued)

(51) **Int. Cl.**
   *G08B 27/00*     (2006.01)
   *G07C 9/00*     (2006.01)
   *B60R 25/24*     (2013.01)
   *B60R 25/04*     (2013.01)

(52) **U.S. Cl.**
   CPC ..........  *G07C 9/00174* (2013.01); *B60R 25/04* (2013.01); *B60R 25/24* (2013.01); *G07C 9/00007* (2013.01); *G07C 9/00563* (2013.01)

(58) **Field of Classification Search**
   CPC .. G07C 9/00; G07C 9/00007; G07C 9/00174; G07C 9/00309; G07C 9/00388; G07C

9/00563; G08B 27/00; G08B 27/005; G08B 27/006; B60R 25/018; B60R 25/04; B60R 25/10; B50R 25/102
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,385,469 A     5/1983   Scheuerpflug et al.
4,544,267 A     10/1985   Schiller
(Continued)

OTHER PUBLICATIONS

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/199,853; copyright and dated Jan. 13, 2012, pp. 1-34, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; U.S. Appl. No. 13/288,065 (34 pages).

(Continued)

*Primary Examiner* — Van Trieu

(57)     **ABSTRACT**

A multi sensor detection and disabling lock system includes detector cases for holding interchangeable detectors that sample for chemical, biological and radiological compounds, agents and elements, with each detector case disposed in or upon the monitored product. The detector case transmits detection information to a monitoring computer terminal and transmits a signal to a lock disabler engaged to the product to lock or disable the product's lock thereby preventing untrained, unauthorized and unequipped individuals from gaining access and entry to the product, and also preventing further contamination of the area. The detection system can be interconnected to surveillance towers scanning detector cases disposed at seaport docks, freight depots and rail terminals for monitoring containers being prepared for shipment or sitting on docks for long periods of time.

**6 Claims, 13 Drawing Sheets**



**US 10,163,287 B2**

Page 2

**Related U.S. Application Data**

division of application No. 12/802,001, filed on May 27, 2010, now Pat. No. 8,334,761, which is a continuation of application No. 12/657,356, filed on Jan. 20, 2010, now Pat. No. 8,106,752, which is a continuation of application No. 12/155,573, filed on Jun. 6, 2008, now Pat. No. 7,636,033, which is a continuation-in-part of application No. 11/397,118, filed on Apr. 5, 2006, now Pat. No. 7,385,497.

(56)                **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,586,441 A | 5/1986 | Zekich | |
| 4,792,226 A | 12/1988 | Fishbine et al. | |
| 5,222,152 A | 6/1993 | Fishbine et al. | |
| 5,223,844 A | 6/1993 | Mansell et al. | |
| 5,233,404 A | 8/1993 | Lougheed et al. | |
| 5,557,254 A | 9/1996 | Johnson et al. | |
| 5,682,133 A | 10/1997 | Johnson et al. | |
| 5,766,956 A | 6/1998 | Groger et al. | |
| 5,938,706 A | 8/1999 | Feldman | |
| 5,959,529 A | 9/1999 | Kail | |
| 5,963,657 A | 10/1999 | Bowker et al. | |
| 5,986,543 A | 11/1999 | Johnson | |
| 5,990,785 A | 11/1999 | Suda | |
| 6,049,269 A | 4/2000 | Byrd et al. | |
| 6,078,265 A | 6/2000 | Bonder et al. | |
| 6,262,656 B1 | 7/2001 | Byrd et al. | |
| 6,271,745 B1 | 8/2001 | Anzai et al. | |
| 6,374,652 B1 | 4/2002 | Ilwang | |
| 6,411,887 B1 | 6/2002 | Martens et al. | |
| 6,470,260 B2 | 10/2002 | Martens et al. | |
| 6,542,076 B1 | 4/2003 | Joao | |
| 6,542,077 B2 | 4/2003 | Joao | |
| 6,588,635 B2 | 7/2003 | Vor Keller et al. | |
| 6,610,977 B2 | 8/2003 | Megerle | |
| 6,613,571 B2 | 9/2003 | Cordery et al. | |
| 6,628,813 B2 | 9/2003 | Scott et al. | |
| 6,647,328 B2 | 10/2003 | Walker | |
| 6,738,697 B2 | 5/2004 | Breed | |
| 6,923,509 B1 | 8/2005 | Barnett | |
| 6,980,092 B2 | 12/2005 | Turnbull et al. | |
| 6,988,026 B2 | 1/2006 | Breed et al. | |
| 7,005,982 B1 | 2/2006 | Frank | |
| 7,034,677 B2 | 4/2006 | Steinthal et al. | |
| 7,034,683 B2 | 4/2006 | Ghazarian | |
| 7,103,460 B1 | 9/2006 | Breed | |
| 7,116,798 B1 | 10/2006 | Chawla | |
| 7,148,484 B2 | 12/2006 | Craig et al. | |
| 7,171,312 B2 | 1/2007 | Steinthal et al. | |
| 7,184,117 B2 | 1/2007 | Breed et al. | |
| 7,243,945 B2 | 7/2007 | Breed et al. | |
| 7,339,469 B2 | 3/2008 | Braun | |
| 7,346,439 B2 | 3/2008 | Bodin | |
| 7,350,608 B2 * | 4/2008 | Fernandez | B60L 1/00 180/65.1 |
| 7,385,497 B2 | 6/2008 | Golden | |
| 7,397,363 B2 | 7/2008 | Joao | |
| 7,636,033 B2 | 12/2009 | Golden | |
| 7,647,180 B2 | 1/2010 | Breed | |
| 7,844,505 B1 | 11/2010 | Arneson et al. | |
| 7,868,912 B2 | 1/2011 | Venetianer et al. | |
| 7,872,575 B2 | 1/2011 | Tabe | |
| 7,880,767 B2 | 2/2011 | Chinigo | |
| 7,961,094 B2 | 6/2011 | Breed | |
| 8,120,459 B2 * | 2/2012 | Kwak | G07C 9/00309 340/5.2 |
| 8,274,377 B2 | 9/2012 | Smith et al. | |
| 8,531,521 B2 | 9/2013 | Romanowich | |
| 8,564,661 B2 | 10/2013 | Lipton et al. | |
| 2002/0145666 A1 | 10/2002 | Scaman | |
| 2003/0063004 A1 | 4/2003 | Anthony et al. | |
| 2003/0137426 A1 | 7/2003 | Anthony et al. | |
| 2003/0179073 A1 * | 9/2003 | Ghazarian | E05B 47/00 340/5.6 |
| 2003/0206102 A1 | 11/2003 | Joao | |
| 2004/0107028 A1 | 6/2004 | Catalano | |
| 2004/0222092 A1 | 11/2004 | Musho | |
| 2005/0195069 A1 | 9/2005 | Dunand | |
| 2006/0164239 A1 | 7/2006 | Loda | |
| 2006/0176169 A1 | 8/2006 | Doolin et al. | |
| 2006/0181413 A1 | 8/2006 | Mostov | |
| 2006/0250235 A1 | 11/2006 | Astrin | |
| 2007/0093200 A1 * | 4/2007 | Dobosz | H04B 7/18565 455/3.02 |
| 2007/0171042 A1 | 7/2007 | Metes et al. | |
| 2007/0257774 A1 * | 11/2007 | Stumpert | G06Q 10/08 340/7.1 |
| 2008/0045156 A1 | 2/2008 | Sakhpara | |
| 2008/0122595 A1 | 5/2008 | Yamamichi et al. | |
| 2008/0234907 A1 | 9/2008 | Labuhn et al. | |
| 2010/0159983 A1 | 5/2010 | Golden | |
| 2011/0178655 A1 | 6/2011 | Golden | |

OTHER PUBLICATIONS

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/065,837; copyright and dated Dec. 2, 2011, pp. 1-27, publisher United States and Trademark Office, Alexandria, Virginia, USA; U.S. Appl. No. 13/288,065 (27 pages).

United States Patent and Trademark Office; Office Action, Office Action from U.S. Appl. No. 13/065,837; copyright and dated Nov. 1, 2011, pp. 1-18, publisher United States Patent and Trademark Office, Alexandria, Virgina, USA; U.S. Appl. No. 13/288,065 (18 pages).

United States Patent and Trademark Office; Office Action from U.S. Appl. No. 11/397,118; dated Nov. 14, 2007, Alexandria, Virgina, USA; pp. 1-12; U.S. Appl. No. 13/288,065 (12 pages).

United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/155,573; dated Apr. 9, 2009; Alexandria, Virgina, USA; pp. 1-7; U.S. Appl. No. 13/288,065 (7 pages).

United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/155,573; dated Jul. 30, 2009; Alexandria, Virgina, USA; pp. 1-9; U.S. Appl. No. 13/288,065 (9 pages).

United States Patent and Trademark Office; Notice of Allowability from U.S. Appl. No. 12/155,573; dated Oct. 28, 2009; Alexandria, Virgina, USA; pp. 1-5; U.S. Appl. No. 13/288,065 (5 pages).

United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/657,356; dated Jul. 12, 2010; Alexandria, Virgina, USA; pp. 1-14; U.S. Appl. No. 13/288,065 (14 pages).

United States Patent and Trademark Office; Notice of Allowability from U.S. Appl. No. 12/657,356; dated Mar. 10, 2011; Alexandria, Virginia, USA; pp. 1-4; U.S. Appl. No. 13/288,065 (4 pages).

United States Patent and Trademark Office; Office Action from U.S. Appl. No. 13/065,837; dated Jul. 18, 2011; Alexandria, Virgina, USA, pp. 1-9; U.S. Appl. No. 13/288,065 (9 pages).

A newspaper article of Mr. Melvin Sullivan and his family that references the date, Mar. 5, 2001, U.S. Appl. No. 13/288,065.

A letter of response Mr. Sullivan received from Pfeiffer & Gantt, PA, dated Sep. 16, 2002, U.S. Appl. No. 13/288,065.

A "Certificate of Existance" Bright Idea Inventor, LLC. Nov. 6, 2002, U.S. Appl. No. 13/288,065.

A letter of response Golden received from the Honorable Congressman from Maryland, Elijah E. Cummings, dated Dec. 16, 2002; U.S. Appl. No. 13/288,065.

A newspaper article of Mr. Melvin Sullivan and Mr. Larry Golden, dated Feb. 27-Mar. 5, 2003; U.S. Appl. No. 13/288,065.

A letter of response Golden received from the Honorable Senator from South Carolina, Ernest F. Hollings, dated May 21, 2003; U.S. Appl. No. 13/288,065.

A letter of response Golden received from the Office of the Vice President, Dick Cheney, dated Jun. 3, 2003; U.S. Appl. No. 13/288,065.

A letter of response Golden received from the Honorable Senator from South Carolina, Ernest F. Hollings, dated Oct. 1, 2003; U.S. Appl. No. 13/288,065.

A letter of response Golden received from the Honorable Senator from South Carolina, Lindsey O. Graham, dated Oct. 21, 2003; U.S. Appl. No. 13/288,065.

US 10,163,287 B2

Page 3

(56)          **References Cited**

OTHER PUBLICATIONS

A letter sent to the President of the United States George W Bush, the President's Cabinet, the United States Senate and the Congressional Black Caucus, dated May 23, 2005; U.S. Appl. No. 13/288,065.

On Nov. 17, 2005, an "Inventor's Office Record of Invention", was filed in my name (Golden) at "The Law Office of David P. Gaudio,P.C.; the Inventors Network."; U.S. Appl. No. 13/288,065.

On Aug. 23, 2005, the "Disclosure Document Registration"; U.S. Appl. No. 13/288,065.

On Apr. 5, 2006, the "Patent Application" was filed in my name (Golden) at the United States Patent & Trademark Office in Washington, D.C.; U.S. Appl. No. 13/288,065.

On Jun. 6, 2008, the "Continuance-In-Part, (CIP) Application" was filed in my name (Golden) at the United States Patent & Trademark Office in Washington, D.C.; U.S. Appl. No. 13/288,065.

On Jan. 20, 2010, a "Continuation Application" (U.S. Appl. No. 12/657,356) was filed in my name (Golden) at the United States Patent & Trademark Office in Washington, D.C.; U.S. Appl. No. 13/288,065.

Reissue of U.S. Pat. No. 7,636,033,"Swear Back"; in accordance to Title 37—Code of Federal Regulations Patents, Trademarks, and Copyrights; Apr. 8, 2011; U.S. Appl. No. 13/288,065.

Reissue of U.S. Pat. No. 7,636,033; "Swearback-History of Work"; Apr. 8, 2011; U.S. Appl. No. 13/288,065.

United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/802,001, dated Apr. 14, 2011, 2011; Alexandria, Virginia, USA; pp. 1-16; U.S. Appl. No. 13/288,065 (16 pages).

United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/802,001; dated May 27, 2011; Alexandria, Virginia, USA; pp. 1-14; U.S. Appl. No. 13/288,065 (14 pages).

United States Department of Homeland Security: Petition for Inter Partes Review of U.S. Pat. No. Re. 43,990 Under 35 U.S.C. §312 and 37 C.F.R. §42.104; Case IPR2014-00714 for U.S. Pat. No. Re. 43,990; Filed Apr. 30, 2014; Washington, D.C., USA: pp. 1-57; U.S. Appl. No. 14/806,988 (57 pages).

United States Department of Homeland Security; Declaration of Dr. Sriram Vishwanath; Case IPR2014-00714 for U.S. Pat. No. Re. 43,990; Filed Apr. 30, 2014; Washington D.C., USA; pp. 1-44; U.S. Appl. No. 14/806,988 (44 pages).

Richard R Brooks and S.S. Iyengar; Multi-Sensor Fusion Fundamentals and Applications with Software; published 1998; Copyright Prentice Hall PTR; Upper Saddle River, New Jersey, USA; pp. 1-20; copy enclosed (20 pages). U.S. Appl. No. 14/806,988 (20 pages).

Ramanarayanan Viswanathan and Pramod K Varshney; Distributed Detection with Multiple Sensors: Part I—Fundamentals; Proceedings of the IEEE; Jan. 1, 1997; pp. 1-11; vol. 85; No. 1; Southern Illinois University Carbondale OpenSIUC: Illinois. USA; pp. 1-11; U.S. Appl. No. 14/806,988 (11 pages).

Blum; Distributed Detection with Multiple Sensors: Part II—Advanced Topics: Proceedings of the IEEE; Jan. 1, 1997; pp. 1-16; vol. 85, No. 1; Southern Illinois University Carbondale OpenSIUC; Illinois, USA; U.S. Appl. No. 14/806,988 (16 pages).

Victor Lesser; Distributed Sensor Networks a Multragent Perspective; 2003; pp. 1, 2, 5, 6322, 26, 27, 36, 275, 320: copyright 2003 Kluwer Academic Publishers; AH Dordrecht. The Netherlands; U.S. Appl. No. 14/806,988 (10 pages).

Samuel Blackman and Robert Popoli; Design and Analysis of Modern Tracking Systems; 1999; pp. 1, 2, 6, 472; copyright 1999 Artech House; Norwood, Massachusetts, USA; U.S. Appl. No. 14/806,988 (4 pages).

Jean-Francois Chamberland; Decentralized Detection in Sensor Networks; 2003; pp. 407-416 IEEE Transactions on Signal Processing; vol. 51, No. 2; Urbana. Illinois, USA; U.S. Appl. No. 14/806,988 (10 pages).

Oleg Kachirski and Ratan Guha; Effective Intrusion Detection Using Multiple Sensors in Wireless Ad Hoc Networks; pp. 1-8; Proceedings of the 36.sup.th Hawaii International Conference on System Sciences; copyright 2003; Orlando, Florida. USA; U.S. Appl. No. 14/806,988 (8 pages).

Lawrence A Klein; Sensor and Data Fusion a Tool for Information Assessment and Decision Making; 2004; pp. 1-4, 6, 81, 87-89; copyright 2004 The Society of Photo-Optical Instrumentation Engineers; Publisher is SPIE—the International Society for Optical Engineering; Bellingham, Waehington, USA; U.S. Appl. No. 14/806,988.

Dale Ferriere and Khrystyna Pysareva and Andrzej Rucinski; Using Technology to Bridge Maritime Security Gaps, Aug. 1, 2005; Sea Technology; pp. 1-6; copyright Compass Publications, Inc. Jan. 2009; Portsmouth, New Hampshire. USA; U.S. Appl. No. 14/806,988 (6 pages).

Corie Lok; Cargo Security; MIT Technology Review; Jun. 2004; No. 107; pp. 74-75; publisher is Massachusetts institute of Technology; Cambridge, Massachusetts, USA; USPASN14/806988 (2 pages).

Thomas C Chen; RFID and Sensor-based Container Content Visibility and Seaport Security Monitoring system; Proceedings of SPIE, vol. 5778; pp. 151-159; Mar. 28, 2005; Publisher is SPIE—the International Society for Optical Engineering; Bellingham, Washington, USA; USPASN14/806988 (10 pages).

United States Department of Homeland Security; The University of Texas at Austin College of Engineering Standard Resume of Sriram Vishwanath; CaseIPR2014-00714 for U.S. Pat. No. Re. 43,990; Filed Apr, 30, 2014; Washington, D.C., USA; pp. 1-21; USPASN14/806988 (21 pages).

Operating Agreement of Bright Idea Inventor, LLC received from Pfeiffer & Gantt, PA, dated Nov. 13, 2002; U.S. Appl. No. 13/288,065.

United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/802,001; dated Oct. 20, 2011; Alexandria, Virginia, USA; pp. 1-5; parent U.S. Appl. No. 13/288,065 (5 pages); U.S. Appl. No. 13/288,065 (5 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 12/802,001; copyright and dated Dec. 12, 2011, pp. 1-9, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA, parent U.S. Appl. No. 13/288,065 (9 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 12/802,001; copyright and dated Mar. 26, 2012, pp. 1-12, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; U.S. Appl. No. 13/288,065 (12 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/199,853; copyright and dated Feb. 22, 2012, pp. 1-38, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; U.S. Appl. No. 13/288,065 (38 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/065,837; copyright and dated Feb. 22, 2012, pp. 1-25, publisher United States Patent and Trademark office, Alexandria, Virginia, USA; U.S. Appl. No. 13/288,065 (25 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/288,065; copyright and dated Aug. 24, 2012, pp. 1-4, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; U.S. Appl. No. 13/288,065 (4 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/288,065; copyright and dated Nov. 28, 2012, pp. 1-11, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; U.S. Appl. No. 13/288,065 (11 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/288,065; copyright and dated Apr. 16, 2013, pp. 1-9, publisher United States Patent and Trademark Office, Alexandria, Virgina, USA; U.S. Appl. No. 13/288,065 (9 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 14/021,693, copyright and dated Apr. 20, 2015, pp. 1-20, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; U.S. Appl. No. 14/021,693 (20 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 14/021,693; copyright and dated Jan.

**US 10,163,287 B2**

Page 4

(56)        **References Cited**

OTHER PUBLICATIONS

20, 2015, pp. 1-17, publisher United States Patent and Trademark
Office, Alexandria, Virgina, USA; U.S. Appl. No. 14/021,693 (17
pages).
United States Patent and Trademark Office; Office Action; Office
Action from U.S. Appl. No. 14/021,693; copyright and dated Sep.
5, 2014, pp. 1-12, publisher United States Patent and Trademark
Office, Alexandria, Virginia, USA; U.S. Appl. No. 14/021,693 (12
pages).
United States Patent and Trademark Office; Office Action; Office
Action from U.S. Appl. No. 14/806,988; copyright and dated Jul. 5,
2015, pp. 1-5, publisher United States Patent and Trademark Office,
Alexandria, Virgina, USA; parent U.S. Appl. No. 14/806,988 (5
pages).
United States Patent and Trademark Office; Notice of Allowance
from U.S. Appl. No. 14/806,988; dated Jan. 3, 2017; Alexandria,
Virgina, USA; pp. 1-8; U.S. Appl. No. 14/806,988 (8 pages).
United States Patent and Trademark Office; Notice of Allowance
from U.S. Appl. No. 14/021,693; dated Jun. 19, 2015; Alexandria,
Virginia, USA; pp. 1-8; U.S. Appl. No. 14/021,693 (8 pages).
United States Patent and Trademark Office; Notice of Allowance
from U.S. Appl. No. 13/288,065; dated May 24, 2013; Alexandria,
Virgina, USA; pp. 1-8; U.S. Appl. No. 13/288,065 (8 pages).

* cited by examiner



**Fig. 1**

**Fig. 2**



**Fig. 3a**



**Fig. 3b**



**Fig. 4**



**Fig. 5**



**Fig. 6**

**Fig. 7**

SAppx942



**Fig. 8**

SAppx943



**Fig. 9**



**Fig. 10**



**Fig. 11**

SAppx945



Fig. 12

Fig. 13

SAppx946



**Fig. 14**

**Fig. 15**

SAppx947



**Fig. 16**

SAppx948



Fig. 17

SAppx949



**Fig. 18**

SAppx950



**Fig. 19**

SAppx951

US 10,163,287 B2

<div style="text-align:center">1</div>

## MULTI SENSOR DETECTION, STALL TO STOP AND LOCK DISABLING SYSTEM

### CROSS REFERENCE TO RELATED APPLICATION

This application is a continuation application and claims the filing date and benefit of U.S. patent application Ser. No. 14/806,988 title "Multi Sensor Detection, Stall to Stop and Lock Disabling System" filed on Jul. 23, 2015 that issued on Mar. 7, 2017 as U.S. Pat. No. 9,589,439, the entire contents of which are incorporated by reference herein in their entirety for all purposes. U.S. Pat. No. 9,589,439 is a continuation application and claims the filing date and benefit of U.S. patent application Ser. No. 14/021,693 title "Multi Sensor Detection, Stall to Stop and Lock Disabling System" filed on Sep. 9, 2013 that issued on Aug. 4, 2015 as U.S. Pat. No. 9,096,189, the entire contents of which are incorporated by reference herein in their entirety for all purposes. U.S. Pat. No. 9,096,189 is a continuation application and claims the filing date and benefit of U.S. patent application Ser. No. 13/288,065 title "Multi Sensor Detection, Stall to Stop and Lock Disabling System" filed on Nov. 3, 2011 that issued on Sep. 10, 2013 as U.S. Pat. No. 8,531,280, the entire contents of which are incorporated by reference herein in their entirety for all purposes. U.S. patent application Ser. No. 13/288,065 that will issue as U.S. Pat. No. 8,531,280 is a divisional application and claims the filing date and benefit of U.S. patent application Ser. No. 12/802,001 title "Multi Sensor Detection, Stall to Stop and Lock Disabling System" filed on May 27, 2010, that issued on Dec. 18, 2012 as U.S. Pat. No. 8,334,761, the entire contents of which are incorporated by reference herein in their entirety for all purposes. U.S. Pat. No. 8,334,761 is a continuation application and claims the filing date and benefit of U.S. patent application Ser. No. 12/657,356 title "Multi Sensor Detection, Stall to Stop and Lock Disabling System" filed on Jan. 20, 2010 that issued on Jan. 31, 2012 as U.S. Pat. No. 8,106,752 the entire contents of which are incorporated by reference herein in their entirety for all purposes. U.S. Pat. No. 8,106,752 is a continuation of and claims priority to U.S. Pat. No. 7,636,033. U.S. Pat. No. 7,636,033 is a continuation-in-part of and claims priority to U.S. Pat. No. 7,385,497. U.S. patent application Ser. No. 13/288,065 that will issue as U.S. Pat. No. 8,531,280 also claims the filing date and benefit of and incorporates the entire contents of U.S. patent application Ser. No. 12/657, 356, now U.S. Pat. No. 8,106,752 herein by reference for all purposes. The present application also claims the filing date and benefit of and incorporates the entire contents of U.S. Pat. Nos. 9,096,189; 8,531,280; 8,334,761; 8,106,752; 7,636,033; and 7,385,497 by reference herein in their entireties for all purposes.

### FIELD OF THE INVENTION

The present invention pertains to anti-terrorist detection and prevention systems, and more particularly pertains to a disabling lock mechanism combined with a chemical/biological/radiological detection system for use with products grouped together by similar characteristics in order to prevent unauthorized entry, contamination and terrorist activity.

### BACKGROUND

Terrorist activity is a continuous, daily, worldwide threat to the stability, prosperity, security and peace within nations

<div style="text-align:center">2</div>

and between and among nations. Its danger lies in its arbitrary destructiveness as much as in its unpredictability, and the constant threat of terrorist activity compels measures and actions that cause strain and contention in free, democratic societies as security concerns and civil liberty concerns must be balanced so that both public safety and civil liberties are maintained. Safety and security concerns can be addressed through numerous proactive steps and measures, many of which cause only minimal interference with and disruption of the daily routines of work, travel, commerce and entertainment. However, because modern industrial societies afford almost limitless places, locations, and opportunities for terrorist activities, no safety measure or security protocol will be foolproof, but many security measures, systems and protocols can be implemented that greatly minimize specific threats through fingerprint identification procedures, chemical, biological, and radiological hazard detections, bomb and explosive detection, and controlling the access to everything from shipping containers to school lockers. Thus, the prior art discloses a wide range of security measures and systems.

For example, the Fishbine et al. patent (U.S. Pat. No. 4,792,226) discloses an optical fingerprinting system that includes an optics/processor unit, a video monitor, a data terminal, and a printer for collecting and storing data characteristics of all ten individual fingerprints for printing demographic information and fingerprint images as desired on a standard booking or applicant card.

The Schiller patent (U.S. Pat. No. 4,544,267) discloses a finger identification unit that includes a fingerprint scanning apparatus using a collimated beam of light to interrogate the fingerprint of a finger placed against a platen so that successive scan positions produce signals containing fingerprint information.

The Fishbine et al. patent (U.S. Pat. No. 5,222,152) discloses a portable fingerprint scanning apparatus for optically scanning and recording fingerprint images and wirelessly transmitting such images to a mobile processing unit for verification and background checking.

The Lougheed et al. patent (U.S. Pat. No. 5,233,404) discloses an optical scanning apparatus that uses a linear charge coupled device (CCD) for recording the image of a fingerprint on the viewing surface.

The Groger et al. patent (U.S. Pat. No. 5,766,956) discloses a diode laser based sensor for undertaking optical, chemical, immunological or nucleic acid-based assay or other chemical analysis.

The Feldman patent (U.S. Pat. No. 5,938,706) discloses a multi element security system for preventing the unauthorized use of an automotive vehicle, and which includes numerous locking and control features interconnected to an onboard cpu.

The Bowker et al. patent (U.S. Pat. No. 5,963,657) discloses a safety access control for doors, handles, locks, etc., wherein the surface relief of a finger is read and verified to either allow or prevent access by the individual to the door, handle, lock, etc.

The Bonder et al. patent (U.S. Pat. No. 6,078,265) discloses a fingerprint identification security system wherein a key lock operated security system utilizes the fingerprint of the individual to control user access to the security system, such as the ignition system of an automotive vehicle.

The Anzai et al. patent (U.S. Pat. No. 6,271,745 B1) discloses a keyless authorization system for use of a motor vehicle that includes fingerprint reading units located on the exterior or interior of the motor vehicle and which are

US 10,163,287 B2

**3**

coupled to a control unit for scanning, comparing and matching fingerprints to allow or disallow access to the motor vehicle.

The Hwang patent (U.S. Pat. No. 6,374,652 B1) discloses a fingerprint-activated doorknob in which a detecting sensor for a fingerprint is placed on the doorknob for measuring and searching the fingerprint against previously stored fingerprint inputs to control access to the door.

The Vor Keller et al. patent (U.S. Pat. No. 6,588,635 B2) discloses a safety holster for a firearm that includes a pivotally mounted retaining member and a fingerprint sensor for scanning fingerprint information so that only authorized users can withdraw the firearm from the holster.

The Cordery et al. patent (U.S. Pat. No. 6,613,571 B2) discloses a method and system for detecting biological and chemical hazards in the mail that includes sensors placed within the mail box for sampling and testing ambient air and so that mail can be safely transported through the mail system.

The Nagata patent (U.S. Pat. No. 6,628,213 B2) discloses a coding method for digital signal coding and decoding that includes a CMI (code-marked inversion) method of signal coding.

Nonetheless, despite the ingenuity of the above devices, methods, and systems, there remains a need for a multi-detector and disabling lock system for use with various types of products collected together by common characteristics into product groupings for detecting chemical, biological and radiological agents and compounds and for selectively disabling and activating the product locks thereby preventing unauthorized entry and further contamination and preventing and thwarting terrorist activities.

## SUMMARY

The present invention comprehends a chemical/biological/radiological detector unit with a disabling locking system for protecting products that can be grouped into several product groupings, from terrorist activity, and also for preventing unauthorized access to and tampering with the storage and transport of ordnance and weapons. The products grouped into what may be referred to as Product grouping 1 include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes and lockers; while the products grouped into what may be referred to as Product grouping 2 include, but are not limited to, chemical, biological, radiological, and nuclear detectors, motion sensors and door sensors. The multi sensor detection system includes the capability to disable an existing lock or activate a lock located inside any of the products named in the product grouping categories upon activation of a sensor or detector included in the system. This is a significant feature for the multi sensor detection system as it prevents unauthorized, unequipped and untrained entry and access to the product thus preventing further contamination of the site and to individuals in the area.

The multi sensor detection and lock disabling system includes a detector case sized to fit in, upon or adjacent any of the aforedescribed products for detecting harmful and dangerous chemical, biological, and radiological agents, compounds and elements. In addition, the multi sensor detection and lock disabling system is capable of transmitting a signal to lock or disable a lock on the product, and is also capable of transmitting signals to a monitoring computer terminal or PC so that appropriate defensive and safeguarding actions can be undertaken and an authorized individual can disarm and reset the locking system and the

**4**

multi sensor detection system. The detector case includes a power source (battery or electrical), interior compartments, Internet and GPS connections and a cpu interconnected with the Internet and GPS connections, and also interconnected with one or more off site monitoring computer terminals or PCs. The detector case includes one or more light alarm indicators that are externally visible and that light up when the chemical, biological, or radiological agent or compound is detected, and the light alarm indicators (which can be indicator lights or panels on the front of the detector case) can be color coded for denoting the specific agent or compound detected, i.e., separate and distinct colors for indicating detection of the chemical, biological, or radiological agent or compound.

The detector case is designed to hold within the interior compartments one or more interchangeable detectors, and each detector is adapted and set up to sample a specific compound or agent. Each detector includes a sound alarm, a sensor, a light alarm, and a readings panel, and is electrically interconnected (either by wire or wirelessly) to the cpu of the detector case so that information regarding the detection of the particular agent or compound can be conveyed from the detectors to the detector case cpu. Each detector can also be used as a manual, stand-alone hand held scanner.

The multi sensor detection and lock disabling system can be interconnected to a surveillance watchtower, as well as monitoring computer terminals or PCs, with the watchtower scanning shipping and cargo crates and containers being prepared for shipment or sitting for extended periods of time on a dock or at a port, at a railway site, or at an industrial storage facility. The watchtower will scan the cargo and shipping crates and containers for the light alarm indicators on detector cases that are mounted in or upon the crates and containers, and thus continuous security surveillance of the crates and containers can be maintained.

An enhanced version of the multi sensor detection and lock disabling system can be employed to prevent car and vehicle bombings. Coupling the multi sensor detection and lock disabling system with satellite service will enable the detection system to detect explosives and transmit an alert signal by satellite to monitoring equipment at a monitoring site. Upon receiving the alert signal at the monitoring site the monitoring equipment activates a stall-to-stop process for disabling the air, fuel, electrical and/or computer system of the vehicle. Moreover, upon receiving the alert signal at the monitoring site the car or vehicle will be locked by transmission of a satellite signal that disables the vehicle's electrical and ignition system thereby preventing escape of the terrorist.

It is an objective of the present invention to provide a multi sensor detection and disabling lock system for securing news racks and vending machines in order to prevent theft, unauthorized use and terrorist activity.

It is another objective of the present invention to provide a multi sensor detection and disabling lock system for preventing terrorist activity by using products grouped together by common features in several product groupings such as design similarity, similarity in the presentation of security problems and similarity with regard to the presentation of solutions to preventing terrorist solutions.

It is still yet another objective of the present invention to provide a multi sensor detection and disabling lock system that is capable of disabling an existing lock or activating a lock inside any of the products of the product grouping lists when a detector or sensor of the system is activated.

It is still yet a further objective of the present invention to provide a multi sensor detection and disabling lock system

US 10,163,287 B2

5

wherein the disabling lock system prevents the unauthorized entry, access and further contamination of the products included in the several product groupings.

A still further objective of the present invention is to provide a multi sensor detection and lock disabling system that utilizes a multi-task device for preventing terrorist activity to vulnerable products that are collected or arranged by product grouping categories.

Yet a further objective of the present invention is to provide a multi sensor detection and disabling lock system to secure cargos and containers, especially cargo and shipping containers, against chemical, biological, radiological and nuclear terrorist activity.

Still another objective of the present invention is to provide a multi sensor detection and disabling lock system capable of detecting chemical, biological and radiological agents and compounds.

Still yet another objective of the present invention is to provide a multi sensor detection and disabling lock system that includes interchangeable detectors that operate in conjunction to detect chemical, biological and radiological agents and compounds.

Still yet a further objective of the present invention is to provide a multi sensor detection and disabling lock system that can be implemented by business or government at a minimum cost by organizing the products to be protected into product grouping categories.

Another objective of the present invention is to provide a multi sensor detection and disabling lock system that accurately and reliably detects harmful agents, compounds and elements, and prevents the placement and storage of weapons and bombs in the range of storage containers and facilities currently available.

Still another objective of the present invention is to provide a multi sensor detection and disabling lock system wherein the interchangeable detectors that comprise part of the system can be used as stand-alone scanners.

These and other objects, features, and advantages will become apparent to those skilled in the art upon a perusal of the following detailed description read in conjunction with the accompanying drawing figures and appended claims.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the primary features of the system which include a detector case, several interchangeable detectors, an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler;

FIG. 2 is a front elevational view of the multi sensor detection and lock disabling system of the present invention illustrating one of the interchangeable detectors first shown in FIG. 1;

FIG. 3a is a top plan view of the multi sensor detection and lock disabling system of the present invention illustrating the mounting of one lock disabler to the lock of a product, such as a container, and disengaged from the lock of the container;

FIG. 3b is a top plan view of the multi sensor detection and lock disabling system of the present invention illustrating the engagement of the lock disabler to the lock of the product for locking or disabling the lock of the product so that unauthorized access is prevented;

FIG. 4 is a side elevational view of the multi sensor detection and lock disabling system of the present invention

6

illustrating the detector case mounted to the product, such as the container, with the light alarm indicators externally visible;

FIG. 5 is a schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the interconnection of detector cases with a surveillance watchtower and a monitoring PC terminal;

FIG. 6 is a schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the placement of detector cases upon containers different from the containers of FIG. 5, and wherein the detectors case are interconnected to a surveillance watchtower and a monitoring PC terminal;

FIG. 7 is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the mounting of one automatic/mechanical lock disabler to the lock of a standalone news rack;

FIG. 8 is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating one interchangeable detector placed within the stand-alone news rack;

FIG. 9 is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the detector case having color coded front panels for specifically indicating the agents, compounds or elements that have been detected;

FIG. 10 is a rear elevational view of the multi sensor detection and lock disabling system of the present invention illustrating the GPS, Internet and power source connections;

FIG. 11 is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the interconnection of the detector with the detector case and the steps undertaken by the system when an agent or compound is detected;

FIG. 12 is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the sequence of steps undertaken by one detector when functioning as a stand alone scanner for detecting an agent or compound;

FIG. 13 is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the interconnection of the detector case with the automatic/mechanical lock disabler for activating the lock disabler upon detection by the system of an agent or compound;

FIG. 14 is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating interconnection of the detector case with the fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock as part of the process of detection and safeguarding the public upon detection of the agent or compound;

FIG. 15 is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the incorporation of the system with a surveillance watchtower and a monitoring PC or computer terminal for monitoring containers, such as shipping or cargo containers, that may sit for extended time periods on docks, at rail yards, and at industrial storage facilities;

FIG. 16 is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the integration of the detection system with a satellite and monitoring equipment at a monitoring site for detecting explosives placed in a vehicle and then transmitting signals to the satellite and then to the monitoring site for disabling and locking the vehicle;

US 10,163,287 B2

7

FIG. **17** is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the incorporation of the features and elements of the detector case to a cell phone and cell phone case;

FIG. **18** is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the incorporation of a GPS satellite, a monitoring site and a cell phone tower for communicating to and with an electronic device such as a laptop computer or a cell phone for transmitting signals to a vehicle for activating an onboard stall-to-stop device for bringing the vehicle to a halt; and

FIG. **19** is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the use of a GPS satellite in conjunction with the monitoring site and monitoring equipment to relay commands and signals to the cpu or transceiver of the vehicle for stopping or locking the vehicle in response to a signal that a certain type of event (detection of a bomb, engine failure or malfunction or unauthorized use) has occurred or is in process.

### DETAILED DESCRIPTION OF REPRESENTATIVE EMBODIMENTS

Illustrated in FIGS. 1-19 is a multi sensor detection and lock disabling system **10** for preventing terrorist activity by monitoring, detecting, and securing those critical areas; sites, and facilities vulnerable to terrorist activity. The first step is the identification of critical areas, sites, locations and facilities that are vulnerable to terrorist activity as convenient places to store and plant explosives and bombs and spread biological, chemical or radiological agents and compounds, followed by the disposition of the multi sensor detection and lock disabling system **10** for monitoring, detecting, and securing the particular location or site. Vulnerable sites, locations, facilities and areas are nearly limitless in their variety; in order to categorize the protection the present invention provides an anti-terrorist product grouping strategy has been developed wherein products made from the same or similar material, products having the same or similar design, and products presenting the same or similar security problems are grouped together with the multi sensor detection and lock disabling system **10** for preventing terrorist activity. For example, two preferred product groupings can be Product Grouping I: cargo containers, shipping containers, cargo planes, freight train cars, tractor trailers, mail carriers (UPS, FedEx), airport lockers, news racks (coin and non-coin operated), mail drop boxes, cluster mail boxes, keyed mail boxes, min-storage houses and buildings, bicycle lockers, stadium lockers, school lockers, cars, trucks, campers, buses, vans and utility vehicles. Product Grouping II: chemical detectors, biological detectors, radiological detectors, nuclear detectors, motion sensors, glass break sensors, plastic film on glass, high security locks, tampering labels, door sensors, disabling locking systems, vehicle detectors and satellite disabling locking systems. In addition to grouping products together by features, designs and materials, the multi sensor detection system **10** includes a lock disabling capability for disabling an existing lock or activating a lock on or inside any of the aforementioned products when a detector or sensor of the system is activated. The lock disabling feature is a crucial component of the invention in so far as it prevents unauthorized, unequipped or untrained individuals from gaining access and entry to the site and causing further contamination of the site.

8

As shown in FIGS. 1-10, the multi sensor detection and lock disabling system **10** includes at least one—and preferably many—detector case **12** that can be placed in, on, upon or adjacent the product, such as the shipping containers **14** of FIGS. **4** and **5** resting upon a platform **16** or the cargo container **18** of FIG. **6** sitting upon a seaport dock or pier **20**. The detector case **12** includes a top **22**, a bottom **24**, a pair of opposed sides **26** and a front side or panel **28** and an opposite rear or back side **30**. The rear side **30** has connections or contacts that can include an Internet connection **32**, a GPS connection **34** and a power connection **36** for a power source. The power source for the detector system **10** can be any conventional battery or electrical source. The detector case **12** includes an interior chamber divided into a number of compartments **38** for holding therein agent or compound detection means hereinafter further described. A cpu **40** is mounted within the detector case **12** and electrically interconnects, routes, and transmits signals among items hereinafter further described and also communicates with a monitoring site and monitoring equipment. The front side **28** of the detector case **12** includes indicator means for visually indicating that a specific agent, compound or element has been detected. The indicator means can include color coded indicator lights **42** in panel form, as shown in FIG. **9**, with each indicator light panel **42** lighting up with a specific color corresponding to the detection of a specific agent or compound; or color coded indicator lights **44**, as shown FIG. **1**, that correspond to and individually light up on the detection of a specific agent or compound (chemical, biological, or radiological).

As shown in FIGS. **1**, **2** and **9-13**, the multi sensor detection and lock disabling system **10** includes a plurality of detectors **46** with each detector **46** adapted for and set up to sample for a specific agent or compound (biological, chemical, or radiological); and the detectors **46** are interchangeable for adapting to the needs and demands of future technology. The detectors **46** can also be used as stand alone scanners. In the preferred embodiment of the invention, at least three detectors **46** are placed within the detector case **12** with one detector **46** for specifically sampling biological agents or compounds, one detector **46** for sampling chemical agents or compounds, and one detector **46** for sampling radiological agents or compounds. The detectors **46** are interconnected to the cpu **40** of the detection system **10** by conventional connections that can be wire or wireless for transmitting the appropriate signals to the cpu **40** upon detection of the particular agent or compound. As shown in FIG. **2**, each detector **46** includes on its front plate or facing surface a sound alarm indicator **48**, a readings panel **50** comprising a plastic shield and LED lights for displaying the various read-out messages, a sensor **52** for detecting the specific agent, element or compound, and a light alarm indicator **54** that can be color coded for each specific agent and which is externally visible when the detector **46** is used as a stand alone scanner. Each detector **46** includes a conventional microprocessor for controlling the various functions and generating the appropriate signals for transmission to the cpu **40** of the detector case **12**.

As shown in FIGS. **1**, **3a**, **3b**, **9**, and **13-15**, used in conjunction with the multi sensor detection and lock disabling system **10** is at least one automatic/mechanical lock disabler **56**—and depending upon the number of products being monitored there can be one lock disabler **56** for each product. The automatic/mechanical lock disabler **56** is physically connected to the detector case **12** by a wire or cable **58** for receiving signals therefrom for disabling an existing lock or activating a lock inside a product to prevent

US 10,163,287 B2

9          10

access to the product. By way of example, FIG. 3a shows the automatic/mechanical lock disabler 56 mounted—by any conventional means—to the lock 60 of the shipping container 14 shown in FIGS. 4 and 5 and connected by wire 58 to the cpu 40 of the detector case 12. There is no detection of the agent or compound, the detector 46 will stay in the sensing mode 78. However, detection of the specific agent will trigger the sound alarm 80 and the light alarm 82, and instant transmittal of a signal to the cpu 40. The readings 84 can be stored by the cpu 40 for verification and future review and evaluation. After all the appropriate corrective and preventative measures have been undertaken by the trained and authorized personal, and the site has been cleansed of the contamination, authorized and equipped personal can then reset 86 the system 10.

In addition to the automatic/mechanical lock disabler 56, the multi sensor detection and lock disabling system 10 can also utilize a fingerprint biometric lock with disabler 62 as shown in FIGS. 1 and 14. The fingerprint biometric lock with disabler 62 is interconnected to the cpu 40 of the detector case 12 for receiving transmissions therefrom after detection of an agent or compound has occurred so that the lock on the product can be locked or disabled. Moreover, resetting of the fingerprint biometric lock with disabler 62 occurs when the fingerprint of the individual is placed on the fingerprint-matching pad 64, and if a match occurs with a known fingerprint stored by the cpu 40, then the individual can reset the fingerprint biometric lock with disabler 56 by turning the manual lock disabler 66. The fingerprint biometric lock with disabler 62 is mounted to the lock of the product in a manner similar to the mounting of the automatic/mechanical lock disabler 56 that is shown in FIGS. 3 and 3b.

FIGS. 4 and 5 show one manner of disposition or placement of the detector case 12 in relation to the product, i.e., the shipping container 14, with the color coded indicator lights 42 externally viewable; FIG. 5 shows a number of shipping containers 14 each equipped with a detector case 12 and integrated with elements hereinafter further described for continuously monitoring the shipping containers 14 as they sit for an extended period of time on the truck or rail platform 16. FIG. 6 illustrates several cargo containers 18 sitting on the shipping dock or pier 20, with each cargo container 18 having a detector case 12 mounted thereon and integrated with and monitored by elements shown in FIG. 5 and hereinafter further described.

FIG. 7 illustrates a typical product from product grouping 1 that is monitored by the multi sensor detection and lock disabling system 10 of the present invention; specifically, FIG. 7 shows a news rack 68 with one automatic/mechanical lock disabler 56 mounted to and interconnected with the locking mechanism of the news rack 68. As long as there is no detection of any agent or compound, the lock disabler 56 is in the disengaged state, and the individual can deposit the coin amount in the chute and then freely open the glass panel 70 by the handle 72 for removing a paper. However, the lock disabler 56 would be activated upon detection of the harmful agent or compound and receipt of a signal from the cpu 40 for locking or disabling the locking mechanism thereby denying access to the interior of the news rack 68 from all untrained, unauthorized and unequipped individuals.

FIG. 8 illustrates one detector 46 disposed within the news rack 68 and which is visible through the panel 70 for detecting one specific agent, compound or element. The detector 46 functions as a stand-alone scanner and can be wirelessly interconnected to off site monitoring equipment.

FIG. 11 illustrates a representative schematic 74 for describing the signal transmission process from the detector 46 to the cpu 40 of the detector case 12. The external stimulus 76 would be the chemical, biological or radiological agent or compound. If there is no detection of the agent or compound, the detector 46 will stay in the sensing mode 78. However, detection of the specific agent will trigger the sound alarm 80 and the light alarm 82, and instant transmittal of a signal to the cpu 40. The readings 84 can be stored by the cpu 40 for verification and future review and evaluation. After all the appropriate corrective and preventative measures have been undertaken by the trained and authorized personal, and the site has been cleansed of the contamination, authorized and equipped personal can then reset 86 the system 10.

FIG. 12 illustrates a representative schematic 88 for the detector 46 when used as stand-alone scanner. The detector 46 undergoes the same essential steps as illustrated in FIG. 11, with the exception of the signal transmission to the cpu 40. The detector 46 remains in detection mode 78 until an agent is detected, and then the various functions-light alarm 82, sound alarm 80, storage of readings 84, and, after the appropriate security and safety steps have been carried out by authorized personal, detector reset 90 by authorized personal can occur thereby placing the detector 46 back in detection or sensing mode 78.

FIG. 13 is a representative schematic 92 that illustrates the steps undertaken by the system 10 to lock or disable a lock, such as the lock 60 for the shipping container 14 shown in FIGS. 3a and 3b. Upon detection of the agent (chemical, biological, radiological) the alarm light indicators 42 or 44 will light up providing external indication that an agent has been detected. In addition, the system 10—the cpu 40—will transmit a lock/disable lock signal 94 to the automatic/mechanical lock disabler 56 to lock or disable the lock on the product, such as the lock 60 on the shipping container 14 of FIGS. 3a-5. This prevents unauthorized, unequipped, or untrained individuals from entering or gaining access to the product for which a dangerous and perhaps lethal agent has been detected. After the proper authorities and authorized personal have been notified and all the appropriate security, preventative and clean up measures have been undertaken, the authorized individual can perform the disarm and reset function 96 for the system 10 placing the system 10 in back in the detection mode 98.

FIG. 14 is a representative schematic 100 illustrating the use of the fingerprint biometric lock with disabler 62 with the system 10. Upon detection of the agent or compound by the detector, the various alarms would sound and light up (shown in previous figures), and the cpu 40 would then transmit a signal to the fingerprint biometric lock with disabler 62 to lock or disable the lock on the product, such as the lock 60 on the shipping containers 14 shown in FIGS. 3a-5. The shipping containers 60 would remain locked and in an access denied mode 101 should an attempt be made to gain access to the container 60 by opening the lock 60 with an unauthorized fingerprint. However, a fingerprint that matches stored and authorized fingerprints 102 would indicate an authorized individual, and would allow the individual to disable and disarm 104 the lock 60 of the shipping container 14. The fingerprint biometric lock with disabler 62 would then be reset 106 after the appropriate safety, cleanup, and protection measures are completed, and the system 10 would be reset and placed back in the detection mode 108.

FIG. 15 is a schematic representation 110 that illustrates the integration of a surveillance watchtower 112 and a monitoring terminal or PC 114 for monitoring products such

US 10,163,287 B2

**11**

as the shipping containers **14** or cargo containers **16** that sit for extended periods of time of docks, piers **20**, truck terminals, rail yards, shipping platforms **16** and industrial sites as shown in FIGS. **5** and **6**. The watchtower **112** would maintain continuous surveillance over a number of shipping containers **60**, for example, with detector cases **12** mounted in or on each container **14** and set in detection mode **116** with one or more detectors **46** disposed in each detector case **12**. The watchtower **112** would continuously scan for light alarm indicators **42** and **44** on the products, such as the containers **14** or **18**, and the watchtower **112** would be interconnected and integrated with the monitoring terminal or PC **114**. Upon detection **118** of an agent or compound in one or more of the shipping containers **14**, the appropriate light alarm indicators **42** or **44** would light providing visible confirmation of the detection of the specific agent or compound. The cpu **40** would transmit a lock/disable signal **120** to the lock **60** on each respective shipping container **14** to lock or disable the lock **60** thus preventing access to that respective shipping container **14**. In addition, signal transmissions would be sent to the monitoring terminal or PC **114** (which could be off site) thereby alerting authorized security personal of the contamination event. With the information received at the monitoring terminal **114**, authorized personal would then be notified and dispatched to the area to undertake the appropriate safety and cleanup measures **122**. Such measures would also include disarming the lock disabling system in order to gain access to the shipping container **14**. After all the cleanup and security measures are completed by the trained and properly equipped authorities, the detection system and the lock disabling feature would reset **124** and the detection system would again be placed in detection mode **116**.

FIG. **16** is a schematic representation **126** that illustrates an enhanced version of the multi sensor detection and lock disabling system **10** for preventing car and vehicle attacks and bombings. The lock disabling system **10** would be interconnected to the locking system and mechanism **128** of the vehicle **130**. In addition, a stall to stop disabling link **132** can be made with the fuel, air, and electrical system **134** of the vehicle **130**. The enhanced version incorporates a satellite **136** for signal receipt and transmission from the vehicle **130** in which the detector system **10** is placed to a monitoring site and monitoring equipment **138**. As shown in FIG. **16**, a detection signal **140** would be sent to the satellite **136** by the detection system **10** upon detection of a bomb or explosive **142** hidden in the vehicle **130**. The satellite **136** would then transmit an alert signal **144** to the monitoring site **138** with the signal **144** containing the relevant data to evaluate the nature of the threat. The monitoring site **138** would than transmit a stall to stop signal **146** to the detection system **10** to lock the vehicle **130** and/or disable the electrical system of the vehicle **130** thereby disabling the vehicle **130**, preventing access to the vehicle **130** by locking the vehicle **130**, and preventing any terrorist in the vehicle **130** from escaping.

The detector case **12** can be modified and adapted for inclusion with cell phone cases, satellite cell phone cases, laptop cases, notebook PC cases, PDA cases, carry-on cases, suitcases; and briefcases. In addition, the basic monitoring terminal or PC **114**, as shown in FIGS. **5** and **15**, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring.

The system **10** and the watchtower **112**, along with the satellite **136** and the monitoring site **138** can be adapted or incorporated with cell phone towers and satellites for use

**12**

with satellite communication and/or a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu **40**, or a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween. The aforementioned telecommunication and radio communication means can be interactive with any type of motive vehicle that includes but is not limited to cars, trucks, vans, SUVs, trains, subways, boats, ships and airplanes, and which is reported stolen, experiences a loss of brakes, or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted to the vehicle and which detection causes an automatic signal transmission or a signal transmission is activated when a call is made to the monitoring station by an authorized person. The authorized individual includes but is not limited to the owner, pilot, conductor, captain, police highway patrol, security guard and military personnel to the monitoring equipment for activating a vehicle slowdown or stall-to-stop disabling system that similar to the disabling system **126** shown in FIG. **16**, or incorporating features of the system **126** shown in FIG. **16**, from the monitoring equipment to the vehicle. The activation of the stall-to-stop disabling means or the vehicle slowdown disables or engages the computer, electrical, fuel and air systems of the vehicle or a combination of the computer, electrical, fuel and air systems that include but are not limited to the brakes, foot peddle, lights, speed controls, ignition, steering, transmission, and the horsepower of the motor.

In addition, the basic stall-to-stop disabling means or the vehicle slowdown means and device can be adapted, modified or designed to include: an open bust or open platform for integrating any new and innovative technology; warning lights indicators; sound alarm indicators; voice alarm indicators; a cell phone to transmit to the vehicle a signal for slowing and halting the vehicle; and a lock disabling system or means to lock a thief or terrorist inside the vehicle after a transmission is received or sent. Open bust or open platform also refers to the compatibility of the detector case **12**, or the incorporation of its features in cell phone cases, satellite cell phone cases, laptop cases, notebook PC cases, PDA cases, carry-on cases, briefcases, and suitcases, etc., with other communication, transmission and surveillance systems whereupon the detector case **12**, and its features, can be seamlessly integrated with other new and emerging systems and technologies.

Thus, as shown more specifically in FIG. **17**, by way of a representative example the features and elements of the detector case **12** are shown as being incorporated into cell phone detector case **150** and associated cell phone monitor **152**. The cell phone monitor **152** includes the standard keypad functions **154** and more specialized system use (ring tone, email, photos, texting) functions **156** as well as a viewing screen **158**. The cell phone detector case **150** includes a recharging cradle or seat **160**, a front side **162**, a top **164**, a bottom **166**, and a pair of opposed sides **168**. At the back of the cell phone detector case **150** are connections, contacts, and ports for at least an Internet connection **170**, a GPS connection **172**, and a contact, plug, or port for a power source **174**. The power source for the cell phone detector case **150** can be any conventional rechargeable battery source or standard electrical power from a standard electrical receptacle or outlet.

As shown in FIG. **17**, the cell phone detector case **150** includes one or more sensor/detector units, cells, or com-

US 10,163,287 B2

13

14

ponents 176 built into and incorporated into the case 150. The detector 176 includes generally disposed at the front 162 of the case 150 the following types of indicators: a sound alarm indicator 178, a readings panel 180, a sensor 182 for detecting one or more specific types of agents, elements, chemicals, compounds, etc., and a light alarm indicator 184. The sensor/detector 176 will be interconnected to the power source 174. In addition, mounted on and externally visible on the sides 168 or front 162 of the case 150 are a plurality of color coded indicator lights 186 with each light 186 corresponding to a specific agent, element, chemical, compound, etc., and lighting up when that agent is detected by the sensor/detector 176. The color coded indicator lights 186 will be electrically interconnected to the sensor/detectors 176 via any standard microprocessor. The cell phone detector case 150 and cell phone monitor 152 thus comprise a hand-held, easily portable and transportable detection means that is both effective and unobtrusive in its disposition and use.

FIGS. 18 and 19 illustrate representative examples of the integration of portable electronic communication or telecommuncation devices such as a cell phone 187a and/or a laptop computer 187b with the monitoring equipment 138 located at a predesignated monitoring site 188, and operating in conjunction with either a satellite and/or a cell phone tower 190 to transmit and receive signals and commands among each other and to a vehicle 192, such as a truck, as part of a stall-to-stop disabling system for slowing and stopping the vehicle 192 and locking a thief, terrorist, or unauthorized individual in the vehicle 192 if needed. A wide range of events can trigger and initiate the stall-to-stop system and the locking or lock disabling system and mechanism, and the event doesn't have to be limited to the detection of a bomb or a chemical, biological, or radiological agent, element, or compound. The events can include, but is not limited to, detection of an engine problem to engine failure to the unauthorized use (stealing) of the vehicle 192. The vehicle 192 includes an electromotive system 194 that comprises, among other components, an onboard computer(s). electrical, fuel and air systems, as well as brakes, ignition, steering, and transmission. Also integrated with and capable of communicating with the vehicle's 192 electromotive system 194 is a stall-to-stop system while a lock disabling mechanism 196 is able to engage and disengage or disable the vehicle's 192 locking system 198 upon receipt of the appropriate commands via a lock disabling communication channel or link 200. This link 200 can also accommodate the stall-to-stop system commands and signals, and thus is a multi-channel communication link. A CPU or a transceiver 202 is programmed to receive signals from the cell phone tower 190 and/or to a GPS satellite 204 and is interconnected with the stall-to-stop system and the lock disabling system 196 via link 200 for engaging the electromotive system 194 and actuating the lock disabling system 196 to stop the vehicle 192 and lock inside the vehicle 192 anyone such as a thief, terrorist or other unauthorized individual.

A representative example for stopping, disabling, and locking the vehicle 192 that utilizes the cell phone tower 190 wherein the activation and/or distress signal 206 originates from the cell phone 187a or the laptop 187b and such activation signal 206 travels to the cell phone tower 190 that is nearest the current location of the vehicle 192. A signal 208 is then transmitted to the monitoring site 188 and specific monitoring equipment 138 that can also include but is not limited to cell phones, laptops, desktop PC's, notebook PC's and LCD monitors. The monitoring site 138 then

communicates by signal 210 to the GPS satellite 204 that an original or activation signal has been received and then the GPS satellite 204 locates and communicates by multiplex signal 212 with the CPU or transceiver 202 on the vehicle 192 and exchanges information on the type of problem, situation, location, and vehicle speed. The monitoring equipment 138 then transmits a signal 214 to the cell phone tower 190 that communicates with the transceiver 202 and/or CPU of the vehicle 192 to initiate or execute any commands that will actuate the stall-to-stop disabling link 200 and lock disabling system 196 for bringing the vehicle 192 to a halt and actuating the vehicle's 192 locking mechanism 198 for locking the thief, terrorist, or other unauthorized person inside the vehicle 192 if needed.

FIG. 19 illustrates a representative example wherein the stall-to-stop system and the lock disabling system 196 are utilized in conjunction with the GPS satellite 204. In FIG. 19 a signal has traveled to the satellites nearest the vehicle's 192 current location and then the signal 218 has traveled to the monitoring equipment 138 and monitoring site 188 which can include but is not limited to satellite cell phones, satellite monitors, cell phones, laptops, desktop PC's, notebook PC's, and LCD monitors. The GPS satellite 204 then locates and communicates with the CPU and/or transceiver 202 on the vehicle 192 via a multiplex (two-way) signal 220 in order to exchange information on such distress and danger event parameters as the specific problem situation, location, and vehicle speed. The monitoring equipment 138 then transmits a signal 222 back to the GPS satellite 204 that in turn communicates via another signal 224 with the CPU and/or transceiver 202 to execute any commands to the stall-to-stop system for executing the disengagement of the vehicle's 192 electromotive system 194 for bringing the vehicle 192 to a halt and for actuating the lock disabling system 196 to direct the lock disabling link 200 to actuate the locking mechanism 198 thereby locking the vehicle 192 and anyone inside the vehicle 192.

The present invention comprehends a chemical/biological/radiological/nuclear/explosive/human/contraband detector unit with a disabling locking system for protecting products that can be grouped into several product groupings, from terrorist activity, and also for preventing unauthorized access to and tampering with the storage and transport of ordnance and weapons. The products grouped into what may be referred to as Product grouping 1 (storage & transportation) include, but are not limited to. cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars, United Parcel Services™ (UPS™), Federal Express™ (FedEx™), airport lockers, news racks (coin and non-coin operated). mail drop boxes, cluster mail boxes, keyed mail boxes, min-storage houses and buildings, bicycle lockers, stadium lockers, school lockers, cars, trucks, campers, buses, vans, unmanned aerial vehicles (UAVs), unmanned ground vehicles (UGVs), and utility vehicles; the products grouped into what may be referred to as Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, door sensors, speed sensors, biometric sensors, glass break sensors, plastic film on glass, high security locks, tampering labels, door sensors, disabling locking systems, vehicle detectors and satellite disabling locking systems, detection of humans, detection of contraband, temperature, and shock levels; the products grouped into what may be referred to as Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, satellite cell phone cases, laptop cases, notebook PC cases,

US 10,163,287 B2

15

PDA cases, carry-on cases, suitcases, eyeglass, briefcases, detector cases of locks, detector cases of tags, detector cases that is mounted to, detector cases that is affixed to, detector cases that is outside of, detector cases that is inside of, and detector cases that is adjacent to; the products grouped into what may be referred to as Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless communication devices, monitoring sites, monitoring terminals, web servers, desktop personal computers (PCs), notebook personal computers (PCs), laptops, satellite cell phones, cell phones, Universal Mobile Telecommunications System (UMTS) phones, personal digital assistants (PDAs), liquid crystal display (LCD) monitors, and satellite monitoring, remote control key fobs, two-way communication key fobs, handhelds; the products grouped into what may be referred to as Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, Cellular, Satellite, Telematics, Wide Area Network (WAN), Wireless Wide Area Network (WWAN), Local Area Network (LAN), Radio Frequency (RF), Broadband Wireless Access (BWA), Global Positioning System (GPS), General Packet Radio Services (GPRS), Global System for Mobile (GSM), Wideband Code Division Multiple Access (W-CDMA), Universal Mobile Telecommunications System (UMTS), Short Message Service (SMS); the products grouped into what may be referred to as Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature. the products grouped into what may be referred to as Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, monitoring sites and terminal personnel. The multi sensor detection system includes the capability to disable an existing lock or activate a lock located inside or outside any of the products named in the product grouping categories upon activation of a sensor or detector included in the system. This is a significant feature for the multi sensor detection system as it prevents unauthorized, unequipped and untrained entry and access to the product thus preventing further contamination of the site and to individuals in the area.

While the invention has been shown and described in a preferred embodiment, it will be apparent to those skilled in the art that numerous alterations, modifications, and variations will possible and practicable without departing from the spirit and scope of the invention as set forth by the appended claims.

What is claimed:

1. Monitoring equipment that is at least one of products grouped together by common features of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone interconnected to a lock for communication therebetween; the monitoring equipment comprising:

at least one of a central processing unit (CPU), a network processor, or a front end processor for communication between the monitoring equipment and the lock;

16

a transmitter for transmitting signals and messages to at least one of a remote lock, an electrical lock, a mechanical lock, or automatic lock;

a receiver for receiving signals from at least one of a remote lock, an electrical lock, a mechanical lock, or automatic lock;

a lock disabling mechanism that is able to engage (lock), or disengage (unlock), or disable (make unavailable) the monitoring equipment after a specific number of tries;

a short-range radio frequency (RF) connection that is near-field communication (NFC);

at least one of the satellite connection, Bluetooth connection, WiFi connection, Internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection that is capable of signal communication with the transmitter or the receiver,

at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature recognition system; and

the monitoring equipment being capable of sending signals to engage (lock), disengage (unlock), or disable (make unavailable) at least one of a remote lock, an electrical lock, a mechanical lock, or automatic lock, whereupon a signal is sent to the receiver of the monitoring equipment from at least one of the remote lock, electrical lock. mechanical lock, or automatic lock, the signal comprising at least one of location data or lock status data to be sent to the monitoring equipment.

2. Monitoring equipment that is at least one of products grouped together by common features of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone interconnected to at least one of a home lock, a building lock, or a cargo container lock for communication therebetween; the monitoring equipment comprising:

at least one of a central processing unit (CPU), a network processor, or a front end processor for communication between the monitoring equipment and the lock;

a transmitter for transmitting signals and messages to at least one of a home lock, a building lock, or a cargo container lock;

a receiver for receiving signals from at least one of a home lock, a building lock, or a cargo container lock;

a lock disabling mechanism that is able to engage (lock), or disengage (unlock), or disable (make unavailable) the monitoring equipment after a specific number of tries;

a short-range radio frequency (RE) connection that is near-field communication (NFC);

at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RE) connection, or GPS connection that is capable of signal communication with the transmitter or the receiver;

at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry. retina scan, iris scan, or signature recognition system; and

the monitoring equipment being capable of sending signals to engage (lock), disengage (unlock), or disable (make unavailable) at least one of a home lock, a building lock, or a cargo container lock whereupon a

US 10,163,287 B2

17

signal is sent to the receiver of the monitoring equipment from at least one of the home lock, building lock, or cargo container lock, the signal comprising at least one of location data or lock status data to be sent to the monitoring equipment.

3. Monitoring equipment that is at least one of products grouped together with common features of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal, digital assistant (PDA) or smart phone interconnected to a vehicle lock for communication therebetween; the monitoring equipment comprising:

at least one of a central processing unit (CPU), a network processor, or a front end processor for communication between the monitoring equipment and the lock;

a transmitter for transmitting signals and messages to at least one of a manned or unmanned aerial vehicle lock, a manned or unmanned ground vehicle lock, or a manned or unmanned sea vehicle lock;

a receiver for receiving signals from at least one of a manned or unmanned aerial vehicle lock, a manned or unmanned ground vehicle lock, or a manned or unmanned sea vehicle lock;

a lock disabling mechanism that is able to engage (lock), or disengage (unlock), or disable (make unavailable) the monitoring equipment after a specific number of tries;

a short-range radio frequency (RF) connection that is near-field communication (NFC);

at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection that is capable of signal communication with the transmitter or the receiver;

at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature recognition system; and

the monitoring equipment being capable of sending signals to engage (lock), disengage (unlock), or disable (make unavailable) at least one of a manned or unmanned aerial vehicle lock, a manned or unmanned ground vehicle lock, or a manned or unmanned sea vehicle lock, whereupon a signal is sent to the receiver of the monitoring equipment from at least one of the manned or unmanned aerial vehicle lock, manned or unmanned ground vehicle lock, or manned or unmanned sea vehicle lock, the signal comprising at least one of location data or lock status data to be sent to the monitoring equipment.

4. A communication device comprising:

at least one central processing unit (CPU);

at least one motion sensor in communication with the at least one CPU;

at least one viewing screen for monitoring in communication with the at least one CPU;

at least one global positioning system (GPS) connection in communication with the at least one CPU;

at least one of an internet connection Wi-Fi connection in communication with the at least one CPU;

at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU;

at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication

18

device, disengage (unlock) the communication device, or disable (make unavailable) the communication device;

at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device;

at least one biometric sensor in communication with the at least one CPU for providing biometric authentication to access the communication device;

at least one or more detectors in communication with the art least one CPU for detecting at least one of a chemical, biological, radiological, or explosive agents;

at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU; and

at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or send signals to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling.

5. A monitoring device, comprising:

at least one central processing unit (CPU);

at least one temperature sensor in communication with the at least one CPU for monitoring temperature;

at least one motion sensor in communication with the at least one CPU;

at least one viewing screen for monitoring in communication with the at least one CPU;

at least one global positioning system (GPS) connection in communication with the at least one CPU;

at least one of an internet connection or a Wi-Fi connection in communication with the at least one CPU;

at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU;

at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device;

at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device;

at least one biometric sensor in communication with the at least once CPU for providing biometric authentication to access the communication device;

at least one sensor for chemical, biological, or human detection in communication with the at least one CPU;

one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents;

at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU; and

at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or send signals to

US 10,163,287 B2

**19**

detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling.

6. A monitoring equipment, comprising:

at least one central processing unit (CPU);

at least one motion sensor in communication with the at least one CPU;

at least one light indicator in communication with the at least one CPU;

at least one viewing screen for monitoring in communication with the at least one CPU;

at least one global positioning system (GPS) connection in communication with the at least one CPU;

at least one of an internet connection Wi-Fi connection in communication with the at least one CPU;

at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU;

at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device;

**20**

at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device;

at least one biometric sensor in communication with the at least one CPU for providing biometric authentication to access the communication device;

at least one or more detectors in communication with the art least one CPU for detecting at least one of a chemical, biological, radiological, or explosive agents;

at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU; and

at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or send signals to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling.

* * * * *



US010984619B2

(12) **United States Patent**
Golden

(10) Patent No.: **US 10,984,619 B2**
(45) Date of Patent: **\*Apr. 20, 2021**

(54) **MULTI SENSOR DETECTION, STALL TO STOP, AND LOCK DISABLING SYSTEM**

(71) Applicant: **Golden Larry**, Greenville, SC (US)

(72) Inventor: **Larry Golden**, Greenville, SC (US)

(\*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

This patent is subject to a terminal disclaimer.

(21) Appl. No.: **16/350,683**

(22) Filed: **Dec. 19, 2018**

(65) **Prior Publication Data**

US 2019/0130679 A1     May 2, 2019

**Related U.S. Application Data**

(60) Continuation of application No. 15/530,839, filed on Mar. 6, 2017, now Pat. No. 10,163,287, which is a
(Continued)

(51) **Int. Cl.**
**G07C 9/00** (2020.01)
**B60R 25/04** (2013.01)
(Continued)

(52) **U.S. Cl.**
CPC .......... **G07C 9/00563** (2013.01); **B60R 25/01** (2013.01); **B60R 25/04** (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC .... G07C 9/00; G07C 9/0007; G07C 9/00174; G07C 9/00309; G07C 9/00388;
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,385,469 A     5/1983   Scheuerpflug et al.
4,544,267 A     10/1985  Schiller
(Continued)

OTHER PUBLICATIONS

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/199,853; copyright dated Jan. 13, 2012, pp. 1-34, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; U.S. Appl. No. 13/288,065 (34 pages).

(Continued)

*Primary Examiner* — Van T Trieu

(57)     **ABSTRACT**

A multi sensor detection and disabling lock system includes detector cases for holding interchangeable detectors that sample for chemical, biological and radiological compounds, agents and elements, with each detector case disposed in or upon the monitored product. The detector case transmits detection information to a monitoring computer terminal and transmits a signal to a lock disabler engaged to the product to lock or disable the product's lock thereby preventing untrained, unauthorized and unequipped individuals from gaining access and entry to the product, and also preventing further contamination of the area. The detection system can be interconnected to surveillance towers scanning detector cases disposed at seaport docks, freight depots and rail terminals for monitoring containers being prepared for shipment or sitting on docks for long periods of time.

**20 Claims, 13 Drawing Sheets**



**US 10,984,619 B2**

Page 2

### Related U.S. Application Data

continuation of application No. 14/806,988, filed on Jul. 23, 2015, now Pat. No. 9,589,439, which is a continuation of application No. 14/021,693, filed on Sep. 9, 2013, now Pat. No. 9,096,189, which is a continuation of application No. 13/288,065, filed on Nov. 3, 2011, now Pat. No. 8,531,280, which is a division of application No. 12/802,001, filed on May 27, 2010, now Pat. No. 8,334,761, which is a continuation of application No. 12/657,356, filed on Jan. 20, 2010, now Pat. No. 8,106,752, which is a continuation of application No. 12/155,573, filed on Jun. 6, 2008, now Pat. No. 7,636,033, which is a continuation-in-part of application No. 11/397,118, filed on Apr. 5, 2006, now Pat. No. 7,385,497.

(51) **Int. Cl.**

| | |
|---|---|
| **B60R 25/01** | (2013.01) |
| **B60R 25/102** | (2013.01) |
| **G08B 13/24** | (2006.01) |
| B60R 25/104 | (2013.01) |
| G08B 25/00 | (2006.01) |
| H04W 4/80 | (2018.01) |
| G07C 9/20 | (2020.01) |
| G08B 15/00 | (2006.01) |
| G08B 21/12 | (2006.01) |
| B60R 25/24 | (2013.01) |

(52) **U.S. Cl.**
CPC ........ **B60R 25/102** (2013.01); **G08B 13/2491** (2013.01); *B60R 25/018* (2013.01); *B60R 25/104* (2013.01); *B60R 25/24* (2013.01); *G07C 9/00174* (2013.01); *G07C 9/00912* (2013.01); *G07C 9/20* (2020.01); *G08B 15/00* (2013.01); *G08B 21/12* (2013.01); *G08B 25/009* (2013.01); *H04W 4/80* (2018.02)

(58) **Field of Classification Search**
CPC .. G07C 9/00563; G08B 27/00; G08B 27/005; G08B 27/006; G08B 15/00; G08B 15/001; G08B 15/004; G08B 15/009; B60R 25/018; B60R 25/04; B60R 25/10; B60R 25/102; B60R 25/0405; B60R 25/104

See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 4,586,441 A | 5/1986 | Zekich | |
| 4,792,226 A | 12/1988 | Fishbine et al. | |
| 5,222,152 A | 6/1993 | Fishbine et al. | |
| 5,223,844 A | 6/1993 | Mansell et al. | |
| 5,233,404 A | 8/1993 | Lougheed et al. | |
| 5,557,254 A | 9/1996 | Johnson et al. | |
| 5,682,133 A | 10/1997 | Johnson et al. | |
| 5,766,956 A | 6/1998 | Groger et al. | |
| 5,938,706 A | 8/1999 | Feldman | |
| 5,959,529 A | 9/1999 | Kail | |
| 5,963,657 A | 10/1999 | Bowker et al. | |
| 5,986,543 A | 11/1999 | Johnson | |
| 5,990,785 A | 11/1999 | Suda | |
| 6,049,269 A | 4/2000 | Byrd et al. | |
| 6,078,265 A | 6/2000 | Bonder et al. | |
| 6,236,365 B1 * | 5/2001 | LeBlanc | G01C 21/206 342/457 |
| 6,262,656 B1 | 7/2001 | Byrd et al. | |
| 6,271,745 B1 | 8/2001 | Anzai et al. | |
| 6,374,652 B1 | 4/2002 | Hwang | |
| 6,411,887 B1 | 6/2002 | Martens et al. | |

| | | | |
|---|---|---|---|
| 6,470,260 B2 | 10/2002 | Martens et al. | |
| 6,542,076 B1 | 4/2003 | Joao | |
| 6,542,077 B2 | 4/2003 | Joao | |
| 6,588,635 B2 | 7/2003 | Vor Keller et al. | |
| 6,610,977 B2 | 8/2003 | Megerle | |
| 6,613,571 B2 | 9/2003 | Cordery et al. | |
| 6,628,813 B2 | 9/2003 | Scott et al. | |
| 6,647,328 B2 | 10/2003 | Walker | |
| 6,738,697 B2 | 5/2004 | Breed | |
| 6,923,509 B1 | 8/2005 | Barnett | |
| 6,980,092 B2 | 12/2005 | Turnbull et al. | |
| 6,988,026 B2 | 1/2006 | Breed et al. | |
| 7,005,982 B1 | 2/2006 | Frank | |
| 7,034,677 B2 | 4/2006 | Steinthal et al. | |
| 7,034,683 B2 | 4/2006 | Ghazarian | |
| 7,103,460 B1 | 9/2006 | Breed | |
| 7,116,798 B1 | 10/2006 | Chawla | |
| 7,148,484 B2 | 12/2006 | Craig et al. | |
| 7,164,117 B2 | 1/2007 | Breed et al. | |
| 7,171,312 B2 | 1/2007 | Steinthal et al. | |
| 7,243,945 B2 | 6/2007 | Breed | |
| 7,339,469 B2 | 3/2008 | Braun | |
| 7,346,439 B2 | 3/2008 | Bodin | |
| 7,350,608 B2 | 4/2008 | Fernandez | |
| 7,385,497 B2 | 6/2008 | Golden | |
| 7,397,363 B2 | 7/2008 | Joao | |
| 7,636,033 B2 | 12/2009 | Golden | |
| 7,647,180 B2 | 1/2010 | Breed | |
| 7,844,505 B1 | 11/2010 | Arneson et al. | |
| 7,868,912 B2 | 1/2011 | Venetianer et al. | |
| 7,872,575 B2 | 1/2011 | Tabe | |
| 7,880,767 B2 | 2/2011 | Chinigo | |
| 7,961,094 B2 | 6/2011 | Breed | |
| 8,120,459 B2 | 2/2012 | Kwak | |
| 8,274,377 B2 | 9/2012 | Smith et al. | |
| 8,531,521 B2 | 9/2013 | Romanowich | |
| 8,564,661 B2 | 10/2013 | Lipton et al. | |
| 8,615,290 B2 | 12/2013 | Lin et al. | |
| 2002/0145666 A1 | 10/2002 | Scaman | |
| 2003/0063004 A1 | 4/2003 | Anthony et al. | |
| 2003/0093187 A1 * | 5/2003 | Walker | B64C 13/20 701/1 |
| 2003/0137426 A1 | 7/2003 | Anthony et al. | |
| 2003/0179073 A1 | 9/2003 | Ghazarian | |
| 2003/0206102 A1 | 11/2003 | Joao | |
| 2004/0107028 A1 | 6/2004 | Catalano | |
| 2004/0222092 A1 | 11/2004 | Musho | |
| 2005/0195069 A1 | 9/2005 | Dunand | |
| 2006/0164239 A1 | 7/2006 | Loda | |
| 2006/0176169 A1 | 8/2006 | Doolin et al. | |
| 2006/0181413 A1 | 8/2006 | Mostov | |
| 2006/0250235 A1 | 11/2006 | Astrin | |
| 2006/0261931 A1 * | 11/2006 | Cheng | B60R 25/102 340/426.1 |
| 2007/0093200 A1 | 4/2007 | Dobosz | |
| 2007/0171042 A1 | 7/2007 | Metes et al. | |
| 2007/0257774 A1 | 11/2007 | Stumpert et al. | |
| 2008/0045156 A1 | 2/2008 | Sakhpara | |
| 2008/0122595 A1 | 5/2008 | Yamamichi et al. | |
| 2008/0234907 A1 | 9/2008 | Labuhn et al. | |
| 2009/0289780 A1 * | 11/2009 | Tenorio-Fox | B60R 25/04 340/425.5 |
| 2010/0159983 A1 | 5/2010 | Golden | |
| 2010/0265068 A1 * | 10/2010 | Brackmann | B60P 3/14 340/572.1 |
| 2011/0178655 A1 | 6/2011 | Golden | |

OTHER PUBLICATIONS

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/065,837; copyright dated Dec. 2, 2011, pp. 1-27, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; U.S. Appl. No. 13/288,065 (27 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/065,837; copyright dated Nov. 1, 2011, pp. 1-18, publisher United States Patent and Trademark

**US 10,984,619 B2**

Page 3

(56)        **References Cited**

OTHER PUBLICATIONS

Office, Alexandria, Virginia, USA; U.S. Appl. No. 13/288,065 (18 pages).
United States Patent and Trademark Office; Office Action from U.S. Appl. No. 11/397,118; dated Nov. 14, 2007; Alexandria, Virginia, USA; pp. 1-12; U.S. Appl. No. 13/288,065 (12 pages).
United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/155,573; dated Apr. 9, 2009; Alexandria, Virginia, USA; pp. 1-7; U.S. Appl. No. 13/288,065 (7 pages).
United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/155,573; dated Jul. 30, 2009; Alexandria, Virginia, USA; pp. 1-9; U.S. Appl. No. 13/288,065 (9 pages).
United States Patent and Trademark Office; Notice of Allowability from U.S. Appl. No. 12/155,573; dated Oct. 28, 2009; Alexandria, Virginia, USA; pp. 1-5; U.S. Appl. No. 13/288,065 (5 pages).
United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/657,356; dated Jul. 12, 2010; Alexandria, Virginia, USA; pp. 1-14; U.S. Appl. No. 13/288,065 (14 pages).
United States Patent and Trademark Office; Notice of Allowability from U.S. Appl. No. 12/657,356; dated Mar. 10, 2011; Alexandria, Virginia, USA; pp. 1-4; U.S. Appl. No. 13/288,065 (4 pages).
United States Patent and Trademark Office; Office Action from U.S. Appl. No. 13/065,837; dated Jul. 18, 2011; Alexandria, Virginia, USA; pp. 1-9; U.S. Appl. No. 13/288,065 (9 pages).
A newspaper article of Mr. Melvin Sullivan and his family that references the date, Mar. 6, 2001. U.S. Appl. No. 13/288,065.
A letter of response Mr. Sullivan received from Pfeiffer & Gantt, PA, dated Sep. 16, 2002. U.S. Appl. No. 13/288,065.
A "Certificate of Existance" Bright Idea Inventor, LLC. Nov. 6, 2002. U.S. Appl. No. 13/288,065.
A letter of response Golden received from the Honorable Congressman from Maryland, Elijah E. Cummings, dated Dec. 16, 2002; U.S. Appl. No. 13/288,065.
A newspaper article of Mr. Melvin Sullivan and Mr. Larry Golden, dated, Feb. 27-Mar. 5, 2003, U.S. Appl. No. 13/288,065.
A letter of response Golden received from the Honorable Senator from South Carolina, Ernest F. Hollings, dated May 21, 2003; U.S. Appl. No. 13/288,065.
A letter of response Golden received from the Office of the Vice President, Dick Cheney, dated Jun. 3, 2003; U.S. Appl. No. 13/288,065.
A letter of response Golden received from the Honorable Senator from South Carolina, Ernest F. Hollings, dated Oct. 1, 2003; U.S. Appl. No. 13/288,065.
A letter of response Golden received from the Honorable Senator from South Carolina, Lindsey O. Graham, dated Oct. 21, 2003; U.S. Appl. No. 13/288,065.
A letter sent to the President of the United States George W Bush, the President's Cabinet, the United States Senate and the Congressional Black Caucus, dated May 23, 2005; U.S. Appl. No. 13/288,065.
On Nov. 17, 2005, an "Inventor's Official Record of Invention", was filed in my name (Golden) at "The Law Office of David P. Gaudio, P.C.; the Inventors Network.", U.S. Appl. No. 13/288,065.
On Aug. 23, 2005, the "Disclosure Document Registration"; U.S. Appl. No. 13/288,065.
On Apr. 5, 2006, the "Patent Application" was filed in my name (Golden) at the United States Patent & Trademark Office in Washington, D.C.; U.S. Appl. No. 13/288,065.
On Jun. 6, 2008, the "Continuance-In-Part, (CIP) Application" was filed in my name (Golden) at the United States Patent & Trademark Office in Washington, D.C.; U.S. Appl. No. 13/288,065.
On Jan. 20, 2010, a "Continuation Application" (U.S. Appl. No. 12/657,356) was filed in my name (Golden) at the United States Patent & Trademark Office in Washington, D.C.; U.S. Appl. No. 13/288,065.
Reissue of U.S. Pat. No. 7,636,033;"Swear Back"; in accordance to Title 37—Code of Federal Regulations Patents, Trademarks, and Copyrights; Apr. 8, 2011; U.S. Appl. No. 13/288,065.
Reissue of U.S. Pat. No. 7,636,033, "Swearback—History of Work"; Apr. 8, 2011; U.S. Appl. No. 13/288,065.

United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/802,001; dated Apr. 14, 2011, 2011; Alexandria, Virginia, USA; pp. 1-16; U.S. Appl. No. 13/288,065 (16 pages).
United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/802,001; dated May 27, 2011; Alexandria, Virginia, USA; pp. 1-14; U.S. Appl. No. 13/288,065 (14 pages).
United States Department of Homeland Security; Petition for Inter Partes Review of U.S. Pat. No. Re. 43,990 Under 35 U.S.C. §312 and 37 C.F.R. §42.104; Case IPR2014-00714 for U.S. Pat. No. Re. 43,990; Filed Apr. 30, 2014; Washington, D.C., USA; pp. 1-57, U.S. Appl. No. 14/806,988 (57 pages).
United States Department of Homeland Security; Declaration of Dr. Sriram Vishwanath; Case IPR2014-00714 for U.S. Pat. No. Re. 43,990; Filed Apr. 30, 2014, Washington, D.C., USA; pp. 1-44; U.S. Appl. No. 14/806,988 (44 pages).
Richard R Brooks and S.S. Iyengar; Multi-Sensor Fusion Fundamentals and Applications with Software; published 1998; Copyright Prentice Hall PTR; Upper Saddle River, New Jersey, USA; pp. 1-20, (20 pages). U.S. Appl. No. 14/806,988 (20 pages).
Ramanarayanan Viswanathan and Pramod K Varshney; Distributed Detection with Multiple Sensors: Part 1—Fundamentals; Proceedings of the IEEE; Jan. 1, 1997; pp. 1-11; vol. 85, No. 1; Southern Illinois University Carbondale OpenSIUC; Illinois. USA; pp. 1-11; U.S. Appl. No. 14/806,988 (11 pages).
Blum; Distributed Detection with Multiple Sensors: Part II—Advanced Topics; Proceedings of the IEEE; Jan. 1, 1997; pp. 1-16; vol. 85, No. 1; Southern Illinois University Carbondale OpenSIUC; Illinois, USA; U.S. Appl. No. 14/806,988 (16 pages).
Victor Lesser; Distributed Sensor Networks a Multiagent Perspective; 2003; pp. 1, 2, 5, 6, 22, 26, 27, 36, 275, 320; copyright 2003 Kluwer Academic Publishers; AH Dordrecht, The Netherlands; U.S. Appl. No. 14/806,988 (10 pages).
Samuel Blackman and Robert Popoli; Design and Analysis of Modern Tracking Systems; 1999; pp. 1, 2, 6, 472; copyright 1999 Artech House; Norwood, Massachusetts, USA; U.S. Appl. No. 14/806,988 (4 pages).
Jean-Francois Chamberland; Decentralized Detection in Sensor Networks; 2003; pp. 407-416; IEEE Transactions on Signal Processing; vol. 51, No. 2; Urbana, Illinois, USA; U.S. Appl. No. 14/806,988 (10 pages).
Oleg Kachirski and Ratan Guha; Effective Intrusion Detection Using Multiple Sensors in Wireless Ad Hoc Networks; pp. 1-8; Proceedings of the 36.sup.th Hawaii International Conference on System Sciences; copyright 2003; Orlando, Florida, USA; U.S. Appl. No. 14/806,988 (8 pages).
Lawrence A Klein; Sensor and Data Fusion A Tool for Information Assessment and Decision Making; 2004; pp. 1-4, 6, 81, 87-89; copyright 2004 The Society of Photo-Optical Instrumentation Engineers; Publisher is SPIE—the International Society for Optical Engineering; Bellingham, Washington, USA; U.S. Appl. No. 14/806,988 (12 pages).
Dale Ferriere and Khrystyna Pysareva and Andrzej Rucinski; Using Technology to Bridge Maritime Security Gaps; Aug. 1, 2005; Sea Technology; pp. 1-6; copyright Compass Publications, Inc. Jan. 2009; Portsmouth, New Hampshire, USA; U.S. Appl. No. 14/806,988 (6 pages).
Corie Lok, Cargo Security; MIT Technology Review; Jun. 2004; No. 107; pp. 74-75; publisher is Massachusetts Institute of Technology; Cambridge, Massachusetts, USA; U.S. Appl. No. 14/806,988 (2 pages).
Thomas C Chen; RFID and Sensor-based Container Content Visibility and Seaport Security Monitoring system; Proceedings of SPIE, vol. 5778; pp. 151-159; Mar. 28, 2005; Publisher is SPIE—the International Society for Optical Engineering; Bellingham, Washington, USA; U.S. Appl. No. 14/806,988 (10 pages).
United States Department of Homeland Security; The University of Texas at Austin College of Engineering Standard Resume of Sriram Vishwanath; Case IPR2014-00714 for U.S. Pat. No. Re. 43,990; Filed Apr. 30, 2014; Washington, D.C., USA; pp. 1-21; U.S. Appl. No. 14/806,988 (21 pages).
Operating Agreement of Bright Idea Inventor, LLC received from Pfeiffer & Gantt, PA, dated Nov. 13, 2002; U.S. Appl. No. 13/288,065.

**US 10,984,619 B2**

Page 4

(56)          **References Cited**

OTHER PUBLICATIONS

United States Patent and Trademark Office; Office Action from U.S. Appl. No. 12/802,001; dated Oct. 20, 2011; Alexandria, Virginia, USA; pp. 1-5, parent U.S. Appl. No. 13/288,065 (5 pages); U.S. Appl. No. 13/288,065 (5 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 12/802 001; copyright dated Dec. 12, 2011, pp. 1-9, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 13/288,065 (9 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 12/802.001; copyright dated Mar. 26, 2012, pp. 1-12, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; U.S. Appl. No. 13/288,065 (12 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/199,853; copyright dated Feb. 22, 2012, pp. 1-38, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; U.S. Appl. No. 13/288,065 (38 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/065,837; copyright dated Feb. 17, 2012, pp. 1-25, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; U.S. Appl. No. 13/288,065 (25 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/288,065; copyright dated Aug. 24, 2012, pp. 1-4, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; U.S. Appl. No. 13/288,065 (4 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/288,065; copyright dated Nov. 28, 2012, pp. 1-11, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; U.S. Appl. No. 13/288,065 (11 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 13/288,065; copyright dated Apr. 16, 2013, pp. 1-9, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; U.S. Appl. No. 13/288,065 (9 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 14/021,693; copyright dated Apr. 20, 2015, pp. 1-20, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; U.S. Appl. No. 14/021,693 (20 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 14/021,693; copyright dated Jan. 20, 2015, pp. 1-17, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; U.S. Appl. No. 14/021,693 (17 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 14/021,693; copyright dated Sep. 5, 2014, pp. 1-12, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; U.S. Appl. No. 14/021,693 (12 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 14/806,988; copyright dated Jul. 5, 2015, pp. 1-5, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 14/806,988 (5 pages).

United States Patent and Trademark Office; Notice of Allowance from U.S. Appl. No. 14/806,988; dated Jan. 3, 2017; Alexandria, Virginia, USA; pp. 1-8; U.S. Appl. No. 14/806.988 (8 pages).

United States Patent and Trademark Office; Notice of Allowance from U.S. Appl. No. 14/021,693; dated Jun. 19, 2015; Alexandria, Virginia, USA; pp. 1-8; U.S. Appl. No. 14/021,693 (8 pages).

United States Patent and Trademark Office; Notice of Allowance from U.S. Appl. No. 13/288,065; dated May 24, 2013; Alexandria, Virginia, USA; pp. 1-8; U.S. Appl. No. 13/288,065 (8 pages).

United States Patent and Trademark Office; Office Action; Office Action from U.S. Appl. No. 15/530,839; copyright dated Sep. 26, 2018, pp. 1-9, publisher United States Patent and Trademark Office, Alexandria, Virginia, USA; parent U.S. Appl. No. 15/530,839 (9 pages).

United States Patent and Trademark Office; Notice of Allowance from U.S. Appl. No. 15/530,839; copyrighted dated May 16, 2018; Alexandria, Virginia, USA; pp. 1-7; U.S. Appl. No. 15/530,839 (7 pages).

Letter from Applicant, Larry Golden regarding Written Description dated Dec. 3, 2019.

Deignan, abstract,Wearable Chemical Sensors: Characterization of Heart Rate Electrodes Using Electrochemical Impedance Spectroscopy,12th Ann. BodySensor Network Con. Jun. 9-12, 2015.

My Tutor website, "How does the body increase heart rate in response to exercise?" https://www.mytutor.co.uk/answers/8802/A-Level/Biology, printed Dec. 3, 2019.

Portions of Moore, Jason, "HRV Demographics: Part 1—Age & Gender," HRVcourse.com, https://hrvcourse.com/hrv-demographics-age-gender/, copyright 2017, portion printed Dec. 2, 2019.

Hernandez, et al., abstract, "Wearable Motion-Based Heart Rate at Rest: A Workplace Evaluation," IEEE J BiomedHealth Inform, Sep. 2019, pp. 1920-1927.

Kalnoskas, A.,Biometric Sensors Include Advanced Heart Monitoring & ECG, Nov. 30, 2017, www.microcontrollertips.com/biometric-sensors-include-advanced-heart-monitoring-and-ecg/.

Holder, et al., pportions of "Using What You Get: Dynamic Physiologic Signatures of Critical Illness," Crit Care Clin, Jan. 2015: 31 (1): 133-164, p. 1 of 35

Brain Signs website,webpage entitled: "ElectroCardioGaphy(ECG) & Heart Rate (HR)," copyrighted 2018, printed Dec. 2, 2019, www.brainsigns.com/en/science/s2/technologies/hr.

Johnson,Carolyn Y., "Spotting a Terrorist," article, Boston Globe, pub. Sep. 18, 2019.

Letter, from applicant, Larry Golden, ATPG Technology, LLC, to Bruce Sewell, • SVP 7 General Counsel, Apple. Inc. dated Nov. 11, 2010.

* cited by examiner



**Fig. 1**

**Fig. 2**



**Fig. 3a**



**Fig. 3b**



**Fig. 4**



**Fig. 5**

SAppx968



**Fig. 6**

**Fig. 7**



**Fig. 8**

SAppx970



**Fig. 9**

SAppx971



**Fig. 10**



**Fig. 11**



Fig. 12

Fig. 13



**Fig. 14**

**Fig. 15**



**Fig. 16**



**Fig. 17**



**Fig. 18**



**Fig. 19**

US 10,984,619 B2

1

# MULTI SENSOR DETECTION, STALL TO STOP, AND LOCK DISABLING SYSTEM

## CROSS REFERENCE TO RELATED APPLICATION

This application is a continuation application and claims the filing date and benefit of U.S. patent application Ser. No. 15/530,839 titled "Multi Sensor Detection. Stall to Stop, and Lock Disabling System" filed on Mar. 6, 2017, the entire contents and complete subject matter of which is incorporated by reference herein in its entirety for all purposes. U.S. patent application Ser. No. 15/530,839 issued as U.S. Pat. No. 10,163,287, is a continuation application and claims the filing date and benefit of U.S. patent application Ser. No. 14/806,988 filed on Jul. 23, 2015, issued as U.S. Pat. No. 9,589,439, and incorporates the entire contents and complete subject matter therein by reference in their entirety for all purposes. U.S. patent application Ser. No. 14/806,988 is a continuation application and claims the filing date and benefit of U.S. patent application Ser. No. 14/021,693 filed on Sep. 9, 2013, issued as U.S. Pat. No. 9,096,189, and incorporates the entire contents and complete subject matter therein by reference in their entirety for all purposes. U.S. patent application Ser. No. 14/021,693 is a continuation application and claims the filing date and benefit of U.S. patent application Ser. No. 13/288,065 filed on Nov. 3, 2011, issued as U.S. Pat. No. 8,531,280, and incorporates the entire contents and complete subject matter therein by reference in their entirety for all purposes. U.S. patent application Ser. No. 13/288,065 is a divisional application and claims the filing date and benefit of U.S. patent application Ser. No. 12/802,001 filed on May 27, 2010, issued as U.S. Pat. No. 8,334,761, and incorporates the entire contents and complete subject matter therein by reference in their entirety for all purposes. U.S. patent application Ser. No. 12/802,001 is a continuation application and claims the filing date and benefit of U.S. patent application Ser. No. 12/657,357 filed on Jan. 20, 2010, issued as U.S. Pat. No. 8,106,752, and incorporates the entire contents and complete subject matter therein by reference in their entirety for all purposes. The present application also claims the filing dates and benefits of and incorporates the entire contents of U.S. patent application Ser. Nos. 14/806,988; 14/021,693; 13/288,065; 12/802,001; 12/657,356; 12/155,573, issued as U.S. Pat. No. 7,636,033, and Ser. No. 11/397,118, issued as U.S. Pat. No. 7,385,497, herein by reference for all purposes.

## FIELD OF THE INVENTION

The present invention pertains to anti-terrorist detection and prevention systems, and more particularly pertains to a disabling lock mechanism combined with a chemical/biological/radiological detection system for use with products grouped together by similar characteristics in order to prevent unauthorized entry, contamination and terrorist activity.

## BACKGROUND

Terrorist activity is a continuous, daily, worldwide threat to the stability, prosperity, security and peace within nations and between and among nations. Its danger lies in its arbitrary destructiveness as much as in its unpredictability, and the constant threat of terrorist activity compels measures and actions that cause strain and contention in free, democratic societies as security concerns and civil liberty con-

2

cerns must be balanced so that both public safety and civil liberties are maintained. Safety and security concerns can be addressed through numerous proactive steps and measures, many of which cause only minimal interference with and disruption of the daily routines of work, travel, commerce and entertainment. However, because modern industrial societies afford almost limitless places, locations, and opportunities for terrorist activities, no safety measure or security protocol will be foolproof, but many security measures, systems and protocols can be implemented that greatly minimize specific threats through fingerprint identification procedures, chemical, biological, and radiological hazard detections, bomb and explosive detection, and controlling the access to everything from shipping containers to school lockers. Thus, the prior art discloses a wide range of security measures and systems.

For example, the Fishbine et al. patent (U.S. Pat. No. 4,792,226) discloses an optical fingerprinting system that includes an optics/processor unit, a video monitor, a data terminal, and a printer for collecting and storing data characteristics of all ten individual fingerprints for printing demographic information and fingerprint images as desired on a standard booking or applicant card.

The Schiller patent (U.S. Pat. No. 4,544,267) discloses a finger identification unit that includes a fingerprint scanning apparatus using a collimated beam of light to interrogate the fingerprint of a finger placed against a platen so that successive scan positions produce signals containing fingerprint information.

The Fishbine et al. patent (U.S. Pat. No. 5,222,152) discloses a portable fingerprint scanning apparatus for optically scanning and recording fingerprint images and wirelessly transmitting such images to a mobile processing unit for verification and background checking.

The Lougheed et al. patent (U.S. Pat. No. 5,233,404) discloses an optical scanning apparatus that uses a linear charge coupled device (CCD) for recording the image of a fingerprint on the viewing surface.

The Groger et al. patent (U.S. Pat. No. 5,766,956) discloses a diode laser based sensor for undertaking optical, chemical, immunological or nucleic acid-based assay or other chemical analysis.

The Feldman patent (U.S. Pat. No. 5,938,706) discloses a multi element security system for preventing the unauthorized use of an automotive vehicle, and which includes numerous locking and control features interconnected to an onboard cpu.

The Bowker et al. patent (U.S. Pat. No. 5,963,657) discloses a safety access control for doors, handles, locks, etc., wherein the surface relief of a finger is read and verified to either allow or prevent access by the individual to the door, handle, lock, etc.

The Bonder et al. patent (U.S. Pat. No. 6,078,265) discloses a fingerprint identification security system wherein a key lock operated security system utilizes the fingerprint of the individual to control user access to the security system, such as the ignition system of an automotive vehicle.

The Anzai et al. patent (U.S. Pat. No. 6,271,745 B1) discloses a keyless authorization system for use of a motor vehicle that includes fingerprint reading units located on the exterior or interior of the motor vehicle and which are coupled to a control unit for scanning, comparing and matching fingerprints to allow or disallow access to the motor vehicle.

The Hwang patent (U.S. Pat. No. 6,374,652 B1) discloses a fingerprint-activated doorknob in which a detecting sensor for a fingerprint is placed on the doorknob for measuring and

US 10,984,619 B2

3

searching the fingerprint against previously stored fingerprint inputs to control access to the door.

The Vor Keller et al. patent (U.S. Pat. No. 6,588,635 B2) discloses a safety holster for a firearm that includes a pivotally mounted retaining member and a fingerprint sensor for scanning fingerprint information so that only authorized users can withdraw the firearm from the holster.

The Cordery et al. patent (U.S. Pat. No. 6,613,571 B2) discloses a method and system for detecting biological and chemical hazards in the mail that includes sensors placed within the mail box for sampling and testing ambient air and so that mail can be safely transported through the mail system.

The Nagata patent (U.S. Pat. No. 6,628,213 B2) discloses a coding method for digital signal coding and decoding that includes a CMI (code-marked inversion) method of signal coding.

Nonetheless, despite the ingenuity of the above devices, methods, and systems, there remains a need for a multi-detector and disabling lock system for use with various types of products collected together by common characteristics into product groupings for detecting chemical, biological and radiological agents and compounds and for selectively disabling and activating the product locks thereby preventing unauthorized entry and further contamination and preventing and thwarting terrorist activities.

SUMMARY

The present invention comprehends a chemical/biological/radiological detector unit with a disabling locking system for protecting products that can be grouped into several product groupings, from terrorist activity, and also for preventing unauthorized access to and tampering with the storage and transport of ordnance and weapons. The products grouped into what may be referred to as Product grouping 1 include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes and lockers; while the products grouped into what may be referred to as Product grouping 2 include, but are not limited to, chemical, biological, radiological, and nuclear detectors, motion sensors and door sensors. The multi sensor detection system includes the capability to disable an existing lock or activate a lock located inside any of the products named in the product grouping categories upon activation of a sensor or detector included in the system. This is a significant feature for the multi sensor detection system as it prevents unauthorized, unequipped and untrained entry and access to the product thus preventing further contamination of the site and to individuals in the area.

The multi sensor detection and lock disabling system includes a detector case sized to fit in, upon or adjacent any of the aforedescribed products for detecting harmful and dangerous chemical, biological, and radiological agents, compounds and elements. In addition, the multi sensor detection and lock disabling system is capable of transmitting a signal to lock or disable a lock on the product, and is also capable of transmitting signals to a monitoring computer terminal or PC so that appropriate defensive and safeguarding actions can be undertaken and an authorized individual can disarm and reset the locking system and the multi sensor detection system. The detector case includes a power source (battery or electrical), interior compartments, Internet and GPS connections and a cpu interconnected with the Internet and GPS connections, and also interconnected with one or more off site monitoring computer terminals or PCs. The detector case includes one or more light alarm

4

indicators that are externally visible and that light up when the chemical, biological, or radiological agent or compound is detected, and the light alarm indicators (which can be indicator lights or panels on the front of the detector case) can be color coded for denoting the specific agent or compound detected, i.e., separate and distinct colors for indicating detection of the chemical, biological, or radiological agent or compound.

The detector case is designed to hold within the interior compartments one or more interchangeable detectors, and each detector is adapted and set up to sample a specific compound or agent. Each detector includes a sound alarm, a sensor, a light alarm, and a readings panel, and is electrically interconnected (either by wire or wirelessly) to the cpu of the detector case so that information regarding the detection of the particular agent or compound can be conveyed from the detectors to the detector case cpu. Each detector can also be used as a manual, stand-alone hand held scanner.

The multi sensor detection and lock disabling system can be interconnected to a surveillance watchtower, as well as monitoring computer terminals or PCs, with the watchtower scanning shipping and cargo crates and containers being prepared for shipment or sitting for extended periods of time on a dock or at a port, at a railway site, or at an industrial storage facility. The watchtower will scan the cargo and shipping crates and containers for the light alarm indicators on detector cases that are mounted in or upon the crates and containers, and thus continuous security surveillance of the crates and containers can be maintained.

An enhanced version of the multi sensor detection and lock disabling system can be employed to prevent car and vehicle bombings. Coupling the multi sensor detection and lock disabling system with satellite service will enable the detection system to detect explosives and transmit an alert signal by satellite to monitoring equipment at a monitoring site. Upon receiving the alert signal at the monitoring site the monitoring equipment activates a stall-to-stop process for disabling the air, fuel, electrical and/or computer system of the vehicle. Moreover, upon receiving the alert signal at the monitoring site the car or vehicle will be locked by transmission of a satellite signal that disables the vehicle's electrical and ignition system thereby preventing escape of the terrorist.

It is an objective of the present invention to provide a multi sensor detection and disabling lock system for securing news racks and vending machines in order to prevent theft, unauthorized use and terrorist activity.

It is another objective of the present invention to provide a multi sensor detection and disabling lock system for preventing terrorist activity by using products grouped together by common features in several product groupings such as design similarity, similarity in the presentation of security problems and similarity with regard to the presentation of solutions to preventing terrorist solutions.

It is still yet another objective of the present invention to provide a multi sensor detection and disabling lock system that is capable of disabling an existing lock or activating a lock inside any of the products of the product grouping lists when a detector or sensor of the system is activated.

It is still yet a further objective of the present invention to provide a multi sensor detection and disabling lock system wherein the disabling lock system prevents the unauthorized entry, access and further contamination of the products included in the several product groupings.

A still further objective of the present invention is to provide a multi sensor detection and lock disabling system that utilizes a multi-task device for preventing terrorist

US 10,984,619 B2

5

activity to vulnerable products that are collected or arranged by product grouping categories.

Yet a further objective of the present invention is to provide a multi sensor detection and disabling lock system to secure cargos and containers, especially cargo and shipping containers, against chemical, biological, radiological and nuclear terrorist activity.

Still another objective of the present invention is to provide a multi sensor detection and disabling lock system capable of detecting chemical, biological and radiological agents and compounds.

Still yet another objective of the present invention is to provide a multi sensor detection and disabling lock system that includes interchangeable detectors that operate in conjunction to detect chemical, biological and radiological agents and compounds.

Still yet a further objective of the present invention is to provide a multi sensor detection and disabling lock system that can be implemented by business or government at a minimum cost by organizing the products to be protected into product grouping categories.

Another objective of the present invention is to provide a multi sensor detection and disabling lock system that accurately and reliably detects harmful agents, compounds and elements, and prevents the placement and storage of weapons and bombs in the range of storage containers and facilities currently available.

Still another objective of the present invention is to provide a multi sensor detection and disabling lock system wherein the interchangeable detectors that comprise part of the system can be used as stand-alone scanners.

These and other objects, features, and advantages will become apparent to those skilled in the art upon a perusal of the following detailed description read in conjunction with the accompanying drawing figures and appended claims.

BRIEF DESCRIPTION OF THE DRAWINGS

FIG. 1 is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the primary features of the system which include a detector case, several interchangeable detectors, an automatic/mechanical lock disabler and a fingerprint biometric lock with disabler;

FIG. 2 is a front elevational view of the multi sensor detection and lock disabling system of the present invention illustrating one of the interchangeable detectors first shown in FIG. 1;

FIG. 3a is a top plan view of the multi sensor detection and lock disabling system of the present invention illustrating the mounting of one lock disabler to the lock of a product, such as a container, and disengaged from the lock of the container;

FIG. 3b is a top plan view of the multi sensor detection and lock disabling system of the present invention illustrating the engagement of the lock disabler to the lock of the product for locking or disabling the lock of the product so that unauthorized access is prevented;

FIG. 4 is a side elevational view of the multi sensor detection and lock disabling system of the present invention illustrating the detector case mounted to the product, such as the container, with the light alarm indicators externally visible;

FIG. 5 is a schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the interconnection of detector cases with a surveillance watchtower and a monitoring PC terminal;

6

FIG. 6 is a schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the placement of detector cases upon containers different from the containers of FIG. 5, and wherein the detectors case are interconnected to a surveillance watchtower and a monitoring PC terminal;

FIG. 7 is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the mounting of one automatic/mechanical lock disabler to the lock of a standalone news rack;

FIG. 8 is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating one interchangeable detector placed within the standalone news rack;

FIG. 9 is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the detector case having color coded front panels for specifically indicating the agents, compounds or elements that have been detected:

FIG. 10 is a rear elevational view of the multi sensor detection and lock disabling system of the present invention illustrating the GPS, Internet and power source connections;

FIG. 11 is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the interconnection of the detector with the detector case and the steps undertaken by the system when an agent or compound is detected;

FIG. 12 is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the sequence of steps undertaken by one detector when functioning as a stand-alone scanner for detecting an agent or compound;

FIG. 13 is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the interconnection of the detector case with the automatic/mechanical lock disabler for activating the lock disabler upon detection by the system of an agent or compound;

FIG. 14 is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating interconnection of the detector case with the fingerprint biometric lock with disabler for engaging and disengaging the fingerprint biometric lock as part of the process of detection and safeguarding the public upon detection of the agent or compound;

FIG. 15 is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the incorporation of the system with a surveillance watchtower and a monitoring PC or computer terminal for monitoring containers, such as shipping or cargo containers, that may sit for extended time periods on docks, at rail yards, and at industrial storage facilities;

FIG. 16 is a representative schematic view of the multi sensor detection and lock disabling system of the present invention illustrating the integration of the detection system with a satellite and monitoring equipment at a monitoring site for detecting explosives placed in a vehicle and then transmitting signals to the satellite and then to the monitoring site for disabling and locking the vehicle;

FIG. 17 is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the incorporation of the features and elements of the detector case to a cell phone and cell phone case;

FIG. 18 is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the incorporation of a GPS satellite, a monitoring site and a cell phone tower for communicating to and with an

US 10,984,619 B2

7

electronic device such as a laptop computer or a cell phone for transmitting signals to a vehicle for activating an onboard stall-to-stop device for bringing the vehicle to a halt; and

FIG. 19 is a perspective view of the multi sensor detection and lock disabling system of the present invention illustrating the use of a GPS satellite in conjunction with the monitoring site and monitoring equipment to relay commands and signals to the cpu or transceiver of the vehicle for stopping or locking the vehicle in response to a signal that a certain type of event (detection of a bomb, engine failure or malfunction or unauthorized use) has occurred or is in process.

DETAILED DESCRIPTION OF
REPRESENTATIVE EMBODIMENTS

Illustrated in FIGS. 1-19 is a multi-sensor detection and lock disabling system 10 for preventing terrorist activity by monitoring, detecting, and securing those critical areas; sites, and facilities vulnerable to terrorist activity. The first step is the identification of critical areas, sites, locations and facilities that are vulnerable to terrorist activity as convenient places to store and plant explosives and bombs and spread biological, chemical or radiological agents and compounds, followed by the disposition of the multi sensor detection and lock disabling system 10 for monitoring, detecting, and securing the particular location or site. Vulnerable sites, locations, facilities and areas are nearly limitless in their variety; in order to categorize the protection the present invention provides an anti-terrorist product grouping strategy has been developed wherein products made from the same or similar material, products having the same or similar design, and products presenting the same or similar security problems are grouped together with the multi sensor detection and lock disabling system 10 for preventing terrorist activity. For example, two preferred product groupings can be Product Grouping I: cargo containers, shipping containers, cargo planes, freight train cars, tractor trailers, mail carriers (UPS, FedEx), airport lockers, news racks (coin and non-coin operated), mail drop boxes, cluster mail boxes, keyed mail boxes, min-storage houses and buildings, bicycle lockers, stadium lockers, school lockers, cars, trucks, campers, buses, vans and utility vehicles. Product Grouping II: chemical detectors, biological detectors, radiological detectors, nuclear detectors, motion sensors, glass break sensors, plastic film on glass, high security locks, tampering labels, door sensors, disabling locking systems, vehicle detectors and satellite disabling locking systems. In addition to grouping products together by features, designs and materials, the multi sensor detection system 10 includes a lock disabling capability for disabling an existing lock or activating a lock on or inside any of the aforementioned products when a detector or sensor of the system is activated. The lock disabling feature is a crucial component of the invention in so far as it prevents unauthorized, unequipped or untrained individuals from gaining access and entry to the site and causing further contamination of the site.

As shown in FIGS. 1-10, the multi sensor detection and lock disabling system 10 includes at least one—and preferably many—detector case 12 that can be placed in on, upon or adjacent the product, such as the shipping containers 14 of FIGS. 4 and 5 resting upon a platform 16 or the cargo container 18 of FIG. 6 sitting upon a seaport dock or pier 20. The detector case 12 includes a top 22, a bottom 24, a pair of opposed sides 26 and a front side or panel 28 and an opposite rear or back side 30. The rear side 30 has connec-

8

tions or contacts that can include an Internet connection 32, a GPS connection 34 and a power connection 36 for a power source. The power source for the detector system 10 can be any conventional battery or electrical source. The detector case 12 includes an interior chamber divided into a number of compartments 38 for holding therein agent or compound detection means hereinafter further described. A cpu 40 is mounted within the detector case 12 and electrically interconnects, routes, and transmits signals among items hereinafter further described and also communicates with a monitoring site and monitoring equipment. The front side 28 of the detector case 12 includes indicator means for visually indicating that a specific agent, compound or element has been detected. The indicator means can include color coded indicator lights 42 in panel form, as shown in FIG. 9, with each indicator light panel 42 lighting up with a specific color corresponding to the detection of a specific agent or compound; or color coded indicator lights 44, as shown FIG. 1, that correspond to and individually light up on the detection of a specific agent or compound (chemical, biological, or radiological).

As shown in FIGS. 1, 2 and 9-13, the multi sensor detection and lock disabling system 10 includes a plurality of detectors 46 with each detector 46 adapted for and set up to sample for a specific agent or compound (biological, chemical, or radiological); and the detectors 46 are interchangeable for adapting to the needs and demands of future technology. The detectors 46 can also be used as stand-alone scanners. In the preferred embodiment of the invention, at least three detectors 46 are placed within the detector case 12 with one detector 46 for specifically sampling biological agents or compounds, one detector 46 for sampling chemical agents or compounds, and one detector 46 for sampling radiological agents or compounds. The detectors 46 are interconnected to the cpu 40 of the detection system 10 by conventional connections that can be wire or wireless for transmitting the appropriate signals to the cpu 40 upon detection of the particular agent or compound. As shown in FIG. 2, each detector 46 includes on its front plate or facing surface a sound alarm indicator 48, a readings panel 50 comprising a plastic shield and LED lights for displaying the various read-out messages, a sensor 52 for detecting the specific agent, element or compound, and a light alarm indicator 54 that can be color coded for each specific agent and which is externally visible when the detector 46 is used as a stand-alone scanner. Each detector 46 includes a conventional microprocessor for controlling the various functions and generating the appropriate signals for transmission to the cpu 40 of the detector case 12.

As shown in FIGS. 1, 3a, 3b, 9, and 13-15, used in conjunction with the multi sensor detection and lock disabling system 10 is at least one automatic/mechanical lock disabler 56—and depending upon the number of products being monitored there can be one lock disabler 56 for each product. The automatic/mechanical lock disabler 56 is physically connected to the detector case 12 by a wire or cable 58 for receiving signals therefrom for disabling an existing lock or activating a lock inside a product to prevent access to the product. By way of example, FIG. 3a shows the automatic/mechanical lock disabler 56 mounted—by any conventional means—to the lock 60 of the shipping container 14 shown in FIGS. 4 and 5 and connected by wire 58 to the cpu 40 of the detector case 12. The lock disabler 56 is in the non-activated or disengaged state in FIG. 3a. FIG. 3b shows the automatic/mechanical lock disabler 56 mounted to the lock 60 of the shipping container 14 and in the activated or engaged state after detection of an agent or

US 10,984,619 B2

9

compound by the system 10 thereby for locking or disabling the lock 60 of the shipping container 14 and preventing unauthorized entry and access by unauthorized, untrained and unequipped individuals. In FIGS. 3a and 3b the lock 60 secures doors of the shipping container 14 that can be slidably or pivotally opened and closed.

In addition to the automatic/mechanical lock disabler 56, the multi sensor detection and lock disabling system 10 can also utilize a fingerprint biometric lock with disabler 62 as shown in FIGS. 1 and 14. The fingerprint biometric lock with disabler 62 is interconnected to the cpu 40 of the detector case 12 for receiving transmissions therefrom after detection of an agent or compound has occurred so that the lock on the product can be locked or disabled. Moreover, resetting of the fingerprint biometric lock with disabler 62 occurs when the fingerprint of the individual is placed on the fingerprint-matching pad 64, and if a match occurs with a known fingerprint stored by the cpu 40, then the individual can reset the fingerprint biometric lock with disabler 56 by turning the manual lock disabler 66. The fingerprint biometric lock with disabler 62 is mounted to the lock of the product in a manner similar to the mounting of the automatic/mechanical lock disabler 56 that is shown in FIGS. 3 and 3b.

FIGS. 4 and 5 show one manner of disposition or placement of the detector case 12 in relation to the product, i.e., the shipping container 14, with the color coded indicator lights 42 externally viewable; FIG. 5 shows a number of shipping containers 14 each equipped with a detector case 12 and integrated with elements hereinafter further described for continuously monitoring the shipping containers 14 as they sit for an extended period of time on the truck or rail platform 16. FIG. 6 illustrates several cargo containers 18 sitting on the shipping dock or pier 20, with each cargo container 18 having a detector case 12 mounted thereon and integrated with and monitored by elements shown in FIG. 5 and hereinafter further described.

FIG. 7 illustrates a typical product from product grouping 1 that is monitored by the multi sensor detection and lock disabling system 10 of the present invention; specifically, FIG. 7 shows a news rack 68 with one automatic/mechanical lock disabler 56 mounted to and interconnected with the locking mechanism of the news rack 68. As long as there is no detection of any agent or compound, the lock disabler 56 is in the disengaged state, and the individual can deposit the coin amount in the chute and then freely open the glass panel 70 by the handle 72 for removing a paper. However, the lock disabler 56 would be activated upon detection of the harmful agent or compound and receipt of a signal from the cpu 40 for locking or disabling the locking mechanism thereby denying access to the interior of the news rack 68 from all untrained, unauthorized and unequipped individuals.

FIG. 8 illustrates one detector 46 disposed within the news rack 68 and which is visible through the panel 70 for detecting one specific agent, compound or element. The detector 46 functions as a stand-alone scanner and can be wirelessly interconnected to offsite monitoring equipment.

FIG. 11 illustrates a representative schematic 74 for describing the signal transmission process from the detector 46 to the cpu 40 of the detector case 12. The external stimulus 76 would be the chemical, biological or radiological agent or compound. If there is no detection of the agent or compound, the detector 46 will stay in the sensing mode 78. However, detection of the specific agent will trigger the sound alarm 80 and the light alarm 82, and instant transmittal of a signal to the cpu 40. The readings 84 can be stored by the cpu 40 for verification and future review and evalu-

10

ation. After all the appropriate corrective and preventative measures have been undertaken by the trained and authorized personal, and the site has been cleansed of the contamination, authorized and equipped personal can then reset 86 the system 10.

FIG. 12 illustrates a representative schematic 88 for the detector 46 when used as stand-alone scanner. The detector 46 undergoes the same essential steps as illustrated in FIG. 11. with the exception of the signal transmission to the cpu 40. The detector 46 remains in detection mode 78 until an agent is detected, and then the various functions-light alarm 82, sound alarm 80, storage of readings 84, and, after the appropriate security and safety steps have been carried out by authorized personal, detector reset 90 by authorized personal can occur thereby placing the detector 46 back in detection or sensing mode 78.

FIG. 13 is a representative schematic 92 that illustrates the steps undertaken by the system 10 to lock or disable a lock, such as the lock 60 for the shipping container 14 shown in FIGS. 3a and 3b. Upon detection of the agent (chemical, biological, radiological) the alarm light indicators 42 or 44 will light up providing external indication that an agent has been detected. In addition, the system 10—the cpu 40—will transmit a lock/disable lock signal 94 to the automatic/mechanical lock disabler 56 to lock or disable the lock on the product, such as the lock 60 on the shipping container 14 of FIGS. 3a-5. This prevents unauthorized, unequipped, or untrained individuals from entering or gaining access to the product for which a dangerous and perhaps lethal agent has been detected. After the proper authorities and authorized personal have been notified and all the appropriate security, preventative and clean up measures have been undertaken, the authorized individual can perform the disarm and reset function 96 for the system 10 placing the system 10 in back in the detection mode 98.

FIG. 14 is a representative schematic 100 illustrating the use of the fingerprint biometric lock with disabler 62 with the system 10. Upon detection of the agent or compound by the detector, the various alarms would sound and light up (shown in previous figures), and the cpu 40 would then transmit a signal to the fingerprint biometric lock with disabler 62 to lock or disable the lock on the product, such as the lock 60 on the shipping containers 14 shown in FIGS. 3a-5. The shipping containers 60 would remain locked and in an access denied mode 101 should an attempt be made to gain access to the container 60 by opening the lock 60 with an unauthorized fingerprint. However, a fingerprint that matches stored and authorized fingerprints 102 would indicate an authorized individual, and would allow the individual to disable and disarm 104 the lock 60 of the shipping container 14. The fingerprint biometric lock with disabler 62 would then be reset 106 after the appropriate safety, cleanup, and protection measures are completed, and the system 10 would be reset and placed back in the detection mode 108.

FIG. 15 is a schematic representation 110 that illustrates the integration of a surveillance watchtower 112 and a monitoring terminal or PC 114 for monitoring products such as the shipping containers 14 or cargo containers 16 that sit for extended periods of time of docks, piers 20, truck terminals, rail yards, shipping platforms 16 and industrial sites as shown in FIGS. 5 and 6. The watchtower 112 would maintain continuous surveillance over a number of shipping containers 60, for example, with detector cases 12 mounted in or on each container 14 and set in detection mode 116 with one or more detectors 46 disposed in each detector case 12. The watchtower 112 would continuously scan for light alarm indicators 42 and 44 on the products, such as the containers

SAppx983

US 10,984,619 B2

11

14 or 18, and the watchtower 112 would be interconnected and integrated with the monitoring terminal or PC 114. Upon detection 118 of an agent or compound in one or more of the shipping containers 14, the appropriate light alarm indicators 42 or 44 would light providing visible confirmation of the detection of the specific agent or compound. The cpu 40 would transmit a lock/disable signal 120 to the lock 60 on each respective shipping container 14 to lock or disable the lock 60 thus preventing access to that respective shipping container 14. In addition, signal transmissions would be sent to the monitoring terminal or PC 114 (which could be off site) thereby alerting authorized security personal of the contamination event. With the information received at the monitoring terminal 114, authorized personal would then be notified and dispatched to the area to undertake the appropriate safety and cleanup measures 122. Such measures would also include disarming the lock disabling system in order to gain access to the shipping container 14. After all the cleanup and security measures are completed by the trained and properly equipped authorities, the detection system and the lock disabling feature would reset 124 and the detection system would again be placed in detection mode 116.

FIG. 16 is a schematic representation 126 that illustrates an enhanced version of the multi sensor detection and lock disabling system 10 for preventing car and vehicle attacks and bombings. The lock disabling system 10 would be interconnected to the locking system and mechanism 128 of the vehicle 130. In addition, a stall to stop disabling link 132 can be made with the fuel, air, and electrical system 134 of the vehicle 130. In addition, a stall to stop disabling link 132 can be made with the fuel, air, and electrical system 134 of the vehicle 130. The enhanced version incorporates a satellite 136 for signal receipt and transmission from the vehicle 130 in which the detector system 10 is placed to a monitoring site and monitoring equipment 138. As shown in FIG. 16, a detection signal 140 would be sent to the satellite 136 by the detection system 10 upon detection of a bomb or explosive 142 hidden in the vehicle 130. The satellite 136 would then transmit an alert signal 144 to the monitoring site 138 with the signal 144 containing the relevant data to evaluate the nature of the threat. The monitoring site 138 would then transmit a stall to stop signal 146 to the detection system 10 to lock the vehicle 130 and/or disable the electrical system of the vehicle 130 thereby disabling the vehicle 130, preventing access to the vehicle 130 by locking the vehicle 130, and preventing any terrorist in the vehicle 130 from escaping.

The detector case 12 can be modified and adapted for inclusion with cell phone cases, satellite cell phone cases, laptop cases, notebook PC cases, PDA cases, carry-on cases, suitcases; and briefcases. In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring.

The system 10 and the watchtower 112, along with the satellite 136 and the monitoring site 138 can be adapted or incorporated with cell phone towers and satellites for use with satellite communication and/or a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such as cpu 40, or a transceiver and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween. The aforementioned telecommunication and radio communication means can be interactive with any type of motive vehicle that includes but is not limited to cars, trucks, vans, SUVs, trains, subways, boats, ships and air-

12

planes, and which is reported stolen, experiences a loss of brakes, or a bomb, explosives or other types of chemical, biological, radiological, or nuclear agents are detected within, upon, affixed or mounted to the vehicle and which detection causes an automatic signal transmission or a signal transmission is activated when a call is made to the monitoring station by an authorized person. The authorized individual includes but is not limited to the owner, pilot, conductor, captain, police highway patrol, security guard and military personnel to the monitoring equipment for activating a vehicle slowdown or stall-to-stop disabling system that similar to the disabling system 126 shown in FIG. 16, or incorporating features of the system 126 shown in FIG. 16, from the monitoring equipment to the vehicle. The activation of the stall-to-stop disabling means or the vehicle slowdown disables or engages the computer, electrical, fuel and air systems of the vehicle or a combination of the computer, electrical, fuel and air systems that include but are not limited to the brakes, foot peddle, lights, speed controls, ignition, steering, transmission, and the horsepower of the motor.

In addition, the basic stall-to-stop disabling means or the vehicle slowdown means and device can be adapted, modified or designed to include: an open bust or open platform for integrating any new and innovative technology; warning lights indicators; sound alarm indicators; voice alarm indicators; a cell phone to transmit to the vehicle a signal for slowing and halting the vehicle; and a lock disabling system or means to lock a thief or terrorist inside the vehicle after a transmission is received or sent. Open bust or open platform also refers to the compatibility of the detector case 12, or the incorporation of its features in cell phone cases, satellite cell phone cases, laptop cases, notebook PC cases, PDA cases, carry-on cases, briefcases, and suitcases, etc., with other communication, transmission and surveillance systems whereupon the detector case 12, and its features, can be seamlessly integrated with other new and emerging systems and technologies.

Thus, as shown more specifically in FIG. 17, by way of a representative example the features and elements of the detector case 12 are shown as being incorporated into cell phone detector case 150 and associated cell phone monitor 152. The cell phone monitor 152 includes the standard keypad functions 154 and more specialized system use (ring tone, email, photos, texting) functions 156 as well as a viewing screen 158. The cell phone detector case 150 includes a recharging cradle or seat 160, a front side 162, a top 164, a bottom 166, and a pair of opposed sides 168. At the back of the cell phone detector case 150 are connections, contacts, and ports for at least an Internet connection 170, a GPS connection 172, and a contact, plug, or port for a power source 174. The power source for the cell phone detector case 150 can be any conventional rechargeable battery source or standard electrical power from a standard electrical receptacle or outlet.

As shown in FIG. 17, the cell phone detector case 150 includes one or more sensor/detector units, cells, or components 176 built into and incorporated into the case 150. The detector 176 includes generally disposed at the front 162 of the case 150 the following types of indicators: a sound alarm indicator 178, a readings panel 180, a sensor 182 for detecting one or more specific types of agents, elements, chemicals, compounds, etc., and a light alarm indicator 184. The sensor/detector 176 will be interconnected to the power source and 176. In addition, mounted on and externally visible on the sides 168 or front 162 of the case 150 are a plurality of color coded indicator lights 186 with

US 10,984,619 B2

13                                                    14

each light 186 corresponding to a specific agent, element, chemical, compound, etc., and lighting up when that agent is detected by the sensor/detector 176. The color coded indicator lights 186 will be electrically interconnected to the sensor/detectors 176 via any standard microprocessor. The cell phone detector case 150 and cell phone monitor 152 thus comprise a hand-held, easily portable and transportable detection means that is both effective and unobtrusive in its disposition and use.

FIGS. 18 and 19 illustrate representative examples of the integration of portable electronic communication or tele-communication devices such as a cell phone 187a and/or a laptop computer 187b with the monitoring equipment 138 located at a predesignated monitoring site 188, and operating in conjunction with either a satellite and/or a cell phone tower 190 to transmit and receive signals and commands among each other and to a vehicle 192, such as a truck, as part of a stall-to-stop disabling system for slowing and stopping the vehicle 192 and locking a thief, terrorist, or unauthorized individual in the vehicle 192 if needed. A wide range of events can trigger and initiate the stall-to-stop system and the locking or lock disabling system and mechanism, and the event doesn't have to be limited to the detection of a bomb or a chemical, biological, or radiological agent, element, or compound. The events can include, but is not limited to, detection of an engine problem to engine failure to the unauthorized use (stealing) of the vehicle 192. The vehicle 192 includes an electromotive system 194 that comprises, among other components, an onboard computer(s), electrical, fuel and air systems, as well as brakes, ignition, steering, and transmission. Also integrated with and capable of communicating with the vehicle's 192 electromotive system 194 is a stall-to-stop system while a lock disabling mechanism 196 is able to engage and disengage or disable the vehicle's 192 locking mechanism 198 upon receipt of the appropriate commands via a lock disabling communication channel or link 200. This link 200 can also accommodate the stall-to-stop system commands and signals, and thus is a multi-channel communication link. A CPU or a transceiver 202 is programmed to receive signals from the cell phone tower 190 and/or to a GPS satellite 204 and is interconnected with the stall-to-stop system and the lock disabling system 196 via link 200 for engaging the electromotive system 194 and actuating the lock disabling system 196 to stop the vehicle 192 and lock inside the vehicle 192 anyone such as a thief, terrorist or other unauthorized individual.

A representative example for stopping, disabling, and locking the vehicle 192 that utilizes the cell phone tower 190 wherein the activation and/or distress signal 206 originates from the cell phone 187a or the laptop 187b and such activation signal 206 travels to the cell phone tower 190 that is nearest the current location of the vehicle 192. A signal 208 is then transmitted to the monitoring site 188 and specific monitoring equipment 138 that can also include but is not limited to cell phones, laptops, desktop PC's, notebook PCs and LCD monitors. The monitoring site 188 then communicates by signal 210 to the GPS satellite 204 that an original or activation signal has been received and then the GPS satellite 204 locates and communicates by multiplex signal 212 with the CPU or transceiver 202 on the vehicle 192 and exchanges information on the type of problem, situation, location, and vehicle speed. The monitoring equipment 138 then transmits a signal 214 to the cell phone tower 190 that communicates with the transceiver 202 and/or CPU of the vehicle 192 to initiate or execute any commands that will actuate the stall-to-stop disabling link 200 and lock

disabling system 196 for bringing the vehicle 192 to a halt and actuating the vehicle's 192 locking mechanism 198 for locking the thief, terrorist, or other unauthorized person inside the vehicle 192 if needed.

FIG. 19 illustrates a representative example wherein the stall-to-stop system and the lock disabling system 196 are utilized in conjunction with the GPS satellite 204. In FIG. 19 a signal has traveled to the satellites nearest the vehicle's 192 current location and then the signal 218 has traveled to the monitoring equipment 138 and monitoring site 188 which can include but is not limited to satellite cell phones, satellite monitors, cell phones, laptops, desktop PC's, notebook PC's, and LCD monitors. The GPS satellite 204 then locates and communicates with the CPU and/or transceiver 202 on the vehicle 192 via a multiplex (two-way) signal 220 in order to exchange information on such distress and danger event parameters as the specific problem situation, location, and vehicle speed. The monitoring equipment 138 then transmits a signal 222 back to the GPS satellite 204 that in turn communicates via another signal 224 with the CPU and/or transceiver 202 to execute any commands to the stall-to-stop system for executing the disengagement of the vehicle's 192 electromotive system 194 for bringing the vehicle 192 to a halt and for actuating the lock disabling system 196 to direct the lock disabling link 200 to actuate the locking mechanism 198 thereby locking the vehicle 192 and anyone inside the vehicle 192.

The present invention comprehends a chemical/biological/radiological/nuclear/explosive/human/contraband detector unit with a disabling locking system for protecting products that can be grouped into several product groupings, from terrorist activity, and also for preventing unauthorized access to and tampering with the storage and transport of ordnance and weapons. The products grouped into what may be referred to as Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars, United Parcel Services™ (UPS™), Federal Express™ (FedEx™), airport lockers, news racks (coin and non-coin operated), mail drop boxes, cluster mail boxes, keyed mail boxes, min-storage houses and buildings, bicycle lockers, stadium lockers, school lockers, cars, trucks, campers, buses, vans, unmanned aerial vehicles (UAVs), unmanned ground vehicles (UGVs), and utility vehicles; the products grouped into what may be referred to as Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, door sensors, speed sensors, biometric sensors, glass break sensors, plastic film on glass, high security locks, tampering labels, door sensors, disabling locking systems, vehicle detectors and satellite disabling locking systems, detection of humans, detection of contraband, temperature, and shock levels; the products grouped into what may be referred to as Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, satellite cell phone cases, laptop cases, notebook PC cases, PDA cases, carry-on cases, suitcases, eyeglass, briefcases, detector cases of locks, detector cases of tags, detector cases that is mounted to, detector cases that is affixed to, detector cases that is outside of, detector cases that is inside of, and detector cases that is adjacent to; the products grouped into what may be referred to as Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, mobile communication units, portable communication devices, portable communication equipment, wired communication devices, wireless

US 10,984,619 B2

15

communication devices, monitoring sites, monitoring termi-
nals, web servers, desktop personal computers (PCs), note-
book personal computers (PCs), laptops, satellite cell
phones, cell phones, Universal Mobile Telecommunications
System (UMTS) phones, personal digital assistants (PDAs),
liquid crystal display (LCD) monitors, and satellite moni-
toring, remote control key fobs, two-way communication
key fobs, handhelds; the products grouped into what may be
referred to as Product grouping 5 (communication methods)
include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max,
Internet, Ethernet, Broadband, Network Bandwidth, Wire-
less, Wired, Text Messaging, Cellular, Satellite, Telematics,
Wide Area Network (WAN), Wireless Wide Area Network
(WWAN), Local Area Network (LAN), Radio Frequency
(RF), Broadband Wireless Access (BWA), Global Position-
ing System (GPS), General Packet Radio Services (GPRS),
Global System for Mobile (GSM), Wideband Code Division
Multiple Access (W-CDMA), Universal Mobile Telecom-
munications System (UMTS), Short Message Service
(SMS); the products grouped into what may be referred to as
Product grouping 6 (biometrics) include, but are not limited
to, fingerprint recognition, voice recognition, face recogni-
tion, hand geometry, retina scan, iris scan and signature. the
products grouped into what may be referred to as Product
grouping 7 (authorized person) include, but are not limited
to, owner, pilot, conductor, captain, drivers of vehicles
identified as high security, airport security, police, highway
patrol, security guard, military personnel, hazardous mate-
rial (HAZMAT) personnel, the Central Intelligence Agency
(CIA), the Federal Bureau of Investigation (FBI), Secret
Service, port security personnel, border security personnel,
first responders, monitoring sites and terminal personnel.
The multi sensor detection system includes the capability to
disable an existing lock or activate a lock located inside or
outside any of the products named in the product grouping
categories upon activation of a sensor or detector included in
the system. This is a significant feature for the multi sensor
detection system as it prevents unauthorized, unequipped
and untrained entry and access to the product thus prevent-
ing further contamination of the site and to individuals in the
area.

While the invention has been shown and described in a
preferred embodiment, it will be apparent to those skilled in
the art that numerous alterations, modifications, and varia-
tions will possible and practicable without departing from
the spirit and scope of the invention as set forth by the
appended claims.

What is claimed:
1. A communication device that is at least a personal
computer (PC), a cellphone, a smartphone, a laptop, or a
handheld scanner, comprising at least a central processing
unit (CPU), capable of:
    processing instructions to lock, unlock, or disable the lock
        of the communication device;
    processing instructions to activate a lock, unlock, or
        disabling lock means by engaging a vehicle with a
        two-way communication key-fob;
    processing instructions to activate a start, stall, stop, or
        disabling means by engaging a vehicle's ignition sys-
        tem;
    processing instructions to activate a lock, unlock. or
        disabling lock means; a start, stall, stop, or disabling
        vehicle means by engaging the operational systems of
        the unmanned aerial vehicle;
    processing instructions to authenticate or identify a user
        by at least one of biometric fingerprint recognition,

16

    biometric facial recognition, biometric iris recognition,
        or biometric retina recognition;
    processing instructions to scan a senor or tag using the
        short-range wireless technology of radio frequency
        near-field communication (NFC);
    processing instructions to monitor or detect at least one of
        a chemical sensor, a biological sensor, a motion sensor,
        a biometric sensor, a signature sensor, or a human
        sensor;
    processing instructions to monitor or detect for at least
        one of chemical agent, biological agent, radiological
        agent, nuclear agent, or explosive agent, weapons of
        mass destruction (WMDs);
    processing instructions received through at least one of a
        Bluetooth, a Wi-Fi, a satellite, a global positioning
        system (GPS), or a cellular transmission;
    processing instructions to connect the communication
        device to the internet or internet-of-things (IoTs) plat-
        form to sync, to at least one of a building's computer
        or security system, a vehicle's computer or security
        system, a lock, a detection device, or another commu-
        nication device; and,
    whereupon, the communication device is capable of pro-
        cessing instructions for operational and functional
        execution, and is capable of providing feedback of the
        execution, and storing the feedback into memory.
2. The communication device of claim 1, comprising at
least a central processing unit (CPU), capable of processing
operational instructions for at least a personal computer
(PC), a cellphone, a smartphone, a laptop, or a handheld
scanner.
3. The communication device of claim 1, comprising at
least a central processing unit (CPU), capable of receiving a
signal to lock, unlock, or disable the lock of the communi-
cation device.
4. The communication device of claim 1, comprising at
least a central processing unit (CPU), capable of receiving a
signal of at least fingerprint recognition, facial recognition,
iris recognition, or retina recognition.
5. The communication device of claim 1, comprising at
least a central processing unit (CPU), capable of receiving a
signal of at least short-range wireless radio frequency near-
field communication (NFC).
6. The communication device of claim 1, comprising at
least a central processing unit (CPU), capable of receiving a
signal from at least chemical sensor, biological sensor,
motion sensor, biometric sensor, signature sensor, or human
sensor.
7. The communication device of claim 1, comprising at
least a central processing unit (CPU), capable of receiving a
signal from at least one of chemical, biological, radiological,
nuclear, or explosives detection.
8. The communication device of claim 1, comprising at
least a central processing unit (CPU), capable of receiving a
signal through at least a Bluetooth, a Wi-Fi, a satellite, a
cellular, or GPS connection.
9. The communication device of claim 1, comprising at
least a central processing unit (CPU), capable of receiving a
signal of the communication device connection to the inter-
net or internet-of-things (IoTs) platform to sync at least a
building's computer or security system, a vehicle's com-
puter or security system, a lock, a detection device, or
another communication device.
10. The communication device of claim 1, comprising at
least a central processing unit (CPU), capable of receiving a
signal of the operational and functional execution of instruc-

US 10,984,619 B2

17

tions; capable of providing feedback of the execution; and, capable of storing the feedback into memory.

**11**. A central processing unit (CPU) of at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, capable of:

processing instructions to lock, unlock, or disable the lock of the communication device:

processing instructions to activate a lock, unlock, or disabling lock means by engaging a vehicle with a two-way communication key-fob;

processing instructions to activate a start, stall, stop, or disabling means by engaging a vehicle's ignition system;

processing instructions to activate a lock, unlock, or disabling lock means; a start, stall, stop, or disabling vehicle means by engaging the operational systems of the unmanned aerial vehicle;

processing instructions to authenticate or identify a user by at least one of biometric fingerprint recognition, biometric facial recognition, biometric iris recognition, or biometric retina recognition;

processing instructions to scan a senor or tag using the short-range wireless technology of radio frequency near-field communication (NFC);

processing instructions to monitor or detect at least one of a chemical sensor, a biological sensor, a motion sensor, a biometric sensor, a signature sensor, or a human sensor;

processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs);

processing instructions received through at least one of a Bluetooth, a Wi-Fi, a satellite, a global positioning system (GPS), or a cellular transmission;

processing instructions to connect the communication device to the internet or internet-of-things (IoTs) platform to sync, to at least one of a building's computer or security system, a vehicle's computer or security system, a lock, a detection device, or another communication device; and,

whereupon, the central processing unit (CPU) of the communication device is capable of processing instructions for operational and functional execution, and is

18

capable of providing feedback of the execution, and storing the feedback into memory.

**12**. The central processing unit (CPU) of claim **11**, capable of processing operational instructions for at least one of a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner.

**13**. The central processing unit (CPU) of claim **11**, capable of processing operational instructions to lock, unlock, or disable the lock of the communication device.

**14**. The central processing unit (CPU) of claim **11**, capable of processing operational instructions of at least fingerprint recognition, facial recognition, iris recognition, or retina recognition.

**15**. The central processing unit (CPU) of claim **11**, capable of processing operational instructions from short-range wireless radio frequency near-field communication (NFC).

**16**. The central processing unit (CPU) of claim **11**, capable of processing operational instructions from at least chemical sensor, biological sensor, motion sensor, biometric sensor, signature sensor, or human sensor.

**17**. The central processing unit (CPU) of claim **11**, capable of processing operational instructions from at least chemical, biological, radiological, nuclear, or explosives detection.

**18**. The central processing unit (CPU) of claim **11**, capable of processing operational instructions through at least a Bluetooth, a Wi-Fi, a satellite, a cellular, or GPS connection.

**19**. The central processing unit (CPU) of claim **11**, capable of processing operational instructions of the communication device connection to the internet or internet-of-things (IoTs) platform to sync at least a building's computer or security system, a vehicle's computer or security system, a lock, a detection device, or another communication device.

**20**. The central processing unit (CPU) of claim **11**, capable of processing operational instructions of functional execution of instructions; capable of providing feedback of the execution; and, capable of storing the feedback into memory.

* * * * *

# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

## CERTIFICATE OF SERVICE

**Case Number** 2024-2024

**Short Case Caption** Golden v. Google LLC

> **NOTE:** Proof of service is only required when the rules specify that service must be accomplished outside the court's electronic filing system.  See Fed. R. App. P. 25(d); Fed. Cir. R. 25(e).  Attach additional pages as needed.

I certify that I served a copy of the foregoing filing on 11/18/2024

by  ☑  U.S. Mail  ☐  Hand Delivery  ☐ Email  ☐ Facsimile
    ☐  Other: _____

on the below individuals at the following locations.

| Person Served | Service Location (Address, Facsimile, Email) |
|---|---|
| Larry Golden, Pro Se | 740 Woodruff Road, No. 1102<br>Greenville, SC 29607<br>atpg-tech@charter.net |
|  |  |
|  |  |
|  |  |
|  |  |

☐    Additional pages attached.

Date: 11/18/2024

Signature:  /s/ Matthew S. Warren

Name:    Matthew S. Warren