# UNITED STATES COURT OF APPEALS
# FOR THE FEDERAL CIRCUIT

RECEIVED

## INFORMAL REPLY BRIEF OF PETITIONER/APPELLANT

NOV 21 2024

**Case Number:** 24-2024

United States Court of Appeals
For the Federal Circuit

**Short Case Caption:** Golden v. Google, LLC

**Petitioner/Appellant:** Larry Golden

---

**Instructions:** Read the Guide for Unrepresented Parties before completing this form. Answer the questions as best as you can. Attach additional pages as needed to answer the questions. This form and continuation pages may not exceed 15 pages.

You may attach other record material as an appendix. Any attached material should be referenced in answer to the below questions. Do not attach material already attached to your informal opening brief. Please redact (erase, cover, or otherwise make unreadable) social security numbers or comparable private personal identifiers that appear in any attachments you submit.

---

1. Have you received a copy of the respondent/appellee's response brief?

   ☑ Yes   ☐ No

   **STOP:** You may use this form to respond to arguments raised in the brief of respondent/appellee. If you have not received that brief, you may not file this form. **Do not proceed or file this form if you answered "No."**

2. What are your arguments in response to the respondent/appellee?

   > Google own Expert Witness Declaration debunks Judge Lin non-infringement theory of modification. Key words: configured to, mobile phones, smartwatch, Bluetooth, NFC, GPS, operating system, processors, software, RF, cellular, WiFi, wireless adapters; biological-pulse, biometric, infrared, skin, light, optical, and ECG sensors, heart rate, remote server, access[ible], wearable, (Appx. VIII)

3. Are there other arguments you wish to make?  ☑ Yes  ☐ No

   If yes, please state them.

---

"Joint Infringement", whereby the actors form a joint enterprise such that performance of every step is attributable to the controlling party's [Google] Tensor CPU/Chipset and Android Open-Source Operating System. (Appx. VIII).

I self-identify as a Christian. Judge Rita Lin is quoted as saying "The problem with the Christian Coalition is not that they are Bible-thumpers but that they're bigots." The Coalition include Baptists (50%), mainline Protestants (25%), Roman Catholics (16%), and Pentecostals (10% to 12%). Judge Lin believes I am one who hate her, or is intolerant of her because of her race and/or religious belief. Judge Lin expressed her personal bias against me by not granting me my guaranteed right to a trial, for claims of patent infringement that are issues of fact tried by a jury [U.S. Cons't. 7th amend.] (Appx. VII)

Judge Lin is bias in favor of Google. Judge Lin is Chinese American born in Oakland, California. In 2023, Googleplex is Google's headquarters located in California. The 1st gen. of Google's AI chip, called a Tensor Processing Unit (TPU), is manufactured in China. Judge Lin dismissed an antitrust lawsuit accusing Google of unlawfully dominating web searches on smartphones, (Aug., 2024). The users quoted the Judge Amit Mehta in US Dept. of Justice v. Google, who said that Google and Apple's default search deal was "arguably a form of exclusivity" preventing rivals from competing. (Appx. VI)

The Trial Court Judge is limited in his ability to weigh disputed facts: "[] the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." Anderson, 477 U.S. at 255. The Supreme Court has long recognized, resolving an issue of fact [claim of patent infringement] requires resorting to "basic, primary or historical facts:" Thompson v. Keohane, 516 U.S. 99, 109-10 (1995) (quoting Townsend v. Sein, 372 U.S. 309 n.6 (1963) (quoting Browning v. Allen, 344 U.S. 443, 506 (1953)).

Judge Lin is bias against Golden. Judge Lin improperly added the inventive step of "modification" to my patent claims to justify dismissing my case. Judge Lin created of the non-infringement theory that has no basis in patent law to conform or comply with the long tradition; honored by the members of a judicial system of systemic and structural racism; that a Black and/or African American inventor will not be compensated for his innovative ideas (Appx. I-V)

---

Date: 11/19/2024

Signature: *Larry Golden*

Name: Larry Golden

# INFORMAL REPLY BRIEF—MEMORANDUM OF LAW

Drafters of the U.S. Constitution, Hamilton for example, believed that "the right to jury trial in federal cases should extend only to a fact-finding function." The issue was not resolved until 1895, when the Supreme Court held in favor of restricting the jury's role to fact-finding so as to avoid "confusion and uncertainty in the administration of the . . . law." *Sparf and Hansen v. United States*, 156 U.S. 51, 101 (1895). This view has prevailed to the present, where the need for uniformity, certainty and predictability appears to be justification enough to restrict the jury's role to fact-finding. *See, e.g., Weiner, The Civil Jury Trial and the Law-Fact Distinction*, 54 CAL. L. REV. 1867, 1924 (1966).

All of the issues Plaintiff-Appellant ("Golden") has presented to the lower court are issues-of-facts to be tried by a jury under the Seventh Amendment of the United States Constitution. The Trial Court judge allowed Google's contentions of redirecting the case away from the issues-of-facts, to that of an issue-of-law. Google convinced the trial court judge to construe the terms "modify", "modified", and "modification". The lower court judge erred in rendering a decision against Golden to dismiss the case without reviewing any intrinsic evidence, expert declarations, or extrinsic evidence.

The problems here are, the lower court never ordered a "claim construction" or "Markman" hearing; and, nowhere in Golden's patent claims asserted in this case is the term(s) "modify", "modified", or "modification" used to described an invention. The Federal Circuit in *Golden v. Google LLC* Case No. 22-1267 stated: "Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the Google [Pixel 5] Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189" … "to the extent that the chart includes the "exact same language" …, it is simply the language of the independent claims being mapped to" …

Claim interpretation is perhaps the most important issue in a patent litigation because it affects the findings on the validity, infringement, and enforceability of the patent. In 1996, the U.S. Supreme Court unanimously held "that the construction of a patent, including terms of art within its claims, is exclusively within the province of the court." *Weiner*, supra. at 1871-1876.

The U.S. Supreme Court agrees: "the claims made in the patent are the sole measure of the grant." *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 339 (1961)"; and, in

the words of Judge Giles Rich, an author of the U.S. Patent Act of 1952, "the name of the game is the claim." Giles S. Rich, *The Extent of the Protection and Interpretation of Claims—American Perspectives*, 21 Int'l Rev. Indus. Prop. & Copyright L. 497, 499 (1990).

We know the trial court judge erred in interpreting, without a "claim construction" or "Markman" hearing, the term(s) "modify", "modified", or "modification" that do not appear in any of the patent claims asserted in this case, but the trial court judge errors are further magnified when the Judge failed to submit the findings in law to a jury to be decided on as an issue-of-fact.

A judge will usually decide prior to trial what the patent claims mean (this is often called a Markman ruling), after the core case that clarified that claims construction is a matter of law for the court rather than a fact question for the jury, and instruct the jury on their meaning.

> In 1996, the Supreme Court decided *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996), a Seventh Amendment case that presented the question of whether a judge or a jury decides the meaning of a patent's claims. Affirming the Federal Circuit's judgment, *Markman* held that "the construction of a patent, including terms of art within its claim," is "exclusively" for "the court," rather than a jury, to determine.

The trial court judge knew, or should have known, that if the court's interpretation of the term(s) "modify", "modified", or "modification", was actually litigated in a Markman hearing, or the Judge's interpretation brought before a jury, Golden would introduce as discovery evidence the claim construction made at the Patent Trials and Appeals Board in *DHS v. Larry Golden.*

In the *United States Department of Homeland Security v. Larry Golden* "Final Written Decision" Case IPR2014-00714, Entered: October 1, 2015, the PTAB construed "built in, embedded" as "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device":

> In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced in the chart below.

| Claim Term | Construction |
|---|---|
| "built in, embedded" (claim 74) | "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device" |

| "communication device" (claim 81) | "monitoring equipment" |

Dec. to Inst. 11–16.

No party challenges these constructions. Both of these terms were modified or removed in the amendment. To the extent that any of these constructions remain relevant after the amendment, we see no reason to modify them.

We further determined that no explicit construction was necessary for any other claim terms. Dec. to Inst. 10–11. Based on the record adduced during trial, we see no need to construe any other terms.

The Trial Court Judge non-infringement theory has no place in patent law. The Judge dismissed Golden's case for the following reason(s): "[T]he FAC claims that newer models of Google's smartphones (Google Pixel 6a, 7, 7a, 7 Pro and Fold) infringe on the '287 Patent, the '439 Patent, '189 Patent, plus one additional patent, U.S. Patent No. 10,984,619 ("619 Patent"). The FAC alleges five theories of direct infringement [] all [] suffer from the same defect for which the original complaint was dismissed: "the theories all require that the accused products be modified in some way for them to infringe on the patents-in-suit".

*ATAK application.* "(finding that the defendants' products "do not infringe without modification—the modification of installing the required software")."

*NFC tags.* "[T]hat a device is capable of being modified to operate in an infringing manner is not sufficient, by itself, to support a finding of infringement.")."

*Camera sensors.* "Therefore, this theory of infringement also fails because the accused products do not infringe without modification."

*Smartphone biosensors.* "As such, this theory also requires modification to the accused smartphones to state an infringement claim."

*Google Beacon.* "[] fails for the same reason, as it requires "Google Beacon," which the FAC's own illustrations show is a separate device from the accused smartphones." [1]

---

[1] The DHS & DOJ, as unauthorized "persons" not allowed to petition the PTAB to institute trial to invalidate a patent; petition for an IPR trial against Golden with 3 unqualified patent references that does not antedate Golden's Patent. The PTAB invalidated three of Golden's substitution claims. Golden made several attempts to have the decision overturned but failed to do so. Therefore, in all fairness, the construed terms ["built in, embedded"] to include devices separate and remote the Google product must be allowed to stand in this case, as applied to Golden's alleged five theories of direct infringement.

# GOLDEN TIMELY REQUESTED A JURY TRIAL

If either party makes a timely jury trial request, the patent infringement case is largely tried to a jury, which decides such things as whether the patent is valid and infringed, whether infringement was willful, and what damages to award. Golden timely requested a jury trial.:

- ➢ *Golden v. Google, LLC*, Case 3:22-cv-05246-RFL, Date Filed: 09/14/2022; [Docket Report] "Jury Demand":

- ➢ Dkt. 1 in *Golden v. Google, LLC*, Case 3:22-cv-05246-RFL Document 1 Filed 09/14/22 Page 1 of 30: "JURY TRIAL DEMANDED" ... Page 30 of 30: "Golden request a trial by jury on all issues so triable by right pursuant to Fed. R. Civ. P. 38. A right guaranteed under the Seventh Amendment of the Constitution."

- ➢ Dkt. 42 in *Golden v. Google, LLC*, Case 3:22-cv-05246-RFL Document 42 Filed 08/23/23 Page 1 of 33: "JURY TRIAL DEMANDED" ... Page 31 of 33: "DEMAND FOR JURY TRIAL. 'Golden requests a trial by jury on all issues so triable by right pursuant to Fed. R. Civ. P. 38. A right guaranteed under the Seventh Amendment of the Constitution'."

- ➢ Dkt. 60 in *Golden v. Google, LLC*, Case 3:22-cv-05246-RFL Document 60 Filed 12/12/23 Page 5 of 9: "Plaintiff is seeking a jury trial" ... "Patent infringement is an issue-of-fact tried by a jury under the Seventh Amendment".

- ➢ Dkt. 61 in *Golden v. Google, LLC*, Case 3:22-cv-05246-RFL Document 61 Filed 12/12/23: "DEMAND for Trial by Jury by Larry Golden." ... "(See Code Civ. Proc. § 631(a): "[t]he right to a trial by jury as declared by Section 16 of Article I of the California Constitution shall be preserved to the parties inviolate"; "[t]rial by jury is an inviolate right—not to be violated or broken—and shall be secured to all")."

- ➢ Dkt. 70 in *Golden v. Google, LLC*, Case 3:22-cv-05246-RFL Document 70 Filed 04/10/24 Page 1 of 90: "JURY TRIAL DEMANDED" ... Page 3-5 of 90: "The Judge Deprived Plaintiff of his Seventh Amendment Right of a Jury Trial". "The question of whether Google's alleged infringing devices, methods or products are covered by the Plaintiff's patent claims is a question of fact to be resolved by the jury. *See*, e.g., *Oakley, Inc. v. Int'l Tropic-Cal, Inc.*, 923 F.2d 167, 169 (Fed. Cir. 1991) ("Infringement is a question of fact"); *SRI v. Matsushita Electronic Corp.*, 775 F.2d 1107, 1125, 227 USPQ

577, ___ (Fed. Cir. 1985) ("It is settled that the question of infringement (literal or by equivalents) is factual")" ... "It has been over twenty-five years since the Supreme Court last assessed the scope of the constitutional right to a jury in a patent-infringement case. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 372 (1996). More remarkable, that decision has been its only direct pronouncement on the matter in the 230 years that patent infringement has been actionable [Act of Apr. 10, 1790, ch. 7, §§ 1, 4, 1 Stat. 109, 110, 111 (first federal patent act)]" ... "The Seventh Amendment requires juries in "Suits at common law"; [U.S. CONST. amend. VII]. Law courts always offered juries; and early juries tried nearly all infringement and validity issues."

## THE FEDERAL CIRCUIT IN *LARRY GOLDEN V. GOOGLE LLC*; CASE NO. 22-1267 DETERMINED GOLDEN HAS ALLEGED "ENOUGH FACTS" [ISSUES-OF-FACTS TO BE TRIED BY A JURY] TO STATE A CLAIM TO RELIEF THAT IS PLAUSIBLE ON ITS FACE

The Federal Circuit in *Golden v. Google LLC* Case No. 22-1267 disclosed in "Discussion" that the Circuit reviewed the case "under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), [a court must dismiss a complaint if it fails to allege "enough facts to state a claim to relief that is plausible on its face]." *Twombly*, 550 U.S. at 570; and, "plaintiff must allege facts that give rise to "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678

The Federal Circuit in *Golden v. Google LLC* Case No. 22-1267 took notice that "in the patent context, th[e] court has explained that a plaintiff need not "plead facts establishing that each element of an asserted claim is met," *In re Bill of Lading Transmission and Processing Sys. Pat. Litig.*, 681 F.3d 1323, 1335 (Fed. Cir. 2012) (citing *McZeal v. Sprint Nextel Corp.*, 501 F.3d 1354, 1357 (Fed. Cir. 2007)), but must plead "'enough fact[s] to raise a reasonable expectation that discovery will reveal' that the defendant is liable for the misconduct alleged." *Id.* at 1341 (alteration in original) (quoting *Twombly*, 550 U.S. at 556)".

The Federal Circuit in *Larry Golden v. Google LLC*; Case No. 22-1267 examined and determined Golden has described how the Google "smartphone", that include the ATAK software, CBRN plugin sensors, and Google's Nest x Yale Locks literally infringes at least claim

5 of Golden's '287 Patent; claim 23 of Golden's '439 Patent; and claim 1 of Golden's '189 Patent. See the chart below:

| Literal Infringement (Precedence) | Literal Infringement (Fed. Cir. *Golden v. Google*) |
|---|---|
| Literal infringement means that each and every element recited in a claim has identical correspondence in the allegedly infringing device or process. To literally infringe a patent, the accused system, method, etc. must include each limitation of a claim. E.g., *Southwall* (Fed. Cir. 05/10/95) To establish literal infringement, every limitation set forth in a claim must be found in an accused product, exactly. *Becton Dickinson* (Fed. Cir. 12/13/90). "Infringement, both literal and under the doctrine of equivalents, is an issue of fact."); *Cobalt Boats* (Fed. Cir. 05/31/19) "patent infringement is an issue of fact, tried by a jury" [U.S. CONST. amend. VII] | "Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the [] Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189 ... It [claim chart] attempts [] to map claim limitations to infringing product features, and it does so in a relatively straightforward manner ...[W]e conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart. Mr. Golden has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart...." |

The Federal Circuit in *Golden v. Google LLC* Case No. 22-1267 goes on to say: "In the Google case, the district court *again* concluded that Mr. Golden's complaint was frivolous. Here, however, Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the Google [Pixel 5] Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189" ... "to the extent that the chart includes the "exact same language" as previously rejected charts, it is simply the language of the independent claims being mapped to" ... "[i]t attempts—whether successfully or not—to map claim limitations to infringing product features, and it does so in a relatively straightforward manner. We conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart. Mr. Golden has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart."

Although the Federal Circuit did not specifically say "'without a doubt', Google's smartphone products that include the ATAK software, CBRN plugin sensors, and *Google's Nest x Yale Locks* are literally and/or under the doctrine of equivalents, infringing Golden's patents asserted in the case", the Federal Circuit imply to say under the "clear and convincing evidence"

standard, Google's smartphone products that include the ATAK software, CBRN plugin sensors, and *Google's Nest x Yale Locks* are allegedly infringing Golden's patents asserted in the case.

Therefore, Golden has satisfied his burden of proof under the "preponderance of evidence" standard with "enough fact[s] to raise a reasonable expectation that discovery will reveal' that the defendant is liable for the misconduct alleged." *Id.* at 1341 (alteration in original) (quoting *Twombly*, 550 U.S. at 556)". Golden need not prove that each element is satisfied, but Golden must allege facts that, taken as true, plausibly suggest that each element is satisfied.

The Seventh Amendment to the Constitution preserves the basic right of trial by jury "in suits at Common Law where the value in controversy exceeds twenty dollars." The creation in 1982 of the United States Court of Appeals for the Federal Circuit ("Federal Circuit") has contributed to the recent increase in the use of juries.

This current case on appeal was filed in the NDC Court because the Circuit determined: "In the Google case, the district court concluded that Mr. Golden's complaint was *frivolous*. ... We conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart ... the [Circuit] "express no opinion as to the adequacy of the complaint or claim chart except that it is not facially *frivolous*."

In the lower court's "Order Granting Motion to Dismiss and Denying Leave to File a Surreply" in *Golden v. Google* Case 3:22-cv-05246-RFL Dkt 68 Filed 04/03/24, the lower court judge completely ignored the pleading standards in the Appellate Court's opinion in *Larry Golden v. Google LLC*, Case No. 22-1267 above, and write to imply Golden's case is frivolous.

> "Furthermore, Golden has had multiple suits with similar allegations dismissed, some as *frivolous*. See, e.g., *Golden v. Samsung Elecs. Am., Inc.*, No. 23-CV-00048-WHO, 2023 WL 3919466 (N.D. Cal. June 8, 2023), aff'd, No. 2023-2120, 2024 WL 539973 (Fed. Cir. Feb. 12, 2024); *Golden v. Qualcomm, Inc.*, No. 22-CV-03283-HSG, 2023 WL 2530857 (N.D. Cal. Mar. 15, 2023) *Golden v. Apple Inc.*, No. 20-cv-04353-JD-KFM, 2021 WL 5074739 (D.S.C. Nov. 2, 2021) (dismissing complaint as "*frivolous*"); *Golden v. Apple Inc.*, No. 20-cv-02270-JD-KFM, 2021 WL 4260782 (D.S.C. Sept. 20, 2021) (dismissing complaint as "*frivolous*")."

This case was ripe for a jury trial when the Appellate Court "Vacated and Remanded" the case back to the lower District Court. The lower court has wasted a lot of time trying to re-instate this case as one that is frivolous to justify unlawfully dismissing Golden's case without a jury trial. *Not, once did the lower court reference the Circuit's decision in Golden v. Google 22-1267.*

# BOTH FORMS OF DIRECT INFRINGEMENT [LITERAL AND INFRINGEMENT BY EQUIVALENTS] ARE QUESTIONS OF FACT [ISSUES-OF-FACTS] TO BE ANSWERED BY A JURY—NOT THE JUDGE

If a jury believes the Google alleged infringing device(s), method or product does not literally meet one (or more) limitation of Golden patent's claims, the jury then inquires whether Google alleged infringing device(s), method or product incorporates an equivalent of the missing limitation. *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, 38, 41 USPQ2d 1865, ___ (1997) ("The Federal Circuit held that it was for the jury to decide whether the accused process was equivalent to the claimed process. There was ample support in our prior cases for that holding").

Equivalency is established using a "tripartite test" which sets out three questions of fact. In the case of the Google device(s), the jury must determine whether the Google alleged infringing device(s) includes something that 1) performs substantially the same function as the claimed element, 2) in substantially the same way, and 3) to give substantially the same result. *See, Machine Co. v. Murphy*, 97 U.S. 120, 125, 24 L. Ed. 935 (1878) ("if two devices do the same work in substantially the same way, and accomplish substantially the same result, they are the same, even though they differ in name, form, or shape"); *see* also *Id.* at 40 (holding that the triplicate test is acceptable, whether framed in terms of "substantial" difference or "insubstantial" differences).

The Supreme Court took the position that the doctrine of equivalents is based on fairness and equity in the general sense, but not on equity in the technical sense. *Warner-Jenkinson Co. v. Hilton Davis Chem. Co.*, 520 U.S. 17, ___, 41 USPQ2d 1865, ___ (1997). Accordingly, the issue of equivalents is presently a question of fact to be decided by the jury.

**Golden Introduced into this Case Seven Infringement Theories that a Jury needs to Decide if the Alleged Direct Infringement is Literal or Infringement by Equivalents**

(*Appx. I:* Supporting Claim Charts for the Seven Infringement Theories)

*Google Tensor CPU:* Golden alleged the Google Tensor (i.e. CPU; Chipset) is considered the "brain" of the Google smartphones, capable of carrying out the operational and functional instructions of the smartphone. Without the alleged infringing Google Tensor CPU (brain) the Google smartphone has no utility; no utility means the phone is incapable of operating.

***Google Smartwatch:*** Golden demonstrated the smartwatch as an "integral part" of the smartphone when connected by Bluetooth or Wi-Fi. Claim 5 of Golden's '287 patent that was reviewed by the Federal Circuit in *Golden v. Google LLC* Case No. 22-1267 has two claim limitations that can be satisfied with the Google smartwatch when paired with the Google smartphone. This level of functionality is accomplished by the smartphone and smartwatch processors; not modifications. Examples are:

- Patent No.: US 10,610,157 B2 Date of Patent: Apr. 7, 2020. "Wearable Electronic Device with Electrodes for Sensing Biological Parameters", Applicant: Apple Inc., Cupertino, CA (US): (***Appx. II***) The processor 2510 can control some or all of the operations of the electronic device 2500. The processor 2510 can communicate, either directly or indirectly, with some or all of the components of the electronic device 2500. ... The processor 2510 can be implemented as any electronic device capable of processing, receiving, or transmitting data or instructions ... the processor 2510 can be a microprocessor, a central processing unit (CPU), an application-specific integrated circuit (ASIC), a digital signal processor (DSP), or combinations of such devices ... the term "processor" is meant to encompass a single processor or processing unit, multiple processors, multiple processing units, or other suitably configured computing element or elements. ... the components of the [] device [] can be controlled by multiple processors"
- Patent No.: US 11,350,869 B2 Date of Patent: Jun. 7, 2022 "Electrocardiogram (ECG) Measurement on a Wrist-Worn Electronic Device. Applicant", Garmin Switzerland GmbH, Schaffhausen (CH): (***Appx. III***) ...bio signals may be received from the wearer [] to the ECG processing element 60 ... In the HRM mode, the system processing element 64 may [] present cardiac metrics such as values for heart rate, pulse oximetry, breathing rate, and heart rate variability... element 64 [] determine values of heart rate, breathing rate, heart rate variability ... In blood pressure mode, [] system processing [] 64 may calculate or determine an estimated blood pressure ... may communicate with smartphones 28, tablets, laptop or desktop computers [] ... In various embodiments, [] the communication element includes a transceiver for each protocol ... Bluetooth TM, Wi-Fi
- Patent No.: US11,717,176 B2 Date of Patent: Aug. 8, 2023. "Smartwatch-type Individual Medical Monitoring Device and Method for Individual Medical Monitoring of a User Thereof", Applicant: Samira Kerrouche and Hayame Bouyahia (***Appx. IV***) The processor is configured to: acquire the measured data of the three sensors, analyze the measured oxygen level, analyze the number of measured vibrations of the blood flow, analyze the measured ascending and descending blood flows, output detection of an anomaly based on analysis of oxygen level, heart rate and ascending and descending blood flows, and store the measured data of the three sensors. A computer program product downloadable from a communication network executable by a microprocessor of a computer or mobile terminal, comprising program code [] for implementing the individual medical monitoring method ...

There are no modifications to the Google Tensor CPUs that are standard equipment for the Google smartphones; nor the Google smartwatches configured to pair with the Google phone.

***Google Smartphone Camera:*** The Google smartphone camera sensor; a standard component *native* to the manufacture and assembly of the Google smartphone device; when used to scan a barcode, is relatively straightforward. Camera-based scanning utilizes the camera within the Google mobile device to collect data.

There are three preferred methods for camera-based scanning: 1- Barcode and QR Code scanning using the Google smartphone camera app; 2- Barcode and QR code scanning using the Google smartphone "assistant"; and, 3- Barcode and QR code scanning using a 3rd party app. that is built on the Google android open-source operating system [the DoD DTRA ATAK app].

Google smartphone cameras have software incorporated to scan barcodes and QR codes automatically. To scan using the Google smartphone camera for CBRNE detection, follow these steps: 1- open the Google smartphone camera app.; 2- hover the Google camera in front of the barcode until the camera focuses and shows a number or link; and, 3- tap the number or link to open a browser window with information about the CBRNE device(s) and links associated with the CBRNE device(s).

Hoovering over a barcode or QR code to gather data from a device designed to detect for CBRN does not require any modifications.

***Google Near-Field Communication (NFC):*** Google NFC is standard technology embedded in Google smartphones—near-field communication (NFC) is for wireless electronic, portable, non-line-of-sight selective detection. The detection devices, card readers, and even other Google smartphones, communicates with a tag that is designed for short-range radio-frequency communication. There are no modifications because the tags are built back to the wireless communication frequency that is standard for NFC communication.

***Google Beacon:*** The Google Beacons are built back to the standard Google communication methods of WiFi and Bluetooth. The Beacons sounds an alarms that is measured by distance with the standard Google GPS receiver. Because the beacons are built back to the Google WiFi and Bluetooth frequencies and the connection is made through a Google wireless modem, there are no modifications to the Google smartphone device.

***Google Smartphone Biosensors:*** Google's standard sensors of cameras, gyroscopes and accelerometers, when used as biosensors, are used primarily in point-of-care situations. Gyroscope and accelerometer can detect the specific rotational movements of the heart, and produce a signal for a 6-channel analysis. The Google standard smartphone sensors can also be

used for ECG test with the phone. The biological parameter may be an electrocardiogram. Examples of input include camera sensors, visible light sensors, or invisible light sensors, proximity sensors, touch sensors, force sensors, vibration sensors, orientation sensors, motion sensors, accelerometers or velocity sensors. Google utilizes the standard sensors as biosensors without medication to the Google smartphone.

*Google Android Open-Source Operating System: Android Team Awareness Kit*, ATAK (built on the Android operating system) provides a single interface for viewing and controlling different CBRN-sensing technologies, whether that is a wearable smartwatch that measures a warfighter's vitals (e.g., heart rate) or a device mounted on a drone to detect chemical agents.

ATAK is a digital application available to warfighters throughout the DoD. ATAK offers warfighters geospatial mapping for situational awareness during combat — on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK now includes chemical, biological, radiological, and nuclear (CBRN) plug-in sensors.

The ATAK is software built back to the Google Android Open-Source Operating System software. Google releases a source code for developers to build back on that enables the Google smartphones to run the apps. This process does not require modifications to the Google phone.

## PATENT INFRINGEMENT CLAIMS OF DIRECT INFRINGEMENT [LITERAL INFRINGEMENT; INFRINGEMENT BY EQUIVALENTS; OR JOINT INFRINGEMENT] ARE ALL ISSUES-OF-FACTS TO BE TRIED BY A JURY—GUARANTEED UNDER THE 7th AMEND. U.S. CONS'T.

Although the Federal Circuit did not specifically say, "without a doubt', the combined Google smartphone, that include the DTRA ATAK software, and Draper's CBRNE plugin sensors, literally infringes, infringes by equivalents, or infringes under the doctrine of joint infringement", the Federal Circuit imply to say under the "clear and convincing evidence" standard, the combined Google smartphone, that include the DTRA ATAK software, and Draper's CBRNE plugin sensors, directly infringes Golden's patents asserted in the case, by at least one of, if not all three, methods of direct infringement plead in this case.

Golden has successfully pleaded that Google directs or controls the DTRA and Draper's performance of the claimed method and has sufficiently demonstrated Google: (1) "conditions participation with its 'Google Android Open-Source Operating System' in an activity or receipt

of a benefit upon others' performance of one or more steps of [the] patented method"; and (2) "establishes the manner [integration of software and hardware] or timing of that performance." *IOENGINE, LLC v. PayPal Holdings, Inc.*, Civil Action No. 18-452-WCB, Civil Action No. 18-826-WCB, 2019 WL 330515, at *1 (D. Del. Jan. 25, 2019)

The trial court judge seems to be confused about how to adjudicate the factual issues of what constitutes "joint infringement". The Judge seemingly do not know if the allegation is one directed at the joint enterprise of Google and DTRA, *or* Google and Draper Laboratory, when in fact the joint enterprise is between the three entities. The Judge states, "there are no factual allegations regarding the degree of control that Google had over Draper Laboratory *or* DTRA", when in fact Google had control over both Draper Laboratory *and* DTRA, for the purpose of forming the enterprise.

Golden has attached as *(Appx. V)* documents to show the degree of Google's control and how the actors formed a joint enterprise such that performance of every step is attributable to the controlling party's [Google] Tensor CPU/Chipset and Android Open-Source Operating System.

Here again, these are issues-of-facts that should have been tried by a jury.

## CONCLUSION

**Fraud upon the Court**

The Trial Court Judge decided not to follow the pleading standards established by *Twombly* and *Iqbal* to determine if Golden have plead "enough fact[s] to raise a reasonable expectation that discovery will reveal' that the defendant is liable for the misconduct alleged."

> *Vertical stare decisis* binds lower courts to follow strictly the decisions of higher courts within the same jurisdiction (e.g., the Northern District of California Court must follow the decisions of the U.S. Court of Appeals for the Federal Circuit). The Supreme Court defines *vertical stare decisis* as the doctrine, "a lower court must strictly follow the decision(s) handed down by a higher court within the same jurisdiction".

The Trial Court Judge decided not to follow the precedence established by the Federal Circuit [stare decisis] in *Golden v. Google LLC* Case No. 22-1267: "[w]e conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart".

14

The Trial Court Judge decided not to follow the pleading requirements in cases alleging patent infringement. In *Bot M8 LLC v. Sony Corporation of America, et al*, No. 2020-2218, the Court rejected any requirement that a plaintiff is required to plead infringement on an element-by-element basis [added: "again"], finding that such a requirement is "unsupported and goes beyond the standard the Supreme Court articulated in *Iqbal* and *Twombly*."

The Trial Court Judge decided not to follow the "final written decision of the PTAB" in the *United States Department of Homeland Security v. Larry Golden* "Final Written Decision" Case IPR2014-00714, Entered: October 1, 2015. The PTAB construed "built in, embedded" as "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device".

The Trial Court Judge completely ignored Golden's claim that Google's Tensor, Tensor 2, and Tensor 3 CPU/Chipset allegedly infringes independent claims 4, 5, & 6 of Golden's '287, and independent claim 11, and dependent claims 12-20 of Golden's '619 patent. Dismissing the case without a jury trial to rule on Golden's claim that the Google Tensor Series CPU/Chipset allegedly infringes Golden patents is in violation of Golden's right tom a trial by jury.

The Trial Court Judge decided not to allow Golden to exercise his constitutional right to a trial by jury. The Seventh Amendment to the Constitution preserves the basic right of trial by jury "in suits at Common Law where the value in controversy exceeds twenty dollars." Golden's claims of patent infringement are issues-of-fact tried by a jury [U.S. CONST' amend. VII].

The Fifth Amendment guarantees that "no person shall ... be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

Sincerely,

Larry Golden, *Pro Se* Plaintiff
740 Woodruff Rd., #1102
Greenville, SC 29607
(H) 8642885605 (M) 8649927104
Email: atpg-tech@charter.net

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 19th day of November 2024, a true and correct copy of the foregoing "PLAINTIFF-APPELLANTS INFORMAL REPLY BRIEF", was served upon the following Defendant by priority "express" mail:

Matthew S. Warren

WARREN KASH WARREN LLP

2261 Market Street, No. 606

San Francisco, California, 94114

Phone: (415) 895-2940

Fax: (415) 895-2964

Email: 22-5246@cases.warrenlex.com

Larry Golden, Pro Se

740 Woodruff Rd., #1102

Greenville, South Carolina 29607

atpg-tech@charter.net

864-288-5605

# *Appendix I*

RECEIVED

NOV 2 1 2024

United States Court of Appeals
For the Federal Circuit

# CLAIM CHART EXHIBITS

| Page | Exhibit | Charts |
|------|---------|--------|
| 3 | A | Duplicate of Claim Chart submitted to the Fed. Cir. In *Golden v. Google* CAFC Case No. 22-1267 that includes the DTRA ATAK software, Draper's CBRNE sensors, and Google's Nest x Yale Locks. |
| 12 | B | Golden's Infringement Theories for CBRNE Detection: The Performing Products Are Either Placed In, On, Upon, or Adjacent the Smartphone |
| 21 | C | Duplicate of Claim Chart submitted to the Fed. Cir. In *Golden v. Google* CAFC Case No. 22-1267 that includes the DTRA ATAK software, Draper's CBRNE sensors, and four of Google's Nest Products that allegedly infringes. |
| 33 | D | Chart: Plaintiff's "Transceiver" is Equivalent to Google's Operating System (OS). The Google OS responsible for managing both hardware and software components. The transceiver performs substantially the same function, in substantially the same way, and achieves substantially the same results, as the Google OS. |
| 42 | E | Smartphones 'product specific operating systems software' that acts as an interface between user and hardware. Between the user of the Google smartphone and the alleged hardware (Draper Plugins—Nest Smoke & CO) for CBRNE detection/sensing. |
| 45 | F | Both the Google smartwatch (external) and the Google smartphone camera are "native" to the manufacture of the Google smartphone. Both are capable of CBRNE detection. Golden can claim both directly infringes and/or both contributes to the infringement of Golden's CMDC i.e., smartphone device. |
| 60 | G | A "reversed engineering" Claim Chart of Induced Infringement with the Advertisement of Google's Android Open-Source Operating Systems [DTRA ATAK-MIL and Draper's ATAK-CIV]; and Contributory Infringement with Google's Pixel 6a, 7, 7a, 7 Pro, and Fold Smartphones. |
| 66 | H | Google, not Plaintiff, is Responsible for the Modifications of Its own Products and the Products of Others to Operate in an Infringing Manner with its Google Android Open-Source Operating System software |
| 75 | I | Google's Tensor CPU/Chipset Directly Infringes Under the Doctrine of Equivalents |
| 81 | J | ***Google Smartwatch internal/external sensing; Direct Infringement; Joint or Divided Infringement; Contributory Infringement; Infringement by Equivalents*** |

# Exhibit A

## DUPLICATE OF THE CLAIM CHART SUBMITTED IN GOLDEN v. GOOGLE, LLC WITH THE GOOGLE NEST PRODUCTS INCLUDED

The Federal Circuit on 09/08/2022, in *Larry Golden v. Google LLC*; Case No. 22-1267 — "VACATED AND REMANDED" the relevant Case No: 22-1267 Document 15; back to the District Court "to be filed and request service of process".

The Federal Circuit determined the complaint, "includes a detailed claim chart mapping features of an accused product, the Google Pixel 5 Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189" ... "in a relatively straightforward manner" ... and that the [Circuit] "express no opinion as to the adequacy of the complaint or claim chart except that it is not facially frivolous."

> Three-Judge Panel: "DISCUSSION. 'Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal,* 556 U.S. 662 (2009), a court must dismiss a complaint if it fails to allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570 ... [T]his standard "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id*. at 555 (citation omitted). A plaintiff must allege facts that give rise to "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted) ... this court has explained that a plaintiff ... must plead "'enough fact[s] to raise a reasonable expectation that discovery will reveal' that the defendant is liable for the misconduct alleged."

> "Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the Google Pixel 5 Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189 ... It [claim chart] attempts [] to map claim limitations to infringing product features, and it does so in a relatively straightforward manner ...[W]e conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart. Mr. Golden has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart...."

## Claim Chart for Google Products

The following Claim Chart is an illustration of literal infringement. At least one of the alleged infringing products of Google (i.e., Google Pixel smartphones 4a, 4a(5G), 5, 6, 6a, 7, & 7a) are representative of all the alleged infringing products of Google asserted in this complaint. At least one of the alleged infringing products of Google (Google Pixel 5) is illustrated to show how the Google Pixel 5 allegedly infringes on at least one of the asserted independent claims of each of the patents-in-suit ('287, '439, and '189 patents).

| Google Pixel 5 Smartphone | Patent #: 10,163,287; Independent Claim 5 | Patent #: 9,589,439; Independent Claim 23 | Patent #: 9,096,189; Independent Claim 1 |
|---|---|---|---|
|  | A monitoring device, comprising: | A cell phone comprising: | A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, comprising: |
| CPU: Octa-core (1 × 2.4 GHz Kryo 475 Prime & 1 × 2.2 GHz Kryo 475 Gold & 6 × 1.8 GHz Kryo 475 Silver) System-on-a-chip: Qualcomm Snapdragon 765G | at least one central processing unit (CPU); | a central processing unit (CPU) for executing and carrying out the instructions of a computer program; | at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or a front-end processor for communication between a host computer and other devices; |

| | | | |
|---|---|---|---|
| Ambient Temperature sensor supported by the Android platform. Measures the ambient room temperature in degrees Celsius (°C). Monitoring air temperatures. Monitoring air temperatures. | at least one temperature sensor in communication with the at least one CPU for monitoring temperature; | X | X |
| Gravity sensor supported by the Android platform. Measures the force of gravity in m/s2 that is applied to a device on all three physical axes (x, y, z). Motion detection (shake, tilt, etc.). | at least one motion sensor in communication with the at least one CPU; | X | X |
| Light sensor supported by the Android platform. Measures the ambient light level (illumination) in lx. Controlling screen brightness. Screen: 6-inch flexible OLED display at 432 ppi | at least one viewing screen for monitoring in communication with the at least one CPU; | X | X |
| Connectivity: Wi-Fi 5 (a/b/g/n/ac) 2.4 + 5.0 GHz, Bluetooth 5.0 + LE, NFC, GPS (GLONASS, Galileo, BeiDou), eSIM capable | at least one global positioning system (GPS) connection in communication with the at least one CPU; | at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; | at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection; |

| | | | |
|---|---|---|---|
| Connectivity: Wi-Fi 5 (a/b/g/n/ac) 2.4 + 5.0 GHz, Bluetooth 5.0 + LE, NFC, GPS (GLONASS, Galileo, BeiDou), eSIM capable | at least one of an internet connection or a Wi-Fi connection in communication with the at least one CPU; | wherein at least one of... WiFi connection, internet connection, radio frequency (RF) connection, cellular connection... capable of signal communication with the transmitter or the receiver; | wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group... of satellite, Bluetooth, WiFi... |
| Connectivity: Wi-Fi 5 (a/b/g/n/ac) 2.4 + 5.0 GHz, Bluetooth 5.0 + LE, NFC, GPS (GLONASS, Galileo, BeiDou), eSIM capable | at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; | at least one of a... Bluetooth connection, WiFi connection, internet connection... cellular connection... short range radio frequency (RF) connection, or GPS connection; | X |
| Google's Android operating system features a lock mechanism to secure your phone, known as pattern lock. To set, drag your finger along lines on the screen. To unlock the phone, replicate the pattern drawn. If you fail to solve the pattern too many times, the phone locks and cannot be unlocked without logging into the associated Google account. Google Nest × Yale Lock is connected to the Nest app; you can lock or unlock your door from your phone. | at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device; | whereupon the cell phone is interconnected to the cell phone detection device to receive signals or send signals to lock or unlock doors, to activate or deactivate security systems, to activate or deactivate multi-sensor detection systems, or to activate or deactivate the cell phone detection device; | X |

| | | | |
|---|---|---|---|
| Pixel phones use USB-C with USB 2.0 power adapters and cables. To charge your phone with a USB-A power adapter, use a USB-C to USB-A cable. | at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device; | X | X |
| BIOMETRICS: Biometric factors allow for secure authentication on the Android platform. The Android framework includes face and fingerprint biometric authentication. Android can be customized to support other forms of biometric authentication (such as Iris). | at least one biometric sensor in communication with the at least once CPU for providing biometric authentication to access the communication device; | wherein the cell phone is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature such that the cell phone is locked by the biometric lock disabler to prevent unauthorized use; and | wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature such that the communication device that is at least one of the cell phone, the smart phone, the desktop, the handheld, the PDA, the laptop or the computer terminal is locked by the biometric lock disabler to prevent unauthorized use |
| *Android Team Awareness Kit*, ATAK (built on the Android operating system) provides a single interface for viewing and controlling different CBRN-sensing technologies, whether that is a wearable smartwatch that measures a warfighter's vitals (e.g., heart rate) or a device mounted on a drone to detect chemical warfare agents. | at least one sensor for chemical, biological, or human detection in communication with the at least one CPU; | the cell phone is at least a fixed, portable or mobile communication device interconnected to the cell phone detection device, capable of wired or wireless communication therebetween; and | the communication device is at least a fixed, portable or mobile communication device interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween... |

| | | | |
|---|---|---|---|
| *Android Team Awareness Kit*, ATAK (built on the Android operating system) is a digital application available to warfighters throughout the DoD. ATAK offers warfighters geospatial mapping for situational awareness during combat — on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK now includes chemical, biological, radiological, and nuclear (CBRN) plug-ins. | one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents; | at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone; | wherein the communication device receives a signal via any of one or more products listed in any of the plurality of product grouping categories; |
| Connectivity: Wi-Fi 5 (a/b/g/n/ac) 2.4 + 5.0 GHz, Bluetooth 5.0 + LE, NFC, GPS (GLONASS, Galileo, BeiDou), eSIM capable | at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU… | X | X |
| Google Nest × Yale Lock is connected to the Nest app; you can lock or unlock your door from your phone.<br><br>*Android Team Awareness Kit*, ATAK (built on the Android operating system) provides a single interface for viewing and controlling different CBRN-sensing technologies | at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or… detect at least one of a chemical biological… agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. | a transmitter for transmitting signals and messages to a cell phone detection device; a receiver for receiving signals from the cell phone detection device; | a transmitter for transmitting signals and messages to at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device;<br><br>a receiver for receiving signals, data or messages from at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device; |

| | | | |
|---|---|---|---|
| Google Nest × Yale Lock is connected to the Nest app; you can lock or unlock your door from your phone.<br><br>*Android Team Awareness Kit*, ATAK (built on the Android operating system) provides a single interface for viewing and controlling different CBRN-sensing technologies | X | X | whereupon the communication device, is interconnected to a product equipped to receive signals from or send signals to lock or unlock doors, activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems |
| *Android Team Awareness Kit*, ATAK (built on the Android operating system) is a digital application available to warfighters throughout the DoD. ATAK offers warfighters geospatial mapping for situational awareness during combat — on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK now includes chemical, biological, radiological, and nuclear (CBRN) plug-ins. | X | a transmitter for transmitting signals and messages to a cell phone detection device; a receiver for receiving signals from the cell phone detection device; | wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection… short range radio frequency (RF) connection is capable of signal communication with the transmitter and the receiver of the communication device and transceivers of the products; |

| | | | |
|---|---|---|---|
| *Android Team Awareness Kit*, ATAK (built on the Android operating system) is a digital application available to warfighters throughout the DoD. ATAK offers warfighters geospatial mapping for situational awareness during combat — on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK now includes chemical, biological, radiological, and nuclear (CBRN) plug-ins. | X | whereupon a signal sent to the receiver of the cell phone detection device from at least one of the chemical sensor, the biological sensor, the explosive sensor, the human sensor, the contraband sensor, or the radiological sensor, causes a signal that includes at least one of location data or sensor data to be sent to the cell phone. | X |

# Exhibit B

Both Google and Judge Rita F. Lin knew the CBRNE devices allegedly infringes Golden's patents when combined with the Google smartphones:

"Plaintiff's complaint alleges that ATAK is not made by Google, and he does not allege that ATAK comes pre-loaded on Google phones: "Through collaboration and innovation, the DTRA has integrated its powerful, hazard-awareness-and-response tools into the Android Tactical Assault Kit (ATAK). ATAK is a digital application available to warfighters throughout the DoD. Built on the Android operating system, ATAK offers warfighters geospatial mapping — on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK now includes (CBRN) plug-ins." *Golden v. Google* Case 3:22-cv-05246-RFL Document 41 Filed 08/10/23

"The FAC alleges five theories of direct infringement [] all of which suffer from the same defect for which the original complaint was dismissed: the theories all require that the accused products be modified in some way for them to infringe on the patents-in-suit. ... "Mr. Golden's allegations, even if true, at best establish that [defendant's] smartphones might be modified post-sale to perform the accused detector/sensor functionality, []." *Golden v. Google* Case 3:22-cv-05246-RFL Dkt. 68 Filed 04/03/24

*ATAK application*: "finding that the defendants' products "do not infringe without modification—the modification of installing the required software". [gateway to the alleged infringing Draper CBRNE Plug-in sensors]

*NFC tags*: "Golden' second theory [] requires combining "Google's NFC sensor," which are allegedly embedded in the accused products, with external NFC tags that have been converted to detect certain chemicals in order for there to be alleged infringement."

*Camera sensors*: "The FAC also alleges that "[s]martphones provide hardware and software capability which can be incorporated with [CBR] sensors, enabling accurate on-site portable sensing," further confirming that the sensors are separate devices that may be "incorporated" into the smartphone. (Id.) Therefore, this theory of infringement also fails because the accused products do not infringe without modification."

*Smartphone biosensors*: "The diagram shows an "add on device" with the alleged biosensors (i.e., "capillary inlet," "microfluidic cassette," VIS-NIR spectrometer, and "NNAP electrodes") attached to a nondescript smartphone. (Id.) As such, this theory also requires modification to the accused smartphones to state an infringement claim."

*Google Beacon*: Golden's fifth theory (see Ex. G at 34–41) fails for the same reason, as it requires "Google Beacon," which the FAC's own illustrations show is a separate device from the accused smartphones." *Golden v. Google* Case 3:22-cv-05246-RFL Document 68 Filed 04/03/24

# CBRNE — Multi-Sensor Detection Systems

Draper designed a chemical, biological, radiological and nuclear (CBRN) Plugin to enable users to integrate CBRN sensors into TAK, collect CBRN sensor data, display it on a map and livestream it across the TAK network to other users. CBRN plugins for ATAK, WinTAK and WebTAK are operational in the field. https://www.draper.com/explore-solutions/tak

**ATAK-CIV (CBRN):** "The Tactical Assault Kit is DoD nomenclature for the Team Awareness Kit (TAK) application: a mission planning, geospatial, Full Motion Video (FMV), and system administrator tool that reduces the operational footprint from a tactical laptop, to a commercial mobile device. Data can be pre-loaded into ATAK or downloaded from the network when available." https://play.google.com/store/apps/details?id=com.atakmap.app.civ&hl=en_US&gl=US



**Near-Field Communication (NFC) Smartphone Sensor:** Nascent technology embedded in modern smartphones—near-field communication (NFC)—for wireless electronic, portable, non-line-of-sight selective detection of gas-phase chemicals *(Fig. 1)*

National Institutes of Health (NIH). *"Wireless gas detection with a smartphone via rf nfc communication"* Published online 2014 Dec 8. doi: 10.1073/pnas.1415403111 Retrieved from: https://www.ncbi.nlm.nih.gov/pmc/articles/PMC4280584/



*Figure 1*

Conversion of an NFC tag into a CARD enables wireless rf detection of chemical analytes with a smartphone. NFC-enabled smartphones communicate with NFC tags by simultaneously energizing the NFC tag with an alternating magnetic field (f = 13.56 MHz) through inductive coupling and transferring data by signal modulation.

**Camera Sensor**: Camera lens in cell phone with microfluidic lens functions as camera; uses microscope to focus on a chemical sensor. A ***megapixel*** camera captures the image from the array of nanopores uses fluid rather than bulky moving parts. The sensors contained in one array is determined by the ***pixel*** resolution phone camera. ***Megapixel*** resolution in cell phone cameras; probe a million different spots on the sensor simultaneously. *Tiny sensors tucked into cell phones could map airborne toxins in real time.* Source: https:// www .understanding nano.com/cell-phone-sensors-toxins.html

Hyperspectral imaging scans for light frequencies that humans can't see in order to identify the unique chemical signatures of different substances. They say their device, which can be mass produced, is compatible with all standard smartphone cameras. *These New Smartphone Cameras Could Tell You What an Object Is Made of* https://www.sciencealert.com/new-smartphone-cameras-



Smartphones provide hardware and software capability which can be incorporated with [CBR] sensors, enabling accurate on-site portable sensing. The camera, screen, and LED flashlight of the smartphone can be employed as components of the sensor. https://link. springer.com/article/10. 1007/s11468-022-01672-1

**Smartphone Biosensors**:
1. Ambient light sensor: Cancer biomarkers; Toxic metals; Pathogens
2. Capillary inlet: (Air analysis). Airborne Pathogens; Aerosols
3. Capillary inlet: (Fluid analysis). Blood analysis; Biomarkers
4. Microfluidic cassette: Interchangeable cassettes with varying assays
5. VIS-NIR spectrometer: Food freshness; Melanoma
6. NNAP Electrodes: Toxic metals and Organic pollutants in water
7. Optical Waveguide: Pathogens in water and food
8. Back and front camera: Colorimetric analysis; Image analysis
9. Microphone: Voice recording stress levels



**Google Beacon: Bluetooth; GPS; Wi-Fi**
Google Android smart phones and WiFi/Bluetooth beacons as detectors and sources. Google smart phone sensors (GPS, WiFi, Bluetooth) and beacon signals to calculate distance between detector and source. Filtering WiFi/ Bluetooth ranging functions and GPS location data. Filtering GPS derived distances based on jump in calculated position or when GPS reports jump in position but phone accelerometer sensors do not show rapid acceleration. Specific models in different categories of radiation instruments (dosimeters, survey meters, personal radiation detectors, backpacks, nuclide identifiers, and mobile systems).



Google Beacon is a type of Bluetooth technology with proximity-based triggers. These triggers affect both the physical and digital world. Using Bluetooth low energy (BLE) hardware technology, beacons communicate with nearby smart devices like smartphones, tablets, etc. Different types of beacons that perform different tasks.

## GOLDEN'S INFRINGEMENT THEORIES FOR CBRNE DETECTION: THE PERFORMING PRODUCTS ARE EITHER PLACED IN, ON, UPON, OR ADJACENT THE SMARTPHONE

| Multi-Sensor Detection Systems | Patent #: 9,589,439; Independent Claim 19 | Patent #: 9,096,189; Independent Claim 7 |
|---|---|---|
| CBRNE Smartwatch, <br><br> CBR Smartphone Camera, <br><br> CBR—NFC Smartphone Sensors <br><br> CBR Smartphone Beacon (Bluetooth) <br><br> Smartphone Biosensors <br><br> CBRNE Plug-in Sensors | A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, radiological agent, or compound, comprising: | A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, or radiological agents and compounds, comprising: |

| | | |
|---|---|---|
| CBRNE Smartwatch,<br><br>CBR Smartphone Camera,<br><br>CBR—NFC Smartphone Sensors<br><br>CBR Smartphone Beacon (Bluetooth)<br><br>Smartphone Biosensors<br><br>CBRNE Plug-in Sensors<br><br>Built on the Android, iOS, and Windows operating system for connecting the software (i.e., ATAK) and the hardware — CBRN sensors and detectors | a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human, or contraband agent or compound, capable of being disposed within, on, upon or adjacent a multi-sensor detection device; | a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human or contraband agents and compounds and capable of being disposed within, on, upon or adjacent a multi sensor detection device; |
| The Smartphones and Smartwatches of Google, Qualcomm, LG, Apple, and Samsung; and, the Laptops, Tablets, and Desktop PCs of Intel and Samsung | monitoring equipment comprising at least one of a computer, personal computer (PC), laptop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone for at least one of a receipt or transmission of signals therebetween; | monitoring equipment comprising at least one of plurality product groups based on the categories of a computer, laptop, notebook, PC, handheld, cell phone, PDA or smart phone for the receipt and transmission of signals therebetween; |
| The Smartphone(s) [Google Pixel 8] connects to a cell tower or base station via radio waves, and that tower is usually physically connected to the infrastructure to send that data wherever it needs to go. Satellite communication on smartphones. The iPhone 14 is the first smartphones widely available in the market that support satellite connectivity. Android 15 extends platform support for satellite connectivity. The platform now has UI elements that are needed to "ensure a consistent user experience across the satellite connectivity landscape." | at least one cell phone tower interconnected to the monitoring equipment for sending signals thereto and receiving signals therefrom or at least one satellite capable of transmitting signals to the monitoring equipment; | at least one cell phone tower interconnected to the monitoring equipment for sending signals thereto and receiving signals therefrom or at least one satellite capable of transmitting signals to the monitoring equipment; |

| | | |
|---|---|---|
| The Smartphone(s) [Google Pixel 8] connects to a cell tower or base station via radio waves, and that tower is usually physically connected to the infrastructure to send that data wherever it needs to go. Satellite communication on smartphones. The iPhone 14 is the first smartphones widely available in the market that support satellite connectivity. Android 15 extends platform support for satellite connectivity. The platform now has UI elements that are needed to "ensure a consistent user experience across the satellite connectivity landscape." | at least one satellite or at least one cell phone tower capable of signal communication between the multi-sensor detection device and the monitoring equipment; | at least one satellite or at least one cell phone tower capable of signal communication between the multi sensor detection device and the monitoring equipment; |
| The internet connection is shared by many smartphone functions on the Google Pixel 8 smartphone such as internet browsing, receiving email messages and installing apps. Wi-Fi is a method for devices such as the Google Pixel 8 smartphone to connect wirelessly to the Internet using radio waves. | at least one internet connection capable of communication between the multi-sensor detection device and the monitoring equipment; | at least one internet connection capable of communication between the multi sensor detection device and the monitoring equipment; |
| Sit(x) is a commercial Server-as-a-Service solution based developed by PAR Government for the U.S. Defense & Intelligence Community. Sit(x) has real-time communication and information sharing. With Sit(x), individuals and teams can communicate via personal computers and handheld mobile [Google Pixel 8 smartphone] devices by voice or text. They can share real-time full-motion video (FMV), airborne/drone imagery, GPS locations, photos, and satellite imagery. | whereupon a signal sent to a receiver of the multi-sensor detection device from a satellite; or to a cell phone tower; or through at least one of a short-range radio frequency or a long-range radio frequency; causes a signal to be sent to the monitoring equipment that includes at least one of location data or sensor data; | whereupon a signal sent to a receiver of the multi sensor detection device from a satellite; or to a cell phone tower; or through short and/or long-range radio frequency; causes a signal to be sent to the monitoring equipment that includes location data and sensor data; |

| | | |
|---|---|---|
| The '287, '439 & '189 patent specs: Product grouping (PG) 1 (storage & transportation); PG 2 (sensors); PG 3 (detector case; modified and adapted); PG 4 (monitoring & communication devices); PG 5 (communication methods); PG 6 (biometrics); and, PG 7 (authorized person) | wherein the monitoring equipment or multi-sensor detection device receives a signal via any of one or more products of any product grouping categories; | wherein the monitoring equipment or multi sensor detection device receives a signal via any of one or more products listed in any of the plurality of product grouping categories; |
| The Android-based [Google] smartphone[s] now contained integrated satellite ...<br><br>Wi-Fi is a method for Google Pixel 8 smartphone to connect wirelessly to the Internet using radio waves...<br><br>The internet connection is shared by many functions on the Google Pixel 8 smartphone such as internet browsing, email messaging; installing apps...<br><br>The Google Pixel 8 phone connects to a cell tower or base station via radio waves, and that tower is usually physically connected to the infrastructure to send that data... | wherein at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency connection, or short-range radio frequency (RF) connection is capable of signal communication with the transmitter, a receiver of the monitoring equipment, the multi-sensor detection device, or transceivers of the products; | wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection is capable of signal communication with the transmitter and the receiver of the monitoring equipment or multi sensor detection device and transceivers of the products; |
| BIOMETRICS: Biometric factors allow secure authentication on the Google Android platform. The Google Android framework includes face and fingerprint biometric authentication.<br><br>The Smartphones and Smartwatches of Google, Qualcomm, LG, Apple, and Samsung; and, the Laptops, Tablets, and Desktop PCs of Intel and Samsung | wherein the monitoring equipment is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan or signature such that the monitoring device that is at least one of the computer, the laptop, the notebook, the PC, the handheld, the cell phone, the PDA, or the smart phone is locked by the biometric lock disabler to prevent unauthorized use; | wherein the monitoring equipment is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature such that the monitoring device that is at least one of the computer, the laptop, the notebook, the PC, the handheld, the cell phone, the PDA, or the smart phone is locked by the biometric lock disabler to prevent unauthorized use; |

| | | |
|---|---|---|
| The Android-based [Google] smartphone[s] now contained integrated satellite ...<br><br>Wi-Fi is a method for devices such as the Google Pixel 8 smartphone to connect wirelessly to the Internet using radio waves...<br><br>The internet connection is shared by many ATAK functions on the Google Pixel 8 smartphone such as internet browsing, receiving email messages; installing apps...<br><br>The Google Pixel 8 phone connects to a cell tower or base station via radio waves, and that tower is usually physically connected to the infrastructure to send that data wherever it needs to go. | wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, long range radio frequency, and short-range radio frequency (RF). | wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, and long and short-range radio frequency (RF). |

"Whoever [Google LLC] offers to sell or sells within the United States [] a component [smartphone] of a [] combination [] or apparatus for use in practicing a patented process, constituting a *material part* of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer." *35 U.S.C. § 271(c)*.

As this is a "contributory" liability doctrine, there must be a direct infringement for there to be Sec. 271(c) liability. Golden alleged the multi-sensor detection systems of a CBRNE Smartwatch, a CBR Smartphone Camera, a CBR—NFC Smartphone Sensor, a CBR Smartphone Beacon, Smartphone Biosensors, and CBRNE Plug-in Sensors infringes Golden's patents.

# Exhibit C

# DUPLICATE OF THE CLAIM CHART SUBMITTED IN GOLDEN v. GOOGLE, LLC WITH THE GOOGLE NEST PRODUCTS INCLUDED

The Federal Circuit on 09/08/2022, in *Larry Golden v. Google LLC*; Case No. 22-1267 — "VACATED AND REMANDED" the relevant Case No: 22-1267 Document 15; back to the District Court "to be filed and request service of process".

The Federal Circuit determined the complaint, "includes a detailed claim chart mapping features of an accused product, the Google Pixel 5 Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189" … "in a relatively straightforward manner" … and that the [Circuit] "express no opinion as to the adequacy of the complaint or claim chart except that it is not facially frivolous."

Three-Judge Panel: "DISCUSSION. 'Under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal,* 556 U.S. 662 (2009), a court must dismiss a complaint if it fails to allege "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570 … [T]his standard "requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555 (citation omitted). A plaintiff must allege facts that give rise to "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted) … this court has explained that a plaintiff … must plead "'enough fact[s] to raise a reasonable expectation that discovery will reveal' that the defendant is liable for the misconduct alleged."

"Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the Google Pixel 5 Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189 … It [claim chart] attempts [] to map claim limitations to infringing product features, and it does so in a relatively straightforward manner …[W]e conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart. Mr. Golden has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart…."

## Claim Chart for Google Nest Products

The following Claim Chart. At least one of the alleged infringing products of Google is illustrated to show how the Google Pixel 5 allegedly infringes on at least one of the asserted independent claims of each of the patents-in-suit ('287, '439, and '189 patents).

The Claim Chart illustrates how the Google Nest products allegedly contribute to the infringement of Golden's patented invention of a CMDC (smartphone) device.

| Google Pixel 5 Smartphone | Patent #: 10,163,287; Independent Claim 5 | Patent #: 9,589,439; Independent Claim 23 | Patent #: 9,096,189; Independent Claim 1 |
|---|---|---|---|
|  | A monitoring device, comprising: | A cell phone comprising: | A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, comprising: |
| CPU: Octa-core (1 × 2.4 GHz Kryo 475 Prime & 1 × 2.2 GHz Kryo 475 Gold & 6 × 1.8 GHz Kryo 475 Silver) System-on-a-chip: Qualcomm Snapdragon 765G | at least one central processing unit (CPU); | a central processing unit (CPU) for executing and carrying out the instructions of a computer program; | at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, a network processor which is specifically targeted at the networking application domain, or a front-end processor for communication between a host computer and other devices; |

| | | | |
|---|---|---|---|
| **Google Nest Thermostat – Device for Regulating Temperature**  | at least one temperature sensor in communication with the at least one CPU for monitoring temperature; | X | X |
| **Google Nest Security Cameras**  | at least one motion sensor in communication with the at least one CPU; | X | X |
| Light sensor supported by the Android platform. Measures the ambient light level (illumination) in lx. Controlling screen brightness. Screen: 6-inch flexible OLED display at 432 ppi | at least one viewing screen for monitoring in communication with the at least one CPU; | X | X |
| Connectivity: Wi-Fi 5 (a/b/g/n/ac) 2.4 + 5.0 GHz, Bluetooth 5.0 + LE, NFC, GPS (GLONASS, Galileo, BeiDou), eSIM capable | at least one global positioning system (GPS) connection in communication with the at least one CPU; | at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; | at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection; |

| | | wherein at least one of… WiFi connection, internet connection, radio frequency (RF) connection, cellular connection… capable of signal communication with the transmitter or the receiver; | wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group… of satellite, Bluetooth, WiFi… |
|---|---|---|---|
| Connectivity: Wi-Fi 5 (a/b/g/n/ac) 2.4 + 5.0 GHz, Bluetooth 5.0 + LE, NFC, GPS (GLONASS, Galileo, BeiDou), eSIM capable | at least one of an internet connection or a Wi-Fi connection in communication with the at least one CPU; | | |
| Connectivity: Wi-Fi 5 (a/b/g/n/ac) 2.4 + 5.0 GHz, Bluetooth 5.0 + LE, NFC, GPS (GLONASS, Galileo, BeiDou), eSIM capable | at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; | at least one of a… Bluetooth connection, WiFi connection, internet connection… cellular connection… short range radio frequency (RF) connection, or GPS connection; | X |
| **Google Nest × Yale Lock**<br> | at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device; | whereupon the cell phone is interconnected to the cell phone detection device to receive signals or send signals to lock or unlock doors, to activate or deactivate security systems, to activate or deactivate multi-sensor detection systems, or to activate or deactivate the cell phone detection device; | X |
| Pixel phones use USB-C with USB 2.0 power adapters and cables. To charge your phone with a USB-A power adapter, use a USB-C to USB-A cable. | at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device; | X | X |

| | | | |
|---|---|---|---|
| BIOMETRICS: Biometric factors allow for secure authentication on the Android platform. The Android framework includes face and fingerprint biometric authentication. Android can be customized to support other forms of biometric authentication (such as Iris). | at least one biometric sensor in communication with the at least once CPU for providing biometric authentication to access the communication device; | wherein the cell phone is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature such that the cell phone is locked by the biometric lock disabler to prevent unauthorized use; and | wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature such that the communication device that is at least one of the cell phone, the smart phone, the desktop, the handheld, the PDA, the laptop or the computer terminal is locked by the biometric lock disabler to prevent unauthorized use |
| **Google Nest Protect Smoke and CO Alarm (Chemical Detector)**  | at least one sensor for chemical, biological, or human detection in communication with the at least one CPU; | the cell phone is at least a fixed, portable or mobile communication device interconnected to the cell phone detection device, capable of wired or wireless communication therebetween; and | the communication device is at least a fixed, portable or mobile communication device interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween… |

| | | | |
|---|---|---|---|
| **Google Nest Protect Smoke and CO Alarm (Chemical Detector)**<br> | one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents; | at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone; | wherein the communication device receives a signal via any of one or more products listed in any of the plurality of product grouping categories; |
| Connectivity: Wi-Fi 5 (a/b/g/n/ac) 2.4 + 5.0 GHz, Bluetooth 5.0 + LE, NFC, GPS, (GLONASS, Galileo, BeiDou), eSIM capable | at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU… | X | X |
| **Google Nest × Yale Lock**<br> | at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or… detect at least one of a chemical biological… agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. | a transmitter for transmitting signals and messages to a cell phone detection device; a receiver for receiving signals from the cell phone detection device; | a transmitter for transmitting signals and messages to at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device;<br><br>a receiver for receiving signals, data or messages from at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device; |

| | | | |
|---|---|---|---|
| **Google Nest × Yale Lock**  | X | X | whereupon the communication device, is interconnected to a product equipped to receive signals from or send signals to lock or unlock doors, activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems |
| *Android Team Awareness Kit*, ATAK (built on the Android operating system) is a digital application available to warfighters throughout the DoD. ATAK offers warfighters geospatial mapping for situational awareness during combat — on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK now includes chemical, biological, radiological, and nuclear (CBRN) plug-ins. | X | a transmitter for transmitting signals and messages to a cell phone detection device; a receiver for receiving signals from the cell phone detection device; | wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection… short range radio frequency (RF) connection is capable of signal communication with the transmitter and the receiver of the communication device and transceivers of the products; |

| Google Nest Protect Smoke and CO Alarm (Chemical Detector) | X | whereupon a signal sent to the receiver of the cell phone detection device from at least one of the chemical sensor, the biological sensor, the explosive sensor, the human sensor, the contraband sensor, or the radiological sensor, causes a signal that includes at least one of location data or sensor data to be sent to the cell phone. | X |
|---|---|---|---|

## GOOGLE ADMITS THAT IT OFFERS FOR SALE AND SELLS [GOOGLE] NEST PRODUCTS

Golden alleges direct infringement, and infringement under the "doctrine of equivalents" for the following Google Nest products: the Google Nest Thermostat – Device for Regulating Temperature; the Google Nest Security Cameras; the Google Nest Smoke and CO Alarm (Chemical Detector); and, the Google Nest x Yale Lock, that are all interconnected to Golden's patented CMDC devices of a personal computer, a cell phone, a smart phone, a PDA, or a laptop.

Golden alleges that under the "doctrine of equivalents" the above listed Google Nest products; in combination with Golden's patented CMDC devices, performs substantially the same function, in substantially the same way, and achieves substantially the same results.

**Google Nest Thermostat – Device for Regulating Temperature**
**U.S. Patent No: 9,096,189**

6.    A built-in multi sensor detection system for detecting at least two items selected from the group consisting of [] motion, perimeter, temperature, tampering, theft, and breach, comprising:

monitoring equipment of at least one of the products grouped together by common

features in the product groupings category of design similarity (i.e. computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone) for the receipt and transmission of signals therebetween ...

wherein the built-in, [] device is built in [connected to] any of one or more products listed in any of the plurality of product grouping categories to include but not limited to [] monitoring equipment (i.e., a computer terminal, personal computer (PC), a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop) ...

... the built-in [] system communicates the alarm by way of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e. [] product-to-cellular, product-to-radio frequency (RF), product-to-internet, product-to-broadband, product-to-smartphone or cell phone, product-to-computer at monitoring site, product-to-WiFi, product-to-handheld, or product-to-laptop or desktop) for the receipt and transmission of signals therebetween ...

... the monitoring equipment that is capable of wireless [] communication to achieve detection of at least one of [] the motion, the perimeter, the temperature, the tampering, the theft, and the breach which allows radio frequency (RF) data to be received and transferred ...

**Google Nest Security Cameras**
**U.S. Patent No: 9,589,439**

1. A multi sensor detection system capable of identifying, monitoring, detecting, and securing those critical areas [] sites, locations and facilities [] comprising:

... a remote video surveillance camera that provides at least one night vision means of surveillance or an infrared human detection means of surveillance capability and is integrated into a [] remotely controlled system that can monitor, [] and identify humans ...

a communication device of at least one of a mobile communication device, ... [] a laptop, [] a smart phone, a cell phone, [], a personal digital assistant (PDA), [] or a handheld, ...

a communication method of at least one of a Bluetooth, Wi-Fi, [] Internet, [] Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, Cellular, Satellite, Telematics, [] Wireless Wide Area Network (WWAN), Local Area Network (LAN), Radio Frequency (RF), [] Global Positioning System (GPS), or central processing unit (CPU) ...

a plurality of sensors for detecting or sensing humans that is at least one of a chemical human sensor, biological human sensor, radiological human sensor, infrared human detector,

motion human detector, or image human detector, interconnected to or disposed within the multi-sensor detection system for sending signals thereto and receiving signals therefrom;

... at least one of [] a surveillance camera, or a stand-alone surveillance scanner, that is mounted in, on, or upon [] monitoring equipment for sending signals thereto and receiving signals therefrom ...

**Google Nest Smoke and CO Alarm (Chemical Detector)**
**U.S. Patent No: 9,589,439**

19.    A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, radiological agent, or compound, comprising:

a plurality of sensors for detecting at least one chemical, [] agent or compound, capable of being disposed within, on, upon or adjacent ...

monitoring equipment comprising at least one of a computer, personal computer (PC), laptop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone for at least one of a receipt or transmission of signals therebetween ...

wherein at least one of a [] Bluetooth connection, [] radio frequency (RF) connection, cellular connection, [] long range [], or short-range radio frequency (RF) connection is capable of signal communication ...

wherein the monitoring equipment is equipped with a biometric ... fingerprint recognition, voice recognition, face recognition, [] such that the monitoring device [] is at least one of the computer, the laptop, the notebook, the PC, the handheld, the cell phone, the PDA, or the smart phone ...

**Google Nest x Yale Lock**
**U.S. Patent No: 10,163,287**

1.    Monitoring equipment that is [] a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone interconnected to a lock for communication therebetween; the monitoring equipment comprising:

at least one of a central processing unit (CPU), a network processor, or a front-end processor for communication between the monitoring equipment and the lock ...

a transmitter for transmitting signals and messages to at least one of a remote lock, an electrical lock, a mechanical lock, or automatic lock …

a receiver for receiving signals from at least one of a remote lock, an electrical lock, a mechanical lock, or automatic lock …

at least one of [], Bluetooth connection, [] radio frequency (RF) connection, cellular connection, [] long range [], short range radio frequency (RF) connection, or GPS connection …

at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature recognition system; and,

the monitoring equipment being capable of sending signals to engage (lock), disengage (unlock), … at least one of a remote lock, an electrical lock, a mechanical lock, or automatic lock, whereupon a signal is sent to the receiver of the monitoring equipment from at least one of the remote lock, electrical lock, mechanical lock, or automatic lock, the signal comprising at least one of location data or lock status data to be sent to the monitoring equipment …

---

As noted above in claim 1 of *Golden's* '287 patent, the limitation calls for "at least one of a central processing unit (CPU), a network processor, or a front-end processor for communication between the monitoring equipment and the lock …". *Ecofactor Inc.*: "[T]he computers include *processors* [CPUs, Chipsets, SoCs] such as those sold by Intel and AMD. Other processors may also be used, including general-purpose processors, multi-chip processors, embedded processors and the like. In one embodiment, computers 104 and servers 106 are conventional computers that are equipped with communications hardware such as modem or a network interface card."

*Google LLC*: Google Nest Wifi Pro, Nest Wifi, and Google Wifi are mesh network Wi-Fi systems that deliver Wi-Fi and Matter radio coverage across your home. A mesh network is a group of connectivity devices, such as Wi-Fi routers that act as a single network, so there are multiple sources of connectivity around your house instead of just a single router. The Nest Wifi Pro devices use Qualcomm's Wi-Fi chip to create a mesh network. It has a 1GHz dual-core processor along with 1GB of RAM and 8GB of flash storage for its firmware.

32

# Exhibit D

# PLAINTIFF'S "TRANSCEIVER" IS EQUIVALENT TO GOOGLE'S OPERATING SYSTEM

Plaintiff's software/programming interface is described in his patent specifications as "the cpu or transceiver":

> "FIG. 19 ... a GPS satellite in conjunction with the monitoring site and monitoring equipment to relay commands and signals to *the cpu or transceiver* of the vehicle ... in response to a signal that a certain type of event ... detection of a bomb..."

> "The system 10 ... can be adapted or incorporated with cell phone towers and satellites for use with satellite communication and/or a cell tower, wi-fi, wi-max, broadband, GPS, navigation, radio frequency interconnected to a central processing unit (cpu), such *as cpu 40, or a transceiver* and monitoring equipment to include but not to be limited to computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals therebetween."

> "*[a] CPU or a transceiver* 202 is programmed to receive signals from the cell phone tower 190 and/or to a GPS satellite 204 ... the monitoring equipment 138 ... which can include but is not limited to ... cell phones, laptops, desktop PC's, notebook PC's, and LCD monitors."

> "[t]he GPS satellite 204 that an original or activation signal has been received and then the GPS satellite 204 locates and communicates by multiplex signal 212 with *the CPU or transceiver* 202 on the vehicle 192 and exchanges information on the type of problem, situation, location ... The monitoring equipment 138 then transmits a signal 214 to the cell phone tower 190 that communicates with *the transceiver 202 and/or CPU ...*"

> "Independent claims 4, 5, & 6 of Plaintiff's Patent No. 10163287 ('287 patent): at least one of ... *a transceiver in communication with the at least one CPU* configured to send signals to ... detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling."

Plaintiff has clearly defined Plaintiff's "transceiver" in the patents' specifications as an "operating system" interconnected to Plaintiff's patented central processing units (CPUs).

Independent Claim 5 of the '287 patent, and Independent Claim 11 of the '619 patent, asserted in this complaint as two of Plaintiff's patent claims that are allegedly being infringed by certain Google smartphone products, illustrates the combined integration:

*Claim 5 ('287 patent).* A monitoring device, comprising:

at least one central processing unit (CPU);

at least one temperature sensor in communication with the at least one CPU for monitoring temperature;

at least one motion sensor in communication with the at least one CPU;

at least one viewing screen for monitoring in communication with the at least one CPU;

at least one global positioning system (GPS) connection in communication with the at least one CPU;

at least one of an internet connection or a Wi-Fi connection in communication with the at least one CPU;

at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU;

at least one locking mechanism in communication with the at least one CPU for locking the communication device, the at least one locking mechanism configured to at least one of engage (lock) the communication device, disengage (unlock) the communication device, or disable (make unavailable) the communication device;

at least one power source comprising at least one of a battery, electrical connection, or wireless connection, to provide power to the communication device;

at least one biometric sensor in communication with the at least once CPU for providing biometric authentication to access the communication device;

at least one sensor for chemical, biological, or human detection in communication with the at least one CPU;

one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents;

at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU; and,

at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or send signals to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling.

***Claim 11 ('619 patent)***.   A central processing unit (CPU) of at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, capable of:

processing instructions to lock, unlock, or disable the lock of the communication device;

processing instructions to activate a lock, unlock, or disabling lock means by engaging a vehicle with a two-way communication key-fob;

processing instructions to activate a start, stall, stop, or disabling means by engaging a vehicle's ignition system;

processing instructions to activate a lock, unlock, or disabling lock means; a start, stall, stop, or disabling vehicle means by engaging the operational systems of the unmanned aerial vehicle;

processing instructions to authenticate or identify a user by at least one of biometric fingerprint recognition, biometric facial recognition, biometric iris recognition, or biometric retina recognition;

processing instructions to scan a senor or tag using the short-range wireless technology of radio frequency near-field communication (NFC);

processing instructions to monitor or detect at least one of a chemical sensor, a biological sensor, a motion sensor, a biometric sensor, a signature sensor, or a human sensor;

processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs);

processing instructions received through at least one of a Bluetooth, a Wi-Fi, a satellite, a global positioning system (GPS), or a cellular transmission;

processing instructions to connect the communication device to the internet or internet-of-things (IoTs) platform to sync, to at least one of a building's computer or security system, a vehicle's computer or security system, a lock, a detection device, or another communication device; and,

whereupon, the central processing unit (CPU) of the communication device is capable of processing instructions for operational and functional execution, and is capable of providing feedback of the execution, and storing the feedback into memory.

A transceiver or transmitter/receiver is a device which combines transmission and reception capability on shared circuitry. There are a number of different types of transceivers designed for an assortment of uses, and the transceiver is the cornerstone of wireless communication. One common example of a transceiver is a cellular phone, which is capable of sending and receiving data, unlike a basic radio, which can only receive signals.

The Mobile phone transceiver connects the Visit system to your mobile phone, tablet, or smartwatch via Bluetooth. Once you have installed the Visit app, you will start to receive Visit notifications on your mobile device. In addition, your Visit receiver will alert you to incoming calls and messages.

| Elements | Patent # 10,163,287; Indep. Claim 5 | Patent # 9,589,439; Indep. Claim 23 | Patent # 9,096,189; Indep. Claim 1 | Patent # 9,589,439; Indep. Claim 19 | Patent# 10,984,619; Indep. Claim 11 |
|---|---|---|---|---|---|
| **Google Pixels 6a, 7, 7a, 7pro, & fold Smartphones** | A monitoring device, comprising: | A cell phone comprising | A communication device of at least one of a cell phone, a smart phone… | A multi-sensor detection system | A central processing unit (CPU) of at least a personal computer (PC), a cellphone, a smartphone… |
| **Google Tensor G1 & G2 i.e., Central Processing Unit (CPU) Processor, SoC, Chipset** | at least one central processing unit (CPU); | a central processing unit (CPU) for executing and carrying out the instructions of a computer program | at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program … | X | the central processing unit (CPU) of the communication device is capable of processing instructions for operational and functional execution |
| **Google Android Open-Source Operating System "Transceiver" is Equivalent to Operating System** | a transceiver in communication with the at least one CPU configured to send signals… | X | the transmitter and the receiver of the communication device and transceivers of the products | communication with the transmitter, a receiver of the monitoring equipment, the multi-sensor detection device, or transceivers of the products | X |
| **Draper Laboratory, Inc. ATAK-CIV CBRN Plugins**  Sold at Google Play | to detect at least one of a chemical biological, radiological, or explosive agent | a chemical sensor, a biological sensor, an explosive sensor … or a radiological sensor… being disposed within, on, upon or adjacent the cell phone; | interconnected to a product… receive signals … send signals to … activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems | sensors detecting … chemical, biological, radiological, explosive, nuclear… disposed within, on, upon or adjacent a … device; | processing instructions to … detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent |

| Elements | Patent # 10,163,287; Indep. Claim 5 | Patent # 9,589,439; Indep. Claim 23 | Patent # 9,096,189; Indep. Claim 1 | Patent # 9,589,439; Indep. Claim 19 | Patent# 10,984,619; Indep. Claim 11 |
|---|---|---|---|---|---|
| **Google Pixels 6a, 7, 7a, 7pro, & fold Smartphones** | A monitoring device, comprising: | A cell phone comprising | A communication device of at least one of a cell phone, a smart phone… | A multi-sensor detection system | A central processing unit (CPU) of at least a personal computer (PC), a cellphone, a smartphone… |
| **Google Tensor G1 & G2 i.e., Central Processing Unit (CPU) Processor, SoC, Chipset** | at least one central processing unit (CPU); | a central processing unit (CPU) for executing and carrying out the instructions of a computer program | at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program … | X | the central processing unit (CPU) of the communication device is capable of processing instructions for operational and functional execution |
| **Google Android Open-Source Operating System** **"Transceiver" is Equivalent to Operating System** | a transceiver in communication with the at least one CPU configured to send signals… | X | the transmitter and the receiver of the communication device and transceivers of the products | communication with the transmitter, a receiver of the monitoring equipment, the multi-sensor detection device, or transceivers of the products | X |
| **Google Megapixel Camera for CBR Detection**  Native to Phone | to detect at least one of a chemical biological, radiological, or explosive agent | a chemical sensor, a biological sensor, an explosive sensor … or a radiological sensor… being disposed within, on, upon or adjacent the cell phone; | interconnected to a product… receive signals … send signals to … activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems | sensors detecting … chemical, biological, radiological, explosive, nuclear… disposed within, on, upon or adjacent a … device; | processing instructions to … detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent |

| Elements | Patent # 10,163,287; Indep. Claim 5 | Patent # 9,589,439; Indep. Claim 23 | Patent # 9,096,189; Indep. Claim 1 | Patent # 9,589,439; Indep. Claim 19 | Patent# 10,984,619; Indep. Claim 11 |
|---|---|---|---|---|---|
| **Google Pixels 6a, 7, 7a, 7pro, & fold Smartphones** | A monitoring device, comprising: | A cell phone comprising | A communication device of at least one of a cell phone, a smart phone… | A multi-sensor detection system | A central processing unit (CPU) of at least a personal computer (PC), a cellphone, a smartphone… |
| **Google Tensor G1 & G2 i.e., Central Processing Unit (CPU) Processor, SoC, Chipset** | at least one central processing unit (CPU); | a central processing unit (CPU) for executing and carrying out the instructions of a computer program | at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program … | X | the central processing unit (CPU) of the communication device is capable of processing instructions for operational and functional execution |
| **Google Android Open-Source Operating System** **"Transceiver" is Equivalent to Operating System** | a transceiver in communication with the at least one CPU configured to send signals… | X | the transmitter and the receiver of the communication device and transceivers of the products | communication with the transmitter, a receiver of the monitoring equipment, the multi-sensor detection device, or transceivers of the products | X |
| **Biosensors: Ambient light sensor: Cancer biomarkers; Toxic metals; Pathogens Capillary inlet: (Air analysis). Airborne Pathogens; Aerosols**  Native Sensors | to detect at least one of a chemical biological, radiological, or explosive agent | a chemical sensor, a biological sensor, an explosive sensor … or a radiological sensor… being disposed within, on, upon or adjacent the cell phone; | interconnected to a product… receive signals to … activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems | sensors detecting … chemical, biological, radiological, explosive, nuclear… disposed within, on, upon or adjacent a … device; | processing instructions to … detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent |

| Elements | Patent # 10,163,287; Indep. Claim 5 | Patent # 9,589,439; Indep. Claim 23 | Patent # 9,096,189; Indep. Claim 1 | Patent # 9,589,439; Indep. Claim 19 | Patent# 10,984,619; Indep. Claim 11 |
|---|---|---|---|---|---|
| **Google Pixels 6a, 7, 7a, 7pro, & fold Smartphones** | A monitoring device, comprising: | A cell phone comprising | A communication device of at least one of a cell phone, a smart phone… | A multi-sensor detection system | A central processing unit (CPU) of at least a personal computer (PC), a cellphone, a smartphone… |
| **Google Tensor G1 & G2 i.e., Central Processing Unit (CPU) Processor, SoC, Chipset** | at least one central processing unit (CPU); | a central processing unit (CPU) for executing and carrying out the instructions of a computer program | at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program … | X | the central processing unit (CPU) of the communication device is capable of processing instructions for operational and functional execution |
| **Google Android Open-Source Operating System "Transceiver" is Equivalent to Operating System** | a transceiver in communication with the at least one CPU configured to send signals… | X | the transmitter and the receiver of the communication device and transceivers of the products | communication with the transmitter, a receiver of the monitoring equipment, the multi-sensor detection device, or transceivers of the products | X |
| **Google Beacon: Bluetooth; GPS; Wi-Fi**  Native to Phone | to detect at least one of a chemical biological, radiological, or explosive agent | a chemical sensor, a biological sensor, an explosive sensor … or a radiological sensor… being disposed within, on, upon or adjacent the cell phone; | interconnected to a product… receive signals … send signals to … activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems | sensors detecting … chemical, biological, radiological, explosive, nuclear… disposed within, on, upon or adjacent a … device; | processing instructions to … detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent |

41

# Exhibit E

**OPERATING SYSTEMS AS AN INTERFACE BETWEEN USER AND HARDWARE**

**The iTAK, ATAK, and WinTAK software is built on the Operating Systems of Apple, Google, and Microsoft.**

ATAK (built on the Android operating system). With DTRA … ATAK includes chemical, biological, radiological, and nuclear (CBRN) plug-ins. The Defense Threat Reduction Agency (DTRA) CBRN ISA: Seamlessly integrates information and control of multiple sensors into a single dashboard, making it easier to detect CBRN threats and monitor a warfighter's vitals https://thelastmile. gotennapro.com/four-useful-atak-app-plugins/

| iTAK | ATAK | | | | WinTAK | |
|---|---|---|---|---|---|---|
| Apple iPhone 12 Smartphone | Google Pixel 5 Smartphone | Samsung Galaxy S21 Smartphone | LG V60 ThinQ 5G | Asus / Qualcomm Smartphone for Snapdragon Insiders | Samsung Galaxy Book2 Pro 360 [PC Mode or Tablet Mode] | HP ZBook Fury 15.6 Inch G8 Mobile Workstation PC |
|  |  |  |  |  |  |  |
| Chipset: Apple A14 Bionic (5 nm). CPU: Hexa-core (2x3.1 GHz Firestorm + 4x1.8 GHz Icestorm). | Chipset: Qualcomm Snapdragon 765G CPU: Octa-core (1 × 2.4 GHz Kryo 475 Prime | Chipset: Qualcomm SM8350 CPU: Octa-core (1x2.84 GHz Cortex-X1 & 3x2.42 GHz | Chipset: Qualcomm SM8250 CPU: Octa-core (1x2.84 GHz Cortex-A77 & 3x2.42 GHz | Chipset: Qualcomm SM8350 CPU: Octa-core (1x2.84 GHz Cortex-X1 & 3x2.42 GHz | CPU: Intel® Core™ i5-1235U / Intel® Core™ i7-1255U. Processor Speed 1.3GHz / 1.7 GHz. | CPU: 11th Generation Intel® Xeon® W-11955M vPro® with Intel® UHD Graphics |
| OS: Apple iOS 14.1, upgradable to iOS 16.1 | OS: Google Android 11, upgradable to Android 13 | OS: Google Android 11, upgradable to Android 13 | OS: Google Android 10, upgradable to Android 13 | OS: Google Android 11 | OS: Preinstalled Microsoft Windows 11 | OS: Preinstalled Microsoft Windows 11 Pro2 |
| CBRNE PLUGINS Draper Laboratory, Inc | CBRNE PLUGINS Draper Laboratory, Inc | CBRNE PLUGINS Draper Laboratory, Inc | CBRNE PLUGINS Draper Laboratory, Inc | CBRNE PLUGINS Draper Laboratory, Inc | CBRNE PLUGINS Draper Laboratory, Inc | CBRNE PLUGINS Draper Laboratory, Inc |

Google Nest x Yale Lock—Apple iOS (OS); Google Nest Protect (Chemical Detector)—Google Android (OS); Google Nest Security Cameras—Microsoft Windows 11 (OS)

Computers and [mobile devices] may use *operating systems* [systems' software that acts as an interface between user and hardware] such as Microsoft Windows, Apple Mac OS, Linux, Unix; and for mobile devices, Apple iOS, and Google Android OS, or the like.

Computers and [mobile devices] may include a range of devices that provide information, sound, graphics and text, and may use a variety of operating systems [system software that acts as an interface between user and hardware] and *software* optimized for distribution via networks.

## GOOGLE NEST PRODUCTS

| Apple iPhone 12 Smartphone | Google Pixel 5 Smartphone | Samsung Galaxy S21 Smartphone | LG V60 ThinQ 5G | Asus / Qualcomm Smartphone for Snapdragon Insiders | Samsung Galaxy Book2 Pro 360 [PC Mode or Tablet Mode] | HP ZBook Fury 15.6 Inch G8 Mobile Workstation PC |
|---|---|---|---|---|---|---|
|  |  |  |  |  |  |  |
| Chipset: Apple A14 Bionic (5 nm). CPU: Hexa-core (2x3.1 GHz Firestorm + 4x1.8 GHz Icestorm). | Chipset: Qualcomm Snapdragon 765G CPU: Octa-core (1 × 2.4 GHz Kryo 475 Prime | Chipset: Qualcomm SM8350 CPU: Octa-core (1x2.84 GHz Cortex-X1 & 3x2.42 GHz | Chipset: Qualcomm SM8250 CPU: Octa-core (1x2.84 GHz Cortex-A77 & 3x2.42 GHz | Chipset: Qualcomm SM8350 CPU: Octa-core (1x2.84 GHz Cortex-X1 & 3x2.42 GHz | CPU: Intel® Core™ i5-1235U / Intel® Core™ i7-1255U. Processor Speed 1.3GHz / 1.7 GHz. | CPU: 11th Generation Intel® Xeon® W-11955M vPro® with Intel® UHD Graphics |
| OS: Apple iOS 14.1, upgradable to iOS 16.1 | OS: Google Android 11, upgradable to Android 13 | OS: Google Android 11, upgradable to Android 13 | OS: Google Android 10, upgradable to Android 13 | OS: Google Android 11 | OS: Preinstalled Microsoft Windows 11 | OS: Preinstalled Microsoft Windows 11 Pro2 |
|  |  |  |  |  |  |  |

# Exhibit F

## THE JUDGE FAIL TO STRICTLY FOLLOW THE DECISION(S) HANDED DOWN BY THE HIGHER COURT WITHIN THE SAME JURISDICTION

Judge Rita F. Lin is in violation of the doctrine of *vertical stare decisis* for not honoring the decision of the higher Appellate Court in *Larry Golden v. Google LLC*; Case No. 22-1267:

The Northern District of California Court Judge, who is bound by and must follow the decisions of the U.S. Court of Appeals for the Federal Circuit [*vertical stare decisis*] fail to abide by the Circuit's decision in *Larry Golden v. Google LLC* Case No. 22-1267, that Google's "smartphone" literally and/or under the doctrine of equivalents infringes Golden's "independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189 … and it does so in a relatively straightforward manner". The District Court Judge was bound by the doctrine of *vertical stare decisis*, to uphold the CAFC's decision.

*Vertical stare decisis* binds lower courts to follow strictly the decisions of higher courts within the same jurisdiction (e.g., the Northern District of California Court Judge must follow the decisions of the U.S. Court of Appeals for the Federal Circuit). The Supreme Court defines *vertical stare decisis* as the doctrine, "a lower court must strictly follow the decision(s) handed down by a higher court within the same jurisdiction".

Judge Rita F. Lin engages in *vertical stare decisis* when she applies precedent from the higher court. For example, if the Northern District of California Court Judge in *Golden v. Golden* adhered to a previous ruling from the United States Court of Appeals for the Federal Circuit, in *Larry Golden v. Google LLC*; Case No. 22-1267, that would be *vertical stare decisis*.

The bigger question is why? Why did Judge Rita F. Lin ignore the ruling from the higher court and decided to be the defendant; the judge; and the jury? "But for" the Judge is racially bias against Golden and is more concern with earning the respect of her co-conspirators who supports a judicial system of systemic and structural racism.

## Standard Claim Charts – I

The claim chart presented and reviewed by the Federal Circuit in *Larry Golden v. Google LLC*; Case No. 22-1267 is based on "reverse engineering". Reverse engineering, also called "tear down", is a method or process to discover how the DTRA ATAK software and/or its Draper CBRNE Plug-in Sensors functions with a Google smartphone product.

In Golden's patent specifications: "[p]roduct grouping 2 (sensors) include, but are not limited to, chemical, biological, [] motion sensors, [] biometric sensors, [] human…" Golden, during patent prosecution was able to get the "heart-rate sensor" allowed as the species of the sensors listed above, to include the signature sensor (i.e., unique cardiac signature) as genesis.

Therefore, one way to read the following standard claim chart is to read it from the Google smartphone; to the Google smartwatch; to the Google smartwatch chemical, biological, motion, biometric, human, or signature "heart-rate" sensor. Another way to read the standard claim chart is to identify exactly where the element can be found in the accused devices (CPU, transmitter, receiver, transceiver, GPS receiver, and antennas for Bluetooth, cellular and Wi-Fi).

Although Golden is not required to plead infringement on an element-by-element basis at the pleading stage, Golden not only plead infringement on an element-by-element basis at the Federal Circuit in *Larry Golden v. Google LLC*; Case No. 22-1267 with a reverse engineered claim chart, Golden also pled infringement on an element-by-element basis that can be read two ways with the standard claim chart in this current case *Golden v. Google LLC*; NDC Case 3:22-cv-05246-RFL. Why would Judge Rita F. Lin not consider Golden's evidence?

The following standard claim chart was presented to Judge Lin for an element-by-element analysis of a Google smartphone and how it functions with a Google smartwatch CBRNE sensing for claim 1 of '189 patent; claim 23 of '439 patent; and claim 5 of '287 patent.

| | **Google Smartwatch CBR Detector for Smartphone** |
|---|---|
|  | The US Military's Latest Wearables [Smart Watch] Can Detect Illness Two Days Before You Get Sick https://www.defenseone.com/technology/2020/09/militarys-latest-wearables-can-detect-illness-two-days-you-get-sick/168664/ |
| | Studies reveal smartwatch biometrics can detect COVID-19: "smartwatches and other wearables measuring biometrics like heart-rate variability have the ability to detect if a person is COVID-19 positive" https://www.biometricupdate.com/202101/studies-reveal-smartwatch-biometrics-can-detect-covid-19-before-symptoms-surface |
| ATAK (built on the Google Android operating system) … controlling different CBRN-sensing technologies, whether that is a wearable smartwatch that measures a warfighter's vitals (e.g., heart rate) … | Homeland Security's Smartwatch Will Detect Nuclear Bombs https://www.popular-mechanics.com/military/research/a18161/homeland-security -smartwatch-detect-nuclear-bombs/ |

## IDENTIFYING IN THE ALLEGED INFRINGING SMARTPHONE WHERE EACH ELEMENT IS FOUND THAT LITERALLY AND/OR UNDER THE DOCTRINE OF EQUIVALENTS INFRINGES GOLDEN'S PATENTS.

| **Google Pixel 8 Smartphone** | **Patent No. 9,096,189 (claim 1 of the '189 patent)** |
|---|---|
| Golden has identified the Google smartphone(s) as "a communication device" and the Google Pixel smartwatch as the multi-sensor detection device or a cell phone detection device | *A communication device* of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, comprising: |
| Golden has identified the Google "Tensor" as the CPU/Chipset for executing and carrying out instructions for the Google Pixel smartphone; the Qualcomm SW5100 / Cortex M33 co-processor CPU/Chipset for executing and carrying out instructions for the Google Pixel smartwatch | at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program … or a front-end processor for communication between a host computer and other devices; |
| The Google Pixel smartphone transceiver connects the Smartwatch (i.e., multi-sensor detection device, or cell phone detection device) to the Google Pixel smartphone via Bluetooth | a transmitter for transmitting signals and messages to at least one of plurality product groups based on the categories of a multi-sensor detection device … a cell phone detection |
| The Google Pixel smartphone transceiver connects the Smartwatch (i.e., multi-sensor detection device, or cell phone detection device) to the Google Pixel smartphone via Bluetooth | a receiver for receiving signals, data or messages from at least one of plurality product groups based on the categories of a multi-sensor detection device … a cell phone detection device |

| | |
|---|---|
| Golden has identified the Google smartphone(s) as "a communication device" and the Google Pixel smartwatch as the multi-sensor detection device or a cell phone detection device for wireless communication therebetween | the communication device is at least a … mobile communication device interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween; |
| The Google Pixel smartphone transceiver connects the Smartwatch (i.e., multi-sensor detection device, or cell phone detection device) to the Google Pixel smartphone via Bluetooth | at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection; |
| The Google Pixel smartphone transceiver connects the Smartwatch (i.e., multi-sensor detection device, or cell phone detection device) to the Google Pixel smartphone via Bluetooth | wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection is capable of signal communication with the transmitter and the receiver of the communication device and transceivers of the products; |
| Golden has identified the Google smartphone(s) fingerprint or facial recognition and the Google Pixel smartwatch as having voice recognition. *"Google Assistant voice commands on Google Pixel Watch"* https://support.google.com/googlepixel watch/answer/12677020?hl=en | wherein the communication device is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature such that the communication device that is at least one of the cell phone, the smart phone, the desktop, the handheld, the PDA, the laptop or the computer terminal is locked by the biometric lock disabler to prevent unauthorized use; |

| IDENTIFYING IN THE ALLEGED INFRINGING SMARTPHONE WHERE EACH ELEMENT IS FOUND THAT LITERALLY AND/OR UNDER THE DOCTRINE OF EQUIVALENTS INFRINGES GOLDEN'S PATENTS. | |
|---|---|
| **Google Pixel 8 Smartphone** | **Patent No. 9,589,439 (claim 23 of the '439 patent)** |
| Golden has identified the Google smartphone(s) as "a new, improved upon, and useful cell phone" and the Google Pixel smartwatch as the multi-sensor detection device or a cell phone detection device | *A cell phone comprising:* |

49

| | |
|---|---|
| Golden has identified the Google "Tensor" as the CPU/Chipset for executing and carrying out instructions for the Google Pixel smartphone; the Qualcomm SW5100 / Cortex M33 co-processor CPU/Chipset for executing and carrying out instructions for the Google Pixel smartwatch | a central processing unit (CPU) for executing and carrying out the instructions of a computer program; |
| The Google Pixel smartphone transceiver connects the Smartwatch (i.e., multi-sensor detection device, or cell phone detection device) to the Google Pixel smartphone via Bluetooth | a transmitter for transmitting signals and messages to a cell phone detection device; |
| The Google Pixel smartphone transceiver connects the Smartwatch (i.e., multi-sensor detection device, or cell phone detection device) to the Google Pixel smartphone via Bluetooth | a receiver for receiving signals from the cell phone detection device; |
| Golden has identified the Google smartphone(s) as "a communication device" and the Google Pixel smartwatch as the multi-sensor detection device or a cell phone detection device for wireless communication therebetween, and | the cell phone is at least a fixed, portable or mobile communication device interconnected to the cell phone detection device, capable of wired or wireless communication therebetween; |
| Golden is identifying the Google Pixel smartphone(s) as "a new, improved upon, and useful cell phone" or "communication device", interconnected to the Google Pixel smartwatch as the cell phone detection device to receive signals or send signals to activate or deactivate | whereupon the cell phone is interconnected to the cell phone detection device to receive signals or send signals to … activate or deactivate multi-sensor detection systems, or to activate or deactivate the cell phone detection device; |
| Golden is identifying the Google Pixel smartwatch as the multi-sensor detection device or a cell phone detection device for CBRNE detection, that is adjacent the Google Pixel smartphone(s) as "a new, improved upon, and useful cell phone" or "communication device" | at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone |
| The Google Pixel smartphone transceiver connects the Smartwatch (i.e., multi-sensor detection device, or cell phone detection device) to the Google Pixel smartphone via Bluetooth | at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; |

| | wherein at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection is capable of signal communication with the transmitter or the receiver; |
|---|---|
| The Google Pixel smartphone transceiver connects the Smartwatch (i.e., multi-sensor detection device, or cell phone detection device) to the Google Pixel smartphone via Bluetooth | |
| Golden has identified the Google smartphone(s) fingerprint or facial recognition and the Google Pixel smartwatch as having voice recognition. *"Google Assistant voice commands on Google Pixel Watch"* https://support.google.com/googlepixelwatch/answer/12677020?hl=en | wherein the cell phone is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature such that the cell phone is locked by the biometric lock disabler to prevent unauthorized use; |

| **IDENTIFYING IN THE ALLEGED INFRINGING SMARTPHONE WHERE EACH ELEMENT IS FOUND THAT LITERALLY AND/OR UNDER THE DOCTRINE OF EQUIVALENTS INFRINGES GOLDEN'S PATENTS.** | |
|---|---|
| **Google Pixel 8 Smartphone** | **Patent No. 10,163,287 (claim 5 of the '287 patent)** |
| Golden has identified the Google smartphone(s) as "a monitoring device" and the Google Pixel smartwatch as the multi-sensor detection device or a cell phone detection device | *A monitoring device, comprising:* |
| Golden has identified the Google "Tensor" as the CPU/Chipset for executing and carrying out instructions for the Google Pixel smartphone; the Qualcomm SW5100 / Cortex M33 co-processor CPU/Chipset for executing and carrying out instructions for the Google Pixel smartwatch | at least one central processing unit (CPU); |
| Golden has identified the Wi-Fi 7 (802.11be) with 2.4GHz+5GHz+6GHz,2x2+ 2x2 MIMO of the Google Pixel smartphone that is in communication with the Google "Tensor" CPU/Chipset]; and the Wi-Fi 802.11 b/g/n 2.4GHz that is in communication with the Google Pixel smartwatch; the Qualcomm SW5100 / Cortex M33 co-processor CPU/Chipset | at least one of an internet connection or a Wi-Fi connection in communication with the at least one CPU; |

51

| | |
|---|---|
| Golden has identified the Bluetooth® v5.3 with dual antennas for enhanced quality of the Google Pixel smartphone that is in communication with the Google "Tensor" CPU/Chipset]; and the Bluetooth® 5.0 that is in communication with the Google Pixel smartwatch; the Qualcomm SW5100 / Cortex M33 CPU/Chipset | at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; |
| Golden has identified the Google Pixel smartphone as an NFC-enabled device that communicates in one or both directions uses a frequency of 13.56 MHz in the globally available unlicensed radio frequency ISM band that is in communication with the Google "Tensor" CPU/Chipset; and the NFC connectivity of the Google Pixel Smartwatch that is in communication with the Qualcomm SW5100 / Cortex M33 co-processor CPU/Chipset | at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU; |
| The Google Pixel smartphone is equipped with the ability to check a "human" heart rate i.e. the number of beats per minute with the smartphone camera, and the working camera flash unit that is in communication with the Google "Tensor" CPU/Chipset; and check a "human" heart rate with the multi-path optical heart rate sensor of the Google Pixel smartwatch that is in communication with the Qualcomm SW5100 / Cortex M33 co-processor CPU/Chipset | at least one sensor for chemical, biological, or human detection in communication with the at least one CPU; |
| Golden is identifying the Google Pixel smartwatch as the multi-sensor detection device or a cell phone detection device for CBRNE detection, that is in communication with the Google Pixel smartphone "Tensor" CPU/Chipset; and in communication with the Google Pixel smartwatch Qualcomm SW5100 / Cortex M33 co-processor CPU/Chipset | one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents; |
| Golden is identifying the Google Pixel smartphone(s), that is in communication with the Google "Tensor" CPU/Chipset, as "a new, improved upon, and useful cell phone" or "communication device", interconnected to the Google Pixel smartwatch, that is in communication with the Qualcomm SW5100 / Cortex M33 co-processor CPU/Chipset, as the cell phone detection device capable of receiving signals or sending signals | at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor … or send signals to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. |

**Standard Claim Charts – II**

In Golden's patent specifications: "[p]roduct grouping 2 (sensors) include, but are not limited to, chemical, biological, [] motion sensors, [] biometric sensors, [] human…" Golden, during patent prosecution was able to get the "heart-rate sensor" allowed as the species of the sensors listed above, to include the signature sensor (i.e., unique cardiac signature) as genesis.

Therefore, one way to satisfy the asserted patent claims requirement for detection of at least the sensors listed in the above paragraph is with the Google smartphone camera "heart-rate" sensor (i.e., chemical, biological, motion, biometric, human, or signature "heart-rate" sensor).

The Google Fit app., that is preinstalled on the Google Pixel handset (smartphone), is used to measure a heart rate on the Google Pixel smartphone. Google Pixel smartphones are capable of monitoring a heart rate even though there isn't any dedicated hardware in the handset to track these metrics. It instead uses a smart approach that leverages the phone's rear camera.

Within the Google Fit app, the user will be able to track their heart rate and their respiratory rate. The user will need a compatible smartphone to be able to do this though, which includes every Google Pixel smartphones since the Google Pixel 3 and Google Pixel 3 XL.

Another way is to identify exactly where in the alleged infringing Google smartphone device, that include identifying where the CPU, transmitter, receiver, transceiver, GPS receiver, and the antennas for Bluetooth, cellular and Wi-Fi can be located that are at least interconnected to the components, devices, or apparatuses capable of CBRNE detection.

Although Golden is not required to plead infringement on an element-by-element basis at the pleading stage, Golden not only plead infringement on an element-by-element basis at the Federal Circuit in *Larry Golden v. Google LLC*; Case No. 22-1267 with a reverse engineered claim chart, Golden also pled infringement on an element-by-element basis that can be read two

ways with the standard claim chart in this current case *Golden v. Google LLC*; NDC Case 3:22-cv-05246-RFL. Why would Judge Rita F. Lin not consider Golden's evidence?

Lastly, the following claim chart of patent claims that was reviewed by the Federal Circuit in *Golden v. Google*; Case No. 22-1267, and presented to Judge Rita F. Lin for an element-by-element analysis between claim 1 of '189 patent; claim 23 of '439 patent; and claim 5 of '287 patent, and the alleged infringing Google smartphone product, is illustrated below. The Google smartphone camera designed for CBR detection is ***internal*** the Google smartphone.

**Camera [1][2] Used for Detecting Chem/Bio Agents.**



**1**      The camera captures the image from the array of nanopores that uses fluid rather than bulky moving parts. The sensors contained in one array is determined by the resolution phone camera. The resolution in cell phone cameras; probe a million different spots on the sensor simultaneously. *Tiny sensors tucked into cell phones could map airborne toxins in real time.* Source: https:// www.understanding nano.com/cell-phone-sensors-toxins.html

**2**      Hyperspectral imaging scans for light frequencies that humans can't see in order to identify the unique chemical signatures of different substances. They say their device, which can be mass produced, is compatible with all standard smartphone cameras. *These New Smartphone Cameras Could Tell You What an Object Is Made of* https://www.sciencealert.com/new-smartphone-cameras-could-tell-you-what-an-object-is-made-of

| The Google "megapixel" Camera is "Native" to the Manufacture of the Google Pixel Smartphone | |
|---|---|
| **Patent No. 9,096,189 (Patent Claim 1 of Golden's '189 Patent)** | **Google "megapixel Camera; embedded in the Google Pixel Smartphone, and interconnected for communication, therebetween** |
| *A communication device* of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, comprising: | [Golden has identified the Google smartphone(s) as "a communication device" and the Google "megapixel" Camera as the multi-sensor detection device or a cell phone detection device] |
| at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program … or a front-end processor for communication between a host computer and other devices; | [Golden has identified the Google "Tensor" as the CPU/Chipset for executing and carrying out instructions for the Google Pixel smartphone; the Google "Tensor" CPU/Chipset for executing and carrying out instructions for the Google "megapixel" Camera] |
| a transmitter for transmitting signals and messages to at least one of plurality product groups based on the categories of a multi-sensor detection device … a cell phone detection device …; | [The Google Pixel smartphone transceiver connects the Google "megapixel" Camera (i.e., multi-sensor detection device, or cell phone detection device) to the Google Pixel smartphone via Bluetooth] |
| a receiver for receiving signals, data or messages from at least one of plurality product groups based on the categories of a multi-sensor detection device … a cell phone detection device …; | [The Google Pixel smartphone transceiver connects the Google "megapixel" Camera (i.e., multi-sensor detection device, or cell phone detection device) to the Google Pixel smartphone via Bluetooth] |
| the communication device is at least a … mobile communication device interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween; | [Golden has identified the Google smartphone(s) as "a communication device" and the Google "megapixel" Camera as the multi-sensor detection device or a cell phone detection device for wireless communication therebetween] |
| at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection, or GPS connection; | [The Google Pixel smartphone transceiver connects the Google "megapixel" Camera (i.e., multi-sensor detection device, or cell phone detection device) to the Google Pixel smartphone via Bluetooth] |

| wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection is capable of signal communication with the transmitter and the receiver of the communication device and transceivers of the products; | [The Google Pixel smartphone transceiver connects the Google "megapixel" Camera (i.e., multi-sensor detection device, or cell phone detection device) to the Google Pixel smartphone via Bluetooth] |
| --- | --- |

| The Google "megapixel" Camera is "Native" to the Manufacture of the Google Pixel Smartphone | |
| --- | --- |
| Patent No. 9,589,439 (Patent Claim 23 of Golden's '439 patent) | Google "megapixel Camera; embedded in the Google Pixel Smartphone, and interconnected for communication, therebetween |
| *A cell phone comprising* | [Golden has identified the Google smartphone(s) as "a new, useful, and improved upon cell phone" and the Google "megapixel" Camera as the multi-sensor detection device or a cell phone detection device] |
| a central processing unit (CPU) for executing and carrying out the instructions of a computer program; | [Golden has identified the Google "Tensor" as the CPU/Chipset for executing and carrying out instructions for the Google Pixel smartphone; the Google "Tensor" CPU/Chipset for executing and carrying out instructions for the Google "megapixel" Camera] |
| a transmitter for transmitting signals and messages to a cell phone detection device; | [The Google Pixel smartphone transceiver connects the Google "megapixel" Camera (i.e., multi-sensor detection device, or cell phone detection device) to the Google Pixel smartphone via Bluetooth] |

| a receiver for receiving signals from the cell phone detection device; | [The Google Pixel smartphone transceiver connects the Google "megapixel" Camera (i.e., multi-sensor detection device, or cell phone detection device) to the Google Pixel smartphone via Bluetooth] |
|---|---|
| the cell phone is at least a fixed, portable or mobile communication device interconnected to the cell phone detection device, capable of wired or wireless communication therebetween; | [Golden has identified the Google smartphone(s) as "a new, useful, and improved upon cell phone" and the Google "megapixel" Camera as the multi-sensor detection device or a cell phone detection device for wireless communication therebetween], |
| at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone | [Golden is identifying the Google "megapixel" Camera as the multi-sensor detection device or a cell phone detection device for CBRNE detection, that is embedded in the Google Pixel smartphone(s) as "a new, improved upon, and useful cell phone" or "communication device"] |
| at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection; | [The Google Pixel smartphone transceiver connects the Google "megapixel" Camera (i.e., multi-sensor detection device, or cell phone detection device) to the Google Pixel smartphone via Bluetooth] |
| wherein at least one of the satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency (RF) connection, short range radio frequency (RF) connection, or GPS connection is capable of signal communication with the transmitter or the receiver; | [The Google Pixel smartphone transceiver connects the Google "megapixel" Camera (i.e., multi-sensor detection device, or cell phone detection device) to the Google Pixel smartphone via Bluetooth] |
| wherein the cell phone is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan, or signature such that the cell phone is locked by the biometric lock disabler to prevent unauthorized use; | [Golden has identified the Google smartphone(s) fingerprint recognition and the Google "megapixel" Camera as having facial recognition. |

| The Google "megapixel" Camera is "Native" to the Manufacture of the Google Pixel Smartphone | |
|---|---|
| Patent No. 10,163,287 (Patent Claim 5 of Golden's '287 patent) | Google "megapixel Camera; embedded in the Google Pixel Smartphone, and interconnected for communication, therebetween |
| *A monitoring device, comprising*: | [Golden has identified the Google smartphone(s) as "a monitoring device" and the Google "megapixel" Camera as the multi-sensor detection device or a cell phone detection device] |
| at least one central processing unit (CPU); | [Golden has identified the Google "Tensor" as the CPU/Chipset for executing and carrying out instructions for the Google Pixel smartphone; the Google "Tensor" CPU/Chipset for executing and carrying out instructions for the Google "megapixel" Camera] |
| at least one of an internet connection or a Wi-Fi connection in communication with the at least one CPU; | [Golden has identified the Wi-Fi 7 (802.11be) with 2.4GHz+5GHz+6GHz,2x2+ 2x2 MIMO of the Google Pixel smartphone and the Google "megapixel" Camera that is in communication with the Google "Tensor" CPU/Chipset] |
| at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; | [Golden has identified the Bluetooth® v5.3 with dual antennas for enhanced quality of the Google Pixel smartphone and the Google "megapixel" Camera that is in communication with the Google "Tensor" CPU/Chipset] |
| at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU; | [Golden has identified the Google Pixel smartphone as an NFC-enabled device that communicates in one or both directions uses a frequency of 13.56 MHz in the globally available unlicensed radio frequency ISM band that is in communication with the Google "Tensor" CPU/Chipset] |

| | |
|---|---|
| at least one sensor for chemical, biological, or human detection in communication with the at least one CPU; | The Google Pixel smartphone is equipped with the ability to check a "human" heart rate i.e. the number of beats per minute with the smartphone camera, and the working camera flash unit that is in communication with the Google "Tensor" CPU/Chipset] |
| one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents | [Golden is identifying the Google "megapixel" Camera as the multi-sensor detection device or a cell phone detection device for CBRNE detection, that is in communication with the Google Pixel smartphone "Tensor" CPU/Chipset] |
| at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor … or send signals to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. | [Golden is identifying the Google Pixel smartphone(s), that is in communication with the Google "Tensor" CPU/Chipset, as "a monitoring device" or "communication device", interconnected to the Google "megapixel" Camera as the cell phone detection device capable of receiving signals or sending signals] |

# Exhibit G

# "REVERSED ENGINNEERING"

**Claim Chart of Induced Infringement with the Advertisement of Google's Android Open-Source Operating Systems [DTRA ATAK-MIL and Draper's ATAK-CIV]; and Contributory Infringement with Google's Pixel 6a, 7, 7a, 7 Pro, and Fold Smartphones.**

| DRAPER'S ATAK-CIVILIAN & DoD/DTRA ATAK-MILITARY | Patent #: 9,589,439; Independent Claim 19 | Patent #: 9,096,189; Independent Claim 7 |
|---|---|---|
|  Both Draper ATAK-CIV and DoD DTRA ATAK-MIL include chemical, biological, radiological, and nuclear (CBRN) plug-ins. Golden has demonstrated throughout the complaint how Google actively encouraged the infringement; and how Google knew that the acts they were doing constituted infringement; and as a result, Google actuated direct patent infringement by those encouraging acts. Golden's evidence proves the inducement ***resulted*** in direct infringement, not that the inducement was of a product that already directly infringes. | A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, radiological agent, or compound, comprising: | A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, or radiological agents and compounds, comprising: |
| **ATAK-CIVILIAN** Draper Laboratory, Inc. designed a CBRN Plugin to enable users to integrate CBRN sensors into TAK, collect CBRN sensor data, display it on a map and livestream it across the TAK network to other users. CBRN plugins for ATAK, are operational in the field. **ATAK-MILITARY** ATAK (built on the Android operating system) With DTRA … ATAK includes chemical, biological, radiological, and nuclear (CBRN) plug-ins. The Defense Threat Reduction Agency (DTRA) CBRN ISA: Seamlessly integrates information and control of multiple sensors into a single dashboard, making it easier to detect CBRN threats and monitor a warfighter's vitals https://thelastmile. gotennapro.com/four-useful-atak-app-plugins/ | a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human, or contraband agent or compound, capable of being disposed within, on, upon or adjacent a multi-sensor detection device; | a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human or contraband agents and compounds and capable of being disposed within, on, upon or adjacent a multi sensor detection device; |

| | | |
|---|---|---|
| Pursuant to 35 U.S.C. § 271(c), Google has contributed an element(s) [ at least that of Google Pixel 6a, 7, 7a, 7 Pro, or Fold] to the alleged infringing ATAK CBRNE Plugins of Draper Laboratory, Inc. and the Defense Threat Reduction Agency (DTRA).<br><br>Google is contributing to the infringement of independent claim 19 of Golden's '439 patent, and independent claim 7 of Golden's '189 patent.<br><br>ATAK (including CivTAK) is an Android smartphone [i.e., Google smartphone] geospatial infrastructure and situational awareness app https://www.civtak.org/atak-about/. ATAK can be downloaded to a phone, tablet, or handheld device.<br><br>ATAK-MIL is a government-off-the-shelf app for Android smartphones. The mobile broadband 4G LTE connection is able to facilitate the data throughput required for the operation of the ATAK. https://apps. dtic.mil/sti/pdfs/AD1069441.pdf<br><br>Golden has alleged Joint or Divided infringement between Google and Draper; and, Google and DTRA, because no single party carried out all the steps of Golden's patented inventions, that would constitute infringement. | monitoring equipment comprising at least one of a computer, personal computer (PC), laptop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone for at least one of a receipt or transmission of signals therebetween; | monitoring equipment comprising at least one of plurality product groups based on the categories of a computer, laptop, notebook PC, handheld, cell phone, PDA or smart phone for the receipt and transmission of signals therebetween; |
| Google Pixel 6a, 7, 7a, 7 Pro, and Fold smartphones connects to a cell tower or base station via radio waves, and that tower is usually physically connected to the infrastructure to send that data wherever it needs to go.<br><br>Draper designed a chemical, biological, radiological and nuclear (CBRN) Plugin to enable users to integrate CBRN sensors into TAK, collect CBRN sensor data, display it on a map and livestream it across the TAK network to other users. CBRN plugins for ATAK, WinTAK and WebTAK are operational in the field. https://www.draper.com/explore-solutions/tak | at least one cell phone tower interconnected to the monitoring equipment for sending signals thereto and receiving signals therefrom or at least one satellite capable of transmitting signals to the monitoring equipment; | at least one cell phone tower interconnected to the monitoring equipment for sending signals thereto and receiving signals therefrom or at least one satellite capable of transmitting signals to the monitoring equipment; |

| | | |
|---|---|---|
| The Android-based Google Pixel 6a, 7, 7a, 7 Pro, and Fold smartphones now contained integrated satellite on-the move capability, on-the-move mapping solutions, and a commercial laser range finder that significantly expanded the end-user range data flow and functionality. The Primary, Alternate, Contingency, and Emergency (PACE) communications architectures established was: • Primary communications structure (P): ATAK— 4G/LTE; Antenna: international [] satellite (INMARSAT) https://apps. dtic.mil/sti/pdfs/ AD1069441.pdf | at least one satellite or at least one cell phone tower capable of signal communication between the multi-sensor detection device and the monitoring equipment; | at least one satellite or at least one cell phone tower capable of signal communication between the multi sensor detection device and the monitoring equipment; |
| The internet connection is shared by many ATAK functions on the Google Pixel 6a, 7, 7a, 7 Pro, and Fold smartphone such as internet browsing, receiving email messages and installing apps. Wi-Fi is a method for devices such as the Google Pixel 6a, 7, 7a, 7 Pro, or Fold smartphones to connect wirelessly to the Internet using radio waves. | at least one internet connection capable of communication between the multi-sensor detection device and the monitoring equipment; | at least one internet connection capable of communication between the multi sensor detection device and the monitoring equipment; |
| Sit(x) is a commercial Server-as-a-Service solution based on the TAK platform developed by PAR Government for the U.S. Defense & Intelligence Community. Sit(x) has real-time communication and information sharing. With Sit(x), individuals and teams can communicate via personal computers and handheld mobile [Google smartphone] devices by voice or text. They can share real-time full-motion video (FMV), airborne/drone imagery, GPS locations, photos, and satellite imagery. Fully secure and compatible with ATAK, WinTAK, and iTAK. Sit(x) accessed via free downloadable gateway apps. | whereupon a signal sent to a receiver of the multi-sensor detection device from a satellite; or to a cell phone tower; or through at least one of a short-range radio frequency or a long-range radio frequency; causes a signal to be sent to the monitoring equipment that includes at least one of location data or sensor data; | whereupon a signal sent to a receiver of the multi sensor detection device from a satellite; or to a cell phone tower; or through short and/or long-range radio frequency; causes a signal to be sent to the monitoring equipment that includes location data and sensor data; |

| | | |
|---|---|---|
| The '439 & '189 patent specs: Product grouping (PG) 1 (storage & transportation); PG 2 (sensors); PG 3 (detector case; modified and adapted); PG 4 (monitoring & communication devices); PG 5 (communication methods); PG 6 (biometrics); and, PG 7 (authorized person) | wherein the monitoring equipment or multi-sensor detection device receives a signal via any of one or more products of any product grouping categories; | wherein the monitoring equipment or multi sensor detection device receives a signal via any of one or more products listed in any of the plurality of product grouping categories; |
| The Android-based [Google] Google Pixel 6a, 7, 7a, 7 Pro, and Fold smartphones now contained integrated satellite ...<br><br>Wi-Fi is a method for devices such as the Google Pixel 6a, 7, 7a, 7 Pro, or Fold smartphone to connect wirelessly to the Internet using radio waves...<br><br>The internet connection is shared by many ATAK functions on the Google Pixel 6a, 7, 7a, 7 Pro, or Fold smartphone such as internet browsing, receiving email messages; installing apps...<br><br>The Google Pixel 6a, 7, 7a, 7 Pro, or Fold smartphone connects to a cell tower or base station via radio waves, and that tower is usually physically connected to the infrastructure to send that data wherever it needs to go. | wherein at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency connection, or short-range radio frequency (RF) connection is capable of signal communication with the transmitter, a receiver of the monitoring equipment, the multi-sensor detection device, or transceivers of the products; | wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection is capable of signal communication with the transmitter and the receiver of the monitoring equipment or multi sensor detection device and transceivers of the products; |
| BIOMETRICS: Biometric factors allow for secure authentication on the Android platform. The Android framework includes face and fingerprint biometric authentication. Android can be customized to support other forms of biometric authentication (such as Iris).<br><br>ATAK (including CivTAK) is an Android smartphone [i.e., Google smartphone] geospatial infrastructure and situational awareness app https://www.civtak.org/atak-about/. ATAK can be downloaded to a phone, tablet, or handheld device. (Google Pixel 6a, 7, 7a, 7 Pro, or Fold smartphones) | wherein the monitoring equipment is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan or signature such that the monitoring device that is at least one of the computer, the laptop, the notebook, the PC, the handheld, the cell phone, the PDA, or the smart phone is locked by the biometric lock disabler to prevent unauthorized use; | wherein the monitoring equipment is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature such that the monitoring device that is at least one of the computer, the laptop, the notebook, the PC, the handheld, the cell phone, the PDA, or the smart phone is locked by the biometric lock disabler to prevent unauthorized use; |

| | | |
|---|---|---|
| The Android-based [Google] Google Pixel 6a, 7, 7a, 7 Pro, and Fold smartphones now contained integrated satellite ...<br><br>Wi-Fi is a method for devices such as the Google Pixel 6a, 7, 7a, 7 Pro, or Fold smartphone to connect wirelessly to the Internet using radio waves...<br><br>The internet connection is shared by many ATAK functions on the Google Pixel 6a, 7, 7a, 7 Pro, or Fold smartphone such as internet browsing, receiving email messages; installing apps...<br><br>The Google Pixel 6a, 7, 7a, 7 Pro, or Fold smartphone connects to a cell tower or base station via radio waves, and that tower is usually physically connected to the infrastructure to send that data wherever it needs to go. | wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, long range radio frequency, and short-range radio frequency (RF). | wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, and long and short-range radio frequency (RF). |

Both Draper ATAK-CIV and DoD DTRA ATAK-MIL include chemical, biological, radiological, and nuclear (CBRN) plug-ins. Golden has demonstrated throughout the complaint how Google actively encouraged the infringement; and how Google knew that the acts they were doing constituted infringement; and as a result, Google actuated direct patent infringement by those encouraging acts. Golden's evidence proves the inducement resulted in direct infringement, not that the inducement was of a product that already directly infringes.

Draper Laboratory, Inc. designed a CBRN Plugin to enable users to integrate CBRN sensors into TAK, collect CBRN sensor data, display it on a map and livestream it across the TAK network to other users. CBRN plugins for ATAK, are operational in the field.

# Exhibit H

## GOOGLE, NOT PLAINTIFF, IS RESPONSIBLE FOR THE MODIFICATIONS OF ITS OWN PRODUCTS AND THE PRODUCTS OF OTHERS TO OPERATE IN AN INFRINGING MANNER

Google's "capable of", "possible to alter", "modification of hardware", "do not infringe without modification", theories are without merit because Plaintiff's patent specifications and patent claims cover communication methods [software] for the integration of a detection means that is either in, on, upon, or adjacent the Google smartphone.

According to Google's theories, tens of thousands of issued patents are considered indefinite or unenforceable because hardware is being modified with the use of Bluetooth software, radio frequency (RF) software, Wi-Fi software, wireless cellular modem software, GPS software, software for the internet-of-things, software for controlling vehicle components, software for locking and unlocking locks, software for controlling drones, etc.; the list goes on.

Example: Plaintiff owns three (3) of the four (4) essential components for Google's smartphone sensing device. The host device smartphone; the central processing unit (CPU), and the smartphones camera used for CBR sensing. The only component Plaintiff have not directly written a patent claim on, but is covered in Plaintiff's patent specifications as a "transceiver" is the operating system.

Many inventions are not entirely new but instead build upon previous inventions and provide meaningful improvements. This might involve adding an element to an existing invention, putting an existing invention to a new and unexpected use, or invigorating an old product with a new form of technology. For example, adding a new technology to an old product occurred when companies started using microprocessors to control devices that had been controlled by analog circuitry. These companies succeeded in obtaining patents for the improved devices, which covered the differences between the original version and the new version.

There are two main types of improvement patents, which are known as addition inventions and substitution inventions. An addition invention adds a component that previously was not present in a product or process. A substitution invention replaces a certain product or process with a new product or process that is more efficient in accomplishing the same purpose.

Below, are a list of modifications Google has made to its 2008 cell phone that's covered by Plaintiff's patents. The individual charts describe each patented limitation that forms Plaintiff's Communicating, Monitoring, Detecting, and Controlling (CMDC) device. [i.e., Google's modified Pixel 6a, 7, 7a, 7pro & fold smartphones]

Google's open-source architecture allow scientist, engineers, developers, manufacturers, etc. to designed products, devices, and apparatuses to be integrated with and configured to operate and function with the host device.

I. Communicating, Monitoring, Detecting, and Controlling (CMDC) Device (i.e., smartphone) – Claim 23 of the '439 Patent

II. Central Processing Units for CMDC Device – Claim 5 of the '287 Patent
III. Camera CBR Sensor(s) for CMDC Device – Claim 4 of the '189 Patent
IV. Smartwatch CBR Detector for CMDC Device – Claim 19 of the '439 Patent
V. Embedded CBRN Sensors for CMDC Device – Claim 16 of the '439 Patent
VI. Interchangeable Sensors for CMDC Device – Claim 20 of the '439 Patent
VII. NFC CBR Tag for CMDC Device – Claim 21 of the '439 Patent
VIII. Remote/Electrical Lock for CMDC Device – Claim 125 of the '990 Patent
IX. Pre-Programmed Lock for CMDC Device – Claim 1 of the '287 Patent
X. Fingerprint / Face Recognition for CMDC Device – Claim 1 of the '619 Patent
XI. Stall, Stop, Slowdown for CMDC Device – Claim 11 of the '891 Patent
XII. Vehicle Monitoring with CMDC Device – Claim 44 of the '891 Patent
XIII. Connect Vehicle with CMDC Device – Claim 4 of the '287 Patent
XIV. Internet-of-Things (IoTs) with CMDC Device – Claim 11 of the '619 Patent

## I. Communicating, Monitoring, Detecting, and Controlling (CMDC) Device (i.e., smartphone) – Claim 23 of the '439 Patent



**Claim 14 of the '439 Patent** "Monitoring equipment of at least one of the products grouped together by common features in the product groupings category of design similarity (i.e., computer terminal, personal computer (PC), laptop, desktop, notebook, handheld, cell phone, PDA or smart phone) interconnected to a product for communication therebetween …

**Communicating, Monitoring, Detecting, and Controlling (CMDC) Device (i.e., smartphone)**

**Claim 23 of the '439 Patent**: "A cell phone comprising: a central processing unit (CPU) for executing and carrying out the instructions; … whereupon the cell phone is interconnected to the cell phone detection device to receive signals or send signals to lock or unlock doors, to activate or deactivate security systems … multi-sensor detection systems, or to activate or deactivate the cell phone detection device;

"In addition, the basic monitoring terminal or PC 114, as shown in FIGS. 5 and 15, can be adapted and incorporated to include desktop PCs, notebook PCs, laptops, cell phones, LCD monitors, and satellite monitoring… computers, laptops, notebooks, PC's, and cell phones for the receipt and transmission of signals

Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, …, wireless communication devices, monitoring sites, monitoring terminals, web servers, desktop personal computers (PCs), notebook personal computers (PCs), laptops, satellite phones, cell phones, … handhelds;

## II. Central Processing Units (CPUs) for CMDC Device – Claim 5 of the '287 Patent



Example: Google Tensor G2 uses the same 2+2+4 configuration that the Tensor G1 came with, but with a different set of mid-range cores. Thus, the Tensor G2 now comes with dual high-performance ARM Cortex-X1 cores, two mid-range Cortex-A78 cores, and finally, quad Cortex-A55 efficiency cores

**Central Processing Units (CPUs) for Smartphone**

**Claim 5 of the '287 Patent**: A monitoring device, comprising: at least one central processing unit (CPU) … at least one of a transmitter or a transceiver in communication with the at least one CPU configured to … send signals to control components of a vehicle, … or send signals to detect … chemical, biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. [**See also claims 4 & 6 of the '287 patent; and, claims 1 & 11 of the '619 patent**].

The "smartphone processor (CPU), also known as chipset, is a component that controls everything going on in your smart-phone and ensures it functions correctly. You can compare it to the brain of the human body. Every action you perform on your smartphone goes straight to the processor." https://www.coolblue.nl/en/advice/smartphone-processors. html. "[T]oday's smartphones all have processors or CPUs. A smartphone CPU (central processing unit) is the brains of the entire device. Without one, no smartphone would be able to function" (smartphonedomain.com., 2021).

## III. Camera CBR Sensor(s) for CMDC Device – Claim 4 of the '189 Patent







### Camera CBR Sensor(s) for Smartphone

Camera Sensor for Radiological Detection: How can a cell phone detect radioactivity? Cell phones have cameras and camera sensors react to radioactivity. High energy particles strike a sensor array and register as small bright pinpoints or thin streaks of light. An app … works well enough to alert users to dangerous levels of radiation.

Camera Sensor for Biological Detection: "In the diagnostic test, a patient sample is mixed with CRISPR Cas13 proteins (purple) and molecular probes (green) which fluoresce, or light up, when cut. Coronavirus RNA present, CRISPR proteins snip the molecular probes, whole sample to emit light. Fluorescence detected with a cell phone camera." (Image: Science at Cal).

Camera Sensor for Chemical Detection: The sensor *Rhevision* and UC San Diego responds to different chemicals by changing color; a single chip with many tiny pores, each respond to a different chemical; a standard cell-phone camera can detect them; the phone's camera watches the chip for color changes.

**Claim 4 of the '189 Patent**: A built-in, embedded multi sensor detection system … sensor array or fixed detection device into the product that detects agents …

## IV. Smartwatch CBR Detector for CMDC Device – Claim 19 of the '439 Patent



Homeland Security's Smartwatch Will Detect Nuclear Bombs https://www.popular-mechanics.com/military/research/a18161/homeland-security -smartwatch-detect-nuclear-bombs/

### Smartwatch CBR Detector for Smartphone

**Claim 19 of the '439 Patent**: A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, radiological agent, or compound, comprising: a plurality of sensors … capable of being disposed within, on, upon or adjacent a multi-sensor detection device.

The US Military's Latest Wearables [Smart Watch] Can Detect Illness Two Days Before You Get Sick https://www. defenseone.com/technology/2020/09/militarys-latest-wearables-can-detect-illness-two-days-you-get-sick/168664/

Studies reveal smartwatch biometrics can detect COVID-19: "smartwatches and other wearables measuring biometrics like heart-rate variability have the ability to detect if a person is COVID-19 positive" https://www.biometricupdate.com/202101/studies-reveal-smartwatch-biometrics-can-detect-covid-19-before-symptoms-surface

## V. Embedded CBRN Nanosensors for CMDC Device – Claim 16 of the '439 Patent



### Embedded CBRN Sensors for Smartphone (NASA)

**Claim 16 of the '439 Patent**: A built-in, embedded multi sensor detection system … a cell phone, a smart phone

A silicon-based sensing chip, which consists of 64 nanosensors can turn a cell phone into a *portable poison detector*. (NASA). "can turn your cellphone into a *portable "silent killer" detector* https://www. foxnews.com/tech/smartphones-take-on-silent-killers-as-portable-danger-detectors & Nuclear Radiation Nanosensors and Nanosensory Systems https://link.springer.com/book/10.1007/978-94-017-7468-0

## VI. Interchangeable Sensor Device for CMDC Device – Claim 20 of the '439 Patent



### Plurality of Interchangeable Sensor Device for Smartphone: (NASA & Subtractor George Yu)

**Claim 20 of the '439 Patent**: A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, radiological agents…

The system he developed with NASA for the DHS Cell-All project, George Yu of Genel Systems Inc., created his NODE+ platform. A cylinder that transmits data from sensors to smartphone. The NODE+ is compatible with Google Android smart devices.

## VII. NFC CBR Tag for CMDC Device – Claim 21 of the '439 Patent



MIT-- wirelessly detect hazardous gases by using a simple sensor made from near-field communication (NFC) tags that can be read by a smartphone… detect gaseous ammonia, hydrogen peroxide, and cyclohexanone, and other gases… Sensors. Retrieved from: https://phys.org/news/ 2014-12-cheap-sensor-transmit-hazardous-chemicals.html

### Near-Field Communication (NFC) CBR Tag for Smartphone (Safer than RFID tag)

**Claim 21 of the '439 Patent**: A multi-sensor detection system … at least one tag that is read by the monitoring equipment that is capable of wireless near-field communication

In November 2007, two Defense Department contractors, and a U.S. city's bomb squad demonstrated how an RFID tag could send a signal to … detonated a small amount of explosives in a container a simple emission of a radio signal traveling on the approved RFID 433 MHz frequency. Officials from the Defense Department and DHS observed the demonstration. https://www.nationaldefense-magazine.org/articles/2011 /2/1/2011february-military-supply-chain-tracking-system-both-inefficient-and-dangerous

## VIII. Remote/Electrical Lock Disabler for CMDC Device – Claim 125 of the '990 Patent



**Remote/Electrical Lock Disabler for Smartphone (Gov. Contractor iControl's MATTs & mLOCK)**

**Claim 125 of the '990 Patent**: A multi-sensor detection system … whereupon detection causes a signal to be sent to the at least one communication device followed by communicating with the internal or external remote/electrical lock disabler.

Marine Asset Tag Tracking System (MATTS) is a DHS initiative for "Smart Container". MATTS "gateway": a wireless electronic device that communicates with a sensor array; the communication device; and locking mechanism for locking status and GPS location. Internal /external sensors are interconnected to operate with the MATTS device and can detect gas concentrations, radiation, humidity and moisture, atmospheric pressure, etc. The mLOCK communicates bi-directionally using encrypted messages between the lock and the MATTs readers or mobile devices (i.e., smartphone)

## IX. Pre-Programmed Lock Disabler for CMDC Device – Claim 1 of the '287 Patent





"Monitoring equipment being capable of sending signals to engage (lock), disengage (unlock), or disable (make unavailable) at least one of a remote lock, an electrical lock, a mechanical lock, or automatic lock…"

**Pre-Programmed Lock Disabler for Smartphone**

Security feature: After several unsuccessful log-in attempts using a passcode or fingerprint, an Android or iOS device automatically locks itself up. If unable to log in after the security layers, the only option is to have the device unlocked. The wrong pin will launch to Account Login. On an Google Android or Apple Phone, multiple attempts (usually five attempts or more) with an unknown or a wrong pin will go either into a delay before further attempts are allowed …

FBI Failed Attempts to Unlock Phone: The FBI recovered an Apple iPhone 5C—owned by the San Bernardino County, California government—that had been issued to its employee Syed Rizwan Farook, one of the shooters involved in the December 2015 San Bernardino attack. The attack killed 14 people and seriously injured 22. The two attackers died four hours after the attack in a shootout with police ... Authorities were able to recover Farook's work phone, but could not unlock its four-digit passcode, and the phone was programmed to automatically delete all its data after ten failed password attempts (an anti-theft measure on smartphones).

**Claim 1 of the '287 Patent**: Monitoring equipment that is at least one … a lock disabling mechanism that is able to engage (lock), or disengage (unlock), or disable (make unavailable) the monitoring equipment after a specific number of tries;

## X. Fingerprint and Face Recognition for CMDC Device – Claim 1 of the '619 Patent



### Fingerprint and Face Recognition for Smartphone

**Claim 1 of the '619 Patent**: A communication device that is at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, comprising at least a central processing unit (CPU), capable of: processing instructions to authenticate or identify a user by at least one of biometric fingerprint recognition, biometric facial recognition, biometric iris recognition, or biometric retina recognition

## XI. Stall, Stop, or Vehicle Slowdown for CMDC Device – Claim 11 of the '891 Patent



Driverless car smartphones, authorizes the phone to control functions. Smartphones and driverless technology: instant braking for autonomous cars; sensors detect interference, obstacles and oncoming cars; instant breaks to avoid collisions.

### Stall, Stop, or Vehicle Slowdown for Smartphone

**Claim 11 of the '891 Patent**: A vehicle adapted for receipt of a signal from a remote location to control the vehicle's stall-to-stop means or vehicle slowdown means, comprising: at least one of a brake, a foot peddle, a radar, a camera, a navigational system, a light, a speed control, an ignition system, a steering wheel, a transmission, a fuel system, and a motor;

Remote Vehicle Shutdown is a system of remotely shutting down the connected vehicle, using radio pulses; intended for police, military and security use. Remotely find and disable stolen vehicles; ability to prevent engine start; prevent movement of a vehicle; stop or slow an operating vehicle; gradually decelerate a vehicle by downshifting, limiting the throttle capability; and, improve security of carriers of high-risk cargo, like hazardous materials. Security features that Remote Vehicle Shutdown provides. https://www.globenewswire.com/en/news-release/2019/12/17/1961557/0/en/Remote-Vehicle-Shutdown

## XII. Vehicle Monitoring with CMDC Device – Claim 44 of the '891 Patent



### Autonomous and Driverless Vehicle Monitoring with Smartphone

**Claim 44 of the '891 Patent**: A vehicles' stall-to-stop system or vehicle slowdown system in signal communication with a pre-programmed automated system is adapted, modified, or designed to control the vehicles' stall-to-stop means or vehicle slowdown means ... (Dep. 55) ... 44, further can be adapted, modified or designed to include a vehicle designed to perform as a driverless or autonomous vehicle ... in operation with or without a user, driver or operator inside the vehicle.

## XIII. Connect Vehicle with CMDC Device – Claim 4 of the '287 Patent



**Connect Vehicle with Smartphone**

**Claim 4 of the '287 Patent**: A monitoring device, comprising: at least one central processing unit (CPU) … at least one of a transmitter or a transceiver in communication with the at least one CPU configured to … send signals to lock or unlock doors, send signals to control components of a vehicle, … or send signals to detect … chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling.

CarLink™ is a Smartphone interface that allows you to start your vehicle, unlock your doors or pop the trunk from virtually any distance, or help you find your car in a large garage after a sporting event or a trip to the mall. *Compatible with iPhone, BlackBerry and Android *Remote Start Compatible *Door lock and unlock *Car find feature (horn honk and/or flashing lights) *Control trunk release or sliding door open)

## XIV. Internet-of-Things (IoTs) with CMDC Device – Claim 11 of the '619 Patent



The smartphone can be used as an IoT device for Personal emergency response, fitness tracking, location-based asset tracking, natural vision processing, and a Bluetooth gateway for wearable Bluetooth devices that enable many IoT monitoring apps. Also, identity verification, GPS based guidance, position/orientation awareness apps for smartphone-based implementation.

**Internet-of-Things (IoTs) with Smartphone**

**Claim 11 of the '619 Patent**: A central processing unit (CPU) of at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, capable of: processing instructions to connect the communication device to the internet or internet-of-things (IoTs) platform to sync, to at least one of a building's computer or security system, a vehicle's computer or security system, a lock, a detection device, or another communication device

The Internet-connected smartphones, can directly capture and compile data from as many as 14 different sensors:
Accelerometer, GPS, Gyroscope, Magnetometer, Biometrics, Camera, Barometer, Proximity Sensors, Bluetooth connectivity, Barcode readers, Touchscreen sensors, Heart rate monitor, ECG, Haptic feedback sensors

The IoTs contain computing hardware, including processors with embedded programming telling them what to do, sensors that gather various sorts of readings (such as temperature, motion, chemical levels, heart rate and body movement) and communication hardware that can send and receive signals.

# Exhibit I

## WHEN JUDGE RITA F. LIN UNLAWFULLY SEPERATED GOLDEN'S PATENTED INVENTION COMBINATION, THE JUDGE ALSO KNOWINGLY CHANGED THE CAUSES OF ACTION FOR THE ALLEGED INFRINGING PRODUCTS

Initially, Golden alleged Google's Pixel 5 smartphone directly infringed Golden's patents; Golden alleged the Google Android Open-Source Operating System platform is the device (software) Google used to induced the infringement of Golden's patents; and Qualcomm contributed to the infringement of Golden's patents with its Snapdragon CPU/Chipset that has no substantial non-infringing use.

Golden also informed the Court that DTRA ATAK software and Draper's CBRNE Plug-in Sensors combination also allegedly infringes Golden's patents, but a claim of direct infringement was not entered in this Court for or by Golden for lack of subject matter jurisdiction. A claim of direct infringement for the alleged patented combination should be made in the United States Court of Federal Claims.

Upon receiving notice that the Federal Circuit in *Larry Golden v. Google LLC*; Case No. 22-1267 "vacated and remanded" the case back to the District Court because the Federal Circuit determined that Google more likely than not, directly (literally) infringed Golden's patents, Google discontinued the making, using, offering for sell, and selling the of the Google Pixel 5 smartphones and selling the ATAK-MIL software from its Google Play store; and discontinued the contract with Qualcomm for its Snapdragon CPU/Chipset.

Judge Rita F. Lin immediately overstepped the jurisdiction of the Northern District of California and demanded Golden prove direct infringement of the ATAK software and Draper CBRNE Plug-in sensors under 28 U.S.C. § 1498(a) as a necessary predicate to proving direct infringement under 35 U.S.C. § 271(a). Which means proving the Government's ATAK infringe.

In complying with Judge Rita F. Lin's demand that Golden prove direct infringement of Golden's multi-sensor detection device(s) and/or Golden's cell phone detection device(s) of at least that of a CBRNE Smartwatch, a CBR Smartphone Camera, a CBR—NFC Smartphone Sensor, a CBR Smartphone Beacon, Smartphone Biosensors, and CBRNE Plug-in Sensors, Golden submitted to the Court a claim chart identifying the alleged infringement of Golden's patented inventions.

The claim chart in the previous sections of this document, illustrates how the Google Pixel smartphone series contributes to the infringement of Golden's multi-sensor detection device(s) and/or Golden's cell phone detection device(s) of at least that of a CBRNE Smartwatch, a CBR Smartphone Camera, a CBR—NFC Smartphone Sensor, a CBR Smartphone Beacon, Smartphone Biosensors, and CBRNE Plug-in Sensors. Golden only needs to show that the distinct and separate "components" has no substantial non-infringing use.

> Labeling it "an important, and previously unresolved, question," a 2-1 panel held that contributory infringement arises where sold devices (optical disc drives) "contain hardware or software components that have no substantial non-infringing use []," even though [the] device has other hardware and embedded software module that cannot be used to infringe—distinguishing *Hodosh* (Fed. Cir. 11/25/87) and relying on *Grokster* (U.S. 06/27/2005) ("one who distributes a device with the object of promoting its use to infringe [], as shown by clear expression or other affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties.") *Ricoh* (Fed. Cir. 12/23/08).
> *In re Bill of Lading* (Fed. Cir. 06/07/12) ("Where the product is equally capable of, and interchangeably capable of both infringing and substantial non-infringing uses, a claim for contributory infringement does not lie."; distinguishing *Ricoh*

The following claim chart was presented to Judge Rita F, Lin for an element-by-element analysis of products Google's alleged infringing smartphone product and how it functions with the Google Tensor CPU / Chipset designed to carry out the operational and functional instructions of the Google smartphone. Which means the Google Smartphone series and the Google Tensor CPU/Chipset; both contributes to the infringement of Golden's patents.

# Google's Tensor CPU/Chipset Directly Infringes Under the Doctrine of Equivalents

| Google Tensor; Tensor 2; and Tensor 3 | Patent #: 10,984,619; Independent Claim 1 | Patent #: 10,984,619; Independent Claim 11 |
|---|---|---|
|  **The Google Tensor (i.e. CPU; Chipset)** is considered the "brain" of the Smartphone, … | ***A communication device*** that is at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, comprising at least a central processing unit (CPU), capable of: | ***A central processing unit (CPU)*** of at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, capable of: |
| The Google Tensor (i.e. CPU; Chipset) is considered the "brain" of the Smartphone, capable of carrying out the operational and functional instructions of the Smartphone | processing instructions to lock, unlock, or disable the lock of the communication device; | processing instructions to lock, unlock, or disable the lock of the communication device; |
| The Google Tensor (i.e. CPU; Chipset) is considered the "brain" of the Smartphone, capable of carrying out the operational and functional instructions of the Smartphone | processing instructions to activate a lock, unlock, or disabling lock means by engaging a vehicle with a two-way communication key-fob; | processing instructions to activate a lock, unlock, or disabling lock means by engaging a vehicle with a two-way communication key-fob; |
| The Google Tensor (i.e. CPU; Chipset) is considered the "brain" of the Smartphone, capable of carrying out the operational and functional instructions of the Smartphone | processing instructions to activate a start, stall, stop, or disabling means by engaging a vehicle's ignition system; | processing instructions to activate a start, stall, stop, or disabling means by engaging a vehicle's ignition system; |

| | | |
|---|---|---|
| The Google Tensor (i.e. CPU; Chipset) is considered the "brain" of the Smartphone, capable of carrying out the operational and functional instructions of the Smartphone | processing instructions to activate a lock, unlock, or disabling lock means; a start, stall, stop, or disabling vehicle means by engaging the operational systems of the unmanned aerial vehicle; | processing instructions to activate a lock, unlock, or disabling lock means; a start, stall, stop, or disabling vehicle means by engaging the operational systems of the unmanned aerial vehicle; |
| The Google Tensor (i.e. CPU; Chipset) is considered the "brain" of the Smartphone, capable of carrying out the operational and functional instructions of the Smartphone | processing instructions to authenticate or identify a user by at least one of biometric fingerprint recognition, biometric facial recognition, biometric iris recognition, or biometric retina recognition; | processing instructions to authenticate or identify a user by at least one of biometric fingerprint recognition, biometric facial recognition, biometric iris recognition, or biometric retina recognition; |
| The Google Tensor (i.e. CPU; Chipset) is considered the "brain" of the Smartphone, capable of carrying out the operational and functional instructions of the Smartphone | processing instructions to scan a senor or tag using the short-range wireless technology of radio frequency near-field communication (NFC); | processing instructions to scan a senor or tag using the short-range wireless technology of radio frequency near-field communication (NFC); |
| The Google Tensor (i.e. CPU; Chipset) is considered the "brain" of the Smartphone, capable of carrying out the operational and functional instructions of the Smartphone | processing instructions to monitor or detect at least one of a chemical sensor, a biological sensor, a motion sensor, a biometric sensor, a signature sensor, or a human sensor; | processing instructions to monitor or detect at least one of a chemical sensor, a biological sensor, a motion sensor, a biometric sensor, a signature sensor, or a human sensor; |
| The Google Tensor (i.e. CPU; Chipset) is considered the "brain" of the Smartphone, capable of carrying out the operational and functional instructions of the Smartphone | processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs); | processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs); |

| | | |
|---|---|---|
| The Google Tensor (i.e. CPU; Chipset) is considered the "brain" of the Smartphone, capable of carrying out the operational and functional instructions of the Smartphone | processing instructions received through at least one of a Bluetooth, a Wi-Fi, a satellite, a global positioning system (GPS), or a cellular transmission; | processing instructions received through at least one of a Bluetooth, a Wi-Fi, a satellite, a global positioning system (GPS), or a cellular transmission; |
| The Google Tensor (i.e. CPU; Chipset) is considered the "brain" of the Smartphone, capable of carrying out the operational and functional instructions of the Smartphone | processing instructions to connect the communication device to the internet or internet-of-things (IoTs) platform to sync, to at least one of a building's computer or security system, a vehicle's computer or security system, a lock, a detection device, or another communication device; and, | processing instructions to connect the communication device to the internet or internet-of-things (IoTs) platform to sync, to at least one of a building's computer or security system, a vehicle's computer or security system, a lock, a detection device, or another communication device; and, |
| The Google Tensor (i.e. CPU; Chipset) is considered the "brain" of the Smartphone, capable of carrying out the operational and functional instructions of the Smartphone | whereupon, the communication device is capable of processing instructions for operational and functional execution, and is capable of providing feedback of the execution, and storing the feedback into memory. | whereupon, the central processing unit (CPU) of the communication device is capable of processing instructions for operational and functional execution, and is capable of providing feedback of the execution, and storing the feedback into memory. |

Judge Rita F. Lin and Google completely ignored Golden's claim that Google's Tensor, Tensor 2, and Tensor 3 CPU/Chipset allegedly infringes independent claims 4, 5, & 6 of Golden's '287, and independent claim 11, and dependent claims 12-20 of Golden's '619 patent. Dismissing the case without a jury trial to rule on Golden's claim that the Google Tensor Series CPU/Chipset allegedly infringes Golden patents is a clear-cut indication that Judge Rita F, Lin is bias in favor of Google and against Golden.

# Exhibit J

# THE GOOGLE SMARTWATCH

According to the Trial Court Judge, the standard communication modules (Bluetooth, Wi-Fi, Cellular, etc.) and the associated applications or software (CPU, SoC, Operating Systems (OS)) for carrying out the functional and operational instructions; are modifications to the smartphone and are therefore excluded from any patented inventive process.

When it comes to connectivity, smartwatches primarily rely on three main technologies: Bluetooth, Wi-Fi, and cellular. Each of these technologies offers a different range, impacting the distance a smartwatch can be from its paired smartphone or network.

Golden demonstrated the smartwatch as an "integral part" of the smartphone when connected by Bluetooth or Wi-Fi. Claim 5 of Golden's '287 patent that was reviewed by the Federal Circuit in *Golden v. Google LLC* Case No. 22-1267 has two claim limitations that can be satisfied with the Google smartwatch when paired with the Google smartphone. This level of functionality is accomplished by the smartphone and smartwatch processors; not modifications. (*Appx. I*)

| **Ind. Claim 5 limitation of the '287 Patent**<br><br>at least one sensor for chemical, biological, or human detection in communication with the at least one CPU;<br><br> | *Android Team Awareness Kit*, ATAK (built on the Android operating system) provides a single interface for viewing and controlling different CBRN-sensing technologies, whether that is a wearable smartwatch that measures a warfighter's vitals (e.g., heart rate) or a device mounted on a drone to detect chemical warfare agents.<br><br>Studies reveal smartwatch biometrics can detect COVID-19: "smartwatches and other wearables measuring biometrics like heart-rate variability have the ability to detect if a person is COVID-19 positive" https://www.biometricupdate.com/202101/studies-reveal-smartwatch-biometrics-can-detect-covid-19-before-symptoms-surface |
|---|---|
| **Ind. Claim 5 limitation of the '287 Patent**<br><br>one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents;<br><br> | *Android Team Awareness Kit*, ATAK (built on the Android operating system) is a digital application available to warfighters throughout the DoD. ATAK offers warfighters geospatial mapping for situational awareness during combat — on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK now includes chemical, biological, radiological, and nuclear (CBRN) plug-in sensors.<br><br>Homeland Security's Smartwatch Will Detect Nuclear Bombs https://www.popular-mechanics.com/military/research/a18161/homeland-security -smartwatch-detect-nuclear-bombs/ |

As demonstrated above and throughout these proceedings, the Google's smartwatch is configured for point-of-care Chem/Bio/Human detecting and sensing; as well as, hazardous CBRN detection and sensing. The Judge is quoted as saying Golden's "theories all require that the accused products be modified in some way for them to infringe on the patents-in-suit". This is an inventive step fabricated by the Judge and used against Golden only to dismiss his case.

There are tens of thousands of smartphone patents. Below are a few smartwatch patents that includes being paired to a smartphone. The patents have two things in common: 1- the smartphones are not modified to include the smartwatch; and; 2- the common denominator between the patents is that there operational and functional capabilities are achieved with the devices' CPUs, processors, microprocessors, etc.

The Judge failed to consider Golden's CPUs. In Golden's claim 5 of his '287 patent, all the claim limitations are linked to the device CPU, the same as the patents illustrated below.

(*Appx. II*) Patent No.: US 10,610,157 B2 Date of Patent: Apr. 7, 2020. "Wearable Electronic Device with Electrodes for Sensing Biological Parameters", Applicant: Apple Inc., Cupertino, CA (US):

"An electronic device, such as a watch ... A processor of the electronic device is operable to determine a biological parameter of the user ... The biological parameter may be an electrocardiogram ... Examples of input devices 102 include [] (e.g., cameras, visible light sensors, or invisible light sensors), proximity sensors, touch sensors, force sensors, [] vibration sensors orientation sensors, motion sensors (e.g., accelerometers or velocity sensors), location sensors (e.g., GPS devices), communication devices (e.g., wired or wireless communication devices), [] or some combination thereof ... a user may be notified upon downloading an app that their personal information data will be accessed [] ... Other electronic devices [] include other wearable electronic devices, other timekeeping devices, other health monitoring or fitness devices, other portable computing devices, mobile phones (including smartphones), tablet computing devices ... The processor 2510 can control some or all of the operations of the electronic device 2500. The processor 2510 can communicate, either directly or indirectly, with some or all of the components of the electronic device 2500. ... The processor 2510 can be implemented as any electronic device capable of processing, receiving, or transmitting data or instructions ... the processor 2510 can be a microprocessor, a central processing unit (CPU), an application-specific integrated circuit (ASIC), a digital signal processor (DSP), or combinations of such devices ... the term "processor" is meant to encompass a single processor or processing unit, multiple processors, multiple processing units, or other suitably configured computing element or elements. It should be noted that the components of the electronic device 2500 can be controlled by multiple processors" ...

83

(*Appx. III*) Patent No.: US 11,350,869 B2 Date of Patent: Jun. 7, 2022 "Electrocardiogram (ECG) Measurement on a Wrist-Worn Electronic Device. Applicant", Garmin Switzerland GmbH, Schaffhausen (CH):

"An electronic device worn, such as a wrist-worn watch, able to generate and display an ECG image associated with the wearer's heart ... may [] receive electrical bio signals (ECG signals) from the wearer ... bio signals may be received from the wearer [] to the ECG processing element 60 ... In the HRM mode, the system processing element 64 may [] present cardiac metrics such as values for heart rate, pulse oximetry, breathing rate, and heart rate variability... element 64 [] determine values of heart rate, breathing rate, heart rate variability ... In blood pressure mode, [] system processing [] 64 may calculate or determine an estimated blood pressure ... may communicate with smartphones 28, tablets, laptop or desktop computers [] ... In various embodiments, [] the communication element 42 may include a transceiver for each protocol ... such as Bluetooth TM, Wi-Fi ... other electronic devices, such as the smartphone 28, the tablet, the laptop, or the desktop computer 30, or commu- nication network interfaces ... determine a current geolocation [] by receiving and processing radio frequency (RF) ... signals from a global [] positioning system (GPS) ... element 64 include electronic hardware components such as processors, microprocessors (single-core or multi-core) ... system processing 64 may generally execute, process, or run instructions, code, code segments, code statements, software, firmware, programs ... system processing 64 may be in communication with the other electronic components ... element 64 may include a heart rate monitor" ...

(*Appx. IV*) Patent No.: US11,717,176 B2 Date of Patent: Aug. 8, 2023. "Smartwatch-type Individual Medical Monitoring Device and Method for Individual Medical Monitoring of a User Thereof", Applicant: Samira Kerrouche and Hayame Bouyahia

"A smartwatch-type individual medical monitoring device ... The processor is configured to: acquire the measured data of the three sensors, analyze the measured oxygen level, analyze the number of measured vibrations of the blood flow, analyze the measured ascending and descending blood flows, output detection of an anomaly based on analysis of oxygen level, heart rate and ascending and descending blood flows, and store the measured data of the three sensors. A computer program product downloadable from a communication network executable by a microprocessor of a computer or mobile terminal, comprising program code [] for implementing the individual medical monitoring method ... A computer program product recorded on a microprocessor-readable non-transitory medium executable by a microprocessor of a computer or mobile terminal, comprising program code instructions for implementing the individual medical monitoring method ... The smartwatch-type medical monitoring device of claim 1, further comprising at least one of the following sensors: a geolocation sensor, a blood glucose level sensor and a temperature sensor ... transmitting the alert message to said at least one predetermined contact via a communications device" ...

If the Trial Court Judge non-infringement theories of "modification" is allowed to stand, the precedence set automatically invalidates tens of thousands of smartphone patents.

# DIRECT INFRINGEMENT

The first smartphone design was issued in a Dept. of Homeland Security solicitation: DHS S&T BAA017-10 *Cell-All Ubiquitous Biological & Chemical Sensing* (2007). The goal was to develop the first smartphone for 300 million consumers to use as a detection or CBRNE sensing device.

Therefore, the smartphone, then and now, is ***configured to*** detect for CBRNE&H. Google provided three of the four OEMs [Samsung, LG, and Qualcomm] selected to assemble and commercialize the new, improved upon, and useful cell phone with the Google Android Operating System beginning in year 2008 and through this date.

Google and the other OEMs [including Apple] motive to assemble and commercialize the smartphone sensing device under contract for the Government, was to avoid infringement liability. It wasn't until 2019 that the Government declared the OEMs were not performing this work for the Government.

Rhevision was one of eight of the contractors chosen to assemble and commercialize the smartphone with a camera that detects for CBR. Which means the smartphone from the very beginning, is "***configured to***" sense for CBRNE. My claims do not specifically call for the camera, but they do call for a [camera] sensor "***configured to***" detect for CBRNE. The phrase "***configured to***" is sometimes construed broadly to mean that a device is "capable of" or "suitable for" performing a function. *See, e.g., TQ Delta LLC v. Adtran, Inc.*, No. 1:14-cv-954-RGA, 2021 WL 1200595 ("***configured to***" means "includes the necessary hardware and software for performing the functionality recited in the claim without the need to rebuild, rewrite or recompile the code for, or redesign any hardware or software").

Claims 4, 5, & 6 of Golden's Patent No. 10,163,287 [the '287 patent] claims a "communication device", "monitoring device", and, "monitoring equipment", that comprises: "at least one of a transmitter or a transceiver [operating system] in communication with the at least one CPU ***configured to*** send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or send signals to detect at least one of a chemical, biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling."

## The Google "megapixel" Camera is "Native" to the Manufacture of the Google Pixel Smartphone and is an "Integral" Part of the Google Pixel Smartphone

| Patent No. 10,163,287 (Patent Claim 5 of Golden's '287 patent) | Google "megapixel Camera; embedded in the Google Pixel Smartphone, and interconnected for communication, therebetween |
|---|---|
| *A monitoring device, comprising*: | [Golden has identified the Google smartphone(s) as "a monitoring device" and the Google "megapixel" Camera as the multi-sensor detection device or a cell phone detection device] |
| at least one central processing unit (CPU); | [Golden has identified the Google "Tensor" as the CPU/Chipset for executing and carrying out instructions for the Google Pixel smartphone; the Google "Tensor" CPU/Chipset for executing and carrying out instructions for the Google "megapixel" Camera] |
| at least one of an internet connection or a Wi-Fi connection in communication with the at least one CPU; | [Golden has identified the Wi-Fi 7 (802.11be) with 2.4GHz+5GHz+6GHz,2x2+ 2x2 MIMO of the Google Pixel smartphone and the Google "megapixel" Camera that is in communication with the Google "Tensor" CPU/Chipset] |
| at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; | [Golden has identified the Bluetooth® v5.3 with dual antennas for enhanced quality of the Google Pixel smartphone and the Google "megapixel" Camera that is in communication with the Google "Tensor" CPU/Chipset] |
| at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU; | [Golden has identified the Google Pixel smartphone as an NFC-enabled device that communicates in one or both directions uses a frequency of 13.56 MHz in the globally available unlicensed radio frequency ISM band that is in communication with the Google "Tensor" CPU/Chipset] |

| | |
|---|---|
| at least one sensor for chemical, biological, or human detection in communication with the at least one CPU; | The Google Pixel smartphone is equipped with the ability to check a "human" heart rate i.e. the number of beats per minute with the smartphone camera, and the working camera flash unit that is in communication with the Google "Tensor" CPU/Chipset] |
| one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents | [Golden is identifying the Google "megapixel" Camera as the multi-sensor detection device or a cell phone detection device for CBRNE detection, that is in communication with the Google Pixel smartphone "Tensor" CPU/Chipset] |
| at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor … or send signals to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. | [Golden is identifying the Google Pixel smartphone(s), that is in communication with the Google "Tensor" CPU/Chipset, as "a monitoring device" or "communication device", interconnected to the Google "megapixel" Camera as the cell phone detection device capable of receiving signals or sending signals] |

## **JOINT or DIVIDED INFRINGEMENT**

### **GOLDEN ALLEGES GOOGLE IS THE ONE PARTY THAT EXERCISES THE REQUISITE 'DIRECTION OR CONTROL' OVER THE DoD/DTRA AND DRAPER LABORATORIES, INC.'S PERFORMANCE**

A claim of joint infringement thus requires pleading facts sufficient to allow a reasonable inference that all steps of the claimed method are performed and either (1) one party exercises the requisite "direction or control" over the others' performance, or… *Lyda v. CBS Corp.*, No. 15-1923 (Fed. Cir. 2016).

Golden has successfully pleaded that Google directs or controls the DTRA and Draper's performance of the claimed method and has sufficiently demonstrated Google: (1) "conditions participation with its 'Google Android Open-Source Operating System' in an activity or receipt of a benefit upon others' performance of one or more steps of [the] patented method"; and (2) "establishes the manner [integration of software and hardware] or timing of that performance."

87

*IOENGINE, LLC v. PayPal Holdings, Inc.*, Civil Action No. 18-452-WCB, Civil Action No. 18-826-WCB, 2019 WL 330515, at *1 (D. Del. Jan. 25, 2019)

The Federal Circuit on 09/08/2022, in *Larry Golden v. Google LLC*; Case No. 22-1267 — "VACATED AND REMANDED" the relevant Case No: 22-1267 Document 15; back to the District Court "to be filed and request service of process".

The Federal Circuit determined the complaint, "includes a detailed claim chart mapping features of an accused product, the Google Pixel 5 Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189" … "in a relatively straightforward manner" … and that the [Circuit] "express no opinion as to the adequacy of the complaint or claim chart except that it is not facially frivolous."

> "Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the Google Pixel 5 Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189 … It [claim chart] attempts [] to map claim limitations to infringing product features, and it does so in a relatively straightforward manner …[W]e conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart. Mr. Golden has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart.…"

The Federal Circuit's decision ideally identified two forms of combinations that results in direct infringement. The first combination is when the new, improved upon, and useful Google cell phone (i.e., smartphone) is "***configured to***" "include the necessary hardware [Draper's CBRNE Plug-in sensors] and software [DTRA ATAK software] for performing the functionality recited in the claim without the need to of modification. The second combination, "joint or divided infringement", the Federal Circuit in *BMC Resources, Inc. v. Paymentech, L.P* 498 F.3d 1373 (Fed. Cir. 2007), writes: "A [Google] party cannot avoid infringement, [] simply by contracting out steps of a patented process to another entity. In those cases, the party in control would be liable for direct infringement." "[W]here the actions of multiple parties combine to perform every step of a claimed method, the claim is directly infringed if one party exercises 'control or direction' over the entire process such that every step is attributable to the controlling party, i.e., the 'mastermind.'" *Muniauction v. Thompson Corp.* 532 F.3d 1318 (Fed. Cir. 2008)

Relevant "elements" and "limitations" of the Claim Chart is asserted below:

| Google Pixel 5 Smartphone | Patent #: 10,163,287; Independent Claim 5 | Patent #: 9,589,439; Independent Claim 23 | Patent #: 9,096,189; Independent Claim 1 |
|---|---|---|---|
|  | A monitoring device, comprising: | A cell phone comprising: | A communication device of at least one of a cell phone, a smart phone, a desktop, a handheld, a PDA, a laptop, or a computer terminal for monitoring products, interconnected to a product for communication therebetween, comprising: |
| CPU: Octa-core (1 × 2.4 GHz Kryo 475 Prime & 1 × 2.2 GHz Kryo 475 Gold & 6 × 1.8 GHz Kryo 475 Silver) System-on-a-chip: Qualcomm Snapdragon 765G | at least one central processing unit (CPU); | a central processing unit (CPU) for executing and carrying out the instructions of a computer program; | at least one of a central processing unit (CPU) for executing and carrying out the instructions of a computer program, ... for communication between a host computer and other devices; |
| *Android Team Awareness Kit, ATAK* (built on the Android operating system) provides a single interface for viewing and controlling different [Draper Laboratories, Inc.] CBRN-sensing technologies, whether that is a wearable smartwatch that measures a warfighter's vitals (e.g., heart rate) or a device mounted on a drone to detect chem warfare agents. | at least one sensor for chemical, biological, or human detection in communication with the at least one CPU; | the cell phone is at least a fixed, portable or mobile communication device interconnected to the cell phone detection device, capable of wired or wireless communication therebetween; and | the communication device is at least a fixed, portable or mobile communication device interconnected to a fixed, portable or mobile product, capable of wired or wireless communication therebetween... |

| | | | |
|---|---|---|---|
| *Android Team Awareness Kit*, ATAK (built on the Android operating system) is a digital application available to warfighters throughout the DoD. ATAK offers warfighters geospatial mapping for situational awareness during combat — on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK now includes [Draper's] chemical, biological, radiological, and nuclear (CBRN) plug-ins. | one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents; | at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone; | wherein the communication device receives a signal via any of one or more products listed in any of the plurality of product grouping categories; |
| Google Nest × Yale Lock is connected to the Nest app; you can lock or unlock your door from your phone.<br><br>*Android Team Awareness Kit*, ATAK (built on the Android operating system) provides a single interface for viewing and controlling different [Draper Laboratories, Inc.] CBRN-sensing technologies | at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or... detect at least one of a chemical biological... agent such that the communication device is capable of communicating, monitoring, detecting, and controlling. | a transmitter for transmitting signals and messages to a cell phone detection device; a receiver for receiving signals from the cell phone detection device; | a transmitter for transmitting signals and messages to at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device;<br><br>a receiver for receiving signals, data or messages from at least one of plurality product groups based on the categories of a multi-sensor detection device, a maritime cargo container, a cell phone detection device, or a locking device; |

| | | | |
|---|---|---|---|
| Google Nest × Yale Lock is connected to the Nest app; you can lock or unlock your door from your phone.<br><br>*Android Team Awareness Kit*, ATAK (built on the Android operating system) … for viewing and controlling different [Draper Laboratories, Inc.] CBRN-sensing technologies | X | X | whereupon the communication device, is interconnected to a product equipped to receive signals from or send signals to lock or unlock doors, activate or deactivate security systems, activate or deactivate multi-sensor detection systems, or to activate or deactivate cell phone detection systems |
| *Android Team Awareness Kit*, ATAK (built on the Android operating system) is a digital application available to warfighters throughout the DoD. ATAK []— on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK now includes [Draper Laboratories, Inc.] chem, bio, rad, nuclear (CBRN) plug-ins. | X | a transmitter for transmitting signals and messages to a cell phone detection device; a receiver for receiving signals from the cell phone detection device; | wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection… short range radio frequency (RF) [] signal communication with the transmitter and the receiver of the [] device and transceivers of the products; |
| *Android Team Awareness Kit*, ATAK (built on the Android operating system) is a digital application available to warfighters throughout the DoD. ATAK [] on an end-user device such as a smartphone or a tablet. With DTRA's contribution, ATAK now includes chem, bio, rad, and nuclear (CBRN) plug-ins. | X | whereupon a signal sent to the receiver of the cell phone detection device from at least one of the chemical sensor, the biological sensor, the explosive sensor, the human sensor, the contraband sensor, or the radiological sensor, causes a signal that includes at least one of location data or sensor data to be sent to the cell phone. | X |

# CONTRIBUTORY INFRINGEMENT:

## GOLDEN ALLEGES GOOGLE "CONTRIBUTES" AT LEAST THE GOOGLE PIXEL 8 SMARTPHONE TO THE INFRINGEMENT OF HIS PATENTS

"2-1 panel held that contributory infringement arises where sold devices "contain hardware or software components that have no substantial noninfringing use other than to practice [the] claimed methods," even though device has other hardware and embedded software module that cannot be used to infringe—distinguishing *Hodosh* (Fed. Cir. 11/25/87) and relying on *Grokster* (U.S. 06/27/2005) ("one who distributes a device with the object of promoting its use to infringe [], as shown by [] affirmative steps taken to foster infringement, is liable for the resulting acts of infringement by third parties.") *Ricoh* (Fed. Cir. 12/23/08). May apply only if the "infringing" component is "distinct" and "separable" from other components.

| Google's "Cell Phone Detection Devices" | Patent #: 9,589,439; Independent Claim 19 | Patent #: 9,096,189; Independent Claim 7 |
|---|---|---|
| CBRNE Smartwatch, CBR Smartphone Camera, CBR—NFC Smartphone Sensors CBR Smartphone Beacon (Bluetooth) Smartphone Biosensors CBRNE Plug-in Sensors | A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, radiological agent, or compound, comprising: | A multi-sensor detection system for detecting at least one explosive, nuclear, contraband, chemical, biological, human, or radiological agents and compounds, comprising: |
| CBRNE Smartwatch, CBR Smartphone Camera, CBR—NFC Smartphone Sensors CBR Smartphone Beacon (Bluetooth) Smartphone Biosensors CBRNE Plug-in Sensors | a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human, or contraband agent or compound, capable of being disposed within, on, upon or adjacent a multi-sensor detection device; | a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human or contraband agents and compounds and capable of being disposed within, on, upon or adjacent a multi sensor detection device; |

| | | |
|---|---|---|
| The Smartphones and Smartwatches of Google, Qualcomm, LG, Apple, and Samsung; and, the Laptops, Tablets, and Desktop PCs of Intel and Samsung | monitoring equipment comprising at least one of a computer, personal computer (PC), laptop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone for at least one of a receipt or transmission of signals therebetween; | monitoring equipment comprising at least one of plurality product groups based on the categories of a computer, laptop, notebook, PC, handheld, cell phone, PDA or smart phone for the receipt and transmission of signals therebetween; |
| The Smartphone(s) [Google Pixel 8] connects to a cell tower or base station via radio waves, and that tower is usually physically connected to the infrastructure to send that data wherever it needs to go. Satellite communication on smartphones. The iPhone 14 is the first smartphones widely available in the market that support satellite connectivity. Android 15 extends platform support for satellite connectivity. The platform now has UI elements that are needed to "ensure a consistent user experience across the satellite connectivity landscape." | at least one cell phone tower interconnected to the monitoring equipment for sending signals thereto and receiving signals therefrom or at least one satellite capable of transmitting signals to the monitoring equipment; | at least one cell phone tower interconnected to the monitoring equipment for sending signals thereto and receiving signals therefrom or at least one satellite capable of transmitting signals to the monitoring equipment; |
| The Smartphone(s) [Google Pixel 8] connects to a cell tower or base station via radio waves, and that tower is usually physically connected to the infrastructure to send that data wherever it needs to go. Satellite communication on smartphones. The iPhone 14 is the first smartphones widely available in the market that support satellite connectivity. Android 15 extends platform support for satellite connectivity. The platform now has UI elements that are needed to "ensure a consistent user experience across the satellite connectivity landscape." | at least one satellite or at least one cell phone tower capable of signal communication between the multi-sensor detection device and the monitoring equipment; | at least one satellite or at least one cell phone tower capable of signal communication between the multi sensor detection device and the monitoring equipment; |

| | | |
|---|---|---|
| The internet connection is shared by many smartphone functions on the Google Pixel 8 smartphone such as internet browsing, receiving email messages and installing apps. Wi-Fi is a method for devices such as the Google Pixel 8 smartphone to connect wirelessly to the Internet using radio waves. | at least one internet connection capable of communication between the multi-sensor detection device and the monitoring equipment; | at least one internet connection capable of communication between the multi sensor detection device and the monitoring equipment; |
| Sit(x) is a commercial Server-as-a-Service solution based developed by PAR Government for the U.S. Defense & Intelligence Community. Sit(x) has real-time communication and information sharing. With Sit(x), individuals and teams can communicate via personal computers and handheld mobile [Google Pixel 8 smartphone] devices by voice or text. They can share real-time full-motion video (FMV), airborne/drone imagery, GPS locations, photos, and satellite imagery. | whereupon a signal sent to a receiver of the multi-sensor detection device from a satellite; or to a cell phone tower; or through at least one of a short-range radio frequency or a long-range radio frequency; causes a signal to be sent to the monitoring equipment that includes at least one of location data or sensor data; | whereupon a signal sent to a receiver of the multi sensor detection device from a satellite; or to a cell phone tower; or through short and/or long-range radio frequency; causes a signal to be sent to the monitoring equipment that includes location data and sensor data; |
| The '287, '439 & '189 patent specs: Product grouping (PG) 1 (storage & transportation); PG 2 (sensors); PG 3 (detector case; modified and adapted); PG 4 (monitoring & communication devices); PG 5 (communication methods); PG 6 (biometrics); and, PG 7 (authorized person) | wherein the monitoring equipment or multi-sensor detection device receives a signal via any of one or more products of any product grouping categories; | wherein the monitoring equipment or multi sensor detection device receives a signal via any of one or more products listed in any of the plurality of product grouping categories; |

| | | |
|---|---|---|
| The Android-based [Google] smartphone[s] now contained integrated satellite …<br><br>Wi-Fi is a method for Google Pixel 8 smartphone to connect wirelessly to the Internet using radio waves…<br><br>The internet connection is shared by many functions on the Google Pixel 8 smartphone such as internet browsing, email messaging; installing apps…<br><br>The Google Pixel 8 phone connects to a cell tower or base station via radio waves, and that tower is usually physically connected to the infrastructure to send that data… | wherein at least one of a satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long range radio frequency connection, or short-range radio frequency (RF) connection is capable of signal communication with the transmitter, a receiver of the monitoring equipment, the multi-sensor detection device, or transceivers of the products; | wherein at least one satellite connection, Bluetooth connection, WiFi connection, internet connection, radio frequency (RF) connection, cellular connection, broadband connection, long and short-range radio frequency (RF) connection is capable of signal communication with the transmitter and the receiver of the monitoring equipment or multi sensor detection device and transceivers of the products; |
| BIOMETRICS: Biometric factors allow secure authentication on the Google Android platform. The Google Android framework includes face and fingerprint biometric authentication.<br><br>The Smartphones and Smartwatches of Google, Qualcomm, LG, Apple, and Samsung; and, the Laptops, Tablets, and Desktop PCs of Intel and Samsung | wherein the monitoring equipment is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan or signature such that the monitoring device that is at least one of the computer, the laptop, the notebook, the PC, the handheld, the cell phone, the PDA, or the smart phone is locked by the biometric lock disabler to prevent unauthorized use; | wherein the monitoring equipment is equipped with a biometric lock disabler that incorporates at least one of a fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature such that the monitoring device that is at least one of the computer, the laptop, the notebook, the PC, the handheld, the cell phone, the PDA, or the smart phone is locked by the biometric lock disabler to prevent unauthorized use; |

| | | |
|---|---|---|
| The Android-based [Google] smartphone[s] now contained integrated satellite …<br><br>Wi-Fi is a method for devices such as the Google Pixel 8 smartphone to connect wirelessly to the Internet using radio waves…<br><br>The internet connection is shared by many ATAK functions on the Google Pixel 8 smartphone such as internet browsing, receiving email messages; installing apps…<br><br>The Google Pixel 8 phone connects to a cell tower or base station via radio waves, and that tower is usually physically connected to the infrastructure to send that data wherever it needs to go. | wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, long range radio frequency, and short-range radio frequency (RF). | wherein the only type or types of communication with the transmitter and the receiver of the communication device and transceivers of the products is a type or types selected from the group consisting of satellite, Bluetooth, WiFi, internet, radio frequency (RF), cellular, broadband, and long and short-range radio frequency (RF). |

"Whoever [Google LLC] offers to sell or sells within the United States [] a component [Google Pixel 8 smartphone] of a [] combination [] or apparatus for use in practicing a patented process, constituting a ***material part*** of the invention, knowing the same to be especially made or especially adapted for use in an infringement of such patent, and not a staple article or commodity of commerce suitable for substantial noninfringing use, shall be liable as a contributory infringer." *35 U.S.C. § 271(c)*.

As this is a "contributory" liability doctrine, there must be a direct infringement for there to be Sec. 271(c) liability. As noted in the above chart, Golden alleged the multi-sensor detection systems of a CBRNE Smartwatch, a CBR Smartphone Camera, a CBR—NFC Smartphone Sensor, a CBR Smartphone Beacon, Smartphone Biosensors, and CBRNE Plug-in Sensors allegedly directly infringes Golden's patents. Google contributes its Google Pixel Smartphone.

# THE DOCTRINE OF EQUIVALENTS

**GOOGLE'S TENSOR CPU ALLEGEDLY PERFORMS THE SAME FUNCTION; IN THE SAME WAY; TO ACHIEVE THE SAME RESULT**

| Google Tensor; Tensor 2; and Tensor 3 | Patent #: 10,984,619; Independent Claim 1 | Patent #: 10,984,619; Independent Claim 11 |
|---|---|---|
|  **The Google Tensor (i.e. CPU; Chipset)** is considered the "brain" of the Smartphone, … | *A communication device* that is at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, comprising at least a central processing unit (CPU), capable of: | *A central processing unit (CPU)* of at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, capable of: |
| The Google Tensor (i.e. CPU; Chipset) is considered the "brain" of the Smartphone, capable of carrying out the operational and functional instructions of the Smartphone | processing instructions to lock, unlock, or disable the lock of the communication device; | processing instructions to lock, unlock, or disable the lock of the communication device; |
| The Google Tensor (i.e. CPU; Chipset) is considered the "brain" of the Smartphone, capable of carrying out the operational and functional instructions of the Smartphone | processing instructions to activate a lock, unlock, or disabling lock means by engaging a vehicle with a two-way communication key-fob; | processing instructions to activate a lock, unlock, or disabling lock means by engaging a vehicle with a two-way communication key-fob; |
| The Google Tensor (i.e. CPU; Chipset) is considered the "brain" of the Smartphone, capable of carrying out the operational and functional instructions of the Smartphone | processing instructions to activate a start, stall, stop, or disabling means by engaging a vehicle's ignition system; | processing instructions to activate a start, stall, stop, or disabling means by engaging a vehicle's ignition system; |

| | | |
|---|---|---|
| The Google Tensor (i.e. CPU; Chipset) is considered the "brain" of the Smartphone, capable of carrying out the operational and functional instructions of the Smartphone | processing instructions to activate a lock, unlock, or disabling lock means; a start, stall, stop, or disabling vehicle means by engaging the operational systems of the unmanned aerial vehicle; | processing instructions to activate a lock, unlock, or disabling lock means; a start, stall, stop, or disabling vehicle means by engaging the operational systems of the unmanned aerial vehicle; |
| The Google Tensor (i.e. CPU; Chipset) is considered the "brain" of the Smartphone, capable of carrying out the operational and functional instructions of the Smartphone | processing instructions to authenticate or identify a user by at least one of biometric fingerprint recognition, biometric facial recognition, biometric iris recognition, or biometric retina recognition; | processing instructions to authenticate or identify a user by at least one of biometric fingerprint recognition, biometric facial recognition, biometric iris recognition, or biometric retina recognition; |
| The Google Tensor (i.e. CPU; Chipset) is considered the "brain" of the Smartphone, capable of carrying out the operational and functional instructions of the Smartphone | processing instructions to scan a senor or tag using the short-range wireless technology of radio frequency near-field communication (NFC); | processing instructions to scan a senor or tag using the short-range wireless technology of radio frequency near-field communication (NFC); |
| The Google Tensor (i.e. CPU; Chipset) is considered the "brain" of the Smartphone, capable of carrying out the operational and functional instructions of the Smartphone | processing instructions to monitor or detect at least one of a chemical sensor, a biological sensor, a motion sensor, a biometric sensor, a signature sensor, or a human sensor; | processing instructions to monitor or detect at least one of a chemical sensor, a biological sensor, a motion sensor, a biometric sensor, a signature sensor, or a human sensor; |
| The Google Tensor (i.e. CPU; Chipset) is considered the "brain" of the Smartphone, capable of carrying out the operational and functional instructions of the Smartphone | processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs); | processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs); |

| The Google Tensor (i.e. CPU; Chipset) is considered the "brain" of the Smartphone, capable of carrying out the operational and functional instructions of the Smartphone | processing instructions received through at least one of a Bluetooth, a Wi-Fi, a satellite, a global positioning system (GPS), or a cellular transmission; | processing instructions received through at least one of a Bluetooth, a Wi-Fi, a satellite, a global positioning system (GPS), or a cellular transmission; |
|---|---|---|
| The Google Tensor (i.e. CPU; Chipset) is considered the "brain" of the Smartphone, capable of carrying out the operational and functional instructions of the Smartphone | processing instructions to connect the communication device to the internet or internet-of-things (IoTs) platform to sync, to at least one of a building's computer or security system, a vehicle's computer or security system, a lock, a detection device, or another communication device; and, | processing instructions to connect the communication device to the internet or internet-of-things (IoTs) platform to sync, to at least one of a building's computer or security system, a vehicle's computer or security system, a lock, a detection device, or another communication device; and, |
| The Google Tensor (i.e. CPU; Chipset) is considered the "brain" of the Smartphone, capable of carrying out the operational and functional instructions of the Smartphone | whereupon, the communication device is capable of processing instructions for operational and functional execution, and is capable of providing feedback of the execution, and storing the feedback into memory. | whereupon, the central processing unit (CPU) of the communication device is capable of processing instructions for operational and functional execution, and is capable of providing feedback of the execution, and storing the feedback into memory. |

Judge Rita F. Lin and Google completely ignored Golden's claim that Google's Tensor, Tensor 2, and Tensor 3 CPU/Chipset allegedly infringes independent claims 4, 5, & 6 of Golden's '287, and independent claim 11, and dependent claims 12-20 of Golden's '619 patent. Dismissing the case without a jury trial to rule on Golden's claim that the Google Tensor Series CPU/Chipset allegedly infringes Golden patents is a clear-cut indication that Judge Rita F, Lin is bias in favor of Google and against Golden

# *Appendix II*

RECEIVED

NOV 2 1 2024

United States Court of Appeals
For the Federal Circuit



US010610157B2

(12) **United States Patent**
Pandya et al.

(10) Patent No.: **US 10,610,157 B2**
(45) Date of Patent: **Apr. 7, 2020**

(54) **WEARABLE ELECTRONIC DEVICE WITH ELECTRODES FOR SENSING BIOLOGICAL PARAMETERS**

(71) Applicant: **Apple Inc.**, Cupertino, CA (US)

(72) Inventors: **Sameer Pandya**, Sunnyvale, CA (US); **Adam T. Clavelle**, San Francisco, CA (US); **Erik G. de Jong**, San Francisco, CA (US); **Michael B. Wittenberg**, San Francisco, CA (US); **Tobias J. Harrison-Noonan**, San Francisco, CA (US); **Martin Melcher**, Mountain View, CA (US); **Zhipeng Zhang**, Santa Clara, CA (US); **Steven C. Roach**, San Francisco, CA (US); **Steven P. Cardinali**, Campbell, CA (US)

(73) Assignee: **Apple Inc.**, Cupertino, CA (US)

(*) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 0 days.

(21) Appl. No.: **16/193,836**

(22) Filed: **Nov. 16, 2018**

(65) **Prior Publication Data**

US 2019/0101870 A1    Apr. 4, 2019

**Related U.S. Application Data**

(63) Continuation of application No. 16/118,282, filed on Aug. 30, 2018.

(Continued)

(51) **Int. Cl.**
*A61B 5/00* (2006.01)
*G06F 1/16* (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC .......... *A61B 5/681* (2013.01); *A61B 5/02427* (2013.01); *A61B 5/02438* (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC ..... A61B 5/681; A61B 5/6824; A61B 5/6898; A61B 5/0404; A61B 5/0408;
(Continued)

(56) **References Cited**

U.S. PATENT DOCUMENTS

7,486,386 B1    2/2009    Holcombe
7,729,748 B2    6/2010    Florian
(Continued)

FOREIGN PATENT DOCUMENTS

CN    102483608    5/2012
CN    203732900    7/2014
(Continued)

OTHER PUBLICATIONS

Dozza et al., "A Portable Audio-biofeedback System to Improve Postural Control," Proceedings of the 26th Annual International Conference of the IEEE EMBS, San Francisco, CA, Sep. 1-5, 2004, pp. 4799-4802.

*Primary Examiner* — Eun Hwa Kim
(74) *Attorney, Agent, or Firm* — Brownstein Hyatt Farber Schreck, LLP

(57) **ABSTRACT**

An electronic device, such as a watch, has a housing to which a carrier is attached. The carrier has a first surface interior to the electronic device, and a second surface exterior to the electronic device. A set of electrodes is deposited on the exterior surface of the carrier. An additional electrode is operable to be contacted by a finger of a user of the electronic device while the first electrode is positioned against skin of the user. The additional electrode may be positioned on a user-rotatable crown of the electronic device, on a button of the electronic device, or on another surface of the housing of the electronic device. A processor of the electronic device is operable to determine a biological

(Continued)



parameter of the user based on voltages at the electrodes. The biological parameter may be an electrocardiogram.

**20 Claims, 41 Drawing Sheets**

**Related U.S. Application Data**

(60) Provisional application No. 62/644,886, filed on Mar. 19, 2018, provisional application No. 62/554,196, filed on Sep. 5, 2017.

(51) **Int. Cl.**

| | |
|---|---|
| *A61B 5/0404* | (2006.01) |
| *A61B 5/024* | (2006.01) |
| *A61B 5/0408* | (2006.01) |
| *A61B 5/044* | (2006.01) |
| *G04G 9/00* | (2006.01) |
| *G04G 21/02* | (2010.01) |
| *G04G 21/08* | (2010.01) |

(52) **U.S. Cl.**
CPC ............ *A61B 5/044* (2013.01); *A61B 5/0404* (2013.01); *A61B 5/04085* (2013.01); *G04G 9/0005* (2013.01); *G04G 21/025* (2013.01); *G04G 21/08* (2013.01); *G06F 1/163* (2013.01)

(58) **Field of Classification Search**
CPC . A61B 5/04085; A61B 5/04284; A61B 5/044; A61B 2562/0209; A61B 2562/0214; G04G 21/025; G04G 21/08; G04G 9/0005; G06F 1/163
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 7,822,469 | B2 | 10/2010 | Lo |
| 7,915,601 | B2 | 3/2011 | Setlak et al. |
| 7,957,762 | B2 | 6/2011 | Herz et al. |
| 8,988,372 | B2 | 3/2015 | Messerschmidt et al. |
| 9,042,971 | B2 | 5/2015 | Brumback et al. |
| 9,100,579 | B2 | 8/2015 | Schatvet et al. |
| 9,348,322 | B2 | 5/2016 | Fraser et al. |
| 9,427,191 | B2 | 8/2016 | LeBoeuf |
| 9,485,345 | B2 | 11/2016 | Dantu |
| 9,557,716 | B1 * | 1/2017 | Inamdar .................. G04G 17/06 |
| 9,620,312 | B2 | 4/2017 | Ely et al. |
| 9,627,163 | B2 | 4/2017 | Ely et al. |
| 9,723,997 | B1 | 8/2017 | Lamego |
| 9,737,221 | B2 | 8/2017 | Sato |

| | | | |
|---|---|---|---|
| 9,848,823 | B2 | 12/2017 | Raghuram et al. |
| 10,123,710 | B2 | 11/2018 | Gassoway et al. |
| 10,126,194 | B2 | 11/2018 | Lee |
| 2004/0181141 | A1 * | 9/2004 | Kislov ............... A61B 5/02116 600/393 |
| 2011/0015496 | A1 | 1/2011 | Sherman et al. |
| 2013/0310656 | A1 | 11/2013 | Lim |
| 2014/0107493 | A1 * | 4/2014 | Yuen ..................... A61B 5/0205 600/473 |
| 2014/0275832 | A1 | 9/2014 | Muehlsteff et al. |
| 2015/0041289 | A1 * | 2/2015 | Ely ....................... H01H 3/122 200/4 |
| 2016/0058309 | A1 | 3/2016 | Han |
| 2016/0058375 | A1 | 3/2016 | Rothkopf |
| 2016/0198966 | A1 | 7/2016 | Uematsu et al. |
| 2016/0242659 | A1 | 8/2016 | Yamashita et al. |
| 2016/0338598 | A1 * | 11/2016 | Kegasawa ............. A61B 5/0205 |
| 2016/0338642 | A1 | 11/2016 | Parara et al. |
| 2016/0349803 | A1 | 12/2016 | Dusan |
| 2016/0378071 | A1 | 12/2016 | Rothkopf |
| 2017/0011210 | A1 | 1/2017 | Cheong et al. |
| 2017/0090599 | A1 | 3/2017 | Kuboyama et al. |
| 2017/0181644 | A1 | 6/2017 | Meer et al. |
| 2017/0230754 | A1 | 8/2017 | Dusan |
| 2017/0354332 | A1 | 12/2017 | Lamego |
| 2018/0235542 | A1 * | 8/2018 | Yun ....................... A61B 5/0205 |
| 2019/0072912 | A1 | 3/2019 | Pandya et al. |
| 2019/0090806 | A1 | 3/2019 | Harrison-Noonan et al. |
| 2019/0220069 | A1 | 7/2019 | Dusan |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| CN | 104050444 | 9/2014 |
| CN | 105339871 | 2/2016 |
| CN | 106462665 | 2/2017 |
| JP | 2001145607 | 5/2001 |
| KR | 1020160145284 | 12/2016 |
| TW | 201610621 | 3/2016 |
| TW | 201621491 | 6/2016 |
| WO | WO 15/030712 | 3/2015 |
| WO | WO 16/040392 | 3/2016 |
| WO | WO 16/204443 | 12/2016 |

OTHER PUBLICATIONS

Ohgi et al., "Stroke phase discrimination in breaststroke swimming using a tri-axial acceleration sensor device," *Sports Engineering*, vol. 6, No. 2, Jun. 1, 2003, pp. 113-123.
Zijlstra et al., "Assessment of spatio-temporal gait parameters from trunk accelerations during human walking," *Gait & Posture*, vol. 18, No. 2, Oct. 1, 2003, pp. 1-10.
Onizuka et al., Head Ballistocardiogram Based on Wireless Multi-Location Sensors, 2015 EEE, pp. 1275-1278.

* cited by examiner



*FIG. 1A*



*FIG. 1B*



*FIG. 2A*



*FIG. 2B*



**FIG. 2C**



**FIG. 3**



**FIG. 4A**



*FIG. 4B*



**FIG. 4C**



*FIG. 4D*



FIG. 5A          FIG. 5B

FIG. 5C          FIG. 5D



FIG. 5E



*FIG. 6*



**FIG. 7**

800



FIG. 8



*FIG. 9A*



*FIG. 9B*



*FIG. 9C*



*FIG. 10A*



*FIG. 10B*



*FIG. 10C*



*FIG. 10D*



*FIG. 11A*



**FIG. 11B**



**FIG. 12A**



*FIG. 12B*



**FIG. 13**



*FIG. 14*



**FIG. 15**



*FIG. 16A*



**FIG. 16B**



**FIG. 17A**



*FIG. 17B*



*FIG. 18A*



**FIG. 18B**



*FIG. 19*



**FIG. 20**



**FIG. 21**



**FIG. 22**



**FIG. 23**



2400

APPLY GROUND VOLTAGE TO USER
VIA FIRST ELECTRODE ON A CRYSTAL ⌇~2402

SENSE FIRST VOLTAGE OR SIGNAL AT
SECOND ELECTRODE ON THE CRYSTAL ⌇~2404

SENSE SECOND VOLTAGE OR SIGNAL AT
THIRD ELECTRODE ON USER-ROTATABLE
CROWN ⌇~2406

DETERMINE BIOLOGICAL PARAMETER OF
USER FROM THE OPTIONAL GROUND
VOLTAGE AND THE FIRST AND SECOND
VOLTAGES OR SIGNALS ⌇~2408

*FIG. 24*



**FIG. 25**



*FIG. 26A*



*FIG. 26B*



**FIG. 27A**



*FIG. 27B*



*FIG. 28A*



**FIG. 28B**

# WEARABLE ELECTRONIC DEVICE WITH ELECTRODES FOR SENSING BIOLOGICAL PARAMETERS

## CROSS-REFERENCE TO RELATED APPLICATIONS

This application is a continuation of U.S. patent application Ser. No. 16/118,282, filed Aug. 30, 2018, and entitled "Wearable Electronic Device with Electrodes for Sensing Biological Parameters," which claims the benefit under 35 U.S.C. § 119(e) of U.S. Provisional Patent Application No. 62/554,196, filed on Sep. 5, 2017, and entitled "Wearable Device with Electrodes for Sensing Biological Parameters," and U.S. Provisional Patent Application No. 62/644,886, filed on Mar. 19, 2018, and entitled "Wearable Device with Electrodes for Sensing Biological Parameters," the contents of which are incorporated herein by reference as if fully disclosed herein.

## FIELD

The described embodiments relate generally to an electronic watch or other wearable electronic device. More particularly, the described embodiments relate to techniques for providing, on a watch or other wearable electronic device, electrodes for sensing biological parameters. The electrodes may be variously provided on a surface of an optical component, crown, button, or housing member of the watch or other wearable electronic device.

## BACKGROUND

A wearable electronic device may include a set of sensors for determining a set of biological parameters of a user that wears the wearable electronic device. Circuitry associated with the set of sensors may generate, for example, electrical signals or measurements corresponding to voltages at, forces applied to, or amounts of light incident on, the sensors. The various signals or measurements may be correlated to, or used to derive, various biological parameters of the user, such as a heart rate of the user.

## SUMMARY

Embodiments of the systems, devices, methods, and apparatuses described in the present disclosure are directed to an electronic watch or other wearable electronic device having a set of electrodes that may be used to sense or determine biological parameters of a user that wears the wearable electronic device. The biological parameters may include, for example, an electrocardiogram (ECG) of the user.

One embodiment takes the form of an electronic watch, comprising: a housing; a crown comprising: a crown body; and a shaft connected to the crown body and passing through the housing; a carrier connected to the housing; a transparent cover connected to the housing; a touch-sensitive display at least partially within the housing and viewable through the transparent cover; a first electrode on the carrier; a second electrode on the crown body; and a processor within the housing and operationally connected to the first electrode and the second electrode; wherein: the first electrode is configured to measure a first voltage; the second electrode is configured to measure a second voltage; the processor is configured to determine an electrocardiogram using the first voltage and the second voltage; and the touch-sensitive display is configured to display the electrocardiogram.

Another embodiment takes the form of an electronic watch, comprising: a housing; a carrier attached to the housing; a first electrode on the carrier; a crown extending through the housing and configured to translate and rotate, comprising a second electrode; and a processor operable to determine a biological parameter of a user based on voltages measured at the first electrode and the second electrode; wherein: the voltages are measured while the user is in contact with the first electrode and the second electrode.

Yet another embodiment takes the form of a method for determining and displaying an electrocardiogram by an electronic watch, comprising: measuring a first voltage at a first electrode on a crown of the electronic watch; measuring a second voltage at a second electrode on a carrier of the electronic watch; determining, by a processor of the electronic watch, the electrocardiogram using the first voltage and the second voltage; and displaying the electrocardiogram on a display of the electronic watch.

In addition to the example aspects and embodiments described above, further aspects and embodiments will become apparent by reference to the drawings and by study of the following description.

## BRIEF DESCRIPTION OF THE DRAWINGS

The disclosure will be readily understood by the following detailed description in conjunction with the accompanying drawings, wherein like reference numerals designate like structural elements, and in which:

FIG. 1A shows a functional block diagram of a wearable electronic device;

FIG. 1B shows an example of an electronic device having a set of electrodes disposed thereon;

FIGS. 2A-2C show an example of an electronic watch that incorporates a set of electrodes;

FIG. 3 shows another example of an electronic watch that incorporates a set of electrodes;

FIGS. 4A-4D show an additional example of an electronic watch that incorporates a set of electrodes on a carrier;

FIGS. 5A-5E illustrate an example of coatings that may be deposited on the interior and exterior surfaces of the carrier shown in FIGS. 4A-4C;

FIG. 6 shows a cross-section of the carrier shown in FIG. 5B;

FIG. 7 shows a cross-section of the carrier shown in FIGS. 5C and 5D;

FIG. 8 shows an example layer construction of an ITO-based electrode;

FIGS. 9A-9C show alternative electrical connections between an electrode on an exterior surface of a carrier that forms part of a housing of an electronic device and an electrical contact interior to the electronic device;

FIGS. 10A-10D show alternative carrier configurations, and alternative attachments or connections of carriers to other housing members of an electronic device;

FIG. 11A is a cross-section of an example crown assembly;

FIG. 11B is a cross-section of another example crown assembly;

FIGS. 12A & 12B show another example of a crown assembly;

FIGS. 13 & 14 show cross-sections of additional examples of crown assemblies;

FIGS. 15-22 show various examples of button assemblies;

FIG. 23 shows a schematic of an electronic device that may be used for acquiring an ECG or other biological parameter from a user of the electronic device;

FIG. 24 shows an example method of determining a biological parameter of a user wearing a watch or other wearable electronic device;

FIG. 25 shows a sample electrical block diagram of an electronic device such as a watch or other wearable electronic device;

FIG. 26A illustrates a sample electronic watch displaying a list;

FIG. 26B illustrates the sample electronic watch of FIG. 26A, with an updated list in response to a crown input;

FIG. 27A illustrates a sample electronic watch displaying a graphic;

FIG. 27B illustrates the sample electronic watch of FIG. 27A with the graphic updated in response to a crown input;

FIG. 28A illustrates a sample electronic watch displaying a first graphic; and

FIG. 28B illustrates the sample electronic watch of FIG. 28A displaying a second graphic in response to a crown input.

The use of cross-hatching or shading in the accompanying figures is generally provided to clarify the boundaries between adjacent elements and also to facilitate legibility of the figures. Accordingly, neither the presence nor the absence of cross-hatching or shading conveys or indicates any preference or requirement for particular materials, material properties, element proportions, element dimensions, commonalities of similarly illustrated elements, or any other characteristic, attribute, or property for any element illustrated in the accompanying figures.

Additionally, it should be understood that the proportions and dimensions (either relative or absolute) of the various features and elements (and collections and groupings thereof) and the boundaries, separations, and positional relationships presented therebetween, are provided in the accompanying figures merely to facilitate an understanding of the various embodiments described herein and, accordingly, may not necessarily be presented or illustrated to scale, and are not intended to indicate any preference or requirement for an illustrated embodiment to the exclusion of embodiments described with reference thereto.

DETAILED DESCRIPTION

Reference will now be made in detail to representative embodiments illustrated in the accompanying drawings. It should be understood that the following description is not intended to limit the embodiments to one preferred embodiment. To the contrary, it is intended to cover alternatives, modifications, and equivalents as can be included within the spirit and scope of the described embodiments as defined by the appended claims.

The following disclosure relates to techniques for distributing a set of electrodes over a set of surfaces of a wearable electronic device, such as an electronic watch, and to techniques for electrically isolating the electrodes from other components of the device and/or mitigating effects of environmental factors when sensing voltages or signals indicative of one or more biological parameters of a user who is in contact with the electrodes, and to techniques for routing the voltages or signals within the device.

Embodiments further may take the form of an electronic watch, or other portable and/or wearable device, configured to detect an electrocardiogram ("ECG") of a person wearing or otherwise interacting with the electronic device. As one non-limiting example, a person may wear an electronic watch that has two external electrodes configured to be touched by the user. A first electrode may be placed on a rear

surface of the watch and be in contact with skin on the wrist of the person. A second electrode may be defined by or on a crown of the watch and may be configured to be touched by a finger (or other body part) of the person.

FIG. 1A shows a functional block diagram of a wearable electronic device 100. In some examples, the device 100 may be an electronic watch or electronic health monitoring device. The wearable electronic device 100 may include one or more input devices 102, one or more output devices 104, and a processor 106. Broadly, the input devices 102 may detect various types of input, and the output devices 104 may provide various types of output. The processor 106 may receive input signals from the input devices 102, in response to inputs detected by the input devices. The processor 106 may interpret input signals received from one or more of the input devices 102 and transmit output signals to one or more of the output devices 104. The output signals may cause the output devices 104 to provide one or more outputs. Detected input at one or more of the input devices 102 may be used to control one or more functions of the device 100. In some cases, one or more of the output devices 104 may be configured to provide outputs that are dependent on, or manipulated in response to, the input detected by one or more of the input devices 102. The outputs provided by one or more of the output devices 104 may also be responsive to, or initiated by, a program or application executed by the processor 106 and/or an associated companion device.

In various embodiments, the input devices 102 may include any suitable components for detecting inputs. Examples of input devices 102 include audio sensors (e.g., microphones), optical or visual sensors (e.g., cameras, visible light sensors, or invisible light sensors), proximity sensors, touch sensors, force sensors, mechanical devices (e.g., crowns, switches, buttons, or keys), vibration sensors, orientation sensors, motion sensors (e.g., accelerometers or velocity sensors), location sensors (e.g., global positioning system (GPS) devices), thermal sensors, communication devices (e.g., wired or wireless communication devices), resistive sensors, magnetic sensors, electroactive polymers (EAPs), strain gauges, electrodes, and so on, or some combination thereof. Each input device 102 may be configured to detect one or more particular types of input and provide a signal (e.g., an input signal) corresponding to the detected input. The signal may be provided, for example, to the processor 106.

The output devices 104 may include any suitable components for providing outputs. Examples of output devices 104 include audio output devices (e.g., speakers), visual output devices (e.g., lights or displays), tactile output devices (e.g., haptic output devices), communication devices (e.g., wired or wireless communication devices), and so on, or some combination thereof. Each output device 104 may be configured to receive one or more signals (e.g., an output signal provided by the processor 106) and provide an output corresponding to the signal.

The processor 106 may be operably coupled to the input devices 102 and the output devices 104. The processor 106 may be adapted to exchange signals with the input devices 102 and the output devices 104. For example, the processor 106 may receive an input signal from an input device 102 that corresponds to an input detected by the input device 102. The processor 106 may interpret the received input signal to determine whether to provide and/or change one or more outputs in response to the input signal. The processor 106 may then send an output signal to one or more of the output devices 104, to provide and/or change outputs as

appropriate. Examples of suitable processors are discussed in more detail below with respect to FIG. 25.

In some examples, the input devices 102 may include a set of electrodes. The electrodes may be disposed on one or more exterior surfaces of the device 100. The processor 106 may monitor for voltages or signals received on at least one of the electrodes. In some embodiments, one of the electrodes may be permanently or switchably coupled to a device ground. The electrodes may be used to provide an ECG function for the device 100. For example, a 2-lead ECG function may be provided when a user of the device 100 contacts first and second electrodes that receive signals from the user. As another example, a 3-lead ECG function may be provided when a user of the device 100 contacts first and second electrodes that receive signals from the user, and a third electrode that grounds the user to the device 100. In both the 2-lead and 3-lead ECG embodiments, the user may press the first electrode against a first part of their body and press the second electrode against a second part of their body. The third electrode may be pressed against the first or second body part, depending on where it is located on the device 100.

FIG. 1B shows an example of an electronic device 110 (here, an electronic watch) having a set of electrodes 112, 114 disposed thereon. The device 110 may be an example of the wearable electronic device described with reference to FIG. 1A, or may be an example of an electronic device that is not wearable. In some embodiments, the set of electrodes 112, 114 may be provided on one surface of the device 110. In other embodiments (as shown), the set of electrodes 112, 114 may include electrodes provided on different surfaces of the device 100, such as a first electrode 112 provided on a first surface 116 of the device 110, and a second electrode 114 provided on a second surface 118 of the device 110. Providing electrodes on different surfaces of a device may make it easier for a user to place different body parts in contact with different electrodes. For example, a user may place one or more of the electrodes (e.g., the first electrode 112) in contact with their wrist, and may touch another one or more of the electrodes (e.g., the second electrode 114) with a finger of their opposite hand. Alternatively, the user may press the electrodes 112, 114 against different parts of their body. A processor 120 of the device 110, or a processor remote from the device 110, may determine, from the voltages or signals (e.g., from stored digital samples or values representing the voltages or signals), the biological parameter(s) of the user. The biological parameter(s) may include, for example, an electrocardiogram (ECG) of the user, an indication of whether the user is experiencing atrial fibrillation, an indication of whether the user is experiencing premature atrial contraction or premature ventricular contraction, an indication of whether the user is experiencing a sinus arrhythmia, and so on.

In some embodiments, one or two thin film electrodes may be PVD deposited on an exterior surface of a structure that forms part of a housing of an electronic device. The surface may be any transparent, semi-transparent, translucent, or opaque surface made out of an amorphous solid, glass, a crystal or crystalline material (such as sapphire or zirconia), plastic, or the like. In the case of a watch (i.e., a type of electronic device), an additional electrode may be positioned on a user-rotatable crown of a watch body, on a button of the watch body, or on another surface of a housing that defines the watch body.

When an electrode is formed on a carrier that forms part of a housing of an electronic device, the electrode may be connected to an electrical contact within the electronic device by depositing the electrode material such that it wraps around an edge or perimeter of the carrier, and onto an interior surface of the carrier. The electrical contact may be on the interior surface of the carrier. In other embodiments, the electrode may be formed on the exterior surface of the carrier, and a thru-carrier via that is filled or coated with a conductive material may connect the electrode to an electrical contact within the electronic device. The carrier may be any appropriate structure that supports the electrodes, on which the electrodes are formed, or to which the electrodes are attached. In certain embodiments described herein, the carrier is an optically transparent material having a dome shape. It should be appreciated that the carrier may have different shapes (flat, stepped, parallelepiped, and so on) and may be made from different materials, including opaque materials.

Generally, the term "attached" means that two elements, objects, structures, or objects are separate but affixed or retained to one another, whether removably, as with an electronic device attached to a user by a band, or fixedly, as with two elements that are affixed to one another with a mechanical fastener not meant to be decoupled (a screw, bolt, or the like), by an adhesive, by plating or depositing one material on another (as with an electrode deposited on the carrier), and so on. The term "connected" means that two elements may be attached to one another, or may be two parts of a unitary whole (as with a shaft and crown body formed from the same material as a single piece). Thus, while two elements that are attached to one another are necessarily connected to one another, the reverse is not necessarily true. For example, two elements may be formed as a single piece or part and thus connected to one another, although they are not attached to one another.

When an electrode is provided on a crown of an electronic device, the crown may be conductive or have a conductive surface, and the conductive portion of the crown may be coupled to a conductive rotatable shaft that extends through an opening in a device housing. An end of the shaft interior to the housing, or a conductive shaft retainer interior to the housing, may be in mechanical and electrical contact with a spring-biased conductor that carries electrical signals between the shaft or shaft retainer and a circuit, thereby providing electrical communication between the crown and the circuit.

A processor of an electronic device (e.g., the processor 120) may be operable to determine a biological parameter of a user based on voltages at various electrodes (e.g., at the set of electrodes 112, 114). In some cases, the biological parameter may be an ECG of a user of the electronic device. For example, when a watch has a first electrode on an exterior surface of a carrier and a second electrode on a crown, the user's fastening of the watch to their wrist may place the first electrode in contact with skin on the user's wrist. To acquire an ECG, the user may touch a conductive portion of the crown with a finger on their opposite hand. For example, the carrier or housing of the watch may touch a wrist adjacent one hand, and the crown may be touched with a finger of the opposite hand. In some cases, the watch may have a third electrode, also on the exterior surface of the carrier, which grounds the user to the watch. The third electrode may be used to reject noise from ECG signals. The electrodes may be positioned on different surfaces, or different portions of surfaces, in various embodiments.

The electrode(s) on the exterior surface of the carrier may be positioned at the periphery of the carrier, or otherwise positioned to enable an optical sensor subsystem to emit and receive light through the carrier. The light may be emitted

into, and reflected from, a user's skin to determine other biological parameters of the user, such as a heart rate, blood pressure, pulse, blood oxygenation, glucose level, and so on.

These and other embodiments are discussed with reference to FIGS. 1-25. However, those skilled in the art will readily appreciate that the detailed description given herein with respect to these figures is for explanatory purposes only and should not be construed as limiting.

FIGS. 2A-2C show an example of an electronic watch 200 that incorporates a set of electrodes. The watch 200 may be an example of the wearable electronic device 100 or 110 described with reference to FIG. 1A or 1B. The watch 200 may include a watch body 202 and a watch band 204. The watch body 202 may include an input or selection device, such as a crown 210 or a button 212. FIG. 2A shows an isometric view of the watch body's front face. FIG. 2B shows an example cross-section of the crown 210. FIG. 2C shows an isometric view of the watch body's rear face. In FIGS. 2A & 2C, only a portion of the watch band 204 is shown (i.e., only the portions of the watch band 204 that attach to the watch body 202).

The watch body 202 may include a housing 206. The housing 206 may include a front side housing member 206a that faces away from a user's skin when the watch 200 is worn by a user (see FIG. 2A), and a back side housing member 206b (or rear cover) that faces toward the user's skin (see FIG. 2C). Alternatively, the housing 206 may include a singular housing member, or more than two housing members. The one or more housing members may be metallic, plastic, ceramic, crystal, or other types of housing members (or may include combinations of such materials).

As shown in FIG. 2A, a transparent cover 208 may be attached to a front side of the watch body 202 (i.e., facing away from a user's skin), over or within an opening in the housing 206, and may protect a display positioned at least partially within the housing 206. The display may be viewable by a user through the cover 208. In some embodiments, the display may depict an ECG waveform of a person who is wearing or otherwise using the watch 200. In some cases, the cover 208 may be part of a display stack, which display stack may include a touch sensing or force sensing capability. The display may be configured to depict a graphical output of the watch 200, and a user may interact with the graphical output (e.g., using a finger or stylus that touches or hovers over the cover 208, or using the crown 210 or button 212). As one example, the user may select (or otherwise interact with) a graphic, icon, indicator, message, or the like (collectively, "graphic") presented on the display by touching or pressing on the display at the location of the graphic. In some embodiments, the user may receive confirmation of their selection by means of haptic output provided by the watch body 202 through the display or cover 208. The exterior surface of the cover 208 may therefore function as a means for receiving input (i.e., function as an input device) and a means for providing output (i.e., function as an output device). The cover 208 may be attached to the housing 206 or part of the housing 206 (e.g., connected to the housing). In some embodiments, the cover 208 may be considered part of the housing 206 because it forms part of an outer shell that defines an interior volume (or houses internal components) of the watch body 202. In some examples, the cover 208 may be or include a crystal, such as a sapphire crystal. Alternatively, the cover 208 may be formed of glass, plastic, or other materials.

The watch body 202 may include at least one input device or selection device, such as a crown 210, scroll wheel, knob,

dial, button 212, or the like, which input device may be operated by a user of the watch 200. In some embodiments, the crown 210, scroll wheel, knob, dial, button 212, or the like may be conductive, or have a conductive surface, and a signal route may be provided between the conductive portion of the crown 210, scroll wheel, knob, dial, button 212, or the like and a circuit (including a processor) within the watch body 202.

The operation of determining and/or displaying a user's ECG may be initiated by rotating the crown 210, translating the crown, tilting the crown, touching the crown, and so on. Likewise the operation of determining the ECG may be initiated by interacting with a touch-sensitive cover 208 or display of the electronic watch. As discussed above, the display may be partially or fully within the housing of the electronic watch.

Turning primarily to FIG. 2B, it is shown that the housing 206 may include an opening through which a shaft 224 extends. A crown 210 may be connected to the shaft 224, and may be accessible to a user exterior to the housing 206. The crown 210 may be manipulated by a user to rotate or translate the shaft, as indicated by arrows 218 and 220. Such manipulations are examples of crown inputs. The shaft may be mechanically, electrically, magnetically, and/or optically coupled to components within the housing 206. In some embodiments, the crown 210 may be part of a crown assembly, as described with reference to FIG. 11, 12A, 12B, 13, or 14.

A user's manipulation of the crown 210 (and thus the shaft 224) may be used to manipulate or select various textual or graphical elements displayed by the watch 200, to adjust a volume of a speaker, to turn the watch 200 on or off, and so on. In some embodiments, the crown 210 may be manipulated (e.g., rotated or pressed) to select or activate a health monitoring function of the watch 200 (e.g., an ECG or other heart monitoring function). For example, a user may rotate the crown to select an ECG application, and may press the crown to activate the ECG application (e.g., initiate determination and display of a wearer's ECG). Alternatively, a user's touch or press of the crown (or touch or press of the crown for a predetermined period of time) may activate the ECG application and cause a heart rhythm of the user to be displayed. As yet another example, the user may interact with the touch-sensitive display to select and/or activate the ECG application. By way of example, a user's activation of an ECG application is indicated by the watch's display of the ECG 222 in FIG. 2A. Alternatively, the user's selection of an ECG application may be indicated by another graphic or text displayed by the watch 200. Generally, the watch 200 (and specifically its display) may change from displaying some graphic or text to displaying the ECG 222 once the ECG (or its corresponding application, or function) is initiated, selected, or determined.

As shown in FIG. 2B, the crown 210 may be connected to the shaft 224 (and may be unitary with the shaft), and the shaft 224 may extend through an opening in the housing 206. In some embodiments, the shaft 224 may be separated from the housing 206 by a bushing or other component, or retained to the housing 206 by a retention mechanism. The shaft 224 may rotate or translate with respect to the housing 206, as indicated by arrows 218 and 220, thereby providing one or more crown inputs to a processor of the electronic device 200. A first sensor 226 within the housing 206 may sense aspects of shaft movement such as direction of rotation, speed of rotation, rotational acceleration, or angular position of the shaft 224. In some embodiments, the first sensor 226 may be an optical sensor positioned adjacent the

shaft 224, such that light 227 is emitted onto, and reflected from, the shaft 224. Light 227 may be reflected from the shaft by a pattern of surface features (such as scallops, grooves, indentation, projections, or the like) or by byproducts of machining the shaft, such as bumps, scratches, irregularities, and so on. The pattern and speed of light 227 reflected onto the optical sensor 226 maybe used to determine a direction and/or speed of rotation of the shaft 224. In other embodiments, different sensors may be used to detection direction and/or speed of rotation of the shaft 224, including mechanical sensors, electrical sensors, capacitive sensors, brush contacts, magnetic sensors, and so on.

A second sensor 228 within the housing 206 may sense aspects of shaft movement such as translation or direction of translation. In some embodiments, the second sensor 228 may be a tactile switch, optical sensor, magnetic sensor, capacitive sensor or the like positioned at an end of the shaft 224.

A third sensor 230 within the housing 206 may sense when a user is touching the crown 210, or may sense signals (e.g., a heart rhythm) received by the crown 210 when a user touches the crown 210. In some embodiments, the third sensor 230 may be electrically coupled to the crown 210 or shaft 224. In some cases, the sensors 226, 228, 230 may be provide signals or information to the processor 214, or may be partly or wholly integrated with the processor 214 or other components of the watch 200. In some embodiments, two or more of the sensors 226, 228, 230 may be combined into a multipurpose sensor. In some embodiments. one or more of the sensors 226, 228, 230 may not be provided. In some embodiments, the functions of one of the sensors 226, 228, 230 may be distributed among multiple sensors, or additional crown sensors may be provided.

Any or all of the first sensor 226, second sensor 228, and third sensor 230 may be attached to or otherwise supported by one or more internal supports 232, as shown in FIG. 2B.

Turning primarily to FIG. 2C, the housing 206 may include structures for attaching the watch band 204 to the watch body 202. In some cases, the structures may include elongate recesses or openings through which ends of the watch band 204 may be inserted and attached to the watch body 202. In other cases (not shown), the structures may include indents (e.g., dimples or depressions) in the housing 206, which indents may receive ends of spring pins that are attached to or threaded through ends of a watch band to attach the watch band to the watch body 202.

The watch band 204 may be used to secure the watch 200 to a user, another device, a retaining mechanism, and so on.

As previously mentioned, the watch 200 may include a set of electrodes. The set of electrodes may be configured, in some cases, as described with reference to FIG. 1A or 1B. The set of electrodes may be used by a processor 214 that is internal to the watch body 202, to sense biological parameters (e.g., an ECG) of a person who wears the watch 200 and presses the electrodes against their skin. In some embodiments, the set of electrodes may include a rear-facing electrode 216 on the back of the watch body 202 (e.g., on the back side housing member 206b). The set of electrodes may also include an electrode on the crown 210 and/or an electrode on the button 212.

The rear-facing electrode 216 may be formed (e.g., printed, plated, or otherwise deposited) on the back side housing member 206b. If the back side housing member 206b is non-conductive, the rear-facing electrode 216 may be formed directly on the back side housing member 206b and connected to circuitry internal to the watch body 202 (e.g., the processor 214) by, for example, conductive vias

formed through the back side housing member 206b. If the back side housing member 206b is conductive, the rear-facing electrode 216 may be separated from the back side housing member 206b by an insulator or insulating layer, and conductive vias formed through the back side housing member 206b may likewise be insulated from the back side housing member 206b. Alternatively, the back side housing member 206b may have an opening to which the rear-facing electrode 216 is mated. In some embodiments, the opening may define a ledge in the back side housing member 206b, and the rear-facing electrode 216 may rest on the ledge (and in some cases may be separated from the back side housing member 206b by an insulator (e.g., a seal) or an insulating layer).

The electrode(s) on the crown 210 or button 212 may be conductive surfaces of the crown 210 or button 212. In some cases, the crown 210 or button 212 may be conductive over its entire exterior surface. In other cases, the crown 210 or button 212 may have conductive portions (e.g., cores or inserts). When the front side housing member 206a is conductive, the crown 210 or button 212 (or the conductive components thereof) may be insulated from the front side housing member 206a by an insulator (e.g., a set of seals, non-conductive coatings, and so on).

In some embodiments, one of the crown 210 or button 212 may have an electrode thereon, and a user wearing the watch 200 on one of their wrists may touch the electrode on the crown 210 or button 212 with a finger of their opposite hand. The processor 214 may then use the electrodes to acquire an ECG for the user. In other embodiments, both the crown 210 and the button 212 may have an electrode thereon, and a user wearing the watch 200 on one of their wrists may touch the electrodes on the crown 210 and button 212 with a finger of their opposite hand. In still other embodiments, the entirety of the back side housing member 206b (or even the entirety of the housing 206) may be an electrode. In these latter embodiments, electrical isolation may be provided between the housing 206 and the crown 210 and/or between the housing 206 and the button 212.

In some examples, the watch 200 may lack the display, the crown 210, or the button 212. For example, the watch 200 may include an audio input or output interface, a touch input interface, a haptic (force) input or output interface, or other input or output interface that does not require the display, crown 210, or button 212. The watch 200 may also include the afore-mentioned input or output interfaces in addition to the display, crown 210, or button 212. When the watch 200 lacks the display, the front face of the watch 200 may be covered by the cover 208, and by a metallic or other type of housing member (e.g., the opening for the cover 208 may not exist, and the front side housing member 206a may extend over the area defined by the cover 208). In these embodiments, the electrode(s) on the crown 210 or button 212 may be replaced by (or supplemented with) an electrode on the front face of the watch body 202. A user may touch the front-facing electrode with a finger, similarly to how they would touch an electrode on the crown 210 and/or button 212. Alternatively, a user could place the front-facing electrode in contact with. for example, an opposite wrist, part of their leg, or their torso or forehead.

In some embodiments, the watch 200 may lack the rear-facing electrode 216, and each of the crown 210 and the button 212 may have a conductive surface that serves as an electrode. In these embodiments, the watch 200 may need to be removed from a user's wrist to enable the user to press different parts of their body against the crown and button electrodes. In some embodiments, the crown 210 or the

button 212 may be moved to an opposite side of the watch body 202, thereby increasing the separation between the crown 210 and the button 212 and making it easier for a user to press different parts of their body against the crown and button electrodes.

Other electronic devices that may incorporate a set of electrodes include other wearable electronic devices, other timekeeping devices, other health monitoring or fitness devices, other portable computing devices, mobile phones (including smart phones), tablet computing devices, digital media players, or the like.

Because the voltages or signals provided at, propagated from, or monitored at the various electrodes of a set electrodes may be low voltage or have low amplitudes, the materials, positions, electrical connections to, and electrical routing paths for the set of electrodes can have a significant impact on a processor's ability to discern useful signals representing an ECG or other biological parameter of a person wearing the watch 200 or a similar device (e.g., one of the other watches or electronic devices described herein). The materials, positions, electrical connections to, and electrical routing paths for the set of electrodes can determine how well the electrodes receive voltages/signals from the person's skin (e.g., a signal-to-noise ratio (SNR) of a device-to-user interface through which the voltages/signals pass); how well voltages/signals are transferred between the electrodes and internal components of the watch 200 (e.g., a voltage/signal propagation SNR); and how well the electrodes operate in the face of environmental factors, such as temperature, humidity, moisture, electromagnetic radiation, dust, and so on. Techniques described in the present disclosure may improve the usability of a set of electrodes under some or all of these conditions.

FIG. 3 shows another example of an electronic watch 300 that incorporates a set of electrodes. The watch 300 may be an example of the wearable electronic device 100 or 110 described with reference to FIG. 1 or 1B, and may include many of the components of the watch 200 described with reference to FIGS. 2A-2C. The watch 300 may include a watch body 202 and a watch band 204. FIG. 3 shows an isometric view of the watch body's rear face. Only a portion of the watch band 204 is shown (i.e., only the portions of the watch band 204 that attach to the watch body 202).

The watch 300 in FIG. 3 differs from the watch 200 of prior figures in that it has a different set of internal components, a different back side housing member 302, and a different set of elements that are provided or exposed on the back side housing member 302. For example, the watch 300 may include a sensor subsystem that includes both electrical and optical components. The electrical components may include one or more electrodes 304, 306 formed on the back side housing member 302. In some cases, each of the electrodes 304, 306 may have a circular shape and may be PVD deposited on the back side housing member 302. Alternatively, only one, or more than two electrodes may be formed on the back side housing member 302, or the electrodes 304, 306 may be positioned over (or inset into) openings in the back side housing member 302.

The optical components of the sensor system may include a set of one or more windows 308, 310, 312, 314 in the back side housing member 302. Each of the windows 308, 310, 312, 314 may pass at least one wavelength of light. In some cases, each of the windows 308, 310, 312, 314 may have a semicircular shape. The windows may alternatively have other shapes. The windows may be formed of crystal, glass, plastic or another material that passes at least one wavelength of light emitted or received by the sensor subsystem.

In some embodiments, the back side housing member 302 may be or include a transparent cover (e.g., a cover including a crystal, such as a sapphire crystal, or glass, or plastic, or the like), and may be substantially flat or planar (as shown) or may be curved or otherwise non-planar. A mask (e.g., an ink mask and/or dark mask) may be applied to the transparent cover to define the windows 308, 310, 312, 314. The electrodes 304, 306 may be formed on top of the mask or over openings in the mask.

In some embodiments, the back side housing member 302 may be an opaque substrate, such as a metal or plastic substrate, and one or more transparent windows 308, 310, 312, 314 may be fitted to openings in the substrate. The transparent windows may be fitted to the openings internally to (or externally from) the watch body 202. The electrodes 304, 306 may be fitted to additional openings that enable the electrodes 304, 306 to protrude outward from the external surface of the back side housing member 302, or the electrodes 304, 306 may be formed on the surface of the back side housing member 302 and the electrically connected to components internal to the watch body 202 by conductive vias or other elements formed through the surface of the back side housing member 302.

By way of example, FIG. 3 shows the electrodes 304, 306 aligned along a first axis that divides the back side housing member 302 into two halves, and shows the windows 308, 310, 312, 314 aligned along a second axis, perpendicular to the first axis, that divides the back side housing member 302 into a different two halves. In this manner, the electrodes 304, 306 and windows 308, 310, 312, 314 may form four circular areas on the exterior surface of the back side housing member 302, with the circular areas that contain the windows 308, 310, 312, 314 appearing bifurcated.

In use, each pair of windows 308/310, 312/314 forming a circular area may include a first window under which one or more light emitters are positioned, and a second window under which one or more light receivers are positioned, with an optional set of one or more light blocking walls positioned between the one or more light emitters and the one or more light receivers (or around the light emitter(s), or around the light receiver(s)).

FIGS. 4A-4D show an additional example of an electronic watch 400 that incorporates a set of electrodes. The watch 400 may be an example of the wearable electronic device 100 or 110 described with reference to FIG. 1A or 1B, and may include many of the components of the watch 200 described with reference to FIGS. 2A-2C. The watch 400 may include a watch body 202 and a watch band 204. FIG. 4A shows an isometric view of the watch body's rear face. Only a portion of the watch band 204 is shown (i.e., only the portions of the watch band 204 that attach to the watch body 202).

Similarly to the watch 300 described with reference to FIG. 3, the watch 400 may include a sensor subsystem that includes both electrical and optical components. However, the electrical and optical components of the watch 400 may be arranged differently than the electrical and optical components of the watch 300.

Referring primarily to FIG. 4A, a light-transmissive element such as a carrier 404 (e.g., a rear-facing or skin-facing carrier) may be coupled to or otherwise attached to a back side housing member 402 of the watch 400, and in some cases may be considered to form a part of the housing 206 of the watch body 202. The carrier 404 may have a first surface 406 that is interior to the watch body 202 (see FIG. 4C) and a second surface 408 that is exterior to the watch body 202 (see FIG. 4A). The carrier 404 may be dome-

| 13 | 14 |

shaped or otherwise non-planar, as shown in FIGS. 4A-4C, such that the second surface 408 protrudes or extends away from a back member 402 of the watch 400. This is best illustrated in FIGS. 4B and 4C.

By way of example, the carrier 404 is shown as having a round perimeter and fitted to a round opening in the back side housing member 402. In other examples, the carrier 404 may have a perimeter that is square, oval, or some other shape. Similarly, the opening in the back side housing member 402 may be square, oval, or some other shape. The perimeter of the carrier 204 and the perimeter of the opening need not have the same size or shape (e.g., the perimeter of the opening in the back side housing member 402 may be smaller or differently shaped than the perimeter of the carrier 404). In some examples, the carrier 404 may be a sapphire crystal. Alternatively, the carrier 404 may be formed from (or replaced by) a light-transmissive element formed of glass, plastic, or another material. The carrier 404 may be transparent to all wavelengths of light or just some wavelengths (and even one wavelength) of light.

The exterior surface 408 of the carrier 404 may have a set of electrodes (e.g., first and second (or rear-facing) electrodes 412, 414) thereon, although in some embodiments a single electrode or more than two electrodes may be used. In some embodiments, the electrodes 412, 414 may be PVD deposited on the carrier 404. Example constructions of the electrodes 412, 414 and masks 422 are described with reference to FIGS. 5A-5E, 6-8, 9A-9C, & 10A-10D. In some embodiments, the electrodes 412, 414 may be opaque. In other examples, the electrodes 412, 414 may be formed of a transparent material, as described with reference to FIG. 6, and the optical sensor subsystem 416 may transmit/receive light through the electrodes 412, 414. The optical sensor subsystem 416 may be, for example, an optical heart rate sensor.

In some cases, the first and second electrodes 412, 414 may be arc-shaped (e.g., semi-circle-shaped), and may be positioned around a central opening 418 and concentric ring of openings 420 formed in the masks 422. The first and second electrodes 412, 414 may extend to the edge of the carrier 404, and in some cases may wrap around the perimeter of the carrier 404 to the interior surface 406 of the carrier 404, or be connected to conductive vias formed in the carrier 404, or otherwise be electrically connected to elements within the watch body 202 that receive a signal sensed by one or both of the first and second electrodes 412, 414. In some cases, the first and second electrodes 412, 414 may be electrically insulated from the back side housing member 402 (e.g., by a non-conductive gasket or adhesive), or the back side housing member 402 may be non-conductive. In some cases, the first and second electrodes 412, 414 may be formed of, or include, stainless steel (SUS) or diamond like carbon (DLC).

The electrodes 412, 414 may be positioned (e.g., at the periphery of the carrier 404 or in other locations) so as not to interfere with optical communication between an optical sensor subsystem 416 interior to the watch body 202 (see FIG. 4C) and a medium (e.g., skin) exterior to the watch body 202. The optical communication may occur through the carrier 404, and in some cases may occur through a number of openings 418, 420 formed in one or more masks 422 applied to the carrier 404. The optical sensing subsystem is discussed in more detail, below.

FIG. 4B shows an elevation of the watch body 202 shown in FIG. 4A. The exterior of the watch body 202 is defined primarily by the housing 206, the transparent cover 208, and the carrier 404. The carrier 404 supports the rear-facing electrodes 412, 414 (e.g., as described with reference to FIGS. 4A, 4C, 5C, 5D, 5E, 6-8, 9A-9C, & 10A-10D). The element 430 may represent the crown 210 or button 212. For ease of explanation, it is noted that the positions of the electrodes 412, 414 on the carrier 404 have been rotated 90 degrees with respect to their positions in FIGS. 4A & 4C.

The watch body 202 may be abutted to a user's wrist 432 or other body part, and may be adhered to the user by the watch band 204 or another element. When abutted to a user's wrist 432, the electrodes 412, 414 on the carrier 404 may contact the user's skin. The user may touch a conductive portion of the element 430 with a finger 434. The user may touch the element 430 in various ways, depending on where the element 430 is conductive, and depending on the user's preference. In some cases, the user may touch the element 430 while also touching their wrist 432. However, high skin-to-skin impedance tends to reduce the likelihood that signals will travel from the electrodes 412, 414, through their wrist 432 to their finger 434, and subsequently to the element 430 (or vice versa). In some cases, the user may touch the element 430 while also touching the housing 206, which may be okay if the housing 206 is not conductive.

FIG. 4C shows an exploded view of components that may be attached to the interior surface 406 of the carrier 404 shown in FIGS. 4A & 4B. When the watch body 202 shown in FIGS. 4A & 4B is assembled, the components shown in FIG. 4C may reside within the housing 206. By way of example, FIG. 4C shows the components in relation to the back side housing member 402 (i.e., in relation to a skin-facing housing member).

In some cases, the interior components shown in FIG. 4C may be attached to (and in some cases directly on) the interior surface 406 of the carrier 404. The interior surface 406 may sometimes be referred to as a first surface of the carrier 404. The components attached to the carrier 404 may include a lens 436, a light filter 438, one or more adhesives 440, 442, the optical sensor subsystem 416, circuitry or a processing subsystem 444, a magnet 446, or a magnetic shield 448.

The lens 436 may abut, be attached to (and optionally, directly on), or be formed on the first or interior surface 406 of the carrier 404. By way of example, the lens 436 is aligned with the center of the carrier 404. In some cases, the interior or exterior surface 406, 408 of the carrier 404 may have a mask 422 thereon (e.g., an ink mask or dark mask, and in some cases a plurality of masks). The mask 422 may define an opening 418 (e.g., a first opening or central opening) that allows light of at least one wavelength to pass through the carrier 404, and the lens 436 may be aligned with the opening 418. In some cases, the lens 436 may be or include a Fresnel lens, a spherical lens, a diffuser film, or the like.

In some cases, the light filter 438 may include one or more segments 450, and each segment 450 may be attached to (e.g., laminated to) the interior surface 406 of the carrier 404 and positioned on the interior surface (e.g., adjacent or around the lens 436) to prevent a set of one or more light receivers of the optical sensor subsystem 416 from receiving a portion of the light that is emitted by a set of one or more light emitters of the optical sensor subsystem 416. The set of light emitters and set of light receivers are not shown in FIG. 4C, and may be attached to an underside of the optical sensor subsystem 416. When the carrier 404 includes the mask 422, the mask 422 may further define a second opening 420a, or a set of openings 420 including the second opening 420a. The second opening 420a or set of openings 420 may be positioned adjacent or around the first opening 418. In these

embodiments, the segments 450 of the light filter 438 (or a light filter ring or other light filter configuration) may be aligned with (e.g., may cover) each of the openings in the set of openings 420.

As an example, FIG. 4C shows a mask 422 that defines a set of eight radial openings 420 around a central opening 418. Each segment 450 of the light filter 438 may block (e.g., absorb) a portion of light emitted by a set of light emitters that is attached to the optical sensor subsystem 416, which portion of light reflects from a surface too close to (or within) the carrier 404 (e.g., the exterior surface 408 of the carrier 404, imperfections within the carrier 404, or a medium too close to the carrier 404), such that the reflected light is not useful in a sensing operation for which the optical sensor subsystem 416 is designed. For example, when the optical sensor subsystem 416 is configured to determine a biological parameter of a user, light reflected from the carrier 404, or from the outer layer of skin of the user, may not have any relation to the biological parameter determined and may not be useful. Accordingly, the filter may be configured to filter out light frequencies associated with light reflected from the carrier and/or a skin surface, allowing light reflected from deeper skin layers, blood vessels, and the like to be received by the receiver(s). In some examples, the light filter 438 or segments 450 thereof may include at least one of a light control film, a light polarizer, an anti-reflective film, a reflective film, or a light absorber. Accordingly and as one non-limiting example, the optical sensor subsystem 416 may act as an optical heart rate detector.

In some embodiments, the mask 422 may represent multiple masks, and different masks may allow different wavelengths of light to pass through the carrier 404, as described for example with reference to FIGS. 5A-5E & 6.

The optical sensor subsystem 416 may include a substrate 452 on which the set of one or more light emitters (e.g., LEDs) and the set of one or more light receivers (e.g., photodetectors, such as photodiodes) are attached. The light emitter(s) and light receiver(s) may be attached or positioned on the substrate 452 to emit and receive light through the carrier 404. The sensor subsystem 416 may be attached to the carrier 404 by one or more adhesives 440/442, such as pressure sensitive adhesives (PSAs) or heat-activated films (HAFs). In some cases, the set of light emitters may be centrally attached on the substrate 452, and a first wall may be attached to (e.g., formed on or bonded to) an underside of the substrate 452 surrounding the set of light emitters. The first wall may be attached to the interior surface 406 of the carrier 404 using a first adhesive 440. The set of light receivers may be attached on the substrate 452 around the set of light emitters, between the first wall and a second wall attached to (e.g., formed on or bonded to) the underside of the substrate 452. The second wall may be attached to the interior surface 406 of the carrier 404 using a second ring of adhesive 442.

The substrate 452 of the optical sensor subsystem 416 may include various contacts, pads, traces, or other conductive structures 454 that enable the processing subsystem 444 to be electrically coupled to the set of light emitters and set of light receivers of the optical sensor subsystem 416. The processing subsystem 444 may include a substrate 456 (e.g., a printed circuit board (PCB)) that is attached to the optical sensor subsystem 416, and thereby to the carrier 404, via the conductive structures 454 and/or additional adhesive between the substrates 452, 456 of the optical sensor subsystem 416 and the processing subsystem 444. The substrates 452, 456 may also or alternatively be connected using mechanical fasteners (e.g., screws). The processing subsys-

tem 444 may activate the light emitters and light receivers to perform a sensor function (e.g., to determine a heart rate). In some cases, the processing subsystem 444 may be attached to another structure within the watch body, and may be electrically connected to the conductive structures 454 of the optical sensor subsystem 416 by a flex circuit or other conductors.

In some embodiments, the substrate 456 of the processing subsystem 444 may have a hole 458 therein, and the magnet 446 may be aligned with the hole 458 and abutted to (or attached to) the substrate 452. In some cases, the magnet 446 may be adhesively bonded to the substrate 452 of the optical sensor subsystem 416. The magnet 446 may inductively couple to a battery charger used for charging a battery included within the watch body, which battery may power components of the watch including the components of the optical sensor subsystem 416 and the processing subsystem 444.

The magnetic shield 448 may abut (or be attached to) the magnet 446. In some cases, the magnetic shield 448 may be adhesively bonded to the magnet 446. The magnetic shield 448 may direct magnetic flux associated with the magnet 446 toward and out the carrier 404 to improve inductive battery charging performance for a battery included within the watch body 202.

Direct or indirect connection of the components shown in FIG. 4C to the interior surface 406 of the carrier 404 can reduce the height of the components when stacked.

FIG. 4D shows the sensor subsystem 416 attached to the carrier 404 shown in FIGS. 4A-4C. FIG. 4B also shows a flex circuit 460, surrounding the sensor subsystem 416, which may provide electrical connections between the electrodes 412, 414 and the sensor subsystem 416 while also providing a ground that operates as an electrical noise mitigation barrier (or E-shield) between the sensor subsystem 416 and the electrodes 412, 414. The electrodes 412, 414 may be connected to the electrical contacts 462, 464, which electrical contacts 462, 464 are on the interior surface of the carrier 404 and connected to both traces in the flex circuit 460 and the electrodes 412, 414. Traces in the flex circuit 460 may be connected to the electrical contacts 462, 464 via a conductive epoxy, and may connect the electrical contacts 462, 464 to the sensor subsystem 416. A processor may be part of the sensor subsystem 416, and the processor may be connected to another processor or other circuitry via a flex circuit 466.

FIGS. 5A-5E illustrate an example of coatings that may be deposited on the interior and exterior surfaces of the carrier 404 shown in FIGS. 4A-4C. As shown in FIG. 5A, a first mask 500 (e.g., a first ink mask) that is opaque to infrared (IR) and visible light may be deposited (e.g., PVD deposited) on the interior surface 406 of the carrier 404. In some examples, the first mask 500 may include an inner ring 500a and an outer ring 500b that define a central first opening 418 and a concentric second opening 506 (i.e., a second opening 506 that is concentric with the first opening 418). The central first opening 418 may be positioned over light emitters of the optical sensor subsystem 416 described with reference to FIG. 4C (and over the optional lens 436), and the concentric second opening 506 may be positioned above light receivers of the sensor subsystem 416. The inner ring 500a of the first mask may prevent the light receivers from receiving light that is unlikely to have passed through a user's skin after passing through the central first opening 418. The outer ring 500b of the first mask 500 may in some cases be provided for cosmetic reasons, and in some cases may not be provided.

FIG. 5B shows a second mask 508 (e.g., a second ink mask) that is opaque to visible light but transparent to IR light. The second mask 508 may be deposited (e.g., PVD deposited) on the interior surface 406 of the carrier 404. The second mask 508 may be deposited on the carrier 404 over the concentric second opening 506 in the first mask 500, and may overlap the inner and outer rings 500a, 500b of the first mask, as shown in FIG. 6. The second mask 508 may define a plurality of visible light openings 420 above respective light receivers of the optical sensor subsystem 416, while allowing IR light to pass through the entirety of the concentric second opening 506. This may increase the amount of IR light received by the light receivers. The second mask 508 may also define an optional opening above a condensation detector 512. In some cases, the second mask 508 may look visually similar to the first mask 500 (e.g., both masks may be dark masks, such that it may be impossible or difficult for a user to visually distinguish the first and second masks 500, 508).

FIGS. 5C and 5D show an example of PVD deposited first and second electrodes 514a, 514b on the interior and exterior surfaces 406, 408 of the carrier 404. The first and second electrodes 412, 414 may be arc-shaped and positioned at the periphery of the carrier 404. The first and second electrodes 412, 414 may be sized based on factors such as: providing a sufficient area to provide good electrical contact between the electrodes 412, 414 and skin (which may improve electrical sensor efficiency); providing electrodes 412, 414 of a size that do not substantially interfere with an antenna or other electrical structures of a device (which may improve wireless communication efficiency); or providing electrodes 412, 414 positioned to allow optical communication through the carrier 404 (which may improve optical communication efficiency). The first and second electrodes 412, 414 may be separated from one another by a pair of gaps 518a, 518b.

The first and second electrodes 412, 414 may be deposited on both the interior and exterior surfaces 406, 408 of the carrier 404 and may wrap around the edge (or perimeter) of the carrier 404. The material used to form the first and second electrodes 412, 414 may be patterned to form electrical contacts 520a, 520b (e.g., tabs) on the interior surface 406 of the carrier 404. The first and second electrodes 412, 414 may overlap the first mask 500 (or outer ring 500b of the first mask) on the interior surface 406 of the carrier 404, such that the first mask 500 is positioned between the first and second electrodes 412, 414 and the interior surface 406 of the carrier 404. Thus, the material used to form the electrodes 412, 414 may need to have properties that enable the material to adhere to a carrier surface (e.g., a sapphire surface) and a mask (e.g., an ink mask). The material or materials used to form the electrodes 412, 414 may also have properties, singularly or in combination, such as: a low impedance and good conductivity (e.g., a low DC resistance); a low electrode-to-skin impedance; a high hardness to reduce scratching of the electrodes 412, 414; a higher elastic modulus than the carrier 404 (e.g., to mitigate the likelihood that a crack in an electrode 412, 414 propagates through the carrier 404); compatibility with a HAF or other adhesive; and good biocompatibility (e.g., not likely to cause an adverse reaction to a user of a device). In some embodiments, the electrodes 412, 414 may include aluminum titanium nitride (AlTiN) or chromium silicon carbonitride (CrSiCN). AlTiN and CrSiCN hold up well to abrasion and corrosion and tend not to place undue stresses on a sapphire carrier.

FIG. 5E shows an example deposition of adhesive on the interior surface 406 of the carrier 404. The adhesive may be deposited in inner and outer rings 440, 442, as described with reference to FIG. 4C. The inner ring 440 of adhesive may be positioned on the inner ring 500a of the first mask. The outer ring 442 of adhesive may be positioned on the second mask 508, outward from the plurality of openings 420 in the second mask 508. In some cases, the adhesive may include a PSA or HAF.

FIG. 6 shows a cross-section of the carrier 404 shown in FIG. 5B, and illustrates an overlap between the first and second masks 500, 508. The second mask 508 may overlap the first mask (e.g., outer ring 500b) on the interior surface 406 of the carrier 404 such that the first mask 500 is positioned between the second mask 508 and the interior surface 406 of the carrier 404.

FIG. 7 shows a cross-section of the carrier 404 shown in FIG. 5C or 5D, and illustrates an overlap between the first electrode 412 (or second electrode) and the first mask 500 (e.g., outer ring 500b of the first mask). The first electrode 412 may overlap the first mask 500 (or outer ring 500b of the first mask) on the interior surface 406 of the carrier 404, such that the first mask 500 is positioned between the first electrode 412 and the interior surface 406 of the carrier 404.

In some embodiments, the electrodes 412, 414 shown in FIGS. 5C, 5D, and 7 may be formed using indium titanium oxide (ITO) or another transparent material. In these embodiments, the electrodes 412, 414 may be transparent to light emitted by an optical sensor subsystem positioned below the carrier 404, and thus the electrodes 412, 414 may extend over a greater portion (or all) of the exterior surface 408 of the carrier 404. FIG. 8 shows an example layer construction of an ITO-based electrode. As shown, the stack 800 may include a layer 802 of aluminum oxide ($Al_2O_3$) on the carrier, a layer 804 of ITO on the layer 802 of aluminum oxide, a first layer 806 of silicon dioxide ($SiO_2$) on the layer 804 of aluminum oxide, a layer 808 of silicon nitride ($Si_3N_4$) on the first layer 806 of silicon dioxide, a second layer 810 of silicon dioxide on the layer 808 of silicon nitride, and a layer 812 of diamond like carbon, or another hard coating, on the second layer 810 of silicon dioxide. Alternatively, the layer 808 of silicon nitride and second layer 810 of silicon dioxide may not be deposited, or only the layer 804 of ITO may be deposited, or just the layer 804 of ITO layer and first layer 806 of silicon dioxide may be deposited. Other variations in the number or types of layers may also be used to form the stack 800. Each of the layers may be transparent to IR or visible light.

FIGS. 9A-9C show alternative electrical connections between an electrode (e.g., an electrode on an exterior surface of a carrier that forms part of a housing of an electronic device) and an electrical contact interior to the electronic device. In some examples, the carriers shown in cross-section in FIGS. 9A-9C may have circular perimeters. In other examples, the carriers may have perimeters that are oval-shaped, square-shaped, rectangular-shaped, and so on. The techniques described with reference to FIGS. 9A-9C can be applied to carriers having various perimeter shapes, to carriers having different compositions, and so on. In some embodiments, the features shown in FIGS. 9-9C may be replicated to electrically connect more than one electrode on an exterior surface of an electronic device to components interior to the electronic device.

In FIG. 9A, the electrode 900 may be a thin film electrode that is PVD deposited on a surface 902 of a carrier 904. The surface 902 on which the electrode 900 is deposited may be a surface of the carrier 904 that is exterior to an electronic device (i.e., the electrode 900 may be deposited on an exterior surface 902 of the carrier 904). As shown, a con-

19                                                                                          20

ductive material used to form the electrode 900 may be deposited on the carrier 904 such that the material wraps around an edge 906 or perimeter of the carrier 904 to form an electrical contact 908 on a surface 910 of the carrier 904 that is interior to the electronic device (i.e., on an interior surface 910 of the carrier 904). In some cases, the electrical contact 908 may be a tab that traces a much smaller arc about the periphery of the carrier 904 than the electrode 900 (as shown, for example, in FIGS. 5C, 5D, and 5E). In other cases, the electrical contact 908 may be arc-shaped and trace an arc that is similar in size to an arc traced by the electrode 900 on the exterior surface 902 of the carrier 904.

In some cases, the conductive material(s) used to form the electrode 900 and electrical contact 908 may be deposited on the exterior surface 902, edge 906, and interior surface 910 of the carrier 904 in a single operation (or single set of operations in which the material(s) are deposited on the exterior surface 902, edge 906, and interior surface 910 of the carrier 904). In other cases, the material(s) used to form the electrode 900 may be deposited on the edge 906 or interior surface 910 of the carrier 904 in operations that are performed separately from one or more operations in which the electrode 900 is deposited on the exterior surface 902 of the carrier 904. In these latter examples, the material(s) may be deposited such that the materials overlap. In some cases, a set of one or more materials used to form the electrode 900 may differ from a set of one or more materials deposited on the edge 906 or interior surface 910 of the carrier 904.

In some embodiments, the conductive material(s) deposited on the exterior surface 902, edge 906, and interior surface 910 of the carrier 904 may include a layer of SUS or a layer of DLC. In other embodiments, only the electrode 900 or edge 906 of the carrier 904 may be coated with a layer of stainless steel or DLC. In some examples, the conductive material(s) may include a PVD deposited layer of AlTiN or CrSiCN.

In some embodiments, one or more masks (e.g., one or more ink masks) may be applied to the interior surface of the carrier (e.g., as described with reference to FIGS. 5A-5E, 6, & 7). In these embodiments, one or more of the conductive materials used to form the electrode 900 and electrical contact 908 may be applied over the mask(s). The conductive material(s), and the manner in which the conductive material(s) are deposited on the carrier 904, may therefore be selected to ensure adhesion of the conductive material(s) to the carrier 904 and to the ink or other material used to form the mask(s).

As shown in FIG. 9A, a peripheral band of the interior surface 910 of the carrier 904 may be attached to a recessed ledge 912 in another housing member 914 of the electronic device (e.g., with the carrier 904 overlapping the housing member 914). In such an embodiment, the carrier 904 may be attached to the housing member 914 using an adhesive 916, such as a heat-activated film (HAF). The adhesive 916 or conductive material(s), and the manner in which the carrier 904 is attached to the housing member 914, may therefore be selected to ensure adhesion of the carrier 904 to the housing member 914.

The electrical contact 908 may have a great enough width (e.g., a great enough width along a radius of the carrier 904) that the electrical contact 908 extends past the recessed ledge 912 in the housing member 914 when the carrier 904 is attached to the housing member 914, making the electrical contact 908 accessible interior to the electronic device. In some cases, a flex circuit, other flexible conductor, or other conductive element may be soldered or otherwise electri-

cally connected to the electrical contact 908, to enable a signal to be received from or applied to the electrode 900.

In FIG. 9B, the electrode 918 may be a thin film electrode that is PVD deposited on a surface 920 of a carrier 922. The surface 920 on which the electrode 918 is deposited may be a surface of the carrier 922 that is exterior to an electronic device (i.e., the electrode 918 may be deposited on an exterior surface 920 of the carrier 922). Prior to or after depositing the electrode 918 on the carrier 922, a thru-carrier via 924 may be drilled or otherwise cut into the carrier 922. The thru-carrier via 924 may extend from the exterior surface 920 of the carrier 922 (or electrode 918) to the interior surface 926 of the carrier 922. The via 924 may be coated or filled with a conductive material 928 such as stainless steel (SUS), and the conductive material 928 may be covered by, overlap, or otherwise electrically connect to the electrode 918. In some cases, the conductive material 928 in the via 924 may be molded or glued in the via 924. The conductive material 928 may provide an electrical contact 930 on a surface 926 of the carrier 922 that is interior to an electronic device (i.e., on an interior surface of the carrier). In some cases, the conductive material 928 in the via 924 may overlap a portion of the interior surface 926 of the carrier 922, or may be connected to another conductive element deposited on the interior surface 926 of the carrier 922.

The conductive material(s) used to form the electrode 918 and deposited in the via 924 may be the same or different. In some embodiments, the conductive material(s) used to form the electrode 918 may include a layer of stainless steel (SUS) or a layer of diamond like carbon (DLC). In some examples, the conductive material(s) may include a PVD deposited layer of Aluminum Titanium Nitride (AlTiN) or Chromium Silicon Carbon Nitride (CrSiCN).

As shown in FIG. 9B, a peripheral band of the interior surface 926 of the carrier 922 may be attached to a recessed ledge 932 in another housing member 934 of the electronic device (e.g., with the carrier 922 overlapping the housing member 934). In such an embodiment, the carrier 922 may be attached to the housing member 934 using an adhesive 936, such as a HAF. The adhesive 936, and the manner in which the carrier 922 is attached to the housing member 934, may therefore be selected to ensure adhesion of the carrier 922 to the housing member 934.

When the carrier 922 is attached to the housing member 934, the via 924 may be positioned such that it overlaps the recessed ledge 932 or is interior to the recessed ledge 932, making the electrical contact 930 accessible interior to the electronic device. In some cases, a flex circuit, other flexible conductor, or other conductive element may be soldered or otherwise electrically connected to the electrical contact 930, to enable a signal to be received from or applied to the electrode 918.

In FIG. 9C, the electrode 938 may be a metallic arc-shaped element positioned between a carrier 940 and another housing member 942 of an electronic device. In some embodiments, the electrode 938 may be a singular metallic ring-shaped electrode (e.g., one electrode). In these embodiments, a peripheral band of a surface of the carrier 940 that is interior to the electronic device (e.g., an interior surface 944 of the carrier 940) may be attached to a recessed ledge 946 in the carrier 940 (e.g., with the carrier 940 overlapping the electrode 938), and the electrode 938 may be attached to a recessed ledge 950 in the housing member 942 (e.g., with the electrode 938 overlapping the housing member 942). In other embodiments, the electrode 938 may be arc-shaped and may be one of two or more arc-shaped

electrodes between the carrier 940 and the housing member 942. In these embodiments, a peripheral band of the interior surface of the carrier 940 may be attached to recessed ledges 946 in multiple arc-shaped electrodes 938 (e.g., with the carrier 940 overlapping the electrodes 938), and each of the arc-shaped electrodes 938 may be attached to the recessed ledge 950 in the housing member 942 (e.g., with the electrodes 938 overlapping the housing member 942). In some cases, the multiple arc-shaped electrodes 938 may be electrically isolated from each other by flexible seals or gaskets, or by rigid separators (e.g., rigid extensions of the housing member 942, which rigid extensions may include extensions of the recessed ledge 950 to which the electrodes 938 are attached. In some cases, the electrode 938 may be attached to the housing member 942 before the carrier 940 is attached to the electrode 938.

The electrode 938 may be formed of a conductive material including a layer of stainless steel (SUS) or DLC. In some examples, the conductive material may include a PVD deposited layer of Aluminum Titanium Nitride (AlTiN) or Chromium Silicon Carbon Nitride (CrSiCN). A surface 954 of the electrode 938 interior to the electronic device may provide an electrical contact for connecting components interior to the electronic device to the electrode 938.

In some cases, an edge 956 or perimeter of the carrier 940 may be abutted directly to the electrode 938, and an edge 958 of the electrode 938 may be abutted directly to the housing member 942. In other cases, an adhesive, seal, gasket, or filler may fill a gap between the carrier 940 and the electrode 938 or a gap between the electrode 938 and the housing member 942.

As shown in FIG. 9C, a peripheral band of the interior surface 944 of the carrier 940 may be attached to a recessed ledge 946 in the electrode 938, and a peripheral band of an interior surface 954 of the electrode 938 may be attached to the housing member 942. In such an embodiment, the carrier 940 may be attached to the electrode 938 or the electrode 938 may be attached to the housing member 942 using an adhesive 948 or 952, such as a HAF. The adhesive 948 or 952, and manner in which the respective elements are attached, may therefore be selected to ensure adhesion of the carrier 940 to the electrode 938 (or adhesion of the electrode 938 to the housing member 942).

When the electrode 938 is attached to the housing member 942, the electrode 938 may be positioned such that it overlaps the recessed ledge 950 or is interior to the recessed ledge 950, making the electrode 938 accessible interior to the electronic device. In some cases, a flex circuit, other flexible conductor, or other conductive element may be soldered or otherwise electrically connected to the electrode 938, to enable a signal to be received from or applied to the electrode 938.

FIGS. 10A-10D show alternative carrier profiles, and alternative attachments (e.g., structural attachments) of carriers to other housing members of an electronic device. In some examples, the carriers may have circular perimeters. In other examples, the carriers may have perimeters that are oval-shaped, square-shaped, rectangular-shaped, and so on. The techniques described with reference to FIGS. 10A-10D can be applied to carriers having various perimeter shapes, to carriers having different compositions, and so on. Each of FIGS. 10A-10D shows an exterior surface (e.g., a back surface) of an electronic device, such as an electronic watch, and a cross-section of the exterior surface of the electronic device.

In FIG. 10A, a carrier 1000 is attached to another housing member 1002 of an electronic device. The carrier 1000

includes an exterior surface 1004 that forms a part of the exterior surface of the electronic device, and an interior surface 1006 that faces components interior to the electronic device.

A peripheral band of the interior surface 1006 of the carrier 1000 may be attached to a recessed ledge 1064 in the housing member 1002 (e.g., with the carrier 1000 overlapping the housing member 1002). In such an embodiment, the carrier 1000 may be attached to the housing member 1002 using an adhesive, such as a HAF. The adhesive, and the manner in which the carrier 1000 is attached to the housing member 1002, may be selected to ensure adhesion of the carrier 1000 to the housing member 1002.

The carrier 1000 may be variously configured, but in FIG. 10A, an inner portion 1008 of the interior surface 1006 of the carrier 1000, such as a portion of the carrier interior to a number of thru-carrier vias 1010, is flat. An outer portion 1012 of the interior surface 1006, such as a portion outside the number of thru-carrier vias 1010, is concave or inwardly-sloped (downwardly-sloped in the figure) with respect to the inner portion 1008 of the interior surface 1006. In contrast, the exterior surface 1004 of the carrier 1000 may be convex. Thus, the thickness of the carrier 1000 may vary to some degree from its center axis to its perimeter.

In some embodiments, one or more arc-shaped electrodes 1014 (e.g., two electrodes) may be positioned around the exterior surface 1004 of the carrier 1000, inward from the perimeter of the carrier 1000. In other embodiments, the electrodes 1014 may have other shapes or may extend to or around the perimeter. The electrodes 1014 may be PVD deposited thin film electrodes. In some cases, the electrodes 1014 may be connected to interior components of the electronic device by the thru-carrier vias 1010, which in some cases may be drilled or formed through the flat inner portion 1008 of the interior surface 1006 of the carrier 1000. In other cases, the electrodes 1014 may be connected to interior components of the electronic device by conductive material that wraps around the edge or perimeter of the carrier 1000, or in any of the ways shown in FIGS. 9A-9C.

In some cases, components such as a sensor subsystem may be attached to the inner, flat portion of the interior surface 1006 of the carrier 1000.

In FIG. 10B, a carrier 1016 is attached to another housing member 1018 of an electronic device. The carrier 1016 includes an exterior surface 1020 that forms a part of the exterior surface of the electronic device, and an interior surface 1022 that faces components interior to the electronic device.

A peripheral band of the interior surface 1022 of the carrier 1016 may be attached to a recessed ledge 1024 in the housing member 1018 (e.g., with the carrier 1016 overlapping the housing member 1018). In such an embodiment, the carrier 1016 may be attached to the housing member 1018 using an adhesive, such as a HAF. The adhesive, and the manner in which the carrier 1016 is attached to the housing member 1018, may be selected to ensure adhesion of the carrier 1016 to the housing member 1018.

The carrier 1016 may be variously configured, but in FIG. 10B, the carrier 1016 has a uniform thickness. The interior surface 1022 of the carrier 1016 may be concave, and the exterior surface 1020 of the carrier 1016 may be convex. To provide a flat surface for connecting components (e.g., a sensor subsystem) to the carrier 1016, a secondary carrier 1026 having a convex exterior surface 1028 and a flat interior surface 1066 may be attached to an inner portion of the interior surface 1022 of the carrier 1016. The secondary (or interior) carrier 1026 may be attached to the primary (or

exterior) carrier 1016 using a transparent adhesive. In some cases, the secondary carrier 1026 may be attached to the primary carrier 1016 interior to a number of thru-carrier vias 1030.

In some embodiments, one or more arc-shaped electrodes 1032 (e.g., two electrodes) may be positioned around the exterior surface of the carrier 1016, inward from the perimeter of the carrier 1016. In other embodiments, the electrodes 1032 may have other shapes or may extend to or around the perimeter. The electrodes 1032 may be PVD deposited thin film electrodes. In some cases, the electrodes 1032 may be connected to interior components of the electronic device by the thru-carrier vias 1030. In other cases, the electrodes 1032 may be connected to interior components of the electronic device by conductive material that wraps around the edge or perimeter of the carrier 1016, or in any of the ways shown in FIGS. 9A-9C.

FIGS. 10C & 10D each show a carrier attached to another housing member of an electronic device. The carrier includes an exterior surface that forms a part of the exterior surface of the electronic device, and an interior surface that faces components interior to the electronic device. In each of FIGS. 10C & 10D, the carrier has a flat interior surface and a convex exterior surface. The carriers shown in FIGS. 10C & 10D may be easier to manufacture than the carriers shown in FIGS. 10A & 10B.

In FIG. 10C, a carrier 1034 is attached to another housing member 1036 of an electronic device. The carrier 1034 includes an exterior surface 1038 that forms a part of the exterior surface of the electronic device, and an interior surface 1040 that faces components interior to the electronic device.

A peripheral band of the interior surface 1040 of the carrier 1034 may be attached to a recessed ledge 1042 in the housing member (e.g., with the carrier 1034 overlapping the housing member 1036). In such an embodiment, the carrier 1034 may be attached to the housing member 1036 using an adhesive, such as a HAF. The adhesive, and the manner in which the carrier 1034 is attached to the housing member 1036, may be selected to ensure adhesion of the carrier 1034 to the housing member 1036.

In some embodiments, one or more arc-shaped electrodes 1044 (e.g., two electrodes) may be positioned around the perimeter of the exterior surface 1038 of the carrier 1034. In other embodiments, the electrodes 1044 may have other shapes or other positions on the exterior surface 1038 of the carrier 1034. The electrodes 1044 may be PVD deposited thin film electrodes. In some cases, the electrodes 1044 may be connected to interior components of the electronic device by conductive material that wraps around the edge or perimeter of the carrier 1034, or in any of the ways shown in FIGS. 9A-9C.

In some cases, components such as a sensor subsystem may be attached to the interior surface 1040 of the carrier 1034.

In FIG. 10D, a carrier 1060 is attached to another housing member 1046 of an electronic device (e.g., an electronic watch), similarly to how the carrier 1034 is attached to another housing member 1036 in FIG. 10C. For example, a peripheral band of the interior surface 1048 of the carrier 1060 may be attached to a recessed ledge 1050 in the housing member 1046 (e.g., with the carrier 1060 overlapping the housing member 1046). The carrier 1060 may be attached to the housing member 1046 using an adhesive, such as a HAF. The adhesive, and the manner in which the

carrier 1060 is attached to the housing member 1046, may be selected to ensure adhesion of the carrier 1060 to the housing member 1046.

The housing member 1046 to which the carrier 1060 is attached may be attached to yet another housing member (e.g., a second housing member 1052). A peripheral band of the interior surface 1054 of the first housing member 1046 may be attached to a recessed ledge 1056 in the second housing member 1052 (e.g., with the first housing member 1046 overlapping the second housing member 1052). The first housing member 1046 may be attached to the second housing member 1052 using an adhesive, such as a HAF. The adhesive, and the manner in which the first housing member 1046 is attached to the second housing member 1052, may be selected to ensure adhesion of the first housing member 1046 to the second housing member 1052. In some cases, the first housing member 1046 may electrically insulate the electrodes 1058 on the carrier 1060 from the second housing member 1052, or may provide a transition between incompatible materials, or may provide a support for the carrier 1060, or may facilitate assembly of the housing of the electronic device.

In some embodiments, one or more arc-shaped electrodes 1058 (e.g., two electrodes) may be positioned around the perimeter of the exterior surface of the carrier 1060. In other embodiments, the electrodes 1058 may have other shapes or other positions on the exterior surface 1062 of the carrier 1060. The electrodes 1058 may be PVD deposited thin film electrodes. In some cases, the electrodes 1058 may be connected to interior components of the electronic device by conductive material that wraps around the edge or perimeter of the carrier, or in any of the ways shown in FIGS. 9A-9C.

In some cases, components such as a sensor subsystem may be attached to the interior surface 1048 of the carrier 1060.

Turning now to the implementation of an electrode on a crown, FIG. 11A shows an example elevation of a crown assembly 1100. The crown assembly 1100 may be an example of a crown assembly included in any of the electronic devices described with reference to FIGS. 1A, 1B, 2A-2C, 3, 4A, or 4B. The crown assembly 1100 may include a crown 210.

The crown 210 may be mechanically and electrically connected to a shaft 1102 that extends through an opening in a housing. By way of example, the housing is shown to be the housing 206 of the watch body 202 described with reference to FIGS. 2A-2C, 3, 4A, & 4B. The crown 210 may be integrally formed from a single piece of material that includes the shaft 1102 (that is, they may be connected to one another), or the shaft 1102 may be semi-permanently attached to a crown body 1104 using a fastening means such as solder, threads, or an adhesive. The crown 210 (or at least the crown body 1104) may be external to the housing 206, and may be rotated and/or translated by a user of the electronic device incorporating the crown assembly 1100. Further, although the crown body 1104 and shaft 1102 are shown as integrally formed in FIGS. 11A and 11B, it should be appreciated that they may be separate pieces that are joined together.

The crown assembly 1100 may further include a shaft retainer 1106 receiving an end of the shaft 1102. The shaft retainer 1106 may be mechanically and/or electrically connected to the shaft 1102 (e.g., using solder, threads, or an adhesive), interior to the housing 206. The shaft retainer 1106 may retain the crown 210 in position in relation to the housing 206.

US 10,610,157 B2

One or more insulators 1108 (e.g., electrical insulators) may electrically insulate the crown 210 and/or shaft 1102 from the housing 206. The term "insulator" encompasses both a single insulator and multiple insulators taken as a set. The insulator 1108 is generally shown in FIG. 11 as an annular seal having an L-shaped profile, functioning as a collar for the shaft. The shaft 1102 and crown body 1104 may translate, moving toward and away from the housing 206 while the insulator 1108 and shaft retainer 1106 move with the shaft 1102. In some embodiments, the insulator 1108 may be stationary relative to the housing 206 while the shaft 1102, crown body 1104 and shaft retainer 1106 move.

The insulator 1108 or seal electrically insulates the shaft 1102 from the housing 206, and may also electrically insulate the housing 206 from the shaft retainer 1106. In some embodiments, the insulator 1108 may alternatively include more than one element and/or be positioned elsewhere within the crown assembly 1100. For example, the insulator 1108 may include an element, layer, or coating 1108a applied to a surface of the housing 206 that faces an underside of the crown 210, or to other elements that face the underside of the crown 210.

A tactile switch 1110 may be axially aligned with the shaft 1102 and positioned at an end of the shaft 1102 opposite the crown body 1104. By way of example, the tactile switch 1110 may be attached on a substrate 1112. The tactile switch 1110 may be actuated (e.g., switched between two or more states) as the shaft 1102 translates along an axis of the shaft 1102 to provide a crown input. A spring-biased conductor 1114 may be mechanically and electrically connected to at least one of the shaft 1102 or the shaft retainer 1106, and in FIG. 11 is shown to be connected to the shaft retainer 1106. The spring-biased conductor 1114 may be biased to electrically contact the shaft 1102 and/or shaft retainer 1106 during all phases of rotation and translation of the crown 210, and may electrically connect the shaft 1102 and/or shaft retainer 1106 to a circuit 1116 (e.g., a processor). When the crown is translated by a user, the spring-biased conductor 1114 may deform to maintain electrical contact with the shaft 1102 and/or shaft retainer 1106.

The crown assembly 1100 may further include an optical encoder 1118. The optical encoder 1118 may be used to detect rotation and/or translation of the shaft 1102 or shaft retainer 1106. In some embodiments, the circuit 1116 and optical encoder 1118 may be attached to the same substrate as the tactile switch 1110.

In some embodiments, the entirety of the crown 210 or crown body 1104 may be conductive and function as an electrode. The conductive crown body 1104 may be electrically connected to the circuit 1116 via the shaft 1102, shaft retainer 1106, and spring-biased conductor 1114. In other embodiments, only a portion of the crown 210 or crown body 1104 may be conductive and function as an electrode, and the conductive portion of the crown body 1104 may be electrically connected to the circuit 1116 via the shaft 1102, shaft retainer 1106, and spring-biased conductor 1114.

Because the signals received by or propagated from the crown 210 may be low voltage or low amplitude signals, the materials, positions, electrical connections to, and electrical routing paths for an electrode formed on or by the crown 210 can have a significant impact on the ability of the circuit 1116 to discern useful signals representing an ECG or other biological parameter of a person wearing an electronic device including the crown assembly 1100. The materials, positions, electrical connections to, and electrical routing paths for the crown assembly 1100 can also determine how well the crown assembly 1100 receives voltages/signals from a person's skin (e.g., a SNR of a device-to-user interface through which the voltages/signals pass); how well voltages/signals are transferred between the crown 210 and internal components of an electronic device (e.g., a voltage/signal propagation SNR); and how well the crown assembly 1100 operates in the face of environmental factors, such as temperature, humidity, moisture, electromagnetic radiation, dust, and so on. In some cases, the insulator 1108 may be positioned to prevent moisture from electrically shorting the crown 210 to the housing 206, or the housing 206 may be grounded to provide electrical shielding for some or all of the signals propagated through the crown assembly 1100, or the interfaces between the shaft 1102 and the shaft retainer 1106, or between the shaft retainer 1106 and the spring-biased conductor 1114, may be configured to increase SNR and reduce signal attenuation.

In some embodiments, the crown 210 may include a coating, layer, or the like 1120 ("coating 1120") that electrically isolates the crown 210. The coating may thus function as, have similar properties to, and/or be made from the same or similar materials as, the insulator 1108. Generally, the coating 1120 prevents electrical connection between the crown 210 and the housing 206, for example when water is present in the space between the crown and housing.

In the absence of the coating 1120, water, sweat, or another conductor may electrically bridge or short the crown 210 to the housing 206, presuming both the crown and housing are made from (or incorporate) an electrical conductor such as metal. In the event the crown 210 or some portion thereof serves as an electrode for measuring an electrocardiogram, shorting the crown 210 to the housing 206 (and thus to the skin of a wearer) may render the crown inoperable or the electrocardiogram unreliable.

The coating 1120 serves as a barrier against shorting the crown 210 to the housing 206 or other electrically conductive material or body, thereby ensuring the electrical functionality of the crown 210. In some embodiments the coating 1120 coats only those surfaces of the crown that oppose or face the housing; in other embodiments and as shown in FIG. 11A, the coating 1108a may extend across one or more sides of the crown 210. Further, the coating 1120 may extend onto a top or outer surface of the crown 210 (e.g., the surface of the crown that does not oppose or face the housing 206), although typically at least a portion of the outer surface is not covered by the coating in order to define an area of the crown that can electrically couple to a wearer's finger.

The coating 1120 may also extend at least partly down a shaft of the crown 210, as discussed in more detail with respect to FIG. 11B.

In some embodiments, a second coating 1122 may be applied to the housing 206 instead of, or in addition to, the coating 1120 on the crown 210. This housing coating 1122 serves the same function as the crown coating 1120, namely electrically insulating the housing 206 from the crown 210 when water or other electrical conductors are in the gap between the housing and crown. The housing coating 1122 may extend across the insulator 1108 (or a non-insulating collar), in some embodiments. Likewise, the housing coating 1122 may extend between the housing 206 and insulator 1108 in some embodiments, or may be an extension of the insulator.

In some embodiments, the coatings 1120, 1122 may improve wear or provide a cosmetic function (e.g., provide an accent or visually conceal a surface of the shaft, crown, and/or housing) for the crown assembly 1100. Alternatively, the housing 206, or that portion of the housing 206 that faces the crown 210, may be formed from a material that operates

as an electrical insulator (e.g., plastic, ceramic, or the like). In some embodiments, one or more of the insulators 1108 (including element, layer, or coating 1108a or 1120) may by overmolded liquid crystal polymer (LCP) elements or coatings, which can provide very good separation resistance (high separation resistance) between moving or other parts. LCP layers may also be used in place of polyimide layers in flex circuits and other elements, and may not require the use of temperature or moisture-sensitive adhesives. LCP elements, layers, and coatings absorb less moisture than poly-imides in high temperature and high humidity environments, which can be useful in maintaining high separation resistance between components when sensing low voltage signals (e.g., biometric signals of a person) under varying conditions (e.g., under non-controlled conditions outside a doctor's office or hospital). LCP elements, layers, and coatings also maintain good separation resistance high temperatures. Other elements, layers, or coatings that may be used to provide electrical isolation include silicone or acrylic elements, layers, or coatings, or other elements having a high surface resistance. Other examples of insulators or insulator positions are described with reference to FIGS. 11B, 12A, 12B, 13, & 14.

FIG. 11B shows another example crown 210 extending through a housing 206 of an electronic watch. As with other embodiments described herein, the crown 210 may be used to provide multiple types of input. For example, the crown may rotate about an axis of rotation (typically extending along a center length of the shaft 1102, from an exterior of the housing 206 to an interior of the housing) to provide a first type of crown input, translate along the axis of rotation (e.g., move towards and/or away from the housing 206) to provide a second type of crown input, and be touch-sensitive to provide a third type of crown input. The first and second types of input may control graphical output on the electronic watch's display, as described below in more detail with respect to FIGS. 26A-28B. The third type of input may be a measurement of an electrical signal (such as voltage, capacitance, current, or the like), or facilitating measurements of a differential in an electrical signal, to provide an ECG of a user. That is and as discussed in greater detail herein, the third type of input may be the crown 210 functioning as one of two electrodes in an electrical circuit configured to measure a user's ECG. Typically, although not necessarily, the second electrode is positioned a back of the electronic watch. This second electrode and its functionality is discussed in more detail elsewhere in this document.

The crown 210 may be formed from multiple elements attached together, as discussed in more detail below, or may be a single piece and connected to one another. The crown 210 generally includes a crown body 1104 coupled to (or formed with) a shaft 1102. The shaft 1102 of the crown may extend through the housing 206 and is typically received in, or passes through, a collar 1124. The collar 1124 may restrict tilting of the shaft 1102 and crown body 1104. Further, the collar 1124 may permit translation of the shaft 1102 and crown body 1104 toward and away from the housing and rotation of the shaft and crown body 1104 about the axis of rotation. The collar 1124 may be the same as, or similar to, the shaft retainer 1106 and/or insulator 1108 of FIG. 11A.

One or more O-rings 1134 are fitted about the shaft 1102 and within the collar 1124. The O-rings 1134 may be received within grooves, depressions, or the like within one or both of the shaft 1102 and collar 1124. The O-rings form a watertight seal and likewise reduce or eliminate contaminants passing into an interior of the housing 206 through the gap 1136 between the crown 210 and housing 206. The

O-rings 1134 may also permit the shat to rotate and/or translate while restricting (or helping to restrict) how far the shaft 1102 translates.

As with the embodiment shown in FIG. 11A, the crown 210 may short to the housing 206 if water or another conductor is present in the gap 1136 between the crown and housing and the two are not electrically insulated from one another. Shorting the crown 210 to the housing 206 results in the electronic watch unreliably measuring and displaying an ECG of a user or not functioning at all.

Accordingly and similar to the embodiment of FIG. 11A, an underside of the crown 210 may be coated with an electrically insulating coating 1132. The coating 1132 may prevent water or another contaminant from acting as a short or ground path between the crown 210 and housing 206. As discussed with respect to FIG. 11A and shown in that figure, such a coating may be applied to the housing 206 in addition to, or instead of, the crown 210.

The crown 210 shown in FIG. 11B is not formed from a single piece of material but instead is formed from multiple elements. The crown body 1104 and shaft 1102 may be formed from or as a single piece of material, for example metal or another suitable conductor, and provide an electrical path between an object touching the crown body 1104 and a sensor within the housing 206, such as the third sensor 230 discussed above. An insulating split 1146 may separate the crown body from a trim 1148; the trim 1148 may be annular, square, or any other suitable shape. The trim and split 1146 may provide various aesthetic looks as well as functional properties, such as different wear resistance, environmental resistance, and the like as compared to the crown body 1104. Accordingly, the trim 1148 may be made from the same material or a different material as the crown body 1104 and the shaft 1102.

Insofar as the split 1146 is an electrical insulator, the coating 1132 need not extend across the split or onto any portion of the trim 1148 (although it can in some embodiments). Thus, the coating 1132 may stop at an edge of the crown body 1104 abutting the split 1146. This may reduce manufacturing and assembly complexity of embodiments, as well as provide cost savings.

In addition to, or instead of, providing a coating 1132 on the crown 210 or housing 206, the collar 1124 may be coated. For example, an electrically insulating coating 1126 may be deposited on the collar 1124 and serve to electrically insulate the collar from the housing 206 and/or crown 210. This may be useful when the collar is made from an electrically conductive material and the crown 210 may be shorted to the collar 1124, in addition to or instead of to the housing 206.

As one non-limiting example, capillary action may retain water (or another liquid) in a portion of the gap between the collar 1124 and crown 210 while the part of the gap 1136 between the crown and housing 206 is sized to permit water to drain out. Thus, in such an embodiment the crown 210 may be at risk of electrically shorting to the collar 1124 but not the housing 206. It should be appreciated that in some embodiments the housing 206 and/or crown 210 may be coated as well as the collar 1124. It should likewise be appreciated that any or all of the electrically insulating coatings described herein may attenuate noise with respect to a signal conducted from the crown body 1104 through the shaft 1102 to a sensor, thereby providing more accurate and/or faster readings of a biological parameter such as an ECG.

Although the coating 1126 (and coating 1132) has been discussed as an electrical insulator, it should be appreciated

that the coating(s) may provide other properties in addition to, or instead of, electrical insulation. For example, the coating 1126 may reduce friction between the collar 1124 and shaft 1102 as the shaft 1102 rotates and/or translates. The coating 1126 may reduce wear on either or both of the collar 1124 and shaft 1102 as another example.

Further, in some embodiments the gap 1136 between the crown 210 and housing 206 may be large enough that the collar 1124 may be visible. In order to obscure the first collar coating and/or the collar, a second collar coating 1128 may be applied over the first, insulating collar coating 1126. The second collar coating 1128 may be darker or otherwise visually conceal the first collar coating 1128 and collar 1124 from the naked eye.

As yet another option, the second coating 1128 may also provide environmental resistance and/or resist wear, tear, and/or friction between the collar 1124 and shaft 1102, as described above. Thus, the first collar coating 1126 may be an electrical insulator while the second collar coating 1128 may be chosen for its other material properties and/or resistances. Similarly, the first collar coating may be chosen for its material properties and/or resistances (including functioning as an electrical insulator) and the second collar coating may be used to obscure the first collar coating.

Any or all of the coatings described herein may be deposited in a number of ways, including electrophoretic deposition or other manners that are suitable and known in the art. Likewise, any or all of the coatings may incorporate materials such as titanium dioxide, Teflon, or the like to provide or enhance properties such as resistance to wear, lowering of friction between adjacent elements, and the like. In some embodiments the first collar coating 1126 (or any other coating) may be approximately 10-30 microns thick or even 5-50 microns. The second collar coating 1128 (or any other coating) may be thinner on the order of 3-5 microns or even 2-10 microns.

More detailed examples of the crown assembly 1100 described with reference to FIG. 11A are shown in FIGS. 12A, 12B, 13, & 14.

Turning now to FIGS. 12A & 12B, there is shown an example of a crown assembly 1200, as may be included in any of the electronic devices described with reference to FIGS. 1A, 1B, 2A-2C, 3, 4A, or 4B. FIG. 12A shows an exploded view of the crown assembly 1200, and FIG. 12B shows an assembled cross-section of the crown assembly 1200, as viewed from the front or rear face of an electronic device such as the watch body 202 described with reference to FIGS. 2A-2C, 3, 4A, & 4B.

The crown assembly 1200 is an example of the crown assembly 1100 shown in FIG. 11, and includes components corresponding to the crown 210, shaft retainer 1106, insulator 1108, tactile switch 1110, substrate 1112, spring-biased conductor 1114, circuit 1116, and optical encoder 1118.

The crown assembly 1200 may include a conductive rotatable shaft 1202 configured to extend through an opening in a housing 1242 (see FIG. 12B), such as the housing described with reference to FIG. 2A, 2C, 3, 4A, 4B, or 11. A user-rotatable crown 1204 may be mechanically attached to the shaft 1202 exterior to the housing 1242. The crown 1204 may be rotated by a user of an electronic watch, to in turn rotate the shaft 1202. In some cases, the crown 1204 may also be pulled or pushed by the user to translate the shaft 1202 along its axis. The crown 1204 may be electrically connected to a circuit within the housing 1242, but electrically isolated from the housing 1242.

The crown 1204 may be electrically connected to the shaft 1202. In some cases, at least part of the crown 1204 and at least part of the shaft 1202 may be molded, machined, or otherwise formed together (e.g., from a same material, such as a conductive ceramic or stainless steel).

In some embodiments, the crown 1204 may be formed of a conductive ceramic or stainless steel (or have a conductive ceramic or stainless steel core). The core may be coated in a PVD deposited layer of SUS or DLC, or an electro-deposited (ED) layer of AlTiN or CrSiCN, and may function as an electrode. In some embodiments, the crown 1204 may have a conductive crown body 1244 surrounded by a ring 1246 of non-conductive material (or other insulator). See, FIG. 12B. The non-conductive ring 1246 may help prevent shorting of the crown 1204 to the housing 1242. The ring 1246 of non-conductive material may in some cases be surrounded by another ring 1248 of conductive material. In the configuration shown, the ring 1248 may optionally contact and electrically short to a grounded housing 1242 when the crown is pressed, thereby helping to electrically shield the conductive crown body 1244 of the crown 1204 from some sources of interference. In some embodiments, the crown 1204 may have a conductive surface covered by a thin non-conductive coating. The non-conductive coating may provide a dielectric for capacitive coupling between the conductive surface and skin of a user of the crown 1204 (or an electronic watch or other device that includes the crown assembly 1200). In the same or different embodiments, the crown 1204 may have a non-conductive coating on a surface of the crown 1204 facing the housing 1242.

A shaft retainer 1206 may be mechanically connected to the shaft 1202, interior to the housing 1242 (e.g., interior to a watch body housing), after the shaft is inserted through the opening in the housing 1242 with the crown 1204 positioned exterior to the housing 1242. In some cases, the shaft retainer 1206 may include a nut, and the shaft 1202 may have a threaded male portion that engages a threaded female portion of the nut. In some cases, the shaft retainer 1206 may be conductive, or have a conductive coating thereon, and mechanical connection of the shaft retainer 1206 to the shaft 1202 may form an electrical connection between the shaft retainer 1206 and the shaft 1202. In an alternative embodiment (not shown), the shaft retainer 1206 may be integrally formed with the shaft 1202, and the shaft 1202 may be inserted through the opening in the housing 1242 from inside the housing 1242 and then attached to the crown 1204 (e.g., the crown 1204 may screw onto the shaft 1202).

In some embodiments, a collar 1208 may be aligned with the opening in the housing 1242, and a collar retainer 1210 may be coupled to the collar 1208 to retain the collar 1208 to the housing 1242 from a side of the housing 1242 opposite a side of the housing 1242 in which the collar 1208 is inserted. In some embodiments, the collar retainer 1210 may be coupled to the collar 1208 via threads on a male portion of the collar 1208 and corresponding threads on a female portion of the collar retainer 1210. Optionally, a gasket 1212 (e.g., an I-ring) made of a synthetic rubber and fluoropolymer elastomer (e.g., Viton), silicone, or another compressible material may be placed over the collar 1208 prior to insertion of the collar 1208 through the opening, and attachment of the collar retainer 1210 to the collar 1208 may compress the gasket 1212. The compressed gasket 1212 may provide stability to the collar 1208 and collar retainer 1210, or provide a moisture barrier between the collar 1208 and the housing 1242. The collar 1208 and collar retainer 1210 may be attached to one another, and thereby to the housing 1242, prior to insertion of the shaft 1202 through the collar 1208. Another gasket 1214 (e.g., a Y-ring) made of Viton, silicone, or another compressible material may be placed over the

collar 1208, before or after insertion of the collar 1208 through the opening, but before the shaft 1202 is inserted through the collar 1208. The second gasket 1214 may provide a moisture barrier between the crown 1204 and the housing 1242 or the crown 1204 and the collar 1208.

Also prior to inserting the shaft 1202 through the collar 1208, and in some cases prior to inserting the collar 1208 into the opening in the housing 1242, an insulator 1216 may be inserted into or deposited on the interior of the collar 1208, or placed around or deposited on the shaft 1202. The insulator 1216 may also be inserted, placed, or deposited as the shaft 1202 is inserted into the collar 1208. In some cases, the insulator 1216 may include a non-conductive sleeve or bushing (e.g., a plastic sleeve) inserted (e.g., press-fit) into the collar 1208 (e.g., into a portion of the collar 1208 positioned interior to the housing 1242). The insulator 1216 may also or alternatively include a non-conductive sleeve overmolded on the collar (e.g., molded within the opening in the collar 1208 and over a surface of the collar 1208 facing the crown 1204). In some cases, the insulator 1216 may be an overmolded liquid crystal polymer (LCP) insulator 1216. The insulator 1216 may also or alternatively include a non-conductive coating on the collar 1208 (e.g., on an inner surface of the collar 1208), or a non-conductive coating on the shaft 1202, or a set of one or more non-conductive gaskets surrounding the shaft 1202. When the shaft 1202 is inserted into the collar 1208, the insulator 1216 may be positioned between the shaft 1202 and the collar 1208 and help to insulate a conductive portion of the shaft 1202 (or the entire shaft 1202) from the collar 1208.

Another insulator 1218 may be positioned between the shaft retainer 1206 and the collar retainer 1210. For example, a non-conductive (e.g., plastic) washer, plate, or shim may be attached to the interior of the collar retainer 1210, between the shaft retainer 1206 and the collar retainer 1210. In some cases, the non-conductive washer may be carried by a plate 1220, such as a plate formed of stainless steel (e.g., the insulator 1218 may be an overmolded LCP insulator 1218). In these cases, the non-conductive washer may be attached to the interior of the collar retainer 1210 by welding (e.g., laser welding) the plate 1220 to the collar retainer 1210. The non-conductive washer or other element may provide a bearing surface for the shaft retainer 1206.

As shown in FIGS. 12A & 12B, one or more O-rings 1222, 1224 or other gaskets may be placed over the shaft 1202 before the shaft 1202 is inserted into the collar 1208. The O-rings 1222, 1224 may be formed of a synthetic rubber, fluoropolymer elastomer, silicone, or another compressible material. The O-rings 1222, 1224 may maintain the shaft 1202 in a position that is centered within the collar 1208. In some cases, the O-rings 1222, 1224 may provide a seal between the shaft 1202 and the collar 1208. The O-rings 1222, 1224 may also function as an insulator between the shaft 1202 and the collar 1208. In some embodiments, the O-rings 1222, 1224 may be fitted to recesses in the shaft 1202. Additionally, a low-friction ring 1306 or filler may be placed around the top of the collar 1208, between the crown 1204 and the collar 1208. Alternatively, the low-friction ring 1250 or filler may be attached to the crown 1204, between the crown 1204 and the collar 1208. In some embodiments, the shaft 1202 may be smooth (not shown) and rotate within a thicker or closer fitting insulator 1216 without use of the O-rings 1222, 1224.

In some embodiments, a bracket 1226 may be attached (e.g., laser welded) to the collar retainer 1210 or another element within the housing 1242. The bracket 1226 may support a spring-biased conductor 1228 and maintain the

spring-biased conductor 1228 in mechanical and electrical contact with the shaft retainer 1206 (or in some cases with an end of the shaft 1202, such as when the shaft extends through the shaft retainer (not shown)). As shown, the spring-biased conductor 1228 may include a shear plate that is spring-biased about an axis 1238, which axis 1238 is perpendicular to and radially outward from a second axis 1240 of the shaft 1202. By way of example, the shear plate is shown to be circular, although the shear plate could also have other shapes. In some embodiments, the surface of the shear plate that abuts the shaft retainer 1206 or shaft end may be hardened (e.g., with a PVD deposited coating of cobalt chromium (CoCr or hard chromium)) to mitigate the likelihood of the shaft retainer 1206 or shaft end wearing through the shear plate after multiple rotations or translations of the shaft 1202. The shear plate (and in some cases the entirety of the spring-biased conductor 1228) may be plated with gold or another material to improve electrical conductivity (e.g., prior to coating the shear plate with a hardener). In some cases, the spring-biased conductor 1228 may be formed (e.g., stamped or bent) from a piece of metal (e.g., stainless steel). In other cases, the spring-biased conductor 1228 may be formed in other ways. The length and thickness of the shear plate, perpendicular to the axis of the shaft 1202, can be optimized to provide a balance between a high enough spring constant to ensure good electrical contact between the shear plate and the shaft retainer 1206 or shaft end (even during rotation of the shaft 1202), on one hand, and a low enough spring constant to mitigate the likelihood that the shaft retainer 1206 or shaft end will wear through the shear plate (or through a coating thereon). A flat or relatively flat shear plate can reduce the dimension of the crown assembly 1200 along the axis 1240 of the shaft 1202.

In some embodiments, a majority or entirety of the shaft 1202, shaft retainer 1206, or crown 1204 may be coated with a non-conductive coating, but for an external conductive surface of the crown 1204 and a portion of the shaft 1202 or shaft retainer 1206 that contacts the spring-biased conductor 1228.

When the shaft 1202 is translatable, translation of the shaft 1202 into the housing 1242 (e.g., into the housing of a watch body) may cause the spring-biased conductor 1228 (or the shear plate thereof) to deform. However, the spring bias of the spring-biased conductor 1228 may cause the spring-biased conductor 1228 (or the shear plate thereof) to maintain electrical contact with the shaft retainer or shaft end, regardless of whether the shaft 1202 is in a first position or a second position with reference to translation of the shaft 1202. The spring-biased conductor 1228 may be electrically connected to a circuit, such as a circuit formed on or in a substrate 1230 such as a flex circuit or printed circuit board (PCB). In some cases, the spring-biased conductor 1228 may be surface-attached to the circuit substrate 1230 (such as soldered or otherwise mechanically connected, for example by using a surface-mount technology process), which circuit substrate 1230 may be supported by the rigid support member (or sub-housing frame member) 1226. A conductive grease may be deposited between the shaft retainer 1206 or shaft 1202 and the shear plate or other member of the spring-biased conductor 1228. The circuit may be in electrical communication with the crown 1204 via the spring-biased conductor 1228, the shaft retainer 1206, and the shaft 1202 (or when an end of the shaft 1202 protrudes through the shaft retainer 1206, the circuit may be in electrical communication with the crown 1204 via the spring-biased conductor 1228 and the shaft 1202).

A tactile (tac) switch 1252, such as a dome switch, may be electrically connected to the circuit and mechanically connected to the circuit substrate 1230. In some cases, the tac switch 1252 may be surface-attached to the circuit substrate 1230 (such as soldered or otherwise mechanically connected). The shear plate of the spring-biased conductor 1228 may be positioned between the shaft retainer 1206 and the tac switch 1252. The tac switch 1252 may be actuated or change state in response to translation of the shaft 1202. Thus, when a user presses on the crown 1204, the shaft 1202 may translate into the housing 1242 (e.g., into the housing of a watch body) and actuate the tac switch 1252, placing the tac switch 1252 in one of a number of states. When the user releases pressure on the crown 1204 or pulls the crown 1204 outward from the housing 1242, the tac switch 1252 may retain the state in which it was placed when pressed, or advance to another state, or toggle between two states, depending on the type or configuration of the tac switch 1252.

The circuit to which the tac switch 1252 and spring-biased conductor 1228 are electrically connected may be part of, or electrically connected to, one or more circuits that carry portions of an optical encoder 1232 and other circuit elements, such as an interface 1234 to the electrodes described with reference to FIGS. 5C, 5D, 5E, 6-8, 9A-9C, & 10A-10D, or a processor that receives and processes signals received from or provided to the crown 1204 or other electrodes. By way of example, FIG. 12A shows a circuit 1236 (e.g., a flex circuit or PCB) to which a set of one or more light emitters and light detectors of an optical encoder 1232 is connected. The light emitter(s) may illuminate an encoder pattern or other rotating portion of the optical encoder 1232, which encoder pattern or other rotating portion of the optical encoder 1232 may be carried on (e.g., formed on, printed on, etc.) the shaft retainer 1206. The light detector(s) may receive reflections of the light emitted by the light emitter(s), and a processor may determine a direction of rotation, speed of rotation, angular position, translation, or other state(s) of the crown 1204 and shaft 1202.

The spring-biased conductor 1228 may be connected to a processor. The processor may be attached or coupled to one or more of the circuits shown in FIG. 12A. The processor may determine whether a user is touching the crown 1204, or determine a biological parameter of the user based on a signal received from or provided to the user via the crown 1204, or determine other parameters based on signals received from or provided to the crown 1204. In some cases, the processor may operate the crown and electrodes described in FIGS. 5C, 5D, 5E, 6-8, 9A-9C, 10A-10D, 11, 12A, & 12B as an electrocardiogram and provide an ECG to a user of a watch including the crown and electrodes.

In an alternate embodiment of the crown assembly 1200 shown in FIGS. 12A & 12B, the spring-biased conductor 1228 may include a conductive brush that is biased to contact a side of the shaft 1202 or a side of the shaft retainer 1206. The conductive brush may maintain electrical contact with the shaft 1202 or shaft retainer 1206 through rotation or translation of the shaft 1202, and may be electrically connected to a circuit such as the circuit that supports the tac switch 1352.

FIG. 13 shows a cross-section of a crown assembly 1300 as viewed from an edge of a watch body (e.g., an edge to which a watch band might be attached). The crown assembly 1300 shown in FIG. 13 differs from the crown assembly 1200 shown in FIGS. 12A & 12B in that the crown 1302 has a somewhat different configuration. For example, the crown 1302 has a conductive crown body 1304 surrounded by a

non-conductive ring 1306. The non-conductive ring 1306 may be attached to the conductive crown body 1304 by an adhesive 1308. Alternatively, the ring 1306 may be conductive, and may be insulated from the conductive crown body 1304 by the adhesive 1308 (e.g., when the adhesive 1308 is non-conductive) or electrically connected to the conductive crown body 1304 (e.g., when the adhesive 1308 is conductive).

As shown in FIG. 13, the crown assembly 1300 may be positioned adjacent a transparent cover 1310 (e.g., a carrier) under which a display may be attached, such that the display is at least partially or fully within the housing. In some cases, the display may be a touch-sensitive display. In some embodiments, the display may also be a force-sensitive display. FIG. 13 shows one example of a force sensor 1312 for a force-sensitive display, in which a compressible gasket 1314 is bounded by first and second capacitive plates 1316, 1318 and positioned between the carrier 1310 and the housing 1242.

FIG. 14 shows a cross-section of a crown assembly 1400, as may be included in any of the electronic devices described with reference to FIGS. 1A, 1B, 2A-2C, 3, 4A, or 4B. Similarly to the crown assemblies 1200 and 1300 shown in FIGS. 12A, 12B, & 13, the crown assembly 1400 is an example of the crown assembly 1100 shown in FIG. 11.

The crown assembly 1400 is similar to the crown assembly 1200 in that its crown 1402 has a conductive crown body 1404 surrounded by an inner ring 1406 of non-conductive material and an outer ring 1408 of conductive material. The conductive crown body 1404 may be formed of a conductive ceramic or stainless steel, and may be coated in a PVD deposited layer of SUS or DLC, or an ED layer of AlTiN or CrSiCN, and may function as an electrode. The non-conductive inner ring 1406 may help prevent shorting of the crown 1402 to the housing 1242, and may be formed of a plastic or elastomer, for example. The conductive outer ring 1408 may be formed of the same or different material(s) as the conductive crown body 1404.

The non-conductive inner ring 1406 may extend from an outer surface of the crown 1402 to under a portion of the conductive crown body 1404. In this manner, the non-conductive inner ring 1406 may prevent the conductive crown body 1404 from contacting the collar 1208 when the crown 1402 is translated toward the housing 1242.

The conductive outer ring 1408 may extend from an outer surface of the crown 1402 to under a portion of the non-conductive inner ring 1406. In this manner, if the housing 1242 is grounded and the conductive outer ring 1408 contacts the housing 1242, the conductive outer ring 1408 may be grounded to the housing 1242.

In contrast to the crown assemblies 1200 and 1300, the crown assembly 1400 has an insulator 1410 (e.g., a non-conductive element, layer, or coating) applied to at least one surface of the collar 1208 (e.g., to at least a portion of the surface or surfaces that face an underside of the conductive crown body 1404). The insulator 1410 may further prevent the conductive crown body 1404 from contacting the collar 1208 when the crown 1402 is translated toward the housing 1242 and may provide increased separation resistance between the collar 1208 and the crown 210. In some embodiments, the insulator 1410 may include a layer of plastic that is overmolded (e.g., LCP overmolded) on at least a portion (or all) of the collar 1208 that faces the crown 210 (or a plastic element that is placed over or adhered to at least a portion (or all) of the collar 1208, or a coating that is applied to at least a portion of the collar 1208). In some embodiments, the plastic may extend to adjacent surfaces of

the housing 206, or into the central opening in the collar 1208. In some embodiments, the insulator 1410 may include a coating (e.g., an electro-deposited (ED) acrylic-based polymer coating). Alternatively or additionally, an insulator (e.g., an element, layer, or coating) may be applied to the underside of the conductive crown body 1404, or to surfaces of the shaft 1202 that face the collar 1208 and/or housing 206. Alternatively, the collar 1208 may be formed from plastic or another material that is non-conductive or otherwise electrically isolates the conductive crown body 1404 of the crown 1402, or the shaft 1202, from other conductive components of the crown assembly 1500.

In any of the crown assemblies 1200, 1300, 1400 described in the present disclosure, the crown 1204, 1302, or 1402 may alternately be a monolithic structure and not include additional conductive or non-conductive rings, or may include a single non-conductive (e.g., plastic) ring surrounding a conductive central portion.

Turning now to the implementation of an electrode on a button, FIG. 15 shows an example cross-section of a button assembly 1500. The button assembly 1500 may be an example of a button assembly included in any of the electronic devices described with reference to FIGS. 1A, 1B, 2A-2C, 3, 4A, or 4B.

The button assembly 1500 may include a conductive button cap 1502. The conductive button cap 1502 may be retained within an opening in a housing by a button cap retention assembly 1504. The button cap retention assembly 1504, or parts thereof, may be conductive. By way of example, the housing is shown to be the housing 206 of the watch body 202 described with reference to FIGS. 2A-2C, 3, 4A, & 4B. The button cap retention assembly 1504 may be attached to the housing 206 and extend through the opening in the housing 206. In some embodiments, the button cap retention assembly 1504 may include a first component 1506 that is inserted through the opening from one side of the housing 206, and a second component 1508 that fastens to the first component 1506 on the other side of the housing 206 (e.g., by threads, screws, solder, or an adhesive).

A set of one or more insulators 1510 (e.g., electrical insulators) may electrically insulate the button cap retention assembly 1504 from the housing 206. The insulator 1510 may also electrically insulate the conductive button cap 1502 from the housing 206. Although the insulator 1510 is generally shown in FIG. 15 as a singular annular seal around the perimeter of the button assembly 1500, the insulator 1510 may alternatively include more than one element or be positioned elsewhere within the button assembly 1500, as described with reference to FIGS. 16A, 16B, 17A, 17B, 18A, & 18C.

The conductive button cap 1502 may translate toward and away from the housing 206, and may be in electrical contact with the button cap retention assembly 1504 during all phases of translation. When the conductive button cap 1502 is pressed by a user and translates toward the housing 206, a tactile switch 1512 may be actuated (e.g., switched between two or more states). A shaft 1514 may extend from an interior surface of, or be formed integrally with, the conductive button cap 1502 and a depressible surface of the tactile switch 1512. The tactile switch 1512 and shaft 1514, or other elements not shown in FIG. 15 (e.g., springs), may bias the conductive button cap 1502 in an outwardly translated position.

The conductive button cap 1502 may function as an electrode, and an electrical signal may be routed between the conductive button cap 1502 and a circuit 1516, at least in

part, via the button cap retention assembly 1504. In some embodiments, the button cap retention assembly 1504, tactile switch 1512, and circuit 1516 may be attached to a common substrate 1518.

Because the signals received by or propagated from the conductive button cap 1502 may be low voltage or low amplitude signals, the materials, positions, electrical connections to, and electrical routing paths for an electrode formed on or by the conductive button cap 1502 can have a significant impact on the ability of the circuit 1516 to discern useful signals representing an ECG or other biological parameter of a person wearing an electronic device including the button assembly 1500. The materials, positions, electrical connections to, and electrical routing paths for the button assembly 1500 can also determine how well the button assembly 1500 receives voltages/signals from a person's skin (e.g., a SNR of a device-to-user interface through which the voltages/signals pass); how well voltages/signals are transferred between the conductive button cap 1502 and internal components of an electronic device (e.g., a voltage/signal propagation SNR); and how well the button assembly 1500 operates in the face of environmental factors, such as temperature, humidity, moisture, electromagnetic radiation, dust, and so on. In some cases, the insulator 1510 may be positioned to prevent moisture from electrically shorting the conductive button cap 1502 to the housing 206, or the housing 206 may be grounded to provide electrical shielding for some or all of the signals propagated through the button assembly 1500.

More detailed examples of the button assembly 1500 described with reference to FIG. 15 are shown in FIGS. 16A, 16B, 17A, 17B, 18A, & 18B.

Turning now to FIGS. 16A & 16B, there is shown an example of a button assembly 1600 that may be included in any of the electronic devices described with reference to FIGS. 1A, 1B, 2A-2C, 3, 4A, or 4B. FIG. 16A shows an exploded view of the button assembly 1600, and FIG. 16B shows an assembled cross-section of the button assembly 1600, as viewed from the front or rear face of an electronic device such as the watch body 202 described with reference to FIGS. 2A-2C, 3, 4A, and 4B.

The button assembly 1600 is an example of the button assembly 1500 shown in FIG. 15, and includes components corresponding to the conductive button cap 1502, button cap retention assembly 1504, insulator 1510, and tactile switch 1512.

The button assembly 1600 may be at least partially within an opening 1602 in a housing 1604 (e.g., an opening in the housing described with reference to FIG. 2A, 2C, 3, 4A, or 4B), and attached to the housing or an internal structure. In some cases, and as shown, the housing 1604 may include a cavity 1606 (FIG. 16B) defined by a sidewall 1608 and a ledge 1610. The ledge 1610 may surround the opening 1602, and the sidewall 1608 may surround the ledge 1610.

The button assembly 1600 may include a conductive button cap 1612. The conductive button cap 1612 may be retained by a button cap retention assembly 1614, and may be translatable toward and away from the housing 1604. The button cap retention assembly 1614 may extend through the opening 1602 and be attached to the housing 1604. In some examples, the button cap retention assembly 1614 may include a bracket 1616 that overlaps the ledge 1610 interior to the housing 1604, and a retainer 1618 that overlaps the ledge 1610 exterior to the housing 1604. The retainer 1618 may be mechanically attached to the bracket 1616 by a set of screws 1620 or other mechanical fastener. The screws 1620 may be inserted into through-holes in the bracket 1616

and screwed into threaded holes in the retainer 1618, clamping the ledge 1610 between the bracket 1616 and the retainer 1618.

The conductive button cap 1612 may have an exterior surface 1622, a sidewall or set of sidewalls 1624 parallel to the sidewall 1608 of the cavity 1606, and an inward facing lip or set of lips 1626 (FIG. 16B) that extends between the retainer 1618 and the ledge 1610 and toward a center axis of the conductive button cap 1612. A set of one or more coil springs 1628 or other spring-biased members may be positioned between an outer surface of the retainer 1618 and an underside of the conductive button cap 1612, and may bias the conductive button cap 1612 in an outward state of translation.

The button cap retention assembly 1614, and in particular the retainer 1618, may have a through-hole 1629 defined therein, with an axis of the through-hole 1629 extending perpendicular to the opening 1602 in the housing 1604. A shaft 1630 may be positioned within the through-hole 1629, and may translate toward and away from the housing 1604. The shaft 1630 may be mechanically connected to the conductive button cap 1612, or may be biased to contact the conductive button cap 1612. By way of example, the shaft 1630 may be non-conductive. In a state of rest, the shaft 1630 and conductive button cap 1612 may be biased in an outward state of translation (i.e., away from the opening 1602) by the coil springs 1628 and/or a spring-biased tactile switch 1632. When a user presses the conductive button cap 1612 toward the housing 1604, the press may overcome the bias provided by the coil springs 1628 and/or tactile switch 1632, and pressure on the conductive button cap 1612 may be transferred to the shaft 1630, which translates toward the housing 1604 and presses on the tactile switch 1632 to change the state of the tactile switch 1632 (e.g., from ON to OFF or vice versa, from one functional state to another, etc.). The tactile switch 1632 may be aligned with an axis of the shaft 1630 and attached to the bracket 1616 using an adhesive 1634 (e.g., a conductive PSA).

In some embodiments, a gasket 1636 (e.g., an O-ring) may be positioned between the shaft 1630 and the through-hole. The shaft 1630 may have a circumferential groove 1638 in which a portion of the gasket 1636 is seated so that the gasket 1636 moves in a predictable way in response to movement of the shaft 1630. In some examples, the gasket 1636 may be non-conductive.

The button assembly 1600 may further include a set of electrical insulators (i.e., one or more electrical insulators), which set of electrical insulators may electrically insulate the button cap retention assembly 1614 from the housing 1604, and electrically insulate the conductive button cap 1612 from the housing 1604. For example, the button assembly 1600 may include a first electrical insulator, such as a sleeve 1640 (or set of shims), positioned between the conductive button cap 1612 and the sidewall 1608 (or set of sidewalls) of the cavity 1606 in the housing 1604. In some cases, the sleeve 1640 may include a closed-shape sidewall and an inward facing lip 1642 (FIG. 16B). In other cases, the sleeve 1640 may not include the inward facing lip 1642 or have a sidewall that does not define a closed shape. In other cases, the first electrical insulator may be a planar perimeter gasket (e.g., an insulator including the lip 1642 but not the sidewall). A second electrical insulator may include an adhesive 1644 (e.g., an adhesive ring) applied to a surface of the retainer 1618 facing the housing 1604, or to the outer surface of the ledge 1610 within the cavity 1606. In some cases, the adhesive 1644 may include a PSA. A gasket or seal 1646, external to the housing 1604, may be bonded to

the adhesive 1644. The adhesive 1644 and seal 1646 may be compressed when the screws 1620 are tightened to clamp the housing 1604 between the bracket 1616 and retainer 1618 of the button cap retention assembly 1614. A third electrical insulator may include a spacer 1648, internal to the housing 1604, positioned between the bracket 1616 and the housing 1604. The third electrical insulator, in conjunction with the first and/or second electrical insulator, may electrically insulate the conductive button cap retention assembly 1614 (e.g., the bracket 1616 and the retainer 1618) from the housing 1604. The first electrical insulator may electrically insulate the conductive button cap 1612 from the housing 1604. In some embodiments, additional or different electrical insulators may electrically insulate the conductive button cap 1612 or button cap retention assembly 1614 from the housing 1604.

In use, a signal may be applied to, or received from, the button cap retention assembly 1614 (e.g., to/from the bracket 1616) via a circuit (e.g., a flex circuit or other circuit element 1650) that is electrically connected to the bracket 1616 (e.g., via a conductive adhesive 1652). A signal may travel through the conductive button cap 1612, coil springs 1628, retainer 1618, screws 1620, and bracket 1616 via a first electrical path, or through the conductive button cap 1612, retainer 1618, screws 1620, and bracket 1616 via a second electrical path. Although the second electrical path may be broken when the conductive button cap 1612 is pressed by a user, the conductive button cap 1612 may remain in electrical contact with the button cap retention assembly 1614 during all states of translation (e.g., via the first electrical path).

With reference to FIGS. 17A & 17B, there is shown another example of a button assembly 1700 that may be included in any of the electronic devices described with reference to FIGS. 1A, 1B, 2A-2C, 3, 4A, or 4B. FIG. 17A shows an exploded view of the button assembly 1700, and FIG. 17B shows an assembled cross-section of the button assembly 1700, as viewed from the front or rear face of an electronic device such as the watch body 202 described with reference to FIGS. 2A-2C, 3, 4A, & 4B.

The button assembly 1700 is an example of the button assembly 1500 shown in FIG. 15, and includes components corresponding to the conductive button cap 1502, button cap retention assembly 1504, insulator 1510, and tactile switch 1512.

The button assembly 1700 may be at least partially within an opening 1702 in a housing 1704 (e.g., an opening in the housing described with reference to FIG. 2A, 2C, 3, 4A, or 4B), and may be attached to any of the housing or an internal structure. In some cases, and as shown, the housing 1704 may include a cavity 1706 (FIG. 17B) defined by at least one sidewall (e.g., a single sidewall 1708 or set of sidewalls) and a ledge 1710. The ledge 1710 may define the opening 1702, and the sidewall 1708 may surround the ledge 1710.

The button assembly 1700 may include a conductive button cap 1712 (or button cap having a conductive portion). The conductive button cap 1712 may be retained by a button cap retention assembly 1714 (or button retainer), and may be translatable toward and away from the housing 1704. The button cap retention assembly 1714 may extend through the opening 1702 and be connected or otherwise attached to the housing 1704. In some examples, the button cap retention assembly 1714 may include a bracket 1716 that overlaps the ledge 1710 interior to the housing 1704, and a retainer 1718 that overlaps the ledge 1710 exterior to the housing 1704. The retainer 1718 may be mechanically attached to the bracket 1716 by a set of screws 1720 or other mechanical

fastener. The screws 1720 may be inserted into through-holes in the bracket 1716 and screwed into threaded holes in the retainer 1718, clamping the ledge 1710 between the bracket 1716 and the retainer 1718.

The conductive button cap 1712 may have an exterior surface 1722, a sidewall or set of sidewalls 1724 parallel to the sidewall 1708 of the cavity 1706, and an inward facing lip or set of lips 1726 (FIG. 19) that extends between the retainer 1718 and the ledge 1710 and toward a center axis of the conductive button cap 1712. A set of one or more coil springs 1728 or other spring-biased members may be positioned between an outer surface of the retainer 1718 and an underside of the conductive button cap 1712, and may bias the conductive button cap 1712 in an outward state of translation.

The button cap retention assembly 1714, and in particular the retainer 1718, may have a through-hole 1729 defined therein, with an axis of the through-hole 1729 extending perpendicular to the opening 1702 in the housing 1704. A shaft 1730 may be positioned within the through-hole 1729, and may translate toward and away from the housing 1704. The shaft 1730 may be mechanically connected to the conductive button cap 1712, or may be biased to contact the conductive button cap 1712. In some cases, the shaft 1730 may be mechanically and electrically connected to the conductive button cap 1712. In a state of rest, the shaft 1730 and conductive button cap 1712 may be biased in an outward state of translation (i.e., away from the opening 1702) by the coil springs 1728 and/or a spring-biased tactile switch 1732. In some cases, a shim 1734, such as a non-conductive shim, may be attached to an end of the shaft 1730 facing the tactile switch 1732. When a user presses the conductive button cap 1712 toward the housing 1704, the press may overcome the bias provided by the coil springs 1728 and/or tactile switch 1732, and pressure on the conductive button cap 1712 may be transferred to the shaft 1730, which translates toward the housing 1704 and presses on the tactile switch 1732 to change the state of the tactile switch 1732 (e.g., from ON to OFF or vice versa, from one functional state to another, etc.). The tactile switch 1732 may be aligned with an axis of the shaft 1730 and attached to the bracket 1716 using an adhesive 1736 (e.g., a conductive PSA).

In some embodiments, a gasket 1738 (e.g., an O-ring) may be positioned between the shaft 1730 and the through-hole. The shaft 1730 may have a circumferential groove 1740 (FIG. 17B) in which a portion of the gasket 1738 is seated so that the gasket 1738 moves in a predictable way in response to movement of the shaft 1730. In some examples, the gasket 1738 may be conductive.

The button assembly 1700 may further include a set of electrical insulators (i.e., one or more electrical insulators), which set of electrical insulators may electrically insulate the button cap retention assembly 1714 from the housing 1704, and electrically insulate the conductive button cap 1712 from the housing 1704. For example, the button assembly 1700 may include a first electrical insulator, such as a sleeve 1742 (or set of shims), positioned between the conductive button cap 1712 and the sidewall 1708 (or set of sidewalls) of the cavity 1706 in the housing 1704. In some cases, the sleeve 1742 may include a closed-shape sidewall and an inward facing lip 1744 (FIG. 18B). In other cases, the sleeve 1742 may not include the inward facing lip 1744 or have a sidewall that does not define a closed shape. In other cases, the first electrical insulator may be a planar perimeter gasket (e.g., an insulator including the lip 1744 but not the sidewall). A second electrical insulator may include an adhesive 1746 (e.g., an adhesive ring) applied to a surface of

the retainer 1718 facing the housing 1704, or to the outer surface of the ledge 1710 within the cavity 1706. In some cases, the adhesive 1746 may include a PSA. A gasket or seal 1748, external to the housing 1704, may be bonded to the adhesive 1746. The adhesive 1746 and seal 1748 may be compressed when the screws 1720 are tightened to clamp the housing 1704 between the bracket 1716 and retainer 1718 of the button cap retention assembly 1714. A third electrical insulator may include a spacer 1750, internal to the housing 1704, positioned between the bracket 1716 and the housing 1704. The third electrical insulator, in conjunction with the first and/or second electrical insulator, may electrically insulate the conductive button cap retention assembly 1714 (e.g., the bracket 1716 and the retainer 1718) from the housing 1704. The first electrical insulator may electrically insulate the conductive button cap 1712 from the housing 1704. In some embodiments, additional or different electrical insulators may electrically insulate the conductive button cap 1712 or button cap retention assembly 1714 from the housing 1704.

In use, a signal may be applied to, or received from, the button cap retention assembly 1714 (e.g., to/from the bracket 1716) via a circuit (e.g., a flex circuit or other circuit element) that is electrically connected to the bracket 1716 (e.g., as described with reference to FIG. 17A). A signal may travel through the conductive button cap 1712, shaft 1730, conductive gasket 1738, retainer 1718, screws 1720, and bracket 1716 via a first electrical path. The signal may also travel through the conductive button cap 1712, coil springs 1728, retainer 1718, screws 1720, and bracket 1716 via a second electrical path, or through the conductive button cap 1712, retainer 1718, screws 1720, and bracket 1716 via a third electrical path. Although the third electrical path may be broken when the conductive button cap 1712 is pressed by a user, the conductive button cap 1712 may remain in electrical contact with the button cap retention assembly 1714 during all states of translation (e.g., via the first and second electrical paths).

FIGS. 18A & 18B show another example of a button assembly 2000 that may be included in any of the electronic devices described with reference to FIGS. 1A, 1B, 2A-2C, 3, 4A, or 4B. FIG. 18A shows an exploded view of the button assembly 1800, and FIG. 18B shows an assembled cross-section of the button assembly 1800, as viewed from the front or rear face of an electronic device such as the watch body 202 described with reference to FIGS. 2A-2C, 3, 4A, & 4B.

The button assembly 1800 is an example of the button assembly 1500 shown in FIG. 15, and includes components corresponding to the conductive button cap 1502, button cap retention assembly 1504, insulator 1510, and tactile switch 1512.

The button assembly 1800 may be at least partially within an opening 1802 in a housing 1804 (e.g., an opening in the housing described with reference to FIG. 2A, 2C, 3, 4A, or 4B), and may be attached to the housing or an internal structure such as a support. In some cases, and as shown, the housing 1804 may include a cavity 1806 (FIG. 18B) defined by at least one sidewall (e.g., a single sidewall 1808 or set of sidewalls) and a ledge 1810. The ledge 1810 may define the opening 1802, and the sidewall 1808 may surround the ledge 1810.

The button assembly 1800 may include a conductive button cap 1812 (or button cap having a conductive portion). The conductive button cap 1812 may be retained by a button cap retention assembly 1814 (or button retainer), and may be translatable toward and away from the housing 1804. The

button cap retention assembly **1814** may extend through the opening **1802** and be connected or otherwise attached to the housing **1804**. In some examples, the button cap retention assembly **1814** may include a bracket **1816** that overlaps the ledge **1810** interior to the housing **1804**, and a retainer **1818** that overlaps the ledge **1810** exterior to the housing **1804**. The retainer **1818** may be mechanically attached to the bracket **1816** by a set of screws **1820** or other mechanical fastener. The screws **1820** may be inserted into through-holes in the bracket **1816** and screwed into threaded holes in the retainer **1818**, clamping the ledge **1810** between the bracket **1816** and the retainer **1818**.

The conductive button cap **1812** may have an exterior surface **1822**, a sidewall or set of sidewalls **1824** parallel to the sidewall **1808** of the cavity **1806**, and an inward facing lip or set of lips **1826** (FIG. 18B) that extends between the retainer **1818** and the ledge **1810** and toward a center axis of the conductive button cap **1812**. A set of one or more coil springs **1828** or other spring-biased members may be positioned between an outer surface of the retainer **1818** and an underside of the conductive button cap **1812**, and may bias the conductive button cap **1812** in an outward state of translation.

The button cap retention assembly **1814**, and in particular the retainer **1818**, may have a through-hole **1829** defined therein, with an axis of the through-hole **1829** extending perpendicular to the opening **1802** in the housing **1804**. A shaft **1830** may be positioned within the through-hole **1829**, and may translate toward and away from the housing **1804**. The shaft **1830** may be mechanically connected to the conductive button cap **1812**, or may be biased to contact the conductive button cap **1812**. In some cases, the shaft **1830** may be mechanically and electrically connected to the conductive button cap **1812**. In a state of rest, the shaft **1830** and conductive button cap **1812** may be biased in an outward state of translation (i.e., away from the opening **1802**) by the coil springs **1828** and/or a spring-biased tactile switch **1832**. In some cases, a spring-biased conductor (e.g., a conductive shear plate **1834**) may extend between the tactile switch **1832** and an end of the shaft **1830** facing the tactile switch **1832**. When a user presses the conductive button cap **1812** toward the housing **1804**, the press may overcome the bias provided by the coil springs **1828** and/or tactile switch **1832**, and pressure on the conductive button cap **1812** may be transferred to the shaft **1830**, which translates toward the housing **1804** and presses on the tactile switch **1832** to change the state of the tactile switch **1832** (e.g., from ON to OFF or vice versa, from one functional state to another, etc.). The tactile switch **1832** may be aligned with an axis of the shaft **1830** and attached to the bracket **1816** using an adhesive **1836** (e.g., a conductive PSA).

In some embodiments, a gasket **1838** (e.g., an O-ring) may be positioned between the shaft **1830** and the through-hole. The shaft **1830** may have a circumferential groove **1840** in which a portion of the gasket **1838** is seated so that the gasket **1838** moves in a predictable way in response to movement of the shaft **1830**. In some examples, the gasket **1838** may be non-conductive.

The button assembly **1800** may further include a set of electrical insulators (i.e., one or more electrical insulators), which set of electrical insulators may electrically insulate the button cap retention assembly **1814** from the housing **1804**, and electrically insulate the conductive button cap **1812** from the housing **1804**. For example, the button assembly **1800** may include a first electrical insulator, such as a sleeve **1842** (or set of shims), positioned between the conductive button cap **1812** and the sidewall **1808** (or set of

sidewalls) of the cavity **1806** in the housing **1804**. In some cases, the sleeve **1842** may include a closed-shape sidewall and an inward facing lip **1844** (FIG. 18B). In other cases, the sleeve **1842** may not include the inward facing lip **1844** or have a sidewall that does not define a closed shape. In other cases, the first electrical insulator may be a planar perimeter gasket (e.g., an insulator including the lip **1844** but not the sidewall). A second electrical insulator may include an adhesive **1846** (e.g., an adhesive ring) applied to a surface of the retainer **1818** facing the housing **1804**, or to the outer surface of the ledge **1810** within the cavity **1806**. In some cases, the adhesive **1846** may include a PSA. A gasket or seal **1848**, external to the housing **1804**, may be bonded to the adhesive **1846**. The adhesive **1846** and seal **1848** may be compressed when the screws **1820** are tightened to clamp the housing **1804** between the bracket **1816** and retainer **1818** of the button cap retention assembly **1814**. A third electrical insulator may include a spacer **1850**, internal to the housing **1804**, positioned between the bracket **1816** and the housing **1804**. The third electrical insulator, in conjunction with the first and/or second electrical insulator, may electrically insulate the conductive button cap retention assembly **1814** (e.g., the bracket **1816** and the retainer **1818**) from the housing **1804**. The first electrical insulator may electrically insulate the conductive button cap **1812** from the housing **1804**. In some embodiments, additional or different electrical insulators may electrically insulate the conductive button cap **1812** or button cap retention assembly **1814** from the housing **1804**.

The shear plate **1834** may be formed from a conductive sheet that is stamped, molded, or otherwise shaped to form an open (shown) or closed (not shown) shape conductive perimeter **1852** and an elevated tab **1854** (e.g., a tab having an end positioned in a different plane than the conductive perimeter **1852**). The conductive perimeter **1852** may be positioned between the bracket **1816** and spacer **1850**, such that the conductive perimeter **1852** and shear plate **1834** are electrically insulated from the housing **1804**. The shear plate **1834** deforms in response to translation of the shaft **1830**.

In use, a signal may be applied to, or received from, the button cap retention assembly **1814** (e.g., to/from the bracket **1816**) via a circuit (e.g., a flex circuit or other circuit element) that is electrically connected to the bracket **1816** (e.g., as described with reference to FIG. 16B). A signal may travel through the conductive button cap **1812**, shaft **1830**, shear plate **1834**, and bracket **1816** via a first electrical path. The signal may also travel through the conductive button cap **1812**, coil springs **1828**, retainer **1818**, screws **1820**, and bracket **1816** via a second electrical path, or through the conductive button cap **1812**, retainer **1818**, screws **1820**, and bracket **1816** via a third electrical path. Although the third electrical path may be broken when the conductive button cap **1812** is pressed by a user, the conductive button cap **1812** may remain in electrical contact with the button cap retention assembly **1814** during all states of translation (e.g., via the first and second electrical paths).

FIG. 19 shows an example elevation of a button assembly **1900**. The button assembly **1900** may be an example of a button assembly included in any of the electronic devices described with reference to FIGS. 1A, 1B, 2A-2C, 3, 4A, or 4B.

The button assembly **1900** may include a conductive button cap **1902**. The conductive button cap **1902** may be retained within an opening in a housing by a button cap retention assembly **1904** (e.g., a button retainer). The button cap retention assembly **1904**, or parts thereof, may be conductive. By way of example, the housing is shown to be

the housing 206 of the watch body 202 described with reference to FIGS. 2A-2C, 3, 4A, & 4B. The button cap retention assembly 1904 may be attached to the housing 206 and extend through the opening in the housing 206. In some embodiments, the button cap retention assembly 1904 may include a first component 1906 that is inserted through the opening from one side of the housing 206, and a second component 1908 that fastens to the first component 1906 on the other side of the housing 206 (e.g., by threads, screws, solder, or an adhesive).

A set of one or more insulators 1910 (e.g., electrical insulators) may electrically insulate the conductive button cap 1902 from the button cap retention assembly 1904. The insulator 1910 may also electrically insulate the conductive button cap 1902 from the housing 206. Although the insulator 1910 is generally shown in FIG. 19 to include a non-conductive liner 1910a on an underside of the conductive button cap 1902, a non-conductive sleeve 1910b positioned between the conductive button cap 1902 and the housing 206, and a non-conductive sleeve 1910c positioned between the button cap retention assembly 1904 and a shaft 1914, the insulator 1910 may alternatively include more or fewer elements, which elements may be positioned in different locations within the button assembly 1900, as described with reference to FIGS. 20, 21, & 22.

The conductive button cap 1902 may translate toward and away from the housing 206, and may be insulated from the button cap retention assembly 1904 during all phases of translation. When the conductive button cap 1902 is pressed by a user and translates toward the housing 206, a tactile switch 1912 may be actuated (e.g., switched between two or more states). The shaft 1914 may extend between an interior surface of the conductive button cap 1902 and a depressible surface of the tactile switch 1912. The tactile switch 1912 and shaft 1914, or other elements not shown in FIG. 19 (e.g., springs), may bias the conductive button cap 1902 in an outwardly translated position.

The conductive button cap 1902 may function as an electrode, and an electrical signal may be routed between the conductive button cap 1902 and a circuit 1916, at least in part, via the shaft 1914. In some embodiments, the button cap retention assembly 1904, tactile switch 1912, and circuit 1916 may be attached to a common substrate 1918.

Because the signals received by or propagated from the conductive button cap 1902 may be low voltage or low amplitude signals, the materials, positions, electrical connections to, and electrical routing paths for an electrode formed on or by the conductive button cap 1902 can have a significant impact on the ability of the circuit 1916 to discern useful signals representing an ECG or other biological parameter of a person wearing an electronic device including the button assembly 1900. The materials, positions, electrical connections to, and electrical routing paths for the button assembly 1900 can also determine how well the button assembly 1900 receives voltages/signals from a person's skin (e.g., a SNR of a device-to-user interface through which the voltages/signals pass); how well voltages/signals are transferred between the conductive button cap 1902 and internal components of an electronic device (e.g., a voltage/signal propagation SNR); and how well the button assembly 1900 operates in the face of environmental factors, such as temperature, humidity, moisture, electromagnetic radiation, dust, and so on. In some cases, the insulator 1910 may be positioned to prevent moisture from electrically shorting the conductive button cap 1902 to the housing 206, or the

housing 206 may be grounded to provide electrical shielding for some or all of the signals propagated through the button assembly 1900.

More detailed examples of the button assembly 1900 described with reference to FIG. 19 are shown in FIGS. 20, 21, & 22.

Referring now to FIG. 20, there is shown an assembled cross-section of another example of a button assembly 2000 that may be included in any of the electronic devices described with reference to FIGS. 1A, 1B, 2A-2C, 3, 4A, or 4B. The button assembly 2000 may be at least partially within an opening 2002 in a housing 2004 (e.g., an opening in the housing described with reference to FIG. 2A, 2C, 3, 4A, or 4B), and may be attached to the housing or an internal structure such as a support. In some cases, and as shown, the housing 2004 may include a cavity 2006 defined by at least one sidewall (e.g., a single sidewall 2008 or set of sidewalls) and a ledge 2010. The ledge 2010 may define the opening 2002, and the sidewall 2008 may surround the ledge 2010.

The button assembly 2000 may include a conductive button cap 2012 (or button cap having a conductive portion). The conductive button cap 2012 may be retained by a button cap retention assembly 2014 (or button retainer), and may be translatable toward and away from the housing 2004. The button cap retention assembly 2014 may extend through the opening 2002 and be connected or otherwise attached to the housing 2004. In some examples, the button cap retention assembly 2014 may include a bracket 2016 that overlaps the ledge 2010 interior to the housing 2004, and a retainer 2018 that overlaps the ledge 2010 exterior to the housing 2004. The retainer 2018 may be mechanically attached to the bracket 2016 by a set of screws 2020 or other mechanical fastener. The screws 2020 may be inserted into through-holes in the bracket 2016 and screwed into threaded holes in the retainer 2018, clamping the ledge 2010 between the bracket 2016 and the retainer 2018.

The conductive button cap 2012 may have an exterior surface 2022, a sidewall or set of sidewalls 2024 parallel to the sidewall 2008 of the cavity 2006, and an inward facing lip or set of lips 2026 that extends between the retainer 2018 and the ledge 2010 and toward a center axis of the conductive button cap 2012. A set of one or more coil springs 2028 or other spring-biased members may be positioned between an outer surface of the retainer 2018 and an underside of the conductive button cap 2012, and may bias the conductive button cap 2012 in an outward state of translation.

The button cap retention assembly 2014, and in particular the retainer 2018, may have a through-hole defined therein, with an axis of the through-hole extending perpendicular to the opening 2002 in the housing 2004. A shaft 2030 may be positioned within the through-hole, and may translate toward and away from the housing 2004. The shaft 2030 may be mechanically and electrically connected to the conductive button cap 2012, or may be biased to contact the conductive button cap 2012. In a state of rest, the shaft 2030 and conductive button cap 2012 may be biased in an outward state of translation (i.e., away from the opening 2002) by the coil springs 2028 and/or a spring-biased tactile switch 2032. In some cases, a shim 2034, such as a non-conductive shim, may be attached to an end of the shaft 2030 facing the tactile switch 2032. When a user presses the conductive button cap 2012 toward the housing 2004, the press may overcome the bias provided by the coil springs 2028 and/or tactile switch 2032, and pressure on the conductive button cap 2012 may be transferred to the shaft 2030, which translates toward the housing 2004 and presses on the tactile switch 2032 to change the state of the tactile switch 2032 (e.g., from ON to

OFF or vice versa, from one functional state to another, etc.). The tactile switch 2032 may be aligned with an axis of the shaft 2030 and attached to the bracket 2016 using an adhesive 2036 (e.g., a non-conductive PSA).

In some embodiments, a gasket 2038 (e.g., an O-ring) may be positioned between the shaft 2030 and the through-hole. In some cases, the gasket 2038 may be positioned between a first non-conductive liner 2044 and a second non-conductive liner 2046. In some examples, the gasket 2038 may be non-conductive.

The button assembly 2000 may further include a set of electrical insulators (i.e., one or more electrical insulators), which set of electrical insulators may electrically insulate the conductive button cap 2012 from the button cap retention assembly 2014 and housing 2004. For example, the button assembly 2000 may include a first electrical insulator, such as a sleeve 2042 (or set of shims), positioned between the conductive button cap 2012 and the sidewall 2008 (or set of sidewalls) of the cavity 2006 in the housing 2004. In some cases, the sleeve 2042 may include a closed-shape sidewall. In other cases, the sleeve 2042 may also include an inward facing lip, or may not have a sidewall that defines a closed shape. A second electrical insulator may include a non-conductive liner 2044 between an interior surface of the conductive button cap 2012 and the button cap retention assembly 2014. In some cases, the non-conductive liner 2044 may be press-fit or adhesively bonded to the interior surface of the conductive button cap 2012. Alternatively, the non-conductive liner 2044 may be press-fit or adhesively bonded to an exterior surface of the retainer 2018. In some embodiments, the non-conductive liner 2044 may extend into the through-hole, between the shaft 2030 and the button cap retention assembly 2014 (e.g., between the shaft 2030 and the retainer 2018). A third electrical insulator may include a second non-conductive liner 2046, positioned in the through-hole between the shaft 2030 and the retainer 2018, below the gasket 2038. The second electrical insulator, in some cases in conjunction with the third electrical insulator, may electrically insulate the conductive button cap 2012 from the button cap retention assembly 2014 (e.g., from the retainer 2018). The first electrical insulator may electrically insulate the conductive button cap 2012 from the housing 2004. In some embodiments, additional or different electrical insulators may electrically insulate the conductive button cap 2012 from the button cap retention assembly 2014 or housing 2004.

A conductive flexure 2048 may be coupled to, but insulated from, the bracket 2016, and positioned (e.g., angled) to contact the end of the shaft 2030 that faces the tactile switch 2032. The conductive flexure 2048 may be spring-biased to contact the end of the shaft 2030, and may be spring-biased to remain in contact with the end of the shaft 2030 during all states of translation of the shaft 2030.

In use, a signal may be applied to, or received from, the conductive button cap 2012 via a circuit (e.g., a flex circuit or other circuit element) that is electrically connected to the conductive flexure 2048. A signal may travel through the conductive button cap 2012, shaft 2030, and conductive flexure 2048.

FIG. 21 shows an assembled cross-section of another example of a button assembly 2100 that may be included in any of the electronic devices described with reference to FIGS. 1A, 1B, 2A-2C. 3, 4A, or 4B. The button assembly 2100 may be at least partially within an opening 2102 in a housing 2104 (e.g., an opening in the housing described with reference to FIG. 2A, 2C, 3, 4A, or 4B), and may be attached to the housing or an internal structure such as a support. In

some cases, and as shown, the housing 2104 may include a cavity 2106 defined by at least one sidewall (e.g., a single sidewall 2108 or set of sidewalls) and a ledge 2110. The ledge 2110 may define the opening 2102, and the sidewall 2108 may surround the ledge 2110.

The button assembly 2100 may include a conductive button cap 2112 (or button cap having a conduction portion). The conductive button cap 2112 may be retained by a button cap retention assembly 2114 (or button retainer), and may be translatable toward and away from the housing 2104. The button cap retention assembly 2114 may extend through the opening 2102 and be connected or otherwise attached to the housing 2104. In some examples, the button cap retention assembly 2114 may include a bracket 2116 that overlaps the ledge 2110 interior to the housing 2104, and a retainer 2118 that overlaps the ledge 2110 exterior to the housing 2104. The retainer 2118 may be mechanically attached to the bracket 2116 by a set of screws 2120 or other mechanical fastener. The screws 2120 may be inserted into through-holes in the bracket 2116 and screwed into threaded holes in the retainer 2118, clamping the ledge 2110 between the bracket 2116 and the retainer 2118.

The conductive button cap 2112 may have an exterior surface 2122, a sidewall or set of sidewalls 2124 parallel to the sidewall 2108 of the cavity 2106, and an inward facing lip or set of lips 2126 that extends between the retainer 2118 and the ledge 2110 and toward a center axis of the conductive button cap 2112.

The button cap retention assembly 2114, and in particular the retainer 2118, may have a through-hole defined therein, with an axis of the through-hole extending perpendicular to the opening 2102 in the housing 2104. A shaft 2128 may be positioned within the through-hole, and may translate toward and away from the housing 2104. The shaft 2128 may be mechanically and electrically connected to the conductive button cap 2112, or may be biased to contact the conductive button cap 2112. In a state of rest, the shaft 2128 and conductive button cap 2112 may be biased in an outward state of translation (i.e., away from the opening 2102) by a conductive flexure 2130 or other spring-biased member positioned between the bracket 2116 and an end of the shaft 2128 that faces the bracket 2116.

The button cap retention assembly 2114, and in particular the retainer 2118, may also have a second through-hole formed therein, with an axis of the second through-hole extending perpendicular to the opening 2102 in the housing 2104. A piston 2132 may be positioned within the through-hole, and may translate toward and away from the housing 2104. In some cases, a shim 2134, such as a non-conductive shim, may be attached to an end of the piston 2132 facing a spring-biased tactile switch 2136. When a user presses the conductive button cap 2112 toward the housing 2104, the press may overcome the bias provided by the conductive flexure 2130 and/or tactile switch 2136, and pressure on the conductive button cap 2112 may be transferred to the piston 2132, which translates toward the housing 2104 and presses on the tactile switch 2136 to change the state of the tactile switch 2136 (e.g., from ON to OFF or vice versa, from one functional state to another, etc.). The tactile switch 2136 may be aligned with an axis of the piston 2132 and attached to the bracket 2116 using an adhesive 2138 (e.g., a non-conductive PSA).

In some embodiments, a first gasket 2140 (e.g., an O-ring) may be positioned between the shaft 2128 and the first through-hole, and a second gasket 2142 (e.g., an O-ring) may be positioned between the piston 2132 and the second through-hole. In some cases, the first gasket 2140 may be

positioned between a first non-conductive liner 2150 and a second non-conductive liner 2152. In some cases, the piston 2132 may have a circumferential groove 2146 in which a portion of the second gasket 2142 is seated so that the second gasket 2142 moves in a predictable way in response to movement of the piston 2132. In some examples, the first and second gaskets 2140, 2142 may be non-conductive.

The button assembly 2100 may further include a set of electrical insulators (i.e., one or more electrical insulators), which set of electrical insulators may electrically insulate the conductive button cap 2112 from the button cap retention assembly 2114 and housing 2104. For example, the button assembly 2100 may include a first electrical insulator, such as a sleeve 2148 (or set of shims), positioned between the conductive button cap 2112 and the sidewall 2108 (or set of sidewalls) of the cavity 2106 in the housing 2104. In some cases, the sleeve 2148 may include a closed-shape sidewall. In other cases, the sleeve 2148 may also include an inward facing lip, or may not have a sidewall that defines a closed shape. A second electrical insulator may include a non-conductive liner 2150 between an interior surface of the conductive button cap 2112 and the button cap retention assembly 2114. In some cases, the non-conductive liner 2150 may be press-fit or adhesively bonded to the interior surface of the conductive button cap 2112. Alternatively, the non-conductive liner 2150 may be press-fit or adhesively bonded to an exterior surface of the retainer 2118. In some embodiments, the non-conductive liner 2150 may extend into the through-hole, between the shaft 2128 and the button cap retention assembly 2114 (e.g., between the shaft 2128 and the retainer 2118). A third electrical insulator may include a second non-conductive liner 2152, positioned in the through-hole between the shaft 2128 and the retainer 2118, below the gasket 2140. The second electrical insulator, in some cases in conjunction with the third electrical insulator, may electrically insulate the conductive button cap 2112 from the button cap retention assembly 2114 (e.g., from the retainer 2118). The first electrical insulator may electrically insulate the conductive button cap 2112 from the housing 2104. In some embodiments, additional or different electrical insulators may electrically insulate the conductive button cap 2112 from the button cap retention assembly 2114 or housing 2104.

In use, a signal may be applied to, or received from, the conductive button cap 2112 via a circuit (e.g., a flex circuit or other circuit element) that is electrically connected to the conductive flexure 2130. A signal may travel through the conductive button cap 2112, shaft 2128, and conductive flexure 2130.

FIG. 22 shows an assembled cross-section of another example of a button assembly 2200 that may be included in any of the electronic devices described with reference to FIGS. 1A, 1B, 2A-2C, 3, 4A, or 4B. The button assembly 2200 may be at least partially within an opening 2202 in a housing 2204 (e.g., an opening in the housing described with reference to FIG. 2A, 2C, 3, 4A, or 4B), and may be attached to the housing or an internal structure such as a support. In some cases, and as shown, the housing 2204 may include a cavity 2206 defined by at least one sidewall (e.g., a single sidewall 2208 or set of sidewalls) and a ledge 2210. The ledge 2210 may define the opening 2202, and the sidewall 2208 may surround the ledge 2210.

The button assembly 2200 may include a conductive button cap 2212 (or button cap having a conductive portion). The conductive button cap 2212 may be retained by a button cap retention assembly 2214 (or button retainer), and may be translatable toward and away from the housing 2204. The

button cap retention assembly 2214 may extend through the opening 2202 and be connected or otherwise attached to the housing 2204. In some examples, the button cap retention assembly 2214 may include a bracket 2216 that overlaps the ledge 2210 interior to the housing 2204, and a retainer 2218 that overlaps the ledge 2210 exterior to the housing 2204. The retainer 2218 may be mechanically attached to the bracket 2216 by a set of screws 2220 or other mechanical fastener. The screws 2220 may be inserted into through-holes in the bracket 2216 and screwed into threaded holes in the retainer 2218, clamping the ledge 2210 between the bracket 2216 and the retainer 2218.

The conductive button cap 2212 may have an exterior surface 2222, a sidewall or set of sidewalls 2224 parallel to the sidewall 2208 of the cavity 2206, and an inward facing lip or set of lips 2226 that extends between the retainer 2218 and the ledge 2210 and toward a center axis of the conductive button cap 2212.

The button cap retention assembly 2214, and in particular the retainer 2218, may have a through-hole defined therein, with an axis of the through-hole extending perpendicular to the opening 2202 in the housing 2204. A shaft 2228 may be positioned within the through-hole, and may translate toward and away from the housing 2204. The shaft 2228 may be mechanically and electrically connected to the conductive button cap 2212, or may be biased to contact the conductive button cap 2212. In a state of rest, the shaft 2228 and conductive button cap 2212 may be biased in an outward state of translation (i.e., away from the opening 2202) by a conductive spring (e.g., a coil spring 2230) or other spring-biased member positioned between the bracket 2216 and an end of the shaft 2228 that faces the bracket 2216.

The button cap retention assembly 2214, and in particular the retainer 2218, may also have a second through-hole formed therein, with an axis of the second through-hole extending perpendicular to the opening 2202 in the housing 2204. A piston 2232 may be positioned within the through-hole, and may translate toward and away from the housing 2204. When a user presses the conductive button cap 2212 toward the housing 2204, the press may overcome the bias provided by the coil spring 2230 and/or tactile switch 2234, and pressure on the conductive button cap 2212 may be transferred to the piston 2232, which translates toward the housing 2204 and presses on the tactile switch 2234 to change the state of the tactile switch 2234 (e.g., from ON to OFF or vice versa, from one functional state to another, etc.). The tactile switch 2234 may be aligned with an axis of the piston 2232 and attached to the bracket 2216 using an adhesive 2236 (e.g., a non-conductive PSA).

In some embodiments, a first gasket 2238 (e.g., an O-ring) may be positioned between the shaft 2228 and the first through-hole, and a second gasket 2240 (e.g., an O-ring) may be positioned between the piston 2232 and the second through-hole. In some cases, the first gasket 2238 may be positioned between a first non-conductive liner 2248 and a second non-conductive liner 2250. In some cases, the piston 2232 may have a circumferential groove 2244 in which a portion of the second gasket 2240 is seated so that the second gasket 2240 moves in a predictable way in response to movement of the piston 2232. In some examples, the first and second gaskets 2238, 2240 may be non-conductive.

The button assembly 2200 may further include a set of electrical insulators (i.e., one or more electrical insulators), which set of electrical insulators may electrically insulate the conductive button cap 2212 from the button cap retention assembly 2214 and housing 2204. For example, the button assembly 2200 may include a first electrical insulator,

such as a sleeve 2246 (or set of shims), positioned between the conductive button cap 2212 and the sidewall 2208 (or set of sidewalls) of the cavity 2206 in the housing 2204. In some cases, the sleeve 2246 may include a closed-shape sidewall. In other cases, the sleeve 2246 may also include an inward facing lip, or may not have a sidewall that defines a closed shape. A second electrical insulator may include a non-conductive liner 2248 between an interior surface of the conductive button cap 2212 and the button cap retention assembly 2214. In some cases, the non-conductive liner 2248 may be press-fit or adhesively bonded to the interior surface of the conductive button cap 2212. Alternatively, the non-conductive liner 2248 may be press-fit or adhesively bonded to an exterior surface of the retainer 2218. In some embodiments, the non-conductive liner 2248 may extend into the through-hole, between the shaft 2228 and the button cap retention assembly 2214 (e.g., between the shaft 2228 and the retainer 2218). A third electrical insulator may include a second non-conductive liner 2250, positioned in the through-hole between the shaft 2228 and the retainer 2218, below the gasket 2238. The second electrical insulator, in some cases in conjunction with the third electrical insulator, may electrically insulate the conductive button cap 2212 from the button cap retention assembly 2214 (e.g., from the retainer 2218). The first electrical insulator may electrically insulate the conductive button cap 2212 from the housing 2204. In some embodiments, additional or different electrical insulators may electrically insulate the conductive button cap 2212 from the button cap retention assembly 2214 or housing 2204.

In use, a signal may be applied to, or received from, the conductive button cap 2212 via a circuit (e.g., a flex circuit or other circuit element) that is electrically connected to the coil spring 2230. A signal may travel through the conductive button cap 2212, shaft 2228, and coil spring 2230.

FIG. 23 shows a schematic 2300 of an electronic device, such as an electronic watch, that may be used for acquiring an ECG or other biological parameter from a user of the electronic device. In some cases, the electronic device may include a watch body. As shown, the electronic device may include a first electrode 2302 on a carrier 2304, an optional second electrode 2306 on the carrier 2304, and a third electrode 2308 on the surface of a user-rotatable crown 2310 (or alternatively, on the surface of a button). The third electrode 2308 may be operable to be contacted by a finger of a user while the first electrode 2302 (and optional second electrode 2306) are positioned against a user's skin (e.g., against the wrist of the user). A processor 2312, which in some cases may be provided in an integrated circuit (IC), an application-specific integrated circuit (ASIC), a field programmable gate array (FPGA), a system in package (SIP), a system on a chip (SOC), etc., may be operable to acquire an ECG from the user, or determine another biological parameter of, the user. The ECG or other biological parameter may be determined based on voltages at the first, optional second, and third electrodes 2302, 2306, 2308 while the user is in contact with the first, optional second, and third electrodes 2302, 2306, 2308.

In some cases, voltages may be sensed at just the first and third electrodes 2302, 2308. In other cases, the second electrode 2306 may be grounded to the electronic device, thereby the user to the electronic device, and the voltage at the second electrode 2306 (i.e., the ground voltage) may be used to remove noise generated by the electronic device or other environmental sources from the signals measured at

the first and third electrodes 2302, 2308. This may result in more accurate readings (or processing) of the first and third voltages.

As shown, a signal or voltages at the first electrode 2302 may be amplified by a first amplifier 2314, and a signal or voltages at the third electrode 2308 may be amplified by a second amplifier 2316.

FIG. 24 shows an example method 2400 of determining a biological parameter of a user wearing an electronic watch or other wearable electronic device, such as a watch or wearable electronic device described herein.

At block 2402, a ground voltage is optionally applied to a user via a first electrode on the electronic device. The first electrode may be on an exterior surface of a carrier that forms part of a housing of the electronic device. The operation(s) at 2402 may be performed, for example, by the processor described with reference to FIG. 24, using one of the electrodes described with reference to FIGS. 1B, 2A-2C, 3, 4A-4C, 5D, 5E, 6-8, 9A-9C, 10A-10D, & 23.

At block 2404, a first voltage or signal is sensed at a second electrode on the electronic device. The second electrode may also be on the exterior surface of the carrier. The operation(s) at 2404 may be performed, for example, by the processor described with reference to FIG. 24, using one of the electrodes described with reference to FIGS. 1B, 2A-2C, 3, 4A-4C, 5D, 5E, 6-8, 9A-9C, 10A-10D, 11, 12A, 12B, 13, 14, 15, 16A, 16B, 17A. 17B, 18A, 18B, 19, 20, 21, 22, & 23.

At block 2406, a second voltage or signal is sensed at a third electrode on the electronic device. The third electrode may be on a user-rotatable crown of the electronic device, or on a button of the electronic device, or on another surface of the housing of the electronic device. In some embodiments, the ground voltage is applied and the first voltage or signal is sensed on a wrist of one arm of the user, and the second voltage or signal is sensed on a fingertip of the user (with the fingertip belonging to a finger on a hand on the other arm of the user). The operation(s) at 2406 may be performed, for example, by the processor described with reference to FIG. 24, using one of the electrodes described with reference to FIGS. 1B, 2A-2C, 3, 4A-4C, 5D, 5E, 6-8, 9A-9C, 10A-10D, 11, 12A, 12B, 13, 14, 15, 16A, 16B, 17A, 17B, 18A, 18B, 19, 20, 21, 22, & 23.

At block 2408, the biological parameter of the user may be determined from the optional ground voltage, the first voltage or signal, and the second voltage or signal. The ground voltage may provide a reference for the first and second voltages or signals, or may otherwise be used to reject noise from the first and second voltages or signals. When the first and second voltages are obtained from different parts of the user's body, the biological parameter may be an electrocardiogram for the user. The operation(s) at 2408 may be performed, for example, by the processor described with reference to FIG. 25.

FIG. 25 shows a sample electrical block diagram of an electronic device 2500, which electronic device may in some cases take the form of any of the electronic watches or other wearable electronic devices described with reference to FIGS. 1-23, or other portable or wearable electronic devices. The electronic device 2500 can include a display 2505 (e.g., a light-emitting display), a processor 2510, a power source 2515, a memory 2520 or storage device, a sensor 2525, and an input/output (I/O) mechanism 2530 (e.g., an input/output device, input/output port, or haptic input/output interface). The processor 2510 can control some or all of the operations of the electronic device 2500. The processor 2510 can communicate, either directly or indirectly, with some or all of the components of the

electronic device 2500. For example, a system bus or other communication mechanism 2535 can provide communication between the processor 2510, the power source 2515, the memory 2520, the sensor 2525, and the input/output mechanism 2530.

The processor 2510 can be implemented as any electronic device capable of processing, receiving, or transmitting data or instructions. For example, the processor 2510 can be a microprocessor, a central processing unit (CPU), an application-specific integrated circuit (ASIC), a digital signal processor (DSP), or combinations of such devices. As described herein, the term "processor" is meant to encompass a single processor or processing unit, multiple processors, multiple processing units, or other suitably configured computing element or elements.

It should be noted that the components of the electronic device 2500 can be controlled by multiple processors. For example, select components of the electronic device 2500 (e.g., a sensor 2525) may be controlled by a first processor and other components of the electronic device 2500 (e.g., the display 2505) may be controlled by a second processor, where the first and second processors may or may not be in communication with each other. In some cases, the processor 2510 may determine a biological parameter of a user of the electronic device, such as an ECG for the user.

The power source 2515 can be implemented with any device capable of providing energy to the electronic device 2500. For example, the power source 2515 may be one or more batteries or rechargeable batteries. Additionally or alternatively, the power source 2515 can be a power connector or power cord that connects the electronic device 2500 to another power source, such as a wall outlet.

The memory 2520 can store electronic data that can be used by the electronic device 2500. For example, the memory 2520 can store electrical data or content such as, for example, audio and video files, documents and applications, device settings and user preferences, timing signals, control signals, and data structures or databases. The memory 2520 can be configured as any type of memory. By way of example only, the memory 2520 can be implemented as random access memory, read-only memory, Flash memory, removable memory, other types of storage elements, or combinations of such devices.

The electronic device 2500 may also include one or more sensors 2525 positioned almost anywhere on the electronic device 2500. The sensor(s) 2525 can be configured to sense one or more type of parameters, such as but not limited to, pressure, light, touch, heat, movement, relative motion, biometric data (e.g., biological parameters), and so on. For example, the sensor(s) 2525 may include a heat sensor, a position sensor, a light or optical sensor, an accelerometer, a pressure transducer, a gyroscope, a magnetometer, a health monitoring sensor, and so on. Additionally, the one or more sensors 2525 can utilize any suitable sensing technology, including, but not limited to, capacitive, ultrasonic, resistive, optical, ultrasound, piezoelectric, and thermal sensing technology. In some examples, the sensors 2525 may include one or more of the electrodes described herein (e.g., one or more electrodes on an exterior surface of a carrier that forms part of a housing for the electronic device 2500 and/or an electrode on a crown, button, or other housing member of the electronic device).

The I/O mechanism 2530 can transmit and/or receive data from a user or another electronic device. An I/O device can include a display, a touch sensing input surface, one or more buttons (e.g., a graphical user interface "home" button), one or more cameras, one or more microphones or speakers, one

or more ports such as a microphone port, and/or a keyboard. Additionally or alternatively, an I/O device or port can transmit electronic signals via a communications network, such as a wireless and/or wired network connection. Examples of wireless and wired network connections include, but are not limited to, cellular, Wi-Fi, Bluetooth, IR, and Ethernet connections.

As discussed above, graphics displayed on the electronic devices herein may be manipulated through inputs provided to the crown. FIGS. 26A-28B generally depict examples of changing a graphical output displayed on an electronic device through inputs provided by force and/or rotational inputs to a crown assembly of the device. This manipulation (e.g., selection, acknowledgement, motion, dismissal, magnification, and so on) of a graphic may result in changes in operation of the electronic device and/or graphical output displayed by the electronic device. Although specific examples are provided and discussed, many operations may be performed by rotating and/or applying force to a crown such as the examples described above. Accordingly, the following discussion is by way of example and not limitation.

FIG. 26A depicts an example electronic device 2600 (shown here as an electronic watch) having a crown 2602. The crown 2602 may be similar to the examples described above, and may receive force inputs along a first lateral direction, a second lateral direction, or an axial direction of the crown. The crown 2602 may also receive rotational inputs. A display 2606 provides a graphical output (e.g., shows information and/or other graphics). In some embodiments, the display 2606 may be configured as a touch-sensitive display capable of receiving touch and/or force input. In the current example, the display 2606 depicts a list of various items 2661, 2662, 2663, all of which are example graphics.

FIG. 26B illustrates how the graphical output shown on the display 2606 changes in a first manner as the crown 2602 rotates, partially or completely (as indicated by the arrow 2660). Rotating the crown 2602 causes the list to scroll or otherwise move on the screen, such that the first item 2661 is no longer displayed, the second and third items 2662, 2663 each move upwards on the display, and a fourth item 2664 is now shown at the bottom of the display. This is one example of a scrolling operation that can be executed by rotating the crown 2602. Such scrolling operations may provide a simple and efficient way to depict multiple items relatively quickly and in sequential order. A speed of the scrolling operation may be controlled by the amount of rotational force applied to the crown 2602 and/or the speed at which the crown 2602 is rotated. Faster or more forceful rotation may yield faster scrolling, while slower or less forceful rotation yields slower scrolling. The crown 2602 may receive an axial force (e.g., a force inward toward the display 2606 or watch body) to select an item from the list, in certain embodiments.

FIGS. 27A and 27B illustrate an example zoom operation. The display 2706 depicts a picture 2766 at a first magnification, shown in FIG. 27A; the picture 2766 is yet another example of a graphic. A user may apply a translating force (e.g., a force along the z-axis) or a lateral force (e.g., a force along the x-axis) to the crown 2702 of the electronic device 2700 (illustrated by arrow 2765), and in response the display may change a graphic in a second manner, such as zooming into the picture 2766 so that a portion 2767 of the picture is shown at an increased magnification. This is shown in FIG. 27B. The direction of zoom (in vs. out) and speed of zoom, or location of zoom, may be controlled through force applied

to the crown **2702**, and particularly through the direction of applied force and/or magnitude of applied force. Applying force to the crown **2702** in a first direction may zoom in, while applying force to the crown **2702** in an opposite direction may zoom out. Alternately, rotating or applying force to the crown **2702** in a first direction may change the portion of the picture subject to the zoom effect. In some embodiments, applying an axial or translating force (e.g., a force along the z-axis) to the crown **2702** may toggle between different zoom modes or inputs (e.g., direction of zoom vs. portion of picture subject to zoom), or otherwise change the displayed graphic in a second manner. In yet other embodiments, applying force to the crown **2702** along another direction, such as along the y-axis, may return the picture **2766** to the default magnification shown in FIG. **27A**.

FIGS. **28A** and **28B** illustrate possible use of the crown **2802** to change an operational state of the electronic device **2800** or otherwise toggle between inputs. Turning first to FIG. **28A**, the display **2806** depicts a question **2868**, namely, "Would you like directions?" As shown in FIG. **28B**, a lateral force may be applied to the crown **2802** (illustrated by arrow **2870**) to answer the question. Applying force to the crown **2802** provides an input interpreted by the electronic device **2800** as "yes," and so "YES" is displayed as a graphic **2869** on the display **2806**. Applying force to the crown **2802** in an opposite direction may provide a "no" input. Both the question **2868** and graphic **2869** are examples of graphics.

In the embodiment shown in FIGS. **28A** and **28B**, the force applied to the crown **2802** is used to directly provide the input, rather than select from options in a list (as discussed above with respect to FIGS. **26A** and **26B**).

As mentioned previously, force or rotational input to a crown of an electronic device may control many functions beyond those listed here. The crown may receive distinct force or rotational inputs to adjust a volume of an electronic device, a brightness of a display, or other operational parameters of the device. A force or rotational input applied to the crown may rotate to turn a display on or off, or turn the device on or off. A force or rotational input to the crown may launch or terminate an application on the electronic device. Further, combinations of inputs to the crown may likewise initiate or control any of the foregoing functions, as well.

In some cases, the graphical output of a display may be responsive to inputs applied to a touch-sensitive display (e.g., displays **2606**, **2706**, **2806**, and the like) in addition to inputs applied to a crown. The touch-sensitive display may include or be associated with one or more touch and/or force sensors that extend along an output region of a display and which may use any suitable sensing elements and/or sensing techniques to detect touch and/or force inputs applied to the touch-sensitive display. The same or similar graphical output manipulations that are produced in response to inputs applied to the crown may also be produced in response to inputs applied to the touch-sensitive display. For example, a swipe gesture applied to the touch-sensitive display may cause the graphical output to move in a direction corresponding to the swipe gesture. As another example, a tap gesture applied to the touch-sensitive display may cause an item to be selected or activated. In this way, a user may have multiple different ways to interact with and control an electronic watch, and in particular the graphical output of an electronic watch. Further, while the crown may provide overlapping functionality with the touch-sensitive display, using the crown allows for the graphical output of the display to be visible (without being blocked by the finger that is providing the touch input).

As another example, and of the inputs described in FIGS. **26A-28B** may be used to select, initiate, or display an ECG, or otherwise begin the operation of determining an ECG or launching an ECG application.

As described above, one aspect of the present technology is the gathering and use of data available from various sources, including the gathering and use of biological parameters of a user, to monitor or improve the user's health or fitness. The present disclosure contemplates that in some instances, this gathered data may include personal information data that uniquely identifies a specific person, or can be used to contact, locate, or identify a specific person. Such personal information data can include demographic data, location-based data, telephone numbers, email addresses, twitter IDs, home addresses, data or records relating to a user's health or level of fitness (e.g., vital sign measurements, medication information, exercise information), date of birth, or any other identifying or personal information.

The present disclosure recognizes that the use of such personal information data, in the present technology, can be used to the benefit of users. For example, the personal information data can be used to aid a user in monitoring or improving their health or fitness (e.g., biological parameters or health and fitness data may be used to provide insights into a user's general wellness, or may be used as positive feedback to individuals using technology to pursue wellness goals).

The present disclosure contemplates that the entities responsible for the collection, analysis, disclosure, transfer, storage, or other use of such personal information data will comply with well-established privacy policies and/or privacy practices. In particular, such entities should implement and consistently use privacy policies and practices that are generally recognized as meeting or exceeding industry or governmental requirements for maintaining personal information data private and secure. Such policies should be easily accessible by users, and should be updated as the collection and/or use of data changes. Personal information from users should be collected for legitimate and reasonable uses of the entity and not shared or sold outside of those legitimate uses. Further, such collection/sharing should occur after receiving the informed consent of the users. Additionally, such entities should consider taking any needed steps for safeguarding and securing access to such personal information data and ensuring that others with access to the personal information data adhere to their privacy policies and procedures. Further, such entities can subject themselves to evaluation by third parties to certify their adherence to widely accepted privacy policies and practices. In addition, policies and practices should be adapted for the particular types of personal information data being collected and/or accessed and adapted to applicable laws and standards, including jurisdiction-specific considerations. For instance, in the US, collection of or access to certain health data may be governed by federal and/or state laws, such as the Health Insurance Portability and Accountability Act (HIPAA); whereas health data in other countries may be subject to other regulations and policies and should be handled accordingly. Hence different privacy practices should be maintained for different personal data types in each country.

Despite the foregoing, the present disclosure also contemplates embodiments in which users selectively block the use of, or access to, personal information data. That is, the present disclosure contemplates that hardware and/or software elements can be provided to prevent or block access to such personal information data. For example, in the case of

55

biological parameters or conditions identified therefrom, the present technology can be configured to allow users to select to "opt in" or "opt out" of participation in the collection of personal information data during registration for services or anytime thereafter. In another example, users can select not to provide health or fitness-associated data to the providers of applications or services, or can prevent the transmission of such data from the device on which it is collected or outside a collection of devices that are personal to a user from which the data is obtained. In yet another example, a user can select to limit the length of time health or fitness data, or biological parameters from which such data is derived, is maintained. In addition to providing "opt in" and "opt out" options, the present disclosure contemplates providing notifications relating to the access or use of personal information. For instance, a user may be notified upon downloading an app that their personal information data will be accessed and then reminded again just before personal information data is accessed by the app.

Moreover, it is the intent of the present disclosure that personal information data should be managed and handled in a way to minimize risks of unintentional or unauthorized access or use. Risk can be minimized by limiting the collection of data and deleting data once it is no longer needed. In addition, and when applicable, including in certain health related applications, data de-identification can be used to protect a user's privacy. De-identification may be facilitated, when appropriate, by removing specific identifiers (e.g., date of birth, etc.), controlling the amount or specificity of data stored (e.g., collecting location data at a city level rather than at an address level), controlling how data is stored (e.g., aggregating data across users), and/or other methods.

Therefore, although the present disclosure broadly covers use of personal information data to implement one or more various disclosed embodiments, the present disclosure also contemplates that the various embodiments can also be implemented without the need for accessing at least some personal information data. That is, the various embodiments of the present technology are not rendered inoperable due to the lack of a portion of such personal information data. For example, biological parameters can be ascertained or stored without associating the biological parameters with information identifying a particular user from which they are obtained, or with a bare minimum amount of personal information, such as non-personal information already available to service providers or publicly available information.

The foregoing description, for purposes of explanation, uses specific nomenclature to provide a thorough understanding of the described embodiments. However, it will be apparent to one skilled in the art that the specific details are not required in order to practice the described embodiments. Thus, the foregoing descriptions of the specific embodiments described herein are presented for purposes of illustration and description. They are not targeted to be exhaustive or to limit the embodiments to the precise forms disclosed. It will be apparent to one of ordinary skill in the art that many modifications and variations are possible in view of the above teachings.

What is claimed is:
1. An electronic watch, comprising:
a housing;
a crown comprising:
   a crown body; and
   a shaft connected to the crown body and extending through the housing;

56

a carrier connected to the housing and formed from a transparent material defining a central window region surrounded by a perimeter;
an optical sensor positioned below the central window region of the carrier;
a transparent cover connected to the housing;
a touch-sensitive display at least partially within the housing and viewable through the transparent cover;
a first electrode positioned directly on the carrier and at least partially surrounding the central window region, the first electrode configured to measure a first voltage;
a second electrode positioned directly on the carrier and at least partially surrounding the central window region, the second electrode configured to measure a second voltage;
a third electrode on the crown body and configured to measure a third voltage; and
a processor within the housing and operationally connected to the first electrode, the second electrode, and the third electrode; wherein:
   the processor is configured to determine an electrocardiogram using the first voltage, the second voltage, and the third voltage; and
   the touch-sensitive display is configured to display the electrocardiogram.
2. The electronic watch of claim 1, wherein:
the transparent material is a glass material; and
the optical sensor is configured to detect a biological parameter through the glass material.
3. The electronic watch of claim 2, wherein:
the first and second electrodes extend from an interior of the housing, around an edge of the carrier, and to an exterior surface of the carrier; and
the first and second electrodes are separated by a pair of gaps along the perimeter of the carrier.
4. The electronic watch of claim 2, wherein:
the electronic watch further comprises an opaque mask disposed on the transparent material of the carrier and surrounding the window region of the carrier; and
at least a portion of the first electrode is formed over at least a portion of the opaque mask.
5. The electronic watch of claim 1, wherein:
the carrier is attached to a rear of the housing and configured to contact a user;
the crown is configured to rotate and translate;
the crown body is integrally formed with the shaft, positioned exterior to the housing, and configured to be rotated by the user;
the third electrode is a surface of the crown body; and
the crown body and the shaft are in electrical communication with the processor.
6. The electronic watch of claim 1, wherein the carrier is positioned at least partially in an opening of the housing.
7. The electronic watch of claim 6, wherein:
the opening is circular; and
the carrier has a circular perimeter.
8. An electronic watch, comprising:
a housing;
a carrier attached to the housing and comprising a transparent substrate that defines a sensor window and a peripheral region that surrounds the sensor window;
a first electrode disposed directly on the carrier along a first portion of the peripheral region;
a second electrode disposed directly on the carrier along a second portion of the peripheral region and separated from the first electrode;

an optical sensor positioned below the sensor window of the carrier;

a crown extending through the housing and comprising a third electrode; and

a processor operable to determine a biological parameter of a user based on voltages measured at the first electrode, the second electrode, and the third electrode; wherein:

the carrier is configured to be contacted by a first body part of the user;

the crown is configured to be contacted by a second body part of the user; and

the voltages are measured while the user is in contact with the first electrode, the second electrode, and the third electrode.

**9**. The electronic watch of claim **8**, wherein:

the first electrode is arc-shaped and defines a first end and a second end;

the second electrode is arc-shaped and defines a third end and a fourth end;

the first end and the third end are separated by a first gap; and

the second end and the fourth end are separated by a second gap.

**10**. The electronic watch of claim **8**, wherein:

the electronic watch further comprises:

a transparent cover attached to a front of the housing; and

a display viewable through the transparent cover;

the biological parameter is an electrocardiogram; and

the display is configured to display the electrocardiogram.

**11**. The electronic watch of claim **8**, wherein:

the carrier is attached to a rear of the housing and protrudes from the housing; and

the first and second electrodes extend from an interior of the housing, around an edge of the carrier, and to an exterior surface of the carrier.

**12**. The electronic watch of claim **8**, wherein:

the crown is configured to rotate and translate and comprises:

a shaft extending through an opening in the housing; and

a crown body integrally formed with the shaft, positioned exterior to the housing, and configured to be rotated by the user;

the third electrode is a surface of the crown body; and

the crown body and the shaft are in electrical communication with the processor.

**13**. The electronic watch of claim **8**, wherein:

the biological parameter is a first biological parameter; and

the optical sensor is configured to sense a second biological parameter through the sensor window of the carrier.

**14**. The electronic watch of claim **13**, wherein:

the first biological parameter is an electrocardiogram; and

the second biological parameter is a heart rate.

**15**. An electronic watch, comprising:

a housing defining a first opening and a second opening;

a carrier protruding from the first opening and formed from a transparent component that defines a central window region and a peripheral region surrounding the central window region;

a first arc-shaped electrode disposed directly on the transparent component along a first portion of the peripheral region;

a second arc-shaped electrode disposed directly on the transparent component along a second portion of the peripheral region;

a shaft extending through the second opening;

a crown body attached to the shaft and comprising a third electrode; and

a processor within the housing; wherein:

the processor is operable to determine an electrocardiogram of a user based on voltages measured at the first arc-shaped electrode, the second arc-shaped electrode, and the third electrode.

**16**. The electronic watch of claim **15**, wherein:

the first opening is circular;

the housing further defines a ledge in the first opening; and

an edge of the carrier is positioned over the ledge and at least partially within the first opening.

**17**. The electronic watch of claim **15**, wherein the voltages are measured while the user is in contact with the first arc-shaped electrode, the second arc-shaped electrode, and the third electrode.

**18**. The electronic watch of claim **15**, wherein:

the crown body is configured to rotate about an axis of rotation and translate along the axis of rotation; and

the axis of rotation extends along a center of the shaft.

**19**. The electronic watch of claim **15**, wherein:

the electronic watch further comprises:

an electrically insulating split around the crown body; and

a trim around the electrically insulating split; and

the electrically insulating split is configured to electrically insulate the trim from the crown body.

**20**. The electronic watch of claim **15**, wherein the shaft and the crown body are integrally formed with one another.

* * * * *

# *Appendix III*

RECEIVED

NOV 21 2024

United States Court of Appeals
For the Federal Circuit



US011350869B2

(12) **United States Patent**
Rasmussen et al.

(10) Patent No.: **US 11,350,869 B2**
(45) Date of Patent: **Jun. 7, 2022**

(54) **ELECTROCARDIOGRAM (ECG) MEASUREMENT ON A WRIST-WORN ELECTRONIC DEVICE**

(71) Applicant: **Garmin Switzerland GmbH**, Schaffhausen (CH)

(72) Inventors: **Adam B. Rasmussen**, Overland Park, KS (US); **Kevin M. Hansen**, Overland Park, KS (US); **Alexander J. Waller**, Olathe, KS (US)

(73) Assignee: **Garmin Switzerland GmbH**

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 206 days.

(21) Appl. No.: **15/686,804**

(22) Filed: **Aug. 25, 2017**

(65) **Prior Publication Data**
US 2019/0059756 A1     Feb. 28, 2019

(51) **Int. Cl.**
$A61B\ 5/332$          (2021.01)
$A61B\ 5/00$           (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC ............. *A61B 5/332* (2021.01); *A61B 5/002* (2013.01); *A61B 5/0006* (2013.01); *A61B 5/02416* (2013.01); *A61B 5/02438* (2013.01); *A61B 5/282* (2021.01); *A61B 5/339* (2021.01); *A61B 5/681* (2013.01); *A61B 5/7225* (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC ..... A61B 5/0404; A61B 5/7225; A61B 5/006; A61B 5/02438; A61B 5/681; A61B 5/02416; A61B 5/04085; A61B 5/02427; A61B 5/0022
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2009/0312655 A1* | 12/2009 | Lo ........................ | A61B 5/681 |
| | | | 600/503 |
| 2017/0119255 A1* | 5/2017 | Mahajan ................. | A61B 7/04 |

(Continued)

OTHER PUBLICATIONS

Printout from https://www.alivecor.com/kardiaband/ dated prior to Aug. 25, 2017.

(Continued)

*Primary Examiner* — Mallika D Fairchild
*Assistant Examiner* — Minh Duc G Pham
(74) *Attorney, Agent, or Firm* — Samuel M. Korte; Max M. Ali

(57)          **ABSTRACT**

An electronic device worn, such as a wrist-worn watch, able to generate and display an ECG image associated with the wearer's heart. The device includes electrically-conductive first and second contact points for conveying first and second signals. The first contact point is located on a bezel or a pushbutton of the electronic device that is physically touchable by the wearer. The second contact point is located on the bottom of the housing so as to physically contact the wearer's skin of the user's wrist when the device is worn. The electronic device may also receive location signals to determine a current location using an antenna at least partially formed by the bezel. A processing element may receive the first and second signals, generate an ECG waveform, and an ECG image based thereon. A display graphically presents the ECG image as a sequence or stream of ECG images.

**30 Claims, 8 Drawing Sheets**



(51) **Int. Cl.**

| | |
|---|---|
| *A61B 5/024* | (2006.01) |
| *A61B 5/282* | (2021.01) |
| *A61B 5/339* | (2021.01) |

(52) **U.S. Cl.**

CPC ......... *A61B 5/0022* (2013.01); *A61B 5/02427* (2013.01); *A61B 2503/10* (2013.01); *A61B 2505/09* (2013.01); *A61B 2560/0468* (2013.01)

(56) **References Cited**

### U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2017/0179581 A1 * | 6/2017 | Puuri | H01Q 7/005 |
| 2017/0181644 A1 * | 6/2017 | Meer | A61B 5/02438 |
| 2018/0235542 A1 * | 8/2018 | Yun | A61B 5/0205 |

### OTHER PUBLICATIONS

Printout from http://download.nautilus.com/supportdocs/om/bowflex/bowflexfittrainerplus.pdf dated prior to Aug. 25, 2017.

Printout from http://lifetrakusa.com/wp-content/uploads/LT_300_QuickStarter-Guide 022814-English PRiNT.pdf dated prior to Aug. 25, 2017.

Printout from http://lifetrakusa.com/wp-content/uploads/LT_R450_OS-Guide_082614-English.pdf dated prior to Aug. 25, 2017.

Printout from http://www.pulseoximeter.org/fl500_html dated prior to Aug. 25, 2017.

\* cited by examiner



*Fig. 1.*



*Fig. 2.*



*Fig. 3.*



*Fig. 4.*



*Fig. 5.*



*Fig. 6A.*



*Fig. 6B.*



*Fig. 7.*



*Fig. 8.*



*Fig. 9.*



*Fig. 10.*

# ELECTROCARDIOGRAM (ECG) MEASUREMENT ON A WRIST-WORN ELECTRONIC DEVICE

## BACKGROUND

Wrist-worn electronic devices often include functionality that may be used to determine and track a current location of the electronic device as well as a distance traveled, a velocity, and other performance metrics or data determined using location information. This functionality may involve the electronic device receiving positional information from a satellite-based positioning system, such as the global positioning system (GPS). The electronic devices may include a location determining element and one or more antennas to receive signals from GPS satellites and provide wireless communication. Typically, the wrist-worn electronic devices also include a watch housing enclosing a processing element and a display, which is surrounded by a watch bezel. In some cases, the one or more antennas coupled to the location determining element and wireless receivers may be incorporated into the watch bezel or a portion thereof.

Electrocardiogram signals may be sensed by conventional sensory equipment having at least two sensors. The sensors are commonly placed on each side of an individual's chest to sense the electrocardiogram signals. For instance, the conventional sensory equipment may be a chest strap having two electrodes (sensors) positioned on an inner surface of the chest strap enabling the electrodes to contact the individual's chest. When the chest strap is worn, each electrode is typically positioned to contact one side of the individual's chest (separated by the sternum) such that a first electrode is positioned to contact the left side of the individual's chest and a second electrode is positioned to contact the right side of the individual's chest. The conventional sensory equipment may also be a cardiovascular monitoring device having two electrodes (sensors) and electrical wiring coupling each electrode to the cardiovascular monitoring device. An inner surface of each electrode may be secured to desires areas of an individual, such as each side of the individual's chest, using adhesive tape to sense electrocardiogram signals from the individual's heart.

The conventional sensory equipment includes wrist-worn electronic devices having two or more sensors utilized to sense electrocardiogram signals without use of a chest strap. Specifically, some conventional wrist-worn electronic devices includes a conductive contact point, such as a metal plate, on the rear surface of the watch and a dedicated conductive contact point on an exterior surface. For example, the conductive contact point on the exterior surface may be a pushbutton composed of an electrically conductive material positioned on a top surface or a side surface of the wrist-worn electronic devices. Similarly, the conductive contact point (e.g., metal plate, pushbutton, etc.) may be located between a display and a strap securing the electronic device to a user's wrist. Some conventional wrist-worn electronic devices include two conductive contact points by positioning a first conductive contact point on the exterior surface between a display and a first strap and a second conductive contact point between the display and a second strap, such that a user may simultaneously place two fingers on the conductive contact point located on an exterior surface of the electronic device.

Individuals engaged in fitness activities without use of the abovementioned conventional sensory equipment that may be uncomfortable or impractical while engaged in the fitness

activities. The individuals may desire to obtain or monitor cardiovascular information, such their heart rate, or other cardiac parameters for use to reach their fitness and cardiovascular objectives while engaged in the fitness activities.

## SUMMARY

Embodiments of the present technology provide an electronic fitness device configured to generate and graphically display one or more electrocardiogram images associated with an electrocardiogram waveform of a wearer's heart. The electronic device may utilize two contact points to receive electrical bio signals (electrocardiogram signals) from the wearer, from which a processing element may generate the electrocardiogram waveform. A first contact point may be located on a watch bezel or a depressible pushbutton that is physically contacted by a finger or thumb of the wearer. A second contact point may be located on an underside of the electronic device where it may be in generally constant contact with the wearer's skin of the wearer's wrist.

In an embodiment, a wrist-worn electronic fitness device may comprise a housing, an electrically-conductive plate, an electrically-conductive bezel, and a processing element. The housing may include a bottom wall, one or more side walls and a bezel enclosing an internal cavity of the housing. The bezel may at least partially surround a display. The electrically-conductive plate may be coupled to the bottom wall and configured to physically contact the skin on a wearer's wrist when the electronic fitness device is worn. The one or more side walls or the bezel may include an electrically-conductive contact point configured to receive physical contact from the skin of the wearer's finger or thumb. The processing element may be electrically coupled with the plate and the electrically-conductive contact point, the processing element configured to generate an electrocardiogram waveform associated with the user based on electrocardiogram signals received through the electrically-conductive plate and the electrically-conductive surface once physical contact is made between the wearer's wrist and the electrically-conductive plate and between the electrically-conductive contact point and the wearer's finger or thumb. The processing element may be further configured to generate, and store in a memory element, electrocardiogram data based on the electrocardiogram waveform and generate an electrocardiogram image based on the stored electrocardiogram data. The processing element may control the display to present the electrocardiogram image.

Various implementations of the embodiment may include any one or more of the following features. The processing element may be further configured to generate a sequence of electrocardiogram images, wherein each electrocardiogram image may correspond to one sequence of heartbeats of the wearer for a period of time. The processing element may be further configured to generate a stream of electrocardiogram images, wherein the stream of electrocardiogram images may correspond to a plurality of heartbeats of the wearer. The processing element may scroll the electrocardiogram images on the display such that a most-recently generated electrocardiogram image is continuously presented on the display.

In embodiments, the electronic device may further comprise a location determining element configured to determine a geolocation based on location determining signals received by an antenna and a portion of the bezel forms the antenna. The processing element may be configured to utilize electrocardiogram signals received through the bezel

once physical contact is made with the bezel to generate the electrocardiogram waveform. The location determining component may be configured to utilize location determining signals received by the bezel when physical contact from the wearer's finger or thumb is not made with the bezel.

This summary is provided to introduce a selection of concepts in a simplified form that are further described below in the detailed description. This summary is not intended to identify key features or essential features of the claimed subject matter, nor is it intended to be used to limit the scope of the claimed subject matter. Other aspects and advantages of the present technology will be apparent from the following detailed description of the embodiments and the accompanying drawing figures.

BRIEF DESCRIPTION OF THE DRAWING
FIGURES

Embodiments of the present technology are described in detail below with reference to the attached drawing figures, wherein:

FIG. 1 is a fragmentary perspective view of an embodiment of an electronic device configured to generate and graphically display an electrocardiogram image corresponding to electrical activity of a wearer's heart, as well as perform one or more additional general and/or fitness-related functions, examples of which are shown, wherein the electronic device is shown adapted to be worn on the wearer's wrist;

FIG. 2 is a block diagram of at least a portion of functional components of the electronic device of FIG. 1;

FIG. 3 is an upper isometric view of at least a portion of the functional components retained within a housing of the electronic device of FIG. 1;

FIG. 4 is a lower isometric view of at least a portion of the functional components retained within the housing of the electronic device of FIG. 1;

FIG. 5 is a block diagram of a heart rate monitoring assembly of the electronic device of FIG. 1;

FIG. 6A is a block diagram of a first implementation of an embodiment of an electrocardiogram subsystem for monitoring an electrical activity of a heart of a wearer of the electronic device of FIG. 1;

FIG. 6B is a block diagram of a second implementation of the embodiment of the electrocardiogram subsystem;

FIG. 7 is a lower view of at least a portion of the housing of the electronic device of FIG. 1;

FIG. 8 is an upper view of at least a portion of the housing of the electronic device of FIG. 1;

FIG. 9 is a plan view of the electronic device of FIG. 1 displaying a sequence of single electrocardiogram images; and

FIG. 10 is a plan view of the electronic device of FIG. 1 displaying a stream of multiple electrocardiogram images.

The drawing figures do not limit the present technology to the specific embodiments disclosed and described herein. The drawings are not necessarily to scale, emphasis instead being placed upon clearly illustrating the principles of the technology.

DETAILED DESCRIPTION

The following detailed description of the technology references the accompanying drawings that illustrate specific embodiments in which the technology can be practiced. The embodiments are intended to describe aspects of the technology in sufficient detail to enable those skilled in the

art to practice the technology. Other embodiments can be utilized and changes can be made without departing from the scope of the present technology. The following detailed description is, therefore, not to be taken in a limiting sense. The scope of the present technology is defined only by the appended claims, along with the full scope of equivalents to which such claims are entitled.

In this description, references to "one embodiment", "an embodiment", or "embodiments" mean that the feature or features being referred to are included in at least one embodiment of the technology. Separate references to "one embodiment", "an embodiment", or "embodiments" in this description do not necessarily refer to the same embodiment and are also not mutually exclusive unless so stated and/or except as will be readily apparent to those skilled in the art from the description. For example, a feature, structure, act, etc. described in one embodiment may also be included in other embodiments, but is not necessarily included. Thus, the present technology can include a variety of combinations and/or integrations of the embodiments described herein.

Embodiments of the present technology provide an electronic fitness device configured to generate and graphically display an electrocardiogram (ECG) waveform of an electrical activity of a wearer's heart. The electronic device may utilize two contact points to receive electrical bio signals (electrocardiogram signals) from the wearer, from which the electrocardiogram waveform is generated. One contact point may be located on an underside of the electronic device where it may be in generally constant contact with the skin of the wearer's wrist. The other contact point may be a bezel or a portion of the bezel that may also function as an antenna, or a pushbutton that may also depress or rotate to provide a user input interface enabling access of additional functionality.

The electronic fitness device 20 may take substantially any suitable form, such as a wrist-worn fitness watch as shown in FIG. 1, a wrist- or arm-worn smartphone, a wrist- or arm-worn navigation device, or other wearable multi-function electronic devices that include a housing and a band, strap, or other attachment mechanism to secure the electronic fitness device 20 to a user's wrist, arm, ankle or leg. Although the electronic fitness device 20 is described herein as being adapted to be worn on a wrist, it may additionally or alternatively be adapted to be worn on other parts of the body, such as the user's forearm or the upper arm. The wearer of the electronic fitness device 20 may be involved in various physical activities such as street running, trail running, jogging, hiking, walking, biking, swimming, exercising, etc. During these activities, in addition to monitoring the electrical activity of the wearer's heart, the electronic fitness device 20 may determine and monitor a current location of the electronic fitness device 20 by receiving wireless location signals from a satellite-based positioning system 22 such as GPS. The electronic fitness device 20 may utilize the determined location to determine and monitor a distance traveled, a velocity, and other performance metrics. In addition, the electronic fitness device 20 may be electronically paired with one or more other electronic devices, such as a foot pod 24 attached to the user's shoe for measuring jogging or running cadence and distance traveled, or a bike speed and cadence sensor 26 attached to a crank arm and wheel hub of the user's bicycle for tracking biking performance, and so forth. Furthermore, the electronic fitness device 20 may be able to communicate with smartphones 28, tablets, laptop or desktop computers 30, Wi-Fi routers 32, cell towers 34, and the like to allow the

user to upload activity data, download apps, receive text messages, emails, and weather alerts, and so on.

Broadly characterized, embodiments of the electronic fitness device 20 may include first and second contact points, a processing element, and a display. The first contact point may be located on an underside (a bottom surface) of the electronic fitness device 20 where it may be in constant contact with the skin of a wearer's wrist when worn by a user. The second contact point may be an electrically-conductive bezel (or a portion of the bezel) that functions as one or more antennas for of the device. For instance, the bezel may provide at least a portion of an antenna coupled with a location determining element. The bezel or portion thereof may be accessible to receive a touch from a user's finger or thumb (of the opposite hand) to initiate the sensing and monitoring of the electrical activity of the wearer's heart. In particular, the electronic fitness device 20 may be configured to perform the location determining function and the heart monitoring function simultaneously or it may be configured to switch between the these functions, in which case the function of the bezel may be selected by system processing element 64 to correspond to a desired function.

Additionally or alternatively, the second contact point may be a pushbutton that is accessible to receive a touch from a user's finger or thumb (of the opposite hand) to initiate the sensing and monitoring of the electrical activity of the wearer's heart. The pushbutton may also be depressed or rotated to access and/or initiate additional general, fitness, or non-fitness-related functionality of the electronic fitness device 20.

The processing element may be a general or dedicated processing element configured to receive a first electrical bio signal (electrocardiogram signal) from the first contact point and a second electrical bio signal (electrocardiogram signal) from the second contact point. The second contact point may be an electrically-conductive bezel or an electrically-conductive pushbutton that is electrically coupled with the processing element. The processing element may be configured to determine the electrical activity of the wearer's heart based on electrical bio signals received through the first contact point and the second contact point once physical contact is made between the wearer's wrist and the first contact point and between the second contact point and the wearer's finger or thumb. The processing element may generate, and store in a memory element, electrocardiogram data based on the electrocardiogram waveform and generate an electrocardiogram image based on the stored electrocardiogram data. The processing element may be further configured to control the display to present determined electrical activity as an electrocardiogram waveform image, a sequence of single waveform images, or a stream of multiple waveform images.

Embodiments of the technology will now be described in more detail with reference to the drawing figures. Referring to FIG. 2, an embodiment of the electronic fitness device 20 is shown broadly comprising a housing 36, a display 38, a user interface 40, a communication element 42, one or more antennas 44 (one of which may be a bezel 46), a location determining element 48, an optical assembly 50, a first contact point 56 in the form of the bezel 46 and/or a pushbutton 58, a second contact point 52 in the form of a back plate 54, a memory element 62, and a system processing element 64.

The memory element 62 may include electronic hardware data storage components such as read-only memory (ROM), programmable ROM, erasable programmable ROM, random-access memory (RAM) such as static RAM (SRAM) or dynamic RAM (DRAM), cache memory, or the like, or combinations thereof. In some embodiments, the memory element 62 may be embedded in, or packaged in the same package as, the system processing element 64. The memory element 62 may include, or may constitute, a "computer-readable medium". The memory element 62 may store the instructions, code, code statements, code segments, software, firmware, programs, applications, apps, services, daemons, or the like that are executed by the system processing element 64. The memory element 62 may also store settings, data, documents, sound files, photographs, movies, images, databases, and the like.

The system processing element 64 may include electronic hardware components such as processors, microprocessors (single-core or multi-core), microcontrollers, DSPs, FPGAs, analog and/or digital application-specific integrated circuits (ASICs), or the like, or combinations thereof. The system processing element 64 may generally execute, process, or run instructions, code, code segments, code statements, software, firmware, programs, applications, apps, processes, services, daemons, or the like. The system processing element 64 may also include hardware components such as finite-state machines, sequential and combinational logic, and other electronic circuits that can perform the functions necessary for the operation of the current invention. The system processing element 64 may be in communication with the other electronic components through serial or parallel links that include universal busses, address busses, data busses, control lines, and the like.

It is to be understood that, in some embodiments, the system processing element 64 may include an electrocardiogram (ECG) processing element 60 and perform all of the associated functions described herein. Similarly, in some embodiments, the system processing element 64 may include a heart rate monitor (HRM) processing element 88 and perform all of the associated functions described herein. In other embodiments, the system processing element 64 may be communicatively coupled with the ECG processing element 60 and the HRM processing element 88. In some embodiments, the system processing element 64 may include the location determining element 48 and perform all of the associated functions described herein.

Referring also to FIGS. 2-4, the housing 36 may generally house, retain, enclose and/or otherwise physical support other components of the electronic fitness device 20 and may include or be coupled to an attachment mechanism 66, such as a wrist or arm band, for securing or retaining the electronic fitness device 20 on or to a body part (limb) of a wearer. The housing 36 may include a lower wall 68, an upper wall 70, at least one side wall 72, and an internal cavity 74. The lower wall 68 may include a lower surface 76 that contacts the wearer's skin, such as the skin on the wearer's wrist or arm, while the user is wearing the electronic fitness device 20. For instance, as shown in FIGS. 7 and 8, lower surface 76 may include the back plate 54. In embodiments, an inner surface (facing internal cavity 74) of back plate 54 may contact a conductive element, such as a surface of a c-shaped spring 68, coupled with ECG processing element 60.

In some embodiments, the lower wall 68 may not be continuous, but may include an opening of circular, square, rectangular, or other geometric shape. The upper wall 70, which may be formed by bezel 46, generally opposes the lower wall 68 and may include an upper surface 78. In some embodiments, the upper surface 78 may further include an opening 80 of circular, square, rectangular, or other geometric shape. The internal cavity 74 may contain and/or retain

many of the other components of the electronic fitness device 20. In some embodiments, such as the exemplary embodiments shown in the figures, the lower wall 68 of the housing 36 may have a round, circular, or oval shape with a single circumferential side wall, while in other embodiments, the lower wall 68 may have a four-sided shape, such as a square or rectangle, or other polygonal shape, with the housing 36 including four or more sidewalls. The upper wall 70 may generally match the shape of the lower wall 68.

In embodiments, the c-shaped spring 68 is formed of an electrically-conductive material, such as a metal, to electronically couple back plate 54 of the lower surface 76 to ECG processing element 60. The c-shaped spring 68 may sufficiently flex when under force to enable a secure contact point with the inner surface (facing internal cavity 74) of back plate 54.

The display 38 may generally show or present information, such as time of day, current location, and the like, as well as cardiovascular information, such as heart rate, breathing rate, cardiac parameters, or electrocardiogram (ECG) images. The ECG images presented on display 38 may include the information shown in FIGS. 9 and 10. The display 38 may be implemented using substantially any suitable technology, such as light-emitting diode (LED), organic LED (OLED), Light Emitting Polymer (LEP) or Polymer LED (PLED), liquid crystal display (LCD), thin film transistor (TFT) LCD, LED side-lit or back-lit LCD, or the like, or combinations thereof. In some embodiments, the display 38 may have a round, circular, or oval shape. In other embodiments, the display 38 may have a square or a rectangular aspect ratio which may be viewed in either a landscape or a portrait orientation. The display 38 may be at least partially positioned in the internal cavity 74 of the housing 36, such that the display 38 is adjacent to the opening 80 of the upper surface 78 of upper wall 70, which may be formed by bezel 46. The electronic fitness device 20 may further include a lens or other covering (not shown) positioned on an upper surface of the display 38 to enhance the visibility of the information presented on the display 38.

The user interface 40 may generally allow the user to directly interact with the electronic fitness device 20 and may include the pushbutton 58, as well as other buttons, knobs, switches, or the like, and combinations thereof. Additionally or alternatively, the display 38 may include a touch screen occupying the entire display 38 or a portion thereof or be otherwise configured so that the display 38 functions as at least a portion of the user interface 40. The touch screen may allow the user to interact with the electronic fitness device 20 by physically touching, swiping, or gesturing on areas of the display 38 to input information or configure the electronic fitness device 20.

The communication element 42 may generally allow communication with external systems or devices. The communication element 42 may include signal or data transmitting and receiving circuits, such as amplifiers, filters, mixers, oscillators, digital signal processors (DSPs), and the like. Various combinations of these circuits may form a transceiver, which transmits, receives, and processes signals such as those listed in the following discussion. The communication element 42 may establish communication wireles sly by utilizing radio frequency (RF) signals and/or data that comply with communication standards such as cellular 2G, 3G, 4G, LTE, or 5G, Institute of Electrical and Electronics Engineers (IEEE) 802.11 standard such as Wi-Fi, IEEE 802.16 standard such as WiMAX, Bluetooth™, or combinations thereof. In addition, the communication element 42 may utilize communication standards such as ANT, ANT+,

Bluetooth™ low energy (BLE), the industrial, scientific, and medical (ISM) band at 2.4 gigahertz (GHz), or the like. The communication element 42 may be in electronic communication with the memory element 62 and the system processing element 64. In various embodiments, the electronic fitness device 20 may be configured to establish communication with more than one protocol or standard, and the communication element 42 may include a transceiver for each protocol or standard, such as Bluetooth™, Wi-Fi, cellular, etc., with which the electronic fitness device 20 can communicate. In addition, the communication element 42 may further include or be electrically coupled with the one or more antennas 44, which allow the electronic fitness device 20 to transmit and receive wireless signals to and from exercise-related sensors, such as the foot pod 24, the bike speed and cadence sensor 26, or the like, other electronic devices, such as the smartphone 28, the tablet, the laptop, or the desktop computer 30, or communication network interfaces such as the Wi-Fi router 32 or the cell tower 34.

The location determining element 48 may generally determine a current geolocation of the electronic fitness device 20 by receiving and processing radio frequency (RF) electronic signals from a global navigation satellite system (GNSS) such as the global positioning system (GPS) primarily used in the United States, the GLONASS system primarily used in the Soviet Union, or the Galileo system primarily used in Europe. The location determining element 48 may include satellite navigation receivers, processors, controllers, other computing devices, or combinations thereof, and memory. The location determining element 48 may further include or be electrically coupled with the antenna 44, from which it may receive a location wireless signal from one or more of the previously-mentioned satellite systems and may generate an electrical geolocation signal. As discussed above, antenna 44 may include a portion of bezel 46, which may be an electrically-conductive watch bezel. The location determining element 48 may process data included in the location electronic signals received by antenna 44 from which geographic information such as the current geolocation is determined. The current geolocation may include geographic coordinates, such as the latitude and longitude, of the current location of antenna 44 and the electronic fitness device 20. The location determining element 48 may communicate the current geolocation to the system processing element 64.

Although embodiments of the location determining element 48 may include a satellite navigation receiver, it will be appreciated that other location-determining technology may be used. For example, cellular towers or any customized transmitting radio frequency towers can be used instead of satellites may be used to determine the location of the electronic fitness device 20 by receiving data from at least three transmitting locations and then performing basic triangulation calculations to determine the relative position of the device with respect to the transmitting locations. With such a configuration, any standard geometric triangulation algorithm can be used to determine the location of the electronic fitness device 20. The location determining element 48 may also include or be coupled with a pedometer, accelerometer, compass, or other dead-reckoning components which allow it to determine the location of the electronic fitness device 20. The location determining element 48 may determine the current geographic location through a communications network, such as by using Assisted GPS (A-GPS), or from another electronic device. The location determining element 48 may even receive location data directly from a user.

As shown in FIGS. 3 and 4, a plurality of latch connectors 96 may electrically couple the bezel 46 with location determining element 48 and an ECG processing element 60, which may be integrated within the system processing element 64 or separate from the system processing element 64. Each latch connector 96 may pass location signals from bezel 46 to the location determining element 48 and bio signals (electrocardiogram signals) from bezel 46 to the ECG processing element 60. The latch connectors 96 are typically located within the inner cavity 74 of the housing 36. In embodiments, any of the latch connector 96 may be coupled with a switch 90, 92 to isolate (open circuit) or pass (closed circuit) electrical signals, such as the location signals and the bio signals (electrocardiogram signals).

As shown in FIGS. 3 and 4, in embodiments, each signal terminal coupled with bezel 46 and the c-shaped spring 68 coupled with back plate 54 may have a switch 90, 92 located between the respective signal terminal or c-shaped spring 68 and the system processing element 64 or ECG processing element 60. Each of the switches 90, 92 may be controlled by the system processing element 64 to cause isolation (open circuit) or conductivity (closed circuit) of the associated component (bezel 46 or c-shaped spring 68). For instance, the signal terminals of bezel 46 may include signal feed (F) and electrical ground (G) terminals that may be isolated or conducted through based on a selected position of an associated switch 90, 92.

In embodiments, the system processing element 64 may select an operating mode by interacting with switches 90, 92 to couple bezel 46 with the location determining element 48 or the ECG processing element 60. For example, the system processing element 64 may output control signals to close a first switch 90 and opening a second switch 92 to put the electronic fitness device 20 to select a GPS mode. Similarly, the system processing element 64 may output control signals 35 to open the first switch 90 and close the second switch 92 to select an ECG mode.

Referring also to FIG. 5, the optical assembly 50 may generally measure the blood flow in an area proximity to the optical assembly 50. For instance, optical assembly 50 may output light and identify changes in the volume of blood in the wearer's capillaries based on reflections of the outputted light from the area. The optical assembly 50 may generate a plethysmogram (PPG) signal based on the intensity of the reflected light and system processing element 64 may determine one or more cardiac performance metrics, such as heart rate, based on the PPG signal.

For example, the optical assembly 50 may use optoelectronic technology including an optical transmitter 84 (e.g., an LED or similar photo transmitters), an optical receiver 86 (e.g., a photodiode, a photodetector or similar photo receivers), and an HRM processing element 88. The optical transmitter 84 illuminates the wearer's skin and some of the transmitted light is reflected and received by the optical receiver 86, which outputs a PPG signal having a magnitude corresponding to the intensity of the reflected light received by the optical receiver 86. The HRM processing element 88 may include digital signal processors (DSPs), field-programmable gate arrays (FPGAs), or the like and may utilize the PPG signal to determine a heart rate or pulse (estimated heart beats per minute (bpm)) for the user. The determined cardiac performance metric, such as heart rate or pulse, may be communicated to the memory element 62 and the system processing element 64, such as in the form of an electrical HRM signal.

The bezel 46, which in one embodiment may form the first contact point 56, may be formed from an electrically-conductive material. The bezel 46 may have substantially any suitable shape, such as a shape that generally corresponds to the shape of the housing 36 or a portion thereof, and may be located on a periphery of the upper wall 70 or the side wall 72 of the housing 36. Bezel 46 may at least partially surround display 38. The bezel 46 may form a portion of antenna 44 coupled with location determining element 48.

In embodiments, different portions of bezel 46 may form a plurality of antennas 44. For example, portions of bezel 46 may form a portion of a first antenna, a second antenna, and a third antenna. The first antenna may be configured to receive a first wireless signal, such as a GPS signal, and generate a corresponding first electronic signal that is provided to the location determining element 48. The first antenna may be of a slot-antenna type and may be formed from a first electronic signal terminal, a first and a second electrical ground terminals, and a first portion of a circumference of the bezel 46. The second antenna may be configured to transmit and receive a second wireless signal, such as Bluetooth, Wi-Fi, cellular, etc., and may transmit and receive a corresponding second electronic signal. The second antenna may also be of the slot-antenna type and may be formed from a second electrical signal terminal, third and fourth electrical ground terminals, and a second portion of the circumference of the bezel 46. The third antenna may be configured to transmit and receive a third wireless signal, such as Bluetooth, Wi-Fi, cellular, etc., and may transmit and receive a corresponding third electronic signal. In embodiments, as shown in FIGS. 3-4, the third antenna 94 may be of an inverted F-antenna type and may be formed from a third electronic signal terminal, a first latch connector 96, an antenna strip electrically connected to the first latch connector 96, a fifth electrical ground terminal, and a third portion of the circumference of the bezel 46. Each of the antennas within antenna 44 may transmit and/or receive signals at a different frequency. By utilizing an electrically-conductive bezel 46 that forms a portion of three separate antennas, the electronic fitness device 20 is able to simultaneously receive GPS signals and wirelessly communicate with at least two other devices or networks.

The back plate 54 which forms the second contact point 52 may be formed from an electrically conductive material, may have substantially any suitable shape, and may be located on the lower surface 76 of the lower wall 68 of the housing 36, so that it is generally in constant contact with the wearer's skin. The back plate 54 may be configured to receive a first electrical bio signal (electrocardiogram signal) via the wearer's skin, and to provide the first electrical bio signal to the ECG processing element 60.

As seen in FIGS. 6A and 6B, the bezel 46 may include electrical ground terminals, indicated by the letter "G", a signal feed terminal, indicated by the letter "F," and an ECG signal terminal, indicated by the letters "ECG." When processing system 64 determines to use bezel 46 as antenna 44, which utilizes the electrical ground (G) and signal feed (F) terminals for operation as described above, the received signals are provided to the location determining element 48 from the signal feed (F) terminal.

In embodiments, the system processing element 64 may control one or more switches 90, 92 to cause isolation (open circuit) of bezel 46 from the ECG signal (ECG) terminal when the bezel 46 is desired to be used to receive location signals from GPS satellites or communication signals from remote devices and conductivity (closed circuit) of bezel 46 with the signal feed (F) and electrical ground (G) terminals.

When bezel 64 is used as a first contact point 56, the first electrical bio signals (electrocardiogram signals) received from the first contact point 56 are provided to the ECG processing element 60, which may be a part of the system processing system 64. In embodiments, when processing system 64 determines to use bezel 46 to serve as a first contact point 56 to receive the first electrical bio signals, the system processing element 64 may control the one or more switches 90, 92 to cause isolation of bezel 46 from the signal feed (F) and one or more ground (G) terminals and conductivity (closed circuit) of bezel 46 with the ECG signal (ECG) terminal.

As shown in FIG. 6B, a switch 90 may be used to isolate (open circuit) or pass (closed circuit) location signals from bezel 46 to location determining element 48. In such embodiments, switch 90 may be opened for two ground (G) terminals reduce the location signals passed to the location determining element 48 from bezel 46 and closed to increase location signals passed to the location determining element 48 from bezel 46. A switch may not be positioned between the signal feed (F) terminal of bezel 46 and the location determining element 48 because some (reduced) location signals may continue to pass to the location determining element 48.

In embodiments, the first electrical bio signals may be received from the wearer and communicated to the ECG processing element 60 at any time, and as long as, the wearer physically contacts the bezel 46 with a finger or thumb of his other hand. In other embodiments, the system processing element 64 controls display 38 to notify the user that the bezel 46 may be contacted with a finger or thumb of his other hand once the switches 90, 92, which were previously isolating bezel 46 from the ECG signal (ECG) terminal when the bezel 46 is desired to be used to receive location signals from GPS satellites or communication signals from remote devices, are closed to enable bezel 64 to act as a first contact point 56 by passing first electrical bio signals (electrocardiogram signals) to ECG processing element 60.

With reference to FIG. 6B, the electronic fitness device 20 may include a first single-pole, single-throw (SPST) switch 90 and a second SPST switch 92. The switches 90, 92 may make or break electrical contact between two connection points of a signal. As seen in FIG. 6B, the first switch 90 may make electrical contact (switch closed) or break electrical contact (switch open) with one or more electrical ground points of the bezel 46. The second switch 92 may make or break electrical contact second electrical bio signal from the ECG contact of the bezel 46. Each switch 90, 92 may further include a control line, which controls whether the switch makes or breaks electrical contact. As detailed herein, the system processing element 64 may send a signal to each control line to open or close the first switch 90 and the second switch 92.

In embodiments, the system processing element 64 may default to closing the first switch 90 and opening the second switch 92 to put the electronic fitness device 20 in GPS mode. If the system processing element 64 determines that the location signals received by location determining element 48 are attenuated (e.g., as a result of the wearer contacting the bezel 46 or a loss of GPS signal), or if the wearer provides an input using user interface 40 to select the ECG mode, the system processing element 64 may send signals to open the first switch 90 and close the second switch 92. The closing of the second switch 92 allows the ECG processing element 60 to receive the electrical bio signal, and in turn, generate an ECG waveform that is used to generate an electrocardiogram image. When the wearer

removes physical contact of his finger or thumb from the bezel 46 (or provides an input provides an input using user interface 40 to select the GPS mode), the system processing element 64 may close the first switch 90 and open the second switch 92.

The pushbutton 58 may be part of the user interface 40 and may include a spring-loaded button that is coupled to a normally-closed (NC) or normally-open (NO) electrical contact. The pushbutton 58 may be constructed from an electrically-conductive material and may have substantially any suitable shape. The pushbutton 58 may have a shaft that passes through an opening located on the side wall 72 of housing 36. The contact of pushbutton 58 may be positioned between two spaced apart electrodes and may make or break electrical connection with the two electrodes depending on the position of pushbutton 58—pushed or not pushed—as is generally known for pushbutton operation. Additionally, pushbutton 58 may be rotated to provide user input.

In embodiments, the pushbutton 58 may form the first contact point 56 for generating ECG signals. As a result, the pushbutton 58 may include two outputs. A first output may provide the first electrical bio signal (electrocardiogram signals) to ECG processing element 60. A second output may be provided by the electrical contact and may include a user interface signal. The system processing element 64 may select use of the second output when the first electrical bio signal is desired to be communicated to the ECG processing element 60 and may be based on a determination by the system processing element 64 that the wearer is physically contacting pushbutton 58 with his skin, such as by using a finger or thumb of the opposing hand. The user interface signal may be communicated to the system processing element 64 and may be generated when the wearer presses (or presses and releases) the pushbutton 58 or rotates the pushbutton 58. The user interface signal may be a pulse or a steady state signal.

The ECG processing element 60 may be configured to receive the first and second electrical bio signals (electrocardiogram signals) from the first and second contact points 56, 52, and determine or detect the electrical activity of the wearer's heart. The first and second electrical bio signals (electrocardiogram signals) represent action potentials that cause muscle contraction due to electrical stimulation of the wearer's heart. Typically, two points, the first contact point 56 and the second contact point 52, are used for the detection of the ECG signal. As discussed above, each contact point is typically located on each side of the heart (i.e., the midline the wearer's body). The electronic fitness device 20 worn on the user's left hand may be configured for receiving the first ECG signal from the first contact point 56 on the wearer's right side (from the opposing hand), and the second ECG signal from the second contact point 52 on the wearer's left side (corresponding the wrist on which the electronic fitness device 20 is worn). In embodiments, the ECG processing element 60 or the system processing element 64 may reverse the polarity of the received ECG signals to cause the displayed ECG image(s) to be inverted.

In an exemplary embodiment, the ECG processing element 60 may include an instrumentation amplifier, an analog-to-digital converter (ADC), and an optional microprocessor. The ECG processing element 60 may include suitable custom or off-the-shelf chips or other devices. For example, the instrumentation amplifier may be embodied by the AD8233 ECG Heart Rate Monitor integrated circuit (IC), available from Analog Devices, Inc., which is configured or configurable to extract, amplify, and filter small biopotential signals under noisy conditions.

In operation, the instrumentation amplifier of the ECG processing element 60 may receive the second electric signal from the second contact point 52 (the back plate 54) constantly while the user is wearing the electronic fitness device 20. The instrumentation amplifier may wait for the presence of the first electric signal from the first contact point 56. The amplitude of the first and second electrical bio signals (electrocardiogram signals) may be between 0.2 and 5.0 mV. Once the first contact point 56 begins providing the first electrical bio signal, the ECG processing element 60 may control its instrumentation amplifier to amplify the signal (by, for instance, between 800:1 and 1000:1), reduce or remove any noise resulting from amplifying the signal, and generate an analog ECG waveform.

The instrumentation amplifier of the ECG processing element 60 may also provide a "leads off" detection function, where a leads off signal is generated to indicate that the first and second electrical bio signals from the wearer have been detected. The ECG processing element 60 may digitize the analog ECG waveform by using an analog-to-digital converter (ADC). The digital ECG waveform may optionally be bandpass filtered. For the embodiments in which system processing element 64 does not include the ECG processing element 60, the ECG waveform may be communicated to the system processing element 64.

By utilizing hardware, software, firmware, or combinations thereof, the processing element 64 may perform the following functions. The system processing element 64 may receive electrical signals from, at the least, the bezel 46, the pushbutton 58, the location determining element 48, the HRM assembly 50, and the ECG processing element 60. The system processing element 64 may control a mode of operation of the electronic fitness device 20 based on whether bezel 46 is to be used to receive location information or cardiovascular (electrocardiogram) information.

The system processing element 64 may control the one or more switches display 38 to present applicable information presented based on the selected mode. For instance, the system processing element 64 may control the one or more switches to cause isolation of bezel 46 from the signal feed (F) and one or more ground (G) terminals and conductivity (closed circuit) of bezel 46 with the ECG signal (ECG) terminal when the processing system 64 determines to use bezel 46 to serve as a first contact point 56 to receive the first electrical bio signals. Similarly, the system processing element 64 may control one or more switches to cause isolation (open circuit) of bezel 46 from the ECG signal (ECG) terminal and conductivity (closed circuit) of bezel 46 with the signal feed (F) and electrical ground (G) terminals when the bezel 46 is desired to be used to receive location signals from GPS satellites or communication signals from remote devices.

In some instances, a current mode of operation may be selected or controlled manually by the wearer by providing an input using the pushbutton 58, which generates a user interface signal when depressed or rotated. For example, upon receipt of the user interface signal, the system processing element 64 may select an active mode, which may be a GPS mode or an ECG mode, among others (e.g., an HRM mode, a blood pressure mode, etc.).

In other instances, a current mode of operation may be selected or controlled automatically when the system processing element 64 receives one or more electrical signals from the location determining element 48, the HRM assembly 50, and/or the ECG processing element 60. For example, if system processing element 64 determines that a user is physically contacting the first contact point 56, which may

occur when the user attempts to provide first and second electrical bio signals (electrocardiogram signals), the system processing element 64 may select the ECG mode and control the one or more switches to cause isolation of bezel 46 from the signal feed (F) and one or more ground (G) terminals and conductivity (closed circuit) of bezel 46 with the ECG signal (ECG) terminal. The system processing element 64 may automatically (after a period of 2-5 seconds) select the GPS mode once it determines that the user is no longer physically contacting the first contact point 56.

In embodiments, the system processing element 64 (and the electronic fitness device 20) may default to the GPS mode, in which the location determining element 48 receives GPS signals from antenna 44 that may be partially formed by bezel 46 and communicates the geolocation to the memory element 62 and system processing element 64. In the GPS mode, the system processing element 64 may determine, and control the display 38 to show, related information such as a current geolocation, a distance traveled for a certain period of time, a velocity of travel, a time of travel, and a route traveled. The user interface 40 may be utilized by the wearer to select the information presented on the display 38 by providing inputs to a touch screen or by pressing (, or pressing and releasing) or rotating the pushbutton 58.

In the ECG mode, the system processing element 64 may generate (or receive from the ECG processing element 60) the electrocardiogram waveform based on electrocardiogram signals received through the first contact point once physical contact is made between the bezel and the wearer's finger or thumb and through the second contact point once physical contact is made between the wearer's wrist and the electrically-conductive plate.

The system processing element 64 may determine generate, and store in the memory element 62, electrocardiogram data based on the electrocardiogram waveform. For instance, the electrocardiogram data may determine a QRS complex, a PR interval, a PR segment, a QT interval, a ST segment, a QR complex, an RS complex, and a QS complex based a determined amplitude of the electrocardiogram waveform at each moment for at least a period of time including one heartbeat. The system processing element 64 may also determine a time between any of this electrocardiogram data (e.g., a time between successive QRS complexes). The electrocardiogram data may include a peak-to-peak period determined by the system processing element 64 based on peaks of the electrocardiogram waveform (e.g., by using the QRS complex). In embodiments, the electrocardiogram data may include heart rate variability (HRV), which is a calculated variability between peak-to-peak periods determined for a plurality of heart beats.

The system processing element 64 may control the display 38 to present the electrocardiogram waveform as one or more electrocardiogram images. In some embodiments, as shown in FIG. 9, the system processing element 64 may control the display 38 to present a sequence of electrocardiogram images, where each electrocardiogram image corresponds to one sequence of heartbeats of the wearer for a period of time. In other embodiments, as shown in FIG. 8, the system processing element 64 may control the display 38 to present a stream of electrocardiogram images, wherein the stream of electrocardiogram image corresponds to a (a plurality) of heartbeats of the wearer and the electrocardiogram images are scrolled such that a current or most-recently generated electrocardiogram image is continuously presented on the display 38. The direction of streaming may be indicated by an arrow, as shown in FIG. 10.

15

The user may manually switch between the GPS mode and the ECG mode by pressing (or pressing and releasing) or by rotating the pushbutton 58. Additionally, or alternatively, the system processing element 64 may automatically switch modes depending on, or according to, the electrical signals that determined to be received by bezel 46 and pushbutton 58. For instance, with reference to FIG. 6A, when the system processing element 64 determines that location determining element 48 is receiving location signals (from satellites) and the wearer is not touching the bezel 46 or the pushbutton 58, then the system processing element 64 may control one or more switches to enable use of bezel 46 to receive location signals for use by location determining element 48. Alternatively, if the system processing element 64 determines that the wearer is contacting the bezel 46 (attenuating any location signals received by the bezel 46), then the system processing element 64 may control one or more switches to enable use of bezel 46 to receive an electrical bio signal for use by the ECG processing element 60 to generate the ECG waveform. Alternatively, if the wearer contacts the pushbutton 58, then the ECG processing element 60 may generate the ECG waveform. The location determining element 48 may stop determining a current geographic location without the location signals. In the presence of the ECG signals, the system processing element 64 may automatically switch from the GPS mode to the ECG mode (whether the location signals are present or not). When the system processing element 64 determines that bezel 46 is no longer receiving an ECG signal (as a result of the wearer no longer contacting the bezel 46 and/or the pushbutton 58), the system processing element 64 may select the GPS mode, or the mode that was active prior to the ECG mode.

In the HRM mode, the system processing element 64 may control the display 38 to present cardiac metrics such as values for heart rate (beats per minute), pulse oximetry (VO2 max), breathing rate, and heart rate variability (HRV). The system processing element 64 may determine values of heart rate, VO2 max, breathing rate, heart rate variability (HRV), and the like based on signals received from the optical assembly 50.

In the blood pressure mode, the system processing element 64 may calculate or determine an estimated blood pressure of the wearer. The electrical HRM signal received by the system processing element 64 may include information or data regarding the pressure pulse in the blood resulting from a heartbeat. Unlike an ECG signal (an electrical signal) that travels nearly instantly from the user's heart to the contact points of the electronic fitness device 20, the pressure pulse travels more slowly from the heart to the electronic fitness device 20. The system processing element 64 may calculate or determine an approximate distance from the user's heart to electronic fitness device 20 or is entered by the wearer, then the system processing element 64 may calculate a pulse wave velocity as the distance divided by the time taken for the pulse wave to travel to the electronic fitness device 20 worn on the user's wrist. Finally, the system processing element 64 may utilize information stored in memory element 62 to correlate the determined pulse wave velocity to an approximate blood pressure of the wearer. The system processing element 64 may then control the display 38 to present the determined blood pressure value.

Although the technology has been described with reference to the embodiments illustrated in the attached drawing figures, it is noted that equivalents may be employed and

16

substitutions made herein without departing from the scope of the technology as recited in the claims.

Having thus described various embodiments of the technology, what is claimed as new and desired to be protected by Letters Patent includes the following:

1. A wrist-worn electronic device comprising:
   a display;
   a memory element;
   a housing including a bottom wall, one or more side walls, and an electrically-conductive bezel at least partially surrounding the display and positioned to receive physical contact from a wearer's finger or thumb, the bezel at least partially forming an antenna and providing a first contact point;
   a location determining element configured to receive location determining signals from the antenna and configured to determine a geolocation of the electronic device based on the received location determining signals;
   an optical assembly centrally-positioned on the bottom wall, the optical assembly including an optical transmitter configured to output light onto the wearer's wrist and an optical receiver configured to receive light reflected from the wearer's wrist;
   an electrically-conductive plate surrounding the optical assembly, coupled to the bottom wall and configured to physically contact a wearer's wrist when the electronic device is worn, the plate forming a second contact point;
   a plurality of electrical switches; and
   a processing element in electronic communication with the display, the memory element, and the plurality of electrical switches, and electrically coupled with the plate and the bezel, the processing element configured to—
      control the plurality of electrical switches to selectively couple the bezel to the location determining component and the processing element,
      generate an electrocardiogram waveform associated with the wearer based on electrocardiogram signals received through the first contact point once physical contact is made between the bezel and the wearer's finger or thumb and through the second contact point once physical contact is made between the wearer's wrist and the electrically-conductive plate,
      generate, and store in the memory element, electrocardiogram data based on the electrocardiogram waveform,
      generate an electrocardiogram image based on the stored electrocardiogram data, and
      control the display to present the electrocardiogram image.

2. The electronic device of claim 1, wherein the processing element is further configured to generate a sequence of electrocardiogram images, wherein each electrocardiogram image corresponds to one sequence of heartbeats of the wearer for a period of time.

3. The electronic device of claim 1, wherein the processing element is further configured to generate a stream of electrocardiogram images, wherein the stream of electrocardiogram images corresponds to a plurality of heartbeats of the wearer, and wherein the processing element scrolls the electrocardiogram images on the display such that a most-recently generated electrocardiogram image is continuously presented on the display.

4. The electronic device of claim 1, wherein the processing element is in electronic communication with the location

17

determining element and is configured to receive the determined geolocation of the electronic device from the location determining component.

5. The electronic device of claim 1, wherein the location determining component is further configured to utilize location determining signals received by the bezel when physical contact from the wearer's finger or thumb is not made with the bezel.

6. The electronic device of claim 1, wherein the processing element is further configured to control the plurality of electrical switches to selectively couple the bezel to the location determining component once physical contact is determined not to be made between the bezel and the wearer's finger or thumb.

7. The electronic device of claim 1, wherein the processing element is further configured to control the plurality of electrical switches to selectively couple the bezel to the processing element once physical contact is made between the bezel and the wearer's finger or thumb.

8. The electronic device of claim 7, wherein the processing element is further configured to:
identify cardiovascular activity in a physical contact is made between the bezel and the wearer's finger or thumb based on the electrocardiogram signals received from the first contact point and the second contact point, and
determine that physical contact is made between the bezel and the wearer's finger or thumb based on the identified cardiovascular activity.

9. The electronic device of claim 1, wherein the processing element comprises an electrocardiogram processing element that receives the electrocardiogram signals from the first and second contact points and generates the electrocardiogram waveform.

10. The electronic device of claim 1, wherein the electrocardiogram data comprises amplitudes corresponding to a QRS complex within the electrocardiogram waveform.

11. The electronic device of claim 1, wherein the optical assembly is configured to generate a photoplethysmogram (PPG) signal, and wherein the processing element is electrically coupled with the optical assembly and further configured to determine a heart rate of the wearer based on the PPG signal and present the determined heart rate on the display.

12. The electronic device of claim 1, wherein the plate includes an opening having a perimeter that encloses the optical assembly.

13. An electronic device configured to be worn on a wrist of a wearer, the electronic device comprising:
a housing including a bottom surface;
a bezel at least partially forming an antenna;
a display at least partially surrounded by the bezel;
a location determining element configured to receive location determining signals from the antenna and configured to determine a geolocation of the electronic device based on the received location determining signals;
an optical assembly centrally-positioned on the bottom wall, the optical assembly including an optical transmitter configured to output light onto the wearer's wrist and an optical receiver configured to receive light reflected from the wearer's wrist;
an electrically-conductive first contact point located on the bezel and positioned to be physically touched by a finger or thumb of the wearer;
an electrically-conductive second contact point located on a plate on the bottom surface of the housing and

18

configured to physically contact a wrist of the wearer when the electronic device is worn, the plate surrounding the optical assembly;
a plurality of electrical switches; and
a processing element electrically coupled with the plate, the bezel and the plurality of electrical switches, the processing element configured to—
control the plurality of electrical switches to selectively coupling the bezel to the location determining component and the processing element,
receive a first electrical bio signal from the first contact point once the bezel is physically touched by the finger or thumb of the wearer,
receive a second electrical bio signal from the second contact point,
generate an electrocardiogram waveform based on the first electrical bio signal and the second electrical bio signal, and
graphically display the electrocardiogram waveform on the display.

14. The electronic device of claim 13, wherein the processing element is further configured to utilize electrocardiogram signals received through the bezel once physical contact is made with the bezel to generate the electrocardiogram waveform.

15. The electronic device of claim 13, wherein the electrocardiogram waveform is displayed as a sequence of single electrocardiogram images, with each electrocardiogram image corresponding to a heartbeat of the wearer.

16. The electronic device of claim 13, wherein the electrocardiogram waveform is displayed as a stream of electrocardiogram images, with each electrocardiogram image corresponding to a heartbeat of the wearer.

17. The electronic device of claim 13, wherein the optical assembly is configured to generate a photoplethysmogram (PPG) signal, and wherein the processing element is further configured to determine a heart rate of the wearer based on the PPG signal and present the determined heart rate on the display.

18. The electronic device of claim 13, wherein the processing element is in electronic communication with the location determining element and is configured to receive the determined geolocation of the electronic device from the location determining component.

19. The electronic device of claim 13, wherein the plate includes an opening having a perimeter that encloses the optical assembly.

20. The electronic device of claim 13, wherein the processing element is further configured to control the plurality of electrical switches to selectively couple the bezel to the location determining component once physical contact is determined not to be made between the bezel and the wearer's finger or thumb.

21. The electronic device of claim 13, wherein the processing element is further configured to control the plurality of electrical switches to selectively couple the bezel to the processing element once physical contact is made between the bezel and the wearer's finger or thumb.

22. An electronic device configured to be worn by a wearer during a physical activity, the electronic device comprising:
a display;
a housing including a bottom surface, a side wall having an opening and an electrically-conductive bezel at least partially forming an antenna;
a location determining element configured to receive location determining signals from the antenna and

configured to determine a geolocation of the electronic device based on the received location determining signals;

an optical assembly centrally-positioned on the bottom wall, the optical assembly including an optical transmitter configured to output light onto the wearer's wrist and an optical receiver configured to receive light reflected from the wearer's wrist:

an electrically-conductive pushbutton including a shaft passing through the opening of the sidewall and configured to be physically touched by a finger or thumb of the wearer, the pushbutton providing a first contact point;

an electrically-conductive second contact point located on a plate positioned on the bottom surface of the housing and configured to physically contact a wrist of the wearer when the electronic device is worn, the plate surrounding the optical assembly;

a plurality of electrical switches; and

a processing element electrically coupled with the plate, the pushbutton and the plurality of electrical switches, the processing element configured to

    control the plurality of electrical switches to selectively coupling the bezel to the location determining component and the pushbutton to the processing element,

    receive a first electrical bio signal from the first contact point once the finger or thumb of the wearer contacts the pushbutton,

    receive a second electrical bio signal from the second contact point,

    generate an electrocardiogram waveform based on the first electrical bio signal and the second electrical bio signal, and

    graphically display the electrocardiogram waveform on the display.

23. The electronic device of claim 22, wherein the pushbutton is further configured to be depressible or rotatable to provide user inputs.

24. The electronic device of claim 22, wherein the electrocardiogram waveform is displayed as a sequence of single electrocardiogram images, with each electrocardiogram image corresponding to a heartbeat of the wearer.

25. The electronic device of claim 22, wherein the electrocardiogram waveform is displayed as a stream of electrocardiogram images, with each electrocardiogram image corresponding to a heartbeat of the wearer.

26. The electronic device of claim 22, wherein the optical assembly is configured to generate a photoplethysmogram (PPG) signal, and wherein the processing element is further configured to determine a heart rate of the wearer based on the PPG signal and present the determined heart rate on the display.

27. The electronic device of claim 22, wherein the processing element is in electronic communication with the location determining element and is configured to receive the determined geolocation of the electronic from the location determining component.

28. The electronic device of claim 22, wherein the plate includes an opening having a perimeter that encloses the optical assembly.

29. The electronic device of claim 22, wherein the processing element is further configured to control the plurality of electrical switches to selectively couple the bezel to the location determining component once physical contact is determined not to be made between the bezel and the wearer's finger or thumb.

30. The electronic device of claim 22, wherein the processing element is further configured to control the plurality of electrical switches to selectively couple the bezel to the processing element once physical contact is made between the bezel and the wearer's finger or thumb.

\* \* \* \* \*

# *Appendix IV*

RECEIVED

NOV 21 2024

United States Court of A...
For the Federal Circuit



(12) **United States Patent**
Kerrouche et al.

(10) **Patent No.:** **US 11,717,176 B2**
(45) **Date of Patent:** **Aug. 8, 2023**

(54) **SMARTWATCH-TYPE INDIVIDUAL MEDICAL MONITORING DEVICE AND METHOD FOR INDIVIDUAL MEDICAL MONITORING OF A USER THEREOF**

(71) Applicants: **Samira Kerrouche**, Garges-les-Gonesse (FR); **Hayame Bouyahia**, Franqueville Saint Pierre (FR)

(72) Inventors: **Samira Kerrouche**, Garges-les-Gonesse (FR); **Hayame Bouyahia**, Franqueville Saint Pierre (FR)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 215 days.

(21) Appl. No.: **17/239,535**

(22) Filed: **Apr. 23, 2021**

(65) **Prior Publication Data**

US 2021/0330199 A1 Oct. 28, 2021

(30) **Foreign Application Priority Data**

Apr. 23, 2020 (FR) ..................................... 20 04049

(51) **Int. Cl.**
*A61B 5/00* (2006.01)
*A61B 5/0205* (2006.01)
(Continued)

(52) **U.S. Cl.**
CPC ........ *A61B 5/02055* (2013.01); *A61B 5/0022* (2013.01); *A61B 5/024* (2013.01);
(Continued)

(58) **Field of Classification Search**
CPC .... A61B 2560/0214; A61B 2562/0271; A61B 5/0022; A61B 5/02055; A61B 5/024; A61B 5/026; A61B 5/1112; A61B
5/14532; A61B 5/14542; A61B 5/681; A61B 5/6843; A61B 5/742; A61B 5/746; G16H 10/60; G16H 40/67; G16H 50/30
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

2017/0014035 A1   1/2017   Newberry
2017/0105676 A1   4/2017   Liu
(Continued)

FOREIGN PATENT DOCUMENTS

WO       2018/114180 A1   6/2018

*Primary Examiner* — George Manuel
(74) *Attorney, Agent, or Firm* — Hoffberg & Associates; Steven M. Hoffberg

(57) **ABSTRACT**

A smartwatch-type individual medical monitoring device includes a main body with a display screen, a bracelet linked to the main body, a processor and a measurement instrument positioned opposite a radial artery of the wrist of the user. The measurement instrument includes a first sensor to continuously measure the oxygen level, a second sensor measures the heart rate by measuring the vibrations of the blood flow at the radial artery, and a third sensor measures the ascending and descending blood flows at the radial artery. The processor is configured to: acquire the measured data of the three sensors, analyze the measured oxygen level, analyze the number of measured vibrations of the blood flow, analyze the measured ascending and descending blood flows, output detection of an anomaly based on analysis of oxygen level, heart rate and ascending and descending blood flows, and store the measured data of the three sensors.

**20 Claims, 3 Drawing Sheets**



(51) **Int. Cl.**

| | |
|---|---|
| *G16H 40/67* | (2018.01) |
| *G16H 10/60* | (2018.01) |
| *G16H 50/30* | (2018.01) |
| *A61B 5/024* | (2006.01) |
| *A61B 5/026* | (2006.01) |
| *A61B 5/11* | (2006.01) |
| *A61B 5/145* | (2006.01) |

(52) **U.S. Cl.**
CPC ............ *A61B 5/026* (2013.01); *A61B 5/1112* (2013.01); *A61B 5/14532* (2013.01); *A61B 5/14542* (2013.01); *A61B 5/681* (2013.01); *A61B 5/742* (2013.01); *A61B 5/746* (2013.01); *G16H 10/60* (2018.01); *G16H 40/67* (2018.01); *G16H 50/30* (2018.01); *A61B 2560/0214* (2013.01); *A61B 2562/0271* (2013.01)

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | |
|---|---|---|---|
| 2018/0116560 A1 * | 5/2018 | Quinn | ............... A61B 5/02055 |
| 2019/0125259 A1 | 5/2019 | Huang | |
| 2020/0093015 A1 * | 3/2020 | Seo | .......................... G06F 1/163 |
| 2020/0093378 A1 | 3/2020 | Lange et al. | |

* cited by examiner



**Fig. 1**



**Fig. 2**



**Fig. 3**



**Fig. 4**

# SMARTWATCH-TYPE INDIVIDUAL MEDICAL MONITORING DEVICE AND METHOD FOR INDIVIDUAL MEDICAL MONITORING OF A USER THEREOF

## RELATED APPLICATION

This application claims priority from French Patent Application No. 20 04049 filed Apr. 23, 2020, which is incorporated herein by reference in its entirety.

## TECHNICAL FIELD

The present invention relates to the field of medical monitoring devices. More particularly, the invention relates to a device for monitoring persons, in particular persons having a need for a medical supervision, in the form of a watch intended to be worn by a user at his wrist and adapted to output information indicative of an anomaly in case of danger to the user, in particular in case of a punctual malaise, a more serious health problem or a long-lasting and treated pathology.

## BACKGROUND OF THE INVENTION

Monitoring of persons suffering from pathologies, such as chronic pathologies, but also frail persons or all persons wishing so, is important in order to be able to provide a suitable response on time. Conventionally, such a monitoring is done during examinations in specialized centers or in hospitals.

Such a monitoring may further be done directly by a patient, for example in the case of a post-treatment supervision or in the case of a daily supervision for chronic pathologies such as diabetes or a cardiac disease.

To perform such supervisions, there are devices allowing measuring physiological parameters of a patient such as the blood glucose level and the heart rate.

However, in too many cases, the supervision is not done in a quite regular basis for a patient who might forget some measurements or not remember when he has performed a measurement which could have substantially serious consequences.

Furthermore, an irregular supervision of a patient may result in a lag between the treatment to which the patient is subjected and that one that would be necessary.

Moreover, such a supervision is not accurate since, for example for cardiac diseases, the time point at which a measurement outputting information indicative of a physiological anomaly (cardiac arrhythmia, a loss of too many heart beats) may turn out to be essential for a quick and effective take-over of a pathology. However, too many persons (for example elderly people) may be unable to provide sufficiently accurate details on such phenomena that might happen to them. Thus, the response provided to this type of incidents may be inadequate which is not satisfactory.

In addition, a continuous supervision of persons at risk could also save the life of patients and prevent avoidable medical expenses (hospitalization, treatment) by allowing avoiding possible health problems of these persons.

Hence, there is a need to provide a medical monitoring and supervision device that allows providing a reliable continuous supervision so that the patients could benefit from an adequate response to symptoms.

There is also a need to provide such a device that is simple to use and inexpensive to implement, so that the largest

number of patients could benefit from it. In particular, it is an objective of the invention to overcome the drawbacks of the prior art.

## OBJECT AND SUMMARY OF THE INVENTION

The invention addresses this need by providing a smartwatch-type individual medical monitoring device adapted to come into contact with a wrist of a user, comprising a main body provided with a display screen, a bracelet linked to the main body, and a measurement instrument intended to be positioned opposite a radial artery of the wrist of the user, when the watch is worn by the user, said measurement instrument comprising:

a first sensor adapted to continuously measure the oxygen level at the radial artery of said user;

a second sensor adapted to measure the heart rate of said user by measuring the vibrations of the blood flow at said radial artery;

a third sensor adapted to measure the ascending and descending blood flows at said radial artery;

said device comprising a processor including:

means for acquiring the measured data of said first sensor, second sensor and third sensor;

first means for analyzing the oxygen level measured by said first sensor, comparing said value of the oxygen level with respect to a predetermined first threshold;

second means for analyzing the number of vibrations of the blood flow measured by said second sensor, comparing said value of the heart rate with respect to a predetermined second threshold;

third means for analyzing the ascending and descending blood flows measured by said third sensor, comparing said value of the ascending blood flow with respect to a predetermined third threshold and of the descending blood flow with respect to a predetermined fourth threshold;

means for outputting information indicating the detection or the non-detection of an anomaly according to said analysis of said oxygen level, heart rate and ascending and descending blood flows of said user;

means for storing said measured data of said first sensor, second sensor and third sensor.

Thus, the invention provides a novel and inventive approach allowing solving at least partially some of the drawbacks of the prior art.

In particular, because this individual medical monitoring device could be worn continuously, it allows providing a medical monitoring and supervision device that allows providing a reliable continuous supervision so that the patients could benefit from an adequate response to symptoms.

Moreover, because these measurements are performed at the radial artery of the user, this device allows obtaining reliable data and performing analyses on accurate data.

Furthermore, thanks to the plurality of implemented sensors as well as the processor, the data can also be cross-checked which enhances this reliability.

Furthermore, such an individual medical monitoring device turns out to be simple to use and inexpensive to implement.

According to a feature of at least one embodiment of the invention, said storage means further contain at least one information relating to said user belonging to the group comprising:

the age of said user;

anatomical data of said user;

morphological data of said user;

an ongoing treatment to which said user is subjected;

a pathology of said user;

the medical history of said user;

the blood type of said user;

the ablations undergone by the user;

the major surgeries undergone by the user;

the blood type of the user;

the results of last examinations (blood test, etc.).

Thus, this allows providing data that are even more accurate.

In this instance, according to a feature of at least one embodiment of the invention:

the predetermined first threshold is defined according to said at least one information relating to said user, and/or

the predetermined second threshold is defined according to said at least one information relating to said user, and/or

the predetermined third threshold is defined according to said at least one information relating to said user, and/or

the predetermined fourth threshold is defined according to said at least one information relating to said user.

According to a feature of at least one embodiment of the invention, the device further comprises alert means. Furthermore, if information indicating the detection of an anomaly is output by said output means, said alert means generate an alert message which is transmitted via a communications device to at least one predetermined contact, said predetermined contact being stored in said storage means.

According to a feature of at least one embodiment of the invention, said communications device comprise a port configured to receive a nano SIM card.

Thus, this allows implementing communication means that are simple and accessible to everyone. Furthermore, this allows avoiding possible problems of compatibility of communication means.

According to a feature of at least one embodiment of the invention, said communications device further comprise means for calling in emergency said at least one predetermined contact.

Thus, this allows providing a quick response in case of emergency.

According to a feature of at least one embodiment of the invention, the device further comprises unique identification means.

Therefore, this allows securing the data contained by this device so that these are not accessible to everyone. Furthermore, this allows ensuring that the data actually correspond to a determined person.

According to a feature of at least one embodiment of the invention, the device further comprises means for detecting a set-up of said device on said wrist of said user.

Therefore, this allows avoiding false measurements and therefore false alerts by ensuring that the device is properly in place on the wrist of the user.

According to a feature of at least one embodiment of the invention, the device further comprises a sensor belonging to the group comprising:

a geolocation sensor;

a blood glucose level sensor;

a temperature sensor.

According to a feature of at least one embodiment of the invention, the device further comprises an electric power supply.

Thus, this allows implementing a device that is autonomous from an energy perspective, with possible charging.

The invention also relates to an individual medical monitoring method, said method being adapted to output information indicating the detection or the non-detection of an anomaly, implementing a smartwatch-type individual medical monitoring device adapted to come into contact with a wrist of a user according to any of the aforementioned embodiments, the method comprising the following steps, implemented by said individual medical monitoring device, when said measurement instrument is positioned opposite a radial artery of said wrist of said user:

measurement of the oxygen level of said user at the radial artery of said user, using said first sensor;

measurement of the heart rate of said user by measuring the vibrations of the blood flow at said radial artery, using said second sensor;

measurement of the ascending and descending blood flows at said radial artery, using said third sensor;

analysis of said oxygen level, heart rate and ascending and descending blood flows of said user, so as to transmit instructions to output information indicating the detection or the non-detection of an anomaly;

output of said information indicating the detection or the non-detection of an anomaly;

storage of said measured oxygen level, heart rate and ascending and descending blood flows of said user,

said analysis step comprising the following successive steps:

comparison of the measured oxygen level with respect to a predetermined first threshold;

comparison of the measured heart rate with respect to a predetermined second threshold;

comparison of the value of the ascending blood flow with respect to a predetermined third threshold and of the value of the descending blood flow with respect to a predetermined fourth threshold, and

instruction to output said information indicating the detection of an anomaly if the oxygen level, and/or the heart rate and/or the ascending and/or descending blood flows of said user respectively exceed the first, second, third and fourth thresholds.

According to a feature of at least one embodiment of the method, if information indicating the detection of an anomaly is output by said output means, the method comprises the following successive steps:

generation of an alert message by said alert means;

sending of said generated alert message to said at least one predetermined contact, via said communications device.

According to a feature of at least one embodiment of the method, the latter comprises a prior authentication step.

The invention further relates to a computer program product downloadable from a communication network and/or stored on a microprocessor-readable medium and/or executable by a microprocessor, characterized in that it comprises program code instructions for the execution of an individual medical monitoring method according to any of the aforementioned embodiments, when it is executed on a computer or a mobile terminal.

The invention also relates to a non-transitory terminal-readable storage medium, storing a computer program comprising a set of instructions executable by a computer or a processor to implement the method according to any of the aforementioned embodiments.

BRIEF DESCRIPTION OF THE DRAWINGS

Other objects, features and advantages of the invention will appear clearly on reading the following description,

5

6

provided as a mere illustrative and non-limiting example, with reference to the figures, amongst which:

FIG. 1 is a diagram illustrating a side view of a monitoring device according to one embodiment;

FIG. 2 is a diagram illustrating a measurement instrument and a processor according to an embodiment of the invention;

FIG. 3 is a diagram illustrating a method for monitoring a user according to an embodiment of the invention; and

FIG. 4 is a diagram illustrating in detail the analysis step of the supervision method according to the embodiment of FIG. 3.

DETAILED DESCRIPTION OF EMBODIMENTS OF THE INVENTION

The general principle of the invention is based on the implementation of a smartwatch-type individual medical monitoring device, adapted to come into contact with a wrist of a user, comprising a main body provided with a display screen, a bracelet linked to the main body, and a measurement instrument intended to be positioned opposite a radial artery of the wrist of the user, when the watch is worn by the user, and adapted to indicate the detection or the non-detection of an anomaly according to several criteria that are measured at this radial artery.

Such a watch allows performing a coherent analysis of the vital data thanks to a combination of sensors, and thus determining the condition of a person. For example, this determination may allow performing live diagnostics by rescue services, performing remote consultations, performing monitoring of elderly people.

Such a device may be used to enhance safety and monitoring of persons, more particularly of vulnerable persons.

For example, such an individual monitoring device may be used for monitoring patients having chronic pathologies or having to be subjected to a particular supervision (for example a post-hospitalization supervision). Such a device may also turn out to be useful for the medical supervision of elderly people.

This type of devices turns out to be simple to design and to use.

A first embodiment of the monitoring device according to the invention is now presented with reference to FIGS. 1 and 2.

As illustrated in these figures, the individual medical monitoring device 1 is of the smartwatch type.

It is configured to come into contact with a wrist of a user, so that one of the portions, more particularly the portion of the device where a measurement instrument 3 is housed, could be positioned opposite a radial artery of the wrist of the user, when the watch is worn by this user. This watch further comprises a main body 2 provided with a display screen 20 and a bracelet 4 linked to the main body 2.

In this embodiment, such a main body 2 is made by injected plastic molding so as to provide a material that is tight and resistant to the different conditions in which it might have to evolve, such as water in a shower or in a bathtub (so that the user could keep his smartwatch all the time).

There may also be provided a main body made of another material that allows providing the same resistance and tightness conditions.

The bracelet 4 may also be made by injected plastic molding or of silicone.

For example, this bracelet may have a closure positioned on one side, so as to facilitate placement and removal thereof.

Nonetheless, the bracelet may also consist of a clasp bracelet or a locking bracelet for safety reasons.

It should be noted that the device presented in this embodiment comprises an electric power supply. Such a power supply is herein in the form of a battery, arranged at the processing means 5, which thus enables this device to be autonomous.

According to one embodiment, this battery may be a rechargeable cell or not.

Such a battery may further consist of a LiPO battery enabling a quick charging. This battery may be connected to a USB port allowing charging thereof. Charging may also be done by induction so as to avoid a possible intake of water or dust.

Charging such a battery may also be performed by the Sun, so as to provide an ecological solution.

As described before, the monitoring device comprises a measurement instrument 3. In this embodiment, this measurement instrument 3 comprises:

a first sensor 31 adapted to continuously measure the oxygen level of the user at the radial artery;

a second sensor 32 adapted to measure the heart rate of the user by measuring the vibrations at the radial artery;

a third sensor 33 adapted to measure the ascending and descending blood flows at the radial artery.

In this embodiment, and in order to have a permanent supervision of the user, these measurements are continuously performed.

Of course, where appropriate, it may be provided that either one of these measurements is performed periodically, for example, so as to save the power of the battery of the smartwatch.

It should be noted that the first sensor 31 measures the oxygen level of the user via an element equipped with a light, the oxygen level being assessed afterwards by an algorithm implemented at the processor (presented hereinafter).

For example, this oxygen sensor may implement miniature plethysmography methods.

In this embodiment, the measurement instrument further comprises a blood pressure sensor 34 allowing measuring the blood pressure of the user at the wrist.

It should be noted that, according to an embodiment of the invention, such a device may also be connected to a blood pressure meter so that the blood pressure measurements are taken and kept for a predefined time period. Thus, this would allow having a condition of a patient over this predefined time period. Such a variant may be a complement to the blood pressure sensor, should a check-up of the data is needed.

It should also be noted that such a blood pressure meter may be adapted to communicate with this monitoring device, by conventional wireless communication means.

According to a non-represented embodiment, this measurement instrument may also comprise a sensor allowing detecting a fall of the user, for example an altimeter adapted to detect an abrupt change in altitude (herein, the altitude of the wrist).

According to another non-represented embodiment, the measurement instrument may also comprise a sensor allowing measuring the blood glucose level of the user.

According to another non-represented embodiment, the measurement instrument may also comprise a sensor allowing measuring the temperature of the user.

According to another non-represented embodiment, the device may also comprise a geolocation sensor. Such a sensor may, for example, turn out to be useful in the context of prevention or of action for persons who would suffer from Alzheimer's disease, elderly people, or persons suffering from a psychiatric pathology.

In order to prioritize essential sensors monitoring the vital functions, it should be noted that one or more of the additional sensors may, according to one embodiment, be activated or deactivated by an action of the user, for example by a tactile action on the display screen 20 or through a combination of buttons.

In this embodiment, the measurement instrument 3 is connected, via a cable, which is herein a ribbon cable, to a processor 5 whose function is to analyze the measured parameters and output information indicating the detection or the non-detection of an anomaly according to said analysis.

This processor or processing unit 5 includes herein:

means 50 for acquiring the measured data of the first sensor 31, second sensor 32 and third sensor 33;

first means 51 for analyzing the oxygen level measured by the first sensor 31, positioned at the radial artery comparing the value of the oxygen level with respect to a predetermined first threshold;

second means 52 for analyzing the number of vibrations measured by the second sensor 32, comparing the value of the heart rate with respect to a predetermined second threshold;

third means 53 for analyzing the ascending and descending blood flows measured by the third sensor 33, comparing the value of the ascending blood flow with respect to a predetermined third threshold and of the descending blood flow with respect to a predetermined fourth threshold, and

means for outputting 54 information indicating the detection or the non-detection of an anomaly according to the analysis of the oxygen level, heart rate and ascending and descending blood flows of the user.

According to an embodiment of the invention, the means for outputting 54 information indicating the detection or the non-detection of an anomaly according to the analysis of the oxygen level, heart rate and ascending and descending blood flows of the user can output information indicating the detection of an anomaly if at least one of the measured parameters is indicative of an anomaly.

For example, in case of an abrupt drop in the oxygen level, perceivable through the measurement of the oxygen level and then the comparison with respect to a predetermined threshold of the expected oxygen level, the output means could output information indicating the detection of an anomaly.

Furthermore, if the comparison of the value of the ascending blood flow with respect to a predetermined third threshold and/or of the descending blood flow with respect to a predetermined fourth threshold reveals an anomaly, this might be indicative of a cardiac pathology (arrhythmia, tachycardia, bradycardia, or heart trouble), the output means could therefore also output information indicating the detection of an anomaly.

According to another embodiment, and in order to be able to reduce the possibility of a false alert, the output means could output information indicating the detection of an anomaly if at least two of the measured parameters are indicative of an anomaly, that is to say if at least two of the measured parameters are beyond the respective predetermined threshold.

It should be noted that this processor 5 further comprises a storage medium 55 for storing the measured data of the first sensor 31, second sensor 32 and third sensor 33.

Storing the measured data of the first sensor 31, second sensor 32 and third sensor 33 allows keeping a history of vital information of the user over a substantially long period depending on the embodiments. In this manner, a person who consults the history, such as a physician or a nurse, can have a complete overview of the medical history of the user of the watch.

According to one embodiment, the device further comprises means for analyzing the measured data stored over a predefined period, for example to detect possible anomalies, such as a cardiac arrhythmia.

This may also be useful in the context of falls detection, an analysis of the data between two successive measurements may allow detecting an abrupt change in the altitude of the wrist, which might be synonym of a fall.

This may also be useful in the context of diabetes supervision, an analysis of the data between several successive measurements may allow detecting an abrupt change in the sugar content in the blood of the user, which may be synonym of a hypoglycemia or a hyperglycemia.

It should be noted that, according to the embodiment presented herein, the storage medium 55 further contain at least one information relating to the user belonging to the group comprising:

the age of the user;

anatomical data of the user;

morphological data of the user;

an ongoing treatment to which the user is subjected;

a pathology of said user;

the medical history of the user;

the blood type of the user;

the ablations undergone by the user;

the major surgeries undergone by the user;

the blood type of the user;

the results of last examinations (blood test, etc.).

In this case, and for the response given to a possible anomaly to be the most suitable as possible, it is preferable that:

the predetermined first threshold is defined according to said at least one information relating to said user, and/or

the predetermined second threshold is defined according to said at least one information relating to said user, and/or

the predetermined third threshold is defined according to said at least one information relating to said user, and/or

the predetermined fourth threshold is defined according to said at least one information relating to said user.

For example, a heart rate threshold will not be the same if the person is athletic or not, according to his age or his morphology.

Similarly, an ongoing treatment may change the alert criteria. For example, a blood pressure treatment may vary the threshold at which a measured blood pressure turns out to be an anomaly.

It should be noted that, according to one embodiment, this or these information relating to the user may be consulted by displaying on the display screen 20 of the main body 2.

For example, this may be accessible through a combination of keys or by pressing on this display screen.

In this manner, this may allow displaying ongoing medical treatments.

According to one embodiment, one or several information relating to the user may be automatically displayed in case of output of information indicating the detection of an

anomaly. For example, such a feature may turn out to be useful in case of intervention of rescue teams who might need to access some data of a patient to be able to quickly intervene.

As illustrated in FIG. 2, the device according to this embodiment further comprises alert means 6. Therefore, if information indicating the detection of an anomaly is output by the output means 54, these alert 6 generates an alert message which is transmitted via the communications device 7 to at least one predetermined contact.

In this instance, the communications device 7 comprise a port 71 configured to receive a SIM card, preferably a nano SIM card.

These communications device means may be accompanied with transmission means implemented in the form of an antenna operating by a wireless technology such as Bluetooth, Wifi, 3G, 4G, or 5G.

In this manner, the alert message may be emitted, for example, in the form of a SMS or a voice message sent on the telephone of a person.

This alert message may also be emitted in the form of a notification on a mobile terminal of the predetermined contact.

This alert message may further be accompanied with an alert sent to rescue services so as to gain in effectiveness for the intervention.

According to one embodiment, the alert message may contain important information on the generated alert, for example the measurement that has generated this alert, information relating to the user (such as a possible ongoing treatment or a pathology).

According to one embodiment, the alert message may also be accompanied with a pre-diagnostic so as to guide a person more easily to the adequate rescue service.

In the presented embodiment, the predetermined contact(s) is/are stored in the storage medium 55.

According to an embodiment of the invention, this predetermined contact may also be automatically displayed on the display screen 20 in case of output of information 40 indicating the detection of an anomaly.

There may be provided an embodiment of the invention wherein the measured data are accessible by the user who, for example by action on the display screen or through a combination of buttons, sends data to a medical practitioner 45 via the communications device 7 so as to be able to perform a remote consultation.

There may also be provided an embodiment wherein the communications device are configured to receive calls, texts and data so that a third-party, for example a medical practitioner, could enter data in a format recognized by the device. In this manner, a medical practitioner could, for example, perform a remote medical prescription, the treatment then being input directly as information relating to the user.

It may also be provided that the monitoring device comprises means for emitting a notification on the digital screen so as to remind the user of a treatment to take or of a scheduled consultation.

Advantageously, the monitoring device according to the presented embodiment further comprises unique identifier 56.

In this manner, this allows securing the device by limiting access to the data and to its use to one or several authorized person(s).

In this instance, the identification of the user is achieved by entering the social security number of the user.

Nonetheless, there may be provided an embodiment wherein the identification means could consist of another means, such as a fingerprint or a facial recognition.

There may also be provided an embodiment wherein these unique identification means comprise a password.

Furthermore, the device according to the presented embodiment comprises means 57 for detecting a set-up of this device on the wrist of the user.

In this manner, this allows avoiding false alerts in case of a suspect measurement while the device is not placed on the wrist of the user.

In the illustrated embodiment, the communications device further comprise means 72 for calling in emergency the predetermined contact.

These emergency call means may be implemented in the form of two buttons placed on either side of the main body, the user having to press simultaneously on both buttons to perform this emergency call.

Such emergency call means may also be implemented in the form of one single button, for example a button placed at a location of the device that is difficult to access so that it could not be used inadvertently.

There is now presented, with reference to FIGS. 3 and 4, an individual medical monitoring method, this method being adapted to output information indicating the detection or the non-detection of an anomaly.

According to the invention, this individual medical monitoring method implements a smartwatch-type individual medical monitoring device 1 adapted to come into contact with a wrist of a user according to any of the aforementioned embodiments.

As illustrated, the method comprises the following steps, implemented by the smartwatch, when the measurement instrument 3 is positioned opposite a radial artery of the wrist of the user:

measurement 10 of the oxygen level of the user, using said first sensor 31 positioned at the radial artery;

measurement 11 of the heart rate of the user by measuring the vibrations of the blood flow at the radial artery, using the second sensor 32;

measurement 12 of the ascending and descending blood flows at the radial artery, using the third sensor 33;

analysis 13 of the oxygen level, heart rate and ascending and descending blood flows of the user, so as to transmit instructions to output information indicating the detection or the non-detection of an anomaly;

output 14 of the information indicating the detection or the non-detection of an anomaly;

storage 15 of the measured oxygen level, heart rate and ascending and descending blood flows of the user.

According to the invention, the analysis step 13 comprises the following successive steps:

comparison 131 of the measured oxygen level with respect to a predetermined first threshold;

comparison 132 of the measured heart rate with respect to a predetermined second threshold;

comparison 133 of the value of the ascending blood flow with respect to a predetermined third threshold and of the value of the descending blood flow with respect to a predetermined fourth threshold, and

instruction to output 134 the information indicating the detection of an anomaly if the oxygen level, and/or the heart rate and/or the ascending and/or descending blood flows of the user respectively exceed the first, and/or second, and/or third and/or fourth thresholds.

According to an embodiment of the invention, the step of instructing the output 14 of information indicating the

detection or the non-detection of an anomaly according to the analysis of the oxygen level, and/or heart rate and/or ascending and/or descending blood flows of the user can output information indicating the detection of an anomaly if at least one of the measured parameters is indicative of an anomaly.

For example, in case of an abrupt drop in the oxygen level, perceivable through the measurement of the oxygen level and then the comparison with respect to a predetermined threshold of the expected oxygen level, the output means could output information indicating the detection of an anomaly.

Furthermore, if the comparison of the value of the ascending blood flow with respect to a predetermined third threshold and/or of the descending blood flow with respect to a predetermined fourth threshold reveals an anomaly, this might be indicative of a cardiac pathology (arrhythmia, tachycardia, bradycardia, or heart trouble), the output means could therefore also output this information indicating the detection of an anomaly.

According to another embodiment, and in order to be able to reduce the possibility of a false alert, the output step adapted to output information indicating the detection of an anomaly could be performed if at least two of the measured parameters are indicative of an anomaly, that is to say if at least two of the measured parameters are beyond the respective predetermined threshold.

In the embodiment of the method illustrated in FIG. 3, if information indicating the detection of an anomaly is output by the output means 54, the method comprises the following successive steps:

generation 16 of an alert message by the alert 6;

sending 17 of the generated alert message to the predetermined contact, via the communications device.

Furthermore, in the illustrated embodiment, the method comprises a prior authentication step 100. In this manner, this allows securing the device by limiting access to the data and to the use thereof to one or several authorized person(s).

The invention also relates to a computer program product downloadable from a communication network and/or stored on a microprocessor-readable medium and/or executable by a microprocessor, comprising program code instructions for the execution of an individual medical monitoring method according to any of the aforementioned embodiments, when it is executed on a computer.

The invention also relates to a non-transitory computer-readable storage medium, storing a computer program comprising a set of instructions executable by a computer or a processor to implement the individual medical monitoring method according to any of the aforementioned embodiments.

More particularly, the storage medium may be included in the main body, for example in the memory 55 embedded within the processor. It may also be included within the measurement instrument.

According to one embodiment, it may be provided that the device and the method are accompanied with the creation of an associated card for a reader (for example a SD card or a chip card that would also contain all of the information stored in the embedded memory. Such a data duplication may be done through an online synchronization or via the communications device.

It may be further provided that such an associated card could be used in connection with a software allowing synchronizing the whole so as to generate a complete medical file for a patient (including for example the invariable information of the patient, the detail of the medical

history of the patient, a record of the specified prescriptions, radiology results, blood tests results enabling an immediate reading of a situation relating to the patient).

For example, it may be provided that the software allows automatically having the transmission of the information per category between the laboratory and one or several physician(s) and an overall synthesis of blood data on a monthly basis and even a yearly basis, without having to carry out any paper review.

It may also be provided that the update of the examinations could be directly transmitted by the physician to the user, for example after validation by the user of access to his smartwatch to save this information.

There may further be provided means for synchronization between the monitoring device, the associated card, and the complete medical file of the patient stored in a database.

It may also be provided that such a device comprises a maintenance schedule, so that the offered functions remain optimal and the medical supervision is reliable for a given user.

The invention claimed is:

1. A smartwatch-type individual medical monitoring device configured to come into contact with a wrist of a user, comprising:

a main body provided with a display screen;

a bracelet linked to the main body;

a measurement instrument configured to be positioned opposite a radial artery of the wrist of the user, when the medical monitoring device is worn by the user, the measurement instrument comprising:

a first sensor configured to continuously measure an oxygen level at the radial artery of the wrist of the user;

a second sensor configured to measure a heart rate of the user by measuring vibrations of a blood flow at the radial artery of the wrist of the user;

a third sensor configured to measure ascending and descending blood flows at the radial artery of the wrist of the user;

a processor configured to:

acquire the measured data of the first sensor, second sensor and third sensor;

analyze the oxygen level measured by the first sensor and compare a measured value of the oxygen level to a first predetermined threshold;

analyze a number of vibrations of the blood flow measured by the second sensor and compare a value of the heart rate to a second predetermined threshold;

analyze the ascending and descending blood flows measured by the third sensor, compare a value of the ascending blood flow to a third predetermined threshold and compare a value of the descending blood flow to a fourth predetermined threshold; and

output on the display screen information indicating a detection or a non-detection of an anomaly in accordance with the analysis of the oxygen level, the heart rate and the ascending and descending blood flows of the user; and

wherein the processor comprises a storage medium to store the measured data of the first sensor, the second sensor and the third sensor.

2. The medical monitoring device of claim 1, wherein the storage medium is configured to store at least one information relating to the user belonging to a group comprising: an age of said user; anatomical data of the user; morphological

data of the user; an ongoing treatment to which the user is subjected; a pathology of the user; a medical history of the user; a blood type of the user; ablations undergone by the user; major surgeries undergone by the user; and results of last examinations.

**3.** The medical monitoring device of claim **2**, wherein at least one of the following:

the first predetermined threshold is defined according to said at least one information relating to the user,

the second predetermined threshold is defined according to said at least one information relating to the user,

the third predetermined threshold is defined according to said at least one information relating to the user, and

the fourth predetermined threshold is defined according to said at least one information relating to the user.

**4.** The medical monitoring device of claim **1**, further comprising an alert device configured to generate an alert message in response to output of the information indicating the detection of the anomaly, the alert message being transmitted via a communications device to at least one predetermined contact, said at least one predetermined contact being stored in the storage medium.

**5.** The medical monitoring device of claim **4**, wherein the communications device comprises a port configured to receive a nano SIM card.

**6.** The medical monitoring device of claim **4**, wherein the communications device is configured to call said at least one predetermined contact in an emergency.

**7.** The medical monitoring device of claim **1**, wherein the processor is configured to identify the user by a unique identifier.

**8.** The medical monitoring device of claim **1**, wherein the processor is configured to detect a set-up of the medical monitoring device on the wrist of the user.

**9.** The medical monitoring device of claim **1**, further comprising at least one of the following sensors: a geolocation sensor, a blood glucose level sensor and a temperature sensor.

**10.** The medical monitoring device of claim **1**, further comprising an electric power supply.

**11.** An individual medical monitoring method for outputting information indicating a detection or a non-detection of an anomaly, implementing a smartwatch-type individual medical monitoring device of claim **1**, the method comprising:

placement of the measurement instrument opposite the radial artery of the wrist of the user;

measurement of the oxygen level of the user by the first sensor;

measurement of the heart rate of the user by measuring the vibrations of the blood flow of the user using the second sensor;

measurement of the ascending and descending blood flows of the user by the third sensor;

analysis of the oxygen level, the heart rate and the ascending and descending blood flows of the user by the processor configured successively to:

compare the oxygen level to the first predetermined first threshold;

compare the heart rate to the second predetermined second threshold; and

compare the value of the ascending blood flow to the third predetermined threshold and compare the value of the descending blood flow to the fourth predetermined threshold;

transmission of instructions to output information indicating the non-detection of the anomaly or the detection

of the anomaly in response to at least one of the following: the oxygen level exceeds the first predetermined threshold, the heart rate exceeds the second predetermined threshold, the ascending blood flows exceed the third predetermined threshold and the descending blood flows exceed the fourth predetermined threshold;

output on the display screen the information indicating the detection or the non-detection of the anomaly; and

storage of the oxygen level, the heart rate and the ascending and descending blood flows of the user in the storage medium.

**12.** The individual medical monitoring method of claim **11**, wherein in response to the output of the information indicating the detection of the anomaly, further comprising successively:

generation of an alert message; and

transmitting the alert message to said at least one predetermined contact via a communications device.

**13.** The individual medical monitoring method of claim **11**, further comprising a prior authentication of the user.

**14.** A computer program product downloadable from a communication network executable by a microprocessor of a computer or mobile terminal, comprising program code instructions for implementing the individual medical monitoring method of claim **11**.

**15.** A computer program product recorded on a microprocessor-readable non-transitory medium executable by a microprocessor of a computer or mobile terminal, comprising program code instructions for implementing the individual medical monitoring method of claim **11**.

**16.** A computer program recorded on a non-transitory terminal-readable storage medium, comprising a set of instructions executable by a computer or a processor to implement the individual medical monitoring method of claim **11**.

**17.** A smartwatch device, comprising:

a display housing attached to a bracelet;

a display screen in the display housing;

a memory;

a sensor housing disposed in the bracelet positioned opposite a radial artery in the wrist of a wearer, when the medical monitoring device is worn by the user, the sensor housing comprising:

a blood oxygen sensor configured to continuously measure a blood oxygen level of the wearer;

a heart rate sensor configured to measure a heart rate of the wearer;

a blood flow sensor configured to measure ascending and descending blood flows at the radial artery in the wrist of the wearer; and

at least one automated processor configured to:

compare the blood oxygen level to a first predetermined threshold, the heart rate to a second predetermined threshold, a value of the ascending blood flow to a third predetermined threshold, and a value of the descending blood flow to a fourth predetermined threshold;

output on the display screen information indicating a detection of an anomaly selectively dependent on the comparisons of the oxygen level, the heart rate and the ascending and descending blood flows of the wearer; and

store information corresponding to at least a portion of the oxygen level, the heart rate and the ascending and descending blood flows of the wearer in the memory.

**18.** The smartwatch device according to claim **17**, further comprising a transmitter configured to communicate an alert message in response to the detected anomaly.

**19.** The smartwatch device according to claim **18**, wherein the transmitter is configured to receive a nano SIM card, and to call at least one predetermined contact in response to the detected anomaly.

**20.** A smartwatch, comprising:

a sensor housing disposed in a bracelet, the bracelet being configured to position the sensor housing adjacent to a radial artery of a wearer, the sensor housing comprising:

a blood oxygen sensor configured to continuously measure a blood oxygen level of the wearer;

a heart rate sensor configured to measure a heart rate of the wearer;

a blood flow sensor configured to measure ascending and descending blood flows at the radial artery in the wrist of the wearer; and

at least one automated processor configured to:

compare the blood oxygen level to a first predetermined threshold, the heart rate to a second predetermined threshold, a value of the ascending blood flow to a third predetermined threshold, and a value of the descending blood flow to a fourth predetermined threshold; and

output an anomaly indication selectively dependent on the comparisons of the oxygen level, the heart rate and the ascending and descending blood flows of the wearer.

* * * * *

# *Appendix V*

RECEIVED

NOV 2 1 2024

United States Court of Appeals
For the Federal Circuit



MEMORANDUM FOR SENIOR PENTAGON LEADERSHIP
COMMANDERS OF THE COMBATANT COMMANDS
DEFENSE AGENCY AND DOD FIELD ACTIVITY DIRECTORS

SUBJECT: Use of Non-Government Owned Mobile Devices

References: (a) DoD Instruction 5200.48, "Controlled Unclassified Information," March 6, 2020
(b) DISA Cloud Computing Security Requirements Guide v1R3, March 6, 2017
(c) DoD Instruction 8500.01, "Cybersecurity," October 7, 2019
(d) DoD Instruction 8510.01, "Risk Management Framework (RMF) for DoD Information Technology (IT)," December 29, 2020
(e) DoD Instruction 8520.03, "Identity Authentication for Information Systems," July 27, 2017
(f) DoD Manual 5200.01, Volume 3, "DoD Information Security Program: Protection of Classified Information," July 28, 2020
(g) DoD Chief Information Officer Memorandum, "Mobile Application Security Requirements," October 6, 2017
(h) DoD Chief Information Officer Memorandum, "DoD Mobile Public Key Infrastructure (PKI) Credentials," December 20, 2019
(i) OMB Circular No. A-130, "Managing Information as a Strategic Resource," July 28, 2016
(j) DoD Instruction 5400.11, "DoD Privacy and Civil Liberty Programs," January 29, 2019
(k) DoD Instruction 5015.02, "DoD Records Management Program," August 17, 2017

This memorandum and attachment establish minimum requirements for the use of non-government owned mobile devices (e.g., personally or commercially owned), hereinafter "Approved Mobile Device" (AMD), to store, process, transmit, or display up to Department of Defense (DoD) Controlled Unclassified Information (CUI). This memorandum's scope is limited to mobile device information technology (IT) with mobile operating systems (OS) (e.g., Apple iOS, Android) used to access and process up to DoD CUI (e.g., Impact Level 5 data), as defined in references (a) and (b). Additional guidance will be provided by the DoD Chief Information Officer (CIO) to expand the scope to additional types of non-government owned devices (e.g., laptops, desktops), OS types (e.g., macOS, Windows), and capabilities (e.g., voice applications).

The benefits associated with the use of AMDs must be balanced carefully with associated operations security and cybersecurity risks. This guidance provides technical and programmatic requirements for Components managing and configuring AMDs to store, process, transmit, access, or display DoD CUI. This memorandum does not supersede, cancel, or change existing requirements for safeguarding, storage, handling, or transmission of DoD CUI.

DoD Component Heads and Authorizing Officials, in collaboration with Component CUI Senior Agency Officials and the DoD Senior Information Security Officer, are responsible for safeguarding DoD systems and CUI under their purview in accordance with references (c) and (d).

DoD Components must ensure solutions meet the requirements in the Attachment prior to procurement, testing, and fielding AMDs and associated systems. Previously approved AMD solutions must be compliant with this guidance within one (1) year following the effective date of this memorandum.

My point of contact for this matter is Ms. Sudha Vyas, ███████████████████
███████.

Ronald S. Moultrie
Under Secretary of Defense for
Intelligence and Security

John B. Sherman
Chief Information Officer of the
Department of Defense

Attachment:
As stated



**DEPARTMENT OF DEFENSE**
6000 DEFENSE PENTAGON
WASHINGTON, D.C. 20301-6000

OCT 0 6 2023

MEMORANDUM FOR SENIOR PENTAGON LEADERSHIP
COMMANDERS OF THE COMBATANT COMMANDS
DEFENSE AGENCY AND DOD FIELD ACTIVITY DIRECTORS

SUBJECT: Use of Unclassified Mobile Applications in Department of Defense

Mobile applications (apps) are software products designed to function on mobile devices. The misuse and mismanagement of mobile apps poses a cybersecurity and operations security (OPSEC) risk and may result in the unauthorized disclosure of controlled unclassified information (CUI) and unclassified Department of Defense (DoD) information that has not been approved for public release (hereinafter jointly referred to as "non-public DoD information") and jeopardize operations, strategies, or missions, as described in references (b) and (c). This memorandum provides guidance on the use of mobile apps on unclassified DoD government owned, leased or issued, mobile devices (hereinafter referred to as "government owned mobile devices") and on the managed partition of non-government owned mobile devices approved in accordance with reference (d) (hereinafter referred to as "Approved Mobile Device" (AMD)).

Numerous mobile apps access or use non-public DoD information (e.g., authorized email apps, collaboration apps, command/control apps). Other applications may be used in support of mission requirements but do not directly access non-public DoD information (e.g., travel and educational apps). Although mobile apps can provide ease of use and increased functionality for users across the Department, there are risks that must be considered. Mobile apps may contain malware or have vulnerabilities that can disclose CUI, personally identifiable information (PII), non-public DoD information not approved for public release, or other sensitive information. This is all possible without the user's consent or knowledge.

In accordance with DoD Instruction 5200.48, DoD personnel will not use non-DoD accounts or personal e-mail accounts, messaging systems or other non-public DoD information systems, except approved or authorized government contractor systems, to conduct official business involving CUI. In accordance with DoD Instruction 5200.01, DoD personnel will not use unclassified systems, government-issued or otherwise, for classified national security information. DoD CIO will continuously consult with all DoD Components to evaluate risks mobile applications may present to the DoD and update References (m), (n), and (o), as appropriate.

**CLEARED**
**For Open Publication**

Oct 11, 2023

Department of Defense
OFFICE OF PREPUBLICATION AND SECURITY REVIEW

DoD Components shall ensure proper implementation of the controls outlined in this policy and appendix B. The point of contact for this memorandum is Patricia Janssen,

John B. Sherman

Attachments:
1. References
2. Mobile Application Security Requirements
3. Glossary

**DEPARTMENT OF DEFENSE**
6000 DEFENSE PENTAGON
WASHINGTON, D.C. 20301-6000

MAY 2 3 2024

MEMORANDUM FOR SENIOR PENTAGON LEADERSHIP
          COMMANDERS OF THE COMBATAN COMMANDS
          DEFENSE AGENCIES AND DOD FIELD ACTIVITY DIRECTORS

SUBJECT: DoD UNCLASSIFIED Wireless Mobile Services and Devices Spiral 4

References: (a) DoD Chief Management Officer Memorandum, "Wireless Device Management
            Reform," September 28, 2018.
        (b) OMB Memorandum M-16-20, "Category Management Policy 16-3: Improving
            the Acquisition and Management of Common Information Technology: Mobile
            Devices and Services," August 4, 2016.

       This memorandum provides guidance to the Department of Defense (DoD) requiring all
Components to procure UNCLASSIFIED wireless mobile services and devices for use within the
50 United States and U.S. territories through a single department-wide contract vehicle - called
Spiral 4 - managed by the Department of the Navy's Wireless Mobility Program Office. This
contract vehicle replaces Spiral 3, which expires on May 7th, 2024, and complies with the OMB
Category Management policy on Mobile Devices and Services to consolidate agency
requirements, fully leverage the Government's buying power, and achieve cost savings.

       Effective May 8th, 2024, all DoD Components, will use the Department of Defense
Wireless Services Spiral 4, Indefinite Delivery, Indefinite Quantity, Multiple Award Contracts
(IDIQ MACs) (N00244-24-D-0005, N00244-24-D-0006, N00244-24-D-0007, N00244-24-D-
0008, N00244-24-D-0009, N00244-24-D-0010, and N00244-24-D-0011) with Firm Fixed Price
(FFP) Task Orders for all new purchases. Spiral 4 provides a best value solution, and the
required cyber security profiles, for the procurement of UNCLASSIFIED Wireless Mobility
Telecommunications Services and Devices through a one-year base period and nine one-year
option periods, through May 7th, 2034, with a contract ceiling of $2.67 billion.

       The Department of Navy Spiral 4 points of contact are Ms. Juana Perez,
                    and Ms. Tine Thompson           .
The DoD CIO POC is Mr. Mike Taylor,           .

                          John B. Sherman

Attachment:
As stated

cc: Joint Staff (J6)

**CLEARED**
**For Open Publication**

May 24, 2024

Department of Defense
OFFICE OF PREPUBLICATION AND SECURITY REVIEW

## MOBILITY PURCHASES CONSOLIDATION

1. **Action:** To streamline requirements and acquisition processes and enable visibility of wireless usage, inventory, and monthly spend, all organizations are directed to move their mobile services and devices acquisitions to the Department of Defense (DoD) Wireless Services Contracts Spiral 4 vehicle no later than at the end of their current order's period of performance.

2. **Scope and Applicability:**
   a. This memorandum establishes acquisition guidance for all UNCLASSIFIED up to Controlled Unclassified Information (CUI) mobile cellular services and devices in the Continental United States (CONUS) which includes the 50 States and U.S. Territories. Mobile devices are defined as "non-desktop, non-laptop, small form factor wireless end-user devices including hardware" that require cellular and data services.
   b. This memorandum applies to all DoD and Office of the Secretary (OSD) Components ("Components"). Services under this procurement cover usage in the 50 United States and U.S. Territories. This memorandum also applies to Military Members and Federal Civilians stationed within the 50 States and U.S. Territories who travel internationally.

3. **Intended Outcome of this Action:** This action will enable portfolio visibility, demand management, and proactive monitoring. Spiral 4 prices include the use of Telecom Expense Management (TEM) tools. The tool is able to track monthly spend, utilization, devices by category and type, and metrics (e.g. zero-use, overages, OCONUS roaming charges, etc.). In addition, vendors can be asked to provide monthly invoice analysis. Access to the TEM tools at both the Task Order (Customer) and Enterprise levels will empower DoD organizations to increase efficiency and further reduce wireless costs by up to 10% and are available for no additional cost.

Consolidating DoD mobility purchases will provide many benefits, including:
   a. Enabling the Department to leverage volume discounts with vendors;
   b. Standardized price ceilings for the Department;
   c. Streamlined acquisitions for mobile services and devices;
   d. Developing and enforcing consistent Terms and Conditions (T&C) with the vendors;
   e. Increased spend visibility, as well as expense and inventory management across the Department; and
   f. Access to Exhibit Line Items (ELINs) with no additional cost devices and asset refresh.

4. **Primary POC:** DoD Wireless Services Contracts-Spiral 4: Ms. Juana Perez, Procuring Contracting Officer, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ ; and Ms. Tine Thompson, Program Manager, ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ . DoD CIO: Mr. Mike Taylor, C3I Wireless and Mobility Branch, ▮▮▮▮▮▮▮▮▮▮▮ ▮▮▮▮▮▮▮ .



Contributor License Agreements

# Google Individual Contributor License Agreement

In order to clarify the intellectual property license granted with Contributions from any person or entity, Google LLC ("Google") must have a Contributor License Agreement ("CLA") on file that has been signed by each Contributor, indicating agreement to the license terms below. This license is for your protection as a Contributor as well as the protection of Google; it does not change your rights to use your own Contributions for any other purpose.

You accept and agree to the following terms and conditions for Your present and future Contributions submitted to Google. Except for the license granted herein to Google and recipients of software distributed by Google, You reserve all right, title, and interest in and to Your Contributions.

1. Definitions.

   "You" (or "Your") shall mean the copyright owner or legal entity authorized by the copyright owner that is making this Agreement with Google. For legal entities, the entity making a Contribution and all other entities that control, are controlled by, or are under common control with that entity are considered to be a single Contributor. For the purposes of this definition, "control" means (i) the power, direct or indirect, to cause the direction or management of such entity, whether by contract or otherwise, or (ii) ownership of fifty percent (50%) or more of the outstanding shares, or (iii) beneficial ownership of such entity.

   "Contribution" shall mean any original work of authorship, including any modifications or additions to an existing work, that is intentionally submitted by You to Google for inclusion in, or documentation of, any of the products owned or managed by Google (the "Work"). For the purposes of this definition, "submitted" means any form of electronic, verbal, or written communication sent to Google or its representatives, including but not limited to communication on electronic mailing lists, source code control systems, and issue tracking systems that are managed by, or on behalf of, Google for the purpose of discussing and improving the Work, but excluding communication that is conspicuously marked or otherwise designated in writing by You as "Not a Contribution."

2. Grant of Copyright License. Subject to the terms and conditions of this Agreement, You hereby grant to Google and to recipients of software distributed by Google a perpetual, worldwide, non-exclusive, no-charge, royalty-free, irrevocable copyright license to reproduce, prepare derivative works of, publicly display, publicly perform, sublicense, and distribute Your Contributions and such derivative works.

3. Grant of Patent License. Subject to the terms and conditions of this Agreement, You hereby grant to Google and to recipients of software distributed by Google a perpetual, worldwide, non-exclusive, no-charge, royalty-

free, irrevocable (except as stated in this section) patent license to make, have made, use, offer to sell, sell, import, and otherwise transfer the Work, where such license applies only to those patent claims licensable by You that are necessarily infringed by Your Contribution(s) alone or by combination of Your Contribution(s) with the Work to which such Contribution(s) was submitted. If any entity institutes patent litigation against You or any other entity (including a cross-claim or counterclaim in a lawsuit) alleging that your Contribution, or the Work to which you have contributed, constitutes direct or contributory patent infringement, then any patent licenses granted to that entity under this Agreement for that Contribution or Work shall terminate as of the date such litigation is filed.

4. You represent that you are legally entitled to grant the above license. If your employer(s) has rights to intellectual property that you create that includes your Contributions, you represent that you have received permission to make Contributions on behalf of that employer, that your employer has waived such rights for your Contributions to Google, or that your employer has executed a separate Corporate CLA with Google.

5. You represent that each of Your Contributions is Your original creation (see section 7 for submissions on behalf of others). You represent that Your Contribution submissions include complete details of any third-party license or other restriction (including, but not limited to, related patents and trademarks) of which you are personally aware and which are associated with any part of Your Contributions.

6. You are not expected to provide support for Your Contributions, except to the extent You desire to provide support. You may provide support for free, for a fee, or not at all. Unless required by applicable law or agreed to in writing, You provide Your Contributions on an "AS IS" BASIS, WITHOUT WARRANTIES OR CONDITIONS OF ANY KIND, either express or implied, including, without limitation, any warranties or conditions of TITLE, NON-INFRINGEMENT, MERCHANTABILITY, or FITNESS FOR A PARTICULAR PURPOSE.

7. Should You wish to submit work that is not Your original creation, You may submit it to Google separately from any Contribution, identifying the complete details of its source and of any license or other restriction (including, but not limited to, related patents, trademarks, and license agreements) of which you are personally aware, and conspicuously marking the work as "Submitted on behalf of a third-party: [named here]".

8. You agree to notify Google of any facts or circumstances of which you become aware that would make these representations inaccurate in any respect.

**<u>Manage your Agreements</u>**


About | Manage Agreements

Contributor License Agreements

# Google Software Grant and Corporate Contributor License Agreement

In order to clarify the intellectual property license granted with Contributions from any person or entity, Google LLC ("Google") must have a Contributor License Agreement (CLA) on file that has been signed by each Contributor, indicating agreement to the license terms below. This license is for your protection as a Contributor as well as the protection of Google and its users; it does not change your rights to use your own Contributions for any other purpose.

This version of the Agreement allows an entity (the "Corporation") to submit Contributions to Google, to authorize Contributions submitted by its designated employees to Google, and to grant copyright and patent licenses thereto.

You accept and agree to the following terms and conditions for Your present and future Contributions submitted to Google. Except for the license granted herein to Google and recipients of software distributed by Google, You reserve all right, title, and interest in and to Your Contributions.

1. Definitions.

   "You" (or "Your") shall mean the copyright owner or legal entity authorized by the copyright owner that is making this Agreement with Google. For legal entities, the entity making a Contribution and all other entities that control, are controlled by, or are under common control with that entity are considered to be a single Contributor. For the purposes of this definition, "control" means (i) the power, direct or indirect, to cause the direction or management of such entity, whether by contract or otherwise, or (ii) ownership of fifty percent (50%) or more of the outstanding shares, or (iii) beneficial ownership of such entity.

   "Contribution" shall mean the code, documentation or any original work of authorship, including any modifications or additions to an existing work, that is intentionally submitted by You to Google for inclusion in, or documentation of, any of the products owned or managed by Google (the "Work"). For the purposes of this definition, "submitted" means any form of electronic, verbal, or written communication sent to Google or its representatives, including but not limited to communication on electronic mailing lists, source code control systems, and issue tracking systems that are managed by, or on behalf of, Google for the purpose of discussing and improving the Work, but excluding communication that is conspicuously marked or otherwise designated in writing by You as "Not a Contribution."

2. Grant of Copyright License. Subject to the terms and conditions of this Agreement, You hereby grant to Google and to recipients of software distributed by Google a perpetual, worldwide, non-exclusive, no-charge, royalty-free, irrevocable copyright license to reproduce, prepare derivative works of, publicly display, publicly perform, sublicense, and distribute Your Contributions and such derivative works.

3. Grant of Patent License. Subject to the terms and conditions of this Agreement, You hereby grant to Google and to recipients of software distributed by Google a perpetual, worldwide, non-exclusive, no-charge, royalty-free, irrevocable (except as stated in this section) patent license to make, have made, use, offer to sell, sell, import, and otherwise transfer the Work, where such license applies only to those patent claims licensable by You that are necessarily infringed by Your Contribution(s) alone or by combination of Your Contribution(s) with the Work to which such Contribution(s) was submitted. If any entity institutes patent litigation against You or any other entity (including a cross-claim or counterclaim in a lawsuit) alleging that your Contribution, or the Work to which you have contributed, constitutes direct or contributory patent infringement, then any patent licenses granted to that entity under this Agreement for that Contribution or Work shall terminate as of the date such litigation is filed.

4. You represent that You are legally entitled to grant the above license. You represent further that each employee of the Corporation designated by You is authorized to submit Contributions on behalf of the Corporation.

5. You represent that each of Your Contributions is Your original creation (see section 7 for submissions on behalf of others).

6. You are not expected to provide support for Your Contributions, except to the extent You desire to provide support. You may provide support for free, for a fee, or not at all. Unless required by applicable law or agreed to in writing, You provide Your Contributions on an "AS IS" BASIS, WITHOUT WARRANTIES OR CONDITIONS OF ANY KIND, either express or implied, including, without limitation, any warranties or conditions of TITLE, NON-INFRINGEMENT, MERCHANTABILITY, or FITNESS FOR A PARTICULAR PURPOSE.

7. Should You wish to submit work that is not Your original creation, You may submit it to Google separately from any Contribution, identifying the complete details of its source and of any license or other restriction (including, but not limited to, related patents, trademarks, and license agreements) of which you are personally aware, and conspicuously marking the work as "Submitted on behalf of a third-party: [named here]".

8. It is your responsibility to notify Google when any change is required to the list of designated employees authorized to submit Contributions on behalf of the Corporation, or to the Corporation's Point of Contact with Google.

**Manage your Agreements**



# Google Play Developer Distribution Agreement

## Effective as of February 5, 2024 (<u>view archived version</u>)

## 1. Definitions

**Authorized Provider:** A third-party non-Google entity authorized by Google to provide services that enable Developers to receive payments for Products that are sold to users of Devices via Google Play.

**Brand Features:** The trade names, trademarks, service marks, logos, domain names, and other distinctive brand features of each party, respectively, as owned (or licensed) by such party from time to time.

**Developer or You:** Any person or company who provides Products for distribution through Google Play in accordance with the terms of this Agreement.

**Developer Account:** A publishing account issued to a Developer in connection with the distribution of Developer Products via Google Play.

**Device:** Any device that can access Google Play.

**Google:** Google LLC, a Delaware limited liability company with principal place of business at 1600 Amphitheatre Parkway, Mountain View, CA 94043, United States; Google Ireland Limited, a company incorporated in Ireland with principal place of business at Gordon House, Barrow Street, Dublin 4, Ireland; Google Commerce Limited, a company incorporated in Ireland with principal place of business at Gordon House, Barrow Street, Dublin 4, Ireland; or Google Asia Pacific Pte. Limited, a company incorporated in Singapore with principal place of business at 70 Pasir Panjang Road, #03-71, Mapletree Business City, Singapore 117371. Google may update the Google entities and their addresses from time to time.

**Google Play:** The software and services, including the Play Console, which allow Developers to distribute Products to users of Devices.

**Intellectual Property Rights:** All patent rights, copyrights, trademark rights, rights in trade secrets, database rights, moral rights, and any other intellectual property rights (registered or unregistered) throughout the world.

**Payments Profile:** A financial service account or profile provided by a Payment Processor to a Developer that enables a Payment Processor to collect and remit payments to the Developer on the Developer's behalf for Products sold via Google Play.

**Payment Processor(s):** A Google-affiliated entity providing services that enable Developers to receive payments for Products sold via Google Play.

**Play Console**: The Google Play Console and other online tools or services provided by Google to developers at https://play.google.com/apps/publish, as may be updated from time to time. The Play Console is also available through an app to developers.

**Products:** Software, content, digital materials, and other items and services as made available by Developers via the Play Console.

**Taxes:** All government-imposed charges, including taxes, duties, imposts, and withholdings. The term Taxes excludes communication taxes and similar fees and surcharges; property taxes; and taxes based on each Party's net income, franchise taxes, business and occupation taxes, and other similar tax types. Each Party is responsible for its own net income taxes. For the avoidance of doubt, the term Taxes includes Transaction Taxes.

**Transaction Taxes:** Any Taxes that are imposed on the purchase price or cost of goods or services, including value-added taxes (VAT), goods and services taxes (GST), sales taxes, government levies and transfer taxes.

## 2. Accepting this Agreement

2.1 This agreement ("**Agreement**") forms a legally binding contract between You and Google in relation to Your use of Google Play to distribute Products. You are contracting with the applicable Google entity based on where You have selected to distribute Your Product (as set forth here). You acknowledge that Google will, solely at Your direction, and acting pursuant to the relationship identified in Section 3.1, display and make Your Products available for viewing, download, and purchase by users. In order to use Google Play to distribute Products, You accept this Agreement and will provide and maintain complete and accurate information in the Play Console.

2.2 Google will not permit the distribution of Your Products through Google Play, and You may not accept the Agreement, unless You are verified as a Developer in good standing.

2.3 If You are agreeing to be bound by this Agreement on behalf of Your employer or other entity, You represent and warrant that You have full legal authority to bind Your employer or such entity to this Agreement. If You do not have the requisite authority, You may not accept the Agreement or use Google Play on behalf of Your employer or other entity.

# 3. Commercial Relationship, Pricing, Payments, and Taxes

3.1 You hereby appoint Google as Your agent or marketplace service provider as outlined here to make Your Products available in Google Play, and subject to the terms and conditions of this Agreement, Google will allow You to use Google Play for Your Products.

3.2 This Agreement covers both Products that users can access for free and Products that users pay a fee to access. In order for You to charge a fee for Your Products and to be paid for Products distributed via Google Play, You must have a valid Payments Profile under a separate agreement with a Payment Processor, be approved by a Payment Processor for a Payments Profile, and maintain that profile in good standing. If there is a conflict between Your Payment Processor agreement and this Agreement, the terms of this Agreement will apply.

3.3 Products are displayed to users at prices You establish in Your sole discretion. If You utilize Google Play's billing system or the Play Console to control settings related to any taxes (including taxes, fees, or surcharges that are outside the scope of this Agreement) on the sale of Products, or if Google believes that Taxes may be owed by You or Google on the sale of Products, You grant Google permission to charge, collect, and discharge any such taxes as required in accordance with applicable law. For the avoidance of doubt, You remain responsible for any such taxes, fees, or surcharges, including as provided under Section 3.5. You may set the price for Your Products in the currencies permitted by Google, the Payment Processor, and, where applicable, the Authorized Provider. Google may display the price of Products to users in their native currency, but Google is not responsible to You for the accuracy of currency rates or currency conversion.

3.4 Acting as Your agent, and with You acting as a principal, Google is the merchant of record for Products sold or made available to users in the countries/territories described here. You are the merchant of record for Products You sell or make available via Google Play to all other users. The sales price You set for Products will determine the amount of payment You will receive. A "**Service Fee**", as set forth here (as may be revised by Google with notice to You in accordance with Section 15), will be calculated and charged on the sales price. The Service Fee is exclusive of Transaction Taxes of any and all kinds required by any applicable governmental tax authority to be charged, and Google is entitled to the Service Fee without reduction for any taxes or government levies, including any Taxes applicable to transactions described under Section 3.5 or Section 3.6. As per applicable law, to the extent Google is responsible to discharge Transaction Taxes arising on Service Fees, Google will charge You such Transaction Taxes, and You are responsible for paying

any Transaction Taxes arising on the Service Fee. More information about the Service Fee can be found here.

3.5 Except in certain countries/territories and subject to certain conditions as described here (which may be updated with notice to You), You are responsible for Transaction Taxes on the sale or provision of Products to users, including (but not limited to): (a) determining if the transaction is taxable; (b) charging and collecting the Transaction Taxes at the applicable rate; (c) remitting the Transaction Taxes to the applicable governmental tax authority; and (d) providing any required documentation to the user or applicable governmental tax authority. You are solely responsible for providing and maintaining accurate inputs that impact taxes on Products, including for any tax categorization of Products. Any adjustments that You make to the tax categorization of Products will take effect only for future sales of Products. Google will determine whether Google, the Payment Processor, or the Authorized Provider is obligated to collect or remit any Transaction Taxes in respect of any transaction and such Transaction Taxes may be recovered from You, deducted from payment due to You, or recovered from the user. Where Google collects and remits Transaction Taxes in applicable countries/territories, You may recognize a deemed supply from You to Google solely for Transaction Tax purposes if required by applicable law. You will be solely responsible for any Tax obligations arising from such deemed supply.

3.6 Where the Authorized Provider notifies Google that it or another Authorized Provider is required by applicable (local) legislation or by the applicable governmental tax authority to declare, charge, deduct, or withhold any taxes on a sale of Your Products, or where Google or a Payment Processor reasonably determines that it is required by applicable (local) legislation or by the applicable governmental tax authority to declare, charge, deduct, or withhold any taxes (in each case, **"Withholding Taxes"**), Google will also deduct the amount of such Withholding Taxes from the amount Google remits to You. Withholding Taxes include, but are not limited to, withholding tax obligations on cross-border payments or imposed by telecommunications taxes. You agree to timely provide, as soon as reasonably practicable, any tax documentation or certification requested by Google. Unless You are a resident of the United States or Singapore for income tax purposes, You hereby certify that any services that You provide to users through Your Product are not performed in the United States or Singapore, and furthermore You agree to provide written notification to Google at least ninety (90) days prior to any such services being performed in the United States or Singapore. Written notification on change in service location may be emailed to play-tax-notices@google.com.

3.7 You may also choose to make Products available for free. If the Product is free, You will not be charged a Service Fee. To avoid unexpected fees for users, You agree that Products that were initially offered free of charge to users will remain free of charge. Any additional charges will correlate with an alternative or supplemental version of the Product.

3.8 You authorize Google to give users refunds in accordance with the Google Play refund policies as located here or the local versions made available to You, and You agree that Google may deduct the amount of those refunds from payments to You. In all other respects, the Payment Processor's standard terms and conditions regarding refunds will apply. User refunds may be exclusive of taxes previously charged to users for Product purchases.

3.9 Users are allowed unlimited reinstalls of each Product distributed via Google Play without any additional fee, provided however, that if You remove any Product from Google Play due to a Legal Takedown (as defined in Section 8.2), that Product will be removed from all portions of Google Play, and users will no longer have a right or ability to reinstall the affected Product.

# 4. Use of Google Play by You

4.1 You and Your Product(s) must adhere to the Developer Program Policies.

4.2 You are responsible for uploading Your Products to Google Play, providing required Product information and support to users, and accurately disclosing the permissions necessary for the Product to function on user Devices.

4.3 You are responsible for maintaining the confidentiality of any developer credentials that Google may issue to You or that You may choose Yourself, and You are solely responsible for all Products that are developed under Your developer credentials. Google may limit the number of Developer Accounts issued to You or to the company or organization You work for.

4.4 Except for the license rights granted by You in this Agreement, Google agrees that it obtains no right, title, or interest from You (or Your licensors) under this Agreement in or to any of Your Products, including any Intellectual Property Rights in those Products.

4.5 You may not use Google Play to distribute or make available any Product that has a purpose that facilitates the distribution of software applications and games for use on Android devices outside of Google Play.

4.6 You agree to use Google Play only for purposes that are permitted by this Agreement and any applicable law, regulation, or generally accepted practices or guidelines in the relevant jurisdictions (including any laws regarding the export of data or software to and from the United States or other relevant countries).

4.7 Users are instructed to contact You concerning any defects or performance issues in Your Products and You are responsible for undertaking or handling the support and maintenance of Your Products and any complaints about Your Products. You agree to supply and maintain valid and accurate contact information that will be displayed in each of Your Products' detail page and made available to users for customer support and legal purposes. For Your paid Products or in-app

transactions, You agree to respond to customer support inquiries within 3 business days, and within 24 hours to any support or Product concerns stated to be urgent by Google.

4.8 You agree that if You make Your Products available through Google Play, You will protect the privacy and legal rights of users. If the users provide You with, or Your Product accesses or uses, usernames, passwords, or other login information or personal information, You agree to make the users aware that the information will be available to Your Product, and You agree to provide legally adequate privacy notice and protection for those users. Further, Your Product may only use that information for the limited purposes for which the user has given You permission to do so. If Your Product stores personal or sensitive information provided by users, You agree to do so securely and only for as long as it is needed. However, if the user has opted into a separate agreement with You that allows You or Your Product to store or use personal or sensitive information directly related to Your Product (not including other products or applications), then the terms of that separate agreement will govern Your use of such information. If the user provides Your Product with Google Account information, Your Product may only use that information to access the user's Google Account when, and for the limited purposes for which, the user has given You permission to do so.

4.9 You will not engage in any activity with Google Play, including making Your Products available via Google Play, that interferes with, disrupts, damages, or accesses in an unauthorized manner the devices, servers, networks, or other properties or services of any third party including, but not limited to, Google or any Authorized Provider.

4.10 You are solely responsible for, and Google has no responsibility to You for, Your Products, including use of any Google Play APIs and for the consequences of Your actions, including any loss or damage which Google may suffer.

4.11 Google Play allows users to rate and review Products. Only users who download the applicable Product will be able to rate and review it on Google Play. For new Developers without Product history, Google may use or publish performance measurements such as uninstall and/or refund rates to identify or remove Products that are not meeting acceptable standards, as determined by Google. Google reserves the right to display Products to users in a manner that will be determined at Google's sole discretion. Your Products may be subject to user ratings and reviews to which You may not agree. If you have concerns regarding such ratings and reviews, you may report it via the Play Console.

# 5. Authorizations

5.1 Upon making Your Product available on Google Play, You authorize Google on a non-exclusive, worldwide, and royalty-free basis to: reproduce, perform, display, analyze, and use Your Products in connection with (a) the operation and marketing of Google Play; (b) the marketing of devices and services that support the use of the Products and the marketing of the Products on Google Play

and Devices; (c) the provision of hosting services to You and on Your behalf to allow for the storage of and user access to the Products and to enable third -party hosting of such Products; (d) making improvements to Google Play, Play Console, and Android platform; and (e) checking for compliance with this Agreement and the Developer Program Policies. The authorization in clause (e) is sublicensable to application security partners for the sole purpose of checking for compliance with this Agreement and the Developer Program Policies. You also authorize such application security partners to use the results of their review in their products and research that may be publicly available. For clarity, the authorizations provided under this Section will cease upon termination of the Agreement.

5.2 You authorize Google to perform the acts described in this section subject to Your control and direction in the manner indicated in the Play Console.

5.3 You grant to the user a nonexclusive, worldwide, and perpetual license to perform, display, and use the Product. The user may include, but is not limited to, a family group and family members whose accounts are joined together for the purpose of creating a family group. Family groups on Google Play will be subject to reasonable limits designed to prevent abuse of family sharing features. Users in a family group may purchase a single copy of the Product (unless otherwise prohibited, as for in-app and subscription Products) and share it with other family members in their family group. If, in the Play Console, You opt in to allowing users to share previously purchased Products, Your authorization of sharing of those purchases by those users is subject to this Agreement. If You choose, You may include a separate end user license agreement ("**EULA**") in Your Product that will govern the user's rights to the Product, but, to the extent that EULA conflicts with this Agreement, this Agreement will supersede the EULA. You acknowledge that the EULA for each of the Products is solely between You and the user. Google will not be responsible for, and will not have any liability whatsoever under, any EULA.

# 6. Brand Features and Publicity

6.1 Each party will own all right, title, and interest, including, without limitation, all Intellectual Property Rights, relating to its Brand Features. Except to the limited extent expressly provided in this Agreement, neither party grants, nor will the other party acquire, any right, title, or interest (including, without limitation, any implied license) in or to any Brand Features of the other party.

6.2 Subject to the terms and conditions of this Agreement, Developer grants to Google and its affiliates a limited, nonexclusive, royalty-free license during the term of this Agreement to display Developer Brand Features, submitted by Developer to Google, for use solely within Google Play, online or on Devices and in each case solely in connection with the distribution and sale of Developer's Product via Google Play or to otherwise fulfill its obligations under this Agreement.

 **Google Play**

  



# CBRNResponder

Attainx, inc

**1K+**
Downloads


Everyone ⓘ

Install

 Share    🏷 Add to wishlist

 

## About this app    

CBRNResponder provides free software tools for logging, transmitting, storing, analyzing, and presenting environmental radiological, chemical, and biological monitoring data. Data is stored in a secure cloud environment accessible only by the user. To register for an account and to obtain further information, please go to www.cbrnresponder.net

The application has a Responder Tracking feature that allows a responder to track and share their location...

**Updated on**
Aug 23, 2024


Games


Apps


Movies & TV


Books


Kids

 Google Play

  



# CERES (Chemical Emergency Resp

**Vlahi Systems LLC**

In-app purchases

| 4.9★ | 5K+ | E |
|------|-----|---|
| 36 reviews | Downloads | Everyone ⓘ |

Install

⤳ Share    ? Add to wishlist

     

## About this app                                    →

CERES (Chemical Emergency Response E-Service) is our chemical incident planning and response platform that brings together plume dispersion models with maps and real-time meteorological data and gas sensors data.

Our software can be used anywhere, anyplace, on any device, phone, tablet or PC. You get free access to a government approved model widely used to plan for and respond to chemical emergencies....

**Updated on**
May 24, 2024

🎮 Games    ▦ Apps    🎬 Movies & TV    📖 Books    ☆ Kids

 **Google Play**

  



# SYGNAL

SYGNAL

In-app purchases

**50+**
Downloaded


Everyone ⓘ

Install

 Share · Add to wishlist

     

## About this app →

SYGNAL is an innovative app for simulated HAZMAT and CBRNE detection training. It turns mobile devices into training tools, offering customizable sessions, real-time GPS tracking, geofencing, and instant messaging. Designed for first responders and confined space rescuers, SYGNAL enhances training with an intuitive interface and secure cloud-based connectivity, compatible with iOS and Android.

For more information, visit SYGNAL App.

**Updated on**
Sep 13, 2024


Games


Apps


Movies & TV


Books


Kids

 **Google Play**

  



# PlumeSIM-SMART
**Argon Electronics**

**500+**
Downloads


Everyone ⓘ

Install

 Share    🔖 Add to wishlist

    

## About this app      →

PlumeSIM-SMART Simulators (SMART-SIMs) available within this application are for use with PlumeSIM-SMART, a full feature Chemical, Biological, Radiological, Nuclear (CBRN) and Hazardous Material (HazMat) training system that enables you to implement single or multiple threat releases incorporating hazardous material, radionuclides and chemical warfare agents to generate virtual Tabletop exercises and wide area Live field exercises.

...

**Updated on**
Feb 29, 2024

 Games       Apps       Movies & TV       Books       Kids

 Google Play

  



# Gas Detection

### Drägerwerk

| 2.4★ | 10K+ |  |
|------|------|------|
| 23 reviews | Downloads | Everyone ⓘ |

Install

< Share    🔖 Add to wishlist

   

## About this app →

The Dräger Gas Detection App provides a general overview of gas and vapor measurement technology. The basic principles of the Dräger-Tube, Dräger Sensor and Dräger Chip Measurement System are described and a complete listing of the Dräger-Tubes and chips are provided with all relevant measurement parameters. In addition, there is an introduction to portable monitors, including electrochemical, catalytic, and infrared sensor technology, as well as a complete list of Dräger sensors and monitors. The support section contains a sensor compatibility chart, how-to videos, error code charts and links to our new customer support pages.

**Updated on**
Apr 28, 2023

 Games     Apps     Movies & TV     Books     Kids



# CivTAK / ATAK

Community, News, Licensing, Support and Download for TAK / ATAK Tools

☐  **MAIN MENU**                                                                                          ☐

**NEWS**

# Samsung Announces S23 Tactical

**May 31, 2023  -  Leave a Comment**

Tech News announced that Samsung announced a new S23-Tactical device for military and emergency responder use with night vision mode and integration with tactical radios. It is of course ATAK-compatible.

From the article:

Samsung has introduced Tactical Edition of its flagship phones Samsung Galaxy S23 and Galaxy XCover 6 Pro, which have been designed keeping in mind the US military. These smartphones are being called "mission ready" phones. These phones meet US military security requirements. These phones come with Android Team Awareness Kit (ATAK) and Battlefield Assisted Trauma Distributed Observation Kit (BATDOK). These phones have been introduced with rugged cases with additional software and protection.

The Galaxy S23 Tactical Edition comes with features like exclusive night vision, stealth mode, and lock screen auto rotate. It features the same 6.1-inch Full HD Plus display as the regular variant of the Galaxy S23 with a refresh rate of 120Hz. Snapdragon 8 Gen 2 processor has been

given in the phone. Apart from this, there is 8 GB RAM and 512 GB storage. Galaxy S23 comes with three rear cameras in which the primary lens is 50 megapixels. 8K video recording can be done with the camera of the phone. Apart from this, it also has 360 degree audio recording.

The Samsung Galaxy S23 Tactical Edition houses a 3900mAh battery that supports 25W wired charging and 15W wireless charging. Samsung Galaxy Xcover 6 Pro Tactical Edition comes with a sturdy design. It has got military grade MIL-STD-810H certification and has also passed the 1.5 meter drop test. It has got IP68 rating for water resistance.

This phone has a 6.6-inch PLS LCD display with Full HD Plus resolution and a refresh rate of 120Hz. The phone has Snapdragon 778G processor with 6GB RAM and 4050mAh battery. The phone has a dual rear camera setup in which the primary lens is 50 megapixels. Samsung DeX is supported on the Galaxy S23 and Galaxy XCover 6 Pro Tactical Edition. There is support for 5G, Wi-Fi 6E and Citizen Broadband Radio Service (CBRS) with these phones. Its protection will work even when the phone is switched off.

TAGGED   2023   S23   SAMSUNG   TACTICAL

## RELATED POSTS



### $20,000 CivTAK Hackathon!!!

October 5, 2024

### How James Bond Would use TAK

May 15, 2024

### Public Documents mentioned in SIBR 23-

September 5, 2023

PREVIOUS ARTICLE

**FTS Supports Slovenian Military**

NEXT ARTICLE

**DARPA Transitions Distributed Information Exchange to TAK**

## Leave a Reply

## WHAT IS TAK?

The Android Team Awareness Kit (ATAK), for civilian use, or Android Tactical Assault Kit (also ATAK) for military use - is a suite of software that provides geospatial information and allows user collaboration over geography.

ATAK was originally developed by the Air Force Research Laboratory (AFRL) and is now maintained by the TAK Product Center (TPC).



ATAK 3.6 Promo





# Company

DS2 was founded in 2011 by Software Engineers experienced in the DoD domain, who were driven by the idea of delivering maximum capabilities to the warfighter without the unnecessary red tape found at larger firms. DS2 implemented Agile development principles from our inception, and the idea of closely collaborating with the end-user community during the development process; not afterwards, when changes are more costly to make. Our business leaders strive to be the most responsive and easiest you'll ever work with, complemented by engineers adhering to the highest technical standards. Our formula is simple: People + Technology = Optimized Outcomes for our customers.



DS2 CORE VALUE #1
**Do the Right Thing**



DS2 CORE VALUE #2
**Work Hard · Play Hard**



DS2 CORE VALUE #3
**Teamwork**



DS2 CORE VALUE #4
**Passion**



DS2 CORE VALUE #5
**Customer Focus**





ATAK Development Services

## Situational Awareness in the Palm of Your Hand

Android Tactical Assault Kit (ATAK, also known as the Android Team Awareness Kit) provides situational awareness for all users engaged in an active scenario. It is a government-off-the-shelf app for Android platforms available to all government agencies for free. ATAK improves tactical efficiencies by providing a complete situational awareness and communication coordination capability that is unmatched, limiting communication requirements for all team members to be informed of operational status. It is beneficial for large teams or multi-agency responses. ATAK can be combined with TAK Server and WinTAK for a more comprehensive response management capability. DS2 provides custom development services to develop plug-ins tailored to your business needs, installation and configuration of TAK products, and customized training based on plug-in development.

DS2 offers a variety of services to support the adoption and use of ATAK. We can provide consultation in basic installation and configuration, as well as design and develop migration strategies to create custom solutions and integrations within ATAK. ATAK provides enhanced real-time situational awareness while providing enterprise information sharing capabilities to increase collaboration and mission success.

As a plug-in developer for ATAK and TAK Server implementer, DS2 is uniquely positioned to assist you with your decisions about ATAK by providing:

- TAK server sales, configuration, and installation

- TAK network hardware sales, configuration, and installation

- Custom ATAK, TAK Server and WinTAK training focused on plugin development

- Custom ATAK plugin development

- TAK network configuration consulting

- End-user device consulting

## Discovery Engagement

DETERMINING YOUR ATAK NEEDS

During a discovery engagement, DS2 will engage with a customer for a set period - typically two days - for a set price. We will consult with the customer and provide advice such as:

- Onsite discovery of short, mid and long-term goals for successful deployment of ATAK & TAK Server



- Technical deep dive into existing business area (network topology, environment, business needs, security constraints)

- Scope planning for short and mid-term goals to deliver ATAK and TAK Server to their internal customers

## Migration Services

MOVING FORWARD WITH ATAK

As part of services engagement, we offer migration services from legacy systems. These services include consulting with the customer's technical staff about the best way to migrate the existing solution to the ATAK architecture. We can implement the migration in a phased approach to ease adoption.

In all cases, a migration plan will be created with the customer to outline goals of the migration, as well as any plans that involve customer or DS2 actions.



# Implementation / Integration Services

## SETTING UP YOUR ATAK BASE OF OPERATIONS

DS2 will also collaborate with a customer's technical team to develop an integration plan for the ATAK implementation. Typically, part of the overall implementation plan, the integration plan will consider a customer's existing systems, workflows, and policies regarding:



- Number of devices/users

- Existing network setup

- Security requirements

- User authentication

- Size of installation

- Workflow

- Bandwidth considerations



# Your Vision, Our Expertise



**Elevating** Solutions for a Dynamic World.

---

(850) 279-6176

310 Government Avenue
Niceville, FL 32578

Technology Partners
Brochures & White Papers
Privacy Statement
Terms of Use



© 2024 Dynamic Software Solutions | Powered by LIFT

# Warfighter Analytics using Smartphones for Health (WASH)

## Mr. Tejas Patel

Currently, understanding and assessing the readiness of the warfighter involves medical intervention with the help of advanced equipment, such as electrocardiographs (EKGs) and other specialized medical devices, that are too expensive and cumbersome to employ continuously or without supervision in non-controlled environments. On the other hand, currently 92 percent of adults in the United States own a cell phone, which could be used as the basis for continuous, passive health, and readiness assessment.

The Warfighter Analytics using Smartphones for Health (WASH) program seeks to use data collected from cellphone sensors to enable novel algorithms that conduct passive, continuous, real-time assessment of the warfighter. The objective of WASH is to extract physiological signals, which may be weak and noisy, that are embedded in the data obtained through existing mobile device sensors (e.g., accelerometer, screen, microphone). Such extraction and analysis, done on a continuous basis, may help determine current health status and identify latent or developing health disorders (Figure 1).



Biologic Onset of Disease/ Illness

WASH Symptom Detection

Noticeable Emergence of Symptoms

Figure 1: WASH health determination

WASH research will explore the development of algorithms and techniques for identifying both known indicators of physiological problems (such as disease, illness, and/or injury) and deviations from the warfighter's micro-behaviors that could indicate such problems. It is also expected that additional "digital biomarkers" of physiological problems may be identified during the research through the combination of big data analytics and medical ground truth provided to performers. Digital biomarkers are consumer-generated physiological and behavioral measures collected through connected digital tools, in this case a smartphone.

A prerequisite for the extraction and interpretation of the raw sensor data and any identified digital biomarkers is determining the context of such data collection and analysis, which may affect the relevance of any given sensor and permit "denoising," or elimination of irrelevant or misleading readings. For example, relying on cellphone accelerometer data while the warfighter is in a moving vehicle would likely negatively influence the utility of such data for WASH-type analysis unless the auxiliary motion is identified and cancelled. Thus, key focus areas will be the extraction of the signal context and the identification of complicated actions and environmental variables, and the association of user state with symptoms of illness conditions in order to identify potential illnesses and conditions before conventional symptomatic display. It

is the union of personal behavior/characteristics, smartphone sensor collection, context of smartphone use, and disease biomarkers that will define the preclinical health determination of the WASH program (Figure 2).



Figure 2: WASH program concept

The program goal is to enable the creation of a mobile application that passively assesses a warfighter's readiness immediately and over time. This application seeks to provide:

- Clinicians with plausible health conditions supported by the analysis, determination, and fusion of digital biomarkers for disease correlation against ground truth;

- Commanders with unit readiness information, both at the current time and in the near future; and

- Users of the device with information about their current health status and early indicators of medical conditions.

## TAGS

| Analytics | Artificial Intelligence | Data | Health |

# SIMILARLY   TAGGED   CONTENT

Hierarchical Identify Verify Exploit (HIVE) Proposers Day

Generating Actionable Understanding of Real-World Phenomena with AI

Teaching Robots "Manners": Digitally Capturing and Conveying Human Norms

CHIKV Challenge Announces Winners, Progress toward Forecasting the Spread of Infectious Diseases

Situational Awareness for HADR

- **PRINT**




# WPI Secures $2.8 Million to Develop a Smartphone App to Help Assess the Health of Soldiers

The project, funded by the Defense Advanced Research Projects Agency (DARPA), aims to use "smartphone biomarkers" and machine learning to create an early warning system for soldiers and veterans who may be suffering from traumatic brain injuries and infectious diseases

**Media Contact**
Colleen Wamback



Director, Public Relations
Marketing Communications
+1 (508) 8316775
media@wpi.edu

September 24, 2018

A device that more than 80 percent of Americans virtually always have with them may become an early warning system for soldiers suffering from traumatic brain injuries (TBI) and infectious diseases, thanks to research by a team of computer scientists at Worcester Polytechnic Institute (WPI). The researchers are developing machine learning algorithms that will sort through a host of data collected by the sensors in smartphones to detect telltale signs of medical conditions that can affect a soldier's readiness.

Computer science professors Emmanuel Agu, faculty director for WPI's Healthcare Delivery Institute, and Elke Rundensteiner, director of the university's Data Science Program, are developing this new technology with support from a four-year, $2.8 million award from the Defense Advanced Research Projects Agency (DARPA) through its Warfighter Analytics using Smartphones for Health (WASH) program.

The goal of WASH is to create a mobile application that passively assesses a soldier's health—immediately and over time—with the goal of detecting potentially severe illnesses at their earliest stages, and pointing soldiers toward care. The system will not replace typical medical assessments, but will augment them by detecting problems outside of scheduled clinical appointments. In this way, the app could help flag small problems before they escalate and before they impair the readiness of soldiers or spread diseases like the flu, tuberculosis, and pneumonia through squadrons.

"Often times, soldiers may exhibit signs of brain injury or other illnesses, like infectious diseases, that could be sensed well before the full-blown symptoms impair their readiness," said Agu, principal investigator for the project. "Our team will research and develop machine learning algorithms that tap into smartphone sensors to passively collect data about certain behaviors that we know are related to such health issues. This will enable continuous, real-time assessment of TBI and infectious diseases afflicting soldiers, who can then be contacted by a clinician to confirm their status."

According to the Department of Defense (DOD), an estimated 22 percent of all combat casualties from Iraq and Afghanistan suffer brain injuries. The DOD and Department of Veterans Affairs (VA) are also monitoring cases of infectious diseases contracted during tours in Iraq or Afghanistan. Currently, a soldier's condition is assessed using specialized medical tests and devices, such as a CT scan or MRI machine, that are available in doctor's offices, clinics, and hospitals, though not always around the clock. With their computing power and array of sensors and processing technology, including cameras, microphones, accelerometers, facial recognition, fingerprint detection, and GPS, smartphones have the ability to continually capture what Agu calls "smartphone biomarkers," which are data points and behavior that correspond to disease symptoms.

"Detecting changes in behavior patterns is critical for early identification of health concerns and unique health care needs, even before the illness fully manifests itself," Agu said. "We can look for symptoms like slurred speech or reduced communication and social interaction that may indicate TBI, or coughing and fatigued movement typical of some infectious diseases, and we can trigger help earlier."



Agu and Rundensteiner plan to test the utility of their approach, first through a study in which they will collect data from 100 volunteer subjects, and later, in a larger phase of the WASH project, through large-scale studies involving up to 100,000 subjects. These will include cohorts with TBI and infectious diseases being studied by other WASH teams. Guided by these results, the WPI team will build machine learning and deep learning algorithms that can instantly and continuously compare an individual patient's biomarkers to biomarkers that are known to correlate well with symptoms of TBI and infectious diseases. Machine learning will enable the app to not only note symptoms, but to also calculate their severity.

"By processing data captured by numerous sensors on the smartphones of 100,000 patients, using open-source machine learning infrastructures and cloud computing power, we will gain the critical capability to infer the health status of individual smartphone users in near real-time and with great precision," said Rundensteiner. "The technology we are creating through WASH, which will discover predictive patterns in massive data sets in real time, is bound to be transformative. In addition, the resulting smartphone sensor data set to be created through the DARPA WASH project will be one of the largest of its kind, representing a significant value and critical resource in its own right."

Participation in the data gathering studies for the app will be voluntary and all data will be confidential and secure.

Five WPI PhD students are currently working on the DARPA-funded project, along with several undergraduate students. Additional personnel may join the project in the future.

DARPA dates back to the launch of Sputnik in 1957, with a mission to make pivotal investments in breakthrough technologies for national security.

"The military is frequently the first funder of big ideas, like the Internet, which decades later is benefiting and transforming society in a fundamental manner," Agu said. "I think that someday the work we are doing to support soldiers through the WASH program may be used by society as a whole."

## Related Stories









# Department Names Vendors to Provide Joint Warfighting Cloud Capability

Dec. 12, 2022 | By C. Todd Lopez, DOD News

The Defense Department awarded contracts to four technology companies to provide services in support of its Joint Warfighting Cloud Capability. The four companies include Amazon Web Services Inc., Google Support Services LLC, Microsoft Corporation and Oracle.



"This is a huge day for the department and what we can bring to our warfighters, particularly for areas like Joint All Domain Command and Control," John Sherman, the DOD's chief information officer, said.

The department announced plans for JWCC back in July 2021 and Sherman said it took 17 months of work by the CIO, the Defense Information Systems Agency, Washington Headquarters Service and others to arrive at contract award.

> *Spotlight: Engineering in the DOD*

"It's been a been a lot of work to get here, and I'm proud of where we've landed," Sherman said.

The JWCC is a multiple-award contract vehicle that allows the department to acquire commercial cloud capabilities and services directly from commercial cloud service providers.



"It brings us really cutting-edge cloud capabilities, to the entire department here," Sherman said. "Very importantly, it brings us cloud computing at all three security classification levels: unclassified, secret and top secret."

The DOD currently has other cloud computing capabilities, which are expected to remain complementary to JWCC. But those cloud capabilities don't bring the breadth and depth that JWCC will have, Sherman said.



"We've got other types of clouds here within the department, but none of them do this at all three security classification levels, spanning the entire enterprise from the continental United States all the way out to what we call the tactical edge — way out, whether it's Western Pacific or Eastern Europe or onboard a ship," he said. "That tactical edge piece is very critical for our warfighters. Whether it's, as I've noted, on a small coral atoll, or somewhere in sub-Sahara Africa or somewhere else."

The JWCC contract also allows the department to have direct access to the four cloud providers, Sherman said, rather than having to go through an intermediary or a reseller.

"This creates for more efficient and effective leveraging of these capabilities," he said. "And this is something we're very excited about. So we're leaning forward on this. This is a big day in the Department of Defense. It's been a long, long journey to get here, and I'm very proud of what the team has done to provide this capability to the Department of Defense."

The JWCC is an indefinite-delivery, indefinite-quantity contract vehicle which offers commercial pricing, or better, and streamlined provisioning of cloud services. As part of JWCC, warfighters will have the opportunity to, under one contract, acquire capabilities such as global accessibility; available and resilient services; centralized management and distributed control; ease of use; commercial parity; elastic computing, storage and network infrastructure; advanced data analytics; fortified security; and tactical edge devices.

Air Force Lt. Gen. Robert J. Skinner, who serves as the director of the Defense Information Systems Agency, said the department has more to be excited about than just the cloud capability that JWCC provides.

"We're also really developing an environment," he said. "That environment includes some great accelerators, as we call them — those capabilities that help enable our mission partners, those warfighters, to be able to leverage cloud a lot more than what they are today."



One such "accelerator," Skinner said, allows JWCC users to make use of pre-configured templates so that those less familiar with cloud computing will be able to make use of it in a much faster environment. He also said there is a cloud provisioning tool that enables users to manage accounts and how they use the cloud capability.

"If you look at this as one of many things that are going on within the department, as we improve the transport layer and how we're transporting data, the integrated data layer that you've heard department leadership talk about, those, along with this cloud contract, and JADC2 ... all those together really improve the resiliency, the capability and the readiness of the department, across the board, in support of those warfighters, whether they're at the strategic level, or down in that foxhole," Skinner said.

Hosted by Defense Media Activity - WEB.mil

# *Appendix VI*

RECEIVED

NOV 2 1 2024

United States Court of A··· ···
For the Federal Circuit



**FACT-FINDING MISSION**

# Judge rules against users suing Google and Apple over "annoying" search results

Users struggled to prove harms from Google's default search deal with Apple.

ASHLEY BELANGER – FEB 7, 2024 2:27 PM | 💬 51



Credit: SOPA Images / Contributor | LightRocket

While the world awaits closing arguments later this year in the US government's antitrust case over Google's search dominance, a California judge has dismissed a lawsuit from 26 Google users who claimed that Google's default search agreement with Apple violates antitrust law and has ruined everyone's search results.

Users had argued that Google struck a deal making its search engine the default on Apple's Safari web browser specifically to keep Apple from competing in the general search market. These payments to Apple, users alleged, have "stunted innovation" and "deprived" users of "quality, service, and privacy that they otherwise would have enjoyed but for Google's anticompetitive conduct." They also allege that it created a world where users have fewer choices, enabling Google to prefer its own advertisers, which users said caused an "annoying and damaging distortion" of search results.

In an order granting the tech companies' motion to dismiss, US District Judge Rita Lin said that users did not present enough evidence to support claims for relief. Lin dismissed some claims with prejudice but gave leave to amend others, allowing users another chance to keep their case—now twice-dismissed—at least partially alive.

Under Lin's order, users will not be able to amend claims that Google and Apple executives allegedly sealed the default search deal on the condition that Apple would not create its own general search engine through "private, secret, and clandestine personal meetings." Because plaintiffs showed no evidence pinpointing exactly when Apple allegedly agreed to stay out of the general search market, these meetings, Lin reasoned, could just as easily indicate "rational, legal business behavior," rather than an "illegal conspiracy."

*ARS VIDEO*
—
**How Scientists Respond to Science Deniers**



Users attempted to argue that Google and Apple intentionally hid these facts from the public, but Lin wrote that their "conclusory and vague allegations that defendants 'secretly conducted meetings' and 'engaged in conduct to obfuscate internal communications' are plainly insufficient."

ADVERTISEMENT

Sharing bystander photos documenting Google's Sundar Pichai and Apple's Tim Cook meeting at a restaurant with a manila folder tucked under Pichai's elbow did not help users' case. Lin was also not moved by users demonstrating that Google

has a history of destroying evidence, because "they put forth no specific factual allegations that defendants did so in this case."

However, users will have 30 days to amend currently "inadequately" alleged claims that "Google's exclusive default agreement, under which Apple set Google as the default search engine for its Safari web browser, foreclosed competition in the general search services market in the United States," Lin wrote. If users miss that deadline, the case will be tossed with no opportunities to further amend claims.

A lawyer representing users did not immediately respond to Ars' request to comment. A Google spokesperson declined to comment.

## Users "parrot" DOJ's case against Google

So far, users have only alleged that Google's 90 percent share of the US general search services market is proof that "exclusive default agreements substantially foreclosed competition." Lin suggested that users could strengthen their arguments by showing how Google's dominance is directly linked to exclusive default agreements that foreclosed competition.

Users may be able to track down more evidence. At a hearing, users' legal counsel told Lin that they could allege more facts supporting a plausible inference that the default deal led to substantial foreclosure of competition in general search.

Until users shore up this argument, Lin said that they have failed to demonstrate any of the antitrust injuries alleged, which plaintiffs claimed require public relief because they impact "all users of search." This includes an array of harms plaintiffs allege arise from Google subjecting users to an "inferior search experience" that, despite being free, can come at a cost to some users. As one example, some plaintiffs claimed that they've been stuck with additional business expenses due to Google's alleged preferencing of its advertising partners in search results.

ADVERTISEMENT

In their motion to dismiss, tech companies told Lin that users had "no antitrust standing" and have not yet explained "how the 'prices' for using Google's free search engine should be lower, how Apple's alleged agreement not to refrain from building a search engine diminished innovation and privacy practices in the industry, or even from what relevant market plaintiffs' alleged injuries flowed."

They also criticized users' alleged attempts to "parrot" arguments advanced by the US Department of Justice in its antitrust case. In their most recent complaint, users quoted the judge in that case, Amit Mehta, who said that Google and Apple's default search deal was "arguably a form of exclusivity" preventing rivals from competing.

To ultimately succeed, users would have to show evidence that Google's alleged conduct in these deals blocked competitors. Since users have so far insufficiently argued that Google's deal stopped Apple from competing, tech companies argued that any amendment to their complaint would be "futile."

"Plaintiffs cannot establish antitrust injury by simply wishing that Apple would launch products," the motion to dismiss said.

The DOJ's antitrust hearing, however, suggested that there may be evidence that Apple was planning to launch a search engine but chose to keep the Google deal instead.

Lin did not completely agree with Google and Apple that users had no hopes of salvaging their suit. Because "it is conceivable that plaintiffs could cure" defects in arguments alleging harms, Lin also granted users another opportunity to allege specific facts entitling them to relief from alleged harms.

The ideal outcome to users suing would be for Google and Apple's deal to be deemed illegal, with Lin ordering both companies to end the deal, disgorge profits, including interest, and compensate users for alleged damages.

Google and Apple have argued that even with sufficient facts, it may not be possible to "determine the damages from reduced search-quality experience" allegedly owed to all Google search users.

"Apportioning the proper share to plaintiffs versus other search engine users would pose innumerable complex proof issues, including, for example, quantifying supposedly 'distorted' search results and the extent to which those results supposedly injured each of the plaintiffs," the motion to dismiss said, criticizing users as pleading "no facts whatsoever to establish that plaintiffs could even quantify such damages, much less properly apportion them."

Listing image: SOPA Images / Contributor | LightRocket



**ASHLEY BELANGER**  *SENIOR POLICY REPORTER*
Ashley is a senior policy reporter for Ars Technica, dedicated to tracking social impacts of emerging policies and new technologies. She is a Chicago-based journalist with 20 years of experience.



**VIEW COMMENTS**

 **PREV STORY**

**NEXT STORY** 

⊙ **MOST READ**


# US Judge Dismisses Antitrust Suit Against Google, but Consumers May Get Another Chance

BY **CPI**
AUGUST 12, 2024



A federal judge in California has dismissed an antitrust lawsuit accusing Google of unlawfully dominating web searches on smartphones. However, the ruling leaves the door open for consumers to revive their case, citing recent legal developments in Washington, D.C. that have

highlighted Google's potentially illegal monopoly over search engines.

[Per Reuters](), U.S. District Judge Rita Lin, presiding over the case in San Francisco, ruled on Friday that the consumers had not provided sufficient evidence to demonstrate harm resulting from Google's market dominance. The lawsuit, originally filed in 2022, alleged that Google engaged in unlawful practices by conspiring with Apple to make Google the default search engine on the iPhone and other Apple devices.

Judge Lin's decision follows a previous dismissal of the case, where she criticized the plaintiffs for making "conclusory" and "speculative" claims without adequate factual backing. In her latest ruling, Lin again noted the lack of detailed allegations, stating that while the plaintiffs had expanded on their claims regarding potential harms to consumer choice, innovation and search quality, they still failed to present the necessary factual evidence.

**Related:** **Google Antitrust Ruling: A Cautionary Tale for Companies on Evidence Preservation**

However, according to Reuters, Judge Lin's ruling offers a glimmer of hope for the plaintiffs. She pointed to a significant ruling made on August 6 by U.S. District Judge Amit Mehta in Washington, D.C. In that case, after a lengthy non-jury trial, Mehta found that Google's substantial payments to Apple and other technology companies to ensure its position as the default search engine constituted a violation of antitrust law.

"Although these findings were made in another litigation involving different issues, they indicate that plaintiffs may be able to plausibly allege facts about consumer harm from the

alleged anticompetitive effects of Google's default agreements," Lin wrote in her order.

The D.C. court's decision could potentially influence the outcome of the California case, should the plaintiffs choose to file an amended lawsuit. Lin's acknowledgment of Mehta's ruling suggests that the legal landscape regarding Google's business practices is still evolving and that new evidence or arguments could alter the case's trajectory.

**Source: Reuters**



CPI TV | SUBSCRIBE

## About

About Us

Editorial Policy

Editorial Advisory Board

## Getting Started

Contact Us

Partnerships

Newsletters

## Follow CPI

© Competition Policy International 2024

Privacy Policy | Terms & Conditions



Login

Get App

Tech Series 2024
The series consists of interesting web panel...

Techfluence: CXOs Shaping...
The initiative will bring together the top executives...

WhatsApp Chann
Tune in to know
updates on the t

Internet    2 Min Read

# Google wins dismissal of US consumer lawsuit over mobile searc

"Although these findings were made in another litigation involving different issues, they indicate that plaintiffs may be able to plausibly allege facts about consumer harm from t alleged anticompetitive effects of Google's default agreements," Lin wrote in her order.

Reuters

Updated On Aug 12, 2024 at 08:47 PM IST



**By Mike Scarcella**

A federal judge in California has dismissed a lawsuit accusing Google of unlawfully dominating web search on smartphones, but said the consumers should get another chance after a Washington, D.C. court separately ruled the tech giant spent billions to create an illegal monopoly.

U.S. District Judge Rita Lin in San Francisco on Friday dismissed the consumers' antitrust lawsuit against Google, finding they had not provided enough factual evidence showing any harm from the Alphabet unit's market dominance.

Lin said the plaintiffs could file an amended lawsuit, citing the D.C. court's blockbuster Aug. 6 ruling that found Google's exclusive contracts with Apple and other companies helped it create an illegal monopoly over search engines.

"Although these findings were made in another litigation involving different issues, they indicate that plaintiffs may be able to plausibly allege facts about consumer harm from the alleged anticompetitive effects of Google's default agreements," Lin wrote in her order.

Google and attorneys for the consumers did not immediately respond to requests for comment.

The consumers first filed their case in 2022, accusing Google of unlawfully scheming with Apple to make Google the exclusive preloaded default search engine on the iPhone maker's devices.

Lin dismissed an earlier version of the case based on a lack of facts. In her latest ruling, she again faulted the plaintiffs for making "conclusory" and "speculative" assertions.

**EVENT**

**Tech Series 2024**



Tue, 31 Dec 2024     Virtual

**Register Now**   Tue, 31 Dec 2024     Virtual

"Although plaintiffs add more words to their recitation of potential harms to consumer choice, innovation, and search quality, they do not add the necessary factual allegations," Lin wrote.

Still, the ruling could give the consumer plaintiffs some hope. Lin's order pointed several times to aspects of U.S. District Judge Amit Mehta's decision last week against Google in Washington.

After a weeks-long non-jury trial, Mehta concluded Google's billions in payments to Apple and other tech companies to be the default search engine violated antitrust law.

Google has denied the allegations in both cases, and it said it would appeal Mehta's order.

Lin set a Sept. 9 deadline for the consumers to file an amended complaint.

The case is Arcell v. Google LLC, U.S. District Court, Northern District of California, No. 22-cv-02499-RFL.

Published On Aug 12, 2024 at 08:43 PM IST

**MOST READ IN INTERNET**

 Amazon AWS CEO: Quit if you don't want to return to office

 India's data centre market projected to touch $8 billion by 2025

 IMC 2024: Space World Group eyes Rs 1,000-crore revenue annually

 IMC 2024: Standards taking centre stage in AI and global governance, says ITU...



Be the first one to comment.

Comment Now

# Appendix VII

RECEIVED

NOV 21 2024

United States Court of Appeals
For the Federal Circuit

**Senator Chuck Grassley, Ranking Member**
**Questions for the Record**
**Judge Rita Faye Lin**
**Nominee to be United States District Judge, Northern District of California**

1. **In a college piece, you wrote that: "The problem with the Christian Coalition is not that they are Bible-thumpers (there are personal beliefs that often result from religious experiences) but that they're bigots." If you are confirmed, how can litigants be assured that you will not allow this bias on your part to impact your rulings and opinions?**

   Response: I do not agree with that statement today. I wrote that when I was 20 years old, in an emotional reaction to the death of Matthew Shepard, and it reflected my limited life experience. I'm now more than 24 years older than I was when I wrote those words, and I am proud to have friends, colleagues, and associates who have a wide range of religious, political, and personal views. And, in general, my adult life over the last two decades as a wife, mother, and member of our local church has enriched my understanding of the human experience, as has my professional career as a civil litigator, federal prosecutor, and judge. In my four years as a judge, I have adjudicated all cases before me without bias of any kind, and I would do the same on the federal bench, if confirmed.

2. **Please explain whether you agree or disagree with the following statement: "The judgments about the Constitution are value judgments. Judges exercise their own independent value judgments. You reach the answer that essentially your values tell you to reach."**

   Response: I disagree. Judges should set aside their personal values in interpreting the law, including the Constitution. Instead, judges should interpret the law fairly and impartially, applying binding precedent to the factual record and evidence in the case before them.

3. **Please define the term "living constitution."**

   Response: Black's Law Dictionary defines "living constitutionalism" as "[t]he doctrine that the Constitution should be interpreted and applied in accordance with changing circumstances and, in particular, with changes in social values." *Black's Law Dictionary* (11th ed. 2019).

4. **Who should respond to a domestic violence call where there is an allegation that the aggressor is armed—the police or a social worker?**

   Response: That is a question better answered by policymakers and law enforcement officials. The adequacy and appropriateness of a government response to a call for service is an issue that could come before me as a judge, so it would be inappropriate for me to comment further.

5. **Is it appropriate for protestors to ignore social distancing mandates and gathering limitations to protest racial injustice?**

   Response: If confirmed and confronted with a case involving the application of COVID-19 mandates to a protest, I would fully and faithfully apply the binding precedents of the Supreme Court and Ninth Circuit to the facts and evidence before me. Depending on the specific facts, that could include the Supreme Court's recent decisions regarding the application of COVID-19 restrictions to burden the exercise of constitutional rights in *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020) and *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021).

6. **Is it appropriate for the government to use law enforcement to enforce social distancing mandates and gathering limitations for individuals attempting to practice their religion in a church, synagogue, mosque or any other place of religious worship?**

   Response: If confirmed and confronted with a case involving the application of COVID-19 mandates to individuals attempting to practice their religion in a place of religious worship, I would fully and faithfully apply the binding precedents of the Supreme Court and Ninth Circuit to the facts and evidence before me. Depending on the specific facts, that could include the Supreme Court's recent decisions regarding the application of COVID-19 restrictions to burden free exercise in *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020) and *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021).

7. **Is it legal for police to stop and frisk someone based on a reasonable suspicion of involvement in criminal activity?**

   Response: Yes, if the officer reasonably suspects (1) that the person is committing or has committed a crime and (2) that the person is armed and dangerous. *Terry v. Ohio*, 392 U.S. 1 (1968).

8. **Do you agree with Judge Ketanji Brown Jackson when she said in 2013 that she did not believe in a "living constitution"?**

   Response: I am unfamiliar with the cited statement from then-Judge Ketanji Brown Jackson concerning a "living constitution." I believe the Constitution has an enduring fixed quality that does not change over time, though it is applied to new circumstances in our modern times. The Constitution may be changed only through the amendment process provided in Article V.

9. **Under Supreme Court precedent, is 18 USC § 1507, or a state statute modeled on § 1507, constitutional on its face?**

   Response: I am unaware of any Supreme Court decision analyzing the constitutionality of 18 U.S.C. § 1507. The Supreme Court upheld a potentially analogous state statute in Louisiana against a facial constitutional challenge in *Cox v. Louisiana*, 379 U.S. 559, 564

(1965). As a sitting judge and judicial nominee, it would be inappropriate for me to state an opinion regarding the constitutionality of a law. If confirmed, I would fully and faithfully apply any precedents of the Supreme Court and Ninth Circuit in any case concerning the constitutionality of 18 U.S.C. § 1507 or a state analog to that statute.

**10. Should judicial decisions take into consideration principles of social "equity"?**

Response: Generally, no. Judicial decisions should be made based on the applicable law and the factual record and evidence before the court. However, in some circumstances, the law requires the court to consider equity. For example, in adjudicating a request for a preliminary injunction, courts must examine the "balance of equities" and the "public interest." *See, e.g., Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). Where required by law, it is proper for courts to consider equities.

**11. What is implicit bias?**

Response: Merriam-Webster's Dictionary defines "implicit bias" as "a bias or prejudice that is present but not consciously held or recognized."

**12. Is the federal judiciary affected by implicit bias?**

Response: I have not reviewed empirical research on whether the federal judiciary holds biases or prejudices that are present but not consciously held or recognized. That is a question better directed at academics or psychologists. As a sitting judge and judicial nominee, it would be inappropriate for me to opine on the issue, because I could be presented with a case alleging that the judge handling it acted in a biased manner. If confirmed and confronted with such a case, I would fully and faithfully apply the binding precedents of the Supreme Court and Ninth Circuit to the factual record and evidence before me.

**13. Do you have any implicit biases? If so, what are they?**

Response: I am not aware of having implicit biases. As a judge, my oath requires me to adjudicate matters fairly and without bias, and to recuse myself in any situation in which I could not be unbiased.

**14. How do you distinguish between "attacks" on a sitting judge and mere criticism of an opinion he or she has issued?**

Response: Criticism of an opinion typically involves finding fault with the reasoning of an opinion. An "attack" on a judge typically involves a threat of violence or a physical assault. That term is also sometimes used to describe *ad hominem* attacks on a judge's character or background.

**15. Do you think the Supreme Court should be expanded?**

Response: The Constitution delegates to Congress the power to determine the size of the Supreme Court. As a sitting judge and a judicial nominee, it would be inappropriate for me to express an opinion on the issue. I will faithfully apply all precedents of the Supreme Court regardless of its size.

16. **Which of the four primary purposes sentencing—retribution, deterrence, incapacitation, and rehabilitation—do you personally believe is the most important? Which of these principles, if confirmed, will guide your approach to sentencing defendants?**

Response: I do not regard any single factor as the most important in sentencing. Sentencing is a highly individualized, fact-specific determination. If I am confirmed, I would apply binding precedents of the Supreme Court and the Ninth Circuit regarding sentencing, and I would consider all the factors outlined in 18 U.S.C. § 3553(a).

17. **In what situation(s) does qualified immunity not apply to a law enforcement officer in California?**

Response: In a suit under 42 U.S.C. § 1983 against a law enforcement officer in any state, qualified immunity does not apply when the plaintiff has demonstrated both (1) that the officer violated a statutory or constitutional right; and (2) that the right was clearly established at the time of the violation. *Saucier v. Katz*, 533 U.S. 194, 200 (2001). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202.

18. **Do you believe that local governments should reallocate funds away from police departments to other support services? Please explain.**

Response: That is a question best suited for policymakers and law enforcement officials. As a sitting judge and judicial nominee, I should not express an opinion on that topic. In my current assignment as a judge overseeing criminal trials, parties sometimes contend that law enforcement investigation in a particular case was insufficient and/or affected by lack of funding, and it would therefore be inappropriate for me to state a personal view regarding the appropriate level of such funding.

19. **Please identify a Supreme Court decision from the last 50 years that is a typical example of your judicial philosophy and explain why.**

Response: There is not any specific Supreme Court decision that exemplifies my judicial philosophy. My judicial philosophy is to resolve the case or controversy before me in a manner that is diligent, open-minded, and fair. I diligently review the applicable law, factual record, evidence, and written submissions of the parties. I listen with an open mind to the parties' arguments and the evidence presented. Then, I provide the parties with a prompt decision that clearly explains my ruling and the reasoning behind it, as well as any issues that I have not decided. For each case that comes before me, I set a

tone in the courtroom that treats litigants with respect and dignity and conveys my
recognition of how important the case is to the individual parties.

20. **Please identify a Ninth Circuit judicial opinion from the last 50 years that is a
typical example of your judicial philosophy and explain why.**

Response: There is not any specific Ninth Circuit decision that exemplifies my judicial
philosophy. As to my judicial philosophy, please see my response to Question 19.

21. **Please answer the following questions yes or no. If you would like to include an
additional narrative response, you may do so, but only after a yes or no answer:**

   a. **Was *Brown v. Board of Education* correctly decided?**

   Response: Yes. As a sitting judge and judicial nominee, I generally refrain from
   expressing an opinion regarding whether a particular case was correctly decided.
   However, because it is unlikely that I will ever be asked to adjudicate the
   constitutionality of laws requiring racial segregation, I can state my view that
   *Brown* was correctly decided.

   b. **Was *Loving v. Virginia* correctly decided?**

   Response: Yes. As a sitting judge and judicial nominee, I generally refrain from
   expressing an opinion regarding whether a particular case was correctly decided.
   However, because it is unlikely that I will ever be asked to adjudicate the
   constitutionality of laws prohibiting interracial marriage, I can state my view that
   *Loving* was correctly decided.

   c. **Was *Griswold v. Connecticut* correctly decided?**

   Response: As a sitting judge and judicial nominee, it would be inappropriate for
   me to state an opinion regarding whether a particular case was correctly decided.
   If confirmed, I would fully and faithfully follow the binding precedents of the
   Supreme Court and the Ninth Circuit.

   d. **Was *Roe v. Wade* correctly decided?**

   Response: As a sitting judge and judicial nominee, it would be inappropriate for
   me to state an opinion regarding whether a particular case was correctly decided.
   If confirmed, I would fully and faithfully follow the binding precedents of the
   Supreme Court and the Ninth Circuit. In *Dobbs v. Jackson Women's Health
   Organization*, 142 S. Ct. 2228 (2022), the Supreme Court overruled *Roe v. Wade*,
   and *Roe* is no longer good law.

   e. **Was *Planned Parenthood v. Casey* correctly decided?**

Response: As a sitting judge and judicial nominee, it would be inappropriate for me to state an opinion regarding whether a particular case was correctly decided. If confirmed, I would fully and faithfully follow the binding precedents of the Supreme Court and the Ninth Circuit. In *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022), the Supreme Court overruled *Casey*, and *Casey* is no longer good law.

**f.** **Was *Gonzales v. Carhart* correctly decided?**

Response: As a sitting judge and judicial nominee, it would be inappropriate for me to state an opinion regarding whether a particular case was correctly decided. If confirmed, I would fully and faithfully follow the binding precedents of the Supreme Court and the Ninth Circuit.

**g.** **Was *District of Columbia v. Heller* correctly decided?**

Response: As a sitting judge and judicial nominee, it would be inappropriate for me to state an opinion regarding whether a particular case was correctly decided. If confirmed, I would fully and faithfully follow the binding precedents of the Supreme Court and the Ninth Circuit.

**h.** **Was *McDonald v. City of Chicago* correctly decided?**

Response: As a sitting judge and judicial nominee, it would be inappropriate for me to state an opinion regarding whether a particular case was correctly decided. If confirmed, I would fully and faithfully follow the binding precedents of the Supreme Court and the Ninth Circuit.

**i.** **Was *Hosanna-Tabor Evangelical Lutheran Church and School v. EEOC* correctly decided?**

Response: As a sitting judge and judicial nominee, it would be inappropriate for me to state an opinion regarding whether a particular case was correctly decided. If confirmed, I would fully and faithfully follow the binding precedents of the Supreme Court and the Ninth Circuit.

**j.** **Was *New York State Rifle & Pistol Association v. Bruen* correctly decided?**

Response: As a sitting judge and judicial nominee, it would be inappropriate for me to state an opinion regarding whether a particular case was correctly decided. If confirmed, I would fully and faithfully follow the binding precedents of the Supreme Court and the Ninth Circuit.

**k.** **Was *Dobbs v. Jackson Women's Health* correctly decided?**

Response: As a sitting judge and judicial nominee, it would be inappropriate for me to state an opinion regarding whether a particular case was correctly decided. If confirmed, I would fully and faithfully follow the binding precedents of the Supreme Court and the Ninth Circuit.

**22. How do you understand the difference, if any, between freedom of religion and freedom of worship?**

Response: Freedom of religion is significantly broader than the freedom of worship. The Free Exercise Clause "protects not only the right to harbor religious beliefs inwardly and secretly" but also protects "the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through the performance of (or abstention from) physical acts." *Kennedy v. Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421 (2022).

**23. Do you believe that the federal government should decriminalize possession of any drugs?**

Response: That is a question best suited for policymakers. As a sitting judge and judicial nominee, it would be inappropriate for me to comment on that topic because drug laws or amendments to drug laws could be the subject of litigation before me. In any case involving a law decriminalizing possession of drugs, I would fairly and impartially assess the case based on the evidence presented and the applicable law, including any binding precedents.

**24. Do you agree that the First Amendment is more often a tool of the powerful than the oppressed?**

Response: I have not studied whether First Amendment protections are more often applied to certain parties. As a sitting judge and judicial nominee, it would be inappropriate for me to comment on any personal views regarding the First Amendment, which is a topic of potential litigation in the courts. In any case involving the First Amendment, I would fairly and impartially assess the case based on the evidence presented and the applicable law, including any binding precedents.

**25. What legal standard would you apply in evaluating whether or not a regulation or statutory provision infringes on Second Amendment rights?**

Response: Where a statute or regulation covers individual conduct that is within the plain text of the Second Amendment's protections, the government must demonstrate that the statute or regulation is "consistent with this Nation's historical tradition of firearm regulation." *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2126 (2022).

**26. When you are considering a case, do you have a process for ensuring that you correctly understand how the law should apply, without letting personal preferences shape your view? If so, what is your process or approach?**

Response: Yes. First, I diligently review the parties' written submissions, the applicable law, and the factual record and evidence, and research any legal issues with which I am not already familiar. Second, I listen to the arguments of the attorneys and the evidence presented with an open mind. I am transparent with the attorneys regarding my initial thoughts, so that they can probe and challenge my thinking. Third, I render my decision based entirely on the law and the facts before me, and I limit my ruling to the case or controversy presented. I make a clear record of my factual findings and legal reasoning, so that if there is an appeal, the appellate court can understand the basis for my decision and assess it thoroughly.

27. **Demand Justice is a progressive organization dedicated to "restor[ing] ideological balance and legitimacy to our nation's courts."**

    a. **Has anyone associated with Demand Justice requested that you provide any services, including but not limited to research, advice, analysis, writing or giving speeches, or appearing at events or on panels?**

    Response: No.

    b. **Are you currently in contact with anyone associated with Demand Justice, including, but not limited to: Brian Fallon, Christopher Kang, Tamara Brummer, Katie O'Connor, Jen Dansereau, Faiz Shakir, and/or Stasha Rhodes?**

    Response: No.

    c. **Have you ever been in contact with anyone associated with Demand Justice, including, but not limited to: Brian Fallon, Christopher Kang, Tamara Brummer, Katie O'Connor, Jen Dansereau, Faiz Shakir, and/or Stasha Rhodes?**

    Response: No.

28. **The Alliance for Justice is a "national association of over 120 organizations, representing a broad array of groups committed to progressive values and the creation of an equitable, just, and free society."**

    a. **Has anyone associated with Alliance for Justice requested that you provide any services, including but not limited to research, advice, analysis, writing or giving speeches, or appearing at events or on panels?**

    Response: No.

    b. **Are you currently in contact with anyone associated with the Alliance for Justice, including, but not limited to: Rakim Brooks and/or Daniel L. Goldberg?**

Response: No.

   c. **Have you ever been in contact with anyone associated with Demand Justice, including, but not limited to: Rakim Brooks and/or Daniel L. Goldberg?**

Response: No.

29. **Arabella Advisors is a progressive organization founded "to provide strategic guidance for effective philanthropy" that has evolved into a "mission-driven, Certified B Corporation" to "increase their philanthropic impact."**

   a. **Has anyone associated with Arabella Advisors requested that you provide any services, including but not limited to research, advice, analysis, writing or giving speeches, or appearing at events or on panels?**

Response: No.

   b. **Please include in this answer anyone associated with Arabella's known subsidiaries the Sixteen Thirty Fund, the New Venture Fund, or any other such Arabella dark-money fund.**

Response: No.

   c. **Are you currently in contact with anyone associated with Arabella Advisors? Please include in this answer anyone associated with Arabella's known subsidiaries the Sixteen Thirty Fund, the New Venture Fund, or any other such Arabella dark-money fund that is still shrouded.**

Response: No.

   d. **Have you ever been in contact with anyone associated with Arabella Advisors? Please include in this answer anyone associated with Arabella's known subsidiaries the Sixteen Thirty Fund, the New Venture Fund, or any other such Arabella dark-money fund that is still shrouded.**

Response: No.

30. **The Open Society Foundations is a progressive organization that "work[s] to build vibrant and inclusive democracies whose governments are accountable to their citizens."**

   a. **Has anyone associated with Open Society Fund requested that you provide any services, including but not limited to research, advice, analysis, writing or giving speeches, or appearing at events or on panels?**

Response: No.

**b. Are you currently in contact with anyone associated with the Open Society Foundations?**

Response: No.

**c. Have you ever been in contact with anyone associated with the Open Society Foundations?**

Response: No.

**31. Fix the Court is a "non-partisan, 501(C)(3) organization that advocates for non-ideological 'fixes' that would make the federal courts, and primarily the U.S. Supreme Court, more open and more accountable to the American people."**

**a. Has anyone associated with Fix the Court requested that you provide any services, including but not limited to research, advice, analysis, writing or giving speeches, or appearing at events or on panels?**

Response: No.

**b. Are you currently in contact with anyone associated with Fix the Court, including but not limited to: Gabe Roth, Tyler Cooper, Dylan Hosmer-Quint and/or Mackenzie Long?**

Response: No.

**c. Have you ever been in contact with anyone associated with Fix the Court, including but not limited to: Gabe Roth, Tyler Cooper, Dylan Hosmer-Quint and/or Mackenzie Long?**

Response: No.

**32. Please describe the selection process that led to your nomination to be a United States District Judge, from beginning to end (including the circumstances that led to your nomination and the interviews in which you participated).**

Response: In February 2021, I submitted applications to the State Chairs of Senator Feinstein's and Senator Padilla's Judicial Advisory Committees for consideration for nomination to the United States District Court for the Northern District of California. On March 19, 2021, I received a request from the State Chair of Senator Feinstein's Judicial Advisory Committee to schedule an interview. On March 22, 2021, in preparation for that interview, I provided supplemental materials to Senator Feinstein's Committee, which I was informed would also be shared with Senator Padilla's Committee. On March 31, 2021, I interviewed with the State Chair of Senator Feinstein's Judicial Advisory

Committee. On April 19, 2022, I received an email communication from Senator Padilla's Counsel on Judicial Nominations requesting an interview, and spoke to him the next day. On May 20, 2022, I interviewed with attorneys from White House Counsel's Office. On May 21, 2022, the White House Counsel's Office advised that I was being considered for nomination to the United States District Court for the Northern District of California. Since May 22, 2022, I have been in contact with officials from the Office of Legal Policy at the Department of Justice. On August 1, 2022, my nomination was submitted to the Senate.

33. **During your selection process did you talk with any officials from or anyone directly associated with the organization Demand Justice, or did anyone do so on your behalf? If so, what was the nature of those discussions?**

    Response: No.

34. **During your selection process did you talk with any officials from or anyone directly associated with the American Constitution Society, or did anyone do so on your behalf?? If so, what was the nature of those discussions?**

    Response: In early 2021, I had a conversation with a friend and former colleague who was on the board of the American Constitution Society's Bay Area chapter at that time, though she is no longer on the board now. In that conversation, the subject of my application to the federal bench came up. My friend asked if she could pass along information about my application to the American Constitution Society and I agreed. I have not had any contact with the American Constitution Society regarding my application since then.

35. **During your selection process, did you talk with any officials from or anyone directly associated with Arabella Advisors, or did anyone do so on your behalf? If so, what was the nature of those discussions? Please include in this answer anyone associated with Arabella's known subsidiaries the Sixteen Thirty Fund, the New Venture Fund, or any other such Arabella dark-money fund that is still shrouded.**

    Response: No.

36. **During your selection process did you talk with any officials from or anyone directly associated with the Open Society Foundations, or did anyone do so on your behalf? If so, what was the nature of those discussions?**

    Response: No.

37. **During your selection process did you talk with any officials from or anyone directly associated with Fix the Court, or did anyone do so on your behalf? If so, what was the nature of those discussions?**

    Response: No.

**38. List the dates of all interviews or communications you had with the White House staff or the Justice Department regarding your nomination.**

Response: On May 20, 2022, I interviewed with attorneys from White House Counsel's Office. On May 21, 2022, the White House Counsel's Office advised that I was being considered for nomination to the United States District Court for the Northern District of California. Between May 22, 2022, and July 17, 2022, I communicated with the Office of Legal Policy at the Department of Justice ("OLP") concerning my vetting and background check. On July 28, 2022, White House Counsel's Office communicated to me that the White House anticipated that it would announce its intent to nominate me the next day, which it did. On August 1, 2022, my nomination was submitted to the Senate. Between August 4, 2022, and August 17, 2022, I communicated with OLP regarding my Senate Judiciary Questionnaire, the attachments, and the financial disclosure forms. Between November 2, 2022, and November 30, 2022, I communicated with the White House Counsel's Office staff and/or OLP staff regarding the confirmation hearing. I received questions for the record on December 7, 2022, from OLP. After I drafted my responses, I received feedback from OLP regarding my draft responses, finalized my responses, and then transmitted the responses back to OLP for filing.

**39. Please explain, with particularity, the process whereby you answered these questions.**

Response: I received the questions on December 7, 2022, from the Office of Legal Policy at the Department of Justice. I reviewed the questions, conducted legal research, and drafted my responses. I received feedback from the Office of Legal Policy regarding my draft responses, which I considered before finalizing my responses.

**SENATOR TED CRUZ**
**U.S. Senate Committee on the Judiciary**

**Questions for the Record for Rita Lin, nominated to be United States District Judge for the Northern District of California**

### I.   Directions

Please provide a wholly contained answer to each question. A question's answer should not cross-reference answers provided in other questions. Because a previous nominee declined to provide any response to discrete subparts of previous questions, they are listed here separately, even when one continues or expands upon the topic in the immediately previous question or relies on facts or context previously provided.

If a question asks for a yes or no answer, please provide a yes or no answer first and then provide subsequent explanation. If the answer to a yes or no question is sometimes yes and sometimes no, please state such first and then describe the circumstances giving rise to each answer.

If a question asks for a choice between two options, please begin by stating which option applies, or both, or neither, followed by any subsequent explanation.

If you disagree with the premise of a question, please answer the question as-written and then articulate both the premise about which you disagree and the basis for that disagreement.

If you lack a basis for knowing the answer to a question, please first describe what efforts you have taken to ascertain an answer to the question and then provide your tentative answer as a consequence of its reasonable investigation. If even a tentative answer is impossible at this time, please state why such an answer is impossible and what efforts you, if confirmed, or the administration or the Department, intend to take to provide an answer in the future. Please further give an estimate as to when the Committee will receive that answer.

To the extent that an answer depends on an ambiguity in the question asked, please state the ambiguity you perceive in the question, and provide multiple answers which articulate each possible reasonable interpretation of the question in light of the ambiguity.

## II.  Questions

1.  **Is racial discrimination wrong?**

    Response: Yes. Racial discrimination is illegal under a variety of federal laws. Supreme Court precedents establish that government classifications based on race are subject to strict scrutiny, and allow such classifications only when narrowly tailored to serve a compelling government interest. *See, e.g., City of Richmond v. J.A. Croson Co.*, 488 U.S. 469, 493 (1989); *Adarand Constructors, Inc. v. Pena*, 515 U.S. 200, 227 (1995).

2.  **Are there any unenumerated rights in the Constitution, as yet unarticulated by the Supreme Court that you believe can or should be identified in the future?**

    Response: The Supreme Court has held that unenumerated rights are protected under the Due Process Clause when such rights are objectively "deeply rooted in this Nation's history and tradition" and are "implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksburg*, 521 U.S. 702, 720-21 (1997). If I were confirmed and I had a case before me that sought recognition of an unenumerated right not previously recognized under binding precedent, I would apply *Glucksburg* and any other relevant precedent of the Supreme Court and the Ninth Circuit.

3.  **How would you characterize your judicial philosophy? Identify which U.S. Supreme Court Justice's philosophy out of the Warren, Burger, Rehnquist, and Roberts Courts is most analogous with yours.**

    Response: My judicial philosophy is to resolve the case or controversy before me in a manner that is diligent, open-minded, and fair. I diligently review the applicable law, factual record, evidence, and written submissions of the parties. I listen with an open mind to the parties' arguments and the evidence presented. Then, I provide the parties with a prompt decision that clearly explains my ruling and the reasoning behind it, as well as any issues that I have not decided. For each case that comes before me, I set a tone in the courtroom that treats litigants with respect and dignity and conveys my recognition of how important the case is to the individual parties.

    While I am not sufficiently familiar with the judicial philosophies of each Supreme Court Justice from those Courts to state whose is most analogous to mine, Justice Kagan was my first-year Civil Procedure professor in law school, and I have always admired her ability to explain complex legal concepts in a way that everyone can understand. In issuing my rulings, I strive to live up to her example of communicating in a clear, plainspoken way.

4.  **Please briefly describe the interpretative method known as originalism. Would you characterize yourself as an 'originalist'?**

Response: Black's Law Dictionary defines originalism as "[t]he doctrine that words of a legal instrument are to be given the meanings they had when they were adopted." *Black's Law Dictionary* (11th ed. 2019). I do not use any particular label to describe my approach to interpreting the law. If confirmed, I would follow the interpretive methods that the Supreme Court and Ninth Circuit have used to interpret the law at issue, including applying the original public meaning where appropriate. *See, e.g., N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022); *Crawford v. Washington*, 541 U.S. 36 (2004).

5. **Please briefly describe the interpretive method often referred to as living constitutionalism. Would you characterize yourself as a 'living constitutionalist'?**

Response: Black's Law Dictionary defines "living constitutionalism" as "[t]he doctrine that the Constitution should be interpreted and applied in accordance with changing circumstances and, in particular, with changes in social values." *Black's Law Dictionary* (11th ed. 2019). I believe the Constitution has an enduring fixed quality that does not change over time, though it is applied to new circumstances in our modern times. The Constitution may be changed only through the amendment process provided in Article V. If confirmed, I would follow binding Supreme Court and Ninth Circuit precedent and interpret the Constitution in the manner directed by those precedents.

6. **If you were to be presented with a constitutional issue of first impression— that is, an issue whose resolution is not controlled by binding precedent—and the original public meaning of the Constitution were clear and resolved the issue, would you be bound by that meaning?**

Response: If I were confirmed and presented with a constitutional issue of first impression whose resolution is not controlled by binding precedent, I would follow the precedents of the Supreme Court and Ninth Circuit concerning the methods of interpretation applicable to that constitutional provision, including applying the original public meaning where appropriate. *See, e.g., N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022); *Crawford v. Washington*, 541 U.S. 36 (2004).

7. **Is the public's current understanding of the Constitution or of a statute ever relevant when determining the meaning of the Constitution or a statute? If so, when?**

Response: In some circumstances, it can be. For example, in certain First Amendment contexts, the constitutional analysis includes looking to "contemporary community standards." *See, e.g., Ashcroft v. American Civil Liberties Union*, 535 U.S. 564, 574-75 (2002). I would follow binding precedents of the Supreme Court and Ninth Circuit in determining when the public's current understanding should be considered in determining the meaning of the Constitution or a statute.

8. **Do you believe the meaning of the Constitution changes over time absent changes through the Article V amendment process?**

Response: No. I believe the Constitution has an enduring fixed quality that does not change over time, though it is applied to new circumstances in our modern times. The Constitution may be changed only through the amendment process provided in Article V. If confirmed, I would follow binding Supreme Court and Ninth Circuit precedent and interpret the Constitution in the manner directed by those precedents.

9. **Is the Supreme Court's ruling in *Dobbs v. Jackson Women's Health Organization* settled law?**

    Response: Yes.

    **a. Was it correctly decided?**

    Response: As a sitting judge and judicial nominee, it would be inappropriate for me to state an opinion regarding whether a particular case was correctly decided. If confirmed, I would fully and faithfully follow the binding precedents of the Supreme Court and the Ninth Circuit.

10. **Is the Supreme Court's ruling in *New York Rifle & Pistol Association v. Bruen* settled law?**

    Response: Yes.

    **a. Was it correctly decided?**

    Response: As a sitting judge and judicial nominee, it would be inappropriate for me to state an opinion regarding whether a particular case was correctly decided. If confirmed, I would fully and faithfully follow the binding precedents of the Supreme Court and the Ninth Circuit.

11. **Is the Supreme Court's ruling in *Brown v. Board of Education* settled law?**

    Response: Yes.

    **a. Was it correctly decided?**

    Response: Yes. As a sitting judge and judicial nominee, I generally refrain from expressing an opinion regarding whether a particular case was correctly decided. However, because it is unlikely that I will ever be asked to adjudicate the constitutionality of laws requiring racial segregation, I can state my view that *Brown* was correctly decided.

12. **What sort of offenses trigger a presumption in favor of pretrial detention in the federal criminal system?**

Response: Under the Bail Reform Act, a rebuttable presumption in favor of pretrial detention arises when a person has been charged with one or more of the offenses listed in 18 U.S.C. § 3142(e)(2) and (e)(3), which includes certain offenses involving drug trafficking, firearms, terrorism, human trafficking, and minor victims.

   a. **What are the policy rationales underlying such a presumption?**

   Response: The presumption under the Bail Reform Act reflects Congress's determination that a defendant's arrest for certain offenses suggests "no condition or combination of conditions will reasonably assure the appearance of the person as required and the safety of any other person and the community." 18 U.S.C. § 1342(e).

13. **Are there identifiable limits to what government may impose—or may require—of private institutions, whether it be a religious organization like Little Sisters of the Poor or small businesses operated by observant owners?**

   Response: Yes. Under the Constitution, laws that burden the free exercise of religion are subject to strict scrutiny unless they are neutral and generally applicable. *See Church of the Lukumi Babalu Aye, Inc. v. Hialeah*, 508 U.S. 520, 531-32 (1993). If the law treats any comparable secular activity more favorably than religious exercise, or if the government acts out of hostility toward religious beliefs, strict scrutiny applies. *See Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021). To survive strict scrutiny, the law must be narrowly tailored to further a compelling government interest.

   In addition to the protections of the Constitution, the Religious Freedom Restoration Act prohibits the federal government from substantially burdening a person's free exercise of religion unless the law is the least restrictive means of furthering a compelling government interest. *See* 42 U.S.C. § 2000bb-1. The RFRA applies to organizations, including closely held for-profit corporations. *Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014).

14. **Is it ever permissible for the government to discriminate against religious organizations or religious people?**

   Response: Strict scrutiny would apply to any law that either (1) treats religious organizations or religious people non-neutrally or (2) singles them out for discrimination with rules not generally applicable to others. *Church of Lukumi Bablau Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993); *see also Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021). Such a law would be permissible only if narrowly tailored to serve a compelling government interest. "A law that targets religious conduct for distinctive treatment or advances legitimate governmental interests only against conduct with a religious motivation will survive strict scrutiny only in rare cases." *Lukumi*, 508 U.S. at 546.

15. **In *Roman Catholic Diocese of Brooklyn v. Cuomo*, the Roman Catholic Diocese of**

**Brooklyn and two Orthodox Jewish synagogues sued to block enforcement of an executive order restricting capacity at worship services within certain zones, while certain secular businesses were permitted to remain open and subjected to different restrictions in those same zones. The religious organizations claimed that this order violated their First Amendment right to free exercise of religion. Explain the U.S. Supreme Court's holding on whether the religious entity-applicants were entitled to a preliminary injunction.**

Response: The Supreme Court granted the request for a preliminary injunction. *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020). The Court concluded that the petitioners had shown a likelihood of success on the merits. The Court held that the executive order was not neutral because it "single[d] out houses of worship for especially harsh treatment," and that the executive order failed strict scrutiny because less restrictive rules could serve the government's interest in reducing COVID-19 risk. *Id.* at 67. The Court further concluded that the other requirements of a preliminary injunction were met, including irreparable harm based on the curtailment of the petitioners' free exercise rights. *Id.*

16. **Please explain the U.S. Supreme Court's holding and rationale in *Tandon v. Newsom.***

Response: In *Tandon v. Newsom*, 141 S. Ct. 1294 (2021), the Supreme Court granted a preliminary injunction against the application of California's COVID-19 restrictions to prohibit more than three households from gathering inside the home for religious worship. The Court held that "government regulations are not neutral and generally applicable, and therefore trigger strict scrutiny under the Free Exercise Clause, whenever they treat *any* comparable secular activity more favorably than religious exercise." *Id.* at 1296. The Court found that California allowed secular businesses to assemble more people indoors than comparable at-home religious gatherings, even though the Court found that the secular activities did not pose any lesser health threat than the at-home religious activities. *Id.* at 1297. The Court therefore applied strict scrutiny, and found that California failed to show that its restrictions were narrowly tailored to a compelling government interest. *Id.*

17. **Do Americans have the right to their religious beliefs outside the walls of their houses of worship and homes?**

Response: Yes.

18. **Explain your understanding of the U.S. Supreme Court's holding in *Masterpiece Cakeshop v. Colorado Civil Rights Commission.***

Response: The Supreme Court concluded that the Colorado Civil Rights Commission violated a baker's free exercise rights when it treated his refusal to provide services for a same-sex wedding with a "clear and impermissible hostility toward the sincere religious

beliefs that motivated his objection." *Masterpiece Cakeshop v. Colorado Civil Rights Commission*, 138 S. Ct. 1719, 1729 (2018).

19. **Under existing doctrine, are an individual's religious beliefs protected if they are contrary to the teaching of the faith tradition to which they belong?**

    Response: Yes, so long as those religious beliefs are sincerely held. "[I]it is not within the judicial function and judicial competence to inquire whether the petitioner or his fellow worker more correctly perceived the commands of their common faith. Court are not arbiters of scriptural interpretation." *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 716 (1981).

    a. **Are there unlimited interpretations of religious and/or church doctrine that can be legally recognized by courts?**

       Response: Please see my response to Question 19.

    b. **Can courts decide that anything could constitute an acceptable "view" or "interpretation" of religious and/or church doctrine?**

       Response: Please see my response to Question 19.

    c. **Is it the official position of the Catholic Church that abortion is acceptable and morally righteous?**

       Response: It is inappropriate for me to opine on the official position of any religion on any topic. That is a question for religious leaders.

20. **In *Our Lady of Guadalupe School v. Morrissey-Berru*, the U.S. Supreme Court reversed the Ninth Circuit and held that the First Amendment's Religion Clauses foreclose the adjudication of employment-discrimination claims for the Catholic school teachers in the case. Explain your understanding of the Court's holding and reasoning in the case.**

    Response: The Supreme Court has recognized a "ministerial exception" that prevents courts from hearing employment disputes involving those holding certain important positions with churches and other religious institutions. In *Our Lady of Guadalupe School v. Morrissey-Berru*, 140 S. Ct. 2049 (2020), the Supreme Court held that the ministerial exception applied to two teachers at a private Catholic school whose duties included "educating and forming students in the Catholic faith." *Id.* at 2069. The Court found that this role "lay at the core of the mission of the schools where they taught," and that "judicial intervention into disputes between the school and the teacher threatens the school's independence in a way that the First Amendment does not allow." *Id.* The Court therefore found that the ministerial exception precluded the courts from hearing the teachers' employment discrimination claims. *Id.*

21.    In *Fulton v. City of Philadelphia*, the U.S. Supreme Court was asked to decide
       whether Philadelphia's refusal to contract with Catholic Social Services to provide
       foster care, unless it agrees to certify same-sex couples as foster parents, violates
       the Free Exercise Clause of the First Amendment. Explain the Court's holding in
       the case.

       Response: The Supreme Court held that Philadelphia's refusal to contract with Catholic
       Social Services was not based on a generally applicable rule, because the city ordinance
       granted city officials discretion to waive the provisions at issue. *Fulton v. City of
       Pennsylvania*, 141 S. Ct. 1868, 1878 (2021). Strict scrutiny therefore applied. The Court
       found that there was "no compelling reason" for Philadelphia's decision to deny the
       exception to Catholic Social Services while making the exception available to others, and
       therefore found Philadelphia's refusal to be in violation of the Free Exercise Clause. *Id.* at
       1881-82.

22.    In *Carson v. Makin*, the U.S. Supreme Court struck down Maine's tuition
       assistance program because it discriminated against religious schools and thus
       undermined Mainers' Free Exercise rights. Explain your understanding of the
       Court's holding and reasoning in the case.

       Response: The Supreme Court held that Maine's tuition assistance program violated the
       Free Exercise Clause by limiting such assistance to "non-sectarian" schools. *Carson v.
       Makin*, 142 S. Ct. 1987, 1997 (2022). The Court found that Maine's program excluded
       religious schools from a public benefit based on their religious nature, which penalized
       free exercise and triggered strict scrutiny. *Id.* The Court further held Maine's program
       failed strict scrutiny because excluding religious schools from the tuition assistance
       program was not required by the Establishment Clause, and was therefore not a
       compelling government interest. *Id.*

23.    Please explain your understanding of the U.S. Supreme Court's holding and
       reasoning in *Kennedy v. Bremerton School District*.

       Response:  The Supreme Court held that Bremerton School District violated the free
       speech and free exercise rights of a high school football coach by disciplining him for
       engaging in a quiet prayer on the football field after games. *Kennedy v. Bremerton School
       District*, 142 S. Ct. 2407 (2022). The Court rejected the school's argument that it was
       required to restrict the coach's First Amendment rights in order to comply with the
       Establishment Clause, concluding that the coach's actions were his own private
       expression and not undertaken as a spokesman for the school. *Id.* at 2429.

24.    Explain your understanding of Justice Gorsuch's concurrence in the U.S. Supreme
       Court's decision to grant certiorari and vacate the lower court's decision in *Mast
       v. Fillmore County*.

       Response: In *Mast v. Fillmore County*, 141 S. Ct. 2430 (2021), the Supreme Court
       vacated the judgment and remanded the case back to the Minnesota courts for further

proceedings in light of *Fulton v. City of Pennsylvania*, 141 S. Ct. 1868, 1878 (2021). Justice Gorsuch wrote a separate concurrence noting that the lower courts had incorrectly applied the Religious Land Use and Institutionalized Persons Act. *Mast*, 141 S. Ct. at 2432 (Gorsuch, J., concurring). The issue in *Mast* was an ordinance requiring a modern septic system that was contrary to the Swartzentruber Amish's faith. Justice Gorsuch found that the lower court had erred in treating "the County's *general* interest in sanitation regulations as 'compelling' without reference to the *specific* application of those rules to *this* community." *Id.* "Courts cannot rely on broadly formulated governmental interests, but must scrutinize the asserted harm of granting specific exemptions to particular religious claimants." *Id.* (internal quotation marks and alterations omitted).

25. **Some people claim that Title 18, Section 1507 of the U.S. Code should not be interpreted broadly so that it does not infringe upon a person's First Amendment right to peaceably assemble. How would you interpret the statute in the context of the protests in front the homes of U.S. Supreme Court Justices following the *Dobbs* leak?**

    Response: I am unaware of any Supreme Court decision analyzing the interaction between the First Amendment right to assembly and 18 U.S.C. § 1507. The Supreme Court upheld a potentially analogous state statute in Louisiana against a facial constitutional challenge in *Cox v. Louisiana*, 379 U.S. 559, 564 (1965). As a sitting judge and judicial nominee, it would be inappropriate for me to comment further on the factual scenario described in the question. If confirmed, I would fully and faithfully apply any precedents of the Supreme Court and Ninth Circuit to any case alleging a violation of 18 U.S.C. § 1507, and would analyze the case based on relevant or analogous precedents and the factual record.

26. **Would it be appropriate for the court to provide its employees trainings which include the following:**

    a. **One race or sex is inherently superior to another race or sex;**

    b. **An individual, by virtue of his or her race or sex, is inherently racist, sexist, or oppressive;**

    c. **An individual should be discriminated against or receive adverse treatment solely or partly because of his or her race or sex; or**

    d. **Meritocracy or related values such as work ethic are racist or sexist?**

    Response: No.

27. **Will you commit that your court, so far as you have a say, will not provide trainings that teach that meritocracy, or related values such as work ethic and self-reliance, are racist or sexist?**

Response: I am not aware of the court providing any such trainings, and if confirmed, I would not support providing such trainings.

**28. Will you commit that you will not engage in racial discrimination when selecting and hiring law clerks and other staff, should you be confirmed?**

Response: Yes. If I am confirmed, I will select and hire law clerks and other staff in compliance with all applicable federal laws prohibiting racial discrimination in hiring.

**29. Is it appropriate to consider skin color or sex when making a political appointment? Is it constitutional?**

Response: The Constitution delegates the appointment power to the President, with the advice and consent of the Senate. When carrying out those duties, the executive and legislative branches must act in compliance with the Constitution and any applicable federal laws. As a sitting judge and a judicial nominee, it would be inappropriate for me to express an opinion on the legality or appropriateness of the consideration of race or sex in making political appointments.

**30. Is the criminal justice system systemically racist?**

Response: Systemic issues are for policymakers to address. As a judge, my role is to decide the individual case or controversy before me. If I were presented with a case in which there were allegations of racial discrimination, I would assess it based on the factual record and evidence in the case, as well as the applicable law.

**31. President Biden has created a commission to advise him on reforming the U.S. Supreme Court. Do you believe that Congress should increase, or decrease, the number of justices on the U.S. Supreme Court? Please explain.**

Response: The Constitution delegates to Congress the power to determine the size of the Supreme Court. As a sitting judge and a judicial nominee, it would be inappropriate for me to express an opinion on the issue. I will faithfully apply all precedents of the Supreme Court regardless of its size.

**32. In your opinion, are any currently sitting members of the U.S. Supreme Court illegitimate?**

Response: No.

**33. What do you understand to be the original public meaning of the Second Amendment?**

Response: The Second Amendment "protect[s] an individual right to armed self-defense." *New York Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2128 (2022).

34. **What kinds of restrictions on the Right to Bear Arms do you understand to be prohibited by the U.S. Supreme Court's decisions in *United States v. Heller*, *McDonald v. Chicago*, and *New York State Rifle & Pistol Association v. Bruen*?**

Response: Where the Second Amendment's text covers the conduct at issue, the government must demonstrate that its regulation of that conduct is "consistent with this Nation's historical tradition of firearm regulation." *New York Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2126 (2022).

35. **Is the ability to own a firearm a personal civil right?**

Response: Yes. The Second Amendment protects "an individual right to keep and bear arms." *District of Columbia v. Heller*, 554 U.S. 570, 595 (2008); *see also McDonald v. Chicago*, 561 U.S. 742 (2010).

36. **Does the right to own a firearm receive less protection than the other individual rights specifically enumerated in the Constitution?**

Response: No. The interpretation of the Second Amendment "accords with how we protect other constitutional rights." *New York Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111, 2130 (2022).

37. **Does the right to own a firearm receive less protection than the right to vote under the Constitution?**

Response: The right to own a firearm is a fundamental right, like the right to vote. *McDonald v. Chicago*, 561 U.S. 742 (2010). I am aware of no authority suggesting that the right to own a firearm is entitled to less protection than the right to vote.

38. **Is it appropriate for the executive under the Constitution to refuse to enforce a law, absent constitutional concerns? Please explain.**

Response: The Supreme Court held that the executive branch generally has "absolute discretion" to decide whether to initiate civil or criminal enforcement proceedings. *Heckler v. Chaney*, 470 U.S. 821, 831 (1985). As a sitting judge and a judicial nominee, it would be inappropriate for me to comment further, because cases are currently pending in the courts concerning the scope of the Executive's authority to decline to enforce certain laws.

39. **Explain your understanding of what distinguishes an act of mere 'prosecutorial discretion' from that of a substantive administrative rule change.**

Response: Black's Law Dictionary defines "prosecutorial discretion" as a "prosecutor's power to choose from the options available in a criminal case, such as filing charges, prosecuting, not prosecuting, plea-bargaining, and recommending a sentence to the

court." *Black's Law Dictionary* (11th ed. 2019). In the administrative law context, a "substantive rule" (also known as a "legislative rule") is an "administrative rule created by an agency's exercise of delegated quasi-legislative authority" and "has the force of law." *Black's Law Dictionary* (11th ed. 2019).

**40.  Does the President have the authority to abolish the death penalty?**

Response: No. State legislatures enacted state death penalty statutes, and the President lacks the authority to invalidate or abolish state laws. Likewise, for federal offenses, Congress enacted the federal death penalty statute, 18 U.S.C. § 3591 *et seq.*, and the President lacks the authority to invalidate or abolish federal laws.

**41.  Explain the U.S. Supreme Court's holding on the application to vacate stay in *Alabama Association of Realtors v. HHS*.**

Response: The Supreme Court held that the Centers for Disease Control and Prevention (CDC) lacked the statutory authority to issue a nationwide moratorium on evictions based on the COVID-19 pandemic. *Alabama Association of Realtors v. HHS*, 141 S. Ct. 2485 (2021). The Court concluded that it would have expected "Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance," and that there was no such clear statement in the Public Health and Service Act. *Id.* at 2489 (internal citations and quotations omitted). The Court vacated the stay on the lower court's ruling, finding that applicants were "virtually certain to succeed on the merits of their argument" that the CDC acted beyond its authority. *Id.*

**42.  You argued *Golinski v. United States Office of Personnel Management*, one of the cases that challenged the Defense of Marriage Act. Leading up to oral argument in the case, you commented publicly, "the demise of this discriminatory statue is long overdue."**

**a.  Would you describe those in Congress who voted for the law, and President Bill Clinton, who signed it into law, as seeking to discriminate?**

Response: No. The Supreme Court held in *United States v. Windsor*, 577 U.S. 744 (2013), that the Defense of Marriage Act had the "purpose and effect" of discriminating against same-sex marriages in a manner that violated equal protection and due process. *Id.* at 770. While I was in private practice, my law firm represented Ms. Golinski, and I worked on that representation. As Ms. Golinski noted in her arguments in that case, the fact that a law fails constitutional scrutiny does not mean that the individual legislators who voted for the law were motivated by malice or a hostile intent. The district court made the same point in its ruling in favor of Ms. Golinski. *See Golinski v. U.S. Off. of Pers. Mgmt.*, 824 F. Supp. 2d 968, 1002 (N.D. Cal. 2012).

**43.  You participated in the preparation of the San Francisco Superior Court's statement on equity and justice. The statement made the following claims.**

**"persistent systemic racism continues to this day, and there is much work left for courts to do to make racial equity and inclusion a lived reality for all."**

a. **Is the United States a systemically racist country?**

Response: I understand the term "systemic racism" to refer to patterns of racial discrimination. America is the best country in the world, and my parents immigrated here because it is a beacon of freedom and opportunity. Unfortunately, incidents of racial discrimination and racially motivated hate crimes do persist in modern times in our country, and can occur in patterns. I do not have data on the frequency or prevalence of those patterns. When such patterns arise, it is important for those issues to be discussed and for policymakers to consider how to address them. As a judge, I am focused on the individual case or controversy before me, rather than on larger systemic issues. My focus is on treating everyone in my courtroom fairly and without bias, regardless of their background.

b. **What is the role of the courts to make racial equity and inclusion a "lived reality" for all?**

Response: It is vitally important that courts stand for the core constitutional principle of equal justice under law. Courts have a responsibility to set a tone that is inclusive and inviting to those of all backgrounds. Many people from all walks of life arrive at court with fears or worries about how our justice system will treat them. I often have victims and their family members, as well as defendants and their family members, in my courtroom. I make every effort to show those who appear in my courtroom that I recognize how important the case is to them and that I see, hear, and respect them when it is their turn to address me, regardless of their background.

c. **How would we measure the end of systemic racism?**

Response: That is a question for policymakers and social scientists. If presented with a case involving a question of measuring whether a pattern of racial discrimination was occurring, I would evaluate the case based on the individual factual record and any expert testimony or other evidence presented, as well as the applicable law.

d. **Would it be complete equality of outcome among all racial groups?**

Response: Please see my response to Question 43(c).

44. **You also signed a document protesting the California Supreme Court Committee on Judicial Ethics Opinions decision that "discouraged participation" by California judges from participating in public demonstrations, concluding that "it is fraught with ethical risk." You were a signatory to a document that argued "Judges are not members of a legal monastery who should be sequestered from engaging their community on critical issues of law, equity and equality."**

a. **How can judges be neutral arbiters of law when they engage in public protests?**

Response: Judges can and should publicly support the core constitutional principle that all people are equal under the law, which is a principle beyond legal dispute. An example provided in the article is a judge holding the hand of her schoolchild in a school march supporting general principles of equality and justice. The article onto which I signed reflected the view that such actions enhance, rather than detract from, public confidence in the judiciary by reaffirming the judicial commitment to equal justice. At the same time, as noted in the cited article, to preserve their impartiality, judges must be very careful in any public setting and may not publicly comment on or attend protests supporting positions on issues that could come before them or other courts.

b. **Are there ethical concerns with judges participating in contentious debates?**

Response: Yes, depending on the topic of the debate. Among other ethical restrictions, judges may not make public statements concerning issues that could come before them or other courts, and may not comment on politics.

c. **In your opinion, would it proper for a judge to engage in a protest concerning a political cause, only to oversee a suit regarding that same cause the following day?**

Response: No.

45. **You authored a number of college writings that are quite troubling. In a piece published in *Perspective* in December 1998 you wrote, "felt screwed over by a religious right that perverted my faith in support of bigotry, a religious right whose homophobic views tacitly encouraged its followers to violate the most sacred Christian law—to love others as we love our God." You also stated, "The problem with the Christian Coalition is not that they are Bible-thumpers (there are personal beliefs that often result from religious experiences) but that they're bigots."**

a. **Do you still believe people on the religious right are bigots?**

Response: No. I wrote that when I was 20 years old, in an emotional reaction to the death of Matthew Shepard, and it reflected my limited life experience. I'm now more than 24 years older than I was when I wrote those words, and I am proud to have friends, colleagues, and associates who have a wide range of religious, political, and personal views. And, in general, my adult life over the last two decades as a wife, mother, and member of our local church has enriched my understanding of the human experience, as has my professional career as a civil litigator, federal prosecutor, and judge. In my four years as a judge, I have adjudicated all cases before me without bias of any kind, and I would do the same on the federal bench, if confirmed.

**b. How old were you when you wrote this article?**

   Response: I was 20 years old.

   **c. In *Obgergefell v. Hodges*, Justice Kennedy wrote, "Many who deem same-sex marriage to be wrong reach that conclusion based on decent and honorable religious or philosophical premises, and neither they nor their beliefs are disparaged here." In your opinion, are people who hold views opposing same-sex marriage decent and honorable?**

   Response: I agree with Justice Kennedy's statement quoted above.

46. **You also authored a piece in the January 1997 issue of *Perspective* entitled *"The New Red Scare: Western Prejudices Against Islamic Fundamentalism"* which caused to you to issue a subsequent apology editorial in *The Harvard Crimson* on February 5, 1997 for implying "that all Orthodox Jews are terrorists or religious lunatics."**

   **a. Was your article anti-Semitic?**

   Response: No. In my letter to editor in the *Crimson*, I stated that my *Perspective* article had been misinterpreted to imply that I "somehow believe[d]" the above claims when "I meant nothing of the sort."

   In general, I no longer agree with the points that I made in the January 1997 *Perspective* article, which reflected a juvenile attempt to draw false equivalencies between movements or events that are clearly not the same. I wrote that article 26 years ago, when I was 18 years old and in my freshman year of college. It was before I went to law school or had any type of professional career and more than twenty years before I became a judge. In my work as a federal prosecutor, I had the honor and privilege of representing the United States in investigations that concerned national security. I am proud of my work supporting and defending our country in that way. As a judge, if I were confronted with a case alleging terrorist acts or material support for terrorism, I would judge it fairly, impartially, and without bias, based on the factual record, the evidence presented, and the binding legal precedents.

   **b. How old were you when you wrote that article?**

   Response: I was 18 years old.

**Senator Ben Sasse**
**Questions for the Record for Rita F. Lin**
**U.S. Senate Committee on the Judiciary**
**Hearing: "Nominations"**
**November 30, 2022**

1. **Since becoming a legal adult, have you participated in any events at which you or other participants called into question the legitimacy of the United States Constitution?**

   Response: No.

2. **How would you describe your judicial philosophy?**

   Response: My judicial philosophy is to resolve the case or controversy before me in a manner that is diligent, open-minded, and fair. I diligently review the applicable law, factual record, evidence, and written submissions of the parties. I listen with an open mind to the parties' arguments and the evidence presented. Then, I provide the parties with a prompt decision that clearly explains my ruling and the reasoning behind it, as well as any issues that I have not decided. For each case that comes before me, I set a tone in the courtroom that treats litigants with respect and dignity and conveys my recognition of how important the case is to the individual parties.

3. **Would you describe yourself as an originalist?**

   Response: I do not use any particular label to describe my approach to interpreting the law. If confirmed, I would follow the interpretive methods that the Supreme Court and Ninth Circuit have used to interpret the law at issue, including the application of the law's original public meaning where appropriate. *See, e.g., N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022); *Crawford v. Washington*, 541 U.S. 36 (2004).

4. **Would you describe yourself as a textualist?**

   Response: I do not use any particular label to describe my approach to interpreting the law. If confirmed, my approach to interpreting legal texts would begin with the text itself and any applicable Supreme Court and Ninth Circuit precedents. If the meaning of the text is clear and unambiguous, my analysis would stop there, unless dictated otherwise by precedent.

5. **Do you believe the Constitution is a "living" document whose precise meaning can change over time? Why or why not?**

   Response: I believe the Constitution has an enduring fixed quality that does not change over time, though it is applied to new circumstances in our modern times. The Constitution may be changed only through the amendment process provided in Article V.

6. **Please name the Supreme Court Justice or Justices appointed since January 20, 1953 whose jurisprudence you admire the most and explain why.**

   Response: While I am not sufficiently familiar with the jurisprudence of each Supreme Court Justice over that time period to identify whose I most admire, Justice Kagan was my first-year Civil Procedure professor in law school, and I have always admired her ability to explain complex legal concepts in a way that everyone can understand. In issuing my rulings, I strive to live up to her example of communicating in a clear, plainspoken way.

7. **In the absence of controlling Supreme Court precedent, what substantive factors determine whether it is appropriate for appellate court to reaffirm its own precedent that conflicts with the original public meaning of the Constitution?**

   Response: If there is no controlling Supreme Court precedent, an appellate court cannot overturn its own precedent unless the court is sitting *en banc* or the precedent is "clearly irreconcilable" with an intervening decision of the Supreme Court. *See* Fed. R. App. P. 35(a)(1); *Miller v. Gammie*, 335 F.3d 889, 892-93 (9th Cir. 2003) (en banc).

8. **In the absence of controlling Supreme Court precedent, what substantive factors determine whether it is appropriate for an appellate court to reaffirm its own precedent that conflicts with the original public meaning of the text of a statute?**

   Response: Please see my response to Question 7.

9. **What role should extrinsic factors not included within the text of a statute, especially legislative history and general principles of justice, play in statutory interpretation?**

   Response: My interpretation of a statute begins with the statutory text itself and any binding precedents interpreting that text. If the meaning of the text is clear and unambiguous, my analysis stops there. If the text is ambiguous, and there is no binding precedent concerning the correct interpretation, I would employ canons of statutory construction and consult binding precedents interpreting analogous texts. If that did not resolve the issue, I would consult persuasive authority from other circuits, and I would employ the methods of interpretation used by the Supreme Court and Ninth Circuit to interpret the text at issue or similar texts, which can include legislative history. General principles of justice would generally not play a role in statutory interpretation, beyond the framework described above.

10. **If defendants of a particular minority group receive on average longer sentences for a particular crime than do defendants of other racial or ethnic groups, should that disparity factor into the sentencing of an individual defendant? If so, how so?**

Response: No. A defendant's racial or ethnic group is not a factor that may be considered in sentencing under 18 U.S.C. § 3553(a).

1. **Then-Judge Ketanji Brown Jackson made a practice of refusing to apply several enhancements in the Sentencing Guidelines when sentencing child pornography offenders. Please explain whether you agree with each of the following Guidelines enhancements and whether, if you are confirmed, you intend to use them to increase the sentences imposed on child pornography offenders.**

   a. **The enhancement for material that involves a prepubescent minor or a minor who had not attained the age of 12 years**

      Response: Sentencing is a highly individualized, fact-specific determination. If confirmed, I would apply binding precedents of the Supreme Court and the Ninth Circuit regarding sentencing, and I would consider the factors outlined in 18 U.S.C. § 3553(a); the Sentencing Guidelines calculation; the recommendations of the prosecution, defense, and Probation Office; any statements from victims; any statement by the defendant; and the facts and circumstances of the individual case.

   b. **The enhancement for material that portrays sadistic or masochistic conduct or other depictions of violence**

      Response: Please see my response to Question 1(a).

   c. **The enhancement for offenses involving the use of a computer**

      Response: Please see my response to Question 1(a).

   d. **The enhancements for the number of images involved**

      Response: Please see my response to Question 1(a).

2. **Federal law currently has a higher penalty for distribution or receipt of child pornography than for possession. It's 5-20 years for receipt or distribution. It's 0-10 years for possession. The Commission has recommended that Congress align those penalties, and I have a bill to do so.**

   a. **Do you agree that the penalties should be aligned?**

      Response: It is Congress's decision what penalties should apply to crimes. As a sitting judge and a judicial nominee, it would be inappropriate to express an opinion on my personal policy preferences about what laws Congress should

pass. If confirmed, I will issue sentences in accordance with the laws enacted by Congress and the applicable binding precedents.

    **b. If so, do you think the penalty for possession should be increased, receipt and distribution decreased, or a mix?**

    Response: Please see my response to Question 2(a).

    **c. If an offender before you is charged only with possession even though uncontested evidence shows the offender also committed the crime of receiving child pornography, will you aim to sentence the offender to between 5 and 10 years?**

    Response: If confirmed, to determine whether to consider uncharged criminal conduct in sentencing, I would analyze whether it is "relevant conduct" within Section 1B1.3 of the United States Sentencing Guidelines Manual, and apply any binding precedents of the Supreme Court and the Ninth Circuit on that issue. With respect to what the ultimate sentence would be, please see my response to Question 1(a).

3. **Justice Marshall famously described his philosophy as "You do what you think is right and let the law catch up."**

    **a. Do you agree with that philosophy?**

    Response: No.

    **b. If not, do you think it is a violation of the judicial oath to hold that philosophy?**

    Response: I cannot speculate about Justice Marshall's philosophy or his understanding of the judicial oath. I believe that a federal judge is duty-bound to apply the law, including binding precedents, in every case regardless of one's own policy preferences, and that is what I would do if confirmed.

4. **Do you believe that the Supreme Court's ruling in *Dobbs* v. *Jackson Women's Health Organization* is settled law?**

Response: Yes.

5. **What is the standard for each kind of abstention in the court to which you have been nominated?**

Response: The most common forms of abstention are discussed below.

*Pullman* abstention is appropriate if all three of the following criteria are met: "(1) the federal plaintiff's complaint must require resolution of a sensitive question of federal constitutional law; (2) that question must be susceptible to being mooted or narrowed by a definitive ruling on state law issues; and (3) the possibly determinative state law must be unclear." *United States v. Morros*, 268 F.3d 695, 703-04 (9th Cir. 2001); *see also R.R. Comm'n of Tex. v. Pullman*, 312 U.S. 496 (1941). In those situations, *Pullman* requires the federal court to abstain from deciding the federal issue while the parties seek a determination from the state court as to the state law issues. *Id.*

*Younger* abstention applies where a federal suit would interfere with ongoing state proceedings. Such abstention is appropriate where (1) there is an ongoing state judicial proceeding; (2) the proceeding implicates important state interests; (3) there is an adequate opportunity in the state proceedings to raise constitutional challenges; and (4) the requested relief seeks to enjoin or has the practical effect of enjoining the ongoing state judicial proceeding. *Arevalo v. Hennessy*, 882 F.3d 763, 765 (9th Cir. 2018); *see also Younger v. Harris*, 401 U.S. 37 (1971).

*Burford* abstention applies upon a showing "(1) that the state has concentrated suits involving the local issue in a particular [state] court; (2) the federal issues are not easily separable from complicated state law issues with which the state courts may have special competence; and (3) that federal review might disrupt state efforts to establish a coherent policy." *Tucker v. First Maryland Sav. & Loan, Inc.*, 942 F.2d 1401, 1405 (9th Cir. 1991); *see also Burford v. Sun Oil Co.*, 319 U.S. 315, 332 (1943).

*Colorado River* abstention applies when a federal court abstains in favor of a concurrent state court proceeding due to considerations of "wise judicial administration, giving regard to conservation of judicial resources and comprehensive disposition of litigation." *Colo. River Water Conservation Dist. v. United States*, 424 U.S. 800, 818 (1976). The Ninth Circuit has articulated eight factors that the federal court should consider in deciding whether to abstain under *Colorado River*: "(1) which court first assumed jurisdiction over any property at stake; (2) the inconvenience of the federal forum; (3) the desire to avoid piecemeal litigation; (4) the order in which the forums obtained jurisdiction; (5) whether federal law or state law provides the rule of decision on the merits; (6) whether the state court proceedings can adequately protect the rights of the federal litigants; (7) the desire to avoid forum shopping; and (8) whether the state court proceedings will resolve all issues before the federal court." *Seneca Ins. Co. v. Strange Land*, 862 F.3d 835, 841-42 (9th Cir. 2017).

Although not formally a doctrine of abstention, the *Rooker-Feldman* doctrine refers to the related concept that the lower federal courts do not have subject matter jurisdiction to hear cases that are effectively appeals from final state court judgments. Accordingly, federal district courts may not adjudicate claims that are "inextricably intertwined" with those already resolved by the state court. *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983). *Rooker-Feldman* applies "when the federal plaintiff both asserts as her injury legal error or errors by the state court *and* seeks as her remedy relief

from the state court judgment." *Kougasian v. TMSL, Inc.*, 359 F.3d 1136, 1140 (9th Cir. 2004).

6. **Have you ever worked on a legal case or representation in which you opposed a party's religious liberty claim?**

   Response: No.

   a. **If so, please describe the nature of the representation and the extent of your involvement. Please also include citations or reference to the cases, as appropriate.**

      Response: Not applicable.

7. **What role should the original public meaning of the Constitution's text play in the courts' interpretation of its provisions?**

   Response: If confirmed, I will follow fully and faithfully all Supreme Court and Ninth Circuit precedent as to the interpretive tools required to analyze constitutional provisions, including applying the original public meaning where appropriate. *See, e.g., N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022); *Crawford v. Washington*, 541 U.S. 36 (2004).

8. **Do you consider legislative history when interpreting legal texts?**

   Response: Sometimes. My interpretation of any legal text begins with the text itself and any binding precedents interpreting that text. If the meaning of the text is clear and unambiguous, my analysis stops there. If the text is ambiguous, and there is no binding precedent concerning the correct interpretation, I would employ canons of statutory construction and consult binding precedents interpreting analogous texts. If that did not resolve the issue, I would consult persuasive authority from other circuits, and I would employ the methods of interpretation used by the Supreme Court and Ninth Circuit to interpret the text at issue or similar texts, which can include legislative history.

   a. **If so, do you treat all legislative history the same or do you believe some legislative history is more probative of legislative intent than others?**

      Response: In any analysis of legislative history, I would follow Supreme Court and Ninth Circuit precedent to determine what legislative history should be consulted and the relative weight of that legislative history. For example, the Supreme Court has held that committee reports are a better source to determine legislative intent than individual legislators' floor statements. *See Garcia v. United States*, 469 U.S. 70 (1984). The Supreme Court has also cautioned that failed legislative proposals are "particularly dangerous" to rely upon and are not generally probative of legislative intent.

*United States v. Craft*, 535 U.S. 274, 285 (2002). In general, the text of the statute is the best evidence of what the legislature intended.

**b. When, if ever, is it appropriate to consult the laws of foreign nations when interpreting the provisions of the U.S. Constitution?**

Response: Our constitution is a domestic document, and I would rely upon domestic law to interpret it, unless Supreme Court or Ninth Circuit precedents counseled reliance upon foreign law in the context of the constitutional provision at issue.

9. **Under the precedents of the Supreme Court and U.S. Court of Appeals for the Circuit to which you have been nominated, what is the legal standard that applies to a claim that an execution protocol violates the Eighth Amendment's prohibition on cruel and unusual punishment?**

Response: The petitioner bears the burden (1) to show that the method of execution presents a "substantial risk of serious harm," which refers to "severe pain over and above death itself," and (2) to identify an alternative method that is "feasible, readily implemented, and in fact significantly reduce[s]" the risk of harm involved. *Nance v. Ward*, 142 S. Ct. 2214, 2220 (2022) (*quoting Glossip v. Gross*, 576 U.S. 863, 877 (2015)) (alterations in original).

10. **Under the Supreme Court's holding in *Glossip v. Gross*, 135 S. Ct. 824 (2015), is a petitioner required to establish the availability of a "known and available alternative method" that has a lower risk of pain in order to succeed on a claim against an execution protocol under the Eighth Amendment?**

Response: Yes.

11. **Has the Supreme Court or the U.S. Court of Appeals for the Circuit to which you have been nominated ever recognized a constitutional right to DNA analysis for habeas corpus petitioners in order to prove their innocence of their convicted crime?**

Response: The Supreme Court has held that substantive due process does not protect a "freestanding right to DNA evidence untethered from the [defendant's] liberty interests." *Dist. Attorney's Office for the Third Judicial Dist. v. Osborne*, 557 U.S. 52 (2009). The Supreme Court has further held that procedural due process is violated only when state procedures regarding postconviction access to DNA offend "some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental" or transgress "any recognized principle of fundamental fairness in operation." *Id.* at 69; *see also Morrison v. Peterson*, 809 F.3d 1059 (9th Cir. 2015) (applying *Osborne*).

12. **Do you have any doubt about your ability to consider cases in which the government seeks the death penalty, or habeas corpus petitions for relief from a sentence of death, fairly and objectively?**

Response: No.

13. **Under Supreme Court and U.S. Court of Appeals for the Circuit to which you have been nominated, what is the legal standard used to evaluate a claim that a facially neutral state governmental action is a substantial burden on the free exercise of religion? Please cite any cases you believe would be binding precedent.**

Response: Strict scrutiny applies to any government burden placed on the free exercise of religion unless the government regulation is a neutral and generally applicable. *Empl. Div., Dep't of Hum. Res. of Ore. v. Smith*, 494 U.S. 872 (1990). A law is not neutral and generally applicable if:

> (1) the object or purpose of the law is suppression of religion or religious conduct, *see Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 533 (1993); *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020); *Kennedy v. Bremerton School District*, 142 S. Ct. 2407 (2022); *and Carson v. Makin*, 142 S. Ct. 1987, 1997 (2022);

> (2) the government acts in a manner hostile toward religious belief, *Masterpiece Cakeshop, Ltd. v. Colorado Civil Rights Comm'n*, 138 S. Ct. 1719 (2018);

> (3) the law is subject to discretionary individualized exemptions, *Fulton v. City of Philadelphia*, 141 S. Ct. 1868, 1878 (2021); or

> (4) the law treats any comparable secular activity more favorably than religious exercise, *Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021).

To survive strict scrutiny, the government bears the burden to show that its regulation is narrowly tailored to serve a compelling government interest.

14. **Under Supreme Court and U.S. Court of Appeals for the Circuit to which you have been nominated, what is the legal standard used to evaluate a claim that a state governmental action discriminates against a religious group or religious belief? Please cite any cases you believe would be binding precedent.**

Response: Strict scrutiny would apply to any law that either (1) treats religious organizations or religious people non-neutrally or (2) singles them out for discrimination with rules not generally applicable to others. *Church of Lukumi Bablau Aye, Inc. v. City of Hialeah*, 508 U.S. 520, 531 (1993); *see also Tandon v. Newsom*, 141 S. Ct. 1294, 1296 (2021). Such a law would be permissible only if narrowly tailored to serve a compelling government interest. "A law that targets religious conduct for distinctive treatment or

advances legitimate governmental interests only against conduct with a religious motivation will survive strict scrutiny only in rare cases." *Lukumi*, 508 U.S. at 546. Please see my response to Question 13 for additional applicable precedents.

**15. What is the standard in the U.S. Court of Appeals for the Circuit to which you have been nominated for evaluating whether a person's religious belief is held sincerely?**

Response: The Ninth Circuit has held that religious beliefs are held sincerely, and thus within the protection of the Free Exercise Clause, so long as they are not "obviously shams and absurdities" or "patently devoid of religious sincerity." *Malik v. Brown*, 16 F.3d 330, 333 (9th Cir. 1994). Courts are not to rely on "a judicial perception of the particular belief or practice in question," and "religious beliefs need not be acceptable, logical, consistent, or comprehensible to others in order to merit First Amendment protection." *Thomas v. Rev. Bd. of Ind. Emp. Sec. Div.*, 450 U.S. 707, 714 (1981).

**16. The Second Amendment provides that, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."**

    **a. What is your understanding of the Supreme Court's holding in *District of Columbia v. Heller*, 554 U.S. 570 (2008)?**

    Response: The Supreme Court held in *District of Columbia v. Heller* that the Second Amendment guarantees an "individual right to possess and carry weapons in case of confrontation." 554 U.S. 570, 592 (2008).

    **b. Have you ever issued a judicial opinion, order, or other decision adjudicating a claim under the Second Amendment or any analogous state law? If yes, please provide citations to or copies of those decisions.**

    Response: No.

**17. Dissenting in *Lochner v. New York*, Justice Oliver Wendell Holmes, Jr. wrote that, "The 14th Amendment does not enact Mr. Herbert Spencer's Social Statics." 198 U.S. 45, 75 (1905).**

    **a. What do you believe Justice Holmes meant by that statement, and do you agree with it?**

    Response: Justice Holmes' dissent reflects the notion that the "Constitution is not intended to embody a particular economic theory." *Lochner v. New York*, 198 U.S. 45, 75 (1905) (Holmes, J., dissenting). I agree that judges should not view interpretation of the Fourteenth Amendment, or any other law, as a method of social engineering, and that judges should make their decisions fairly and impartially without regard to personal policy preferences.

b. Do you believe that *Lochner v. New York*, 198 U.S. 45 (1905), was correctly decided? Why or why not?

Response: *West Coast Hotel Co. v. Parrish*, 300 U.S. 379 (1937), overruled *Lochner*. If confirmed, I would follow the binding precedents of the Supreme Court, which includes *West Coast Hotel* but not *Lochner*.

18. Are there any Supreme Court opinions that have not been formally overruled by the Supreme Court that you believe are no longer good law?

a. If so, what are they?

Response: "If a precedent of [the Supreme] Court has direct application in a case, yet appears to rest on reasons rejected in some other line of decisions, the Court of Appeals should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions." *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (1989). If confirmed, I would fully and faithfully apply all Supreme Court precedents.

b. With those exceptions noted, do you commit to faithfully applying all other Supreme Court precedents as decided?

Response: Not applicable.

19. Judge Learned Hand famously said 90% of market share "is enough to constitute a monopoly; it is doubtful whether sixty or sixty-four percent would be enough; and certainly thirty-three per cent is not." *United States v. Aluminum Co. of America*, 148 F.2d 416, 424 (2d Cir. 1945).

a. Do you agree with Judge Learned Hand?

Response: As a sitting judge and a judicial nominee, it would be inappropriate for me to express an opinion on this issue. If confirmed, I will faithfully apply all precedents of the Supreme Court and the Ninth Circuit as to what constitutes a monopoly, regardless whether they align with Judge Hand's assessment.

b. If not, please explain why you disagree with Judge Learned Hand.

Response: Please see my response to Question 19(a).

c. What, in your understanding, is in the minimum percentage of market share for a company to constitute a monopoly? Please provide a numerical answer or appropriate legal citation.

Response: I am not aware of Supreme Court precedent specifying a minimum market share for a monopoly under Section 2 of the Sherman Act. The Ninth Circuit has held that "a market share of less than 50 percent is presumptively insufficient to establish market power." *Rebel Oil Co., Inc. v. Atlantic Richfield Co.*, 51 F.3d 1421, 1438 (9th Cir. 1995). By comparison, a "65% market share" typically "establishes a *prima facie* case of market power." *See Image Tech. Servs., Inc. v. Eastman Kodak Co.*, 125 F.3d 1195, 1206 (9th Cir. 1997). That said, the Ninth Circuit has expressed reluctance "to apply bright-line rules regarding market share" and relies on analyzing "certain telltale factors in the relevant market: market share, entry barriers and the capacity of existing competitors to expand output." *Rebel Oil*, 51 C.3d at at 1438 n. 10. If confirmed, I would fully and faithfully apply the antitrust laws and precedents on monopolization to the individual factual record and evidence in the case before me.

**20. Please describe your understanding of the "federal common law."**

Response: There is "no federal general common law." *Erie R. Co. v. Tompkins*, 304 U.S. 64, 78 (1938). Generally, in diversity cases, the federal courts apply state substantive law, and in federal question cases, the federal courts apply federal statutory law. There are only a few limited areas of substantive federal common law where there is no statutory law and decisional common law is "necessary to protect uniquely federal interests," such as in admiralty cases and certain controversies between States. *See Rodriguez v. FDIC*, 140 S. Ct. 713, 717 (2020).

**21. If a state constitution contains a provision protecting a civil right and is phrased identically with a provision in the federal constitution, how would you determine the scope of the state constitutional right?**

Response: State law governs the scope of a state constitutional right. Accordingly, "the views of the State's highest court with respect to state law are binding on the federal courts." *Wainwright v. Goode*, 464 U.S. 78, 84 (1983).

**a. Do you believe that identical texts should be interpreted identically?**

Response: Generally, yes. However, the same text can mean different things if adopted by different government actors or enacted at different times. Also, federal and state courts may interpret the same text differently, and state court decisions are binding on federal courts with respect to the interpretation of state law.

**b. Do you believe that the federal provision provides a floor but that the state provision provides greater protections?**

Response: State constitutions may provide greater protections to its citizens than provided by the United States Constitution.

**22. Do you believe that *Brown v. Board of Education*, 347 U.S. 483 (1954), was correctly decided?**

Response: Yes. As a sitting judge and judicial nominee, I generally refrain from expressing an opinion regarding whether a particular case was correctly decided. However, because it is unlikely that I will ever be asked to adjudicate the constitutionality of laws requiring racial segregation, I can state my view that *Brown* was correctly decided.

**23. Do federal courts have the legal authority to issue nationwide injunctions?**

Response: Federal Rule of Civil Procedure 65 describes the scope of federal courts' authority to issue injunctions. In general, injunctive relief is an "extraordinary remedy." *Monsanto Co. v. Geertson Seed Farms*, 561 U.S. 139, 165 (2010). "[I]njunctive relief should be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979). The Ninth Circuit has held that "although there is no bar against nationwide relief in federal district court or circuit court, such broad relief must be necessary to give prevailing parties the relief to which they are entitled." *California v. Azar*, 911 F.3d 558, 582 (9th Cir. 2018) (finding the issuance of a nationwide injunction failed the required standard and was an abuse of discretion). If confirmed and faced with a case where a party sought a nationwide injunction, I would fully and faithfully apply Supreme Court and Ninth Circuit precedent to the factual record and evidence before me.

    **a. If so, what is the source of that authority?**

    Response: Please see my response to Question 23.

    **b. In what circumstances, if any, is it appropriate for courts to exercise this authority?**

    Response: Please see my response to Question 23.

**24. Under what circumstances do you believe it is appropriate for a federal district judge to issue a nationwide injunction against the implementation of a federal law, administrative agency decision, executive order, or similar federal policy?**

Response: Please see my response to Question 23.

**25. What is your understanding of the role of federalism in our constitutional system?**

Response: The Constitution created a federal government of limited, enumerated powers. Those powers that were not delegated to the federal government have been reserved to the states and the people under the Tenth Amendment. This division of power between the federal government and the states is an essential bulwark of liberty. "It assures a

decentralized government that will be more sensitive to the diverse needs of a heterogenous society; it increases opportunity for citizen involvement in democratic processes; it allows for more innovation and experimentation in government; and it makes government more responsive by putting the States in competition for a mobile citizenry." *Gregory v. Ashcroft*, 501 U.S. 452, 458 (1991).

**26. Under what circumstances should a federal court abstain from resolving a pending legal question in deference to adjudication by a state court?**

Response: Please see my answer to Question 5.

**27. What in your view are the relative advantages and disadvantages of awarding damages versus injunctive relief?**

Response: Generally, damages provide a remedy for a past harm, whereas injunctive relief is designed to prevent future harm. I believe litigants should choose which form of relief they seek, and the court should determine whether the facts and the law authorize that relief.

**28. What is your understanding of the Supreme Court's precedents on substantive due process?**

Response: The Supreme Court has held that the Fifth and Fourteenth Amendments protect those substantive due process rights that are "deeply rooted in this Nation's history and tradition" and "implicit in the concept of ordered liberty, such that neither liberty nor justice would exist if they were sacrificed." *Washington v. Glucksburg*, 521 U.S. 702, 720-21 (1997).

**29. The First Amendment provides "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances."**

**a. What is your view of the scope of the First Amendment's right to free exercise of religion?**

Response: Please see my responses to Questions 13 and 15.

**b. Is the right to free exercise of religion synonymous and coextensive with freedom of worship? If not, what else does it include?**

Response: No. The Free Exercise Clause "protects not only the right to harbor religious beliefs inwardly and secretly" but also protects "the ability of those who hold religious beliefs of all kinds to live out their faiths in daily life through the performance of (or abstention from) physical acts." *Kennedy v.*

*Bremerton Sch. Dist.*, 142 S. Ct. 2407, 2421 (2022). That extends beyond the right to worship.

    **c. What standard or test would you apply when determining whether a governmental action is a substantial burden on the free exercise of religion?**

    Response: Please see my response to Question 13.

    **d. Under what circumstances and using what standard is it appropriate for a federal court to question the sincerity of a religiously held belief?**

    Response: Please see my response to Question 15.

    **e. Describe your understanding of the relationship between the Religious Freedom Restoration Act and other federal laws, such as those governing areas like employment and education?**

    Response: The Religious Freedom Restoration Act (RFRA) "applies to all Federal law, and the implementation of that law, whether statutory or otherwise, … unless such law explicitly excludes such application by reference" to the Act. 42 U.S.C. § 2000bb-3.

    **f. Have you ever issued a judicial opinion, order, or other decision adjudicating a claim under the Religious Freedom Restoration Act, the Religious Land use and Institutionalized Person Act, the Establishment Clause, the Free Exercise Clause, or any analogous state law? If yes, please provide citations to or copies of those decisions.**

    Response: No.

**30. Justice Scalia said, "The judge who always likes the result he reaches is a bad judge."**

    **a. What do you understand this statement to mean?**

    Response: I am not familiar with Justice Scalia's statement or its context. However, I understand it to mean that if a judge fairly and impartially sets aside personal beliefs and enters rulings solely based on applicable law and the factual record, that judge will at least occasionally reach results that are at odds with the judge's own personal policy preferences. If a judge never encounters that situation, it can be a sign that the judge is either deliberately or unknowingly allowing personal policy preferences to dictate judicial decisions, in violation of the judicial oath.

**31. Have you ever taken the position in litigation or a publication that a federal or state statute was unconstitutional?**

Response: Yes. In my role as an advocate while in private practice, I worked on matters in which my law firm represented clients who challenged the constitutionality of federal and state laws prohibiting recognition of same-sex marriages.

    **a. If yes, please provide appropriate citations.**

    Response: I worked on a matter in which my law firm represented federal employee Karen Golinski in her constitutional challenge to the Defense of Marriage Act. *Golinski v. Office of Personnel Management*, 587 F.3d 956 (9th Cir. 2009) (Kozinski, J.); 781 F. Supp. 2d 967 (N.D. Cal. 2011) (White, J.); 824 F. Supp. 2d 968 (N.D. Cal. 2012) (White, J.); 724 F.3d 1048 (9th Cir. 2013) (Alarcón, Thomas, Berzon, JJ.); 570 U.S. 931 (2013). I also worked on matters in which my law firm represented various professors as *amici curiae* in constitutional challenges to state laws concerning same-sex marriage. *Bishop v. Smith*, 760 F.3d 1070, 1074 (10th Cir. 2014); *Kitchen v. Herbert*, 755 F.3d 1193 (10th Cir. 2014); *Latta v. Otter*, 771 F.3d 456 (9th Cir. 2014); *Bostic v. Schaefer*, 760 F.3d 352 (4th Cir. 2014); *DeBoer v. Snyder*, 772 F.3d 388 (6th Cir. 2014).

**32. Since you were first contacted about being under consideration for this nomination, have you deleted or attempted to delete any content from your social media? If so, please produce copies of the originals.**

Response: No.

**33. Do you believe America is a systemically racist country?**

Response: I understand the term "systemic racism" to refer to patterns of racial discrimination. America is the best country in the world, and my parents immigrated here because it is a beacon of freedom and opportunity. Unfortunately, incidents of racial discrimination and racially motivated hate crimes do persist in modern times in our country, and can occur in patterns. I do not have data on the frequency or prevalence of those patterns. When such patterns arise, it is important for those issues to be discussed and for policymakers to consider how to address them. As a judge, I am focused on the individual case or controversy before me, rather than on larger systemic issues. My focus is on treating everyone in my courtroom fairly and without bias, regardless of their background.

**34. Have you ever taken a position in litigation that conflicted with your personal views?**

Response: Yes.

**35. How did you handle the situation?**

Response: I set aside my personal views and zealously advocated for my client, advancing the arguments that best supported its position, consistent with my ethical duty as an attorney.

**36. If confirmed, do you commit to applying the law written, regardless of your personal beliefs concerning the policies embodied in legislation?**

Response: Yes.

**37. Which of the Federalist Papers has most shaped your views of the law?**

Response: There is no particular Federalist Paper that has most shaped my views of the law.

**38. Do you believe that an unborn child is a human being?**

Response: *Dobbs v. Jackson Women's Health Organization*, 142 S. Ct. 2228 (2022), held that this is a "profound moral issue" and returned the issue of abortion to the people and their elected representatives rather than the federal courts. As a sitting judge and a judicial nominee, it would be inappropriate for me to express an opinion on this issue.

**39. Other than at your hearing before the Senate Judiciary Committee, have you ever testified under oath? Under what circumstances? If this testimony is available online or as a record, please include the reference below or as an attachment.**

Response: No.

**40. In the course of considering your candidacy for this position, has anyone at the White House or Department of Justice asked for you to provide your views on:**

   **a.  *Roe v. Wade*, 410 U.S. 113 (1973)?**

   **b.  The Supreme Court's substantive due process precedents?**

   **c.  Systemic racism?**

   **d.  Critical race theory?**

Response: During the consideration of my application for this position, no one from the White House or Department of Justice asked for me to provide my views on any legal issue or question that could come before me as a judge.

**41. Do you currently hold any shares in the following companies:**

a. **Apple?**

b. **Amazon?**

c. **Google?**

d. **Facebook?**

e. **Twitter?**

Response: No. I do have investments in mutual funds that hold stocks, but am not aware of the specific securities held in those funds.

42. **Have you ever authored or edited a brief that was filed in court without your name on the brief?**

Response: Yes. In 2008, as a law firm associate at Morrison & Foerster, I drafted briefs in connection with cross-motions for summary judgment in a software copyright dispute, but my name did not appear on the pleadings because I was only temporarily helping in the matter and could not be permanently assigned due to competing case obligations. That is the only instance that I can recall in which I authored or edited a brief that was filed in court without my name on it.

a. **If so, please identify those cases with appropriate citation.**

Response: *SCO Group v. Novell Inc.* 2:04-cv-00139 (D. Utah).

43. **Have you ever confessed error to a court?**

Response: No.

a. **If so, please describe the circumstances.**

Response: Not applicable.

44. **Please describe your understanding of the duty of candor, if any, that nominees have to state their views on their judicial philosophy and be forthcoming when testifying before the Senate Judiciary Committee. *See* U.S. Const. art. II, § 2, cl. 2.**

Response: At the outset of my testimony before the Senate Judiciary Committee, I took an oath to tell the truth. I understand the same obligation extends to these questions for the record. I have attempted to answer each of these questions truthfully and to the best of my ability and in a manner consistent with my ethical obligations as a sitting judge and under the Code of Conduct for United States Judges as it applies to judicial nominees.

1. **Do you believe that a judge's personal views are irrelevant when it comes to interpreting and applying the law?**

   Response: Yes.

2. **What is judicial activism? Do you consider judicial activism appropriate?**

   Response: Black's Law Dictionary defines "judicial activism" as a "philosophy of judicial decision-making whereby judges allow their personal views about public policy, among other factors, to guide their decisions, usually with the suggestion that adherents of this philosophy tend to find constitutional violations and are willing to ignore governing texts and precedents." *Black's Law Dictionary* (11th ed. 2019). I do not consider judicial activism appropriate.

3. **Do you believe impartiality is an aspiration or an expectation for a judge?**

   Response: Impartiality is an expectation for a judge.

4. **Should a judge second-guess policy decisions by Congress or state legislative bodies to reach a desired outcome?**

   Response: No.

5. **Does faithfully interpreting the law sometimes result in an undesirable outcome? How, as a judge, do you reconcile that?**

   Response: Yes. My duty is to apply the law to the facts before me, without regard to my personal views. That is what I always wanted from judges as an advocate, and it is the backbone of our entire system of law. I do not find it difficult to reconcile myself to doing my duty, because my commitment to the rule of law far outweighs any policy preference I might have. That is the oath I have sworn, and I take it very seriously.

6. **Should a judge interject his or her own politics or policy preferences when interpreting and applying the law?**

   Response: No.

7. **What will you do if you are confirmed to ensure that Americans feel confident that their Second Amendment rights are protected?**

   Response: If confirmed, I will apply all precedents of the Supreme Court and the Ninth Circuit to the facts of each case before me. In the Second Amendment context, I would fully and faithfully follow the Supreme Court's holdings in *District of Columbia v. Heller*, 554

U.S. 470 (2008); *McDonald v. City of Chicago*, 561 U.S. 742 (2010); *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022), as well as any other applicable precedent.

8.  **How would you evaluate a lawsuit challenging a Sheriff's policy of not processing handgun purchase permits? Should local officials be able to use a crisis, such as COVID-19 to limit someone's constitutional rights? In other words, does a pandemic limit someone's constitutional rights?**

    Response: If confirmed, I would evaluate the factual record and evidence presented to me and apply any applicable precedent of the Supreme Court and the Ninth Circuit. Depending on the facts, that could include *New York State Rifle & Pistol Association v. Bruen*, 142 S. Ct. 2111 (2022), on the scope of the Second Amendment's protections regarding the right to keep and bear arms. It could also include *Tandon v. Newsom*, 141 S. Ct. 1294 (2021), and *Roman Catholic Diocese of Brooklyn v. Cuomo*, 141 S. Ct. 63 (2020) (per curiam), on the application of COVID-19 restrictions to burden constitutional rights.

9.  **What process do you follow when considering qualified immunity cases, and under the law, when must the court grant qualified immunity to law enforcement personnel and departments?**

    Response: The Supreme Court has held that qualified immunity in a suit under 42 U.S.C. §1983 applies when the plaintiff has failed to demonstrate both (1) that the official violated a statutory or constitutional right; and (2) that the right was clearly established at the time of the violation. *Saucier v. Katz*, 533 U.S. 194, 200 (2001). "The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Id.* at 202.

10. **Do you believe that qualified immunity jurisprudence provides sufficient protection for law enforcement officers who must make split-second decisions when protecting public safety?**

    Response: That issue is best left to policymakers. As a sitting judge and a judicial nominee, it would be inappropriate for me to comment on an issue that might come before me. If confirmed, I would fully and faithfully apply Supreme Court and Ninth Circuit precedent in any case involving potential issues of qualified immunity.

11. **What do you believe should be the proper scope of qualified immunity protections for law enforcement?**

    Response: Please see my response to Question 10.

12. **Throughout the past decade, the Supreme Court has repeatedly waded into the area of patent eligibility, producing a series of opinions in cases that have only muddled the standards for what is patent eligible. The current state of eligibility jurisprudence is in abysmal shambles. What are your thoughts on the Supreme Court's patent eligibility jurisprudence?**

Response: The Supreme Court has held that 35 U.S.C. § 101, which governs patent eligibility, contains an implicit exception for laws of nature, natural phenomena, and abstract ideas. *Alice Corp. v. CLS Bank International*, 573 U.S. 208, 216 (2014). Under Supreme Court precedent applying that exception, claims to the "building blocks" of human ingenuity are ineligible for patent protection, but claims integrating those building blocks into something more can "transform the nature of the claim" into one that is eligible for protection. *Id.* at 217. Specifically, the Court considers whether the elements of the claim individually, and as an ordered combination, disclose an "inventive concept" that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept alone. *Id.* at 217-18; *see also Bilski v. Kappos*, 561 U.S. 593 (2010); *Mayo Collaborative Servs. v. Prometheus Labs, Inc.*, 566 U.S. 66 (2012). As a sitting judge and a judicial nominee, it is generally inappropriate for me to express an opinion regarding whether a particular case or body of cases was correctly decided, or regarding an issue that could come before me. If confirmed and confronted with an issue of patent eligibility, I will apply Section 101, and any applicable Supreme Court and Federal Circuit precedents, to the case or controversy presented to me.

13. **How would you apply current patent eligibility jurisprudence to the following hypotheticals. Please avoid giving non-answers and actually analyze these hypotheticals.**

   a. *ABC Pharmaceutical Company* **develops a method of optimizing dosages of a substance that has beneficial effects on preventing, treating or curing a disease or condition for individual patients, using conventional technology but a newly-discovered correlation between administered medicinal agents and bodily chemicals or metabolites. Should this invention be patent eligible?**

   b. *FinServCo* **develops a valuable proprietary trading strategy that demonstrably increases their profits derived from trading commodities. The strategy involves a new application of statistical methods, combined with predictions about how trading markets behave that are derived from insights into human psychology. Should** *FinServCo's* **business method standing alone be eligible? What about the business method as practically applied on a computer?**

   c. *HumanGenetics* **Company wants to patent a human gene or human gene fragment as it exists in the human body. Should that be patent eligible? What if** *HumanGenetics* **Company wants to patent a human gene or fragment that contains sequence alterations provided by an engineering process initiated by humans that do not otherwise exist in nature? What if the engineered alterations were only at the end of the human gene or fragment and merely removed one or more contiguous elements?**

   d. *BetterThanTesla ElectricCo* **develops a system for billing customers for charging electric cars. The system employs conventional charging technology and conventional computing technology, but there was no previous system combining computerized billing with electric car charging. Should** *BetterThanTesla's* **billing**

system for charging be patent eligible standing alone? What about when it explicitly claims charging hardware?

e. *Natural Laws and Substances, Inc.* specializes in isolating natural substances and providing them as products to consumers. Should the isolation of a naturally occurring substance other than a human gene be patent eligible? What about if the substance is purified or combined with other substances to produce an effect that none of the constituents provide alone or in lesser combinations?

f. A business methods company, *FinancialServices Troll,* specializes in taking conventional legal transaction methods or systems and implementing them through a computer process or artificial intelligence. Should such implementations be patent eligible? What if the implemented method actually improves the expected result by, for example, making the methods faster, but doesn't improve the functioning of the computer itself? If the computer or artificial intelligence implemented system does actually improve the expected result, what if it doesn't have any other meaningful limitations?

g. *BioTechCo* discovers a previously unknown relationship between a genetic mutation and a disease state. No suggestion of such a relationship existed in the prior art. Should *BioTechCo* be able to patent the gene sequence corresponding to the mutation? What about the correlation between the mutation and the disease state standing alone? But, what if *BioTech Co* invents a new, novel, and nonobvious method of diagnosing the disease state by means of testing for the gene sequence and the method requires at least one step that involves the manipulation and transformation of physical subject matter using techniques and equipment? Should that be patent eligible?

h. Assuming *BioTechCo's* diagnostic test is patent eligible, should there exist provisions in law that prohibit an assertion of infringement against patients receiving the diagnostic test? In other words, should there be a testing exemption for the patient health and benefit? If there is such an exemption, what are its limits?

i. *Hantson Pharmaceuticals* develops a new chemical entity as a composition of matter that proves effective in treating TrulyTerribleDisease. Should this new chemical entity be patent eligible?

j. *Stoll Laboratories* discovers that superconducting materials superconduct at much higher temperatures when in microgravity. The materials are standard superconducting materials that superconduct at lower temperatures at surface gravity. Should *Stoll Labs* be able to patent the natural law that superconductive materials in space have higher superconductive temperatures? What about the space applications of superconductivity that benefit from this effect?

Response: The Supreme Court has held that 35 U.S.C. § 101, which governs patent eligibility, contains an implicit exception for laws of nature, natural phenomena, and abstract ideas. *Alice Corp. v. CLS Bank International*, 573 U.S. 208, 216 (2014). Under Supreme Court precedent applying that exception, claims to the "building blocks" of human ingenuity are ineligible for patent protection, but claims integrating those building blocks into something more can "transform the nature of the claim" into one that is eligible for protection. *Id.* at 217. Specifically, the Court considers whether the elements of the claim individually, and as an ordered combination, disclose an "inventive concept" that is sufficient to ensure that the patent in practice amounts to significantly more than a patent upon the ineligible concept alone. *Id.* at 217-18; *see also Bilski v. Kappos*, 561 U.S. 593 (2010); *Mayo Collaborative Servs. v. Prometheus Labs, Inc.*, 566 U.S. 66 (2012). As a sitting judge and a judicial nominee, it would be inappropriate for me to comment on issues that might come before me, and the fact patterns described in these hypotheticals could bear relation to cases that could come before me if confirmed. If I am confirmed and confronted with an issue of patent eligibility, I will apply Section 101, and any applicable Supreme Court and Federal Circuit precedents, to the case or controversy presented to me.

14. **Based on the previous hypotheticals, do you believe the current jurisprudence provides the clarity and consistency needed to incentivize innovation? How would you apply the Supreme Court's ineligibility tests—laws of nature, natural phenomena, and abstract ideas—to cases before you?**

    Response: As a sitting judge and a judicial nominee, it is generally inappropriate for me to express an opinion regarding the public policy effects of a particular case or line of cases, or regarding issues that could come before me. If confirmed, I would follow the precedent established by the Supreme Court and the Federal Circuit concerning the issues of patent eligibility.

15. **Copyright law is a complex area of law that is grounded in our constitution, protects creatives and commercial industries, and is shaped by our cultural values. It has become increasingly important as it informs the lawfulness of a use of digital content and technologies.**

    a. **What experience do you have with copyright law?**

       Response: I worked on two matters concerning software copyrights while in private practice at Morrison & Foerster. In 2008, I represented Autodesk in its suit against Assimilate, Inc., for copyright infringement. *Autodesk Canada Co. v. Assimilate, Inc.*, 08-587-SLR-LPS (D. Del.). I managed the case on a day-to-day basis, including fact development, witness interviews, working with experts, drafting the initial complaint, and motions practice. Also in 2008, I worked on *SCO Group v. Novell Inc.*, No. 2:04-cv-00139 (D. Utah), a high-profile copyright litigation in which SCO and Novell asserted competing claims of copyright ownership over the source code to the Unix operating system. I drafted a series of

briefs on behalf of Novell in connection with cross-motions for summary judgment. It is possible that I also worked on a few other software copyright matters at Morrison & Foerster, but I no longer recall any specific matters beyond the two listed.

**b. Please describe any particular experiences you have had involving the Digital Millennium Copyright Act.**

Response: In 2002, while in law school, I wrote a case summary regarding a suit by motion picture studios to take down source code and object code enabling decryption of encoded DVDs under the Digital Millennium Copyright Act. *Recent Case: Second Circuit Classifies the Posting and Linking of Computer Code as Expressive Conduct Rather than Pure Speech*, 115 Harv. L. Rev. 2042 (2002). A copy was attached to my questionnaire.

**c. What experience do you have addressing intermediary liability for online service providers that host unlawful content posted by users?**

Response: In my eighteen years as a civil litigator, federal prosecutor, and state court judge, I do not recall having handled a matter concerning the issue of intermediary liability for online service providers.

**d. What experience do you have with First Amendment and free speech issues? Do you have experience addressing free speech and intellectual property issues, including copyright?**

Response: While in private practice, in 2007, I worked as part of a team of attorneys on a *pro bono* matter involving a defamation suit in state court against the creator of a parody blog, which raised First Amendment issues. I also wrote the case summary mentioned in Question 15(b) above. Other than that, in my eighteen years as a civil litigator, federal prosecutor, and state court judge, I do not recall having addressed the issues mentioned in the question.

16. **The legislative history of the Digital Millennium Copyright Act reinforces the statutory text that Congress intended to create an obligation for online hosting services to address infringement even when they do not receive a takedown notice. However, the Copyright Office recently reported courts have conflated statutory obligations and created a "high bar" for "red flag knowledge, effectively removing it from the statute..." It also reported that courts have made the traditional common law standard for "willful blindness" harder to meet in copyright cases.**

    a. **In your opinion, where there is debate among courts about the meaning of legislative text, what role does or should Congressional intent, as demonstrated in the legislative history, have when deciding how to apply the law to the facts in a particular case?**

Response: My interpretation of any statutory text begins with the text itself and any binding precedents interpreting that text. If the meaning of the text is clear and unambiguous, my analysis stops there. If the text is ambiguous, and there is no binding precedent concerning the correct interpretation, I would employ canons of statutory construction and dictionary definitions. I would also consult binding precedents interpreting analogous statutory texts. If that did not resolve the issue, I would consult persuasive authority from other jurisdictions. Finally, if none of those sources resolved the issue, I would follow the interpretive methods that the Supreme Court and Ninth Circuit have used to interpret the statute at issue, which could include consulting the legislative history.

b. **Likewise, what role does or should the advice and analysis of the expert federal agency with jurisdiction over an issue (in this case, the U.S. Copyright Office) have when deciding how to apply the law to the facts in a particular case?**

Response: If confirmed, I would apply the precedents of the Supreme Court and the Ninth Circuit regarding the level of deference afforded to an agency interpretation of its authorizing statute. If the statutory language is clear and unambiguous, the analysis would stop there. If the statutory language is ambiguous, I would generally defer to the agency interpretation if it is reasonable and was adopted through formal rulemaking procedures, unless an exception to *Chevron* deference applied (*e.g.*, the non-delegation doctrine). *See Chevron U.S.A. Inc. v. Nat'l Res. Def. Council, Inc.*, 468 U.S. 837 (1984). Informal agency advice and analysis would generally be subject to deference only to the extent that they are persuasive. *See Inhale, Inc. v. Starbuzz Tobacco Inc.*, 755 F.3d 1038, 1041-42 (9th Cir. 2014) ("When interpreting the Copyright Act, we defer to the Copyright Office's interpretations in the appropriate circumstances. Because *Chevron* deference does not apply to internal agency manuals or opinion letters, we defer to the Copyright Office's views expressed in such materials only to the extent that those interpretations have the power to persuade.") (internal citations and quotations omitted).

c. **Do you believe that awareness of facts and circumstances from which copyright infringement is apparent should suffice to put an online service provider on notice of such material or activities, requiring remedial action?**

Response: As a sitting judge and judicial nominee, it would be inappropriate for me to comment on an issue that could come before me. If confirmed and faced with a scenario like the one described, I will apply Supreme Court and Ninth Circuit precedents to the factual record and evidence before me.

17. **The scale of online copyright infringement is breathtaking. The DMCA was developed at a time when digital content was disseminated much more slowly and there was a lot less infringing material online.**

a. **How can judges best interpret and apply to today's digital environment laws like the DMCA that were written before the explosion of the internet, the ascension of dominant platforms, and the proliferation of automation and algorithms?**

Response: If confirmed, and faced with a question about the interpretation of the DMCA, I would begin by evaluating any Supreme Court or Ninth Circuit authority interpreting the provision at issue. If there were no such authority, I would examine the text itself. If the text is clear and unambiguous, my analysis would stop there. If the text is ambiguous, and there is no binding precedent concerning the correct interpretation, I would examine Supreme Court and Ninth Circuit precedent interpreting the DMCA and follow whatever interpretive methods those precedents employed. I would also look to persuasive authority from other circuits, as well as canons of interpretation and dictionary definitions.

b. **How can judges best interpret and apply prior judicial opinions that relied upon the then-current state of technology once that technological landscape has changed?**

Response: Please see my response to Question 17(a).

18. **In some judicial districts, plaintiffs are allowed to request that their case be heard within a particular division of that district. When the requested division has only one judge, these litigants are effectively able to select the judge who will hear their case. In some instances, this ability to select a specific judge appears to have led to individual judges engaging in inappropriate conduct to attract certain types of cases or litigants. I have expressed concerns about the fact that nearly one quarter of all patent cases filed in the U.S. are assigned to just one of the more than 600 district court judges in the country.**

a. **Do you see "judge shopping" and "forum shopping" as a problem in litigation?**

Response: In the district to which I am nominated, the Clerk of the Court randomly and blindly assigns cases to particular divisions and judges pursuant to the Assignment Plan of the Court, set forth in General Order No. 44. If confirmed, I will fully comply with the Assignment Plan of the Court, venue rules, and any other applicable precedents.

b. **If so, do you believe that district court judges have a responsibility not to encourage such conduct?**

Response: Please see my response to Question 18(a).

c. **Do you think it is *ever* appropriate for judges to engage in "forum selling" by proactively taking steps to attract a particular type of case or litigant?**

Response: I am unfamiliar with the term "forum selling." However, I do not think it is appropriate for judges to take proactive steps for the purpose of attracting a

particular type of case or litigant. A judge should decide cases fairly and impartially based on the factual record and applicable law.

**d. If so, please explain your reasoning. If not, do you commit not to engage in such conduct?**

Response: I commit that, as a judge, I will not take proactive steps for the purpose of attracting any particular type of case or litigant.

**19. In just three years, the Court of Appeals for the Federal Circuit has granted no fewer than 19 mandamus petitions ordering a particular sitting district court judge to transfer cases to a different judicial district. The need for the Federal Circuit to intervene using this extraordinary remedy so many times in such a short period of time gives me grave concerns.**

**a. What should be done if a judge continues to flaunt binding case law despite numerous mandamus orders?**

Response: As a sitting judge and a judicial nominee, it would be inappropriate for me to express an opinion on an issue that is currently before another court or could come before another court. If confirmed, I will fully and faithfully apply all venue rules and applicable precedents to any venue issues that come before me.

**b. Do you believe that some corrective measure beyond intervention by an appellate court is appropriate in such a circumstance?**

Response: Please see my response to Question 19(a).

**20. When a particular type of litigation is overwhelmingly concentrated in just one or two of the nation's 94 judicial districts, does this undermine the perception of fairness and of the judiciary's evenhanded administration of justice?**

Response: As a sitting judge and a judicial nominee, it would be inappropriate for me to express an opinion on an issue that could come before me or another court. If confirmed, I will fully and faithfully apply all venue rules and applicable precedents to any venue issues that come before me.

**a. If litigation does become concentrated in one district in this way, is it appropriate to inquire whether procedures or rules adopted in that district have biased the administration of justice and encouraged forum shopping?**

Response: Please see my response to Question 20.

**b. To prevent the possibility of judge-shopping by allowing patent litigants to select a single-judge division in which their case will be heard, would you support a**

**local rule that requires all patent cases to be assigned randomly to judges across the district, regardless of which division the judge sits in?**

Response: Please see my response to Question 20.

21. **Mandamus is an extraordinary remedy that the court of appeals invokes against a district court only when the petitioner has a clear and indisputable right to relief and the district judge has clearly abused his or her discretion. Nearly every issuance of mandamus may be viewed as a rebuke to the district judge, and repeated issuances of mandamus relief against the same judge on the same issue suggest that the judge is ignoring the law and flouting the court's orders.**

   a. **If a single judge is repeatedly reversed on mandamus by a court of appeals on the same issue within a few years' time, how many such reversals do you believe must occur before an inference arises that the judge is behaving in a lawless manner?**

   Response: As a sitting judge and a judicial nominee, it would be inappropriate for me to express an opinion on an issue that is currently before another court or could come before another court. If confirmed, I will fully and faithfully apply all applicable precedents in the cases that come before me.

   b. **Would five mandamus reversals be sufficient? Ten? Twenty?**

   Response: Please see my answer to Question 21(a).

# Appendix VIII

UNITED STATES PATENT AND TRADEMARK OFFICE

_____

BEFORE THE PATENT TRIAL AND APPEAL BOARD

_____

GOOGLE LLC,
Petitioner,

v.

SMARTWATCH MOBILE CONCEPTS, LLC,
Patent Owner.

_____

Case No. IPR2024-00852
Patent No. 10,362,480

_____

**DECLARATION OF DAVID H. WILLIAMS**

Google Exhibit 1003
Google v Smartwatch

# TABLE OF CONTENTS

I. PERSONAL AND PROFESSIONAL BACKGROUND ................................1

II. MATERIALS REVIEWED AND CONSIDERED .............................8

III. MY UNDERSTANDING OF PATENT LAW ...............................9

    A. Anticipation ................................................................11

    B. Obviousness ................................................................11

IV. PERSON OF ORDINARY SKILL IN THE ART ("POSA")........................14

V. BACKGROUND OF THE TECHNOLOGY ..................................16

    A. Form Factors.................................................................17

    B. Location Services .......................................................19

    C. Biometric Sensors and Associated Applications.........................22

    D. User Authentication.....................................................24

VI. THE '480 PATENT.................................................26

    A. Introduction to '480 Patent.........................................26

    B. Prosecution History of the '480 Patent................................28

    C. The Challenged Claims ..............................................28

VII. CLAIM INTERPRETATION ...........................................30

    A. "at least one of" .......................................................30

    B. Other Matters of Claim Interpretation..................................32

VIII. GROUND 1: CLAIMS 1-5 ARE OBVIOUS OVER AGRAFIOTI
ALONE OR WITH BERNEY .........................................32

    A. Agrafioti (EX1011).....................................................32

    B. Berney (EX1008)........................................................38

    C. Combining Agrafioti and Berney ......................................40

    D. Claim 1 ..................................................................43

        1. [1PRE]: "A method for enabling a wearable device user to
access secured electronic systems" ...................................43

        2. [1A] "placing a wearable device in contact with a user"..................43

            a. [1A-1] "said wearable device including a
telecommunications carrier access identification module" ........44

   b.  [1A-2] "a cellular RF communications module"........................46

   c.  [1A-3] "said wearable device including...a short-range RF communications module" ............................................48

3.  [1B] "achieving secured, short-range RF communication between the wearable device and a secured electronic system".........49

4.  [1C] "authenticating the user with at least one of [1C-1] the wearable device, [and] [1C-2] a remote server via cellular communications"................................................................52

   a.  [1C-1] "the wearable device".......................................52

   b.  [1C-2] "a remote server via cellular communications supported by the telecommunications carrier access identification module and the cellular RF communications module" ............................................................53

      i.   User Authentication Through Biometric Authentication Server. ........................................54

      ii.  User Authentication Through the AAD..............55

5.  [1D] "providing the user with access to or through the secured electronic system once authenticated" ...............................58

6.  [1E] "wherein said wearable device comprises a smartwatch including a microphone and skin illumination and measurement hardware" .................................................................60

7.  [1F] "and wherein authentication of the user is based on biometric information obtained from the user via at least one of the microphone and the skin illumination and measurement hardware" .................................................................62

E.  Claim 2 .................................................................................63

1.  Location.............................................................................63

2.  [2E]: "said wearable device includes a GPS module for determining location of the wearable device user with respect to the secured electronic system" ..........................................65

3.  [2F] "the step of providing a user access to or through the secured electronic systems is also dependent on the location of the wearable device user"....................................................67

F.  Claim 3 .................................................................................69

1. [3PRE] – [3D] ...................................................................69

2. [3E] "said wearable device further comprises a registration module" ......................................................................69

3. [3F]: "providing a user access to or through the secured electronic system is determined by at least one of the wearable device and the registration module based on at least one of: [3F-1] the user authenticated for access to secured electronic system bythe wearable device, ... [3F-4] the user granted access based on location, and [3F-5] the user granted access based on proximity to a secured electronic system" .........................................70

G. Claim 4 [PRE] The method of claim 2, [A] wherein said wearable device further comprises a smartwatch including a microphone and skin illumination and measurement hardware, [B] wherein authentication of the user is based on biometric information obtained from the user via at least one of the microphone and the skin illumination and measurement hardware..........................................71

H. Claim 5 [PRE] The method of claim 1, [A] wherein said wearable device further comprises a GPS module for determining location of the wearable device user with respect to secured electronic systems, and [B] wherein access to the secured electronic systems is dependent on the location of the wearable device user in relationship to the secured electronic systems. .........................................71

I. Claim 6 [PRE] The method of claim 3, [A] wherein said wearable device further comprises a smartwatch including a microphone and skin illumination and measurement hardware, [B] wherein authentication of the user is based on biometric information obtained from the user via at least one of the microphone and the skin illumination and measurement hardware..........................................72

IX. GROUND 2: CLAIMS 1-9 ARE OBVIOUS OVER AGRAFIOTI, BERNEY, AND LEE ...................................................................72

A. Lee (EX1009) ...................................................................72

B. It Would Have Been Obvious to Combine Agrafioti, Berney, and Lee73

C. Claims 1-6...................................................................74

1. [1E] ("wherein said wearable device comprises a smartwatch including a microphone and skin illumination and measurement

iii

hardware" / [4A] ("wherein said wearable device further comprises a smartwatch including a microphone and skin illumination and measurement hardware") / [6A] ("wherein said wearable device further comprises a smartwatch including a microphone and skin illumination and measurement hardware") ......75

2. [1F] ("wherein authentication of the user is based on biometric information obtained from the user via at least one of the microphone and the skin illumination and measurement hardware") / [4B] ("wherein authentication of the user is based on biometric information obtained from the user via at least one of the microphone and the skin illumination and measurement hardware") / [6B] ("wherein authentication of the user is based on biometric information obtained from the user via at least one of the microphone and the skin illumination and measurement hardware") .......................................................................76

D. Claim 7 .....................................................................................77

1. [7PRE] "A method for enabling a smartwatch user to access secured electronic systems" ................................................77

2. [7A] "placing a smartwatch in contact with a user, the smartwatch including a registration module, a short-range RF communications module, a microphone, and skin illumination and measurement hardware" ................................................77

3. [7B]-[7D] "achieving secured, short-range RF communication between the smartwatch and a secured electronic system"; [7C] "authenticating the user with at least one of the smartwatch and the secured electronic system using at least one biometric obtained from at least one of the microphone and the skin illumination and measurement hardware"; [7D] "providing the user with access to or through the secured electronic system once authenticated" ................................................78

4. [7E] "a subscriber identification module (SIM) and a cellular communications module, wherein authentication of the user is also achievable by accessing a remote server via cellular communications supported by the SIM and the cellular communications module and matching the at least one biometric" ................................................78

E. Claim 8 .....................................................................................79

iv

1. [8A] "wherein the smartwatch wearable device includes a GPS module for determining location of the smartwatch user with respect to the secured electronic system"; [8B] "wherein the step of providing a user access to or through the secured electronic systems is also dependent on a location of the smartwatch user with respect to a location of the secured electronic system" ...............................................................................79

F. Claim 9 "The method of claim 8, wherein providing a user access to or through the secured electronic system is determined by the registration module based on at least one of: [1] user authentication for access to secured electronic system by smartwatch, [2] user biometric authentication by a wireless carrier, [3] user biometric authentication by remote server, [4] user location, and [5] user proximity to a secured electronic system." ..............................................80

X. GROUND 3: CLAIMS 2, 5, 8 ARE OBVIOUS OVER AGRAFIOTI-........80

A. Jun (EX1010)..........................................................................................80

B. Combining Agrafioti and Jun ...............................................................81

C. Claims 2, 5, 8........................................................................................83

1. [2E] ("wherein said wearable device includes a GPS module for determining location of the wearable device user with respect to the secured electronic system")/ [5A] ("wherein said wearable device further comprises a GPS module for determining location of the wearable device user with respect to secured electronic systems")/ [8A] (wherein the smartwatch wearable device includes a GPS module for determining location of the smartwatch user with respect to the secured electronic system").......83

2. [2F] ("wherein the step of providing a user access to or through the secured electronic systems is also dependent on the location of the wearable device user")/ [5B] ("wherein access to the secured electronic systems is dependent on the location of the wearable device user in relationship to the secured electronic systems") / [8B] ("wherein the step of providing a user access to or through the secured electronic systems is also dependent on a location of the smartwatch user with respect to a location of the secured electronic system") ......................................................84

XI. GROUND 4: CLAIMS 1-9 ARE OBVIOUS OVER THARAPPEL-BERNEY ...............................................................................................84

A. Tharappel (EX1007) ........................................................................84

B. Combining Tharappel and Berney ...............................................87

C. Claim 1 .........................................................................................90

    1. [1PRE] "A method for enabling a wearable device user to access secured electronic systems" ....................................90

    2. [1A] "placing a wearable device in contact with a user"....................91

        a. [1A-1] "said wearable device including a telecommunications carrier access identification module" ........91

        b. [1A-2] "a cellular RF communications module"........................91

        c. [1A-3] "said wearable device including…a short-range RF communications module" ..........................................................92

    3. [1B] "achieving secured, short-range RF communication between the wearable device and a secured electronic system".........94

        a. Locked Smartphone as SES:.......................................................94

        b. Other Types of SES....................................................................95

        c. Achieving Secured, Short-Range RF Communication:..............95

    4. [1C] "authenticating the user with at least one of [1C-1] the wearable device, [1C-2] a remote server…, and [1C-3] the secured electronic system via the secured, short-range RF communication" ....................................................................96

        a. Authenticating with Wearable ([1C-1]) .....................................96

        b. Authenticating with a Remote Server via Cellular Communications ([1C-2]) ..........................................................98

        c. Authenticating with SES via Secured, Short-Range RF Communication ([1C-3])..........................................................99

    5. [1D] "providing the user with access to or through the secured electronic system once authenticated" .............................100

    6. [1E] "wherein said wearable device comprises a smartwatch including a microphone and skin illumination and measurement hardware" ..................................................................101

    7. [1F] "and wherein authentication of the user is based on biometric information obtained from the user via at least one of

the microphone and the skin illumination and measurement hardware" ...................................................................103

D. Claim 2 ...............................................................................103

   1. [2PRE]-[2D] ..................................................................103

   2. [2E] "said wearable device includes a GPS module for determining location of the wearable device user with respect to the secured electronic system" ...........................104

   3. [2F] "the step of providing a user access to or through the secured electronic systems is also dependent on the location of the wearable device user" ...........................................105

E. Claim 3 ...............................................................................107

   1. [3PRE]-[3D] ..................................................................107

   2. [3E] "said wearable device further comprises a registration module" ..............................................................107

   3. [3F] "providing a user access to or through the secured electronic system is determined by at least one of the wearable device and the registration module based on at least one of: [3F-1] the user authenticated for access to secured electronic system by the wearable device, ... [3F-4] the user granted access based on location, and [3F-5] the user granted access based on proximity to a secured electronic system" .......................108

F. Claim 4 "[PRE] The method of claim 2, [A] wherein said wearable device further comprises a smartwatch including a microphone and skin illumination and measurement hardware, [B] wherein authentication of the user is based on biometric information obtained from the user via at least one of the microphone and the skin illumination and measurement hardware." ...................109

G. Claim 5 "[PRE] The method of claim 1, [A] wherein said wearable device further comprises a GPS module for determining location of the wearable device user with respect to secured electronic systems, and [B] wherein access to the secured electronic systems is dependent on the location of the wearable device user in relationship to the secured electronic systems." ...................110

H. Claim 6 "[PRE] The method of claim 3, [A] wherein said wearable device further comprises a smartwatch including a microphone and skin illumination and measurement hardware, [B] wherein

vii

    authentication of the user is based on biometric information
    obtained from the user via at least one of the microphone and the
    skin illumination and measurement hardware." ...................................... 110

I.   Claim 7 .................................................................................................. 110

    1.   [7PRE] "A method for enabling a smartwatch user to access
        secured electronic systems" ............................................................. 110

    2.   [7A] "placing a smartwatch in contact with a user, the
        smartwatch including a registration module, a short-range RF
        communications module, a microphone, and skin illumination
        and measurement hardware" ............................................................. 111

    3.   [7B] achieving secured, short-range RF communication
        between the smartwatch and a secured electronic system; [7C]
        authenticating the user with at least one of the smartwatch and
        the secured electronic system using at least one biometric
        obtained from at east one of the microphone and the skin
        illumination and measurement hardware; [7D] providing the
        user with access to or through the secured electronic system
        once authenticated; and ................................................................... 111

    4.   [7E] "a subscriber identification module (SIM) and a cellular
        communications module, wherein authentication of the user is
        also achievable by accessing a remote server via cellular
        communications supported by the SIM and the cellular
        communications module and matching the at least one
        biometric" ....................................................................................... 112

J.   Claim 8 "[PRE] The method of claim 7, [A] wherein the
    smartwatch wearable device includes a GPS module for
    determining location of the smartwatch user with respect to the
    secured electronic system, and [B] wherein the step of providing a
    user access to or through the secured electronic systems is also
    dependent on a location of the smartwatch user with respect to a
    location of the secured electronic system." ........................................... 113

K.  Claim 9 "The method of claim 8, wherein providing a user access
    to or through the secured electronic system is determined by the
    registration module based on at least one of: [1] user authentication
    for access to secured electronic system by smartwatch, [2] user
    biometric authentication by a wireless carrier, [3] user biometric

authentication by remote server, [4] user location, and [5] user proximity to a secured electronic system." ............................................ 113

XII. GROUND 5: CLAIMS 1-9 ARE OBVIOUS OVER THARAPPEL-BERNEY-LEE ........................................................................................ 114

    A.  Tharappel-Berney-Lee ........................................................................... 114

    B.  Claims 1-9 ................................................................................................ 115

        1.  [1E] ("wherein said wearable device comprises a smartwatch including a microphone and skin illumination and measurement hardware") / [4A] (wherein said wearable device further comprises a smartwatch including a microphone and skin illumination and measurement hardware") / [6A] ("wherein said wearable device further comprises a smartwatch including a microphone and skin illumination and measurement hardware") / [7A] ("placing a smartwatch in contact with a user, the smartwatch including a registration module, a short-range RF communications module, a microphone, and skin illumination and measurement hardware") ............................................................. 116

        2.  [1F] ("wherein authentication of the user is based on biometric information obtained from the user via at least one of the microphone and the skin illumination and measurement hardware") / [4B] ("wherein authentication of the user is based on biometric information obtained from the user via at least one of the microphone and the skin illumination and measurement hardware") / [6B] ("wherein authentication of the user is based on biometric information obtained from the user via at least one of the microphone and the skin illumination and measurement hardware") / [7C] ("authenticating the user with at least one of the smartwatch and the secured electronic system using at least one biometric obtained from at least one of the microphone and the skin illumination and measurement hardware") ......................... 116

XIII. GROUND 6: CLAIMS 2 AND 4 ARE OBVIOUS OVER THARAPPEL AND JUN .............................................................................. 117

    A.  Combining Tharappel and Jun ............................................................... 117

    B.  Claim 2 ..................................................................................................... 118

        1.  [2PRE] "A method for enabling a wearable device user to access secured electronic systems" .................................................... 118

2. [2A] "placing a wearable device in contact with a user, said wearable device including [1] a telecommunications carrier access identification module, [2] a cellular RF communications module, and [3] a short-range RF communications module"...........119

3. [2B] "achieving secured, short-range RF communication between the wearable device and a secured electronic system".......119

4. [2C] "authenticating the user with at least one of [1] the wearable device, [2] a remote server via cellular communications supported by the telecommunications carrier access identification module and the cellular RF communications module, and [3] the secured electronic system via the secured, short-range RF communication"............................120

5. [2D] "providing the user with access to or through the secured electronic system once authenticated" .............................................121

6. [2E] "wherein said wearable device includes a GPS module for determining location of the wearable device user with respect to the secured electronic system" ........................................................122

7. [2F] "wherein the step of providing a user access to or through the secured electronic systems is also dependent on the location of the wearable device user" .............................................................123

C. Claim 4 ...................................................................................124

1. [4A] "wherein said wearable device further comprises a smartwatch including a microphone and skin illumination and measurement hardware"..................................................................124

2. [4B] "wherein authentication of the user is based on biometric information obtained from the user via at least one of the microphone and the skin illumination and measurement hardware" ........................................................................................124

XIV.CONCLUSION............................................................................124

CLAIM LISTING .................................................................................127

I, David H. Williams, declare:

1.      I have been retained by Wolf, Greenfield & Sacks, P.C., counsel for

Petitioner Google LLC, to assess claims 1-9 (the "challenged claims") of U.S.

Patent No. 10,362,480 ("the '480 patent").  I have personal knowledge of the facts

and opinions set forth in this declaration and believe them to be true.  If called

upon to do so, I would testify competently thereto.  I am being compensated for my

time at my standard rate, plus actual expenses.  My compensation is not dependent

in any way upon the outcome of the *inter partes* review of the '480 patent.

2.      My analysis is based on my years of education, research and

experience, as well as my investigation and study of relevant materials, including

those cited herein.

## I.      PERSONAL AND PROFESSIONAL BACKGROUND

3.      I am an expert in the fields of electrical engineering, electronic system

security (including system access based on user location or proximity to the

system), and user authentication techniques.  I have studied, practiced, and

researched in this field for over 35 years.  More specifically, as of 2015, I had more

than 13 years of industry experience in electronic systems security and access to

such systems based on user authentication over the period from 1987 through

2010.    I have summarized in this section my education background, work

experience, and other relevant qualifications. My curriculum vitae, which I

understand has been designated EX1004, further describes my background and experience.

4.    I earned a Bachelor of Science in Electrical Engineering degree (BSEE), with an emphasis on digital system design, from Purdue University in 1983. In 1987, I earned a Master of Business Administration degree (MBA), with a focus on information systems management, from The University of Texas at Austin.

5.    From 1983 to 1985, I worked at Hughes Aircraft Company as an electrical engineer, where I focused on microcomputer and digital system design on the F-15 fighter radar system.

6.    After completing by MBA, I worked for Deloitte Consulting (originally Touche Ross) as a Senior Manager from 1987 to 1991. At Deloitte, I provided consulting services for technology-intensive companies in developing business and product strategies.

7.    From 1991 to 1993, I worked as a Senior Associate in the Information Technology Practice of Booz Allen & Hamilton, providing consulting services for communications industry and information technology-intensive companies. From 1993 to 2002, I worked at Accenture as an Associate Partner in the Communications and High-Technology Strategy and Information and Technology Strategy groups. At Accenture, I led development of business, technology, and

product strategies for numerous communications and technology-centric companies looking to enter new markets. I specialized in new product design, development, and implementation, as well as network infrastructure design need to support next generation, high bandwidth-consuming digital media content and associated infrastructure.

8. In 2002, I founded E911-LBS Consulting, which was later renamed E911-LBS Forensics Engineering ("E911-LBS"). I am the president of E911-LBS, which provides services across the entire wireless value chain, particularly with respect to technology and business strategic planning and product design, development, implementation, and ongoing management and operations. (E911 refers to "enhanced 911," which is a system for emergency dialing in which the caller's location is automatically determined and provided to the emergency dispatcher. LBS refers to location-based services.)

9. I have worked on a wide variety of matters as a consultant through E911-LBS. Relevant to this matter, I managed the development of the Nextel (now Sprint/T-Mobile) Location-Based Services strategy, including researching and incorporating context-aware/presence concepts into product/device and network engineering plans. I also provided E911 consulting expertise in support of new spectrum regulatory approval and technical implementation issues for a

startup carrier and managed the design, collection, and analysis of E911 infrastructure deployment of western region of major wireless carrier.

10. Additionally, from 2007 to 2010 I worked for AT&T Mobility, first in a consulting role as a Consumer LBS Product Realization Manager, then as a Senior Product Manager – Enterprise LBS. At AT&T Mobility, my work included design, troubleshooting, and implementation of AT&T location-related network, application, user interface, digital media and content delivery, and privacy infrastructure and associated issues such as accuracy and privacy. I also managed products including telematics, fleet/vehicle management, asset/freight management, and mobile resource management GPS/LBS apps on a variety of platforms such as Telenav, and played key role in design of company-wide location services product and implementation roadmap.

11. I have written a number of books on wireless location including: The Definitive Guide to IoT Sensors and IoT Use Cases (In Development), The Definitive Guide to GPS, RFID, Wi-Fi, and Other Wireless Location-Based Services (2005/2009 versions, new version in development), The Definitive Guide to Wireless E911, and (co-authored) The Definitive Guide to Mobile Positioning and Location Management.

12. I am the inventor or a co-inventor of nine issued U.S. patents and numerous pending applications. These include:

- "Method and apparatus for providing mobile social networking privacy." (U.S. Patent Number 8,613,109, issued on December 17, 2013).

- "Systems and methods of using wireless location, context, and/or one or more communication networks for monitoring for, preempting, and/or mitigating pre-identified behavior." (U.S. Patent Number 10,477,342, Issued November 12, 2019).

- "Systems and methods for monitoring for and preempting pre-identified restriction violation-related behavior(s) of persons under restriction." (U.S. Patent Number 10,497,242, Issued December 3, 2019).

- "Systems and methods for providing location-based security and/or privacy for restricting user access." (U.S. Patent Number 10,555,112, Issued February 4, 2020).

- "Systems and methods for developing, monitoring, and enforcing agreements, understandings, and/or contracts." (U.S. Patent Number 10,853,897, Issued 12/1/2020).

- "Systems and methods for monitoring for and preempting pre-identified restriction violation-related behavior(s) of persons under

restriction." (U.S. Patent Number 10,861,307, Issued December 8, 2020).

- "Systems and methods for monitoring for and lowering the risk of addiction-related or restriction violation-related behavior(s)." (U.S. Patent Number 11,388,546, Issued July 12, 2022).

- "Systems and methods for monitoring for and preempting the risk of a future occurrence of a quarantine violation." (U.S. Patent Number 11,412,353, Issued August 9, 2022).

- "Dynamic and adaptive systems and methods for rewarding and/or disincentivizing behaviors" (U.S. Patent Number 11,636,941, Issued April 25, 2023).

13. Specifically, I have had much more than two years of industry experience or graduate-level experience with user authentication techniques for accessing secure electronic systems. In fact, as demonstrated by the examples below, as of 2015, I had more than 13 years of industry experience in electronic systems security and access to such systems based on user authentication over the period from 1987 through 2010. Specifically:

- 1987-1990 - As Senior Consultant at Deloitte and Touche, designed communications network and oversaw software design for from-scratch data center (mainframe) interfacing with 250+

6

hotels and restaurants, including all security protocols for interfacing with POS hotel and restaurant systems (Brock Hotels, Chuck-E-Cheese). (2.5 years)

- 1991-1992 – As Senior Associate at Booz Allen & Hamilton, led Project Management Office for design of TravelBase (American Airlines system for travel agents), including oversight of design of security and authorization for using TravelBase. (1 year)

- Mid-1990s – As Senior Manager at Accenture, designed and implemented AT&T Local Services Resale platform, including all aspects of user authentication and security. (approximately 2 years)

- 1998-2000 – Led the development of Nextel's location-based services product strategy, and the design of the underlying network and IT architectures to support such products, including user authentication and security. (approximately 2 years)

- 2004-2006 – Developed NAVTEQ web developer ecosystem, which included both the user authentication and security requirements and tools for various map data packages, as well as web developer access to overall platform. (approximately 2 years)

- (2007-2010) - Led design finalization and implementation of several of AT&T's first generation of location-based services, as

well as design of underlying location enabler network. Became the only non-employee inventor on U.S. Patent Number 8,613,109, Method and Apparatus for Mobile Social Networking Privacy (issued December 17, 2013). (approximately 4 years)

- (2013-2014) – Provided expert services in assessing validity of GPS tracking bracelet/system in parole violation matters.

14. In addition to the above, I have also provided expert analysis in connection with patent proceedings in this field for clients such as Nest and VIVINT. I have also worked with wearables (including wearable tags and sensor tracking systems) for spatial orientation detection, health monitoring, and tracking. This includes, for example, expert services in connection of GPS tracking for parole violations, as well as my own research and development work related to data collection from wearable devices, including wrist wearable devices, as shown in my patents. *See* paragraph 12. I also have experience working with near-range communication, such as Bluetooth, RFID, and WiFi. This includes in my expert testimony work. This experience is set forth in my CV, EX1004.

## II. MATERIALS REVIEWED AND CONSIDERED

15. My findings, as explained below, are based on my years of education, research, experience, and background in the field of electronic system security, as well as my investigation and study of relevant materials for this declaration. When

8

developing the opinions set forth in this declaration, I assumed the perspective of a

person having ordinary skill in the art, as set forth in Section IV below. In forming

my opinions, I have studied and considered the materials identified in Appendix A,

Materials Considered.

## III.  MY UNDERSTANDING OF PATENT LAW

16.     In developing my opinions, I discussed various relevant legal

principles with Petitioner's attorneys. Though I do not purport to have prior

knowledge of such principles, I understood them when they were explained to me

and have relied upon such legal principles, as explained to me, in the course of

forming the opinions set forth in this declaration. My understanding in this respect

is as follows:

17.     I understand that "*inter partes* review" (IPR) is a proceeding before

the United States Patent & Trademark Office for evaluating the patentability of an

issued patent's claims based on prior-art patents and printed publications.

18.     I understand that, in this proceeding, Petitioner has the burden of

proving that the challenged claims of the '480 patent are unpatentable by a

preponderance of the evidence. I understand that "preponderance of the evidence"

means that a fact or conclusion is more likely true than not true.

19.     I understand that, in IPR proceedings, claim terms in a patent are

given their ordinary and customary meaning as understood by a person of ordinary

skill in the art ("POSA") in the context of the entire patent and the prosecution history pertaining to the patent. If the specification provides a special definition for a claim term that differs from the meaning the term would otherwise possess, the specification's special definition controls. If a claim element is expressed as a "means" for performing a specified function, I understand that it covers the corresponding structure described in the specification and equivalents of the described structure. I have applied these standards in preparing the opinions in this declaration.

20. I understand that determining whether a particular patent or printed publication constitutes prior art to a challenged patent claim can require determining the effective filing date (also known as the priority date) to which the challenged claim is entitled. I understand that for a patent claim to be entitled to the benefit of the filing date of an earlier application to which the patent claims priority, the earlier application must have described the claimed invention in sufficient detail to convey with reasonable clarity to the POSA that the inventor had possession of the claimed invention as of the earlier application's filing date. I understand that a disclosure that merely renders the claimed invention obvious is not sufficient written description for the claim to be entitled to the benefit of the filing date of the application containing that disclosure.

21.     I understand that for an invention claimed in a patent to be patentable, it must be, among other things, new (novel—*i.e.*, not anticipated) and not obvious from the prior art.  My understanding of these two legal standards is set forth below.

## A.     Anticipation

22.     I understand that, for a patent claim to be "anticipated" by the prior art (and therefore not novel), each and every limitation of the claim must be found, expressly or inherently, in a single prior-art reference.  I understand that a claim limitation is disclosed for the purpose of anticipation if a POSA would have understood the reference to disclose the limitation based on inferences that a POSA would reasonably be expected to draw from the explicit teachings in the reference when read in light of the POSA's knowledge and experience.

23.     I understand that a claim limitation is inherent in a prior art reference if that limitation is necessarily present when practicing the teachings of the reference, regardless of whether a person of ordinary skill recognized the presence of that limitation in the prior art.

## B.     Obviousness

24.     I understand that a patent claim may be unpatentable if it would have been obvious in view of a single prior-art reference or a combination of prior-art references.

25.     I understand that a patent claim is obvious if the differences between the subject matter of the claim and the prior art are such that the subject matter as a whole would have been obvious to a person of ordinary skill in the relevant field at the time the invention was made.  Specifically, I understand that the obviousness question involves a consideration of:

- the scope and content of the prior art;

- the differences between the prior art and the claims at issue;

- the knowledge of a person of ordinary skill in the pertinent art; and

- if present, objective factors indicative of non-obviousness, sometimes referred to as "secondary considerations."  To my knowledge, the Patent Owner has not asserted any such secondary considerations with respect to the '480 patent.

26.     I understand that in order for a claimed invention to be considered obvious, a POSA must have had a reason for combining teachings from multiple prior-art references (or for altering a single prior-art reference, in the case of obviousness in view of a single reference) in the fashion proposed.

27.     I further understand that in determining whether a prior-art reference would have been combined with other prior art or with other information within the knowledge of a POSA, the following are examples of approaches and rationales that may be considered:

- combining prior-art elements according to known methods to yield predictable results;

- simple substitution of one known element for another to obtain predictable results;

- use of a known technique to improve similar devices in the same way;

- applying a known technique to a known device ready for improvement to yield predictable results;

- applying a technique or approach that would have been "obvious to try," *i.e.*, choosing from a finite number of identified, predictable solutions, with a reasonable expectation of success.

- known work in one field of endeavor may prompt variations of it for use in either the same field or a different one based on design incentives or other market forces if the variations would have been predictable to one of ordinary skill in the art;

- some teaching, suggestion, or motivation in the prior art that would have led one of ordinary skill to modify the prior-art reference or to combine prior-art reference teachings to arrive at the claimed invention. I understand that this teaching, suggestion or motivation may come from a prior-art reference or from the knowledge or common sense of one of ordinary skill in the art.

28.    I understand that for a single reference or a combination of references to render the claimed invention obvious, a POSA must have been able to arrive at the claimed invention by altering or combining the applied references.

## IV.    PERSON OF ORDINARY SKILL IN THE ART ("POSA")

29.    I have been informed and understand that for purposes of assessing whether prior-art references disclose every element of a patent claim (thus "anticipating" the claim) and/or would have rendered the claim obvious, the patent and the prior-art references must be assessed from the perspective of a person having ordinary skill in the art ("POSA") to which the patent is related, based on the understanding of that person at the time of the patent claim's priority date.  I have been informed and understand that a POSA is presumed to be aware of all pertinent prior art and the conventional wisdom in the art, and is a person of ordinary creativity.  I have applied this standard throughout my declaration.

30.    The '480 patent involves technology in the field of electronic systems security and access to such systems based on user authentication.  I have been asked to provide my opinions as to the state of the art in this field by August 12, 2015.  I use this timeframe because the face of the '480 patent indicates an earliest claimed priority date of August 12, 2015.  Whenever I offer an opinion in this declaration about the knowledge of a POSA, the manner in which a POSA would have understood the claims of the '480 patent or its description, the manner in

14

which a POSA would have understood the prior art, or what a POSA would have been led to do based on the prior art, I am referencing the August 12, 2015 timeframe, even if I do not say so specifically in each case.

31.    I understand that the Patent Owner may attempt to prove that the alleged invention recited in the challenged claims was conceived at some time prior to the earliest claimed priority date on the face of the patent. At the time of this declaration, I am unaware of the Patent Owner having alleged any earlier conception date or produced any evidence to establish any earlier conception date.

32.    In my opinion, a person of ordinary skill in the art in the August 12, 2015 timeframe ("POSA") would have had a bachelor's degree in electrical engineering, computer science, or a related field, plus at least two years of industry experience or graduate-level experience with user authentication techniques for accessing secure electronic systems. This person would have been capable of understanding and applying the teachings of the '480 patent and the prior-art references discussed in this declaration.

33.    By 2015, I held a Bachelor of Science in Electrical Engineering (BSEE) degree with an emphasis in Digital System Design, in addition to a Master of Business Administration (MBA) in Information Systems Management, and I had over 13 years of experience with user authentication techniques for accessing secure electronic systems. *See* paragraph 13. Therefore, I was a person of more

than ordinary skill in the art during the relevant timeframe. Additionally, I worked with many people who fit the characteristics of the POSA, and I am familiar with their level of skill. When developing the opinions set forth in this declaration, I assumed the perspective of a person having ordinary skill in the art, as set forth above.

## V.     BACKGROUND OF THE TECHNOLOGY

34.     The background of the various technical fields/disciplines associated with the '480 patent are straightforward, and all were well established prior to the 2015 priority date. Specifically, the following was well known to a POSA by that time:

- Numerous form factors of computer system-oriented electronic devices existed, including smartwatch-type forms, that could communicate with other systems using known methods;

- Such form factors could use well-known absolute and relative location techniques/technologies to be located and to locate other devices around them;

- Such form factors also incorporated other biometric-type sensors, including skin illumination; and

- All the above could be used for electronic system access/security purposes.

## A.    Form Factors

35.    The concept of "wearables" in the form of electronics and computers has been around for decades. In fact, the first IEEE Symposium for Wearable Computers (ISWC) in 2022 celebrated its 25th anniversary of the first symposium in 1997.[1]

36.    The concept of, and use of the term, "Smartwatch" was known at least as early as 2007, with an article that introduced "our concept of a Smartwatch -- a wrist-worn form of a general-purpose wearable computer."[2] These kinds of articles about smartwatches focused on a variety of factors, but generally they narrowed into two areas: how to get as much functionality into the form factor, and how to do so while making the user interface as friendly as possible.

37.    Addressing both of these areas depended on, or at least utilized, some form of communications capabilities with other devices, such as people's phones. As a consequence, smartwatch innovations incorporated various communications

---

[1] EX1042, "The 25th Edition of the International Symposium on Wearable Computers," IEEE Pervasive Computing (April-June 2022).

[2] EX1043, Pascoe, "On the Use of Mobile Tools in Everyday Life," OZCHI '07: Proceedings of the 19th Australasian conference on Computer-Human Interaction: Entertaining User Interfaces, 39-47 (November 2007).

methods, including RF, Bluetooth, and others, such as described by 2001 patent

application Berney (EX1008), enabling a variety of use cases such as its

"authentiswatch" checkout capability, below:

FIGURE 3

18

## B.    Location Services

38.    One core aspect of mobile devices (including smartwatches), and key requirement in most mobile applications, is to take advantage of their mobility, e.g. use their location in some form to aid or add functionality.

39.    Since the early days of mobile devices, and particularly since the passage of The 1996 Telecommunications Act, more and more devices and applications have had GPS and/or other location capabilities built in.  For example, one of the first GPS-enabled phones was the Benefon Esc! launched in 1999.[3]

40.    Location was not just limited to mobile phones; watches were a natural companion form factor. In fact, in 1927 there was a watch that used paper maps (manually) scrolled on a watch to help people navigate:[4]

---

[3] EX1044, IT History Society, "Benefon ESC!," available at

https://www.ithistory.org/db/hardware/benefon/benefon-esc

[4] EX1045, "(Sc)Rolling Down the Highway: Vintage 1927 Analog GPS," available at https://gajitz.com/scrolling-down-the-highway-vintage-1927-analog-gps/



**(Sc)Rolling Down the Highway: Vintage 1927 Analog GPS**

41.     Fast forwarding to modern times saw the 2003 Garmin Forerunner watch having GPS to enable a variety of location-based services:[5]

---

[5] EX1046, "Garmin Forerunner," available at https://trigearlab.com/garmin-forerunner/.

## 2003: Garmin Forerunner



WAREABLE

42. It is worth pointing out that location-enabled devices can utilize two types of locations: absolute and relative. Absolute location is a very specific location, such as a latitude and longitude, or a street address. This kind of location generally has some sort of reference system underlying it, such as the WGS 84 reference system for the United States GPS system.[6]

43. The second kind of location is relative: where a device (e.g. person) is relative to some other person, place or thing. While GPS can be used to determine relative location, there are other, more efficient ways, such as whether (or not) one device is within range of the Bluetooth signal for another device. Since there such

---

[6] EX1047, "World Geodetic System," available at
https://en.wikipedia.org/wiki/World_Geodetic_System#WGS84

signals have a very short range (e.g. 10 meters), such techniques are very good for determining if a device is "in proximity" to another device. Both absolute and relative location determination are useful in location services, depending on the application, use cases, and capabilities of the devices involved. These distinctions and key aspects are discussed more in the Grounds (particularly for claim 2).

### C.  Biometric Sensors and Associated Applications

44.  Location was not the only capability that innovators looked to include in form factors such as smartwatches; numerous other ones soon followed, particularly biometric-related ones (particularly useful for fitness and other purposes, such as authentication, discussed shortly).  All sorts of sensors were evaluated and incorporated into smartwatch design, including the "photoplethysmogram sensors," near infrared sensors, light sensors, and optical sensors described in Agrafioti, prior art in this matter.  Applications using these kinds of sensors were varied; for example Agrafioti (EX1011) states that its biometric wearable may include pulse detection ([0108], [0116]) or vein pattern recognition ([0028]).

45.  These kinds of sensors are known as skin illumination measurement hardware, because they emit light (or other optical output) and measure a response to that light (or other optical output).  Other art, such as Tamura (Exhibit 1030) uses the associated light reflection, seen below, for a variety of purposes:

22

 

(transmission)        (reflectance)

46.    These capabilities, and continued development of computer-type capabilities in smartwatches, such as the 2012 Sony SmartWatch below, had set the logical stage for using smartwatches for authenticating accessing electronic systems using smartwatches, next.

## 2012: Sony SmartWatch



**D.    User Authentication**

47.    Well before biometrics came on the scene, computer security experts recognized the utility of requiring multiple layers of authentication to access systems and applications. For example, a 1990 study, *When a Password is Not a Password*, looked at "How two-factor systems can be technically overlaid for implementation in existing environments."[7]

48.    Location-related two-factor authentication innovations also occurred, taking advantage of the location capabilities explosion that followed The 1996 Telecommunication Act. Various research investigated various aspects of using location—and biometrics—in such authentication and authorization. For example, a 2012 paper—*Location-based Authentication and Authorization Using Smart Phones*[8]—while focusing on using mobile location in user authentication and authorization, emphasized the utility of broader biometrics for such purposes:

---

[7] EX1048, Weiss, "When a Password Is Not a Password," IEEE Proceedings IEEE International Carnahan Conference on Security Technology, Crime Countermeasures, Abstract (1990).

[8] EX1049, Zhang, "Location-based Authentication and Authorization Using Smart Phones," IEEE Proceedings 11th International Conference on Trust, Security and Privacy in Computing and Communications (2012).

24

"Authentication and authorization are two of the most important security features for mobile transaction systems. Most commonly, these schemes depend on three factors: what you know (secret), what you have (token), **and what you are (biometrics).**" Abstract (emphasis added).

49.     By the time of the '480 patent 2015 priority date, there had been numerous research studies and innovations in such biometric-based authentication and authorization, including for form factors such as smartwatches. Studies such as a 2010 article, *Biometric Identification Through Hand Vein Patterns*[9], focused on aspects such as "statistical processing of the...vein patterns," while Lee (2013, EX1009), describes a wrist wearable such as a watch with contact sensors "for authenticating a user based on a wrist vein pattern." Lee, [0003]. Other art, such as Jun (EX1010) disclosed at length key applications for such capabilities, such as unlocking car doors:

---

[9] EX1050, Yuksel, "Biometric Identification Through Hand Vein Patterns," IEEE Proceedings 2010 International Workshop on Emerging Techniques and Challenges for Hand-Based Biometrics, Abstract (2010).



FIG.9

50.    Thus, in total, a POSA would recognize that by the time of the '480

priority date, all the component relevant and associated technology fields and

disciplines were well known.

## VI.    THE '480 PATENT

### A.    Introduction to '480 Patent

51.    The '480 patent relates to wearable devices ("wearables"), e.g.,

smartwatches, that allow a user to access secured electronic systems based on user

authentication.  EX1001, Abstract, 2:53-3:61.  An SES is "broadly defined" as any

"system requiring electronic initiation for its operation or to gain access to it."

EX1001, 4:57-59.  Examples include secured entry barriers (safes, doors),

laboratory equipment, ATMs, payment mechanisms (e.g., parking meters), point-

of-sale, and other secured databases.  EX1001, 2:60-3:3.  Wearables, including

smartwatches, with "wireless communication capability" and a subscriber

identification module ("SIM") were already well-known and on the market by 2015. EX1001, 1:37-65, 4:51-52.

52. The claimed authentication techniques include biometric authentication (voice, heart rate pattern) and relative location authentication (user location in relation to the SES). EX1001, 3:4-:3; 5:62-7:22. The wearable includes appropriate hardware to enable such authentication, such as a microphone (for voice authentication) and "skin illumination hardware" (for "vital pattern" authentication). EX1001, 3:29-37, 7:11-12. The disclosed authentication methods can be used independently or together. EX1001, 5:50-53.

53. Claims 1-9 are method claims. The independent claims share common steps [PRE] through [D], which relate to wearable functionality and hardware that was well-known in 2015. The patent's purported novelty appears in steps [E]-[F], which recite certain hardware (e.g., a microphone, skin illumination/measurement hardware, a GPS module) and related user authentication techniques to access a "secured electronic system" ("SES"). As demonstrated herein, these purportedly novel hardware components and user authentication techniques also were well-known and used in wearables by 2015. It was also well-established by 2015 that multifactor authentication (e.g., requiring user authentication to be verified via more than one authentication technique) enhanced security and was an important feature in environments involving highly

sensitive information or areas. It would have been obvious over one or more of the references relied on in the Petition and discussed herein to arrange well-known hardware components and authentication techniques in the claimed manner, and POSAs would have expected success in doing so.

**B.     Prosecution History of the '480 Patent**

54.     During prosecution, original claims 9-19 were elected in response to a restriction requirement. EX1002, 82, 76. The Examiner rejected original independent claims 9 and 16 as anticipated by O'Toole (EX1012) and Agrafioti (EX1011) but indicated (without explanation) that the pending dependent claims, including original claims 10-12 and 17, were allowable. EX1002, 61-62.

55.     In response, applicants canceled the original independent claims and rewrote original claims 10-12 and 17 as independent claims, with the limitations that were originally recited as dependent claims now recited in steps [E]-[F] for each rewritten claim. EX1002, 47-50. This resulted in issued independent claims 1-3 and 7 having shared limitations from the canceled original independent claims, plus differing limitations [E]-[F] from the rewritten dependent claims.

**C.     The Challenged Claims**

56.     Independent claim 1 is reproduced below with labels for individual limitations added:

| **[1PRE]:** A method for enabling a wearable device user to access secured electronic systems, said method comprising: |
| --- |

| |
|---|
| **[1A]** placing a wearable device in contact with a user, said wearable device including **[1A-1]** a telecommunications carrier access identification module, **[1A-2]** a cellular RF communications module, and **[1A-3]** a short-range RF communications module; |
| **[1B]** achieving secured, short-range RF communication between the wearable device and a secured electronic system; |
| **[1C]** authenticating the user with at least one of **[1C-1]** the wearable device, **[1C-2]** a remote server via cellular communications supported by the telecommunications carrier access identification module and the cellular RF communications module, and **[1C-3]** the secured electronic system via the secured, short-range RF communication; and |
| **[1D]** providing the user with access to or through the secured electronic system once authenticated; |
| **[1E]** wherein said wearable device comprises a smartwatch including a microphone and skin illumination and measurement hardware, and |
| **[1F]** wherein authentication of the user is based on biometric information obtained from the user via at least one of the microphone and the skin illumination and measurement hardware. |

57. Independent claims 2, 3, and 7 include claim 1's steps [PRE] through [D] but recite different requirements for steps [E]-[F]. Steps [2E]-[2F] relate to user location determined by a "GPS module." Steps [3E]-[3F] recite a "registration module." Steps [7E]-[7F] relate to user authentication with a SIM and a cellular communications module.

58. Each dependent claim merely replicates elements from other independent claims. For example, claim 4 depends from claim 2 and adds the biometric authentication limitations of claim 1.

59. I have been asked to provide my opinion concerning whether claims 1-9 of the '480 patent are anticipated or would have been obvious to a POSA in

light of the prior-art references identified in the Petition. For the reasons explained below, it is my opinion that each of claims 1-9 is anticipated and/or would have been obvious to a POSA.

## VII. CLAIM INTERPRETATION

60.    I understand that determining whether a claimed invention is novel and non-obvious requires comparing the prior art to the claim. I discuss in this Section below the interpretations I have applied to certain claim terms, in accordance with the standards set forth in Section III above.

### A.    "at least one of"

61.    Each challenged claim includes the phrase "at least one of" followed by a list of options joined by the word "and."

62.    I understand that, in the challenged claims, the term "at least one of" has a disjunctive meaning—i.e., the claim is met when one or more of the listed items is present. In other words, the phrase "at least one of" as used in the challenged claims does not require that all listed items be present.

63.    Further, I have been informed that "at least one" may be presumed to have a conjunctive meaning *only when* it "precedes a series of categories" that contain multiple possible values. Here, the '480 patent uses "at least one of" not before a series of categories that can each have multiple values, but rather either before a list of single-valued conditions or options (e.g., "authenticating the user

with at least one of" followed by various optional authentication methods) or to introduce two single-valued items, only one of which is required (e.g., "at least one of the microphone and the skin illumination and measurement hardware"). Therefore, I understand that this presumption does not apply to the phrase "at least one of" in the challenged claims.

64.     Additionally, I understand that such a presumption can be rebutted if the surrounding claim language or the patent's specification support such a rebuttal. Here, even if there is a presumption that "at least one of" is used conjunctively in the challenged claims, my review of the surrounding claim language and specification rebuts that presumption. *See, e.g.,* EX1001, 6:55-57; 6:64-65; 7:14-16. For example, the '480 patent expressly refers to these listed items as "conditions." *See* EX1001, 6:64; 7:15-16.

65.     I also understand that Patent Owner interprets "at least one of" in the challenged claims to have a disjunctive meaning parallel district-court litigation. *See* EX1006 at 7. This further supports interpreting "at least one" disjunctively.

66.     Accordingly, in my analysis, I interpret and assess the unpatentability of the challenged claims using a disjunctive meaning for the phrase "at least one of"—*i.e.*, the claim is met when one or more of the listed items is present.

## B. Other Matters of Claim Interpretation

67. I have been informed that in the parallel District Court litigation, Petitioner has asserted that the step of "authenticating the user" must be performed in the order recited, before the step of "providing the user with access to or through the secured electronic system once authenticated." EX1023, 4. The opinions as set forth herein do not depend on whether or not it is ultimately determined that the steps must occur in this order, nor do my opinions change if no determination is made on this issue. This is because the prior art renders obvious the claims when the step of "authenticating the user" must be performed before the step of "providing the user with access to or through the secured electronic security system once authenticated." Accordingly, the claims are obvious whether or not that order is required.

## VIII. GROUND 1: CLAIMS 1-5 ARE OBVIOUS OVER AGRAFIOTI ALONE OR WITH BERNEY

### A. Agrafioti (EX1011)

68. Agrafioti is directed to a user authentication system that is "centered around a wearable biometric device that authenticates the wearer based on one or more unique biometric characteristics." [0055]-[0057]; *see id.*, Abstract, [0030]-[0033], [0045]-[0046], [0089]. Agrafioti's system allows an authenticated user to gain "secure access to other systems and devices at one or more" access points. [0054]. Agrafioti defines an "access point" as "any logical or physical gateway,

device, or application that requires authorization, …and is otherwise locked or inaccessible to the user." [0029]-[0030], [0093]-[0096], [0104]-[0107], [0155]-[0171], [0196]-[0198]. Agrafioti's biometric wearable is "any device that can be worn by a user and is capable of obtaining a biometric signal" such as "a wristband, wristwatch, bracelet, necklace," etc. Agrafioti, [0044], [0089].

69.    An exemplary wristband/bracelet biometric wearable 400 is illustrated in Figures 4A and 4B and includes, among other things, high and low bandwidth radio transceivers, a GPS module, an ECG sensor, other biometric sensors, and optional additional sensors.  [0113]-[0123].



FIG. 4A

FIG. 4B

Figs. 4A-4B (annotated).

70.     Other biometric sensors may include "microphones, near infrared sensors, light sensors, ... photoplethysmogram sensors," and others, including "optical sensors." [0122]. Additional sensors 424 include motion sensors, proximity sensors, and GPS sensors. [0109]; Figs. 4A-4B. "These additional sensors may provide one or more contextual signals such as the location of the wearable device and/or proximity to trusted environments." Id.; [0096], [0112], [0121]. The wearable's sensors may be used to identify a range of "biometric signals and/or data that represent biometric features that may be employed to uniquely identify the user." [0091]; id., [0028], [0124]. "Non-limiting examples of biometric data that may be employed to uniquely identify a user" include "heart rate, galvanic skin response, ...voice or voiceprint, body electrical characteristic, body thermal characteristic," as well as "vein pattern" and "photoplethysmogram, electromyogram, [or] electroencephalogram." [0091]; id. [0028]; [0124].

71.     The wearable's "additional sensors" may be used "to obtain additional biometric or environmental readings. Some non-limiting examples of an additional sensor are motion sensor, proximity sensor," as well as "GPS sensor." [0109]. "These additional sensors may provide one or more contextual signals such as the location of the wearable device and/or proximity to trusted environments." Id.; see

[0096] (discussing use of proximity data); [0112] (discussing tacking or GPS detector activity); [0121] (discussing GPS transceiver).

72.     POSAs would have understood that proximity refers to a relative location between two or more objects while "location" refers to absolute location (e.g., latitude and longitude). [0121]. *See* below, Section VIII.E.1.

73.     Agrafioti describes multiple ways of user authentication, including by the wearable itself, by an authorized authentication device ("AAD") that can communicate with the wearable, and/or by a biometric authentication server that can communicate with the wearable and the AAD. [0028], [0033]-[0037], [0057], [0091]-[0093], [0103]. For example, Agrafioti describes user authentication based on biometric data (e.g., pulse, vein pattern) captured by the wearable's biometric sensors. [0033], [0091] (biometric sensors capture a range of "biometric signals and/or data" that may be used "to uniquely identify the user"), [0124]. Agrafioti also describes creating a "unique biometric profile" that can be stored on the wearable or on the AAD to authenticate a user or pre-authenticate the wearable. [0055], [0095], [0102]-[0103], [0140]-[0153], [0196], Fig. 7.

74.     Agrafioti also teaches that wearable biometric "devices may be arranged to employ additional non-biometric security factors," such as "a password, a Personal Identification Number (PIN), a gesture, a voice command, a finger tap, a distance between the preauthorized biometric device and the at least

35

[one] access point, [or] one or more additional biometric features of the user."
[0035]; [0153] (similar).

75.     Agrafioti's Figures 6-15 depict "generalized operations" of certain embodiments.  [0131].  In the Figure 12 embodiment, a wearable is "sensed by an access point."  [0196].  At step 1204, if the user is authenticated, the user is granted access to the access point.  [0196]-[0198].  In some embodiments, proximity data may be used to unlock an access point when the wearable "is within a specific range" or distance of an access point.  Agrafioti, [0096], [0167].

76.     Agrafioti's user authentication techniques are described in greater detail in the limitation-by-limitation analysis below.  As discussed below, Agrafioti discloses or renders obvious claims 1-4. Agrafioti Figures 6-12 depict "generalized operations" of its various embodiments.  In the Figure 12 embodiment, a biometric wearable is "sensed by an access point."  [0196].  Access points include "any logical or physical gateway, device, or application that requires authorization, …and is otherwise locked or inaccessible to the user."  [0029].  At step 1204, if the biometric wearable is authenticated, the user may be granted access to the access point.  [0196]-[0198].

77.     Agrafioti also allows the biometric wearable to be "pre-authenticated." [0196]; *see* [0140]-[0153] (Fig. 7).  In one such embodiment, the biometric wearable captures biometric signals to authenticate the user.  [0143].

Then, the biometric data may be transmitted wirelessly to a paired "authorized authentication device" (AAD). [0144]; *see* [0055].

78.     The AAD may authenticate the user and authorize the biometric wearable to wirelessly communicate the preauthenticated user identity to other devices and systems," such as access points.  [0055]; *see id.*, [0030], [0034], [0106], [00143]-[0153]. Once preauthorized, the biometric wearable "may stay in the preauthorized mode until it is separated from the user." Agrafioti, [0140].

79.     Agrafioti's wearable biometric "devices may be arranged to employ additional non-biometric security factors for preauthorizing an enrolled device," such as "a password, a Personal Identification Number (PIN), a gesture, a voice command, a finger tap, a distance between the preauthorized biometric device and the at least [one] access point, [or] one or more additional biometric features of the user." Agrafioti, [0035]; [0153] (similar).  In some embodiments, proximity data may be used to unlock an access point when the biometric wearable "is within a specific range," for example, "a door lock is only unlocked when the authorized user is within a certain distance." Agrafioti, [0096]; [0167] ("an access point …grants access to the user when the preauthorized wearable biometric device is detected to be in close proximity").

80.     As discussed below, Agrafioti discloses or renders obvious claims 1-4. To the extent that Agrafioti alone does not render obvious using GPS location

information for authentication purposes, it would have been obvious to do so based on Berney, discussed below in Section VII.C.

**B.    Berney (EX1008)**

81.    Like Agrafioti, Berney teaches using a wearable to authenticate user identity and authorize the authenticated user for transactions such as "car parking at a public parking meter" ([0036]), gaining authorized entry to a restrict area ([0037]), and other use cases with "no discernable limit" on the wireless transaction use cases that could be applicable ([0035]).  *See* Berney, [0001] Berney's exemplary wearable is a watch that "provides a biometric data reader" ([0028]-[0029]) and includes "other functional circuitry" such as a GPS receiver ([0039]-[0040]).  *See* Berney, [0012]; [0032].  Berney's Fig. 1 is reproduced below:



FIGURE 1

82. Like Agrafioti, Berney describes user authentication via the wearable. [0032]. Berney teaches that requiring multiple layers of authentication enhances security, including requiring biometric-based authentication in conjunction with authentication based on location, proximity, or both. Berney, [0034] (noting that "requiring multiple levels" of security provides "virtually ironclad" security for "a single specific user"), [0035]-[0040].

83. For example, Berney describes "a proximity check" enabled by "RF communications such as Bluetooth" ([0038]), where the user is authenticated by the wearable using "the user's biometric data" *and* by whether the wearable is "worn by the authorized user" and "in suitable proximity to [the] transaction device" ([0041]). Berney further teaches that "very accurate location information" from a GPS receiver can be used as an additional "backup to a proximity indication," by requiring a wearable's GPS location to "agree with proximity communications devices in order to authenticate a transaction." Berney, [0040] (explaining that such a configuration makes "forgery" of the wearable "much more difficult"). POSAs would have understood these disclosures as teaching using a GPS module to obtain the absolute location information of two or more devices and comparing those locations to determine the relative location of the devices, in order to provide "backup" proximity information. Further, POSAs would have known that one way of determining a wearable user's location with respect to a

device or system (e.g., SES) is by comparing GPS location information of each respective device/system. Berney, [0040]; EX1026, 5:4-14, 6:65-7:2, 10:8-45; 12:31-66; Fig. 5.

### C. Combining Agrafioti and Berney

84. Well before the '480 patent's priority date, POSAs would been familiar with multiple authentication methods, including passcodes, passwords, biometric data readings, and location and proximity metrics. Agrafioti, [0003]; Berney, [0002]-[0010], [0028]. Also in this timeframe, POSAs would have understood that using multiple authentication techniques together enhanced security. *See* EX1010, 13:49-14:5; EX1033, 3:4-14, 16:3-14; EX1034.

85. It would have been obvious to POSAs to combine Berney's teachings about using GPS location information with Agrafioti's systems and method. Each reference describes wearables with sensors (including biometric sensors), short-range communication capability, and GPS capabilities. Further, each reference describes user authentication with biometric features and contemplates that location and/or proximity data may be used as an additional security measure before providing the user access to secured (e.g., locked) data or areas. Agrafioti, [0055]-[0057], [0096], [0167]; Berney, [0028]-[0029], [0038]-[0041].

86. Based on Agrafioti's teachings that its wearable biometric devices may "employ ***additional non-biometric security factors*** for preauthorizing an

40

enrolled device" (Agrafioti, [0153])[10] coupled with Agrafioti's description of using proximity data and GPS location ([0096], [0167]), POSAs would have been motivated to require that GPS location information "agree with proximity communications" as taught by Berney ([0040], [0029]). Further, POSAs would have understood that Berney's location and proximity authentication techniques are alternative options for authentication that are consistent with Agrafioti's teachings. Berney, [0037]-[0038], [0040]; Agrafioti, [0003]; below Section X.B (discussing corroborating references for multifactor authentication).

87.    Additionally, in view of Berney, POSAs would have been motivated to apply Agrafioti's methods and systems to both Agrafioti's uses (e.g., unlocking access points) and the types of "wireless transactions" described in Berney (e.g., authorizing "car parking at a public parking meter" ([0036]), "an authorized person seeking entry into a restricted entry area" ([0037])).

88.    POSAs would have reasonably expected success in combining Agrafioti and Berney. Both Agrafioti and Berney describe a wearable device with a GPS receiver having similar form factors (e.g., watches) and describe similar platforms (including processors, memory, biometric readers, and antennas).

---

[10] **Bold and italics** emphases herein are added unless otherwise indicated. *Italics* emphases herein are added to indicate challenged claim language.

Agrafioti, Fig. 4B, [089], [0104], [0112]-[0115], [0121]; Berney, Fig. 6, [0029], [0039], [0040].  By the critical date, POSAs would have known how to configure and program Agrafioti's hardware to implement programs using GPS in a wrist-wearable device because implementation of GPS location technology in a wrist-wearable form factor was well understood by POSAs.  *See* EX1027, U.S. Patent No. 6,185,157, ("Farine"), Abstract; EX1028, U.S. Patent No. 7,391,677 ("Urano"), 4:61-67; EX1029, 7,889,085 ("Downey"), 1:25-35, 3:61-63.  Farine incorporates a GPS receiver into a traditional analog watch to "indicat[e] the direction of a 'target' destination or location from a 'source' location where the GPS receiver is situated" as an aid to navigation.  EX1027, 1:7-11.  Urano describes improvements to transmission of data needed by a GPS receiver to optimize for use in "small devices such as a wristwatch."  EX1028, 10:59-62.  Downey describes a watch that couples GPS-based location with location based on motion so that location can be tracked underwater where GPS is unavailable.  EX1029, 5:27-6:3.  These examples demonstrate that incorporating GPS into wearable devices, and specifically wristwatch-style devices, was well-known by the critical date.  Accordingly, a POSA would understand how to implement applications of GPS in a wrist wearable form factor.

## D. Claim 1

89.     Agrafioti alone or in combination with Berney renders obvious claim 1.

### 1.     [1PRE]: "A method for enabling a wearable device user to access secured electronic systems"

90.     Agrafioti discloses methods for authenticating a user of a wearable device before allowing the user to access an "access point." Agrafioti, [Abstract], [0029]-[0030], [0044], [0054], [0093]-[0096], [0104]-[0107], [0155]-[0171], [0196]-[0198]. Agrafioti's "access points" are examples of "secured electronic systems" as demonstrated below §VIII.D.3 ([1B]). Thus, to the extent [1PRE] is limiting, Agrafioti satisfies "*a method for enabling a wearable device user to access secured electronic systems.*"

### 2.     [1A] "placing a wearable device in contact with a user"

91.     Agrafioti uses biometric wearable devices including is "any device that can be worn by a user and is capable of obtaining a biometric signal," such as wristbands, wristwatches, bracelets, necklaces, or rings. Agrafioti, [0044], *also* [0089], [0114]-[0115], Fig. 4A-4B. Agrafioti further teaches that that the wearable includes sensors that are in physical contact with the user. *See* Agrafioti, [0124] ("biometric sensor [] may be arranged to include a variety of components for interacting with the wearer"); [0091] (biometric data collected from user); [0099] (wearable's "electrodes make[] contact with the wrist"), [0107]. Berney also

teaches POSAs that wrist-worn wearables like Agrafioti's are worn in contact with the user. Berney, [0032] (watch sensor). As stated in the '480 Patent, contact includes "placement" on wrist. EX1001, 6:33-36. Thus, Agrafioti's method places the wearable "*in contact with a user*" as claimed.

### a. [1A-1] "said wearable device including a telecommunications carrier access identification module"

92. Agrafioti's wearable communicates with client computers 102-105 over a network such as wireless network 108. Agrafioti, [0044]-[0049], [0117]. Agrafioti's Fig. 1 is reproduced below.



93.    "Wireless network 108 may include virtually any wireless communication mechanism by which information may travel between client computers 103-105, ***biometric device 106***, and another computer network." Agrafioti, [0049] (also discussing "cellular" communication such as 2G/3G/4G/5G for network 108).

94.    Agrafioti ([0042]) describes using mechanisms implemented by modules within client computers 103-105 (e.g., mobile identification number,

electronic serial number) to "uniquely identify themselves" on network 108.

POSAs would have understood that the same mechanisms could beneficially be included in biometric device 106 to uniquely identify itself on the same network. These "uniquely" identifying mechanisms within Agrafioti's wearable are types of "*telecommunications carrier access identification modules*" as claimed. EX1001, Abstract ("A wearable device can include a telecommunications carrier identification module (e.g., SIM)."), 2:21-34, 4:4-14.

### b. [1A-2] "a cellular RF communications module"

95. [1A-2] recites "*a cellular RF communications module*." "RF communications" means "radio frequency communications." EX1001, 5:5:33; *see also* EX1041, Merriam-Webster's Collegiate Dictionary, 1068 (2006) (defining "RF" as "radio frequency"). Agrafioti's wearable device has "one or more radios or transceivers ...to communicate with other computers or devices." Agrafioti, [0095], [0105], [0113]-[0115], Figs. 4A-4B.



FIG. 4A

FIG. 4B

96.     For example, wearable 400 includes high bandwidth radio

transceivers 410 that can include "high bandwidth mechanisms such as Wi-Fi, or

the like" for "communication with various devices," including "biometric servers

and cloud services." Agrafioti, [0117]. The transceiver may be coupled to a dipole

or other antenna "to facilitate the transmission and reception of wireless signals."

Agrafioti, [0104]. The wearable communicates with biometric servers and cloud

services (e.g., server 116) via networks 108 and 110 (see FIG. 1), where network

108 may employ 2G/3G/4G/5G "radio access for cellular systems." Agrafioti,

[0049]. POSAs would thus have understood that the wearable's high bandwidth

radio transceivers 410 alone or coupled with antenna(e) include cellular

47

communications and, therefore, comprise a *"cellular RF communications module"* as claimed. EX1001, 5:31-37; Agrafioti, [0047]-[0050]; EX1022, 1:9-2:28.

**c.      [1A-3] "said wearable device including…a short-range RF communications module"**

97.      Bluetooth communications and near field communication (NFC) are examples of *"short-range RF communications"* as claimed. EX1001, 2:6-10 ("short range radio frequency" communications include "Bluetooth" and "NFC"), 5:22-25, 6:23-24 (similar) 6:41-45 (similar); EX1014, (US 2010/0178866), [0002]-[0003] ("[N]ear field communication covers various *short-range* techniques and technologies which enable wireless communication.") EX1018, US Patent No. 8,208,867, 1:24-28 ("Electronic devices may use short-range wireless communications links," such as "the WiFi® (IEEE 802.11) bands at 2.4 GHz and 5 GHz and the Bluetooth® band at 2.4 GHz."); EX1024, U.S. Patent Publication No. 2010/0178866, [0002]-[0003] ("[N]ear field communication covers various short-*range* techniques and technologies which enable wireless communication."), [0013] (Bluetooth is a short-range communication technology)).

98.      Agrafioti's biometric wearable includes a low bandwidth radio transceiver 412, which "may represent components for communicating using low-power, shorter range radio systems such as, Blue Tooth, …NFC, …the like, or combination[s] thereof." Agrafioti, [0117], [0002]-[0003], [0030], [0094]-[0096],

48

[0165]-[0166]. Thus, Agrafioti's wearable includes "*a short-range RF communications module*" (e.g., low bandwidth radio transceiver 412) as claimed.

### 3. [1B] "achieving secured, short-range RF communication between the wearable device and a secured electronic system"

99. The '480 patent's Figure 2 (excerpt below) illustrates a "secured" connection between wearable device 100 and SESes 130, such as "secured barriers, vehicle, equipment, ATM" and others. *See* EX1001, 5:62-64.



100. Agrafioti discloses the same type of secured, short-range RF communication between a wearable biometric device and "access points." Agrafioti, [0030], [0166] (explaining that explains that the "transmission of entry authorization signals from the preauthorized wearable biometric device to the desired access point ... is preferably accomplished wirelessly," for example, by "Bluetooth, WIFI, NFC, or the like"). For example, the wearable may send a

"control signal…to a physical or logical access point that may enable the user to unlock or access the access point." "The control signal may be a binary encoded sequence transmitted wired or wirelessly using but not limited to bluetooth, near field communication or Wifi." Agrafioti, [0030], [0049], [0166], [0196]-[0199]. Agrafioti also describes biometric authentication using the cloud. [0102]-[0103], [0131], [0211-0215].[11]

101. The '480 patent "broadly define[s]" an SES "as a system requiring electronic initiation for its operation or to gain access to it." EX1001, 4:57-59. Agrafioti similarly defines an access point as "any logical or physical gateway, device, or application that requires authorization, such as for security or personalization purposes, and is otherwise locked or inaccessible to the user." Agrafioti, [0029]. Agrafioti describes non-limiting physical examples of access points including "electronically locked doors" and "parking transceivers" and non-limiting logical examples of access points including "passcode protected electronic devices or accounts" and "proof of payment systems." *Id.* Agrafioti's "access points" are thus "*secured electronic systems*" as claimed. EX1001, 2:63-3:3

---

[11] Agrafioti also describes biometric authentication using the cloud. Agrafioti, [0102]-[0103], [0131], [0211-0215].

(examples of SES include secured doors, parking meters, point-of-sale systems and secured databases); Section VIII.D.1 (discussing SES).

102. Additionally or alternatively, POSAs would have been motivated to extend Agrafioti's wearable to apply to the "wireless transactions" described in Berney (e.g., "car parking at a public parking meter" ([0036]), "an authorized person seeking entry to a restricted entry area" ([0037]); and "paying for a store-bought purchase by the use of" a wearable device ([0035])). *See* Section VIII.C(discussing Agrafioti-Berney). All such applications encompass "achieving secured, short-range RF communication between the wearable device" and the types of "secured electronic systems" expressly discussed in the '480 patent. EX1001, 2:60-3:3 ("Examples of secured electronic systems include: *secured entry barriers* (e.g., doors, gates, safes),…*payment mechanisms* (e.g., vending machines, *parking meters*), *point-of-sale (POS)*…."). As discussed *supra* in Section VIII.C, POSAs would have been motivated to ensure that Agrafioti's wearable extended to these wireless transactions described in Berney and would have reasonably expected success in doing so. Agrafioti as modified in view of Berney satisfies [1B] for this additional reason.

### 4. [1C] "authenticating the user with at least one of [1C-1] the wearable device, [and] [1C-2] a remote server via cellular communications"

103. For the same reasons I previously mentioned in Section VII.A, the phrase "at least one of" in [1C] is disjunctive and does not require that all the listed possibilities be satisfied. Therefore, Agrafioti satisfies [1C] because it satisfies both two of the three alternatives—specifically, [1C-1] and [1C-2].

### a. [1C-1] "the wearable device"

104. Agrafioti describes "authenticating users *using biometric devices*." [0032], [0057], [0089]-[0091]. For example, Agrafioti describes using the wearable to acquire biometric data (e.g., fingerprint, voice, pulse, ECG, or vein pattern data captured via sensors) and establish a "unique biometric profile" associated with a user and wearable. Agrafioti, [0028], [0089]-[0091], [0095], [0124].Agrafioti's user's biometric profile may be created "by the wearable itself" ([0103]) and stored on the wearable "to authenticate the user" ([0102], [0124]).

105. For example, Agrafioti teaches that a user "may be authenticated" by the wearable device using the wearable's biometric sensors. [0091] (biometric sensors capture a range of "biometric signals and/or data" that may be used "to uniquely identify the user"), [0033], [0097], [0124]. "Non-limiting examples" of uniquely identifying biometric data captured by biometric sensors include "heart rate, galvanic skin response," voice/voiceprint, pulse, and "vein pattern." Agrafioti,

[0091], [0028], [0124]. Alternatively or additionally, Agrafioti also teaches that authentication can be achieved by the wearable by entering a password or PIN, which is the same type of user authentication by the wearable described in the '480 patent. *Compare* Agrafioti, [0035] *with* EX1001, 3:11-15, 6:58-61.

106. Thus, Agrafioti teaches multiple ways of authenticating the user "*with the wearable*" as claimed. Indeed, the '480 patent has the same examples of how to authenticate with the wearable as Agrafioti. *See* EX1001, 3:11-15 ("a user can be authenticated by biometric hardware (e.g., voice, skin illumination) integrated on the smartwatch worn by the user"), 6:58-61 ("Authentication can be accomplished by password entry on the user interface (e.g., touch screen) of the smartwatch or by using the smartwatch to obtain biometric information from the user.").

> **b.** **[1C-2] "a remote server via cellular communications supported by the telecommunications carrier access identification module and the cellular RF communications module"**

107. Agrafioti teaches authenticating the user by a remote server in at least two ways: (1) authentication through the "biometric authentication server" (*id.*, [0045]) and (2) authentication through the AAD (Agrafioti, [0033]; [0144]).

### i.   User Authentication Through Biometric Authentication Server.

108.    Agrafioti describes a "*remote* server," e.g., biometric authentication server 116, which "may be implemented using one or more cloud instances in one or more cloud networks." Agrafioti, [0053], [0180], Fig. 1 (excerpt below).



109.    The user's biometric profile may be stored alternatively or additionally in this biometric authentication server. Agrafioti, [0211]. Agrafioti thus describes some embodiments in which the wearable transmits biometric data

acquired by the wearable's sensors to a biometric authentication server 116 for user authentication. Agrafioti, [0044]-[0045], [0052]-[0053].

110.    Configured user profiles may be stored in the biometric authentication server computer 116, including when it is implemented virtually in a cloud environment. Agrafioti, [0211]. "[E]nabling access for [a] user to access points [may be] based at least on the user profile information for the authenticated users." Agrafioti, [0037]; [00138].

111.    The wearable communicates with biometric authentication server 116 via wireless network 108 and network 110. Agrafioti, [0047]-[0050], Fig. 1. Wireless network 108 includes 2G/3G/4G/5G "radio access for cellular systems" (Agrafioti, [0049]) which is supported by the wearable's modules that meet [1A-1]-[1A-2] as discussed §§VIII.D.2.a-VIII.D.2.b. Thus, authentication by Agrafioti's biometric authentication server computer constitutes authentication by a "*remote server via cellular communications supported by the telecommunications carrier access identification module and the cellular RF communications module*" as claimed.

### ii.    User Authentication Through the AAD.

112.    In another embodiment (e.g., Figure 7), the user's biometric profile is stored on an AAD that "may be separate from the biometric" wearable. Agrafioti, [0033], [0100]-[0103], [0132]-[0135], [0137]-[0138]. In this embodiment, the

wearable transmits biometric feature(s) captured by the wearable to an AAD that

performs the user authentication. Agrafioti, [0142]-[0150]. Agrafioti's Figure 7 is

reproduced below:



**FIG. 7**

113.   Specifically, the AAD compares the received biometric features to the stored biometric profile "that corresponds to the user." Agrafioti, [0033], [0037], [0138], [0142]-[0150], [0219]; Fig. 7.

114.   If the features received by the AAD correspond to a stored biometric profile for the user, then the wearable biometric "may be preauthorized for the user." Agrafioti, [0033], [0037], [0138], [0142]-[0150], [0219]. This process "authenticates the identity of the user and authorizes the wearable biometric device to wirelessly communicate the preauthenticated user identity to other devices and systems," including access points. Agrafioti, [0055], [0146]-[0149], [0152], [0160]-[0162].

115.   The wearable communicates with the AAD via "radios/transducers," and the AAD may be one of client computers 103-105 with which the wearable communications over network 108 (including cellular communications supported by the wearables modules that meet [1A-1] to [1A-2] as discussed *supra,* Sections VIII.D.2.a-VIII.D.2.b. Agrafioti, [0093], [0039]. POSAs would this have understood that the corresponding authentication occurs by "*a remote server via cellular communications supported by the telecommunications carrier access identification module and the cellular RF communications module*" as claimed. *See* VIII.D.2 ([1A]). POSAs would therefore have understood that the corresponding authentication satisfies [1C-2].

5.    **[1D] "providing the user with access to or through the secured electronic system once authenticated"**

116.    Agrafioti describes granting the user access to an "access point" (i.e., the SES as claimed) after authenticating the user.  Agrafioti, [0107], [0148], [0154]-[0163], Fig. 8 (showing authorization followed by enabling user access to one or more access points).  Thus, Agrafioti's method provides the user with access to the SES *once authenticated*," as claimed.  Indeed, Agrafioti's descriptions of granting access to an "access point" is highly similar to the sequence described in the '480 patent in which "a smartwatch is placed in contact with a user's wrist," "[t]he smartwatch then authenticates the user," "[t]he smartwatch then establishes communication with a secured electronic system," and, finally, "the user can be granted access to [the] secured electronic system." '480 patent, 6:46-7:2.  Agrafioti performs the same sequence.  For example, Agrafioti's Fig. 8 shows a "process [] for authenticating a user" in which, at block 802, the process asks whether the "biometric device [is] preauthorized?" Fig. 8.  If the biometric device is preauthorized (and in range), the process asks "if one or more additional conditions (if any) are met. Agrafioti, [0155].  If these conditions are met, "*access* to one or more access points *may be enabled* for the user that has the biometric device." Agrafioti, [0160] (emphasis added).

58



**FIG. 8**

117. Similarly, Agrafioti explains that "one method of gaining entry at an access point" includes determining "whether a wearable biometric device has been preauthorized and if that wearable biometric device is within an allowable range of the access point." If the answer is yes for both, then the biometric wearable "may be arranged to transmit a control signal to the access point that affirmatively confirms that the biometric device is preauthorized. Accordingly, the user may *obtain access* to the access point." Agrafioti, [0161] (emphasis added).

**6. [1E] "wherein said wearable device comprises a smartwatch including a microphone and skin illumination and measurement hardware"**

118. Agrafioti describes a "wristwatch" wearable ([0044]) and teaches that the wearable includes a microphone and can recognize voice commands ([0035], [0105]-[0109], [0122]), may include high and low frequency radio transceivers, GPS and other sensors, and can send and receive signals including cellular signals (e.g., via network 108) ([0038], [0044]-[0050], [0092]-[0097]). *See* section VIII.A. POSAs would have understood that a wristwatch wearable as described in Agrafioti is a "smartwatch" including a microphone as claimed. Indeed, Agrafioti's biometric wearable can recognize "voice command[s]" ([0035]) and use "voice of voiceprint" as a biometric signal" ([0028]). Agrafioti biometric wearable may also include "near infrared sensors [or] light sensors." [0122], [0109].

119. Agrafioti teaches that the wristwatch wearable may include "photoplethysmogram sensors" and discusses near infrared sensors, light sensors, and optical sensors. Agrafioti, [0122]. Agrafioti also states that its biometric wearable may include pulse detection ([0108], [0116]) or vein pattern recognition ([0028]). POSAs would have understood that photoplethysmogram ("PPG") sensors, infrared sensors, light sensors, and optical sensors are types of "skin illumination measurement" sensors—i.e., skin illumination measurement

60

hardware—because they emit light (or other optical output) and measure a response to that light (or other optical output).

120. Agrafioti also teaches that the biometric wearable device (e.g., smart wristwatch) may perform biometric authentication via pulse detection ([0108], [0116]). POSAs would have understood that PPG was a common and conventional implementation of pulse detection at that time typically involved emitting infrared, red, or green-light from a light source and measuring the light's reflection, transmission, or variation with a sensor (e.g., a photodetector). *See* EX1030, 283-84 (describing PPG pulse sensing using "reflection from or transmission through the tissue" of the user from red, infrared, or green light sources). For example, Tamura compares reflection to transmission in Fig. 2, reproduced below:



(transmission)    (reflectance)

121. EX1030, 285 (annotated); *also* EX1031, (PPG pulse monitoring using "a light source to illuminate the skin tissue, and a photodetector to measure small variations in light intensity"); EX1009, [0026]-[0030]; EX1021, US Patent No. 6,178,343, 1:8-56 (pulse oximeters used two light sources passed through user's

skin to determine pulse rate ); EX1019, US Publication No. 20020188210, [0005]

(pulse rate detector including LED (light emitting diode) and photodetector…to

measure heart rate from frequency of pulse waves from reflected or transmitted

light); EX1020, US Patent No. 8,781,569, 7:13-28 (light-based pulse sensor),

EX1021, U.S. Patent No. 6,178,343, 1:8-56.

122.    Thus, POSAs would have understood that a conventional and obvious

implementation of Agrafioti's described pulse detection would include a light

source and a measurement sensor (such as the optical or infrared sensors disclosed

by Agrafioti).  Further, POSAs would have understood that a biometric wearable

device (e.g., smart wristwatch) that includes a pulse detection light source and

measurement sensor has "*skin illumination and measurement hardware*" as

claimed.

> 7.    **[1F] "and wherein authentication of the user is based on biometric information obtained from the user via at least one of the microphone and the skin illumination and measurement hardware"**

123.    As discussed above in sections VIII.D.4 (1[C]), and VIII.A, Agrafioti

describes biometric user authentication which may be performed by the wearable

device, by a remote authentication server, or by an AAD.  In any implementation,

the biometric user authentication may be based on voice/voiceprint or pulse

detection.  Agrafioti, [0028], [0091], [0124], [0140], [0153].  POSAs would have

understood from Agrafioti and their knowledge and experience that

voice/voiceprint biometric authentication includes acquiring biometric information (the user's voice) from a microphone, which Agrafioti discloses on the wearable (*see* §VIII.A). Additionally, for the reasons discussed Section VIII.D.6 (1[E]), POSAs would have understood from Agrafioti and their knowledge and experience that pulse detection biometric authentication includes acquiring biometric information (the user's pulse patterns) from the skin illumination and measurement hardware (e.g., PPG-related sensors). Thus, Agrafioti satisfies [1F].

### E.    Claim 2

124.    [2PRE]-[2D] are identical to [1PRE]-[1D]. Agrafioti alone or in combination with Berney satisfies [2PRE]-[2D] for the discussed Section VIII.D.1-VIII.D.5.

#### 1.    Location

125.    [2E] recites "*said wearable device includes a GPS module for determining location of the wearable device user with respect to the secured electronic system*" and [2F] recites "*the step of providing a user access to or through the secured electronic systems is also dependent on the location of the wearable device user.*"

126.    Before addressing these limitations, I will briefly address how a POSA would have understood the concept of location, with respect to absolute location and relative location (or proximity). POSAs would have understood that

63

proximity refers to a relative location between two or more objects while "location" refers to absolute location (e.g., latitude and longitude). Agrafioti, [0121]. For example, an absolute location could be a set of coordinates made up of a latitude and longitude, or a street address, typically associated with a standardized reference system. In the case of latitude and longitude this reference system typically is the World Geodetic System 1984 (WGS 84) system. For a street address in the United States, it typically uses a grid system, assigned by city or county planning departments or municipal governments, and/or in coordination with state reference systems and/or the U.S. Postal Address system (particularly for rural addresses).

127. In contrast, a proximity location is defined by its "nearness" to (e.g. in reference to) another person, place or thing. It does not require linkages to an underlying reference system; rather, its "reference system" is on a case-by-case basis, e.g. where (or, how close to) one person's device is to another person's device. In relative location, an absolute location is not necessary. Indeed, a person can determine if they are in proximity to another without having any idea where they are in absolute location terms (I'm standing by the big tree to your left. I am 10 meters straight ahead of you).

128. Finally, while proximity can be determined without absolute locations (such as via GPS), proximity can be determined using two sets of absolute location

coordinates, e.g. determining the coordinates of two devices, calculating the

distance between the devices, and comparing that distance to a value that defines

proximity (e.g. less than or equal to X = proximity, greater than X = not in

proximity. This kind of technique could serve as a backup to more "direct" forms

of proximity determination (e.g. are the two devices within range of each other or

not). It can also enable use cases where "proximity" is a large distance, e.g. within

the same city – use cases not possible using short-range communications.

### 2. [2E]: "said wearable device includes a GPS module for determining location of the wearable device user with respect to the secured electronic system"

129. Agrafioti's biometric wearable includes a GPS transceiver 422, which

"may represent the radios, hardware, and instructions (e.g., software) for receiving

geo-location." Agrafioti, [0121],[0109], [0112]-[0115].



**FIG. 4A**

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| Presence Sensor | High B/W Radio | RAM | Secure Memory | GPS | Additional Sensors | Vibration Motor | | Power Supply |
| Clasp Sensor | Low B/W Radio | ROM | CPU/SOC | ECG Sensor | Biometric Sensors | User Interface | | |

*406* *410* *414* *418* *422* *424* *430* *402*

*408* *412* *416* *420* *426* *428* *432* *434*

**FIG. 4B**

130. "GPS transceiver 422 may determine the physical coordinates of biometric device 402 on the surface of the Earth" and "typically outputs a location as latitude and longitude values." [0121]. Under some conditions, "GPS transceiver 422 may determine a physical location within millimeters for biometric device 402." *Id.* Agrafioti thus discloses *"a GPS module for determining the location of the wearable device"* as claimed.

131. To the extent Agrafioti does not expressly teach "*determining location of the wearable device user* ***with respect to the [SES]***," it would have been obvious to configure Agrafioti's biometric wearable to do so in view of Agrafioti alone or in combination with Berney in the manner discussed Section VIII.C.

132. Determining the location of the wearable device user with respect to the SES is a relative location determination—i.e., a type of proximity information. Both Agrafioti and Berney describe using proximity information for accessing an SES or as part of authenticating a user. Agrafioti teaches that "access control may be further conditioned by requiring ...*determination of proximity/range of the wearable biometric device to the access point.*" [0167], [0095]-[0096] ("only unlocking a device when the proximity is within a specified range"), [0106], [0112], [0169], [0187], [0194]. Similarly, Berney teaches that proximity information may be considered together with a GPS receiver's very accurate location information and may be required to agree with each other in order to authenticate the user.

133. Thus, it would have been obvious to POSAs in view of Agrafioti alone and/or Berney's teachings to use Agrafioti's GPS transceiver 422 to "determin[e] location of the wearable device user *with respect to the [SES]*" as claimed. Agrafioti, [0112].

### 3. [2F] "the step of providing a user access to or through the secured electronic systems is also dependent on the location of the wearable device user"

134. Agrafioti teaches that the wearable provides "access control" based on "*determination of proximity/range of the wearable* biometric *device to the access point.*" Agrafioti, [0167], [0095]-[0096], [0106], [0112], [0169], [0187], [0194].

For example, "to access a smartphone, the wearable biometric device may transmit a control signal to the smartphone indicating that the wearable biometric device is preauthorized, and is also *within proximity to the device or system to be unlocked or accessed*." Agrafioti, [0169][0095]-[0096] ("only unlocking a device when the proximity is within a specified range"), [0106], [0112]. Agrafioti thus discloses "*providing a user access to or through the [SES] dependent on the location of the wearable device user*," because the user wearing the wearable must be located close to the access point in order to gain access.

135. To the extent that [2F] requires that "the location of the wearable device" be an absolute location (e.g., determined by the GPS module), this step would have been obvious to POSAs for the reasons discussed in Sections VIII.C and VIII.E.3 ([2E]), and Agrafioti's teachings that access control is based on the proximity of the wearable to an access point. For example, it would have been obvious to POSAs to configure Agrafioti in view of Berney such that access to the SES granted only when the wearable's GPS location indicates that the wearable is in a particular location (and additionally close to the access point).

### F.    Claim 3

#### 1.    [3PRE] – [3D]

136.    [3PRE]-[3D] are identical to [1PRE]-[1D].  Agrafioti alone or in combination with Berney satisfies [3PRE]-[3D] for the reasons discussed Sections VIII.D.1-VIII.D.5.

#### 2.    [3E] "said wearable device further comprises a registration module"

137.    The '480 patents states that the registration module (a.k.a "electronic system registration module") is "for registering secured electronic devices." EX1001, 4:12-13, Abstract ("A registration module can register secure electronic systems, authenticate a wearable device user, and grant the wearable device user with access to secured electronic systems."); 6:1-6 (similar).  Using a registration module, an SES may be registered with the wearable.  "[R]egistration of [an SES] is different from merely setting up a Bluetooth connection."  EX1001, 6:2-28.

138.    Agrafioti explains that access point (i.e., SES) "permission information may be communicated to the biometric device "in the form of a list of" restricted or accessible (or both) access points.  Agrafioti, [0174], [0034], [0179]. Agrafioti's list of accessible/r inaccessible) access points is the type of *"registration module"* claimed at least because the wearable receives the information and "registers" the access points by listing them with accessible/inaccessible status.  Agrafioti, [0174].

69

3. **[3F]: "providing a user access to or through the secured electronic system is determined by at least one of the wearable device and the registration module based on at least one of: [3F-1] the user authenticated for access to secured electronic system by the wearable device, ... [3F-4] the user granted access based on location, and [3F-5] the user granted access based on proximity to a secured electronic system"**

139.    [3F] recites that "*providing a user access to or through the secured electronic system is determined by at least one of the **wearable device** and the registration module based on at least one of*" five authentication options.  In the first place, the alternative language of limitation 3F means that the access may be provided by the wearable device, the registration module, or both.  *See* Section VII.A (discussing disjunctive interpretation of "at least one of").  Agrafioti satisfies "providing a user access to or through the secured electronic system" at least by the wearable for the reasons discussed in Section VIII.D.5.

140.    Agrafioti satisfies [3F-1] ("the user authenticated for access to secured electronic system by the wearable device") for substantially the same reasons as [1C-1] ("authenticating the user with ...the wearable device").  *See* Section VIII.D.4.a.  Agrafioti also renders obvious at least "[3F-3] the user biometrically authenticated for access by remote server" (Section VIII.D.4.b); "[3F-4] the user granted access based on location" (Sections VIII.E.2-VIII.E.3); and "[3F-5] the user granted access based on proximity to a secured electronic system" (Sections VIII.E.2-VIII.E.3).

**G.** **Claim 4 [PRE] The method of claim 2, [A] wherein said wearable device further comprises a smartwatch including a microphone and skin illumination and measurement hardware, [B] wherein authentication of the user is based on biometric information obtained from the user via at least one of the microphone and the skin illumination and measurement hardware.**

141. Claim 4 depends from claim 2 and recites the identical requirements of [1E]-[1F]. Thus, Agrafioti alone or in combination with Berney satisfies claim 4 for the reasons discussed §§ VIII.D.6-VIII.D.7.

**H.** **Claim 5 [PRE] The method of claim 1, [A] wherein said wearable device further comprises a GPS module for determining location of the wearable device user with respect to secured electronic systems, and [B] wherein access to the secured electronic systems is dependent on the location of the wearable device user in relationship to the secured electronic systems.**

142. Claim 5 depends from claim 1 and recites the identical requirements of [2E] and nearly-identical requirements of [2F]. Thus, Agrafioti alone or combined with Berney satisfies claim 5 for substantially the same reasons discussed Sections VIII.E.2-VIII.E.3. Claim 5 differs from [2F] by further reciting the clause "in relationship to the secured electronic systems." Agrafioti combined with Berney satisfies this requirement at least because the combination discussed §§VIII.B-VIII.C requires that "accurate location information" from a GPS receiver "agree with proximity communications devices to order to authenticate a

transaction" (Berney, [0040]), which is *"location ... in relationship to the [SESes]"* as claimed.

I. **Claim 6 [PRE] The method of claim 3, [A] wherein said wearable device further comprises a smartwatch including a microphone and skin illumination and measurement hardware, [B] wherein authentication of the user is based on biometric information obtained from the user via at least one of the microphone and the skin illumination and measurement hardware.**

143. Claim 6 depends from claim 3 and recites the identical requirements of [1E] and [1F]. Agrafioti alone or combined with Berney satisfies claim 6 for substantially the same reasons discussed supra §§VIII.D.6-VIII.D.7.

IX. **GROUND 2: CLAIMS 1-9 ARE OBVIOUS OVER AGRAFIOTI, BERNEY, AND LEE**

A. **Lee (EX1009)**

144. Lee describes a wrist wearable such as a watch with contact sensors "for authenticating a user based on a wrist vein pattern." Lee, [0003]. Wrist contact sensor have an array of illuminators and sensors on a surface of the wrist device that is opposite the user's wrist when the device is worn by the user. Lee, [0031]. "The illuminators [] produce illumination in the infrared spectrum which directed into the skin of the palmar side of the wrist." Lee, [0031]; [0036]. The wrist contact sensor obtains "digital data representing the wrist vein pattern for the user." Lee, [0003]. The user's wrist vein pattern is compared to stored wrist vein pattern information to authenticate the user. Lee, [0005], [0070] ("The

authentication software ...compares the digital data presenting the wrist vein pattern with digital data representing one or more reference wrist vein patterns."). The digital data may be encrypted and transferred for authentication of the user. Lee, [0055]. The authentication may be used for "security of computer access and data stored by a computer system" and may also be used for continuous authentication "in military or other environments requiring high securing or monitoring of activity over time." Lee, [0026].

**B.    It Would Have Been Obvious to Combine Agrafioti, Berney, and Lee**

145. Agrafioti explains that "a user of [its] wearable biometric device may be authenticated with one or more biometric technologies or sensors that may capture biometric signals" ([0091]) such as vein patterns ([0028]). Agrafioti, [0124]. Agrafioti explains that vein patterns are one of the "examples of biometric signals" that "can be obtained from a user that can uniquely identify the user." Agrafioti, [0028]; *also* [0091]; [0124] (user may provide vein pattern data). To the extent that Agrafioti does not expressly disclose how to obtain such "vein patterns," POSAs would have been motivated to use an array of illuminators and sensors on a surface opposite a section of a user's wrist as taught by Lee (Lee, [0031], [0036]) to obtain "digital data representing the wrist vein pattern for the user" (Lee, [0003], [0005], [0070]).

146. POSAs would have had such motivation to implement Agrafioti's wearable itself and/or as modified in view of Berney (as discussed Section VIII.C) to obtain vein patterns based on Lee's teachings. Both options are collectively discussed herein as "Agrafioti-Berney-Lee." POSAs would have reasonably expected success in incorporating Lee's array of illuminators into Agrafioti-Berney-Lee at least because Agrafioti, Berney, and Lee all describe a wearable device having similar form factors (e.g., watches) and describe similar platforms (processors, memory, biometric readers, and antennas). Agrafioti, Fig. 4B, [089], [0104], [0112]-[0115], [0121]; Berney, [0028]-[0029], [0032], claim 2; Lee, [0005], [0070].

## C. Claims 1-6

147. To the extent that Agrafioti alone or combined with Berney does not satisfy the "skin illumination" claim requirements of claim 1-6 (i.e., elements [1E]-[1F], [4A]-[4B], [6A]-[6B]), Agrafioti-Berney-Lee satisfies those limitations as set forth below. Agrafioti-Berney-Lee satisfies the other limitations of claims 1- 6 for the same reasons set forth Section VIII.

1. **[1E] ("wherein said wearable device comprises a smartwatch including a microphone and skin illumination and measurement hardware" / [4A] ("wherein said wearable device further comprises a smartwatch including a microphone and skin illumination and measurement hardware") / [6A] ("wherein said wearable device further comprises a smartwatch including a microphone and skin illumination and measurement hardware")**

148. Agrafioti-Berney-Lee renders obvious a "wearable device compris[ing] a smartwatch including a microphone and skin illumination and measurement hardware." Agrafioti-Berney-Lee includes Agrafioti's watch wearable biometric device, which is a smartwatch that includes a microphone as discussed Sections VIII.A and VIII.D.6. Agrafioti, [0044], [0089], [0099].

149. Agrafioti-Berney-Lee's biometric authentication may include measuring vein pattern data as taught by Agrafioti and described in detail in Lee. EX1011, [0028], [0091], [0124]; EX1009, [0003]-[0008], [0054]-[0064], [0070]-[0072]; §IX.A-IX.B. Agrafioti-Berney-Lee's array of illuminators and sensors comprise "*skin illumination and measurement hardware*," as claimed. Lee, [0030]-[0031], [0058].

2.   **[1F] ("wherein authentication of the user is based on biometric information obtained from the user via at least one of the microphone and the skin illumination and measurement hardware") / [4B] ("wherein authentication of the user is based on biometric information obtained from the user via at least one of the microphone and the skin illumination and measurement hardware") / [6B] ("wherein authentication of the user is based on biometric information obtained from the user via at least one of the microphone and the skin illumination and measurement hardware")**

150.   Agrafioti-Berney-Lee satisfies [1F]/[4B]/[6B] for the reasons discussed Section VIII.

151.   Agrafioti-Berney-Lee additionally implements Lee's teaching that its array of illuminators is illuminated (e.g., one at a time) to illuminate skin of the wrist proximate the illuminators.  Lee, [0036]-[0037].  Lee's wearable uses data from its sensors to generate reference user wrist vein pattern data and then authenticates users by matching the sensed wrist vein data to the reference data using pattern recognition signal processing software.  Lee, [0038], [0058].  When the user's wrist matches the reference wrist vein pattern, a user identity is "communicated to ... applications [] requesting user authentication."  Lee, [0059].  Thus, Agrafioti-Berney-Lee satisfies [1F].  Thus, based on Lee, POSAs would have configured the Agrafioti-Berney-Lee wearable to generate a user's biometric profile based on wrist vein pattern data. Agrafioti, [0028], [0091], [0124]; Lee, [0038], [0058].  Agrafioti-Berney-Lee would be configured to authenticate users by matching the sensed wrist vein pattern data to the biometric profile wrist vein

pattern data. Lee, [0038], [0058]-[0059]; Agrafioti, [0124] (biometric data include vein pattern). Agrafioti-Berney-Lee thus satisfies authenticating the user "*based on biometric information obtained from the user via ...the skin illumination and measurement hardware*" for these additional reasons. Thus, Agrafioti-Berney-Lee satisfies [1F], [4B], and [6B].

### D. Claim 7

#### 1. [7PRE] "A method for enabling a smartwatch user to access secured electronic systems"

152. Claim 7's preamble differs from claim 1's preamble only in that claim 7 refers to "a smartwatch user." To the extent [7PRE] is limiting, Agrafioti-Berney-Lee renders obvious [7PRE] for the same reasons Agrafioti satisfies [1PRE] (*see* Section VIII.D.1) and because POSAs would understand that Agrafioti discloses a smartwatch (see Section VIII.D.6 ([1E])).

#### 2. [7A] "placing a smartwatch in contact with a user, the smartwatch including a registration module, a short-range RF communications module, a microphone, and skin illumination and measurement hardware"

153. Agrafioti-Berney-Lee discloses placing a wearable device in contact with a user (*see* Section VIII.D.2 ([1A])) and the wearable device may be a smartwatch (*see* previous section). Agrafioti discloses that its wearable device may include: [1] a registration module and [2] a short-range RF communications module and [3] a microphone (Agrafioti, [0109]). §§VIII.F.2 ([3E]), VIII.D.2.c

([1A-3]). Finally, including [4] skin illumination and measurement hardware was obvious as discussed in Section VIII.D.6 ([1E]).

> 3. **[7B]-[7D] "achieving secured, short-range RF communication between the smartwatch and a secured electronic system"; [7C] "authenticating the user with at least one of the smartwatch and the secured electronic system using at least one biometric obtained from at least one of the microphone and the skin illumination and measurement hardware"; [7D] "providing the user with access to or through the secured electronic system once authenticated"**

154. Agrafioti-Berney-Lee renders obvious [7B], [7C], and [7D] for the reasons discussed in Sections VIII.D.3, VIII.D.4, VIII.D.5, and VIII.D.7, respectively.

> 4. **[7E] "a subscriber identification module (SIM) and a cellular communications module, wherein authentication of the user is also achievable by accessing a remote server via cellular communications supported by the SIM and the cellular communications module and matching the at least one biometric"**

155. Limitation [7E] recites "a subscriber identification module (SIM) and a cellular communications module..." The limitation is indefinite because [7E] recites an apparatus when claim 7 is a method claim. It is also obvious over Agrafioti-Berney-Lee.

156. Agrafioti discloses that its biometric device may communicate via cellular communication. See §§VIII.D.2.a-VIII.D.2.b ([1A-1]-[1A-2]); Agrafioti, [0047], [0049]. A POSA would understand that including a SIM was well-known

means for identifying the device to permit a cellular wireless connection. Indeed, the '480 patent admits that smartwatches incorporating SIMs were known in the prior art. '480 patent, 1:43-47. Other prior art confirms this. *See, e.g.,* EX1032, U.S. Patent No. 8,851,372 (describing wearable personal digital device which may be a watch (10:32-33) and may include a SIM (8:16-17)).

157. The biometric data may be transferred via a secure wireless connection. Agrafioti, [0047]-[0049]. Thus, Agrafioti-Berney-Lee satisfies matching the biometric data sensed by the wearable device by accessing a remote server via the cellular communications.

### E. Claim 8

    1. **[8A] "wherein the smartwatch wearable device includes a GPS module for determining location of the smartwatch user with respect to the secured electronic system";**
**[8B] "wherein the step of providing a user access to or through the secured electronic systems is also dependent on a location of the smartwatch user with respect to a location of the secured electronic system"**

158. Claim 8 depends from claim 7 and recites substantively the same requirements of claim 5 except that claim 8 specifically recites a smartwatch. As discussed in section VIII.A, Agrafioti's wearable may be a smartwatch. Agrafioti-Berney-Lee satisfies claim 8 for the same reasons that Agrafioti-Berney satisfies claim 5. *See* section VIII.H.

**F. Claim 9 "The method of claim 8, wherein providing a user access to or through the secured electronic system is determined by the registration module based on at least one of: [1] user authentication for access to secured electronic system by smartwatch, [2] user biometric authentication by a wireless carrier, [3] user biometric authentication by remote server, [4] user location, and [5] user proximity to a secured electronic system."**

159. Agrafioti-Berney-Lee renders obvious at least *"providing a user access to or through the secured electronic system [] determined by the registration module based on … [1] user authentication for access to secured electronic system by smartwatch,"* for the reasons discussed in Sections VIII.D.4, VIII.F.3.

## X. GROUND 3: CLAIMS 2, 5, 8 ARE OBVIOUS OVER AGRAFIOTI-

### A. Jun (EX1010)

160. I understand that Jun qualifies as prior art pursuant to §102(a)(2) because it (1) meets the "ministerial requirements for claiming priority to" an earlier application (EX1039, Korean Patent Application 10-2015-0068739 ("Jun-739"), filed May 18, 2015); and (2) the earlier application describes the same subject matter from Jun that Petitioner relies upon.

161. Jun describes a wearable (*e.g.*, smartwatch) that can transmit short-range RF signals to unlock a target object (e.g., vehicle) as shown in Figure 9, reproduced below. Jun, Abstract, 4:65-5:5; 6:65-7:9; 8:20-56; 11:53-57; 13:49-57.



FIG.9

162. Jun describes using the wearable to extract authentication information from the target object and then determine "whether the target object [] is an authenticated object." Jun, 13:57-14:5. The wearable can also "transmit[] a control signal for controlling the authenticated object," such as *"opening and closing of a lock* of a target object." Jun, 14:10-15, 8:6-7, 14:32-61 (discussing biometric and location authentication). Jun teaches using its wearable's GPS sensor to "detect[] an approach of the smart key [] to the target object" and unlock the target. Jun, 15:10-16.

## B. Combining Agrafioti and Jun

163. POSAs would have had reasons to combine Agrafioti's wearable and Jun's GPS-based proximity-detection access control (e.g., door unlocking) technique ("Agrafioti-Jun"). Agrafioti and Jun each describe a wearable device having a GPS receiver and that performs user authentication before granting access

81

to a locked or secured system; thus POSAs would have recognized Jun's techniques as applicable and beneficial to Agrafioti. Agrafioti, [0109], [0112], [0121], [0163]-[0164]; Jun, 4:65-5:10, 14:32-61, 15:10-16.

164. POSAs would have had reasons to implement within Agrafioti's system and wearable Jun's methods using GPS information acquired by a wearable device to manage control signals. Jun, 15:10-16; Agrafioti, [0210] ("[A] user may be restricted or enabled access to access points based on geolocation"); Section X.A. For example, POSAs would have been motivated to apply Jun's teachings to Agrafioti to provide additional security. *See* Jun, 13:49-14:5 (explaining that its techniques provide ways to authenticate a user before permitting access to secured system); *see* EX1033, US Patent No. 5,708,422, 3:4-14 (describing two-factor authentication using a pager) and 16:3-14 (controlling "entry door to a secure room" using claimed two-factor authentication); EX1034, Lieber, "A Two-Step Plan to Stop Hackers," The New York Times (2014) (multifactor authentication "add[s] to the consumer's security").

165. POSAs would have reasonably expected success in modifying Agrafioti's system and method to include Jun's GPS-based techniques, at least because GPS location technology and authentication methods were well understood by POSAs and used in wearables long before the '480's priority date. Further, Jun explains a GPS-based, proximity authentication technique is

82

successfully implementable in a wearable device, such as a wrist-wearable device

of the same form as Agrafioti's wearable device. Jun, 11:53-57, 13:49-53.

### C.    Claims 2, 5, 8

166.    Agrafioti-Jun renders obvious claims 2, 5, and 8, reciting a GPS

module providing user access, because Agrafioti-Jun includes Agrafioti's teachings

for limitations of claims 2, 5, and 8, discussed in Sections VIII.E, VIII.H, IX.D,

IX.E and Jun's teachings discussed below respecting limitations [2E]-[2F], [5A]-

[5B], and [8A]-[8B].

> **1.    [2E] ("wherein said wearable device includes a GPS module for determining location of the wearable device user with respect to the secured electronic system")/ [5A] ("wherein said wearable device further comprises a GPS module for determining location of the wearable device user with respect to secured electronic systems")/ [8A] (wherein the smartwatch wearable device includes a GPS module for determining location of the smartwatch user with respect to the secured electronic system")**

167.    Jun's wearable, like Agrafioti's, includes a GPS module for

determining location of the wearable user. Jun, 7:47-49, 8:55-56, 13:49-57, 14:32-

35; 15:10-16. Applying Jun's teachings to Agrafioti's wearable results in the

location being determined relative to the SES (i.e., relative to Agrafioti's access

point). Jun, 15:10-16 (wearable detects "approach …to the target object"); *see*

Section XV.B.[2E].

2. **[2F] ("wherein the step of providing a user access to or through the secured electronic systems is also dependent on the location of the wearable device user")/ [5B] ("wherein access to the secured electronic systems is dependent on the location of the wearable device user in relationship to the secured electronic systems") / [8B] ("wherein the step of providing a user access to or through the secured electronic systems is also dependent on a location of the smartwatch user with respect to a location of the secured electronic system")**

168.  Applying Jun's teachings to Agrafioti results in the wearable using GPS-determined location in part to "provid[e] a user access" to the SES. Jun, 15:10-23 ("lock releasing function"; "opening of a door"); *see* Section XV.B.[2F].

## XI. GROUND 4: CLAIMS 1-9 ARE OBVIOUS OVER THARAPPEL-BERNEY

### A. Tharappel (EX1007)

169.  Tharappel provides a wearable that extends "authentication across a trust group of smart devices" (1:6-10) and provides "secure convenient access to multiple smart electronic devices" (3:55-58). Tharappel, 1:14-29; 2:16-4:15 (discussing challenges associated with the "proliferat[ion]" of wearables).

170.  Figure 1 depicts an example trust group with two smart devices: wearable 40 and smart device 20. Tharappel, 2:24-26.



**FIG. 1**

171. Wearable 40 is "any smart device capable of voice audio, media, or data exchanges" (3:14-20), including an "electronic watch or bracelet" (3:58-61). Wearable 40 has biometric authentication capabilities. Tharappel, 2:28-29; 3:58-61.

172. Wearable 40 and smartphone 20 communicate "via a secure network 50." Tharappel, 2:26-27; Fig. 1. Smart device 20 and wearable 40 include "respective wireless adapters 21 and 41" that include "wireless communication

circuitry" such as Wi-Fi, Bluetooth, NFC, satellite, and/or any cellular technologies ("including '3G/4G/5G/nG'"). Tharappel, 4:50-5:30.

173. Both smart device 20 and wearable 40 "include respective biometric sensors 29 and 49 for sensing" user "biological characteristics," including but not limited to "voice patterns, speech, fingerprints ... hand features, palm prints, and pulse features." Tharappel, 6:31-41. Biometric sensors 29 and 49 can include any suitable biometric sensor for sensing the desired biological characteristic, such as "a pulse sensor ... to sense pulse features." Tharappel, 6:41-49. Wearable 40 includes "a biometric authentication module 42" (2:28-29), which allows the user to "authenticate[] to the wearable based on the user specific biometric credentials" (4:16-20). *See* Tharappel, 2:24-45. Wearable 40 "may be configured to allow a user to authenticate based on a single biometric credential or multiple biometric credentials." Tharappel, 4:22-25.

174. Smart device 20 includes enrollment module 28, which allows the user to enroll his/her biometric characteristic "to enable biometric authentication." Tharappel, 3:61-4:15; 2:46-55. In some embodiments, after authenticating the user using biometric credentials, "a determination may be made as to whether smart device 20 is in the trust group" by searching a trust group table "to find a device identifier corresponding to" smart device 20. Tharappel, 18:3-10; Fig. 8. "If smart

device [20] is in the trust group," the user's biometric authentication is extended to the smart device [20]." Tharappel, 18:14-18.

175.    As discussed below, Tharappel discloses or renders obvious claims 1 and 3 and most limitations of all other challenged claims. Tharappel does not expressly disclose limitations (e.g., [2E]-[2F]) that require using GPS location for authentication or for allowing SES access. However, these limitations are rendered obvious by Tharappel-Berney. *See* Sections XI.D.2-XI.D.3.

**B.    Combining Tharappel and Berney**

176.    It would have been obvious to POSAs to combine Berney's teachings about using GPS location and proximity information with Tharappel's system and method. Tharappel and Berney both describe wearables that perform biometric-data-based authentication before providing user access to secured (e.g., locked) systems, data, and/or areas. Further, both Tharappel and Berney confirm that POSAs understood that implementing multi-factor authentication beneficially enhanced security. Tharappel, 1:14-31, 3:21-43, 4:20-28; Berney, [0002]-[0010], [0026]-[0027], [0038]; EX1013, 1:15-33, 1:54-2:50.

177.    Berney specifically describes benefits of using GPS location data and proximity information to enhance wearable-based user authentication. For example, Berney teaches that requiring the wearable's GPS receiver's "very accurate location information" to "agree with proximity communications devices"

87

provides heightened security. Berney, [0040]. Berney discloses that using location and/or proximity information *in addition* to biometric-based authentication beneficially makes "forgery…much more difficult." Berney, [0029], [0040].

178. Tharappel teaches that a wearable device configured for biometric authentication may also be "configured to accept other types of authentication credentials." Tharappel, 4:16-28. POSAs would have recognized that Berney's authentication using device proximity with GPS backup are "other types" of authentication credentials expressly permitted by Tharappel. Berney, [0037]-[0038], [0040].

179. POSAs also would have understood that including Berney's proximity authentication with GPS backup in Tharappel would have furthered Tharappel's goal of providing "secure, convenient access to" multiple smart devices (e.g., by providing another layer of security or backup authentication). Berney, [0038]; EX1013, U.S. Patent No. 8,943,580, Fadell, 6:54-67.

180. Additionally, in view of Berney, POSAs would have been motivated to apply Tharappel's methods and systems (with or without Berney's method of using location information) to both Tharappel's use cases (e.g., unlocking smartphones) *and* the types of "wireless transactions" described in Berney (e.g.,

authorizing "car parking at a public parking meter" ([0036]), "an authorized person seeking entry to a restricted entry area" ([0037])).

181. POSAs would have reasonably expected success in implementing the above-described Tharappel-Berney combination, e.g., with the system described in Tharappel, (e.g., device 20, wearable 40, and accompanying circuitry), including because Tharappel and Berney disclose similar form factors (*e.g.*, watches) and describe similar platforms (including processors, memory, biometric readers, and antennas) for a wearable. Berney, Fig. 6, [0039]; Tharappel; Figs. 10-11, 19:13-14.

182. Both Berney and Tharappel describe wearable devices that include a GPS component and perform user authentication. Tharappel, 19:18-44; Berney, [0029], [0040]. Thus, POSAs would have expected success in implementing proximity authentication with GPS backup in Tharappel's wearable based on Berney's teachings. Such a modification could be implemented with software modifications to use GPS location data for authentication. Further, both GPS location technology generally and location-based authentication methods were well understood by POSAs at that time. EX1027, Abstract; EX1028, 4:61-67; EX1029, 1:25-35, 3:61-63.

183. Similarly, POSAs would have expected success in extending Tharappel (with and without Berney's location-based authentication) to Berney's

"transactions" (parking meters, locked doors, and POS systems (Berney, [0035]-[0037])), at least because Tharappel already discloses a flexible understanding of smart devices including e.g., "embedded controllers, car infotainment systems, navigation systems" (Tharappel, 3:4-13) and uses proximity of the wearable device to the smart device as part of the process for forming a secure connection. Tharappel, 4:16-20; 18:3-6.

## C. Claim 1

### 1. [1PRE] "A method for enabling a wearable device user to access secured electronic systems"

184. To the extent [1PRE] is limiting, Tharappel-Berney satisfies it via Tharappel's methods (augmented by Berney's techniques discussed §§VIII.B, VIII.D.1) for using "[a] *wearable* electronic *device*" to provide "*users*" with "*secure*, convenient *access* to multiple smart *electronic* devices," including smartphones. Tharappel, 3:55-58, 2:16-19, 2:64-3:20, Abstract; Fig. 1. Thus, Tharappel-Berney allows an authenticated wearable device user to "interact with" and "control" a secured (e.g., locked) smartphone. Tharappel, 4:28-41, 6:62-7:15. As explained in §VIII.D.3 ([1B]), Patent Owner argues that locked smartphones are SES. Further, even under a narrower interpretation of SES, Tharappel-Berney satisfies [1PRE]. *See* Sections VIII.D.1 ([1PRE]), VIII.D.3 ([1B]).

### 2. [1A] "placing a wearable device in contact with a user"

185. Tharappel-Berney satisfies [1A] because the "*[w]earable device*...can be worn by a user" in contact with ("by attachment to") a user's "body part." Tharappel, 3:14-20, 14:15-19, 14:49-50, Fig. 3B. Tharappel's wearable can be a bracelet or a watch (Tharappel, 3:14-20), which POSAs understood (and Berney corroborates) to be worn in contact with the user. Berney, [0032] ("a sensor...on the back of watch 100...could read body temperature" or vein patterns "on the wearer's wrist").

#### a. [1A-1] "said wearable device including a telecommunications carrier access identification module"

186. Tharappel-Berney satisfies [1A-1] via the wearable's "subscriber identity module (SIM) I/F 1030" (Tharappel, 19:27), which is part of "processor 1000" within Tharappel's wearable 40 (Tharappel, 15:28-32, 16:51-55, 17:35-39, 19:12-45). According to the '480 patent, a "SIM" is an example of the claimed "telecommunications carrier access identification module." EX1001, Abstract ("A wearable device can include a telecommunications carrier identification module (e.g., SIM)."), 2:21-34, 4:4-14.

#### b. [1A-2] "a cellular RF communications module"

187. In [1A-2], "RF communications" means "radio frequency communications." *See* Section VIII.D.2.b.

188. Tharappel's wearable includes Tharappel's "wireless adapter[]"
including circuitry for communications via *cellular* technologies (e.g.,
3G/4G/5G/nG, etc.), other *radio frequencies*…and/or any other networking
protocols that facilitate wireless *communications*." Tharappel, 4:50-5:8, Fig. 1,
5:9-30 ("the wireless connection may also include any *cellular* wireless"), 19:27-
45 (wearable device processor 1000 includes "3G/4G modem 1075"). Tharappel-
Berney's "wireless adapter" with at least "3G" "cellular technologies" is a
"*cellular RF communications module*," as claimed. *See, e.g.,* EX1001, 5:31-37
(discussing cellular RF communications module using GSM or CDMA); EX1024,
U.S. Patent No. 8,825,011, 7:48-50 (corroborating that 3G cellular used CDMA);
EX1025, U.S. Patent No. 8,781,475, 6:36 (corroborating that 3G wireless used
"CDMA/GSM").

    c.    **[1A-3] "said wearable device including…a short-
        range RF communications module"**

189. In addition to the "*cellular communications module*" (e.g., wireless
adapter configured for 3G/4G/5G/nG cellular communication), Tharappel-
Berney's wireless adapter's wireless communication circuitry also includes
Bluetooth and NFC modules, which are types of claimed "*short-range RF
communications modules*." Tharappel, 4:50-59, 19:27-45 (wearable device
processer may include "BluetoothTM"), 5:9-15 (discussing connection via
"Bluetooth™"), Fig. 1, 5:28-30 ("[N]etwork 50 represents a BluetoothTM secure

wireless connection between wearable device 40 and smart device 20."); EX1001, 2:6-10 ("short range radio frequency, and/or line of sight communications standards" include "Bluetooth" and "NFC"), 5:22-25, 6:23-24 (similar) 6:41-45 (similar); EX1024, U.S. Patent Publication No. 2010/0178866, [0002]-[0003] ("[N]ear field communication covers various short-*range* techniques and technologies which enable wireless communication."), [0013] (Bluetooth a short-range communication technology)).

190.  The wearable can include these modules alongside (i.e., in addition to) the circuitry for "cellular technologies" discussed §VIII.D.2.b ([1A-2]). Tharappel, 4:50-5:5 ("The wireless communications may be inclusive of wireless technologies…, cellular technologies…, other radio frequencies (e.g., near field communications (NFC),…and/or any other networking protocols that facilitate wireless communications."), 5:9-30 ("the wireless connection" may include "BluetoothTM" and "may also include any cellular wireless…connection"). It also would have been obvious to implement Tharappel-Berney's wearable to include both near field and cellular wireless communication, to support different use cases and enhance flexibility.  EX1029, U.S. Patent No. 7,889,085, 4:1-5, 5:10-14; EX1035, U.S. Patent No. 8,111,589, 24:63-25:20 33:5-22; EX1036, U.S. Patent No. 8,467,272, 8:11-21; 26:34-37.

### 3. [1B] "achieving secured, short-range RF communication between the wearable device and a secured electronic system"

191. Tharappel-Berney satisfies [1B] in two alternative ways.

#### a. Locked Smartphone as SES:

192. The '480 patent "broadly define[s]" an SES "as a system requiring electronic initiation for its operation or to gain access to it." EX1001, 4:57-59. I understand that, in district court, Patent Owner has asserted that the recited SES can be a locked mobile phone. *See* EX1016, 5 ("a secured electronic system includes a mobile phone that uses a password"); EX1015, 6-7 ("[T]he mobile phone is a secured electronic system accessible by the accused watch."); *id.* ("[T]he secured electronic system is the mobile phone[.]"); *id.* ("Access to or through the secured electronic system occurs during pairing of the accused watch to the mobile phone.").

193. Under Patent Owner's interpretation of SES, Tharappel-Berney's locked smartphone (e.g., smart device 20) is an SES. Tharappel, 3:4-10, 3:64-65, 4:28-37, 6:62-7:15, 8:4-7 ("[S]ecurity proxy 22 may be configured to unlock the operating system of smart device 20 after verifying a received request was sent by wearable device 40."). For example, Tharappel teaches that smart device 20 or its operating system may be "locked" (i.e., "capabilities of the smart device cannot be

accessed by a user") until a "security proxy 22" electronically unlocks it.

Tharappel, 2:49-51, 6:64-67, 7:38-53, 8:4-7.

### b.  Other Types of SES.

194.   Tharappel-Berney extends Tharappel's system and method to

Berney's "wireless transactions," including "car parking at a public parking meter"

([0036]), "an authorized person seeking entry to a restricted entry area" ([0037]),

and "paying for a store-bought purchase by the use of" a wearable device ([0035]).

Section XI.B.  Tharappel-Berney's "wireless transactions" are the *same types* of

SESes expressly discussed in the '480 patent.  EX1001, 2:60-3:3 ("Examples of

secured electronic systems include: *secured entry barriers* (e.g., doors, gates,

safes),...*payment mechanisms* (e.g., vending machines, *parking meters*), *point-of-

sale (POS)*...."); *see* §XI.B (discussing Tharappel-Berney).

### c.  Achieving Secured, Short-Range RF Communication:

195.   Tharappel-Berney's "wearable device 40 communicates with a smart

device 20 via a *secure* network 50."  Tharappel, 2:24-45, 4:16-49 ("Where the user

authenticates to the wearable device ... the wearable device establishes a *secure*

wireless connection."), Fig. 5 (Step 502), Fig. 7 (similar).  In one embodiment,

"network 50 represents a Bluetooth™ *secure* wireless connection between

wearable device 40 and smart device 20."  Tharappel, 5:28-30,  5:9-30; *see*

§VII.D.2.c (Bluetooth is short-range RF communication).  Tharappel-Berney's

wearable would connect with Berney's "wireless transaction" devices (parking meter, point-of-sale, secure entry device/system) in the same manner. Berney, [0026]. Thus, Tharappel-Berney satisfies [1B].

### 4. [1C] "authenticating the user with at least one of [1C-1] the wearable device, [1C-2] a remote server…, and [1C-3] the secured electronic system via the secured, short-range RF communication"

196. Tharappel-Berney satisfies [1C] because if it satisfies any one or more of the three alternatives—[1C-1] through [1C-3]. *See* §VII.A

### a. Authenticating with Wearable ([1C-1])

197. Tharappel-Berney authenticates the user with the wearable as recited by [1C-1]. A user may enroll biometric credentials "to enable authentication of the user by" Tharappel-Berney's wearable. Tharappel, 6:9-29. The wearable's biometric sensors can detect "voice patterns, speech, fingerprints, …hand features, palm prints, and pulse features." Tharappel, 6:30-49, 13:52-14:2, Fig. 8, 17:29-18:18. If the "biometric input data" acquired by the sensors matches the user's previously- enrolled biometric credentials, then "authentication is successful." Tharappel, 17:43-18:18. Tharappel-Berney's wearable authentication with biometric input data (e.g., voice patterns, speech, pulse features) is the same type of wearable authentication that the '480 patent describes. EX1001, 3:11-15 ("a user can be authenticated by biometric hardware (e.g., voice, skin illumination)

integrated on the smartwatch worn by the user"), 6:58-61; *see* Section XI.A

(Tharappel-Berney implements Tharappel's pulse sensing via skin illumination).

198. Tharappel-Berney additionally meets [1C-1] by incorporating any of

Berney's authentication techniques in Tharappel's wearable, including "read[ing]

body temperature," "vein patterns on the wearer's wrist," "fingerprint," and

"speech pattern recognition," both to secure access to the wearable itself and to

transmit authentication to a separate transaction device. Berney, [0032]-[0033],

[0037]-[0038], [0041]; *see* §XI.B (Tharappel-Berney combination).

199. Claim 1 does not require that the user authentication in [1C-1] be

performed *after* the "secured communication" of [1B]. Nothing in the claim

language's "logic or grammar" requires that [1B] occur before [1C-1]. The '480

specification also explicitly teaches that the "communication" step ([1B]) and the

user authentication ([1C]) with a wearable step may occur in either order.

*Compare* EX1001, 6:29-45; 7:3-11 (communication before authentication) *with*

6:46-53 (authentication before communication). For example, Figure 4's "arrow

labeled 325" illustrates that secured communication ([1B]) and user authentication

(e.g., [1C-1]) can occur in either sequence. EX1001, 6:46-7:2; *see id.*, 7:3-22.

200. Nevertheless, Tharappel-Berney satisfies authenticating the user with

the wearable ([1C-1]) even if it must be performed after [1B], because Tharappel-

Berney's wearable can receive the user's enrolled biometric credentials from smart

device 20 via "secure wireless connection" and store the credentials for later

biometric user authentication.[12] Tharappel, 14:57-15:47, 9:46-10:15, 12:12-15,

Figs. 4-5. Communication of the biometric credentials to the wearable via secure

wireless connection is a *"secured, short-range RF communication between the*

*wearable"* and the smartphone (SES) as required by [1B] and occurs *before* the

wearable uses those credentials to biometrically authenticate the user.

Specifically, Tharappel states that, "[a]t [step] 804, a determination is made as to

whether a biometric authentication has been successful. Generally, a comparison

may be made between the biometric input data and biometric credentials

*previously enrolled* on wearable device." Tharappel, 17:46-53 ("Thus, the

implementation of Tharappel-Berney performs step [1B] (Tharappel's step

406/502) before thrapple-Berney performs step [1C-1] (Tharappel's steps 802-

804).

### b. Authenticating with a Remote Server via Cellular Communications ([1C-2])

201. Tharappel-Berney authenticates the user with a remote server via

cellular communications as recited by [1C-2] for the reasons discussed below

Section XI.I.4.

---

[12] In other embodiments, the wearable receives the credentials via the cloud rather

than directly from the smart device. Tharappel, 9:61-64.

### c. Authenticating with SES via Secured, Short-Range RF Communication ([1C-3])

202.  Tharappel-Berney additionally satisfies authenticating the user with the SES via the secured short-range RF communication ([1C-3]).

203.  Tharappel teaches the security proxy in the SES (e.g., smartphone) determines "whether to unlock the operating system," and what "level of security" to use to control the user's "access to services and applications" on the SES, "based on an authentication result that the security proxy receives from the wearable device," thus establishing an "authenticated session." Tharappel, 19:3-11. This is authenticating the user with the SES. *See* Tharappel, 2:46-55 (describing "extending user authentication across a trust group of smart devices"); *id.*, 7:47-49. Tharappel also teaches that the Bluetooth connection (secured, short-range RF communication) may be used as a part of the authentication process. *See* Tharappel, 8:13-24. Thus, Tharappel's techniques in Tharappel-Berney meet [1C-3].

204.  Additionally, Berney discloses Berney's "authorized entry" use case in which the SES is part of the authentication process. Berney, [0037]-[0038]. In this implementation, a "biometric data reader" on the wearable transmits identity data to "a counterpart device" via the Bluetooth RF communication. *Id.* A "security system associated with the secured area" determines "whether the validly identified user is or is not an authorized person." *Id.* Applying Tharappel's

wearable in this use case in Tharappel-Berney additionally meets [1C-3]. *See*

§XI.A (Tharappel-Berney incorporates Berney's described use cases).

### 5.   [1D] "providing the user with access to or through the secured electronic system once authenticated"

205.   Tharappel teaches that "[w]hen appropriate biometric credentials have

been provided, the accessed smart device [*i.e.*, the SES] can unlock its operating

system to allow the user to interact with the smart device." Tharappel, 4:29-31,

2:49-51 ("An operating system (OS) unlock 26 is enabled by security proxy 22

when authentication of a user is extended from wearable device 40 to smart device

20."), 4:16-49, 7:6-15.

206.   Unlocking constitutes providing access to/through the SES as

claimed. EX1001, 6:38-45. "[U]nlocking" allows users to access "applications

data, and/or other capabilities of the smart device." Tharappel, 6:67-7:6 ("A smart

device" is "'locked' when any applications, data, and/or other capabilities of the

smart device cannot be accessed by a user unless appropriate authentication

credentials…are provided."). Unlocking constitutes providing access *to* the SES.

Additionally, because a smartphone includes applications that communicate

*through* the smartphone to other devices, a POSA would appreciate that unlocking

also constitutes providing access *through* the SES.

207.   Tharappel teaches that a user may be granted access to the SES only

after authentication. Tharappel, 7:4-43 ("In at least one embodiment, wearable

device 40 sends trusted requests from the user to smart device 20 *only after the user has been successfully authenticated.*"), 8:4-7; 18:3-18. POSAs would have maintained this functionality in Tharappel-Berney. Additionally, based on Berney's teachings, it would have been obvious to POSAs to "provide the user with access to or through" Berney's wireless transaction SESes *"once authenticated"* as claimed. *See* Berney, [0035]-[0036] (enabling transactions at checkout counter, parking meter); §VIII.B. Thus, Tharappel-Berney satisfies [1D].

### 6. [1E] "wherein said wearable device comprises a smartwatch including a microphone and skin illumination and measurement hardware"

208. Tharappel-Berney includes Tharappel's "biometric authentication capability" for any type of suitable biometric authentication, such as by voice, fingerprint, hand features, or pulse. *See* Tharappel, 3:58-64, 2:28-29 (wearable device with biometric authentication module), 4:16-41, 6:11-27, 6:30-49 (biometric sensor 49 may be "a fingerprint sensor" or "a microphone"), 9:65-10:32 (biometric input includes "voice input, fingerprint input, ...hand input, pulse input"), 13:27-64, 15:4-8, Fig. 1 (biometric sensor 49). Tharappel-Berney's wearable thus includes a microphone and voice authentication capabilities as taught by Tharappel. *See* Tharappel, 6:44-45 ("microphone can be used to sense a voice" for "voice identification"), 13:30-35, 13:52-56.

209. Tharappel-Berney's biometric authentication may include fingerprint or pulse authentication (Tharappel, 3:58-64) with appropriate sensors (Tharappel, 6:43-48). For example, "a pulse sensor can be used to sense pulse features." Tharappel, 6:43-48. POSA' would have understood that a typical, conventional, and obvious implementation of "a pulse sensor" was a reflection-type pulse sensor, including hardware that operated by emitting infrared, red, or green-light, and then measuring reflection, transmission, or variation as discussed in Section VIII.D.6; Thus, Tharappel-Berney satisfies "*skin illumination and measurement hardware*" for substantially the same reasons that Agrafioti-Berney satisfies "*skin illumination and measurement hardware.*"

210. Additionally, from Berney, POSAs understood that biometric authentication can be based on "vein patterns" on a user's wrist. Berney, [0032]. And long before the '480 patent, POSAs knew that vein patterns were commonly detected and measured with sensors considered "*skin illumination and measurement hardware,*" as claimed. For example, POSAs understood that illuminators and sensors were commonly used to collect wrist vein pattern data, and such data were commonly used for authentication purposes.

211. For example, the use of skin illumination and sensors to collect wrist vein pattern data was demonstrated by Lee and Fadell. *See* Lee, [0030]-[0031],

[0058]; EX1037, US Publication No. 2015/0304322, [0040], [0053]; EX1013, Fadell, 9:48-53.

212. POSAs would have been motivated and reasonably expected success in including Berney's vein-pattern sensors as part of Tharappel's biometric authentication methods and sensors including hand feature biometrics. *See* Tharappel, 3:61-66, 6:37-41; §IX.B.

213. In view of Berney's and Tharappel's teachings, Tharappel-Berney would include at least the types of skin illuminators and sensors used for pulse and vein reading. Thus, Tharappel-Berney satisfies [1E].

### 7. [1F] "and wherein authentication of the user is based on biometric information obtained from the user via at least one of the microphone and the skin illumination and measurement hardware"

214. In Tharappel-Berney, the authentication described above in connection with [1C] is "based on biometric information obtained from the user via at least one of the microphone and the skin illumination and measurement hardware" as discussed in connection with [1E]. *See* §XI.C.6. Thus, Tharappel-Berney satisfies [1F].

### D. Claim 2

#### 1. [2PRE]-[2D]

215. [2PRE]-[2D] are identical to [1PRE]-[1D]. Tharappel-Berney satisfies [2PRE]-[2D] for the reasons discussed above. *See* §XI.C.

2.  **[2E] "said wearable device includes a GPS module for determining location of the wearable device user with respect to the secured electronic system"**

216. Tharappel-Berney's wearable includes a GPS module. Tharappel, 19:20-21, 19:44; Berney, [0029], [0040]. As discussed in §XI.B, Tharappel-Berney incorporates Berney's teaching to use the GPS receiver to acquire absolute location information from at least two devices and then compare those locations as a back-up for proximity information. Berney, [0040] (discuss use of GPS's "very accurate location information" that may provide "a backup to a proximity location").

217. Further, POSAs would have known generally that one way of determining a wearable user's location with respect to a device or system (e.g., SES) is by comparing GPS location information of each respective device/system. Berney, [0040]; EX1026, 5:4-14, 10:33-45 (U.S. Patent No. 9,743,279) (corroborating POSA's background knowledge "to authenticate one or more mobile devices of a user using a wearable device of the user" using "sensor data" from a "GPS"); *see also id.*, 6:65-7:2; 10:8-30; 12:31-36; 12:65-66 (describing capturing GPS data, and determining a "threshold value represents the maximum distance between any two similar sensor signatures."); Fig. 5 (where "comparison value < threshold value" proceeding to "[l]ogin to the mobile device").

218. Thus, and as discussed above in section XI.A, Tharappel-Berney's wearable device includes the ability to determine the location of the wearable device user with respect to Tharappel-Berney's SESes (including Tharappel's smartphone and Berney's wireless transactions). Berney, [0040]; Sections VIII.B (Berney), VIII.E.3 ([2F]), XI.B (Tharappel-Berney); *see also* EX1010, 15:10-18 (describing "detect[ing] an approach of the smart key [] to the target object [] *based on a GPS sensor* included in the smart key" and sending a unlock instruction in response), 14:32-35.

### 3. [2F] "the step of providing a user access to or through the secured electronic systems is also dependent on the location of the wearable device user"

219. As discussed above (§XI.B-XI.C), Tharappel-Berney implements a comparison of the "very accurate location information" obtained from the wearable's GPS receiver against the desired SES's location. Further, Tharappel-Berney's method determines whether the wearable's GPS location data "agree[s]" with other proximity information (e.g., a short-range RF connection) to confirm validity of the wearable device and to make "forgery" more difficult. Berney, [0041]. Tharappel-Berney also authenticates the wearable user's identity. *See id.*, [0031] (explaining that "proper [biometric] authentication *coupled with proximity* and communication would result in a valid user identification"). Thus, Tharappel-

Berney performs the step of providing user access to a desired SES dependent on the location of the wearable user.

220. To the extent that [2F] requires that "the location of the wearable device" be the location determined by the GPS module, this step would have been obvious to POSAs for the same reasons discussed in Sections XI.B, VIII.E.2, Berney's teachings that GPS location is "very accurate," and a POSA's familiarity with the many possible uses of GPS location information. For example, it would have been obvious to POSAs to configure Tharappel-Berney such that access to the SES granted only when the wearable's GPS location indicates that the wearable is in a particular location. *See* Section VIII.C (Agrafioti-Berney).

221. In the parallel litigation, Patent Owner asserts that providing access is "dependent on the location of the wearable device user" when the wearable device user is required to be within range of a short-range signal, e.g., Bluetooth, to access the SES. *See* EX1016, No. 3:24-cv-00937-TSH (N.D. Cal.), No. 21 at 5-6 (arguing that access to or through the secured electronic system is dependent on the location of the wearable device user because "the phone must be within 0.5 m."). Under Patent Owner's interpretation of [2F], Tharappel-Berney additionally satisfies [2F] because Tharappel-Berney provides access to the SES when authentication is successful and the wearable and smartphone are within wireless range of each other, as taught by Tharappel. Tharappel, 18:3-6 ("If the authentication is

successful,...the wearable device may establish a secure wireless connection to a smart device *within a wireless range* of the wearable device."); Fig. 8.

### E.    Claim 3

#### 1.    [3PRE]-[3D]

222.    [3PRE]-[3D] are identical to [1PRE][1D]. Tharappel-Berney satisfies [3PRE]-[3D] for the reasons discussed §§XI.C.1-XI.C.5.

#### 2.    [3E] "said wearable device further comprises a registration module"

223.    Tharappel-Berney's wearable includes Tharappel's trust group table, which is a "registration module" as recited by [3E]. Tharappel, 2:36-45, 10:33-65. As discussed (*supra* §XI.A), Tharappel describes "extending user authentication across a trust group of smart devices." Tharappel, 2:16-19. Tharappel, 2:16-19. The devices in the trust group are identified within a "trust group table" stored on the wearable device. The trust group table includes a "device ID" of each smart device in the trust group. Tharappel, 10:33-37. The device ID in Tharappel's trust group table "can be an index" providing "uniquely identifying information for each smart device." Tharappel, 10:42-44. For example, "each device ID can be mapped to a different shared secret." Tharappel, 10:45-46. The shared secret "may be used to secure a wireless connection between [a] wearable device [] and [a] smart device." Tharappel, 10:50-52. Additionally, Tharappel's "device IDs can be mapped to wireless connection security information." Tharappel, 10:66-11:8.

224. The presence of a device in the trust group table may be used at least in part to determine whether the device is a member of the trust group. *See, e.g.,* Tharappel, 18:10-12 ("In at least one embodiment, the smart device is determined to be in the trust group if its device identifier is mapped to a shared secret in trust group table 45."); 32:19-29 (similar). When "the smart device is included in [the] trust group," an authenticated user e can "send a communication to unlock the smart device." Tharappel, Abstract. Tharappel-Berney thus registers the smart device (SES) for access via the wearable's user authentication, and therefore the wearable includes "*a registration module,*" as claimed.

> **3. [3F] "providing a user access to or through the secured electronic system is determined by at least one of the wearable device and the registration module based on at least one of: [3F-1] the user authenticated for access to secured electronic system by the wearable device, ... [3F-4] the user granted access based on location, and [3F-5] the user granted access based on proximity to a secured electronic system"**

225. [3F] first recites "*providing a user access to or through the secure electronic system is determined by at least one of the wearable device and registration module.*"

226. Tharappel-Berney can authenticate the user using the wearable device as discussed *supra* § XI.C[1C]). Tharappel-Berney can also authenticate the user using the trust group table, *i.e.*, a registration module. *Compare* Tharappel, 18:6-16 (when a determination is made that the smart device is in the trust group, then

"*biometric authentication is extended to the smart device*") *with id.* 17:63-18:2,

18:12-14 (user is not authenticated to access smart device "[i]f the smart device is

*not* in the trust group").

227.    [3F] next recites that the providing access step is "based on at least

one of" five disjunctive options. *See supra* claim construction §VII.A. Tharappel-

Berney satisfies at least three of those options, thus rendering limitation [3F]

obvious (*supra* Section VII.A): [3F-1] for the reasons discussed above §XI.C.4.a;

[3F-4] for the reasons discussed *supra* §XI.D.3; and [3F-5] for the reasons

discussed *supra* §XI.D.3   In each case, "*providing a user access*" is based on the

respective authentication, as explained *supra* § XI.C.5 ([1D]).

F.    **Claim 4 "[PRE] The method of claim 2, [A] wherein said
      wearable device further comprises a smartwatch including
      a microphone and skin illumination and measurement
      hardware, [B] wherein authentication of the user is based
      on biometric information obtained from the user via at least
      one of the microphone and the skin illumination and
      measurement hardware."**

228.    Claim 4 depends from claim 2 and recites the identical requirements

of [1E]-[1F].  Tharappel-Berney satisfies claim 4 for the reasons discussed *supra*

§§XI.C.6-XI.C.7.

**G.** **Claim 5 "[PRE] The method of claim 1, [A] wherein said wearable device further comprises a GPS module for determining location of the wearable device user with respect to secured electronic systems, and [B] wherein access to the secured electronic systems is dependent on the location of the wearable device user in relationship to the secured electronic systems."**

229. Claim 5 depends from claim 1 and recites the identical requirements of [2E] and a similar requirement to [2F] with the additional requirement that access to the SES "*is dependent on the location of the wearable device user in relationship to the*" SES. Tharappel-Berney satisfies claim 5 for the reasons discussed above in sections XI.D.2-XI.D.3.

**H.** **Claim 6 "[PRE] The method of claim 3, [A] wherein said wearable device further comprises a smartwatch including a microphone and skin illumination and measurement hardware, [B] wherein authentication of the user is based on biometric information obtained from the user via at least one of the microphone and the skin illumination and measurement hardware."**

230. Claim 6 depends from claim 3 and recites the identical requirements of [1E]-[1F]. Tharappel-Berney satisfies claim 6 for the reasons discussed *supra* §§XI.C.6-XI.C.6.

**I.** **Claim 7**

**1.** **[7PRE] "A method for enabling a smartwatch user to access secured electronic systems"**

231. [7PRE] is nearly identical [1PRE] except that [7PRE] refers to "*a smartwatch user*" rather than a "*wearable device user*." Tharappel-Berney's

110

wearable includes a smartwatch, and its user may be a smartwatch user. *See*

Tharappel, 3:14-20; 6:25-26; 8:64-9:3; 13:30-14:2. Tharappel-Berney satisfies

[7PRE] for the same reasons it satisfies [1PRE] and because the user may be a

smartwatch user. *See supra* §XI.C.1.

> **2.** **[7A] "placing a smartwatch in contact with a user, the smartwatch including a registration module, a short-range RF communications module, a microphone, and skin illumination and measurement hardware"**

232. [7A] is similar to [1A] but specific to a smartwatch. Tharappel-

Berney's wearable can be a smartwatch. Thus, Tharappel-Berney satisfies [7A] for

the same reasons explained above Section XI.C.2.

> **3.** **[7B] achieving secured, short-range RF communication between the smartwatch and a secured electronic system; [7C] authenticating the user with at least one of the smartwatch and the secured electronic system using at least one biometric obtained from at least one of the microphone and the skin illumination and measurement hardware; [7D] providing the user with access to or through the secured electronic system once authenticated; and**

233. [7B]-[7D] [7B]-[7D] are substantially the same as [1B]-[1D] but

specific to a smartwatch. Tharappel-Berney's method includes a smartwatch and

satisfies [7B]-[7D] for the reasons discussed *supra* §§ XI.C.3-XI.C.5.

4. **[7E]**[13] **"a subscriber identification module (SIM) and a cellular communications module, wherein authentication of the user is also achievable by accessing a remote server via cellular communications supported by the SIM and the cellular communications module and matching the at least one biometric"**

234. As discussed *supra* §XI.A and §XI.c.2, Tharappel-Berney includes a SIM and a cellular communications module that support cellular communications.

235. Tharappel-Berney's biometric data may be transferred via a secure wireless connection. Tharappel, 12:12-29. For example, "the biometric credentials" may be "transferred to the cloud and then transferred to a primary wearable device 60." Tharappel, 12:22-25. POSAs would have understood that such data transfer involves the wearable accessing a remote server (in the cloud) to obtain the biometric credentials and match the user's current biometric input to those past credentials. POSAs would recognize that the smartwatch can access the cloud in multiple ways, including using the internet (*e.g.*, via WiFi) and cellular data, both of which Tharappel discloses. Tharappel, 4:59-5:2 ("WiFi" and "cellular technologies"), 5:24-27 (same), 19:35-45.

236. Accordingly, cellular data is a disclosed option, as well as one of a finite number of known, conventional options for accessing the cloud. *Id.*; *see also*

---

[13] [7E] renders claim 7 indefinite because it recites an apparatus when claim 7 is a method claim.

Tharappel, 4:59-5:2;12:22-25. Thus, Tharappel-Berney satisfies matching the biometric data sensed by the wearable device by accessing a remote server via the cellular communications.

**J.    Claim 8 "[PRE] The method of claim 7, [A] wherein the smartwatch wearable device includes a GPS module for determining location of the smartwatch user with respect to the secured electronic system, and [B] wherein the step of providing a user access to or through the secured electronic systems is also dependent on a location of the smartwatch user with respect to a location of the secured electronic system."**

237. Claim 8 depends from claim 7 and recites substantially the same requirements as [2F] and claim 5, and Tharappel-Berney satisfies [8B] for substantially the same reasons as [2F]. *See* Section XI.D.3.

**K.    Claim 9 "The method of claim 8, wherein providing a user access to or through the secured electronic system is determined by the registration module based on at least one of: [1] user authentication for access to secured electronic system by smartwatch, [2] user biometric authentication by a wireless carrier, [3] user biometric authentication by remote server, [4] user location, and [5] user proximity to a secured electronic system."**

238. Claim 9 depends from claim 8 and recites substantially the same requirements as [3F]. Tharappel-Berney satisfies claim 9 for the reasons discussed *supra* §XI.E.3.

## XII. GROUND 5: CLAIMS 1-9 ARE OBVIOUS OVER THARAPPEL-BERNEY-LEE

### A. Tharappel-Berney-Lee

239. Based on Lee, POSAs would have had reasons to modify Tharappel-Berney to incorporate Lee's wrist-vein-pattern biometric authentication techniques discussed above in section IX.A (resulting in "Tharappel-Berney-Lee"). For example, POSAs would have understood that Lee's biometric authentication techniques based on wrist-vein-pattern identification provide "other types" of authentication credentials contemplated by Tharappel and that Lee describes in detail the type of wrist-contact authentication techniques mentioned in Berney. Lee, [0005], [0070]; Tharappel, 8:53, Berney, [0032]; *see* §§ IX.A- IX.B. POSAs also would have understood that including Lee's biometric authentication methods would further Tharappel's goal of providing "secure, convenient access to" multiple smart devices. Tharappel, 3:55-58.

240. Incorporating Lee's biometric authentication teachings in Tharappel-Berney-Lee would have been nothing more than using a known biometric authentication method using the techniques described in Lee. POSAs would have had a reasonable expectation of success in implementing Lee's wrist-vein-pattern biometric-sensor-based authentication in Tharappel-Berney-Lee's wearable.

241. Tharappel, Berney, and Lee each have similar form factors (*e.g.*, watches) and describe similar platforms (including processors, memory, biometric

114

readers, and antennas). Lee, Fig. 4A, [0045]-[0046]; Tharappel; Figs. 10-11, 19:13-14; Berney, Fig. 6, ¶[0026], [0028]-[0029], [0038]-[0039]. For example, Tharappel, Berney, and Lee each describe a wearable that authenticates a user with biometric data before providing the user access to secured (e.g., locked) data or areas. Further, both biometric sensors generally and biometric-based authentication methods were well understood by POSAs by the '480 patent's claimed priority date.

**B.    Claims 1-9**

242.    Tharappel-Berney-Lee satisfies claims 1-9 for the same reasons that Tharappel-Berney satisfies claims 1-9. *See* §§XI.C-XI.K. However, to the extent that Tharappel-Berney does not satisfy limitations that include "skin illumination and measurement hardware," Tharappel-Berney-Lee satisfies those limitations as set forth below.

1.    [1E] ("wherein said wearable device comprises a
      smartwatch including a microphone and skin illumination
      and measurement hardware") / [4A] (wherein said wearable
      device further comprises a smartwatch including a
      microphone and skin illumination and measurement
      hardware") / [6A] ("wherein said wearable device further
      comprises a smartwatch including a microphone and skin
      illumination and measurement hardware") / [7A] ("placing
      a smartwatch in contact with a user, the smartwatch
      including a registration module, a short-range RF
      communications module, a microphone, and skin
      illumination and measurement hardware")

243.  Tharappel-Berney-Lee satisfies [1E]/[4A]/[6A]/[7A] at least because

it includes Lee's array of illuminators and sensors which are "skin illumination and

measurement hardware," as claimed. *See* §§IX.A, IX.C.1

2.    [1F] ("wherein authentication of the user is based on
      biometric information obtained from the user via at least
      one of the microphone and the skin illumination and
      measurement hardware") / [4B] ("wherein authentication of
      the user is based on biometric information obtained from
      the user via at least one of the microphone and the skin
      illumination and measurement hardware") / [6B] ("wherein
      authentication of the user is based on biometric information
      obtained from the user via at least one of the microphone
      and the skin illumination and measurement hardware") /
      [7C] ("authenticating the user with at least one of the
      smartwatch and the secured electronic system using at least
      one biometric obtained from at least one of the microphone
      and the skin illumination and measurement hardware")

244.  Tharappel-Berney-Lee satisfies [1F]/[4B]/[6B]/[7C] for the reasons

that Tharappel-Berney does as set forth in Section IX.C.2.  Additionally, when

Tharappel-Berney-Lee uses Lee's wrist vein data for authentication, that wrist vein

data is obtained from the Tharappel-Berney-Lee wearable's array of illuminators and other sensors that illuminate the wrist skin. Lee, [0036]-[0038]. Tharappel-Berney-Lee uses the gathered vein pattern data to authenticate by using Lee's "authentication software" to correlate the gathered vein pattern data with "reference wrist vein patterns." Lee, [0058]-[0059].

## XIII. GROUND 6: CLAIMS 2 AND 4 ARE OBVIOUS OVER THARAPPEL AND JUN

### A.    Combining Tharappel and Jun

245.    POSAs would have had reasons to implement (in Tharappel's system) Jun's GPS-location proximity-detection access control (e.g., door unlocking) technique discussed above in section X.A (resulting in "Tharappel-Jun"). Tharappel and Jun each describe a wearable device having a GPS receiver that performs user authentication before granting access to a locked or secured system. Tharappel, 2:16-23, 4:37-41, 19:18-44; Jun, 4:65-5:10, 14:32-61, 15:10-16. POSAs would have recognized Jun's techniques as applicable and beneficial to Tharappel.

246.    For example, POSAs would have been motivated to apply Jun's methods using GPS and proximity of the wearable device to manage control signals from the smart device to Tharappel to provide additional security. *See* Jun,13:49-14:5 (explaining that its techniques provide ways to authenticate a user before permitting access to secured system), 15:10-16; Tharappel, 4:16-28; *supra*

117

Section VIII.C (describing recognized benefits of user authentication and security enhancement by using multiple authentication mechanisms).

247. POSAs would have reasonably expected success in modifying Tharappel's wearable to include Jun's GPS-based authentication, at least because GPS location technology and authentication methods were well understood by POSAs long before the '480's invention date. Further, Jun explains a GPS-based, proximity authentication technique is successfully implementable in a wearable device, such as a wrist-wearable device of the same form as Tharappel's wearable device. Jun, 11:53-57; 13:49-53.

## B. Claim 2

### 1. [2PRE] "A method for enabling a wearable device user to access secured electronic systems"

248. Tharappel-Jun includes Tharappel's system and methods for providing "secure, convenient access to multiple smart electronic devices," including smartphones. Tharappel, 3:55-58; *see also* Section XI.C.1. In view of Jun's teachings, POSAs would have extended Tharappel's system for providing "secure, convenient access" to allow the user to access the types of SESes described in Jun—e.g., unlocking and locking a target object. Jun, 4:4-9, 7:52-53, 8:3-10, 8:53-56, 11:53-59, 14:13-17 ("[T]he smart key [] transmits a control signal regarding opening and closing of a lock of a target object ..."), 15:10-16 ("when

the smart key [] approaches the target object [] ... a lock releasing function"
occurs).

> 2. **[2A] "placing a wearable device in contact with a user, said
> wearable device including [1] a telecommunications carrier
> access identification module, [2] a cellular RF
> communications module, and [3] a short-range RF
> communications module"**

249. Tharappel-Jun includes Tharappel's method modified in view of Jun,
which includes using a wearable for biometric and other types (e.g., location-
based) of user authentication. *See* Sections XI.A, XI.B, XIII.A. As discussed in
Sections XI.A, XI.C.2, Tharappel-Jun's method *"places a wearable device in
contact with a user"* as claimed. Additionally, Tharappel-Jun's method of using a
wearable includes the circuity disclosed in Tharappel and discussed in Sections
XI.A, XI.C.2. Thus, Tharappel-Jun satisfies [2A1]-[2A2].

> 3. **[2B] "achieving secured, short-range RF communication
> between the wearable device and a secured electronic
> system"**

250. Tharappel-Jun's method includes Tharappel's method for biometric
authentication and secured short-range RF communication between the wearable
and a locked smartphone as described in Tharappel. *See* §XI.A. Under Patent
Owner's interpretation of SES, Tharappel-Jun's locked smartphone (e.g.,
smartphone 20) is an SES. Tharappel, 3:4-10, 3:64-65, 4:28-37, 6:62-7:15, 8:4-7.

Additionally, Tharappel-Jun extends Tharappel's system to applications described

in Jun, such as unlocking and controlling a target object. For example, Jun

describes using its wearable to "control[] transmission of a control signal regarding

opening and closing of a locker for a target object (for example, opening and

closing of a door of a vehicle or opening and closing of an entrance gate)." Jun,

8:2-10; *see also* 14:9-16. Jun also uses the wearable device to "turn[] on a starter

of a vehicle." 14:22-24. The '480 patent expressly identifies "*secured entry*

*barriers* (e.g., doors, *gates*, safes)" and "*vehicle[s]* (e.g., to compartment access

and start ignition)" as examples of SESes. EX,1001, 2:60-3:3. Thus, Tharappel-

Jun satisfies [2B] for this additional reason.

4. **[2C] "authenticating the user with at least one of [1] the wearable device, [2] a remote server via cellular communications supported by the telecommunications carrier access identification module and the cellular RF communications module, and [3] the secured electronic system via the secured, short-range RF communication"**

251. Tharappel-Jun includes Tharappel's systems and methods and

satisfies [2C] at least for the same reasons that Tharappel-Lee does. *See* Section

XI.C.4 ([1C]).

252. Specifically, Tharappel-Jun includes Tharappel's method for

biometric user authentication and thus authenticates the user with the wearable

(e.g., by matching voice, fingerprint, voice data to previously-enrolled biometric

credentials) as recited by [2C-1]. Tharappel, 6:9-49, 13:52-14:2, 7:29-18:18;

120

EX1001, 3:11-15, 6:58-61; §XI.C.4 ([1C]). To the extent [2C] must be performed after [2B], Tharappel-Jun satisfies [2C] because the wearable can receive the user's enrolled biometric credentials from smart device 20 via "secure wireless connection" and store the credentials for later biometric user authentication. Tharappel, 14:57-15:47; *id.*, 9:46-10:15, 12:12-15, Figs. 4-5. Communication of the biometric credentials from the smart device to the wearable via secure wireless connection is a *"secured, short-range RF communication between the wearable"* and the smartphone (SES) as required by [2B] and occurs *before* the wearable uses those credentials to biometrically authenticate the user. Tharappel, 17:46-53 ("At 804, a determination is made as to whether a biometric authentication has been successful. Generally, a comparison may be made between the biometric input data and biometric credentials previously enrolled on wearable device.").

253. Tharappel-Jun additionally satisfies authenticating the user with the SES via the secured short-range RF communication as recited by [2C-3], including because Tharappel-Jun encompasses Tharappel's "security proxy" that establishes an "authenticated session." Tharappel, 19:3-11; Section [1C] (discussing Tharappel's "security proxy").

## 5. [2D] "providing the user with access to or through the secured electronic system once authenticated"

254. Tharappel-Jun includes Tharappel's functionality for unlocking the smart phone only after "appropriate biometric credentials" have been provided and

verified. Tharappel, 4:29-31; id. 2:49-51, 7:6-15. "[U]nlocking" allows users to

access "applications data, and/or other capabilities of the smart device" (Tharappel,

6:67-7:6) and constitutes providing access to/through the SES as claimed (EX1001,

6:38-45). Tharappel-Jun further applies Tharappel's wearable to Jun's disclosed

use case, which also provides the user with access to or through a secured

electronic system, such as to unlock or start a vehicle only after authentication has

been performed. Jun, 14:9-61, 8:3-10. Thus, Tharappel-Jun satisfies [2D] in two

alternative ways.

> ### 6.    [2E] "wherein said wearable device includes a GPS module for determining location of the wearable device user with respect to the secured electronic system"

255.    Tharappel-Jun's wearable includes "a global position system (GPS)."

Tharappel, 19:18-44 (discussing ARM architecture that includes "a global position

system (GPS)"). Tharappel-Jun implements using a wearable's GPS for

determining location of the wearable device user with respect to the secured

electronic system (e.g., Jun's locked target object). Jun, 7:47-49, 8:55-56, 13:49-

57, 14:32-35, 15:10-16; *supra* Section XIII.A. For example, Jun describes an

embodiment in which "when the user approaches the target object [e.g., a car]

while carrying (or wearing) the smart key [], the smart key [] detects an approach

of the smart key [] to the target object [] based on a GPS sensor included in the

smart key." Jun, 15:10-16 (emphasis added).

256. Based on Jun (e.g., Jun, 15:10-16) Tharappel-Jun utilizes the

wearable's GPS for determining location of the wearable device user with respect

to the secured electronic system, as claimed.

### 7. [2F] "wherein the step of providing a user access to or through the secured electronic systems is also dependent on the location of the wearable device user"

257. Tharappel-Jun meets [2F] because it implements Jun's teaching that

the wearable "performs a control function," e.g., "a lock releasing function" (Jun,

15:10-16) or "opening of a door of a vehicle, turning on the vehicle light, opening

of a trunk, or automatic startup of the vehicle" (Jun, 15:18-23).

258. Second, Tharappel-Jun also provides user access *dependent* on the

location of the wearable device user as taught by Jun. For example, after the smart

key "detects an approach of the smart key [] to the target object [] based on a GPS

sensor included in the smart key []" as described above, the smart key "performs a

control function designated to be performed when the smart *key [] approaches the*

*target object* []" Jun, 15:10-16 (emphasis added); see also 15:18-23 ("the smart key

...*when recognizing location information of the* user, performs a designated

control function regarding, for example opening of a door of a vehicle...").

### C.  Claim 4

#### 1.  [4A] "wherein said wearable device further comprises a smartwatch including a microphone and skin illumination and measurement hardware"

259.  Tharappel-Jun includes Tharappel's biometric authentication using microphone and voice authentication and fingerprint/hand input, as discussed in Section XI.C.6 ([1E]), as well as Jun's biometric data collection and authentication including fingerprint and iris scan (Jun, 14:37-61).  Thus, Tharappel-Jun meets [4A].

#### 2.  [4B] "wherein authentication of the user is based on biometric information obtained from the user via at least one of the microphone and the skin illumination and measurement hardware"

260.  Tharappel-Jun meets [4B] because Tharappel and Jun each perform biometric authentication using the microphone and/or skin measurement techniques, as described in the previous section.

## XIV.  CONCLUSION

261.  As explained above, the Challenged Claims of the '480 Patent are rendered obvious by the combinations discussed above and the Challenged Claims are unpatentable under 35 U.S.C. § 103.

262.  In signing this declaration, I understand that the declaration will be filed as evidence in a review proceeding before the Patent Trial and Appeal Board of the U.S. Patent and Trademark Office.  I acknowledge that I may be subject to

cross examination in the case and that cross examination will take place within the United States. If cross examination is required of me, I will appear for cross examination within the United States during the time allotted for cross examination.

I declare that all statements made herein of my own knowledge are true, that all statements made on information and belief are believed to be true, and that these statements were made with the knowledge that willful false statements and the like are punishable by fine or imprisonment, or both, under Section 1001 of Title 18 of the United States Code.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on: <u>April 26, 2024</u>

David H. Williams

# CLAIM LISTING

The following claim listing assigns element labels (e.g., [1A], [1B], etc.) to certain claims for clarity.

| Claim 1 |
| --- |
| **[1PRE]**: A method for enabling a wearable device user to access secured electronic systems, said method comprising: |
| **[1A]** placing a wearable device in contact with a user, said wearable device including [1] a telecommunications carrier access identification module, [2] a cellular RF communications module, and [3] a short-range RF communications module; |
| **[1B]** achieving secured, short-range RF communication between the wearable device and a secured electronic system; |
| **[1C]** authenticating the user with at least one of [1] the wearable device, [2] a remote server via cellular communications supported by the telecommunications carrier access identification module and the cellular RF communications module, and [3] the secured electronic system via the secured, short-range RF communication; and |
| **[1D]** providing the user with access to or through the secured electronic system once authenticated; |
| **[1E]** wherein said wearable device comprises a smartwatch including a microphone and skin illumination and measurement hardware, and |
| **[1F]** wherein authentication of the user is based on biometric information obtained from the user via at least one of the microphone and the skin illumination and measurement hardware. |

| Claim 2 |
| --- |
| **[2PRE]**: A method for enabling a wearable device user to access secured electronic systems, said method comprising: |
| **[2A]** placing a wearable device in contact with a user, said wearable device including [1] a telecommunications carrier access identification module, [2] a cellular RF communications module, and [3] a short-range RF communications module; |
| **[2B]** achieving secured, short-range RF communication between the wearable device and a secured electronic system; |

**[2C]** authenticating the user with at least one of [1] the wearable device, [2] a remote server via cellular communications supported by the telecommunications carrier access identification module and the cellular RF communications module, and [3] the secured electronic system via the secured, short-range RF communication; and

**[2D]** providing the user with access to or through the secured electronic system once authenticated;

**[2E]** wherein said wearable device includes a GPS module for determining location of the wearable device user with respect to the secured electronic system, and

**[2F]** wherein the step of providing a user access to or through the secured electronic systems is also dependent on the location of the wearable device user.

**Claim 3**

**[3PRE]:** A method for enabling a wearable device user to access secured electronic systems, said method comprising:

**[3A]** placing a wearable device in contact with a user, said wearable device including [1] a telecommunications carrier access identification module, [2] a cellular RF communications module, and [3] a short-range RF communications module;

**[3B]** achieving secured, short-range RF communication between the wearable device and a secured electronic system;

**[3C]** authenticating the user with at least one of [1] the wearable device, [2] a remote server via cellular communications supported by the telecommunications carrier access identification module and the cellular RF communications module, and [3] the secured electronic system via the secured, short-range RF communication; and

**[3D]** providing the user with access to or through the secured electronic system once authenticated;

**[3E]** wherein said wearable device further comprises a registration module,

**[3F]** wherein providing a user access to or through the secured electronic system is determined by at least one of the wearable device and the registration module based on at least one of: [1] the user authenticated for access to secured electronic system by the wearable device, [2] the user biometrically authenticated for access by a wireless carrier, [3] the user biometrically authenticated for access by remote server, [4] the user granted access based on location, and [5] the user granted access based on proximity to a secured electronic system.

## Claim 4

**[4PRE]** The method of claim 2,

**[4A]** wherein said wearable device further comprises a smartwatch including a microphone and skin illumination and measurement hardware,

**[4B]** wherein authentication of the user is based on biometric information obtained from the user via at least one of the microphone and the skin illumination and measurement hardware.

## Claim 5

**[5PRE]** The method of claim 1,

**[5A]** wherein said wearable device further comprises a GPS module for determining location of the wearable device user with respect to secured electronic systems, and

**[5B]** wherein access to the secured electronic systems is dependent on the location of the wearable device user in relationship to the secured electronic systems.

## Claim 6

**[6PRE]** The method of claim 3,

**[6A]** wherein said wearable device further comprises a smartwatch including a microphone and skin illumination and measurement hardware,

**[6B]** wherein authentication of the user is based on biometric information obtained from the user via at least one of the microphone and the skin illumination and measurement hardware.

## Claim 7

**[7PRE]** A method for enabling a smartwatch user to access secured electronic systems, said method comprising:

**[7A]** placing a smartwatch in contact with a user, the smartwatch including a registration module, a short-range RF communications module, a microphone, and skin illumination and measurement hardware;

**[7B]** achieving secured, short-range RF communication between the smartwatch and a secured electronic system;

**[7C]** authenticating the user with at least one of the smartwatch and the secured electronic system using at least one biometric obtained from at least one of the microphone and the skin illumination and measurement hardware;

**[7D]** providing the user with access to or through the secured electronic system once authenticated; and

**[7E]** a subscriber identification module (SIM) and a cellular communications module, wherein authentication of the user is also achievable by accessing a remote server via cellular communications supported by the SIM and the cellular communications module and matching the at least one biometric.

### Claim 8

**[8PRE]** The method of claim 7,

**[8A]** wherein the smartwatch wearable device includes a GPS module for determining location of the smartwatch user with respect to the secured electronic system, and

**[8B]** wherein the step of providing a user access to or through the secured electronic systems is also dependent on a location of the smartwatch user with respect to a location of the secured electronic system.

### Claim 9

The method of claim 8, wherein providing a user access to or through the secured electronic system is determined by the registration module based on at least one of: [1] user authentication for access to secured electronic system by smartwatch, [2] user biometric authentication by a wireless carrier, [3] user biometric authentication by remote server, [4] user location, and [5] user proximity to a secured electronic system.

# APPENDIX A MATERIALS CONSIDERED

| Exhibit | Description |
|---------|-------------|
| 1001 | U.S. Patent No. 10,362,480 ("the '480 patent") |
| 1002 | Prosecution History of U.S. Patent No. 10,362,480 |
| 1006 | Exhibit to Plaintiff's Preliminary Infringement Contentions, *SmartWatch Mobileconcepts, LLC v. Google LLC*, 6:23-cv-00398 (W.D. Tex.) (now Case No. 3:24-cv-00937-RFL (N.D. Cal.) due to transfer) (as filed 11/9/2023) |
| 1007 | U.S Patent No. 9,684,778 ("Tharappel") |
| 1008 | U.S. Patent Application Publication No. 2003/0046228 ("Berney") |
| 1009 | U.S. Patent Application Publication No. 2014/0196131 ("Lee") |
| 1010 | U.S. Patent No. 9,836,900 ("Jun") |
| 1011 | U.S. Patent Application Publication No. 2015/0028996 ("Agrafioti") |
| 1012 | U.S. Patent Application Publication No. 2016/0155281 ("O'Toole") |
| 1013 | U.S. Patent No. 8,943,580 ("Fadell") |
| 1014 | U.S. Patent Application Publication No. 2010/0178866 ("Jalkanen") |
| 1015 | Plaintiff's Response to Defendant's Motion To Dismiss, *Smartwatch Mobileconcepts, LLC v. T-Mobile USA, Inc.*, No. 6:23-400, Doc. 16 (W.D. Tex.) |
| 1016 | Plaintiff's Response to Defendant's Motion To Dismiss, *SmartWatch Mobileconcepts, LLC v. Google LLC*, No. 6:23-00398, Doc. 21 (W.D. Tex.) (now Case No. 3:24-cv-00937-RFL (N.D. Cal.) due to transfer) |
| 1018 | U.S. Patent No. 8,208,867 |
| 1019 | U.S. Patent Application Publication No. 2002/0188210 |
| 1020 | U.S. Patent No. 8,781,569 |
| 1021 | U.S. Patent No. 6,178,343 |
| 1022 | U.S. Patent No. 6,192,253 |
| 1023 | Defendant Google LLC's Opening Claim Construction Brief, *SmartWatch Mobileconcepts, LLC v. Google LLC*, No. 6:23-00398, |

| | |
|---|---|
| | Doc. 34 (W.D. Tex.) (now Case No. 3:24-cv-00937-RFL (N.D. Cal.) due to transfer) |
| 1024 | U.S. Patent No. 8,825,011 |
| 1025 | U.S. Patent No. 8,781,475 |
| 1026 | U.S. Patent No. 9,743,279 |
| 1027 | U.S. Patent No. 6,185,157 |
| 1028 | U.S. Patent No. 7,391,677 |
| 1029 | U.S. Patent No. 7,889,085 |
| 1030 | Toshiyo Tamura, et al., "Wearable Photoplethysmorgraphic Sensors—Past and Present," Electronics, 3:282-302 (2014) |
| 1031 | Yuka Maeda, "The Advantages of Wearable Green Reflected Photophethysmography," J. Medical Sys. 35:829-834 (2010) |
| 1032 | U.S. Patent No. 8,851,372 |
| 1033 | U.S. Patent No. 5,708,422 |
| 1034 | Lieber, "A Two-Step Plan to Stop Hackers," The New York Times (2014) |
| 1035 | U.S. Patent No. 8,111,589 |
| 1036 | U.S. Patent No. 8,467,272 |
| 1037 | U.S. Patent Application Publication No. 2015/0304322 |
| 1039 | Certified Translation of Korean Patent Application 10-2015-0068739 ("Jun-739") |
| 1041 | Merriam-Webster's Collegiate Dictionary (2006) |
| 1042 | "The 25th Edition of the International Symposium on Wearable Computers," IEEE Pervasive Computing (April-June 2022), available at https://ieeexplore.ieee.org/document/9817040. |
| 1043 | Pascoe, "On the Use of Mobile Tools in Everyday Life," OZCHI '07: Proceedings of the 19th Australasian conference on Computer-Human Interaction: Entertaining User Interfaces, 39-47 (November 2007). |
| 1044 | IT History Society, "Benefon ESC!," available at https://www.ithistory.org/db/hardware/benefon/benefon-esc |

| 1045 | "(Sc)Rolling Down the Highway: Vintage 1927 Analog GPS," available at https://gajitz.com/scrolling-down-the-highway-vintage-1927-analog-gps/ |
|------|------|
| 1046 | "Garmin Forerunner," available at https://trigearlab.com/garmin-forerunner/ |
| 1047 | "World Geodetic System," available at https://en.wikipedia.org/wiki/World_Geodetic_System#WGS84 |
| 1048 | Weiss, "When a Password Is Not a Password," IEEE Proceedings IEEE International Carnahan Conference on Security Technology, Crime Countermeasures (1990) |
| 1049 | Zhang, "Location-based Authentication and Authorization Using Smart Phones," IEEE Proceedings 11th International Conference on Trust, Security and Privacy in Computing and Communications (2012). |
| 1050 | Yuksel, "Biometric Identification Through Hand Vein Patterns," IEEE Proceedings 2010 International Workshop on Emerging Techniques and Challenges for Hand-Based Biometrics (2010) |

**TO:**


**UNITED STATES POSTAL SERVICE**®

**PRIORITY MAIL EXPRESS**®



EI 975 707 185 US

**CUSTOMER USE ONLY**

**FROM:** (PLEASE PRINT)   PHONE 864 288-5605

LARRY GOLDEN
740 WOODRUFF RD.
#1102
GREENVILLE, SC 29607

**PAYMENT BY ACCOUNT** (if applicable)
Federal Agency Acct. No. or Postal Service™ Acct. No.

**DELIVERY OPTIONS** (Customer Use Only)

☑ **SIGNATURE REQUIRED** Note: The mailer must check the "Signature Required" box if the mailer: 1) Requires the addressee's signature; OR 2) Purchases additional insurance; OR 3) Purchases COD service; OR 4) Purchases Return Receipt service. If the box is not checked, the Postal Service will leave the item in the addressee's mail receptacle or other secure location without attempting to obtain the addressee's signature on delivery.
**Delivery Options**
☐ No Saturday Delivery (delivered next business day)
☐ Sunday/Holiday Delivery Required (additional fee, where available*)
   *Refer to USPS.com® or local Post Office™ for availability.

**TO:** (PLEASE PRINT)   PHONE ( )
U.S. COURT OF APPEALS FOR THE FEDERAL CIRCUIT
CASE: 24-2024
717 MADISON PLACE, NW
WASHINGTON, DC

ZIP + 4® (U.S. ADDRESSES ONLY)

2 0 4 3 9 - ___ ___ ___ ___

■ For pickup or USPS Tracking™, visit USPS.com or call 800-222-1811.
■ $100.00 insurance included.

◁ **PEEL FROM THIS CORNER**

**ORIGIN (POSTAL SERVICE USE ONLY)**

| ☑ 1-Day | ☐ 2-Day | ☐ Military | ☐ DPO |
|---|---|---|---|

| PO ZIP Code | Scheduled Delivery Date (MM/DD/YY) | Postage |
|---|---|---|
| 29615 | 11-20-24 | $ |

| Date Accepted (MM/DD/YY) | Scheduled Delivery Time | Insurance Fee | COD Fee |
|---|---|---|---|
| 11-19-24 | ☐ 6:00 PM | $ | $ |

| Time Accepted | | Return Receipt Fee | Live Animal Transportation Fee |
|---|---|---|---|
| 10:41 ☑ AM ☐ PM | | $ | $ |

| Special Handling/Fragile | Sunday/Holiday Premium Fee | Total Postage & Fees |
|---|---|---|
| $ | $ 72.00 | $ |

| Weight | ☐ Flat Rate | Acceptance Employee Initials |
|---|---|---|
| 8 lbs. 70 | 8??? | |

**DELIVERY (POSTAL SERVICE USE ONLY)**

| Delivery Attempt (MM/DD/YY) | Time | Employee Signature |
|---|---|---|
| | ☐ AM ☐ PM | |
| Delivery Attempt (MM/DD/YY) | Time | Employee Signature |
| | ☐ AM ☐ PM | |

LABEL 11-B, NOVEMBER 2023   PSN 7690-02-000-9996