# UNITED STATES COURT OF APPEALS FOR THE FEDERAL CIRCUIT

LARRY GOLDEN
*Appellant*

v.

Google, LLC
*Appellee*

RECEIVED

DEC 3 1 2024

United States Court of Appeals
For the Federal Circuit

ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR

THE NORTHERN DISTRICT OF CALIFORNIA—

SAN FRANCISCO IN 4:22-cv-05246-RFL

JUDGE RITA F. LIN

## PLAINTIFF-APPELLANT'S MOTION FOR
## ORAL ARGUMENT

LARRY GOLDEN
740 Woodruff Rd., #1102
Greenville, S.C. 29607
(864-288-5605)
Atpg-tech@charter.net

Appearing ProSe

December 28, 2024

# CONTENT PAGE

APPELLANT EXPLAINS WHY ORAL ARGUMENT WILL HELP
THE COURT DECIDE THIS CASE ...............................................................PG. 1

APPELLANT WILL ARGUE GOOGLE ADMITS ITS OWN LIABILITY ..............PG. 5

    Element-By-Element Analysis of Google's Tensor CPU/Chipsets ..................PG. 6

APPELLANT WILL ARGUE GOOGLE'S "EXPERT WITNESS"
DEBUNKS JUDGE LIN'S NON-INFRINGEMENT THEORIES ........................PG. 10

APPELLANT WILL ARGUE: THE LOWER COURT IMPROPERLY
ENTERED INTO CLAIM CONSTRUCTION AND WRONGFULLY
MODIFIED THE PATENT CLAIMS ASSERTED IN THIS CASE TO
INCLUDE AN UNSOLICITED STEP ..........................................................PG. 15

    Patent Specifications [in, on, upon, or adjacent] .......................................PG. 16
    Golden's '439 Patent Claims [in, on, upon, or adjacent] ............................PG. 16
    IPR Final Written Decision [built-in, embedded] .....................................PG. 17
    U.S. Patent and Trademark Office [combined or modified] .......................PG. 18

APPELLANT WILL ARGUE: GOLDEN'S PATENT RIGHTS COVERS
ANY AND ALL "MODIFICATIONS" RECOGNIZED BY GOOGLE;
INCLUDING "MODIFICATIONS" MADE BY THIRD PARTIES AND
THE GOVERNMENT ............................................................................PG. 20

    Golden's patent no: 9,589,439 (the '439 patent) ......................................PG. 21
    Golden's patent no: 10,163,287 (the '287 patent) ....................................PG. 21

APPELLANT WILL ARGUE: DIRECT INFRINGEMENT; INDIRECT
INFRINGEMENT; AND JOINT INFRINGEMENT ARE ALL ISSUES-
OF-FACTS TRIED BY A JURY—SEVENTH AMENDMENT ............................PG. 22

    *BMC Resources, Inc. v. Paymentech, L.P.* 498 F.3d 1373 (Fed. Cir. 2007): .......PG. 22
    *Muniauction v. Thompson Corp.* 532 F.3d 1318 (Fed. Cir. 2008): .................PG. 22
    *Akamai Techs. v. Limelight Networks* 629 F.3d 1311 (Fed. Cir. 2010)):............PG. 22
    *Limelight Networks v. Akamai Techs.* 692 F.3d 1301 (Fed. Cir. 2012)): ............PG. 23
    Legislative Action: 271 has been amended to address loopholes ..................PG. 23

BECAUSE I'VE BEEN BURNED BEFORE BY JUDGES WHO AREN'T
AS DILIGENT AS THEY SHOULD BE WHEN IT COMES TO STUDYING
AND READING THE RECORD AND WRITTEN ARGUMENTS, ORAL
ARGUMENT WILL HELP THE COURT DECIDE THIS CASE ........................PG. 24

**APPELLANT WILL ARGUE: THE LOWER COURT'S NON-INFRINGEMENT THEORIES "DEFIES LOGIC"** ……………………………....PG. 28

**APPELLANT WILL ARGUE: THE UNITED STATES GOVERNMENT IS RESPONSIBLE FOR THE DEVELOPMENT, ASSEMBLY, AND DISTRIBUTION OF THE FIRST SMARTPHONE—BUT NOT THE INVENTION** …………………………………………………………………………PG. 29

**CONCLUSION** …………………………………………………………………....PG. 30

## APPELLANT EXPLAINS WHY ORAL ARGUMENT WILL HELP THE
## COURT DECIDE THIS CASE

The "takings" clause of the Fifth Amendment of the United States Constitution states: "[n]o person ... shall be deprived of life, liberty, or property without due process of law, and just compensation". Intellectual property rights are just what they say they are – property rights. Due process is the constitutional clause that seeks to ensure that those property rights are not wrongfully taken from their holder without the proper procedure.

Golden will argue: Since due process guarantees access to the courts to remedy an injury to property, a necessary question is whether courts treat a patent as a property right that is afforded the same due process protections contemplated by the Fifth Amendment.

The Seventh Amendment of the United States Constitution states: "[i]n Suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved".

Golden will argue: Patent infringement is an issue-of-fact tried by a jury under the Seventh Amendment. Chief Judge Markey's comments in *SRI International v. Matsushita Electric Corp.* reveal obvious disdain for those who question the capabilities of lay juries, even in complicated patent cases. Throughout his decade-long tenure as head of the Court of Appeals for the Federal Circuit ("CAFC"), Markey consistently promoted the "fundamental Constitutional right" to a jury in civil cases—including patent trials.

In *Bot M8 LLC v. Sony Corporation of America, et al.*, No. 2020-2218 (Fed. Cir. July 13, 2021), the Federal Circuit affirmed the district court's dismissal of *Bot M8's* claims as to the '540 and '990 patents for failure to state a plausible claim of infringement. On appeal, the Federal Circuit clarified the pleading requirements for patent infringement cases. It reiterated that "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." But it disagreed with the district court's instruction that a complaint must "explain . . . every element of every claim that you say is infringed and/or explain why it can't be done." The Court explained that a plaintiff need not "prove its case at the pleadings stage" and is not required to plead infringement on an element-by-element basis. It held that, while a formulaic recitation of the elements would not be acceptable, to the extent the district court adopted a blanket element-by-element pleading standard for patent infringement, that approach is unsupported and goes beyond what the Supreme Court articulated in *Iqbal* and

*Twombly*. The Court explained that it is enough "that a complaint places the alleged infringer on notice of what activity . . . is being accused of infringement." Finally, the Court outlined several factors that would influence the level of detail required for a complaint in a given case, such as (1) the complexity of the technology, (2) the materiality of an element to practicing the asserted claim(s), and (3) the nature of the allegedly infringing device. Applying this clarified standard, the Court found *Bot M8's* allegations regarding the '988 and '670 patents sufficient to survive a motion to dismiss.

Golden will argue: The Federal Circuit in *Larry Golden v. Google LLC* Case No. 22-1267 "vacated and remanded" the lower court case *Larry Golden v. Google LLC* Case No. 21-0244 back to the lower [District] court because Golden had met all the pleading requirements, and was therefore ready for trial. The original case *Golden v. Google LLC*, SCDC No. 6:2021cv00244 was filed in the South Carolina District Court on 01/26/2021. The case was dismissed as being "frivolous". Golden appealed the case to the U.S. Court of Appeals for the Federal Circuit.

The Federal Circuit in *Golden v. Google LLC* Case No. 22-1267 disclosed in "Discussion" that the Circuit reviewed the case "under the pleading standards set forth in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), [a court must dismiss a complaint if it fails to allege "enough facts to state a claim to relief that is plausible on its face]." *Twombly*, 550 U.S. at 570; and, "plaintiff must allege facts that give rise to "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678 (citation omitted)

The Federal Circuit in *Golden v. Google LLC* Case No. 22-1267 took notice that "in the patent context, th[e] court has explained that a plaintiff need not "plead facts establishing that each element of an asserted claim is met," *In re Bill of Lading Transmission and Processing Sys. Pat. Litig.*, 681 F.3d 1323, 1335 (Fed. Cir. 2012) (citing *McZeal v. Sprint Nextel Corp*, 501 F.3d 1354, 1357 (Fed. Cir. 2007)), but must plead "'enough fact[s] to raise a reasonable expectation that discovery will reveal' that the defendant is liable for the misconduct alleged." *Id.* at 1341 (alteration in original) (quoting *Twombly*, 550 U.S. at 556)".

The Federal Circuit in *Larry Golden v. Google LLC*, Case No. 22-1267 examined and determined Golden has described how the Google "smartphone", that include the ATAK software and CBRN plugin sensors literally infringes at least claim 5 of Golden's '287 Patent; claim 23 of Golden's '439 Patent; and claim 1 of Golden's '189 Patent. See the chart below:

| Literal Infringement (Precedence) | Literal Infringement (Fed. Cir. *Golden v. Google*) |
|---|---|
| Literal infringement means that each and every element recited in a claim has identical correspondence in the allegedly infringing device or process. To literally infringe a patent, the accused system, method, etc. must include each limitation of a claim. E.g., *Southwall* (Fed. Cir. 05/10/95) To establish literal infringement, every limitation set forth in a claim must be found in an accused product, exactly. *Becton Dickinson* (Fed. Cir. 12/13/90). "Infringement, both literal and under the doctrine of equivalents, is an issue of fact."); *Cobalt Boats* (Fed. Cir. 05/31/19) "patent infringement is an issue of fact, tried by a jury" [U.S. CONST. amend. VII] | "Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the [] Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189 ... It [claim chart] attempts [] to map claim limitations to infringing product features, and it does so in a relatively straightforward manner ... [W]e conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart. Mr. Golden has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart...." |

The Federal Circuit in *Golden v. Google LLC* Case No. 22-1267 goes on to say: "In the Google case, the district court **again** concluded that Mr. Golden's complaint was frivolous. Here, however, Mr. Golden's complaint includes a detailed claim chart mapping features of an accused product, the Google [Pixel 5] Smartphone, to independent claims from U.S. Patent Nos. 10,163,287, 9,589,439, and 9,069,189" ... "to the extent that the chart includes the "exact same language" as previously rejected charts, it is simply the language of the independent claims being mapped to" ... "[i]t attempts—whether successfully or not—to map claim limitations to infringing product features, and it does so in a relatively straightforward manner. We conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart. Mr. Golden has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart."

Golden will argue: Although the Federal Circuit did not specifically say "'without a doubt', Google's smartphone products that include the ATAK software and CBRN plugin sensors are literally and/or under the doctrine of equivalents, infringing Golden's patents asserted in the case", the Federal Circuit imply to say under the "clear and convincing evidence" standard, Google's smartphone products that include the ATAK software and CBRN plugin sensors are more likely than not, directly infringing Golden's patents asserted in the case.

Therefore, Golden will argue he has satisfied his burden of proof under the "preponderance of evidence" standard with "enough fact[s] to raise a reasonable expectation that discovery will reveal" that the defendant is liable for the misconduct alleged." *Id.* at 1341 (alteration in original) (quoting *Twombly*, 550 U.S. at 556)".

Golden will argue, the Defendant Google filed a 12(b)(6) motion to dismiss in the lead case *Golden v. Google LLC*, SCDC No. 6:2021cv00244 for failure to state a claim upon which relief can be granted. The SC District court granted the Defendant's motion.

When the case was vacated and remanded by the Federal Circuit in *Golden v. Google LLC* Case No. 22-1267, Golden filed the identical complaint and claim charts filed in the lead case *Golden v. Google LLC*, SCDC No. 6:2021cv00244; that was reviewed at the Federal Circuit, in the Northern District of California Court as *Golden v. Google, LLC* Case No. 22-5246.

The Defendant Google filed another 12(b)(6) motion to dismiss on the same complaint and claim charts that had been vacated and remanded back to the lower district court by the Federal Circuit in *Golden v. Google LLC* Case No. 22-1267. A 12(b)(6) motion argues that a complaint did not satisfy applicable pleading requirements or for another reason does not state a claim for relief.

In considering the Defendant Google's motion to dismiss in the Northern District of California Court case *Golden v. Google, LLC* No. 3:22-cv-05246-RFL, it is demanded upon the Court to accept as true all the well-pleaded facts alleged in Golden's complaint and claim charts [that had been reviewed by the Federal Circuit in *Golden v. Google LLC* Case No. 22-1267]; and draw all reasonable inferences in Golden's favor. *Kassner*, 496 F.3d at 237.

A 12(b)(6) motion argues a complaint did not satisfy applicable pleading requirements or for another reason does not state a claim for relief. The Federal Circuit reviewed and signaled Golden had satisfied all the pleading requirements when he alleged "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; and, "plaintiff must allege facts that give rise to "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678.

Golden will argue the lower court not only violated Golden's due process rights; but the lower court also violated Golden's guaranteed right to a trial by jury in a patent infringement claim that is an issue-of-fact. [Seventh Amendment]

The lower court also violated the doctrine of *"vertical stare decisis"*.

## APPELLANT WILL ARGUE GOOGLE ADMITS ITS OWN LIABILITY

Golden owns the patent rights for a smartphone [communication device] that comprises a central processing unit; a central processing unit designed specifically for the smartphone. Golden has demonstrated throughout this case that the Google smartphone has to be *"modified"* with Golden's patented CPUs in order to function; meaning, in order to function as a communicating, monitoring, detecting, and controlling (CMDC) device [i.e., a smartphone].

Golden's patented CPUs, or Central Processing Units, are often referred to as the "brain" of the smartphone [Google smartphone]. They are responsible for executing instructions and performing calculations necessary for the functioning of the system. The CPU consists of various components, including the control unit, arithmetic logic unit (ALU), and cache memory.

Golden's patented CPUs operates a set of instructions stored in memory, commonly referred to as a program. The CPUs fetches these instructions, decodes them, performs the necessary operations, and stores the results back in memory.

The Google Tensor is a Google-designed system-on-chip (SoC/CPU) that first began in April 2016, after the introduction of the company's first Pixel smartphone. Beginning in 2017, Google began to include custom-designed co-processors in its Pixel smartphones.

| Google Tensor "CPU" |
|---|



Google's alleged infringing smartphone device(s) must be *"modified"* by Google with the alleged infringing Google Tensor CPU; recognized as the *"brains"* of the alleged Google smartphone device(s); responsible for carrying out the operational and functional instructions of the Google smartphone device(s) in order to *"perform substantially the same function"*; in *"substantially the same way"*; to achieve *"substantially the same result"*; as Golden's patented CMDC device(s), that includes Golden's patented central processing units (CPUs).

Golden's patented CPUs primary role is to handle general-purpose tasks that require complex calculations and rapid decision-making. The CPUs execute instructions related to operating system operations, software applications, and managing various hardware components; tasks such as running programs, performing mathematical calculations, handling system requests, and managing memory allocation all fall under the responsibilities of the CPU(s).

Golden's patented CPUs are the central components that carries out the instructions necessary for the Google smartphones to function. Without Golden's patented CPUs [invented for smartphones] the Google smartphones, would not be able to execute tasks or process data.

# Element-By-Element Analysis of Google's Tensor CPU/Chipsets

| Google Tensor 1,2, & 3 | Patent #: 10,984,619; Independent Claim 1 | Patent #: 10,984,619; Independent Claim 11 |
|---|---|---|
| Google Tensor (i.e. CPU; Chipset) | A communication device that is at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, comprising at least a central processing unit (CPU), capable of: | A central processing unit (CPU) of at least a personal computer (PC), a cellphone, a smartphone, a laptop, or a handheld scanner, capable of: |
| The Google Tensor (i.e. CPU; Chipset) is considered the "brain" of the Smartphone, capable of carrying out the operational/ functional instructions of the phone | processing instructions to lock, unlock, or disable the lock of the communication device | processing instructions to lock, unlock, or disable the lock of the communication device; |
| The Google Tensor (i.e. CPU; Chipset) is considered the "brain" of the Smartphone, capable of carrying out the operational/ functional instructions of the phone | processing instructions to activate a lock, unlock, or disabling lock means by engaging a vehicle with a two-way communication key-fob; | processing instructions to activate a lock, unlock, or disabling lock means by engaging a vehicle with a two-way communication key-fob; |
| The Google Tensor (i.e. CPU; Chipset) is considered the "brain" of the Smartphone, capable of carrying out the operational / functional instructions of the phone | processing instructions to activate a start, stall, stop, or disabling means by engaging a vehicle's ignition system; | processing instructions to activate a start, stall, stop, or disabling means by engaging a vehicle's ignition system; |
| The Google Tensor (i.e. CPU; Chipset) is considered the "brain" of the Smartphone, capable of carrying out the operational/ functional instructions of the phone | processing instructions to activate a lock, unlock, or disabling lock means; a start, stall, stop, or disabling vehicle means by engaging the operational systems of the unmanned aerial vehicle; | processing instructions to activate a lock, unlock, or disabling lock means; a start, stall, stop, or disabling vehicle means by engaging the operational systems of the unmanned aerial vehicle; |
| The Google Tensor (i.e. CPU; Chipset) is considered the "brain" of the Smartphone, capable of carrying out the operational / functional instructions of the phone | processing instructions to authenticate or identify a user by at least one of biometric fingerprint recognition, biometric facial recognition, biometric iris recognition, or biometric retina recognition; | processing instructions to authenticate or identify a user by at least one of biometric fingerprint recognition, biometric facial recognition, biometric iris recognition, or biometric retina recognition; |
| The Google Tensor (i.e. CPU; Chipset) is considered the "brain" of the Smartphone, capable of carrying out the operational / functional instructions of the phone | processing instructions to scan a senor or tag using the short-range wireless technology of radio frequency near-field communication (NFC) | processing instructions to scan a senor or tag using the short-range wireless technology of radio frequency near-field communication (NFC); |
| The Google Tensor (i.e. CPU; Chipset) is considered the "brain" of the Smartphone, capable of carrying out the operational / functional instructions of the phone | processing instructions to monitor or detect at least one of a chemical sensor, a biological sensor, a motion sensor, a biometric sensor, a signature sensor, or a human sensor; | processing instructions to monitor or detect at least one of a chemical sensor, a biological sensor, a motion sensor, a biometric sensor, a signature sensor, or a human sensor; |

| | | |
|---|---|---|
| The Google Tensor (i.e. CPU; Chipset) is considered the "brain" of the Smartphone, capable of carrying out the operational / functional instructions of the phone | processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs); | processing instructions to monitor or detect for at least one of chemical agent, biological agent, radiological agent, nuclear agent, or explosive agent, weapons of mass destruction (WMDs); |
| The Google Tensor (i.e. CPU; Chipset) is considered the "brain" of the Smartphone, capable of carrying out the operational / functional instructions of the phone | processing instructions received through at least one of a Bluetooth, a Wi-Fi, a satellite, a global positioning system (GPS), or a cellular transmission; | processing instructions received through at least one of a Bluetooth, a Wi-Fi, a satellite, a global positioning system (GPS), or a cellular transmission; |
| The Google Tensor (i.e. CPU; Chipset) is considered the "brain" of the Smartphone, capable of carrying out the operational / functional instructions of the phone | processing instructions to connect the communication device to the internet or internet-of-things (IoTs) platform to sync, to at least one of a building's computer or security system, a vehicle's computer or security system, a lock, a detection device, or another communication device; and, | processing instructions to connect the communication device to the internet or internet-of-things (IoTs) platform to sync, to at least one of a building's computer or security system, a vehicle's computer or security system, a lock, a detection device, or another communication device; and, |
| The Google Tensor (i.e. CPU; Chipset) is considered the "brain" of the Smartphone, capable of carrying out the operational / functional instructions of the phone | whereupon, the communication device is capable of processing instructions for operational and functional execution, and is capable of providing feedback of the execution, and storing the feedback into memory. | whereupon, the ... (CPU) of the communication device is capable of processing instructions for operational and functional execution, and is capable of providing feedback of the execution, and storing the feedback into memory. |

| Google Tensor 1, 2, & 3 | Patent #:10,163,287; Independent Claim 4 | Patent #:10,163,287; Independent Claim 5 |
|---|---|---|
| A communicating or monitoring device of at least a Google smartphone comprising: | A communication device comprising: | A monitoring device comprising: |
| The Google Tensor (i.e. CPU; Chipset) is considered the "brain" of the Smartphone... | at least one central processing unit (CPU); | at least one central processing unit (CPU); |
| The Google Tensor (i.e. CPU; Chipset) is considered the "brain" of the Smartphone... | at least one motion sensor in communication with the at least one CPU; | at least one motion sensor in communication with the at least one CPU; |
| The Google Tensor (i.e. CPU; Chipset) is considered the "brain" of the Smartphone... | X | at least one temperature sensor in communication with the at least one CPU for monitoring temperature; |
| The Google Tensor (i.e. CPU; Chipset) is considered the "brain" of the Smartphone... | at least one viewing screen for monitoring in communication with the at least one CPU; | at least one viewing screen for monitoring in communication with the at least one CPU; |

| | | |
|---|---|---|
| The Google Tensor (i.e. CPU; Chipset) is considered the "brain" of the Smartphone... | at least one global positioning system (GPS) connection in communication with the at least one CPU; | at least one global positioning system (GPS) connection in communication with the at least one CPU; |
| The Google Tensor (i.e. CPU; Chipset) is considered the "brain" of the Smartphone... | at least one of an internet connection Wi-Fi connection in communication with the at least one CPU; | at least one of an internet connection Wi-Fi connection in communication with the at least one CPU; |
| The Google Tensor (i.e. CPU; Chipset) is considered the "brain" of the Smartphone... | at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; | at least one of a Bluetooth connection, a cellular connection, or a satellite connection in communication with the at least one CPU; |
| The Google Tensor (i.e. CPU; Chipset) is considered the "brain" of the Smartphone... | at least one locking mechanism in communication with the at least one CPU for locking the communication device... | at least one locking mechanism in communication with the at least one CPU for locking the communication device... |
| The Google Tensor (i.e. CPU; Chipset) is considered the "brain" of the Smartphone... | at least one power source comprising at least one of a battery, electrical connection, or wireless connection... | at least one power source comprising at least one of a battery, electrical connection, or wireless connection... |
| The Google Tensor (i.e. CPU; Chipset) is considered the "brain" of the Smartphone... | at least one biometric sensor in communication with the at least one CPU for providing biometric authentication... | at least one biometric sensor in communication with the at least one CPU for providing biometric authentication... |
| The Google Tensor (i.e. CPU; Chipset) is considered the "brain" of the Smartphone... | X | at least one sensor for chemical, biological, or human detection in communication with the at least one CPU; |
| The Google Tensor (i.e. CPU; Chipset) is considered the "brain" of the Smartphone... | at least one or more detectors in communication with the act least one CPU for detecting at least one of a chemical, biological, radiological, or explosive agents; | at least one or more detectors in communication with the act least one CPU for detecting at least one of a chemical, biological, radiological, or explosive agents; |
| The Google Tensor (i.e. CPU; Chipset) is considered the "brain" of the Smartphone... | at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU; | at least one radio-frequency near-field communication (NFC) connection in communication with the at least one CPU; |
| The Google Tensor (i.e. CPU; Chipset) is considered the "brain" of the Smartphone... | at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals... such that the communication device is capable of communicating, monitoring, detecting, and controlling. | at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals... such that the communication device is capable of communicating, monitoring, detecting, and controlling. |

Golden alleged in this case that the Google Tensor CPU directly infringes patent claims 1 & 11, of his '619 patent, and patent claims 4 & 5 of his '287 patent. The Trial Court Judge completely ignored Golden's alleged infringement claims that the Google's Tensor, Tensor 2, and Tensor 3 CPU/Chipset allegedly infringes Golden's patents.

When the smartphone battery is empty, does it need to be *modified* with a third-party charger in order to function? In order for the smartphone to function as a wireless phone, does it need to be *modified* with a third-party [Qualcomm] wireless cellular modem in order to function? When the phone is in a no service zone, does it need to be *modified* with a third-party cellular tower fully equipped with antennas, transmitters, and receivers in the area in order to function?

In claims 4 & 5 of Golden's '287 patent, Golden is required to identify "at least one CPU *"configured to"* send signals to monitor ... or send signals to detect";

> *"at least one of a transmitter or a transceiver in communication with the at least one CPU configured to send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or send signals to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling."*

Example of configuration in the Google smartphone: "*'Google Assistant'*, the personal assistant baked into [Google] Android that can [] control compatible smart home devices." https://www.wired.com/story/how-to-set-up-your-new-android-phone/

In this current case, there are numerous Google smartphone hardware, software, components, antennas, receivers, transmitters, transceivers, etc. *internal* the Google device that enables the Google device to function as a sensing device, without *modification* by a third party.

Smartphones are essentially mini-computers, and they work in much the same way. The CPU processor is the *"brain"* of the phone and is responsible for running applications and managing tasks. Without the *"brain"* of the Google smartphone, it cannot function. Golden owns the patent rights to the *"brain"* [CPU] of the Google smartphone.

In *Microprocessor Enhancement Corp. v Texas Instruments Inc.*, 520 F.3d 1367 (Fed. Cir. 2008), the Court determined that a claim directed to a computer processor including instructions for performing various functions was definite. These functions included "performing a Boolean algebraic evaluation," "producing an enable-write," "enabling" or "disabling," and "determining." The Court found that the claim was "clearly limited to a . . . processor possessing the recited structure and capable of performing the recited functions."

If Google and the Trial Court's non-infringement theory of *"modification in order to function"* is allowed to stand, then it must likewise be applied to apply the same theory to the "Google smartphone having to be *'modified'* with Golden's patented CPUs in order to function; and function as a communicating, monitoring, detecting, and controlling [smartphone] device".

9

**APPELLANT WILL ARGUE GOOGLE'S "EXPERT WITNESS" DEBUNKS
JUDGE LIN'S NON-INFRINGEMENT THEORIES**

During oral argument Golden will show Google own Expert Witness *Declaration* debunks Judge Lin's non-infringement theory that the *"Google device has to be modified by the user for the [smartwatch] to function as a sensing device"*. Key words found in the declaration are: configured to, mobile phones, smartwatch, Bluetooth, NFC, GPS, operating system, processors, software, RF, cellular, WiFi, wireless adapters; biological-pulse, biometric, infrared, skin, light, optical, and ECG sensors, heart rate, remote server, accessible, wearable, antennas...
**[Dkt 24 filed 11/24/2024 Appx. VIII pages 338-482 *Golden v. Google* CAFC Case: 24-2024]**

According to the Trial Court Judge, the standard communication modules (Bluetooth, Wi-Fi, Cellular, etc.) and the associated applications or software (CPU, SoC, Operating Systems (OS)) for carrying out the functional and operational instructions; are *modifications* to the Google smartphone and/or Google smartwatch; and is therefore excluded from any patented inventive process. Google's expert witness declaration debunks this theory.

Golden will argue that for the purpose of "communication devices grouped together by common features of design similarities"; the Google smartphone and Google smartwatch can be grouped together for the purpose of pleading enough sufficient and factual allegations to show the two Google devices are basically the same. The differences are insignificant for proving infringement by Google of Golden's patents.

When it comes to connectivity, Google's Expert describes how smartwatches primarily rely on three main technologies: Bluetooth, Wi-Fi, and Cellular—same as the Google smartphone. Each of these technologies offers a different range, impacting the distance a smartwatch can be from its paired smartphone or network.

Golden's infringement theories cover multiple scenarios of functionality when combining his patented inventions capabilities for CBRNE-H sensing that Google has allegedly infringed upon.

Golden demonstrated the smartwatch as an "integral part" of the smartphone when connected by Bluetooth or Wi-Fi. Claim 5 of Golden's '287 patent that was reviewed by the Federal Circuit in *Golden v. Google LLC* Case No. 22-1267 has two claim limitations that can be satisfied with the Google smartwatch when paired with the Google smartphone. This level of functionality is accomplished by the smartphone and smartwatch processors; not modifications.

| Ind. Claim 5 of the '287 Patent | Heart rate monitors are sensors found in smartwatches that allow users to track their heart rate in real-time. The oximetry sensor is one of the sensors that are present in smartwatches used to measure the oxygen saturation in the blood to determine how well the lungs are functioning. The ECG sensor is one sensor present in smartwatches used to measure the electrical activity of the heart and can be used to detect arrhythmias. |
|---|---|
| at least one sensor for chemical, biological, or human detection in communication with the at least one CPU;  | The US Military's Latest Wearables [Smart Watch] Can Detect Illness Two Days Before You Get Sick https://www. defenseone.com/ technology/2020/09/militarys-latest-wearables-can-detect-illness-two-days-you-get-sick/168664/ <br><br> Studies reveal smartwatch biometrics can detect COVID-19: "smartwatches and other wearables measuring biometrics like heart-rate variability have the ability to detect if a person is COVID-19 positive" https://www.biometricupdate.com/ 202101/studies-reveal-smartwatch-biometrics-can-detect-covid-19-before-symptoms-surface |
| **Ind. Claim 5 of the '287 Patent** <br><br> one or more detectors in communication with the at least one CPU for detecting at least one of chemical, biological, radiological, or explosive agents;  | *Android Team Awareness Kit*, ATAK (built on the Android operating system) provides a single interface for viewing and controlling different CBRN-sensing technologies, whether that is a wearable smartwatch that measures a warfighter's vitals (e.g., heart rate) or a device mounted on a drone to detect chemical warfare agents. <br><br> *Android Team Awareness Kit*, ATAK (built on the Android operating system) is a digital application available to warfighters throughout the DoD. ATAK offers warfighters geospatial mapping for situational awareness [] — on an end-user device such as a smartphone, smartwatch, or a tablet. With DTRA's contribution, ATAK now includes chemical, biological, radiological, and nuclear (CBRN) plug-in sensors. <br><br> Homeland Security's Smartwatch Will Detect Nuclear Bombs https://www.popular-mechanics.com/military/research/a18161/ homeland-security -smartwatch-detect-nuclear-bombs/ |

As demonstrated above and throughout these proceedings, the Google's smartwatch is *configured* for point-of-care Chem/Bio/Human detecting and sensing; as well as, hazardous CBRN detection and sensing. The Judge is quoted as saying Golden's "theories all require that the accused products be modified in some way for them to infringe on the patents-in-suit". This is an inventive step fabricated by the Judge and used against Golden only to dismiss his case.

Golden will argue that when it comes to connectivity, smartwatches primarily rely on three main technologies: Bluetooth, Wi-Fi, and cellular. Each of these technologies offers a different range, impacting the distance a smartwatch can be from its paired smartphone or network. Golden demonstrated the Google smartwatch as an "integral part" of the Google smartphone when paired or connected by Bluetooth or Wi-Fi.

Google's Expert declaration underscores the significance of the connectivity of the smartwatch when paired with the smartphone, and how the smartwatch functions as a stand-

alone when connected through cellular. This level of functionality is accomplished by the smartphone and smartwatch processors; not modifications.

Applying the same non-infringement theories to the prior-art references used by Google's Expert, it is fair to say, the Google smartphone and smartwatch require "modification" by a third-party to function as a wireless consumer device; or the Google devices cannot function as a wireless mobile device without modification; the modification of at least that of a cellular tower.

According to the Expert, without the connection of a wireless networking protocol of at least that of Bluetooth, Wi-Fi, or Cellular, the smartwatch does not function as a wireless device.

United States Patent and Trademark Office before the Patent Trial and Appeal Board in *Google LLC, Petitioner, v. Smartwatch Mobile Concepts, LLC, Patent Owner.* Case No. IPR2024-00852 Patent No. 10,362,480 **"Declaration of David H. Williams"** Google Exhibit 1003; *Google v. Smartwatch.* David H. Williams, declare: "1. 1 have been retained by Wolf, Greenfield & Sacks, P.C., counsel for Petitioner Google LLC, to assess claims 1-9 (the "challenged claims") of U.S. Patent No. 10,362,480 ("the '480 patent")." **[Dkt 24 filed 11/24/2024 Appx. VIII pages 338-482** *Golden v. Google* **CAFC Case: 24-2024]**

27. I further understand that in determining whether a prior-art reference would have been combined with other prior art or with other information within the knowledge of a POSA, the following are examples of approaches and rationales that may be considered: * some teaching, suggestion, or motivation in the prior art that would have led one of ordinary skill to *modify* the prior-art reference or to combine prior-art reference teachings to arrive at the claimed invention.

102. Additionally, or alternatively, POSAs would have been motivated to extend Agrafioti's Wearable to apply to the "wireless transactions" described in Berney (e.g., "car parking at a public parking meter" ([0036]), "an authorized person seeking entry to a restricted entry area" ([0037]) ... Agrafioti as *modified* in view of Berney satisfies [1B] for this additional reason.

146. POSAs would have had such motivation to implement Agrafioti's wearable itself and/or as *modified* in view of Berney (as discussed Section VIII.C) to obtain vein patterns based on Lee's teachings. Both options are collectively discussed herein as "Agrafioti-Berney-Lee." POSAs would have reasonably expected success in incorporating Lee's array of illuminators into Agrafioti Berney-Lee at least because

Agrafioti, Berney, and Lee all describe a wearable device having similar form factors (e.g., watches) and describe similar platforms (processors, memory, biometric readers, and antennas).

165. POSAs would have reasonably expected success in *modifying* Agrafioti's system and method to include Jun's GPS-based techniques, at least because GPS location technology and authentication methods were well understood by POSAs and used in wearables long before the '480's priority date. Further, Jun explains a GPS-based, proximity authentication technique is successfully implementable in a wearable device, such as a wrist-wearable device of the same form as Agrafioti's wearable device. Jun, 11:53-57, 13:49-53.

172. Wearable 40 and smartphone 20 communicate "via a secure network 50." Tharappel, 2:26-27; Fig. 1. Smart device 20 and wearable 40 include "respective wireless adapters 21 and 41" that include "wireless communication circuitry" such as Wi-Fi, Bluetooth, NFC, satellite, and/or any cellular technologies ("including '3G/4G/5G/nG'"). Tharappel, 4:50-5:30.

173. Both smart device 20 and wearable 40 "include respective biometric sensors 29 and 49 for sensing" user "biological characteristics," including but not limited to "voice patterns, speech, fingerprints ... hand features, palm prints, and pulse features." Tharappel, 6:31-41. Biometric sensors 29 and 49 can include any suitable biometric sensor for sensing the desired biological characteristic, such as "a pulse sensor ... to sense pulse features." Tharappel, 6:41-49. Wearable 40 includes "a biometric authentication module 42" (2:28-29), which allows the user to "authenticate [] to the wearable based on the user specific biometric credentials" (4:16-20). See Tharappel, 2:24-45. Wearable 40 "may be *configured to* allow a user to authenticate based on a single biometric credential or multiple biometric credentials." Tharappel, 4:22-25.

182. Both Berney and Tharappel describe wearable devices that include a GPS component and perform user authentication. Tharappel, 19:18-44; Berney, [0029], [0040]. Thus, POSAs would have expected success in implementing proximity authentication with GPS backup in Tharappel's wearable based on Berney's teachings. Such a *modification* could be implemented with software modifications to use GPS

location data for authentication. Further, both GPS location technology generally and location-based authentication methods were well understood by POSAs at that time.

239. Based on Lee, POSAs would have had reasons to *modify* Tharappel Berney to incorporate Lee's wrist-vein-pattern biometric authentication techniques discussed above in section IX.A (resulting in "Tharappel-Berney-Lee"). For example, POSAs would have understood that Lee's biometric authentication techniques based on wrist-vein-pattern identification provide "other types" of authentication credentials contemplated by Tharappel and that Lee describes in detail the type of wrist-contact authentication techniques mentioned in Berney. Lee, [0005], [0070]; Tharappel, 8:53, Berney, [0032]; see §§ IX.A- IX.B. POSAs also would have understood that including Lee's biometric authentication methods would further Tharappel's goal of providing "secure, convenient access to" multiple smart devices. Tharappel, 3:55-58.

247. POSAs would have reasonably expected success in *modifying* Tharappel's wearable to include Jun's GPS-based authentication, at least because GPS location technology and authentication methods were well understood by POSAs long before the '480's invention date. Further, Jun explains a GPS-based, proximity authentication technique is successfully implementable in a wearable device, such as a wrist-wearable device of the same form as Tharappel's wearable device. Jun, 11:53-57; 13:49-53.

249. Tharappel-Jun includes Tharappel's method *modified* in view of Jun, which includes using a wearable for biometric and other types (e.g., location based) of user authentication. See Sections XI.A, XI.B, XIII.A. As discussed in Sections XI.A, XI.C.2, Tharappel-Jun's method "places a wearable device in contact with a user" as claimed. Additionally, Tharappel-Jun's method of using a wearable includes the circuity disclosed in Tharappel and discussed in Sections XI.A, XI.C.2. Thus, Tharappel-Jun satisfies [2A1]-[2A2].

Tharappel, 4:50-5:5 ("The wireless communications may be inclusive of wireless technologies..., cellular technologies..., other radio frequencies (e.g., near field communications (NFC)...and/or any other networking protocols that facilitate wireless communications."), 5:9-30 ("the wireless connection" may include "BluetoothTM" and "may also include any cellular wireless...connection").

**APPELLANT WILL ARGUE: THE LOWER COURT IMPROPERLY ENTERED INTO CLAIM CONSTRUCTION AND WRONGFULLY MODIFIED THE PATENT CLAIMS ASSERTED IN THIS CASE TO INCLUDE AN UNSOLICITED STEP**

Golden has stated time and time again, that Google's non-infringement theories of "infringement only occurs when the Google device is *'modified'* in order to function as a sensing device", and/or "the Google device must be *'modified'* by a third party in order to function as a sensing device", has *NO* place in patent law and if allowed to stand, will likely challenge the entire patent grant system.

Oral argument will allow Golden the opportunity to, not only explain, but to expose Google on the record for framing a challenge to the validity of Golden's patents as a defense of non-infringement. Google opened claim construction without presenting any 101, 102, 103, 112, or 120 objections; without presenting any prior art references; without claiming Golden's patent claims are invalid because of novelty, anticipation, obviousness; or of being indefinite.

Oral argument is needed to show the lower court allowed Google to open up claim construction on a term "modify", "modified", or "modification", that does not appear in any of Golden's patent claims asserted in this case. Golden used the claim term *"configured to"* to describe the interconnection of components to function as a communicating, monitoring, detecting, and controlling (CMDC) device.

Claims 4, 5, & 6 of Golden's Patent No. 10,163,287 [the '287 patent] asserted in this case, claims a "communication device", "monitoring device", and, "monitoring equipment", that comprises:

> "at least one of a transmitter or a transceiver in communication with the at least one CPU *configured to* send signals to monitor at least one of a door, a vehicle, or a building, send signals to lock or unlock doors, send signals to control components of a vehicle, send signals to control components of a building, or send signals to detect at least one of a chemical biological, radiological, or explosive agent such that the communication device is capable of communicating, monitoring, detecting, and controlling."

Oral argument is needed to show the lower court:

- ignored the written description in Golden's patent specification;
- ignored Golden's patent claims issued with the presumption of validity;
- ignored the final decision of an *Inter Partes Review* (IPR) trial;
- ignored the United States Patent and Trademark Office; and,
- ignored Google Expert's declaration presented in this case by Appellant

by narrowing the Google smartphone device to "only infringe when the Google device is *'modified'* in order to function as a sensing device", and/or "the Google device must be *'modified'* by a third party in order to function and infringe as a CMDC device".

## Patent Specifications [in, on, upon, or adjacent]

"The multi sensor detection [] system includes a detector case sized to fit in, upon or adjacent any of the aforedescribed products for detecting harmful and dangerous chemical, biological, and radiological agents, compounds and elements" ... "As shown in FIGS. 1-10, the multi sensor detection [] system 10 includes at least one—and preferably many—detector case 12 that can be placed in, on, upon or adjacent the product" ... "Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, satellite cell phone cases, laptop cases, notebook PC cases, PDA cases, carry-on cases, suitcases, eyeglass, briefcases, detector cases of locks, detector cases of tags, detector cases that is mounted to, detector cases that is affixed to, detector cases that is outside of, detector cases that is inside of, and detector cases that is adjacent to" ...

## Golden's '439 Patent Claims [in, on, upon, or adjacent]

13. at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; that is wired or wireless, capable of being disposed within, on, upon or adjacent the communication device;

14. at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; that is wired or wireless, capable of being disposed within, on, upon or adjacent the monitoring equipment;

19. a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human, or contraband agent or compound, capable of being disposed within, on, upon or adjacent a multi-sensor detection device;

20. a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human, or contraband agent or compound, capable of being disposed within, on, upon or adjacent a multi-sensor detection device;

21. a plurality of sensors for detecting at least one chemical, biological, radiological, explosive, nuclear, human, or contraband agent or compound, capable of being disposed within, on, upon or adjacent a multi-sensor detection device, wherein at least one of the sensors is

capable of detecting agents of an item of interest (IOI);

22. at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor; that is wired or wireless, capable of being disposed within, on, upon or adjacent the communication device;

23. at least one of a chemical sensor, a biological sensor, an explosive sensor, a human sensor, a contraband sensor, or a radiological sensor capable of being disposed within, on, upon or adjacent the cell phone;

## IPR Final Written Decision [built-in, embedded]

In the *United States Department of Homeland Security v. Larry Golden* "Final Written Decision" Case IPR2014-00714, Entered: October 1, 2015, the PTAB construed "built in, embedded" as "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device'.

In the Decision to Institute, we construed certain claim terms. Those constructions are reproduced in the chart below.

| Claim Term | Construction |
|---|---|
| "built in, embedded" (claim 74) | "something is included within, incorporated into, disposed within, affixed to, connected to, or mounted to another device, such that it is an integral part of the device" |
| "communication device" (claim 81) | "monitoring equipment" |

Dec. to Inst. 11–16.

No party challenges these constructions. Both of these terms were modified or removed in the amendment. To the extent that any of these constructions remain relevant after the amendment, we see no reason to modify them.
We further determined that no explicit construction was necessary for any other claim terms. Dec. to Inst. 10–11. Based on the record adduced during trial, we see no need to construe any other terms.

Golden will continue to argue the alleged infringing Google smartphone devices are *"configured to"* communicate, monitor, detect, and control (CMDC), and more specifically argue that the Google smartphone devices are *"configured to"* function as a sensing device in at least the methods asserted in this case, that includes the Google smartwatch.

In *Core Wireless Licensing, S.A.R.L. v. LG Electronics, Inc.*, the Federal Circuit affirmed summary judgment that a claim for a "computing device *configured to* display" claimed patent

eligible subject matter. Nos. 2016-2684 & 2017-1922 (Jan. 25, 1988 Fed. Cir.). (the Federal Circuit held that the claims "were directed to an improved user interface for computing devices).

The asserted patents disclosed improved display interfaces for small screens, such as mobile telephone screens. Based on the patent specification, the Federal Circuit held that the claims disclosed an improved user interface for electronic devices. The Federal Circuit put much emphasis on the fact that the claim recited a particular manner and provided an improvement over the art.

**United States Patent and Trademark Office [combined or modified]**

Golden is requesting oral argument to show how outlandish Google's non-infringement theories are as they relate to patent law and the patent grant system. One of many thousands of examples, is the "intermittent windshield wiper" case.

Robert Kearns invented a windshield wiper that mimics the human eye. Before his invention, the windshield wiper had only two speeds [low and high]. Mr. Kearns figured "a windshield wiper ought to function as a human eye, allowing the driver to control the pauses between, and speed of, the swipes".

Then, Ford stole his idea. For nearly 30 years, Kearns waged an impossible legal battle against one of America's most powerful companies. Mr. Kearns eventually won the patent infringement case against Ford, but it took 12 years before the case ever went to trial.

Based on Google and the lower court Judge non-infringement theories, Ford could have won the case in a few months. First, Ford could have taken the position that the Ford vehicle had to be "modified" in order to function as a vehicle capable of intermittently wiping the windshield.

Second, Ford could have taken the position that a third-party would have to "modify" the Ford vehicle with the intermittent windshield wiper that included the telematic software; or, a third-party human interaction [such as a driver of the vehicle] to select or turn on [i.e., modify] the intermittent windshield wiper in order for the Ford vehicle to function as a vehicle capable of intermittently wiping the windshield.

Golden will argue that this case is about what was invented and how the Google smartphone devices allegedly infringe Golden's patent claims for a communicating, monitoring, detecting, and controlling (CMDC) device. Google and the lower count have unlawfully initiated and litigated its own fabricated non-infringement theories.

Oral argument will show Google opened claim construction without presenting any 101, 102, 103, 112, or 120 objections; without presenting any prior art references; without claiming Golden's patent claims are invalid because of novelty, anticipation, obviousness; or of being indefinite. Google is attempting to invalidate Golden's patents without any intrinsic or extrinsic evidence. The USPTO clarifies what is needed to invalidate Golden's patents for obviousness:

- Obviousness can be established by combining or modifying the teachings of the prior art to produce the claimed invention where there is some teaching, suggestion, or motivation to do so. *In re Kahn*, 441 F.3d 977,986, 78 USPQ2d 1329, 1335 (Fed. Cir. 2006) (discussing rationale underlying the motivation-suggestion-teaching test as a guard against using hindsight in an obviousness analysis).

- The mere fact that references can be combined or modified does not render the resultant combination obvious unless the results would have been predictable to one of ordinary skill in the art. *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398,417, 82 USPQ2d 1385, 1396 (2007) ("If a person of ordinary skill can implement a predictable variation, § 103 likely bars its patentability.

- If a proposed modification would render the prior art invention being modified unsatisfactory for its intended purpose, there may be no suggestion or motivation to make the proposed modification. *In re Gordon*, 733 F.2d 900, 221 USPQ 1125 (Fed. Cir. 1984)

- If the proposed modification or combination of the prior art would change the principle of operation of the prior art invention being modified, then the teachings of the references are not sufficient to render the claims prima facie obvious. *In re Ratti*, 270 F.2d 810, 813, 123 USPQ 349, 352 (CCPA 1959)

Invalidity is the inverse of the patent application phase. To this end, product-by-process claims are interpreted in the same way as the patent application phase. During the invalidity analysis, the focus is still on the end-product, not the process steps in the claim. *See, Amgen Inc. v. F. Hoffman-La Roche Ltd*, 580 F.3d 1340, 1369-70 (Fed. Cir. 2009) ("In determining validity of a product-by-process claim, the focus is on the product and not on the process of making it.").

As noted above, the lower court improperly entered into claim construction and wrongfully modified the patent claims asserted in this case to include an unsolicited step. The lower court also improperly narrowed the functionality of Golden's patent claims to only that of modification in order to infringe or function as a sensing device.

**APPELLANT WILL ARGUE: GOLDEN'S PATENT RIGHTS COVERS ANY AND ALL "MODIFICATIONS" RECOGNIZED BY GOOGLE; INCLUDING "MODIFICATIONS" MADE BY THIRD PARTIES AND THE GOVERNMENT**

Golden's "product grouping" strategy that allows or permits the combining of products is found in each of Golden's patents' specifications and claimed in certain of Golden's patent claims. The patent specifications and certain patent claims are duplicated below:

Product grouping 1 (storage & transportation) include, but are not limited to, cargo containers, shipping containers, tractor trailers, mail carriers, mail boxes, airplanes, subways, cargo planes, freight train cars, [] (UPS™), [] (FedEx™), airport lockers, news racks [] houses and buildings, [] lockers, cars, trucks, campers, buses, vans, [] (UAVs), [] (UGVs), ...

Product grouping 2 (sensors) include, but are not limited to, chemical, biological, radiological, explosive and nuclear detectors, motion sensors, door sensors, speed sensors, biometric sensors, glass break sensors, plastic film on glass, high security locks, tampering labels, door sensors, disabling locking systems, vehicle detectors and satellite disabling locking systems, detection of humans, detection of contraband, temperature, and shock levels...

Product grouping 3 (detector case; modified and adapted) include, but are not limited to, cell phone cases, [], laptop cases, notebook PC cases, PDA cases, [] tags, detector cases that is mounted to, detector cases that is affixed to, detector cases that is outside of, detector cases that is inside of, and detector cases that is adjacent to...

Product grouping 4 (monitoring & communication devices) include, but are not limited to, mobile communication devices, [], wireless communication devices, monitoring sites, monitoring terminals, web servers, desktop personal computers (PCs), notebook personal computers (PCs), laptops, satellite cell phones, cell phones, [], personal digital assistants (PDAs), [] (LCD) monitors, and satellite monitoring, [] key fobs, [], handhelds...

Product grouping 5 (communication methods) include, but are not limited to, Bluetooth, Wi-Fi, Wi-Max, Internet, Ethernet, Broadband, Network Bandwidth, Wireless, Wired, Text Messaging, Cellular, Satellite, Telematics, [] (WAN), [] (WWAN), [] (LAN), Radio Frequency (RF), [] (BWA), Global Positioning System (GPS), [] (GPRS), [] (GSM), [] (W-CDMA), [] (UMTS), [] (SMS)...

Product grouping 6 (biometrics) include, but are not limited to, fingerprint recognition, voice recognition, face recognition, hand geometry, retina scan, iris scan and signature...

Product grouping 7 (authorized person) include, but are not limited to, owner, pilot, conductor, captain, drivers of vehicles identified as high security, airport security, police, highway patrol, security guard, military personnel, hazardous material (HAZMAT) personnel, the Central Intelligence Agency (CIA), the Federal Bureau of Investigation (FBI), Secret Service, port security personnel, border security personnel, first responders, []...

**Golden's patent no: 9,589,439 (the '439 patent)**

Claim 14: "wherein the monitoring equipment is implemented by business or government at a minimum cost by products grouped together by common features in at least one of several product groupings of design similarity;" [this case the business is Draper; Gov't is DoD DTRA]

Claim 16: "wherein the built-in embedded multi-sensor detection device is implemented by business or government at a minimum cost by products grouped together by common features in at least one of the several product groupings of design similarity."

Claim 17: "wherein the built-in multi-sensor detection device is implemented by business or government by products grouped together by common features in at least one of several product groupings of design similarity;" [this case the business is Draper; Gov't is DoD DTRA]

Claim 18: "wherein, [] the built-in multi sensor detection system communicates [] by way of at least one of the products grouped together by common features in a product groupings category of design similarity comprising at least one of product-to-product, product-to-satellite, product-to-cellular, product-to-radio frequency (RF), product-to-internet, product-to-broadband, product-to-smartphone or cell phone, product-to-computer at monitoring site, product-to-WiFi, product-to-handheld, or product-to-laptop or desktop for [] transmission of signals []"

Claim 20: "wherein the multi-sensor detection device is implemented by business or government by products grouped together by common features in at least one of several product groupings of design similarity;" [this case the business is Draper; Gov't is DoD DTRA]

**Golden's patent no: 10,163,287 (the '287 patent)**

Claims 1, 2, & 3 [preamble of each claim]: "Monitoring equipment that is at least one of products grouped together by common features of a computer terminal, personal computer (PC), laptop, desktop, notebook PC, handheld, cell phone, personal digital assistant (PDA) or smart phone" ...

## APPELLANT WILL ARGUE: DIRECT INFRINGEMENT; INDIRECT INFRINGEMENT; AND JOINT INFRINGEMENT ARE ALL ISSUES-OF-FACTS TRIED BY A JURY—SEVENTH AMENDMENT

*BMC Resources, Inc. v. Paymentech, L.P.* 498 F.3d 1373 (Fed. Cir. 2007):

- "Infringement r e q u i r e s...a showing that a defendant has practiced each and every element of the claimed invention."

- "[L]iability for infringement requires a party to make, use, sell, or offer to sell the patented invention, meaning the entire patented invention."

- "Courts faced with a divided infringement theory have also generally refused to find liability where one party did not control or direct each step of the patented process."

- "A party cannot avoid infringement, however, simply by contracting out steps of a patented process to another entity. In those cases, the party in control would be liable for direct infringement."

- "This court acknowledges that the standard requiring control or direction for a finding of joint infringement may in some circumstances allow parties to enter into arms-length agreements to avoid infringement. Nonetheless, this concern does not outweigh concerns over expanding the rules governing direct infringement. For example, expanding the rules governing direct infringement to reach independent conduct of multiple actors would subvert the statutory scheme for indirect infringement."

*Muniauction v. Thompson Corp.* 532 F.3d 1318 (Fed. Cir. 2008):

- "[W]here the actions of multiple parties combine to perform every step of a claimed method, the claim is directly infringed only if one party exercises 'control or direction' over the entire process such that every step is attributable to the controlling party, i.e., the 'mastermind.'"

- "[M]ere 'arms-length cooperation' will not give rise to direct infringement by any party."

*Akamai Techs. v. Limelight Networks* [Panel decision] 629 F.3d 1311 (Fed. Cir. 2010)):

- "[W]hat is essential is not merely the exercise of control or the providing of instructions, but whether the relationship between the parties is such that acts of one may be attributed to the other."

- "[T]here can only be joint infringement when there is an agency relationship between the parties who perform the method steps or when one party is contractually obligated to the other to perform the steps."

*Limelight Networks v. Akamai Techs.* [*En banc* **decision**] **692 F.3d 1301 (Fed. Cir. 2012)):**
- 10–1: single actor must perform or direct or control performance of all steps to be liable for direct infringement under Section 271(a)
- 6–4–1: can be found liable for inducing parties to infringe in combination even in the absence of an act of direct infringement
  - Majority: Rader, Lourie, Bryson, Moore, Reyna, Wallach
  - Dissent: Linn, Dyk, Prost, O'Malley
  - Newman dissent:
- Direct infringement is a strict liability tort—No intent required
- Indirect infringement requires intent—Knowledge of the patent a required element
- Joint tortfeasor rules—require knowledge of the damage being inflicted

**Legislative Action: 271 has been amended to address loopholes**
- 271(g): imposing infringement liability for importing, selling, or using a product made abroad by a patented process.
- 271(h)?
  - Joint tortfeasor
  - Conspiratorial infringement

The court also noted, however, that the standard requiring control or direction for a finding of joint infringement may in some circumstances allow parties to enter into arms-length agreements to avoid infringement. This implicates a problem where companies can enter in conspiracies, where there is no directing or controlling party, to split up the steps of a patent and avoid infringement.

Using the scienter requirements of civil conspiracy, conspiratorial infringement is narrowly tailored to apply only to those who intend to exploit the loophole pointed out by the court while not imposing liability on companies that inadvertently combine to perform the steps of a patent.

**BECAUSE I'VE BEEN BURNED BEFORE BY JUDGES WHO AREN'T AS DILIGENT AS THEY SHOULD BE WHEN IT COMES TO STUDYING AND READING THE RECORD AND WRITTEN ARGUMENTS, ORAL ARGUMENT WILL HELP THE COURT DECIDE THIS CASE**

The Supreme Court used Golden's case against the United States [13-307C] in *Return Mail v. The United States Postal Service* to illustrate why the DHS & DOJ, two agencies who are not *"persons"* authorized to petition the PTAB to invalidate a patent, should be allowed to petition the PTAB to invalidate a patent; and, 2- why the two agencies, who are not *"persons"* authorized to petition the PTAB to invalidate a patent, should be allowed to petition for an IPR trial with three unqualified patents that does not antedate Golden's priority date for his family of patents:

> "[w]hen, for example, the Department of Homeland Security recently instituted
> a research initiative to equip cell phones with hazardous-materials sensors in
> order to mitigate the risk of terrorist attacks, it faced an infringement lawsuit
> that threatened to interfere with the project. See *Golden v. United States*, 129
> Fed. Cl. 630 (2016); Brief for Prof. Tejas N. Narechania as Amicus Curiae 9."
> *See also, Return Mail v. The United States Postal Service*

In other words, the Court demonstrated it wasn't as diligent as it should have been when it came down to studying and reading the record of Golden's case(s) history.

Appellant's case against Google was originally dismissed in the South Carolina District Court because the Judge stated Golden's case was "frivolous". The judge in that case dismissed Golden's case because "the chart[s] includes the "exact same language" as previously rejected charts". When the case reached the Federal Circuit in *Golden v. Google LLC* Case No. 22-1267, a three-judge panel decided:

> "In the Google case, the district court *again* concluded that Mr. Golden's
> complaint was frivolous. Here, however, Mr. Golden's complaint includes a
> detailed claim chart mapping features of an accused product, the Google [Pixel
> 5] Smartphone, to independent claims from U.S. Patent Nos. 10,163,287,
> 9,589,439, and 9,069,189" ... "to the extent that the chart includes the "exact
> same language" as previously rejected charts, it is simply the language of the
> independent claims being mapped to" ... "[i]t attempts—whether successfully

24

or not—to map claim limitations to infringing product features, and it does so in a relatively straightforward manner. We conclude that the district court's decision in the Google case is not correct with respect to at least the three claims mapped out in the claim chart. Mr. Golden has made efforts to identify exactly how the accused products meet the limitations of his claims in this chart."

Below is a chart of twenty-eight filings that relates to Golden's intellectual property for at least the causes of actions, "antitrust violations, government 'takings', government patent infringement, and patent infringement by private entities. They all have similar stories relating to the dismissal of Golden's complaint as the examples above.

After nearly fifteen years of filings, and at least twenty-eight cases later, Golden can say he has never had the opportunity to present his cases to the Supreme Court; never had the opportunity for oral argument; and was never granted a jury trial. See the list below:

---

**U.S. Supreme Court:** Docket for 23-904. Title: Larry Golden, Petitioner v. United States *Petition Denied* March 25, 2024 Larry Golden, Petitioner United States Court of Appeals for the Federal Circuit Petition for a writ of certiorari filed. Party name: Larry Golden

---

**U.S. Supreme Court:** Docket for 23-740. Title: Larry Golden, Petitioner v. Qualcomm, Inc. *Petition Denied* March 18, 2024 Larry Golden, Petitioner United States Court of Appeals for the Federal Circuit Petition for a writ of certiorari filed. Party name: Larry Golden

---

**U.S. Supreme Court:** Docket for 23-1001. Title: Larry Golden, Petitioner v. Samsung Electronics America, Inc. *Petition Denied* April 22, 2024 Larry Golden, Petitioner United States Court of Appeals for the Federal Circuit Petition for a writ of certiorari filed. Party name: Larry Golden

---

| Party Name | Case Number | Case Title | Court | Filed - Closed |
|---|---|---|---|---|
| Larry Golden | 2024cvpri02024 | Golden v. Google LLC | U.S. Court of Appeals, Federal Circuit | 07/01/2024-?????????? |
| Larry Golden | 2024cvus02256 | Golden v. US | U.S. Court of Appeals, Federal Circuit | 08/26/2024-?????????? |
| Larry Golden | 2023cvpri02120 | Golden v. Samsung Electronics America, Inc. | U.S. Court of Appeals, Federal Circuit | 07/07/2023-02/12/2024 |
| Larry Golden | 2018cvus01942 | Golden v. US | U.S. Court of Appeals, Federal Circuit | 05/10/2018-08/01/2018 |

| Larry Golden | 2019and00100 | Golden In re: Golden | U.S. Court of Appeals, Federal Circuit | 10/03/2018-11/05/2018 |
|---|---|---|---|---|
| Larry Golden | 2019cvus02134 | Golden v. US | U.S. Court of Appeals, Federal Circuit | 07/12/2019-04/10/2020 |
| Larry Golden | 2019cvus02135 | Golden v. US | U.S. Court of Appeals, Federal Circuit | 07/12/2019-09/13/2019 |
| Larry Golden | 2020cvpri01508 | Golden v. Apple Inc. | U.S. Court of Appeals, Federal Circuit | 02/25/2020-09/03/2020 |
| Larry Golden | 2022cvus01196 | Golden v. US | U.S. Court of Appeals, Federal Circuit | 11/29/2021-09/08/2022 |
| Larry Golden | 2022cvpri01229 | Golden v. Apple Inc. | U.S. Court of Appeals, Federal Circuit | 12/07/2021-09/08/2022 |
| Larry Golden | 2022cvpri01267 | Golden v. Google LLC | U.S. Court of Appeals, Federal Circuit | 12/16/2021-09/08/2022 |
| Larry Golden | 2023cvpri01161 | Golden v. Apple Inc. | U.S. Court of Appeals, Federal Circuit | 01/18/2022-05/12/2023 |
| Larry Golden | 2023cvpri01257 | Golden v. Intel Corporation | U.S. Court of Appeals, Federal Circuit | 12/16/2022 -05/05/2023 |
| Larry Golden | 2023cvpri01818 | Golden v. Qualcomm Incorporated | U.S. Court of Appeals, Federal Circuit | 04/28/2023 -10/10/2023 |
| Larry Golden | 2023cvus02139 | Golden v. US | U.S. Court of Appeals, Federal Circuit | 07/11/2023-12/15/2023 |
| Larry Golden | 3:2022cv05246 | Golden v. Google LLC | California Northern District Court | 09/14/2022-04/03/2024 |
| Larry Golden | 4:2022cv03283 | Golden v. Qualcomm, Inc | California Northern District Court | 06/06/2022-03/15/2023 |
| Larry Golden | 5:2022cv03828 | Golden v. Intel Corporation | California Northern District Court | 06/28/2022-11/22/2022 |
| Larry Golden | 3:2022cv04152 | Golden v. Apple Inc. | California Northern District Court | 07/15/2022 -10/20/2022 |
| Larry Golden | 3:2023cv00048 | Golden v. Samsung Electronics America, Inc. | California Northern District Court | 01/05/2023-06/08/2023 |
| Larry Golden | 1:2013cv00307 | Golden v. USA | U.S. Court of Federal Claims | 05/01/2013-11/10/2021 |

| Larry Golden | 1:2019cv00104 | Golden v. USA | U.S. Court of Federal Claims | 01/17/2019-05/15/2019 |
|---|---|---|---|---|
| Larry Golden | 1:2023cv00185 | Golden v. USA | U.S. Court of Federal Claims | 02/07/2023-05/31/2023 |
| Larry Golden | 1:2023cv00811 | Golden v. USA | U.S. Court of Federal Claims | 05/31/2023-04/24/2024 |
| Larry Golden | 6:2021cv00244 | Golden v. Google LLC | South Carolina District Court | 01/26/2021-04/19/2023 |
| Larry Golden | 6:2019cv02557 | Golden v. Apple Inc. et al | South Carolina District Court | 09/11/2019-01/27/2020 |
| Larry Golden | 6:2020cv02270 | Golden v. Apple Inc. et al | South Carolina District Court | 06/16/2020-09/20/2021 |
| Larry Golden | 6:2020cv04353 | Golden v. Apple Inc. et al | South Carolina District Court | 12/16/2020-12/01/2021 |

The chart above is representative of the number of times Golden, a Black and/or African American, have filed cases in the Supreme Court, the Appellate Courts, the District Court, and the Court of Federal Claims and has never gotten pass the pleading stage, over the past ten years.

The chart above is also illustrative of the number of times Golden, a Black and/or African American, have been deprived of his property, due process of law, and a jury trial as guaranteed by the Seventh Amendment of the United States Constitution.

In this current case, *Larry Golden v. Google LLC*, NDC Case 3:22-cv-05246-RFL Order Granting Motion to Dismiss... Dkt. 68; Filed 04/03/24. Judge Rita F. Lin confirmed to all the other co-conspirators that she was onboard with the purpose and intent of the conspiracy and that she was not going to be the one to break ranks. Judge Lin is quoted as saying:

> *"Golden has had multiple suits with similar allegations dismissed, some as frivolous.* See, e.g., *Golden v. Samsung Elecs. Am., Inc.,* No. 23-CV-00048-WHO, 2023 WL 3919466 (N.D. Cal. June 8, 2023), aff'd, No. 2023-2120, 2024 WL 539973 (Fed. Cir. Feb. 12, 2024); *Golden v. Qualcomm, Inc,* No. 22-CV-03283-HSG, 2023 WL 2530857 (N.D. Cal. Mar. 15, 2023) *Golden v. Apple Inc.,* No. 20-cv-04353-JD-KFM, 2021 WL 5074739 (D.S.C. Nov. 2, 2021) (dismissing complaint as "frivolous"); *Golden v. Apple Inc.,* No. 20-cv-02270-JD-KFM, 2021 WL 4260782 (D.S.C. Sept. 20, 2021) (dismissing complaint as "frivolous")."

## APPELLANT WILL ARGUE: THE LOWER COURT'S NON-INFRINGEMENT THEORIES "DEFIES LOGIC"

Judge Rita F. Lin of the lower court is quoted as saying: "[t]he Google device has to be 'modified' with a third-party app to function as a sensing device". First of all, this is not true.

In 2021, Google acquired Fitbit. Since that acquisition, every version of the Pixel Watch, including the Pixel Watch 3, has come with Fitbit preinstalled. To measure your heart rate on your Pixel phone, you'll need the Google Fit app. This app is preinstalled on the Pixel handset. The Google Fitbit app is also available for download from the Google Play store.

Google Pixel smartphones are capable of monitoring your heart rate even though there isn't any dedicated hardware in the handset to track these metrics. It instead uses a smart approach that leverages your phone's rear camera.

Within the Google Fit app, you'll able to track your heart rate and your respiratory rate. You'll need a compatible smartphone to be able to do this though, which includes every Pixel handset [smartphone] since the Google Pixel 3. [heart rate and respiratory rate falls in the categories of biological and chemical sensing; and biometric and human detection—covered in Golden's patents' specifications].

Based on Google's illogical theories; an inventor can invent a flashlight that comprises at least that of batteries as its power source. But, the patent claim for the invention offers no protection because the flashlight would have to be modified by a third-party with batteries in order to function as a flashlight, or infringe.

Based on Google's illogical theories; an inventor [Lonnie Johnson] can invent a water gun that comprises at least that of water as its power source. But, the patent claim for the invention offers no protection because the water gun would have to be modified by a third-party with water in order to function as a water gun, or infringe.

Based on Google's illogical theories; an inventor can invent a race car that comprises at least that of a remote control as its power source. But, the patent claim for the invention offers no protection because the race car would have to be modified by a third-party with a remote control in order to function as a race car, or infringe.

Google's alleged infringing device is recognized in the industry as a handset—needs to modified with a hand in order to function; a smartphone—needs to be modified with some level of intelligence in order to function; or an electronic device—needs to be modified with electricity

**APPELLANT WILL ARGUE: THE UNITED STATES GOVERNMENT IS RESPONSIBLE FOR THE DEVELOPMENT, ASSEMBLY, AND DISTRIBUTION OF THE FIRST SMARTPHONE—BUT NOT THE INVENTION**

House Minority Leader Nancy Pelosi said [] that federally-funded research, not Apple and late CEO Steve Jobs, invented the iPhone. https://www.cbsnews.com/sanfrancisco/news/ nancy-pelosi-apple-iphone-steve-jobs-federal-research/ A spokesperson for Nancy Pelosi emailed the following statement to clarify her remarks:

> "The late Steve Jobs and the team at Apple that made the iPhone would be the first to tell you that they didn't invent many of its core technologies we now take for granted. Leader Pelosi counted Steve Jobs as friend and meant no disrespect to his legacy, but the point she was making is a valid one. Leader Pelosi believes that Steve Jobs and his colleagues at Apple, deserve enormous credit for taking federally-backed innovations off the shelf, refining them, comercializing them and turning them into a beautiful device that changed the world."

Golden will argue he is the one responsible for a communicating, monitoring, detecting, and controlling (CMDC) device, and that Apple was awarded in 2007-08 by the Dept. of Homeland Security to assemble and commercialize Golden's CMDC device. Apple conveniently named the device a "smartphone". There were others awarded under the *Cell-All* initiative on the same contract: Samsung, Qualcomm; LG, Synkera, Rhei vision, SeaCoast, and NASA.

Apple, Samsung, LG, and Qualcomm [the OEMs] continued to develop, assemble, and commercialize the smartphones under the government contract until 2012. In 2012 a decision in *Zoltek V* closed a nine-year loophole that allowed the government to escape liability for patent infringement if only one part of the process for the smartphone was developed and assembled abroad. The OEMs were able to avoid personal liability for patent infringement as long as they were developing the phones under a government contract and in accordance to the specifications.

Google performed work for the government in the contract under what is called "implied authorization". Google provided the Google android open-source operating system for at least the OEMs Samsung, LG, and Qualcomm. The Google android open-source operating system is used to connect the hardware and software of the smartphone. The specifications of the DHS S&T *Cell-All* initiative call for a cell phone capable of CBRNE detection. The Google android OS provided the connectivity needed for the software to enable the hardware to perform.

Phase I of the *Cell-All* initiative calls for the sensors to be located *internal* the cell phone. Phase II of the initiative calls for the sensors or detection equipment to be *external* the cell

phone. The Google android open-source operating system releases a source code that the developers and contractors can build on to satisfy both the *internal* and *external* request.

Before the smartphone could be released to the public, Google, Apple, Samsung, LG, and Qualcomm [the OEMs] had to equipped the phones with certain of Golden's safety components: facial and/or fingerprint authentication; lock disabler that locks the phones after multiple failed attempts to unlock; NFC in lieu of RFID; and, advanced GPS (A-GPS) location and tracking.

Google, Apple, Samsung, LG, and Qualcomm [the OEMs] copied Golden's patented central processing units (CPUs) designed for the new, improved upon, and useful cell phones; Golden's patented CMDC devices; or the OEMs alleged infringing smartphones.

## CONCLUSION

If Google's non-infringement theories of "modification in order to infringe" is allowed to stand, it is only fair and just that Golden's patented central processing units (CPUs) are considered a "modification" to the Google device; resulting in the Google's Tensor CPUs infringing Golden's patented claims for central processing units (CPUs).

Golden has far surpassed the pleadings requirements with "enough facts to state a claim to relief that is plausible on its face." *Twombly*, 550 U.S. at 570; and "'enough fact[s] to raise a reasonable expectation that discovery will reveal' that the defendant is liable for the misconduct alleged." This is the second time the lower court have asked Golden to prove Google's alleged infringing devices infringes Golden's patent claims at the pleading stage.

If this Court chose not to grant Appellant oral argument, Appellant is asking the Court to remand the case back to the District Court for trial. [Please honor a Seventh Amendment right]

Sincerely,

Larry Golden, *Pro Se* Plaintiff
740 Woodruff Rd., #1102
Greenville, SC 29607
(H) 8642885605 (M) 8649927104
Email: atpg-tech@charter.net

# CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 28th day of December 2024, a true and correct copy of the foregoing "PLAINTIFF-APPELLANT'S MOTION FOR ORAL ARGUMENT", was served upon the following Defendant by priority "express" mail:

> Matthew S. Warren
> WARREN KASH WARREN LLP
> 2261 Market Street, No. 606
> San Francisco, California, 94114
> Phone: (415) 895-2940
> Fax: (415) 895-2964
> Email: 22-5246@cases.warrenlex.com

Larry Golden, Pro Se
740 Woodruff Rd., #1102
Greenville, South Carolina 29607
atpg-tech@charter.net
864-288-5605



**UNITED STATES POSTAL SERVICE**®

# PRIORITY MAIL EXPRESS®



EI 935 866 427 US

**CUSTOMER USE ONLY**

FROM : (PLEASE PRINT)   PHONE ( 864 ) 992-7104

LARRY GOLDEN
740 WOODRUFF RD.
#1102
GREENVILLE, SC 29607

**DELIVERY OPTIONS (Customer Use Only)**

✗ SIGNATURE REQUIRED Note: The mailer must check the "Signature Required" box if the mailer: 1) Requires the addressee's signature; OR 2) Purchases additional insurance; OR 3) Purchases COD service OR 4) Purchases Return Receipt service. If the box is not checked, the Postal Service will leave the item in the addressee's mail receptacle or other secure location without attempting to obtain the addressee's signature on delivery.

**Delivery Options**
☐ No Saturday Delivery (delivered next business day)
☐ Sunday/Holiday Delivery Required (additional fee, where available*)
  *Refer to USPS.com® or local Post Office™ for availability.

TO: (PLEASE PRINT)   PHONE ( 202 ) 275-8000

U.S. COURT OF APPEALS FOR THE FEDERAL
CIRCUIT
CASE No: 24-2024
717 MADISON PLACE, NW
WASHINGTON, DC
ZIP + 4® (U.S. ADDRESSES ONLY)

2  0  4  3  9  -  _  _  _  _

■ For pickup or USPS Tracking™, visit USPS.com or call 800-222-1811.
■ $100.00 Insurance Included.

☜ **PEEL FROM THIS CORNER**

**PAYMENT BY ACCOUNT (if applicable)**
Federal Agency Acct. No. or Postal Service™ Acct. No.

**ORIGIN (POSTAL SERVICE USE ONLY)**

| ☐ 1-Day | ☑ 2-Day | ☐ Military | ☐ DPO |
|---|---|---|---|

| PO ZIP Code | Scheduled Delivery Date (MM/DD/YY) | Postage |
|---|---|---|
| 29615 | 12/30/24 | $ 32.00 |

| Date Accepted (MM/DD/YY) | Scheduled Delivery Time | Insurance Fee | COD Fee |
|---|---|---|---|
| 12/28/24 | ☐ 6:00 PM  6pm | $ | $ |

| Time Accepted | | Return Receipt Fee | Live Animal Transportation Fee |
|---|---|---|---|
| 1:48 ☐ AM ☑ PM | | $ | $ |

| Special Handling/Fragile | Sunday/Holiday Premium Fee | Total Postage & Fees |
|---|---|---|
| $ | | |

| Weight | ☐ Flat Rate | Acceptance Employee Initials | |
|---|---|---|---|
| lbs.  ozs. | | AN | $ 32.00 |

**DELIVERY (POSTAL SERVICE USE ONLY)**

| Delivery Attempt (MM/DD/YY) | Time | Employee Signature |
|---|---|---|
| | ☐ AM ☐ PM | |

| Delivery Attempt (MM/DD/YY) | Time | Employee Signature |
|---|---|---|
| | ☐ AM ☐ PM | |

LABEL 11-B, NOVEMBER 2023   PSN 7690-02-000-9996